Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>RICHARD AYVAZYAN,<br>MARIETTA TERABELIAN,<br>ARTUR AYVAZYAN,<br>TAMARA DADYAN,<br><br>*Defendants*. | Case No.  20-cr-579 (SVW)<br><br>**DEFENDANT RICHARD AYVAZYAN'S NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE FROM PRETEXTUAL DETENTION AND WARRANTLESS SEARCHES**<br><br>Judge:   Hon. Stephen V. Wilson<br>Date:    April 5, 2021<br>Time:    11:00 a.m. |

1

### NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE FROM

2

### PRETEXTUAL DETENTION AND WARRANTLESS SEARCHES

3

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

4

PLEASE TAKE NOTICE that on Monday, April 5, 2021 or as soon thereafter as

5

this counsel may be heard in Courtroom 10A of this Court at 350 W. 1st Street, 10th

6

Floor, Los Angeles, CA 90012, Defendant Richard Ayvazyan ("Ayvazyan"), through

7

undersigned counsel, will move the Court to suppress all evidence obtained in

8

connection with the unlawful detention, interrogations, and searches of Ayvazyan at the

9

Miami International Airport on October 19-20, 2020, and the tainted fruits thereof.

10

This motion is based on this notice, the accompanying memorandum of points

11

and authorities, Declaration of Ashwin Ram, Declaration of Richard Ayvazyan, any

12

reply that Ayvazyan may make, such as other evidence and arguments as may be

13

presented at or prior to the hearing, and all records and files in this action.

14

15

Dated:   March 8, 2021

Respectfully submitted,

16

**STEPTOE & JOHNSON LLP**

17

18

_/s/ Ashwin J. Ram_

Ashwin J. Ram (SBN 227513)

19

_aram@steptoe.com_

Michael A. Keough (SBN 327037)

20

_mkeough@steptoe.com_

Nicholas P. Silverman (_pro hac vice_)

21

_nsilverman@steptoe.com_

22

**STEPTOE & JOHNSON LLP**

633 West Fifth Street, Suite 1900

23

Los Angeles, CA 90071

24

Telephone: (213) 439-9400

Facsimile: (213) 439-9599

25

26

_Counsel for Defendant Richard Ayvazyan_

27

28

NOTICE OF MOTION AND MOTION TO SUPPRESS – WARRANTLESS
DETENTION AND SEARCHES

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

I.   PRELIMINARY STATEMENT .......................................................................1

II.  STATEMENT OF FACTS ...............................................................................3

     A.   THE PPP LOAN INVESTIGATION ....................................................3

     B.   THE MISUSE OF MULTIPLE TERRORISM TASK FORCES TO
          INVESTIGATE PPP LOANS ................................................................3

     C.   THE DETENTION, INTERROGATIONS, AND SEARCHES .................7

          1.   Detention .....................................................................................7

          2.   First Interview and Baggage Search............................................8

          3.   Second Interview and Baggage Search .........................................9

          4.   Electronic Media Search ............................................................10

          5.   Third Interview ..........................................................................11

III. ARGUMENT ................................................................................................12

     A.   WARRANTLESS DETENTIONS AND SEARCHES ARE
          UNCONSTITUTIONAL UNLESS THE GOVERNMENT CAN
          CARRY ITS BURDEN OF PROOF THAT AN EXCEPTION
          APPLIES ...........................................................................................12

     B.   NO EXCEPTION TO THE FOURTH AMENDMENT WARRANT
          REQUIREMENT APPLIES TO THE WARRANTLESS
          DETENTION AND SEARCHES IN THIS CASE...................................12

          1.   The Border Search Exception Does Not Apply ...........................13

               a.   The Scope of the Border Search Exception Does
                    Not Extend to Pretextual Detention and
                    Warrantless Searches for General Law
                    Enforcement Purposes.......................................................15

               b.   The Warrantless Detention, Interrogations, and
                    Searches Were Unreasonable.............................................19

          2.   The Consent Exception Does Not Apply .....................................21

     C.   THE DIRECT AND INDIRECT PRODUCTS OF THE
          UNCONSTITUTIONAL DETENTION AND SEARCHES
          SHOULD BE SUPPRESSED ...............................................................24

IV.  CONCLUSION..............................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Adlerstein v. U.S. Customs & Border Prot.*,
No. 19-cv-500, 2020 WL 5846600 (D. Ariz. Oct. 1, 2020) ...............................16, 22

*Arizona v. Gant*,
129 S. Ct. 1710 (2009)..................................................................................................19

*Carroll v. United States*,
267 U.S. 132 (1925)......................................................................................................13

*Florida v. Jimeno*,
500 U.S. 248 (1991)......................................................................................................24

*Jones v. United States*,
357 U.S. 493 (1958) ...............................................................................................12, 13

*Katz v. United States*,
389 U.S. 347 (1967) ......................................................................................................12

*Mincey v. Arizona*,
437 U.S. 385 (1978) ...............................................................................................12, 13

*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019) .....................................................................................16

*Phillips v. U.S. Customs & Border Prot.*,
No. 19-cv-6338 (SVW), 2020 WL 4118010 (C.D. Cal. Mar. 9, 2020).........14, 20, 21

*Riley v. California*,
573 U.S. 373 (2014)...........................................................................................12, 13, 14

*In re Search of [Redacted]*,
No. 2:20-mj-5282, Dkt. 1 (C.D. Cal. Nov. 3, 2020)....................................................25

*Silverthorne Lumber Co. v. United States*,
251 U.S. 385 (1920)......................................................................................................24

*Tabbaa v. Chertoff,*
    509 F.3d 89 (2d Cir. 2007)...........................................................20, 21, 22

*United States v. Alfonso,*
    759 F.2d 728 (9th Cir. 1985) ..................................................................18

*United States v. Barnett,*
    935 F2d 178 (9th Cir. 1991) ...................................................................16

*United States v. Bosse,*
    898 F.2d 113 (9th Cir. 1990) ............................................................23, 24

*United States v. Cano,*
    934 F.3d 1002 (9th Cir. 2019), *petition for cert. filed* ......................*passim*

*United States v. Carbajal,*
    956 F.2d 924 (9th Cir. 1992) ..................................................................12

*United States v. Chadwick,*
    433 U.S. 1 (1977)....................................................................................19

*United States v. Chan-Jimenez,*
    125 F.3d 1324 (9th Cir. 1997) ...............................................................21

*United States v. Cotterman,*
    709 F.3d 952 (2013) .........................................................................14, 20

*United States v. Diamond,*
    471 F.2d 771 (9th Cir. 1973) ..................................................................18

*United States v. Flores-Montano,*
    541 U.S. 149 (2004)................................................................................14

*United States v. Grey,*
    959 F.3d 1166 (9th Cir. 2020) ...............................................................17

*United States v. Huguez-Ibarra,*
    954 F.2d 546 (9th Cir. 1992) ..................................................................12

*United States v. Johnson,*
    889 F.3d 1120 (9th Cir. 2018) ...............................................................17

*United States v. Koshnevis,*
    979 F.2d 691 (9th Cir. 1992) ..................................................................16

NOTICE OF MOTION AND MOTION TO SUPPRESS – WARRANTLESS
DETENTION AND SEARCHES

*United States v. Magdirila*,
    962 F.3d 1152 (9th Cir. 2020) ...................................................... 16

