Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*aram@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      *Plaintiff,*<br><br>      v.<br><br>RICHARD AYVAZYAN,<br>MARIETTA TERABELIAN,<br>ARTUR AYVAZYAN,<br>TAMARA DADYAN,<br><br>      *Defendants.* | Case No.  20-cr-579 (SVW)<br><br>**DEFENDANT RICHARD AYVAZYAN'S NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY SEIZED IN SEARCH OF SUBJECT PREMISES-1 AND MEMORANDUM IN SUPPORT**<br><br>Judge:  Hon. Stephen V. Wilson<br>Date:    April 12, 2021<br>Time:   11:00 a.m. |

NOTICE OF MOTION AND MOTION TO SUPPRESS AND RETURN PROPERTY

## NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY SEIZED IN SEARCH OF SUBJECT PREMISES-1

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on Monday, April 12, 2021 or as soon as this counsel may be heard in Courtroom 10A of this Court at 350 W. 1st Street, 10th Floor, Los Angeles, CA 90012, Defendant Richard Ayvazyan ("Ayvazyan"), through undersigned counsel, will move the Court to suppress and return property seized in search of Subject Premises-1.

This motion is based on this notice, the accompanying memorandum of points and authorities, the Declaration of Richard Ayvazyan filed concurrently with this motion, any reply that Ayvazyan may make, such other evidence and arguments as may be presented at or prior to the hearing, and all records and files in this action.

Dated:   March 11, 2021                Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF FACTS ...................................................................... 2

    A.   DANGEROUS LAW ENFORCEMENT MISCONDUCT AT A FAMILY HOME ............................................................................. 2

    B.   SEIZURE OF VALUABLES UNRELATED TO THE ALLEGED PROBABLE CAUSE ................................................................... 6

    C.   AFFIDAVIT SUBMITTED TO OBTAIN SEARCH WARRANT FOR SUBJECT PREMISES-1 ........................................................ 9

    D.   SEARCH WARRANT FOR SUBJECT-PREMISES 1 ........................... 10

III. LEGAL STANDARD ........................................................................ 12

IV.  ARGUMENT .................................................................................. 13

    A.   THE SEIZED PROPERTY SHOULD BE SUPPRESSED AND RETURNED BECAUSE THE SEARCH WARRANT LACKS PARTICULARITY ................................................................... 13

    B.   THE SEIZED PROPERTY SHOULD BE SUPPRESSED AND RETURNED BECAUSE THE WARRANT WAS OVERBROAD ......... 16

    C.   THE SEIZED PROPERTY SHOULD BE SUPPRESSED AND RETURNED BECAUSE THE WARRANT WAS EXECUTED UNREASONABLY BY SEIZING VALUABLES IN FLAGRANT DISREGARD OF THE WARRANT DESPITE READILY AVAILABLE PROOF THAT THE VALUABLES WERE NOT RESPONSIVE ................................................................... 20

    D.   ALL NON-RESPONSIVE PROPERTY SHOULD BE RETURNED REGARDLESS OF SUPPRESSION ......................................... 22

    E.   ALL DIGITAL DEVICE DATA NOT MARKED RESPONSIVE BY MARCH 5, 2021 SHOULD BE RETURNED REGARDLESS OF SUPPRESSION ................................................................... 23

V.   CONCLUSION ................................................................................ 24

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                    **Page(s)**

3

4      *Cassady v. Goering,*
           567 F.3d 628 (10th Cir. 2009) .................................................................... 14

5
6      *Center Art Galleries-Hawaii, Inc. v. United States,*
           875 F.2d 747 (9th Cir. 1989) ..................................................................... 16

7
8      *Go-Bart Importing Co. v. United States,*
           282 U.S. 344 (1931)...................................................................................... 12

9
10     *In re Grand Jury Subpoena,*
           926 F.2d 847 (9th Cir. 1991) ..................................................................... 16

11
12     *Marron v. United States,*
           275 U.S. 192 (1927)...................................................................................... 14

13     *Maryland v. Garrison,*
           480 U.S. 79 (1987)........................................................................................ 16

14
15     *Payton v. New York,*
           445 U.S. 573 (1980)...................................................................................... 12

16
17     *In re Search of [Redacted], Tarzana, CA 91356,*
           No. 2:20-mj-5282 (C.D. Cal. Nov. 3, 2020)........................................ *passim*

18
19     *In re Solid State Devices, Inc.,*
           130 F.3d 853 (9th Cir. 1997) ..................................................................... 12

20
21     *United States v. Abrams,*
           615 F.2d 541 (1st Cir. 1980)................................................................ 14, 22

22
23     *United States v. Bridges,*
           344 F.3d 1010 (9th Cir. 2003) ....................................................... 12, 13, 15

24
25     *United States v. Bright,*
           630 F.2d 804 (5th Cir. 1980) ..................................................................... 19

26     *United States v. Cardwell,*
           680 F.2d 75 (9th Cir. 1982) ................................................................. 14, 19

27

28

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

*United States v. Duong,*
    156 F. Supp. 2d 564 (E.D. Va. 2001) ......................................................... 18

*United States v. Galpin,*
    720 F.3d 436 (2d Cir. 2013) ...................................................................... 13

*United States v. Hill,*
    459 F.3d 966 (9th Cir. 2006) ..................................................................... 13

*United States v. Jacobson,*
    4 F. Supp. 3d 515 (E.D.N.Y. 2014) ........................................................... 16

*United States v. Kow,*
    58 F.3d 423 (9th Cir. 1995) ............................................................... 16, 19

*United States v. Lazar,*
    604 F.3d 230 (6th Cir. 2010) ..................................................................... 18

*United States v. Matias,*
    836 F.2d 744 (2d Cir. 1988) ............................................................... 13, 21

*United States v. Payton,*
    573 F.3d 859 (9th Cir.2009) ..................................................................... 21

*United States v. Ramirez,*
    523 U.S. 65 (1998) ........................................................................... 13, 20

*United States v. SDI Future Health, Inc.,*
    568 F.3d 684 (9th Cir. 2009) ..................................................................... 16

*United States v. Sedaghaty,*
    728 F.3d 885 (9th Cir. 2013) ............................................................. 13, 21

