TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/3819
     Facsimile: (213) 894-6269/0141
     E-mail:    Scott.Paetty@usdoj.gov/Brian.Faerstein@usdoj.gov

DANIEL A. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue NW, 3rd Floor
     Washington, DC 20530
     Telephone: (202) 320-0539
     Facsimile: (202) 514-0152
     E-mail:    Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-579(A)-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT AYVAZYAN'S AND DEFENDANT TERABELIAN'S MOTIONS TO SUPPRESS (ECF 130, 135, 136); DECLARATIONS OF SCOTT PAETTY AND TIMOTHY MASSINO; EXHIBITS |
| v. | |
| RICHARD AYVAZYAN, aka "Richard Avazian" and "Iuliia Zhadko," MARIETTA TERABELIAN, aka "Marietta Abelian" and "Viktoria Kauichko," ARTUR AYVAZYAN, aka "Arthur Ayvazyan," and TAMARA DADYAN, MANUK GRIGORYAN, aka "Mike Grigoryan," and "Anton Kudiumov," ARMAN HAYRAPETYAN, EDVARD PARONYAN, | |

|  | aka "Edvard Paronian" and<br>     "Edward Paronyan," and<br>VAHE DADYAN,<br><br>          Defendants. | Hearing Date: April, 12, 2021[1]<br>Hearing Time: 11:00 a.m.<br>Location:     Courtroom of the<br>              Hon. Stephen V.<br>              Wilson |
|---|---|---|

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Scott Paetty and Brian Faerstein, and United States Department of Justice Trial Attorney Christopher Fenton, hereby files its Consolidated Opposition to defendant Richard Ayvazyan's and defendant Marietta Terabelian's Motions to Suppress (ECF Nos. 130, 135, 136).

This opposition is based upon the attached memorandum of points and authorities, the Declaration of Scott Paetty and attached

//

//

---

[1] Defendants noticed a hearing on these motions for April 5, 2021.  However, defendant Richard Ayvazan subsequently filed a separate motion to suppress (ECF 146) and noticed a hearing on that motion for April 12, 2021.  To foster the efficient use of the Court's resources, the government respectfully requests that any hearing on these motions be consolidated to the later date, or at a time thereafter that is convenient for the Court.

1   exhibits, the Declaration of Timothy Massino, the files and records

2   in this case, and such further evidence and argument as the Court may

3   permit.

4   Dated: March 15, 2021              Respectfully submitted,

5                                      TRACY L. WILKISON
                                       Acting United States Attorney
6
                                       BRANDON D. FOX
7                                      Assistant United States Attorney
                                       Chief, Criminal Division
8

9                                      _____/s/_____
                                       SCOTT PAETTY
10                                     BRIAN FAERSTEIN
                                       Assistant United States Attorneys
11                                     CHRISTOPHER FENTON
                                       Department of Justice Trial Attorney
12
                                       Attorneys for Plaintiff
13                                     UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                                 PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  STATEMENT OF FACTS..............................................2

     A.   The Investigation..........................................2

     B.   The Border Stop in Miami International Airport............3

     C.   Defendants' Arrest and Subsequent Search Warrants........4

     D.   Indictment and First Superseding Indictment..............5

III. ARGUMENT........................................................5

     A.   The Searches and Seizures at Miami International
          Airport were Valid Exercises of the Government's
          Border Search Authority..................................5

          1.   The Seizure of Credit Cards in the Names of
               Iuliia Zhadko and Viktoria Kauichko was Justified....8

          2.   The Manual Search of Defendants' Digital Devices
               and Seizure of Digital Contraband was Justified......9

     B.   The Good Faith Exception Applies to the Manual Search
          of the Digital Devices in Miami Consistent With
          Controlling Eleventh Circuit Precedent...................13

     C.   The Government Obtained Valid Warrants to Search the
          Digital Devices Seized from Defendants in Miami and to
          Search Defendants' and Co-conspirators' Residences.......16

     D.   Defendants Were Not Entitled to Miranda Warnings Prior
          to Secondary Screening...................................19

IV.  CONCLUSION.....................................................25

i

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                          <u>PAGE</u>

3

**Federal Cases**

4

<u>Davis v. United States</u>,
5    564 U.S. 229, 237-39, 241, 249-50 (2011) .............. 13, 15, 16

6
<u>Messerschmidt v. Millender</u>,
7    565 U.S. 535, 556 (2012) ...................................... 19

<u>Riley v. California</u>,
8    573 U.S. 373 (2014) .......................................... 15

9
<u>Santos-Pineda v. Axel, No. CV 10-6285 MMM</u>,
10   2011 WL 13103995 (C.D. Cal. July 26, 2011) ................... 10

11
<u>Sash v. United States, No. 09 Civ. 450</u>,
12   2009 WL 3007379 (S.D.N.Y. Sept. 22, 2009) ................... 10

<u>Torres v. Commonwealth of P.R.</u>,
13   442 U.S. 465, 472-73 (1979) ................................... 5

14
<u>United States v. Arnold</u>,
    533 F.3d 1003, 1007 (9th Cir. 2008) ........................... 8
15
<u>United States v. Barragan</u>,
16   589 F. Supp. 2d 1012, 1015-16 (S.D. Ind. 2008) ............... 14

17
<u>United States v. Bengivenga</u>,
    845 F.2d 593, 599 (5th Cir. 1988) ........................... 21
18
<u>United States v. Bolar</u>,
19    569 F.2d 1071, 1072 (9th Cir. 1978) ......................... 10

20
<u>United States v. Cano</u>,
    934 F.3d 1002, 1011-20 (9th Cir. 2019) .................. passim
21
<u>United States v. Chavez-Martinez</u>,
22   407 F.2d 535, 539 (9th Cir. 1969) ........................... 22

23
<u>United States v. Cotterman</u>,
    709 F.3d 952 (9th 2013) ................................... 7, 15
24
<u>United States v. Driver</u>,
25   776 F.2d 807, 811-12 (9th Cir. 1985) ........................ 19

26
<u>United States v. Fernandez-Ventura</u>,
    132 F.3d 844, 846 (1st Cir. 1998) ........................... 21
27
<u>United States v. FNU LNU</u>,
28   653 F.3d 144 (2d Cir. 2011) ................................. 21

