Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

John L. Littrell (SBN 221601)
*jlittrell@bklwlaw.com*
Ryan V. Fraser (SBN 272196)
*rfraser@bklwlaw.com*
**BIENERT KATZMAN LITTRELL
WILLIAMS, LLP**
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Counsel for Defendant
Marietta Terabelian*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-cr-579 (SVW) |
| *Plaintiff,* | **JOINT REPLY IN SUPPORT OF MOTIONS TO SUPPRESS EVIDENCE FROM PRETEXTUAL DETENTION AND WARRANTLESS SEARCHES** |
| v. | |
| RICHARD AYVAZYAN, MARIETTA TERABELIAN, *et al.,* | |
| *Defendants.* | Judge:   Hon. Stephen V. Wilson |
| | Date:    April 5, 2021 |
| | Time:   11:00 a.m. |

REPLY – WARRANTLESS DETENTION AND SEARCHES

1

# <u>TABLE OF CONTENTS</u>

I.    THE BORDER SEARCH EXCEPTION DOES NOT APPLY BECAUSE
      THE DETENTION AND SEARCHES' PURPOSE FELL OUTSIDE THE
      EXCEPTION'S NARROW SCOPE ...................................................................2

      A.    The Purpose of the Detention, Repeated Interrogations, and
            Repeated Searches Was to Find Evidence of PPP Loan Fraud...................3

      B.    Searching for "Fake Identification Documents … to Prevent Such
            Contraband from Entering the United States" Cannot Justify the
            Warrantless Searches In This Case ...........................................................6

      C.    Even If the Searches' Purpose Had Been Interdiction of Third
            Parties' Access Devices, They Would Not Have Been "Conducted
            to Enforce Importation Laws"...................................................................8

II.   THE BORDER SEARCH EXCEPTION DOES NOT APPLY BECAUSE
      THE TEN-HOUR DETENTION, REPEATED INTERROGATIONS,
      AND REPEATED SEARCHES WERE UNREASONABLE ...........................11

III.  THE GOOD FAITH EXCEPTION DOES NOT APPLY TO THE
      NINTH-CIRCUIT-BASED PROSECUTION TEAM'S VIOLATION OF
      NINTH CIRCUIT LAW...............................................................................14

IV.   THE DIRECT AND INDIRECT PRODUCTS OF THE
      UNCONSTITUTIONAL DETENTION AND SEARCHES SHOULD BE
      SUPPRESSED ..............................................................................................16

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REPLY – WARRANTLESS DETENTION AND SEARCHES

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Mincey v. Arizona*,
   437 U.S. 385 (1978) ............................................................................ 2

6

7

*Perez Cruz v. Barr*,
   926 F.3d 1128 (9th Cir. 2019) ........................................................... 5

8

9

*United States v. Ayvazyan*,
   No. 20-mj-3857 (S.D. Fla. Nov. 13, 2020) ..................................... 15

10

11

*United States v. Azzara*,
   358 F. App'x 802 (9th Cir. 2009) ................................................... 10

12

13

*United States v. Cano*,
   934 F.3d 1002 (9th Cir. 2019) ...................................................*passim*

14

15

*United States v. Gerena*,
   667 F. Supp. 911 (D. Conn. 1987) ................................................. 15

16

17

*United States v. Orozco*,
   858 F.3d 1204 (9th Cir. 2017) ........................................................... 5

18

*United States v. Thirty-Seven (37) Photographs*,
   402 U.S. 363 (1971) .......................................................................... 9

19

20

*United States v. Touset*,
   890 F.3d 1227 (11th Cir. 2018) ..................................................... 15

21

**Statutes**

22

6 U.S.C. § 211(e)(3)(A)-(B) ..................................................................... 8

23

24

18 U.S.C. § 1029(a)(3) ........................................................................... 10

25

18 U.S.C. § 2320 ...................................................................................... 9

26

19 U.S.C. § 4301 ...................................................................................... 9

27

49 U.S.C. § 80302(a)-(b) .......................................................................... 9

28

ii

REPLY – WARRANTLESS DETENTION AND SEARCHES

**Rules**

Fed. R. Civ. P. 11(b)(3) ................................................................................ 4

**Other Authorities**

*iCloud*, Apple Inc., https://www.apple.com/icloud/ .................................... 7

*What's In 'Others' In Your iCloud Storage?*, Apple Inc.,
    https://support.apple.com/en-us/HT209249 ........................................... 7

*What Does iCloud Back Up?*, Apple Support,
    https://support.apple.com/en-us/HT207428 ........................................... 7

Dep't of Homeland Security, *Written Testimony to House Committee on
    Homeland Security* (May 3, 2017),
    https://www.dhs.gov/news/2017/05/03/written-testimonycbp-ice-plcy-
    house-committee-homeland-security-task-force-denying ......................... 6

FBI, *Joint Terrorism Task Forces*, https://www.fbi.gov/
    investigate/terrorism/jointterrorism-task-forces .................................... 6

Quentin Hardy, *Where Does Cloud Storage Really Reside? And Is It
    Secure?*, N.Y. Times (Jan. 23, 2017) ................................................... 8

Turks & Caicos, U.S. News & World Reports,
    https://travel.usnews.com/Turks-Caicos/ .............................................. 6

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

Both parties agree that warrantless detentions, interrogations, and searches are presumptively unconstitutional.  Both parties agree that "[a] border search must be conducted to enforce importation laws, and not for general law enforcement purposes,"[1] that it must be conducted in a reasonable manner, and that no other exception applies to the facts of this case.  This motion therefore presents the questions of (I) whether the government has carried its burden to demonstrate that the October 19, 2020 detention, interrogation, and search of Terabelian and Ayvazyan was "conducted to enforce importation laws" instead of in furtherance of the government's PPP loan fraud investigation, and (II) whether the ten-hour detention of Terabelian and Ayvazyan, forced separation, repeated interrogations about finances, denial of repeated requests for counsel, and repeated searches conducted under false pretenses was reasonable.  The answer to both questions is no.

