Ashwin J. Ram (SBN 227513)
aram@steptoe.com
Michael A. Keough (SBN 327037)
mkeough@steptoe.com
Nicholas P. Silverman (*pro hac vice*)
nsilverman@steptoe.com
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Ryan V. Fraser (SBN 272196)
rfraser@bklwlaw.com
**BIENERT KATZMAN LITTRELL
WILLIAMS, LLP**
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Counsel for Defendant
Marietta Terabelian*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>    v.<br><br>RICHARD AYVAZYAN,<br>MARIETTA TERABELIAN,<br>*et al.,*<br><br>    *Defendants.* | Case No. 20-cr-579 (SVW)<br><br>**JOINT REPLY IN FURTHER SUPPORT OF MOTIONS TO SUPPRESS EVIDENCE COLLECTED IN VIOLATION OF THE FOURTH, FIFTH, AND SIXTH AMENDMENTS (DKTS. 135 & 136)**<br><br>Judge:  Hon. Stephen V. Wilson<br>Date:   April 5, 2021<br>Time:   11:00 a.m. |

# <u>TABLE OF CONTENTS</u>

I.  PRELIMINARY STATEMENT ............................................................................1

II.  ARGUMENTS IN REPLY .................................................................................2

    A.  THE GOVERNMENT DOES NOT CONTEST THAT AYVAZYAN AND TERABELIAN ASKED FOR A LAWYER, OR THAT EVIDENCE RELATED TO THE INVOCATION OF COUNSEL WAS DESTROYED ............................................................2

    B.  AYVAZYAN AND TERABELIAN'S STATEMENTS ARE SUPPRESSIBLE ON EITHER *MIRANDA* OR *EDWARDS* GROUNDS BECAUSE THEY REQUESTED COUNSEL AND YET WERE INTERROGATED IN CUSTODY WITHOUT *MIRANDA* WARNINGS ............................................................4

        1.  The Interrogation Was Custodial Due to the Inability to Leave, the Seizure of the Defendants' Phones, and the Threat of Indefinite Detention by CBP Officers ......................5

        2.  Following the FBI's Direction, CBP Officers Made Sure This Border Stop Was Anything But Routine ......................7

    C.  AYVAZYAN AND TERABELIAN'S STATEMENTS WERE INVOLUNTARY ............................................................10

    D.  SUPPRESSION APPLIES TO BOTH THE COERCED STATEMENTS AND SEARCHES BASED ON COERCED CONSENT CONDUCTED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS ............................................................11

        1.  Any Evidence Collected After Ayvazyan and Terabelian's Invocation of Counsel Must Be Suppressed ............................................................11

        2.  Even If a Routine Detention and Search Was Permissible, a Non-Routine Detention and Search Was Not ............................................................13

    E.  THE GOVERNMENT'S ATTACKS ON AYVAZYAN'S CREDIBILITY FALL FLAT ............................................................15

III.  CONCLUSION ............................................................16

i

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

4

**Cases**

5

*Arizona v. Johnson*,
    555 U.S. 323 (2009)................................................................................ 14

6

7

*Berghuis v. Thompkins*,
    560 U.S. 370 (2010).................................................................................. 4

8

9

*Dickerson v. United States*,
    530 U.S. 428 (2000)................................................................................ 10

10

11

*Edwards v. Arizona*,
    451 U.S. 477 (1981)......................................................................... 3, 4, 10

12

13

*Fisher v. United States*,
    425 U.S. 391 (1976)................................................................................ 13

14

15

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*,
    670 F.3d 1335 (11th Cir. 2012) .............................................................. 13

16

*Kastigar v. United States*,
    406 U.S. 441 (1972)................................................................................ 11

17

18

*McKathan v. United States*,
    969 F.3d 1213 (11th Cir. 2020) .............................................................. 13

19

20

*Oregon v. Elstad*,
    470 U.S. 298 (1985).................................................................................. 4

21

22

*Phillips v. U.S. Customs & Border Prot.*,
    No. 2:19-CV-6338-SVW-JEM, 2020 WL 4118010
    (C.D. Cal. Mar. 9, 2020) ........................................................................ 10

23

24

*Rodriguez v. McDonald*,
    872 F.3d 908 (9th Cir. 2017) .................................................................... 4

25

26

*Rodriguez v. United States*,
    575 U.S. 348 (2015)................................................................................ 14

27

28

ii

JOINT REPLY ON SUPPRESSION MOTIONS RE EVIDENCE COLLECTED IN
VIOLATION OF THE FOURTH, FIFTH, AND SIXTH AMENDMENTS
(DKTS. 135 & 136)

*United States v. Bengivenga,*
   845 F.2d 593 (5th Cir. 1988) ........................................................................ 10

*United States v. Djibo,*
   151 F. Supp. 3d 297 (E.D.N.Y. 2015) ......................................... 11, 12, 15

*United States v. Fernandez-Ventura,*
   132 F.3d 844 (1st Cir. 1998) ...................................................................... 10

