TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/3819
     Facsimile: (213) 894-6269/0141
     E-mail:   Scott.Paetty@usdoj.gov/Brian.Faerstein@usdoj.gov

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue NW, 3rd Floor
     Washington, DC 20530
     Telephone: (202) 320-0539
     Facsimile: (202) 514-0152
     E-mail:   Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-579(A)-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S *EX PARTE* APPLICATION FOR MODIFIED PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF BRIAN FAERSTEIN; EXHIBITS |
| v. | |
| RICHARD AYVAZYAN, aka "Richard Avazian" and "Iuliia Zhadko," MARIETTA TERABELIAN, aka "Marietta Abelian" and "Viktoria Kauichko," ARTUR AYVAZYAN, aka "Arthur Ayvazyan," and TAMARA DADYAN, MANUK GRIGORYAN, aka "Mike Grigoryan," and "Anton Kudiumov," ARMAN HAYRAPETYAN, EDVARD PARONYAN, | *[PROPOSED] MODIFIED PROTECTIVE ORDER FILED CONCURRENTLY HEREWITH*<br><br>*[PROPOSED] ORDER REGARDING CLAW-BACK OF CONFIDENTIAL DISCOVERY FROM DEFENDANTS FILED CONCURRENTLY HEREWITH* |

aka "Edvard Paronian" and
       "Edward Paronyan," and
VAHE DADYAN,

                Defendants.

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Scott Paetty and Brian Faerstein, and United States Department of Justice Trial Attorney Christopher Fenton, hereby applies <u>ex parte</u> for entry of a modified protective order pursuant to Federal Rule of Criminal Procedure 16(d)(1), replacing the protective order entered by the Court on December 11, 2020 (ECF 92).

This <u>ex parte</u> application is based upon the attached memorandum of points and authorities, the Declaration of Brian Faerstein and attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

The government submits this application on an <u>ex parte</u> basis due to the extraordinary nature of defendants R. Ayvazyan's and T. Dadyan's abuse of discovery and violations of the existing protective order in this case to commit new crimes, as described further herein and alleged in the first superseding indictment. The government has recently produced a significant amount of confidential information to both the original defendants and newly-charged defendants in this case and submits there is an urgent need to protect the vast amount

//

//

2

1  of PII and other sensitive third-party, witness, and victim

2  information from being misused for additional criminal purposes.

3   Dated: March 29, 2021          Respectfully submitted,

4                                  TRACY L. WILKISON
                                   Acting United States Attorney

5
                                   BRANDON D. FOX
6                                  Assistant United States Attorney
                                   Chief, Criminal Division

7

8                                        /s/
                                   _____
                                   SCOTT PAETTY
9                                  BRIAN FAERSTEIN
                                   Assistant United States Attorneys
10                                 CHRISTOPHER FENTON
                                   Department of Justice Trial Attorney

11
                                   Attorneys for Plaintiff
12                                 UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................2

      A.   Indictment Filed November 17, 2020......................2

      B.   Meet-and-Confers Regarding Protective Order.............3

      C.   Litigation Regarding Protective Order...................6

      D.   Protective Order Entered December 11, 2020..............8

      E.   Defendants' Commission of Additional Crimes in
           December 2020 Through February 2021 Using Discovery.....9

      F.   First Superseding Indictment Filed March 9, 2021.......13

III.  ARGUMENT.....................................................13

      A.   Defendants' Violations of the Court's Orders and
           Commission of New Crimes Constitute Good Cause for
           Modifying the Protective Order and Implementing
           Standard Safeguards....................................16

      B.   Defendants' Violations of the Court's Orders and
           Commission of New Crimes Constitute Good Cause to
           Enter an Order Clawing Back Confidential Discovery
           Materials from the Defendants..........................20

      C.   The Proposed Modified Protective Order Will Not Unduly
           Prejudice Defendants...................................20

      D.   The Terms of the Proposed Modified Protective Order
           are Reasonable and Narrowly Tailored to Address the
           Demonstrated Risks of Specific Injury..................22

      E.   An Ex Parte Order Is Appropriate and Necessary to
           Limit the Opportunities for Defendants to Commit New
           Crimes While on Pretrial Release and Cause Further
           Harm...................................................23

IV.   CONCLUSION...................................................24

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Cases**

Alderman v. United States,
  394 U.S. 165 (1969) ............................................... 14

Anderson v. Cryovac, Inc.,
  805 F.3d 1 (1st Cir. 1986) ....................................... 14

Cipollone v. Liggett Group, Inc.,
  785 F.2d 1108 (3d Cir. 1986) ..................................... 15

United States v. Concord Mgmt. & Consulting LLC,
  404 F. Supp. 3d 67 (D.D.C. 2019) ............................. 15, 22

United States v. Johnson,
  191 F. Supp. 3d 363 (E.D. Pa. 2016) ......................... 15, 22

United States v. Luchko,
  No. CRIM.A. 06-319, 2007 WL 1651139 (E.D. Pa. June 6, 2007) ...... 15

United States v. Ohiri,
  No. CR 19-0042-SVW, (C.D. Cal. Mar. 14, 2019) ............... 15, 22

United States v. Smith,
  985 F. Supp. 2d 506 (S.D.N.Y. 2013) ........................ passim

United States v. Torres,
  No. 20-cr-00418, 2020 WL 4500046 (D.N.J. Aug. 5, 2020) ....... 18, 19

United States v. Wecht,
  484 F.3d 194 (3d Cir. 2007) ................................. 14, 16

