Ashwin J. Ram (SBN 227513)
aram@steptoe.com
Michael A. Keough (SBN 327037)
mkeough@steptoe.com
Nicholas P. Silverman (*pro hac vice*)
nsilverman@steptoe.com
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>RICHARD AYVAZYAN, *et al.*,<br><br>    *Defendants.* | Case No. 20-cr-579 (SVW)<br><br>**DEFENDANT RICHARD AYVAZYAN'S RESPONSE TO GOVERNMENT'S *EX PARTE* APPLICATION FOR MODIFIED PROTECTIVE ORDER (DKT. 219)**<br><br>Hon. Stephen V. Wilson |

**TABLE OF CONTENTS**

I.   THE GOVERNMENT'S APPLICATION IS AN END-RUN AROUND THIS COURT'S DISCOVERY ORDER ................................................................. 3

II.  THE "ABUSE OF DISCOVERY" ALLEGED BY THE GOVERNMENT IS A COMPLETE FICTION ........................................................................................ 5

   A.   Ayvazyan is Not Responsible for the December 2020 Transfers from JPMC Account 5268 .............................................................................. 6

   B.   There is No Nexus Between the December 2020 Transfers and Any Party's Use of Discovery ............................................................................. 7

III. THIS COURT HAS ALREADY REJECTED AN *EX PARTE* APPLICATION BY THE GOVERNMENT ATTACHING ESSENTIALLY THE SAME PROTECTIVE ORDER .................................................................... 8

IV.  THE APPLICATION SHOULD ALSO BE DENIED BECAUSE THE GOVERNMENT HAS ABUSED THE *EX PARTE* PROCEDURE ..................... 11

V.   CONCLUSION ................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Napue v. Illinois*,
    360 U.S. 264 (1959) .................................................................................................. 7

*United States v. Concord Mgmt. & Consulting LLC*,
    404 F. Supp. 3d 67 (D.D.C. 2019) ..................................................................... 10, 11

*United States v. Garcia*,
    730 F. Supp. 2d 1159 (C.D. Cal. 2010) ..................................................................... 5

*United States v. Roybal*,
    566 F.2d 1109 (9th Cir. 1977) ................................................................................... 4

*United States v. Schwartz*,
    857 F.2d 655 (9th Cir. 1988) ..................................................................................... 4

*United States v. Yunis*,
    867 F. 2d 617 (D.C. Cir. 1989) ................................................................................ 11

# RESPONSE TO GOVERNMENT'S *EX PARTE* APPLICATION

The government is—to put it mildly—in a pickle. Trial in this case is approaching on May 4, 2021. The Court-ordered discovery deadline passed on March 15, 2021. The defense has filed several suppression motions detailing the government's misconduct during so-called border stops and search warrants executed as if they were military raids. The defense is prepared to proceed with a trial on May 4, 2021, but it remains clear that the government is not.

Running out of options, the government has now engaged in blatant gamesmanship by dumping a 29-page *ex parte* application (accompanied by over a hundred pages of exhibits and other supporting papers) in the middle of the night alleging that Ayvazyan and others engaged in discovery misconduct months earlier. The application invites the Court to revisit its prior discovery orders and grant the government the relief that it sought—and was denied—in December 2020. The Court should decline this invitation and deny the application for four principal reasons:

*First,* the Court should enforce its existing discovery orders and penalize the government for assuming that the Court-ordered discovery deadlines are mere suggestions. The government flouted the Court's orders by dumping ninety percent of its discovery on the defendants at the deadline instead of "mak[ing] every effort to produce outstanding discovery well in advance of [March 15]" and by continuing to produce months-old discovery after the deadline has already passed. Indeed, in a recent letter, the government abandoned all pretext that it would comply with the Court's discovery deadline by admitting that it had no projected date by which it could produce information from devices seized before the November 2020 indictment. The government's failure to comply with the Court's discovery orders should not be tolerated and this red herring application should not relieve the government of its discovery obligations ahead of the May 4, 2021 trial date.

