Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    *Plaintiff,*<br><br>               v.<br><br>RICHARD AYVAZYAN,<br>*et al.*<br><br><br>                    *Defendants*. | Case No.  20-cr-579 (SVW)<br><br>**DEFENDANT RICHARD AYVAZYAN'S NOTICE OF MOTION AND MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT**<br><br>Judge:   Hon. Stephen V. Wilson<br>Current Hearing Date:    May 24, 2021<br>Requested Hearing Date:  May 3, 2021<br>Time:    11:00 a.m. |

NOTICE OF MOTION AND MOTION TO DISMISS

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2

## TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

3       PLEASE TAKE NOTICE that on Monday, May 3, 2021; Monday, May 24,

4  2021; or as soon thereafter as this counsel may be heard in Courtroom 10A of this

5  Court at 350 W. 1st Street, 10th Floor, Los Angeles, CA 90012, Defendant Richard

6  Ayvazyan ("Ayvazyan"), through undersigned counsel, will move the Court to dismiss

7  the indictments with prejudice.

8       This motion is based on this notice, the accompanying memorandum of points

9  and authorities, Declaration of Ashwin Ram, Declaration of Richard Ayvazyan, any

10 reply that Ayvazyan may make, such as other evidence and arguments as may be

11 presented at or prior to the hearing, and all records and files in this action.

12

13      Dated:   April 21, 2021                    Respectfully submitted,

14                                                 **STEPTOE & JOHNSON LLP**

15
                                                   _/s/ Ashwin J. Ram_
16                                                 Ashwin J. Ram (SBN 227513)
                                                   _aram@steptoe.com_
17                                                 Michael A. Keough (SBN 327037)
                                                   _mkeough@steptoe.com_
18                                                 Nicholas P. Silverman (_pro hac vice_)
                                                   _nsilverman@steptoe.com_
19
                                                   **STEPTOE & JOHNSON LLP**
20                                                 633 West Fifth Street, Suite 1900
21                                                 Los Angeles, CA 90071
                                                   Telephone: (213) 439-9400
22                                                 Facsimile: (213) 439-9599
23
                                                   _Counsel for Defendant Richard Ayvazyan_
24

25

26

27

28

1
2

## <u>TABLE OF CONTENTS</u>

3

4    I.    LEGAL BACKGROUND ....................................................................2

5    II.   THE GOVERNMENT'S MISCONDUCT BEGAN DURING THE
6          MIAMI AIRPORT STOP AND HAS CONTINUED THROUGH THE
          LAST SIX MONTHS ......................................................................3

7          A.   The Government's Miami Airport Stop Has Tainted This Case ................3

8               1.   The Government Committed Misconduct, and
9                    Compounded that Misconduct by Trying to Cover It
                    Up by Recklessly Destroying Material Evidence ..........................3

10              2.   The Government's Misconduct Tainted the
                    Indictments ..............................................................8
11
12         B.   The Government Committed Serious Misconduct During the Search
                Warrant Execution, Then Compounded That Misconduct With
13              Misleading, Meritless, and Bad Faith Arguments........................9

14         C.   The Government Has Continued to Commit Serious Misconduct
                Since the Indictment ................................................10

15              1.   The Government Was Not Ready For Trial, So It
16                   Abused the Grand Jury's Powers to Gather Discovery
                    Beyond the Reach of Fed. R. Crim. P. 16 ....................10

17              2.   The Government Contacted a Represented Defendant
                    Seeking Information Regarding a Co-Defendant.........................13
18
19              3.   The Government Violated Its Obligations Under
                    Brady and Its Progeny and the California Rules of
20                   Professional Conduct....................................................14

21         D.   The Government Flagrantly Violated the Court's Discovery Order
                and Compounded That Misconduct By Lying to the Court......................16

22   III.  THE GOVERNMENT'S CUMULATIVE MISCONDUCT MERITS
          DISMISSAL UNDER EITHER THE DUE PROCESS CLAUSE AND
23         THE COURT'S SUPERVISORY POWERS........................................18

24         A.   Dismissal Is Proper Under the Due Process Clause Because the
                Government's Misconduct During and After the Miami Airport Stop
25              Shocks the Universal Sense Of Justice ...................................18

26         B.   Dismissal Is Proper Pursuant to the Court's Supervisory Power
                Because the Aggregated Abuses Justify Ending This Tainted
27              Prosecution and Deterring Future Misconduct .........................19

28              1.   The Government's Misconduct Has Been Flagrant.....................20

i

NOTICE OF MOTION AND MOTION TO DISMISS

2.   The Government's Misconduct Has Substantially
     Prejudiced Ayvazyan ............................................................. 20

3.   Dismissal Is Proper to Deter the Government From
     Future Misconduct ................................................................ 23

C.   The Court Should Order the Government to Produce Discovery
     Regarding Its Abuse of the Grand Jury Process and Presentation of
     Tainted Evidence ............................................................................ 24

IV.   CONCLUSION ............................................................................................ 25

NOTICE OF MOTION AND MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

**Cases**                                                          **Page(s)**

3

*Berger v. United States,*
4    295 U.S. 78 (1935)..................................................................................2

5

*Donnelly v. DeChristoforo,*
6    416 U.S. 637 (1974)................................................................................3

7

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels),*
8    767 F.2d 26 (2d Cir. 1985).....................................................................14

9

*In re Grand Jury Subpoenas Issued May 3, 1994 (Nash),*
10    858 F. Supp. 132 (D. Ariz. 1994) ....................................................13, 14

11

*Klopfer v. North Carolina,*
12    386 U.S. 213 (1967)..............................................................................24

13

*Rochin v. California,*
14    342 U.S. 165 (1952)..............................................................................20

15

*United States v. Aguilar,*
16    831 F. Supp. 2d 1180 (C.D. Cal. 2011) ..........................................*passim*

17

*United States v. Chapman,*
18    524 F.3d 1073 (9th Cir. 2008) .........................................................19, 21

19

*United States v. Finazzo,*
20    407 F. Supp. 1127 (E.D. Mich. 1975)....................................................14

21

*United States v. Kojayan,*
22    8 F.3d 1315 (9th Cir. 1993) .............................................................3, 24

23

*United States v. Loud Hawk,*
24    474 U.S. 302 (1986)..............................................................................23

25

*United States v. Marshank,*
26    777 F. Supp. 1507 (N.D. Cal. 1991)................................................21, 24

27

*United States v. Russell,*
28    411 U.S. 423 (1973)..............................................................................20

*United States v. Salyer,*
    No. 10-cr-61, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010)....................16

iii
NOTICE OF MOTION AND MOTION TO DISMISS

*United States v. Samango*,
   607 F.2d 877 (9th Cir. 1979) ..................................................................21

*United States v. Strobehn*,
   421 F.3d 1017 (9th Cir. 2005) ..................................................................8

**Statutes**

18 U.S.C. § 3161(b) .................................................................................10

Cal. Evid. Code § 980 ...............................................................................8

Cal. R. Prof'l Conduct 3.8.....................................................................3, 15

Cal. R. Prof'l Conduct 4.2.........................................................................14

**Other Authorities**

@TheJusticeDept (Mar. 12, 2021),
   https://twitter.com/TheJusticeDept/status/1370415336202379264 ...........24

@TheJusticeDept (Nov. 18, 2020 1:52 p.m.), https://twitter.com/
   TheJusticeDept/status/1329135318495334407 ......................................24

@USAO_LosAngeles (Mar. 12, 2021 12:33 p.m.),
   https://twitter.com/USAO_LosAngeles/status/1370427658715213830 ..................24

