**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>RICHARD AYVAZYAN, et al.<br><br>Defendants. | **CASE NO.  2:20-cr-579-SVW**<br><br>**ORDER RE: MOTIONS TO SUPPRESS [130], [135], [136], [146] FILED BY DEFENDANTS RICHARD AYVAZYAN AND MARIETTA TERABELIAN** |

Before the Court are motions to suppress filed by Defendants Richard Ayvazyan and Marietta Terabelian (collectively "Defendants").  *See* Dkts. 130, 135, 136, 146.  For the below reasons, Defendants' motions to suppress the physical fruits of a *Miranda* violation are GRANTED IN PART.  Defendants' remaining motions are DENIED.

## I.  Factual and Procedural Background.[1]

In June 2020, the Government began investigating a Los Angeles-based conspiracy involving fraudulent applications for forgivable loans authorized by the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act").  The Government determined that stolen, fake, and synthetic identities were used to obtain forgivable loans as part of the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Relief Program ("EIDL").  The false identities listed on the applications included, among others, "Iuliia Zhadko" and "Viktoria Kauichko."  The Government alleges that Defendants used those identities, and others, to obtain forgivable loans.  Defendants then allegedly used the funds to purchase real estate, luxury home furnishings, precious metals, and jewelry.

On October 19, 2020, Defendants were returning to Los Angeles from a vacation in Turks and Caicos.  Their journey included a flight from Turks and Caicos to Miami, Florida.  Justin Palmerton—an FBI agent in Los Angeles who was investigating the above described conspiracy—had previously received notice about Defendants' flight to Miami.  He contacted

---

[1] The facts stated in this section are sourced from the criminal complaint, the affidavit in support of the warrant to search Defendants' home, and the parties' briefs in support of the instant motions.  The Court recites limited facts in order to provide a broad overview of the events and allegations at issue; nothing in this section should be construed as a factual finding by the Court.  More specific facts that are relevant to the Court's analysis are included throughout the order.

the Miami-based Joint Terrorism Task Force and requested that customs agents conduct a secondary screening of Defendants upon their arrival at the Miami airport. In doing so, he provided some details of his investigation and identified several questions that he wanted customs officials to ask Defendants.

At around 3:30 p.m. on October 19, 2020, Defendants arrived at the Miami airport and were referred by customs officials for a secondary screening. Defendants were then detained until approximately 1:45 a.m., when they were informed that they were being arrested. Between 3:30 p.m. on October 19, 2020 and 1:45 a.m. on October 20, 2020, customs agents interviewed Defendants multiple times and searched Defendants' luggage, wallets, and cell phones. Those searches yielded the following evidence:

- a credit card in the name of "Viktoria Kauichko," contained in Terabelian's wallet;

- credit cards belonging to "Viktoria Kauichko" and "Iuliia Zhadko," contained in Ayvazyan's luggage; and

- photographs on Defendants' cell phones of (1) a driver's license in the name of "Iuliia Zhadko" that listed Defendants' home address, (2) a social security card in Zhadko's name, and (3) numerous other credit cards and driver's licenses in various names.

Later in the day on October 20, 2020, the Government filed criminal complaints alleging that Defendants conspired with others to commit bank and wire fraud.

On November 3, 2020, the Government applied for a warrant to search Defendants' home in Tarzana, California. The Government sought evidence of the fraudulent loan applications and the proceeds of fraudulently obtained loans, including but not limited to records related to the businesses and individuals that applied for loans, records concerning the creation or use of false identities, and jewelry, precious metals, and cash. A magistrate judge approved the application and issued the warrant.

Agents executed the search on November 5, 2020. During the search, agents seized a variety of items, including financial records, jewelry, gold coins, and a grocery bag containing nearly $450,000 of cash. Agents also seized a cell phone that contained digital photographs of credit cards belonging to "Iuliia Zhadko" and "Viktoria Kauichko."

On November 17, 2020, Defendants were indicted on a variety of charges including conspiracy to commit bank and wire fraud. On March 9, 2021, the Government filed its first superseding indictment, which alleges that Defendants received over $18 million in fraudulently obtained PPP and EIDL funds.

Also in early March, 2021, Defendants filed the instant motions to suppress.  Defendants' motions are as follows:

- Dkt. 130: a joint motion to suppress evidence seized at the Miami airport on the grounds that the customs agents' warrantless search violated the Fourth Amendment;[2]

- Dkts. 135 and 136: separately filed motions to suppress evidence seized and statements made at Miami airport on the grounds that customs agents violated Defendants' *Miranda* rights;[3] and

- Dkt. 146: a joint motion to suppress evidence seized during the search of Defendants' home on the grounds that the warrant was overbroad and lacked particularity.

After briefing, the Court took the motions under submission.

## II.    Defendants' Motion to Suppress Evidence Seized at the Miami Airport on Fourth Amendment Grounds is Denied.

Defendants move this Court to suppress evidence seized at the Miami airport on the grounds that the customs agents' warrantless search violated the Fourth Amendment.  Dkt. 130.

The Court reviewed the parties' briefs and exhaustively researched the relevant authorities.  Having done so, the Court concludes that resolution of Defendants' motion turns on whether the Court must apply Ninth Circuit law or Eleventh Circuit law.[4]  After explaining why that is the case, the Court will then explain why Eleventh Circuit law applies and requires denial of Defendants' motion.

---

[2] Although the motion was filed by Ayvazyan, *see* Dkt. 130, Terabelian joined Ayvazyan's motion, *see* Dkt. 153.

[3] Defendant Ayvazyan also asserts that customs agents violated his Sixth Amendment rights.  *See* Dkt. 135 at 11 ("The Evidence Collected from Ayvazyan During the Miami Detention Should Be Suppressed Under the Fifth and Sixth Amendments.").  However, nowhere in his papers does Ayvazyan provide support for the premise that the Sixth Amendment right to counsel had attached, or that Defendants' detention at Miami airport was a critical stage at which the Sixth Amendment right to counsel applies.  *See United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003).  To the extent Ayvazyan argues that the Sixth Amendment right had attached because the FBI was in the process of filing a criminal complaint against him, the Court rejects that argument.  The Ninth Circuit has expressly held that, for the purpose of federal criminal prosecutions, the Sixth Amendment right to counsel does not attach upon the filing of a criminal complaint by the FBI.  *See United States v. Pace*, 833 F.2d 1307, 1312 & n.3 (9th Cir. 1987).  Accordingly, Ayvazyan's Sixth Amendment motion is denied.

[4] The airport search here occurred in Miami, which is located in the Eleventh Circuit.  However, the search was instigated by an officer in the Ninth Circuit—*i.e.*, Agent Palmerton, an FBI agent based out of the Los Angeles Field Office.

A.     **The Resolution of Defendants' Motion Turns on Whether Ninth Circuit Law
       or Eleventh Circuit Law Applies.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.
Generally, police must obtain a warrant issued by a judicial officer before conducting a search.
That warrant must be based "upon probable cause, supported by Oath or affirmation, and
particularly describ[e] the place to be searched, and the persons or things to be seized."  *Id.*
There are only a handful of "specifically established and well-delineated exceptions" to the
warrant requirement.  *Katz v. United States*, 389 U.S. 347, 357 (1967).

One of those exceptions is for searches conducted at the nation's border.  There, "[t]he
Government's interest in preventing the entry of unwanted persons and effects is at its zenith."
*United States v. Flores–Montano*, 541 U.S. 149, 152 (2004).  "Border searches are generally
deemed 'reasonable simply by virtue of the fact that they occur at the border.'"  *United States v.
Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (quoting *United States v. Ramsey*, 431 U.S. 606,
616 (1977)).  "This does not mean, however, that at the border 'anything goes.'"  *Id.* (quoting
*United States v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc)).

Indeed, under Ninth Circuit law, the search at issue falls outside the scope of the border
search exception.  In the Ninth Circuit, "[a] border search must be conducted to enforce
importation laws, and not for general law enforcement purposes."  *United States v. Cano*, 934
F.3d 1002, 1013 (9th Cir. 2019) (internal quotations and citations omitted).  The *Cano* Court
elaborated as follows:

> [B]order officials have no general authority to search for crime. . . . So, for example, if
> U.S. officials reasonably suspect that a person who has presented himself at the border
> may be engaged in price fixing, *see* 15 U.S.C. § 1, they may not conduct a forensic search
> of his phone or laptop.  Evidence of price fixing—texts or emails, for example—is not
> itself contraband whose importation is prohibited by law.  Such emails may be evidence
> of a crime, but they are not contraband, and there is no law prohibiting the importation of
> mere evidence of crime.[5]

---

[5] There appears to be a circuit split on the scope of the border search exception.  The First Circuit expressly rejected
the *Cano* Court's position, and the Second Circuit has done so implicitly.  *See Alasaad v. Mayorkas*, 988 F.3d 8, 20–
21 (1st Cir. 2021) ("We cannot agree with [*Cano*'s] narrow view of the border search exception because *Cano* fails
to appreciate the full range of justifications for the border search exception beyond the prevention of contraband
itself entering the country."); *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) ("Whether a Customs
official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is
irrelevant to the validity of a border search, which we have held 'does not depend on whether it is prompted by a
criminal investigative motive.'") (internal citations omitted).  By contrast, the Fourth Circuit recently narrowed the
scope of the border search exception in a manner similar to the Ninth Circuit.  *See United States v. Aigbekaen*, 943
F.3d 713, 721 (4th Cir. 2019) (noting that agents "must have individualized suspicion of an offense that bears some

*Id.* at 1017.  To determine whether a search was conducted for general law enforcement purposes, courts must conduct an objective inquiry.  *See id.* at 1016 n.9.

Here, in light of an objective analysis of the record, the Court finds that the border search at the Miami airport was conducted for a "general law enforcement purpose" because it was conducted to assist Los Angeles agents in their investigation of Defendants' alleged PPP loan fraud.  Agent Palmerton contacted the Joint Terrorism Task Force—not customs agents who search for contraband—and requested a secondary screening of Defendants.  *See* Dkt. 133, Ex. 6. Palmerton described the details of his investigation as follows:

> Case Summary: LA [Field Office] is investigating a PPP fraud ring that has fraudulently obtained PPP and SBA loans in excess of $20 million.  The funds were primarily used for the purchase of residences, jewelry, diamonds and gold bullion.  The majority of the loans were obtained through the use of stolen/synthetic identities and businesses. Marietta Terabelian was the recipient of approximately $565,000 in PPP funds that were used for the purchase of a house in LA and was previously indicted for mortgage fraud in 2012.

*See id.*  Palmerton also identified several questions that he wanted customs officials to ask Defendants, none of which are directly related to contraband.  *See id.*  In response, the Miami-based FBI agent copied a customs official and described the request as follows: "Carlos – please [see] below request for secondary.  *It's a PPP related fraud*."  *Id.* (emphasis added).

Paperwork completed by customs officials also supports a finding that the border search was conducted for a general law enforcement purpose.  For example, an incident report identifies the following topic: "USCS/ FBI SUBJECTS OF INTEREST /FRAUD."  *See* Dkt. 133, Ex. 17. That same report describes Ayvazyan as a "Subject of interest for FBI."  *Id.*  Another report states that the search and detention occurred "for purposes of national security,"  Dkt. 133, Ex. 7, and a different report describes the "Reason for Search" as "National Security Concern," Dkt. 133, Ex. 18.  Yet, there is no evidence in the record that either Ayvazyan or Terabelian presented any national security concerns.  This raises the inference that "national security concerns" were merely a pretext for the actual purpose of the search: investigating the alleged PPP loan fraud.

There is also evidence that Palmerton was communicating with customs agents throughout the detention.  For example, Palmerton testified at Defendants' detention hearing that he spoke with customs agents about three hours after Defendants were detained.  *See* Oct. 22, 2020 Detention Hearing Tr. at 20, *United States v. Ayvazyan*, No. 20-mj-3857, Dkt. 17 (S.D. Fla.

---

nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband.").

Nov. 13, 2020).  Palmerton also emailed customs agents during Defendants' detention to "check in" and offer assistance.  *See* Dkt. 133, Ex. 6.

Under these circumstances, the record as a whole establishes that the border search was executed for general law enforcement purposes—*i.e.*, to assist the LA Field Office in its investigation of Defendants' alleged PPP loan fraud.[6]  Accordingly, if Ninth Circuit law applies, the search of Defendants' luggage and devices was unlawful.[7]  *See Cano*, 934 F.3d at 1013.

