1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4    THE HON. JUDGE STEPHEN V. WILSON, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                   Plaintiff,       )
                                     )
8         vs.                        ) NO. 20-CR-00579-SVW
                                     )
9   RICHARD AYVAZYAN, et al.,        )
                                     )
10                  Defendants.      )
    _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               Video Conference

16             Los Angeles, California

17             Friday, April 2, 2021

18

19

20

21

22        Lisa M. Gonzalez, CSR 5920, CCRR
                   Official Reporter
23        United States District Courthouse
            350 W. First Street, Room 4455
24         Los Angeles, California  90012
          213.894-2979; www.lisamariecsr.com

25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   OFFICE OF THE U.S. ATTORNEY
                           BY:  BRIAN R. FAERSTEIN
 3                              ASSISTANT UNITED STATES ATTORNEY
                           312 North Spring Street, Suite 1200
 4                         Los Angeles, CA 90012
                           213-894-2400
 5
                           U.S. DEPARTMENT OF JUSTICE
 6                         BY:  CHRISTOPHER FENTON
                           1400 New York Avenue, NW
 7                         Washington, DC 20530
                           202-320-0539
 8

 9   FOR THE DEFENDANTS:   STEPTOE AND JOHNSON LLP
                           BY:  ASHWIN J. RAM, ESQ.
10                         633 West 5th Street, Suite 1900
                           Los Angeles, CA 90071
11                         213-439-9443

12                         BY:  NICHOLAS P. SILVERMAN, ESQ.
                           1330 Connectiut Avenue NW
13                         Washington, DC 20036
                           202-429-8096
14
                           DIAMOND AND ASSOCIATES
15                         BY:  DAVID D. DIAMOND, ESQ.
                           1200 Wilshire Boulevard, Suite 406
16                         Los Angeles, CA 90017
                           213-250-9100
17
                           BIENERT KATZMAN LITTRELL WILLIAMS LLP
18                         BY:  JOHN LEWIS LITTRELL, ESQ.
                           903 Calle Amanecer, Suite 350
19                         San Clemente, CA 92673
                           949-369-3700
20
                           MESEREAU LAW GROUP
21                         BY:  THOMAS A. MESEREAU, JR.
                           10100 Santa Monica Boulevard, Suite 300
22                         Los Angeles, CA 90067
                           310-651-9960
23

24

25
```

```
 1   APPEARANCES (Continued):

 2

 3                       LAW OFFICES OF FRED G. MINASSIAN INC.
                         BY:  FRED G. MINASSIAN, ESQ.
 4                       101 North Brand Boulevard, Suite 1970
                         Glendale, CA 91203
 5                       818-240-2444

 6                       HANUSZ LAW, PC
                         BY:  JOHN HANUSZ, ESQ.
 7                       800 Wilshire Boulevard, Suite 1050
                         Los Angeles, CA 90017
 8                       213-204-4200

 9                       TAHMAZIAN LAW FIRM PC
                         BY:  JILBERT TAHMAZIAN, ESQ.
10                       1518 West Glenoaks Boulevard
                         Glendale, CA 91201
11                       818-242-8201

12                       WERKSMAN JACKSON AND QUINN
                         BY:  MICHAEL GREGORY FREEDMAN, ESQ.
13                       888 West 6th Street, 4th Floor
                         Los Angeles, CA 90017
14                       213-688-0460

15                       LAW OFFICE OF PETER JOHNSON
                         BY:  PETER JOHNSON, ESQ.
16                       409 North Pacific Coast Highway
                         Suite 651
17                       Redondo Beach, CA 90277
                         310-295-1785

18

19

20

21

22

23

24

25
```

1           Los Angeles, California; Friday, April 2, 2021

2                          11:33 a.m.

3                           -o0o-

4           THE COURT:  I see the lawyers' names on the

5    screen, and I have a schedule here.

6           Let me start the hearing in this way.  I know that

7    the specific purpose of the status conference is with regard

8    to the ex parte application for protective order --

9    application for modified protective order.  And there is

10   opposition.  And there have been substantial briefs filed

11   with regard to this protective order, which is somewhat

12   unusual, but has to be addressed.

13          Before I can get to that specific question, I

14   would benefit from, perhaps, a better understanding of the

15   indictment.  And I'm directing my questions initially to --

16   who is the prosecutor here?  It's Andre, Julian Andre.

17   Where's Julian Andre?

18          MR. FAERSTEIN:  Your Honor, I'm sorry.  This is

19   Brian Faerstein on behalf of the United States.  I'm also

20   joined by my colleague, Scott Paetty and Christopher Fenton.

21   Mr. Andre left our office about a month or two ago, but

22   myself and Mr. Paetty have made appearances, and Mr. Fenton

23   has been on the case from the inception.

24          THE COURT:  Who are the other assistants?

25          MR. FAERSTEIN:  The other AUSA is Scott Paetty

1  from the U.S. Attorney's Office.

2             THE COURT:  How do you spell his name?

3             MR. FAERSTEIN:  His last name is P-a-e-t-t-y.

4             THE COURT:  He is not appearing here today;

5  correct?

6             MR. FAERSTEIN:  He is present.  I will be taking

7  the lead for the Government, but he is present, as well as

8  Mr. Fenton.

9             THE COURT:  I see.  So my questions initially are

10  directed to you, and maybe defendants can benefit in some

11  way from my questions also.

12             I read the indictment several times, and it has so

13  many details in it that I want to make sure I get the thread

14  of it and not get lost in the details.

15             So understanding that it's just an indictment and

16  the lawyers should understand that nothing is likely to be

17  decided at this hearing, and my questions are really

18  questions trying to get some insight as to at least what the

19  indictment alleges, which is the starting point.

20             And I'm not interested in how the indictment or

21  the evidence meshes to specific statutes or charges, I'm

22  just interested, in nonlegal term, let's call it "The

23  story."  Every case has a story.

24             And so here is my very rough understanding.  And

25  I'm not interested in too many details.  I'm just trying to

1   get the broad strokes.

2          My understanding is that the indictment alleges

3   that the scheme involved applications for these PPP loans

4   and Small Business Administration loans which appear to be

5   similar in purpose.  Maybe there are some distinctions.  And

6   that what happened, according to the indictment, was that

7   the defendant -- and the focus as far as I can see from the

8   pleadings -- and I'm doing this also to better understand

9   the motions to suppress which are on calendar for next

10  week -- seem to put defendant Ayvazyan and Terabelian at the

11  helm here, so to speak.

12          And that there was a series of PPP and SBA loan

13  applications for the benefits under those programs.  The

14  moneys under those programs were limited to certain business

15  expenses and purposes, and that instead of using those funds

16  for business purposes, they were used for the personal

17  purposes of the defendants buying homes or other things.

18          And that -- and carrying out the scheme -- and

19  this, perhaps, gets closer to the protective order issue --

20  the Government maintains that there were some fictitious,

21  non-existent persons or entities that were the applicants

22  for these loans.

23          Two prominent names in the indictment are Zhadko

24  and Kauichko, and that they are the -- in fact, the

25  indictment so alleges that those are AKAs or names used by

```
 1   Ayvazyan and his wife Terabelian.  I don't fully
 2   understand -- maybe I should, maybe it's my deficiency, but
 3   I don't fully understand the other defendants' roles in the
 4   indictment.
 5           Were they persons who were similarly situated to
 6   Ayvazyan and Terabelian, or were those persons who somehow
 7   involved themselves in the scheme to help benefit the
 8   Ayvazyan and Terabelian?
 9           So, as a first matter, I'll just ask you,
10   Mr. Faerstein, in terms of what I just said, am I close to
11   the mark, or have I misread the indictment?
12           MR. FAERSTEIN:  Thank you, Your Honor.
13           You are -- Your Honor is very close to the mark.
14           I will mention that there was an initial
15   indictment in this case, of course, back in November where
16   there were four defendants, Richard Ayvazyan, Marietta
17   Terabelian as Your Honor has already mentioned, along with
18   Richard Ayvazyan's brother, Artur Ayvazyan and his wife,
19   Tamara Dadyan.
20           The indictment at that time alleged, as Your Honor
21   described, a conspiracy to submit fraudulent loan
22   applications for COVID-19 disaster relief fund.  And the
23   core component of the conspiracy and the scheme is using
24   fake, stolen and synthetic identities of individuals, as
25   well as entities to submit these fraudulent loan
```

1  applications for --

2          THE COURT:  That's what I described, I thought.

3  And you make a point here about the synthetic and stolen.

4  From my reading of the indictment -- and it has so many

5  details -- it appeared to me that there was only one -- I'll

6  call it a real person -- whose identity was stolen or

7  misused to get these loans and that all the other names of

8  the businesses, at least from the indictment's standpoint,

9  were used or synthetic.  I guess that means made up; right?

10          MR. FAERSTEIN:  It does, Your Honor.

11          THE COURT:  So in terms of real persons whose

12  identity was somehow stolen or misused and manipulated for

13  the purposes of the indictment, how many persons of that

14  kind were there?

15          MR. FAERSTEIN:  Well, Your Honor, I was going to

16  mention, the Government --

17          THE COURT:  Just answer my question.  Listen to

18  what I'm saying.  There are a lot of people here, and I'm

19  trying to unearth a better understanding so that I can do my

20  job.  This is not the time to argue.  I'm just interested in

21  getting my questions answered.  Not long-winded answers.

22          So answer my question "yes" or "no" first, and

23  then give me a further answer if there is one.

24          MR. FAERSTEIN:  Yes, Your Honor.

25          There are six specific stolen identities of real

1    people alleged in the first --

2            THE COURT:  Why didn't you say that at the outset.

3    That was my question.

4            MR. FAERSTEIN:  I apologize, Your Honor.

5            THE COURT:  Then, are the six people mentioned in

6    the indictment?

7            MR. FAERSTEIN:  They are mentioned in the

8    first-superseding indictment, Your Honor.

9            THE COURT:  And do these people claim, as per the

10   indictment, that they discovered the misuse because of money

11   unexplainably going to their bank account or the business

12   bank account?

13           How is it that they knew their identity was

14   misused?  I mean, when the application was made in the name

15   of a real person whose identity was misused or stolen, did

16   the PPP or the SBA wire the money to their bank account, or

17   was it somehow directed somewhere else?  And, if so, how did

18   these persons know that their identity was misused?

19           MR. FAERSTEIN:  Yes, Your Honor.  The money was

20   not wired to these individuals, it was wired to bank

21   accounts controlled by the defendants in this case.  And as

22   part of the investigation of these fraudulent loan

23   applications, agents have interviewed a number of the

24   witnesses or alleged identity theft victims in sort of

25   trying to figure out did you submit this loan application

1   and they have confirmed they have not.

2            A couple of the other identity theft victims have

3   not been interviewed, but I will also mention there are

4   numerous other individuals that are not alleged in

5   aggravated identity theft counts in the first-superseding

6   indictment, but whose identity we believe, based on

7   interviews with them, have also been used and stolen and

8   used in connection in furtherance of the conspiracy.

9            THE COURT:  All right.  And I did read -- my

10  research is not complete on the motions that are pending,

11  but I did read the declaration or affidavit by the FBI agent

12  in furtherance of the warrant.

13           Well, before I get to that, let me ask a question

14  about Zhadko and Kauichko.

15           There seems to be a clear dispute between the

16  defendants and the Government as to whether Zhadko and

17  Kauichko are fictitious or real.  In the FBI agent's

18  declaration, there is information, at least from that

19  declaration, that the FBI agent says supports the view that

20  they're not real, but the defendants claim they are real.

21  I'm going to ask you briefly what evidence is there that

22  they're not real, and give me your response.

23           MR. FAERSTEIN:  Yes, Your Honor.  With respect to

24  the identifying information for, for instance, Iuliia Zhadko

25  and the drivers' licenses that were on defendant Ayvazyan's

1   phone and the social security number, that information is

2   not real.  There may be an individual named Iuliia Zhadko,

3   but the information in these profiles that the defendants

4   were in possession of is not real.

5          THE COURT:  One moment.  And you say that the

6   information that you received, was this from the search of

7   the phones at the Miami Airport?

8          MR. FAERSTEIN:  Both in terms of the search of the

9   phones at the Miami Airport, as well as the cards that the

10  defendants had on them during that search.

11         THE COURT:  But it stems from the search at the

12  Miami Airport?

13         MR. FAERSTEIN:  Yes, Your Honor.

14         There's also --

15         THE COURT:  Why do you -- yes, it stems from Miami

16  Airport.

17         MR. FAERSTEIN:  The agents had previously

18  identified the person Iuliia Zhadko or the identity Iuliia

19  Zhadko before the Miami stop, and they did so in connection

20  with investigating suspected fraudulent loan applications

21  for COVID-19 disaster relief funds.

22         One of the companies that they were investigating

23  in the summer of last year before the border stop in October

24  was a company called Timeline Transport.  And that

25  particular PPP loan application was submitted by an

1  individual named Iuliia Zhadko.

2         THE COURT:  I know that because that's highlighted

3  in the FBI agent's affidavit.

4         Let me, perhaps, be a little disjointed and

5  backtrack here and ask you how did this all start.

6         MR. FAERSTEIN:  How did the investigation start,

7  Your Honor?

8         THE COURT:  Yes.

9         MR. FAERSTEIN:  Well, after Congress passed the

10 CARES Act, there was an emphasis on trying to root out fraud

11 in connection with the Payment Protection Program, as well

12 as this other program, the Economic Injury Disaster Relief

13 program because those funds were obviously sorely needed by

14 the businesses that legitimately needed them.

15        In this particular case, this company Timeline

16 Transfer was among a few that -- of construction companies

17 that had some hallmarks or question marks that the FBI began

18 investigating.

19        THE COURT:  You know, you say a lot of things, and

20 understand I'm not being personally critical, but I have a

21 goal here, and I just can't let you keep on talking.

22        It seems to me what you're saying is that it

23 became -- began with some sort of audit.

24        MR. FAERSTEIN:  I can't say whether it was an

25 audit, Your Honor, or an anonymous tip.

1          THE COURT:  You can't say because you don't know,

2    or because you feel that you don't want to make that

3    revelation known?

4          MR. FAERSTEIN:  I, sitting here right now without

5    going back to the specific warrant affidavit, I can't say

6    because I don't know the specific --

7          THE COURT:  Why don't you know?  I mean, you

8    should know that.  I mean, you're the prosecutor.

9          Are you telling me that you don't know how this

10   all started?  I mean, I find that stunning.

11         How did this start?

12         MR. FAERSTEIN:  It started with an investigation

13   of a company called Timeline Transport.

14         THE COURT:  You said that, and the impression I

15   was getting was that there was this program, and the

16   Government, in its wisdom, said, well, maybe we ought to

17   check to see if everything is kosher about this business,

18   this program.  And so they sort of, like the IRS, they do

19   random audits and sometimes the IRS -- someone calls up the

20   hotline and says, you know, "Dr. Smith down the street here,

21   he keeps four sets of books.  I know where they are."  I

22   mean, you know, all kinds of reasons to start audits.

23         Was this audit started because there were some

24   hallmarks?  I mean, we all know the IRS has some gadgetries,

25   algorithms, programs, where they look for indicia of fraud,

1   use that as a starting point and sometimes it's someone who

2   shows up and says, "I've got a good lead for you."

3          How did this one start?

4          MR. FAERSTEIN:  Your Honor, I do not know sitting

5   here right now whether it was an audit or algorithms or

6   whether it came in through an anonymous tip.  My colleague,

7   Christopher Fenton, will be able to answer that question.

8          THE COURT:  Well, who is the lead prosecutor in

9   this case?

10          MR. FAERSTEIN:  Your Honor, I'm not sure we have a

11   designated lead prosecutor.  I am speaking here today on the

12   ex parte application.

13          THE COURT:  You know something, this is just not

14   satisfactory.  I mean -- I mean, if it were a defense lawyer

15   who said, you know, "I'm carrying the bags.  I'm the guy

16   who's going to try the case" and couldn't answer the

17   questions, I'd be equally perturbed.

18          I mean, I'm taking pains as is my responsibility

19   to understand what's going on because there's a lot at

20   stake, and you're supposed to be helping me, not persuading

21   me, but answering my questions.  And I've used that word

22   before stunned by the fact that you don't know how this

23   began.  It may not be pivotal, but it --

24          Let me turn to something related.

25          MR. FENTON:  Your Honor, this is Christopher

1    Fenton for the Government as well.  I can answer your

2    question if it would please the Court.

3            THE COURT:  Go ahead and answer.

4            MR. FENTON:  Sure.  So the Department of Justice

5    worked with an independent expert to audit data from the SBA

6    to try to find certain hallmarks for fraud.  What we found

7    in this particular instance, without going into too much

8    detail, unless the Court would prefer that --

9            THE COURT:  No.

10           MR. FENTON:  -- what we found here is that there

11   was a certain grouping of individuals who appeared to be a

12   ring who were using common types of fraudulent documents and

13   also using fake IDs.  One of those fake IDs was

14   Iuliia Zhadko.

15           Once we identified that ring using the SBA data,

16   what happened from that date forward was we started to

17   basically follow the money.  We followed the money and found

18   that there were other applications submitted by

19   Iuliia Zhadko or that went into Iuliia Zhadko's bank account

20   or bank accounts --

21           THE COURT:  Hold on.  Because you're getting

22   closer to what I was interested in.  You're saying that

23   there were certain hallmarks about the Timeline loan or

24   about Zhadko.

25           In other words, was the initial focus on Zhadko?

1          MR. FENTON:  Iuliia Zhadko.  The initial focus was

2    on a grouping of individuals that included Iuliia Zhadko.

3          THE COURT:  But I mean there must have been a

4    gazillion people applying for loans in this program.

5          How was it that this Zhadko stood out or became

6    the focus of some inquiry?

7          MR. FENTON:  Well, in some instances you can

8    readily identify that the individuals are not actually real

9    people by doing background searches.

10          There was also an issue that they were submitting

11    similar supporting documentation.  So the SBA data was able

12    to identify that similar types of payroll reports or similar

13    IRS tax forms had been filed, and they would look at the

14    similarities, and say, well, that's strange that this group

15    of companies that otherwise don't have any connection, you

16    know, are submitting similar types of forms.

17          THE COURT:  Hold on.

18          And how many companies were identified as

19    applicants by virtue of the focus on Zhadko?

20          MR. FENTON:  So -- well, there was a handful of

21    companies that were tied to Zhadko, including Timeline

22    Transport, Top Quality Construction, and then also another

23    one Touring Info Solutions.

24          THE COURT:  And are those companies in the

25    indictment?  Timeline, I know is.  Top -- whatever it was

1  also; correct?

2          MR. FENTON:  Yes.  And Touring Info Solutions as

3  well.

4          THE COURT:  I see.

5          MR. FENTON:  And one additional point, Your Honor,

6  that I think would be helpful is that often Department of

7  Justice reviews suspicious activity reports that are

8  provided by banks which provides leads as well.  So these

9  are not leads or complaints that are filed, but those are

10  investigations obviously conducted by financial

11  institutions.

12          THE COURT:  I see.

13          MR. FENTON:  One additional point that I think

14  would be helpful to Your Honor --

15          THE COURT:  Was there such a report filed by a

16  bank in this instance?

17          MR. FENTON:  Yes, there were SARs reports, yes.

18          THE COURT:  And were those reports focused on

19  Zhadko?

20          MR. FENTON:  Yes, Your Honor.

21          THE COURT:  And none of that to my memory is

22  described in the declaration, the affidavit.

23          MR. FENTON:  Well, the Government is not able to

24  rely on SARs for the purpose of search warrants or for

25  alleging crimes, so we don't allege --

1          THE COURT:  What is SARs?

2          MR. FENTON:  Suspicious Activity Report generated

3    under the bank --

4          THE COURT:  I know, but here's what I'm getting at

5    and this maybe doesn't relate to this specific issue.  I'll

6    zero in on it hopefully with further questions, but -- I may

7    have the dates off a bit, but my memory is that Miami

8    Airport search occurred, I think, in the middle of

9    October 2020; correct?

10          MR. FENTON:  Yes, Your Honor.  October 20th.

11    October 19th and 20th.

12          THE COURT:  Yeah.  And that the indictment was

13    returned early November, mid November.

14          MR. FENTON:  That's correct, Your Honor.

15          THE COURT:  So given the amount of detail in the

16    indictment, it seemed that -- and, of course, the fact that

17    in the Miami situation, the agents there were prompted by

18    agents who were investigating this case.  So it appears that

19    all the documentary evidence in the indictment predated the

20    search.

21          MR. FENTON:  That's correct, Your Honor.  That's

22    correct.

23          THE COURT:  No "and."  No "and."  Just answer the

24    question.  That's the answer; right?

25          MR. FENTON:  Yes, Your Honor.

```
1              THE COURT:  I'm going to turn now to the Miami
2    search, not in terms of its legality because the parties
3    have put that issue squarely to the court.  I understand the
4    issue, and it has to be resolved, and I will resolve it, but
5    I don't need any further input on that now.
6              My understanding of the Miami search was that
7    Ayvazyan and Terabelian were coming back to the
8    United States from some Caribbean island and that their
9    arrival was tipped off to Customs people by agents, FBI
10   agents.
11             Again, I'm not getting into the Fourth Amendment
12   questioning.
13             When Ayvazyan and Terabelian were questioned and
14   searched, the declaration says they found identity
15   information on Ayvazyan of Zhadko; is that correct?
16             I'm asking you, Fenton.  Is it -- you're speaking,
17   or is it now Faerstein?  Who is going to speak to that?
18             MR. FENTON:  I can answer that question,
19   Your Honor.
20             Yes, identity information was found on
21   Mr. Ayvazyan.
22             THE COURT:  And Ayvazyan.  And it was Zhadko
23   identity information?
24             MR. FENTON:  Yes, Your Honor.
25             THE COURT:  And what other identities, other than
```

1    that in his name Ayvazyan, were found on him?

2           MR. FENTON:  A credit card from Viktoria Kauichko.

3           THE COURT:  Okay.  Those are the two principal

4    things?

5           MR. FENTON:  Yes, Your Honor.

6           THE COURT:  And was Viktoria Kauichko known to the

7    Government before that?

8           MR. FENTON:  Yes, Your Honor.

9           THE COURT:  How?

10          MR. FENTON:  Through the same process.  Because it

11   was a ring, the Government followed the money.  And what the

12   Government determined is what was essentially outlined in

13   the October 20th Complaint that was filed, which is that

14   money was used, disaster relief money was used to purchase a

15   house that Mr. Ayvazyan and Ms. Terabelian --

16          THE COURT:  I --

17          MR. FENTON:  -- so we traced the money that was

18   used to buy that house --

19          THE COURT:  Was that all the money that went in

20   escrow?

21          MR. FENTON:  That's -- yes, a lot of -- a lot of

22   the funds went into the escrow, not all of them, yes.

23          THE COURT:  Now, what other physical evidence was

24   taken or seized from Ayvazyan and Terabelian at that Miami

25   search, other than the identity of Zhadko and Kauichko?

1          MR. FENTON:  So there were the credit cards.

2    There was --

3          THE COURT:  Credit cards in whose name?

4          MR. FENTON:  The credit cards -- the identity

5    document that you referred to, Your Honor, those are credit

6    cards in the name of Iuliia Zhadko and Viktoria Kauichko.

7    So that's what I'm referring to.  Credit cards.

8          THE COURT:  I see.  And then they were questioned,

9    and what information -- what did they say in that

10   questioning, if anything, that the Government intends to use

11   or was a lead to something else?

12         MR. FENTON:  What statements were made during --

13         THE COURT:  Yes.  Maybe just make it a broad

14   question.  What did they say?

15         MR. FENTON:  The Government is not intending to

16   rely on any statements that were made during that

17   questioning --

18         THE COURT:  What did they say?

19         MR. FENTON:  So they were basically asked, you

20   know, was commonly referred to as the five Ws.  The who,

21   what, where, why, and when with respect to who they were and

22   their travel.

23         And when they were confronted about the identities

24   with respect to Mr. Ayvazyan, Mr. Ayvazyan claimed that

25   Iuliia Zhadko was his girlfriend, and he was just concealing

```
 1   that information from his wife.

 2           And his wife, when she was confronted with

 3   Viktoria Kauichko identity, she said that -- she initially

 4   said I don't know who that is, and my husband put that card

 5   in there, in my wallet.

 6           THE COURT:  I see.

 7           And what about the other defendants, beginning

 8   with Ayvazyan, Dadyan, Grigoryan and so forth?  I guess

 9   there are two Dadyans here.

10           How did they become part of the indictment?  Were

11   they persons who did things to help Ayvazyan and Terabelian

12   in the alleged scheme, or did they have their own scheme?

13           MR. FENTON:  So they were co-conspirators in the

14   same scheme.  And what is alleged is that the disaster

15   relief funds were fraudulently applied for, and that the

16   proceeds were then taken to buy a variety of different

17   things, including these luxury homes.  And the Government

18   was able to follow the money and find that the disaster

19   relief funds were being used to buy these homes.  And that's

20   how we initially landed on Richard Ayvazyan and

21   Marietta Terabelian.

22           And then from there we identified the other

23   individuals who were involved in applying for and then

24   moving those criminal proceeds.  And then that led us to

25   Artur Ayvazyan and Tamara Dadyan --
```

1          THE COURT:  When you say "moving," what exactly do

2    you mean?

3          MR. FENTON:  Well, laundering and spending.

4          THE COURT:  So the proceeds of the loans somehow

5    went to the applicants.  Let's say Timeline.  And then from

6    Timeline, at least according to the FBI affidavit, they were

7    shortly thereafter wired to this escrow account?

8          MR. FENTON:  In some instances, yes, but there are

9    other ways that they laundered or spent --

10         THE COURT:  How -- give me an example of how some

11   of these other defendants became co-conspirators, according

12   to the indictment.

13         MR. FENTON:  Well, sir, so the other

14   co-conspirators all submitted or caused to be submitted

15   fraudulent PPP or EIDL loan applications.

16         THE COURT:  In their names?

17         MR. FENTON:  Some were in their names, some used

18   fake identities.

19         So, for example, Tamara Dadyan applies for several

20   loans in her own name, but also applied for many loans using

21   stolen, fake or synthetic identities.

22         THE COURT:  Stolen, fake, or synthetic.  Those are

23   different things.  I mean --

24         MR. FENTON:  That's right.

25         THE COURT:  One is made up names and the other is

```
 1   stolen identities of real people.  So you're saying it was
 2   both?
 3           MR. FENTON:  That's correct.
 4           THE COURT:  And -- but when these other
 5   defendants -- when I say "other," I'm referring to anyone
 6   other than Ayvazyan and Terabelian -- applied for a loan and
 7   got the proceeds, is the Government's documentary evidence
 8   that the monies were shortly thereafter transferred to the
 9   benefit of Ayvazyan and Terabelian?
10           MR. FENTON:  In some instances, yes.  Like one
11   example, Your Honor, would be Vahe Dadyan.  So he obtained a
12   loan in his own name, using his own company, and then gave
13   nearly all of the proceeds were used to purchase one of the
14   houses.  That's correct.
15           THE COURT:  Is there an allegation that
16   defendants, other than Ayvazyan and Terabelian when making
17   these fraudulent loan applications, as the indictment
18   alleges, that they did it for their own benefit?  In other
19   words, kept the money themselves?
20           MR. FENTON:  Absolutely, Your Honor, yes.
21           THE COURT:  So how were they -- how were those
22   schemes, even though they are similar in structure, related
23   to Ayvazyan and Terabelian?
24           In other words, if they had their own scheme to
25   obtain funds illegally, how is it tied to this overall
```

```
 1  conspiracy?

 2          MR. FENTON:  So the defendants -- the defendants

 3  are working together to apply for these loans, teaching each

 4  other how to use -- how to get --

 5          THE COURT:  There's a trial date, isn't there?

 6          MR. FENTON:  Yes, Your Honor.

 7          THE COURT:  When is the trial date?

 8          MR. FENTON:  The current trial date is May 4.

 9          THE COURT:  So does the Government have some

10  inside witness?

11          MR. FENTON:  We do have at least one confidential

12  witness.  Yes, Your Honor.

13          THE COURT:  And when you say "confidential," was

14  that someone who -- is that a defendant?

15          MR. FENTON:  No, Your Honor.

16          THE COURT:  And has that person been identified to

17  the defense?

18          MR. FENTON:  Not as yet, Your Honor, no.

19          THE COURT:  I bet they're curious to know who that

20  might be.

21          When do you plan on telling them?

22          MR. FENTON:  Well, Your Honor, so we have, in

23  connection with the application for the modified protective

24  order, we have included provision that would allow us to

25  share that information with their attorneys.  The request is
```

```
 1    that that information not be shared with defendants because

 2    there's a concern with respect to the safety of that

 3    particular individual.

 4              THE COURT:  But, in other words, what is the --

 5    are there links between these defendants in terms of aiding

 6    and abetting each other, or is -- do these defendants -- the

 7    defendants other than Ayvazyan and Terabelian have done

 8    similar things to what is alleged against Ayvazyan and

 9    Terabelian for their own -- just for their own benefit?

10              MR. FENTON:  Yes, Your Honor.

11              THE COURT:  What is the linkage?

12              MR. FENTON:  Well, the linkage is that they're

13    applying for -- they're fraudulently obtaining these funds,

14    and then they're transferring the funds amongst each other

15    in some instances.

16              THE COURT:  Is Ayvazyan and Terabelian

17    transferring funds they got from these others too?

18              MR. FENTON:  To some of the individuals, yes.

19              THE COURT:  I see.

20              MR. FENTON:  The theory --

21              THE COURT:  What is the Government's theory as to

22    why they're doing that?  Why wouldn't they just keep the

23    money?

24              MR. FENTON:  Well, it's our understanding that

25    they're taking a large portion of those funds and they're
```

1  using them to buy houses, and they fancy themselves to be

2  real estate experts and presumably they'd flip them and sell

3  them for some profit as part of an effort to launder money.

4        THE COURT:  That is what I was getting at.  In

5  other words, let's say, for example, Dadyan filed -- had a

6  false company and false identity, filed for a PPP loan, the

7  money went to that entity and Dadyan used the money to buy a

8  house or a car, or a watch or whatever, wouldn't that be --

9  why is that scheme part of Ayvazyan's scheme?

10        MR. FENTON:  Well, they're sharing.  I mean,

11  they're sharing the funds.  So they may spend the money on

12  individual things here and there; right?  So some of the

13  defendants might buy a personal luxury.  They might buy a

14  wrist watch, like a Rolex or something of that nature.

15  Another one might buy a Fendi handbag.

16        THE COURT:  Are you saying that these defendants

17  bought things together; in other words, as a group?

18        MR. FENTON:  They raised the money together, and

19  then they spent the money together on some things like these

20  houses.

21        THE COURT:  The houses, were they handled jointly

22  or were they held in individual defendants' names?

23        MR. FENTON:  So one of the homes was purchased in

24  the name of Richard Ayvazyan and Marietta Terabelian, and

25  two of the other homes were purchased using the names of --

```
1   one was purchase name of Iuliia Zhadko, and the other was

2   purchased in the name of another individual, Anna

3   Manukian (ph), who's believed to be a stolen identity.  A

4   relative of one of the defendants whose identity was stolen.

5           THE COURT:  And let me ask you this.  The

6   defendants maintain that these co-defendants are -- they're

7   all relatives; is that your view also?  Or do you have a

8   different view?

9           MR. FENTON:  Our understanding is they're

10  relatives, they're close family friends.

11          THE COURT:  I see.

12          MR. FENTON:  Right.

13          THE COURT:  And are there any fictitious people in

14  the case related to some of these other defendants, other

15  than Zhadko and Kauichko?  Any other names like that?

16          MR. FENTON:  Your Honor, are you asking -- just so

17  I can be clear about the question.  Are you asking if there

18  are -- if some of the defendants are using other fake names

19  or aliases?

20          THE COURT:  Yes.

21          MR. FENTON:  Absolutely.

22          THE COURT:  I mean, similar at least in style to

23  Zhadko and Kauichko?

24          MR. FENTON:  Yes.

25          THE COURT:  Just names you believe are synthetic
```

1    as you call them?

2             MR. FENTON:  That's correct.

3             THE COURT:  Now, let me ask you about the SBA and

4    the PPP.  The way I'm understanding the difference is that

5    in the funding process under the PPP program, the funding is

6    through private banks; and under the SBA process, it's

7    through the Government.

8             Is there some other difference in these programs?

9             MR. FENTON:  No, Your Honor.  I think that that's

10   the primary difference.

11            THE COURT:  And were most of the loans PPP or SBA?

12            MR. FENTON:  They -- so most of the loans were

13   PPP, but I mean, it's very close.  There are a large number

14   of PPP and a large number of EIDL loans as well.

15            THE COURT:  Now, how many of the loans were made

16   with what the Government alleges to be stolen identity of

17   real people?

18            MR. FENTON:  So in the first-superseding

19   indictment, there's over 150 fraudulent loans.  And this is

20   a rough estimate, Your Honor.  But I would say that about

21   85 percent of those were -- used fake or stolen names.

22            THE COURT:  But fake or stolen, those are two

23   categories.  I'm asking who -- how many of the loans were

24   made by using the stolen identity of a real person?

25            MR. FENTON:  Many of the loans.  The synthetic

1   identities are really a combination of information that is

2   in part real information and in part fake information.

3          For example, in this particular case, a lot of the

4   identities appear to be Russian foreign exchange students or

5   foreign exchange students from Eastern Europe, and their

6   names and their birthdates are taken and then other

7   information is added to that to build a profile of an

8   individual.  And that profile, which we call synthetic, is

9   then used to take out the loans.

10         THE COURT:  So what you're describing is a real

11  person whose biography was manufactured?

12         MR. FENTON:  Right.  And I can give you a good

13  example here.  Iuliia Zhadko.  It's our understanding that

14  Iuliia Zhadko is a female Russian foreign exchange student

15  who has the date of birth that is on that driver's license,

16  but when you look at the way that Iuliia Zhadko's name has

17  been used in this particular instance, Richard Ayvazyan has

18  turned him into a man and given him additional information.

19         And then if you see in the submission that we made

20  most recently, the ex parte submission, you can see three

21  examples of three different men who are presented to be

22  Iuliia Zhadko.  That's a perfect example of a synthetic

23  identity.

24         THE COURT:  You know, it almost seems like -- I

25  hate to make humor of such an important issue, but that

1    there is this program on television where the format is --

2    you know, the panel asks questions -- To Tell the Truth.  My

3    wife just told me.  Where the panel asks questions and then

4    they have to guess who the real person is, and then that

5    real person stands up.  It's kind of dramatic.  But I'm

6    asking whether the Government has ever met or talked to this

7    foreign exchange student, Zhadko.

8            MR. FENTON:  We have not spoken to Ms. Zhadko, no.

9            THE COURT:  Do you know -- I mean, you said you

10   thought she's a foreign exchange student.  Have you tried to

11   locate her?

12           MR. FENTON:  Not at this point, Your Honor.

13           THE COURT:  Well, at this point.  I mean, the

14   trial could be around the corner.

15           MR. FENTON:  That's correct.  I don't -- the

16   Government doesn't believe that we need to contact

17   Ms. Zhadko in order to prove our case, but Ms. Zhadko is in

18   Russia as far as we understand it, or at least hasn't been

19   in the United States.  She left the United States a long

20   time ago.

21           THE COURT:  Well, I mean, is there passport

22   information that gives some information about her coming and

23   going?

24           MR. FENTON:  Yes.  Yes, Your Honor.  These

25   individuals who have been used to build synthetic identities

1    in many instance are Russian or Eastern European foreign

2    exchange students, and we have identified their travel

3    information, saw that they came in on a Visa, saw that they

4    left and never came back, and then we produced that

5    information to the defense.

6            THE COURT:  I see.  Now, I'm going to ask you --

7    of course, I'm going to immediately turn it over to the

8    defendant because I'm anxious for their answer on this

9    question.

10           My understanding is that defendant Ayvazyan and

11   Terabelian claim that Zhadko and Kauichko are relatives of

12   theirs.

13           Is that what they're saying?  I don't know.

14           MR. FENTON:  I don't know, Your Honor.

15           THE COURT:  They're saying they're real people,

16   and you seem to say the same thing with some qualification.

17           MR. FENTON:  Well, but I think, Your Honor, what's

18   important here, if you look at the ex parte submission that

19   we made, the licenses that were found on the defendants for

20   Kauichko and for Zhadko show different people.

21           So for Mr. Ayvazyan to say, "Well, I know who is

22   Zhadko, and he told me it's okay for me to use his

23   identity."  Well, Mr. Ayvazyan has been found with three

24   different Iuliia Zhadkos.  Which one could possibly be the

25   right one?

```
 1              With respect to Ms. Kauichko, it's the same
 2    information as well.  They were found with identification.
 3    There were two different identification documents for
 4    Viktoria Kauichko.  If you look at them, they are two
 5    completely different people.  It's impossible for that to be
 6    the case that these individuals are giving --
 7              THE COURT:  I don't know what's possible or not.
 8    That's for a jury to decide, not me.
 9              What -- now, let me turn to the reason for this
10    hearing.  What is, from the Government's standpoint, what is
11    the protective order about?  What does the Government want
12    to protect or modify?
13              MR. FAERSTEIN:  Yes, Your Honor.  This is
14    Brian Faerstein again on behalf of the Government.
15              The discovery that we've produced contains a
16    significant amount of the personally identifiable
17    information that Mr. Fenton has just been describing.  The
18    names --
19              THE COURT:  Of which people?
20              MR. FAERSTEIN:  Well, the individuals we've just
21    described, as well as numerous other individuals.  We've
22    submitted some exhibits.
23              THE COURT:  Are you talking about the real people
24    whose identity was taken?
25              MR. FAERSTEIN:  Both the real people and the
```

1   synthetic identity or profiles of those people, as well as

2   the drivers licenses.

3          THE COURT:  The real people, so-called real

4   people, I can understand the argument, at least on its

5   surface, but why are you wanting to protect the identities

6   of synthetic people?

7          MR. FAERSTEIN:  Your Honor, the Government's

8   concern is that the defendants in this conspiracy are using

9   the information of these synthetic identities to apply for

10  these fraudulent loans and to launder the proceeds.  And the

11  best evidence of that happening after we brought -- after

12  the initial indictment was returned is that, as we describe

13  in our ex parte application and as the grand jury found in

14  the first-superseding indictment, defendant Ayvazyan, as

15  it's alleged, used the synthetic identity information of

16  Iuliia Zhadko to move money between bank accounts in the

17  name of Iuliia Zhadko and a company called Touring Info

18  Solutions, which has the sole signatory of Iuliia Zhadko and

19  to open a cryptocurrency account and to -- an account at

20  T.D. Ameritrade to move money that is traceable to the

21  fraudulent loan proceeds in this case.

22          Similarly, defendant Tamara Dadyan in this past

23  January and February was using the identity of one of the

24  aggravated identity theft victims in this case whose

25  initials are A.D. to try to access a bank account in A.D.'s

1    name that we allege that she fraudulently set up with other

2    co-conspirators and to obtain the money in that bank account

3    in A.D.'s name by impersonating A.D.

4            THE COURT:  But don't these defendants already

5    have that information?

6            MR. FAERSTEIN:  Well, Your Honor, the Government

7    seized pursuant to the border search and then also search

8    warrants at seven different locations -- and this is all

9    between October 20th and November 5th -- seized a

10   significant amount of this information.  And that consisted

11   of both digital devices, but also hard copy documents,

12   identification documents.

13           One example of that is Exhibit 2 to the

14   Government's ex parte application.  And that information was

15   in our possession, and we brought down the indictment on

16   November 17th.  And after the protective order, existing

17   protective order, was entered by the Court on December 11th,

18   the Government started to produce discovery the following

19   Monday, on December 14th, and that included the information

20   that we are concerned about.  The synthetic identity

21   information, as well as the real victim information.

22           And within days of starting those productions on

23   December 14th, defendant Ayvazyan, Richard Ayvazyan, as we

24   allege and as the grand jury found, started moving money in

25   the Iuliia Zhadko's account and opened additional -- a

```
 1   brokerage and a cryptocurrency account.  That is --
 2              THE COURT:  So your fear is that if the defendants
 3   had access to the information they previously allegedly
 4   used, that they would continue to launder money?
 5              MR. FAERSTEIN:  Yes, Your Honor.
 6              THE COURT:  Now, anything is possible, but now
 7   that the defendants know you're glued to these accounts, I
 8   mean, human nature being what it is, it's unpredictable, but
 9   isn't it less predictable that they would do such a thing,
10   even if they had done it in the past?
11              MR. FAERSTEIN:  Your Honor, I wish that -- I wish
12   that could be said, but we have the grand jury finding,
13   making a probable cause finding in the first-superseding
14   indictment that defendants Richard Ayvazyan and Tamara
15   Dadyan did just that with the stolen identity information.
16              THE COURT:  You say the grand jury found
17   something.  I know that's part of our lure, but you've heard
18   of the adage that the grand jury would indictment a ham
19   sandwich?
20              MR. FAERSTEIN:  I have, Your Honor.
21              THE COURT:  So anyway.
22              Okay.  I want to hear now -- it isn't that I've
23   been ignoring the defendants.
24              First of all, defendants don't have to say
25   anything.  I mean, I'm peppering the Government with
```

1   questions to find out some background information only for

2   the purpose of helping me understand the motions and this

3   motion, but I haven't asked the defendants questions because

4   they don't have to say anything.

5            But I am interested in their view of this

6   protective order question.  So I would take it that there's

7   probably one common response -- maybe I'm wrong.

8            Is there one lawyer who would best speak to that

9   question, or do I have to hear many lawyers?  Who would like

10  to take the lead on that question?

11           MR. RAM:  Your Honor, it's Ashwin Ram representing

12  Richard Ayvazyan.

13           THE COURT:  Let me see where you are.

14           MR. RAM:  Top of the screen, Your Honor.

15           THE COURT:  Go ahead, Mr. Ram.

16           MR. RAM:  A couple of big picture points

17  specifically with respect to the comments we just heard from

18  the Government with respect to a modified protective order.

19  The Court obviously considered the original protective order

20  and arguments in December, and the question is what has

21  changed from December to now.

22           And the Government is alleging that -- and they

23  went as far as, if I heard correctly, to say that the grand

24  jury found that discovery abuse is occurring.  And discovery

25  is being used to commit crimes post -- you know, on pretrial

1    release.  That's what I'm hearing.

2          And the problem -- there's several problems with

3    that theory, Your Honor.  First and foremost is the

4    explanation you just heard from the prosecutors when you

5    asked them:  What is the interdependence here?  How are

6    these people connected in any way?  Why is this not multiple

7    conspiracies and schemes you're alleging?  All great

8    questions.

9          And the answer was:  They're all connected.

10   They're passing around funds, information is being shared.

11   I quote, "They're educating each other on how to apply for

12   these loans;" right?  So the problem with the Government's

13   theory, Your Honor, is that these identifications, credit

14   cards, name -- what are we talking about when we say

15   identification.  The Government is talking about names.

16   They're talking about names in which profiles are built

17   behind those names.

18          THE COURT:  And businesses.

19          MR. RAM:  And businesses.  Absolutely.  And if

20   these things are being passed around to groups of dozens of

21   people, dozens; right?  We're just at the tip of the sphere

22   according to the Government in their papers.  They're still

23   investigating.  So if these things are being passed around

24   and aren't contained, any remedial protective order measures

25   even if they were necessary -- and I'll address that in a

1  second -- would be wholly ineffective to accomplish anything

2  the Government is seeking here.

3          THE COURT:  Say what you just said again.  I

4  didn't hear.

5          MR. RAM:  Sure, Your Honor.

6          So basically if these identifications, business

7  names, synthetic information, whatever we want to call it,

8  if it's being passed around to dozens of people as part of

9  this grand conspiracy that the Government has alleged, any

10  protective order now, you know, five months after the fact,

11  would have no ability to cabin what's already out there in

12  the community for dozens of people that aren't even charged

13  yet.  That's point number one, Your Honor.

14          Point number two, if I may, is even more directly

15  to the point, and it's devastating to the Government.  They

16  noted in their briefs in December, Steptoe and Johnson,

17  that's my law firm, Your Honor, has mechanisms to track and

18  identify and record who is reviewing discovery.  When, how

19  long they spend on a single page, and whether anything is

20  downloaded, forwarded or otherwise manipulated.  Okay?  That

21  was an accurate representation.

22          And the -- where the Government literally hits the

23  wall here, Your Honor, is that we can affirmatively prove,

24  if you look at Exhibit 4 attached to the Government's

25  opposition to the ex parte application, Richard Ayvazyan

1   spent less than 20 seconds on average flipping through the

2   relevant pages of the discovery the Government has

3   identified.

4           THE COURT:  I know.  But I'm still a yellow pad

5   and pencil guy.

6           MR. RAM:  Yes.

7           THE COURT:  How long does it take to look at a

8   screen and write something down on a yellow pad?

9           MR. RAM:  That's a great question, Your Honor.  So

10  what we've seen from the data, which we provided to the

11  Court I believe in our submission under seal, in camera, is

12  there's -- literally it's consistent with flipping through

13  these pages.  And unless they're alleging that Richard

14  Ayvazyan is rain man, and he's just picking up data:

15  Account numbers, names, date of births, driver's license

16  numbers as these pages are flipping every 20 seconds, I

17  mean, we have a different case here.

18          And, by the way, if that was true, Your Honor, I'm

19  also a pen and pad guy, but if that was true and Ayvazyan is

20  rain man and he's picked up these numbers just by flipping

21  through them every 20 seconds, again, another protective

22  order modifying conditions here would be wholly ineffective

23  because it's already in his head, and it's already in the

24  heads of the other defendants.

25          I won't speak for Tammy Dadyan because I'm not her

 1   attorney, her attorney's on the line.  I can tell you, and

 2   Mr. Minassian can speak to it, it's unclear she's even

 3   reviewed a single page of discovery, let alone flipped

 4   through a page at a time.

 5          So, you know, there's two fundamental core

 6   problems here, Your Honor.  One is there's been no

 7   containment, so to speak, as to point one, and it's already

 8   out there.  We can't unring that bell.  There's people in

 9   the community that can be making transactions -- and,

10   frankly, the more fundamental point to address here is

11   there's this group of Ukranians or Russians that are out

12   there, the Government says they don't exist, they're not

13   real, they're fake, or even if they are real, they're not

14   the people who applied for these loans.  And the Government

15   has repeatedly said in their briefs, this is a simple and

16   straightforward case.  We agree.  We absolutely agree.

17          At trial, the question is going to be:  Are the

18   Ukranians real or some composite people purporting to be the

19   Ukranians, are they real?  And did they shout from the

20   rooftops to the Armenian people and many of the people who

21   are charged in this case, you should apply for a PPP loan.

22   It's free Government money, and we'll help you do it.

23          And the question is:  Did that happen?  Are they

24   real, or are people purporting to be these Ukranians real?

25   It's that simple.

```
1            And as for the protective order --
2            THE COURT:  I don't agree with that.  I mean, at
3    least from what I've seen so far, I don't think it's that
4    simple because the defense will have to contend with at
5    least a declaration as proveable with a lot of
6    circumstantial evidence.
7            MR. RAM:  I agree a trial would be necessary,
8    Your Honor, but just to come back to the key points on the
9    protective order here, the last point really is, if what the
10   Government is alleging is true in both the initial
11   indictment where there was one alleged real person versus
12   the superseding indictment where there's now six alleged
13   real people, right, whose identities were used in aggravated
14   identity theft counts, if that is true, the information is
15   already out there and known to each of the defendants
16   charged currently and unindicted co-conspirators, according
17   to the Government's view of the world, and that's not going
18   to change.  One.
19            And two, there has been no material change in
20   circumstances from where we were at in December.  My client
21   is going to plead not guilty, when he's arraigned on the
22   superseding indictment as to these new money laundering
23   charges.  And fundamentally, the question is, is there a
24   Iuliia Zhadko out there running around engaging in
25   transactions, right, whether his name is really Zhadko or
```

```
 1   not.  Is he doing this?
 2              THE COURT:  Is it a he or a she?
 3              MR. RAM:  It's a he, Your Honor.  As far as --
 4              THE COURT:  I see.  And your position is this
 5   Iuliia Zhadko is real?
 6              MR. RAM:  Yes, Your Honor.
 7              THE COURT:  And have you met that person?
 8              MR. RAM:  I have not, Your Honor.
 9              THE COURT:  Do you anticipate -- you don't have to
10   answer this or not -- that that person will appear at the
11   trial?
12              MR. RAM:  I do anticipate that that person or an
13   agent for that person would be, and I would be relying on
14   the Government to make that available to us.  But I know my
15   client is very interested in having the testimony of Zhadko
16   and some of the other -- frankly, some of the other
17   Ukranians and Russians that are part of --
18              THE COURT:  Are these Ukranians and Russian people
19   in the United States now, or are they back in their home
20   country?
21              MR. RAM:  From what I understand, some are back in
22   their home country.  That was accurate when the prosecutor
23   represented that.
24              THE COURT:  Do any of the other lawyers wish to
25   weigh in on this issue?
```

1          MR. JOHNSON:  Yes, Your Honor.  This is

2    Peter Johnson on behalf of Vahe Dadyan.

3          THE COURT:  Who are are you speaking on behalf of?

4          MR. JOHNSON:  On behalf of defendant number 8,

5    Vahe Dadyan.

6          We join the co-defendant counsel's statement, but

7    also add specific prejudice to Vahe Dadyan.

8          As the Court knows from reading the papers, there

9    were only two individuals that were alleged of discovery

10   abuses in this case.  There are six other defendants that

11   are not alleged, but just simply are grouped into this.

12         And the specific prejudice to Mr. Dadyan is that

13   they're attempting to review hundreds of thousands of pages

14   of documents in the middle of a pandemic, and it would be

15   virtually impossible for me to sit down with the -- with

16   Mr. Dadyan and go through these documents when it's -- we

17   join that it's unnecessary.

18         So for those reasons, we would ask the Court to

19   deny the relief for the Government.

20         THE COURT:  Last matter is the matter of

21   discovery.  The defendants maintain that the Court issued an

22   order ordering the Government to complete discovery by

23   March 15th of this year and that that hasn't happened; that

24   the Government is still filtering or handing over documents

25   to the defendants as we speak.

```
 1              What is the status of discovery?

 2              MR. FAERSTEIN:  Yes, Your Honor.  And defendant

 3   Richard Ayvazyan filed a motion on this last night, but this

 4   goes to something Mr. Ram said.

 5              THE COURT:  Who represents Mr. Ayvazyan?  Ram?

 6              MR. FAERSTEIN:  Mr. Ram.

 7              First of all, the Government has complied with the

 8   Court's discovery cutoff order for the discovery cutoff of

 9   March 15th.  Mr. Ram mentioned a moment ago that there are

10   no changed circumstances in this case since December.  That

11   completely disregards the fact that there's a

12   first-superseding indictment that has significantly expanded

13   this case.  It's doubled the number of defendants --

14              THE COURT:  The first-superseding indictment

15   occurred after that discovery order.  Is that what you're

16   saying?

17              MR. FAERSTEIN:  No, Your Honor.  The

18   first-superseding indictment was returned on March 9th and

19   it was unsealed on March 11th.

20              THE COURT:  Of this year?

21              MR. FAERSTEIN:  Of this year, Your Honor.

22              THE COURT:  So that had to be after the Court

23   issued an order setting the March 15th discovery cutoff.

24              MR. FAERSTEIN:  Yes, Your Honor.  The Court's

25   order -- and, you know, of course, I'm interpreting it, but
```

1    the Court's order, as we understand it, pertains to

2    discovery relating to the indictment that was returned by a

3    grand jury on November 17th, 2020.  We continued

4    investigating because the indictment now contains over 150

5    alleged fraudulent loans, not just 35 as the initial

6    indictment did, and it now contains four additional

7    defendants.  And it contains money laundering conspiracy and

8    additional substantive counts on everything that's charged.

9    And it's a much broader indictment that has a lot of

10   discovery that supports the charges in this significantly

11   expanded indictment.

12           So we could not produce the discovery relating to

13   the new indictment, the investigation that we've been doing

14   since December until this new indictment was unsealed and we

15   arrested three of the four new defendants, but we

16   couldn't -- we couldn't produce that information relating to

17   the new charges, not the old charges, and we actually stated

18   that expressly in our discovery letter that went out to the

19   defendants on March 12th.  We said that a substantial amount

20   of the discovery relates to the new charges and the new

21   defendants.

22           THE COURT:  Okay.  Okay.

23           MR. FAERSTEIN:  Sorry, Your Honor.

24           THE COURT:  So what is the intention from this

25   point forward?  When is this going to end?  I mean, is this

47

1    going to be a career project, or is there some cutoff where

2    you say we have enough -- I don't know why 35 wasn't enough

3    if you can prove it --

4            By the way, I always like to fast forward to the

5    trial because that's what I think that I should do.  Are

6    there going to be 150 separate trials on each transaction?

7            MR. FAERSTEIN:  No, Your Honor.  And as we've

8    alleged in the superseding indictment, we have overt acts in

9    furtherance of the conspiracy to commit mail and wire fraud,

10   as well as the money laundering.  And that describes a

11   number of the specific, fraudulent loan applications that

12   are indicative of the overall conspiracy.

13           THE COURT:  How many of these 150 loans that you

14   say are now in this new indictment are going to be the

15   subject of evidence at the trial?

16           MR. FAERSTEIN:  You know, Your Honor, I think --

17   we're thinking about how to present that in the most

18   efficient manner possible and, you know, whether it's

19   through summary chart and a summary witness or series of

20   summary witnesses from various lenders.  That is something

21   we will seek to accomplish in an efficient manner as

22   possible, but it's unfortunate that we are continuing to

23   investigate, but we have the obligation where this fraud is

24   continuing even after the initial indictment and we're

25   continuing to investigate --

1          THE COURT:  Well, are there -- of these additional

2   instances beyond the 35 or so that you mentioned in the

3   first indictment, are they loans that you just uncovered

4   that were made previous to the first indictment, or are you

5   saying that between the first indictment and the new

6   indictment there are over 100 fraudulent loans made?

7          MR. FAERSTEIN:  Well, Your Honor, we've had --

8   we've been working to identify --

9          THE COURT:  You know, Mr. Faerstein, I asked you a

10  question, and I expect an answer.  You have a wind up.

11  Baseball pitchers, it's okay.  Not lawyers.  No wind ups.

12          Tell me what's the answer.

13          MR. FAERSTEIN:  We identified additional loan

14  applications that we believed were fraudulent after the

15  initial --

16          THE COURT:  How many between the 35 and the 150

17  you now claim?

18          MR. FAERSTEIN:  How many were previously not

19  identified before the first indictment?

20          THE COURT:  How many new loans did you uncover

21  after the first indictment that are now part of this new

22  indictment?

23          MR. FAERSTEIN:  Your Honor, I can't give you a

24  specific or an approximate number on that.

25          THE COURT:  Maybe Fenton has the answer.

```
 1              What's the answer, Fenton?

 2              MR. FENTON:  Some of the loans were known to the

 3    Government at that time, but they had not yet been tied to

 4    the defendants.  And we also believed that there were

 5    additional co-conspirators that would be charged later.

 6              THE COURT:  What about the dates of loans?  In

 7    other words, what was the date of the initial indictment,

 8    the one we issued the protective order on?

 9              MR. FENTON:  Mid November.

10              THE COURT:  So between mid November and March 11th

11    I thought I heard --

12              MR. FENTON:  That's correct, Your Honor.  The

13    loans --

14              THE COURT:  How many of the new loans in the

15    March 11 indictment were loans that were dated between

16    November of 2020 and March 11 of 2021?

17              MR. FENTON:  Zero.

18              THE COURT:  All right.  That's an answer.

19              Let me thank the parties for appearing.  You know,

20    this Zoom, it's not in-person stuff.  I mean, it's hard to

21    manage.  The purpose of the hearing was just as I stated and

22    the parties have responded.  Sometimes I'm a little curt,

23    but that's not because I don't respect the lawyers, it's

24    because sometimes in this Zoom thing, there's no body

25    language.  When we're in court, the lawyers can see the body
```

1    language.  And, generally, if the lawyer is experienced,

2    they respond, but here there's no body language.  It's

3    almost like a telephone call.  So the only way I have to cut

4    you off is to cut you off, so no disrespect intended.

5        But thank you for giving me the information.  I'm

6    going to chew on it and probably give you some direction

7    this afternoon as to how we want to approach.

8        Thank you.

9    *(Thereupon, at 12:58 p.m., proceedings adjourned)*

10

11                          *-oOo-*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                              *CERTIFICATE*

4

5          *I hereby certify that pursuant to Section 753,*

6   *Title 28, United States Code, the foregoing is a true and*

7   *correct transcript of the stenographically reported*

8   *proceedings held in the above-entitled matter and that the*

9   *transcript format is in conformance with the regulations of*

10  *the Judicial Conference of the United States.*

11

12  *Date:  April 8, 2021*

13

14                                *Lisa M. Gonzalez*
                        */s/_____*
15                      *Lisa M. Gonzalez, U.S. Court Reporter*
                        *CSR No. 5920*
16

17

18

19

20

21

22

23

24

25