1  TRACY L. WILKISON
   Acting United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   SCOTT PAETTY (Cal. Bar No. 274719)
4  BRIAN FAERSTEIN (Cal. Bar No. 274850)
   Assistant United States Attorneys
5  Major Frauds/Environmental and Community Safety Crimes Sections
        1100/1300 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-6527/3819
        Facsimile: (213) 894-6269/0141
8       E-mail:   Scott.Paetty@usdoj.gov/Brian.Faerstein@usdoj.gov

9  DANIEL S. KAHN
   Acting Chief, Fraud Section
10 Criminal Division, U.S. Department of Justice
   CHRISTOPHER FENTON
11 Trial Attorney, Fraud Section
   Criminal Division, U.S. Department of Justice
12      1400 New York Avenue NW, 3rd Floor
        Washington, DC 20530
13      Telephone: (202) 320-0539
        Facsimile: (202) 514-0152
14 E-mail:   Christopher.Fenton@usdoj.gov

15 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
16
17                    UNITED STATES DISTRICT COURT

18              FOR THE CENTRAL DISTRICT OF CALIFORNIA

19 UNITED STATES OF AMERICA,          No. CR 20-579(A)-SVW

20          Plaintiff,                GOVERNMENT'S OPPOSITION TO
                                      DEFENDANT RICHARD AYVAZYAN'S
21               v.                   MOTION TO DISMISS FOR
                                      PROSECUTORIAL MISCONDUCT (ECF
22 RICHARD AYVAZYAN,                  289); DECLARATIONS OF CHRISTOPHER
     aka "Richard Avazian" and        FENTON AND JUSTIN PALMERTON;
23     "Iuliia Zhadko,"               EXHIBITS
   MARIETTA TERABELIAN,
24   aka "Marietta Abelian" and       Hearing Date: May 24, 2021
       "Viktoria Kauichko,"           Hearing Time: 11:00 a.m.
25 ARTUR AYVAZYAN,                    Location:    Courtroom of the
     aka "Arthur Ayvazyan," and                    Hon. Stephen V.
26 TAMARA DADYAN,                                   Wilson
   MANUK GRIGORYAN,
27   aka "Mike Grigoryan," and
       "Anton Kudiumov,"
28 ARMAN HAYRAPETYAN,
   EDVARD PARONYAN,

1    aka "Edvard Paronian" and
     "Edward Paronyan," and

2 VAHE DADYAN,

3        Defendants.

4

5      Plaintiff United States of America, by and through its counsel

6 of record, the Acting United States Attorney for the Central District

7 of California and Assistant United States Attorneys Scott Paetty and

8 Brian Faerstein, and United States Department of Justice Trial

9 Attorney Christopher Fenton, hereby files its Opposition to defendant

10 Richard Ayvazyan's Motion to Dismiss for Prosecutorial Misconduct

11 (ECF No. 289).

12      This opposition is based upon the attached memorandum of points

13 and authorities, the Declaration of Christopher Fenton and attached

14 exhibits, the Declaration of Justin Palmerton, the files and records

15 in this case, and such further evidence and argument as the Court may

16 permit.

17  Dated: May 3, 2021        Respectfully submitted,

18                            TRACY L. WILKISON
                           Acting United States Attorney

19

20                            BRANDON D. FOX
                           Assistant United States Attorney
                           Chief, Criminal Division

21

22                              /s/
                          _____

23                            SCOTT PAETTY
                           BRIAN FAERSTEIN

24                            Assistant United States Attorneys
                           CHRISTOPHER FENTON

25                            Department of Justice Trial Attorney

26                            Attorneys for Plaintiff
                           UNITED STATES OF AMERICA

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.   INTRODUCTION ................................................... 1

II.  STATEMENT OF FACTS ............................................. 2

     A.   The Investigation ........................................ 2

     B.   The Border Stop........................................... 5

     C.   The Search of Defendant's Home ........................... 6

     D.   The Initial Indictment ................................... 7

     E.   The First Superseding Indictment ......................... 8

     F.   Discovery................................................. 9

     G.   Accidental Contact With the Defendant .................... 9

III. ARGUMENT ...................................................... 10

     A.   The Standard for Dismissal for "Outrageous Government
          Conduct" is "Extremely High" ............................ 10

     B.   Defendant Fails to Show "Outrageous Government
          Conduct" Warranting Dismissal ........................... 12

          1.   The Conduct at the Border Was Not Outrageous........ 12

          2.   The Execution of the Search Warrant on
               Defendant's Home Was Not Outrageous ............... 13

          3.   The Call to Defendant Was a Mistake, Not
               Misconduct......................................... 15

          4.   Counsel for the Government Did Not Lie to the
               Court.............................................. 15

          5.   Use of the Grand Jury to Investigate New Crimes
               and New Defendants was Appropriate................. 19

          6.   The Government Has Complied With Its *Brady*
               Obligations........................................ 21

          7.   The Government Has Complied With Its Discovery
               Obligations and the Court's Discovery Order........ 23

     C.   Dismissal Under the Court's Supervisory Powers Is
          Unwarranted Because Defendant Fails to Show "Flagrant
          Misconduct" or "Substantial Prejudice" .................. 24

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                          PAGE

IV.   CONCLUSION ..................................................... 25

1

**TABLE OF AUTHORITIES**

2

**DESCRIPTION**                                                    **PAGE**

3

**Federal Cases**

4

Branzburg v. Hayes,
5    408 U.S. 665 (1972) ......................................... 20

6

Douglas Oil Co. of California v. Petrol Stops Nw.,
    441 U.S. 211 (1979) ......................................... 21

7

United States v. Aguilar,
8    831 F.Supp.2d 1180 (C.D. Cal. 2011) ................... 13, 24, 25

9

United States v. Black,
    733 F.3d 294 (9th Cir. 2013) ................................. 11

10

United States v. Chapman,
11    524 F.3d 1073 (9th Cir. 2008) ................................ 24

12

United States v. Ferreboeuf,
    632 F.2d 832 (9th Cir. 1980) ................................. 21

13

United States v. Furrow,
14    125 F. Supp. 2d 1170 (C.D. Cal. 2000) ....................... 20

15

United States v. Garza-Juarez,
16    992 F.2d 896 (9th Cir. 1993) ................................. 11

17

United States v. Gross,
    424 F. Supp. 3d 800 (C.D. Cal. 2019) ........................ 22

18

United States v. Gurolla,
19    333 F.3d 944 (9th Cir. 2003) ................................. 11

20

United States v. Jones,
    129 F.3d 718 (2d Cir. 1997) ................................. 20

21

United States v. Kearns,
22    5 F.3d 1251 (9th Cir. 1993) ................................. 24

23

United States v. Mechanik,
    475 U.S. 66 (1986) .......................................... 19

24

United States v. Montilla,
25    870 F.2d 549 (9th Cir. 1989) ................................. 12

26

United States v. Patane,
    542 U.S. 630 (2004) ......................................... 12

27

United States v. Russell,
28    411 U.S. 423 (1973) ......................................... 11

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Salyer,
    2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) ...................... 22

United States v. Sasso,
    59 F.3d 341 (2nd Cir. 1995) .................................. 20

United States v. Skilling,
    554 F.3d 529, 576 (5th Cir. 2009) ............................ 22

United States v. Stinson,
    647 F.3d 1196 (9th Cir. 2011) ................................ 11

United States v. Vortman,
    801 F. App'x 470 (9th Cir. 2020) ............................. 11

United States v. Williams,
    791 F.2d 1383 (9th Cir. 1986) ................................ 11

## I.   INTRODUCTION

From the start, Defendant Richard Ayvazyan ("Ayvazyan" or "Defendant") has repeated a false account of the government's investigation and prosecution of this case.  Defendant persistently claims that the government mistakenly blamed Defendant for fraudulent disaster relief loan applications purportedly submitted by Defendant's friends and a supposed associate, "Iuliia Zhadko," and indicted the case before it was ready.  According to Defendant, the government wanted to pin the crimes on Defendant because he and his wife had previously pled guilty to a similar crime, but lacked the evidence to do so.  Defendant claims that, in order to "fill that hole," the government "began a pattern of misconduct" that started with an illegal border stop.  Claiming that the illegal border stop was the lynchpin of the government's case, defendant asserts that everything that came after it was tainted, and the government is desperately attempting to avoid trial.

Defendant's version of events, much like his use of "Iuliia Zhadko," is fictitious.  The truth is that, amidst the global pandemic, the government worked quickly to detect and disrupt the COVID-19 related schemes underlying this case.  By June 2020, the government had identified "Iuliia Zhadko" as a fake identity used to fraudulently apply for disaster relief loans.  The government then followed the money and, by August 2020, had developed evidence that "Iuliia Zhadko" was Defendant's alias.  The evidence showed Defendant had directed stolen disaster relief money to purchase a multi-million dollar mansion in his and his wife's actual legal names.  By late October 2020, when Defendant and his wife were stopped at the border in Miami, the government already had obtained the information it

1  needed to charge Defendant, which is why the government was able to

2  swear out a detailed complaint within hours of his probable cause

3  arrest.  While Defendant's possession of credit cards belonging to

4  "Iuliia Zhadko" no doubt offered confirmation, as the Court already

5  found, there was "ample" evidence linking Defendant and his wife to

6  "Iuliia Zhadko" and another fake identity, "Viktoria Kauchiko," even

7  without the evidence lawfully obtained during the border stop.  The

8  government's case is thus not tainted for the reasons already found

9  by the Court.

10  Defendant also has repeatedly attempted to stop the government's

11  ongoing investigation into his criminal activities by raising

12  meritless allegations.  Defendant's misconduct allegations are

13  conclusory, contrary to the factual record, and without basis in law

14  or fact.  As the superseding indictment demonstrates, the government

15  had a duty to continue its investigation given the scope of

16  Defendant's criminal conduct that continued even while he was on pre-

17  trial release in this case.  For all of these reasons, Defendant's

18  motion should be denied.

19  **II.  STATEMENT OF FACTS**

20  **A.  The Investigation**

21  In June 2020, the government opened an investigation into a Los

22  Angeles-based ring that was using stolen, fake, and synthetic

23  identities to fraudulently apply for COVID-19 relief funds.

24  (Declaration of Timothy Massino ("Massino Decl.") (ECF 188-1), ¶ 1.)

25  The original subjects included "Iuliia Zhadko" (later determined to

26  be a fake identity), who submitted fraudulent loan applications on

27  behalf of numerous shell companies.  (Id. ¶ 2.)

28

1    Throughout the summer, the government served subpoenas,
2    obtaining information from federal and state agencies, lenders,
3    retail banks, and escrow companies, among other sources.  (Id. ¶ 3.)
4    The investigation identified dozens of additional fraudulent loan
5    applications that had been submitted using fake and stolen
6    identities, such as "Viktoria Kauichko," on behalf of fake businesses
7    or businesses whose identities had been stolen.  (See generally ECF 1
8    ("Ayvazyan Compl."); United States v. Dadyan et al., 20-mj-5321
9    (filed Nov. 3, 2020), ECF 1 ("Dadyan Compl.").)  The investigation
10   also revealed that fraudulent documents had been submitted in support
11   of the applications, including fake driver's licenses, federal tax
12   forms, payroll reports, and bank statements.  (Affidavit, In the
13   Matter of the Search of [REDACTED] Tarzana California 91356, No.
14   2:20-MJ-05282 ("SW Aff.") at 27-28, 33-36, 40.[1])
15   By tracing the stolen funds, investigating agents learned that a
16   substantial amount of the criminal proceeds had been laundered,
17   including through a bank account in defendant Marietta Terabelian's
18   ("Terabelian") name, and used by her husband, Defendant, to purchase
19   luxury properties, including a home that Defendant and Terabelian
20   purchased in their own legal names.  (Ayvazyan Compl. ¶¶ 5, 16-26,
21   27-33; Dadyan Compl. ¶¶ 5, 23-24, 47; SW Aff. at 25-28, 31.)
22   By early August 2020, the investigation had revealed a direct
23   connection between the fake identity "Iuliia Zhadko" and Defendant,
24   leading federal law enforcement agents to believe that "Iuliia
25   Zhadko" was Defendant's alias.  On August 4, 2020, FBI Special Agent
26   Justin Palmerton sent an email to the investigative team, writing:
27
28   [1] The page numbers cited in the Affidavit are the ECF stamped numbers
     on the top right-hand corner of the page, ranging from 1 to 74.

3

1
2
3
4
5
6

> I think I found out the identity of one of our subjects. I just received partial information from Encore Escrow in regards to the wire transfer they received in the name of Iuliia Zhadko/ Timeline Transport. There is an email discussion with a Richard Ayvazyan discussing the $110,000 wire as well as another from BofA [sic] for $65K. I ran this individuals [sic] name in our database and it hit off a case from 2017, where he was listed as a possible participant in a mortgage fraud ring. Additionally, I ran his name in CLEAR and some of the businesses he's associated with included, Fetch Industries, one of our fraudulent loan applicants.

7
8
9
10
11
12

(Declaration of Christopher Fenton ("Fenton Decl.") ¶ 1, Ex. 1.) SA Palmerton's email attached subpoena returns establishing a direct link between "Iuliia Zhadko" and Defendant. These documents showed that Defendant had directed money fraudulently obtained using the fake identity "Iuliia Zhadko" to an escrow company to buy a luxury home in Ayvazyan's own name. (Ayvazyan Compl. ¶¶ 16-26.)

13
14
15
16
17
18

Also in August 2020, the investigation developed evidence that Defendant had directly received stolen PPP funds. Approximately $260,000 in fraudulently obtained PPP funds for a purported company called Mod Interiors, Inc., had been deposited into a bank account for which Ayvazyan was a co-signer and largely spent by defendant on himself, his wife, and his family. (Fenton Decl. ¶ 2, Ex. 2.)

19
20
21
22
23
24
25
26
27
28

By September 2020, the investigation further revealed that approximately $238,000 in additional PPP funds was fraudulently obtained using the fake identity "Viktoria Kauichko" and used to purchase a luxury home in Glendale, California, using the name of "Iuliia Zhadko," which, by that time, was already believed to be Defendant's alias. (Fenton Decl. ¶ 3, Ex. 3.) Information obtained by the U.S. Postal Service revealed that one of the recipients of mail at this Glendale property was Gohar Terabelian, who is Terabelian's sister and the former wife of Defendant's business partner, A.P. (SW Aff. at 32.)

1    Through the beginning of October 2020, agents conducted
2    surveillance of these and other properties believed to be associated
3    with Defendant and his coconspirators, including, in some instances,
4    searching the trash left outside for pickup.  (SW Aff. at 26, 28-32,
5    36-38, 43.)  Surveillance yielded additional evidence directly
6    linking Ayvazyan with "Iuliia Zhadko" and "Viktoria Kauichko," such
7    as (i) commingled mail addressed to all three that was found at a
8    luxury residence in Woodland Hills, California, that had also been
9    purchased using stolen PPP money; and (ii) receipts addressed to
10   Defendant regarding a vehicle registered to "Fiber One Media," a
11   company for which "Viktoria Kauichko" had submitted fraudulent loan
12   applications. (SW Aff. at 28-31; ECF 296 at 21-22.)

13       **B.   The Border Stop**

14       On October 19, 2020, Defendant and Terabelian were returning to
15   Los Angeles from Turks and Caicos via Miami.  Customs at the Miami
16   airport referred them for a secondary screening at the request of SA
17   Palmerton.  The FBI then made a probable cause arrest and, within
18   hours, defendants were charged in a detailed complaint for their role
19   in a massive loan fraud ring.[2]  (<u>See generally</u> Ayvazyan Compl.)

20

21   ───────────────────

22       [2] At Defendant's detention hearing, defense counsel asked how
     the government determined that there was a link between "Iuliia
23   Zhadko" and the defendant.  Consistent with the email correspondence
     described and quoted above, SA Palmerton testified that the
     government traced the flow of fraudulently obtained money and learned
24   that it was being directed by Defendant to purchase real estate.
     (Fenton Decl. ¶ 4, Ex. 4.)  SA Palmerton further explained that, in
25   addition to open source research, the evidence obtained at the border
     stop confirmed this link.  (<u>Id.</u>) At the hearing, the government
26   misspoke when it said Defendant had been sentenced to 36 months in
     custody rather than 36 months' probation for a state conviction for
27   theft.  The government's arguments for detention – that Defendant was
     a flight risk because he wished to avoid jail time and presented a
28   danger to the community because of his criminal history – remained
     the same.

5

1    The facts relating to the border stop were extensively addressed
2    in the government's opposition to Defendant and Terabelian's motions
3    to suppress evidence seized in Miami as well as the Court's opinion
4    and order.  (ECF 152, 296.)  Rather than repeat them here, the
5    government incorporates by reference its earlier submission and the
6    Court's opinion.  (Id.)  Relevant to the instant motion, the Court
7    denied defendants' motion to suppress evidence found in defendants'
8    luggage (namely credit cards belonging to "Iuliia Zhadko" and
9    "Viktoria Kauichko"), but granted defendants' motion to suppress
10   evidence found on their digital devices.  (ECF 296 at 18.)
11   Importantly, the Court rejected defendants' allegations that the
12   government acted in bad faith or engaged in intentional misconduct in
13   connection with the border stop.  (Id. at 12-14, 18.)

14       **C.   The Search of Defendant's Home**

15       Shortly after Defendant and Terabelian were arrested, the
16   government moved quickly to charge two of their co-conspirators by
17   complaint and obtained warrants to search seven residences associated
18   with the fraud ring, including the luxury home Defendant and
19   Terabelian purchased using stolen disaster relief money.  (See
20   generally Dadyan Compl.; SW Aff.)

21       The facts relating to the warrant and the search are set forth
22   in detail in the government's opposition to Defendant and
23   Terabelian's motion to suppress the evidence seized during the
24   search, and the Court's opinion and order denying the motion, which
25   the government incorporates by reference here.  (ECF 188, 296.)
26   Significantly, the Court rejected Defendant's fruit of the poisonous
27   tree argument, finding that the search warrant was supported by
28   probable cause after excising all references to the evidence obtained

during the border stop.[3]  (ECF 296 at 18-22.)  Specifically, the
Court found that, even without the evidence from the border stop,
"there was ample evidence linking Defendants to Zhadko and Kauichko."
(Id.)  The Court also rejected Defendant's allegations that the
government acted in bad faith and that the warrant was executed in an
unreasonable manner.  (Id. at 29-38, 40 n. 28.)

### D.    The Initial Indictment

On November 17, 2020, a grand jury returned an indictment
against Defendant, his wife, and two co-conspirators for conspiracy
to commit wire fraud and bank fraud, among other charges.  (ECF 32.)
The indictment traced the flow of stolen COVID-19 relief money, which
defendants used to fund a luxurious lifestyle, including to purchase
a multi-million dollar mansion in the name of Defendant and
Terabelian.

---

[3] The Court found that, even without the credit cards seized at
the border stop, "there was a fair probability that Zhadko was a fake
identity and, specifically, an alias for one or both of Ayvazyan and
Terabelian."  The Court's finding was based on the fact that "[t]he
Government traced the fraudulent loans procured by Zhadko and
determined that some of the funds were used to purchase Defendants'
home."  (ECF 296 at 22.)

1 ████████████████████████████████████████████

2 ██████████████████████████████████████████ [4]

### E.   The First Superseding Indictment

The government continued its investigation and identified hundreds of additional fraudulent loans and potential new coconspirators, and pursued new charging theories – including conspiracy to commit money laundering.  The government also learned that, while on pretrial release, Defendant and a co-defendant had violated their bond conditions and committed new crimes, which the government also investigated.

On March 9, 2021, the government obtained a superseding indictment.  (ECF 154.)  The First Superseding Indictment ("FSI") added charges based on more fraudulent loans (the loans at issue increased from 35 to over 150) resulting in a higher alleged loss (from $5.6 million to at least $21.9 million).  The FSI also charged a money laundering conspiracy in addition to significantly expanding the initially charged wire fraud and bank fraud conspiracy, charged multiple new counts of aggravated identity theft, and added four defendants.  The FSI further charged Defendant and a co-conspirator with crimes they committed through January and February 2021 while on pretrial release.

████████████████████████████████████████████

████████████████████████████████████████████

---

[4] The government is redacting this and several other portions of this publicly-filed opposition as they discuss information presented to the grand jury.  An unredacted version of this opposition is being lodged with the Court concurrently herewith. The government will submit a copy of the grand jury transcripts relating to the initial and first superseding indictments for in camera inspection upon request by the Court.

1

2

3

4

5

6

7

8    **F.    Discovery**

9         The government addressed discovery in its opposition to

10   Defendant's frivolous motion to dismiss the FSI with prejudice or, in

11   the alternative, exclude from evidence discovery that no one

12   seriously disputes was timely produced.  The government incorporates

13   by reference its prior submission.  (ECF 278.)  Of particular

14   relevance to this motion, the government submitted a compilation of

15   correspondence showing that the government provided a detailed index

16   of its productions, and transparency into the discovery process.

17   (ECF 278-5.) Importantly, while Defendant had notice of the

18   government's discovery plan based on the government's understanding

19   of the Court's discovery order as early as January 4, 2021, Defendant

20   did not seek relief from the Court relating to discovery until April

21   2021.

22        **G.    Accidental Contact With the Defendant**

23        On March 11, 2021, SA Palmerton attempted to locate and arrest

24   Manuk Grigoryan ("Grigoryan"), who had been added as a new defendant

25   in the FSI.  (Palmerton Decl. ¶¶ 2-4.)  After SA Palmerton's efforts

26   to contact Grigoryan directly were unsuccessful, SA Palmerton

27   attempted to contact Grigoryan's mother with whom Grigoryan sometimes

28   stayed.  (Id. ¶ 5.)  SA Palmerton recalled that a witness he had

interviewed during the course of the investigation had given him a
list of telephone numbers, including for Grigoryan's mother.  (<u>Id.</u>
¶¶ 6.)  SA Palmerton, while in his car, reviewed on a digital device
an electronic copy of the FBI Form 302 report ("302 report")
memorializing that interview to retrieve the telephone number.  (<u>Id.</u>)
SA Palmerton accidentally used the wrong telephone number and
telephoned Defendant.  (<u>Id.</u> ¶¶ 7-8.)  SA Palmerton believed he was
speaking to Grigoryan, whom SA Palmerton assumed was using his
mother's telephone.  The individual told SA Palmerton that he was
represented by Ashwin Ram, who is Defendant's counsel.  (<u>Id.</u>)  SA
Palmerton immediately reached out to counsel for the government, who
also contacted counsel for Defendant.  (<u>Id.</u> ¶¶ 9-10.)

Counsel for the government asked Mr. Ram whether he represented
Grigoryan and he said that he did not.  (Fenton Decl. ¶ 7.)  Later
that morning, Mr. Ram informed counsel for the government that SA
Palmerton had telephoned Defendant.  (<u>Id.</u> ¶ 8.)  Counsel for the
government explained that SA Palmerton had not intended to contact
Defendant and had intended to telephone Grigoryan's mother.  (<u>Id.</u>)[5]

## III. ARGUMENT

### A.   The Standard for Dismissal for "Outrageous Government Conduct" is "Extremely High"

The standard for finding that an investigation involves
"outrageous government conduct" is as demanding as any standard
applied by the federal judicial system.  "Outrageous government
conduct occurs when the actions of law enforcement officers or

---

[5] Defense counsel asserts that the government "concedes" various
factual points in dispute.  (ECF 289 at 2, 8, 15, 17.)  However, the
government does not concede any of the points Defendant claims that
the government conceded in his opening submission.

informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013) (quoting United States v. Russell, 411 U.S. 423, 431-32 (1973)). Dismissal of an indictment for outrageous government conduct is "limited to extreme cases" in which the defendant can show the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. Stinson, 647 F.3d 1196, 1209 (9th Cir. 2011); see also United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003). Only the most "flagrant, scandalous, intolerable and offensive" conduct meets that "extremely high" standard. United States v. Garza-Juarez, 992 F.2d 896, 904 (9th Cir. 1993).

Indeed, the doctrine is so rarely invoked that the Ninth Circuit has rejected outrageous conduct claims for the government's operation of an online child pornography forum, United States v. Vortman, 801 F. App'x 470, 473 (9th Cir. 2020), cert. denied, 141 S. Ct. 261, 208 L. Ed. 2d 30 (2020); threatening a witness with the death penalty unless he cooperated, Stinson, 647 F.3d at 1209; and assisting a prison escape, United States v. Williams, 791 F.2d 1383, 1386-87 (9th Cir. 1986). The government's conduct in this case has been appropriate, ethical, and lawful, and comes nowhere near the level needed to support the dismissal of Defendant's indictment.

**B.    Defendant Fails to Show "Outrageous Government Conduct" Warranting Dismissal**

1.    <u>The Conduct at the Border Was Not Outrageous</u>

Defendant alleges a <u>Miranda</u> violation at the Miami airport as the basis for dismissal of the indictment.  (ECF 296 at 14.)  After extensive briefing by the parties, the Court considered Defendant's allegations and rejected his claims that the government acted in bad faith or engaged in intentional misconduct.  (<u>Id.</u> at 12-14, 18.)  The proper remedy for a <u>Miranda</u> violation where statements are coerced is suppression of the fruits (which is what the Court ordered here), not dismissal of the indictment with prejudice.  <u>See</u> <u>United States v. Patane</u>, 542 U.S. 630, 644 (2004).  Indeed, none of the authorities on which defendant relies supports finding that a <u>Miranda</u> violation, such as that alleged here, meets the "extremely high" standard for "outrageous government conduct."[6]

Dismissal is also not warranted because the suppressed evidence from the border stop did not taint the indictments.  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6] To the extent that Defendant argues the Customs and Border Protection ("CBP") officer's conduct should be considered separate from the <u>Miranda</u> violation (ECF 289 at 18-19), it does not independently meet the "extremely high" standard for "outrageous government conduct".  The CBP officers' statements about checking to see whether Defendant was a "terrorist" may not have been truthful, but government agents "may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency."  <u>United States v. Montilla</u>, 870 F.2d 549, 552 (9th Cir. 1989), amended by 907 F.2d 115 (9th Cir. 1990).  Separately, Defendant claims that CBP officers deleted video footage, but he does not point to any evidence supporting an inference that the officers' actions were willful or deliberate.  To the contrary, the government submitted under seal a declaration from a CBP officer explaining the good faith efforts undertaken to retrieve the video.  (ECF 152-14.)

12

1 ████████████████████████████████████████████████████

2 █████████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 █████████ [7]

5      2.    The Execution of the Search Warrant on Defendant's
           Home Was Not Outrageous

6

7       The Court already considered and rejected Defendant's arguments

8  that the government acted in bad faith and that the warrant was

9  executed in an unreasonable manner.  (ECF 295 at 29-38, 40 n.28.)

10 For the same reasons, Defendant's arguments, which were insufficient

11 to warrant suppression, are insufficient to meet the much higher

12 standard for dismissal based on "outrageous government conduct."[8]

13 _____

14     [7] Defendant argues for the first time that customs officials
   intentionally invaded Defendant's spousal privilege by taking a
15 photograph of a text between Defendant and his wife and cites United
   States v. Aguilar to argue that this is prosecutorial misconduct
16 warranting dismissal.  (ECF 289 at 7-8.)  As discussed more fully
   below, Aguilar has no application here.  In Aguilar, a prosecutor
17 affirmatively sought potentially privileged communications without
   Court authorization.  831 F.Supp.2d 1180, 1193-94 (C.D. Cal. 2011).
18 Here, in contrast, there is no evidence supporting an inference that
   an agent intentionally invaded communications he knew to be
19 privileged, nor any allegation that the government subsequently lied
   to the Court about it.  Moreover, the conduct in Aguilar was
20 considered flagrant because it concerned communications between
   defendant and her attorneys in her criminal case, not pre-arrest
21 spousal communications.  When assessing intent, it is also important
   to consider that, following Defendant's arrest, the government
22 established an independent filter team to review potentially
   privileged communications so as to protect Defendant's privileges.
23 (See generally ECF 278-5 (compilation of the government's discovery
   correspondence detailing filter process).)

24     [8] Defendant repeats his allegation that the FBI SWAT team
   "terroriz[ed]" and "assaulted" children.  (ECF 289 at 1, 2, and 9.)
25 The Court generally rejected defendants' allegations that the
   government acted in bad faith and that the warrant was executed in an
26 unreasonable manner.  (ECF 296 at 29-38, 40 n. 28.) Moreover,
   Defendant has not provided evidence supporting this allegation.  The
27 photographs Defendant included in his original submission do not
   demonstrate wrongdoing.  (ECF 146 at 4-5.)  To the contrary, the
28 photographs show the SWAT team doing its job by securing the search
   site to ensure the safety of the agents who would conduct the search.

1        Defendant also alleges the government "misrepresented" in its

2   briefing to the Court the threat Defendant and his family posed to

3   the agents who searched his home as part of an effort to invent an

4   after-the-fact justification for the agents' alleged misconduct.

5   (ECF 289 at 9.)   These claims are meritless.   First, Defendant

6   falsely accuses the government of "fabricating" the allegation that

7   A.P., Defendant's former brother-in-law and current business partner,

8   was an associate of "Armenian Power."   (Id.)   But that allegation was

9   made in the search warrant affidavit based on a plea agreement that

10  A.P. signed in which A.P. admitted he "was an associate of the

11  Armenian Power criminal enterprise."   (Fenton Decl. ¶ 5, Ex. 5.)

12  Second, Defendant falsely accuses the government of "burying its

13  assessment that [Defendant] was not considered dangerous and his home

14  did not involve 'a potentially dangerous environment'."   (ECF 289 at

15  9 (citing ECF 222 at Ex. A).)   In truth, the government produced this

16  assessment to Defendant as part of a compilation clearly labeled "FBI

17  reports and attachments regarding investigative activities [and]

18  . . . surveillance."   (ECF 278-5 (Mar. 15, 2021 Letter).)

19  Critically, the document Defendant cites assessed the risk Defendant

20  posed to agents conducting street-level surveillance, not the risk

21  Defendant posed to agents entering his home (ECF 222 at Ex. A), which

22  are distinct circumstances presenting unique safety considerations

23  for law enforcement.[9]   Thus the government did not make any

24

25  ─────────────────

26       [9] Defendant ultimately proved to pose a potentially serious risk
    of harm to the searching agents:  the agents who searched Defendant's
    home found a gun safe and receipts showing that, in August 2020,
27  Defendant had purchased accessories designed to store firearms in the
    safe, and the agents who searched Defendant's brother's home found an
28  arsenal of 12 firearms, ammunition, and empty magazines.  (ECF 188 at
    6.)

1  misrepresentations to the Court, and it did not engage in any

2  misconduct in briefing Defendant's motions to suppress.

3          3.   The Call to Defendant Was a Mistake, Not Misconduct

4          When SA Palmerton was sitting outside defendant Grigoryan's

5  parents' home and attempted to call Grigoryan's mother, he

6  accidentally dialed Defendant's number instead.  (Palmerton Decl.

7  ¶¶ 5-8.)  When a male voice answered, SA Palmerton believed it was

8  Grigoryan and asked Grigoryan to self-surrender.  (Id. ¶ 8.)  SA

9  Palmerton did not know that he had dialed and spoken to Defendant

10 until government counsel later informed SA Palmerton of that fact

11 after speaking with Defendant's counsel.  (Id. ¶¶ 9-11.)  Such

12 unintentional contact, which did not solicit nor result in

13 substantive communications with Defendant, does not meet the

14 "extremely high" standard for "outrageous government conduct."[10]

15         4.   Counsel for the Government Did Not Lie to the Court

16         Defendant wrongly accuses government counsel of lying to the

17 Court at the April 2, 2021 hearing.  (ECF 289 at 3-6.)  Defendant's

18 primary claim is that Trial Attorney Christopher Fenton and AUSA

19 Brian Faerstein attempted to "blur the lines" between the physical

20 and digital evidence in Defendant's possession at the Miami airport

21 by suggesting that Defendant was in physical possession of fake

22 identification documents when, in reality, photographs of such

23 documents were found on a digital device in his possession.  (Id.)

24 Defendant's argument is contradicted by the record.

25

26         [10] Defendant accuses SA Palmerton of trying to "cover[] up" the
   fact of his call to Defendant by writing a misleading 302 report.
27 (ECF 289 at 21.)  Not so.  By the time SA Palmerton prepared the 302
   report, there was no secret to conceal: the telephone call was known
28 to Defendant, Defendant's counsel, and government counsel.

1    In written submissions and at the April 2 hearing, government
2    counsel distinguished between the physical evidence and digital
3    evidence seized at the border stop – and the Court understood and
4    appreciated that distinction as reflected in its most recent opinion
5    and order (ECF 296).  On the first page of the government's
6    opposition to Defendant's motion to suppress, the government wrote:
7    "Defendants now seek to suppress items that were legally seized from
8    them at the airport in Miami, Florida, ... including credit cards in
9    the names of 'Iuliia Zhadko' and 'Viktoria Kauichko,' ... as well as
10   digital contraband in the form of numerous images of drivers'
11   licenses, personal identification documents, and credit cards in an
12   assortment of names."  (ECF 152 at 1:15-22.)  The government
13   repeatedly distinguished in that submission between the physical
14   evidence (i.e., the credit cards) and digital evidence (i.e., the
15   photographs of the fake identification documents) and made arguments
16   specific to each.  (Id. at 3-4, 8 (section titled "The Seizure of
17   Credit Cards in the Names of Iuliia Zhadko and Viktoria Kauichko was
18   Justified"), 9-13 (section titled "The Manual Search of Defendants'
19   Digital Devices and Seizure of Digital Contraband was Justified").)
20   At the April 2 hearing, the government drew the same distinction.
21   Defendant claims that, "When asked about what evidence it had
22   seized that supported the government's position that Zhadko and
23   Kauichko are 'not real,' AUSA Faerstein responded that the government
24   had seized fake identifying information for Iuliia Zhadko, fake
25   driver's licenses, and fake social security numbers both from the
26   second physical search of Ayvazyan ('the cards that the defendants
27   had on them during that search') and from the subsequent search of
28   'Ayvazyan's phone' at the Miami airport."  (ECF 289 at 4 (purporting

1  to quote ECF 289-4 ("Apr. 2, 2021 Hr'g Tr.") at 10-11).)  Selectively

2  quoting from the transcript, Defendant muddles what was a clear

3  exchange between AUSA Faerstein and the Court:

> THE COURT: There seems to be a clear dispute between the
> defendants and the Government as to whether Zhadko and Kauichko
> are fictitious or real.  In the FBI agent's declaration, there
> is information, at least from that declaration, that the FBI
> agent says supports the view that they're not real, but the
> defendants claim they are real. I'm going to ask you briefly
> what evidence is there that they're not real, and give me your
> response.
>
> MR. FAERSTEIN: Yes, Your Honor.  With respect to the identifying
> information for, for instance, Iuliia Zhadko and the drivers'
> licenses that were on defendant Ayvazyan's phone and the social
> security number, that information is not real.  There may be an
> individual named Iuliia Zhadko, but the information in these
> profiles that the defendants were in possession of is not real.
>
> THE COURT: One moment.  And you say that the information that
> you received, was this from the search of the phones at the
> Miami Airport?
>
> MR. FAERSTEIN: Both in terms of the search of the phones at the
> Miami Airport, as well as the cards that the defendants had on
> them during that search.

(Apr. 2, 2021 Hr'g Tr. at 10-11.)[11]

When the Court later returned to the issue, Trial Attorney

Fenton was clear that the physical evidence found on Defendant and

---

[11] Defendant also claims that AUSA Faerstein lied to the Court because "it was Zhadko's phone—not Ayvazyan's—that contained a photograph of Zhadko's license."  (ECF 289 at 4.)  The government's charging theory is that "Iuliia Zhadko" is a fake identity that Defendant used as an alias to commit crimes, as indicated in the case caption.  Counsel for the government did not lie to the Court by refusing to adopt Defendant's defense that "Iuliia Zhadko" is not an alias Defendant used to commit crimes.  AUSA Faerstein's point was that Defendant, not the purported "Zhadko," was in possession of the phone containing a digital photograph of fake identification documents for "Iuliia Zhadko," which the government clearly and correctly represented in writing and at the hearing.

17

his wife were credit cards belonging to "Iuliia Zhadko" and "Viktoria Kauichko," not fake identification documents:

> THE COURT: Now, what other physical evidence was taken or seized from Ayvazyan and Terabelian at that Miami search, other than the identity of Zhadko and Kauichko?

> MR. FENTON: So there were the credit cards.  There was –

> THE COURT: Credit cards in whose name?

> MR. FENTON: The credit cards -- the identity document that you referred to, Your Honor, those are credit cards in the name of Iuliia Zhadko and Viktoria Kauichko.  So that's what I'm referring to.  Credit cards.

(Apr. 2, 2021 Hr'g Tr. at 19-20.)

Defendant also falsely claims that Trial Attorney Fenton misrepresented to the Court that the two fake identification documents for Viktoria Kauichko were "physical documents."  (ECF 289 at 4.)  This is not true.  Trial Attorney Fenton did not tell the Court these fake identification documents were "physical documents." And Defendant does not cite evidence showing otherwise.[12]

In sum, Government counsel's exchanges with the Court at the April 2 hearing were accurate, honest, and forthcoming and do not constitute "outrageous government conduct" warranting dismissal.

---

[12] Defendant falsely claims that Trial Attorney Fenton committed misconduct by misrepresenting the substance of the interrogation at the Miami airport.  (ECF 289 at 6-7.)  After explaining to the Court that the government did not intend to offer Defendant's statements from the interrogation as part of its case-in-chief, Trial Attorney Fenton responded to the Court's request for a brief summary of what was said.  Trial Attorney Fenton explained that Defendant was asked "[t]he who, what, where, why, and when with respect to who they were and their travel," and then the Court moved on to another subject. (Apr. 2, 2021 Hr'g Tr. at 21-22.)  Defendant's claim that customs officials asked about Defendant's home, source of income, and the luxury watch that Defendant was bringing back into the country (ECF 289 at 7) is not inconsistent with the brief summary that Trial Attorney Fenton provided to the Court.

18

5.   <u>Use of the Grand Jury to Investigate New Crimes and</u>
<u>New Defendants was Appropriate</u>

Defendant argues that the government improperly used the grand jury to continue to investigate the same conspiracy it had already charged in the initial indictment. (ECF 289 at 10.)  According to Defendant, the FSI revolves around precisely the same purported conspiracy as the initial indictment. (<u>Id.</u>)  Defendant is wrong.

After the initial indictment was returned, the continuing grand jury investigation focused on additional loans, defendants, and victims, which resulted in a superseding indictment involving a fundamentally different and much larger conspiracy to commit wire fraud and bank fraud. (<u>Compare</u> ECF 32 <u>with</u> ECF 154.)  Moreover, the grand jury investigation related to a second, separate conspiracy to commit money laundering, which is related to, but independent of, the previously charged wire fraud and bank fraud conspiracy. (ECF 154 ¶¶ 52-54.)  For example, the FSI alleges that the money laundering conspiracy continued temporally beyond the wire fraud and bank fraud conspiracy. (<u>Id.</u> ¶¶ 30, 53.)  The grand jury also investigated Defendant's ongoing criminal activities while on pre-trial release, resulting in charges for conduct by Defendant (and a co-defendant) that post-dated the initial indictment. (<u>Id.</u> ¶¶ 57-63.)

In any event, "[a] grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." <u>United States v. Mechanik</u>, 475 U.S. 66, 75, (1986) (O'Connor, J., concurring).  And post-indictment grand jury proceedings are routinely considered legally tenable as well as logical.  "The investigative power of a grand jury does not necessarily end with the

19

return of an indictment." <u>United States v. Jones</u>, 129 F.3d 718, 723
(2d Cir. 1997).  Rather, "[a] grand jury investigation is not fully
carried out until every available clue has been run down and all
witnesses examined . . . [and] may be triggered by tips, rumors,
evidence proffered by the prosecutor, or the personal knowledge of
the grand jurors." <u>Branzburg v. Hayes</u>, 408 U.S. 665, 701 (1972)
(internal citations omitted).  Among other things, "the government
may properly use the grand jury 'to identify or investigate other
individuals involved in criminal schemes, or to prepare superseding
indictments against persons already charged.'" <u>Jones</u>, 129 F.3d at
723 (citing <u>United States v. Sasso</u>, 59 F.3d 341, 352 (2d Cir. 1995)).
"[A]bsent some indicative sequence of events demonstrating an
irregularity, a court has to take at face value the Government's word
that the dominant purpose of the Grand Jury proceedings is proper."
<u>United States v. Furrow</u>, 125 F. Supp. 2d 1170, 1176 (C.D. Cal. 2000).

    Defendant does not identify any particularized proof of
irregularities to rebut the presumption in favor of deference.  At
most, Defendant proffers a chart of twelve topics he claims the
government improperly investigated.

1   The grand jury proceedings here are thus entitled to a presumption

2   they were proper and Defendant's motion should be denied.[13]

3          6.   The Government Has Complied With Its *Brady* Obligations

4          Although numerous, Defendant's initial <u>Brady</u> requests to the

5   government essentially sought information supporting Defendant's

6   theory that third parties were responsible for the alleged fraud.

7   (ECF 289 at 14 (citing ECF 133-1 at 008-010).)  Such information is

8   not exculpatory given the charging theories in this case, namely,

9   that Defendant was a participant in conspiracies and schemes in which

10  he acted, <u>or caused others to act on his behalf</u>.  (<u>See, e.g.,</u> ECF 154

11  ¶¶ 31-33.)  The same is true for the crimes committed in violation of

12  the conditions of his pre-trial release for which the government

13  alleges that Defendant "knowingly conducted, and willfully caused

14  others to conduct, the [] financial transactions involving the

15  proceeds of specified unlawful activity."  (<u>Id.</u> ¶ 58.)

16         To comply with its discovery obligations in this case, the

17  government has organized and prepared a detailed index of the

18  discovery it produced to Defendant so that Defendant's counsel may

19

20         [13] Defendant makes a broad request that the Court order the

21  government to produce a copy of transcripts from the grand jury
    proceedings in this case.  (ECF 289 at 12 n.7.)  The Supreme Court

22  has articulated a three-part analysis for this disclosure:
    "[p]arties seeking grand jury transcripts under Rule 6(e) must show

23  that the material they seek is needed to avoid a possible injustice
    in another judicial proceeding, that the need for disclosure is

24  greater than the need for continued secrecy, and that their request
    is structured to cover only material so needed."  <u>Douglas Oil Co. of</u>

25  California v. Petrol Stops Nw., 441 U.S. 211, 222 (1979).  This
    showing must be made even if the grand jury whose transcripts are

26  sought has "ended its activities."  Id.  And "[m]ere
    'unsubstantiated, speculative assertions of improprieties in the

27  proceedings' do not supply the 'particular need' required to outweigh
    the policy of grand jury secrecy."  United States v. Ferreboeuf, 632

28  F.2d 832, 835 (9th Cir. 1980) (citation omitted).  Here, Defendant
    makes no such showing.

                                    21

1  efficiently and easily find specific types of information, including

2  with respect to third parties.  (ECF 278-5 (compilation of discovery

3  production letters containing detailed index prepared by the

4  government for defense counsel).)  For example, Defendant and his

5  counsel may use the index to identify specific discovery by Bates

6  number relating to IP addresses, bank accounts, and loans, among

7  other specific types of information.  Additionally, most of the

8  discovery was produced in a searchable format.  (Id.)  The FSI also

9  specifically identifies key loans and bank accounts at issue,

10  providing a veritable road map.  (See, e.g., ECF 154 ¶ 33.)  On the

11  basis of this record, the government has met – and will continue to

12  meet – its Brady obligations.  See United States v. Gross, 424 F.

13  Supp. 3d 800, 804 (C.D. Cal. 2019) (the government complied with its

14  Brady obligations with respect to voluminous discovery where it

15  contains almost exclusively electronically stored information and was

16  accompanied by an index).[14]

17      Defendant purports to provide an example of Brady material he

18  claims the government failed to produce, arguing that the government

19  used in a brief an excerpt of an otherwise exculpatory document.

20  (ECF 289 at 15.)  This is not true.  The government clearly

21  identified for the Court and Defendant that the government was using

22  an excerpt of a document (which was appropriate) and that the

---

24      [14] The government is not obligated to affirmatively identify
    additional materials.  See, e.g., Gross, 424 F. Supp. 3d at 803
25  (citing United States v. Skilling, 554 F.3d 529, 576 (5th Cir.
    2009)).  Moreover, United States v. Salyer, which is the only case
26  Defendant cites, has no application here.  (ECF 289 at 14 (citing
    2010 WL 3036444, at *3 (E.D. Cal. Aug. 2, 2010).)  There, the
27  government provided a massive amount of discovery gathered over the
    course of five years, including millions of pages and rooms full of
28  documents.  Here, the government has provided a discrete set of
    organized and indexed discovery.

1   government had already produced the complete copy in discovery.  (ECF

2   219-1 ¶ 17 ("Exhibit 13 are true and correct copies of an excerpt of

3   the account profile and supporting identification documents for a

4   cryptocurrency account in the name of "Iuliia Zhadko."  These

5   documents were Bates-stamped DOJ_PROD_0000130410 -

6   DOJ_PROD_0000130413, and produced in discovery.")[15]

7             7.   The Government Has Complied With Its Discovery
                    Obligations and the Court's Discovery Order
8

9        The parties have extensively addressed Defendant's allegations

10  with respect to discovery which, like its other allegations, are

11  contrary to the factual record and without basis in fact or law. (ECF

12  248, 278, 287.)  Rather than re-address Defendant's allegations here,

13  the government incorporates by reference its response to Defendant's

14  other motion, which the government understands is sub judice.  (ECF

15  278.)  Defendant filed a frivolous motion asking the Court to dismiss

16  the FSI with prejudice or, in the alternative, exclude from evidence

17  discovery that no one seriously disputes was timely produced.  (ECF

18  248.)  Defendant's motion has no basis in fact or law, and should be

19  denied.  Defendant also asks the Court to read a scheduling order

20  relating to discovery to impose a blanket prohibition on the

21

22

23       _____

24       [15] Defendant also argues that a small redaction on a CBP form
    relating to the border stop is Brady material because it seems likely
25  to prove his argument that border concerns were used as a pretext to
    unlawfully search for PPP loan fraud evidence.  (ECF 289 at 15-16.)
26  There is no basis for disclosure given that (i) at best, this
    information would be duplicative of information already known to
27  Defendant; and (ii) its relevance is limited to the issue of
    suppression, on which the Court already ruled.  The government,
28  however, is willing to submit an unredacted copy for in camera
    inspection if the Court wishes.

                                   23

production of any discovery after March 15, 2021 – without regard to the circumstances relating to the evidence or subsequent developments, including the filing of a superseding indictment that exposed more of Defendant's fraud ring.  (ECF 248.)  This request is also meritless and should be denied.

### C. Dismissal Under the Court's Supervisory Powers Is Unwarranted Because Defendant Fails to Show "Flagrant Misconduct" or "Substantial Prejudice"

"Dismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice."  United States v. Kearns, 5 F.3d 1251, 1253-54 (9th Cir. 1993).  Defendant fails to make either showing.

Defendant does not actually allege misconduct, much less a pattern of intentional wrongdoing or even reckless disregard on the part of the government.  As described above, many of the allegations are without factual support; others are contrary to the factual record.  This is insufficient to meet the high standard for "flagrant misbehavior."  At most, Defendant points to an honest mistake made by an agent that had no prejudicial effect on Defendant, but accidental conduct is insufficient to establish flagrant misbehavior.  United States v. Chapman, 524 F.3d 1073, 1085 (9th Cir. 2008).

The facts of this case are therefore completely distinguishable from the facts of Aguilar, on which Defendant primarily relies.  (ECF 289 at 20.)  In Aguilar, the Court found that the government allowed a key FBI agent to testify untruthfully before the grand jury, inserted material falsehoods into warrant affidavits submitted to magistrate judges, improperly reviewed e-mails between one defendant and her lawyer, recklessly failed to comply with its discovery

obligations, posed questions to certain witnesses in violation of the Court's rulings, engaged in questionable behavior during closing argument, and made misrepresentations to the Court.  831 F. Supp. 2d at 1182.  In this case, Defendant has not demonstrated one such example of misconduct, let alone a pattern like that in Aguilar.

Defendant also fails to show "substantial prejudice."  He primarily argues that the fact he has been charged has had a negative reputational impact and that, as a result of this case, he has been confined to home detention in the mansion he purchased using stolen COVID-19 relief funds.  These types of allegations are insufficient to constitute "substantial prejudice," which "entails that the government's conduct had at least some impact on the verdict," not Defendant's life more generally.  Aguilar, 831 F. Supp. 2d at 1207 (citing United States v. Lopez, 4 F.3d 1455 (9th Cir. 1993) (internal quotations omitted).  Open judicial proceedings are important to preserve the rule of law and publicizing cases, like this one, is necessary to deter others from similarly stealing disaster relief funds intended for families suffering from COVID-19.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant Richard Ayvazyan's motion to dismiss.