Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  20-cr-579 (SVW) |
| *Plaintiff,* | **DEFENDANT RICHARD AYVAZYAN'S REPLY IN SUPPORT OF MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT** |
| v. | |
| RICHARD AYVAZYAN, *et al.* | |
| *Defendants.* | Judge:          Hon. Stephen V. Wilson<br>Hearing Date: May 24, 2021<br>Time:           11:00 a.m. |

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

# TABLE OF CONTENTS

I.    NEWLY DISCLOSED EVIDENCE OF GOVERNMENT
      MISCONDUCT IN CONNECTION WITH STATE CHARGES
      INVESTIGATED BY STATE AND FEDERAL MEMBERS OF THE
      PROSECUTION TEAM WITHHELD DURING DISCOVERY..........................2

II.   THE GOVERNMENT'S MISCONDUCT BEGAN DURING THE
      MIAMI AIRPORT STOP AND HAS CONTINUED THROUGH THE
      LAST SIX MONTHS ........................................................................5

      A.    THE GOVERNMENT'S MISCONDUCT DURING THE MIAMI
            AIRPORT STOP HAS TAINTED THIS CASE .........................................5

            1.    The Government Lied About Its Pretextual Stop...........................5

            2.    The Government Destroyed Evidence .............................................6

            3.    The Government Misled the Court...................................................8

            4.    The Government Intentionally Invaded Privileged
                  Confidential Marital Communications............................................9

      B.    THE GOVERNMENT'S MISCONDUCT TAINTED THE
            INDICTMENTS ........................................................................10

      C.    THE GOVERNMENT COMMITTED SERIOUS MISCONDUCT
            DURING THE SEARCH WARRANT EXECUTION, THEN
            COMPOUNDED THAT MISCONDUCT WITH MISLEADING,
            MERITLESS, AND BAD FAITH ARGUMENTS ...................................12

      D.    THE GOVERNMENT HAS CONTINUED TO COMMIT
            SERIOUS MISCONDUCT SINCE THE INDICTMENT ........................14

            1.    The Government Was Not Ready For Trial, So It
                  Abused the Grand Jury's Powers to Gather Discovery
                  Beyond the Reach of Fed. R. Crim. P. 16 .....................................14

            2.    The Government Contacted a Represented Defendant
                  Seeking Information Regarding a Co-Defendant..........................15

i

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

3.    The Government Violated Its Obligations Under *Brady* and Its Progeny and the California Rules of Professional Conduct ...................................................................... 16

E.    THE GOVERNMENT FLAGRANTLY VIOLATED THE COURT'S DISCOVERY ORDER AND COMPOUNDED THAT MISCONDUCT BY LYING TO THE COURT ........................................ 18

III.    THE COURT SHOULD DISMISS THE CASE, OR IN THE ALTERNATIVE, ORDER DISCOVERY ........................................... 20

A.    THE COURT SHOULD DISMISS THE CASE UNDER THE DUE PROCESS CLAUSE OR SUPERVISORY POWERS ............................. 20

B.    THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE DISCOVERY REGARDING ITS INTERNAL DECISION-MAKING AND PRESENTATION OF TAINTED EVIDENCE .............................................................................. 22

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Chavez v. Martinez*,
   538 U.S. 760 (2003) ..................................................................................... 22

*In re Grand Jury Subpoenas Issued May 3, 1994 (Nash)*,
   858 F. Supp. 132 (D. Ariz. 1994) ............................................................... 13

*Kastigar v. United States*,
   406 U.S. 441 (1972) ................................................................................ 2, 23

*Kinsella v. United States ex rel. Singleton*,
   361 U.S. 234 (1960) ..................................................................................... 20

*United States v. Aguilar*,
   831 F. Supp. 2d 1180 (C.D. Cal. 2011) ....................................... 1, 9, 20, 21

*United States v. Allen*,
   864 F.3d 63 (2d Cir. 2017) ..................................................................... 23, 24

*United States v. Barrera-Moreno*,
   951 F.2d 1089 (9th Cir. 1991) .................................................................... 20

*United States v. Bayer*,
   331 U.S. 532 (1947) ..................................................................................... 14

*United States v. Chapman*,
   524 F.3d 1073 (9th Cir. 2008) .................................................................... 20

*United States v. Dudden*,
   65 F.3d 1461 (9th Cir. 1995) ...................................................................... 23

*United States v. Felix*,
   503 U.S. 378 (1992) ..................................................................................... 14

*United States v. Flores*,
   No. 16-cr-833, 2017 WL 2622733 (C.D. Cal. June 13, 2017) ................... 24

*United States v. Gross*,
   424 F. Supp. 3d 800 (C.D. Cal. 2019) ....................................................... 17

iii

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

*United States v. Hsia*,
   24 F. Supp. 2d 14 (D.D.C. 1998) .................................................................. 17

*United States v. Hylton*,
   294 F.3d 130 (D.C. Cir. 2002) .................................................................... 23

*United States v. Kojayan*,
   8 F.3d 1315 (9th Cir. 1993) ................................................................... 1, 20

*United States v. Russell*,
   411 U.S. 423 (1973) ................................................................................... 20

*United States v. Salyer*,
   No. 10-cr-61, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) ....................... 17

**Other Authorities**

Cal. R. Prof'l Conduct 3.8 ........................................................... 5, 15, 18

Fed. R. Crim. P. 16 .............................................................................. 14

Fed. R. Crim. P. 17 .................................................................. 2, 14, 22

U.S.S.G. § 1B1.3(a) ............................................................................ 14

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

1    The Court should dismiss the indictments based on the government's sustained

2    pattern of misconduct, which is both undeniable and more expansive than that leading

3    to dismissal in *United States v. Aguilar*, 831 F. Supp. 2d 1180 (C.D. Cal. 2011).  In

4    *Aguilar*, the court dismissed the indictment even though a trial had already occurred

5    because of the "astonishing number of 'mistakes'" that the government made

6    throughout the proceeding.  *Id.* at 1207.  Here, the government claims that it

7    "misspoke" (but did not correct itself) when lying to the U.S. District Court for the

8    Southern District of Florida during a detention hearing, that it "may not have been

9    truthful" when lying to the defendant during the Miami airport stop, lies that were

10   repeated on official government forms and twisted during the detention hearing; that it

11   "deleted video footage" but not willfully or deliberately; that it made "honest

12   mistake[s]"; that it unintentionally invaded privileged communications by searching a

13   wife's cell phone for text messages with her husband and photographing them; but even

14   with all of these admissions, the government fails to be forthright about the rest of its

15   misconduct.  *See* Opp'n to Motion to Dismiss at 5 n.2, 12 n.6, 13 n.7, 15 (Dkt. 310)

16   ("Opp'n").  The pattern of misconduct is too broad to be explained as mistakes; the

17   only reasonable inference is that the government has committed flagrant misconduct.

18   "[T]he judiciary—especially the court before which the primary misbehavior took

19   place—may exercise its supervisory power to make it clear that the misconduct was

20   serious and that steps must be taken to avoid a recurrence."  *Aguilar*, 831 F. Supp. 2d at

21   1206-07 (quoting *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993)).  So too

22   here.  The Court should dismiss the indictments to send a message of deterrence and

23   ensure that future defendants are not subjected to the same violations of their rights.

24   The government's misconduct began with the unlawful interrogation of

25   Ayvazyan at Miami International Airport on October 19, 2020 and has continued into

26   new misconduct as recently as the last two weeks (*see* Section I).  Having indicted a

27   case it was not prepared to try, the government exploited federal joinder rules by

28   holding back defendants and counts, then used a grand jury to subpoena additional

1

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

evidence to get around Ayvazyan's speedy trial rights and the limits placed on trial subpoenas by Fed. R. Crim. P. 17.  It further appears that when the Court ordered a trial date over two months before the government's requested date, the government responded by working with state authorities to press charges against Ayvazyan, imprison him for another week despite the ongoing pandemic, and (so far unsuccessfully) seek prohibitive detention terms that would prevent him from preparing for the Court-ordered trial and force a continuance.  This follows a seven-month campaign during which the government has exploited every dirty trick in its arsenal to intimidate Ayvazyan and gain a tactical advantage.

The government is obligated to act as a minister of justice, not a mere advocate or sharp-elbowed competitor, and dismissal will send the message that this level of misconduct falls short of meeting that obligation.  The government has failed to timely produce exculpatory evidence and has committed misconduct leaving it with the "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."[1]  However, the Court need not wait for the government to fail to carry its production or litigation burdens because the government's sustained pattern of misconduct spanning the past seven months is sufficient to merit dismissal.

## I.    NEWLY DISCLOSED EVIDENCE OF GOVERNMENT MISCONDUCT IN CONNECTION WITH STATE CHARGES INVESTIGATED BY STATE AND FEDERAL MEMBERS OF THE PROSECUTION TEAM WITHHELD DURING DISCOVERY

The government's prosecution team includes the U.S. Attorney's Office for the Central District of California, the Department of Justice Criminal Division, the Federal Bureau of Investigation, the Internal Revenue Service, the Small Business Administration Office of Inspector General, the Federal Housing Finance Agency Office of Inspector General, the Department of Homeland Security, and various state and local authorities including the California Attorney General's Office, the State of

---

[1] *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972).

2

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

California Department of Justice, and the Los Angeles Police Department.  These agencies have worked together to investigate Ayvazyan's case by executing searches together, issuing subpoenas, sharing evidence, and consulting with each other on strategic decisions.

After the government's latest attempt to buy more time to investigate was denied and trial was set for June 15, 2021, Dkt. 292, it appears that the government decided to bring charges in a years-old FBI-state investigation that the Opposition cites as one of the key sources of evidence in this case.  *See* Opp'n at 4 (alleging that Ayvazyan's status as a "possible participant" in the FBI-state investigation was part of the reason he became a suspect in this case).  The government buried that FBI-state investigation and the evidence it had obtained during the investigation until long after the March 15 discovery cut-off.

The government responded to the Court's April 16 ruling by having the state government charge Ayvazyan and co-defendants Tamara Dadyan and Artur Ayvazyan in a state indictment, arrest them, and seek draconian state detention orders that would inhibit the defendants' abilities to prepare for a June 15 federal trial.  Until the eve of that state indictment, the government withheld all discovery, even the fact that the FBI-state investigation existed.  The government withheld evidence from the FBI-state investigation that was material to the allegations and motions in this case, including:

- evidence that someone other than Ayvazyan controls the email account and bank accounts belonging to Iuliia Zhadko, including the Turing Info Solutions account in the superseding indictment, and is responsible for related transactions contrary to the government's allegations in the complaint, indictments, search warrant affidavits, and briefs;

- evidence that someone other than Ayvazyan controls accounts belonging to Viktoria Kauichko and is responsible for related transactions contrary to the complaint, indictments, and search warrant affidavits;

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

1
2
3

- evidence that someone other than Ayvazyan controls accounts belonging to Anna Manukyan and is responsible for related transactions contrary to the government's allegations in the search warrant affidavits;

4

- evidence that certain co-defendants are victims of identity theft;

5
6

- evidence of additional sources of income that would explain the purportedly PPP-related transfers among alleged co-conspirators;

7
8
9
10
11

- evidence tending to prove that the nearly $450,000 in cash seized from Ayvazyan and Terabelian's home was not a proceed of the crime charged in this case (which would be material to the forfeiture allegations in addition to the return of property briefing previously before this Court (another material government misrepresentation by omission));

12
13

- exculpatory evidence that Ayvazyan is not "at the helm" of the alleged conspiracy (*see* Tr. of Apr. 2, 2021 Hr'g at 6 (Dkt. 299));

14
15
16

- evidence that Ayvazyan did not commit the alleged mortgage fraud and that Agent Palmerton's conclusion that Ayvazyan is "the identity of one of our subjects" (Dkt. 310-3) is therefore unreliable; and

17
18

- evidence that federal and state authorities have conspired to undermine Court orders and Ayvazyan's fundamental rights.

19
20
21

This evidence was all withheld by the government in violation of the Court-ordered discovery cut-off of March 15, and appears to be only the tip of the iceberg of withheld evidence.[2]

22
23
24
25

The circumstantial evidence strongly implies that the state government arrested and charged Ayvazyan after a years-long investigation at the behest of the federal government. The government aggressively pushed for Ayvazyan's detention (and that of his co-defendants) in the state case knowing that it would detract from federal trial

26

27
28

---

[2] Last week, Ayvazyan sent a letter to the government seeking discovery relevant to evaluating just how far the government's latest misconduct stretches. *See* Decl. of Ashwin Ram Supp. Reply Supp. Mot. to Dismiss for Prosecutorial Misconduct ("Ram Decl."), Ex. A.

4

preparation, force another continuance, or coerce defendants into pleading out.  Such gamesmanship is the latest piece in a pattern of misconduct meriting dismissal.

## II.   THE GOVERNMENT'S MISCONDUCT BEGAN DURING THE MIAMI AIRPORT STOP AND HAS CONTINUED THROUGH THE LAST SIX MONTHS

### A.   The Government's Misconduct During the Miami Airport Stop Has Tainted This Case

#### 1.   The Government Lied About Its Pretextual Stop

The government committed flagrant misconduct by taking the Joint Terrorism Task Force and Tactical Terrorism Response Team away from their work protecting national security, and instead assigning them to investigate domestic loan fraud allegations.  Dkt. 130 at 5-6.  This abuse of government resources and power led to a ten-plus hour detention of Richard Ayvazyan and Marietta Terabelian during which they were denied explicit requests for counsel, denied requests to speak to each other or sit together, and forced to undergo repeated interrogations and searches.  *Id.* at 7-11.  The government compounded this misconduct by lying about the stop's national security purpose in official government records, Dkt. 133 Ex. 7, 18, lying about the stop's contraband purpose to the magistrate judge presiding over the detention hearing in the U.S. District Court for the Southern District of Florida, Oct. 22 Tr. at 11, and lying to this Court regarding the content of evidence that undercut the government's previous lies, Dkt. 152 at 7.  The government utterly failed to uphold its responsibility as a minister of justice with respect to being honest and forthright about the purpose of its investigatory stop, and instead acted simply as an advocate contrary to California Rule of Professional Conduct 3.8 & cmt.1.

The Opposition tries to justify this misconduct by mischaracterizing the Court's Order: claiming that the Court found that none of its conduct "in connection with the border stop"—not the misuse of national security resources, the lying, the refusal of requests for counsel, the claims of being able to detain people indefinitely, the destruction of evidence, or the misleading statements and lies in briefs and oral

5

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

argument—was in bad faith or intentional misconduct.  Opp'n at 6.  That is not what the Court found.  The Court's Order concluded that it could "infer[] that 'national security concerns' were merely a pretext for the actual purpose of the search," Dkt. 296 at 5, but that *even if Agent Palmerton subjectively schemed in bad faith* to evade the Ninth Circuit's prohibition on such searches, the reasonableness of his direction was an objective inquiry, Dkt. 296 at 13 n.10.  Contrary to the Opposition's broad claim, the Court made no finding that the government's lies, misleading statements, or destruction of evidence was in good or bad faith.

### 2. The Government Destroyed Evidence

The government compounded its flagrant misconduct by destroying evidence. *See* Dkt. 289 at 6; Dkt. 209 at 3-4; Dkt. 135 at 17-18.  The government argues that Ayvazyan's opening brief was not clear enough in its description of "any evidence supporting an inference that the [government's] actions were willful or deliberate." Opp'n at 12 n.6.  To be clear, here is the evidence:

- <u>November 6, 2020</u>: Ayvazyan's counsel requested any records related to Ayvazyan's detention at Miami International Airport.  Dkt. 133 ¶ 2.

- <u>November 9, 2020</u>: Ayvazyan's counsel discussed with the government how Ayvazyan had invoked his right to counsel and again requested any records related to the airport detention.  Dkt. 133 ¶ 2.

- <u>November 18, 2020</u>: Ayvazyan wrote a discovery letter requesting all recordings of Ayvazyan, including all interactions from the waiting areas and interrogation rooms, and reiterated that "[t]his request includes all audio or visual recordings of Ayvazyan . . . ."  Dkt. 133-1 ¶ 4.

- <u>December 14, 2020</u>: The government made its first production of CBP documents including inaccurate reports that claimed the search was undertaken pursuant to national security purposes and omitted the repeated invocations of counsel.  Dkt. 278-5 at 6 (production letter); Dkt. 133 Ex. 7, 16, 17, 18 (inaccurate reports).  The government did not disclose any recordings or the fact

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

that those recordings would soon be deleted because the government had not issued a preservation notice.

- <u>December 24, 2020</u>: Ayvazyan again requested all recordings of Ayvazyan including the waiting areas and interrogation rooms, and requested contact information for the CBP officers on duty during the detention. Dkt. 133-2.

- <u>December 31, 2020</u>: The government deleted the recordings of Terabelian's initial interrogation and search in the fingerprint room. *See* Dkt. 152 Ex. 14.

- <u>January 4, 2021</u>: The government informed Ayvazyan that he could not contact CBP employees because they were represented parties and requests for CBP records must go through the government. Dkt. 133-3. The government did not disclose any recordings or the fact that those recordings would soon be deleted because the government had not issued a preservation notice.

- <u>January 6, 2021</u>: For the first time, the prosecutors transmitted some portion of Ayvazyan's November-December 2020 requests to CBP. *See* Dkt. 152 Ex. 14.

- <u>January 15, 2021</u>: Ayvazyan learned from publicly available information on the internet that certain CBP camera systems had 90-day deletion policies and immediately informed the government. Ayvazyan again requested all recordings of Ayvazyan including the waiting areas and interrogation rooms. Ayvazyan requested that the government issue a preservation notice to CBP that day, and that the government produce all preservation notices that had been issued. The government refused to disclose whether any such notices had been issued. Dkt. 133-3. The prosecutors do not appear to have transmitted this warning to CBP.

- <u>January 17-18, 2021</u>: The government deleted the recordings of the pre-interrogation invocations of counsel and up to six hours of interrogating and searching Ayvazyan (from 5:00 p.m. through 10:56 p.m.). *See* Dkt. 152 Ex. 14.

- <u>February 2, 2021</u>: The government's first production of recordings from CBP, which only included interactions with Ayvazyan beginning at 10:56 p.m. (over

seven hours after he was detained and approximately six hours after his interrogation and searches began, Dkt. 152 Ex. 14).

- <u>March 8, 2021</u>: Ayvazyan filed his motion to suppress noting the government's destruction of evidence.

- <u>March 15, 2021</u>: The government filed its opposition including a letter from CBP dated March 10 confirming that either the prosecutors or CBP repeatedly failed to heed Ayvazyan's warnings and requests over the course of November 2020, December 2020, and January 2021 and instead destroyed evidence.

It is difficult to see what more could be required to demonstrate that the government acted in bad faith in light of the government's refusal to produce additional communications.  The government either recklessly or intentionally destroyed evidence that an individual defendant was repeatedly requesting for months on end.

### 3.    The Government Misled the Court

Ayvazyan's opening motion described how the government misled the Court by claiming to prove that Zhadko and Kauichko were not real because it "seized fake identifying information for Iuliia Zhadko, fake driver's licenses, and fake social security numbers" both from physical cards in Ayvazyan's possession and from Ayvazyan's phone.  Dkt. 289 at 3-4 (citing Apr. 2, 2021 Hr'g Tr. at 10-11); *see* Opp'n at 17.[3]  The government's claims were false for two reasons.

First, Ayvazyan was not in possession of physical cards bearing any of this identifying information but rather only had several of Zhadko's credit cards.  The identifying information referenced by the government were text message photographs or other image files contained on cell phones belonging to Zhadko and Kauichko.  There is a real and substantial difference between possession of a physical card and possession of a device containing tens of thousands of files—particularly a device that

---

[3] Similarly, the government claimed that Ayvazyan and Terabelian were found with "two different identification documents for Viktoria Kauichko," when the government actually found a cell phone registered to and belonging to Kauichko that contained photographs of her IDs.

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

1  the prosecutors claim was "pass[ed] around," *see* Dkt. 289 at 16; Dkt. 289-3 ¶ 4—

2  particularly when the Court was tasked with determining whether the physical evidence

3  was sufficient to sustain consequent search warrants at the time of the hearing.

4         Second, neither of these pieces of evidence were found on Ayvazyan's phone.

5  The government apparently believes that it is entitled to shade the evidence to fit its

6  theory of the case when making representations to the Court, *see* Opp'n at 17 n.12, but

7  it is not.  As reflected in the government's own discovery productions, it is perfectly

8  capable of distinguishing between "Iuliia Zhadko iPhone 11 (+1747█4170)," Dkt.

9  278-5 at 50, and Ayvazyan's phone (+1818█6000).  It simply failed to do so because

10  it wanted to convince the Court that the evidence belonged to Ayvazyan instead of

11  providing an accurate recitation of the facts.[4]

**4.      The Government Intentionally Invaded Privileged Confidential Marital Communications**

13        After detaining and interrogating Ayvazyan and Terabelian, CBP Officers

14  searched Terabelian's phone outside of her presence contrary to CBP regulations,[5]

15  found a text message conversation with "Rich" with a phone number matching the

16  Richard Ayvazyan cell phone they had also seized, and proceeded to review and

17  photograph extended portions of a privileged communication, which they then turned

18  over to the prosecutors in this case.  The Opposition claims that this is distinguishable

19  from *United States v. Aguilar* because "there is no evidence supporting an inference

20  that an agent intentionally invaded communications he knew to be privileged."  Opp'n

21  at 13 n.7.  It is difficult to conceive what more evidence could exist than a CBP officer

---

[4] The government compounded these errors later in the hearing by claiming that CBP had merely discussed its standard "5 Ws" with Ayvazyan and Terabelian, when in fact, they had been interrogated about financial issues.  To state the obvious, interrogation about sources of income, paying for a new house, and affording a vacation or jewelry is not a typical, routine interview that ordinary travelers encounter.  These were tailored questions to investigate PPP loan fraud.

[5] Dkt. 152 Ex. 4 ¶ 5.1.6 ("Searches of electronic devices should be conducted in the presence of the individual whose information is being examined unless there are national security, law enforcement, officer safety, or other operational considerations that make it inappropriate to permit the individual to remain present.")

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

who coerced an individual and her husband into turning over their phones, separated them from each other, then specifically reviewed a conversation between the two phones that was specifically labeled as such.  The Opposition also argues that the government "established an independent filter team," *id.* at 13 n.7, but the filter team produced this entire text chain to the prosecutors without redaction or deletion.  The filter team took no steps to mitigate the government's intentional violation of privilege.

### B.    The Government's Misconduct Tainted the Indictments

In 1957's *Witness for the Prosecution*, Charles Laughton famously asks a witness, in substance, "were you lying then or are you lying now?"  Sixty-four years later, that question is still relevant.  Within two days of Ayvazyan's arrest, Agent Palmerton testified before the U.S. District Court for the Southern District of Florida and was asked "how do you know that Mr. Ayvazyan and Miss Terabelian were the ones who actually filed these applications through the computer?"  Agent Palmerton testified in response:

> For some of the applications filed under the name Iuliia Zhadko, the funds were deposited into a bank account. From there, the funds float into an escrow account. And in reviewing the records from that escrow company, there was an e-mail from a Richard Ayvazyan that appeared to be directing the flow of funds from that bank account.  And then, **once the CBP stopped for the secondary inspection, we learned that there was a photograph of Iuliia Zhadko on the digital device and we made the connection that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan**.

Dkt. 310-6 at 23-24 (emphasis added).

The indictment and superseding indictment each claim that Ayvazyan is "also known as … Iuliia Zhadko," Dkt. 32 ¶ 1; Dkt. 154 ¶ 2, and allege his control over key bank accounts "in his legal name *or using one of his aliases*," Dkt. 32 ¶ 16; Dkt. 154 ¶

22 (emphasis added).  The indictment and superseding indictment, for example, allege

that "On or about June 15, 2020, defendant R. Ayvazyan, using the alias 'Iuliia

Zhadko,' together with other coconspirators, submitted and caused to be submitted to

the SBA an application in the name of Timeline Transport, Inc."  Dkt. 154 Overt Act

No. 42.  This allegation is typical of Ayvazyan's alleged involvement in the loan

submissions: he is alleged to be responsible for the acts of Iuliia Zhadko.  *See, e.g.*, *id.*

Overt Act No. 19; *id.* Overt Act No. 59; *id.* Overt Act No. 61.[6]  Agent Palmerton's

testimony makes clear that these allegations are tainted—indeed, they are *directly*

traceable to learning about tainted evidence.[7]

In a desperate attempt to save its indictment, and likely the majority of its yet-to-

be-disclosed trial exhibits pertaining to Ayvazyan, the Opposition argues, in effect, that

Agent Palmerton's October 22, 2020 testimony was false.  The Opposition even offers

an August 4, 2020 email (Dkt. 310-3) suggesting that—contrary to his in-court

testimony—Agent Palmerton "made the connection" that Zhadko was allegedly

Ayvazyan's alias over two months earlier because Ayvazyan "was listed as a possible

participant" in the FBI-state investigation and Encore Escrow received a $110,000

transfer from Zhadko's company Timeline Transport, Inc. for the benefit of Ayvazyan's

escrow account—with no mention of the fact that far more of Zhadko's money was

transferred to other recipients or remained in Zhadko's possession.

This post hoc rationalization based on unclear mortgage fraud suspicions[8] should

be rejected out of hand because it plainly contradicts Agent Palmerton's sworn

testimony.  Moreover, it is fundamentally incredible that the transfer to escrow and

---

[6] Other allegations allege that co-defendants submitted different loan applications and that Ayvazyan conspired with them without mentioning Zhadko.  *See, e.g.*, Overt Act Nos. 25-36.  The superseding indictment does not allege that Ayvazyan had any particular involvement in submitting those applications, and he did not.

[7] Ayvazyan sent a letter to the government late last week seeking discovery on the extent of the taint caused by the government's Fifth Amendment violations.  *See* Ram Decl. Ex. B.

[8] As discussed *infra* in section I, Ayvazyan has requested discovery regarding these allegations, but the sole production to date that relates to Ayvazyan is a copy of his California DMV registration.

11

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

1   Ayvazyan's supposed status as a possible participant was sufficient for anyone to

2   conclude that Zhadko was an alias of Ayvazyan.  If the FBI's previous 2017

3   investigation were so important, then the government would have (presumably)

4   produced it in discovery.  It didn't.  Instead, it withheld all information from the

5   defense about this investigation until long after the March 15, 2021 discovery cut-off

6   when it was necessary to respond to Agent Palmerton's sworn testimony.  The

7   government is attempting to pivot from its admission of the central nature of tainted

8   evidence because it knows that taint will ultimately require exclusion of all derivative

9   work product and evidence.  *See infra* Section III.B.  The government already conceded

10  the importance of the tainted evidence on the record and under oath.  It was either lying

11  then, or—more likely—it is lying now.

### C.   The Government Committed Serious Misconduct During the Search Warrant Execution, Then Compounded That Misconduct With Misleading, Meritless, and Bad Faith Arguments

15       The government committed serious misconduct during its search warrant

16  execution, and it cannot seriously dispute it because when agents tried to break or

17  disable all of the home's security cameras, they missed one.  The government claims

18  the SWAT team was just "doing its job," Opp'n at 13 n.8, but no government agent's

19  job includes assaulting children and holding them at gunpoint.  The Opposition argues

20  that the video recording of the SWAT Team is insufficient, but ignores the fact that the

21  government itself destroyed the other cameras that would have provided additional

22  corroborating evidence.  The government chose to destroy cameras to prevent its

23  conduct from being documented and now argues "lack of evidence" because its

24  misconduct was apparently not documented on a sufficient number of cameras.

25       The Opposition makes two arguments to defend the indefensible, but neither has

26  merit.  First, the Opposition argues that the Court blessed the government's warrant

27  execution tactics.  *See* Opp'n at 7.  That is false.  The Court explicitly informed the

28  parties that it denied the motion to suppress solely because "the record does not reflect

a flagrant general search."  Dkt. 296 at 40 & n.28 ("For this reason alone, the Court rejects Defendants' argument that all evidence should be suppressed because the warrant was executed in an unreasonable manner. See Dkt. 146 at 20–21. *Regardless of the propriety of the Government's tactical decisions* in approaching Defendants' home and detaining persons on the premises, the search itself was not a flagrant general search." (emphasis added)).  At no point did the Court endorse the government's misconduct as good faith or proper.

Second, the Opposition attempts to resuscitate the government's lie that it believed Richard Ayvazyan was a threat.  As previously explained, at length and with citation to contemporaneous documentation, the government knew Ayvazyan was not a threat.  *See* Dkt. 222 at 1-6.  Contemporaneous documentation proves that even when executing live surveillance on the home and following Ayvazyan, the government did not deem him a threat of violence.  *Id.* at 3.  *A fortiori*, he could not be a threat of violence during a dawn raid.  (In fact, Ayvazyan was polite and courteous.  The government responded by assaulting Ayvazyan's children and trashing his property both of which continued *after* Ayvazyan and Terabelian had been handcuffed.)  This was a show of intimidation, not a necessary precaution.[9]  The government made these bad-faith arguments because there is no excuse for its misconduct.

---

[9] The government again cites a guilty plea from a former brother-in-law while withholding material information from the Court: the pleadings in that former brother-in-law's case reflected that the in-law *was not a member of the gang*. Dkt. 222 at 4-5.  Nor does the government allege that Ayvazyan has any ties to the gang at all.  Moreover, the Opposition claims that the former brother-in-law is Ayvazyan's "current business partner," Opp'n at 14, but that claim is flatly incorrect and a transparent attempt to make up for the government's since-abandoned misrepresentation that Ayvazyan was responsible for gun paraphernalia found in the trash at someone else's home.  *See* Dkt. 222 at 5 & n.3.

13

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

### D.     The Government Has Continued to Commit Serious Misconduct Since the Indictment

#### 1.     The Government Was Not Ready For Trial, So It Abused the Grand Jury's Powers to Gather Discovery Beyond the Reach of Fed. R. Crim. P. 16

When Ayvazyan refused to waive his speedy trial rights, the government decided to continue subpoenaing evidence of the same alleged conspiracy it had already indicted. "The grand jury may not be used by the government for pretrial criminal discovery." *In re Grand Jury Subpoenas Issued May 3, 1994 (Nash)*, 858 F. Supp. 132, 134 (D. Ariz. 1994). The government violated this black-letter law by engaging in repeated fishing expedition subpoenas for people and businesses already alleged to be a part of the conspiracy. The government unilaterally decided that it was not bound by the limits of Fed. R. Crim. P. 16 and 17 and that it would wield the grand jury's power for the purpose of gathering evidence even though those rules do not provide for such expansive evidence gathering.

The government's counterargument is premised on a fundamental misrepresentation of conspiracy law. A conspiracy is "an agreement of two or more persons to commit one or more crimes." Ninth Circuit Model Jury Instr. 8.20. "[T]he 'essence' of a conspiracy offense 'is in the agreement or confederation to commit a crime.'" *United States v. Felix*, 503 U.S. 378, 389-90 (1992) (quoting *United States v. Bayer*, 331 U.S. 532, 542 (1947)). The initial indictment charges the same agreement now charged in the superseding indictment.

The government argues repeatedly that it was able to gather additional information about the conspiracy raising the alleged loss from $5.6 million to $21.9 million. The government's argument is both fundamentally wrong and proof of the prejudice to the defendants. It is fundamentally wrong because the conspiracy had the same loss regardless of whether that loss is based on loans in the indictment or not. *See* U.S.S.G. § 1B1.3(a)(1), (2) (relevant conduct). The government did not uncover additional crimes raising the loss amount; it subpoenaed tainted evidence to support the

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

same charge it had already levied.  After all, the initial indictment alleged that the conspiracy involved *at least* 35 loans and *at least* $4.6 million in proceeds.  Indictment ¶ 22 (Dkt. 32).  The fact that the government has used the grand jury's subpoena power to improve the government's ability to adduce evidence on a wider variety of loans and proceeds merely improves its tactical position regarding the same charged conspiracy to the detriment of the individual defendants who lack symmetric subpoena power; it does not change the conspiracy.

As shown in the table at pages 11-12 of the opening motion, the government wielded the grand jury's subpoena power to receive more and more detail on companies and individuals who had already been charged as part of the alleged conspiracy.  At the very least, those subpoena returns should be suppressed and the government should be compelled to produce a complete set of grand jury subpoenas to the defense.

### 2. The Government Contacted a Represented Defendant Seeking Information Regarding a Co-Defendant

The government claims that Agent Palmerton "accidentally" contacted Ayvazyan rather than doing so out of frustration.  It argues that Agent Palmerton attempted to contact Grigoryan's mother and dialed the wrong number, and that when a man picked up the phone, he believed he was speaking to Manuk Grigoryan.  Opp'n at 9-10.  This conflicts with Ayvazyan's sworn recollection that Agent Palmerton referred to him by name and conflicts with Ayvazyan's recollection that Agent Palmerton referred to Manuk in the third person repeatedly.  Dkt. 289-2 ¶¶ 6, 10.  To credit Agent Palmerton's version of events, one must believe the claims that: (1) Agent Palmerton—having just spoken with Manuk Grigoryan, *see* Dkt. 310-1 ¶ 4—did not realize that he was speaking to someone else when he called Ayvazyan; (2) after this confusing call in which Agent Palmerton was surprised by a male voice "[u]nexpectedly" answering the phone and saying they were represented by Ashwin Ram, neither Agent Palmerton nor the Assistant U.S. Attorney's thought to check the phone number Agent Palmerton had dialed; (3) Agent Palmerton then conspiciously omitted his contact with a represented

15

defendant from his FD-302 report of the event.  Individually, each of these three claims is dubious.  In combination, they are incredible.

### 3. The Government Violated Its Obligations Under *Brady* and Its Progeny and the California Rules of Professional Conduct

California Rule of Professional Conduct 3.8(d) requires timely disclosure of all "evidence or information" known to the prosecution team that the prosecutor "knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence …." *Id.* (noting that this obligation applies more broadly than *Brady*).  The dispute over whether the government has complied with its *Brady* and Rule 3.8 obligations boils down to two questions: (1) does the government have an obligation to produce evidence that a third person was responsible for the unlawful actions charged against Ayvazyan? and (2) does this case involve sufficient information that the government has an obligation to identify *Brady* material with specificity?  Although either would be sufficient to establish a violation, both answers are "yes."

Despite being told *six months ago* that information or evidence that a third person was responsible for the unlawful actions charged against Ayvazyan would be exculpatory and the discovery cut-off passing almost two months ago, the Opposition for the first time takes the novel position that the government is not obligated to produce that information and evidence.  Opp'n at 21.  The Opposition takes the position that "[s]uch information is not exculpatory" because "the charging theories in this case" allege that Ayvazyan "acted, *or caused others to act on his behalf*." *Id.*  The Opposition is plainly wrong.  First, to state the obvious, if the government alleges two theories and evidence would contradict one of them, then the evidence is exculpatory. Second, the Superseding Indictment alleges that Ayvazyan is Zhadko and that, as Zhadko, he took a number of direct actions including controlling checking accounts in the name of Iuliia Zhadko; submitting fraudulent applications in the name of Iuliia Zhadko (Overt Act No. 42); and purchasing property in the name of Iuliia Zhadko. Dkt. 154 ¶¶ 22, 33.  The government already argued to this Court that Ayvazyan was

16

responsible for certain allegedly unlawful transactions from Turing Info Solutions because the two accounts in question used Iuliia Zhadko's "unique synthetic identity." Dkt. 219 at 10-11. Evidence that someone else—not Ayvazyan—is actually taking actions in the name of Zhadko is facially and directly exculpatory.[10] This evidence exists—as shown by the government's delinquent productions from the FBI-state investigation—and the government failed its obligation to timely produce it.

The government's attempt to avoid identifying *Brady* information and evidence with particularity fares no better. Ayvazyan asked back in November 2020 for the government to "identify with particularity" all *Brady* materials before it objected; the government raised no objection until the Opposition (nearly two months after such identifications were due as part of discovery). Setting aside the failure to make a timely objection, the Opposition's argument is wholly without merit. Its argument hinges on the assertion that this case does not involve the "massive amount of discovery," at issue in *United States v. Salyer*, No. 10-cr-61, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010). As the court observed in *Salyer*, *Brady* and *Giglio* duties are on the government, not the defense. *Id.* at *5. The court held that in cases involving substantial enough disclosure, *Brady* obligations require both disclosure and identification. *Id.* at *6; *see also United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998), *rev'd in part on other grounds*, 176 F.3d 517 (D.C. Cir. 1999) ("the government cannot meet its Brady obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack.").

The Opposition argues that this case does not involve as substantial discovery as *Salyer* because there discovery involved "multiple gigabytes" of electronic information which it calculated as millions of pages but also two storage containers of documentation. Opp'n at 22 n.14. Contrary to the Opposition's argument, this case

---

[10] Indeed, Ayvazyan made this argument to the Court when litigating the government's second motion for a protective order. *See* Dkt. 234 at 6-7. Although the Court did not explicitly rule on the factual dispute, it denied the government's request for relief. Dkt. 258.

17

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

involves substantially *more* discovery than *Salyer*.  There are 1,000 gigabytes in 1 terabyte.  Even assuming the "multiple gigabytes" in Salyer meant "one thousands gigabytes," the government here has produced *over 20 terabytes' worth of data* including over 40 digital devices,[11] i.e., *more than twenty times as much discovery as Salyer*.[12]  Specific identification is appropriate in a case with discovery productions this substantial.

The government's objections have no merit and were waived during the six months the government sat on their hands.  The government committed misconduct by failing to produce and identify *Brady* and Rule 3.8 evidence and it should be held accountable.

### E.   The Government Flagrantly Violated the Court's Discovery Order and Compounded That Misconduct By Lying to the Court

Contrary to the government's in-court representations, the government did not comply with the March 15 discovery order.  The Opposition misrepresents Ayvazyan's position by claiming it relies on reading the discovery order to impose a "blanket prohibition" on producing discovery after March 15; to the contrary, the discovery order permits production of discovery after March 15 in "extraordinary circumstances." Dkt. 105.  The problem is that the government committed misconduct by unilaterally deciding that "extraordinary circumstances" is so capacious that it includes discovery regarding the individuals, companies, and properties charged in the initial indictment back in November 2020.  The government failed to timely produce items like:

---

[11] This does not include two 10-terabyte hard drives, which the government recently requested for discovery productions and the defense provided.

[12] The government also cites to *United States v. Gross*, attempting to score political points off of the fact that the undersigned was an AUSA prosecuting that case.  Unfortunately for the government, a key fact underlying the court's determination were the facts that the defense had more than one year to review the vast majority of evidence, and that seventeen months earlier, the government had produced binders containing the "key documents" that it planned to introduce in its case-in-chief.  424 F. Supp. 3d 800, 804 (C.D. Cal. 2019).  Here, in contrast, the government has fought requests for early discovery every step of the way and refused repeated requests to identify its trial exhibits.

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

- *Brady* evidence listed above in Section I, which included evidence undercutting Ayvazyan's responsibility for the actions of various people who allegedly committed fraud, demonstrates alternative sources of income explaining purportedly PPP-related transfers, undercuts the government's assertion that the money seized from Ayvazyan is subject to forfeiture instead of return, and generally mitigates even the alleged culpability of Ayvazyan, *see supra* Section I, which was produced in part on April 26, May 3, and May 7 2021, and has not yet been produced in substantial part.

- Bank statements regarding Secureline Realty, *see* Dkt. 32 Overt Act Nos. 1-9, which were produced April 9, 2021.

- Bank statements regarding various other suspects who were not charged, which were produced April 9, 2021.

- Bank statements for Marietta Terabelian and Richard Ayvazyan, which were produced on May 3, 2021.

- Bank statements showing that other contributors to Ayvazyan's home purchase did not obtain money from PPP or EIDL loans, which were produced on May 3, 2021.

This ignores entirely the government's failures to promptly produce discovery devices including those that contain exculpatory data. *See* Dkt. 248 at 2, 9. To the extent the government has previously blamed its failures on CART, Dkt. 278 at 7 n.5, that was a misrepresentation. The recent discovery productions show that CART repeatedly processed any and all devices the government gave it within mere days. The problem was that the government waited until December 16, 2020 or later to request discovery copies of materials that had been seized on or before November 5, 2020.[13]

---

[13] DOJ_PROD_0000153655 shows a December 16, 2020 request completed by December 21, 2020. DOJ_PROD_0000153807 shows a January 4, 2021 request completed by January 7, 2021. DOJ_PROD_0000153808 shows another January 4, 2021 request completed by January 7, 2021

19

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

1    The government could have applied to the Court if it could not comply with the

2    discovery order, but instead, it decided that it did not need to comply.  The government

3    indicted a case that it was not ready to bring to trial and the result is that even when

4    given a charitable discovery cut-off with nearly four months' notice, the government

5    flagrantly violated that Court order and compounded its error by lying to the Court

6    about whether it had complied with the Court's order.

## III.    THE COURT SHOULD DISMISS THE CASE, OR IN THE ALTERNATIVE, ORDER DISCOVERY

The government's aggregated misconduct has irreparably tainted its case against

Ayvazyan and merits dismissal.  In the event that the Court does not grant this motion,

however, it should order the government to produce discovery regarding its internal

decision-making about whether and how to charge different individuals and discovery

regarding its presentation of tainted evidence to the grand jury.

### A.    The Court Should Dismiss the Case Under the Due Process Clause or Supervisory Powers

When prosecutors fail to live up to their role as representatives of a sovereignty

obligated to govern impartially with justice elevated above convictions, dismissal of an

indictment may be proper under either of two theories.  First, a "court may dismiss an

indictment on the ground of outrageous government conduct if the conduct amounts to

a due process violation." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir.

2008) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)).

The due process clause is violated when the conduct of law enforcement "violate[s] that

'fundamental fairness, shocking to the universal sense of justice' mandated by the Due

Process Clause of the Fifth Amendment.'" *United States v. Russell*, 411 U.S. 423, 431-

32 (1973) (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246

(1960).  Second, "[i]f the conduct does not rise to the level of a due process violation,

the court may nonetheless dismiss under its supervisory powers." *Chapman*, 524 F.3d

at 1084.  Supervisory power dismissals require flagrant misconduct that substantially

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

prejudices the defendant.  Dkt. 289 at 19.  Dismissal of Ayvazyan's indictments is proper under either theory, but it is particularly appropriate given the purpose of supervisory power dismissals.

Deterring prosecutorial misconduct is one of the core reasons to exercise the Court's supervisory powers.  *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206 & n.20 (C.D. Cal. 2011); *see also United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993) (emphasizing the use of supervisory power to establish and enforce standards of prosecutorial conduct).  Prosecutors need to be deterred from following the path laid out by the government in this case.

The government—having gathered key evidence by intentionally violating Ayvazyan and Terabelian's Fifth Amendment rights during the Miami airport stop— charged a case with no intention of providing a speedy trial.  Instead of heading to trial, the government empaneled a grand jury to continue gathering evidence on the indictment it had already obtained.  The government knew that it would seek a superseding indictment, which is why it held back certain allegations to ensure that it could add detail to the future superseding indictment to (wrongfully) excuse its post-indictment use of the grand jury.  When the government was ordered to produce "all outstanding discovery" by March 15, the government decided that "all" did not mean "all" (and now claims that the onus was somehow on Ayvazyan to seek relief before March 15).  The government then withheld multiple pieces of exculpatory evidence and produced substantial discovery after the discovery cut-off without proof of extraordinary circumstances.  After the Court set trial for sooner than the government would like, it tried to secure a continuance or a tactical advantage by colluding with state authorities to charge and detain Ayvazyan pending trial.

These are not actions that should be tolerated from ministers of justice.  They fall below the level of objectivity and responsibility that the justice system requires of prosecutors.  This case—no less than *Aguilar*—presents a vehicle for the Court to send a message that this sort of gamesmanship will not be tolerated.

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

**B.**     **The Court Should Order the Government to Produce Discovery Regarding Its Internal Decision-Making and Presentation of Tainted Evidence**

Discovery is necessary for two independent purposes.  First, discovery of the government's internal decision-making regarding whether and how to charge different individuals is necessary because the government has abused its prosecutorial discretion. The government has abused its prosecutorial powers for tactical gain both by holding back certain charges to gain more time to investigate at the expense of the defendants' rights and by conspiring with state authorities to bring charges after years of investigation just in time for the government to secure another tactical gain from detaining Ayvazyan.  Second, discovery of the grand jury transcripts and subpoenas is necessary because regardless of whether the government presented the suppressed phones to the grand jury, the derivative taint is far broader.

Discovery of the government's internal decision-making regarding whether and how to charge different individuals is necessary to discern the extent to which the government has abused that authority to evade the defendants' speedy trial rights, obtain continuances, and wield the grand jury's subpoena power.  Despite contemporaneously averring probable cause to believe that certain co-defendants had committed crimes or that the identity of N.T. had been "stolen," Compl. ¶¶ 26.c-.e (Dkt. 152 Ex. 11 at 68); Search Warrant App. ¶¶ 33.k, 62.d (Dkt. 152 Ex. 11 at 31, 44-45), the government held those allegations back from the Indictment and added them as part of the superseding indictment four months later, *see* Superseding Ind. Overt Act Nos. 29-31 & ¶¶ 37, 44-45 (Dkt. 154 at 18, 29-30, 36).  The government knew full well that it intended to use a superseding indictment to extend its evidence gathering process without being bound by the limitations in Fed. R. Crim. P. 16 and 17.  The substantial issues regarding the degree to which this misconduct was willful merits discovery regarding the government's internal decision-making about whether and when to charge different individuals or include different loans in charging documents.

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

Discovery of the government's internal decision-making regarding whether and how to charge different individuals is independently justified by the state charges and detention of Ayvazyan immediately after the Court rejected the government's bid to delay trial. If the government is conspiring to shape charging decisions to gain a tactical advantage, then it is both committing gross misconduct and violating the due process rights of Ayvazyan.

Discovery of the grand jury transcripts and subpoenas is merited because the ramifications of the government's Fifth Amendment violations during the Miami airport stop are not limited to the involuntarily obtained phones themselves.[14] Any use of compelled statements—including investigatory leads, influencing a witness to testify, or informing the government's theory of the case—is prohibited.[15] The Fifth Amendment prohibited the government from using the information on the Miami airport phones in any way, but based on the direct links between the tainted evidence highlighted by CBP for the government's use and the government's consequent indictment and acquisition of a CI, it is a near certainty that the government has already used the tainted evidence to build its case.

The tainted photographs taken by CBP and shared with Agent Palmerton and the rest of the government team included an array of topics that the government has since

---

[14] *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003) ("[O]ur cases provide that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."); *Kastigar v. United States*, 406 U.S. 441, 460-61 (1972) (the unlawful compulsion of evidence places an "affirmative duty" on the government "to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of compelled testimony.").

[15] *See Kastigar*, 406 U.S. at 460 ("This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing the investigation on a witness as a result of his compelled disclosures."); *United States v. Hylton*, 294 F.3d 130, 134 (D.C. Cir. 2002) ("[I]f Hylton's statements were a cause of Wright's decision to plead and testify against Hylton, Wright's testimony was impermissible even if the government had prior knowledge of Wright's role."); *see also United States v. Dudden*, 65 F.3d 1461, 1469 (9th Cir. 1995) ("If the district court finds that the government did use Dudden's immunized statements, either directly or in developing the case against her, Dudden's conviction must be set aside.").

23

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

investigated: Iuliia Zhadko; Viktoria Kauichko; N.T.; Turing Info Solutions; the Palm Desert house added to the Superseding Indictment as Residential Property 3; people who have since been interviewed by the government including the person identified by the government as its CI; Anton Kudiumov; Manuk Grigoryan; Mod Interiors; the jewelry company checks cited by the government to oppose Ayvazyan's motion to suppress and return search warrant seizures; and more.  *See* Ram Decl. Ex. B.  This evidence was tainted and neither it, *nor any evidence derived from it*, could lawfully be presented to the grand jury.  But that is exactly what appears to have occurred.

It is undisputed that "exploration of the question of taint can be made . . . by review of the prosecution's evidence and of the grand jury transcript."  *United States v. Allen*, 864 F.3d 63, 99-100 (2d Cir. 2017) (internal quotation marks and citations omitted).  Indeed, where similarities between the case at bar and another involving suppression "suggested that the grand jury transcripts contain information that is material to defendants' motion to suppress," a court in this district concluded that the defendants satisfied the required "particularized and compelling need for disclosure of the grand jury testimony at issue" and ordered disclosure.  *United States v. Flores*, No. 16-cr-833, 2017 WL 2622733, at *3 (C.D. Cal. June 13, 2017) (noting that the court has "substantial discretion" regarding grand jury transcripts and that "[b]ecause indictments have already issued, there is little reason for continuing secrecy").  In *Allen*, the grand jury transcripts revealed that an FBI agent had testified after speaking to a witness who had reviewed compelled statements.  *See* 864 F.3d at 78-79.  The court held that because the agent's testimony derived in part from a witness who had been tainted by reviewing compelled statements, the agent's testimony and consequent indictment were also tainted.  864 F.3d at 100-01 (rejecting the argument that documentary evidence insulated the grand jury's indictment from taint).

The tainted evidence in this case strongly imply that further suppression or dismissal will similarly be proper based on the grand jury's transcripts and subpoenas.  The tainted evidence includes documents related to every alleged crime in the

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

indictment and superseding indictment, including the counts added in the superseding indictment that the government claims to have investigated after the Miami airport stop. For example, the lead agent testified that exposure to the tainted evidence caused the government to conclude "that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan." Dkt. 310-6 at 24. That allegation is explicitly made in the grand jury's indictment and superseding indictment, and is the basis of nearly every allegation against Ayvazyan. As another example, after being exposed to their presence in the tainted evidence, the government investigated several of the defendants and companies added in the superseding indictment. As a third example, the government does not appear to have contacted its CI until after it was exposed to information about her in the tainted evidence. The taint appears to have stretched into every crevice of the government's case, and grand jury transcripts and subpoenas will aid in proving that appearance correct.

While the government bears the burden of disproving taint, discovery is necessary to ensure that litigation occurs via the adversarial process. The government will not be prejudiced by producing the grand jury transcripts and subpoenas, as shown by its offer to produce the grand jury transcripts for *in camera* inspection. *See* Opp'n at 8 n.4. At this point in the proceeding, with only five weeks until trial, there is no need to withhold those transcripts from the defense. They should be produced to both the Court and the defense along with a complete set of grand jury subpoenas to facilitate evaluation of the government's misconduct by opening it up to the adversarial process.

\*     \*     \*

The government has committed an unparalleled array of flagrant misconduct to Ayvazyan's detriment. Ayvazyan respectfully submits that dismissal is the appropriate remedy for that misconduct, but if the Court disagrees, then Ayvazyan respectfully requests that it order discovery of the government's internal decision-making regarding whether and how to charge different individuals, and discovery of the grand jury transcripts and subpoenas.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:   May 10, 2021

Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*aram@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant*
*Richard Ayvazyan*

REPLY SUPP. MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT