Ashwin J. Ram (SBN 227513)
aram@steptoe.com
Michael A. Keough (SBN 327037)
mkeough@steptoe.com
Meghan L. Newcomer (*pro hac vice*)
mnewcomer@steptoe.com
Nicholas P. Silverman (*pro hac vice*)
nsilverman@steptoe.com
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Ryan V. Fraser (SBN 272196)
rfraser@bklwlaw.com
**BIENERT KATZMAN LITTRELL WILLIAMS, LLP**
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Counsel for Defendant Marietta Terabelian*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> v. <br><br> RICHARD AYVAZYAN, MARIETTA TERABELIAN, *et al.,* <br><br> *Defendants.* | Case No.  20-cr-579 (SVW) <br><br> **DEFENDANTS RICHARD AYVAZYAN'S AND MARIETTA TERABELIAN'S JOINT NOTICE OF MOTION AND MOTION FOR A *KASTIGAR* HEARING, TO DISQUALIFY THE PROSECUTION TEAM, AND TO DISMISS** <br><br> Hon. Stephen V. Wilson <br><br> Current Hearing Date:  June 14, 2021 <br> Requested Hearing Date: June 7, 2021 <br> Time:  11:00 a.m. |

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

**NOTICE OF MOTION AND MOTION FOR *KASTIGAR* HEARING, TO DISQUALIFY THE PROSECUTION TEAM, AND TO DISMISS**

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on Monday, June 7, 2021; Monday, June 14, 2021; or as soon thereafter as this counsel may be heard in Courtroom 10A of this Court at 350 W. 1st Street, 10th Floor, Los Angeles, CA 90012, Defendant Richard Ayvazyan ("Ayvazyan") and Defendant Marietta Terabelian ("Terabelian"), through undersigned counsel, will move the Court (i) to hold a *Kastigar* hearing to confirm the government has used information directly or indirectly derived from tainted evidence, (ii) to disqualify the prosecution team, and (iii) to dismiss the case as a result of the pervasive taint caused by seven months of evidentiary and non-evidentiary use of tainted evidence.

This motion is based on this notice, the accompanying memorandum of points and authorities, the Declaration of Ashwin J. Ram in support, any reply that Ayvazyan and Terabelian may make, such other evidence and arguments as may be presented at or prior to the hearing, and all records and files in this action.

//
//
//
//
//
//
//
//
//
//
//
//

1

Dated:   May 17, 2021                    Respectfully submitted,

2

3                                        **STEPTOE & JOHNSON LLP**

4                                        */s/ Ashwin J. Ram*
                                         Ashwin J. Ram (SBN 227513)
5                                        *aram@steptoe.com*
                                         Michael A. Keough (SBN 327037)
6                                        *mkeough@steptoe.com*
                                         Meghan L. Newcomer (*pro hac vice*)
7                                        *mnewcomer@steptoe.com*
                                         Nicholas P. Silverman (*pro hac vice*)
8                                        *nsilverman@steptoe.com*
                                         633 West Fifth Street, Suite 1900
9                                        Los Angeles, CA 90071
                                         Telephone: (213) 439-9400
10                                       Facsimile: (213) 439-9599

11

12

13                                       *Counsel for Defendant Richard Ayvazyan*

14                                       **BIENERT KATZMAN LITTRELL**
                                         **WILLIAMS, LLP**
15

16                                       */s/ John L. Littrell*
                                         John L. Littrell (SBN 221601)
17                                       *jlittrell@bklwlaw.com*
                                         Ryan V. Fraser (SBN 272196)
18                                       *rfraser@bklwlaw.com*
                                         601 W. 5th Street, Suite 720
19                                       Los Angeles, CA 90071
                                         Telephone: (213) 528-3400
20                                       Facsimile: (949) 369-3701
21

22

23                                       *Counsel for Defendant Marietta Terabelian*

24

25

26

27

28

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

1

# **TABLE OF CONTENTS**

I.  BACKGROUND ................................................................................................2

II. THE FIFTH AMENDMENT PLACES A HEAVY BURDEN ON THE
    GOVERNMENT TO PROVE THAT IT HAS NOT USED AND WILL
    NOT USE INFORMATION DIRECTLY OR INDIRECTLY DERIVED
    FROM TAINTED EVIDENCE................................................................................4

    A.  *KASTIGAR* APPLIES TO THE COMPELLED STATEMENTS
        FROM MIAMI INTERNATIONAL AIRPORT .........................................4

    B.  DURING THE *KASTIGAR* HEARING, THE GOVERNMENT
        MUST PROVE THAT IT HAS NOT USED AND WILL NOT USE
        ANY DIRECTLY OR INDIRECTLY DERIVED INFORMATION
        IN EITHER EVIDENTIARY OR NON-EVIDENTIARY WAYS............8

        1.  The Government Must Disprove Evidentiary Use.........................9

        2.  The Government Must Disprove Non-Evidentiary Use...............10

III. THE GOVERNMENT CANNOT MEET ITS BURDEN OF
     DISPROVING EVIDENTIARY OR NON-EVIDENTIARY USE ....................11

    A.  THE GOVERNMENT WAS EXPOSED TO A BROAD ARRAY
        OF TAINTED INFORMATION AND INCORPORATED THAT
        INFORMATION INTO ITS INVESTIGATION AND
        PROSECUTION................................................................................12

    B.  THE MAJORITY OF THE GOVERNMENT'S INVESTIGATION
        OCCURRED AFTER EXPOSURE TO TAINTED EVIDENCE.............14

IV. CONCLUSION................................................................................................17

i

1

**<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**Cases**

4

5   *Bram v. United States,*
       168 U.S. 532 (1897) ...................................................................................... 7

6

7   *Chavez v. Martinez,*
       538 U.S. 760 (2003) ...................................................................................... 5

8   *Counselman v. Hitchcock,*
9      142 U.S. 547 (1892) ...................................................................................... 5

10  *In re Grand Jury Subpoena,*
11     670 F.3d 1335 (11th Cir. 2012) ................................................................... 7

12  *In re Grand Jury Subpoena,*
13     75 F.3d 446 (9th Cir. 1996) ......................................................................... 7

14  *Greene v. Johnson,*
15     No. 12-cv-1824, 2013 WL 950788 (S.D. Cal. Feb. 4, 2013) ...................... 5

16  *Kastigar v. United States,*
       406 U.S. 441 (1972) ............................................................................. *passim*
17

18  *Malloy v. Hogan,*
       378 U.S. 1 (1964) ........................................................................................ 6
19

20  *United States v. Allen,*
       864 F.3d 63 (2d Cir. 2017) .......................................................................... 9

21  *United States v. Anderson,*
22     79 F.3d 1522 (9th Cir. 1996) ...................................................................... 6

23  *United States v. Antelope,*
24     395 F.3d 1128 (9th Cir. 2005) .................................................................... 6

25  *United States v. Benson,*
       12-cr-00480, 2015 WL 1064738 (N.D. Cal. Mar. 11, 2015) ...................... 7
26

27  *United States v. Benson,*
       No. 12-cr-00480, 2016 WL 215233 (N.D. Cal. Jan. 19, 2016) ........... *passim*
28

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

*United States v. Crowson,*
   828 F.2d 1427 (9th Cir. 1987) ............................................................. 15, 16

*United States v. Danielson,*
   325 F.3d 1054 (9th Cir. 2003) ..................................................*passim*

*United States v. Dudden,*
   65 F.3d 1461 (9th Cir. 1995) ........................................... 5, 8, 9, 10

*United States v. Gardner,*
   22 M.J. 28 (C.M.A. 1986) ........................................................... 11

*United States v. Hampton,*
   775 F.2d 1479 (11th Cir. 1985) ....................................... 8, 9, 10

*United States v. Hsia,*
   131 F. Supp. 2d 195 (D.D.C. 2001) ................................. 8, 9, 11

*United States v. Hubbell,*
   530 U.S. 27 (2000) .......................................................................... 6

*United States v. Lacey,*
   86 F.3d 956 (10th Cir. 1996) ....................................................... 11

*United States v. Mapelli,*
   971 F.2d 284 (9th Cir. 1992) ..................................................*passim*

*United States v. Mapes,*
   59 M.J. 60 (C.A.A.F. 2003) ......................................................... 11

*United States v. Montoya,*
   45 F.3d 1286 (9th Cir. 1995) ............................................ 8, 15, 16

*United States v. North,*
   910 F.2d 843 (D.C. Cir. 1990) ...................................................... 9

*United States v. North,*
   920 F.2d 940 (D.C. Cir. 1990) ...................................................... 9

*United States v. Oriho,*
   969 F.3d 917 (9th Cir. 2020) ........................................................ 7

*United States v. Patane,*
   542 U.S. 630 (2004) .................................................................. 5, 6

iii

*United States v. Schmidgall,*
   25 F.3d 1523 (11th Cir. 1994) ....................................................................... 9

*United States v. Schwimmer,*
   882 F.2d 22 (2d Cir. 1989)........................................................................... 11

*United States v. Semkiw,*
   712 F.2d 891 (3d Cir. 1983) ........................................................................ 11

*United States v. Zielzinsky,*
   740 F.2d 727 (9th Cir. 1984) ........................................................................ 9

**Statutes**

18 U.S.C. § 6002 ........................................................................................... 5, 6

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3      In its April 27, 2021 Order, the Court held that the government violated the Fifth

4   Amendment by unlawfully compelling Richard Ayvazyan and Marietta Terabelian to

5   provide phone passcodes.  The Court therefore suppressed the core of the government's

6   case against Ayvazyan and Terabelian: cell phones and digital devices containing over

7   500,000 pages of data (or the equivalent thereof).  The government therefore bears the

8   affirmative duty of disproving *any* use of either the compelled statements or any

9   information or evidence directly or indirectly derived from those statements.  *Kastigar*

10  *v. United States*, 406 U.S. 441, 462 (1972) (emphasizing that this is a "heavy burden").

11  The prohibition on using tainted information or evidence applies to both use at trial and

12  use in front of the grand jury, and applies to both evidentiary use and non-evidentiary

13  use, including, but not limited to, assisting in focusing the investigation, deciding to

14  initiate prosecution, refusing to plea bargain, interpreting evidence, and generally

15  planning trial strategy.

16      Under the circumstances of this case, it will be impossible for the government to

17  carry its heavy burden of proof.  The tainted evidence was seized at the outset of the

18  investigation, before the government conducted the vast majority of evidentiary review

19  or witness outreach.  Within two days of the unlawful seizure, the government's case

20  agent testified to the crucial importance of the tainted evidence in altering the

21  government's theory of the case.  Since then the government has sworn out affidavits,

22  filed indictments, and submitted briefs to this Court arguing that altered theory.  It

23  stands to reason that the government has likewise issued tainted subpoenas and

24  conducted tainted investigation based on that altered theory.

25      The case agent's testimony, however, does not stand alone.  The unlawful seizure

26  of now-suppressed electronic devices returned a broad array of tainted evidence, some

27  of which was photographed by border officers and sent to the government's trial team,

28  including, for example, the name and contact information for the witness that the

1

government would later approach and reference to the Court as its "inside witness," *see* Apr. 2, 2021 Hr'g Tr. at 25 (Dkt. 289-4).  The tainted evidence is also connected to multiple allegations in the indictment and counts added to the superseding indictment reflecting newly investigated loans, companies, and defendants.  *See infra* § III.A.  The government refused to substantively respond to the defendants' May 7 request for information regarding the extent and scope of the taint, *see* Ram Decl. Ex. A, B,[1] but it appears that the taint of the October 19, 2020 misconduct enveloped the government's case theory, team, and investigation.  The result is that there is no way for the government to separate the pre-October 19 portions of its case theory and trial planning from the tainted portions, and when combined with the practical impossibility of disqualification under the circumstances, dismissal is simply inevitable.

## I.    BACKGROUND

This case began on June 16, 2020 as an investigation of three individuals, Iuliia Zhadko, T.P., and V.A., in response to a referral from Wells Fargo—contrary to the government's in-court representations that the case began in response to an expert's audit of SBA files for hallmarks of fraud, *see* Apr. 2, 2021 Tr. at 15 (Dkt. 289-4).[2] Ayvazyan became a "subject" two months later because he purchased a home using contributions from multiple people, including Zhadko, and because he had previously been considered a "possible participant" in a mortgage fraud investigation that the FBA closed in 2019.  *See* Reply Supp. Mot. to Dismiss for Prosecutorial Misconduct at 11-12 (Dkt. 329); Aug. 4, 2020 Email from Justin Palmerton to Christopher Fenton et al. (Dkt. 310-3).  Two months after that, on October 19, 2020, the government executed a pretextual stop[3] of Terabelian and Ayvazyan.  *See* Mot. to Suppress at 3-4 (Dkt. 130).

---

[1] Citations to "Ram Decl." refer to the Declaration of Ashwin Ram filed concurrently with this motion.

[2] *See* Ram Decl. Ex. C (DOJ_PROD_0000151831).  T.P. and V.A. were not indicted.

[3] The Court later held that this pretextual stop would have been unlawful if Ninth Circuit law applied but did not require suppression based on the Eleventh Circuit location of the search.  Apr. 27, 2021 Order at 6, 14 (Dkt. 296).

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

1   Although the government's request targeted Terabelian, *see* Dkt. 133-6, Ayvazyan was
2   stopped as well.

3       Terabelian and Ayvazyan were then detained, isolated, and repeatedly
4   interrogated and searched.  *See* Apr. 27, 2021 Order at 15-16 (Dkt. 296).  Their
5   repeated requests for counsel were ignored or denied.  *Id.* at 15.  After several hours of
6   detention, the Customs and Border Patrol officers (under the direction of the FBI and
7   Agent Palmerton) coerced Terabelian and Ayvazyan into sharing passcodes to the
8   phones in their possession.  The officers spent hours searching the phones, during
9   which they viewed an unknown number of files and took photographs of approximately
10  141-196 files.  Those 141-196 photographs were transmitted to Agent Palmerton and
11  the rest of the government team along with the seized phones themselves.[4]  On
12  November 16, 2020, Agents Palmerton and Zellhart reviewed an unknown number of
13  files from the seized phones and took 65 additional photographs.  Ram Decl. Ex. D.
14  Except for producing the photographs from CBP, the government has refused to
15  substantively respond to questions regarding which files were analyzed or seized, but it
16  appears to be a bare minimum of 206.

17      These seized images have appeared in government submissions and been
18  referenced by the government during oral argument.  *See, e.g.*, Dkt. 152 Ex. 8; Dkt. 219
19  Ex. 4, 5, 6, 7, 8, 9, 10, 11; Apr. 2, 2021 Hr'g Tr. at 10-36 (Dkt. 289-4).  Moreover, the
20  seized images had a material effect on the government's investigation and prosecution.
21  On an immediate level, Ayvazyan transformed from a "subject" suspected of receiving
22  money from Zhadko to an arrestee suspected of *being* Zhadko.  *See* Oct. 22, 2020 Hr'g
23  Tr. at 23-24 (Dkt. 310-6) (testimony of Agent Palmerton attributing this conclusion to a
24  specific set of images on a seized device).  This tainted case theory made its way into
25  the indictment, the superseding indictment, and the government's submissions to this

26

---

27  [4] The government refused to substantively respond to Ayvazyan's May 7 inquiry seeking a list of who
    accessed tainted files on which dates, *see* Ram Decl. Ex. A, B, which is necessary information with
28  respect to any further transmission of the tainted files or derivative taint.

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

Court.  The government's suspicions about Ayvazyan were not the only taint from its Fifth Amendment violations.  As more fully described below in § III.A, the tainted evidence about Zhadko did not stand alone.  Instead, the government received and reviewed tainted evidence about a bevy of subjects including charges in the original indictment, charges later added to the superseding indictment, defendants added to the superseding indictment, the witness who would later be approached by the government and become its confidential informant, and other material information.

Compelling Terabelian and Ayvazyan to divulge their passcodes violated their Fifth Amendment rights.  Because it happened so early in the investigation and its effects were not contained, the taint had nearly *seven months* to spread and infect everyone and everything involved in the investigation and prosecution.[5]

On May 7, 2021, Ayvazyan wrote to the government seeking discovery on the extent of the derivative taint that has infected the government's case.  Ram Decl. Ex. A.  The government refused to voluntarily respond to the substance of Ayvazyan's letter, and instead replied on May 17, 2021 that it "disagree[s] that [*Kastigar*] applies here."  Ram Decl. Ex. B.  This motion followed.

## II.    THE FIFTH AMENDMENT PLACES A HEAVY BURDEN ON THE GOVERNMENT TO PROVE THAT IT HAS NOT USED AND WILL NOT USE INFORMATION DIRECTLY OR INDIRECTLY DERIVED FROM TAINTED EVIDENCE

### A.    *Kastigar* Applies to the Compelled Statements from Miami International Airport

The Fifth Amendment's Self-Incrimination Clause is "self-executing" (unlike the Fourth Amendment), and the Supreme Court has instructed that "those subjected to coercive police interrogations have an *automatic* protection from the use of their

---

[5] While defendants have no burden to stop evidentiary taint from spreading, Ayvazyan and Terabelian informed the government early on—even before indictment—that the Miami airport stop violated their Fourth and Fifth Amendment rights.  Their motions to suppress were delayed until March 8, 2021 because the government refused to make timely disclosure of discovery from CBP and did not even request that discovery until January 2021.  *See* Reply Supp. Mot. to Dismiss at 6-8 (Dkt. 329).

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

1  involuntary statements (or evidence derived from their statements) in any subsequent

2  criminal trial." *United States v. Patane*, 542 U.S. 630, 639-40 (2004) (quoting *Chavez*

3  *v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion)).

4          The scope of the Fifth Amendment's automatic protection was established in

5  *Kastigar v. United States*, 406 U.S. 441 (1972). *Kastigar* held that the Fifth

6  Amendment prohibits the government from using testimony or other information

7  compelled by the government "or any information directly or indirectly derived from

8  such testimony or other information." *Id.* at 453 ("We hold that [this proscription] is

9  coextensive with the scope of the privilege against self-incrimination….").[6]  Under the

10  Fifth Amendment, the government cannot use compelled testimony as an investigatory

11  lead, to focus the investigation, or "in any respect" whatsoever. *Id.* at 460. The Court

12  described this prohibition as "total"; "sweeping"; and "comprehensive." *Id.*

13          The *Kastigar* Court further held that it is the government that bears the "heavy

14  burden" of affirmatively proving that it has not violated this total prohibition on use or

15  derivative use and that "all of the evidence it proposes to use was derived from

16  legitimate independent sources," that must be "wholly independent of the compelled

17  testimony." *Id.* at 460, 461-62. "Before trial, the government must prove the

18  independent sources [of any evidence it intends to use] by a preponderance of the

19  evidence" at a *Kastigar* hearing. *United States v. Dudden*, 65 F.3d 1461, 1468 (9th Cir.

20  1995) (vacating sentence due to lack of *Kastigar* hearing); *see Greene v. Johnson*, No.

21  12-cv-1824, 2013 WL 950788, at *17 (S.D. Cal. Feb. 4, 2013) ("The government must

22

---

23  [6] Although *Kastigar* arose in the context of interpreting the formal immunity statute (18 U.S.C. §
24  6002), the Supreme Court held that the statute's prohibition on direct or indirect use of compelled
testimony or derivative information "is coextensive with the scope of the [Fifth Amendment]
25  privilege." *Id.* at 458 ("This protection coextensive with the privilege is the degree of protection that
the Constitution requires…."); *see also Counselman v. Hitchcock*, 142 U.S. 547, 585-586 (1892)
26  (holding that a previous immunity statute violated the Fifth Amendment's privilege against self-
incrimination because it "does not supply a complete protection from all the perils against which the
27  constitutional prohibition was designed to guard …. In view of the constitutional provision a statutory
enactment, to be valid, must afford absolute immunity against future prosecution for the offence to
28  which the question relates.").

5

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

prove the independent nature of its sources before trial by a preponderance of the evidence and a *Kastigar* hearing is usually required to determine if the government has met its burden.").

The Ninth Circuit has stated plainly: "If a defendant's statements were compelled in violation of the Fifth Amendment, he is entitled to a *Kastigar* hearing." *United States v. Anderson*, 79 F.3d 1522, 1526 (9th Cir. 1996); *accord United States v. Antelope*, 395 F.3d 1128, 1141 n.5 (9th Cir. 2005) (holding that for a defendant compelled to disclose information to a counselor, "The scope of the immunity should be consistent with the Supreme Court's opinion in *Kastigar*"). The Supreme Court has been equally clear in its discussion of the interconnectivity between different Fifth Amendment issues. *See Patane*, 542 U.S. at 640 (noting that the prohibition on use and derivative use applies to "those subjected to coercive police interrogations"); *United States v. Hubbell*, 530 U.S. 27, 45 (2000) ("Given our conclusion that respondent's act of production had a testimonial aspect, at least with respect to the existence and location of the documents sought by the Government's subpoena, respondent could not be compelled to produce those documents without first receiving a grant of immunity under § 6003. As we construed § 6002 in *Kastigar*, such immunity is coextensive with the constitutional privilege."). In fact, *Kastigar*'s holding was explicitly based on the Supreme Court's assertion that there is "no justification in reason or policy" for according greater protections to immunized testimony than coerced statements, implying that coerced statements receive the same protection it held was sufficient for immunized testimony. *Kastigar*, 406 U.S. at 462. This Court has already held that the defendants' statements were compelled in violation of the Fifth Amendment because they were "actually coerced" and "not voluntary."[7]  *Kastigar* and the Fifth Amendment's derivative use prohibition therefore apply.

---

[7] Coercion or involuntariness is the standard for whether a statement is "compelled" and therefore implicates the Fifth Amendment's Self-Incrimination Clause. *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) ("Under this test, the constitutional inquiry is … whether the confession was free and voluntary; that

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

1    This logic played out in a recent case from this circuit involving compelled

2    statements during a competency interview (ordered at the defendant's request).  *See*

3    *United States v. Benson*, No. 12-cr-00480, 2016 WL 215233, at *1 (N.D. Cal. Jan. 19,

4    2016).  There, the court held that "[a]lthough the defendant failed to invoke the Fifth

5    Amendment prior to submitting to his interviews with [the examining doctor], the Court

6    subsequently held that the statements were compelled and therefore entitled to use and

7    derivative use immunity."  *Id.* (citing *United States v. Benson*, 12-cr-00480, 2015 WL

8    1064738, at *4 (N.D. Cal. Mar. 11, 2015)).  Similarly, the Ninth Circuit has considered

9    the rights of potential suspects who had been compelled to give statements under threat

10   of loss of employment.  *See In re Grand Jury Subpoena*, 75 F.3d 446, 447 (9th Cir.

11   1996).  The court held that as with compulsion by immunity, compulsion of these

12   statements required *Kastigar* protection against improper use.  *Id.* at 448; *see also*

13   *United States v. Oriho*, 969 F.3d 917, 929 (9th Cir. 2020) ("[T]he self-incrimination

14   privilege extends, not just to evidence that might be used in the government's case-in-

15   chief, but to all evidence that might provide a 'link in the chain of evidence' in any

16   future criminal proceeding[.]")); *In re Grand Jury Subpoena*, 670 F.3d 1335, 1350-53

17   (11th Cir. 2012) (holding that *Kastigar* immunity was necessary to compel production

18   of decryption password).

19

20

21

22   _____

23   is, it must not be extracted by any sort of threats or violence, nor obtained by any direct or implied
     promises, however slight, nor by the exertion of any improper influence. … In other words the person
24   must not have been compelled to incriminate himself." (internal quotation marks and citations
     omitted)); *Bram v. United States*, 168 U.S. 532, 542 (1897) ("In criminal trials, in the courts of the
25   United States, wherever a question arises whether a confession is incompetent because not voluntary,
     the issue is controlled by that portion of the Fifth Amendment to the constitution of the United States
26   commanding that no person 'shall be compelled in any criminal case to be a witness against
     himself.'"); *see Kastigar*, 406 U.S. at 462  ("[A] defendant raising a coerced-confession claim under
27   the Fifth Amendment must first prevail in a voluntariness hearing before his confession and evidence
     derived from it become inadmissible.").

28

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

**B.**   **During the *Kastigar* Hearing, the Government Must Prove That It Has Not Used and Will Not Use Any Directly or Indirectly Derived Information In Either Evidentiary or Non-Evidentiary Ways**

At a *Kastigar* hearing, the government bears the "heavy burden" of proving by a preponderance "that 'all of the evidence it proposes to use,' and all of its trial strategy, were 'derived from legitimate independent sources.'"  *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (quoting *Kastigar*, 406 U.S. at 460).[8]  In addition to this prospective burden of proof, the government must "demonstrate that 'none of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony[.]'"  *United States v. Hampton*, 775 F.2d 1479, 1489 (11th Cir. 1985).  "The particular proof that will satisfy the government's 'heavy burden,' … [varies] from case to case…."  *Danielson*, 325 F.3d at 1072.  But "the mere assertion by the government of 'the integrity and good faith of the prosecuting authorities' is not enough. … Rather, the government must present evidence" to carry its burden.  *Id.*; *see United States v. Mapelli*, 971 F.2d 284, 288 (9th Cir. 1992).

The onus is on the government to disprove both evidentiary (§ II.B.1 *infra*) and non-evidentiary (§ II.B.2 *infra*) uses of the tainted information.  The government must prove that it did not use the tainted information or any derivative information *in any respect*, including but not limited to:

- To interpret evidence, focus the investigation, develop pre-trial strategy, or to build a case;[9]

---

[8] *Danielson* involved the intentional use of a confidential informant to gather information about the defendant's trial strategy (under the guise of gathering information about new crimes) in violation of the Sixth Amendment.  The Ninth Circuit's discussion of *Kastigar* hearings was part of its holding because it was instructing the district court on remand to conduct a hearing consistent with the *Kastigar* standard.

[9] *See, e.g.*, *Dudden*, 65 F.3d at 1467; *Benson*, 2016 WL 215233, at *2; *see also Kastigar*, 406 U.S. at 460; *United States v. Montoya*, 45 F.3d 1286, 1293 (9th Cir. 1995) ("The focus of the inquiry under *Kastigar* is whether the immunized testimony was in any way used to build a case against [the defendants].");  *United States v. Hsia*, 131 F. Supp. 2d 195, 202 (D.D.C. 2001).

8

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

- As an investigatory lead or to uncover other evidence;[10]
- To identify, prepare, refresh, or in any way impact the statement of a witness;[11]
- To decide to initiate prosecution;[12]
- To present evidence or testimony to the grand jury;[13]
- To refuse to plea bargain;[14]
- To plan or adjust trial strategy such as case theory, anticipating defenses, selecting exhibits, making witness decisions, or planning examinations.[15]

In short, the government must prove that there was no "link in the chain" involving tainted evidence and that Ayvazyan and Terabelian will be left "in substantially the same position" as if their Fifth Amendment rights had never been violated.  *See Kastigar*, 406 U.S. at 462.

### 1.    The Government Must Disprove Evidentiary Use

At the entry-level, *Kastigar* requires that the government prove that "all of the evidence it proposes to use" and all of the evidence it in fact used in front of the grand jury was derived from wholly independent sources.  *Danielson*, 325 F.3d at 1072 (quoting *Kastigar*, 406 U.S. at 460); *Hampton*, 775 F.2d at 1489.  "Wholly independent" is a high bar.  "[T]he government must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted."  *United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994) (citing *Hampton*, 775 F.2d at 1489).

---

[10] *See, e.g.*, *Kastigar*, 406 U.S. at 460; *Dudden*, 65 F.3d at 1467; *Hsia*, 131 F. Supp. 2d at 202.

[11] *See, e.g.*, *United States v. North*, 910 F.2d 843, 860-63 ("*North I*"), *on pet. for reh'g*, 920 F.2d 940 (D.C. Cir. 1990) ("*North II*"); *Hampton*, 775 F.2d at 1488; *see also United States v. Allen*, 864 F.3d 63, 93 (2d Cir. 2017).

[12] *See, e.g.*, *Danielson*, 325 F.3d at 1072; *Dudden*, 65 F.3d at 1467.

[13] *See, e.g.*, *United States v. Zielzinsky*, 740 F.2d 727, 733 (9th Cir. 1984); *Hampton*, 775 F.2d at 1485 (11th Cir. 1985).

[14] *See, e.g.*, *Danielson*, 325 F.3d at 1072; *Hsia*, 131 F. Supp. 2d at 202.

[15] *See, e.g.*, *Danielson*, 325 F.3d at 1072; *Mapelli*, 971 F.2d at 287; *Dudden*, 65 F.3d at 1467; *Benson*, 2016 WL 215233, at *4.

9

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

This inquiry proceeds item-by-item, witness-by-witness, and line-by-line.  The government must make an affirmative showing that no grand jury or trial witnesses were identified as a result of the tainted information, no grand jury or trial testimony was shaped or altered as a result of the tainted information, and no grand jury or trial exhibits were obtained, reviewed, interpreted, or used as a result of the tainted information.  *See, e.g.*, *Danielson*, 325 F.3d at 1072; *Dudden*, 65 F.3d at 1467; *Hampton*, 775 F.2d at 1489 (government must make "an affirmative showing of an independent source required for each and every item of evidence" that will be presented at trial or was presented to the grand jury).  Put simply, the government must prove that the tainted evidence had no effect on the evidence and testimony it has now used or plans to use.

### 2.    The Government Must Disprove Non-Evidentiary Use

The government does not only have an obligation to prove that all of its evidence derives from independent sources; "it must [also] show that … all of its pre-trial and trial strategy was based on independent sources. Strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal." *Danielson*, 352 F.3d at 1074; *see Mapelli*, 971 F.2d at 287 ("The statute expressly proscribes use of information indirectly derived from immunized testimony, not just direct use of the immunized testimony itself. The proscribed indirect use includes planning trial strategy." (internal quotation marks and citation omitted)); *Dudden*, 65 F.3d at 1467 ("The government may not use the statements to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy.").  As noted in the lengthy list above, non-evidentiary use includes every part of the process of building a case against the defendants.

10

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

1    This case involves a wealth of tainted evidence revealed early in the

2    government's investigation.  The Fifth Amendment violation occurred early in the

3    investigation and has infected both the case agents and government counsel.  After the

4    taint spread throughout the government's case, the government conducted the vast

5    majority of its investigation including document review and analysis, witness

6    identification and interviews, and returning two separate indictments.  To Ayvazyan

7    and Terabelian's knowledge, the government did not create any canned memoranda or

8    transcripts that will cure the broad taint that infected those uses.

## III.   THE GOVERNMENT CANNOT MEET ITS BURDEN OF DISPROVING EVIDENTIARY OR NON-EVIDENTIARY USE

    The government bears the burden of proving that the case agents and

prosecutors—**all of whom were exposed to tainted evidence and had their case**

**theories shaped by it**—will not make even non-evidentiary use of that knowledge or

those case theories.  Under ordinary circumstances, the government's only hope to

avoid dismissal from this level of taint would be to disqualify all prosecutors and case

agents and replace them with a new group.[16]  While there is no *per se* rule requiring

---

[16] *See, e.g.*, *Benson*, 2016 WL 215233, at *4 (holding that the government's trial team had to be disqualified because it could not prove that it would not make "adjustments to trial strategy in light of knowledge of [tainted] statements"); *United States v. Semkiw*, 712 F.2d 891, 895 (3d Cir. 1983) (holding that the government failed to disprove non-evidentiary use of the tainted evidence in part because the trial prosecutor "had 'access' to the compelled testimony"); *United States v. Lacey*, 86 F.3d 956, 972 (10th Cir. 1996) (holding that no *Kastigar* violation occurred because the government assigned the retrial to a prosecutor who had not been exposed to tainted evidence); *United States v. Schwimmer*, 882 F.2d 22, 26 (2d Cir. 1989) (advising the government to ensure that prosecutors involved in the retrial were not exposed to tainted testimony in order to avoid non-evidentiary use of compelled testimony—such as "focusing additional investigation, planning, cross-examination, or otherwise generally mapping a strategy for retrial"); *United States v. Gardner*, 22 M.J. 28, 32 (C.M.A. 1986) (emphasizing that trial judge disqualified prosecutor exposed to tainted evidence and advising future advocates "to ensure that, whenever possible, handling of a subsequent prosecution of an immunized witness is entirely removed from any personnel involved in obtaining the immunized testimony"); *Hsia*, 131 F. Supp. 2d at 201-02 (holding that government committed *Kastigar* violation in large part "because it took no steps at all to insulate" a supervisor exposed to a summary of tainted testimony from Hsia's case, such as replacing that supervisor).  Indeed, two of the four factors weighed by the U.S. Court of Appeals for the Armed Forces relate to whether the government was able to avoid exposing the investigation or prosecution team to the tainted information.  *See United States v. Mapes*, 59 M.J. 60 (C.A.A.F. 2003).

11

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

withdrawal, "[t]he government … often protects against a claim of indirect use by assigning the case to others not exposed and barring communication between them and the prosecutors who obtained the compelled testimony."  *Mapelli*, 971 F.2d at 287-88 (vacating conviction because the government failed to carry its burden of proof that it "made no indirect use of [tainted] testimony").  In this case, however, even disqualification of the prosecution team would be insufficient.  Even if the prosecution team is disqualified, any witness tainted (including by information exchanged with these prosecutors and case agents) would require a *Kastigar* hearing to ensure that their testimony is not tainted by their derivative exposure to tainted evidence.

### A. The Government Was Exposed to a Broad Array of Tainted Information and Incorporated that Information into Its Investigation and Prosecution

The government took an enormous gamble by intentionally directing and conducting a pretextual border stop at the Miami airport on October 19, 2020.  It has now lost that gamble, *see* Apr. 27, 2021 Order (Dkt. 296), and the taint of the Miami airport stop has permeated the government's case over the last seven months.

As discussed in Ayvazyan's Reply in Support of the Motion to Dismiss for Prosecutorial Misconduct, the government's lead case agent testified under oath two days after seizing the tainted evidence about the importance of the tainted evidence to the government's theory of the case:

Question: My question is how do you know that Mr. Ayvazyan and Miss Terabelian were the ones who actually filed these applications through the computer?

Agent Palmerton: For some of the applications filed under the name Iuliia Zhadko, the funds were deposited into a bank account. From there, the funds float into an escrow account. And in reviewing the records from that escrow company, there was an e-mail from a Richard Ayvazyan that appeared to be directing the flow of funds from that bank account.  And

12

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

then, **once the CBP stopped for the secondary inspection, we learned**
**that there was a photograph of Iuliia Zhadko on the digital device and**
**we made the connection that Iuliia Zhadko was, in fact, an alias of**
**Richard Ayvazyan**.

Oct. 22, 2020 Hr'g Tr. at 23-24 (Dkt. 310-6) (emphasis added); *see also* Compl.
Palmerton Aff.  ¶ 41 (Dkt. 1) ("CBP also conducted a manual search of Terabelian's
cellphone for digital contraband and discovered text messages in which Terabelian
appeared to be using the identity of 'Viktoria Kauichko' to communicate with others.").
These tainted allegations made their way into both the indictment and the superseding
indictment, which allege that Ayvazyan is responsible for the acts of Zhadko and that
Ayvazyan and Terabelian are responsible for the acts of Kauichko.  *See* Reply Supp.
Mot. to Dismiss for Prosecutorial Misconduct at 10-11 (Dkt. 329).

The taint is not limited, however, to the government's theory of the case
regarding Ayvazyan and Terabelian.  Indeed, the government has *already* used tainted
evidence against both them and their co-defendants.  In its March 15, 2021 Opposition
to the Motion to Suppress and March 29, 2021 *Ex Parte* Application for a Modified
Protective Order, the government used the following tainted photographs:

- N.T.'s credit cards (he was later added to the Superseding Indictment as an alleged victim of identity theft and related substantive counts);
- An email containing contact information for the person who later became the government's confidential informant and who was not approached by the government until months later;
- Identification cards belonging to Anton Kudiumov who was later alleged to be an alias of Manuk Grigoriyan in the Superseding Indictment;
- Handwritten notes listing account numbers, log in credentials, and other information related to accounts owned by Viktoria Kauichko, some of which appear to be associated with allegedly fraudulent PPP loans;
- Iuliia Zhadko's identification cards;

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

1      • Viktoria Kauichko's identification cards.

2   Dkt. 152 Ex. 8; Dkt. 219 Ex. 4, 5, 6, 7, 8, 9, 10, 11.

3          The government's exposure to tainted evidence goes much further than the above

4   list of filing attachments.  As summarized in Ayvazyan's May 7 letter, the government

5   also reviewed tainted evidence regarding topics added to the superseding indictment,

6   including but not limited to Terabelian allegedly posing as Viktoria Kauichko, Turing

7   Info Solutions, the sale of Residential Property 3 (as referenced in the superseding

8   indictment), a photograph of co-defendant Manuk Grigoriyan and his contact

9   information, and applications and debit cards related to Mod Interiors.  *See* Dkt. 329-4

10  (listing the relevant document ID ranges).  Even this list—based solely on the

11  photographs taken by CBP and sent to the FBI or prosecutors—is only the tip of the

12  iceberg.  CBP and other parts of the government team have likely viewed a substantial

13  number of other files and used those files (whether consciously or not) as part of their

14  investigation during the seven months it has had the tainted information and evidence in

15  its possession.  The government has the burden of proving that did not occur.

16      **B.    The Majority of the Government's Investigation Occurred After
17             Exposure to Tainted Evidence**

18          The majority of the government's investigation occurred after the government

19  compelled Ayvazyan and Terabelian's statements in violation of the Fifth Amendment.

20  The government has spent months telling Ayvazyan and Terabelian that its

21  investigation was ongoing.  *See, e.g.*, Dkt. 278 at 1 ("The government put defendant on

22  notice that he was subject to ongoing investigation").  The government's opposition to

23  Ayvazyan's motion to enforce this Court's discovery order argued repeatedly that it had

24  continued investigating after indicting Ayvazyan.  For example, the government

25  claimed that it had "continued its investigation into the pandemic fraud ring" and

26  "continued its investigation even as grand juries were suspended in this District because

27  of COVID-19 from December 2020 into February 2021."  Dkt. 278 at 4.  The

28  government claimed this continued investigation resulted in productions that "were

                                              14
MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

substantially larger than earlier productions because they included information relating to the 150-plus loans, new companies, new money laundering charges, and the four newly-charged defendants that were the subject of the First Superseding Indictment." Even now, the government describes its investigation as "ongoing" despite the taint (*see* Dkt. 307 at 2).

What the government previously believed were winning arguments in defense of its late productions in violation of this Court's discovery cutoff are now admissions that the superseding indictment was procured with tainted evidence. As discussed above, Agent Palmerton formed his theory of this case based on the evidence found as a result of the compelled statements and the government at large thereafter adopted that theory of the case. Like a virus, the tainted information derived from compelled statements appears to have spread throughout the government teams, infecting both investigatory and prosecution decisions. As *Danielson* warned, tainted evidence has plagued the trial strategy of the prosecutors, worming their way into in-court submissions and both the original and superseding indictment.

Given the difficulty of proving that compelled statements have not indirectly affected the prosecution's trial strategy as required by Ninth Circuit law, dismissal is inevitable. The recent *Benson* case from the U.S. District Court for the Northern District of California involving a defendant who was compelled to answer questions during a competency interview is once again instructive. During the two-day *Kastigar* hearing in *Benson*, the government submitted exhibits, a declaration from its lead investigator, and testimony claiming "prior independent sources of evidence relating to each statement made by [the defendant]." 2016 WL 215233, at *1. The magistrate judge and district court judge agreed that the government's submissions were insufficient to carry the government's heavy burden to disprove derivative use. In particular, the court reviewed the Ninth Circuit authority on the issue of non-evidentiary use, comparing *United States v. Crowson*, 828 F.2d 1427 (9th Cir. 1987); *United States v. Mapelli*, 971 F.2d 284 (9th Cir. 1992); *United States v. Montoya*, 45

15

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

F.3d 1286 (9th Cir. 1995); and *United States v. Danielson*, 325 F.3d 1054 (9th Cir. 2003):

- In *Crowson*, "as here, the criminal investigation was 'substantially completed' by the time the testimony was received, [but] the testimony there largely involved authentication of documents which themselves served as prior independent sources…."

- In *Mapelli*, the Ninth Circuit held that the trial court "erred in denying a defendant's motion to disqualify prosecutors who had been exposed to her immunized testimony and might have improperly used it to plan trial strategy." *Id.* It was insufficient for the government to argue that it would not use the testimony to plan strategy; it had to prove that fact.

- In *Montoya*, the government carried its burden because the government proved that the tainted prosecutor's involvement was limited to a pre-indictment request to prosecute and that the government's new prosecutor had not been exposed to any of the immunized statements.

- In *Danielson*, the Ninth Circuit stated that under the *Kastigar* standard, the government must show that all of its evidence and all of its trial strategy were derived from legitimate independent sources.

2016 WL 215233, at *2. The *Benson* court therefore concluded that "binding precedent does indeed cover non-evidentiary uses, including adjustments to trial strategy in light of knowledge of such statements." *Id.* at *4. The district court judge therefore disqualified the prosecutors in order to ensure that the immunized statements were not put to non-evidentiary use in preparing for trial. *Id.* The facts of this case compare favorably with those of *Benson*. Unlike *Benson*, the investigation here was not "substantially complete" when the government was exposed to tainted evidence. Here, the government compelled statements near the outset of its investigation. In addition, the tainted evidence not only formed a significant portion of the government's overall evidence, it also consisted of some of the government's strongest evidence in support of

16

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

its theory of the case.  The government will not be able to carry its heavy burden of proof that this evidence was not used in developing its case.

## IV.    CONCLUSION

The Fifth Amendment violation has infected this case since the moment it occurred, and it is too late to excise the taint now.  The Court should hold a *Kastigar* hearing, disqualify the prosecution team, and dismiss the case.

Dated:   May 17, 2021                 Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Meghan L. Newcomer (*pro hac vice*)
*mnewcomer@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

**BIENERT KATZMAN LITTRELL WILLIAMS, LLP**

*/s/ John L. Littrell*
John L. Littrell (SBN 221601)
*jlittrell@bklwlaw.com*
Ryan V. Fraser (SBN 272196)
*rfraser@bklwlaw.com*
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Counsel for Defendant Marietta Terabelian*

17
MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL

## SIGNATURE ATTESTATION

Pursuant to Local Rule 5-4.3.4(a)(i), the filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

MOTION FOR *KASTIGAR* HEARING, DISQUALIFICATION, AND DISMISSAL