Ashwin J. Ram (SBN 227513)
aram@steptoe.com
Michael A. Keough (SBN 327037)
mkeough@steptoe.com
Meghan L. Newcomer (*pro hac vice*)
mnewcomer@steptoe.com
Nicholas P. Silverman (*pro hac vice*)
nsilverman@steptoe.com
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

John L. Littrell (SBN 221601)
jlittrell@bklwlaw.com
Ryan V. Fraser (SBN 272196)
rfraser@bklwlaw.com
**BIENERT KATZMAN LITTRELL
WILLIAMS, LLP**
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Counsel for Defendant Marietta Terabelian*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>RICHARD AYVAZYAN,<br>MARIETTA TERABELIAN,<br>*et al.,*<br><br><br>*Defendants.* | Case No.  20-cr-579 (SVW)<br><br>**DEFENDANTS RICHARD AYVAZYAN'S AND MARIETTA TERABELIAN'S NOTICE OF MOTION AND JOINT MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE THE TRIAL TO HOLD A PRE-TRIAL *KASTIGAR* HEARING**<br><br>Hon. Stephen V. Wilson<br><br>Current Hearing Date:   June 28, 2021<br>Requested Hearing Date: June 14, 2021<br>Time:                          11:00 a.m. |

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

1

**NOTICE OF MOTION AND MOTION TO DISMISS FED. R. CRIM. P. 12(B)**

2

**OR CONTINUE THE TRIAL TO HOLD A PRE-TRIAL *KASTIGAR* HEARING**

3

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

4        PLEASE TAKE NOTICE that Defendant Richard Ayvazyan ("Ayvazyan") and

5   Defendant Marietta Terabelian ("Terabelian"), through undersigned counsel, hereby

6   move the Court (i) to dismiss the original and first superseding indictments (the

7   "indictments") because they are defective by virtue of their evidentiary and non-

8   evidentiary use of tainted information, or, in the alternative, (ii) to continue the June 15,

9   2021 trial date approximately three weeks in order to hold a pre-trial *Kastigar* hearing

10  regarding the non-evidentiary and evidentiary use that has already occurred consistent

11  with the pre-trial hearing in *United States v. Kilroy*, 27 F.3d 679 (D.C. Cir. 1994).

12       This motion is based on this notice, the accompanying memorandum of points

13  and authorities, any reply that Ayvazyan and Terabelian may make, such other evidence

14  and arguments as may be presented at or prior to the hearing, and all records and files in

15  this action.

16  Dated:   May 30, 2021                    Respectfully submitted,

17                                           **STEPTOE & JOHNSON LLP**

18                                           */s/ Ashwin J. Ram*

19                                           Ashwin J. Ram (SBN 227513)
                                             *aram@steptoe.com*

20                                           Michael A. Keough (SBN 327037)
                                             *mkeough@steptoe.com*

21                                           Meghan L. Newcomer (*pro hac vice*)

22                                           *mnewcomer@steptoe.com*
                                             Nicholas P. Silverman (*pro hac vice*)

23                                           *nsilverman@steptoe.com*

24                                           633 West Fifth Street, Suite 1900
                                             Los Angeles, CA 90071

25                                           Telephone: (213) 439-9400

26                                           Facsimile: (213) 439-9599

27

28

1

2        *Counsel for Defendant Richard Ayvazyan*

3

4

5        **BIENERT KATZMAN LITTRELL**
         **WILLIAMS, LLP**

6
         */s/ John L. Littrell*
7        John L. Littrell (SBN 221601)
         *jlittrell@bklwlaw.com*
8        Ryan V. Fraser (SBN 272196)
         *rfraser@bklwlaw.com*
9        601 W. 5th Street, Suite 720
         Los Angeles, CA 90071
10       Telephone: (213) 528-3400
         Facsimile: (949) 369-3701
11

12
         *Counsel for Defendant Marietta Terabelian*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

# **TABLE OF CONTENTS**

I.   THE COURT SHOULD DISMISS THE INDICTMENTS UNDER FED.
     R. CRIM. P. 12(B)(3)(A) AND 12(B)(3)(B) BECAUSE THE
     INDICTMENTS ARE DEFECTIVE .................................................................3

     A.   The Indictments Are Tainted By Evidentiary Use of Information
          Directly or Indirectly Derived From Compelled Statements ......................5

     B.   The Indictments Are Tainted by Non-Evidentiary Use of
          Information Directly or Indirectly Derived from Compelled
          Statements.................................................................................................9

II.  IN THE ALTERNATIVE, THE COURT SHOULD CONTINUE THE
     TRIAL FOR A PRE-TRIAL *KASTIGAR* HEARING CONSISTENT
     WITH *UNITED STATES V. KILROY*..........................................................11

     A.   A Pre-Trial Hearing Is Merited by the *United States v. Kilroy* Case
          Cited in the Court's May 21 Order.............................................................12

     B.   The Defendants Will Be Prejudiced By Proceeding to Trial Without
          Resolving the Non-Evidentiary Use and Evidentiary Use of Tainted
          Information That Has Already Occurred ....................................................14

III. CONCLUSION.............................................................................................17

i

1

## MEMORANDUM OF POINTS AND AUTHORITIES

In its April 27, 2021 Order, the Court held that the government violated the Fifth Amendment by unlawfully compelling Richard Ayvazyan and Marietta Terabelian to provide phone passcodes during an extended, multi-hour, interrogation.  The Court therefore prohibited the government from using any of the 500,000 pages of data from the phones that it had unlawfully obtained.  In its May 21, 2021 Order, the Court held that *Kastigar v. United States* applies to the suppressed evidence, and that the government therefore bears the affirmative duty of disproving *any* use of either the compelled statements or any information or evidence directly or indirectly derived from those statements.  *See* May 21, 2021 In-Chambers Order at 3, Dkt. 356 ("Where there is actual coercion, however, defendants are afforded the full panoply of Fifth Amendment protection."); *Kastigar v. United States*, 406 U.S. 441, 462 (1972) (emphasizing that this is a "heavy burden").  The prohibition on using tainted information applies not just to the investigation and at trial, but to the indictments obtained in this case.  Setting aside the question of trial evidence, the government cannot disprove evidentiary or non-evidentiary use of the tainted information to obtain the indictments.

The government cannot disprove non-evidentiary use of tainted information to obtain the superseding indictment, which alleges a conspiracy to submit "at least 151" fraudulent loan applications.  On May 21, the government disclosed the list of 151 applications forming the basis of the grand jury's allegation.  Of the 151 loan applications, at least 83 have already been directly linked to people or entities present in the tainted evidence already known to have been reviewed by the government (counting only those people or entities mentioned in the tainted photographs taken by CBP or the FBI, excluding derivative taint and taint from other reviews of the devices).  The grand jury inevitably received that tainted evidence and returned a tainted indictment.  Similarly, during the May 21 hearing, the government disclosed that the grand jury's indictments rest not on percipient witness testimony (which may or may not be tainted

1

based on exposure to tainted information) but rather on agent testimony, despite the fact that the agents in this case received tainted information beginning over *seven months ago* and have baked into their decision-making and thought processes a tainted interpretation of the facts.

Even if the government could disprove evidentiary use (which it cannot), *Kastigar* prohibits *non-evidentiary use* of tainted information, and the government has already demonstrated that such use occurred.  At a minimum, the government has testified and sworn out a complaint showing that the roots of its theory that Ayvazyan and Terabelian are Iuliia Zhadko and Viktoria Kauichko are the unconstitutionally compelled statements and derivative evidence thereof.  That proof is sufficient to dismiss this case right now.

Ayvazyan and Terabelian therefore move to dismiss the defective indictment under Fed. R. Crim. P. 12(b).  Rule 12(d) requires that such motions be decided before trial absent good cause, and we understand that the Court was previously willing to defer such a ruling until after trial based on the defendants' request to go to trial on June 15, 2021.  To the extent that a brief continuance of approximately three weeks is necessary to obtain a pre-trial *Kastigar* hearing and determination of the effect of the violation of Ayvazyan and Terabelian's Fifth Amendment rights, the defendants hereby consent to and request that continuance.

Litigating the *Kastigar* issue before trial—or at least the portion of the tainted use that has already occurred—is consistent both with the case law cited by the Court's May 21, 2021 Order and the efficient use of judicial resources.  As noted in the Court's Order, the D.C. Circuit lauded the district court's practice in *United States v. Kilroy*, 27 F.3d 679 (D.C. Cir. 1994).  *See* In-Chambers Order at 4, Dkt. 356 (citing *Kilroy* in support of a post-trial hearing being the more appropriate vehicle for resolving *Kastigar* issues after the record became concrete).  The *Kilroy* court's practice, however, was to hold a **pre-trial *Kastigar* hearing on the taint in the investigation and indictment process**, and then hold a post-trial *Kastigar* hearing on the taint in the trial evidence.

The *Kilroy* practice would ensure that the parties, the Court, and the jurors can avoid the burden and prejudice of an unnecessary trial. The defendants therefore alternatively request that the Court continue the trial approximately three weeks, follow the laudable practice of the *Kilroy* court, and hold a pre-trial *Kastigar* hearing that will ensure that the defendants are not victimized by the government's unconstitutional use of tainted information.

## I. THE COURT SHOULD DISMISS THE INDICTMENTS UNDER FED. R. CRIM. P. 12(B)(3)(A) AND 12(B)(3)(B) BECAUSE THE INDICTMENTS ARE DEFECTIVE

The government's statements during the May 21 hearing confirm that the indictments are defective and must be dismissed before trial under Fed. R. Crim. P. 12(b)(3)(A) (requiring pretrial motion for defect in instituting the prosecution including error in the grand jury proceeding) and 12(b)(3)(B) (requiring pretrial motion for defect in the indictment). The indictments are defective because they are tainted by both evidentiary use and non-evidentiary use of information directly or indirectly derived from compelled statements.

In the leading case of *United States v. North*, the D.C. Circuit explained that—unlike indictments based on hearsay evidence—"what is prohibited and unconstitutional under the Fifth Amendment and *Kastigar* is the *very presentation of the immunized testimony*. Where immunized testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed, they are one and the same." 910 F.2d 843, 868-69 (*North I*), *on pet. for reh'g*, 910 F.2d 940 (D.C. Cir. 1990) (emphasis in the original). Where testimony compelled in violation of the Fifth Amendment is presented to the grand jury, "the grand jury process itself is violated and corrupted, and the indictment becomes indistinguishable from the constitutional and statutory transgression." *Id.* at 869. *Kastigar* prohibits use of tainted evidence or tainted information. "There is no antecedent or prior wrong to be remedied, but *use* is a wrong that goes to the quick of the indictment." *Id.* (emphasis added).

3

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

The *North I* court put the government to its proof on the content and sources of each grand jury witnesses' testimony:

> For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the [prosecutor] in questioning the witness. This burden may be met by establishing that the witness was never exposed to North's immunized testimony, or that the allegedly tainted testimony contains no evidence not 'canned' by the prosecution before such exposure occurred. Unless the District Court can make express findings that the government has carried this heavy burden as to the content of all of the testimony of each witness, that testimony cannot survive the *Kastigar* test. We remind the prosecution that the *Kastigar* burden is 'heavy' not because of the evidentiary standard, but because of the constitutional standard: the government has to meet its proof only by a preponderance of the evidence, but any failure to meet that standard must result in exclusion of the testimony.

*Id.* at 872.

The Eleventh Circuit reached a similar conclusion five years earlier in *United States v. Hampton*, 775 F.2d 1479 (11th Cir. 1985).  There, Hampton testified to a state grand jury and provided documents pursuant to a subpoena and participated in immunized interviews ultimately leading indirectly to the indictment and guilty plea of a co-conspirator.  *Id.* at 1480, 1482 n.12.  Hampton's testimony and documents were later turned over to federal agents, who (unaware that Hampton's statements were protected by the Fifth Amendment) were also briefed by the state investigators.  *Id.* at 1480.  Although the federal prosecutors were not shown to have read the compelled statements, they received and relied upon investigative summaries and briefings prepared by tainted agents.  *See id.* at 1481, 1483 (noting also "[a prosecutor] also conceded that the federal agents upon whom he relied had received the state materials and used them to work up leads in the case some two years before the agents became aware that there were immunity problems with some of the state information.").

The Eleventh Circuit held that "in order to sustain Hampton's indictment, the government had the burden of establishing that all of the evidence presented to the

4

grand jury[] … was derived from legitimate, independent sources." *Id.* at 1485 ("*Kastigar* and *Murphy* emphasize that, as a matter of constitutional imperative, "[state-immunized] testimony and its fruits may not be used in any manner by federal officials in connection with a criminal prosecution" against the previously-immunized witness." (citing *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 (1964); *Kastigar*, 406 U.S. at 441))).  The court concluded that "the government plainly did not carry its burden" by pointing to two pre-compulsion unimmunized statement.  *Id.* at 1486.  Although the unimmunized statements provided a prior independent source of some allegations, the court rejected the "faulty notion" that the government could satisfy its *Kastigar* burden by establishing independent sources for "a portion of the evidence that may have been considered by the indicting grand jury."  *Id.* at 1489.  Instead, *Kastigar* and its progeny required dismissal of the indictment "unless the government can demonstrate that *none* of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony."  *Id.* (emphasis in the original, cleaned up).

The government must show that "each and every item of evidence presented to the indicting grand jury" and "[e]ach step of the investigative chain" is free of taint.  *Id.* at 1489-90.  In this case, dismissal is proper because the government cannot carry its burden to show that grand jury testimony and the resulting indictments are free of taint from either evidentiary or non-evidentiary use of information directly or indirectly derived from compelled statements.  Indeed, the opposite is true:  the government has all but conceded the use of such tainted information in the grand jury process itself.

### A.    The Indictments Are Tainted by Evidentiary Use of Information Directly or Indirectly Derived From Compelled Statements

Dismissal is proper because the indictments on their faces rely on tainted information.  On Friday, May 21, 2021, the government revealed two new categories of information about how far that taint spread into the first superseding indictment.

First, the government revealed a chart of the 151 loans shown to the grand jury and alleged to be attributable to Ayvazyan and Terabelian as part of a conspiracy.  *See*

5

Superseding Ind. ¶ 32, Dkt. 154; Ram Decl. Ex. A (loan chart).  Within a week, Ayvazyan and Terabelian were able to identify 83 of the 151 loans as potentially tainted by prohibited evidentiary or non-evidentiary use of data photographed by the government.[1]  Specifically, Ayvazyan and Terabelian have already found references in the tainted evidence to 58 individuals or entities associated with loans charged in the indictment including 16 individuals or entities explicitly named in the indictments[2] and 42 individuals or entities included in the superseding indictment's reference to "151 or more loans."[3]  The grand jury heard evidence and argument about each of these 58 individuals or entities and that evidence and argument violated the defendants' Fifth Amendment rights.

If the indictment was untainted, the government would respond to this motion with a declaration to the Court, swearing under penalty of perjury that each of the above-referenced allegations was proven to the grand jury solely by untainted evidence.

---

[1] The government has refused to respond to Ayvazyan's May 7, 2021 and May 20, 2021 discovery requests.  *See* Dkt. 353-1.  This information is necessary to litigate the extent of the taint and the government has a history of destroying evidence despite defense requests.   The defendants have pushed for this information since May 7 (and would have done so sooner if the state government members of the prosecution team had not arrested Ayvazyan immediately after the Court's suppression ruling issued).  While the defendants accept the Court's position that Ayvazyan should have moved for a hearing before the government responded, this discovery is material to the constitutional question of taint.  The government must prove that each link in the "investigatory chain" was free of taint to sustain the indictment.  *Hampton*, 775 F.2d at 1489-90.  The defendants therefore respectfully request that the Court order the government to produce the requested discovery.

[2] Anton Kudiumov; Artur Ayvazyan; Fiber One Media, Inc.; Iuliia Zhadko; Manuk Grigoryan; Marietta Terabelian; Mod Interiors; Nazar Terabelian; Redline Auto Mechanics; Richard Ayvazyan; Runyan Tax Service Inc.; Tamara Dadyan; Time Line Transport; Top Quality Contracting; Turing Info Solutions; Viktoria Kauichko.

[3] Anastasia Baranovska; Anastasia Rysik; Anna Manukyan; Annandale Nursery; Apex Health and Safety Consultants; Armen Injijian; Arsa Medical Wholesale Inc.; Arshak Sarukhanyan; Artavasd Ginosyan; Artem Serba; Artem Zherdov; Bayview Consulting; Camilo Amaya; Classic Nursery; Comfort Diagnostics Inc.; EM Construction; EM Jewelry; Fadehaus Barbershop; Fetch Industries, Inc.; Gagik Khachatryan; GAZ Construction; Gevorg Boyrazyan; Greenshop Hydro Inc.; Greg Zadikov; Journeyman Construction; KGG Home; Lilia Turcan; Liubov Podoba; Liudmyla Kopytova; LK Design; Long Canyon Nursery; Manukyan Construction; MD Acquisition Services; Misak Arakelyan; Mykhail Diuzhenko; Nelson's Nursery; New World Empire Trading Inc.; Oleksandr Moroz; Radgistics Inc.; TM Events Inc.; Turcan Tours; US Medical Supply Inc.

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

But the government will not provide that declaration because it cannot.  The taint for some allegedly fraudulent loans is more obvious than others (even without the constitutionally compelled *Kastigar*-related discovery that the government has yet to produce).  For example:

- During their November 13, 2020 review of the tainted information, S.A. Palmerton and S.A. Zellhart took a photograph of a PPP loan application update for a loan to Annandale Nursery.  Ram Decl. Ex. B (DOJ_PROD_0000002008).  Ten days later, on November 23, 2020, the government began searching SBA records and printing information about Annandale Nursery.  *See* Ram Decl. Ex. C (DOJ_PROD_0000078852; DOJ_PROD_0000078853; DOJ_PROD_0000078854).

- During their November 13, 2020 review of the tainted information, S.A. Palmerton and S.A. Zellhart took a photograph of an identification card for Camilo Amaya.  Ram Decl. Ex. D (DOJ_PROD_0000104877).  That day, the government searched SBA records and printed information about Amaya.  Ram Decl. Ex. E (DOJ_PROD_0000079767; DOJ_PROD_0000079377; DOJ_PROD_0000079378).  Ten days later, on November 23, 2020, the government again searched SBA records and printed information about Amaya.  *Id.*

- During their November 13, 2020 review of the tainted information, S.A. Palmerton and S.A. Zellhart took a photograph of an identification card for Lilia Turcan.  Ram Decl. Ex. F (DOJ_PROD_0000104878).  On December 11, 2020 and December 14, 2020, prosecutor Julian Andre and S.A. Palmerton issued multiple subpoenas for information about Turcan.  Ram Decl. Ex. G (DOJ_PROD_0000137140; DOJ_PROD_0000129747).

- On October 19, 2020, CBP took a photograph of a credit card belonging to Gevorg Boyrazyan and sent it to the government, who later used it in a submission to the Court.  *See* Dkt. 152 Ex. 8 at 12.  On January 5, 2021, the

7
MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

1    government began searching SBA records and printing information about Gevorg

2    Boyrazyan's application on behalf of Bayview Consulting.  Ram Decl. Ex. H

3    (DOJ_PROD_0000079164; DOJ_PROD_0000079165).

4    These examples are merely representative, not exhaustive, but each relates to the use of

5    tainted information to return the superseding indictment.  A similar pattern is present

6    with respect to other loans because the government *prioritized the tainted evidence* as

7    an investigatory lead and presented the results to the grand jury.

8         The defendants are aware of no case that deferred a *Kastigar* hearing until after

9    trial where it had been so conclusively demonstrated before trial that the grand jury's

10   indictment rested on prohibited uses of tainted information. Second, the government

11   confirmed at the May 21 hearing that the grand jury proceedings relied on agent

12   testimony, not percipient witnesses.  The agents were exposed to tainted information by

13   October 22, 2020 at the latest and were subject to pervasively tainted evidence as part

14   of their review of: (a) nearly 200 tainted files photographed by CBP or the FBI; (b) the

15   November 13, 2020 review of tainted files on the raw devices (conspicuously four days

16   before the indictment was returned); (c) the post-indictment review—which *prioritized*

17   reviewing the tainted devices, *see* Dkt. 363-5 ¶ 8.a (under seal); and (d) undisclosed use

18   of the tainted devices.  These tainted devices were what the government chose to

19   review and rely upon.  All of that review and investigation was tainted from the start.

20        The government's recent revelations about the importance of tainted information

21   in securing the indictments comes against a backdrop of other tainted charges:

22   •   The superseding indictment alleges that Ayvazyan and Terabelian stole the

23       identity of Nazar Terabelian and applied for loans in his name.  Superseding Ind.

24       ¶¶ 33, 45.  Before the Miami search, the government believed that Nazar

25       Terabelian was a potential relative or co-conspirator, not an alleged victim.  *See*

26       Dkt. 133-6 (under seal) (listing Nazar Terabelian as a "Known Associate" and

27       not knowing his precise relationship to the defendants).  After the Miami search,

28       however, the government was exposed to tainted evidence including files

8

depicting at least three credit cards owned by Nazar Terabelian (each of which predated his death).

- The superseding indictment alleges that Ayvazyan and Terabelian are part of a conspiracy with, and therefore allegedly culpable for certain actions of, Manuk Grigoryan and his alleged alias Anton Kudiumov. Superseding Ind. ¶¶ 6, 26, 32-33, Dkt. 154. Before the Miami search, the government did not list Grigoryan or Kudiumov as a "Known Associate." *See* Dkt. 133-6 (under seal). After the Miami search, however, the government was exposed to tainted evidence including Kudiumov's identification cards, Kudiumov's contact information, a phone used by Kudiumov, a photograph of Manuk Grigoryan, and contact information for Manuk Grigoryan.

*       *       *

The government has not and cannot disprove this degree of taint. The indictments are hopelessly infected by the government's evidentiary use of tainted information, meriting dismissal.

## B.   The Indictments Are Tainted by Non-Evidentiary Use of Information Directly or Indirectly Derived from Compelled Statements

As the Ninth Circuit has repeatedly emphasized, *Kastigar* prohibits the government from making non-evidentiary use of tainted information. *United States v. Benson*, No. 12-cr-480, 2016 WL 215233, at *4 (N.D. Cal. Jan. 19, 2016) (providing overview of Ninth Circuit cases); *see, e.g.*, *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995) ("The government may not use the statements to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy."); *United States v. Mapelli*, 971 F.2d 284, 287 (9th Cir. 1992) ("The statute expressly proscribes use of information indirectly derived from immunized testimony, not just direct use of the immunized testimony itself. The proscribed indirect use includes planning trial strategy." (internal quotation marks and citation omitted)). Even though the government's refusal to produce

9

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

1    discovery has limited the record, *see* Joint Motion for *Kastigar* Hearing,

2    Disqualification, and Dismissal at 11-17, Dkt. 338; Opp'n to App'n for Recon. at 1-3,

3    14-16, Dkt. 351, the existing record contains enough non-evidentiary use to require

4    dismissal.

5        The indictments' "charging theory is that 'Iuliia Zhadko' is a fake identity that

6    Defendant used as an alias to commit crimes … ."[4]  Before those indictments were

7    returned, however, S.A. Palmerton effectively testified that the very theory referenced

8    was tainted by information from the Miami airport stop: "once the CBP stopped for the

9    secondary inspection, we learned that there was a photograph of Iuliia Zhadko on the

10   digital device and we made the connection that Iuliia Zhadko was, in fact, an alias of

11   Richard Ayvazyan."[5]  Before the Miami search, the government did not even view the

12   ties between Zhadko and Ayvazyan to be sufficient to mention Zhadko's name in the

13   request for CBP secondary screening.  *See* Dkt. 133-4 (under seal) (CBP agents

14   referencing Zhadko as "his side piece" allegedly based on interview but not recalling

15   his name); Dkt. 133-6 (under seal) (summary from S.A. Palmerton omitting any

16   reference to Zhadko as a potential identity).  After the Miami search, however, the

17   government was exposed to tainted evidence including files depicting Zhadko's license,

18   Zhadko's social security card, mortgage information for Zhadko's property (referenced

19   in the indictments as Residential Property 2), and one of Zhadko's debit cards.

20       Similarly, the indictments are tainted by the theory that "Viktoria Kauichko" is

21   "Terabelian's alias" and that Kauichko's conduct is attributable to Terabelian.  *See,*

22   *e.g.*, Ind. ¶ 2, 17, 23, Dkt. 32; Superseding Ind. ¶ 3, 23, 33, Dkt. 154.  Before the Miami

---

23   [4] Opp'n to Mot. to Dismiss for Prosecutorial Misconduct at 17 n.11 (Dkt. 310); *see also* App'n for

24   Modified Protective Order at 10-11 (Dkt. 219) (arguing government's case theory that Zhadko is "the
     unique synthetic identity belonging to defendant R. Ayvazyan").  The indictments allege that

25   Ayvazyan is "also known as … Iuliia Zhadko" and that Zhadko's conduct is attributable to Ayvazyan
     because Zhadko is "Ayvazyan's alias."  *See, e.g.*, Ind. ¶¶ 1, 16, 23, Dkt. 32; Superseding Ind. ¶ 2, 22,

26   33, 58, Dkt. 154.

27   [5] Oct. 22, 2020 Hr'g Tr. at 23-24, Dkt. 310-6; *see also* Compl. ¶ 41, Dkt. 1 (alleging that this
     "photograph of Iuliia Zhadko" was "a digital image of a CADL in the name of 'Iuliia Zhadko' bearing

28   Ayvazyan's address").

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

search, the government did not even view the ties between Kauichko and Terabelian to be sufficient to mention Kauichko's name in the request for CBP secondary screening. *See* Dkt. 133-6 (under seal) (summary from S.A. Palmerton omitting any reference to Kauichko as a potential identity). After the Miami search, however, the government was exposed to tainted evidence including "text messages in which Terabelian" allegedly "us[ed] the identity of Viktoria Kauichko to communicate with others" (Compl. ¶ 41, Dkt. 1), files depicting handwritten notes on account numbers, log-in credentials, and information related to accounts owned by Kauichko, and identification cards belonging to Kauichko.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD CONTINUE THE TRIAL FOR A PRE-TRIAL *KASTIGAR* HEARING CONSISTENT WITH *UNITED STATES V. KILROY*

The government will not be able to carry its heavy burden of proving that no link in the chain of its investigation, indictment, or prosecution made non-evidentiary use of tainted information. Unlike cases in which non-evidentiary use is in question, here, the government has conceded such use under oath, and its submission to the Court studiously avoided the topic altogether. Nor will the government be able to prove that no link in the chain of its investigation, indictment, or prosecution made evidentiary use of tainted information. A *Kastigar* hearing will therefore result in a finding that the government has violated the Fifth Amendment. The question is whether the Court, jurors, and the parties should wait until after trial—a prejudicial dress rehearsal trial in which the defendants' strategic and evidentiary options would be constrained by their desire to protect their Fifth Amendment rights—to address Fifth Amendment violations that have *already, indisputably occurred*. The evidence admitted at trial is not necessary to conclude that the government has made prohibited use of tainted information in the process of its investigation and indictment.

The defendants respectfully submit that continuing the trial date approximately three weeks to facilitate a pre-trial *Kastigar* hearing is proper—at least on the issues of non-evidentiary and evidentiary use of tainted information in pursuing the investigation

11

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

and seeking the indictments consistent with the case law cited by the Court's May 21, 2021 In-Chambers Order,[6] which bifurcated a *Kastigar* hearing into a pre-trial hearing on pre-trial violations and a post-trial hearing on trial violations. Understanding that their ability to proceed to trial on June 15, 2021 is in tension with their right not to have compelled statements used against them to initiate criminal proceedings and that one of those interests must yield, the defendants respectfully request that the Court continue trial approximately three weeks to hold a pre-trial *Kastigar* hearing.[7]

### A. A Pre-Trial Hearing Is Merited by the *United States v. Kilroy* Case Cited in the Court's May 21 Order

In its May 21 Order, the Court favorably cited *United States v. Kilroy*, in which the district court bifurcated the *Kastigar* hearing into two parts: (1) a three-day pre-trial hearing regarding prohibited use of tainted information to obtain a grand jury indictment, *see id.* at 686-87; *United States v. Kilroy*, 769 F. Supp. 6, 8 n.2, 10 n.7 (D.D.C. 1991), and (2) a post-trial hearing regarding prohibited use of tainted information at trial, *see Kilroy*, 27 F.3d at 687. The pre-trial *Kastigar* hearing culminated in the district court's holding that the indictment was not tainted because the prosecution's use of a prophylactic wall[8] ensured that the sole source of evidence before

---

[6] After initially setting the *Kastigar* hearing for before trial, May 18, 2021 In-Chambers Order, Dkt. 341, the Court issued a second May 21, 2021 In-Chambers Order, Dkt. 356 in which it held that a *Kastigar* hearing was required but that given the lack of time to hold a *Kastigar* hearing before the June 15, 2021 trial—a trial date that was originally set at the defendants' request over the government's objection and request for an August 24, 2021 trial date, *see* Dkt. 264 ("the government respectfully requests that the Court continue the trial date to August 24, 2021"), Dkt. 267—a post-trial hearing would be the most prudent course of action.

[7] This would be the defendants' first request for a continuance, if necessary and however short. The Court has granted two continuances at the government's request over the opposition of the defendants. In addition to the *Kastigar* issues meriting a continuance, a continuance would similarly be necessary if the Court denies the defendants' motion to suppress and the government is permitted to use seized versions of the digital devices obtained on November 5, 2020. *See* Joint Motion to Exclude Digital Device Files at 14, Dkt. 363 (noting that it would be potentially impossible to adequately prepare if the government dumps a set of newly seized data from the digital devices).

[8] The *Kilroy* fact pattern involved an investigation that effectively segregated taint and avoided the type of spread in this case. In short, defendant Kilroy provided compelled statements to Las Vegas

---

12

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

1   the grand jury was not exposed to any tainted information.  *Id.* at 686.  A trial was

2   therefore necessary to resolve the remaining *Kastigar* issues.  The D.C. Circuit

3   complimented the wisdom of this *Kastigar* procedure.  27 F.3d 679, 687 (D.C. Cir.

4   1994).

5       In *Kilroy*, only the question of *trial taint* was deferred until after trial and, even

6   then, it was accompanied by a "preliminary determin[ation on] the question of trial

7   evidence, deciding no doubt wisely, to take that question [*of trial evidence*] up once

8   again when the record became concrete and not merely predictive."  *Id.*  Here, the grand

9   jury's indictment *is* tainted and a pre-trial hearing like the one in *Kilroy* will confirm

10  that fact.

11      This is not a case like most.  In most cases—including *Kilroy*, *Benson*, *United

12  States v. Connolly*, No. 16-cr-370, Dkt. 145 (S.D.N.Y. Oct. 19, 2017) (setting pre-trial

13  *Kastigar* hearing because of concerns about indictment's use of indirectly tainted

14  information), and *United States v. Gardner*, 22 M.J. 28, 32 (C.M.A. 1986)

15  (emphasizing that trial judge disqualified prosecutor exposed to tainted evidence and

16  advising future advocates "to ensure that, whenever possible, handling of a subsequent

17  prosecution of an immunized witness is entirely removed from any personnel involved

18  in obtaining the immunized testimony")—prosecution teams are either able to wall off

19  tainted information or the prosecutors and agents infected by tainted information are

20  removed and replaced.  Here, the taint pervaded the prosecution team *during the

21  investigation and both of the grand juries*.  Tainted FBI agents testified to the grand

22

23  prosecutors as part of a plea negotiation.  Contemporaneously with the Las Vegas case, a National
24  Council of Senior Citizens audit in Washington D.C. led to a civil investigation by the Department of
    Labor and an AUSA from the U.S. Attorney's Office in Washington D.C.  Both the Department of
25  Labor and AUSA were "told 'nothing substantive'" about the Las Vegas statements.  *Kilroy*, 769 F.
    Supp. at 10.  From the beginning of the AUSA's investigation, he "cautioned everyone involved in the
26  DOL's investigation of the need for an 'independent source' of evidence against Kilroy should they
    decide to prosecute him …, and to avoid any 'taint' resulting from exposure to information derived in
27  any fashion from Kilroy's debriefings or immunized testimony."  *Id.*  Despite avoiding exposure to
    any "substantive" tainted information, the AUSA recused himself from the case before trial out of an
28  abundance of caution.  *Id.* at 11.

1   jury about their tainted opinions about the case.  Trial evidence is unnecessary to

2   answer the question of whether the indictment or the investigation made

3   unconstitutional use of tainted information.

### B.   The Defendants Will Be Prejudiced By Proceeding to Trial Without Resolving the Non-Evidentiary Use and Evidentiary Use of Tainted Information That Has Already Occurred

7   Even if this Court grants the defendants' motion to dismiss after trial, that will

8   not repair the prejudice of having to stand trial on a tainted indictment where the

9   government is allowed evidentiary and non-evidentiary use of tainted information.

10  Federal criminal trials are naturally resource-intensive burdens on the Court, jurors, and

11  parties.  Unnecessary trials are not in anyone's interest and should be avoided.  *See*

12  *United States v. Bulger*, 928 F. Supp. 2d 294, 300 (D. Mass. 2013) ("Conversely, a

13  finding that defendant's prosecution is barred by a valid grant of immunity would

14  prevent an unnecessary trial and the expenditure of considerable public resources.

15  Under these circumstances, it would present a disservice to judicial economy and the

16  orderly administration of justice [to continue with a potentially unnecessary trial].");  *cf.*

17  *United States v. Moskow*, 588 F.2d 882, 888 (3d Cir. 1978) (noting that unnecessary

18  trials delay the administration of justice and drain financial resources);  *United States v.*

19  *Matthews*, 1992 WL 429967, at *3 (E.D. Wash. Oct. 19, 1992) ("The net result is that

20  Matthews, the government and the Court were all prejudiced by the burden of an

21  unnecessary trial.").  The cost of an unnecessary trial is particularly salient and worthy

22  of avoidance as we enter the tail-end of the COVID-19 pandemic with its attendant

23  protocols and burdens—financial, physical, and mental.  Here, there is no reason to

24  proceed with a trial that would likely be unnecessary and where any conviction would

25  be vacated by a post-trial *Kastigar* hearing.

26  Holding a trial now would impose unique burdens that would unfairly prejudice

27  Ayvazyan and Terabelian.  This prejudice would infect every part of trial: by forcing

28  Ayvazyan and Terabelian to expend their resources to focus on *Kastigar* issues rather

14

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

than their own defense; by preventing them from offering an adequate defense while the government takes advantage of tainted information; and by revealing defense strategy to the government so that it can adjust its case for a second trial.

Ayvazyan and Terabelian will be stuck in limbo, required to spend trial focused on preserving issues for the *Kastigar* hearing instead of defending against the substantive allegations. The government has not produced the discovery necessary to understand the breadth of the tainted information's infection of the government, *see* note 1 *supra*, so the defendants must object to every government exhibit, argument, and witness as potentially tainted. The defendants must spend their time focused on *Kastigar* issues implicated by evidence and testimony rather than their substantive defense. Defending against *Kastigar* violations presents a different set of issues from defending a substantive case; it focuses on issues related to exposure to tainted evidence instead of which inferences can be drawn from the evidence.

Nor can Ayvazyan and Terabelian offer the exculpatory aspects of the government's tainted evidence—for example, that the list of 151 loans plainly encompasses more than a single conspiracy and reveals that someone else used one of Ayvazyan's former businesses to apply for three loans. Ayvazyan and Terabelian need to be able to respond to allegations like this, but they quite simply cannot do so without risking their Fifth Amendment protection. Ayvazyan and Terabelian cannot offer other documents or communications present on their cell phones—beyond the ~200 documents already known to be tainted—without risking a government argument that they have waived an argument that those additional files were tainted. Ayvazyan and Terabelian cannot testify in their own defense because that would open the door for potential questions about the Miami airport stop, the cell phones in their possession, and the compelled statements that were made that could provide a hook for the government to argue a future prosecution could make use of the tainted devices.[9]

---

[9] Post-conviction dismissal of the indictment would give rise to double jeopardy issues, *see Martinez*

15

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

1  Instead of defending themselves, Ayvazyan and Terabelian will be forced to sit idly and
2  endure the non-evidentiary and evidentiary use of tainted information in violation of
3  their Fifth Amendment rights.  And all the while, Ayvazyan and Terabelian are at risk
4  that the government will delete search logs (as they did with video evidence from the
5  Miami airport stop), memoranda, and records of how the taint spread among the
6  government's broad prosecution team.

7         To the extent that Ayvazyan and Terabelian reveal any of their evidence, defense
8  theory, and arguments, they will be weakening their case at a second trial.  The element
9  of surprise is one of the few procedural advantages accorded to federal criminal
10 defendants, who otherwise find the rules stacked against them.  Ayvazyan and
11 Terabelian are left with the choice between sailing into Scylla or Charybdis: either
12 (a) the defendants can disclose their best case at a first trial and allow the government to
13 use tainted information and possibly tainted evidence in response, leading to a potential
14 conviction and a second trial where the government has a "sneak peek" at the defense's
15 case, or (b) the defendants can sit through a two-week trial in federal court during
16 which the government advances an unopposed case and the defendants are left with a
17 hope that the post-trial *Kastigar* hearing will go their way.  *Kastigar* protections are
18 mean to ensure that a witness is "left 'in substantially the same position' vis-à-vis the
19 government 'as if the witness had claimed the Fifth Amendment privilege'" and said
20 nothing.  *Hampton*, 775 at 1488 (quoting *Kastigar*, 406 U.S. at 462, and noting that if
21 not, "Fifth Amendment rights would therefore be violated").  Neither choice (a) nor
22 choice (b) will leave Ayvazyan and Terabelian in substantially the same position as if
23 the government had never compelled them to speak.

24

25 *v. Illinois*, 134 S. Ct. 2070, 2072 (2014) ("[J]eopardy attaches when the jury is empaneled and
26 sworn."), and the defendants would move the Court not to permit a retrial.  In the event that the Court
   denied that motion, however, the defendants cannot risk heading into a retrial with the government
27 knowing their testimony and having a roadmap to their best evidence and arguments.  The adversarial
   criminal system provides parties with asymmetric advantages and one of the very few accorded
28 individual defendants is the right to not disclose such information ahead of time.

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

A brief continuance of approximately three weeks will enable the Court and the parties to each have their rights and interests fully vindicated. The government would have until the current June 15 trial date to produce all relevant *Kastigar* discovery and related witness testimony. And the defendants will not be put through a trial with one hand proverbially tied behind their backs. Finally, the Court and the jurors will not need to sit through a federal criminal trial that may ultimately prove unnecessary.

## III.   CONCLUSION

The Fifth Amendment violation has infected this case since the moment it occurred, and it is too late to excise the taint now. The Court should dismiss the case. If the Court does not dismiss the case, then Ayvazyan and Terabelian request a brief continuance of approximately three weeks to facilitate a pre-trial *Kastigar* hearing and ensure that neither the jurors, nor the Court, nor the parties must endure an unnecessary trial.

Dated:   May 30, 2021                   Respectfully submitted,

**STEPTOE & JOHNSON LLP**

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Meghan L. Newcomer (*pro hac vice*)
*mnewcomer@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

**BIENERT KATZMAN LITTRELL
WILLIAMS, LLP**

17

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL

1

2   */s/ John L. Littrell*
    John L. Littrell (SBN 221601)

3   *jlittrell@bklwlaw.com*
    Ryan V. Fraser (SBN 272196)

4   *rfraser@bklwlaw.com*
    601 W. 5th Street, Suite 720

5   Los Angeles, CA 90071
    Telephone: (213) 528-3400

6   Facsimile: (949) 369-3701

7

8   *Counsel for Defendant Marietta Terabelian*

9   **SIGNATURE ATTESTATION**

10         Pursuant to Local Rule 5-4.3.4(a)(i), the filer attests that all signatories listed, and

11  on whose behalf the filing is submitted, concur in the filing's content and have

12  authorized the filing.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS UNDER FED. R. CRIM. P. 12(B) OR CONTINUE TRIAL