TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
    1100/1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527/2424/3819
    Facsimile: (213) 894-6269/0141
    E-mail:    Scott.Paetty@usdoj.gov
               Catherine.S.Ahn@usdoj.gov
               Brian.Faerstein@usdoj.gov

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
    1400 New York Avenue NW, 3rd Floor
    Washington, DC 20530
    Telephone: (202) 320-0539
    Facsimile: (202) 514-0152
    E-mail:  Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-579(A)-SVW |
|       Plaintiff, | REPLY IN SUPPORT OF THE GOVERNMENT'S MOTION *IN LIMINE* #2 TO ADMIT EVIDENCE INEXTRICABLY INTERTWINED WITH THE CHARGED OFFENSES; DECLARATION OF CATHERINE AHN; REDACTED EXHIBITS 3 AND 6 ATTACHED AND EXHIBITS 1-2 AND 4-5 ATTACHED AND FILED UNDER SEAL |
|           v. | |
| RICHARD AYVAZYAN, <br>   aka "Richard Avazian" and <br>     "Iuliia Zhadko," <br> MARIETTA TERABELIAN, <br>   aka "Marietta Abelian" and <br>     "Viktoria Kauichko," <br> ARTUR AYVAZYAN, <br>   aka "Arthur Ayvazyan," and <br> TAMARA DADYAN, <br> MANUK GRIGORYAN, <br>   aka "Mike Grigoryan," and | Hearing Date: June 14, 2021 <br> Hearing Time: 1:30 p.m. <br> Trial Date:  June 14, 2021 <br> Location:  Courtroom of the <br>            Hon. Stephen V. <br>            Wilson |

1 | "Anton Kudiumov,"
ARMAN HAYRAPETYAN,
2 | EDVARD PARONYAN,
    aka "Edvard Paronian" and
3 | "Edward Paronyan," and
VAHE DADYAN,
4 |
5 |              Defendants.

6       Plaintiff United States of America, by and through its counsel

7  of record, the Acting United States Attorney for the Central District

8  of California, Assistant United States Attorneys Scott Paetty,

9  Catherine Ahn, and Brian Faerstein, and Department of Justice Trial

10 Attorney Christopher Fenton, hereby files this reply in support of

11 the government's motion _in limine_ seeking admission of evidence

12 inextricably intertwined with the charged bank fraud and wire fraud

13 and money laundering conspiracies and schemes.

14      This reply is based upon the attached memorandum of points and

15 authorities, the attached declaration, the files and records in this

16 case, and such further evidence and argument as the Court may permit.

17 Dated: June 7, 2021            Respectfully submitted,

18                                TRACY L. WILKISON
                                  Acting United States Attorney
19
20                                SCOTT M. GARRINGER
                                  Assistant United States Attorney
21                                Chief, Criminal Division

22                                _____/s/_____
                                  CATHERINE AHN
23                                SCOTT PAETTY
                                  BRIAN FAERSTEIN
24                                Assistant United States Attorneys
                                  CHRISTOPHER FENTON
25                                Department of Justice Trial Attorney

26                                Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA
27

28

                                      2

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION................................................1

II.   ARGUMENT....................................................1

      A.    The Reserve Identities Evidence is Derived from
            Federal Search Warrants and Is Inextricably
            Intertwined with the Charged Fraud and Money
            Laundering Conspiracy Offenses.........................1

      B.    Ninth Circuit Precedents are Squarely in Favor of the
            Reserve Identities' Evidence Admission.................8

      C.    The Reserve Identities Evidence is Inextricably
            Intertwined with the Same Scheme and Conspiracy for
            which Defendants Paronyan and V. Dadyan are Charged
            and are Therefore Admissible Against Them.............10

      D.    The Reserve Identities Evidence is Admissible under
            Rule 404(b)..........................................12

III. CONCLUSION..................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**CASES**

United States v. Anderson, 741 F.3d 938 (9th Cir. 2013)............10

United States v. Dorsey, 677 F.3d 944 (9th Cir. 2012)..............10

United States v. Loftis, 843 F.3d 1173 (9th Cir. 2016)........4, 8, 9

United States v. Romero, 282 F.3d 683 (9th Cir. 2002).............12

United States v. Vizcarra-Martinez, 66 F.3d 1006 (9th Cir. 1995)....9

United States v. Vo, 413 F.3d 1010 (9th Cir. 2005).................12

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      The government moved <u>in limine</u> for the admission of evidence

4  related to identities, and instruments of fraud, that were not

5  directly used in identified PPP or EIDL applications but were

6  collocated with, and whose possession was inextricably intertwined

7  with, evidence of business and individual identities directly used in

8  PPP and EIDL applications and associated financial accounts and

9  transactions (the "reserve identities evidence").  Defendants Richard

10  Ayvazyan, Marietta Terabelian, Artur Ayvazyan, and Tamara Dadyan

11  filed their opposition arguing that such evidence should be excluded

12  under Fed. R. Evid. ("Rule") 404(b) (ECF 419), and defendants Edvard

13  Paronyan and Vahe Dadyan filed an opposition arguing that the

14  evidence was not admissible against them under a Rule 404(b) analysis

15  and, if admitted, a limiting instruction should be provided (ECF 420

16  and 424).  For the reasons described below, this Court should find

17  that the reserve identities evidence is inextricably intertwined with

18  the charged schemes and conspiracies, and that presentation of the

19  evidence is necessary to tell a coherent story of how defendants

20  executed the scheme to defraud and conspiracies.

21

**II.   ARGUMENT**

22

        **A.    The Reserve Identities Evidence is Derived from Federal
              Search Warrants and Is Inextricably Intertwined with the

23            Charged Fraud and Money Laundering Conspiracy Offenses**

24      Defendants R. Ayvazyan, M. Terabelian, A. Ayvazyan, and T.

25  Dadyan open their opposition with a factual inaccuracy.  Defendants

26  appear to argue from the position that the evidence discussed in the

27  government's motion <u>in limine</u> was obtained from a state

28  investigation.  As discussed at length in its motion (<u>see</u> <u>e.g.,</u> Mot.

1   at 5-6), the evidence was obtained through <u>federal</u> and not state

2   search warrants, which this Court previously reviewed and upheld.

3   (ECF 269 and 297.)

4       Defendants' misconception appears to be based on their assertion

5   that defendants – as alleged by the state – used some of the same

6   identities and instruments of fraud to perpetrate mortgage fraud.

7   (ECF 419 at 9-10.)  This argument reveals an inconvenient truth for

8   defendants, which is that defendants have apparently used the same

9   identities, the same instruments of fraud, for multiple forms of

10  fraud and conspiracy, including the ones charged in the instant case.

11  (<u>Id.</u>)

12      For example, defendants point to identification cards and

13  documents related to Liudmyla K., Egia K., Mykhail D., and others as

14  examples of "reserve identities" evidence that should be excluded.

15  Defendants are simply incorrect – the identities of Liudmyla K., Egia

16  K., Mykhail D., Roza A., and others were directly used in the PPP and

17  EIDL fraud, as evidenced by defendants R. Ayvazyan and T. Dadyan's

18  own text messages.  (Mot. at 15 and Exh. 3 (previously filed under

19  seal).)  However, the striking similarities between this and the

20  reserve identities evidence may have fueled that confusion and is

21  further evidence of their use in a common criminal scheme.  The

22  reserve and used identities evidence were all found in the same

23  general location because these identities are – as discussed in the

24  government's motion – interchangeable components of the fraud and

25  money laundering conspiracies.  (Mot. at 2, 15, 24.)  Defendants'

26  actual use of the identities highlighted by the defense provides a

27  useful lens through which to better understand how and why the

28

reserve identities evidence is inextricably intertwined with the overall conspiracies and schemes.

As further discussed below, to execute their conspiracies to submit fraudulent EIDL and PPP applications, obtain the proceeds, and distribute the proceeds to co-conspirators for personal use, defendants needed the following:

1)   A ready supply of individual and business identities whose existence and operations could be proved to the government in support of a PPP or EIDL application;

2)   Purportedly official-looking documents that supported the pre-COVID-19 existence and operation of these applying businesses and their employees;

3)   Bank accounts whose real, fake, or synthetic owners and signatories sufficiently matched the PPP and EIDL applications to ensure the funds would be disbursed after approval;

4)   Additional bank accounts through which the PPP and EIDL proceeds could be distributed to co-conspirators for payment and to conceal the source of funds when used for personal benefit;

5)   A ready supply of individual and business documents to prove the existence of these individuals and businesses to banks if or when the accounts were flagged for fraud; and

6)   A similar ready supply of individual and business documents to open new accounts if and when accounts were frozen or closed out due to fraud.

A common theme in each of the steps above is defendants' access to personal and business identities and the instruments of fraud to prove their existence – which is why defendants' possession of the reserve identities evidence is inextricably intertwined with the charged fraud and money laundering conspiracies.  It shows the jury how defendants managed to complete each of the above-referenced steps on the fraud assembly line, proves the fraudulent scheme as a whole, and enables the government to tell a complete and coherent story of

1   the charged crimes.  <u>United States v. Loftis</u>, 843 F.3d 1173, 1175-78

2   (9th Cir. 2016).

3       At its core, defendants' fraud and money laundering conspiracies

4   operated as follows:  defendants used a combination of real, stolen,

5   and fake personal and business information to develop synthetic

6   individual and business identities.  Defendants used businesses and

7   identities that they had already created, such as Secureline Realty

8   and ABC Realty, as well as quickly created paper companies like

9   "Green Label Nutrienrs" (sic)[1].  (<u>See</u> Mot. at 9 (T.D. iPhone Excerpt

10  2) and Gov't. Exh. 1 (filed under seal).)  They soon brought their

11  pre-existing access to online databases to the conspiracy, as well.

12  As shown through T. Dadyan's text messages, T. Dadyan had a

13  subscription to information database TLOxp through her apparently

14  <u>suspended</u> (not legitimately operating) real estate company Secureline

15  Realty, and defendants further used public websites to steal the

16  information of real businesses for use on PPP and EIDL applications.

17  (<u>See</u> Mot. at 9-10 (T.D. iPhone Excerpt 2), 13-14 (T.D. iPhone Excerpt

18  5), and 18-19 (T.D. iPhone Excerpt 7).)  The government does not

19  intend to try defendants for committing mortgage loan fraud.  But it

20  cannot tell the story of the PPP and EIDL fraud without reference to

21  defendants' use of their real-estate business and the tools they used

22  to commit PPP and EIDL fraud and money laundering conspiracy.  It was

23  the defendants, not the government, who brought these lines of fraud

24  together.  The government should not be artificially limited in its

25  presentation of proof because defendants committed multiple crimes

26

27      [1] File name "GREEN LABEL TAX ID.pdf" sent from "tammy" to "Rich
    New" on or about May 28, 2020 with the message, "Look that's mine I
28  can apply."  The document is an EIN assignment letter from the IRS
    dated May 7, 2020 – well after the COVID-19 pandemic began.

                                    4

1    using the same instruments of fraud.  United States v. Williams, 989

2    F.2d 1061, 1071 (9th Cir. 1993).

3         Defendants also manufactured false and fraudulent identification

4    cards to support the lie that the identified people were the actual

5    owners of businesses legitimately seeking PPP and EIDL funds.  Not

6    only did the government find numerous false and fraudulent CADLs in

7    the same location in T. Dadyan's and A. Ayvazyan's residence, the

8    government also discovered notes on how to falsify CADLs, images from

9    identification making software, and images of many of the same CADLs

10   on A. Ayvazyan's phone. (See Gov't. Exh. 2 at 1 (showing physical

11   CADLs found at the T. Dadyan and A. Ayvazyan residence) and 2-3

12   (showing digital images of identification cards bearing different

13   photos and notes on how to create doctored identification cards found

14   on A. Ayvazyan's phone).)

15        One set of images found on A. Ayvazyan's phone is particularly

16   critical to explaining to the jury how this part of the scheme and

17   conspiracy operated.  The government found on A. Ayvazyan's phone a

18   photograph of a hand-written note containing instructions on how to

19   doctor the identification card of Nerses N.  ("Please use a (sic) old

20   Armenian guy and Please match his Description to . . .")  (Id. at 3.)

21   This explicitly shows the jury the role A. Ayvazyan played and the

22   deliberate and intentional use of synthetic identities as part of the

23   fraud conspiracy.  During the November 2020 residential searches, the

24   same Nerses N. CADL was found in A. Ayvazyan's and T. Dadyan's

25   residence, along with CADLs of identities like Roza A., Liudmyla K.,

26   and Mykhail D., among others, that were used in PPP and EIDL

27   applications.  (Id. at 1; see also Fenton Decl. (ECF 207) Exh. 8 at

28   1-3.)  To confirm A. Ayvazyan's knowledge of and role in the

5

conspiracy, the government found screenshots and photographs of SBA EIDL websites confirming the submission of applications using emails associated with Liudmyla K. and Mykhail D., among others, on A. Ayvazyan's phones.  (See Gov't. Exh. 2 at 4-5.)

Unlike with Roza A., Mykhail D., Egia K., and Tony G., the government has not found a PPP or EIDL application using the Nerses N. identity, but its physical collocation with those that were used, and its presence on A. Ayvazyan's phone with other doctored identification cards, shows how it is inextricably intertwined with the conspiracy and necessary for the government to complete the story of this criminal enterprise.

The text messages between "tammy" and "Rich New" also show R. Ayvazyan using Gusto, an online payroll service provider, to generate false payroll reports in support of purported payroll expenses in EIDL and PPP applications.  This includes payroll reports purportedly for "LK Designs" owned by Liudmyla K. sent between "tammy" and "R. Ayvazyan" through text messages.  As shown below, "tammy" explicitly references a payroll report "Rich new" did for "22" while also texting "Rich New" a file named "LK Schedule C Copy.pdf."

**T.D. iPhone Excerpt 9 (July 1, 2020):**

| #    | Time (UTC) | From     | Body                                                                 |
|------|-----------|----------|----------------------------------------------------------------------|
| 3429 | 9:05 PM   | tammy    | Bro look this idiot want detailed payroll report or w2 s [LIUDMYLA KOPYTOVA.png] |
| 3431 | 9:15 PM   | tammy    | 7472324114                                                           |
| 3432 | 9:16 PM   | tammy    | U have this number                                                   |
| 3433 | 9:16 PM   | tammy    | Urgent for                                                           |
| 3434 | 9:16 PM   | tammy    | Fiber one                                                            |
| 3435 | 9:16 PM   | Rich New | I don't have that number aziz                                        |
| 3436 | 9:26 PM   | tammy    | 8185939816                                                           |
| 3437 | 9:26 PM   | tammy    | U have this phone babe                                               |
| 3438 | 9:27 PM   | Rich New | No that's the number you gave me                                     |

| | | | |
|---|---|---|---|
| 3450 | 11:51 PM | tammy | FIBER ONE MEDIA EMAIL OF RICH:<br>EMAIL.FIBERONEMEDIA.COM<br>PASSWORD: Shoup@317<br>Email: INFO@FIBERONEMEDIA.COM |
| 3451 | 11:59 PM | tammy | 7472324114 can u please update website Put this a phone |
| 3452 | 12:00 AM | tammy | On it |
| 3453 | 12:00 AM | tammy | And text me when u so so Steph does yellow pages |
| 3454 | 12:20 AM | tammy | Mayor talking now |
| 3455 | 12:36 AM | Rich New | Ok I got that email |
| 3456 | 12:36 AM | Rich New | You need to send a code? |
| 3457 | 12:37 AM | tammy | Yes hold on u have it open |
| 3458 | 12:37 AM | Rich New | Ya |
| 3459 | 1:07 AM | Rich New | [61534485256__015D99A0-04CD-4F44-9A6E-<br>A172C089D9C9.jpeg] |
| 3460 | 1:07 AM | Rich New | Here is the account for the tax account |
| 3461 | 1:33 AM | tammy | Ok 👍 |
| 3462 | 2:18 AM | tammy | I need a detailed payroll report like the redacted one u gave me |
| 3463 | 2:25 AM | tammy | [Gusto Employee report.pdf] |
| 3464 | 2:25 AM | Rich New | Ok |
| 3465 | 2:25 AM | tammy | U did one like |
| 3466 | 2:25 AM | tammy | That for 22 |
| 3467 | 2:25 AM | Rich New | I have u one |
| 3468 | 2:26 AM | tammy | This idiot wants either that or |
| 3469 | 2:26 AM | Rich New | I don't know if it's 22 |
| 3470 | 2:26 AM | tammy | W2 |
| 3471 | 2:26 AM | Rich New | I think it's 14 |
| 3472 | 2:27 AM | tammy | This is like8 |
| 3473 | 2:30 AM | Rich New | Hold on let me find it |
| 3474 | 2:53 AM | tammy | That's the one<br>[LK Schedule C Copy.pdf] |
| 3475 | 2:53 AM | tammy | 22 employees |
| 3476 | 2:54 AM | tammy | U want the amounts for each month ? Or no u going to off of the schedule cc |
| 3477 | 2:54 AM | Rich New | Ok |
| 3478 | 2:54 AM | Rich New | No all good |
| 3479 | 2:56 AM | tammy | Tom comming over now I told art show him the decline letter from the eidl and it's simple it's  35 percent for ppp |

A quick glance at the July 2020 LK Designs PPP application submitted to Newtek Small Business Finance shows that it included a 22-employee Gusto-generated payroll report, which uses – down to the

penny – the exact same monthly payroll cost, adjusted earnings, and state taxes numbers over the same time period and same number employees as at least two other applications.  (See Gov't. Exh. 3 at 1-3 (redacted).)  These are the Journeyman Construction PPP application submitted purportedly in the name of Anna M. that was submitted from co-defendant Manuk Grigoryan's Sun Valley residence, and the Mykhail D. dba MD Acquisition Services EIDL application. (Id.)  The fake payroll reports sent between the co-conspirators included purported Fiber One Media paystubs for Egia K. and Tony G. (See Gov't. Exh. 4 at 1-2 (filed under seal).)  These reports were texted from "tammy" to "Rich New" on or about October 9, 2020, with the request, "Rich see if you u can print this for me on the check paper u have at work" and "And this I keep printing doesn't come out good."

The coconspirators also relied on a ready supply of new identities to open bank accounts when existing ones were frozen or closed due to fraud concerns.  (See Mot. at 14 (T.D. iPhone Excerpt 6).)  As before, defendants' possession of the reserve identities evidence completes the story of, and is inextricably intertwined with, the charged conspiracies.

### B. Ninth Circuit Precedents are Squarely in Favor of the Reserve Identities' Evidence Admission

Defendants' attempts to distinguish Loftis and other case precedents rely on a misunderstanding of the underlying facts of the case.  The additional wires found to be inextricably intertwined with the charged fraud in Loftis were not simply additional transfers of the *same exact* financial transaction (e.g., the completion of a wire request).  Rather, the Ninth Circuit held that the additional wires

8

1  were admissible and not subject to Rule 404(b) because "it is

2  evidence of part of the *crime charged* in the indictment – the overall

3  scheme to defraud." Loftis, 843 F.3d at 1176 (emphasis in

4  original).) Although the presence of other act evidence within the

5  same actual transaction (e.g., possession of a firearm during a

6  shoot-out) does weigh in favor of admissibility, it is not a

7  requirement to such a finding.

8      The scheme and conspiracy charged in the First Superseding

9  Indictment includes, within its manner and means, the use and

10 transfer of fraudulent individual and business identities. It

11 includes the fraudulent use of financial accounts in names not

12 defendants' own. As such, the reserve identities evidence falls

13 squarely within the four corners of Loftis and its holding.

14     Defendants' attempts to distinguish United States v. Vizcarra-

15 Martinez, 66 F.3d 1006 (9th Cir. 1995) is similarly unavailing. The

16 basis for the Ninth Circuit's exclusion of defendant's possession of

17 a personal-use amount of methamphetamine was because it "was,

18 unquestionably, not a part of the transaction with which he was

19 charged . . . The prosecution presented absolutely no evidence that

20 the methamphetamine in question was obtained from a member of the

21 conspiracy or that Vizcarra-Martinez had been involved in its

22 manufacture or distribution." Id. at 1013. The facts of the instant

23 case are starkly different. In contrast to the facts of Vizcarra-

24 Martinez, the reason why the government seeks to introduce the

25 reserve identities evidence is because of how it was used and

26 exchanged between members of the conspiracy, and its importance in

27 being able to explain to the jury how the overall conspiracy

28 operated.

**C.   The Reserve Identities Evidence is Inextricably Intertwined with the Same Scheme and Conspiracy for which Defendants Paronyan and V. Dadyan are Charged and are Therefore Admissible Against Them**

Defendant Paronyan and V. Dadyan's argument that Rule 404(b) prohibits the introduction of the reserve identities evidence against him avoids engaging with the threshold inquiry as to whether Rule 404(b) applies.  As discussed above, evidence is inextricably intertwined when introduction of that evidence is necessary to tell a clear and comprehensible story and the acts are part of a single, criminal episode.  United States v. Anderson, 741 F.3d 938, 949 (9th Cir. 2013) (quoting United States v. Dorsey, 677 F.3d 944, 951 (9th Cir. 2012)).

Defendant Paronyan directly benefited from charged fraud conspiracy and scheme through the May 2020 submission of a $130,187 PPP application on behalf of Redline Auto Collision, which was submitted in Paronyan's name.  The PPP application asserted defendant had 12 employees with an average monthly payroll cost of $52,075.25. (See Gov't. Exh. 5 at 1 (redacted).)  As a result of this loan $130,187 in PPP proceeds were wired to an account controlled by Paronyan.  However, only about one month prior, an EIDL application had been submitted, also on behalf of Redline Auto Collision and in Paronyan's name, claiming the company had only 4 employees.  (See Gov't. Exh. 5 at 5 (relevant portions magnified and highlighted for ease of review).)

What is striking about Paronyan's PPP application is not just the fact that over a single month Paronyan's business tripled its employees in the midst of a once-in-a-lifetime economic disaster. What is also striking is that the 12-employee Gusto generated payroll

10

report submitted for Redline Auto Collision had – to the penny – the same average monthly payroll cost, the same adjusted earnings, the same taxes, benefits, and the same number of employees for the same exact dates as: (1) the Fiber One Media, Inc. PPP application submitted in the name of Viktoria Kauikchko (application number 16289241); (2) the Mod Interiors, Inc. PPP application submitted in the name of A.I. (application number 16173818); and (3) the Hart Construction PPP application submitted in the name of identity theft victim M.H. (application number 16031166). (See Gov't. Exh. 5 at 2-4.) This is because – as discussed above for other PPP and EIDL applications – members of the conspiracy like R. Ayvazyan and T. Dadyan repeatedly used the same falsified Gusto payroll reports to support fraudulent PPP and EIDL applications. (See Mot. at 15 and Exh. 3 (previously filed under seal).) The Redline Auto Collision PPP application shows that defendant Paronyan participated in, and benefitted from, the PPP fraud scheme and conspiracy and therefore, acts in furtherance of that conspiracy are admissible against him.

The same is true for defendant V. Dadyan. Defendants like T. Dadyan relied on coconspirators like V. Dadyan to receive PPP proceeds and fraudulently transfer those proceeds to other accounts for impermissible purposes (e.g., not actual payroll or operational expenses). For example, PPP and bank records show that co-defendant Vahe Dadyan received a $157,500 PPP loan for his company, Voyage Limo, into a Voyage Limo account for which he was the sole signatory. (See Gov't. Exh. 6 at 1 (line 2 of table) and 3-6 (filed under seal).) On or about July 3, 2020, the same day "tammy" texted "Rich New" that "I'm expecting a wire for Art for $73,500 / And for me $157," approximately $155,000 was transferred from the Voyage Limo

11

account into the Runyan Tax Bank 2 account controlled by T. Dadyan. (See Mot. at 18 (T.D. iPhone Excerpt 7) and Gov't. Exh. 6 at 2.)   It was only after these transfers that "tammy" and "Rich New" discussed ways in which they could wire "Vahe" at least $25,000 per attempted transfer.  (See Mot. at 18-19 (T.D. iPhone Excerpt 7).)

   **D.   The Reserve Identities Evidence is Admissible under Rule 404(b)**

   As discussed in its original motion, even if this Court does not find the reserve identities evidence admissible as inextricably intertwined, it should still be admissible under the "low threshold" of Rule 404(b).  As discussed in this motion, defendant relied on a pre-existing reserve of individual and business identities and tools of fraud to perpetrate the charged offenses.  Their possession of this evidence shows opportunity, knowledge, intent, plan, and absence of mistake that all lean in favor of inclusion.  United States v. Vo, 413 F.3d 1010, 1018 (9th Cir. 2005) and United States v. Romero, 282 F.3d 683, 688 (9th Cir. 2002).

**III.  CONCLUSION**

   For the aforementioned reasons, the government respectfully requests the Court grant the government's motion and find the reserve identities evidence admissible as inextricably intertwined with the charged offenses.