*United States v. Montoya de Hernandez*,
    473 U.S. 531 (1985)............................................................... 13, 20

*United States v. Orozco*,
    858 F.3d 1204 (9th Cir. 2017) ............................................. 16, 17

*United States v. Phillips*,
    497 F.2d 1131 (9th Cir. 1974) ............................................. 23, 24

*United States v. Place*,
    462 U.S. 696 (1983)....................................................................... 12

*United States v. Reid*,
    226 F.3d 1020 (9th Cir. 2000)............................................. 21, 22

*United States v. Soto-Soto*,
    598 F.2d 545, 549 (9th Cir. 1979) ............................................. 18

*United States v. Tsai*,
    282 F.3d 690 (9th Cir. 2002) ...................................................... 13

*Wong Sun v. United States*,
    371 U.S. 471 (1963)....................................................................... 24

**Other Authorities**

FBI, *Joint Terrorism Task Forces*,
    https://www.fbi.gov/investigate/terrorism/joint-terrorism-task-forces
    (last visited Mar. 5, 2021) .............................................................. 5

U.S. Customs & Border Protection, *Advance Passenger Information
    System*, https://www.cbp.gov/travel/travel-industry-personnel/apis2
    (last modified May 18, 2018) ......................................................... 4

U.S. Dep't of Homeland Security, *Privacy Impact Assessment: Advance
    Passenger Information System* (Mar. 21, 2005), *available at*
    https://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbpapis.pdf..................... 4

NOTICE OF MOTION AND MOTION TO SUPPRESS – WARRANTLESS
DETENTION AND SEARCHES

*Written Testimony to House Committee on Homeland Security* (May 3, 2017), *available at* https://www.dhs.gov/news/2017/05/03/written-testimony-cbp-ice-plcy-house-committee-homeland-security-task-force-denying ........................................................................................................... 6, 7

NOTICE OF MOTION AND MOTION TO SUPPRESS – WARRANTLESS
DETENTION AND SEARCHES

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3          Defendant Richard Ayvazyan, through undersigned counsel, moves the Court to

4    suppress all evidence obtained in connection with the unlawful detention,

5    interrogations, and searches of Ayvazyan at the Miami International Airport on October

6    19-20, 2020, and the tainted fruits thereof.

## I.    PRELIMINARY STATEMENT

7          This case and motion arise out of the disturbing emerging practice of law

8    enforcement agencies to direct border officers to use their border search authority to

9    investigate alleged criminal conduct untethered from any border or national security

10   concern.  The result is an "anything goes" free-for-all when hapless subjects of a

11   domestic criminal investigation happen to travel through an airport and are denied

12   fundamental rights.  In response, the Ninth Circuit has made clear:

13          [B]order officials have no general authority to search for crime. This is true

14          even if there is a possibility that such crimes may be perpetrated at the border

15          in the future.  So, for example, if U.S. officials reasonably suspect that a

16          person who has presented himself at the border may be engaged in price

17          fixing, they may not conduct a forensic search of his phone or laptop.

18          Evidence of price fixing—texts or emails, for example—is not itself

19          contraband whose importation is prohibited by law.  Such emails may be

20          evidence of a crime, but they are not contraband, and there is no law

21          prohibiting the importation of mere evidence of crime.

22   *United States v. Cano*, 934 F.3d 1002, 1017 (9th Cir. 2019), *petition for cert. filed*.

23          Notwithstanding this clear admonition, the government here—knowing that the

24   Fourth Amendment prohibited them from executing warrantless searches and

25   seizures—deputized Customs and Border Protection (CBP) officials charged with

26   protecting our borders from terrorists and national security threats and diverted their

27   resources to the investigation of suspected PPP loan fraud.  In the process, Richard

28

1

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

Ayvazyan and his wife, Marietta Terabelian, both U.S. citizens, were detained by CBP for over ten hours in the midst of on an afternoon flight connecting through Miami International Airport.  To make matters worse, Ayvazyan was refused representation by counsel, isolated from his wife, interrogated at least three separate times, and searched at least three separate times, including repeated baggage searches and cell phone searches despite his initial refusals to allow the same.

This conduct was designed and intended to break Ayvazyan's will against the backdrop of the government's attempt to exploit CBP's solemn duties in order to circumvent the Fourth Amendment and controlling case law.  The government's repeated manipulation and deceit on this issue confirms its intent.  For example, the government lied over and over that the search was "random" or, even more insidiously, was intended to dispel potential ties to terrorism.  The objective evidence—emails, telephone calls, and recordings—disproves both claims.  There was also a cover up, as the government lied on official forms and reports that the prolonged detention and searches were conducted due to national security concerns and redacted other purposes before producing the forms to the defense.  The government reports even claimed that the cell phone searches were conducted due to national security concerns because Ayvazyan and Terabelian were traveling from a vacation resort in Turks & Caicos. These lies were only discovered by the defense upon reviewing limited and specifically negotiated-for internal emails of the FBI directing CBP to detain, interrogate, and search the defendants in furtherance of their PPP loan fraud investigation, as well as internal emails from CBP affirming their understanding of that purpose.

This motion focuses on the reason for that manipulation and deceit: recognition that the Fourth Amendment prohibited the warrantless detention and searches the government wished to conduct.  Rather than accept that prohibition and utilize accepted investigation avenues, the government chose to abuse the authority of CBP officers to conduct searches related to protecting our country.  Accordingly, the evidence obtained

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

from the Miami International Airport detention, interrogations, and searches of

Ayvazyan, as well as the unconstitutional fruits of the same, must be suppressed.

## II.    STATEMENT OF FACTS

### A.    The PPP Loan Investigation

Around July 2020, FBI Special Agent Justin Palmerton in Los Angeles allegedly received information that Richard Ayvazyan and his wife, Marietta Terabelian, had received the proceeds of a loan under the Paycheck Protection Program (PPP).  Agent Palmerton and the Los Angeles FBI opened an investigation into Ayvazyan and Terabelian based on this tip and spent the following months investigating through the use of subpoenas, interviews, and other common law enforcement methods of gathering evidence.  Based on the government's partial production of Agent Palmerton's correspondence with CBP, it appears that Agent Palmerton suspected that Ayvazyan and Terabelian had worked with others to submit loan applications and use the proceeds for personal expenses.

### B.    The Misuse of Multiple Terrorism Task Forces to Investigate PPP Loans

Agent Palmerton is a trained FBI Agent who understood that he cannot conduct warrantless searches of people he suspects of committing a crime.  He also knew that CBP officers have broader authority to engage in warrantless searches in order to protect the United States from the smuggling of weapons, items subject to unpaid duties, and similar customs violations and national security concerns.  Agent Palmerton knew that FBI Agents were not allowed to engage in such warrantless searches.  Despite this knowledge and despite having no evidence of customs violations or national security concerns, Agent Palmerton placed an alert regarding Ayvazyan and Terabelian in the Advance Passenger Information System ("APIS"), a CBP database with:

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

[t]he purpose … to identify those passengers who (1) may pose a risk to the transportation industry, to other travelers and to the United States, (2) are identified as or suspected of being a terrorist or having affiliations to terrorist organizations, (3) have active warrants for criminal activity, (4) are currently inadmissible, or have been previously deported from the United States, or (5) are subject to other intelligence that may identify them as a security risk.

U.S. Dep't of Homeland Security, *Privacy Impact Assessment: Advance Passenger Information System* at 14 (Mar. 21, 2005), *available at* https://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbpapis.pdf ("purpose" given in response to "How Is the Information Used?" and accompanied by claim that the information will also enable "immediate determinations as to a traveler's security risk and admissibility"); *see also* U.S. Customs & Border Protection, *Advance Passenger Information System*, https://www.cbp.gov/travel/travel-industry-personnel/apis2 (last modified May 18, 2018) (characterizing APIS' function as "enhanc[ing] border security").  APIS data is intended to be limited to the information "necessary for [APIS]'s purposes," and access to that data is intended to be "limited and confined only to those entities that have a need for the data in the performance of official duties." *Privacy Impact Assessment* at 9-10.  Agent Palmerton knew that his use of APIS was not intended "to identify high risk passengers … who may pose a risk or threat to vessel or aircraft safety or to national security" or to "enhance border security" in any sense of those terms.

On October 16, 2020, Agent Palmerton received an automated "silent hit" from APIS noting that Marietta Terabelian would be arriving in Miami on a flight from Turks and Caicos—where she and Ayvazyan were on vacation—later that day.  Ram Decl.[1] Ex. 6 (DOJ_PROD_0000021400), at 4-5.  Agent Palmerton responded by

---

[1]  All references to "Ram Decl." refer to the Declaration of Ashwin Ram in Support of Motions to Suppress and its accompanying exhibits filed concurrently with this motion.

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

contacting the Joint Terrorism Task Force in Miami, an agency with the purpose of serving as "our nation's front line of defense against terrorism."  According to the FBI website:

> When it comes to investigating terrorism, [Joint Terrorism Task Forces] do it all: chase down leads, gather evidence, make arrests, provide security for special events, collect and share intelligence, and respond to threats and incidents at a moment's notice.

FBI, *Joint Terrorism Task Forces*, https://www.fbi.gov/investigate/terrorism/joint-terrorism-task-forces (last visited Mar. 5, 2021).  Agent Palmerton did not ask the Joint Terrorism Task Force for assistance in investigating terrorism.

Instead of asking the Joint Terrorism Task Force for assistance in investigating terrorism or submitting a written, formal request Agent Palmerton initiated an informal telephone call with a Joint Terrorism Task Force Agent that the government has declined to produce[2] during which he appears to have orally communicated his desired detention and search of Ayvazyan and Terabelian.  Ram Decl. Ex. 6 at 4.  Agent Palmerton then wrote a follow-up email to the Joint Terrorism Task Force with carefully framed information about his investigation into "a PPP fraud ring that has fraudulently obtained PPP and SBA loans."  *Id.*  Agent Palmerton asked the Joint Terrorism Task Force to detain Terabelian in furtherance of that investigation even though he conceded that the reason she was travelling to a Caribbean vacation destination was "unknown."  *Id.*

The Joint Terrorism Task Force FBI Agent that spoke with Agent Palmerton forwarded his "request for secondary" to investigate "a PPP related fraud."  *Id.* at 3. This email went from the FBI side of the Joint Terrorism Task Force to the CBP side,

---

[2] The only reason Ayvazyan knows this key telephone call took place is a stray reference in Agent Palmerton's email to the fact that he is providing this information "as requested" by the JTTF Agent during a previous, unproduced conversation.  Ram Decl. Ex. 6 at 4.  If not for Agent Palmerton's use of "as requested," the key telephone call directing a pretextual border stop would have been successfully buried despite discovery requests for such communications.

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

1   specifically CBP officer Carlos Desouza.  Neither the Joint Terrorism Task Force FBI

2   Agent nor CBP officer mentioned any concern regarding terrorism or national security.

3          The Joint Terrorism Task Force thereafter deputized the Customs and Border

4   Patrol to perform a secondary examination and search of Terabelian because she was an

5   FBI Los Angeles "subject of interest."  Ram Decl. Ex. 15 (DOJ_PROD_0000023587),

6   at 1.  Officer Desouza drafted a CBP Person Query regarding the request.  He noted that

7   although the matter would ultimately be handled by the Tactical Terrorism Response

8   Team, the "CATEGORY" was "FI: FINANCIAL."  Ram Decl. Ex. 16

9   (DOJ_PROD_0000023624), at 7; Ram Decl. Ex. 17 (DOJ_PROD_0000023563) (CBP

10  "Incident Topic": "USCS/ **FBI SUBJECTS OF INTEREST /FRAUD**/FIS-D/IN-

11  BOUND/AA 2409/2 ARRESTS BY FBI") (emphasis added).

12         Based on the request from the FBI and its Joint Terrorism Task Force, CBP

13  assigned the Tactical Terrorism Response Team to conduct the stop in furtherance of

14  the FBI Los Angeles PPP loan fraud investigation.  Tactical Terrorism Response Teams

15  are "CBP Officers who are specially trained in counterterrorism response."  Dep't of

16  Homeland Security, *Written Testimony to House Committee on Homeland Security*

17  (May 3, 2017), *available at* https://www.dhs.gov/news/2017/05/03/written-testimony-

18  cbp-ice-plcy-house-committee-homeland-security-task-force-denying.  Tactical

19  Terrorism Response Team officers are intended to use "targeting and inspection to

20  mitigate possible threats" posed by "travelers suspected of having a nexus to terrorism."

21  *Id.*  When deputizing the Tactical Terrorism Response Team officers to detain,

22  interrogate, and search Ayvazyan and Terabelian, no one stated any concern, evidence,

23  or allegation related to terrorism or national security.

24         Over the ensuing 24 hours, the CBP Tactical Terrorism Response Team

25  exchanged several emails and at least 22 WhatsApp messages[3] regarding their efforts to

---

[3] WhatsApp is an online messaging application that facilitates, among other things, group discussions.
The government partially produced the message chain from CBP's "Midnight Express" WhatsApp
group, but the production appears to be missing key portions of the officers' communications during

1  detain, interrogate, and search Ayvazyan and Terabelian in furtherance of Agent

2  Palmerton's investigation.  Not one of the emails or messages mentioned any concern,

3  evidence, or allegation that Ayvazyan or Terabelian posed a threat related to terrorism

4  or national security.  As summarized at the conclusion of Ayvazyan's interrogation:

5  "We're just the people in Miami.  Your case is out [of] L.A. … This was just

6  something we were asked to do" by the Los Angeles FBI.  Ram Decl. Ex. 11

7  (DOJ_PROD_0000023814), at 1:44:38-1:45:40.

8      **C.**    **The Detention, Interrogations, and Searches**

9          **1.**    **Detention**

10      Ayvazyan and Terabelian arrived at approximately 3:00 p.m. on October 19,

11  2020.  Ayvazyan Decl. ¶ 4.  They proceeded to the Customs area of the North Terminal,

12  where they stood in line.  They moved to the front and underwent the routine

13  examination applied to international travelers including any routine questioning or

14  searches.  Unbeknownst to Ayvazyan and Terabelian, when their passports were

15  scanned, it triggered a flag reading "1DAY Hit - Mandatory Referral ONE DAY PAU

16  CUSTOM."  Ram Decl. Ex. 7 (DOJ_PROD_0000002343), at 3.  This flag, and not

17  anything observed by the customs officer during the routine examination, prompted a

18  CBP officer to detain Ayvazyan and Terabelian for further questioning in furtherance of

19

20  ───────────────────────────

21  the detention, interrogation, and search of Ayvazyan and Terabelian.  Ram Decl. Ex. 4
   (DOJ_PROD_0000023636).  In particular, it focuses on Midnight Express chains from 4:45-7:05 p.m.

22  and 10:54 p.m.-2:23 a.m.  *Id.*  at 4-8.  The 7:05 p.m. chain concludes with an interrogation-related
   question, *id.* at 6, and the 10:54 p.m. chain reveals an unproduced 10:53 p.m. message and a 10:54

23  p.m. message that appeared to result in a communication outside of this WhatsApp chain, *id.* at 5.  The
   7:05 p.m.-10:54 p.m. gap and non-chain communications have not been produced.  As another

24  example, a 4:54 p.m. message hints at a contemporaneous detention-related telephone call between the
   TTRT report drafter and the Joint Terrorism Task Force officer Desouza, who was responsible for

25  liaising in efforts to carry out the FBI's requested detention, interrogation, and search of Ayvazyan
   and Terabelian.  *Id.* at 6 (in response to unproduced image re "L/o states to contact TFO Desouza,"

26  officer Brewster states "@Kristian Mendoza is on the phone with Desouza [right now]").  That call
   has not been produced.  Based on the government's pattern of deleting unfavorable evidence and

27  attempting to bury the existence of key telephone calls, it is possible that there are additional
   communications that have not been produced.

28                              7

the FBI investigation.  Ayvazyan and Terabelian were told that they had been "randomly selected" for additional screening.  Ayvazyan Decl. ¶ 6.  That was a lie.

A second officer led Ayvazyan and Terabelian to a waiting area and took their passports.  Within less than an hour of their arrival, Ayvazyan and Terabelian were instructed that they could not use their cell phones and placed in an area that prohibited phone calls.  Ayvazyan Decl. ¶ 8.

As explained in greater detail in the concurrently-filed Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments, after being detained, Ayvazyan asked several times whether he could speak with an attorney, and each request was denied.  Ayvazyan and Terabelian watched over a dozen other passengers come and go.  When they expressed concern about missing their flight home—where their children were waiting—Ayvazyan and Terabelian were told that CBP could hold them as long as they wanted and that they should stay seated.

### 2. First Interview and Baggage Search

At approximately 6:15-6:30 p.m., Officer Isaiah Smith brought Ayvazyan to an interview room.  Unbeknownst to Ayvazyan, Officer Smith chose one of the few interview rooms purportedly without a camera for this interview.[4]  Officer Smith told Ayvazyan that he had been randomly selected for secondary screening.  Again, this was a lie.  Officer Smith instructed Ayvazyan to fill out a form with biographical information.  Officer Smith then proceeded to interview Ayvazyan.

Officer Smith's interview of Ayvazyan took a long time and represents approximately 40% of the narrative of the only CBP report of Ayvazyan's detention, interrogation, and search.  As part of his interview, Officer Smith searched Ayvazyan's carry-on bag.  Officer Smith's search of Ayvazyan's bag—the first search beyond

---

[4] As discussed in today's Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments, the government responded to Ayvazyan's repeated requests for the recordings of him in the room where he first requested counsel and of him during his subsequent interviews and searches by producing only the recording of the final, perfunctory interview.  The government claims that all other recordings have now been deleted or were not created in the first place.

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

1    routine—did not result in any seizures or relevant evidence.  Officer Smith asked

2    Ayvazyan to provide the passcodes to the phones in his bag, but Ayvazyan declined.

3    Officer Smith threatened to confiscate the phones and have a supervisor come to meet

4    Ayvazyan and confirm that the phones would be confiscated.  Ayvazyan nonetheless

5    declined to provide any passcodes to the phones.  Officer Smith returned Ayvazyan to

6    the waiting room and prohibited him from speaking to his wife.

7         To be clear, the purpose of Officer Smith's interview of Ayvazyan was to gather

8    evidence for the PPP loan investigation.  As Officer Desouza of the Joint Terrorism

9    Task Force reported to Agent Palmerton as early as 5:05 p.m., "Subject is still being

10   interviewed.  I [will] share the information tomorrow."  Ram Decl. Ex. 15

11   (DOJ_PROD_0000023587), at 23.  From the moment Ayvazyan and Terabelian were

12   stopped until they were arrested, CBP was acting in service of the FBI's investigation.[5]

13            **3.    Second Interview and Baggage Search**

14        Approximately 45-60 minutes later, Ayvazyan was interviewed again, this time

15   by Officer Ramirez.  Officer Ramirez instructed Ayvazyan to identify his checked

16   luggage, and Ayvazyan complied.  Officer Ramirez then searched Ayvazyan's checked

17   luggage and carry-on bag without Ayvazyan's consent.  This search—the second search

18   beyond routine—resulted in the recovery of several credit cards belonging to Iuliia

19   Zhadko from Ayvazyan's carry-on bag.  Officer Ramirez's interview of Ayvazyan

20   again took a long time and represents approximately 40% of the narrative of the lone

21   CBP report of Ayvazyan's detention, interrogation, and search.  But as with Officer

22   Smith's interview, Officer Ramirez perplexing conducted this interview without a video

23   recording.

---

27   [5] CBP's intent can be seen, for example, in their repeated interrogation into who paid for the trip to
28   Turks and Caicos and what payment method they used, questions about a watch Terabelian purchased
     three years ago, and recent purchase of a home.

### 4. Electronic Media Search

After his baggage search, Officer Ramirez pressed Ayvazyan again for the passcodes to the phones.  When Ayvazyan requested a lawyer—his fourth such request, *see* Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments—Officer Ramirez told Ayvazyan that he did not need a lawyer because Officer Ramirez was just going to review the phones to ensure that Ayvazyan was not a terrorist and that was "all a lawyer would tell you."  Officer Ramirez told Ayvazyan that they would search to confirm Ayvazyan was not a terrorist or associated with known terrorists, and then he could get on a plane home.  Officer Ramirez's lie worked.  Ayvazyan provided the passcodes and Officer Ramirez and others performed lengthy searches of the cell phones using unknown methods targeted at obtaining purported evidence of PPP loan fraud.

The officers wrote in their reports that these cell phone searches were conducted "Due to [Ayvazyan] traveling from an area of interest, intelligence indicating the need for increased vigilance and thorough in-depth inspections and interviews when processing arriving travelers, and for purposes of national security."  Ram Decl. Ex. 7 (DOJ_PROD_0000002343), at 4.[6]  That report statement was plainly a lie.  Ayvazyan and Terabelian had traveled only to a Caribbean vacation destination, nowhere else.[7]  Nor had any intelligence indicated the need for "increased vigilance" or "thorough in-depth inspections and interviews" except for Agent Palmerton's request to investigate suspected PPP loan fraud.  Neither Agent Palmerton's request nor anything else about Ayvazyan or Terabelian required a cell phone search "for purposes of national security."  That statement in the CBP report was intended to covered up the fact that the

---

[6] The same language is included in both reports.  It bears noting that one of the authors was instructed to "[m]ake sure to use the TTRT code when you … get that arrest report done."  Ram Decl. Ex. 4 (DOJ_PROD_0000023636), at 3.  It is unclear whether this instruction related to using this boilerplate (but false) justification.

[7] Indeed, when the officer interviewing Terabelian reeled off a list of places of interest, he referenced Russia, "the Middle Eastern countries," "the 'Stans," and Africa.  He did not ask such pointed questions about other vacation travel to the Caribbean.

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

1   cell phone searches were actually conducted due to a request to exploit border officials'

2   authority in furtherance of a general law enforcement investigation.

3         Similarly, the CBP Electronic Media Report claims that the "Reason For Search"

4   was "National Security Concern [REDACTED]."  Ram Decl. Ex. 18

5   (DOJ_PROD_0000023569), at 2.  That too was a lie.  As revealed by internal emails

6   and confirmed by the evidence CBP chose to seize, the cell phone searches had nothing

7   to do with any national security concern.  Instead, it seems likely that the

8   [REDACTED] portion will reveal that the search was conducted in furtherance of

9   Agent Palmerton's investigation.  The government reports lied in order to obscure the

10  basis of their searches and cover up the fact that they were functioning purely as an arm

11  of the FBI investigation into alleged PPP loan fraud.

12              **5.     Third Interview**

13        At approximately 11:00 p.m., Ayvazyan underwent a final "clean-up" interview

14  during which he answered approximately 35-45 questions.  This minor interview,

15  representing approximately 20% of the narrative of the lone CBP report of Ayvazyan's

16  detention, interrogation, and search was the only interview that CBP chose to record.[8]

17  At 3:00 a.m., twelve hours after he landed, Ayvazyan was arrested and charged with

18  offenses related to PPP loan fraud based the interrogation and searches.  None of the

19  allegations related to customs offenses, terrorism, or national security.  Approximately

20  two weeks later, the government executed a series of seven warrants based in part on

21  the evidence from Ayvazyan's interrogation and searches at the Miami Airport.

22  Ayvazyan was thereafter charged in the instant indictment.

23

24

25  [8] Before these interviews in enclosed interview rooms, Ayvazyan and Terabelian discussed their
    detention with CBP officials and requested that they be represented by counsel.  *See* Motion to

26  Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments.  These discussions
    were recorded by cameras in the secondary inspection area and Ayvazyan repeatedly requested that

27  they be produced in discovery.  After Ayvazyan followed up these requests with a preservation
    inquiry, CBP chose to delete these recorded interactions.  *See id.*  There is therefore reason to doubt

28  CBP's claims that Ayvazyan's first and second interviews and all three searches were not recorded.

1    III.    **ARGUMENT**

2         A.    **Warrantless Detentions and Searches Are Unconstitutional Unless the**

3                **Government Can Carry Its Burden of Proof that an Exception Applies**

4         "The Fourth Amendment proscribes all unreasonable searches and seizures."

5    *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).  "[I]t is a cardinal principle that 'searches

6    conducted outside the judicial process, without prior approval by judge or magistrate,

7    are *per se* unreasonable under the Fourth Amendment—subject only to a few

8    specifically established and well-delineated exceptions.'"  *Id.* (quoting *Katz v. United*

9    *States*, 389 U.S. 347, 357 (1967)) (unanimous); *see also United States v. Place*, 462

10   U.S. 696, 700-01 (1983) (search of bag contents requires warrant); *Riley v. California*,

11   573 U.S. 373 (2014) (smartphone search requires warrant).  The government failed to

12   get a warrant in this case and its search is therefore presumed to be *per se* unreasonable

13   under the Fourth Amendment.

14        To rebut the presumption that its warrantless search was unreasonable, it is the

15   government's burden to demonstrate that its search was blessed by a specifically

16   established and well-delineated exception.  *United States v. Huguez-Ibarra*, 954 F.2d

17   546, 551 (9th Cir. 1992) ("The government has the burden of justifying the seizure

18   under one of a few specifically established exceptions to the warrant requirement.");

19   *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992) ("The burden is on the

20   Government, moreover, to show the reasonableness of a warrantless search. … This

21   includes demonstrating that the search comes within one of the narrow exceptions to

22   the warrant requirement.").  The government cannot meet its burden in this case.

23        B.    **No Exception to the Fourth Amendment Warrant Requirement**

24                **Applies to the Warrantless Detention and Searches in This Case**

25        The exceptions to the Fourth Amendment warrant requirement are "jealously and

26   carefully drawn."  *Jones v. United States*, 357 U.S. 493, 499 (1958).  "[T]he Fourth

27   Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a

28   person's … property may not be totally sacrificed in the name of maximum simplicity

                                            12

1    in enforcement of the criminal law." *Id.* at 393.  For this reason, "[w]arrants are

2    generally required 'unless the exigencies of the situation make the needs of law

3    enforcement so compelling that the warrantless search is objectively reasonable under

4    the Fourth Amendment.'"  *United States v. Cano*, 934 F.3d 1002, 1010 (9th Cir. 2019)

5    (quoting *Mincey*, 437 U.S. at 393-94).

6         Exceptions to the warrant requirement are subject to "important constraints" on

7    their application.  *Id.* at 1011.  Most importantly, where application of an exception

8    "would untether the rule from the justifications underlying the exception," that

9    application falls outside of the scope and does not apply.  *See id.* (quoting *Riley*, 573

10   U.S. at 386).  Thus, application of the search warrant exceptions is constrained to those

11   applications that are consistent with their purpose.  That constraint precludes the

12   application of any exception to the Fourth Amendment warrant requirement in this

13   case.

14               **1.    The Border Search Exception Does Not Apply**

15        The border search exception to the Fourth Amendment allows the government to

16   conduct certain warrantless searches in order to prevent unlawful people and items from

17   entering the United States.  "The authority to search at the border has always been

18   justified as necessary to prevent smuggling and to prevent prohibited articles from

19   entry, and to determine whether the individual presenting himself at the border is

20   entitled to come in."  *United States v. Tsai*, 282 F.3d 690, 699 (9th Cir. 2002) (Berzon,

21   J., concurring) (internal citations omitted); *Carroll v. United States*, 267 U.S. 132, 154

22   (1925) (citing statutes passed by the First, Second, and Fourth Congresses permitting a

23   warrantless border search of a traveler to "identify himself as entitled to come in, and

24   his belongings as effects which may be lawfully brought in.").  Border searches

25   tethered to these two purposes are considered "routine" and do not require any

26   suspicion of wrongdoing.  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538

27   (1985); *see United States v. Flores-Montano*, 541 U.S. 149, 153 (2004).  The border

28   search exception for routine searches, however, is "narrow" and "does not mean … that

1    at the border 'anything goes.'" *Cano*, 934 F.3d at 1013 (quoting *United States v.*

2    *Cotterman*, 709 F.3d 952, 960 (2013) (en banc)).

3        The core limitation that narrows the border search doctrine is that it only applies

4    to routine searches.  It does not give the government unfettered investigatory powers

5    that it would not enjoy elsewhere simply because a person of interest in an investigation

6    happens to travel across the border.  The Ninth Circuit has identified two ways in which

7    a search conducted at the border may fall outside of the border search exception.

8        *First*, "any search conducted under an exception must be within the scope of the

9    exception." *Cano*, 934 F.3d at 1011.  The Ninth Circuit's paradigmatic illustration of

10   the scope requirement was that while searching a container was generally covered by

11   the search incident to arrest exception, the search of a cell phone was insufficiently

12   tethered to "the justifications underlying the exception." *Id.* (quoting *Riley*, 573 U.S. at

13   386 (2014)).  Because the government's purpose for searching the phone "'would

14   represent a broadening' of the exception's foundational concern," it did not fall within

15   the scope of the exception and a warrant was required.  *Id.* (quoting *Riley*, 573 U.S. at

16   387-88).

17       *Second*, even if a search and seizure is otherwise within the scope of the

18   exception, it must be reasonable.  *Cotterman*, 709 F.3d at 963.  This reasonableness test

19   requires a "case-by-case analysis" of the totality of the circumstances.  *Id.* at 963, 966.

20   "The reasonableness of a border detention is determined by analyzing all of the facts

21   together, 'including the scope and duration of the deprivation,'" *Phillips v. U.S.*

22   *Customs & Border Prot.*, No. 19-cv-6338 (SVW), 2020 WL 4118010, at *3 (C.D. Cal.

23   Mar. 9, 2020) (quoting *Cotterman*, 709 F.3d at 963), and their level of intrusiveness,

24   *Cano*, 934 F.3d at 1011.

25       The warrantless detention and searches in this case fail both prongs of this test.

26   First, detentions and searches executed for general law enforcement purposes are not

27   within the scope of the border search exception.  Second, the lengthy detention during

28   which Ayvazyan and Terabelian were systematically isolated, denied access to counsel,

repeatedly interrogated, and repeatedly searched exceeds that which is reasonable for a border stop.

**a.**   **The Scope of the Border Search Exception Does Not Extend to Pretextual Detention and Warrantless Searches for General Law Enforcement Purposes**

The Ninth Circuit[9] has recently summarized the scope requirement applicable to border searches as a limitation "in two important ways."  First, "[a] border search must be conducted to enforce importation laws, and not for general law enforcement purposes." *Cano*, 934 F.3d at 1013 (internal quotation marks and citations omitted) ("A general search cannot be justified on the mere basis that it occurred at the border."). Second, a border search must be conducted by a person authorized under customs laws. *Id.*  The search in this case fails both limitations.

The search in this case was unlawful because it was conducted for "general law enforcement purposes," not "to enforce importation laws."  *See id.* (noting that photos on a laptop may be "merchandise, … [b]ut border officials have no general authority to search for crime" or evidence thereof).  The border search doctrine does not protect "a warrantless search for evidence of past or future … crimes" even when those crimes are related to the border.  *Id.* (vacating conviction for smuggling cocaine over border); *see also United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) ("[A] search conducted pursuant to a regulatory scheme is invalid if the officer's sole purpose in performing it is investigatory.").  Searches for evidence of alleged crimes unrelated to the border obviously fall even farther outside of the border search doctrine and likewise

---

[9] During his interview of Terabelian, a CBP officer noted that they intended to evade Ninth Circuit law: "Some people think that we can't [check their] phones.  That's a big misunderstanding. … you're from, what, the State of California?  California has an understanding that it's very difficult for an officer to go through someone's phone, which is true—in the state of California.  But we are in a different district.  As far as searching through someone's phone at the airport, you gotta assume it's a lot easier for us [here in Miami]."  Ram Decl. Ex. 12 (DOJ_PROD_0000023808), at 35:55-36:50. Regardless of the CBP officer's intent to evade the Ninth Circuit standard by stopping Terabelian and Ayvazyan before they reached California, it is the Ninth Circuit that has laid out the relevant tests applicable to the Fourth Amendment.

15

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

require a warrant.  Thus in *Cano*, a random computer-generated referral to secondary screening became unlawful when officers started "search[ing] for evidence of a crime" instead of contraband in violation of importation laws "and thus exceeded the proper scope of a border search."  934 F.3d at 1016.[10]  In some cases, CBP officers do search for "contraband whose importation is prohibited by law," *id.* at 1017 (noting that "the detection-of-contraband justification would rarely seem to apply to an electronic search of a cell phone outside the context of child pornography"), but like *Cano* and despite the government's deceptive boilerplate forms about national security and contraband, this is not such a case.  In this case, there was never a random stop and never a search for contraband "to enforce importation laws"; there was only a search for evidence of PPP loan fraud and claims that doing so was in furtherance of national security interests.  That search exceeded the proper scope of a border search.

   The Ninth Circuit has made clear that investigators are not free to exploit administrative searches under a pretext in order to evade Fourth Amendment requirements.  In *United States v. Orozco*, law enforcement officers acting on a tip that narcotics were being carried in a commercial truck used an administrative stop for routine safety inspections as a pretext to investigate whether that particular truck was

---

[10] The prohibition on searches conducted for general law enforcement purposes does not render unconstitutional every search which a CBP official subjectively hopes will yield evidence of criminal activity.  *See Cano*, at 1008, 1016 n.9 (emphasizing that a search pursuant to a random computer referral did not become unconstitutional based on the searching agent's subjective purpose "on its own").  Instead, "to determine whether the search is invalid because of an impermissible purpose, we ask whether the officer *would* have made the stop in the absence of the invalid purpose."  *Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019) (quoting *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017)).  Thus, an "inquiry into the subjective purpose of [an] agent making referrals to secondary inspection [is not mandated] *unless there is some objective evidence supporting the charge of pretext.*"  *United States v. Barnett*, 935 F.2d 178, 181 (9th Cir. 1991) (emphasis added); *United States v. Koshnevis*, 979 F.2d 691, 694 (9th Cir. 1992) (same); *see also Adlerstein v. U.S. Customs & Border Prot.*, No. 19-cv-500, 2020 WL 5846600, at *15, 16 (D. Ariz. Oct. 1, 2020) (holding that complaint successfully alleged that pretextual secondary inspections violated Fourth Amendment because detention was based on subjective investigatory or retaliatory intent, not probable cause).  Here, the search of Ayvazyan began, proceeded, and concluded as a search for evidence of alleged fraud untethered from customs laws and contraband.  It was therefore unconstitutional from its inception and even further outside of the realm of reasonableness than the facts in *Cano*.

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

Case 2:20-cr-00579-SVW   Document 130   Filed 03/08/21   Page 24 of 32   Page ID #:874

indeed carrying narcotics.  858 F.3d 1204, 1209 (9th Cir. 2017).  The Ninth Circuit ruled that, because the stop never would have happened but for the desire to investigate unrelated criminal activity, any evidence located during that stop should be suppressed. *Id.* at 1210; *see also United States v. Johnson*, 889 F.3d 1120, 1128 (9th Cir. 2018) (holding that to qualify for inventory exception to Fourth Amendment warrant requirement, "the purpose of such a search must be unrelated to criminal investigation). The fact that the search was cloaked in the pretense of an administrative search did not save it—the Ninth Circuit noted that "it could hardly be that a suspicion-less stop made for reasons unrelated to the programmatic purpose of the scheme is valid simply because it is undertaken by those charged with enforcing that scheme." *Orozco*, 858 F.3d at 1212.

As the Ninth Circuit noted in *United States v. Grey*, the *Orozco* test and its reasoning are "applicable to border searches" and several other exceptions.  959 F.3d 1166, 1180 (9th Cir. 2020).  And this case mirrors *Orozco*: the government relied on pretextual search that it would not otherwise have been able to conduct.  The investigation into the alleged PPP fraud began long before the search in Miami.  Ram Decl. Ex. 5.  And when Ayvazyan and Terabelian were linked to an alert in APIS, it was the FBI Agent based in Los Angeles—investigating the PPP fraud, with no link to border security—who requested that Ayvazyan and Terabelian be detained so that the alleged PPP fraud could be investigated.  Ram Decl. Ex. 15.  The CBP officers detained, interrogated, and searched Ayvazyan for general law enforcement purposes, not to enforce importation laws.

Setting aside the invalid purpose, the Miami search was also unconstitutional because it was conducted under the authority and direction of the FBI, not CBP.  The scope of the border search doctrine includes CBP officers and "not general law enforcement officers such as FBI agents" because "customs agents are not general guardians of the public peace."  *See Cano*, 934 F.3d at 1013 (quoting *United States v. Diamond*, 471 F.2d 771, 773 (9th Cir. 1973) (explaining the distinction between CBP

17

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

officers and FBI agents)).  The fact that Agent Palmerton sat in Los Angeles while CBP officers executed his directives in Miami does not change the analysis.  In *United States v. Soto-Soto*, the Ninth Circuit found that an FBI Agent cannot use the border search doctrine in furtherance of his authority to investigate stolen vehicles because he "acted for general law enforcement purposes, not for enforcement of customs laws."  598 F.2d 545, 549 (9th Cir. 1979).  Six years later, the Ninth Circuit clarified that holding by concluding that the relevant inquiry is not who "participat[es] in a search" but rather whether the search is "executed under the *authority and direction* of those agencies having jurisdiction in safeguarding the borders."  *United States v. Alfonso*, 759 F.2d 728, 735 (9th Cir. 1985) (emphasis added) (distinguishing the unlawful search in *Soto-Soto* as being "conducted as part of a general law enforcement effort" directed by the FBI from a lawful search in which CBP "enlist[ed] the aid" of FBI Agents in order to "meet [CBP's] needs" in protecting the border).  Thus, while the *Soto-Soto* search was unlawful because it was authorized and directed by the FBI, the search in *Alfonso* was lawful because it was authorized and directed by CBP and the FBI was merely deputized to assist.

The facts of the Miami search present the converse of *Alfonso*.  The FBI—who is constitutionally prohibited from performing a warrantless search for evidence of loan fraud—directed CBP to detain Ayvazyan and Terabelian, interrogate them, and search them.  The FBI cannot circumvent the Fourth Amendment by deputizing CBP officers to set aside their homeland security duties for a day and investigate an FBI loan fraud matter through methods that would be prohibited if done directly by the FBI.

\*     \*     \*

The government's expansive view of its border search powers strikes at the very heart of the Fourth Amendment.  The Fourth Amendment analysis begins with the premise that warrantless searches and seizures are *per se* unreasonable and that any exceptions must be construed narrowly.  *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) ("Consistent with our precedent, our analysis begins, as it should in every case

18

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'").  These exceptions are "well-delineated" for a reason—when the government operates outside the bounds of the Fourth Amendment, critical safeguards ensuring that no one is subjected to an unreasonable search are lost.  *See United States v. Chadwick*, 433 U.S. 1, 9 (1977) ("The judicial warrant … provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.'").

The government's position would vastly expand what the Ninth Circuit has repeatedly admonished is meant to be a "narrow exception."  FBI Agents have myriad powers to gather evidence at their disposal, but warrantless border searches are not one of them.  Just because those other evidence-gathering methods are less convenient does not justify exploitation of border search doctrine.  Untethering a narrow exception from its purpose to protect American borders would both violate the Fourth Amendment rights of travelers like Ayvazyan and divert limited resources from protecting our country from actual threats and undermine respect for the rule of law.  Unconstitutional shortcuts and end-runs around Constitutional rights can and should be deterred via suppression.

###           b.           The Warrantless Detention, Interrogations, and Searches Were Unreasonable

"The reasonableness of a border detention is determined by analyzing all of the facts together, 'including the scope and duration of the deprivation.'"  *Phillips*, 2020 WL 4118010, at *3 (C.D. Cal. Mar. 9, 2020) (quoting *Cotterman*, 709 F.3d at 960).  In this case the lengthy detention during which Ayvazyan and Terabelian were isolated and forbidden from speaking to each other, repeated interrogation sessions, and

19

1   multiple cell phone searches for general law enforcement purposes rendered the Miami
2   search unreasonable.

3         Ayvazyan and Terabelian were detained and forbidden from speaking with each
4   other or a lawyer for over *ten hours* from just after 3:00 p.m. until their arrest at
5   approximately 1:40 a.m.  They were interviewed over and over again in a location
6   chosen by CBP purportedly lacking the cameras present in other interview rooms.
7   They had their bags searched and re-searched and answered questions about relatives,
8   relationships, and finances.  The search in this case was categorically "nonroutine" and
9   unreasonable.

10        As this Court observed in *Phillips*, there are not "hard-and-fast time limits" on
11  detention at the border.  *Id.* (quoting *Tabbaa v. Chertoff*, 509 F.3d 89, 100 (2d Cir.
12  2007)).  Instead, stops "lasting less than two hours" are typically not to be considered
13  arrests requiring heightened suspicion or cause, *id.* at *3, and courts rely on "common
14  sense and ordinary human experience" in determining whether a stop has stretched
15  beyond what "was to be expected at the border" to "an unexpected level of intrusion
16  into a person's privacy, that by itself would render the searches non-routine."  *Id.* at *4
17  (quoting *Tabbaa*, 509 F.3d at 100-01).  Thus, in *Montoya de Hernandez*, a sixteen-hour
18  detention was routine to accommodate the border interest of detecting alimentary canal
19  drug smuggling, *see* 473 U.S. at 543 ("alimentary canal smuggling cannot be detected
20  in the amount of time in which other illegal activity may be investigated through brief
21  *Terry*-type stops."), and in *Tabbaa*, six hours was routine to accommodate the border
22  interest in preventing terrorists from entering the country, 509 F.3d at 100.

23        But where CBP held a passenger for "six to seven hours in an isolated area"
24  where he was not free to leave and was instead interrogated on issues "unrelated to
25  CBP's routine functions," this Court has correctly declined to conclude that the search
26  was routine as a matter of law and instead concluded that probable cause may have
27  been required.  *Phillips*, 2020 WL 4118010, at *3, *5.  The facts of this case go far
28  beyond the detention in *Phillips*.  Ayvazyan and Terabelian were systematically

isolated, searched three or more times, and interrogated three or more times—often by an officer who refused to properly wear his mask in a small CBP interview room—over the course of over ten hours.  Each of these actions was "unrelated to CBP's routine functions" and was instead an effort to exploit the powers entrusted to CBP to execute searches that would be unlawful if executed by the FBI.  The duration and intrusion of the search of Ayvazyan and Terabelian was therefore unreasonable and unconstitutional.

### 2.    The Consent Exception Does Not Apply

To "establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given."  *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (quoting *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997)).  The government cannot meet that "heavy burden" in this case.  Based on CBP's reports, we anticipate that the government may argue that Ayvazyan's constitutional rights were not violated as to the search of his cell phone because he purportedly consented.  After being detained for hours, refused a lawyer, separated from his wife, subjected to other unconstitutional searches and interrogation, and told he could not leave, Ayvazyan was told that officers needed access to the phones in his bag to make sure that he did not have ties to any known terrorists before he was released.  Ayvazyan still nonetheless refused the officers request for passcodes.  Only after additional pressure tactics and Officer Ramirez misrepresenting the purpose of the search, Ayvazyan provided the passcodes.

The determination of whether Ayvazyan's consent was voluntary turns on "the totality of all the circumstances," including whether the person was in custody, whether guns were drawn, whether a *Miranda* warning had been given, whether the person was told that he had the right not to consent, whether the person was told that a search warrant could be obtained.  *Id.*  "Although no one factor is determinative in the equation, many of [the Ninth Circuit]'s decisions upholding consent as voluntary are supported by at least several of the factors."  *Id.* at 126-27.

21

1    Here, the most salient factors and a totality of the circumstances weigh heavily

2    against a finding of free and voluntary consent.  He was in custody and had been in

3    custody for hours.  He had been systematically separated from his wife and his requests

4    to speak with her had been denied.  The government not only failed to issue a *Miranda*

5    warning but, to the contrary, told Ayvazyan that the government could detain him as

6    long as they wanted and that he could not have a lawyer.  While this treatment is not

7    unprecedented, *see Adlerstein*, 2020 WL 5846600, at *2 (recounting allegations that

8    CBP officer similarly told detainee that she could be detained "indefinitely" and could

9    not speak with her lawyer because "there [were not] any charges yet"), it is

10   unreasonable and would place undue pressure on a detainee in Ayvazyan's position, *see*

11   *id.* (describing how Adlerstein responded by becoming "increasingly concerned and

12   upset").

13   Finally, the CBP officers repeatedly pressured Ayvazyan when he did not give

14   them the consent they wanted.  After Ayvazyan told Officer Smith that he would not

15   provide passcodes to allow a cell phone search, Officer Smith told Ayvazyan that his

16   alternative was to leave the phones behind for administrative confiscation.  Ayvazyan

17   Decl. ¶ 18.  When that approach did not work, the CBP officers did not proceed with

18   administrative confiscation.  Instead, they called in a second officer, Officer Ramirez,

19   who repeatedly pushed for the passcodes and deflected Ayvazyan's requests for a

20   lawyer before giving him the passcodes.  *Id.* ¶¶ 23-24.  When Ayvazyan asked a

21   question, Officer Ramirez responded by lying: "When I asked why he needed the

22   codes, Officer Ramirez told me that it was for national security purposes and just to

23   confirm that I was not a terrorist.  Officer Ramirez told me that if I called a lawyer, the

24   lawyer would tell me the same thing.  Officer Ramirez told me that once they

25   confirmed he was not a terrorist, they would have me out in fifteen to twenty minutes."

26   *Id.* ¶ 24.  Under those circumstances, Ayvazyan was not voluntarily consenting to the

27   search that CBP performed.

28

22

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES

Although the totality of circumstances show that Ayvazyan's consent was not voluntary, the Court need not dwell on that question for long because Officer Ramirez violated the bright-line rule not to misrepresent the purpose of the search.  Where consent is "acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation," the search is unreasonable under the Fourth Amendment. *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990); *accord United States v. Phillips*, 497 F.2d 1131, 1135 n.4 (9th Cir. 1974) ("To be valid, a consent must be intelligently and knowingly given. Before a person can be deemed to have 'knowingly' consented, he must be aware of the purpose for which the agent is seeking entry."). Here, the government told Ayvazyan that the purpose of their search was to protect national security by clearing him of any ties to known terrorists—that was a lie.[11]  The search had nothing to do with terrorism or national security; instead, the officers were searching for evidence of alleged PPP loan fraud.  *Bosse* presented similar facts—in that case, a law enforcement officer gained admission to the defendant's home by claiming that he was assisting with a state licensing inspection, but in reality, was investigating the defendant for firearms violations and preparing to arrest him.  *Id.*  The Ninth Circuit deemed this a "ruse entry" and ruled that the entry into the defendant's home based on this entry was illegal and remanded the case to the district court to decide the scope of suppression.  *Id.* at 115-16.  Suppression is appropriate here just as it was in *Bosse*.[12]

---

[11] Indeed, several hours later when the government turned on the cameras and began recording again, Ayvazyan alluded to this limited purpose asking "What do[] credit cards have to do with [the] national security [purpose] that Ramirez is talking about?"  Ram Decl. Ex. 13 (DOJ_PROD_0000023810), at 39:40-40:00.

[12] The pretextual stop, totality of the circumstances, and *Bosse* preclude reliance on any purported consent.  Even if it were valid, however, any consent would be limited in scope to communications related to terrorism.  Where limited consent is given for the search, the scope of that search is limited by the scope of the consent granted.  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  None of the relevant evidence related to terrorism and therefore suppression would still be proper.

1
2

### C. The Direct and Indirect Products of the Unconstitutional Detention and Searches Should Be Suppressed

3   The Fourth Amendment does not allow law enforcement to deputize others to

4   execute searches they themselves are forbidden from performing.  The government

5   attempted to evade the Fourth Amendment by exploiting CBP's obligations to prevent

6   terrorism and protect national security.  That attempted end-run merits suppression.

7   Suppression extends to both the "indirect" and "direct" products of unlawful

8   searches.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  "The essence of a

9   provision forbidding the acquisition of evidence in a certain way is that not merely

10   evidence so acquired shall not be used before the Court but that it shall not be used at

11   all."  *Id.* at 485 (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392

12   (1920)).

13   The direct products of the government's unlawful search of Ayvazyan were the

14   evidence and statements obtained on October 19-20, 2020.  Two weeks later, on

15   November 3, 2020, the government used that tainted evidence to obtain search warrants

16   for seven homes associated with this case.  The government's affidavit rested squarely

17   upon the tainted evidence.  Indeed, after three paragraphs summarizing the alleged

18   crimes, the first pieces of evidence cited in the "SUMMARY OF PROBABLE

19   CAUSE" are the fruits of the government's unlawful search on October 19-20, 2020.

20   Affidavit ¶ 19, *In re Search of [Redacted]*, Tarzana, CA 91356, No. 2:20-mj-5282, Dkt.

21   1 (C.D. Cal. Nov. 3, 2020).  The products of those search warrants are therefore fruit of

22   the poisonous tree and should be suppressed along with the direct products of the

23   government's unlawful search.

24

### IV. CONCLUSION

25   For the foregoing reasons, Ayvazyan respectfully requests that this Court

26   suppress the evidence collected during his unlawful detention, interrogation, and search

27   on October 19-20, 2020, and the direct and indirect fruits of that tainted evidence.

28

Dated:   March 8, 2021

Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*aram@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

MOTION TO SUPPRESS –WARRANTLESS DETENTION AND SEARCHES