*United States v. Spilotro,*
    800 F.2d 959 (9th Cir. 1986) ............................................................. 12, 14

*United States v. Tamura,*
    694 F.2d 591 (9th Cir. 1982) ..................................................................... 22

*United States v. Weber,*
    923 F.2d 1338 (9th Cir. 1990) ........................................................... 13, 17

*United States v. Wey,*
    256 F. Supp. 3d 355 (S.D.N.Y. 2017) ....................................... 13, 15, 16, 17

iii

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

*United States v. Winn*,
   79 F. Supp. 3d 904 (S.D. Ill. 2015)..............................................................18

*VonderAhe v. Howland*,
   508 F.2d 364 (9th Cir. 1974) ......................................................................13

*Wheeler v. State*,
   135 A.3d 282 (Del. 2016) ............................................................................16

**Other Authorities**

Fed. R. Crim. P. 41.........................................................................................23

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

Defendant Richard Ayvazyan, through undersigned counsel, moves this Court to

3

suppress evidence collected during the unlawful search of his family's home, Premises-

4

1, and for the return of unlawfully seized property.[1]  As discussed below, this relief is

5

necessary because the Warrant lacked particularity, was overbroad, and was executed

6

unreasonably.

7

## I.    PRELIMINARY STATEMENT

8

The Search Warrant in this case authorized entry into a family's home and the

9

seizure of any item or document related to either the father or mother who lived in that

10

home.  The Fourth Amendment was famously enacted to end wide-ranging exploratory

11

searches of homes conducted by British officers who would enter a home with a writ of

12

assistance that purported to authorize the search of anything related to the homeowner's

13

purported guilt of any offense.  In the eighteenth century, the Warrant would have been

14

recognized as a writ of assistance; in today's parlance, it lacked particularity, was

15

unconstitutionally overbroad, and was executed unreasonably.

16

This was not a case of mistaken identity or confusion about which items were

17

alleged evidence, instrumentalities, or proceeds.  The alleged PPP loan fraud

18

purportedly ran from March 27, 2020 when the CARES Act was passed until

19

approximately July 2020.  *See* Affidavit[2] ¶ 16 (stating that the alleged scheme began in

20

or around March 2020 and "continu[ed] through at least in or around July 2020" in the

21

Summary of Probable Cause); *see also* Dkt. 1, Complaint, Statement of Facts

22

---

23

[1] The evidence seized during the search of Premises-1 should also independently suppressed as fruit of the poisonous tree stemming from the illegal detention and interrogation of Ayvazyan and Terabelian at Miami International Airport on October 19-20, 2020.  *See* Motion to Suppress Evidence From Pretextual Detention and Warrantless Searches, Dkt. 130; Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments, Dkt. 135.  This motion will be moot if the Court grants derivative suppression under either of the foregoing motions.

24

25

26

[2] The terms "Affidavit" and "Warrant" refer to the Application for a Warrant by Telephone or Other Reliable Electronic Means for Premises-1 issued on November 3, 2020, docketed at *In re Search of [Redacted]*, *Tarzana, CA 91356*, No. 2:20-mj-5282, Dkt. 1 (C.D. Cal. Nov. 3, 2020) and produced to the defense as DOJ_PROD_0000002552.

27

28

1

MOTION TO SUPPRESS AND RETURN PROPERTY

Constituting the Offense (same).  A probable cause statement related to conduct beginning on March 27, 2020 did not justify the seizure of property obtained years earlier.  Although it is the government's burden to link alleged proceeds to the alleged offense, some of the property seized facially and plainly could not have been within the scope of a permissible search warrant.  For example, agents seized watches and jewelry from Ayvazyan's home and simultaneously seized the receipts that proved that the watches and jewelry in question pre-dated the alleged conduct under investigation by a matter of several years.

Nor did agents executing the Warrant attempt to cabin its all-encompassing scope.  Instead, they took full advantage of the discretion it improperly afforded them to seize whatever valuables they could find.  For example, agents seized the family's cash savings, old wedding jewelry, and a child's phone.

Because the Warrant's overbreadth and execution in this case was unconstitutional, sections IV.A, IV.B, and IV.C below request that the Court suppress the evidence seized from Search Premises-1 and order its return.   Setting aside the question of suppression, Section IV.D and Section IV.E request the return of non-responsive physical property and any digital device data that has not been marked responsive now that the time for doing so has expired.

## II.    STATEMENT OF FACTS

### A.    Dangerous Law Enforcement Misconduct at a Family Home

At dawn on November 5, 2020, dozens of law enforcement officers in military garb invaded and ransacked the home of defendant Richard Ayvazyan and his wife (co-defendant Mary Terabelian).  They did so under the color of law, brandishing a deeply flawed warrant as a hall pass to do whatever they wished.

Despite the non-violent, white-collar nature of the allegations in this case—and lack the of *any* indication that Ayvazyan, Terabelian, or their children were or would be violent—the officers dressed and behaved as though they were soldiers entering a

2

terrorist camp in a war zone, instead of officers entering a peaceful family home.  From their days of observation, they knew who was home: Ayvazyan, Terabelian, their 12-year-old son R.A., 14-year-old daughter J.A., 15-year-old D.A., sister-in-law G.T., 13 year-old niece Ad.P., and 8 year-old nephew Ar.P.  The affidavit alleged no threat of violence or resistance and, of course, the officers encountered none.  This was a search of a family home on a weekday morning, one typically conducted in a peaceful manner to avoid injuring or traumatizing children and relatives.  The opposite occurred in this case.



     In a scene reminiscent of a battlefield, the agents—many of whom loaded onto a military-style armored Humvee—carried assault rifles and wore camouflage body armor and helmets, as evidenced by the following images from Ayvazyan's home security system on the day of the search:

3



The unjustified application of this show of force was even worse.  When this army arrived, Ayvazyan, Terabelian, and the children quickly and peacefully walked outside with their hands above their heads.  Despite repeated assurances from Ayvazyan, Terabelian, and their children that they would comply with the agents' orders, the agents brandished their assault rifles at the children and shouted commands like "HANDS UP!" and "LET ME SEE YOUR HANDS!"



NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

One by one, the children—who were clad in pajamas and embarrassed—were rounded up and held at gun point for a sustained period of time. ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████ Only Ayvazyan's 15 year-old son remained in the house because he was still asleep. Agents entered the house with guns drawn, shouted to wake him up, and then commanded him to walk towards their drawn assault rifles with his hands up. They pushed the startled child against a wall, patted him down, and handcuffed him.





5

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

1

2

3

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The officers inflicted this punishment—at

5 best—in reckless disregard for the fact that the warrant did not authorize it.

### B. Seizure of Valuables Unrelated to the Alleged Probable Cause

The officers disabled the home's security cameras (except for the one that provides the above evidence of them threatening children with guns) to avoid having their search warrant execution memorialized. The officers shot the cameras, snapped them in half, and in some cases simply pointed the camera away so that it could not record their manner of execution. The officers also sawed off the protective gate at the driveway's entrance—despite lacking probable cause or permission for a no-knock warrant. They then proceeded from room to room seizing anything that appeared to be valuable.

The agents seized few items related to Agent Palmerton's affidavit. Instead, they appear to have seized anything that looked like it was valuable—seizing only the most valuable pieces of Ayvazyan's watch collection, for example, while leaving less valuable watches behind—without probable cause to believe that the valuable items were evidence, instrumentalities, or proceeds of the alleged fraud scheme. Specifically, the alleged scheme spanned only from March 27, 2020 (when the CARES Act was passed) until approximately July 2020. *See* Affidavit[3] ¶ 16 (stating that the alleged scheme began in or around March 2020 and "continu[ed] through at least in or around July 2020" in the Summary of Probable Cause); *see also* Dkt. 1, Complaint, Statement

---

[3] The terms "Affidavit" and "Warrant" refer to the search warrant for Premises-1, issues on November 3, 2020, docketed at Search Warrant and Affidavit, *In re Search of [Redacted]*, Tarzana, CA 91356, No. 2:20-mj-5282, Dkt. 1 (C.D. Cal. Nov. 3, 2020) and produced to the defense as DOJ_PROD_0000002552.

6

of Facts Constituting the Offense (same).  Valuables purchased years earlier could not possibly have been proceeds of any alleged PPP loan fraud, as PPP loans did not even exist as a concept until March 2020.[4]

There was no excuse for overseizure.  The Warrant did not permit mass seizures for the purpose of sorting through property off-site.  Indeed, rather than seize Ayvazyan's safe for off-site inspection, the officer cut through the safe destroying it. Despite lacking permission for a general seizure of property, that is precisely what followed.

The officers seized almost all of Ayvazyan and Terabelian's family jewelry and a large portion of their life savings despite a plain absence of probable cause.  The government bears the burden of demonstrating probable cause for any particular jewelry or money, and we have been able to identify numerous items seized without probable cause, including:

- Two Cartier watches seized along with receipts demonstrating that they could not be proceeds of the alleged offense because they were obtained long before March 27, 2020.[5]

- Terabelian's wedding ring received from Ayvazyan almost a decade ago and bearing the signs of age precluding any reasonable conclusion that it was purchased within the last year.[6]

- Two rings received by Terabelian in 2007 to commemorate the recent births of the couple's second and third children along with the receipts for the gems in the

_____

[4] The alleged conduct also involves EIDL loans, but each of those occurred after March 2020 when the CARES Act changed the eligibility and effect of EIDL loans.  There is no allegation in the search warrant application of criminal activity preceding the March 27, 2020 passage of the CARES Act.

[5] Ex. A to Declaration of R. Ayvazyan ("Ayvazyan Decl.") filed concurrently with this motion. (stainless steel Santos de Cartier model 4183 purchased May 1, 2019); Ex. B to Ayvazyan Decl. (stainless steel Cartier Chronoscaph 21 model 2424 purchased Oct. 24, 2007 [Inv. # 33 or 41].

[6] Ex. C to Ayvazyan Decl. The inventory does not describe the items seized with particularity, and this item may be Inv. # 35, 36, 37, or 38.

7

rings and the replacement ring bands.[7]

- A large portion of the family's life savings (approximately $450,000 in cash)[8]
- Approximately eight other pieces of jewelry for which the officers lacked probable cause because the jewelry was purchased prior to the alleged scheme, including:[9]
  - Terabelian's yellow-gold Rolex model 18238 watch[10];
  - a stainless steel Rolex Datejust model 126200 watch with a black dial purchased many years ago by Ayvazyan[11];
  - a stainless steel Rolex Datejust model 279160 watch with a pink dial purchased years ago by Ayvazyan[12];
  - a platinum ring[13];
  - a ring with Ayvazyan's initials that he received as a gift from his uncle upon the birth of his son in 2007;
  - a yellow gold necklace Ayvazyan/Terabelian has had since before they

---

[7] Ayvazyan purchased the gems in 2007 and the bands in 2008.  *See* Ex. D to Ayvazyan Decl. (receipt seized by officers showing that one diamond was purchased on June 30, 2007 [Inv. # 35, 36, 37, or 38]); Ex. E to Ayvazyan Decl. (certificate seized by officers showing that the other diamond was certified before sale on May 30, 2007); Ex. F to Ayvazyan Decl. (receipt seized by officers showing that the bands for both rings were purchased on Oct. 22, 2008).  The inventory does not describe the items seized with particularity, and this item may be Inv. # 35, 36, 37, or 38.

[8] [Inv. # 6, 12, 13, 16].

[9] This excludes the seizure of four Audemars Piguet watches [Inv. # 3, 24, 25, 26].  Although Ayvazyan contends that his possession of these watches was lawful, these appear to have been the subject of Affidavit ¶ 62.f, which alleges that the affiant has "records from Radius Bank and luxury watch retailers" reflecting transactions in "the last several months" that the affiant alleges utilized fraudulently obtained loan proceeds.  Although the affiant fails to specifically describe the transactions, these watches arguably could have been purchased during the time period described in Affidavit ¶ 62.f.

[10] *See* Ex. G to Ayvazyan Decl. (Feb. 3, 2018 photo of watch).

[11] *See* Ex. H to Ayvazyan Decl. (Apr. 19, 2019 photo of Ayvazyan wearing the watch at church with his son) [Inv. #30].

[12] *See* Ex. I to Ayvazyan Decl. (Aug. 26, 2017 photo of watch [Inv. # 31]).

[13] *See* Ex. J to Ayvazyan Decl. (July 31, 2017 photo of ring [Inv. # 40]).

8

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

1    were married[14];

2         o   a white gold ring marked 585 DJ purchased by Ayvazyan in 2018;[15] and

3    •   gold coins dated 1979-1987.[16]

4  In addition to ransacking the house for valuables untethered from the alleged probable

5  cause, officers seized an iPhone belonging to Ayvazyan and Terabelian's daughter, J.A.

6  To state the obvious, there was no need to seize a child's phone and no probable cause

7  to justify that seizure.  To add insult to injury, agents seized the phones Ayvazyan and

8  Terabelian had purchased just one week prior to the search (to replace the phones the

9  government had already taken from them in Miami), and—upon hearing Ayvazyan

10  discuss the need to purchase yet another replacement phone as he would need to check

11  in with probation and for ordinary life—officers seized every dollar in his wallet.

12       **C.**   **Affidavit Submitted to Obtain Search Warrant for Subject Premises-1**

13       As summarized in the Affidavit's "Statement of Probable Cause," there was no

14  probable cause justifying these seizures.  The Affidavit summarizes an alleged

15  PPP/EIDL loan fraud scheme running from those programs' COVID-era initiation on

16  March 27, 2020 through approximately July 2020.  *See* Affidavit ¶ 16.  The probable

17  cause to search Subject Premises-1 is set out in two sections of the Affidavit's

18  Statement of Probable Cause (Part VI):

19  •   Part VI Section B ("Statement of Probable Cause" for "Subject Premises-1")

20       alleges that Ayvazyan utilized SBA loan funds received by Iulia Zhadko of

21       Timeline Transport Inc. as a down payment for the purchase of Subject Premises-

22       1, that Terabelian utilized SBA loan funds received from G&A Diamonds and

23       Redline Auto Collision for the purchase of Subject Premises-1, and that

---

[14] *See* Ex. K to Ayvazyan Decl. (photo including necklace [Inv. # 48]).

[15] *See* Ex. L to Ayvazyan Decl. (Oct. 31, 2018 receipt from Sevana Jewelry).  The inventory does not describe the items seized with particularity, and this item may be Inv. # 35, 36, 37, or 38.

[16] [Inv. # 45].

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

1    Ayvazyan and Terabelian own Subject Premises-1.  Affidavit ¶ 23.

2    • Part VI Section I ("Statement of Probable Cause" "that Evidence, Fruits, and

3    Instrumentalities of the Subject Offenses Will Be Found at Subject Premises 1-7

4    and on the Subject Persons") alleges a variety of practices that the affiant thinks

5    are typical in his experience.  Most pertinent to this motion, paragraph 62.f

6    alleges that others sometimes "liquidate criminal proceeds to cash or cash

7    equivalent" or "us[e] criminal proceeds to purchase or finance automobiles, real

8    estate, and other types of property or assets…."  It then drills down to the

9    allegations at issue: "Here, records from financial institutions have revealed" that

10   hundreds of thousands of dollars were sent via check—checks that the

11   government had received in discovery—to "diamond retailers in both Los

12   Angeles and New York." *Id.*  Records from financial institutions and retailers—

13   including the records from "luxury watch retailers"—indicated the alleged

14   fraudulent purchase of "luxury watches" in "the last several months," and

15   "luxury home furnishings e last several months." *Id.*  Similar records from

16   financial institutions and retailers indicated purchases of "luxury home

17   furnishings … and luxury personal items." *Id.*  There were no alleged cash

18   withdrawals or purchases of other items.

19   In short, the Affidavit argues that there is probable cause to believe that proceeds from

20   these post-March 27, 2020 loans exist in the form of the house, furnishings, and certain

21   diamonds and watches purchased since March 27, 2020.  There is no allegation that any

22   proceeds are in the form of cash or gold coins or jewelry acquired *before* March 27,

23   2020, or that these are evidence, instrumentalities, or proceeds from the alleged scheme.

24   **D.    Search Warrant for Subject-Premises 1**

25   The Warrant for Subject Premises-1, however, goes much further than the

26   Affidavit's allegations.  Instead of cabining the seizures to the evidence,

27   instrumentalities, and proceeds of the alleged March-July 2020 scheme, the Warrant

28

10

appears to leave agents with discretion to seize whatever they wish.

The opening paragraph of the Warrant renders the rest of the document irrelevant by defining all items and records related to Ayvazyan or Terabelian (or either of their co-defendants) as "evidence" to be seized.  Paragraph 1.a of the "Items to be Seized" authorizes officers to seize all "[r]ecords or items concerning [a series of businesses the government alleged were affiliated with Ayvazyan, Terabelian, and their co-defendants], or any affiliated … individuals."  Warrant Attach. B ¶ 1.a.  Because Ayvazyan and Terabelian were alleged to be the owners of, or affiliated with, the referenced companies, Ayvazyan and Terabelian were encompassed within the expansive term "affiliated individuals."  This first paragraph—standing alone—granted officers discretion to seize any item related to Ayvazyan or Terabelian anywhere in their own home without regard to content or time period.

The first paragraph, however, does not stand alone.  Instead, the Warrant went further—endowing the officers with discretion to seize:

- Any cash irrespective of whether it was a proceed of the alleged fraud.  Warrant ¶ 1.r (noting that as long as there was over $1,000 in the premises and the persons to be searched then agents were given discretion to seize any cash on hand).[17]

- Any "financial records" including tax, bank, corporate, and "other financial records" regardless of which person or company they regarded.  Warrant ¶ 1.i.

- Any "[b]anking and financial records" regardless of whether they related to the alleged scheme.  Warrant ¶ 1.m.

- Any travel records and passports regardless of who they relate to encompassing, for example, the children's passports.  Warrant ¶ 1.p.

---

[17] The agents appear to have interpreted this paragraph as a license to seize any jewelry and gold as well.  It was not.  It instructed the agents to seize any cash if more than $1,000 is present and to seize any "records relating to disposition of any loan proceeds including … jewelry."  Warrant ¶ 1.r.  Thus, only jewelry that related to the disposition of loan proceeds could be lawfully seized.  The officers did not adhere to this limit.

11
NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

1     • Any digital device capable of storing data regardless of the apparent owner.
2        Warrant ¶ 6.
3  The Warrant defined each item in these categories as evidence, instrumentalities, or
4  proceeds of the alleged scheme despite the patent inaccuracy from that definition.  The
5  agents seized upon that discretion to rummage through the Ayvazyan family's home
6  and seize property with impunity.

7  ## III.  LEGAL STANDARD

8        "The Fourth Amendment is to be liberally construed and all owe the duty of
9  vigilance for its effective enforcement lest there shall be impairment of the rights for
10 the protection of which it was adopted."  *United States v. Bridges*, 344 F.3d 1010, 1014
11 (9th Cir. 2003) (quoting *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357
12 (1931)).  The Fourth Amendment requires that a warrant "particularly describ[e] the …
13 things to be seized" in order to "ensure[] that the magistrate issuing the warrant is fully
14 apprised of the scope of the search and can thus accurately determine whether the entire
15 search is supported by probable cause."  *United States v. Spilotro*, 800 F.2d 959, 963
16 (9th Cir. 1986).  A warrant must "clearly state what is sought," and its scope must "be
17 limited by the probable cause on which the warrant is based."  *In re Solid State Devices,*
18 *Inc.*, 130 F.3d 853, 856 (9th Cir. 1997).

19       The requirement to particularly describe the items to be seized and limit those
20 items to the probable cause underlying the warrant stems from the Fourth Amendment's
21 purpose to prevent general warrants executed on suspects' homes.  *Payton v. New York*,
22 445 U.S. 573, 583 (1980) ("[I]ndiscriminate searches and seizures conducted under the
23 authority of 'general warrants' were the immediate evils that motivated the framing and
24 adoption of the Fourth Amendment.").  Most saliently, general warrants permitted law
25 enforcement officers blanket authorization to search homes and elsewhere "for goods
26 imported in violation of British tax laws."  *Bridges*, 344 F.3d at 1014 n.1.  "By limiting
27 the authorization to search to the specific areas and things for which there is probable

28

12

1  cause to search, the requirement ensures that the search will be carefully tailored to its

2  justifications and will not take on the character of the wide-ranging exploratory

3  searches the Framers intended to prohibit." *United States v. Wey*, 256 F. Supp. 3d 355,

4  379-80 (S.D.N.Y. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir.

5  2013)).  All Fourth Amendment doctrinal rules serve this common purpose: "to protect

6  privacy by prohibiting a general, 'exploratory rummaging in a person's belongings.'"

7  *United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir. 1990).

8       The Fourth Amendment's specificity rule has two prongs: particularity and

9  breadth.  Particularity requires that the warrant should list the items to be seized with

10  such specificity that "nothing is left to the discretion of the officer executing the

11  warrant." *Bridges*, 344 F.3d at 1016.  "Breadth deals with the requirement that the

12  scope of the warrant be limited by the probable cause on which the warrant is based."

13  *See United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006); *VonderAhe v. Howland*,

14  508 F.2d 364 (9th Cir. 1974).  To be facially constitutional, a warrant must be both

15  particular and not overbroad.

16       Even if a warrant is valid, however, its fruits will still be suppressed if law

17  enforcement officers execute the warrant in an unreasonable manner.  *United States v.*

18  *Ramirez*, 523 U.S. 65, 71 (1998).  To be reasonable, a search "must be confined to the

19  terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d

20  744, 747 (2d Cir. 1988); *see United States v. Sedaghaty*, 728 F.3d 885, 915 (9th Cir.

21  2013) (holding that "The government's seizure of items beyond the terms of the

22  warrant violated the Fourth Amendment.").

23  **IV.   ARGUMENT**

24       **A.   The Seized Property Should Be Suppressed and Returned Because the**
           **Search Warrant Lacks Particularity**
25

26       The constitutional command that warrants "particularly describ[e] the place to be

27  searched and the … things to be seized" requires that "nothing is left to the discretion of

28

13

the officer executing the warrant." *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). Items or records subject to seizure must be described with sufficient specificity that "the executing officers" are not left "to make a legal distinction between fraudulent records and records that are not fraudulent, which they [a]re not qualified to do." *Id.* at 78 (quoting *United States v. Abrams*, 615 F.2d 541, 542 n.2 (1st Cir. 1980)). A warrant seeking evidence of fraud or other crime must therefore state both the statute at issue *and* provide "guidelines to aid the determination of what may or may not be seized" in order to survive the Fourth Amendment's particularity requirement. *Id.*; *see also Spilotro*, 800 F.2d at 965 (finding that search warrant violated particularity requirement where only limitation on scope of search was items to be seized had to be evidence of violation of one of thirteen statutes, some of exceptional scope); *Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009) ("It is not enough that the warrant makes reference to a particular offense; the warrant must ensure that the search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."). The government's warrant in this case fails on the latter prong and is no more particular than a general warrant.

In determining whether a warrant is sufficiently precise, it considers three factors: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *Spilotro*, 800 F.2d at 963-64. The Warrant in this case does not pass any of the three factors.

Paragraph 1.a of the "Items to be Seized" Warrant section authorizes officers to seize any records or items "concerning" a list of entities and people that includes Ayvazyan and Terabelian themselves. This paragraph gives officers discretion to seize

1   any item related to Ayvazyan or Terabelian anywhere in their own home, rendering it,

2   by definition, a general warrant.  There was not probable cause to seize all items of this

3   type; the warrant contained no objective standards by which to differentiate those items;

4   and the government had ample ability to describe the items more particularly.  It is

5   precisely this evil—a warrant authorizing seizure of any records or items related to the

6   home's owner—that the Fourth Amendment was meant to prevent.

7        As the Ninth Circuit has observed, warrants like the one in this case are

8   "fundamentally offensive to the underlying principles of the Fourth Amendment when

9   they are so bountiful and expansive in their language that they constitute a virtual, all-

10  encompassing dragnet of personal papers and property to be seized at the discretion of

11  the State." *Bridges*, 344 F.3d at 1016 (reversing and instructing that evidence be

12  suppressed because warrant's "language authorizes the Government to seize almost all

13  of [business]'s property, papers, and office equipment").  Paragraph 1.a is similar to the

14  warrant held to be unconstitutionally unparticular in *Bridges*—indeed, the *Bridges*

15  language limited seizures to the business's papers, and the Warrant in this case

16  authorized seizures of the businesses' papers ***and anything else related to Ayvazyan or***

17  ***Terabelian***.

18       Setting aside the similarity to the warrant held unconstitutional in *Bridges*, this

19  warrant is nearly identical to the one held unconstitutionally unparticular in *Wey*.  In

20  *Wey*, the U.S. District Court for the Southern District of New York held a search

21  warrant to be unlawful despite a 112-page affidavit because its only purported limiting

22  principle was that documents concern either the defendant or his company.  256 F.

23  Supp. 3d at 386.  The court held that when combined with the lack of a temporal

24  limitation or requirement that documents be evidence of enumerated crimes, the

25  warrants "on their face plainly violate multiple components of the Fourth Amendment's

26  particularity requirement." *Id.*  at 398.  So too here.  Paragraph 1.a provides the same

27  authorization held unlawful in *Wey*—any record or item concerning Ayvazyan or

28

15

1  Terabelian can be seized.  Just like the warrant in *Wey*, this warrant fails to restrict the

2  potential seizures by content or temporal limitations.[18]  It too must be suppressed.

3      **B.**    **The Seized Property Should Be Suppressed and Returned Because the**

4                  **Warrant Was Overbroad**

5         It is axiomatic that search warrants must limit their authorization to the "specific

6  areas and things for which there is probable cause to search."  *Maryland v. Garrison*,

7  480 U.S. 79, 84 (1987).  "[This] requirement ensures that the search will be carefully

8  tailored to its justifications, and will not take on the character of the wide-ranging

9  exploratory searches that the Framers intended to prohibit."  *Id.*  "A warrant must not

10  only give clear instructions to a search team, it must also give legal, that is, not

11  overbroad, instructions.  Under the Fourth Amendment, this means that "there [must]

12  be probable cause to seize the particular thing[s] named in the warrant." *United States*

13  *v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (quoting *In re Grand Jury*

14  *Subpoena*, 926 F.2d 847, 857 (9th Cir. 1991)).  Because warrants must be carefully

15  tailored to ensure that there is "probable cause to seize the particular thing[s] named in

16  the warrant," *id.*, the Ninth Circuit has held that a warrant permitting seizure of artwork

17  evidence was overbroad because the underlying probable cause related only to artwork

18  of Salvador Dali, not other artists.  *Center Art Galleries-Hawaii, Inc. v. United States*,

19  875 F.2d 747, 750 (9th Cir. 1989) (holding unconstitutional the seizure of other artists'

20  work in art forgery investigation because all misrepresentations involved Dali

21  paintings).

22

23

24  [18] *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (warrant "not sufficiently particular" in
25  part because the "government did not limit the scope of the seizure to a time frame within which the
suspected criminal activity took place"); *United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y.
26  2014) ("a warrant's failure to include a temporal limitation on the things to be seized may, in certain
circumstances, render a warrant insufficiently particular"); *Wheeler v. State*, 135 A.3d 282, 304 (Del.
27  2016) ("Federal Courts of Appeals have concluded that warrants lacking temporal constraints, where
relevant dates are available to the police, are insufficiently particular.").

28

1    In this case, the Warrant is unconstitutionally overbroad for two reasons. *First*,
2  paragraph 1.a (discussed above) provides the officer discretion to seize any item or
3  record in Ayvazyan and Terabelian's home despite failing to establish probable cause
4  for such broad discretion. *See United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir.
5  1990) ("The scope of a warrant "must be no broader than the probable cause on which
6  it is based."); *see also Wey*, 256 F. Supp. 3d at 393 (holding that in addition to failing
7  on particularity, the warrant authorizing seizure of all documents related to Wey was
8  overbroad because it "exceed[ed] the scope of the probable cause showing submitted to
9  the Magistrate Judge"). In *Wey*, the court held that "some subset" of the materials
10 could be evidence of the crimes in question, but "the sheer scope of the Warrants—
11 reaching … essentially all documents pertaining to NYGG and/or the Weys unlimited
12 by relevance to criminal conduct or by timeframe—precludes a finding that the seizure
13 authorization remained within the bounds of the Government's probable cause
14 showing." *Id.* at 393-94. Just as in *Wey*, paragraph 1.a of the Warrant here reaches
15 "essentially all documents pertaining to [Ayvazyan and Terabelian and/or their alleged
16 and actual companies] unlimited by relevance to criminal conduct or by timeframe."
17 *Id.* at 394.[19] It is therefore overbroad for the same reasons given by the court in *Wey*.

18 [19] The government may argue that Paragraph 1 limits seizure only to the named items that are *also*
19 evidence of the alleged crimes. It does not. The plain language of Paragraph 1 states that "The items
   to be seized are evidence, contraband, fruits, or instrumentalities of violations of [enumerated statutes]
20 occurring on or after January 1, 2020 [sic], *namely*: [paragraph 1.a and others]" Warrant Attach. B ¶ 1
   (emphasis added). "Namely" means "that is to say" or "to wit." Merriam-Webster Dictionary,
21 https://www.merriam-webster.com/dictionary/namely (last accessed Mar. 11, 2021). It is a way for
   the author to use a specific item equal to a previously unclear predicate in order to clarify the
22 definition of that predicate. *See id.* (providing examples where a vague concept is followed by
   "namely, [specific description]"). The latter item, not the predicate, performs the clarifying function.
23 In this case, the latter item is paragraph 1.a, and that item clarifies the definition of what executing
   agents may seize. Moreover, any ambiguity, should be read against the government in light of the
24 government's role as drafter and the purpose of the Fourth Amendment's warrant requirement.

25    Even if the government were correct, it would not save their warrant. As discussed *infra* in
26 Section IV.C, such a construction would render the agents' execution unreasonable because so many
   of the items seized were not potential evidence, contraband, fruits, or instrumentalities of the alleged
27 misconduct. The government's seizure of those items either fails because they were included in an
   unconstitutional warrant or because they were not included in the warrant.
28
                                    17

1    *Second*, the warrant gives officers unfettered discretion to seize cash, gold, and

2    jewelry obtained before the alleged fraud could have begun in March 2020 or discretion

3    to seize financial records without regard to date or subject matter.  *See* Warrant ¶ 1.

4    The Eastern District of Virginia dealt with a similar fact pattern in *United States v.*

5    *Duong*, 156 F. Supp. 2d 564 (E.D. Va. 2001).  There, officers obtained a search warrant

6    to search for evidence of a robbery conspiracy running from approximately March 1995

7    through June 1995.  Despite the "relatively narrow" time frame implicated by the

8    probable cause supporting the search, officers seized documents that went back as far as

9    1987, based on the warrant's authorization to seize "books, records, receipts, bank

10   statements, and records, money drafts, letters of credit, money order and cashier's

11   checks, receipts, pass books, bank checks and any other items evidencing the obtaining,

12   secreting, transfer, concealment and/or expenditure of money."  *Id.* at 567-68, 572.  The

13   court held that "where, as here, the language in a warrant 'authorized a broader search

14   than was reasonable given the facts in the affidavit supporting the warrant,' seized

15   evidence arguably falling within broad language but unrelated to facts stated in the

16   affidavit must be suppressed."  *Id.* at 572; *see also United States v. Lazar*, 604 F.3d

17   230, 238 (6th Cir. 2010) (affirming suppression because "failure to limit broad

18   descriptive terms by relevant dates, when such dates are available to the police, will

19   render a warrant overbroad."); *United States v. Winn*, 79 F. Supp. 3d 904, 920 (S.D. Ill.

20   2015) (suppressing evidence from warrant due to failure to limit date range to that

21   supported by specific evidence in the complaint).  As in *Duong*, the Warrant here

22   cannot constitutionally authorize a search sweeping more broadly than the allegations

23   of PPP/EIDL loan fraud from March through July 2020.

24           The Warrant's failure to limit the authorized seizure to the March-July 2020 time

25   frame for which the affidavit purported to allege probable cause—and to limit the

26   seizure to records related to the allegedly fraudulent loans—is particularly

27   objectionable, where, as here, the government had information in its possession

28

18

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

sufficient to more carefully tailor the warrant.  "One of the crucial factors to be considered is the information available to the government." *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982).  "Generic classifications in a warrant are acceptable only when a more precise description is not possible." *Id.* (quoting *United States v. Bright*, 630 F.2d 804, 812 (5th Cir. 1980)).  Where the investigating agency had already been investigating such that it knew "what it needed and wanted and where the records were located," it was unconstitutional for the warrant to authorize seizure of any "corporate books and records" including checks, journals, and ledgers because of the lack of time and subject-matter limitations. *Id.* at 78-79.

In this case, the Warrant's authorization to seize all cash, all jewelry, and all financial records followed months of investigation during which the government received countless third-party productions.  Metadata indicates that the government had already obtained productions from the banks identified in the Warrant, and had months to review those productions to identify probable cause to seize alleged proceeds.  *See also* Warrant Attach. B ¶ 1.k; Affidavit ¶ 23.a.  Similarly, metadata indicates that the government had already obtained productions from the retailers and escrow companies at which the loan money was allegedly spent.  *See also* Affidavit ¶ 62.f.  While it is the government's job to investigate sufficiently to particularly identify the items to be seized—*United States v. Kow*, 58 F.3d 423, 428 n.2 (9th Cir. 1995) ("To the extent that it was difficult for the government to create a more particularized warrant, the government may be to blame. Like the district court, we are troubled by 'the government's decision to refrain from further investigation …, and yet rely on the lack of specific information to justify the lack of particularity in the warrant.'")—in this case, the government had all of that information at its fingertips.

If the affiant had evidence that Ayvazyan or Terabelian had withdrawn large sums of cash, he would have said so.  He remained silent because there was no evidence and no probable cause to seize any cash.  To the contrary, each of his

19

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

allegations as to Ayvazyan's alleged proceeds was that Ayvazyan had transferred that money *to an escrow company* to purchase real estate and to retailers to purchase home furnishings and jewelry.  Affidavit ¶ 62.f.  There was not a single alleged cash withdrawal by either Ayvazyan or Terabelian.  There was therefore no probable cause to seize their family's savings merely because it was kept in cash.  Cultural differences in how we store money do not justify baseless seizures of property.  Similarly, the affiant had reviewed productions from those retailers and knew full well which jewelry had been purchased with allegedly PPP-linked funds and which had not.  But he decided not to describe the allegedly PPP-linked jewelry and instead drafted a warrant so broad that it would sweep in jewelry and other property for which he knew the government lacked probable cause to believe were linked to the alleged PPP loan fraud.

The result of the affiant's choices was a warrant that authorized seizures beyond the probable cause alleged by the affiant and was therefore unconstitutionally overbroad.  The property seized pursuant to that warrant should be suppressed and returned.

### C.  The Seized Property Should Be Suppressed and Returned Because the Warrant Was Executed Unreasonably By Seizing Valuables In Flagrant Disregard of the Warrant Despite Readily Available Proof that the Valuables Were Not Responsive

Even if the Warrant's plain language limited the items to be seized to evidence, instrumentalities, or proceeds of the alleged PPP/EIDL loan fraud scheme running from March 27, 2020 through July 2020 (it does not), suppression and return would still be merited because the executing agents exceeded any imaginable bounds of the warrants by seizing everything in sight.

"The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998).  In a search involving a person's papers, reasonableness requires that the search is "conducted in a manner that minimizes unwarranted

20

intrusions upon privacy." *United States v. Sedaghaty*, 728 F.3d 885, 914 (9th Cir. 2013) (holding that the government failed to minimize intrusions of privacy because it "seized papers and records beyond those the warrant authorized"). To be reasonable, a search "must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988); *see Sedaghaty*, 728 F.3d at 915 ("The government's seizure of items beyond the terms of the warrant violated the Fourth Amendment.").

"[T]he exclusionary rule generally bars admission of the evidence seized that was beyond the scope of the warrant." *Sedaghaty*, 728 F.3d at 915.  But where the officers executing the warrant acted with "flagrant disregard" of the warrant's terms, suppression of all evidence is justified.  *Id.* (citing *United States v. Payton*, 573 F.3d 859, 864 (9th Cir.2009) (reversing conviction where "search of [defendant's] computer without explicit authorization in the warrant exceeded the scope of that warrant")). This is such a case.

Here, the officers acted with flagrant disregard of any sort of temporal or evidentiary restriction by seizing any valuable property they saw—even when they simultaneously seized proof that the valuable property did not fall within the terms and scope of the Search Warrant.  As described *supra* in Section B, the officers did not just seize cash, gold, and wedding jewelry without probable cause.  They seized valuable jewelry *while simultaneously seizing receipts that proved the jewelry was purchased long before the alleged scheme.*  Undersigned counsel is unaware of any case in which officers have simultaneously seized an individual citizen's valuables along with proof that the valuables were not subject to seizure.  This was a ransacking in the truest sense of the word and merits complete suppression.

Setting aside the officers' choice to disregard the Fourth Amendment, they also acted with flagrant disregard of the fundamental rights of Ayvazyan and his family. Storming a family home without cause, holding children at gunpoint, ███████

21

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY

1  ████████████ seizing brand new phones, seizing the money necessary to replace
2  those phones, and seizing a child's phone is wholly inappropriate.  We respectfully
3  submit that the Court can and should deter this misconduct by suppressing all evidence
4  obtained under the Search Warrant.

### D.   All Non-Responsive Property Should Be Returned Regardless of Suppression

Aside from the suppression issues above, all non-responsive property seized
should be returned.  The Ninth Circuit has held that "in searches made pursuant to
warrants, only the specifically enumerated items may be seized."  *United States v.
Tamura*, 694 F.2d 591, 595 (9th Cir. 1982).  "[T]he wholesale seizure for later detailed
examination of records not described in a warrant is significantly more intrusive, and
has been characterized as 'the kind of investigatory dragnet that the [F]ourth
[A]mendment was designed to prevent.'"  *Id.* (quoting *United States v. Abrams*, 615
F.2d 541, 543 (1st Cir. 1980)).  The *Abrams* court held that absent physical attachment,
*see id.* at 595 n.2, or "application for specific authorization for large-scale removal of
material, which should be granted by the magistrate issuing the warrant only where on-
site sorting is infeasible and no other practical alternative exists," *id.* at 596, it was
improper to seize non-responsive property.  *Id.*  The government is therefore obligated
to return the non-responsive property without "unnecessary delay."  *See id.* ("The
government's unnecessary delay in returning the [non-responsive property] appears to
be an unreasonable and therefore unconstitutional manner of executing the warrant.").

As explained *supra* in Section B, the warrant fails to establish probable cause to
continue the seizure of the following property and it should therefore be returned
forthwith:

- Cash savings of approximately $450,000.
- All jewelry except the four watches identified *supra* in footnote 9.

22

- The digital devices including the iPhones purchased in late October 2020 and the iPhone belonging to J.A.
- Any other property for which the government lacks probable cause or which the government concludes is non-responsive.
- Gold coins dated 1979-1987.

These items are non-responsive and their seizure is not justified by the affidavit's claimed probable cause.

### E.    All Digital Device Data Not Marked Responsive By March 5, 2021 Should Be Returned Regardless of Suppression

The Fourth Amendment and Fed. R. Crim. P. 41 permit the temporary overseizure of electronic data to identify the limited files within that data that fall within the scope of the warrant's probable cause.  Fed. R. Crim. P. 41(e)(2)(B).  In order to avoid "frequent petitions to the court for additional time," Rule 41 does not impose a one-size-fits-all deadline and instead permits "a judge [to] impos[e] a deadline … at the time the warrant is issued."  Fed. R. Crim. P. 41 adv. comm. note (2009).  In this case, that deadline has expired and the government has no authority to continue its overseizure.  Any files not yet reviewed and marked as subject to seizure should be returned along with the physical devices.

The Warrant instructed that "[t]he search team shall complete the search of [digital devices or forensic copies thereof] as soon as is practicable but not to exceed 120 days from the date of execution of the warrant."  Warrant Attach. B ¶ 4.a.  The Warrant was executed on November 5, 2020.  *See* Fed. R. Crim. P. 41 adv. comm. note (noting that the "actual execution of the warrant" must occur within ten days of its issuance and describing the responsiveness review as "subsequent … review").  Therefore, the 120-day period expired on March 5, 2020.  As a result, any data from a digital device seized during the search of Premises-1—including laptops, phones, routers, or any other digital device—that was not marked as responsive and segregated

23

when the warrant's authorization expired on March 5, 2020, must immediately be returned.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Ayvazyan's motion and suppress any evidence seized during the search of Premises-1 (and any fruits of that evidence).  Separately, all non-responsive property, as well as any data from digital devices that was not marked and segregated as responsive by March 5, should be returned for the reasons set forth above.

Dated:   March 11, 2021                    Respectfully submitted,

                                           **STEPTOE & JOHNSON LLP**

                                           /s/ *Ashwin J. Ram*
                                           Ashwin J. Ram (SBN 227513)
                                           *aram@steptoe.com*
                                           Michael A. Keough (SBN 327037)
                                           *mkeough@steptoe.com*
                                           Nicholas P. Silverman (*pro hac vice*)
                                           *aram@steptoe.com*
                                           **STEPTOE & JOHNSON LLP**
                                           633 West Fifth Street, Suite 1900
                                           Los Angeles, CA 90071
                                           Telephone: (213) 439-9400
                                           Facsimile: (213) 439-9599

                                           *Counsel for Defendant Richard Ayvazyan*

NOTICE OF MOTION TO SUPPRESS AND RETURN PROPERTY