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

<u>United States v. Galloway</u>,
   316 F.3d 624 (6th Cir. 2003) ................................. 21

<u>United States v. Gates, No. CR 08-42-P-H</u>,
   2008 WL 5382285 (D. Me. Dec. 19, 2008) ...................... 14

<u>United States v. Gerena</u>,
   667 F. Supp. 911, 927 (D. Conn. 1987) ...................... 14

<u>United States v. Gupta</u>,
   183 F.3d 615 (7th Cir. 1999) ............................... 21

<u>United States v. Guzman-Padilla</u>,
   573 F.3d 865, 883-34 (9th Cir. 2009) ....................... 22

<u>United States v. Harrell</u>,
   530 F.3d 1051, 1057 (9th Cir. 2008) ........................ 10

<u>United States v. Hassanshahi</u>,
   75 F. Supp. 3d 101, 117 (D.D.C. 2014) ...................... 7

<u>United States v. Kennedy, No. CR 13-240</u>,
   2014 WL 6090409 (W.D. Pa. Nov. 13, 2014) ................... 14

<u>United States v. Kiam</u>,
   432 F.3d 524 (3d Cir. 2006) ................................ 21

<u>United States v. Leon</u>,
   468 U.S. 897, 920-21 (1984) ................................ 16

<u>United States v. Levy</u>,
   803 F.3d 120, 123 (2d Cir. 2015) ........................... 7

<u>United States v. Moya</u>,
   74 F.3d 1117, 1119-20 (11th Cir. 1996) ................... 21, 22

<u>United States v. Nava</u>,
   363 F.3d 942, 946 (9th Cir. 2004) .......................... 22

<u>United States v. Ocheltree</u>,
   622 F.2d 992 (9th Cir. 1980) ............................... 12

<u>United States v. Ozuna</u>,
   170 F.3d 654, 658 (6th Cir. 1999) ................... 22, 23, 25

<u>United States v. Reid</u>,
   226 F.3d 1020 (9th Cir. 2000) .............................. 12

<u>United States v. Reyes</u>,
   631 F.2d 616, 622 (9th Cir. 1980) ....................... 22, 24

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Schoor,
    597 F.2d 1303, 1306 (9th Cir. 1979) ........................ 6, 7

United States v. Touset,
    890 F.3d 1227, 1233-34 (11th Cir. 2018) ..................... 15

United States v. Vasey,
    834 F.2d 782, 788 (9th Cir. 1987) ........................... 18

**Federal Statutes**

6 U.S.C. §§ 202, 211 ........................................... 7

8 U.S.C. § 1225(a)(5) .......................................... 22

18 U.S.C. § 1029(a) ............................................ 8

18 U.S.C. § 1029(e)1) .......................................... 8

19 U.S.C. § 1582 .............................................. 22

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3          Defendant Richard Ayvazyan ("Ayvazyan") and his wife Marietta

4    Terabelian ("Terabelian") (collectively, "defendants") orchestrated a

5    vast fraud ring that used an array of fake businesses, aliases, and

6    stolen identities, to steal tens of millions of dollars from the

7    Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan

8    Program ("EIDL")---federal loan programs which were intended to

9    assist struggling businesses during the COVID-19 pandemic.

10   Defendants then impermissibly used the disaster relief funds for

11   their own personal use and enjoyment, including to buy luxury homes,

12   gold coins, diamonds, jewelry, luxury watches, fine imported

13   furnishings, designer handbags and clothing, cryptocurrency, and

14   securities.

15          Defendants now seek to suppress items that were legally seized

16   from them at the airport in Miami, Florida, as they returned to the

17   United States from a luxury vacation in Turks and Caicos, including

18   credit cards in the names of "Iuliia Zhadko" and "Viktoria Kauichko,"

19   two fake identities used by defendants to carry out the loan fraud

20   scheme, as well as digital contraband in the form of numerous images

21   of drivers' licenses, personal identification documents, and credit

22   cards in an assortment of names.  The border search of defendants,

23   the seizure of physical and digital contraband, the interviews of

24   defendants during the border stop, and the search warrants that were

25   subsequently obtained on the devices and defendants' residence were

26   conducted lawfully and comported with the constitution, and therefore

27   defendants' motions to suppress (ECF 130, 135, 136) should be denied.

28

## II.  STATEMENT OF FACTS

### A.  The Investigation

In June 2020, the government opened an investigation into a Los Angeles-based ring that was using stolen, fake, and synthetic identities to fraudulently apply for COVID-19 relief funds. (Declaration of Timothy Massino ("Massino Decl.") ¶ 1.)  The original subjects included "Iuliia Zhadko" (later determined to be a fake identity), who submitted fraudulent loan applications on behalf of Top Quality Contracting and Turing Info Solutions.  (Id. ¶ 2.)  Among other things, the driver's license submitted in support of Zhadko's applications was fake.  (Id. ¶ 3.)

Over the next four months, the government served over 200 subpoenas, obtaining information from federal and state agencies, lenders, retail banks, and escrow companies, among others.  (Id. ¶ 4.)  The government identified additional fraudulent loan applications, including one using the name "Viktoria Kauichko" (also later identified as fake) submitted on behalf of Runyan Tax Services. (Id. ¶ 5.)  The government traced the funds and learned that the proceeds had been funneled through various bank accounts, including one in defendant Terabelian's name, and had been used by her husband, defendant Ayvazyan, to purchase luxury homes, including a $3.25 million mansion that defendants put in their own names.  (Id. ¶ 6; ECF 1.)  Further investigation revealed that, in 2012, both defendants had pled guilty to conspiracy to commit bank fraud for their role in a similar scheme involving fraudulent loan applications.  See United States v. Ayvazyan, et al., 11-cr-180 (CDCA).  The government identified them as targets and submitted

their names to the Department of Homeland Security ("DHS") TECS System, which provides travel alerts. (Id. ¶ 7.)

**B. The Border Stop in Miami International Airport**

On October 16, 2020, FBI SA Justin Palmerton received notice that defendant Terabelian was traveling from Turks and Caicos to the United States via the Miami International Airport ("MIA"). He contacted Customs and Border Protection ("CBP") to ask that she be referred for secondary inspection, explaining she may be involved in "the use of stolen/synthetic identities and businesses" and may be "transporting fake id's, gold or large amounts of cash." (See Declaration of Scott Paetty ("Paetty Decl."), Ex. 1.)

On October 19, 2020, at around 3:30 p.m., defendants arrived at MIA and were referred for secondary inspection. CBP Officers conducted a search of defendants' belongings and found (i) in defendant Terabelian's luggage, a credit card in the name of "Viktoria Kauichko"; and (ii) in defendant Ayvazyan's belongings, one credit card in the name of "Runyan Tax Services/Viktoria Kauichko," and four credit cards in the name of "Iuliia Zhadko," including cards associated with "Top Quality Contracting" and "Turing Info Solutions." (Id., Exs. 2, 3.)

CBP Officers also conducted a "basic search" of defendant Terabelian's iPhone and one of defendant Ayvazyan's five digital devices.[1] CBP provided defendants with a copy of the "Inspection of Electronic Devices" tear sheet (Id., Exs. 5, 6), which explained that

---

[1] CBP defines a "basic search" as a manual search, without the aid of external equipment, that may be conducted with or without suspicion. (Paetty Decl.; Ex. 4 at § 5.1.3.) An "advanced search" involves the use of external equipment to conduct a forensic analysis of the contents of a digital device. (See id. at § 5.1.4.)

3

1  CBP had authority to search defendants' digital devices and that, if

2  they did not provide passcodes, their digital devices could be

3  detained for inspection and returned at a later date (Id.; Ex. 7.)

4  Defendants both provided passcodes. (Id., Exs. 5, 6.) CBP Officers

5  notified their supervisors and documented the search. (Id.) The

6  basic search of defendants' digital devices revealed digital

7  photographs of a driver's license in the name of "Iuliia Zhadko" with

8  defendants' home address, a social security card in Zhadko's name,

9  and numerous other credit cards and driver's licenses in various

10 names. (Id., Ex. 8.)

11      As part of the secondary inspection process, CBP Officers

12 interviewed defendants, including about information they provided on

13 a biographical questionnaire. (Id., Ex. 9.) The interviews were

14 memorialized in written reports and some portions were also video

15 recorded. (Id., Exs. 5, 6.)[2]

16      **C.   Defendants' Arrest and Subsequent Search Warrants**

17      On October 20, 2020, at around 1:45 a.m., CBP admitted

18 defendants and turned them over to the FBI, who made a probable cause

19 arrest. (Id., Ex. 10.) Later that day, the government filed a

20 complaint against defendants, alleging conspiracy to commit bank and

21 wire fraud. (ECF 1.) The government subsequently obtained warrants

22 to search the six digital devices seized incident to defendants'

23 arrest and seven premises (including two of defendants' homes). The

24 basis for probable cause included volumes of evidence independent of

25

26 _____

27      [2] The government made a good faith effort to produce a copy of
   all video and audio recordings made of the interviews. Approximately
   four hours of recordings was produced. Other video recordings of the

28 interviews may have been inadvertently deleted and subsequent efforts
   to recover them have been unsuccessful. (Paetty Decl., Ex. 14.)

4

the border stop, such as loan applications and bank records,
surveillance, and trash pulls.  (<u>See, e.g.</u>, <u>Id.</u> Ex. 11 (20-mj-5282),
Ex. 12 (20-mj-5484).)

### D.   Indictment and First Superseding Indictment

On November 17, 2020, a grand jury indicted the defendants and
two others with, among other charges, conspiracy, bank fraud, and
wire fraud, based on 35 fraudulent loan applications seeking over
$5.6 million in COVID-19 relief funds.  (ECF 32.)  On March 9, 2021,
a grand jury returned a superseding indictment that significantly
expanded the charges.  In addition to naming four new defendants, the
superseding indictment charges the original defendants with
conspiracy to commit money laundering and aggravated identity theft.
It also charges defendant Ayvazyan with new crimes he committed while
on pretrial release.  As alleged, the scheme involves at least 151
fraudulent loan applications seeking over $21.9 million in COVID-19
relief funds.

## III. ARGUMENT

### A.   The Searches and Seizures at Miami International Airport were Valid Exercises of the Government's Border Search Authority

Goods and property crossing international borders are not
subject to ordinary warrant requirements.  Rather, the government's
"inherent sovereign authority to protect its territorial integrity"
itself demonstrates the reasonableness of a border search.  <u>Torres v.
Commonwealth of P.R.</u>, 442 U.S. 465, 472-73 (1979).  "[B]order
searches typically do not require any particularized suspicion, so
long as they are routine inspections and searches of individuals or
conveyances seeking to cross our borders."  <u>United States v. Cano</u>,

934 F.3d 1002, 1012 (9th Cir. 2019). "Such searches are reasonable simply by virtue of the fact they occur at the border." Id.

The border search and seizures that are the subject of defendants' motions to suppress fell squarely within this longstanding exception to the warrant requirement. Upon learning through TECS that defendants would be arriving at MIA from Turks and Caicos, FBI SA Palmerton sent CBP an email alerting customs officials that defendants may be "transporting fake id's" related to suspected fraudulent loan applications involving "stolen/synthetic identities and businesses." (Paetty Decl., Ex. 1.) CBP thereafter conducted a secondary inspection of defendants pursuant to its border search authority. During the search, CBP found both physical credit cards in fake names and digital contraband reflecting counterfeit identification documents and credit cards on defendants' phones.

Defendant Ayvazyan principally challenges the legitimacy of the border search on the basis that it was "pretextual" and "conducted under the authority and direction of the FBI, not CBP." (ECF 130 at 15-18.) Defendant's arguments fail as a matter of law and practice.

First, the fact that the FBI referred the matter to CBP does not undermine the validity of the border search. Courts have consistently rejected challenges to border searches where the customs officers who conducted them collaborated with other law enforcement agencies. The Ninth Circuit rejected this very argument in Cano, explaining, "[w]e have upheld border searches of persons seeking entry even when those searches were conducted 'at the behest' of DEA agents seeking criminal evidence." Cano, 934 F.3d at 1016 n.9; see also United States v. Schoor, 597 F.2d 1303, 1306 (9th Cir. 1979) ("Here there is no dispute that the search was conducted at an

international border by customs officers legally entitled to search persons entering the United States.  That the search was made at the request of the DEA officers does not detract from its legitimacy."); United States v. Levy, 803 F.3d 120, 123 (2d Cir. 2015) ("Official interagency collaboration, even (and perhaps especially) at the border, is to be commended, not condemned.").  Not only is such coordination between federal law enforcement unsurprising, but it falls squarely within CBP's role as the gatekeeper at and protector of the U.S. border.  The border search authority is essential to the ability of DHS and CBP to fulfill statutory responsibilities, including to "ensure the interdiction of persons and goods illegally entering or exiting the United States".  6 U.S.C. §§ 202, 211.

Second, as a practical matter, TECS hits that provide a predicate for secondary screenings at the border are common and entirely permissible so long as the search is conducted by CBP (or other officials with border authority) and the search focuses on the interdiction of contraband.  See, e.g., United States v. Cotterman, 709 F.3d 952 (9th Cir. 2013) (reversing suppression after CBP search found digital contraband pursuant to a TEC hit); United States v. Hassanshahi, 75 F. Supp. 3d 101, 117 (D.D.C. 2014) (denying suppression after CBP found incriminating evidence based on a TECS hit).

Defendants' additional pretext arguments relating to terrorism (ECF 130 at 16-17; ECF 136 at 10-11), are inapposite because, here, the TECS hit and FBI referral expressly discussed defendants' nexus to fake identification documents and the need for CBP to initiate a secondary screening to prevent such contraband from entering the United States.  Cano, 934 F.3d at 1013-14 ("the purpose of the border

7

1  search is to interdict contraband").  This legitimate rationale for

2  conducting a secondary stop proved prescient:  CBP found fake credit

3  cards and digital photographs of fake identification documents and

4  credit cards, all pursuant to its legitimate exercise of its border

5  search authority.

6       1.   <u>The Seizure of Credit Cards in the Names of Iuliia
            Zhadko and Viktoria Kauichko was Justified</u>

7

8       During its search of defendant's luggage and personal

9  belongings, CBP found credit cards not in defendants' names but

10 rather in the names of defendants' suspected fake aliases, "Iuliia

11 Zhadko" and "Viktoria Kauichko."  The search of defendants'

12 belongings and seizure of these items was proper under the

13 government's plenary border search authority.  Suspicionless border

14 searches have been endorsed in an array of contexts, including

15 searches of "(1) the contents of a traveler's briefcase and luggage;

16 (2) a traveler's 'purse, wallet, or pockets'; (3) papers found in

17 containers such as pockets; and (4) pictures, films and other graphic

18 materials."  <u>United States v. Arnold</u>, 533 F.3d 1003, 1007 (9th Cir.

19 2008) (internal citations omitted).

20      Credit cards, which are "access devices" under 18 U.S.C.

21 § 1029(e)(1), in the names of fake identities constitute contraband

22 subject to seizure under the border search exception.  Indeed, there

23 can be no legitimate purpose for the possession, use, or transfer of

24 such counterfeit access devices.[3]  <u>See generally</u> 18 U.S.C. § 1029(a).

25 Contrary to defendant Ayvazyan's contentions regarding the purpose of

26

27      [3] 18 U.S.C. § 1029(e)(2) defines "counterfeit access device" to
   mean "any access device that is counterfeit, fictitious, altered, or
28 forged, or an identifiable component of an access device or a
   counterfeit access device."

8

1   the border search (ECF 130 at 17), CBP had a legitimate basis in

2   seizing these counterfeit access devices as contraband in furtherance

3   of "enforce[ing] importation laws, and not for general law

4   enforcement purposes."  <u>Cano</u>, 934 F.3d at 1013 (internal quotations

5   omitted).  Thus, defendants' challenge to the seizure of these

6   physical contraband items should be rejected.

7            2.   <u>The Manual Search of Defendants' Digital Devices and
                   Seizure of Digital Contraband was Justified</u>
8

9        During the secondary screening, CBP agents also conducted a

10  routine, manual search of defendants' digital devices that resulted

11  in the lawful seizure of digital contraband, including photographs of

12  counterfeit access devices and identification documents.[4]

13       In <u>Cano</u>, the Ninth Circuit held that "[m]annual searches of a

14  cell phone at the border can be conducted without any suspicion

15  whatsoever."  <u>Cano</u>, 934 F.3d at 1019.  The court further explained

16  that, in conducting a manual suspicionless search or a forensic

17  search supported by reasonable suspicion, "border officials are

18  limited to searching for contraband only."[5]  <u>Id.</u>  The court posited

19  that the "best example" of "digital contraband" is child pornography,

20  but it did not limit the definition to this specific category of

21  contraband.  <u>Id.</u> at 1014.

22

23       [4] These items included a photograph of a fake driver's license
    in the name of "Iuliia Zhadko" with an address matching defendants'
24  actual home address and featured a photograph of a man resembling
    defendant Ayvazyan, as well as numerous other photographs of driver's
25  licenses and credit cards in the names of various individuals.  (<u>See</u>
    Paetty Decl., Exs. 5, 6,_8.)
26
         [5] CBP's search of defendants' digital devices here was a manual,
27  not a forensic, search.  In any event, based on the initial referral
    email from FBI, CBP had, at a minimum, reasonable suspicion to
28  conduct a forensic search of defendants' phones for contraband at the
    time of the search.

                                    9

1    The digital photographs of counterfeit access devices,

2  identification documents, and means of identification found during

3  CBP's manual search here constitute another such form of digital

4  contraband.  Indeed, an item is contraband per se "if its possession,

5  without more, constitutes a crime; or in other words, if there is no

6  legal purpose to which the object could be put."  United States v.

7  Harrell, 530 F.3d 1051, 1057 (9th Cir. 2008).  For example, in United

8  States v. Bolar, the Ninth Circuit held that photographic negatives

9  of Federal Reserve Notes are contraband per se because "there is no

10  legal purpose to which those negatives could be put."  569 F.2d 1071,

11  1072 (9th Cir. 1978).[6]

12    The photographs of counterfeit credit cards and identification

13  documents on defendants' phones here pose the same core concerns

14  recognized in Cano with respect to the illegal possession, use, and

15  transfer of digital contraband, such as child pornography.  "The

16  contents may be digital when they are on the phone, but the

17  physicality of the phone itself and the possibility that the phone's

18  contents can be printed or shared electronically gives border

19  officials sufficient reason to inspect it at the border."  Id. at

20  1013-14.  Indeed, fake drivers' licenses and counterfeit credit

21  cards, and the information contained on their face, are illicit

22  commodities that are bought, sold, and transferred among fraudsters

23  to execute their criminal schemes.  As alleged in the first

24  _____

25    [6] Notably, while citing Bolar, a court in this district ruled
   that fake California drivers' licenses constituted contraband.  See
26  Santos-Pineda v. Axel, No. CV 10-6285 MMM, 2011 WL 13103995, at *7
   (C.D. Cal. July 26, 2011), aff'd, 621 F. App'x 407 (9th Cir. 2015)
27  (citing Sash v. United States, No. 09 Civ. 450, 2009 WL 3007379, *3-4
   (S.D.N.Y. Sept. 22, 2009) ("[defendant] was convicted of unlawful
28  transfer of badges and ID cards . . . The badges and identifications
   themselves are contraband per se")).

superseding indictment in this case, the fake identities and corresponding identification documents of Iuliia Zhadko and Viktoria Kauichko were, in fact, used by defendants in submitting fraudulent PPP and EIDL loan applications and opening bank accounts, among other things.  The photographs of the counterfeit access devices and identification documents, and the underlying fake means of identification, found on defendants' phones and seized by CBP have no legitimate purpose and exist only to further criminal activity.

Defendant Terabelian incorrectly alleges that forensic searches were conducted on the digital devices.  (ECF 136 at 12-13.)  As reflected in CBP reports, however, a basic manual, not forensic, search was conducted on all devices.  (See Paetty Decl., Ex. 5 at 3; Ex. 6 at 4.)  Defendant Ayvazyan similarly challenges the searches of the digital devices as being unreasonable due to the length of time CBP possessed the devices.  (ECF 130 at 19-21.)  The fact that the manual searches of defendants' digital devices took place over several hours is not, in and of itself, unreasonable.  Electronic devices can contain immense amounts of data and are capable of storing contraband that could be located in unexpected places on a phone.  See, e.g., Cano, 934 F.3d at 1019 ("Criminals may hide contraband in unexpected places, so it was reasonable for the two HSI officers to open the phone's call log to verify that the log contained a list of phone numbers and not surreptitious images or videos.").  Even if a more advanced forensic search had been conducted (which it was not), such a search would have been supported by reasonable suspicion based on the TECS hit and referral of information provided by FBI to CBP.

1    Defendants also contend that they did not give valid consent to
2    the officers to use their passcodes to access the digital devices.
3    (ECF 130 at 21-23; ECF 136 at 13-15.)  This argument is irrelevant
4    because, as discussed above, CBP has the right and ability to conduct
5    a basic search of all digital devices for contraband regardless of
6    whether consent is provided.  (See Paetty Decl., Ex. 4 at §§ 5.3.3,
7    5.3.4.)  Indeed, CBP is authorized to request passcodes for any
8    encrypted digital devices at the border and, if passcodes are not
9    provided, to detain the devices for further review pending
10   determination of the devices admissibility.  (Id. at § 5.3.1).

11        These facts were communicated to defendants during the secondary
12   inspection.  They were given a copy of a CBP "Inspection of Digital
13   Devices" tear sheet describing the scope of CBP's authority to review
14   their devices and defining defendants' rights in that process.  (Id.,
15   Ex. 7; Ex. 5 at 3; Ex. 6 at 4.)  Defendants' challenge to the basis
16   for their consent is irrelevant.  CBP was authorized to manually
17   search the devices at the border — with or without defendants'
18   consent.  Neither case defendants cite in support of their consent
19   arguments address border searches.  (ECF 130 at 21 (citing United
20   States v. Reid, 226 F.3d 1020 (9th Cir. 2000); ECF 136 at 14 (citing
21   United States v. Ocheltree, 622 F.2d 992 (9th Cir. 1980)).

22        Moreover, the CBP tear sheet also explained to defendants that
23   they may be subject to inspection because "you have a name that
24   matches a person of interest in one of the government's enforcement
25   databases; or you have been selected for a random search," and
26   further advised them that "CBP officers may not be able to answer all
27   of your questions about an examination that is underway."  (Paetty
28   Decl., Ex. 7 at 2.)  That CBP officers may have told defendants that

they were randomly selected or selected to ensure they were not

affiliated with terrorists, as opposed to being the subject of a TECS

hit, does not matter.  There is no requirement that the officers

disclose to defendants that the TECS hit was the actual reason for

the stop.  Accordingly, CBP's manual search of defendants' digital

devices and seizure of digital contraband pursuant to its border

search authority was justified in this case.[7]

**B.  The Good Faith Exception Applies to the Manual Search of the Digital Devices in Miami Consistent With Controlling Eleventh Circuit Precedent**

As discussed above, CBP's manual searches of defendants' digital

devices (in addition to the physical search of their possessions)

were constitutional and comported with Ninth Circuit authority.  But

even if the Court disagrees, CBP's searches should be subject to the

good faith exception to the exclusionary rule.

Recognizing that "[e]xclusion exacts a heavy toll on both the

judicial system and society at large," the Supreme Court has

established that the exclusionary rule does not apply "when the

police conduct a search in objectively reasonable reliance on binding

judicial precedent."  Davis v. United States, 564 U.S. 229, 237-27,

249-50 (2011).  "An officer who conducts a search in reliance on

binding appellate precedent does no more than ac[t] as a reasonable

officer would and should act under the circumstances."  Id. at 241

(internal quotations omitted).

---

[7] To the extent any of the digital information seized pursuant to the manual searches of defendants' digital devices constituted evidence of criminal conduct but not digital contraband, such evidence was independently obtained through the execution of a subsequent warrant to search all six of defendants' digital devices. See infra section III.C.

The manual search of defendants' digital devices occurred in Miami, Florida, and thus the relevant question is whether binding Eleventh Circuit precedent authorized the border search of the devices.  As one district court explained,

> tainted evidence obtained within [a different circuit] but nonetheless admissible there should also be admissible here regardless of whether this circuit has a more stringent exclusionary device.  Applying the principles that form the foundation of the Court's lex loci approach, the Court finds that there is no logical basis for the conclusion that the forum should reward or punish the Government with either a more lenient or a more severe penalty than that proclaimed by the courts of the jurisdiction where the conduct occurred.

United States v. Gerena, 667 F. Supp. 911, 927 (D. Conn. 1987).  Numerous other district courts have similarly held that where, as here, a court in one circuit is considering the propriety of law enforcement's actions in another circuit, the court should apply the law of the circuit where the challenged conduct occurred, i.e., the "lex loci" of the conduct.  See, e.g., United States v. Kennedy, No. CR 13-240, 2014 WL 6090409, at *5 (W.D. Pa. Nov. 13, 2014) (Sixth Circuit law applied to search and seizure that occurred in Sixth Circuit but was challenged in Third Circuit); United States v. Gates, No. CR 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008), aff'd, 709 F.3d 58 (1st Cir. 2013) (Fourth Circuit law applied in First Circuit); United States v. Barragan, 589 F. Supp. 2d 1012, 1015–16 (S.D. Ind. 2008) (Ninth Circuit law applied in Seventh Circuit).  These courts have generally reasoned that officers should be able to rely on their understanding of the law as their circuit has interpreted it.  See generally id.

The Eleventh Circuit has not adopted Cano's framework for searching digital devices at the border, nor has it distinguished

14

between the government's ability to conduct a manual search for
digital contraband or evidence of criminality.  However, the court
has expressly rejected the Ninth Circuit's limited view of border
search authority as articulated in United States v. Cotterman, 709
F.3d 952 (9th 2013) – a case significantly relied on by the panel in
Cano.  See United States v. Touset, 890 F.3d 1227 (11th Cir. 2018).

    In Touset, the Eleventh Circuit held that customs officials did
not need to have reasonable suspicion in order to conduct a forensic
(as opposed to a manual) search of a cell phone.  Id. at 1233.  In so
holding, the court carefully considered the Ninth Circuit's reasoning
in Cotterman, concluding that it was "unpersuaded" and "fail[ed] to
see how the personal nature of data stored on electronic devices
could trigger" a greater "personal indignity" than a suspicionless
search of a home at the border.  Id. at 1234.  Moreover, the Touset
court also found that Riley v. California, 573 U.S. 373 (2014) (also
a case Cano relies on to narrow the scope of the border search), 934
F.3d at 1011, 1020, has no application at the border.  See 890 F.3d
at 1234.  In sum, the Eleventh Circuit has firmly rejected
significant tenets underlying the Cano panel's more narrow view of
the government's border search authority of digital devices.

    In conducting the manual searches of the digital devices at
issue here, the CBP officers in Miami relied upon "binding judicial
precedent" within the Eleventh Circuit and acted as "a reasonable
officer would and should act under the circumstances." Davis, 564
U.S. at 239, 241.  Thus, should the Court find that CBP's searches of
the digital devices or seizures of digital contraband violated Ninth
Circuit border search precedent, the Court should nonetheless find
that CBP's actions fall squarely within the good faith exception.

1  See Davis, 564 U.S. at 241 ("About all that exclusion would deter in

2  this case is conscientious police work.").

3      **C.  The Government Obtained Valid Warrants to Search the
   Digital Devices Seized from Defendants in Miami and to**

4            **Search Defendants' and Co-conspirators' Residences**

5      Defendant Ayvazyan also summarily challenges subsequent search

6  warrants obtained by the government as the purported "fruit of the

7  poisonous tree" of the border search at issue in his motion. (ECF

8  130 at 24; ECF 135 at 18.)  Defendant Ayvazyan ignores the extensive

9  investigation that preceded the border search in October 2020, as

10 well as the actual content of the affidavits in support of these

11 warrants, which were based substantially on evidence independent of

12 the border stop.  The exclusionary rule is not appropriate under

13 these circumstances.

14     "Exclusion exacts a heavy toll on both the judicial system and

15 society at large.  It almost always requires courts to ignore

16 reliable, trustworthy evidence bearing on guilt or innocence.  And

17 its bottom-line effect, in many cases, is to suppress the truth and

18 set the criminal loose in the community without punishment." Davis,

19 564 U.S. at 237 (internal citations omitted).  Suppression thus is a

20 remedy of "last resort." Id. Application of the exclusionary rule

21 is "particularly" inappropriate when "an officer acting with

22 objective good faith has obtained a search warrant from a judge or

23 magistrate and acted within its scope." United States v. Leon, 468

24 U.S. 897, 920 (1984).  "In most such cases, there is no police

25 illegality and thus nothing to deter." Id. at 920-21.  Once a judge

26 signs a warrant, "there is literally nothing more the policeman can

27 do in seeking to comply with the law." Id. at 921.

28

The warrants at issue here were lawfully obtained and largely independent of information developed during the border stop.  In particular, around two weeks after the border stop, agents obtained warrants to search seven residences linked to the scheme and to search the original defendants charged in this case.  (See Paetty Decl., Ex. 11.)[8]  Shortly thereafter, the government obtained a search warrant for the six digital devices seized in Miami.[9]  (See id., Ex. 12.)

The warrants resulted in the seizure of, among other things, additional evidence corroborating defendants' use of their aliases, Iuliia Zhadko and Viktoria Kauichko, to apply for fraudulent PPP and EIDL loans.  The warrants also yielded evidence connecting defendants' coconspirators to the scheme, such as stolen stamping devices from notaries and clerks of court (including a stamp from the clerk of the Bankruptcy Court for the Central District of California).  (See id., Ex. 13 at 1.)

In establishing probable cause, the affidavits in support of the search warrants for the residences and individuals relied in substantial part on evidence obtained during the months-long investigation that preceded the border search in Miami.  Indeed, by the time of the border stop in October 2020, federal agents had been investigating defendants' fraudulent loan scheme for more than four

---

[8]  The government submitted the same central affidavit in support of the eleven search warrant applications.  We attach one application here – an application for the search of defendants' residence located at 4910 Topeka Drive in Tarzana – as an exact representation of the probable cause statement supporting the other ten applications.

[9]  The  warrants, which remain under seal, have the following case numbers: 20-MJ-5282, 20-MJ-5284, 20-MJ-5285, 20-MJ-5286, 20-MJ-5288, 20-MJ-5289, and 20-MJ-5290 (for the seven residences); 20-MJ-5292, 20-MJ-5293, 20-MJ-5294, and 20-MJ-5296 (for the four defendants); and 20-MJ-5484 (for the six digital devices).

months.  During that time, agents had conducted numerous interviews,
pursued leads and other investigative activities, obtained
information from federal and state agencies, lenders, banks, and
other entities, and served more than 200 grand jury subpoenas.  (See
Massino Decl. ¶ 4.)  The statements of probable cause supporting the
search warrant applications for the residences and individuals were
based predominantly on the fruits of this independent investigation,
not the more limited information derived from the border search in
Miami.  (See generally Paetty Decl., Ex. 11.)  The affidavit in
support of the subsequent devices search warrant application directly
incorporated and attached the probable cause statement from these
prior search warrants, as well as the affidavits in support of the
criminal complaints filed against all four original defendants, which
also detailed the investigation preceding the border stop.  (See
generally id., Ex. 12.).  In short, all of the search warrant
applications were supported in substantial part by significant
evidence of probable cause obtained independent of the border stop in
Miami.

Moreover, even if the border search resulted in illegally
obtained evidence (which it did not), the isolated references to such
evidence in the search warrant affidavits do not invalidate the
entire warrants.  "[T]he mere inclusion of tainted evidence in an
affidavit does not, by itself, taint the warrant or the evidence
seized pursuant to the warrant."  United States v. Vasey, 834 F.2d
782, 788 (9th Cir. 1987).  "A reviewing court should excise the
tainted evidence and determine whether the remaining, untainted
evidence would provide a neutral magistrate with probable cause to
issue a warrant."  Id.  This is so because a "warrant may be upheld

even where it contains tainted and untainted facts as long as the untainted portions contain a sufficient showing of probable cause to render the warrant valid." United States v. Driver, 776 F.2d 807, 812 (9th Cir. 1985).  In reviewing information in support of a search warrant, courts should do so in a "common sense and realistic fashion." Id. at 811.

In light of the ample evidence detailed in the warrant applications linking defendants to the fraud scheme independent of the Miami border stop, the subsequent search of the defendants, the subject residences, and defendants' digital devices pursuant to those warrants was not unreasonable at all, much less "obviously" unreasonable. Messerschmidt v. Millender, 565 U.S. 535, 556 (2012) (the question under the good-faith exception is not whether the magistrate judge "erred" in issuing a warrant, but whether "the magistrate so obviously erred that any reasonable officer would have recognized the error").  The warrants were obtained primarily independent of any purported Fourth Amendment violations from the border stop, and evidence obtained from these warrants should not be excluded.

**D.   Defendants Were Not Entitled to <u>Miranda</u> Warnings Prior to Secondary Screening**

Defendants also seek to suppress statements they made during secondary screening, contending that the questioning violated their constitutional rights because they were not given Miranda warnings. (ECF 135 at 11-18; ECF 136 at 6-12.)  Defendants' Fifth Amendment and Sixth Amendment challenges should be rejected as well.

As a threshold matter, the government does not dispute that video evidence relating to portions of the interviews conducted by

CBP officers may have been inadvertently deleted by CBP despite the
government's good faith efforts to preserve such information.
However, to the extent it existed and was deleted, such video
evidence would be, at most, relevant only to defendants' motions to
suppress statements made during the video recorded interviews.  Such
evidence would not be relevant to the seizure of the physical
contraband from defendants' personal belongings or CBP's basic search
of defendants' digital devices (which did not require consent or even
the passcodes).  Defendants' other arguments – about the alleged
denial of the right to counsel and about the alleged tactics used by
CBP during the interviews – are similarly relevant only to
defendants' motion to suppress statements.  Importantly, defendants
do not actually identify any statements that they made during these
interviews that should be suppressed.  But even if they did and the
Court were to find suppression to be warranted, the proper remedy
would be to suppress those statements only.

   Defendants' allegations that the government acted in bad faith
are directly refuted by the government's transparency in detailing
for counsel and the Court the information it learned about the
secondary stop, including about the video evidence that may have been
inadvertently deleted, and the extensive efforts undertaken by CBP to
recover such evidence.  (See Paetty Decl., Ex. 14.)  Defendants'
allegations of bad faith are further undermined by the fantastical
nature of their alleged motive, a purported government cover-up of
the use of policies and procedures that are public knowledge (such as
interagency coordination among federal law enforcement agencies, the
use of the TECS System in secondary inspections, and search of
digital devices at the border).  Not only has the federal government

made such information available to the general public (see, e.g., https://www.dhs.gov/publication/tecs-system-cbp-primary-and-secondary-processing-tecs-national-sar-initiative), but it provides certain information – such as about the search of digital devices at the border – directly to travelers, like defendants, in mass-produced handouts. (See Paetty Decl., Exs. 4, 7.)

In any event, questions at the border do not trigger Miranda merely because they are posed during a secondary screening at the border. United States v. Kiam, 432 F.3d 524 (3d Cir. 2006). Courts agree that such questioning can also be viewed as non-custodial, even if the individual is not free to leave. See, e.g., United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998); United States v. FNU LNU, 653 F.3d 144 (2d Cir. 2011); United States v. Bengivenga, 845 F.2d 593, 599 (5th Cir. 1988) (en banc); United States v. Galloway, 316 F.3d 624 (6th Cir. 2003); United States v. Gupta, 183 F.3d 615 (7th Cir. 1999); United States v. Moya, 74 F.3d 1117, 1120 (11th Cir. 1996).

For the reasons explained above in section III.B with respect to digital devices, under the "lex loci" approach, the law of the Eleventh Circuit should apply. In Moya, the Eleventh Circuit held that because of the sovereign's responsibility to secure its borders, "some degree of questioning and of delay is necessary and is to be expected at entry points into the United States." 74 F.3d at 1120. "Because of this expectation, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." Id. (internal quotations omitted). Events which might be enough often to signal "custody" away from the

1   border will not be enough to establish "custody" in the context of

2   entry into the country.  Id.  In sum, Miranda warnings are not

3   required under these circumstances even in cases where a secondary

4   interview is part of the border routine.  Id.

5       But even if the Court applies Ninth Circuit law, questioning at

6   the border similarly is afforded more latitude.  See United States v.

7   Guzman-Padilla, 573 F.3d 865, 883-84 (9th Cir. 2009) (noting that the

8   Government has more leeway to detain individuals at the border

9   without effecting an arrest because "special rules apply at the

10  border"); see also United States v. Nava, 363 F.3d 942, 946 (9th Cir.

11  2004) (defendant not arrested at border after being escorted in

12  handcuffs to security office, having pat down search conducted, and

13  being forced to wait in locked office during truck search).

14      Defendants were being interviewed to determine their

15  admissibility into the United States.  Under 8 U.S.C. § 1225(a)(5),

16  CBP officers may require any applicant for admission into the United

17  States to give statements to assist the officers in determining

18  whether the applicant is admissible.  In addition, the Ninth Circuit

19  recognizes that under 19 U.S.C. § 1582, all persons entering the

20  United States are subject to search and detention, including to

21  answer "routinely asked questions" regarding, among other things,

22  their travels and "any merchandise or goods" they are carrying with

23  them.  United States v. Chavez-Martinez, 407 F.2d 535, 539 (9th Cir.

24  1969); see also United States v. Reyes, 631 F.2d 616, 622 (9th Cir.

25  1980) ("[R]outine inquiries during extended border searches

26  concerning ownership of the containers crossing the border do not

27  constitute 'custodial interrogation' within the meaning of

28  Miranda."); United States v. Ozuna, 170 F.3d 654, 658 (6th Cir. 1999)

1    ("Other courts have held consistently that the <u>Miranda</u> warnings need
2    not precede initial routine questioning by Immigration or Customs
3    officials because such questioning is not 'custodial
4    interrogation'").

5        Notably, defendants do not actually identify any statements they
6    made that they seek to suppress.  The practical effect of defendants'
7    motion to suppress these unidentified statements is therefore to put
8    before the Court defendants' version of events, which, according to
9    them, include their repeated efforts to invoke a right to counsel.
10   There are, however, significant reasons to question defendants'
11   credibility.  Defendants both previously pled guilty for their joint
12   participation in a conspiracy to commit bank fraud that included
13   making false and misleading statements about the true identity of
14   defendant Ayvazyan's mother.  <u>See</u> <u>United States v. Richard Ayvazyan</u>,
15   CR 11-180-CJC.  Moreover, in the declaration he submitted in support
16   of the instant motions, defendant Ayvazyan brazenly lies to this
17   Court when he misrepresents that he had the permission of Viktoria
18   Kauichko and Iuliia Zhadko – who are fake and synthetic identities –
19   to use credit cards opened in their names and omits that he also
20   possessed images of driver's licenses and credit cards in the names
21   of several other individuals.  (Ayvazyan Decl. ¶ 22.)

22       Even accepting defendants' version of events, their description
23   of what they were asked by CBP does not rise to the level of
24   interrogation that would merit <u>Miranda</u> warnings or trigger the need
25   for an attorney, especially at the border.  Nor do the alleged
26   categories of questions constitute interrogation about a particular
27   crime – namely, wire or bank fraud involving PPP or EIDL loan funds.

28

1    Specifically, according to defendant Ayvazyan, at his secondary

2  inspection he was asked questions about "where [he] was coming from,

3  phone numbers, relatives' names, children's names, social media

4  accounts, employment, bank accounts, whether [he] was associated with

5  organized crime, and whether [he] had any prior convictions" as well

6  as questions about where he lived and his employment. (Ayvazyan

7  Decl. ¶ 17.)  Ayvazyan also stated that he was asked whether he owned

8  the digital devices he was carrying and was asked questions about the

9  credit cards he was carrying in the names of Iuliia Zhadko and

10  Viktoria Kauichko.  (Id. ¶¶ 18, 22.)  According to defendant

11  Terabelian, she was asked questions about her background, her

12  husband, his work, and where she had traveled. (Terabelian Decl. ¶

13  16.)

14    The questions posed to both defendants address either background

15  questions that speak to their identity or questions related to the

16  contraband they carried and as such fall squarely within the realm of

17  routine customs questions required for CBP to fulfill its essential

18  tasks of ensuring that defendants are admissible and interdicting

19  contraband.  See Reyes, 631 F.2d at 622.  Even accepting defendants'

20  declarations as true, none of the questions purportedly asked by CBP

21  sought information about PPP or EIDL loans, which comports with the

22  scope of questions that SA Palmerton requested that CBP ask

23  defendants.  (See Paetty Decl., Ex. 1.)  All of these questions are

24  routine customs-related inquiries as reflected on the checklist

25  provided to CBP officers to assist in secondary screenings.  (Id.,

26  Ex. 9.)

27    Thus, defendants' own declarations belie their claim that CBP

28  officers asked them questions designed to incriminate them and

24

1  ultimately undercut the notion that the questions "went to the heart"
2  of the PPP/EIDL loan fraud scheme.  (ECF 136 at 7.)  Furthermore, the
3  CBP Officers' lack of knowledge of the nature of the charges under
4  investigation (id. at 10) further supports the inference that the
5  officers were not even equipped to interrogate defendants about the
6  loan fraud scheme.  And defendant Terabelian's lack of knowledge
7  about what charges she may have faced supports that CBP officers did
8  not ask her questions about those charges or else she would have
9  known what the charges were.  (Id.)

10      Defendants' assertions that they were subjected to an
11  unreasonably lengthy detention are undermined by the fact that they
12  were carrying numerous digital devices that, upon manual review,
13  revealed a trove of digital contraband.  As reflected in defendant
14  Terabelian's motion (ECF 136 at 10), defendants also gave
15  inconsistent and conflicting answers to officers' questions and were
16  travelling with credit cards in other people's names.  See e.g.,
17  Ozuna, 170 F.3d at 658 ("incomplete and inconsistent answers . . .
18  necessitated repetition of the questions.").  All of these red flags
19  make it entirely reasonable that defendants would be detained while
20  officers made a determination, pursuant to their plenary authority as
21  gatekeepers at the border, to interdict contraband and ensure that
22  persons seeking admission to the United States were in fact
23  admissible.

24  **IV.  CONCLUSION**

25      For the foregoing reasons, the government respectfully requests
26  that this Court deny defendants' motions to suppress.

27

28