The government's own documents show that its purpose was to investigate PPP loan fraud and that evidence is further supported by the questions asked of Terabelian and Ayvazyan, which centered on their sources of income, a newly purchased home suspected to be a proceed of the subject fraud, and how they paid for items like the vacation from which they were returning.  The government knew that it could not use the border search exception to conduct the PPP loan fraud investigation, and so it lied.  The government lied to Ayvazyan and Terabelian, and the government lied by filing official reports citing to national security and terrorism to justify the searches even though there were no national security or terrorism concerns.  The Opposition implicitly concedes that these were lies and does not argue them.  Instead, the Opposition curiously avoids any direct claims of *purpose* at all, and repeatedly focuses on the *results* of the searches—which it mischaracterizes as the seizure of digital

---

[1] *United States v. Cano*, 934 F.3d 1002, 1013 (9th Cir. 2019), *petition for cert. filed* (quoted by Opp'n at 8).

1   contraband.  But it is the prohibition of a "general law enforcement *purpose*[]" that is at

2   issue in this case, and the Opposition does not deny that purpose.

3   Travelers understand that they may be subject to routine searches when

4   reentering the country, but this was not a routine search.  It was an unreasonable search

5   conducted in furtherance of an unconstitutional purpose and therefore merits

6   suppression.

7   **I.    THE BORDER SEARCH EXCEPTION DOES NOT APPLY BECAUSE
        THE DETENTION AND SEARCHES' PURPOSE FELL OUTSIDE THE
8        EXCEPTION'S NARROW SCOPE**

9   Under the Fourth Amendment, "[w]arrants are generally required 'unless *the*

10  *exigencies of the situation* make the needs of law enforcement so compelling that the

11  warrantless search is objectively reasonable under the Fourth Amendment.'"  *Cano*,

12  934 F.3d at 1010 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)) (emphasis

13  added).  Where CBP is enforcing importation laws against the ingress of prohibited

14  items or people or enforcing national security laws, "the exigenc[y] of the situation"

15  makes a warrantless search reasonable.  In this case, CBP acted in service of an FBI

16  agent's purpose to collect evidence of loan fraud, not to enforce importation laws.  The

17  "exigencies" of seeking evidence for a domestic investigation are not sufficiently

18  compelling to make a border search objectively reasonable, and therefore, the detention

19  and searches in this case were not protected by the border search exception and were

20  unconstitutional.

21  Ayvazyan's opening motion explained how Agent Palmerton, knowing that he

22  could not conduct a warrantless detention and search of two persons of interest in his

23  ongoing PPP loan fraud investigation, instead drafted the Joint Terrorism Task Force

24  and CBP's Tactical Terrorist Response Team to do so in furtherance of his

25  investigation.  Mot. to Suppress Evid. from Pretextual Detention & Warrantless

26  Searches at 3-11, Dkt. 130.  The Opposition claims that despite contemporaneous

27  evidence that the "Reason For Search" was "National Security Concern

28

REPLY – WARRANTLESS DETENTION AND SEARCHES

[REDACTED],"[2] or "a PPP related fraud,"[3] the warrantless detention and repeated searches were permissible because they "resulted in the lawful seizure of digital contraband."  Gov't Consol. Opp'n to Mots. to Suppress at 9, Dkt. 152 (hereinafter "Opp'n").  The Opposition's claim that the seizure of third parties' access devices and text message attachments[4] justified the warrantless detention, repeated interrogations, and repeated searches in this case is without merit.  It is contradicted by CBP's internal documents, contradicted by the facts of the search, and contradicted by the law.

### A.   The Purpose of the Detention, Repeated Interrogations, and Repeated Searches Was to Find Evidence of PPP Loan Fraud

"A border search must be conducted to enforce importation laws, and not for general law enforcement purposes."  *Cano*, 934 F.3d at 1013 (internal quotation marks and citation omitted).  Both parties agree with this principle.  *See* Opp'n at 9.  The detention and search of Ayvazyan and Terabelian, however, was conducted for general law enforcement purposes, not to enforce importation laws.

The general law enforcement purpose of detaining and searching Ayvazyan and Terabelian was to locate evidence for use in the government's PPP loan fraud investigation.  As one FBI Agent contemporaneously summarized its request for secondary inspection to his CBP counterpart on the Joint Terrorism Task Force: "It's a PPP related fraud."  Dkt. 133 Ex. 6 at 039 (under seal).  The government knew that this

---

[2] Dkt. 133 Ex. 18 (under seal); *accord* Dkt. 133 Ex. 7 (under seal) (CBP report claiming that searches were conducted "traveling from an area of interest, intelligence indicating the need for increased vigilance and thorough in-depth inspections and interviews when processing arriving travelers, and for purposes of national security.").  The government has declined to produce the "REDACTED" portion of the form in Ex. 18.

[3] Dkt. 133 Ex. 6 at 039.

[4] The government variously uses terminology including "fake identification documents," "counterfeit access devices," and others to describe the credit cards belonging to Viktoria Kauichko and Iuliia Zhadko and the photographs of third parties' driver's licenses and credit cards found in the text message attachments to Kauichko and Zhadko's phones.  For simplicity, we refer to both the actual credit cards and text message attachments as "third parties' access devices."

1   was impermissible, so the search report authors wrote that the search's purpose was

2   "National Security Concern" and "for purposes of national security."  Dkt. 133 Ex. 18

3   at 112 (under seal); Dkt. 133 Ex. 7 at 045 (under seal).  And despite CBP's clear

4   directive that "the individual subject to search will be notified of the purpose [of] …

5   such search"—as stated in government exhibit Dkt. 152 Ex. 4 ¶ 5.4.1.3—CBP instead

6   chose to lie about its digital device search and tell Ayvazyan that it was searching to

7   confirm that he was not a terrorist.[5]  The government does not contest—and therefore

8   concedes—that these were lies; the detention and search of Ayvazyan and Terabelian

9   was not related to national security or terrorism.  CBP inadvertently left corroborating

10  evidence behind: pre-search CBP files on Terabelian labeled "Category: FI –

11  FINANCIAL" (Dkt. 133 Ex. 16 at 098 (under seal)) and post-search incident reports

12  filed to the "FBI SUBJECTS OF INTEREST/FRAUD" folder, Dkt. 133 Ex. 17 (under

13  seal).  Not one of the CBP reports claimed that they had been searching for

14  "contraband."  Notably, CBP's interrogation topics and seizures centered on the alleged

15  PPP loan fraud scheme.

16          The Opposition is remarkable for what it lacks in this regard.  Despite 25 pages

17  of text and 35 references to "contraband," the Opposition never actually states that the

18  *purpose* of CBP's searches was to find contraband or denies that the searches were

19  "*conducted … for general law enforcement purposes*."  *Cano*, 934 F.3d at 1013

20  (emphasis added); *cf.* Fed. R. Civ. P. 11(b)(3).[6]  Instead, the Opposition attempts to

21

22  [5] Ayvazyan Decl. ¶¶ 24-25, Dkt. 134.

23  [6] The closest that the government comes is misrepresenting the content of a defense exhibit on file
    with the Court.  The government deceptively claims that one email "discussed defendants' nexus to
24  fake identification documents *and the need for CBP to initiate a secondary screening to prevent such
    contraband from entering the United States*."  Opp'n at 7 (misstating the contents of Dkt. 133 Ex. 6 at
25  040) (emphasis added).  The email discussed no such thing.  It discussed the need for CBP to initiate
    secondary for "a PPP related fraud," as summarized by Agent Luna in his email forwarding the same.
26  Dkt. 133 Ex. 6 at 039.  Agent Palmerton did not dispute Agent Luna's summary because that was in
    fact his request for secondary.  There is no evidence that the two Agents ever "discussed … the need
27  for CBP to initiate a secondary screening to prevent such contraband from entering the United States."
    Opp'n at 7.  The Opposition misrepresents the evidence in this regard.
28

4

REPLY – WARRANTLESS DETENTION AND SEARCHES

argue from the *results* of the search that several (a minority) of the seizures qualify as "digital contraband." *See, e.g.*, Opp'n at 9 (claiming [incorrectly] that the searches "resulted in the lawful seizure of digital contraband," not that their purpose was to interdict digital contraband). The Opposition does not claim that seizing digital contraband was the purpose of detaining and searching Ayvazyan and Terabelian or attach a declaration from Agent Palmerton, the Joint Terrorism Task Force, or CBP's Tactical Terrorism Response Team regarding the purpose of the October 19 detention, interrogations, and searches of Ayvazyan and Terabelian. Instead, it appears that the Opposition takes the position that regardless of the purpose of a CBP search, it is permissible as long as it ultimately recovers "digital contraband."

The reason for the Opposition's sleight of hand is clear. The Ninth Circuit does not determine constitutionality based on whether a search *resulted* in detention of contraband. Instead, "to determine whether the search is invalid because of an impermissible purpose, we ask whether the officer would have made the stop in the absence of the *invalid purpose*." *Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019) (quoting *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017) (emphasis added)). Here, the only purpose of the stop was collecting evidence of PPP loan fraud. That purpose was impermissible, and in the absence of that purpose, the stop would not have occurred. CBP's repeated lies about national security make that clear.

The Opposition focuses on results instead of purpose because it knows what the result will be of *Cano*'s "conducted … for general law enforcement purposes" test. The purpose of CBP's actions—in detaining Ayvazyan for over ten hours, conducting repeated searches of his property until they found evidence they could bring back to the FBI, and subjecting Ayvazyan to three separate interviews targeting information about his finances—was to gather evidence supporting the ongoing PPP loan fraud

REPLY – WARRANTLESS DETENTION AND SEARCHES

1    investigation.[7]  Those actions were therefore not protected by the border search
2    exception and were unconstitutional.

3         **B.      Searching for "Fake Identification Documents ... to Prevent Such**
4                    **Contraband from Entering the United States" Cannot Justify the**
5                    **Warrantless Searches In This Case**

6         The government's claim that the exigency requiring a warrantless search was
7    searching for "fake identification documents" that needed to be "prevent[ed] ... from
8    entering the United States" is contradicted by the facts of that search.  The search was
9    conducted by the Tactical Terrorism Response Team under the direction of the Joint
10   Terrorism Task Force.  These are the elite teams brought in to "investigat[e] terrorism."
11   Dkt. 130 at 5 (quoting FBI, *Joint Terrorism Task Forces*, https://www.fbi.gov/
12   investigate/terrorism/jointterrorism-task-forces).  They are "specially trained in
13   counterterrorism response" so that they can "target[] and inspect[] ... travelers
14   suspected of having a nexus to terrorism."  *Id.* at 6 (quoting Dep't of Homeland
15   Security, *Written Testimony to House Committee on Homeland Security* (May 3, 2017),
16   https://www.dhs.gov/news/2017/05/03/written-testimonycbp-ice-plcy-house-
17   committee-homeland-security-task-force-denying).  These are not the officers who are
18   brought in when CBP wants to search luggage for fake IDs.  They are brought in when
19   CBP wants to do a favor for the FBI at the expense of individual travelers.

---

21   [7] Late in the brief, the Opposition erroneously claims that the "Officers' lack of knowledge of the
22   nature of the charges under investigation [in a cited comment made during the ride from the airport to
     jail] supports the inference that the officers were not even equipped to interrogate defendants about the
23   loan fraud scheme." Opp'n at 25.  This is yet another misrepresentation of material fact.  The
     "Officers" referenced in that citation were not the CBP officers who interrogated Ayvazyan and
24   Terabelian repeatedly about the loan fraud investigation.  They were two police officers or FBI agents
     whose sole role was transporting Ayvazyan and Terabelian after they had already been interrogated
25   and arrested.  The CBP officers who interrogated Ayvazyan and Terabelian were briefed on the PPP
     loan fraud investigation and asked repeated questions about sources of income, the purchase of a home
26   allegedly procured with loan proceeds, and how Ayvazyan and Terabelian had paid for their vacation.
     The Opposition's contrary claim misrepresents key facts and is contradicted by video-recorded
27   evidence.

---

REPLY – WARRANTLESS DETENTION AND SEARCHES

The claim that the government searched Ayvazyan and Terabelian's phones in order to "prevent" the "fake identification documents" "from entering the United States" is irreconcilable with the facts.  The government had already subpoenaed loan applications including the alleged documents and conducted trash pulls from a co-defendant's house where they found alleged fake identification documents.  For all of its uncertainty,[8] the one thing the government knew was that the allegedly fake documents were without a doubt already in the United States.

Setting aside the fact that the documents that had to be "prevent[ed] … from entering the United States" were already here, the government's repeated interrogations—focused on topics like Ayvazyan's job, the couple's new home, and the source of funding for their trip—and the digital nature of the documents further contradicts that purported purpose.  The government seized a series of approximately 197 text messages and photo attachments (of which it cherry-picked less than 10% in Dkt. 152 Ex. 8 to erroneously imply that CBP's seizures were predominantly third-party access devices), all of which were already fully accessible and present in the United States rendering moot the government's purported intent.

Each of these text messages and photo attachments was both in the United States by virtue of the other party to each text message chain—in the United States for all of the relevant messages—and in the United States as a function of cloud-based storage. Cloud-based storage "is built into every Apple device" and "automatically backs up"

---

[8] Agent Palmerton cited no justification to believe that Ayvazyan and Terabelian would be traveling with fake identification documents, which is particularly glaring based on the fact that they were traveling under the names Richard Ayvazyan and Marietta Terabelian.  Agent Palmerton conceded that he did not know why Ayvazyan and Terabelian went to Turks and Caicos—famously an island vacation destination and one of the top-ranked "Best Cheap Caribbean Vacations," *see* Turks & Caicos, U.S. News & World Reports, https://travel.usnews.com/Turks-Caicos/—and had no evidence that they were traveling for any reason other than vacation.  His reference to fake IDs, gold, and cash—made only after his unproduced teleconference with Agent Luna—appears to have been boilerplate and was untethered from the Joint Terrorism Task Force and CBP's implementation of his request to search for evidence supporting the PPP loan fraud investigation.  Agent Luna's summary of Agent Palmerton's request makes clear that "It's a PPP related fraud," not suspicion of contraband.

REPLY – WARRANTLESS DETENTION AND SEARCHES

and "stores" the information on that device to the iCloud.[9]  That data is shared across the user's other Apple devices and is accessible to them "wherever [they] are" through any computer.[10]  An Apple device's data is accessible from anywhere in the world—including from within the United States—regardless of the location of a single device.  In fact, that cloud data was almost certainly already in California because such data would generally be stored close to the California-based phones' homes to enable rapid access.[11]  The post hoc justification proffered by the government related to keeping information out of the United States that was already here makes no sense.  It should not be credited by the Court.

## C.  Even If the Searches' Purpose Had Been Interdiction of Third Parties' Access Devices, They Would Not Have Been "Conducted to Enforce Importation Laws"

"[B]order officials have no general authority to search for crime."  *Cano*, 934 F.3d at 1017 (noting that border officials cannot search for "[e]vidence of price fixing … [that] is not itself contraband whose importation is prohibited by law").  "A border search must be conducted *to enforce importation laws*…."  *Id.* at 1013 (emphasis added); *accord* Dkt. 152 Ex. 4 ¶ 1 (directing that border searches be conducted "to ensure compliance with customs, immigration, and other laws that CBP is authorized to enforce and administer").  CBP has statutory authority to conduct border searches to "interdict[] persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a

---

[9] *iCloud*, Apple Inc., https://www.apple.com/icloud/ (last visited Mar. 18, 2021); *see also What Does iCloud Back Up?*, Apple Support, https://support.apple.com/en-us/HT207428 (last visited Mar. 18, 2021).

[10] *iCloud*, *supra* note 9; *see also What's In 'Others' In Your iCloud Storage?*, Apple Inc., https://support.apple.com/en-us/HT209249 (last visited Mar. 18, 2021).

[11] Quentin Hardy, *Where Does Cloud Storage Really Reside? And Is It Secure?*, N.Y. Times (Jan. 23, 2017), https://www.nytimes.com/2017/01/23/insider/where-does-cloud-storage-really-reside-and-is-it-secure.html.

REPLY – WARRANTLESS DETENTION AND SEARCHES

1  designated port of entry" and to "deter and prevent the illegal entry of terrorists,

2  terrorist weapons, persons, and contraband."  6 U.S.C. § 211(e)(3)(A)-(B).  The

3  government's argument is that third parties' access devices (or text message

4  photographs thereof)[12] are included within "illegal entry of terrorists, terrorist weapons,

5  persons, and contraband."  The government is wrong.

6      The Opposition concedes that the Ninth Circuit "posited that the 'best example'

7  of 'digital contraband' is child pornography," Opp'n at 9, but the Opposition curiously

8  omits the rest of the Ninth Circuit's opinion on the topic: "Indeed, the detection-of-

9  contraband justification would rarely seem to apply to an electronic search of a cell

10  phone outside the context of child pornography."  *Cano*, 934 F.3d at 1021 n.13.  This

11  omission is rendered all the more conspicuous because Congress has actually

12  "declare[d child pornography] contraband and prohibit[ed] its importation … in [19

13  U.S.C.] § 1305(a) …."  *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363,

14  376-77 (1971).  No such law declares third parties' access devices to be contraband and

15  prohibits their importation.  To the contrary, the definition of contraband that cannot be

16  transported, concealed, or possessed on an aircraft includes drugs, weapons, counterfeit

17  money, certain cigarettes, counterfeit versions of certain copyrighted materials, and

18  goods bearing a counterfeit mark as defined under 18 U.S.C. § 2320.  49 U.S.C. §

19  80302(a)-(b); *accord* 19 U.S.C. § 4301 (adopting that definition and adding other goods

20

21  [12] The government characterizes the credit cards and photographs of driver's licenses as "counterfeit access devices," Opp'n at 8, but that characterization blurs the line between CBP's search and the

22  government's allegations.  Setting aside that Ayvazyan has pleaded not guilty and disputes the government's allegations, it is the intended search that is relevant.  CBP was not given any way to

23  differentiate between a legitimate credit card or picture of a license belonging to a third party and a counterfeit one.  Agent Palmerton did not provide CBP with the allegedly counterfeit license number,

24  or *even the names or any information at all* that would enable CBP to identify an access device as counterfeit.  Dkt. 133 Ex. 6 at 040.  If the government's purpose was to interdict such documents,

25  Agent Palmerton would have provided the basic information necessary to identify allegedly fraudulent identification documents.  The Opposition characterizes Zhadko and Kauichko as "suspected fake

26  aliases," but that is not what Agent Palmerton wrote at the time.  Agent Palmerton did any information

27  to distinguish aliases from legitimate acquaintances because that was not the purpose of the search.  He intended CBP to search for as much evidence as they could find, whether or not any third parties'

28  credit card or driver's license images were legitimate or counterfeit.

9

REPLY – WARRANTLESS DETENTION AND SEARCHES

whose importation is prohibited by the Tariff Act of 1930, *i.e.*, the Act prohibiting importation of child pornography but not photographs of allegedly fake identification documents).  Not one of the "AUTHORITY/REFERENCES" cited in the CBP memorandum provided by the government (Dkt. 152 Ex. 4 ¶ 4) references authority to interdict third parties' access devices.  Indeed, Counsel has been unable to find a single case, statute, or regulation that would take the step the government requests here and define CBP's authority to search for "contraband" as including authority to search for third parties' access devices.

Lacking any precedent to support its request to expand the definition of digital contraband, the government claims that—as with child pornography—the "possession, without more, [of other people's credit cards and allegedly fake identification documents] constitutes a crime."  Opp'n at 10.  The government is wrong.  The very statute cited by the government makes clear that even if the government were correct that these were counterfeit access devices, possession of a counterfeit access device without more is not a crime.  To the contrary, the statute the government cites makes clear that *unlike child pornography*, "possess[ing] fifteen or more devices which are counterfeit or unauthorized access devices" is only a crime if done "knowingly and with intent to defraud."  18 U.S.C. § 1029(a)(3).  Thus, possession of a counterfeit or unauthorized access device would be mere evidence of a crime, not a crime in and of itself.  The Ninth Circuit's holding in *Cano* is clear on this point: the "proper scope of a border search" includes the power to search for contraband, *not* evidence.  934 F.3d at 1018; *see also id.* at 1022 ("Searching for evidence and searching for contraband are not the same thing.").

Seeing the writing on the wall with respect to its attempted sleight of hand, the government pivots in a footnote to argue that under the independent source doctrine, "evidence of criminal conduct [that was] not digital contraband, … was independently obtained through the execution of a subsequent warrant to search [those] digital devices."  Opp'n at 13 n.7.  The government's pivot is also misplaced.  The

10

independent source doctrine does not apply because it requires "that the district court must explicitly find both that the information obtained during the illegal search was not presented to the magistrate, and that the agents would have sought a warrant even if they had not performed the illegal search." *United States v. Azzara*, 358 F. App'x 802, 805 (9th Cir. 2009) (reversing denial of motion to suppress because even a warrant that did not reference the illegal search may have been prompted by it). The government fails both parts of this two-part test. If the government was searching for evidence instead of contraband, then its stop and detention of Ayvazyan and Terabelian *and the resulting seizure and search of the phones they were carrying*, was unlawful. But for the unlawful detention and search, the government would not have searched the phones because the phones would not have been in the government's possession or custody. The independent source doctrine simply does not apply.

If the government were correct and the border search exception were expanded to encompass searches for access devices belonging to others as "digital contraband," or that a post-search warrant was sufficient to cure an unlawful search that turned up evidence, it would represent a massive expansion of the border search exception. The definition of access device is broad—including any card, number, or "other means of account access" that can be used even in conjunction with other such means to obtain anything of value. The government has even argued that a third party's name is a potential access device. Permission for CBP to execute searches for access devices belonging to others—*e.g.*, business cards exchanged at a conference, under the government's view of the world—would consume the Ninth Circuit limits on the narrow exception for border searches and turn them into a free-for-all.

## II. THE BORDER SEARCH EXCEPTION DOES NOT APPLY BECAUSE THE TEN-HOUR DETENTION, REPEATED INTERROGATIONS, AND REPEATED SEARCHES WERE UNREASONABLE

Rather than dispute that the extended detention and repeated interrogations and searches of Ayvazyan were unreasonable, the government tries to misrepresent the detention, interrogations, and searches. The Opposition claims that "at around 3:30

11

REPLY – WARRANTLESS DETENTION AND SEARCHES

p.m., defendants arrived at MIA and were referred for secondary inspection" where "a search" recovered several credit cards belonging to Viktoria Kauchiko and Iuliia Zhadko, Opp'n at 3, resulting in "searches of defendants' digital devices [that] took place over several hours," *id.* at 11. That is not true. The Opposition claims that the only ground on which its search was potentially unreasonable was "due to the length of time CBP possessed the devices." *Id.* That too is false. In fact, CBP claims that it only took thirty minutes to search Ayvazyan's devices. Dkt. 133 Ex. 7 at 045.[13] Rather than own up to the non-routine nature of the detention, interrogations, and searches in this case, the Opposition attempts to deceive the Court because the truth of the government's actions is patently unreasonable.

Terabelian and Ayvazyan were detained in the midst of a pandemic for over ten hours. During that time, they were denied repeated requests for counsel and refused even each other's company—facts irreconcilable with any supposed purpose to detect contraband. Terabelian and Ayvazyan were not searched one time. They were searched over and over again and interrogated repeatedly.

Ayvazyan was detained at 3:34 p.m. Officer Smith conducted the search and interrogation of Ayvazyan from approximately 5:00 p.m., Dkt. 152 Ex. 14 (under seal) until approximately 5:45 p.m., *see* Ayvazyan Decl. ¶¶ 17-18, Dkt. 134. He asked to search Ayvazyan's phones, but upon Ayvazyan declining, said that Ayvazyan would need to sign a form, and then he would be allowed to depart. *Id.* ¶ 18. That was the purportedly "routine" portion of the secondary screening. It lasted approximately 2 hours and 10 minutes—likely more than any one of us would consider to be routine—and it *did not result in the seizure of any third-party access devices or photographs*

---

[13] The Opposition claims that CBP only searched "one of [the] five digital devices" in Ayvazyan's bag. Opp'n at 3. That is a lie. CBP conducted a comprehensive search of each of the four phones that Ayvazyan was carrying as reflected in CBP's own report. *See* Dkt. 133 Ex. 18 (claiming to have searched four iPhones due to "National Security Concern [REDACTED]"). The government's consistent attempts to play down the degree of invasion that occurred here is consistent with the government's understanding that its search was unconstitutional.

REPLY – WARRANTLESS DETENTION AND SEARCHES

1   *thereof*.  None of the evidence cited by the government was seized during the

2   purportedly "routine" portion of the secondary screening.

3       The conduct that came after this purportedly "routine" search and interrogation

4   was non-routine and unreasonable, particularly when combined with the repeated denial

5   of Ayvazyan's right to counsel.  Ayvazyan was again searched—this time in a separate,

6   unvideotaped "search room"—at approximately 6:25-6:40 p.m. during which time he

7   was interrogated by Officer Ramirez and another officer.  During this search and

8   interrogation, Officer Ramirez denied Ayvazyan his right to counsel, lied about the

9   purpose and scope of a requested media search (the third search of Ayvazyan) in

10  violation of CBP policy, and lied that Ayvazyan was being detained to confirm he was

11  not a terrorist.  *See* Ayvazyan Decl. ¶¶ 21-24.  Over the ensuing hours Ayvazyan was

12  interrogated again and again until 1:44 a.m.  Dkt. 152 Ex. 14 (under seal).  That is a

13  substantial part of what made CBP's search of Ayvazyan unreasonable, not the 30

14  minutes that it purportedly took to search Ayvazyan's phone.

15      The government also contends that its search of both Ayvazyan's and

16  Terabelian's smartphones was reasonable because it was a "basic" manual search.

17  Opp'n at 11.  The government's "use of basic"—drawn solely from CBP's use of the

18  same word—does not reflect the reality of the government's search.  They spent nearly

19  four hours searching Terabelian's smart phone outside of the presence of Terabelian

20  and Ayvazyan—in violation of CBP Policy.[14]  They lied about the purpose of the

21  smartphone searches—in violation of CBP policy.[15]  They wrote reports that lied about

22

23  [14] Dkt. 152 Ex. 4 ¶ 5.1.6 ("Searches of electronic devices should be conducted in the presence of the
individual whose information is being examined unless there are national security, law enforcement,
24  officer safety, or other operational considerations that make it inappropriate to permit the individual to
remain present.").  If CBP was searching for evidence of fake identification documents, then there
25  would be no reason to do so outside of Terabelian's presence.  Thus, the CBP reports do not include
any such reason.

26  [15] Contrary to the Opposition's mistaken claim that U.S. citizens can be detained and searched without
27  knowing CBP's purpose, *see* Opp'n at 12, the CBP memo relied upon by the government prohibited
CBP's deceit.  That memo directed that "the individual subject to search will be notified of the

28

13

REPLY – WARRANTLESS DETENTION AND SEARCHES

the purpose of those searches—in violation of CBP policy.[16]  They wrote other reports

that appear to have lied about the time they spent searching each device—in violation

of CBP policy.  And to be clear, these searches were not targeted at interdicting

contraband; the 17 photos produced by the government at Dkt. 152 Ex. 8 are *less than*

*10%* of the 197 seized photos produced by the government thus far.  Moreover,

assuming CBP is telling the truth about their search execution, they spent nearly four

hours searching Terabelian's device, but each of the 17 photos came from a different

device that they searched in only 30 minutes.  Either CBP is lying about their search

execution or the execution was targeted at something other than third-party access

devices.  CBP conducted a series of searches of private smartphones over the course of

almost four hours, lied about the purpose of their search, violated CBP policy by

executing the search without the travelers present, and appears likely to have lied about

the search's execution.  Regardless of whether CBP considers this to be a "basic"

search, it was unreasonable.[17]

## III.   THE GOOD FAITH EXCEPTION DOES NOT APPLY TO THE NINTH-CIRCUIT-BASED PROSECUTION TEAM'S VIOLATION OF NINTH CIRCUIT LAW

In one of the few moments of Ayvazyan and Terabelian's interrogation that

escaped the government's deletion,[18] a CBP officer stated: "California has an

---

purpose [of] … such search."  Dkt. 152 Ex. 4 ¶ 5.4.1.3.

[16] *See* Dkt. 152 Ex. 4 ¶ 5.6.1 ("Reports are to be created and updated in an accurate, thorough, and timely manner.  Reports must include all information related to the search through the final disposition including supervisory approvals ….").

[17] Nor did CBP have reasonable suspicion for a forensic search seeking such evidence.  There was no evidence in the TECS hit and referral information suggesting that the smartphones carried by Terabelian and Ayvazyan would contain evidence of any crime.  That referral contained no discussion of which phones had been used to commit alleged crimes or in what way.  It was a request for CBP to search for such information and not a summary of the basis for believing it existed.

[18] The Opposition states "some portions were also video recorded."  Opp'n at 4.  To be clear, nearly all of the interrogations and searches and were video recorded in Interview Room 10 and Interview Room 12 from at least 5:00 p.m. through 1:46 a.m.  Dkt. 152 Ex. 14 (under seal).  The government chose not to transmit Ayvazyan's November 18 discovery request and December 24 follow-up to CBP until January 6, 2021, *id.* and chose to delete the relevant interrogations after Ayvazyan explicitly

REPLY – WARRANTLESS DETENTION AND SEARCHES

1    understanding that it's very difficult for an officer to go through someone's phone,

2    which is true—in the state of California. But we are in a different district. As far as

3    searching through someone's phone at the airport, you gotta assume it's a lot easier for

4    us [here in Miami]."  Dkt. 133 Ex. 12.  The Opposition seizes upon this aside to argue

5    that the government acted in good faith.  The Opposition is wrong.

6         The pertinent inquiry for purposes of the Fourth Amendment is whether the

7    government violated the Constitution by deputizing CBP officers to perform

8    warrantless searches the government knew were unconstitutional.  The government

9    team members who requested that search were sitting in California and subject to Ninth

10   Circuit law.  Moreover, the direction and authority of the California-based agents and

11   prosecutors continued.  Agent Palmerton spoke with the CBP officers around 6:30 p.m.,

12   *see* Oct. 22, 2020 Detention Hr'g Tr. at 20, *United States v. Ayvazyan*, No. 20-mj-3857,

13   Dkt. 17 (S.D. Fla. Nov. 13, 2020), right when the second search and interrogation of

14   Ayvazyan was conducted.  And Agent Palmerton knew that the Fourth Amendment

15   prohibited the warrantless detention and search of Ayvazyan, which is precisely why he

16   failed to disclose his role in directing that activity when testifying at the detention

17   hearing.

18        Setting aside Agent Palmerton's violation of the Fourth Amendment, the CBP

19   officers were part of a California-based prosecution team.  *See* Dkt. 135 at 16.  The

20   Opposition does not contest this fact.  A California-based prosecution team is not free

21   to delegate unconstitutional misconduct by finding a jurisdiction with favorable case

22   law[19] and drafting a new team member to do its dirty work.  As explained by the

─────────────────────────────────────────

23   warned them on January 15, 2021 about CBP's deletion policy.

24   [19] The government exaggerates whether the Fourth Amendment would permit this search under

25   Eleventh Circuit case law.  It would not.  The case cited by the government permits searching for child

     pornography, *i.e.*, actual digital contraband rather than evidence of an intent-based crime.  *United*

26   *States v. Touset*, 890 F.3d 1227, 1236 (11th Cir. 2018); *see Cano*, 934 at 1015 n.8 (distinguishing

     *Touset* on this ground).  Whether or not a reasonable search for contraband would have been

27   permissible, this was neither a search for contraband nor a reasonable search.  It was therefore

28   unconstitutional under the Fourth Amendment regardless of which circuit's law applied.  The intent to

REPLY – WARRANTLESS DETENTION AND SEARCHES

government's own case law citation, *lex loci* applies when it would *deter* forum-shopping, not encourage it.  *See United States v. Gerena*, 667 F. Supp. 911, 915 (D. Conn. 1987).  No case holds that a prosecution team may engage in forum shopping in order to evade Fourth Amendment precedent.  Such a result would be ridiculous and make a mockery of the idea of "good faith" reliance on precedent.

## IV. THE DIRECT AND INDIRECT PRODUCTS OF THE UNCONSTITUTIONAL DETENTION AND SEARCHES SHOULD BE SUPPRESSED

The government relies on generalizations and mischaracterization to obscure the fact that despite its months-long investigation and "over 200 subpoenas," it lacked probable cause to suspect Ayvazyan and Terabelian had submitted fraudulent loan applications.  For example, the government claims to have "traced the funds" from a loan submitted by Viktoria Kauichko on behalf of Runyan Tax Services "through various bank accounts, including one in defendant Terabelian's name, and [were] used by her husband, defendant Ayvazyan, to purchase [Search Premises-1, the home of the Ayvazyan/Terabelian family]."  Opp'n at 2.  The government's claim is intentionally deceptive.  The alleged Runyan Tax loan occurred *after* the purchase of Search Premises-1 and was never transferred from Kauichko or Runyan to Terabelian.  The government attempts to muddy the waters to cover up its lack of probable cause.

While the government allegedly believed that some—but not all—of the transfers from third parties contributing to Ayvazyan and Terabelian's down payment came from people who had applied for the Paycheck Protection Program, there was no evidence that Ayvazyan or Terabelian were involved in any PPP application or knew that their friends and family had allegedly obtained PPP funds through misrepresentations.  The government's theory was instead that because of a decade-old conviction for falsely stated income mortgage forms, Ayvazyan and Terabelian must have been involved in or known about the allegedly fraudulent PPP applications submitted by others.

---

circumvent the Ninth Circuit's law, however, is relevant because it is evidence of bad faith: causing searches that the government knew it could not engage in.

REPLY – WARRANTLESS DETENTION AND SEARCHES

1       This hole in the government's evidence is why the Statement of Probable Cause

2   leads with its first evidentiary argument that Ayvazyan possessed credit cards

3   belonging to Zhadko and Kauichko and a digital attachment of Zhadko's driver's

4   license, then in the next sentence, says that Zhadko and Kauichko's names were "used

5   to fraudulently obtain numerous disaster loans…."  Dkt. 152 Ex. 11 Aff. ¶ 19 (under

6   seal).  The allegation that Ayvazyan was responsible for the actions of Zhadko and

7   Terabelian for those of Kauichko was *essential* to the government's application.[20]

8   Without that allegation—and evidence purportedly supporting it—the government

9   would not have applied for, much less been granted, a search warrant for the home of

10  two people who had no involvement in or knowledge of the allegedly fraudulent

11  applications.  Because that purported support was obtained by violating the Fourth

12  Amendment, the resulting search warrant and its fruits are tainted.

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23

---

24  [20] Indeed, were this link anything less than *essential* to the government's allegations or the rest of the
    government's evidence sufficient to make out an allegation on its own, it is doubtful that the
25  government would have disclosed classified border patrol practices required to be filed under seal and
    a wealth of government misconduct, ranging from mistreating U.S. citizens to lying on official reports
26  to deleting exculpatory evidence.  If the government had the independent evidence it claims, it would
    have simply agreed to suppress the seized evidence and focused its argument on fruit of the poisonous
27  tree.  That did not happen because the government understands that this link is essential to its
28  allegations and that it adduced no other evidence.

17

REPLY – WARRANTLESS DETENTION AND SEARCHES

1    Dated:   March 22, 2021                Respectfully submitted,

2                                           **STEPTOE & JOHNSON LLP**

3
     /s/ Ashwin J. Ram
4    Ashwin J. Ram (SBN 227513)
     *aram@steptoe.com*
5    Michael A. Keough (SBN 327037)
     *mkeough@steptoe.com*
6    Nicholas P. Silverman (*pro hac vice*)
     *nsilverman@steptoe.com*
7    **STEPTOE & JOHNSON LLP**
     633 West Fifth Street, Suite 1900
8    Los Angeles, CA 90071
     Telephone: (213) 439-9400
9    Facsimile: (213) 439-9599

10
     *Counsel for Defendant Richard Ayvazyan*
11

12   **BIENERT KATZMAN LITTRELL
     WILLIAMS, LLP**
13

14   /s/ John L. Littrell
     John L. Littrell (SBN 221601)
15   *jlittrell@bklwlaw.com*
     Ryan V. Fraser (SBN 272196)
16   *rfraser@bklwlaw.com*
     **BIENERT KATZMAN LITTRELL
17   WILLIAMS, LLP**
     601 W. 5th Street, Suite 720
18   Los Angeles, CA 90071
     Telephone: (213) 528-3400
19   Facsimile: (949) 369-3701

20
     *Counsel for Defendant Marietta
21   Terabelian*

22

23

24

25

26

27

28

REPLY – WARRANTLESS DETENTION AND SEARCHES

## SIGNATURE ATTESTATION

Pursuant to Local Rule 5-4.3.4(a)(i), the filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

19