*United States v. FNU LNU,*
   653 F.3d 144 (2d Cir. 2011) ...................................................................... 10

*United States v. Galloway,*
   316 F.3d 624 (6th Cir. 2003) ...................................................................... 10

*United States v. Gupta,*
   183 F.3d 615 (7th Cir. 1999) ...................................................................... 10

*United States v. Haswood,*
   350 F.3d 1024 (9th Cir. 2003) .................................................................... 10

*United States v. Hernandez,*
   476 F.3d 791 (9th Cir. 2007) ................................................................ 5, 6, 7

*United States v. Kiam,*
   432 F.3d 524 (3d Cir. 2006) ...................................................................... 10

*United States v. Martinez-Fuerte,*
   428 U.S. 543 (1976) .................................................................................... 14

*United States v. Mata-Abundiz,*
   717 F.2d 1277 (9th Cir. 1983) ...................................................................... 8

*United States v. Molina-Gomez,*
   781 F.3d 13 (1st Cir. 2015) .................................................................. 6, 7, 8

*United States v. Nava,*
   363 F.3d 942 (9th Cir. 2004) ........................................................................ 6

*United States v. Patane,*
   542 U.S. 630 (2004) .................................................................................... 11

iii

*United States v. Villa-Gonzalez*,
   623 F.3d 526 (8th Cir. 2010) ........................................................................ 12

**Statutes**

8 U.S.C. § 1225(a)(5) ...................................................................................... 13

JOINT REPLY ON SUPPRESSION MOTIONS RE EVIDENCE COLLECTED IN
VIOLATION OF THE FOURTH, FIFTH, AND SIXTH AMENDMENTS
(DKTS. 135 & 136)

1

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

2       Defendants Richard Ayvazyan and Mary Terabelian, through undersigned

3 counsel, submit this joint reply memorandum of law in further support of their motions

4 (Dkts. 135 & 136) to suppress all evidence, including statements, collected during their

5 unlawful detention, interrogations, and searches at Miami International Airport

6 ("Miami Airport") on October 19-20, 2020, as well as the direct and indirect fruits of

7 that evidence.

8 **I.**     **PRELIMINARY STATEMENT**

9       The Opposition is more notable for what it leaves out than for what it includes.

10 The Opposition side-steps, ignores, or admits that:

11        • The defendants' statements were involuntary.

12        • The government provided no *Miranda* warnings.

13        • Ayvazyan and Terabelian repeatedly requested to speak to a lawyer.

14        • Rather than stop questioning or provide access to counsel, CBP officers

15           informed Ayvazyan and Terabelian that they had no right to speak to an

16           attorney and could be held indefinitely, then proceeded with repeated

17           interrogations.

18        • Any evidence collected regarding the alleged PPP loan fraud—including

19           statements, searches of cell phones and persons, and other evidence—came

20           *after* Ayvazyan and Terabelian's repeated requests for an attorney.

21        • Despite Ayvazyan's requests for production of video and audio recordings

22           showing these requests for an attorney—which Ayvazyan explained were

23           critical to this motion to suppress—the government allowed these

24           recordings and the recordings of the initial interrogations to be destroyed.

25        The Opposition's claim that there was no right to counsel because only a routine

26 border inspection was conducted—when the defendants were detained in purported

27 secondary inspections for over ten hours, isolated from each other, deprived of their

28

AYVAZYAN & TERABELIAN'S JOINT REPLY RE SUPPRESSION MOTIONS
(DKTS. 135 & 136)

phones, repeatedly searched, and repeatedly interrogated about ostensible evidence of fraud pursuant to the FBI's instructions—is as wrong as it sounds.  This was not a routine border inspection.  The questions asked of Ayvazyan and Terabelian had nothing to do with their admissibility into the United States and everything to do with the FBI's investigation of alleged PPP fraud.  This was by design—as CBP officers were carrying out the FBI's orders to use the border crossing as a pretext to collect information related to their PPP investigation.

The subsequent searches conducted of Ayvazyan and Terabelian would never have occurred had the government honored their request for counsel.  CBP officers never would have interrogated them regarding alleged PPP fraud, and never would have been able to go beyond a routine border search to conduct repeated searches for evidence of PPP loan fraud.

To be clear, the "routine" portion of CBP's detention of Ayvazyan and Terabelian did not result in the seizure of any evidence.  Each piece of evidence that the Opposition cites was seized only during the extended, non-routine, portion of the ten-hour detention, repeated interrogations, and repeated searches.  Even if the border search exception permitted a routine, standard, screening without an attorney, that is not what occurred here.  Instead, Ayvazyan and Terabelian were repeatedly refused an attorney despite being subjected to interrogation and searches while in detention.  These refusals continued well past any arguably routine portion of their interaction with CBP was over (to the extent such a portion existed at all).

Accordingly, the evidence from the Miami Airport should be suppressed.

## II.    ARGUMENTS IN REPLY

### A.    The Government Does Not Contest That Ayvazyan and Terabelian Asked for a Lawyer, or That Evidence Related to the Invocation of Counsel Was Destroyed

The Opposition does not contest that Ayvazyan and Terabelian asked for counsel.  The United States Supreme Court has made clear that when this request is

2

1  made, the questioning must stop until the lawyer is present.  *See Edwards v. Arizona*,

2  451 U.S. 477 (1981).  Because the questioning of Ayvazyan and Terabelian did not

3  stop, suppression is the appropriate remedy.  *See* Def.'s Mot. Suppress Evid. Collected

4  Violation Fifth and Sixth Amends. at 13-14, Dkt. 135.

5          The Opposition also concedes that evidence related to Ayvazyan and

6  Terabelian's request for counsel was destroyed, and argues only that this was not done

7  in bad faith because of the government's "transparency" and because of the "extensive

8  efforts" undertaken to find the missing footage.  Gov't Consol. Opp'n Def. Ayvazyan's

9  and Def. Terabelian's Mots. Suppress at 20, Dkt. 152 [hereinafter "Opp'n"].  To be

10  clear:  there has been nothing transparent about the government's efforts.  Defense

11  counsel told the government for months that the footage needed to be preserved.  The

12  government spent months obfuscating, only to later admit that the footage could have

13  been preserved if they had listened to defense counsel from the beginning.  And the

14  letter from CBP attached as Exhibit 14 to the Declaration of S. Paetty ("Paetty Decl.") –

15  created after Ayvazyan and Terabelian filed the underlying motion to suppress – does

16  not detail any "extensive effort" to locate the footage, as it merely observes that CBP

17  "made efforts" to retrieve the footage, without mention of what those efforts were.  *See*

18  Dkt. 152 Ex. 14 (under seal).  The letter also fails to address why this video was deleted

19  despite the repeated requests of defense counsel that it be preserved.  And the letter

20  flatly contradicts CBP's position that all of the footage from the room where Ayvazyan

21  was interrogated beginning at 11:15 p.m.—Interview Room 10—was preserved and

22  produced.  Instead, the letter admits *for the first time* that Ayvazyan was interrogated on

23  *two separate occasions* in the same interview room but offers no explanation for why

24  these videos were not produced.  *See id.* (indicating that Ayvazyan was interrogated in

25  Interview Room 10 at 5:00 p.m. and 6:40 p.m. but offering no indication why these

26  Interview Room 10 videos were not preserved and produced when others were).

27

28

3

1    A bare-bones and self-serving letter, hastily drafted in the two days after the

2  suppression motions were filed, does not show that the government did not act in bad

3  faith.  The government's actions in allowing this evidence to be destroyed rise to the

4  level of bad faith and the Court should respond accordingly.  And even if the Court

5  finds that this letter is enough to defeat apparent bad faith, the government did not

6  respond to Ayvazyan's argument that they should not be rewarded for recklessly

7  allowing evidence relevant to this motion to be destroyed.  Dkt. 135 at 17-18.  The

8  government also does not dispute that this evidence was deleted despite repeated

9  defense requests to preserve it, notices about the dangers of deletion, and a Court Order

10  to expeditiously produce discovery.  *Id.* at 17.  The Court should not reward this

11  behavior, and instead should suppress any evidence collected during the detention and

12  interrogation at the Miami Airport.

13    **B.    Ayvazyan and Terabelian's Statements Are Suppressible on Either**

14    ***Miranda* or *Edwards* Grounds Because They Requested Counsel and**

15    **Yet Were Interrogated in Custody Without *Miranda* Warnings**

16    Despite bearing the burden to show a knowing, intelligent, and voluntary waiver

17  of *Miranda* rights, *see, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 383-84 (2010)

18  *Rodriguez v. McDonald*, 872 F.3d 908, 921 (9th Cir. 2017) (*Edwards* context), the

19  Opposition offers nothing here to dispute the facts that (1) Ayvazyan and Terabelian

20  asked for counsel repeatedly; and (2) officers provided them no *Miranda* warnings.

21  Given these undisputed facts, and because even "patently *voluntary* statements taken in

22  violation of *Miranda* must be excluded from the prosecution's case," *Oregon v. Elstad*,

23  470 U.S. 298, 307 (1985), the issue here becomes whether custodial interrogation took

24  place.  It unequivocally did.

25    Ayvazyan and Terabelian landed at the Miami Airport shortly after 3 p.m. on

26  October 19, 2020.  Ayvazyan Decl. Supp. Mots. Suppress ¶ 4, Dkt. 134.  After being

27  flagged during primary screening, Ayvazyan and Terabelian were taken to a separate

28  area where they were not allowed to use their phones and were unable to leave.

4

Ayvazyan Decl. ¶¶ 8-10; Decl. of M. Terabelian ¶¶ 4-7, Dkt. 139 ("Terabelian Decl."). This was no ordinary secondary screening.  Ayvazyan and Terabelian had been held in this area for over two hours before their first demand for an attorney was rebuffed and they were told that they could be held indefinitely—despite the fact that *the initial round of questioning in the secondary screening area yielded no evidence that justified additional detention*. Ayvazyan Decl. ¶¶ 10-15; Terabelian Decl. ¶¶ 8-10, Dkt. 139.  By this point—before any questioning regarding alleged PPP fraud had begun—Ayvazyan and Terabelian were in custody.

Relying primarily on out-of-circuit cases, the Opposition claims the defendants were not in custody for *Miranda* purposes even though they were not free to leave.  *See* Opp'n at 21.  The Opposition also claims the defendants' detention and interrogation, which lasted over ten hours and occurred only because of an FBI request, was merely a routine customs inspection.  *Id.* at 22–23.  Neither of these claims is tenable.[1]

1.    **The Interrogation Was Custodial Due to the Inability to Leave, the Seizure of the Defendants' Phones, and the Threat of Indefinite Detention by CBP Officers**

By the time questioning of Ayvazyan and Terabelian began—some two hours after they landed at the Miami Airport—Ayvazyan and Terabelian were in custody. Ayvazyan and Terabelian were explicitly told they faced indefinite detention as they languished in confinement within secondary inspections, surrounded by CBP officers and deprived of free access to each other, an attorney, or a phone. Ayvazyan Decl. ¶ 14; *see also* Terabelian Decl. ¶ 10.  These facts mirror those in *United States v. Hernandez*,

---

[1] The Opposition also complains that the defendants did not identify particular statements they seek to suppress.  Opp'n at 23.  Because the interrogation was permeated with an effort to collect evidence for the government's investigation into alleged PPP loan fraud, any statement made during this interrogation should be suppressed.  This includes the statements made in response to questions about whether income received from Ayvazyan's employment at Inception Ventures was legitimate and questions about the home that Ayvazyan had recently purchased (allegedly with proceeds from the fraud), as well as phones in his baggage and credit cards belonging to Iuliia Zhadko and Viktoria Kauichko. Dkt. 135 at 6-7.  Terabelian too was subject pervasive interrogation that went to the heart of Agent Palmerton's investigation into PPP loan fraud.  Dkt. 136 at 7.

5

476 F.3d 791, 796 (9th Cir. 2007), where the Ninth Circuit concluded that a defendant was in custody at a secondary customs inspection at an international border because he was surrounded by CBP officers, unable to leave, and subject to detention that was indefinite in nature. *Id.* at 796-97. The Opposition does not dispute that Ayvazyan and Terabelian were in custody under the Ninth Circuit's standard in *Hernandez*; indeed, it does not address *Hernandez* at all.

The Opposition does note that in *United States v. Nava*, 363 F.3d 942, 946 (9th Cir. 2004), a defendant at the border was not in custody for *Miranda* purposes when he was momentarily handcuffed in a security office during the search of his truck. *Id. Nava* is distinguishable from Ayvazyan and Terabelian's case and reconcilable with *Hernandez*, because until discovery of the marijuana, Nava's time in the security office was not indefinite, but limited by the time to complete the search. *See id.* In contrast here, more than two hours had already passed before officers told Ayvazyan and Terabelian that they were being detained and could be detained indefinitely. Ayvazyan Decl. ¶ 14; *see also* Terabelian Decl. ¶ 10. The government then repeatedly interrogated and searched Ayvazyan and Terabelian and confronted them with accusations and evidence, all while refusing their requests to speak with counsel or each other.

The Opposition also fails to address *United States v. Molina-Gomez*, 781 F.3d 13, 21 (1st Cir. 2015), *see* Dkt. 135 at 12. In *Molina-Gomez*, non-routine border questioning rose to the level of custodial interrogation because of "lengthy detention in a small, windowless room and probing questions about potential illegal activity" that went "above and beyond" a routine customs inspection to determine if the subject should be admitted to the United States. *Id.* at 23. The Opposition does not dispute that several similar factors were present here.

- Terabelian and Ayvazyan were obviously not free to leave the secondary-inspections area. Like the defendant in *Hernandez*, they were surrounded

6

1   by CBP officers in customs. Terabelian was explicitly advised that she and
2   her husband were being "detained." Terabelian Decl. ¶ 6.

- While being held for over ten hours in the Miami airport—indeed, within
  the first two hours—Ayvazyan and Terabelian were told their detention
  could be indefinite. Ayvazyan Decl. ¶ 14; *see also* Terabelian Decl. ¶ 10.

- Ayvazyan and his wife were separated from each other for hours and
  refused requests to speak with one another, making it impossible to leave
  together. Ayvazyan Decl. ¶ 19; *see also* Terabelian Decl. ¶ 11.

- Officers indicated to both defendants that the only way to leave was to
  cooperate and answer questions. *See* Ayvazyan Decl. ¶ 23-24; Terabelian
  Decl. ¶ 12 ("She told me that if I would cooperate with her, I would be on
  the next flight.").

Therefore, under *Hernandez* and *Molina-Gomez*, Ayvazyan and Terabelian were
in custody for *Miranda* purposes throughout their time in secondary inspection.

### 2. Following the FBI's Direction, CBP Officers Made Sure This Border Stop Was Anything But Routine

While Ayvazyan and Terabelian were already in custody before any questioning
began, what followed was anything but routine. The Opposition claims that this
questioning was nothing more than "Defendants [] being interviewed to determine their
admissibility into the United States." Opp'n at 22. This is a lie. Ayvazyan—a U.S.
citizen indisputably admissible to the United States—was subject to three separate
searches and three rounds of interrogation over the course of a ten-hour detention.
Even the officers themselves admitted their questioning of Ayvazyan and Terabelian
was not routine. Officer Smith told Ayvazyan that "this is the longest I've ever had to
wait. And the longest report I've ever had to write." Dkt. 135 at 9. He also told
Ayvazyan that they were "waiting for the bosses to see what's up," *id.*, and commented
that Ayvazyan owed him overtime for how long it was taking. *Id.* Agents told

7

AYVAZYAN & TERABELIAN'S JOINT REPLY RE SUPPRESSION MOTIONS
(DKTS. 135 & 136)

1    Ayvazyan and Terabelian, "We're not the case agents, we're just the people in Miami,

2    your case is out in LA . . . . This was just something we were asked to do." *Id.*

3        The border stop was also not routine because CBP's questioning of both these

4    defendants focused on collecting evidence for the alleged PPP fraud scheme that the

5    FBI was investigating, as CBP lacked any reasonable suspicion that he or Terabelian

6    were attempting to bring contraband into the United States.  As discussed in the

7    opening briefs and further below, Ayvazyan and Terabelian were each asked several

8    questions related to their sources of income, the home they had recently purchased, and

9    relationships to actual and possible family members.  Ayvazyan Decl. ¶ 17; Terabelian

10   Decl. ¶ 16; Dkt. 141 Exs. E-I.  This, of course, was reasonably likely to elicit an

11   incriminating response.  Critically, this questioning came *after* the initial screening and

12   questioning of Ayvazyan and Terabelian—the only part of the border stop that could be

13   considered routine—which revealed no information that was either relevant to the

14   alleged PPP fraud or that would have justified further detention of Ayvazyan and

15   Terabelian.  What came next—hours of additional detention, additional searches, and

16   additional questioning at the direction of the FBI that focused on the alleged PPP

17   fraud—was anything but routine.  *See Molina-Gomez*, 781 F.3d at 21.[2]

18       The events here went well beyond a routine border stop and rose to the level of

19   custodial interrogation.  Analysis of whether a question is "routine booking" or

20   "interrogation" is context-specific.  *See United States v. Mata-Abundiz*, 717 F.2d 1277,

21   1278-80 (9th Cir. 1983).  Thus, what officers know or should know at the time of the

22   questioning matters, and the "relationship of the question asked to the crime suspected

23   is highly relevant."  *Id.* at 1280.  In *Mata-Abundiz*, the Ninth Circuit held that questions

24   about "biographical information" still constituted interrogation because they were asked

25   as part of a criminal investigator's attempt to build a firearms case and could elicit

---

[2] The government argues further that any extended detention was justified because they were able to
collect evidence that potentially supported their alleged PPP loan fraud investigation.  Opp'n at 25.
But a post hoc justification cannot cure the constitutional violations that came before it.

incriminating responses in that context.

In this case, likewise, the information and instructions the FBI sent to CBP made it so that questions on a wide array of seemingly innocuous background topics became interrogation. Dkt. 141 Ex. A (under seal). And the interrogations of Terabelian and Ayvazyan did just that: asking questions that the CBP officers knew would fulfill FBI Agent Palmerton's request to ferret out incriminating information for his PPP fraud investigation. For example, during Terabelian's interrogation, CBP asked about:

- The Tarzana house that FBI Agent Palmerton suspected had been purchased with proceeds from the alleged PPP fraud scheme, *see* Dkt. 141 Ex. E (first interrogation video, beginning at 8:16 p.m.);
- Terabelian and Ayvazyan's sources of income and how they had paid for specific services such as the vacation from which they were returning, Dkt. 141 Ex. F (second interrogation video);[3]
- Ayvazyan's business. Dkt. 141 Ex. I.

Officers also confronted Ayvazyan in similar fashion about the PPP loan fraud investigation, focusing his interview on his sources of income, the Tarzana house, and his business's legitimacy. *See also* Ayvazyan Decl. ¶¶ 17-18. The officers' questions and comments throughout the video-recorded interview of both defendants constituted interrogation and were directed at uncovering evidence of PPP loan fraud. While the CBP officers bragged on video about using seemingly innocuous questions to build a rapport with their targets, the relevant statements came in response to interrogation on the topics noted above.

\* \* \*

---

[3] Terabelian was later questioned about Viktoria Kauichko. No evidence related to Kauichko was found during the initial processing and search of Terabelian. This evidence was not collected until a luggage search that took place at approximately 7:50 p.m. *See* Dkt. 152 Ex. 14. The CBP report of the event states: "During a baggage examination conducted on TERABELIAN's luggage, a Credit Card with the name 'Viktoria Kauichko,' was discovered inside of her wallet." Fraser Decl. Ex. D, Dkt. 141 Ex. D (under seal). The questioning of Terabelian regarding Viktoria Kauichko followed this search and began at approximately 8:40 p.m.

AYVAZYAN & TERABELIAN'S JOINT REPLY RE SUPPRESSION MOTIONS (DKTS. 135 & 136)

1    Therefore, advance *Miranda* warnings were required and the defendants'

2    requests for counsel required that no further interrogation proceed.  Because no

3    warnings were given and the questioning proceeded despite their demand for counsel,

4    their custodial airport statements must all be suppressed.[4]

5    **C.    Ayvazyan and Terabelian's Statements Were Involuntary**

6        *Miranda* and *Edwards* are not the end of the voluntariness inquiry.  *See*

7    *Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda*

8    warnings be given does not, of course, dispense with the voluntariness inquiry.").  It is

9    the government's burden to establish voluntariness.  *See United States v. Haswood*, 350

10   F.3d 1024, 1027 (9th Cir. 2003).  The government has failed to address this issue at all,

11   but the statements were not voluntary under all the circumstances.  *See* Dkt. 136 at 9-

12   11.  The defendants' statements should be suppressed on voluntariness grounds, apart

13   from *Miranda* and *Edwards*.

---

[4]The cases cited by the Opposition do not warrant a different result, as all of them involved routine questioning about border topics lasting less than two hours.  *See United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003) (ten minute interview about travel outside U.S.); *United States v. Bengivenga*, 845 F.2d 593, 594-95 (5th Cir. 1988) (two minutes); *United States v. Fernandez-Ventura*, 132 F.3d 844, 848 (1st Cir. 1998) (pat down search and "a few straightforward questions"); *United States v. Kiam*, 432 F.3d 524, 527 (3d Cir. 2006) (brief detention to question traveler about potential human smuggling); *United States v. Gupta*, 183 F.3d 615, 616-17 (7th Cir. 1999) (same).  In the most extreme case cited by the Opposition, a traveler was questioned for ninety minutes about the passport she was traveling on.  *United States v. FNU LNU*, 653 F.3d 144, 155 (2d Cir. 2011) (emphasizing that it was "crucial[]" that "all" questions related to admissibility to the United States and the in-use travel document).  As this Court has observed, such stops are routine and "generally not arrests" if they last less than two hours.  *Phillips v. U.S. Customs & Border Prot.*, No. 2:19-CV-6338-SVW-JEM, 2020 WL 4118010, at *3 (C.D. Cal. Mar. 9, 2020) (Wilson, J.) ("At the border, stops lasting less than two hours are generally not arrests").  The government does not cite a single case in which a U.S. citizen traveler was held for over ten hours and interrogated about domestic law enforcement topics.

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D. SUPPRESSION APPLIES TO BOTH THE COERCED STATEMENTS AND SEARCHES BASED ON COERCED CONSENT CONDUCTED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS

The government effectively concedes that suppression is appropriate but asks the Court to draw a line between the statements obtained as a result of its constitutional violations and the data seized as a result of its constitutional violations.  No such line exists.  The Court should suppress both the oral statements of Ayvazyan and Terabelian and the data that the government seized by coercing Ayvazyan and Terabelian into consenting to smartphone searches.  *See Kastigar v. United States*, 406 U.S. 441, 453 (1972) (holding that suppression based on the privilege against self-incrimination includes "compelled testimony, as well as evidence derived directly and indirectly therefrom"); *see also United States v. Patane*, 542 U.S. 630, 644 (2004) ("[T]he Court requires the exclusion of the physical fruit of actually coerced statements").

#### 1. Any Evidence Collected After Ayvazyan and Terabelian's Invocation of Counsel Must Be Suppressed

The data seized from the government's cell phone searches must be suppressed as a fruit of the government's constitutional violations.  Before any questioning or search of Ayvazyan and Terabelian occurred, they demanded that they be allowed to speak to an attorney.  Dkt. 135 at 5.  And before Ayvazyan provided the passcode to any phone, he again asked to consult a lawyer.  Dkt. 135 at 7.  Terabelian was also coerced into providing her phone and its passcode after she had asked to speak to a lawyer.  Dkt. 136 at 12-15.  The government would have never received this information—either the statements containing the passcode, or the coerced consent to search the phones—had they honored Ayvazyan and Terabelian's request for an attorney.

These facts mirror *United States v. Djibo*, 151 F. Supp. 3d 297, 307 (E.D.N.Y. 2015).  In that case, a traveler was subject to a border inspection conducted by CBP officers that rose to the level of custodial interrogation, but no *Miranda* warning was

11

1   given.  *Id.* at 306.  The government argued that, even if statements were suppressed, the

2   data seized from the traveler's iPhone should not be.  *Id.* at 307, 309 (arguing in part

3   based on a later-obtained warrant).  That is the same argument that the government

4   makes here.  Opp'n at 20.  The *Djibo* court correctly rejected this argument.

5       The court in *Djibo* held that, not only was providing the passcode to a phone a

6   "statement" that should be suppressed, but the searches of the phones themselves

7   conducted using those passcodes were fruit of the poisonous tree that were also subject

8   to suppression.  *Id.* at 308-10.  The court was especially concerned with the

9   government's attempt to access the defendant's phone after failing to provide a

10  *Miranda* warning, noting that the phone's passcode was the modern-day "key to a

11  man's kingdom" given the incredible amount of information that could be stored on a

12  phone.  *Id.* at 310.  Obtaining the passcode by violating the right to counsel was

13  equivalent to obtaining the underlying data and required suppression of the seized data.

14      A similar result is appropriate here.  If Ayvazyan and Terabelian had been

15  afforded the counsel they requested—and were entitled to under the Constitution—no

16  further questioning or searches would have occurred.  And the violation here goes

17  beyond *Miranda*, as the passcodes and searches were also the result of coercion.  As a

18  result, the fruits of searches conducted by CBP officers after Ayvazyan and

19  Terabelian's request for counsel must be suppressed in addition to any statements

20  made.  *See United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010)

21  (suppressing fruit of search conducted after statements made without *Miranda* warning,

22  in addition to the statements themselves).  The court in *Djibo* suppressed "any

23  documents obtained by virtue of [the defendant] providing his passcode" because that

24  passcode was provided during an un-Mirandized interrogation.  151 F. Supp. 3d at 310.

25  The same facts occurred here and the same result is appropriate.[5]

26

27  [5] Even under Eleventh Circuit precedent, the fruits of the phone searches would be suppressed under
    the Fifth Amendment as the products of self-incrimination compelled and coerced by the government.

28

## 2.  Even If a Routine Detention and Search Was Permissible, a Non-Routine Detention and Search Was Not

Nor can the border search exception save the government from the consequences of its constitutional violations.  The government detained two U.S. citizen travelers for over ten hours—separating them from each other and confiscating their cell phones so they could not contact a lawyer or other support system—and then interrogated each of them *repeatedly*, and searched each of them *repeatedly*.  The government refused these two U.S. citizen travelers' requests for a lawyer and told them that, not only would they miss their flight home, but the government could detain them without counsel *indefinitely* and that they were suspected of ties to terrorism (a flat lie).  This was not a "routine" border encounter in any sense of the word.

In response, the Opposition argues that "Defendants were being interviewed to determine their admissibility into the United States" and therefore, CBP officers could "require [them as] applicant[s] for admission into the United States to give statements to assist the officers in determining whether the applicant is admissible."  Opp'n at 22 (citing 8 U.S.C. § 1225(a)(5)).  It is absolutely true that routine questions to determine a traveler's admissibility into the United States or searches to administer customs laws such as declaration requirements for certain commercial merchandise or agricultural goods may occur without a *Miranda* warning.  But it is equally true that the Opposition's arguments about such *routine* questions and *routine* searches are a red

---

Compelling an accused person to make an incriminating testimonial communication violates the Fifth Amendment.  *Fisher v. United States*, 425 U.S. 391, 408 (1976).  "To succeed under a Fifth Amendment challenge on a motion seeking to suppress [the entry of a cellphone passcode and the fruits obtained therefrom], [the defendant must] show three things: (1) that the government compelled him to make a (2) testimonial communication or act and (3) that the testimonial communication or act incriminated him."  *McKathan v. United States*, 969 F.3d 1213, 1223–24 (11th Cir. 2020).  Under this framework, the fruits of the phone searches must be suppressed under the Fifth Amendment because the passcodes and the searches of the phones that resulted were a testimonial act done against the defendants' will.  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345–46 (11th Cir. 2012) ("decryption and production would be tantamount to testimony by Doe of his knowledge of the existence and location of potentially incriminating files; of his possession, control, and access to the encrypted portions of the drives; and of his capability to decrypt the files").

AYVAZYAN & TERABELIAN'S JOINT REPLY RE SUPPRESSION MOTIONS
(DKTS. 135 & 136)

herring because this border encounter—involving a ten-plus hour detention of U.S. citizens, repeated interrogations, and repeated searches—was not routine.

A seizure based on a Fourth Amendment exception cannot be "prolonged beyond the time reasonably required to complete the mission" that justifies the exception. *See Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015).   Instead, the government's seizure "remains lawful only 'so long as unrelated inquiries do not measurably extend the duration of the stop.'"  *Id.* at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)); *see also United States v. Martinez-Fuerte*, 428 U.S. 543, 566-67 (1976) (in context of immigration checkpoints, holding that "the principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop" because "any further detention [] must be based on consent or probable cause"). Border concerns might justify a routine interview or search without a Miranda warning, but they do not entitle the government to interrogate U.S. citizen travelers over and over again, to deny affirmative requests for counsel, or to coerce them into repeated searches over an extended period of time.

To the extent that any portion of this border encounter was "routine" and within "the time reasonably required to complete the mission"—which it was not because it occurred only as the result of a pretextual border stop and involved refusing requests for counsel—that "routine" portion ended before the government unconstitutionally seized data from the smartphones.  As described in the concurrently-filed Reply in Support of the Motion to Suppress Evidence from Pretextual Detention and Warrantless Searches, the purportedly "routine" interrogation and search of Ayvazyan[6] did not result in the seizure of any of the evidence described by the government.  Def.'s Mot. to Suppress Evid. Pretextual Det. and Warrantless Searches, Dkt. 130.  It was only after he was repeatedly interrogated and repeatedly searched over the course of the night that the

---

[6] It is unclear whether Terabelian provided the passcode during her first or second interrogation.  If the government could prove that she provided the passcode during the first interrogation then this paragraph would not apply to her.

government was able to coerce Ayvazyan into providing access to the telephones.  The purportedly "routine" portion of the secondary screening did not result in the seizure of any of the relevant evidence.  Therefore, the fact that routine screenings generally occur cannot be used to defend the government's constitutional violations that continued long after the conclusion of any such routine screening in this case.

The Opposition also notes that after it unconstitutionally interrogated Ayvazyan and Terabelian and seized and searched their devices, it secured a search warrant to search those devices again.  Notably, this argument was rejected by the Court in *Djibo*. *Djibo*, 151 F. Supp. 3d at 310 (rejecting argument that a search warrant was later obtained because the warrant "could have been . . . obtained before any searching occurred" but the government instead "sought to sidestep these constitutional guarantees").  After violating the constitution to seize data from an iPhone and the iPhone itself, the government should not be allowed to ask permission for the misconduct it already committed.  Both the searches of Ayvazyan and Terabelian's phones in the airport and later were products of the unconstitutional detention, interrogation, and seizures that occurred at the airport.  To permit the government to retroactively paper over its constitutional violation would eviscerate the basic purpose of suppression: to deter such constitutional violations from occurring at all.

### E.    The Government's Attacks on Ayvazyan's Credibility Fall Flat

In a last-ditch effort to distract from its shortcomings, the government resorts to attacking Ayvazyan's credibility (and simultaneously touches on an underlying flaw in its investigation).  Opp'n at 23.  But these attacks merely offer additional support for why Ayvazyan's request for counsel—which the government does not and cannot dispute—was made.  The government first observes that Ayvazyan had a previous conviction.  *Id.*  But Ayvazyan's past experience with the criminal justice system only makes it *more* likely that he understood his right to an attorney and the importance of asking for one.  The government also offers the conclusory accusation that Ayvazyan

15

"brazenly lie[d] to the Court," yet presents no evidence showing why any of Ayvazyan's statements were untrue.  Only one of the parties to this case has repeatedly violated the Constitution and withheld and destroyed video records of its constitutional violations, and that party is not Ayvazyan.  If any party's credibility is lacking, it is the government's.  The Court can dismiss the government's misplaced personal attacks and focus instead on the government's pervasive misconduct at every step of this case.

## III.   CONCLUSION

For the foregoing reasons, and those set forth in their motions and supporting papers thereto, Ayvazyan and Terabelian respectfully request that this Court suppress any evidence collected during their unlawful detention and interrogation at Miami International Airport on October 19-20, 2020, as well as the direct and indirect fruits of that evidence.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

16

Dated:   March 22, 2021                    Respectfully submitted,

                                           **STEPTOE & JOHNSON LLP**

                                           */s/ Ashwin J. Ram*
                                           Ashwin J. Ram (SBN 227513)
                                           *aram@steptoe.com*
                                           Michael A. Keough (SBN 327037)
                                           *mkeough@steptoe.com*
                                           Nicholas P. Silverman (*pro hac vice*)
                                           *nsilverman@steptoe.com*
                                           **STEPTOE & JOHNSON LLP**
                                           633 West Fifth Street, Suite 1900
                                           Los Angeles, CA 90071
                                           Telephone: (213) 439-9400
                                           Facsimile: (213) 439-9599

                                           *Counsel for Defendant Richard Ayvazyan*

                                           **BIENERT KATZMAN LITTRELL
                                           WILLIAMS, LLP**

                                           */s/ John L. Littrell*
                                           John L. Littrell (SBN 221601)
                                           *jlittrell@bklwlaw.com*
                                           Ryan V. Fraser (SBN 272196)
                                           *rfraser@bklwlaw.com*
                                           **BIENERT KATZMAN LITTRELL
                                           WILLIAMS, LLP**
                                           601 W. 5th Street, Suite 720
                                           Los Angeles, CA 90071
                                           Telephone: (213) 528-3400
                                           Facsimile: (949) 369-3701

                                           *Counsel for Defendant Marietta
                                           Terabelian*

17

AYVAZYAN & TERABELIAN'S JOINT REPLY RE SUPPRESSION MOTIONS
(DKTS. 135 & 136)

1

## **SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(i), the filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

AYVAZYAN & TERABELIAN'S JOINT REPLY RE SUPPRESSION MOTIONS
(DKTS. 135 & 136)