United States v. Workman,
  No. 1:18-CR-00020, 2019 WL 276843 (W.D. Va. Jan. 22, 2019) ... 15, 22

**Statutes, Rules, and Other Authority**

18 U.S.C. § 3771 ................................................... 18

Fed. R. Crim. P. 16(d) ........................................ passim

2 Fed. Prac. & Proc. Crim. § 262 .................................. 14

## I.    INTRODUCTION

Two of the defendants in this case -- Richard Ayvazyan ("R. Ayvazyan") and Tamara Dadyan ("T. Dadyan") -- have already violated the Court's existing protective order, violated their conditions of pretrial release, and been indicted for new crimes, namely money laundering and attempted bank fraud.  These new crimes involved the use of information relating to two of the dozens of fake, stolen, and synthetic identities available to defendants through the discovery materials the government produced to their respective counsel.  The government requests that the Court intervene and modify the operative protective order to mitigate the specific risk that defendants cause further injury by using discovery to commit more crimes.

At the outset of this case, the government sought an order that would have implemented standard safeguards for the handling of confidential discovery containing volumes of personally identifiable information ("PII") belonging to victims and other third-parties. The standard safeguards would have required defendants to review such confidential information under the supervision of their respective counsel.  Defendant R. Ayvazyan, joined by defendant T. Dadyan and the other two original defendants in this case (Marietta Terabelian and Artur Ayvazyan, or "A. Ayvazyan"), objected to any restriction that would limit their direct possession of discovery materials, including, for example, fraudulent driver's licenses and Social Security cards for their aliases.

Within days of the government's production of discovery, defendant R. Ayvazyan used identification information for one of the fake identities to set up online brokerage and cryptocurrency accounts and launder hundreds of thousands of dollars of stolen

COVID-19 disaster relief money.  Defendant T. Dadyan followed shortly thereafter, using the stolen identification information of a victim to attempt to impersonate that victim and access stolen COVID-19 disaster relief funds that had been frozen by a bank.

The recently unsealed first superseding indictment charges defendants R. Ayvazyan (five counts of concealment money laundering) and T. Dadyan (attempted bank fraud) with these additional crimes. However, defendants continue to possess the vast amount of confidential discovery materials in this case.  Defendants R. Ayvazyan's and T. Dadyan's violations of the existing protective order demonstrate the risk of specific injury that remains unchecked under the existing protective order and provide the Court with a compelling basis to implement standard discovery safeguards at this stage of the proceeding.  The need to do so is urgent given that dozens of fake, stolen, and synthetic identities and dozens of fake and stolen business names remain available to defendants to use to engage in further criminal activities.  As the government continues its investigation, the potential for additional criminal conduct is substantial, as reflected by the massive scope of the alleged conspiracy already charged in this case and the fact that a large amount of the criminal proceeds has yet to be traced.

## II.   STATEMENT OF FACTS

### A.   Indictment Filed November 17, 2020

On November 17, 2020, a grand jury indicted defendants R. Ayvazyan, Terabelian, A. Ayvazyan, and T. Dadyan with conspiracy to commit bank fraud and wire fraud as well as individual counts of bank fraud, wire fraud, and aggravated identity theft (the latter charge then against defendant R. Ayvazyan only).  (ECF 32.)  The charges

arose out of defendants' scheme to fraudulently obtain millions of dollars in COVID-19 disaster relief funds under the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan Program ("EIDL").  (Id.)

The indictment, which has since been superseded as described further below, alleged that the defendants used fake, stolen, and synthetic identities and fake and stolen business names to submit fraudulent loan applications, using their ill-gotten gains to purchase luxury residential properties and other high-end goods. (Id.)  In furtherance of the scheme, defendants made false statements and submitted fraudulent documents, including fake Internal Revenue Service ("IRS") forms and fake or stolen California drivers' licenses.  (Id.)  The indictment further alleged that the defendants controlled numerous bank accounts, in many cases using fake or stolen identities to establish and move fraudulent loan proceeds between those accounts.  (Id.)

### B.   Meet-and-Confers Regarding Protective Order

Prior to defendants' arraignment, on November 30, 2020, the government provided counsel for the original defendants with a proposed protective order that would govern the production and handling of discovery containing PII and Privacy Act information in this case.  (See ECF 65, Declaration of Julian L. André ("André Decl."), ¶ 14; see also ECF 63, Ex. C.)  The proposed protective order was based on the standard protective order adopted by the U.S. Attorney's Office in March 2020 after consultations with the Office of the Federal Public Defender.  (See id.)

The government informed counsel that it required the entry of a protective order prior to producing copies of discovery in large part

3

due to particularized concerns about the content of the discovery and the nature of the charges in this case, in addition to concerns about defendant R. Ayvazyan's and Terabelian's prior fraud convictions in this District.  See United States v. Ayvazyan et al., No. SA CR 11-180-CJC, Dkt. Nos. 55, 58, 90, 99.[1]

Specifically, the government detailed that the discovery contained significant amounts of sensitive and confidential information, including:

- PII belonging to real persons, including victims and other third-parties, among others (ECF 65, André Decl., ¶ 11.a.);

- unauthorized and counterfeit access devices relating to fake, stolen, and synthetic identities (id., ¶ 11.b.);

- financial records, including bank records, credit card records, and loan applications containing PII relating to real and synthetic identities (id., ¶ 11.c.);

- telephone and Internet service provider records containing third-party PII (id., ¶ 11.d.);

- credit reports relating to real persons (Id., ¶ 11.e.);

- records and information obtained from government agencies, including the IRS and California Employment Development Department (id., ¶ 11.f.); and

---

[1] Defendants R. Ayvazyan and Terabelian were convicted of conspiracy to commit bank fraud in 2012.  In the factual basis to his plea agreement, defendant R. Ayvazyan admitted that he defrauded three financial institutions by submitting fraudulent loan applications and false supporting documentation.  United States v. Ayvazyan et al., No. SA CR 11-180-CJC, Dkt. No. 58.  Defendant R. Ayvazyan also admitted that, in connection with a short sale of his residence to his mother, he caused his mother to submit a fraudulent letter to a financial institution falsely stating she was not related to the owner of the property.  Id.

4

- physical evidence and digital devices seized pursuant to search warrants that the government understood contained significant amounts of third-party PII. (Id., ¶ 12.)

The government explained that the PII and other sensitive information contained in the discovery included names, dates of birth, addresses, phone numbers, email addresses, Social Security numbers, drivers' license numbers, bank account numbers, credit card numbers, other bank and credit card account information, tax information, mobile identification numbers, and personal online passwords. (See generally id., ¶¶ 11-12.)

The government informed the defense that it could not produce such discovery without meaningful safeguards in place. (See ECF 63-6, Ex. E; ECF 65, André Decl., ¶ 2.) Such protections necessarily included restrictions on defendants' possession, outside of defense counsels' presence, of PII relating to third-parties or witnesses, or materials reflecting unauthorized and counterfeit access devices -- the possession of which could be used to commit new crimes. (Id.) Counsel for defendant R. Ayvazyan advised the government that it objected to the government's proposed protective order, including any provisions that would preclude defendant R. Ayvazyan from possessing discovery in this case. (ECF 65, André Decl., ¶ 15.)

Counsel for defendant R. Ayvazyan pointed to the purported "illogic" of the government's concerns about discovery abuse, stating, "under the government's own charging theory, [defendant R. Ayvazyan] and his alleged co-conspirators would also be the 'legitimate owners' of information in loan applications, most of which were submitted by Iuliia Zhadko and Viktoria Kauichko, who the government alleges to be [defendant R. Ayvazyan] and his wife. It

would be illogical to insist on protection of Zhadko's and Kauichko's information to the detriment of [defendant R. Ayvazyan's] defense -- especially when the government contends that these individuals do not exist." (ECF 63-5, Ex. D at 1 (citation omitted).) Putting aside the fallacy that the defendants could ever be "legitimate owners" of fake, stolen, or synthetic identities, defense counsel's lack of concern about adequate protections for information pertaining to the fake alias "Iuliia Zhadko" proved short-sighted. As explained further below and alleged in the first superseding indictment, as soon as he received discovery, defendant R. Ayvazan used information relating to "Iuliia Zhadko" to launder the fraudulent proceeds of COVID-19 disaster relief loans.

On December 2, 2020, the government and counsel for defendant R. Ayvazyan met and conferred regarding the government's proposed protective order, but were unable to reach an agreement as to the terms of the protective order.[2] (Id.)

**C.  Litigation Regarding Protective Order**

On December 7, 2020, the government and defendant R. Ayvazyan filed separate ex parte applications seeking relief, which each party opposed. (See ECF 63, 65, 73, 74.)

The government's ex parte application sought the Court's entry of a protective order substantially identical to the proposed order the government previously provided to the defense (with the exception

---

[2] On November 30, 2020, counsel for defendant Terabelian initially signed the government's stipulation for protective order, representing that he had conferred with his client regarding the proposed order and agreed to its terms. (ECF 50 at 8.) However, several days later, counsel for defendant Terabelian filed a notice indicating he was withdrawing the stipulation because he mistakenly thought the agreed-upon protective order was a different version apparently circulated by counsel to defendant R. Ayvazyan. (ECF 52.)

6

1  of an additional provision permitting the defendants to review
2  discovery over video-conferencing technology, accommodating a concern
3  raised by the defense).  (ECF 65; ECF 65-1.)  In support of its
4  application, the government summarized the serious potential for the
5  misuse of discovery under the specific circumstances of this case:
6  "if given unfettered access to this sensitive information, the
7  defendants may use these fake, stolen, and synthetic identities to
8  commit new crimes, such as obtaining new credit cards, applying for
9  new loans or other lines of credits, and opening new bank accounts to
10  launder criminal proceeds."  (ECF 73 at 7.)[3]

11      In his ex parte application, filed the same day, defendant R.
12  Ayvazyan alternatively proposed the entry of a protective order with
13  few restrictions that, as explained further below, would prove to be
14  fatally inadequate in this case.  (See ECF 63-2, Ex. A.)  Defendant
15  R. Ayvazyan challenged the government's purported "vague, speculative
16  averments of risk unsupported by particular threats," contending the
17  "the government cannot and will not be able to satisfy its heavy
18  burden that a specific prejudice or harm will occur in the absence of
19  a protective order."  (ECF 63 at 9-10.)  Counsel for defendant R.
20  Ayvazyan also vouched for their client, representing that defendant
21  "Ayvazyan has demonstrated that he can follow rules similar to the
22  ones that adhere to discovery."  (ECF 63 at 10.)  Counsel further
23  assured the Court by proffering their own ability to monitor and
24  ensure their client would not misuse the discovery in this case.

25

26      [3] In the interest of focusing the Court's attention on the new
   information regarding defendants' abuses of discovery, the government
27  does not repeat all of its arguments in its initial ex parte
   application or its opposition to defendant R. Ayvazyan's ex parte
28  application.  The government hereby incorporates by reference the
   information and arguments in those filings.  (ECF 65, 73.)

Counsel represented that defendant Ayvazyan "would be reviewing discovery through Steptoe's eDiscovery system, which will track every document he views.  It would be fundamentally illogical for Ayvazyan to misuse data or information when he knows that there will be an easily collectible record of his access."  (ECF 74 at 3.)

### D. **Protective Order Entered December 11, 2020**

On Friday, December 11, 2020, the Court entered the protective order proposed by defendant R. Ayvazyan.  (ECF 92.)  The protective order permitted defendants' direct "[a]ccess to and possession of the unredacted discovery materials" in this case.  (Id., ¶ 3.)  Other than requiring redaction of discovery materials that the defense provided to any third party "for the purpose of preparing their defense," the protective order contained only one condition restricting defendants' use of the sensitive information that would be directly in their possession:  "Use of the unredacted discovery materials is limited to the preparation of the defense and litigation of this case only."  (Id., ¶ 4.)

On Monday, December 14, 2020, pursuant to the Court's entry of the protective order, the government made its first production of copies of discovery to counsel for the original defendants.[4]  (See Declaration of Brian Faerstein ("Faerstein Decl."), ¶¶ 2-3, Ex. 1.) Within days, defendant R. Ayvazyan began using the discovery to commit new crimes -- in violation of the protective order's one limitation that the discovery be used for "the preparation of the

---

[4] The government made a small number of redactions relating to loans that were not the subject of the indictment but were the subject of the government's ongoing investigation.  The government did not redact PII.

defense and litigation of this case only" and in violation of the conditions of his pretrial release.  (ECF 92, ¶ 4.)

At the same time defendant R. Ayvazyan was abusing his access to unfettered discovery in this case to commit more crimes (described below), his counsel was preparing and publishing an article in the Daily Journal that portrayed themselves as "savvy defense attorneys" who had done "battle" with prosecutors over "unnecessarily restrictive [protective] orders."  Counsel offered "practice pointers" to the rest of the criminal defense bar based on what counsel characterized as their personal "success" in litigating the issue before this Court.  See "Advocating against 'one-size-fits-all' protective orders during the COVID-19 pandemic," Daily Journal, January 6, 2021, available at: https://www.dailyjournal.com/mcle/865-advocating-against-one-size-fits-all-protective-orders-during-the-covid-19-pandemic (last viewed March 29, 2021).

**E.  Defendants' Commission of Additional Crimes in December 2020 Through February 2021 Using Discovery**

As alleged in the original indictment, defendant R. Ayvazyan applied for loans using his fake alias -- "Iuliia Zhadko" -- and deposited the fraudulently obtained proceeds in bank accounts he opened using his alias's name.  (ECF 32 ¶¶ 1, 16.c, 23 (Overt Acts Nos. 12, 27-29, 33).)  Between October 20 and November 5, 2020, law enforcement arrested defendants R. Ayvazyan, Terabelian, A. Ayvazyan, and T. Dadyan, searched their residences, and seized evidence relating to their criminal activities.  (See Faerstein Decl., ¶ 1.) After law enforcement seized the evidence, the activity in the "Iuliia Zhadko" bank accounts stopped.  (See, e.g., id., ¶ 7, Ex. 3.)

9

In its first production of discovery on December 14, 2020, the government produced unredacted digital copies of different versions of fake California driver's licenses in the name of "Iuliia Zhadko":

 

(Id., ¶¶ 8-9, Exs. 4, 5.)[5]  The December 14 production also included unredacted digital copies of: (i) fake social security cards in the name of "Iuliia Zhadko"; (ii) handwritten notes listing retail bank and brokerage account numbers, login credentials, and pin numbers relating to aliases, addresses, and fake businesses used to apply for PPP and EIDL loans; and (iii) handwritten notes containing detailed information about PPP and EIDL loans submitted on behalf of fake and stolen businesses.  (Id., ¶¶ 10-13, Exs. 6, 7, 8, 9.)[6]

After the government produced these materials, defendant R. Ayvazyan used his alias "Iuliia Zhadko" to open additional accounts. For example, on December 21, 2020, "Iuliia Zhadko" opened an online

---

[5] The government has redacted the reproduced images of the digital copies of the driver's licenses here in compliance with Federal Rule of Criminal Procedure 49.1 and Local Criminal Rule 49.1-1.  The images also reflect counterfeit access devices, which should not be made publicly-available.  The government is moving to file unredacted versions of these images under seal concurrently herewith.

[6] The December 14 production also contained digital copies of fake identification documents for Terabelian's alias -- "Viktoria Kauichko" (a/k/a "Vicktoria Kauchko") -- including a fake or stolen U.S. Passport Card and a California driver's license picturing different women.  (Faerstein Decl. ¶¶ 14-15, Exs. 10, 11.)

brokerage account using the identifiers associated with the unique synthetic identity belonging to defendant R. Ayvazyan, including date of birth, social security number, home address, employer, employer's address, and email address.  (See First Superseding Indictment (ECF 154) ¶ 58; Faerstein Decl., ¶ 16, Ex. 12.)  Similarly, on January 7, 2021, "Iuliia Zhadko" opened a cryptocurrency account using a third version of a fake California driver's license containing the same information reflected in the driver's licenses the government produced three weeks earlier:



(ECF 154 ¶ 58; Faerstein Decl., ¶ 17, Ex. 13.)  As with the new online brokerage account, "Iuliia Zhadko" used the same identifiers associated with the unique synthetic identity belonging to defendant R. Ayvazyan to open the cryptocurrency account.  (See Faerstein Decl., ¶ 17, Ex. 13.)

In addition, following the government's first production on December 14, 2020, defendant R. Ayvazyan also used his alias "Iuliia Zhadko" to launder and spend hundreds of thousands of dollars in stolen COVID-19 disaster relief money.  (ECF 154, ¶¶ 58-59.)  For example, between December 21, 2020, and January 25, 2021, defendant R. Ayvazyan transferred over $300,000 in fraudulently obtained PPP and EIDL loan funds from a bank account for which "Iuliia Zhadko" was

sole signatory to the newly-opened online brokerage and
cryptocurrency accounts, as well as to another bank account in his
alias's name. (ECF 154, ¶ 58; see also Faerstein Decl., ¶ 7, Ex. 3.)

Defendant T. Dadyan similarly used information seized during the
residential search warrant executions but once again made accessible
through discovery in this case to commit additional crimes.

In particular, on December 17, 2020, the government made
available evidence seized pursuant to premises search warrants to
counsel for the original four defendants so that counsel could
inspect and copy the evidence, which counsel did. (See Faerstein
Decl., ¶ 4.) The evidence inspected by counsel included dozens of
fake and stolen identification documents, including fake and stolen
driver's licenses, Social Security cards, and credit cards seized
from defendants A. Ayvazyan's and T. Dadyan's residence. (See id.,
¶¶ 4-5, Ex. 2.) One of the fake driver's licenses was in the name of
A.D., which is a name defendants A. Ayvazyan and T. Dadyan used to
fraudulently obtain COVID-19 disaster relief funds. (See id.; see
also ECF 154, ¶¶ 24.c, 33 (Overt Act Nos. 62-64), 48-49, 60-64.) The
stolen money had been deposited in a bank account defendants A.
Ayvazyan and T. Dadyan fraudulently opened at a financial institution
(referred to as "Bank 8" in the first superseding indictment) using
A.D.'s name. (ECF 154, ¶¶ 60-64.) Defendants A. Ayvazyan and T.
Dadyan also used that account to receive other fraudulently obtained
COVID-19 disaster relief funds. (Id.)

After the government made the dozens of fake and stolen
identification documents available to counsel for inspection and
copying, defendant T. Dadyan used this identification information to
commit a new crime. For example, on or around January 22, 2021, Bank

8 froze the account, which at that time contained over $300,000 in criminal proceeds.  (Id.)  In an effort to defraud the bank and fraudulently obtain the funds, defendant T. Dadyan repeatedly telephoned the bank, falsely claiming she was A.D. and that the stolen money belonged to her.  (Id.)

### F.   First Superseding Indictment Filed March 9, 2021

On March 9, 2021, a grand jury returned a first superseding indictment that significantly expands the charges in this case.  The new charges include five counts of concealment money laundering against defendant R. Ayvazyan relating to the above-described crimes involving the use of the alias "Iuliia Zhadko" that he committed while on pretrial release.  (ECF 154, ¶¶ 58-59.)  The first superseding indictment also charges defendant T. Dadyan with one count of attempted bank fraud for the conduct described above involving the use of A.D.'s identity, which she also committed while on pretrial release.  (Id., ¶¶ 60-64.)

In addition, the first superseding indictment substantially expanded the scope of the charged conspiracy from at least 35 fraudulent loan applications to over 150 seeking over $21.9 million in COVID-19 disaster relief funds.  (Id., ¶ 32.)  The first superseding indictment also adds four new defendants, charges all defendants with conspiracy to commit money laundering, and includes aggravated identity theft counts against all of the original four defendants and two of the new defendants.  (See generally id.)

## III. ARGUMENT

"[T]he trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to

13

inspect." <u>Alderman v. United States</u>, 394 U.S. 165, 185 (1969). Federal Rule of Criminal Procedure 16(d) provides the Court the mechanism to enter "protective and modifying orders" in carrying out this role:  "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  Fed. R. Crim. P. 16(d)(1).  The Court maintains "ample power" and "vast" discretion in fashioning relief under Rule 16(d)(1) upon a showing of good cause.  <u>See</u> Federal Practice and Procedure (Wright & Miller), 2 Fed. Prac. & Proc. Crim. § 262 (4th ed.), Oct. 2020; <u>see also</u> Fed. R. Crim. P. 16, Adv. Comm. Notes, 1966 Amend. ("Control of the abuses of discovery is necessary if it is to be expanded in the fashion proposed in" amendments broadening "the scope of pretrial discovery" under Rule 16).

While the Ninth Circuit Court of Appeals has not spoken directly to what constitutes "good cause" under Rule 16(d)(1), courts generally find good cause "is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." <u>United States v. Wecht</u>, 484 F.3d 194, 211 (3d Cir. 2007).  That is, a "finding of harm 'must be based on a particular factual demonstration of potential harm, not on conclusory statements.'" <u>United States v. Smith</u>, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013) (quoting <u>Anderson v. Cryovac, Inc.</u>, 805 F.3d 1, 8 (1st Cir. 1986)) (citation omitted).  In addition, courts must "balance several interests, including whether dissemination of the discovery materials inflicts hazards to others, and whether the imposition of the protective order would prejudice the defendant." <u>Smith</u>, 985 F. Supp. 2d at 523 (citations and internal quotation marks omitted).

1    Protective orders governing large amounts of discovery
2    containing sensitive information are appropriate upon a showing of
3    good cause.  See, e.g., United States v. Concord Mgmt. & Consulting
4    LLC, 404 F. Supp. 3d 67, 74 (D.D.C. 2019) ("district courts have
5    issued 'umbrella' protective orders to manage large amount[s] of
6    sensitive information") (citation omitted); Smith, 985 F. Supp. 2d at
7    546 (finding it "consistent with the proper allocation of evidentiary
8    burdens for the [C]ourt to construct a broad 'umbrella' protective
9    order upon a threshold showing by [the Government] of good cause")
10   (quoting Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1122 (3d
11   Cir. 1986)); United States v. Luchko, No. CRIM.A. 06-319, 2007 WL
12   1651139, at *11 (E.D. Pa. June 6, 2007) ("Given the large-scale
13   nature of the discovery involved in this case and the attendant
14   monumental burden on the government involved in reviewing and making
15   redaction decisions with respect to all of these documents, an
16   umbrella protective order is appropriate.").

17   Moreover, "[c]ourts regularly require sensitive discovery to be
18   viewed in a particular location in the presence of counsel, and only
19   after viewers agree (by signing a memorandum of understanding) not to
20   misuse the discovery."  Concord Mgmt., 404 F. Supp. 3d at 77
21   (collecting cases); see also, e.g., United States v. Johnson, 191 F.
22   Supp. 3d 363, 374 (E.D. Pa. 2016) ("[R]equiring the Defendants to
23   review the protected documents in the presence of counsel in no way
24   impairs the effectiveness of their proffered defenses."); United
25   States v. Workman, No. 1:18-CR-00020, 2019 WL 276843, at *2 (W.D. Va.
26   Jan. 22, 2019) (finding good cause for protective order restricting
27   defendant's access to discovery only in counsel's presence where,
28   among other things, indictment provided "probable cause to believe

1  [defendant] intimidated a confidential informant and altered or

2  destroyed records, making it appropriate to limit his unsupervised

3  access to discovery materials").

4    **A.  Defendants' Violations of the Court's Orders and Commission
         of New Crimes Constitute Good Cause for Modifying the**

5    **Protective Order and Implementing Standard Safeguards**

6    At this stage of the case, good cause for the government's

7  proposed modified protective order is evident based on defendants'

8  abuse of the discovery process and breach of the Court's trust.

9    Following the government's production of discovery, defendants

10 R. Ayvazyan and T. Dadyan used that information to continue their

11 criminal scheme.  There is nothing stopping them or the other

12 defendants in this case -- some of whom are family members and all of

13 whom are charged in the same criminal scheme rooted in the misuse of

14 fake, stolen, and synthetic identities -- from continuing to do the

15 same.  Indeed, the government continues to investigate other

16 allegations of misuse of discovery to commit new crimes.

17   These are not "conclusory statements;" the grand jury's findings

18 of probable cause of defendants R. Ayvazyan's and T. Dadyan's post-

19 indictment and post-discovery money laundering and attempted bank

20 fraud offenses concretely support a "particular factual demonstration

21 of potential harm," as well as proof of actual harm already done.

22 Smith, 985 F. Supp. 2d at 523.  There can be no more "clearly defined

23 and serious injury," Wecht, 484 F.3d at 211, than the misuse of

24 sensitive discovery materials as a sword to commit additional crimes

25 instead of as a shield to defend oneself against allegations of

26 crimes already committed.  Defendants R. Ayvazyan's and T. Dadyan's

27 violations of the existing protective order -- not to mention their

28

violations of pretrial bail conditions[7] -- provide more than sufficient good cause for the Court to exercise its broad discretion under Rule 16(d)(1).  Indeed, one of the core principles underlying the Court's critical role under Rule 16(d)(1) is to "control . . . abuses of discovery" in consideration of the potential expansive nature of discovery under Rule 16.  Fed. R. Crim. P. 16, Adv. Comm. Notes, 1966 Amend.  Defendants' use of discovery information to commit new crimes and enrich themselves further using the stolen money that is the subject of the indictments qualifies as one such blatant abuse of discovery.

The other previously identified rationales that the government proffered in support of its proposed protective order are similarly compelling in light of defendants' discovery abuses.  The discovery contains extensive PII and sensitive information relating to victims and other third-parties.  The original defendants continue to possess these unredacted materials, including discovery relating to more than one hundred additional loans charged in the first superseding indictment.  And the newly-charged defendants will soon, if they have not yet received them from defense counsel, possess these discovery materials as well.  (See Faerstein Decl., ¶ 6.)  All defendants are alleged to have conspired and worked together in a sweeping fraudulent scheme to use fake, stolen, and synthetic identities in

---

[7] In addition to the standard condition that both defendants not commit any federal, state, or local crimes, defendant Ayvazyan's conditions of pretrial release include, among other things, that he not use or access any bank accounts where he is not a signatory in his legal name.  (ECF 47-48.)  Defendant T. Dadyan similarly is prohibited from "us[ing] or possess[ing] any identification, mail matter, access device, or any identification-related material other than in [her] own legal or true name without prior permission from [Pretrial Services]," including not using a bank account that is not in her true name.  (ECF 20.)

submitting over 150 fraudulent loan applications and laundering the proceeds they reaped from their fraud.  (<u>See generally</u> ECF 154.)  At least two of the defendants have made clear the filing of criminal charges has not deterred their continuation of the fraud and use of the underlying discovery for criminal purposes.

On this record, the government's proposed modified protective order is necessary to preserve the security and protect against the misuse of the PII and sensitive information of victims and other third-parties.  The need to safeguard the privacy interests of victims, consistent with the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, itself is sufficient good cause supporting the Court's entry of a protective order as to confidential victim information. The CVRA "provides victims of crime with a collection of rights including the 'right to be reasonably protected from the accused' and the 'right to be treated with fairness and with respect for the victim's dignity and privacy.'  Courts around the country have relied on the CVRA to find good cause for entry of protective orders." <u>United States v. Torres</u>, No. 20-cr-00418, 2020 WL 4500046, at *4 (D.N.J. Aug. 5, 2020) (collecting cases).

As for the scope of the proposed modified protective order, the order should apply to all discovery designated as confidential under the terms of the order and apply to all eight defendants.  The first superseding indictment charges only defendants R. Ayvazyan and T. Dadyan with criminal conduct following the production of discovery in this case.  However, their spouses (defendant Terabelian and defendant A. Ayvazyan, respectively) also are charged as defendants, as is at least one other believed-to-be relative of T. Dadyan (defendant Vahe Dadyan).  Moreover, the other newly-charged

1    defendants (defendants Manuk Grigoryan, Arman Hayrapetyan, and Edvard

2    Paronyan) all are alleged to have participated in the same close-knit

3    bank and wire fraud and money laundering conspiracies in this case,

4    including the transfer of fraudulent loan proceeds between bank

5    accounts controlled by the defendants and for the benefit of each

6    other.  (See generally ECF 154.)

7        Other common threads in the manner and means of the conspiracy

8    raise similar acute concerns about several of the newly-charged

9    defendants having direct possession of the sensitive information in

10   the discovery.  For instance, similar to defendant R. Ayvazyan's use

11   of the fake alias "Iuliia Zhadko" to submit fraudulent loan

12   applications and set up bank accounts to control the fraudulent loan

13   proceeds, defendant Grigoryan used the alias "Anton Kudiumov" to

14   apply for fraudulent loans and set up a bank account for laundering

15   the proceeds.  (See, e.g., ECF 154, ¶¶ 26.c, 31, 33 (Overt Act Nos.

16   45-46, 48-49), 46-47.)  And similar to the aggravated identity theft

17   charges against the four original defendants and defendant Grigoryan,

18   defendant Hayrapetyan is alleged to have stolen at least two

19   different real victims' personal and business identities to set up

20   fraudulent bank accounts in their businesses' names and submit

21   fraudulent loan applications in their personal names.  (See, e.g.,

22   id., ¶¶ 27.a, 27.b, 27.c, 31, 33 (Overt Act Nos. 1-7), 50-51.)

23       In sum, good cause exists for the Court to enter the

24   government's proposed modified protective order.  The proposed order

25   will prevent defendants from directly possessing any confidential

26   discovery materials, without supervision of counsel, to use for their

27   own criminal devices.  The modified protective order also will

28   preserve the privacy and security of the significant amounts of PII

1   and other sensitive information of third-parties, including victims,

2   while still allowing defendants access to the materials through their

3   counsel in preparation of their defense as discussed below.

4       **B.   Defendants' Violations of the Court's Orders and Commission**
        **of New Crimes Constitute Good Cause to Enter an Order**

5       **Clawing Back Confidential Discovery Materials from the**
        **Defendants**

6

7       The government also asks the Court to enter an order under Rule

8   16(d)(1) requiring counsel for the defendants to take possession of

9   any and all confidential discovery materials they previously provided

10  to their respective clients.  In balancing the relative interests,

11  continuing to allow defendants unsupervised access to discovery

12  materials presents a demonstrable threat of "inflict[ing] hazards to

13  others."  Smith, 985 F. Supp. 2d at 523.  At least two of the

14  original defendants have shown how the discovery materials can be

15  used to commit new crimes using the names "Iuliia Zhadko" and A.D.

16  And dozens of additional fake, stolen, and synthetic identities

17  remain accessible to defendants to use to engage in further criminal

18  activity, as well as dozens of fake and stolen business names.  Good

19  cause thus exists to enter an order clawing back all confidential

20  discovery materials from the defendants.

21      **C.   The Proposed Modified Protective Order Will Not Unduly**
        **Prejudice Defendants**

22

23      The proposed modified protective order will not unduly prejudice

24  the defense in preparation for trial in this case.  Defendants will

25  continue to have the opportunity to review discovery, either from

26  home through any number of video-teleconferencing platforms (e.g.,

27  Zoom, WebEx, Microsoft Teams, Blue Jeans), or in their respective

28

counsel's offices.[8]  Entry of the proposed modified protective order will not delay such review in any respect.  Moreover, defendants will continue to have the opportunity to review a copy of the discovery materials that has not been redacted to remove PII, which will make preparation for trial easier than if the government were to produce a copy that was redacted to remove PII (which is voluminous in this case).  Defendants therefore will be able to continue to participate fully in all aspects of their defense.

In any event, in light of recent developments, the balancing of interests has shifted drastically.  At this stage, any argument that the proposed modified protective order would unfairly inconvenience defendants such that they could not adequately prepare for trial should be met with skepticism.  The original four defendants never articulated a specific reason as to why it would be unfair to them if they were not permitted to physically possess a copy of discovery that included fake and stolen driver's licenses, Social Security cards, credit cards, bank account numbers and login credentials, and other highly sensitive materials that can be used to commit further crimes.  And, in hindsight, defendants' protestations appear to have been pretext.  Defendants' violation of the Court's orders and breach of trust in this case necessitate more effective safeguards,

---

[8] Only one of the eight defendants -- Arman Hayrapetyan, who is one of the newly-charged defendants and was taken into custody on March 25, 2021 -- is currently detained pending trial in this case. As previously noted, defendant Hayrapetyan is alleged to have stolen the identities of at least two people and two businesses in furtherance of the fraudulent scheme.  (See, e.g., id., ¶¶ 27.a, 27.b, 27.c, 31, 33 (Overt Act Nos. 1-7), 50-51.)  The government understands that defense counsel currently are permitted to conduct client meetings through both in-person meetings and, where necessary, video-teleconferencing technology at the Metropolitan Detention Center, where defendant Hayrapetyan is believed to be housed.

including requiring that defense counsel maintain sole custody of the confidential discovery materials. See Johnson, 191 F. Supp. 3d at 374 ("[G]iven the sensitive nature of the covered documents, Defendants' 'just trust us' approach is simply inadequate as a matter of law."). Such conditions requiring defendants review discovery with counsel are not uncommon notwithstanding defendants' typical arguments regarding prejudice.[9] See, e.g., Concord Mgmt., 404 F. Supp. 3d at 77; United States v. Johnson, 191 F. Supp. 3d at 374; United States v. Workman, 2019 WL 276843, at *2.

### D. The Terms of the Proposed Modified Protective Order are Reasonable and Narrowly Tailored to Address the Demonstrated Risks of Specific Injury

The government's proposed protective order is the same in nearly all material respects as the standard protective order the government initially sought, and which is, notably, fundamentally the same order that is the product of negotiation with the Federal Public Defender's Office and which is used throughout this District in criminal cases. (See ECF 65-1; ECF 65, André Decl., ¶ 14.) Rather than repeat the

---

[9] Defendants R. Ayvazyan's and T. Dadyan's violations of this Court's orders and unremitting criminal conduct have given the government significant cause for concern about their continued review of PII in this case, even through their counsel. Indeed, given the assurances made by counsel for defendant R. Ayvazyan in response to the risks identified by the government in its initial application, the government's concerns now extend to counsel's ability to monitor their client and prevent his misuse of discovery. (ECF 74 at 3.) Nonetheless, the government is not at this stage seeking an order barring defendants from even having access to confidential discovery, as courts have found appropriate in certain cases. See, e.g., United States v. Concord Mgmt. & Consulting LLC, 404 F. Supp. 3d 67, 77 (D.D.C. 2019) (collecting cases where "courts have outright barred counsel from discussing certain discovery with their clients") (emphasis in original). However, should the government become aware of continuing abuses of discovery, including for the purpose of committing new crimes, following the entry of the proposed modified protective order, the government reserves its rights to seek additional restrictions on the discovery in this case under Federal Rule of Criminal Procedure 16(d)(1).

22

explanation as to why these terms are reasonable and tailored in light of the risks of specific injury posed by the defendants in this case, the government expressly incorporates its initial application by reference.  (See ECF 65, André Decl.)[10]  The lone material addition to the initial protective order is to include one additional category of confidential information, defined as "CI Materials," which is reasonable and tailored to address the unique risks presented by the production of information provided by confidential informants or cooperating witnesses who may testify at trial.[11]

**E.   An Ex Parte Order Is Appropriate and Necessary to Limit the Opportunities for Defendants to Commit New Crimes While on Pretrial Release and Cause Further Harm**

The government submits this application on an ex parte basis for at least three reasons.

First, the Court should take immediate action to prevent the original defendants from using the discovery materials to commit new crimes, including further laundering and spending of the stolen disaster relief money.  This is a demonstrated risk of specific injury, and that risk is ongoing due to the sheer number of fake, stolen, and synthetic identities and fake and stolen business names available to the original defendants, and accompanying bank accounts. Defendants R. Ayvazyan and T. Dadyan have already been indicted for using two of the dozens of the fake, stolen, and synthetic identities

---

[10] The terms of the proposed modified protective order, including the conditions precluding the defendants from possessing sensitive personal and financial information, also are consistent with prior protective orders entered by this Court.  See, e.g., Protective Order, United States v. Ohiri, No. CR 19-0042-SVW, Dkt. 35 (C.D. Cal. Mar. 14, 2019).

[11] The government anticipates producing such discovery upon the Court's entry of the proposed modified protective order or imposition by the Court of otherwise adequate measures to protect any confidential informants in this case.

1   contained in the discovery materials.  And the government's

2   investigation into the commission of even more crimes is ongoing.

3       Second, whereas the original indictment concerned 35 PPP and

4   EIDL loans, the first superseding indictment concerns over 150 PPP

5   and EIDL loans, and the government recently provided counsel for the

6   original defendants a substantial volume of new discovery materials

7   relating to these new loans.  This presents additional opportunities

8   for the original defendants to cause more harm.

9       Third, this past week, the government produced a substantial

10  volume of discovery to counsel for the four newly-added defendants,

11  who pose the same risks and threats of harm as the original

12  defendants.

13      Thus, while the government complies with its discovery

14  obligations in a timely and diligent manner, the significant risk of

15  continued discovery abuses and the commission of new crimes increases

16  every day under the current protective order.  The Court's

17  intervention on an _ex parte_ basis is necessary to implement standard

18  safeguards over the discovery through the government's proposed

19  modified protective order.

20  **IV.  CONCLUSION**

21      For the foregoing reasons, the government respectfully requests

22  that this Court (1) enter the government's proposed modified

23  protective order filed concurrently herewith; and (2) enter the

24  proposed order filed concurrently herewith requiring counsel to all

25  defendants to take possession of all discovery designated as

26  confidential under the existing protective order, whether in hard

27  copy or digital format, that counsel previously provided to

28  defendants.