1

RESPONSE TO *EX PARTE* APPLICATION – MODIFIED PROTECTIVE ORDER

*Second,* the so-called discovery misconduct that the government alleges is a complete fiction. The government's accusation that Richard Ayvazyan was the person behind the Zhadko internet brokerage and cryptocurrency accounts is unsupported by the very evidence it cites. And even if *someone* used Zhadko's identity to open these accounts, the government presents no evidence that the information related to Zhadko was *taken from discovery produced in this case*. The government also appears to misrepresent that the grand jury was presented with evidence of *discovery misconduct* to the extent it alleged that Ayvazyan was involved in the transactions in the superseding indictment. The superseding indictment makes no reference to the use of any discovery and the government has yet to produce any grand jury transcripts supporting such a strained proposition.[1]

*Third,* the Court should not enter essentially the same protective order that the government tried and failed to receive through an earlier *ex parte* application. Putting aside the government's unsupported and wishful thinking, as well as its continued misconduct (including its open defiance and blatant disregard with respect to the Court's discovery order), there are no new circumstances that warrant a change to the existing protective order (as the "discovery" misconduct alleged by the government is a complete fiction). Moreover, the government's overly-restrictive protective order denies the defendants from possessing *any* discovery and creates an unconstitutional burden that prevents them—particularly under the circumstances of this case—from assisting in their own defense.

*Fourth,* the government has utterly failed to show why its application should be heard on an *ex parte* basis. The government did not file its application as soon as the requested relief became necessary—instead, it waited *months* after the alleged conduct to file the motion. It provided no notice to the defendants and made no attempt to meet and confer. In short, conduct that supposedly happened months ago does not require

---

[1] Ayvazyan has previously requested the grand jury transcripts and exhibits and hereby reiterates that request. *See* Dkt. 133-1 at 002; see also id. at 007-008, 012.

that immediate relief be granted *now*. This improper use of the *ex parte* procedure is an independent ground to deny the application entirely.

I.  **THE GOVERNMENT'S APPLICATION IS AN END-RUN AROUND THIS COURT'S DISCOVERY ORDER**

At bottom, the government's application is a thinly-veiled attempt to get out from under the Court's December 22, 2020 discovery order (Dkt. 105). The Court ordered the government to "expeditiously comply with its discovery obligations" and "produce all outstanding discovery, including documentary and physical evidence it intends to rely on in its case in chief" by March 15, 2021 at the latest. Dkt. 105. The Order further directed the government to "make every effort to produce outstanding discovery well in advance of this deadline." *Id.* To the disappointment and prejudice of the defendants, the government has failed to comply with this Order at every turn. To say that the government gamed discovery and sandbagged the defense is an understatement. On Friday, March 12, 2021, for example, the government unloaded on the defense a 242,753 page document dump just before the Court's Monday discovery deadline. This document dump was *seven times* larger than any previous government production in this case and represented *ninety percent* of the government's production up to that time, despite the Court's admonition to produce discovery "well in advance" of the March 15, 2021 deadline. *See* March 12, 2021 Ltr. from S. Paetty (Ex. 1).[2] The government implied that it planned to continue producing documents, claiming that it was "rolling production of these additional discovery materials out beginning on the same day that the first superseding indictment was unsealed." *Id.* The government claimed that it made this production "[r]ather than wait for the Court to enter a new scheduling order," despite the fact that the Court has given no indication that the government has somehow been excused from complying with this Order.

---

[2] "Ex." refers to the Exhibits attached to the Declaration of Ashwin J. Ram dated March 31, 2021, and filed concurrently with this response.

3
RESPONSE TO *EX PARTE* APPLICATION – MODIFIED PROTECTIVE ORDER

1       Nor has this document dump on the eve of the discovery cut-off stopped the
2 government from flouting the discovery order to produce documents after the deadline
3 that could have been produced long before March 15.  For example, on March 18,
4 2021, the government produced additional discovery to defendants, including bank
5 statements from two different banks for time periods well before the close of discovery,
6 a firearm history report dated October 27, 2020, and a correction to a report that was
7 originally written on November 5, 2020.  *See* March 18 Ltr. from S. Paetty (Ex. 2).  On
8 March 26, 2021, the government made yet another belated production.  *See* March 26
9 Ltr. from S. Paetty (Ex. 3).  And for the first time, the government informed the defense
10 that it could not even provide a date certain by which information for several electronic
11 devices seized during searches conducted *on November 5, 2020*—including three
12 routers, two modems, one cable box, and two GPS devices—would be produced.
13       Facing a May 4 trial date, realizing its failures to comply with the court's
14 discovery orders, and recognizing its own misconduct that formed the basis for the
15 defendants' several suppression motions, the government now brings this eleventh-hour
16 application in the hopes that the Court will revisit its past orders and grant the
17 government relief that it has already been explicitly denied.  The Court should decline
18 the invitation and enforce its own discovery orders.
19       The Court undoubtedly has the power to enforce its own discovery orders by
20 excluding evidence or testimony disclosed by the government in violation of a
21 discovery order.  *See United States v. Roybal*, 566 F.2d 1109, 1110–11 (9th Cir. 1977)
22 (reversing conviction, emphasizing that the provision of late discovery in violation of a
23 specific order resulted in "unfairness and potential prejudice to the defendant" as well
24 as "unfairness and discourtesy to the trial judge"); *United States v. Schwartz*, 857 F.2d
25 655, 659 (9th Cir. 1988) (reaffirming that "the district court may exclude documents or
26 witnesses" where the government "fail[s] to comply with the court's pretrial or
27 discovery orders.").
28

The government's blatant disregard of the Court's order mirrors the behavior at issue in *United States v. Garcia*, 730 F. Supp. 2d 1159 (C.D. Cal. 2010). In that case, the government sought to admit evidence that it did not produce to defendant by the discovery deadline set by the Court. *Id.* at 1168. The government argued that "so long as it complied with Rule 16 of the Federal Rules of Criminal Procedure, 'reliance on the Court's Discovery Order to establish a discovery violation is inapposite.'" *Id.* The Court soundly rejected that argument, finding it "troubling inasmuch as it implies that the government believes it has discretion to determine whether it will comply with court orders." *Id.* After detailing the Ninth Circuit's long history of excluding evidence as a remedy for failure to comply with a discovery order, the Court granted the defendant's motion *in limine* to exclude documents produced after the close of discovery. *Id.* at 1169.

The government's actions here similarly show that it believes "it has discretion to determine whether it will comply with court orders." *Id.* The government has already made two productions after the close of discovery and indicated its intent to make additional productions. The Court should not permit this blatant failure to comply with its order and should see the government's most recent application for exactly what it is: an attempt by the government to seek relief from the Court's discovery orders. Those orders were sound and should be enforced.

## II. THE "ABUSE OF DISCOVERY" ALLEGED BY THE GOVERNMENT IS A COMPLETE FICTION

Ayvazyan is subject to a protective order restricting the manner in which he can use discovery, and he has complied with that order. Yet, the government suggests that the superseding indictment alleges (and the grand jury found) that Ayvazyan has "abused" discovery. Simply reading the superseding indictment confirms that is not the case.

5
RESPONSE TO *EX PARTE* APPLICATION – MODIFIED PROTECTIVE ORDER

### A. Ayvazyan is Not Responsible for the December 2020 Transfers from JPMC Account 5268

The government's allegation on this score is based entirely on its mistaken belief that Ayvazyan is "Iuliia Zhadko," that Zhadko was the "sole signatory" on account 5268 at JP Morgan Chase, and that Ayvazyan was therefore responsible for the December 2020 transfers from account 5268. Gov't's *Ex Parte* App. for Modified Protective Order, Dkt. 219 at 11-12 ("App."). The government's own exhibits disprove its allegation that Ayvazyan controls that account. Page 3 of Exhibit 3 to the Faerstein Declaration shows that Zhadko used the account to make an October 13, 2020 purchase at Lamps Plus in California, *four days after Ayvazyan and Terabelian undisputedly left California for Turks and Caicos*. Ayvazyan did not make the purchase in question and he was not responsible for any of the transactions thereafter. Most importantly, Ayvazyan did not conduct the December 2020 transfers alleged by the Superseding Indictment and the government's instant application. While Ayvazyan understands that the Court is not adjudicating guilt or innocence at this juncture, the fact that the government's own evidence contradicts its theory of the case demonstrates how the government has failed to prove that Ayvazyan presents a specific risk of harm under the protective order governing discovery in this case.

The government further accuses Ayvazyan of "using discovery" to open two online brokerage and cryptocurrency accounts using a fake ID. First, the relevant fake ID is *absent* from the discovery. And second, this accusation is based on the fact that the new two accounts used Iuliia Zhadko's "unique synthetic identity." App. at 10-11. The government knows full well that Ayvazyan was not the person who used Zhadko's identity to set up either account because both the online brokerage and the cryptocurrency exchange produced IP address registries showing that the person who logged into those accounts was not Ayvazyan (who is on house arrest and subject to location monitoring). That is why the government produced only "an excerpt of the account profile" (Dkt. 219-1 ¶ 17) from the cryptocurrency exchange as Ex. 13; the

other pages of the document strategically "excerpt[ed]" by the government show that a different person was the one logging into the account, not Ayvazyan. Similarly, that is why the government produced only the "account opening documents for [the] online brokerage," Dkt. 219-1 ¶ 16; the IP registry produced by the same brokerage shows that a different person was the one logging into the account, not Ayvazyan.[3] The government is stuck on the idea that Zhadko is a unique synthetic identity created and used by Ayvazyan, but the government is wrong. Whether the government can make those allegations at trial subject to its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959) remains to be seen, but the Court is not obligated to credit the government's demonstrably flawed theory of the case at this juncture and hamstring Ayvazyan's ability to prepare for trial.

### B. There is No Nexus Between the December 2020 Transfers and Any Party's Use of Discovery

As discussed during the previous protection order briefing and attached in the government's instant application, Ayvazyan "would be reviewing discovery through Steptoe's eDiscovery system, which will track every document he views." App. at 7-8 (quoting Dkt. 74 at 3). Consistent with that statement, included with this opposition is a log from Steptoe's Relativity database of every document Ayvazyan reviewed during the time in question. *See* Ex. 4 (filed concurrently under seal and in camera). ███

[3] ███

7
RESPONSE TO *EX PARTE* APPLICATION – MODIFIED PROTECTIVE ORDER

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ayvazyan did not print, download, or spend an inordinate amount of time viewing any of the documents cited by the government.

The lack of any connection between Ayvazyan's discovery review and the December 2020 transfers makes sense. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Even the government cannot truly believe that Ayvazyan abused discovery documents to enable him to make the transfers identified in its motion. If the government's allegations were correct that Ayvazyan had established an entirely separate identity as Zhadko, then Ayvazyan plainly would not need to delve into a monitored database to obtain basic identifying information concerning that identity. The government makes an overly cynical leap of logic that because transfers began after it produced discovery, it must mean that Ayvazyan is responsible and that he abused discovery. The government is wrong and its allegations are contradicted by incontrovertible data.

### III. THIS COURT HAS ALREADY REJECTED AN *EX PARTE* APPLICATION BY THE GOVERNMENT ATTACHING ESSENTIALLY THE SAME PROTECTIVE ORDER

This Court has already denied the government's request for an overly restrictive protective order that would prevent Ayvazyan from preparing his defense. Dkt. 90. The government's *ex parte* application seeks a second bite at the protective order apple, which the Court should not countenance.

On December 7, 2020, both the government and Ayvazyan submitted *ex parte* applications to the Court regarding the government's proposed protective order. The government's motion requested that the Court enter a protective order that would

---

[4] The government cites nine documents that were in Steptoe's database at the time, which comprise Ex. 4-11 (DOJ_PROD_0000002030; DOJ_PROD_0000002032; DOJ_PROD_0000002039; DOJ_PROD_0000002041; DOJ_PROD_0000002049; DOJ_PROD_0000002050; DOJ_PROD_0000002051; DOJ_PROD_0000002054 DOJ_PROD_0000002055).

8
RESPONSE TO *EX PARTE* APPLICATION – MODIFIED PROTECTIVE ORDER

effectively prevent Ayvazyan from reviewing a single document relevant to his case. Dkt. 65. Ayvazyan's *ex parte* application requested that the Court order the government finally begin producing discovery, and, if the Court found a protective order necessary, enter a reasonable protective order that would have allowed Ayvazyan to review documents produced in discovery to assist in preparing his defense. Dkt. 63.

As detailed in Ayvazyan's motion, the government's proposed protective order was grossly overbroad. Dkt. 63 at 5. It defined "Confidential Information" requiring protection as "any document ... containing" "a name," an "email address," "financial information," an "address," or any other "information that can be used to identify a person," and prevented Ayvazyan from viewing any Confidential Information outside the presence of counsel, taking notes on any information contained in a document marked confidential, or receiving notes from counsel concerning information contained in documents marked confidential. *Id.* (citing Dkt. 65-1, Gov't's Dec. 7, 2020 Proposed Protective Order, 5.a, 5.b, 5.g, and 5.j). Given the subject matter of this case, that definition would have encompassed every single document produced during discovery. The effect would have been to prohibit Ayvazyan from participating in the investigation of his case or preparation of his defense based on any discovery received from the government.

When Ayvazyan asked the government to identify the risks posed by Ayvazyan preparing for trial that were distinct from any other defendant, the government refused to do so. *Id.* at 6-7. Ayvazyan emphasized that each of the loan applications was allegedly submitted by one of the defendants, their aliases, or their supposed co-conspirators, and that with a single exception, the government had not identified any actual individuals whose personal information was at risk. As Ayvazyan pointed out, it would be illogical and unfair to claim that Ayvazyan created synthetic identification information and then deprive him of the ability to review that information to defend against those allegations. *Id.*

Ayvazyan argued that the government had failed to carry its burden to demonstrate the necessity of a protective order, Dkt. 63 at 8-11, but proposed that should the Court believe a protective order was necessary, a much more limited protective order would be appropriate. Ayvazyan highlighted that it is impractical for counsel to sit with a defendant while they review discovery in a case, and would impede the common practice of clients providing written comments about discovery to counsel to facilitate efficient preparation. *Id.* at 12. Ayvazyan provided the Court with multiple examples of protective orders entered in cases involving aggravated identity theft or fraud which permitted defendants unrestrained access to discovery to prepare their own defense. *Id.* at 12-14.

This Court agreed with Ayvazyan and entered a protective order which permitted Ayvazyan to assist in the preparation of his own defense. Dkt. 92. The Court also denied the government's overly restrictive protective order. Dkt. 90. Now, the government has resubmitted its rejected protective order as a "modified" proposed protective order. *Compare* Dkt. 65-1 with 219-15.[5] Given that the material facts at issue here have not changed—Ayvazyan is entitled to prepare his defense, and the Government has not identified any legitimate risk posed by Ayvazyan accessing the documents produced in discovery—the Court should deny the government's *ex parte* application to modify the existing protective order.

To justify their second bite at the protective order apple, the government argues that "umbrella protective orders" are permitted in cases containing large amounts of sensitive discovery, relying on *United States v. Concord Management and Consulting LLC*, 404 F. Supp. 3d 67, 70 (D.D.C. 2019). That interpretation of *Concord Management* is a stretch, at best. The alleged crime at issue in Concord Management was a conspiracy to defraud the United States by "impairing the lawful functions of the

---

[5] The government's modified proposed protective order adds two paragraphs restricting Ayvazyan from learning any information about the government's cooperating witnesses, thus making it even more restrictive than the protective order this Court rejected in December.

Federal Election Commission, the Department of Justice, and the Department of State" related to Russian interference in the 2016 U.S. presidential election. *Id.* at 70. The government sought a broad protective order "to protect certain national security and law enforcement interests." *Id.* The court found the threat of "foreign counter-intelligence specialists'" ability to "learn much about this nation's intelligence-gathering capabilities from what these documents reveal[] about sources and methods" was good cause to issue a broad protective order requiring defendants to view discovery in their counsel's office. *Id.* at 76 (quoting *United States v. Yunis*, 867 F. 2d 617, 623 (D.C. Cir. 1989). The court found the threat of misuse of discovery "far from hypothetical," citing discovery documents that were leaked on Twitter in an effort to "to discredit the Special Counsel's investigation" into Russian election interference. *Id.* at 72. These facts are far afield from Ayvazyan's case. The government has not alleged that this case is of interest to foreign counterintelligence specialists, or that Ayvazyan poses a threat to national security. The government has not alleged any facts legitimate facts that would at all justify entering a broad protective order preventing Ayvazyan from accessing the documents relevant to his defense and trial preparation.

### IV. THE APPLICATION SHOULD ALSO BE DENIED BECAUSE THE GOVERNMENT HAS ABUSED THE *EX PARTE* PROCEDURE

The government's failure to comply with the requirements for an *ex parte* application presents an independent ground to deny the application. The Court's individual practices state that "counsel are advised to file and serve their ex parte applications *as soon as* they realize that extraordinary relief is necessary."[6] Here, the conduct alleged by the government took place in December 2020 yet the government waited approximately *three months* to bring an *ex parte* application and offers no explanation for why this relief must be now be granted *immediately*. The government also provided no notice of this *ex parte* application, and there were no attempts to meet and confer with defense counsel on the subject of the application. Dkt. 224-1 ¶ 3.

---

[6] https://www.cacd.uscourts.gov/honorable-stephen-v-wilson (emphasis added)

Instead, the government filed the application at approximately 8:00 p.m. Pacific time (11:00 p.m. Eastern time), followed by an email directing defense counsel to the Court's website for rules regarding responses to *ex parte* applications and implying that the defense would only have nineteen hours to investigate the allegations contained in 131 pages of briefs, exhibits, and related documents, and draft and file a response. *Id.* ¶¶ 2, 4. This improper use of the *ex parte* procedure alone is an appropriate grounds to deny the application.[7]

## V. CONCLUSION

For the foregoing reasons, the government's *ex parte* application should be denied.

Dated: March 31, 2021                          Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

---

[7] The Court's individual practices also note that "ex parte applications solely for extraordinary relief - sanctions may be imposed for misuse of ex parte applications." To the extent the government has misused the ex parte process here, sanctions may be appropriate.