@USAO_LosAngeles (Nov. 18, 2020 1:20 p.m.),
   https://twitter.com/USAO_LosAngeles/status/1329127326119030804 ..................24

DOJ Office of Public Affairs, Press Release (Mar. 12, 2021),
   https://www.justice.gov/opa/pr/four-additional-members-los-angeles-
   based-fraud-ring-indicted-exploiting-covid-relief;................................24

DOJ Office of Public Affairs, Press Release (Nov. 18, 2020),
   https://www.justice.gov/opa/pr/four-members-los-angeles-based-fraud-
   ring-indicted-covid-relief-fraud;.............................................................24

NBC Los Angeles, *Brothers and Wives Charged in $5.6 Million COVID-
   19 Loan Scheme* (Nov. 18, 2020),
   https://www.nbclosangeles.com/news/local/encino-coronavirus-fraud-
   scheme/2465391/ ..................................................................................24

iv

U.S. Attorney's Office Central District of California (Nov. 18, 2020),
   https://www.justice.gov/usao-cdca/pr/4-san-fernando-valley-residents-
   indicted-fraudulently-obtaining-nearly-5-million-covid; ...........................................24

U.S. Attorney's Office Central District of California, Press Release (Mar.
   12, 2021), https://www.justice.gov/usao-cdca/pr/3-additional-members-
   alleged-fraud-ring-based-san-fernando-valley-arrested-charges;.............................24

Wayne LaFave, et al., 3 Crim. Proc. § 8.8(f) (4th ed. Dec. 2020 update) .....................13

NOTICE OF MOTION AND MOTION TO DISMISS

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3        The Court should dismiss the indictments based on the government's sustained

4   pattern of misconduct including a pretextual border stop and lies about the purpose of

5   that stop, deprivation of the right to counsel, destruction of evidence, dangerous

6   misconduct at a family home involving terrorizing children, lying about that

7   misconduct, abusing the grand jury process, contacting a represented defendant to

8   solicit information about a co-defendant, disregarding *Brady* obligations, flagrantly

9   violating a court order, and lying to the Court.

10       During the April 2, 2021 hearing with all parties, the root of this misconduct was

11  revealed.  There, the government explained that its case began based on a suspicion of

12  fraud committed by Iuliia Zhadko and his company, Timeline Transport, in a PPP loan

13  application.  The government's sights turned to Ayvazyan because Zhadko was one of

14  several friends and associates who transferred money to help make a down-payment on

15  Ayvazyan's home.  Based on Ayvazyan's decade-old record involving a non-jail plea,

16  the government assumed that he too must be culpable.  But there was a hole in that

17  assumption: Ayvazyan was not involved in Zhadko's allegedly fraudulent application.

18       In an effort to fill that hole, the government began a pattern of misconduct that

19  has plagued this case.  The government unlawfully stopped, interrogated, and searched

20  Ayvazyan based on a pretextual invocation of the border search authority and "National

21  Security."  *See* Dkt. 130, 135, 136.  As case agent Justin Palmerton testified at the

22  Miami bail hearing, "once the CBP stopped for the secondary inspection, we learned

23  that there was a photograph of Iuliia Zhadko on the digital device and we made the

24  connection that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan."  Oct. 22,

25  2020 Hr'g Tr. at 23-24, *United States v. Ayvazyan*, 20-mj-3857, Dkt. 17 (S.D. Fla. Oct.

26  22, 2020) ("Oct. 22 Tr.").  The tainted evidence from the October 19, 2020 Miami

27  airport stop is the lynchpin of the government's case against Ayvazyan.

28       Seizing that tainted evidence came at a price.  The government was not done with

1

NOTICE OF MOTION AND MOTION TO DISMISS

1  its investigation or ready to go to trial, but it had to seize the opportunity presented by
2  Ayvazyan's possession of Zhadko's phone, which in turn contained identification
3  documents including Zhadko's license.  If the government was going to argue that
4  Ayvazyan was Zhadko, it needed the phone it had unlawfully seized.  That, in turn,
5  required indicting within thirty days of October 19, 2020 even though the government
6  had not finished its investigation and was not ready to go to trial.

7        That haste to indict led to a series of errors and misconduct.  The government has
8  conceded that it continued investigating the alleged conspiracy and scheme to defraud
9  even after the indictment was returned—an abuse of the grand jury power that
10  independently merits discovery regarding the grand jury proceedings (see *infra* § III.C).
11  The government assaulted children and held them at gunpoint while executing search
12  warrants on family homes in flagrant disregard for the Constitutional rights of private
13  citizens.  The government lied to the Court at detention hearings, in filings, and most
14  recently during the April 2, 2021 hearing.  The government knowingly contacted
15  represented parties.  Finally, the government violated the Court's discovery order and
16  slow-rolled discovery while withholding exculpatory evidence.

17        While these actions are also the subject of several pending motions to suppress,
18  the government's conduct, when taken together, obviates the need to rule on the
19  motions to suppress because it justifies dismissal in its own right.  The only remedy that
20  can stop these abuses—and prevent them from happening again in future cases—is
21  dismissal.  The Court should not hesitate to use that remedy.

22  **I.    LEGAL BACKGROUND**

23        Prosecutors play a unique role within criminal cases.  They do not represent "an
24  ordinary party to a controversy"; instead, prosecutors represent "a sovereignty whose
25  obligation [is] to govern impartially … and whose interest … in a criminal prosecution
26  is not that it shall win a case, but that justice shall be done."  *Berger v. United States*,
27  295 U.S. 78, 88 (1935).  "The function of the prosecutor under the Federal Constitution
28  is not to tack as many skins of victims as possible to the wall [but] to vindicate the right

1    of people as expressed in the laws and give those accused of crime a fair trial."

2    *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting).

3        "While lawyers representing private parties may—indeed, must—do everything

4    ethically permissible to advance their clients' interests, lawyers representing the

5    government in criminal cases serve truth and justice first. The prosecutor's job isn't just

6    to win, but to win fairly, staying well within the rules."  *United States v. Kojayan*, 8

7    F.3d 1315, 1323 (9th Cir. 1993).  Because the conduct of U.S. Attorney's offices is

8    largely shielded from public scrutiny, it is "particularly important that the government

9    discharge its responsibilities fairly, consistent with due process."  *Id.* at 1324.  A

10   prosecutor's paramount obligation is to ensure due process and procedural justice for

11   every defendant whose liberty is at stake.  *See* Cal. Rule Prof'l Conduct 3.8 cmt. 1.

12   **II.    THE GOVERNMENT'S MISCONDUCT BEGAN DURING THE MIAMI**
13   **AIRPORT STOP AND HAS CONTINUED THROUGH THE LAST SIX**
     **MONTHS**

14
15        **A.    The Government's Miami Airport Stop Has Tainted This Case**

16            **1.    The Government Committed Misconduct, and Compounded**
                 **that Misconduct by Trying to Cover It Up by Recklessly**
                 **Destroying Material Evidence**

17        The importance of the Miami airport stop cannot be overstated.  During the April

18   2 hearing, the government attempted to amplify the misimpression *it had created* that

19   Ayvazyan was some sort of "ring leader" instead of someone who merely received

20   funds from an array of friends and associates including several people who had

21   allegedly submitted fraudulent PPP loan applications.  That misimpression is based on

22   the tainted fruits of the Miami airport stop—fruits that the government misrepresented.

23        When asked about what evidence it had seized that supported the government's

24   position that Zhadko and Kauichko are "not real," AUSA Faerstein responded that the

25   government had seized fake identifying information for Iuliia Zhadko, fake driver's

26   licenses, and fake social security numbers both from the second physical search of

27   Ayvazyan ("the cards that the defendants had on them during that search") and from the

28

                                            3

consequent search of "Ayvazyan's phone" at the Miami airport.  Apr. 2, 2021 Hr'g Tr. at 10-11 ("[T]hat information is not real.  … [T]he information in these profiles that the defendants were in possession of is not real.") (Ram Decl. Ex. A) ("Apr. 2 Tr.").  In fact, no such fake identifying information was found during the physical searches of Ayvazyan, one of which resulted in finding several of Zhadko's credit cards (which contained no identifying information other than his name).  Ayvazyan was not in possession of a physical driver's license, social security card, or any other identification document belonging to Zhadko.  Moreover, it was Zhadko's phone—not Ayvazyan's— that contained a photograph of Zhadko's license.[1]

Not to be outdone, attorney Fenton stated that Ayvazyan and Terabelian "were found with … two different identification documents for Viktoria Kauichko." Tr. at 33. He continued, "If you look at them [i.e., the identification documents], they are two completely different people." *Id.*  Neither Ayvazyan nor Terabelian were found in possession of any identification documents other than their own.  The physical documents referenced by attorney Fenton were not found; instead, *the photographs* of a passport card and driver's license (predating the CARES Act) of those documents were among the digital files on Kauichko's cell phone.

Ayvazyan was in possession of a bag containing several phones—including Zhadko's—and several credit cards.  But Ayvazyan did not possess any driver's licenses, personal identification cards, social security cards, or any other physical identification documents that the government has alluded to.  *Zhadko's phone* had text message or camera files including pictures of Zhadko's driver's license and his identification documents.  The government attempted to blur the lines between Ayvazyan's physical possessions and files on massive digital devices owned by third

---

[1] AUSA Faerstein did not clarify his misrepresentation.  Later on, Attorney Fenton noted that the defendants' physical luggage included several credit cards belonging to Zhadko and Kauichko, *see* Apr. 2 Tr. at 19-20, but even then, he did not clarify that neither Ayvazyan nor Terabelian was carrying a single fake physical identification document or even a real physical identification document belonging to a third party.

NOTICE OF MOTION AND MOTION TO DISMISS

1 parties to mislead the Court into adopting an inaccurate view of the evidence.  The truth
2 is simple: Ayvazyan was carrying a bag that contained Zhadko's phone and several
3 credit cards.  Ayvazyan was not carrying *any* of Zhadko's identification documents.

4       This misrepresentation—targeted at exaggerating the government's limited
5 support for its conclusion that Ayvazyan is Iuliia Zhadko—reveals the importance of
6 the Miami airport stop to the government's case and was part of a broader pattern of
7 misconduct committed by the government with respect to that unlawful stop.

8       *First*, the government committed misconduct by engaging in the stop at all.  The
9 government knew that the airport stop's purpose was to gather evidence of PPP loan
10 fraud and chose to abuse its border search authority to further that purpose.

11       *Second*, the government lied about the purpose of the stop.  The government lied
12 on official forms, to the magistrate judge at the detention hearing, and in submissions to
13 this Court.  As detailed in Dkt. 130 & 208, the government claimed on multiple forms
14 that the search was for national security purposes when the real purpose was enabling
15 warrantless searches for a PPP loan fraud investigation.

16       Perhaps knowing that the national security purpose would not hold water, the
17 government lied during the detention hearing in Miami, claiming to the magistrate
18 judge that Ayvazyan and Terabelian had been "searched for contraband," Oct. 22 Tr. at
19 11, and failed to disclose that, in reality, Ayvazyan and Terabelian had been searched
20 for evidence of PPP loan fraud, not contraband.  Instead of disclosing that he had
21 masterminded the border stop, Agent Palmerton—when asked "you don't know
22 whether or not they were stopped [pursuant] to a warrant or for some other reason?"—
23 said only "They were not stopped pursuant to the warrant," and withheld material
24 information from the court.  *Id.* at 19; *see also id.* at 20 (failing to disclose that he had
25 instigated the pretextual stop—with no warrant—and only disclosing that he was
26 contacted by CBP *after* the stop).[2]

27
28 [2] Nor were these the only lies told by the government during Ayvazyan's detention hearing.  They also

NOTICE OF MOTION AND MOTION TO DISMISS

When confronted with a motion to suppress based on the unlawful purpose of the Miami airport stop, the government filed an opposition that largely abandoned its claim that the Miami airport stop was rooted in anything other than seeking evidence of PPP loan fraud.  The government did not attach an affidavit or declaration from Agent Palmerton or the Joint Terrorism Task Force, ceased direct statements about any purpose related to contraband, and instead attempted to push the Court's focus away from the stop's purpose.  Even so, the government stooped to misrepresenting the contents of a key exhibit, claiming that it "expressly discussed" a purpose it did not. *See* Dkt. 208 at 4 n.6.  The government thereby managed to misrepresent material facts, while simultaneously failing to contest that the government's actual purpose for the "border stop" was to seek evidence of PPP loan fraud.

*Third*, the government committed misconduct by refusing Ayvazyan and Terabelian's requests for counsel, failing to memorialize those requests, and destroying evidence of those requests.  There is no doubt that violating the Fifth and Sixth Amendments and refusing repeated invocations of counsel was serious misconduct. But the government made that misconduct much worse when it ignored Ayvazyan's subsequent requests for the critical video evidence—failing to transmit Ayvazyan's early and mid-November requests to CBP until January 6, *see* Dkt. 152 Ex. 14—and refused to respond to inquiries about preservation of evidence.  Ayvazyan warned the government repeatedly, but the government deleted the evidence anyways.

*Fourth*, the government committed misconduct by misrepresenting the substance of the Miami airport interrogation during the April 2, 2021 hearing.  *See* Apr. 2 Tr. at 21 (claiming that Ayvazyan was asked the typical five Ws about travel that apply to all travelers); Dkt. 152 at 22 (claiming that Ayvazyan was interviewed to determine his admissibility into the country).  This omits material information: the questioning

---

argued that Ayvazyan had previously served three years in prison and that he would be so "very eager to avoid prison time again," that he presented a flight risk requiring detention without bond. *Id.* at 31. This was flat-out false.  Ayvazyan has never served time in prison as the government well knew from running numerous background checks on him during its investigation.

NOTICE OF MOTION AND MOTION TO DISMISS

1    repeatedly focused on the alleged PPP fraud including repeated interrogation about the

2    Tarzana home that forms the center of the government's case against Ayvazyan, how

3    the couple had paid for expenses, and a watch that the government claims was

4    purchased with PPP loan proceeds.  This misrepresentation continues the trend

5    previously begun by the government of downplaying the intensity of the ten-plus-hour

6    set of interrogations and searches that Ayvazyan and Terabelian endured.[3]  The

7    government is desperate to obscure what occurred during the ten-plus hour detention of

8    Ayvazyan and Terabelian because it knows that the truth reflects unconstitutional

9    detention, interrogation, and searches.

10          *Fifth*, the government committed misconduct by intentionally invading the

11   confidential marital communications of Ayvazyan and Terabelian.  First, CBP

12   intentionally used Terabelian's phone to access her conversation with her husband

13   (clearly labeled "Rich" in the phone) and took photographs of that conversation.  The

14   government then seized the phone and produced it—including this privileged

15   conversation—to the prosecutors in this case.  The marital communication privilege

16   protects statements from one spouse to the other that are intended to be confidential.

17   *See United States v. Strobehn*, 421 F.3d 1017, 1021 (9th Cir. 2005).  "Federal common

18   law assumes that private communications between spouses are intended to be

19   confidential, and thus privileged."  *Id.*; *see also* Cal. Evid. Code § 980 ("[A] spouse …

20   has a privilege … to refuse to disclose, and to prevent another from disclosing, a

21   communication if he or she claims the privilege and the communication was made in

22   confidence between him or her and the other spouse while they were spouses.").  The

23   intentional invasion of privilege represents unreasonable misconduct committed by the

24   government—both by CBP and by the prosecution team.  *Cf. United States v. Aguilar*,

---

[3] In reality, Ayvazyan was stopped, interrogated and searched for over two hours, then promised that he would be let go.  Instead of being let go, he was subjected to an *additional* eight hours of non-routine interrogations and searches.  It was during this second, non-routine portion that the credit cards were found.  *See* Dkt. 209 at 7-9, 14-15; Dkt. 208 at 12-13.  Both the seizure of the digital devices and the data on those digital devices is traceable to the non-routine and unreasonable repeat searches, and that is why the government has lied to try to erase that portion of the Miami airport stop.

7

NOTICE OF MOTION AND MOTION TO DISMISS

831 F. Supp. 2d 1180, 1191 (C.D. Cal. 2011) (citing the government's intrusion on attorney-client privilege as one of the pieces of misconduct justifying dismissal). The government's denial of a wife's repeated requests to speak with her husband while simultaneously invading her privileged confidential marital communications is without precedent and takes this case beyond others involving invasions of privilege.

### 2.    The Government's Misconduct Tainted the Indictments

The fruits of this misconduct are the core of the government's case against Ayvazyan. The government repeatedly asserted during the April 2 hearing before this Court that "all the *documentary evidence* in the indictment predated the [Miami airport stop]," Tr. at 18 (emphasis added). This statement—demonstrably false as to the superseding indictment—misses the point. The November 2020 indictment was based on evidence seized during the Miami airport stop. The indictment cites documents regarding alleged fraud committed by Iuliia Zhadko, not Richard Ayvazyan. The indictment then alleges that Ayvazyan is responsible for the alleged misconduct by Zhadko because Zhadko is his alias. *See, e.g.*, Ind. ¶¶ 16, 16.a, 16.c. Agent Palmerton, however, confirmed under oath that this idea that Zhadko is Ayvazyan's alias came from the government's unlawful Miami airport stop. *See* Oct. 22 Tr. at 23-24 ("And then once the CBP stopped for the secondary inspection, we learned that there was a photograph of Iuliia Zhadko on the digital device and we made the connection that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan."). Without the tainted evidence, there would be no indictment and no case against Ayvazyan.[4]

---

[4] The government has not yet produced the grand jury transcripts despite defense requests. The only way the grand jury could have returned the indictment, however, is if it was presented with the tainted evidence referenced by Agent Palmerton. The only other evidence that Agent Palmerton referenced— which he implicitly conceded was insufficient for the government to form the belief that Ayvazyan was responsible for Zhadko's conduct—was that Zhadko had previously lived Ayvazyan and Terabelian (though Agent Palmerton failed to disclose that this predated 2020 and the alleged PPP loan fraud) and that Ayvazyan sent an email noting that Zhadko would be sending funds to escrow and that Ayvazyan would forward the confirmation when he received it from Zhadko. Because both pieces of evidence are consistent with receiving a contribution from a third party who was one of several people to contribute to Ayvazyan's purchase, the government did not reference either piece of

8

NOTICE OF MOTION AND MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The Government Committed Serious Misconduct During the Search Warrant Execution, Then Compounded That Misconduct With Misleading, Meritless, and Bad Faith Arguments**

The government's misconduct during the execution of the search warrant at Ayvazyan's home has already been subject to briefing.  As shown by images from one of the few cameras that the government was unable to break or disable during its search, the government agents executed a military-style raid on Ayvazyan's family home, holding Ayvazyan's children and niece at gunpoint for an extended period of time and committing the misconduct redacted in previous submissions.  *See* Dkt. 146 at 2-9.  The government caused tens of thousands of dollars' worth of damage, then proceeded to seize valuables regardless of the lack of connection to the alleged fraud.

The government compounded its errors by making bad-faith arguments in search of a justification for its misconduct.  Most notably, the government misrepresented the reason for its violence by burying its assessment that Ayvazyan was not considered dangerous and his home did *not* involve "a potentially dangerous environment," Dkt. 222 at 3 (quoting Dkt. 223 Ex. A), and instead fabricating allegations that it had been concerned about ties to a gang based on a selective reading of a *former* in-law's probation-only conviction years earlier.  Dkt. 222 at 4-6.[5]  Indeed, when later executing searches at the homes of that former in-law's direct relatives, the government did not use the military-style tactics employed against Ayvazyan's family.  The government made these bad-faith arguments because there is no excuse for its misconduct.

---

evidence in the Complaint or Search Warrant Affidavit filed approximately contemporaneously with the grand jury and instead relied solely upon the tainted evidence seized during the Miami airport stop.  Based on the available evidence, it appears the grand jury received only tainted evidence regarding whether Ayvazyan was Zhadko.

[5] The government also referenced trash pulls from a Glendale house showing that either the resident or a neighbor had purchased accessories for a handgun, but neither of those people was Ayvazyan.  The government misled the Court by omitting the photos of the rest of the trash, which demonstrated that a different family—not Ayvazyan—was living at that house.  Dkt. 222 at 5 & n.3.

9

NOTICE OF MOTION AND MOTION TO DISMISS

1

2

**C.  The Government Has Continued to Commit Serious Misconduct Since the Indictment**

3

4

**1.  The Government Was Not Ready For Trial, So It Abused the Grand Jury's Powers to Gather Discovery Beyond the Reach of Fed. R. Crim. P. 16**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

"Once an indictment has been returned, the Government is presumed to be ready to proceed to trial ...." *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1184-85 (C.D. Cal. 2011) (noting that this presumption holds even if the government is compelled to indict "sooner than it would have preferred"). As a result of the Miami airport stop, the government was forced to file an indictment by November 18, 2021. *See* 18 U.S.C. § 3161(b) ("Any ... indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested ... in connection with such charges."). The government pressed Ayvazyan to waive his right to a speedy trial, but when he refused, the government was stuck in a position where it had "indict[ed] a case that it had not fully investigated and [wa]s not prepared to prosecute," and needed to use COVID-19 to secure a tactical advantage of time to gather evidence to support its alleged conspiracy. Dkt. 96 at 1 ("This tactic of indicting first and investigating later is not authorized by any rule of federal criminal procedure or law; indeed, it is fundamentally at odds with justice and basic fairness."). Notwithstanding its outrage at being accused of using COVID-19 to secure time to gather post-indictment evidence, that is precisely what the government did.

21

22

23

24

25

26

Fed. R. Crim. P. 16-17 govern the right to gather evidence for trial. The government unilaterally decided that those rules should not apply to this case, and instead empaneled a grand jury to continue to investigate the same conspiracy it had already charged in an indictment. Indeed, the superseding indictment revolves around precisely the same purported conspiracy as the initial indictment. *Compare* Dkt. 32 ¶¶ 20-22, *with* Dkt. 154 ¶¶ 30-32.

27

28

On the last business day before the court-imposed discovery deadline, the government disclosed some of the fruits of that post-indictment investigation. The

10

NOTICE OF MOTION AND MOTION TO DISMISS

production revealed that the government had continued to use the grand jury to subpoena evidence related to the entities in the first indictment, for example, Time Line Transport, Inception Ventures Inc., Allstate Towing & Transport, and other entities and loans in the initial indictment.  The following is a sample of one dozen topics for documents *produced by the government between March 12, 2021 and April 9, 2021* that indicate that the government continued to use the grand jury to obtain discovery regarding the same allegations in the indictment:

| Sample of Indictment-Related Productions Subpoenaed After the Indictment | | |
|---|---|---|
| **Rec. by Gov't** | **Topic** | **Bates** |
| Feb. 25, 2021 | Time Line Transport, Inc. (see Ind. ¶¶ 16.a, 23, and Count Seven) (bank statements) | DOJ_PROD_0000065698 |
| Jan. 12, 2021 | Time Line Transport Inc. (PayPal production noting post-indictment request) | DOJ_PROD_0000125302; DOJ_PROD_0000125417 |
| Feb. 25, 2021 | Time Line Transport bank account (see Ind. ¶¶ 16.a, 23, and Count Seven) (bank email) | DOJ_PROD_0000065696 |
| Jan. 12, 2021 | Iuliia Zhadko (PayPal production noting post-indictment request) | DOJ_PROD_0000125262, 68; DOJ_PROD_0000125331, 38 |
| Feb. 23, 2021 | Inception Ventures Inc. (see Ind. ¶¶ 16.b, 23) (bank statements and transaction histories) | DOJ_PROD_0000066813, 15 |
| Feb. 18, 2021 | Marietta Terabelian (see Ind. ¶¶ 17.a, 23, and Count Six) (personal bank account statements and transaction histories) | DOJ_PROD_0000069449, 53; DOJ_PROD_0000067569, 99; DOJ_PROD_0000067601, 06 |
| Mar. 9, 2021 | Marietta Terabelian and Richard Ayvazyan (response to a Feb. 23, 2021 subpoena) | DOJ_PROD_0000147671 |
| Feb. 11, 2021 | Residential Property-1 (see Ind. ¶¶ 21.f, 23, 35.a, 38.a, 41.a, 44.a) (email communications and financial documents related to purchase, escrow, and payments) | DOJ_PROD_0000133715- DOJ_PROD_0000134073 |
| Feb. 16, 2021 | Allstate Towing & Transport (see Ind. ¶¶ 18.a, 18.b, 23, Count Two, and Count Nine) (list of checks paid) | DOJ_PROD_0000069453 |
| Jan. 12, 2021 | Secureline Realty (PayPal production noting post-indictment request) | DOJ_PROD_0000125318 |

11
NOTICE OF MOTION AND MOTION TO DISMISS

| | | |
|---|---|---|
| Apr. 1, 2021 | Secureline Realty (see Ind. 19.a, 19.c, 23, Count Four, Count Ten) (emails, IP information, bank statements, deposit/withdrawal tickets, loan records, and letter) | DOJ_PROD_0000156389-DOJ_PROD_0000156499 |
| Jan. 12, 2021 | Tamara Dadyan (PayPal production noting post-indictment request) | DOJ_PROD_0000125277 |

The government is transparently using the grand jury to get around the limits of its discovery rights under rule 16.  "The grand jury may not be used by the government for pretrial criminal discovery."  *In re Grand Jury Subpoenas Issued May 3, 1994 (Nash)*, 858 F. Supp. 132, 134 (D. Ariz. 1994) (collecting cases).  "The investigatory power of the grand jury may not be used if the primary purpose of the investigation is to gather evidence for use at the trial of a pending matter."  *Id.* (citing *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972) ("We condemn any such conduct by the United States Attorney.")); *see also* Wayne LaFave, et al., 3 Crim. Proc. § 8.8(f) (4th ed. Dec. 2020 update) (grand jury's purpose is "to determine whether a crime has been committed and an indictment should issue, not to gather evidence for use in cases in which indictments have already issued").  The test for whether a prosecutor has abused the grand jury's investigatory power is whether "its 'sole or dominating purpose' [was] the procurement of evidence for trial."  *See Nash*, 858 F. Supp. at 134.[6]  Here, the government used the grand jury for the dominant purpose of gathering evidence to prove the alleged conspiracy to defraud that is charged in both indictments.[7]

---

[6] "The question of a grand jury's dominant purpose is not the typical question of historical fact nor even the typical inquiry as to the state of mind of a witness or a party. It is the application of a legal standard designed to ensure that the grand jury, a body operating peculiarly under court supervision[,] is not misused by the prosecutor for trial preparation."  *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26 (2d Cir. 1985) (citing *In re Cuisinarts, Inc.*, 665 F.2d 24, 31 (2d Cir. 1981)).

[7] The government previously offered to produce information about its post-indictment investigation in camera and under seal.  Dkt. 99-2 at 6 n.4; *see also United States v. Finazzo*, 407 F. Supp. 1127, 1132 (E.D. Mich. 1975) (ordering the government to submit an affidavit and an offer of proof so that the Court could determine which transcripts were necessary for its perusal).  Now that there is no fear of "jeopardiz[ing] the investigation," (the only proffered justification for *in camera* submission) Ayvazyan requests that the government be compelled to produce that information—including grand jury transcripts—to the defendants and the Court.

12
NOTICE OF MOTION AND MOTION TO DISMISS

### 2. The Government Contacted a Represented Defendant Seeking Information Regarding a Co-Defendant

The government knows which cell phone belongs to Richard Ayvazyan. The government seized Ayvazyan's phone in Miami and generated numerous reports along with discovery, all of which correctly identifies Ayvazyan's phone number as 818-███-6000. Moreover, Ayvazyan's phone number has been listed on multiple court forms and CBP forms since the moment he was arrested in October 2020.

The government also knows that it is forbidden from contacting a represented defendant. *See* Cal. R. Prof'l Conduct 4.2; *cf.* Justice Manual § 296 (noting that analysis of a potential violation of Model Rule 4.2 should consider whether DOJ knew the person was represented, whether a formal proceeding was pending, and whether the person was represented by a lawyer in the matter related to DOJ's communication).[8]

On the morning of March 11, 2021, however, Agent Palmerton called Ayvazyan directly at 818-███-6000 and pressed him for information on finding co-defendant Manuk Grigoryan (who voluntarily turned himself in that day). Agent Palmerton directed Ayvazyan, "Richard, tell Manuk to come out." Ayvazyan Decl. ¶ 6. Ayvazyan responded by asking who was calling and, upon learning it was an FBI Agent, telling him to call his lawyer (the undersigned). *Id.* ¶¶ 7-9. Agent Palmerton nonetheless persisted, indicating that he knew where Grigoryan was and that Ayvazyan should tell Grigoryan to come outside. *Id.* ¶ 10. When questioned about Agent Palmerton's telephone call, the government claimed that Grigoryan had been evading officers and that calling Ayvazyan was a mistake because "we thought we were calling the number of Manuk's mother [or mother-in-law]." Ram Decl. ¶¶ 3-4.

The evidence, however, demonstrates that Agent Palmerton's misconduct was no mistake. Agent Palmerton addressed Ayvazyan by name, and refused to stop questioning Ayvazyan despite his invocation of counsel. Moreover, Agent Palmerton

---

[8] Indeed, the government forbade the defense from contacting CBP officers based on the argument that CBP officers were represented by the government.

13

NOTICE OF MOTION AND MOTION TO DISMISS

had been the one who led the pre-airport investigation and reviewed the Miami airport stop discovery back in November 2020, both of which distinguished Ayvazyan's telephone number as 818-██-6000.  There is no credible reason that Agent Palmerton would have mistakenly dialed Ayvazyan's number and expected anyone but a represented defendant to answer the phone.  Finally, Agent Palmerton's 302 covers up this incident, stating only that he and others "located and arrested" Grigoryan and that he was taken into custody "without incident."   Ram Decl. Ex. B.

### 3. The Government Violated Its Obligations Under *Brady* and Its Progeny and the California Rules of Professional Conduct

California Rule of Professional Conduct 3.8(d) requires timely disclosure of all "evidence or information" known to the prosecution team that the prosecutor "knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence …."  *Id.*  "[T]he obligations include, at a minimum, the duty to disclose impeachment evidence that a prosecutor knows or reasonably should know casts significant doubt on the accuracy or admissibility of witness testimony on which the prosecution intends to rely."  Cal. R. Prof'l Conduct 3.8 cmt. 3 (noting that this obligation applies more broadly than "material" evidence).

Within 24 hours of indictment, Ayvazyan requested that the government identify and disclose all discoverable material or information (whether or not memorialized) in the prosecution team's possession, custody, or control and provided 11 exemplar categories of *Brady* material including any documents and information demonstrating "a third person was responsible for the loan applications or succeeding financial transactions at issue in any part of the search warrant(s), complaint, or indictment." Dkt. 133-1 at 008-010.  Ayvazyan requested that the government "identify with particularity" all such materials pursuant to the general rule that burying exculpatory information amongst hundreds of thousands of other documents is not sufficient to meet the government's discovery obligations.  *Id.* at 011; *see United States v. Salyer*, No. 10-cr-61, 2010 WL 3036444, at *3 (E.D. Cal. Aug. 2, 2010) ("The government cannot

1   meet its Brady obligations by providing [the defendant] with access to 600,000
2   documents and then claiming that she should have been able to find the exculpatory
3   information in the haystack.").  The government raised no objection.

4          Despite the discovery deadline passing over one month ago, the government has
5   failed to identify *Brady* material with particularity, and it appears to have failed to
6   produce certain *Brady* material at all.  *Brady* material exists.  For example, the
7   government noticed that IP address evidence undercut certain allegations against
8   Ayvazyan, most notably that none of the IP addresses in a document related to Counts
9   28-31 were tied to Ayvazyan.  Rather than disclose that exculpatory information, the
10  government submitted an "excerpt" of that document to the Court, strategically deleting
11  the portion of the document containing the exculpatory IP address log.  Dkt. 234 at 6-7.
12  Based on the amount of time and federal government resources that have gone into
13  analyzing subpoena returns in this case, the government has undoubtedly identified
14  additional exculpatory information and it has an obligation to disclose that information
15  to the defense, not bury it.

16          In other areas, the government appears to have failed to produce exculpatory
17  evidence altogether.  The government's case hinges on the inference that Ayvazyan is
18  responsible for alleged misconduct of Iuliia Zhadko because Ayvazyan purportedly *is*
19  Zhadko.  Because the government has conceded that it has continued to subpoena
20  financial records related to the indictment, it must be obtaining evidence that shows that
21  Zhadko is continuing to access his accounts and engage in transactions, and thus could
22  not possibly be Richard Ayvazyan.  Ayvazyan has been confined to his home for the
23  vast majority of the last six months.  If Zhadko has continued to use his accounts in any
24  traceable fashion, then that will both show that Ayvazyan is not Zhadko and will aid
25  Ayvazyan in finding Zhadko to testify at trial.

26          As a second example, the government has refused to un-redact a key CBP form
27  regarding the pretextual Miami airport stop.  The CBP form states that the "Reason for
28  Search[ing]" Ayvazyan was "National Security," but a second line is redacted and has

15
NOTICE OF MOTION AND MOTION TO DISMISS

been withheld from the defense.  Dkt. 133-18 at 112.  Based on all available evidence, it seems likely to prove Ayvazyan's argument that border concerns were used as a pretext to unlawfully search for PPP loan fraud evidence.

As a third example, during a March 11, 2021 call, one of the prosecutors stated that the government believes that some undefined group of people "pass around the[] phones" that may have been used to apply for loans or conduct transactions in this case. Ram Decl. ¶ 4.  If true, this would support reasonable doubt that any defendant was responsible for whatever unlawful acts he or she is accused of committing using any of "these phones."  The government has not, however, memorialized and produced this exculpatory information.

Ayvazyan understands that the government indicted this case before it was ready to proceed to trial and that it has spent resources both conducting an investigation and diligence that would ordinarily occur before indictment.  But the government's *Brady* obligations do not change simply because the government indicted this case before it was ready to proceed to trial.

### D. The Government Flagrantly Violated the Court's Discovery Order and Compounded That Misconduct By Lying to the Court

As described in Ayvazyan's Motion to Enforce the December 22, 2020 Discovery Order, the government violated the Court's discovery order.  Dkt. 248.  The Court ordered the government to "expeditiously comply" with its discovery obligations, and "make every effort" to produce its documents "well in advance of the" March 15, 2021 discovery cut-off set forth in the order.  Dkt. 105.  The government did not do so, and instead empaneled a grand jury to get around the Court's warning that "Any evidence produced after March 15, 2021 will not be admitted absent extraordinary circumstances."  Dkt. 105.  Rather than expeditiously comply and make every effort, the government dumped the majority of its documents on Ayvazyan on March 12, three days before the discovery cut-off date, and continued producing documents after the Court's March 15 deadline.

16

NOTICE OF MOTION AND MOTION TO DISMISS

1    The government attempted to excuse its blatant violations of the Discovery Order

2    by misrepresenting what it was producing, claiming that the documents related to the

3    superseding indictment.  The government's excuses fall flat for three reasons.  First, as

4    reflected in the Chart in Ayvazyan's Reply in Support of his Motion to Enforce the

5    Court's December 22, 2020 Discovery Order (Dkt. 287 at 6-8), many of the late

6    productions relate to the entities and loans in the initial indictment.  Second, nothing in

7    the Court's Discovery Order contemplated an extension of the order should the

8    government file a superseding indictment.  The March 15 discovery deadline did not

9    contain an exception where the prosecutors—who had already alleged a conspiracy

10   involving others known to the government—could evade their obligations by seeking

11   another indictment of the same conspiracy.  Third, even if the late-produced documents

12   only concerned the new conduct alleged in the superseding indictment (which they did

13   not), all of the documents produced to date relate to one conspiracy—the one charged

14   in the November indictment.  Indeed, the pre-March 12 indictment discovery included

15   documents related to every one of the new defendants and new allegations that were

16   allegedly part of the same overarching conspiracy.  The government's dumping of data

17   related to this alleged overarching conspiracy and continued production after the close

18   of discovery violated this Court's Discovery Order.

19       The government compounded its errors by misrepresenting the state of its

20   productions to the Court: "First of all, the Government has complied with the Court's

21   discovery cutoff order for the discovery cutoff of March 15th."  Apr. 2 Tr. at 45.  This

22   was a lie.  The government has made five productions after the March 15 deadline,

23   many of which contained documents that were in the government's possession before

24   the discovery cut-off.  The government has not explained why these documents were

25   not timely produced. *See generally* Dkt. 278.  Worse yet, the government has conceded

26   that it does not know when it will be able to produce potentially exculpatory evidence.

27   Dkt. 287 at 5.  The government flagrantly violated the Court's Order and compounded

28   its error by lying to the Court about that violation.

NOTICE OF MOTION AND MOTION TO DISMISS

## III. THE GOVERNMENT'S CUMULATIVE MISCONDUCT MERITS DISMISSAL UNDER EITHER THE DUE PROCESS CLAUSE AND THE COURT'S SUPERVISORY POWERS

The government's aggregated misconduct has irreparably tainted its case against Ayvazyan. When prosecutors fail to live up to their role as representatives of a sovereignty obligated to govern impartially with justice elevated above convictions, dismissal of an indictment may be proper under either of two theories. "[First, a] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)). Dismissal of Ayvazyan's indictments is proper under either theory.

### A. Dismissal Is Proper Under the Due Process Clause Because the Government's Misconduct During and After the Miami Airport Stop Shocks the Universal Sense of Justice

Under the due process clause, a court may dismiss an indictment when the conduct of law enforcement "violate[s] that 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment.'" *United States v. Russell*, 411 U.S. 423, 431-32 (1973) (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960) and citing *Rochin v. California*, 342 U.S. 165 (1952) as an example). In *Rochin*, the Supreme Court vacated a conviction because the unlawful means of gathering evidence (attempting to pull evidence out of a suspect's mouth during an unlawful search, and then having the suspect's stomach pumped to retrieve the evidence) was too similar to violations of the Fifth Amendment right against self-incrimination to accord with modern conceptions of justice. *See Rochin*, 342 U.S. at 173 ("It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract

18

NOTICE OF MOTION AND MOTION TO DISMISS

what is in his stomach. … To attempt in this case to distinguish what lawyers call 'real evidence' from verbal evidence is to ignore the reasons for excluding coerced confessions.").  Here, the government not only denied the right to counsel guaranteed by the Fifth Amendment but it did so as part of a broader invasion of liberty: using the guise of "terrorism" and "national security" to detain and search citizens in manners that would otherwise violate the constitution, and following that up by deleting evidence after it was identified by Ayvazyan.  While shocking the universal sense of justice is a high standard, the government's determination to trample the civil liberties while cloaking itself in "terrorism" and "national security" is so outrageous as to merit dismissal, particularly when combined with the consequent deletion of evidence and pattern of misconduct.

### B.    Dismissal Is Proper Pursuant to the Court's Supervisory Power Because the Aggregated Abuses Justify Ending This Tainted Prosecution and Deterring Future Misconduct

The Court's supervisory powers permit it to dismiss an indictment in response to the cumulative effect of government indiscretions that fall short of a due process violation and even if none of them, standing alone, would be sufficient to merit dismissal.  "The supervisory power has frequently been used by federal courts as a means of sanctioning and deterring prosecutorial misconduct."  *United States v. Marshank*, 777 F. Supp. 1507, 1529 (N.D. Cal. 1991).  Dismissal under the supervisory power requires that (1) the government's misconduct must be flagrant and (2) the government's misconduct must have substantially prejudiced the defendant.  *Id.* (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)).  In assessing these factors, it is "the cumulative effect of the errors and indiscretions" that matters; the Court need not consider them individually.  *See United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) (affirming supervisory power dismissal because "the cumulative effect of the ... errors and indiscretions, none of which alone might have been enough to tip the scales operated to the defendants' prejudice"); *United States v.*

NOTICE OF MOTION AND MOTION TO DISMISS

*Aguilar*, 831 F. Supp. 2d 1180, 1201 (C.D. Cal. 2011) (dismissing indictment despite guilty verdict based on an entire pattern of misconduct and noting "numerous decisions of the Ninth Circuit Court of Appeals have reversed convictions because of multiple wrongful acts that, in the aggregate, warranted the exercise of supervisory power"). This case meets that standard because the government's cumulative misconduct is so flagrant and prejudicial that it merits dismissal.

### 1.    The Government's Misconduct Has Been Flagrant

Flagrant misconduct does not require "willfulness"; "reckless disregard" of the defendant's rights satisfies the standard. *Chapman*, 524 F.3d at 1085. But this case involves willful *and* reckless misconduct as summarized above. In *Aguilar*, the Honorable Judge Matz held that a false statement inserted into a search warrant affidavit, failure to correct a testifying witness in the grand jury, and obtaining privileged communications (particularly because it was followed by a misrepresentation to the presiding judge) constituted flagrant misconduct. 831 F. Supp. 2d at 1208-09. The pattern of misconduct that has occurred in this case is similar to that in *Aguilar*— the government here too has misled the Court, failed to disclose discovery materials, and invaded a defendant's privileged communications—but it also involves issues not present in *Aguilar*: repeated violations of the Fourth Amendment, an attempted cover-up of those violations, child endangerment and a bad-faith justification for that endangerment, contacting a represented defendant, deleting key evidence, and an overall pattern of attempting to evade accountability. As the *Aguilar* court asked, "How could [that] not be flagrant?" *Id.* at 1208.

### 2.    The Government's Misconduct Has Substantially Prejudiced Ayvazyan

To evaluate the prejudice inflicted upon Ayvazyan by the government's campaign of misconduct, it is helpful to take a step back to the examine the state of the government's investigation before the Miami airport stop. As of mid-October 2020, the government asked CBP to detain, interrogate, and search Marietta Terabelian. Dkt.

20

NOTICE OF MOTION AND MOTION TO DISMISS

1    133-6 at 039-040.  The ensuing constitutional violations led the government to

2    conclude "that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan."  Oct. 22 Tr. at

3    24.  As a result of its erroneous conclusion based on unlawfully seized evidence, the

4    government became convinced that Ayvazyan was somehow the leader of what the

5    government continuously characterizes as a "fraud ring."  The government therefore

6    acted on the unlawfully seized evidence to turn Ayvazyan's life upside down.  The

7    government contacted Ayvazyan's mortgage holder and pressured him to foreclose on

8    Ayvazyan in the middle of a pandemic that the government characterized as too unsafe

9    for a trial and yet somehow safe enough to foreclose on a family.  All the while the

10   government has pressured, cajoled, or subpoenaed anyone Ayvazyan has ever spoken

11   with, asking them to turn on Ayvazyan.  The government has built a mass of hundreds

12   of loan applications that it plans to lay at Ayvazyan's feet even though he has never

13   heard of most of the companies involved and does not know anything about the

14   applications.  The six months during which the government has effectively held

15   Ayvazyan hostage while investigating the same conspiracy charged in the indictment to

16   increase the potential loss amount under the most aggressive Guidelines reading

17   possible have rung a bell that cannot be unrung by any remedy short of dismissal.

18         The government has restricted Ayvazyan's liberty, publicly maligned him, and

19   forced him to devote enormous effort to responding to and redressing the government's

20   misconduct consistent with the concerns in *Aguilar*.  In *Aguilar*, the court found

21   prejudice in large part because of the drain on preparation resources caused by the

22   government's misconduct: "Within only one year after the return of the First

23   Superseding Indictment—an unusually brief period for this kind of case [a complex

24   FCPA allegation involving international business]—the docket had almost 700 entries,

25   many of which consist of the motions, ex parte applications, oppositions, hearings, and

26   rulings necessitated by the prosecution's astonishing number of "mistakes" (as the

27   Government chooses to characterize them) ….."  831 F. Supp. at 1207.  In this "simple

28

21

NOTICE OF MOTION AND MOTION TO DISMISS

and straightforward" case,[9] we have over 280 docket entries (not including exhibits or search warrant documents) in less than six months including four motions to suppress based on government constitutional violations and two motions to get the government to comply with its discovery obligations.  The government has committed so much misconduct that defense counsel has been forced to restrict preparation time in order to focus on enforcing basic procedural and constitutional rights.

All the while, Ayvazyan has remained under the cloud of indictment and subject to the "substantial impairment of liberty imposed on an accused while released on bail" to house arrest.  *See United States v. Loud Hawk*, 474 U.S. 302, 311 (1986) (emphasizing "the disruption of life caused by the arrest and the presence of unresolved criminal charges"); *Klopfer v. North Carolina*, 386 U.S. 213, 221-22 (1967) (emphasizing the restraint on liberty applicable from the pendency of an indictment subjecting an individual to public scorn and depriving him of employment).  The government has exacerbated this prejudice by using its considerable resources to drag Ayvazyan through the reputational mud, not just via an indictment but through prosecutorial press releases[10] that the government then went to great length to publicize on Twitter[11] and through television interviews with lead AUSAs[12] touting the tainted

---

[9] Dkt. 188 at 13, 16, 23; Dkt. 207 at 7.

[10] U.S. Attorney's Office Central District of California (Nov. 18, 2020), https://www.justice.gov/usao-cdca/pr/4-san-fernando-valley-residents-indicted-fraudulently-obtaining-nearly-5-million-covid; DOJ Office of Public Affairs, Press Release (Nov. 18, 2020), https://www.justice.gov/opa/pr/four-members-los-angeles-based-fraud-ring-indicted-covid-relief-fraud; U.S. Attorney's Office Central District of California, Press Release (Mar. 12, 2021), https://www.justice.gov/usao-cdca/pr/3-additional-members-alleged-fraud-ring-based-san-fernando-valley-arrested-charges; DOJ Office of Public Affairs, Press Release (Mar. 12, 2021), https://www.justice.gov/opa/pr/four-additional-members-los-angeles-based-fraud-ring-indicted-exploiting-covid-relief;.

[11] @USAO_LosAngeles (Nov. 18, 2020 1:20 p.m.), https://twitter.com/USAO_LosAngeles/status/1329127326119030804; @TheJusticeDept (Nov. 18, 2020 1:52 p.m.), https://twitter.com/TheJusticeDept/status/1329135318495334407; @USAO_LosAngeles (Mar. 12, 2021 12:33 p.m.), https://twitter.com/USAO_LosAngeles/status/1370427658715213830; @TheJusticeDept (Mar. 12, 2021), https://twitter.com/TheJusticeDept/status/1370415336202379264.

[12] NBC Los Angeles, *Brothers and Wives Charged in $5.6 Million COVID-19 Loan Scheme* (Nov. 18, 2020), https://www.nbclosangeles.com/news/local/encino-coronavirus-fraud-scheme/2465391/

22
NOTICE OF MOTION AND MOTION TO DISMISS

allegations.

### 3.   Dismissal Is Proper to Deter the Government From Future Misconduct

Ayvazyan's case presents a particularly worthy vehicle for dismissal by supervisory power.  "The supervisory power has frequently been used by federal courts as a means of sanctioning and deterring prosecutorial misconduct." *Marshank*, 777 F. Supp. at 1529 *see also Aguilar*, 831 F. Supp. 2d at 1206 & n.20 (noting that deterrence is one of the core reasons for exercising supervisory powers).  In addition to deterring violations, the supervisory power can be used to convince prosecutors to adhere to standards of prosecutorial conduct, *Kojayan*, 8 F.3d at 1325 (quoting *United States v. Williams*, 504 U.S. 36 (1992)).  Deterrence is particularly important here because the misconduct involves areas where the government's abuse of power is difficult to detect such as pre-indictment searches, cover-ups, and abuse of the grand jury process.

The government has committed flagrant misconduct in violation of ethical rules, the Fourth Amendment, assault and battery laws, destruction of property laws, the Federal Rules of Criminal Procedure and the Court's discovery order.  As a result Ayvazyan has suffered—during his bout with COVID-19 contracted in government custody, during the November 5 search warrant execution, and during the six months of house arrest that have followed.  *See Aguilar*, 831 F. Supp. 2d at 1210 ("dismissal of the Superseding Indictment is justified not only as a deterrent but to release [defendant] from further anguish and uncertainty." (citation omitted)).  If the Court permits the prosecution to continue, there is every reason to believe that the government's misconduct will continue unabated and the government will continue to stretch its power beyond its breaking point.

(interview of then-lead AUSA given within one day of indictment).

NOTICE OF MOTION AND MOTION TO DISMISS

1

2

**C.    The Court Should Order the Government to Produce Discovery Regarding Its Abuse of the Grand Jury Process and Presentation of Tainted Evidence**

3

4        The chart in Section II.C describes one dozen examples of how the government

5   abused the grand jury process to continue gathering evidence regarding the entities and

6   people in the initial indictment.  But the government's misconduct also extended to

7   failing to disclose to the Court that it planned all along to supersede on the same

8   conspiracy charged in November as a way of evading its Speedy Trial and Discovery

9   Order obligations.

10        In October and November 2020, the government filed both a complaint and

11   indictment alleging probable cause to believe that many of the loans and entities in the

12   superseding indictment were part of the same conspiracy as the original indictment.

13   For example, in the October 20, 2020 complaint, the government alleged probable

14   cause to believe that Edward Paronyan submitted the allegedly fraudulent Redline Auto

15   Collision loan application in the indictment.  *Compare* Compl. ¶¶ 26.c-.e (Dkt. 152 Ex.

16   11 at 68), *with* Superseding Ind. Overt Acts 29-31 (Dkt. 154 at 18).  Similarly, the

17   November 3, 2020 search warrant application alleged that Ayvazyan and Terabelian

18   had "stolen" the identity of N.T. and used that identity to apply for disaster loans, i.e.,

19   Counts Eleven and Twenty-Two in the superseding indictment, but it held those

20   allegations back for four more months.  *Compare* Search Warrant App. ¶¶ 33.k, 62.d

21   (Dkt. 152 Ex. 11 at 31, 44-45), *with* Superseding Ind. ¶¶ 37, 44-45 (Dkt. 154 at 29-30,

22   36).  But the government held these allegations and others back from the indictment,

23   and instead plotted to use a superseding indictment to extend its evidence gathering

24   process without being bound by the limitations in Fed. R. Crim. P. 16 and 17.

25        What makes the government's misconduct particularly wrongful is its intent to

26   evade both defendants' Speedy Trial rights and a Court order.  The Court made clear

27   that the government could not leverage COVID-19 as an opportunity to build out its

28   case, but that is precisely what the government did.  From the moment Ayvazyan

NOTICE OF MOTION AND MOTION TO DISMISS

invoked his speedy trial rights, the government appears to have intentionally manipulated the grand jury process to lengthen the time during which it could build a case against Ayvazyan. There are substantial issues regarding the degree to which this misconduct was willful and who was involved.

Ayvazyan therefore requests that the Court (a) order the government to produce discovery regarding the government's internal decision-making regarding whether and when to charge different individuals or include different loans in charging documents, in addition to (b) ordering the government to produce the above-requested discovery regarding the government's presentation of tainted evidence to the grand jury.

## IV.   CONCLUSION

This case is abnormal for many reasons. Chief among them, the government's desire not to lose the fruits of an unconstitutional search led it to indict a case that it now admits it had not finished investigating. A Family Circus-like path of destruction has followed since then as the government has bounced from one lie to another. The resulting mess has substantially prejudiced the very people whose procedural rights the government is responsible for protecting. At some point, enough is enough. Ayvazyan respectfully requests that this Court dismiss the indictments with prejudice.

Dated:   April 21, 2021          Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
Michael A. Keough (SBN 327037)
Nicholas P. Silverman (*pro hac vice*)
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

25