However, if Eleventh Circuit law applies, the search was lawful.  In the Eleventh Circuit, border searches of property are reasonable without any level of suspicion.  *See United States v. Touset*, 890 F.3d 1227, 1232, 1237 (11th Cir. 2018).  This includes searching a traveler's luggage, *see id.* at 1232, and forensic and manual searches of electronic devices, *see id.* at 1233.

Here, the only evidence that Defendants move to suppress in the instant motion resulted from a border search for property as governed by Eleventh Circuit law.  Specifically, Miami customs agents searched Defendants' luggage and their cell phones.  It does not matter whether the cell phone search was a "manual" search or a "forensic" search because, in the Eleventh Circuit, both are searches of property and neither requires any level of suspicion.  *See id.*

In a single footnote, Defendants argue that the Miami airport search was not permissible under Eleventh Circuit law.  Specifically, Defendants suggest that *Touset* permits forensic searches of electronic devices without suspicion only if agents are "searching for child pornography, *i.e.*, actual digital contraband rather than evidence of an intent based crime."  Dkt. 208 at 15 n.19.

Defendants are incorrect.  Nowhere in *Touset* did the Eleventh Circuit limit its holding to searches of electronic devices for child pornography.[8]  Nor did the court limit its holding to

---

[6] The Government argues that the purpose of the search was to search for contraband and, specifically, fake IDs.  The Government relies solely on a single sentence in Palmerton's email to Miami agents in which Palmerton notes that Defendants "may have been transporting fake id's, gold or large amounts of cash."  Dkt. 133, Ex. 6.  Aside from this single reference in a single email, the Government does not identify any evidence supporting its position.  Indeed, an objective inquiry into the record establishes that the purpose of the search was general law enforcement and, specifically, assisting the LA Field Office in its investigation of Defendants' alleged loan fraud.

[7] Because an objective inquiry establishes that the search was conducted for general law enforcement purposes, the Court need not address the parties' dispute regarding whether fake (or synthetic) third-party access devices—or images of those devices—constitute "contraband" for the purposes of the border search exception.

[8] The *Touset* Court did note that "child pornography, no less than drugs or other kinds of contraband, is prohibited from entering the country, and the government interest in stopping contraband at the border does not depend on whether child pornography takes the form of digital files or physical photographs."  890 F.3d at 1235.  The court further explained that, "if we were to require reasonable suspicion for searches of electronic devices, we would create special protection for the property most often used to store and disseminate child pornography."  *Id.*  In doing so, the court was merely explaining some of the policy interests at stake in their decision.  Nothing about this

searches of electronic devices for "digital contraband." Rather, the court clearly stated that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border." *Touset*, 890 F.3d at 1231; *see also id.* at 1233 ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property."); *id.* at 1234 ("[A] forensic search of an electronic device is a search of property. And our precedents do not require suspicion for intrusive searches of any property at the border."); *id.* at 1229 ("[N]o suspicion is necessary to search electronic devices at the border."). And district courts in the Eleventh Circuit have applied *Touset* to border searches of electronic devices even though agents were not searching for child pornography or "digital contraband." *See, e.g.*, *United States v. Haynes*, 2020 WL 109061, at *2 (S.D. Fla. Jan. 9, 2020) (applying *Touset* to search of cell phone for evidence related to firearms offenses).

Defendants' position is also undermined by the second portion of the *Touset* opinion. In that section the court found that, even if a forensic search of the defendant's electronic device required reasonable suspicion, the record supported a finding of reasonable suspicion. In doing so, the court did not apply the standard Defendants suggest—*i.e.*, the court did not analyze whether agents had reasonable suspicion of *contraband*. Rather, the standard applied by the court was broader: "Reasonable suspicion must be based upon a 'particularized and objective basis for suspecting the particular person of *criminal activity*.'" *Touset*, 890 F.3d at 1237 (quoting *Denson v. United States*, 574 F.3d 1318, 1339 (11th Cir. 2009)) (emphasis added).

Accordingly, Defendants' motion turns on the governing law. If Ninth Circuit law applies, Defendants' motion must be granted. However, if Eleventh Circuit law applies, Defendants' motion must be denied.

The Court now turns to determining which law applies.

**B.    Eleventh Circuit Law Applies and Requires Denial of Defendants' Motion.**

The parties' briefing on this issue is limited. The Government argues that the good faith exception announced in *Davis v. United States*—which held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule," 564 U.S. 229, 232 (2011)—applies here and prohibits exclusion of the evidence, *see* Dkt. 152 at 13–16. However, the Government also relies on case law that frames the issue not as an exception to the exclusionary rule but, rather, as a choice-of-law inquiry—*i.e.*, the threshold question of the search's legality should be answered based on Eleventh Circuit law. *See id.*

---

language suggests that border searches are limited to those particular policy interests and cannot be used to promote other policy interests (*e.g.*, investigating criminal activity).

Defendants cite to minimal authority and instead argue that, because a California-based agent and California-based prosecution team instigated the search, Ninth Circuit law should apply.  Dkt. 208 at 14–16.

The Court researched this issue extensively and found no cases directly on point. Although some cases involve out-of-circuit searches based on information provided by forum agents to out-of-circuit agents,[9] none of those cases present the situation here: a forum agent who directed an out-of-circuit search that is unlawful if the forum's law applies but lawful if the law of the situs of the search applies.

Given the absence of controlling authority, the Court looked to a variety of doctrines for guidance.  These include (1) choice-of-law, (2) the *Davis* good faith exception, and (3) joint venture.  As explained below, although none of these three doctrines are directly on point, the guiding principles in each of them all point to the same result: Eleventh Circuit law applies in this particular case.

### 1.    A Choice-of-Law Approach Suggests Eleventh Circuit Law Applies.

Nearly all of the district courts confronted with a similar issue—*i.e.*, what law applies to a motion to suppress the fruits of an out-of-circuit search—have found that the search should be governed by the law of the place where the search occurred.  *See, e.g.*, *United States v. Restrepo*, 890 F. Supp. 180, 191 (E.D.N.Y. 1995) (Weinstein, J.); *United States v. Longo*, 70 F. Supp. 2d 225, 261 (W.D.N.Y. 1999); *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1354–55 (S.D. Fla. 2001), *aff'd*, 48 F. App'x 739 (11th Cir. 2002); *United States v. Barragan*, 589 F. Supp. 2d 1012, 1015 (S.D. Ind. 2008); *United States v. Gerena*, 667 F. Supp. 911, 918 (D. Conn. 1987); *United States v. Gates*, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008), *aff'd*, 709 F.3d 58 (1st Cir. 2013); *United States v. Kennedy*, 2014 WL 6090409, at *5 (W.D. Pa. Nov. 13, 2014).

The *Restrepo* Court's explanation of why courts should apply the law of the place where the search occurred is instructive as applied here:

The [Miami] officers should have been able to rely on their understanding of the law in the [Eleventh] Circuit and could not have been expected to know the law in circuits other than the one in which they were operating.  Consequently, suppression of evidence

---

[9] *See, e.g.*, *United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007) (Ninth Circuit prosecution relying on evidence seized in Sixth Circuit); *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) (Second Circuit prosecution relying on evidence seized in Eleventh Circuit); *United States v. Irving*, 452 F.3d 110, 124 (2d Cir. 2006) (Second Circuit prosecution relying on evidence seized in Fifth Circuit).  None of the courts in these three cases addressed the issue of which circuit's law should apply in evaluating the lawfulness of the search.  This Court will not speculate as to why those courts did not address the issue.  However, the Court notes that it reviewed the parties' briefs in each of the cases, and none of the parties raised the issue or indicated that the law differed across the relevant circuits.

inadmissible in this circuit but admissible in the [Eleventh] Circuit would not deter misconduct of officers based in [Miami]; rather, it would penalize officers' good faith efforts to comply with the law.  Correlatively, suppressing evidence in this Circuit based on its illegality in the [Eleventh] Circuit, irrespective of its admissibility in this circuit, makes sense since it ensures that the proper level of deterrence is maintained in the locale where the violation occurred.

890 F. Supp. at 191 (Weinstein, J.) (alteration in original).  The Court finds this reasoning persuasive.  Indeed, "law enforcement officials conform their conduct to comply with the requirements established by the courts which exercise supervisory authority over their surveillance activities," and a "standard that would force an official to predict a possible future forum (as well as the laws peculiar to that forum) invites confusion and might lead to error and frustration . . . ."  *Gerena*, 667 F. Supp. at 918.

One potential distinction between the above-cited cases and the instant case is that the former mostly involve a search conducted by officers acting independently, whereas the instant case involves forum agents directing the out-of-circuit officers to engage in the challenged search and seizure.  This potentially requires evaluating the deterrent effect of suppression on two sets of officers: first, the out-of-circuit agents who conducted the search, and second, the forum agents who instigated the search.

However, one of the above cases does in fact parallel the structure of the instant case.  *See Longo*, 70 F. Supp. 2d at 245–47, 261 (applying Sixth Circuit law where FBI agents in Second Circuit directed agents in Sixth Circuit to execute search).  Moreover, as discussed below, there is no factual or legal support for the premise that deterrence is warranted here.  *See infra* at 12–14.

Accordingly, the choice-of-law approach suggests that Eleventh Circuit law should apply here.

### 2. The *Davis* Good Faith Exception Suggests Eleventh Circuit Law Applies.

In *Davis*, the Supreme Court held that the exclusionary rule does not apply when the police conduct a search in objectively reasonable reliance on binding circuit precedent.  *See* 564 U.S. at 232.  Applying that reasoning here, the Government argues that, because the search occurred in the Eleventh Circuit and was executed by agents who operate in the Eleventh Circuit, Eleventh Circuit law applies.  *See* Dkt. 152 at 13–16.

At the outset, the Court notes that the *Davis* good faith exception is not precisely on point.  First, *Davis* involved reliance on circuit precedent that was binding at the time of the search but was later overruled or undermined by higher authority.  *See* 564 U.S. at 236; *see also United States v. Thomas*, 726 F.3d 1086, 1095 (9th Cir. 2013) ("Because LeBlanc acted in accord with *then-binding precedent*, the marijuana seized is not subject to exclusion on the basis of an unconstitutional trespass or physical intrusion.") (emphasis added).  Here, that is not the case.  *Touset* remains binding in the Eleventh Circuit; the only question is whether or not it applies.

Second, *Davis* is an exception to the exclusionary rule, not the warrant requirement.  *See id.* (affirming Eleventh Circuit and noting that Eleventh Circuit viewed the constitutional violation as a "separate issue" from whether the violation warranted suppression).  In other words, *Davis* only comes into play if a court first finds that a search was unlawful.  Here, by contrast, the question is whether the search itself was lawful.  Eleventh Circuit law establishes that it was; Ninth Circuit law says otherwise.

Nevertheless, the principles articulated by the Supreme Court in *Davis* support a finding that the challenged search should be evaluated based on Eleventh Circuit law.  In explaining its decision in *Davis*, the Supreme Court stated as follows:

> [L]aw enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. . . . But by the same token, when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities.  An officer who conducts a search in reliance on binding appellate precedent does no more than "'ac[t] as a reasonable officer would and should act'" under the circumstances.

*Id.* at 241 (citations omitted).  This is similar to the reasoning applied in the above-cited district courts that applied the choice-of-law approach.  *See, e.g.*, *Gerena*, 667 F. Supp. at 918 ("[L]aw enforcement officials conform their conduct to comply with the requirements established by the courts which exercise supervisory authority over their surveillance activities."); *Restrepo*, 890 F.Supp. at 191 ("[S]uppression of evidence inadmissible in this circuit but admissible in the [Eleventh] Circuit would not deter misconduct of officers based in [Miami]; rather, it would penalize officers' good faith efforts to comply with the law.") (alteration in original).

Accordingly, the *Davis* good faith exception suggests that Eleventh Circuit law should apply here.

3.     **Joint-Venture Case Law Suggests Eleventh Circuit Law**
       **Applies.**

The final area of law the Court looked to for guidance involves cases where United States agents engaged in a joint investigation with officials in foreign jurisdictions.  Generally speaking, "[F]ourth [A]mendment principles do not apply to searches by foreign authorities in their own countries, even if the targets of the search are American."  *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) (Kennedy, J.).  However, such principles do come into play if "United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials."  *Id.*

Yet, even when a search qualifies as a "joint venture," courts do not evaluate the lawfulness of the search based on American law.  Instead, courts apply the law of the foreign jurisdiction—*i.e.*, the law of the situs of the search.  *See id.* ("[T]he law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable."); *see also United States v. Barona*, 56 F.3d 1087, 1094 (9th Cir. 1995) ("Because there was a joint venture, we must decide whether the search was reasonable. In determining whether the search was reasonable, we must first consult the law of the relevant foreign countries.").

Indeed, the Ninth Circuit in *Barona* expressly rejected the dissenting judge's contention that legal requirements beyond those imposed in the foreign jurisdiction—*e.g.*, the American requirement of probable cause—are relevant to the joint venture inquiry.  *See id.* at 1092 n.1 (rejecting argument that "there is some additional requirement, such as 'probable cause,' that must be satisfied" and noting that "compliance with foreign law alone determines whether the search violated the Fourth Amendment").

Of course, the joint venture doctrine is not on point for the obvious reason that the search at issue here did not occur in a foreign jurisdiction.  Nevertheless, the focus on foreign jurisdictions' law in *Peterson* and *Barona* further suggests that, when evaluating searches that occurred outside of this circuit's jurisdiction, the governing law should be the law of the situs of the search.   Here, that is Eleventh Circuit law.

4.     **Under the Circumstances of this Case, Eleventh Circuit Law Applies.**

The cases applying the above doctrines all share a common thread: the lawfulness of the search was governed by the law of the place where the search occurred.  That makes sense.  As the above cases demonstrate, an officer who directs a search authorized by the law where the search occurs "does no more than 'ac[t] as a reasonable officer would and should act' under the circumstances."  *Davis*, 564 U.S. at 241.

11

Defendants argue that applying Eleventh Circuit law here would allow federal agents to "delegate unconstitutional misconduct by finding a jurisdiction with favorable case law and drafting a new team member to do its dirty work." Dkt. 208 at 15. Defendants essentially argue that the Court should deter Ninth Circuit agents from directing out-of-circuit searches that are legal at the situs of the search but illegal in the Ninth Circuit.

The Court declines to do so. First, the Court is not aware of any authority—case law, statutes, treatises, or otherwise—that suggests forum agents cannot direct an out-of-circuit search that complies with the law of the situs of the search. To the contrary, the three doctrines discussed above all suggest that forum agents can and should rely on the law of the situs of the search when directing an out-of-circuit search.

Moreover, Defendants' position "would penalize officers' good faith efforts to comply with the law." *Restrepo*, 890 F. Supp. at 191. It would also inhibit "[o]fficial interagency collaboration [] at the border, [which] is to be commended, not condemned." *Levy*, 803 F.3d at 123 (alteration added). Indeed, under these facts, Defendants' rule would impose Ninth Circuit law in Miami—a jurisdiction governed by the Eleventh Circuit—and it would require Miami-based officers to familiarize themselves with Ninth Circuit law before collaborating with Ninth Circuit agents.

Second, Defendants' argument is undermined by the Supreme Court's discussion in *Davis* regarding the circumstances warranting deterrence. The Supreme Court explained as follows:

> [T]he deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Davis*, 564 U.S. at 238 (cleaned up); *see also Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").

Applying those principles to the unique circumstances before the Court, deterrence is not warranted merely because the Miami airport search violated Ninth Circuit law. Such a result would ignore the obvious fact that the search occurred in the Eleventh Circuit and all agents

involved fully complied with Eleventh Circuit law. It would also ignore the absence of authority prohibiting forum agents from directing out-of-circuit searches that comply with the law of the situs of the search, and the three doctrines discussed above which raise the inference that forum agents can, in fact, do that.

Rather, deterrence is only warranted in these particular circumstances if forum agents exhibited deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. *See id.* Defendants seem to suggest that occurred. Specifically, they accuse Agent Palmerton of "finding a jurisdiction with favorable case law" and "forum shopping in order to evade Fourth Amendment precedent." *Id.*

Defendants are incorrect. Even if the record established that Agent Palmerton knew the search he directed would be unlawful in the Ninth Circuit,[10] Defendants' argument would fail because the record does not support a finding that Agent Palmerton recklessly or deliberately disregarded Defendants' Fourth Amendment rights by "forum shopping."

Borrowing from the civil context, "forum shopping" is the "practice of *choosing* the most favorable jurisdiction or court in which a claim might be heard." *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 981 (9th Cir. 2011) (citing Black's Law Dictionary 726 (9th ed. 2009)) (emphasis added). The accusation of "forum shopping" suggests that the "shopper"—here, Agent Palmerton—actively decided *where* the search would occur or, at least, had options to choose from.

That is not the case here. Nothing suggests Agent Palmerton controlled the location of the border search. For example, there is no indication that Agent Palmerton manipulated Defendants' travel plans and diverted them to the Eleventh Circuit. Nor did Agent Palmerton otherwise induce Defendants to enter the country through the Eleventh Circuit by, for example, using an undercover agent to encourage Defendants to travel to a border in the Eleventh Circuit.

Rather, the record establishes that Defendants voluntarily entered the country through a port of entry where officers are authorized to conduct the search that Defendants were subjected to. Agent Palmerton then alerted customs agents and directed them to conduct a secondary

---

[10] Agent Palmerton's knowledge would be of little relevance to the inquiry because "Fourth Amendment reasonableness 'is predominantly an objective inquiry.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). Indeed, in *Cano*, the court noted that "the mere fact that [the officers] subjectively hoped to find 'investigative leads' pertaining to the seized shipment of cocaine does not render their searches . . . beyond the border search exception." 934 F.3d at 1017. Similarly, here, it is of little import if Agent Palmerton subjectively understood that the search he directed would be unlawful in the Ninth Circuit but lawful in the Eleventh Circuit. Rather, the inquiry is whether "the circumstances, viewed objectively, justify the challenged action." *al-Kidd*, 563 U.S. at 736. For the reasons discussed above, *see supra* at 7–12, it was objectively reasonable for Agent Palmerton to direct out-of-circuit agents to conduct a search that was lawful at the situs of the search.

screening that complied with the law of the situs of the search.  In sum, there is no "forum shopping" to deter here because no forum shopping occurred.

* * *

For the foregoing reasons, Defendants' motion to suppress must turn on Eleventh Circuit law.  That is true whether the Court applies a choice-of-law lens and evaluates the threshold question of lawfulness based on Eleventh Circuit law, *see Restrepo*, 890 F. Supp. at 191, or if the Court considers the issue through the lens of the *Davis* good faith exception, *see* 564 U.S. at 238–41.  Either way, the result is the same: Eleventh Circuit law requires the denial of Defendants' motion to suppress.

Accordingly, Defendants' motion to suppress evidence seized at the Miami airport on Fourth Amendment grounds is denied.

## III.    Defendants' Motion to Suppress the Physical Fruits of a *Miranda* Violation is Granted in Part.

Defendants move to suppress the physical fruits of an alleged *Miranda* violation at the Miami airport.[11]  Three categories of evidence are at issue: (1) evidence discovered during a search of Ayvazyan's luggage; (2) evidence discovered during a search of Ayvazyan's electronic devices; and (3) evidence discovered during a search of Terabelian's electronic devices.

A suspect's *Miranda* rights are triggered during custodial interrogation even when that suspect is questioned at the border.[12]  *United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007); *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).  Interrogation is "express questioning" by the police, or "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

---

[11] Although both Defendants also move to suppress any statements made during the Miami interrogation, the Government stated during the April 2, 2021 hearing that it does not intend to rely on any statements made during that interrogation.  Accordingly, Defendants' motion is moot as it pertains to statements made during the Miami interrogation.

[12] It is not entirely clear to the Court whether the choice-of-law issue discussed in the context of the Fourth Amendment inquiry, *see supra* at 7–13, applies to alleged *Miranda* violations.  However, the resolution of that potential issue does not have the same impact with regards to the *Miranda* inquiry because Eleventh Circuit law and Ninth Circuit law are not meaningfully different on this point.  Nevertheless, out of an abundance of caution—and unless it cites to Supreme Court authority—the Court will cite to both Ninth Circuit and Eleventh Circuit law in evaluating the *Miranda* issue.

An individual is in custody if, considering the circumstances surrounding an interrogation, "a reasonable person . . . felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). In the Ninth Circuit, relevant circumstances for the custody analysis "include the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt." *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001). In the Eleventh Circuit, courts focus on whether the degree of restraint is comparable to that of arrest, and relevant factors include whether the defendant asked to leave or see a lawyer, whether the agent told the defendant she was not free to leave, and whether the defendant was handcuffed or physically held, accompanied by uniformed officers, or informed of formal accusations. *Moya*, 74 F.3d at 1119.

The Court finds that, under either Ninth Circuit law or Eleventh Circuit law, Defendants were subject to custodial interrogation.

First, Terabelian and Ayvazyan were subject to interrogation because customs agents asked questions that they knew were reasonably likely to elicit an incriminating response. Customs agents had already been informed that Terabelian was a suspect in a PPP fraud investigation that involved synthetic or stolen identities. Dkt. 133, Ex. 6. Armed with this information, the agents asked Terabelian about her employment status, her husband's employment status, whether her husband conducted business under an official entity, her criminal history, and the contents of her luggage, including credit cards belonging to "Viktoria Kauichko" and a box for a brand new Rolex. Dkt. 133, Ex. 15. Similarly, agents asked Ayvazyan about his employment status, income sources, business ventures, real estate deals, and the contents of his luggage, including credit cards with the names "Julia Zhadko" and "Victoria Kauicko." Dkt. 133, Ex. 17. Given the allegations against Defendants, these questions— particularly those regarding the credit cards—were reasonably likely to elicit an incriminating response. Accordingly, Defendants were subject to interrogation. *See Innis*, 446 U.S. at 300–01

Second, the record establishes that Defendants were in custody for the purposes of *Miranda*. Defendants repeatedly asked to leave or call an attorney, and in each instance they were either (1) ignored, (2) told that they were being detained and could not speak to an attorney, or (3) told they did not need an attorney because the agents just needed to confirm they were not terrorists. *See* Terabelian Decl. ¶¶ 8–10, 14; Ayvazyan Decl. ¶¶ 13–14, 24.[13] When Ayvazyan requested to leave and go smoke, an officer rejected that request and told Ayvazyan and Terabelian that they were being detained. Terabelian Decl. ¶ 6.

---

[13] The Court relies on the declarations submitted by each Defendant because, aside from a general attack on Defendants' credibility (based on convictions from nearly a decade ago), the Government never disputes most of the specific facts attested to by Defendants.

After detaining Ayvazyan in a variety of waiting areas for approximately three hours, agents began interrogating Ayvazyan and searching through some of his luggage. Ayvazyan Decl. ¶¶ 15–18. One hour later, a different agent searched through Ayvazyan's remaining luggage, took Ayvazyan to another room, and continued to question him. *Id.* at ¶¶ 19–24. The interrogation included questions about the credit cards in his luggage. *Id.* Later, at approximately 11 p.m., a third interrogation began. *Id.* at ¶ 26. Terabelian experienced a similar pattern. After approximately three hours, agents separated Terabelian from Ayvazyan and moved her to a different room. Terabelian Decl. ¶¶ 10–11. Agents then interrogated her and detained her in that room for several hours. *Id.* ¶¶ 11–16. The interrogation included questions about the credit card in her wallet. Dkt. 133, Ex. 15.

Under these circumstances, Defendants were in custody under Ninth Circuit law. They were detained for approximately four hours by the time they made statements that yielded physical evidence, and they were told they could not leave or speak to an attorney. Defendants were isolated from one another for much of the detention, accompanied by customs officers to various interrogation rooms and waiting rooms, and confronted with evidence of their alleged crimes. The totality of the circumstances compels a finding that Defendants were in custody under Ninth Circuit law. *See Butler*, 249 F.3d at 1099 (relevant circumstances for custody analysis include "language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt").

The same factors compel a finding that Defendants were in custody under Eleventh Circuit law. Defendants requested a lawyer, and agents refused that request. Agents told Defendants they were being detained and were not free to leave. And, although Defendants were not handcuffed or informed of formal accusations, they were confronted with evidence of guilt and supervised by customs agents for the vast majority of the detention. Under these circumstances, the Court finds that the "restrictions on the suspect[s'] freedom of movement [were] 'of the degree associated with formal arrest.'" *Moya*, 74 F.3d at 1119; *see also id.* (noting that relevant factors include whether defendant asked to leave or see a lawyer, whether agent told defendant she was not free to leave, and whether defendant was handcuffed or physically held, accompanied by uniformed officers, or informed of formal accusations). Indeed, at the end of their detention, Defendants were formally arrested.

Accordingly, Defendants were entitled to *Miranda* warnings because they were subjected to custodial interrogation. *Hernandez*, 476 F.3d at 796; *Moya*, 74 F.3d at 1119.

However, that does not necessarily mean that all physical evidence seized during the custodial interrogation must be suppressed. Rather, under *United States v. Patane*, physical evidence obtained as a result of a custodial interrogation without *Miranda* warnings is not

16

subject to the exclusionary rule unless the evidence is the "physical fruit of actually coerced statements." 542 U.S. 630, 644 (2004). Accordingly, the Court must determine whether the challenged evidence was the physical fruit of actually coerced statements. *See id.*

In both the Ninth and Eleventh Circuit, courts assess the totality of the circumstances in determining whether a particular statement was coerced. *See United States v. Mora-Alcaraz*, 986 F.3d 1151, 1157 (9th Cir. 2021) (noting courts should consider whether defendant was in custody, whether the arresting officers have their guns drawn, whether *Miranda* warnings have been given, whether defendant was told he has a right not to consent, and whether defendant was told a search warrant could be obtained); *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police"); *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.") (internal quotations and citations omitted).

Although Defendants' briefing is not particularly clear on this point, it appears that three statements led to physical evidence: (1) Ayvazyan's identification of his luggage at the baggage carousel; (2) Ayvazyan's disclosure of his phone passcode; and (3) Terabelian's disclosure of her phone passcode.[14]

The Court finds that Defendants' disclosure of their phone passcodes was not voluntary. Several factors compel this result. Defendants were in custody without being given *Miranda* warnings. Defendants had been detained for approximately four hours when they provided their phone passcodes and, at that time, Defendants had been separated from one another and individually interrogated. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (noting that "factors taken into account" in determining voluntariness include "the lack of any advice to the accused of his constitutional rights . . . the length of detention . . . [and] the repeated and prolonged nature of the questioning").

Most importantly, each defendant was induced to provide their phone passcode with false information. Specifically, Ayvazyan was told that he only needed to search the cell phone for "national security purposes and just to confirm that [Ayvazyan] was not a terrorist." Ayvazyan Decl. ¶ 24; *see also* Dkt. 133, Ex. 13 (transcript of video interrogation in which Ayvazyan asks "What does credit cards have to do with national security that Ramirez is talking about? What is it?"). Terabelian was told that agents needed to look at her phone to see if Terabelian was a

---

[14] Terabelian does not move to suppress the evidence seized from her wallet. *See* Dkt. 136 at 16 ("Terabelian respectfully requests the Court suppress her statements at Miami International Airport on *Miranda* and voluntariness grounds and suppress all evidence obtained from her smartphone in violation of the Fourth Amendment.").

national security threat, and that Terabelian would "be on the next flight" if she cooperated with agents.  Terabelian Decl. ¶ 12.

Under these circumstances, the provision of passcodes by Defendants to customs agents was not voluntary, and any evidence discovered on Defendants' smartphones at the Miami airport will be suppressed.  *See Thompson*, 422 F.3d at 1295–96 ("Sufficiently coercive conduct normally involves . . . the making of a promise that induces a confession.").

However, the Court reaches a different conclusion with respect to the contents of Ayvazyan's luggage.  The only specific statement that is relevant here appears to be Ayvazyan's identification of his luggage, and the record does not support a finding that said identification was coerced.  Although many of the same factors that led to a contrary finding with regards to the passcodes are equally relevant to the identification of luggage (*e.g.*, the length of the detention, the lack of *Miranda* warnings, and the custodial setting), no false statements were made to Ayvazyan to induce the identification of his luggage.  Rather, it appears that an agent simply asked Ayvazyan to identify his luggage, and Ayvazyan complied.  *See* Ayvazyan Decl. ¶¶ 21–22 ("Officer Ramirez and Officer Twelve next took me to the luggage carousel to retrieve our luggage.  Officer Ramirez then asked me if there was anything in my bag he should know about, and I responded no.  Officer Ramirez proceeded to search the bag that I had been carrying."); *see also* Dkt. 133, Ex. 7 ("A baggage examination was conducted by [customs agents] at 1824 hours.  [Ayvazyan] verbally declared ownership of a black D&G luggage bag and a grey Gucci Purse with red and blue stripes.").[15]  Under these circumstances, the Court finds that Ayvazyan's identification of his luggage was "an essentially free and unconstrained choice" and, accordingly, suppression of the contents of the luggage is not warranted. *Schneckloth*, 412 U.S. at 225.

For the foregoing reasons, Defendants' motion is granted with respect to the evidence on their smartphones and denied with respect to the evidence in Ayvazyan's luggage.

## IV.     Defendants' Fruit of the Poisonous Tree Argument Fails Because the Warrant is Supported by Probable Cause After Excising All Evidence Procured in Miami.

Defendants argue that, because the application for a warrant to search Defendants' home referenced the tainted evidence seized at the Miami airport, the evidence seized during the search of Defendants' home is the fruit of the poisonous tree and should also be suppressed.  *See* Dkt. 130 at 24 (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

---

[15] Another key distinction is that, beyond an identification of the luggage, no other information was necessary for the officers to access Ayvazyan's luggage.  By contrast, Defendants' phones could only be accessed if Defendants provided officers with the passcode to the phones—passcodes that one court has described as, "[i]n today's modern world . . . the proverbial 'key to a man's kingdom.'"  *United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015).

However, a search warrant is not "rendered invalid merely because some of the evidence included in the affidavit is tainted." *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014) (citing *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994)). "The warrant remains valid if, after excising the tainted evidence, the affidavit 'remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" *Id.* (quoting *Reed*, 15 F.3d at 933). Accordingly, the Court must assess the application for the warrant to search Defendants' home.

A judge may authorize a search of a location only if officers establish probable cause to believe evidence of a crime may be found there. *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006). "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The Ninth Circuit has held that, "[b]ased on the nature of the evidence and the type of offense, a magistrate may draw reasonable inferences about where evidence is likely to be kept." *United States v. Vaandering*, 50 F.3d 696, 700 (9th Cir. 1995) (quotation omitted).

The Court reviewed the application for the search warrant. *See In the Matter of the Search of [REDACTED] Tarzana, California 91356*, 2:20-mj-05282, Dkt. 1 (Application for Search Warrant (hereinafter cited as "Warrant Application" or "App.")). Having done so—and having excised any references to evidence seized or statements made at the Miami airport—the Court finds that probable cause existed to search Defendants' home.[16] The following facts support that conclusion.

### **Fraudulent Loans Linked to Ayvazyan**

The Warrant Application states that, on or about June 15, 2020, the SBA received an EIDL loan application in the name of Timeline Transport, Inc. ("Timeline"). App. at 63.[17] The application sought $150,000 and was submitted in the name of Iuliia Zhadko. *Id.* Zhadko represented that, as of January 31, 2020, Timeline employed 22 individuals and had an employer identification number ("EIN") of 85-0925228. *Id.*

The Government's investigation revealed that Timeline's loan application contained materially false information. First, contrary to the application's statement that Timeline employed 22 people, the State of California's Employment Development Department ("CA EDD" or "EDD") was unable to locate any record of Timeline having employees in 2019 or

---

[16] The Court notes that it need not excise all of the evidence seized at Miami airport. Terabelian did not move to suppress the credit card that was found in her wallet at the Miami airport, and the Court found that suppression of the credit cards in Ayvazyan's luggage is not warranted. *See supra* at 3–18. Accordingly, those cards are not "tainted" evidence and need not be excised from the warrant application. Nevertheless, out of an abundance of caution, the Court will not rely on that evidence in its probable cause analysis.

[17] The page numbers cited are the ECF stamped numbers on the top right-hand corner of the page, ranging from 1 to 74.

2020.  *Id.* at 64.  Second, the "85" prefix for EINs was not in use until March 23, 2020, but Timeline claimed it was in business and employed 22 individuals as early as January 31, 2020. *Id.*  Third, the IRS confirmed that there was no record of Timeline filing employment tax or federal income returns with the IRS in 2019.  *Id.*  Finally, law enforcement was unable to locate any record of a "Iuliia Zhadko" in California Department of Motor Vehicles' ("DMV") records. *Id.* at 65.

Despite these false statements, the loan was approved and $149,900 was transferred to a bank account ending in 0172, for which "Iuliia Zhadko" was the sole signatory.  *Id.* at 63–64. Two days after the $149,900 was deposited into the account ending in 0172, a $110,000 wire transfer was sent from the account ending in 0172 to Encore Escrow.  *Id.* at 65.  The entirety of the $110,000 appeared to have derived from the $149,900 EIDL loan.  *Id.*

A review of Encore Escrow's records revealed that the escrow account to which the $110,000 was transferred was created to hold funds for a down-payment on the purchase of Defendants' home in Tarzana, California.  *Id.*  That home was purchased in the names of Ayvazyan and Terabelian.  *Id.* at 66.  An email sent from an individual identifying himself as "Richard Ayvazyan" to the escrow agent on June 24, 2020, stated as follows: "This one went through for 65k.  The other one for 110k I don't have confirmation yet.  I will send that over as soon as I get it."  *Id.* at 65–66.

### **Fraudulent Loans Linked to Terabelian**

In addition to the $110,000 wire from the account ending in 0172, a $565,000 wire transfer was sent from an account ending in 1475 to Encore Escrow on or about June 22, 2020. *Id.* at 66.  The only signatory on the account ending in 1475 was Terabelian.  *Id.*

A review of bank records revealed that the funds for the $565,000 wire transfer came from approximately nine preceding wire transfers to Terabelian's account ending in 1475.  *Id.* Several of these preceding transfers came from accounts that had recently received PPP or EIDL loans.  *Id.*

For example, bank records show that an unidentified "Person 1" applied for a PPP loan in the amount of $113,750 on behalf of G&A Diamonds.  *Id.*  That loan was approved, and $113,750 was deposited into an account ending in 1964.  Person 1 also applied for an EIDL loan in the amount of $145,000 on behalf of G&A Diamonds.  *Id.* at 66–67.  That loan was approved, and $144,900 was deposited into the account ending in 1964.  *Id.* at 67.  G&A Diamonds did not use the PPP or EIDL loans to pay employees or for any other business purpose.  Instead, on or about June 19, 2020, Person 1 wired $100,000 from the account ending in 1964 to Terabelian's account ending in 1475.  *Id.*

As another example, bank records show that an unidentified "Person 2" applied for an EIDL loan in the amount of $150,000 on behalf of Redline Auto Collision ("Redline").  *Id.*  That loan was approved, and $149,900 was wired into an account ending in 1732.  *Id.*  Redline did not use the EIDL loan to pay employees or for any other business purpose; rather, it wired $150,000 to Terabelian's account ending in 1475 on or about June 17, 2020.  *Id.*

### Other Evidence of Fraudulent Loans and Ties Between Defendants and Kauichko/Zhadko

The Government's investigation revealed other fraudulent loans.  For example, on or about July 13, 2020, an individual purporting to be "Viktoria Kauichko" submitted a loan application on behalf of Runyan Tax Services, Inc. ("Runyan").  *Id.* at 68.  The application stated that Runyan employed 22 individuals as of January 31, 2020, and Kauichko claimed her driver's license number was D3257870.  *Id.*  A $276,653 loan was approved and deposited into an account ending in 9700, for which "Viktoria Kauichko" was the sole signatory.  *Id.*

Runyan's loan application contained materially false information.  For example, information provided by the CA EDD established that no employment records existed for Runyan in 2019 or 2020.  *Id.*  Additionally, DMV records revealed that no California driver's license existed for a "Viktoria Kauichko," and the driver's license number listed by the person purporting to be Kauichko was actually registered to a different individual.  *Id.* at 69.

Bank records established that $238,614 was transferred from the bank account ending in 9700 to Beverly Hills Escrow.  *Id.*  The entirety of the $238,614 appeared to have derived from the $276,653 in PPP loans.  *Id.*  The $238,614 wired to Beverly Hills Escrow was used for a down payment on a property in Glendale, California purchased by a "Iuliia Zhadko"—the same person who wired funds to Ayvazyan, *see supra at* 19–20—for approximately $1,000,000.  *Id.*

According to records obtained by the U.S. Postal Service, one of the recipients of mail at the Glendale property is Gohar Terabelian.  *Id.* at 32.  Gohar Terabelian is the sister of Defendant Terabelian and, at the time the Warrant Application was filed, Gohar Terabelian had recently posted bond for Defendants Ayvazyan and Terabelian.  *Id.*

Aside from the fraudulent loans described above, the Government's investigation revealed over one dozen other fraudulent loan applications submitted by individuals purporting to be Zhadko or Kauichko.  *See id.* at 69–72.  Five of those loan applications were submitted by a person purporting to be Kauichko on behalf of Fiber One Media, Inc. ("Fiber One").  *Id.* at 72.

During a search of the trash outside one of the suspect's homes, the Government found a receipt for automotive work for a Mercedes-Benz vehicle registered to Fiber One (the company

for which Kauichko submitted fraudulent loans).  *Id.* at 29.  The receipt was addressed to "Rich Avazian."  *Id.*

Finally, Iuliia Zhadko was listed as a resident of another house purchased with fraudulently obtained funds ("Subject Premises 6").  *Id.* at 41.  Publicly available databases revealed that Defendants were both listed as current or former residents of Subject Premises 6. *Id.* at 42.  Similarly, Defendants' drivers licenses list another home ("Subject Premises 7") as their residence, and publicly available databases list Zhadko as a current or former resident of Subject Premises 7.  *Id.*

**Probable Cause Conclusion**

Based on the foregoing, probable cause existed to authorize a search of Ayvazyan's and Terabelian's home.  The Warrant Application demonstrated that persons purporting to be Zhadko and Kauichko submitted fraudulent loan applications.  However, the Warrant Application also demonstrated that Zhadko and Kauichko are fake or synthetic identities.  Accordingly, the Warrant Application resulted in a fair probability that Zhadko and Kauichko were, in fact, aliases for other individuals.

The Government traced the fraudulent loans procured by Zhadko and determined that some of the funds were used to purchase Defendants' home—the home that was the subject of the search warrant.  Based on this information, there was a fair probability that Zhadko was a fake identity and, specifically, an alias for one or both of Ayvazyan and Terabelian.

The Government also found evidence directly linking Ayvazyan to Kauichko—namely, receipts addressed to Ayvazyan regarding a vehicle registered to "Fiber One Media," a company for which Kauichko submitted fraudulent loans.  Terabelian was also the recipient of proceeds from at least two fraudulently obtained loans.  In sum, there was ample evidence linking Defendants to Zhadko and Kauichko.

Under these circumstances, the Court finds that—based on the Warrant Application as construed without references to evidence seized or statements made at the Miami airport— probable cause to search Defendants' home existed because there was a fair probability that evidence of criminal activity would be located at Defendants' home.  *See Hill*, 459 F.3d at 970. Accordingly, Defendants are not entitled to suppression of the evidence seized at Defendants' home under a fruit of the poisonous tree theory.

## V.    Defendants' Motion Regarding the Warrant's Particularity and Overbreadth is Denied.

Defendants argue that evidence seized during the search of their home should be suppressed because the warrant was facially invalid.  Specifically, they argue that the warrant lacked particularity and was overbroad.  *See* Dkt. 146 at 13–20.

The Court will discuss the language of the warrant and will then turn to the merits of Defendants' argument.

### A.    The Search Warrant.

The warrant issued on November 3, 2020 authorized a search of Defendants' home.  *See In the Matter of the Search of [REDACTED] Tarzana, California 91356*, 2:20-mj-05282, Dkt. 3. (hereinafter cited as "Warrant").

The warrant authorized the seizure of "evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); 18 U.S.C. § 1349 (Conspiracy to Commit Wire and Bank Fraud); 18 U.S.C. §§ 1956(a) and (h) (Money Laundering and Conspiracy to Commit Money Laundering); 18 U.S.C. § 1014 (False Statements to a Financial Institution); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 15 U.S.C. § 645(A) (False Statements to the Small Business Administration)."  *Id.* at 5.[18]

The warrant narrowed "evidence, contraband, fruits, or instrumentalities" to more specific categories, including but not limited to the following:

- Records or items concerning ABC Realty Advisors, Allstate Towing and Transport, Crystalcare Home Health, EM Construction, Fadehaus Barbershop, Fiber One Media, G&A Diamonds, Inception Fund, Journeymen Construction, Nelson's Nursery, Redline Auto Mechanics Inc., Runyan Tax Services, Secureline Realty and Funding, Timeline Transport, VB Trucking, TM Events, Top Quality Contracting, or any affiliated entities or individuals;

- Records or items concerning the Paycheck Protection Program ("PPP"), the Economic Injury Disaster Loan ("EIDL") program, or other Small Business Administration ("SBA") or other commercial loan programs, including communications with or about the SBA, financial institutions offering loan programs, or other entities or individuals concerning SBA or other commercial loan programs;

---

[18] The page numbers cited are the ECF stamped numbers on the top right-hand corner of the page, ranging from 1 to 15.

- Records or items concerning Iuliia Zhadko, Viktoria Kauichko, Varuzhan Berberyan, Mark Zindroski, Nazar Terabelian, Zhaneta Momdzayan, Tony Gleb, Artem Zherdov, Anton Kudiumov, or any other identities reasonably determined to be stolen, fake, or synthetic;

- Records or items concerning the creation, alteration, falsification, or use of tax documents, bank records or other financial records, payroll reports or other payroll records, or other financial or corporate records;

- Banking and financial records for any bank, credit card, and brokerage or investment accounts associated with RICHARD AYVAZYAN, ARTHUR AYVAYZAN, MARIETTA TERABELIAN, TAMARA DADYAN, ANNA MANUKYAN, or any of the other individuals and entities described herein in Attachment B.

- Records and items concerning the purchase of luxury watches, jewelry, and/or precious metals since March 1, 2020.

- United States currency in excess of $1,000, including the first $1,000 if more than $1,000 is seized and records relating to disposition of any loan proceeds including bank records, money orders, wire transfer instructions, cashier's checks, receipts, passbooks, cash cards, gift cards, checkbooks, check registers, securities, precious metals, jewelry, automobiles or other vehicles, and other financial records and instruments, including stocks, bonds, and derivatives, such as puts, options, collars, and hedges.

*Id.* at 5–8.  The Court now turns to the merits of Defendants' arguments.[19]

---

[19] It appears that the warrant did not "incorporate" the affidavit because there is no evidence agents possessed the affidavit while executing the search.  Accordingly, the Court cannot rely on the affidavit in discussing the particularity of the warrant.  *See United States v. SDI Future Health*, 568 F.3d 684, 699 (9th Cir. 2009).  However, "because an overbreadth evaluation is a type of probable cause inquiry, [courts] must always evaluate the affidavit—regardless of whether the warrant at issue properly incorporated that affidavit—when determining whether a warrant was overbroad."  *United States v. Morton*, 776 F. App'x 395, 397 (9th Cir. 2019), cert. denied, 140 S. Ct. 882 (2020).  Indeed, Ninth Circuit courts routinely note that the overbreadth assessment is akin to a probable cause inquiry.  *See, e.g., id.*; *Blight v. City of Manteca*, 944 F.3d 1061, 1066 (9th Cir. 2019) ("To determine whether a warrant was overbroad, we review, with deference, whether the issuing judge had a substantial basis to conclude that the affidavit supporting the search warrant established probable cause."); *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991) ("[T]he concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant."); *United States v. Schesso*, 730 F.3d 1040, 1045 (9th Cir. 2013) (reversing district court's conclusion that warrant was facially overbroad because "the facts cited in the affidavit, combined with reasonable inferences drawn from those facts, provided probable cause").  And, inherently, a probable cause inquiry requires analysis of the source of probable cause: the affidavit.  Prohibiting reliance on the affidavit in determining overbreadth would result in almost every warrant being found overbroad, because the basis for probable cause is rarely set forth on the face of the warrant; instead, it is set forth in the affidavit.  *See United States v. Grubbs*, 547 U.S. 90, 98 (2006) ("The Fourth Amendment does not require that the

**B.      The Warrant Is Not Facially Invalid for Lack of Particularity.**

To satisfy the particularity requirement, a warrant must make clear to the executing officer exactly what it is that he or she is authorized to search for and seize.  *In re Grand Jury Subpoenas*, 926 F.2d at 857. "The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized."  *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005) (alteration removed) (quoting *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)).

However, a detailed and specific list of items is not necessarily required.  Rather, "the level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought."  *United States v. Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006).  Indeed, "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Spilotro*, 800 F.2d at 963.

Despite Defendants' arguments, the warrant here is sufficiently particular to comply with the Fourth Amendment.  On that point, the Ninth Circuit's opinion in *SDI Future Health* is instructive.  There, the warrant included the following category of evidence: "Rolodexes, address books and calendars."  568 F.3d at 704.  Despite describing that category as "the laziest of gestures in specificity," *see id.* at 705, the court found it was sufficiently particular because it "enable[d] the person conducting the search reasonably to identify the things authorized to be seized," *id.* at 702 (quoting *Smith*, 424 F.3d at 1004).  Specifically, "[t]he officers could tell from the warrant that, should they happen upon a rolodex, they should seize it."  *Id.* at 702.

Similarly, here, the warrant allowed executing agents to reasonably identify the things authorized to be seized.  For example, the officers could tell from the warrant that, if they found "[r]ecords or items concerning the Paycheck Protection Program ("PPP"), the Economic Injury Disaster Loan ("EIDL") program, or other Small Business Administration ("SBA") or other commercial loan programs," Warrant at 5, they should seize those records or items.  Similarly, the officers could tell from the warrant that, if they found "United States currency in excess of $1,000" or "luxury watches, jewelry, and/or precious metals" purchased after March 1, 2020, they should seize those items.  *Id.* at 7–8.

Defendants' particularity challenge focuses largely on the following paragraph: "Records or items concerning ABC Realty Advisors, Allstate Towing and Transport, Crystalcare Home Health, EM Construction, Fadehaus Barbershop, Fiber One Media, G&A Diamonds, Inception Fund, Journeymen Construction, Nelson's Nursery, Redline Auto Mechanics Inc., Runyan Tax Services, Secureline Realty and Funding, Timeline Transport, VB Trucking, TM Events, Top

---

warrant set forth the magistrate's basis for finding probable cause . . . .").  Accordingly, the Court will rely on the affidavit in determining whether the warrant at issue is facially overbroad, but will not rely on the affidavit in the particularity analysis.

Quality Contracting, or *any affiliated entities or individuals*." *Id.* at 5 (emphasis added). Specifically, Defendants argue that the phrase "any affiliated entities or individuals" means "Richard Ayvazyan or Marietta Terabelian," thereby creating a circular structure in which the paragraph reads as follows: "Records or items concerning . . . Richard Ayvazyan or Marietta Terabelian." *See* Dkt. 222 at 15–18; *see also United States v. Wey*, 256 F. Supp. 3d 355, 386 (S.D.N.Y. 2017) (finding warrant lacked particularity where paragraph authorized seizure of records related to entities listed in exhibit but referenced exhibit listed targets of search, thereby authorizing seizure of any records related to targets of search).

The Court rejects that argument.  In *United States v. Riley*, the defendant challenged the following language in a warrant: "things, including but not limited to, bank records, brokerage house records, business records, safety deposit box keys or records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same."  906 F.2d 841, 843 (9th Cir. 1990).  The district court found that the warrant's description of the category of records was insufficiently particularized, but the Ninth Circuit reversed.  *Id.* at 844.  In doing so, the court explained as follows:

> In upholding broadly worded categories of items available for seizure, we have noted that *the language of a warrant is to be construed in light of an illustrative list of seizable items*.  In the pending case, the warrant supplied sufficient examples of the type of records that could be seized—bank records, business records, and safety deposit box records.  No doubt the description, even with illustrations, did not eliminate all discretion of the officers executing the warrant, as might have occurred, for example, if the warrant authorized seizure of the records of defendant's account at a named bank.  But the particularity requirement is not so exacting.  Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.

*Id.* at 844–45 (emphasis added).

Here, construing the language "in light of an illustrative list of seizable items," *see id.* at 844, it is clear that the paragraph at issue is sufficiently particular.  The challenged language authorizes the seizure of "[r]ecords or items concerning . . . affiliated entities or individuals" only if those records or items relate to the businesses at issue—*i.e.*, the businesses previously described in the paragraph.  In other words, the warrant does not authorize the broad seizure of any records or items belonging to Defendants; rather, it authorizes the seizure of Defendants' records or items *if they relate to the businesses at issue*.  As in *Riley*, the "Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as

to whether a particular document" belonging to Defendants relates to the businesses at issue.  *Id.* at 845.

To the extent Defendants challenge, for lack of particularity, language authorizing the seizure of jewelry and precious metals, the Court rejects that argument as well.  That language reads as follows: "Records and items concerning the purchase of luxury watches, jewelry, and/or precious metals since March 1, 2020."[20]  This language is sufficiently particular.  First, it "enable[s] the person conducting the search reasonably to identify the things authorized to be seized."  *Smith*, 424 F.3d at 1004.  "The officers could tell from the warrant that, should they happen upon [jewelry, luxury watches, or precious metals purchased after March 1, 2020], they should seize it."  *SDI Future Health*, 568 F.3d at 702.  Second, the clause is temporally limited to items purchased after March 1, 2020.  *See United States v. Luk*, 859 F.2d 667, 677 (9th Cir. 1988) (noting temporal limitations can satisfy particularity requirement); *see also Morton*, 776 F. App'x at 399 (particularity requirement satisfied in part because warrant limited "date ranges within which the documents had to fall").

Finally, the Court is not persuaded by Defendants' argument that the Government should have specified which particular watches or pieces of jewelry were tied to the alleged loan fraud. The Court acknowledges that there is some evidence suggesting that the Government could have listed certain items with more specificity than the warrant reflects.  *See* Dkt. 223, Ex. C. However, "the level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought."  *Adjani*, 452 F.3d at 1147.  Under the circumstances of this case, it was not necessary for the agents to limit their search to specific watches or pieces of jewelry.  Moreover, the warrant implicitly contained such a limitation on its face: it limited agents to seizing jewelry purchased after March 1, 2020.  *See* Warrant at 7.  Although agents who executed the search may have seized jewelry that should be returned because it was purchased before March 1, 2020, *see infra* at 39–40, that does not render the warrant facially invalid.

Accordingly, the warrant is not facially invalid for lack of particularity.

## C.     The Warrant Is Not Facially Overbroad.

"A warrant must not only give clear instructions to a search team, it must also give legal, that is, not overbroad, instructions."  *SDI Future Health*, 568 F.3d at 702.  "Under the Fourth

---

[20] Defendants seem to argue that the clause agents relied on to seize jewelry and precious metals appears later in the warrant and reads as follows: "records relating to disposition of any loan proceeds including . . . precious metals [and] jewelry."  Warrant at 8; *see also* Dkt. 222 at 10 n.6.  Defendants' reading of the warrant is incorrect.  The clause Defendants point to only authorizes the seizure of "records" related to jewelry and precious metals, *id.* at 8, whereas the clause cited above by the Court authorizes the seizure of "records or *items*," *id.* at 7.  Accordingly, the only clause in the warrant that agents could have relied on to seize actual jewelry or precious metals—*i.e.*, "items"— is the clause cited above in the body, not the clause on which Defendants rely.

Amendment, this means that 'there [must] be probable cause to seize the particular thing[s] named in the warrant.'" *Id.* (quoting *In re Grand Jury Subpoenas*, 926 F.2d at 857). "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *Hill*, 459 F.3d at 970 (citing *Gates*, 462 U.S. at 238).

Here, probable cause exists as to all of the challenged categories of evidence. First, there was probable cause to seize records or items concerning the businesses identified in paragraph 1(a) of the warrant. As discussed at length above, *see supra* at 19–22, the Warrant Application demonstrated that persons purporting to be Zhadko and Kauichko submitted fraudulent loan applications on behalf of some of the businesses listed in paragraph 1(a). The Government traced the fraudulent loans procured by Zhadko and determined that some of the funds were used to purchase Defendants' home—*i.e.*, the home that was the subject of the search warrant. Based on this information, there was a fair probability that Zhadko was an alias for one or both of Ayvazyan and Terabelian. The Government also found evidence linking Ayvazyan to Kauichko—namely, receipts addressed to Ayvazyan regarding a vehicle registered to "Fiber One Media," a company for which Kauichko submitted fraudulent loans. Terabelian was also the recipient of proceeds from at least two fraudulently obtained loans. Finally, Defendants' co-conspirators obtained fraudulent loans on behalf of many of the businesses identified in paragraph 1(a). *See* Warrant App. at 33–39. Under these circumstances, there was probable cause to search for records or items concerning the businesses identified in paragraph 1(a) because there was a fair probability those records or items were evidence of the alleged loan fraud. *See Hill*, 459 F.3d at 970.

Second, there was probable cause to search for watches, jewelry, and precious metals purchased after March 1, 2020. The affidavit explained that individuals committing financial crimes "often liquidate criminal proceeds to cash or cash equivalents (such as luxury watches, jewelry or precious metals) . . . in order to launder the proceeds and profit from the crimes." Warrant App. at 46. The affidavit further noted that, in this particular case, "numerous checks totaling in the hundreds of thousands of dollars have been sent to diamond retailers in both Los Angeles and New York. Additionally, records from Radius Bank and luxury watch retailers, indicates that for the last several months, [Ayvazyan] has been using fraudulently obtained loan proceeds to purchase luxury watches." *Id.* at 46–47. Considering the totality of the affidavit, *see supra* at 19–22, and the specific information regarding watches, jewelry, and precious metals, the Court finds there was probable cause to seize such items because there was a fair probability those items were evidence of the alleged loan fraud. *See Hill*, 459 F.3d at 970.

Third, there was probable cause to seize currency in excess of $1,000. As just noted, the affidavit explained that individuals committing financial crimes "often liquidate criminal proceeds to cash." *Id.* at 46. The affidavit also explained that, at the time the warrant was issued, law enforcement had not yet located "a large portion of fraud proceeds." *Id.* at 47. The

affidavit further noted that Defendants—and Ayvazyan in particular—had been purchasing luxury watches and home furnishings, thereby raising the inference that Defendants were, in fact, attempting to launder the proceeds from the alleged loan fraud. *Id.* at 46–47. Finally, Defendants' alleged co-conspirator, Tamara Dadyan, withdrew approximately $120,000 of fraudulently obtained PPP loans as cash. *See id.* at 34; *see also United States v. Bowman*, 215 F.3d 951, 964 (9th Cir. 2000) (probable cause to search home of defendant suspected of bank robbery supported in part by co-conspirator's possession of $1.8 million in cash linked to robbery). Under these circumstances, there was probable cause to seize cash in excess of $1,000 because there was a "fair probability" that evidence of the scheme included large sums of cash. *See Hill*, 459 F.3d at 970.

Finally, there was also probable cause to seize other financial records, including tax, bank, and corporate records. Defendants were linked to fake and synthetic identities that submitted at least twenty fraudulent loan applications. *See id.* at 63–72. Those applications included false information, including materially false statements regarding corporate and tax information. *See id.* The loans were then deposited into bank accounts whose sole signatories were Defendants or synthetic identities. *See id.* Given these allegations, there was probable cause to seize bank, corporate, and tax records because there was a "fair probability" that such records were evidence of the fraudulent loan applications. *See Hill*, 459 F.3d at 970.

In sum, the warrant is not overbroad because there was probable cause to seize the categories of evidence identified in the warrant. *See SDI Future Health*, 568 F.3d at 702

### D.    Even if the Warrant is Facially Invalid for Overbreadth or Lack of Particularity, the Good Faith Exception Applies.

Under the good faith exception, "[e]vidence seized pursuant to a facially valid search warrant which later is held to be invalid may nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) (citing *United States v. Leon*, 468 U.S. 897, 925 (1984)). The good faith inquiry is "confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23).

"Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness" because "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal citations and quotations omitted). "Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23.

In *Leon*, the Supreme Court explained that there are four circumstances in which the good faith exception does not apply because reliance is *per se* unreasonable: (1) the magistrate or judge who issued the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the issuing magistrate wholly abandoned her judicial role and acted as a mere rubber stamp; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) depending on the circumstances of the particular case, a warrant may be so facially deficient the executing officers cannot reasonably presume it to be valid. *See* 468 U.S. at 923.

Here, the first three circumstances are inapplicable. There is no evidence suggesting that Agent Palmerton submitted false information to the magistrate judge, or that the magistrate judge wholly abandoned her judicial role. Nor can it be said that the warrant was so lacking in indicia of probable cause that reliance was unreasonable; to the contrary, as discussed above, *see supra* at 19–22, the warrant is supported by probable cause.

Rather, Defendants' argument focuses on the fourth exception: that the warrant is so facially deficient that the executing officers could not have reasonably presumed it was valid. Specifically, Defendants argue that, because this is a facial overbreadth challenge, the good faith exception is inapplicable unless agents received "specific assurances" about the warrant's facial deficiencies. Dkt. 222 at 21 n.14.

At the outset, the Court notes that the Supreme Court has never stated that the good faith exception is inapplicable—or that a different legal standard applies—where a defendant brings a facial challenge to a warrant. Indeed, that rule would swallow *Leon*'s good faith exception. After all, most challenges to a warrant are "facial" in the sense that the defendant asserts that the warrant, on its face, lacks probable cause, lacks particularity, or is overbroad.

Rather, the issue is one of degree. The Supreme Court said as much in *Leon*: "depending on the circumstances of the particular case, a warrant may be *so* facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." 468 U.S. at 923 (emphasis added). The Ninth Circuit has also explained that the issue is one of degree. *See, e.g.*, *Ortiz v. Van Auken*, 887 F.2d 1366, 1370 (9th Cir. 1989) ("A warrant may be *so* facially overbroad that it precludes reasonable reliance. . . . A warrant overbroad *to this extent* provides officers no guidance as to the boundaries of the search which they must execute. . . . Requiring that an officer know when a warrant is facially overbroad *to this degree* presents little burden.") (emphasis added); *United States v. Schmidt*, 947 F.2d 362, 373–74 (9th Cir. 1991) (noting that case where facial

overbreadth precluded application of *Leon* involved warrant that was "facially overbroad *to the extent* that the officers could not have acted in good faith in enforcing it") (emphasis added).[21]

Secondary sources confirm that the issue is one of degree.  The following example is illustrative:

> One [particularity-of-description problem] is that in which the description is simply too broad, as where the warrant authorizes seizure of objects W, X and Y but the probable cause showing in the affidavit is only as to objects W and X, or where the warrant authorizes seizure of all objects of Z variety but the probable cause showing only covers some such objects (*e.g.*, not all patient records of a doctor suspected of fraud, but only those of patients treated during the time of the suspected fraud).  This kind of case, it is submitted, does not fit within the *Leon* third situation, described as a "facially deficient" warrant, as there is nothing inherently wrong with the description when it is viewed in isolation, and the problem is essentially a deficiency in the probable cause showing vis-a-vis certain of the described items.

LaFave, Search & Seizure § 1.3(f) (6th ed.).

Given this emphasis on the degree of deficiency (rather than the label a defendant applies to her challenge), it is not surprising that the Ninth Circuit has applied the *Leon* good faith exception to cases where a defendant alleges facial overbreadth or facial lack of particularity. For example, in *United States v. Michaelian*, a defendant argued that the warrant to search his business was facially overbroad.  803 F.2d 1042, 1046 (9th Cir. 1986).  The district court agreed but declined to suppress the evidence on the basis of the *Leon* good faith exception.  *Id.*  The Ninth Circuit explained that it need not address the defendant's overbreadth challenge "so long as we conclude that the warrants were not so facially overbroad as to preclude reasonable reliance by the executing officers."  *Id.*  The Ninth Circuit then affirmed, finding that the warrant did not "approximate the *degree of facial deficiency* which would preclude objective reasonable reliance by federal agents."  *Id.* at 1047 (emphasis added).  The court never stated that the facial nature of the defendant's challenge required application of a different legal standard—*e.g.*, requiring special assurances from a magistrate regarding the warrant's overbreadth.  *See generally id.*

---

[21] The applicability of the good faith exception to other facial challenges—*e.g.*, a challenge that a warrant lacks probable cause—is also an issue of degree.  *KRL v. Est. of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2008) ("Our cases repeatedly emphasize this distinction between warrants with disputable probable cause and warrants so lacking in probable cause that no reasonable officer would view them as valid.").

The Ninth Circuit's decision in *Michaelian* is not an outlier. Rather, courts in the Ninth Circuit have repeatedly explained that the *Leon* good faith exception can apply in cases where a defendant asserts facial overbreadth. *See, e.g.*, *Schmidt*, 947 F.2d at 373–74 ("Even if we consider the warrant to be [facially overbroad], the good faith exception applies."); *United States v. Towne*, 997 F.2d 537, 549–50 (9th Cir. 1993) ("[T]he good faith exception to the exclusionary rule might well be applicable even if the warrant must be deemed facially invalid as a technical matter."); *Luk*, 859 F.2d at 677 (applying good faith exception because "warrant, construed in conjunction with affidavit, was not 'so facially overbroad as to preclude reasonable reliance by the executing officers'"); *United States v. Sakuma*, 2012 WL 5954962, at *13 (D. Haw. Nov. 28, 2012) ("[E]ven if the warrant was technically deficient, a reasonably well trained officer would not have known that the search was illegal given all of the circumstances. The [*Leon*] good faith exception applies.") (emphasis added), *aff'd sub nom. United States v. Sakuma*, 585 F. App'x 467 (9th Cir. 2014) ("The district court did not err in finding that the good faith exception applied to any deficiency in the warrant because the police officers' reliance on the warrant was not per se unreasonable."); *United States v. Cummings*, 2020 WL 1983342, at *10 (D. Ariz. Apr. 27, 2020) ("[T]he good faith exception would apply even if the warrant were overbroad or not sufficiently particular."); *United States v. Babichenko*, 2020 WL 4043143, at *4 (D. Idaho July 16, 2020) ("Thus, even if the warrants were overbroad, the good faith exception would prevent any suppression of evidence."). None of these cases required "special assurances" from the magistrate.

More recent Supreme Court authority further confirms that, regardless of whether officers received "special assurances," the *Leon* good faith exception applies to facially deficient warrants so long as the warrant is not *so* facially deficient that an officer could not reasonably rely on it. In *Messerschmidt v. Millender*, respondents brought an action seeking to hold police officers personally liable under 42 U.S.C. § 1983 for an unlawful search. 565 U.S. 535, 539 (2012). Sitting en banc, the Ninth Circuit found that the warrant used to search respondents' home was facially overbroad because there was probable cause to search for a single, specific weapon—*i.e.*, a sawed off shotgun with a pistol grip—but not to search for the "broad class of firearms and firearm-related materials described in the warrant." *Id.* at 545 (citing *Millender v. County of Los Angeles*, 620 F.3d 1016, 1027 (9th Cir. 2010), *rev'd sub nom. Messerschmidt*, 565 U.S. 535) (internal quotation marks omitted).

The Supreme Court reversed. First, the Supreme Court described the *Leon* good faith exception and explained that, "'[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'" *Id.* at 547 (quoting *Leon*, 468 U.S. at 921) (alterations in original).

Second, the Supreme Court applied that law to the facts of the case before it and found that, "[e]ven if the scope of the warrant were overbroad in authorizing a search for all guns when there was information only about a specific one . . . it would not have been 'entirely unreasonable' for an officer to believe, in the particular circumstances of this case, that there was probable cause to search for all firearms and firearm-related materials." *Id.* at 548–49 (citing *Leon*, 468 U.S. at 923).

Finally, the Supreme Court distinguished prior cases on the basis of the degree of overbreadth. Specifically, the *Messerschmidt* Court noted that, in *Groh v. Ramirez*, the good faith exception was inapplicable because "even a cursory reading of the warrant in [that] case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 555 (citing 540 U.S. 551, 564 (2004)). In *Messerschmidt*, by contrast, "any defect . . . would have become apparent only upon a close parsing of the warrant application." *Id.* at 556.

Accordingly, recent Supreme Court authority clearly indicates that facially deficient warrants are not per se excluded from the *Leon* good faith exception; rather, the issue is one of degree.[22] Moreover, the *Messerschmidt* Court never discussed whether the agents received "special assurances" from the magistrate regarding the warrant's overbreadth. *See generally id.*

Again, this is not a groundbreaking development. Indeed, the same day the Supreme Court decided *Leon*, it applied the good faith exception in *Massachusetts v. Shepard*, a case involving a warrant that was facially defective for lack of particularity.[23] *See* 468 U.S. 981, 987 (1984) (applying good faith exception where "warrant failed to conform to the commands of the Fourth Amendment because it did not particularly describe the items to be seized"); *see also*

---

[22] Although *Messerschmidt* applied the good faith exception in the context of a qualified immunity analysis, *see* 565 U.S. at 546–53, the case is still binding authority in determining the contours of the good faith exception in a criminal defendant's Fourth Amendment challenge. Indeed, the Supreme Court said as much in *Messerschmidt*: "Although *Leon* involved the proper application of the exclusionary rule to remedy a Fourth Amendment violation, we have held that 'the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer' who obtained or relied on an allegedly invalid warrant." *Id.* at 547 n.1.

[23] In *Shepard*, the warrant was facially defective because it was a form application that authorized a search for "controlled substances" even though the defendant was suspected of committing homicide. *See* 468 U.S. at 985–86. The officer who applied for the warrant informed the judge that the form warrant incorrectly authorized a search for "controlled substances," and the judge provided "assurances that the requested search would be authorized and the necessary changes [to the form warrant] would be made." *Id.* at 985–86, 989. The judge never made the changes, the search was executed, and the warrant was later found to be facially invalid. *Id.* at 987. The Supreme Court applied the good faith exception because "there is little reason why [an officer] should be expected to disregard assurances that everything is all right, especially when he has alerted the judge to the potential problems." *Id.* at 990. However, at no point did the Supreme Court suggest that such assurances were *required* to apply the good faith exception to facially invalid warrants. Rather, the judge's assurances were but one piece of evidence regarding "the only question" in the case: "whether there was an objectively reasonable basis for the officers' mistaken belief." *Id.* at 988.

*United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990) ("In *Massachusetts v. Sheppard*, the [Supreme] Court held that the [good faith] exception could also be applied to warrants that violate the fourth amendment's particularity requirement.").

The Court recognizes that there is some authority that indicates, at first glance, that officers cannot reasonably rely on facially invalid warrants unless the officers receive "specific assurances" about the warrant's facial deficiencies.  For example, in *Kow*, the Ninth Circuit stated as follows: "when a warrant is facially overbroad, absent *specific assurances* from an impartial judge or magistrate that the defective warrant is valid despite its overbreadth, a reasonable reliance argument fails."  58 F.3d at 429 (emphasis in original).  Similarly, Defendants rely on *United States v. Crozier*, which declined to apply the good faith exception because the federal agent received "no specific assurance from the magistrate that the overbroad warrant was acceptable" and "evidence of [the agent's] good faith was lacking."  777 F.2d 1376, 1382 (9th Cir. 1985).

However, despite this language, *Kow* cited favorably to *Luk* and *Michaelian*—two cases where the Ninth Circuit applied the good faith exception to a facially overbroad warrant without discussing whether the executing officer received any "specific assurances" from a magistrate. *See generally Luk*, 859 F.2d 667 (no discussion of specific assurances); *Michaelian*, 803 F.2d 1042 (same).  *Kow* also distinguished *Luk* and *Michaelian* on the basis that the warrants in those cases were not so facially overbroad as to preclude reasonable reliance.  *See Kow*, 58 F.3d at 428 (citing *Michaelian*, 803 F.2d at 1048) (noting that warrant in *Michaelian* "was not 'so overbroad as to be facially deficient'"); *see also id.* at 429 (noting that warrant in *Luk* "did not involve the same degree of overbreadth" as warrants precluding reasonable reliance).

*Kow* did not purport to overturn *Luk* or *Michaelian*.  Nor could it—after all, only the Ninth Circuit sitting en banc can overturn a published three-judge panel opinion.  *See, e.g.*, *State Bar of Cal. v. Findley*, 593 F.3d 1048, 1050 (9th Cir.2010) ("[T]hree judge panels of our Circuit are bound by prior panel opinions 'unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions.'") (quoting *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1441 (9th Cir.1994)).

Accordingly, it appears that when *Kow* required specific assurances for "facially overbroad" warrants, 58 F.3d at 429, it was referring to warrants that are "so overbroad" that a reasonable officer could not rely on it, *see* 58 F.3d at 430 n.4 ("[B]oth the warrant and the affidavit at issue here were *so facially overbroad* as to preclude reasonable reliance . . . .") (emphasis added).  That reading is consistent with *Leon*, *see* 468 U.S. at 923, and Ninth Circuit authority contemporaneous to *Kow*, *see, e.g.*, *Luk*, 859 F.2d at 677–78; *Michaelian*, 803 F.2d at 1048; *Schmidt*, 947 F.2d at 374.  It is also consistent with later Supreme Court authority—*i.e.*, *Messerschmidt*, where the Supreme Court applied the good faith exception to a facially

overbroad warrant even though nothing suggests that the executing officers received "specific assurances" regarding the warrant's overbreadth. *See generally* 565 U.S. 535.

Moreover, a closer reading of both *Kow* and *Crozier* reveals that both cases are distinguishable and actually involved straightforward applications of the *Leon* good faith exception. First, the warrants in both cases were, in fact, "so facially deficient" that no officer could reasonably rely on them. *Leon*, 468 U.S. at 923. For example, in *Crozier*, the officer "relied on a warrant that merely stated 'Material evidence of violation 21 USC 841, 846 (Manufacture and Possession with intent to distribute Amphetamine and Conspiracy).'" *Id.* Such a warrant clearly "fails to offer sufficiently detailed instruction and instead leaves [officers] guessing as to their task." *Ortiz*, 887 F.2d at 1370. And, in *Kow*, the court repeatedly noted that the *degree* of overbreadth in the warrant precluded reasonable reliance. *See* 58 F.3d at 430 n.4 ("[B]oth the warrant and the affidavit at issue here were *so facially overbroad* as to preclude reasonable reliance . . . .") (emphasis added); *see also id.* at 429 (distinguishing warrant at issue from warrant subject to good faith exception on basis that the latter "did not involve the same degree of overbreadth").

Second, a key factor in both *Kow* and *Crozier* was the lack of evidence establishing the officers' good faith or reasonable reliance. For example, in *Crozier*, the court distinguished the case before it from the Supreme Court's decision in *Shepard* because, unlike in *Shepard*, "evidence of [the officer's] good faith was lacking." 777 F.2d at 1382. Similarly, in *Kow*, the court found insufficient evidence of good faith and reasonable reliance in part because no evidence indicated that the officers relied on an affidavit that could cure the warrant's overbreadth.[24] Accordingly, *Kow* and *Crozier* were cases where *evidence* of good faith and reasonable reliance—be it "specific assurances" or any other type of evidence—was lacking.

---

[24] To the extent Defendants argue that the good faith exception is inapplicable to facially overbroad warrants unless the warrant incorporated a curative affidavit, the Court rejects that argument. In *Luk*, the Ninth Circuit found that a warrant was facially overbroad but also found that the good faith exception applied. 859 F.2d at 678. In doing so, the court first discussed the "cure by affidavit" rule, *i.e.*, "the well-settled principle that a warrant's overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized." *Id.* at 676. The cure by affidavit rule only applies if the warrant "incorporates" the affidavit, which means (1) the warrant expressly incorporates the affidavit by reference; and (2) the affidavit is attached physically to the warrant or accompanies agents while they execute the search. Although the cure by affidavit rule was inapplicable in *Luk* because the warrant did not satisfy the first prong, the court found that the executing officers' reliance on the affidavit could still be evidence of good faith under *Leon*—*i.e.*, the cure by affidavit rule is a separate inquiry from the good faith exception. *Id.* at 676–67. Indeed, the *Luk* court was careful to note as follows: "Although we noted in *Crozier* that an agent's possession of the affidavit when he conducts the search pursuant to an overbroad warrant is *evidence* of good faith, we do not read *Crozier* to hold the converse: that the absence of the affidavit at the scene *precludes* a finding of good faith." *Id.* at 677 n.10 (emphasis in original) (internal citations omitted); *see also Towne*, 997 F.2d at 549 ("[E]ven if [an attachment that could cure overbreadth] cannot be considered an integral part of the search warrant as a matter of law, it does not follow that the good faith exception cannot apply.").

Similarly, in *Messerschmidt*, the Supreme Court relied on the affidavit in determining whether the good faith exception applied. *See* 565 U.S. at 548–52. The Supreme Court did so even though the Ninth Circuit sitting en banc had already found that the warrant did not incorporate the affidavit because, as is the case here, the second prong of

Here, unlike in *Kow* and *Crozier*, (1) the warrant is not so facially overbroad that agents could not reasonably rely on it, and (2) the record contains ample evidence that agents acted in good faith and reasonably relied on the warrant.

First, the degree of overbreadth here is not comparable to cases where courts declined to apply the good faith exception. The warrant does not simply state "material evidence of wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud." *See Crozier*, 777 F.2d at 1382 (degree of facial overbreadth precluded reasonable reliance where warrant "merely stated 'Material evidence of violation 21 USC 841, 846 (Manufacture and Possession with intent to distribute Amphetamine and Conspiracy).'"). Nor did the warrant in this case "encompass[] essentially all documents on the premises." *Kow*, 58 F.3d at 428.

Instead, the challenged provisions of the warrant are all supported by probable cause and limited in scope. *See supra* at 19–22, 28–29. The warrant specifies the crimes being investigated, describes the documents to be seized, and requires certain categories of documents to relate to specific entities and individuals. *See Morton*, 776 F. App'x at 399.

Accordingly, even if Defendants are correct that the Government was required to identify specific watches or pieces of jewelry (it was not), or that the phrase "any affiliated entities or individuals" buried at the end of one paragraph renders the warrant technically overbroad (it does not), those deficiencies—and the others alleged by Defendants—are not "glaring" errors revealed

---

the incorporation test was not satisfied—*i.e.*, "there [was] no evidence in the record, nor d[id] the deputies argue, that the affidavit was physically attached to the warrant or accompanied the warrant on the search." *Millender*, 620 F.3d at 1026, *rev'd sub nom. Messerschmidt*, 565 U.S. 535. Accordingly, the good faith exception can apply to a facially overbroad warrant even if that warrant does not "incorporate" the affidavit, as that term is defined in the Ninth Circuit.

The Ninth Circuit's opinion in *SDI Future Health*—issued prior to *Messerschmidt*—does not command otherwise. There, the Ninth Circuit declined to apply the good faith exception because the Government could not prove that executing officers relied on an affidavit that could cure a facially overbroad warrant. 568 F.3d at 706 (O'Scannlain, J.). However, *SDI Future Health* does not *require* officers' reliance on an affidavit to apply the good faith exception to facially defective warrants. Rather, it appears that the *SDI Future Health* Court was deciding whether it should apply the good faith exception as it was specifically applied in *Luk*—*i.e.*, whether to apply the exception on the basis of the executing officers' good faith reliance on an affidavit that was not technically incorporated into the warrant. Indeed, the *SDI Future Health* Court repeatedly referred to the good faith exception not as the "*Leon* exception" but, rather, as the "*Luk* good faith exception" or the "*Luk* exception." 568 F.3d at 706. Moreover, the author of the panel opinion in *SDI Future Health* had previously stated that, even if an attachment that could cure overbreadth did not accompany the officers executing the search, "it does not follow that the good faith exception cannot apply." *Towne*, 997 F.2d at 549 (O'Scannlain, J.). The *SDI Future Health* opinion cites favorably to *Towne* and *Luk*—both of which explain that reliance upon a curative affidavit is *evidence* of good faith but not *necessary* to find good faith—and *SDI Future Health* does not purport to overturn *Towne* or *Luk*. Accordingly, *SDI Future Health* does not require officers' reliance on an affidavit to apply the good faith exception to facially defective warrants. A contrary interpretation would conflate the *Leon* good faith exception with the "cure by affidavit" rule—*i.e.*, it would conflate two distinct albeit somewhat overlapping inquiries. It would also run counter to the Supreme Court's guidance in *Leon* that the good faith exception's applicability should be determined on a "case-by-case basis," 468 U.S. at 918, and, finally, it would be directly at odds with *Messerschmidt*, where the Supreme Court applied the good faith exception on the basis of an affidavit that was *not* "incorporated," as that term is defined in the Ninth Circuit.

by "a simple glance" or a "cursory reading of the warrant." *Groh*, 540 U.S. at 564. "Rather, any arguable defect would have become apparent only upon a close parsing of the warrant application, and a comparison of the affidavit to the terms of the warrant to determine whether the affidavit established probable cause to search for all the items listed in the warrant." *Messerschmidt*, 565 U.S. at 556.

Second, there is ample evidence that the agents acted in good faith and that their reliance on the warrant was objectively reasonable. The most important piece of evidence is that the warrant was issued by a neutral magistrate—a fact that the Supreme Court has described as the "clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt*, 565 U.S. at 546.

Other evidence also supports a finding of objectively reasonable reliance and good faith. For example, Defendants argue that the warrant is so overbroad as to preclude reasonable reliance because it allowed the Government to seize cash in excess of $1,000. *See* Dkt. 146 at 19–20.

However, the affidavit[25] explained that individuals committing financial crimes "often liquidate criminal proceeds to cash" and high value assets. Warrant App. at 46. The affidavit also noted that, at the time the warrant was issued, law enforcement had not yet located "a large portion of fraud proceeds." *Id.* at 47. Defendants—and Ayvazyan in particular—had been purchasing luxury watches and home furnishings, thereby raising the inference that Defendants were, in fact, attempting to launder the proceeds from the alleged loan fraud, perhaps by selling items they purchased for cash. *Id.* at 46–47. Finally, Defendants' alleged co-conspirator, Tamara Dadyan, withdrew approximately $120,000 of fraudulently obtained PPP loans as cash. *See id.* at 34; *see also Bowman*, 215 F.3d at 964 (probable cause to search home of defendant suspected of bank robbery supported in part by co-conspirator's possession of $1.8 million in cash linked to robbery). "Given the foregoing, it would not have been 'entirely unreasonable' for an officer to believe, in the particular circumstances of this case, that there was probable

---

[25] As noted above, *see supra* n.24, the Court can rely on the information in the affidavit in order to determine whether the executing agents acted in good faith and reasonably relied on the warrant, much like the Supreme Court did in *Messerschmidt*.

cause to search for" cash in excess of $1,000 and to seize the grocery bag[26] containing $450,000 of cash.[27] *Messerschmidt*, 565 US. at 549 (quoting *Leon*, 468 U.S. at 923).

Defendants also argue that the warrant is so overbroad as to preclude reasonable reliance because it authorized the seizure of any banking, financial, or travel documents, regardless of whether those documents related to the alleged scheme. *See* Dkt. 146 at 11. Similarly, they argue that the warrant was overbroad because it allowed officers to seize jewelry obtained before the alleged fraud could have begun. *Id.* at 18–20.

However, there was ample probable cause to seize the above described documents and jewelry purchased on or after March 1, 2020. *See supra* at 19–22, 28–29. Moreover, the Government only seized approximately ten documents from Defendants' home, *see* Fenton Decl., ¶ 11, Ex. 11, and Defendants acknowledge that, when seizing jewelry and watches, the agents "le[ft] less valuable watches behind," Dkt. 146 at 6. The limited nature of these seizures is evidence that the agents acted in good faith—not indiscriminately—and reasonably relied on the warrant. *See Luk*, 859 F.3d at 647 ("Unlike cases in which the executing officers seized evidence to the full extent of an overbroad warrant, the agents here acted in good faith by limiting their search to items relating to those transactions described in the affidavit with respect to which there existed probable cause to seize."); *see also United States v. Burke*, 718 F. Supp. 1130, 1146 (S.D.N.Y. 1989) (finding good faith reliance in part because "the officers seized only items relating to activities described in the affidavit").

In sum, even if Defendants are correct that, facially, the warrant is overbroad or lacks the requisite particularity—they are not, *see supra* at 25–29—the warrant is not "so facially defective" that no reasonable officer could rely on it. *Leon*, 468 U.S. at 923. This is simply not a case where, on its face, the warrant authorized "the wide-ranging exploratory searches the Framers intended to prohibit." *Horton v. California*, 496 U.S. 128, 140 (1990) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). Moreover, none of the remaining exceptions to the *Leon* rule apply, and no evidence indicates that the officers' reliance on the warrant was objectively unreasonable. Accordingly, the *Leon* good faith exception applies.

---

[26] The Government notes that, as agents were pulling up to Defendants' home to execute the search, agents witnessed Terabelian exiting the back door of the residence and throwing an object into the bushes. *See* Fenton Decl., ¶ 7, Ex. 7. That object turned out to be the grocery bag with $450,000 of cash. *Id.* These facts do not play a role in the Court's analysis because the good faith inquiry focuses on whether the "officers' reliance on *the magistrate's* determination of probable cause was objectively reasonable," and, here, the magistrate was not aware of these facts. *Leon*, 468 U.S. at 926 (emphasis added).

[27] The bushes where officers discovered the cash were covered by the warrant because they fell within the curtilage of the home. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013); *see also United States v. Gorman*, 104 F.3d 272, 275 (9th Cir. 1996) ("If a search warrant specifying only the residence permits the search of 'closets, chests, drawers, and containers' therein where the object searched for might be found, so should it permit the search of similar receptacles located in the outdoor extension of the residence, *i.e.*, the curtilage, such as the container in this case.").

## VI.     Return of Property Not Supported by Probable Cause.

It appears to the Court that, although the warrant itself was supported by probable cause and not facially deficient, the Government nevertheless seized evidence for which it lacks probable cause to retain.  Specifically, the following items of jewelry appear to be unrelated to the alleged scheme because they were not purchased on or after March 1, 2021.  *See* Warrant at 7 (authorizing seizure of jewelry purchased since March 1, 2021):

- Two Cartier watches purchased in May 2019 and October 2007;

- Terabelian's wedding ring;

- Two rings Terabelian received in 2007 to commemorate the recent births of Defendants' second and third children;

- Terabelian's yellow-gold Rolex model 18238 watch;

- a stainless-steel Rolex Datejust model 126200 watch with a black dial;

- a stainless-steel Rolex Datejust model 279160 watch with a pink dial purchased years ago by Ayvazyan;

- a platinum ring;

- a ring with Ayvazyan's initials that he received as a gift from his uncle upon the birth of his son in 2007;

- a yellow gold necklace Ayvazyan/Terabelian has had since before they were married; and

- a white gold ring marked 585 DJ purchased by Ayvazyan in 2018.

Dkt. 146 at 7–9.

The above identified property should be returned pursuant to Federal Rule of Criminal Procedure 41(g) because the Government lacks probable cause to retain it.  Accordingly, the Government is ordered to return that property to Defendants within fourteen days of this order.  *See United States v. Tamura*, 694 F.2d 591, 596 (9th Cir. 1982) (noting that property seized unlawfully should be returned without "unnecessary delay").

Nevertheless, the Court will not suppress the above evidence.  That result is compelled by *United States v. Sedaghaty*, 728 F.3d 885, 914 (9th Cir. 2013).  In *Sedaghaty*, the court found that there was "no error" in the warrant the defendant challenged.  *Id.* at 913; *see also id.* at 914 ("The search warrant here was properly issued and clearly stated the locations to be searched and the items that could be seized.").  Rather, the issue was that "[t]he government agents responsible [for executing the search] . . . seized papers and records beyond those the warrant authorized." *Id.* at 914–15.  Despite this unlawful seizure, the court noted that, "[i]n the absence of 'flagrant disregard for the terms of the warrant,' a district court need not 'suppress all of the evidence, including evidence that was not tainted by the violation.'" *Id.* at 915.  The court concluded that the record "d[id] not reflect a flagrant general search" and, only evidence seized beyond the scope of the warrant's authorization needed to be suppressed.  *Id.*

However, the *Sedaghaty* Court also declined to determine which particular items should be suppressed because the parties had not "considered[ed] the applicability of the exclusionary rule" and, particularly, the good faith exception.  *Id.*  Instead, the court directed the district court to determine whether the seizure of items beyond the scope of the warrant implicated the principles of *Leon*.  *Id.*

Here, as in *Sedaghaty*, there was no error with the properly issued warrant.  *See supra* at 19–22, 25–29.  Moreover, the record does not reflect a flagrant general search.[28]  Rather, government agents simply seized some evidence that was beyond the scope of the warrant's authorization.[29]  Accordingly, the Court finds that suppression of all evidence is not warranted. *See Sedaghaty*, 728 F.3d at 915.

However, unlike in *Sedaghaty*, the Court already found above that the *Leon* good faith exception applies in this case.  *See supra* at 29–38.  The Court also specifically explained why the agents' search for jewelry was supported by probable cause and executed in good faith and in reasonable reliance on the warrant.  *See supra* at 28, 36–38.  Accordingly, suppression of the above identified property is not appropriate here.  *See Sedaghaty*, 728 F.3d at 915.

---

[28] For this reason alone, the Court rejects Defendants' argument that all evidence should be suppressed because the warrant was executed in an unreasonable manner.  *See* Dkt. 146 at 20–21.  Regardless of the propriety of the Government's tactical decisions in approaching Defendants' home and detaining persons on the premises, the search itself was not a flagrant general search.

[29] As noted above, *see supra* at 39, the jewelry identified above was beyond the scope of the warrant because it was not purchased on or after March 1, 2021, *see* Warrant at 7 (authorizing seizure of jewelry purchased since March 1, 2021).

**VII.   Conclusion.**

For the foregoing reasons, the Court rules as follows:

- Defendants' motion to suppress evidence seized at the Miami airport on Fourth Amendment grounds is DENIED.

- Defendants' motion to suppress the physical fruits of a *Miranda* violation is GRANTED IN PART.  The motion is GRANTED with respect to the evidence retrieved from Defendants' cell phones.  The motion is DENIED with respect to the evidence seized from Defendants' luggage.

- Defendants' motion to suppress evidence seized during a search of their home on the grounds that the warrant lacked particularity and was overbroad is DENIED.

- The Government is ORDERED to return the property identified in Section V above, *see supra* at 39–40, within fourteen days of this order.

**IT IS SO ORDERED.**

Date: April 27, 2021

HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE