# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>RICHARD AYVAZYAN, et al.<br><br>Defendants. | **CASE NO.  2:20-cr-579-SVW**<br><br>**ORDER RE: PRETRIAL MOTIONS [340], [358], [363], [381], [384], [390], [393], [422], [426].** |

Before the Court are a number of pre-trial motions filed by the parties.  The Court's rulings are below.  The Court notes that it requests a supplemental filing from the Government.  *See infra* at 15.

## Dkt. 340: Motion to Exclude Evidence of Prior Convictions

**The motion is GRANTED IN PART.**  The Court is not persuaded that the offenses underlying the prior convictions are sufficiently similar to allow the Government to offer the prior convictions as evidence under FRE 404(b).  There is some broad language in Ninth Circuit case law suggesting otherwise.  *See United States v. Evans*, 796 F.2d 264, 265 (9th Cir. 1986) ("[S]ince all of the crimes involved the conversion of assets (whether by embezzlement or by fraud) through the *misstatement of financial information*, we cannot conclude the district court abused its discretion in admitting the evidence of the prior convictions . . . .") (emphasis added). Moreover, the Ninth Circuit has stated that "[a] much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove"—as is the case here—"a state of mind."  *United States v. Luna*, 21 F.3d 874, 878 (9th Cir. 1994).

However, in cases involving financial crimes where courts admitted evidence of the defendant's prior conviction for a similar offense, there is generally a particular characteristic about the conduct—beyond the use of false statements or documents—that ties the two offenses together.  *See, e.g.*, *United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986) (both fraudulent schemes involved purchase of mobile homes); *United States v. Ruiz*, 665 F. App'x 607, 610 (9th Cir. 2016) (evidence of defendant's failure to file taxes for five years admissible in tax fraud case); *United States v. Spillone*, 879 F.2d 514, 517 (9th Cir. 1989) (conviction for making extortionate extension of credit admissible where defendant charged with use of

extortionate means to collect extensions of credit); *United States v. Sager*, 227 F.3d 1138, 1148 (9th Cir. 2000) (both schemes centered around credit card theft); *United States v. Kaur*, 752 F. App'x 409, 410 (9th Cir. 2018) (defendant conspired with same ringleader in both schemes).

Here, by contrast, beyond the use of false statements and documents—conduct that is part of most financial crimes—the two offenses are not particularly similar. Indeed, some of the critical aspects of the scheme in the instant case are missing from the prior offense, *i.e.*, the use of fake and synthetic identities, the federal government's role as a guarantor, and the false representations about business information, including number of employees and payroll expenses.

The Court notes that it is a very close call. Ultimately, however, the Court finds that the evidence is inadmissible under FRE 404(b).

As for admitting the prior conviction to attack Defendants' credibility, the parties agree that the Court has no discretion and must admit the conviction for that purpose. *See* FRE 609(a)(2). However, Defendants argue that the Government should not be able to state the name of the offense—*i.e.*, conspiracy to commit bank fraud. Reply at 7. Instead, Defendant argues, the Government should only be allowed to inquire as to the fact of a felony conviction and the date of that conviction. *Id.*

The Court rejects that argument. "The presumption under Rule 609(a)(2) . . . is that the 'essential facts' of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed, are included within the 'evidence' that is to be admitted for impeachment purposes." *United States v. Estrada*, 430 F.3d 606, 615 (2d Cir. 2005) (Sotomayor, J.).

Courts have explained that the probative value of a prior conviction offered for impeachment "necessarily varies with [its] nature . . . ." *United States v. Burston*, 159 F.3d 1328, 1335 (11th Cir. 1998). Accordingly, a juror cannot properly assess a prior conviction's impact on credibility without understanding at least the nature of that conviction.

Indeed, the reason courts do not have discretion to prohibit evidence of prior convictions falling under FRE 609(a)(2) is because those convictions are particularly probative of credibility. *See Estrada*, 430 F.3d at 615 (noting that convictions under FRE 609(a)(2) are "*per se* probative of credibility"); *see also United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977) (explaining prior convictions involving dishonesty and false statements "are peculiarly probative of credibility and, under [FRE 609(a)(2)], are always to be admitted. Thus, judicial discretion granted with respect to the admissibility of other prior convictions is not applicable . . . .").

The cases cited by Defendants where courts chose to exclude the name of the prior offense are inapposite because none of those cases involved FRE 609(a)(2). *United States v. Martinez-Martinez*, 369 F.3d 1076, 1088 (9th Cir. 2004) (prior conviction for possession of marijuana for sale where defendant charged with illegal re-entry); *United States v. Robinson*, 8 F.3d 398, 409 (7th Cir. 1993) (prior conviction for accessory after the fact to attempted murder where defendant charged with racketeering);[1] *United States v. Cox*, 2018 WL 9786084, at *2 (D. Ariz. Apr. 27, 2018) (prior conviction for burglary where defendant charged with receiving and distributing child pornography); *United States v. Swint*, 2012 WL 3962704, at *1 (D. Ariz. Sept. 11, 2012), *aff'd*, 566 F. App'x 618 (9th Cir. 2014) (prior conviction for assault where defendant charged with assault of federal officer).

Similarly, "the failure to include the names and nature of prior offenses may prejudice the defendant because the jury is left to speculate as to the essential facts of prior convictions." *United States v. Smalls*, 752 F.3d 1227, 1240 (10th Cir. 2014).

Finally, to the extent FRE 403 balancing applies to the specific decision about including the name of the prior conviction for a crime involving dishonesty,[2] the Court concludes that FRE 403 does not require prohibiting the Government from inquiring as to the name of the offense. This is because the Court will give a limiting instruction regarding the purpose for which the jury may consider the prior conviction (*i.e.*, Defendants' credibility), and the Government will not be permitted to probe the facts or circumstances underlying the prior conviction.

**Accordingly, Defendants' motion is GRANTED IN PART.  The prior convictions are inadmissible under FRE 404(b) but, if Defendants testify, FRE 609(a)(2) allows the Government to inquire as to the "'essential facts' of [Defendants'] convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed." *Estrada*, 430 F.3d at 615 (Sotomayor, J.).**

## Dkt. 358: Motion to Exclude Evidence and Argument of Victim Negligence and Guarantees

**The motion is GRANTED IN PART**.  As to the issue of materiality, the intentional conduct of the lender does not constitute a defense to materiality.  *See United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017).  This is because a false statement is "material" if it "objectively had a tendency to influence, or was capable of influencing, a lender to approve a

---

[1] Indeed, in *Robinson*, it appears that the Seventh Circuit took no issue with naming the offense.  The "details" of the conviction that were impermissible were the facts underlying the conviction, not the name of the offense.  *See* 8 F.3d at 409.  Here, the Government will not be permitted to delve into the facts underlying the prior convictions.

[2] The Court makes no finding as to whether FRE 403 balancing is required for such a decision.  However, given that FRE 609(a)(2) leaves no discretion to the court to admit the prior conviction to attack credibility, the Court is skeptical that FRE 403 applies to naming the offense.

loan.  This standard is not concerned with a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement itself.  For this reason [the Ninth Circuit] ha[s] previously held that misrepresentation may be material without inducing any actual reliance." *Id.* (cleaned up) (alterations added).

Accordingly, "a victim's negligence is not a defense to wire fraud" in this case.  *Id.* Additionally, "a victim's intentional disregard of relevant information is not a defense to wire fraud" in this case.  *Id.* at 1016.

Defendants correctly argue that evidence of industry-wide practices and standards regarding PPP loans is relevant as to materiality.  *See* Opp. at 3–4 (citing *Lindsey*, 850 F.3d at 1016).  However, resting upon that premise, Defendants proceed to argue as follows: "Certainly, if expert testimony regarding general industry practices is relevant, then percipient testimony about specific bank practices is that much more relevant."  Opp. at 4.

That argument is flatly incorrect.  The *Lindsey* Court expressly stated that evidence regarding "the behavior of individual lenders" or "the practice of particular lenders" is inadmissible.  850 F.3d at 1016.  The reason why evidence of industry-wide practices is admissible while evidence of a particular lender's practices is not is, again, that "materiality measures natural capacity to influence, not whether the statement actually influenced any decision.  The way the entire market has historically treated a statement or requirement says a lot about that statement or requirement's natural capacity to influence a decision by market participants.  But the way one market participant of many has previously treated a statement says little or nothing about that statement's inherent ability to affect decision making."  *Id.* at 1017 (citations omitted).

"This line between evidence of industry practice and the practice of particular lenders is subtle."  *Id.* at 1016.  However, the following hypothetical from *Lindsey* is instructive:

[S]uppose a defendant is charged with wire fraud for falsely stating on a loan application that he was married.  In such a case, it would be admissible for a defense expert to testify that, while mortgage applications usually ask about marital status, the general practice in the industry is to ignore marital status when making lending decisions.  The defendant could then argue in closing that his false statement about marriage was immaterial, and so the elements of wire fraud have not been proven.  By contrast, a district court could properly exclude evidence that (a) the particular lender to whom the defendant lied did not generally give weight to marital status when deciding whether to lend, or (b) there were prior instances in which that lender did not consider marital status in making loans.

*Id.*  Similarly, in *United States v. Markevich*, the Ninth Circuit held that the district court erred by refusing to admit testimony from defense experts who would have testified that lenders in the subprime mortgage industry knew that applicants were providing false representations but made no effort to verify the representations.  775 F.App'x 287, 290 (9th Cir. 2019).  However, the Court found that the error was harmless because, even accepting the experts' testimony, the jury would have had to find that the materiality element was satisfied.  This was because the experts would have stated that, "where a loan application originally stated the applicant made $16,741 in monthly income, instead representing that the applicant in fact made $4,000 in monthly income would 'tend to prevent the funding of the loan.'"  *Id.*

**Accordingly, to the extent Defendants intend to present evidence of *industry-wide* lending practices and standards regarding PPP loans, they may do so for the purpose of negating the materiality element.**  For example, if Defendants have expert testimony that the general practice amongst lenders processing PPP loans was to not consider the accuracy of the representations made in applications—and that PPP loans were generally approved regardless of those misrepresentations, *see id.*—they may present such evidence.[3]  **However, Defendants may not present evidence or argument regarding a particular lender's negligence or intentional disregard of certain representations.**  *See Lindsey*, 850 F.3d at 1015–16.  **Nor may Defendants present evidence or argument "about specific bank practices."**  Opp. at 4; *see also Lindsey*, 850 F.3d at 1016.

Regarding evidence of loan guarantees, Defendants argue that such evidence is relevant to showing a lack of intent to defraud.  Opp. at 5–6.  However, the Ninth Circuit has explained that a defendant's belief that the victim will not sustain any permanent economic losses is not a defense to wire fraud or bank fraud.  *See United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993) ("[A] defendant's belief that the victim of the fraud will be paid in the future or will sustain no economic loss is no defense to [bank fraud].");  *see also United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1085 (2021) ("[T]his court already considered and rejected the argument that the wire fraud statute requires an intent to permanently deprive a victim of money or property.");  *see also id.* at 1103 n.10 ("[W]ire fraud requires the intent to deprive a victim of money or property, at least momentarily.  But nothing [] compels us to go so far as to hold that wire fraud requires an intent to *permanently* deprive the victim of property. We know of no cases that so hold . . . .") (emphasis in original).  Accordingly, evidence or argument that the victims in this case suffered no losses because the loans were guaranteed is inadmissible.[4]

---

[3] Such expert testimony must comply with FRE 702, including the requirements that the testimony be "based on sufficient facts or data" and is the "product of reliable principles and methods."

[4] Indeed, accepting Defendants' argument would mean that one can never intend to defraud a financial institution by applying for a loan guaranteed by the federal government.

Similarly, evidence or argument that lenders received benefits for participating in the PPP and EIDL loan programs is inadmissible. First, such evidence appears to be another way of arguing that the victims sustained no losses—an argument that is "no defense" to bank fraud and wire fraud. *Molinaro*, 11 F.3d at 863; *see also Miller*, 953 F.3d at 1103.

Second, the single[5] case cited by Defendants is distinguishable and presented a unique set of facts. In *United States v. Thomas*, the defendant was a fruit broker who "obtain[ed] the highest possible price for growers' fruit, and then remitted the proceeds to the growers after deducting his own percentage commission and other fixed costs." 32 F.3d 418, 419 (9th Cir. 1994). The broker implemented an "averaging scheme" whereby he would report (a) artificially high prices to growers when fruit prices were low, and contribute his own money to make up the difference; and (b) artificially low prices when fruit prices were high, and retain the extra proceeds for himself. *Id.* The defendant argued that he took "concrete steps" to make sure growers never lost money and, in fact, "the uncontested accounting evidence showed that the growers came out ahead by approximately $175,980." *Id.* "The defendant maintained at trial that the purpose of the system was not to defraud the growers of money, but to even out fluctuating crop prices in order to assuage grower discontent." *Id.* Under those facts, the Ninth Circuit held that the district court erred by refusing to allow the defendant to cross-examine the growers about benefits they received. *See id.* at 420–21.

As the above discussion demonstrates, the defendant in *Thomas* presented a substantial foundation for the court to conclude that the victims' gains were highly probative of a lack of intent to defraud. *See id.*; *see also Ciccone*, 219 F.3d at 1082 ("We held [in *Thomas*] that, given the nature of both the evidence and the scheme . . . [e]vidence showing actual gain was highly probative on the issue of the nature of [the defendant's] scheme and whether he had an intent to deprive growers of their property."). Here, unlike in *Thomas*, Defendants have not provided any foundation that would allow the Court to conclude that benefits received by lenders for participating in the PPP and EIDL programs are "highly probative on the issue of the nature of the scheme and whether [Defendants] had an intent to [defraud]." *Id.* Indeed, there is no foundation at all akin to that presented by *Thomas*. Under these circumstances, the Court finds that the proffered evidence is irrelevant and, alternatively, inadmissible under FRE 403 because the minimal probative value is substantially outweighed by a danger of misleading the jury, confusing the issues, and wasting time. *See id.* (affirming trial court's exclusion of evidence that victims of fraud believed they were benefiting from defendant's scheme).

For the foregoing reasons, the Government's motion is GRANTED.

---

[5] Defendants also cite to *United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000), for the premise that evidence of a victim's actual gain is highly probative of the nature of the scheme and the defendant's intent to defraud, Opp. at 6. Yet, when the *Ciccone* Court stated that premise, it was describing why evidence of a victim's gain was admissible in *Thomas*. *See* 219 F.3d at 1082. Indeed, *Ciccone* proceeded to hold that the defendant's proffered evidence of benefits received by victims was *inadmissible*. *See id.*

**Dkt. 363: Motion to Exclude Evidence From Digital Devices**

**The motion is DENIED.**  The devices at issue were discovered during searches of Defendants' homes on November 5, 2020.  The Government produced a complete forensic copy of the four digital devices to Defendants on February 1, 2021.  Dkt. 391-7 at 3.  In other words, Defendants have had access to all of the material on the four digital devices for over four months.

However, the prosecution team did not receive the material from the phones when Defendants received it.  Instead, the material from the phones was reviewed by an independent filter team before it was handed over to the prosecution team.  *See* Dkts. 391-4; 391-5; 391-6; 391-7.  After the independent filter team reviewed the materials, the prosecution team conducted its "responsiveness review" to determine what materials from the phones were responsive to the warrant and therefore "seized" under the Fourth Amendment.  *See id.*

Defendants' issue with the above procedure appears to be two-fold.  First, Defendants argue that the execution of the search of the phones was unreasonable because the Government did not complete the responsiveness review "as soon as is practicable," as the warrant required.  *See* Warrants Attach. B ¶ 4.a.  Second, Defendants argue that the execution of the warrant was unreasonable because the prosecution team participated in the responsiveness review and identified trial exhibits while doing so.  *See* Mot. at 9–11.

The Court rejects Defendants' arguments.  As to the timeliness of the responsiveness review, the magistrate judge granted an extension to the Government to complete the responsiveness review—an extension contemplated by the Warrant in the event that the Government was unable to conduct the responsiveness review within 120 days.  *See* Warrants Attach. B ¶ 4.a.  The Government then completed the responsiveness review prior to the magistrate judge's new deadline.

Moreover, Defendants have not shown that the probable cause to search the phones dissipated before the responsiveness review was completed.  *See, e.g.*, *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005) (explaining "[c]ourts have permitted some delay in the execution of search warrants involving computers  because of the complexity of the search" and finding government's five-month delay in searching defendant's computer did not invalidate search where there was "no showing that the delay caused a lapse in probable cause" or prejudiced defendant).  Nor have they shown that they were prejudiced by the delayed responsiveness review.  *See id.*  To the contrary, Defendants have had complete copies of the materials on the digital devices since February 1, 2021, and the prosecution team did not get a copy of that material unless it was first reviewed by the independent filter team.  Under these

circumstances, suppression of the evidence due to the length of the responsiveness review is not warranted under the Federal Rules of Criminal Procedure or the Fourth Amendment.

As to the prosecution team's participation in the responsiveness review, the Court finds that the Warrant expressly authorized prosecutors to participate in the responsiveness review. *See* Warrants Attach. B ¶ 5 ("The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, *attorneys for the government*, attorney support staff, and technical experts.") (emphasis added);[6] *see also id.* ¶ 4.a (defining "search team" as "Law enforcement personnel or *other individuals assisting law enforcement personnel*"); ¶ 4.f (noting that government officials "may not access data falling outside the scope of the other items to be seized (*after the time for searching the device has expired*) absent further court order.") (emphasis added).  Accordingly, the Warrant authorized the very conduct Defendants challenge.

To the extent Defendants argue that the Fourth Amendment does not allow the prosecution team to participate in the responsiveness review, the Court rejects that argument.  In making this argument, Defendants rely heavily on *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) ("*CDT III*").  Yet, that case is inapposite for two reasons.

First, much of the language cited by Defendants from *CDT III* relates to the section of the court's opinion addressing the government's argument that the "plain view" doctrine allowed the government to seize evidence discovered on digital devices even if it was not responsive to the

---

[6] The Court rejects Defendants' argument that the Warrant does not authorize the prosecution to conduct the responsiveness review.  First, paragraph 5 of the Warrant authorizes prosecutors to participate in the responsiveness review.  Defendants argue that paragraph 5 only provides that, "after the investigating agency delivers a copy of all of the *seized* or copied data to the attorneys for the government, government attorneys and others not contained within the definition of the search team may engage in 'independent review.'"  Reply at 17–18 (emphasis added).  However, the use of the word "seized" by Defendants in that sentence is somewhat misleading.  The first clause of paragraph states that "[t]he review of the electronic data *obtained* pursuant to this warrant may be conducted by any government personnel assisting in the investigation [including] attorneys for the government . . . ."  Warrant Attach. B ¶ 5 (emphasis added).  The next clause in paragraph 5 states as follows: "Pursuant to this warrant, the investigating agency may deliver a complete copy of the *seized* or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review."  *Id.* (emphasis added)  In other words, the individuals identified in the first clause of paragraph 5 are those who may determine what portion of the "obtained" data was responsive to the warrant, and the second clause of paragraph 5 then authorizes the individuals who conducted the responsiveness review to deliver the "seized" data to others.

Second, even if paragraph 5 did not authorize prosecutors to participate in the responsiveness review, paragraph 4 of the Warrant independently does.  *See id.* ¶ 4.a (defining "search team" as "Law enforcement personnel or *other individuals assisting law enforcement personnel*") (emphasis added).

Third, even if the Warrant did not expressly authorize prosecutors to participate in the responsiveness review, Defendants' motion would still fail because (1) the Fourth Amendment does not prohibit prosecutors from participating in the responsiveness review; and (2) Defendants would only be entitled to suppression of evidence seized beyond the scope of the Warrant, and Defendants have not identified any such evidence.  *See infra* at 9–12.

warrant.  *See* Reply at 19; *see also CDT III*, 621 F.3d at 1170–71.  The *CDT III* Court rejected that argument.  *Id.*  In doing so, however, the court expressly stated that it had "no cavil with th[e] general proposition" that the government must "examin[e] the contents of every file" to ensure data is not concealed, compressed, erased, or booby-trapped.  *Id.*

In other words, the Ninth Circuit agreed with the government that a search team must be able to search the entirety of the digital device to ensure that all evidence responsive to the warrant is seized.  The *CDT III* Court's opinion did not take issue with that premise; rather, it disagreed with the government's view that agents could seize evidence *beyond* the scope of the warrant merely because that evidence was discovered during the responsiveness review.  Here, there is no such issue: as discussed below, Defendants identify no evidence that the Government seized beyond the scope of the warrant.  *See infra* at 11–12.

That leads to the second distinction between the instant case and *CDT III*.  Crucially, the instant case does not present the primary issue presented in *CDT III*: that the government's failure to conduct a proper responsiveness review resulted in the government's *seizure of data for which it lacked probable cause*.  *See, e.g., id.* at 1172 ("This was an obvious case of deliberate overreaching by the government in an *effort to seize data as to which it lacked probable cause*.") (emphasis added); *id.* ("Judge Illston also found that the government's *seizure*, in callous disregard of the Fourth Amendment, *reached information clearly not covered by a warrant*.") (emphasis added).

That effort to seize data beyond the scope of the warrant is why the Ninth Circuit found it so important that the government comply with the terms of the warrant requiring an independent responsiveness review by a computer expert.  *See id.*  ("[T]he representation in the warrant that computer personnel would be used to examine and segregate the data was obviously designed to reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of *dredging up information it could not otherwise lawfully seize*.") (emphasis added).  Here, Defendants do not argue that the Government "seized data for which it lacked probable cause."  *Id.*

Indeed, the Ninth Circuit has emphasized this aspect of *CDT III* in later cases.  In *United States v. Schesso*, the Ninth Circuit upheld a search of digital devices because, "unlike *CDT III* . . . the government properly executed the warrant, seizing only the devices covered by the warrant and for which it had shown probable cause." 730 F.3d 1040, 1049 (9th Cir. 2013); *see also id.* ("Tellingly, the search did not involve an over-seizure of data that could expose sensitive information about other individuals not implicated in any criminal activity—a key concern in both the per curiam and concurring opinions of *CDT III* . . . .").  Although the seized data in *Schesso* was reviewed by a computer expert before the data was delivered to the case agent, the *Schesso* court also noted that "the proper balance between the government's interest in law

enforcement and the right of individuals to be free from unreasonable searches and seizures of electronic data must be determined on a case-by-case basis." *Id.*

Here, there is no indication that the procedure implemented by the Government was unreasonable for Fourth Amendment purposes. Defendants suggest that the key issue here "is not that the government gains possession of a broad swath of information; it is that the government can use whatever it wants from that broad swath against the information's owner." Reply at 19. Yet, Defendants identify no evidence whatsoever indicating that the Government is "us[ing] whatever it wants" from the digital devices, and Defendants identify no seized evidence that falls beyond the scope of the warrant.

In many respects, the instant case is similar to *United States v. Aboshady*, 951 F.3d 1, 5 (1st Cir. 2020). There, the government executed a search warrant on the defendants' Google email account. *Id.* Google produced a duplicate data file of the email account to government agents. *Id.* "Subsequently, in accord with the plain terms of that section of the warrant, personnel from the [FBI] who were not part of the prosecution team then uploaded to a searchable database the estimated 430,081 documents contained in the data file that Google, Inc. had turned over, applied search terms to filter out potentially privileged communications, and then turned the database over to the investigative team." *Id.* The First Circuit reviewed that procedure and found "no violation of the warrant, let alone a flagrant one, in either the government's execution of the warrant on Google, Inc. or its subsequent creation of the database." *Id.*

Similarly, here, after the Government obtained the devices, an independent filter team reviewed the underlying data and then turned over material that survived the filter process to the prosecution team. The prosecution team then conducted a responsiveness review to determine what data fell within the scope of the warrant.

Indeed, the Government here implemented more safeguards than in *Aboshady*. There, the government never conducted a responsiveness review at all. *See id.* Instead, it simply seized *all* of the data that survived the filter process. *See id.* Here, by contrast, an independent filter team reviewed the data, then prosecutors conducted a responsiveness review, and *then* the Government seized the evidence responsive to the warrant. The prosecutors' decision to identify trial exhibits while they identified what evidence was responsive to the warrant does not change the fact that, as in *Aboshady*, the Government's search procedure here includes "no violation of the warrant, let alone a flagrant one." *Id.*

Defendants rely extensively on a concurring opinion in *CDT III*, in which Judge Kozinski argued as follows:

[T]he warrant application should normally include, or the issuing judicial officer should insert, a protocol for preventing agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown.  The procedure might involve, as in this case, a requirement that the segregation be done by specially trained computer personnel who are not involved in the investigation.  In that case, it should be made clear that *only* those personnel may examine and segregate the data. The government should also agree that such computer personnel will not communicate any information they learn during the segregation process absent further approval of the court.

621 F.3d at 1179 (Kozinski, J., concurring).

Defendants are careful to characterize this language as "guidance" and "best practices" that the Ninth Circuit has "encouraged" judges to implement.  They do so for good reason: the Ninth Circuit has never issued binding authority prohibiting prosecutors from participating in the responsiveness review to determine what evidence should be "seized" within the scope of the warrant.  In some cases, like in *CDT III*—where the raw evidence included "drug testing records for hundreds of players in Major League Baseball (and a great many other people)," not just drug testing records for the ten players within the scope of the warrant, *id.* at 1166 (per curiam)—it may be necessary to prohibit prosecutors and case agents from participating in the responsiveness review.  That prohibition would ensure that the privacy interests of uninvolved parties are zealously guarded.

However, the Fourth Amendment does not require such a prohibition in every case.  Rather, "the proper balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures of electronic data must be determined on a case-by-case basis."  *Schesso*, 730 F.3d at 1049.  Defendants offer no persuasive reasons why the prosecutors in this case should have been forbidden from participating in the responsiveness review after the raw data was filtered for privilege.  To the contrary, such a result would inhibit the government agents most knowledgeable about the case and the warrant—*i.e.*, the prosecutors—from determining what actually falls within the scope of the warrant.

Finally, even if prosecutors' participation in the responsiveness review rendered the execution of the search and seizure unlawful, Defendants would not be entitled to the remedy they seek: wholesale exclusion of all evidence seized from the digital devices.  Once again, *Aboshady* is analogous:

[E]ven if we were persuaded by Aboshady's argument . . . Aboshady is not entitled to the remedy he seeks — the blanket suppression of all emails seized and admitted at trial. . . . [T]he remedy in the case of a seizure that casts its net too broadly is not blanket

11

suppression but partial suppression.  If the scope of the government's search was too broad, Aboshady would only be entitled to suppression of those emails that were introduced at trial and that reasonably fell outside the scope of the warrant unless the lawful and unlawful parts of the search are inextricably intertwined or where the lawful part seems to have been a kind of pretext for the unlawful part.

*Id.* at 9.  Similarly, here, even if the Government executed the warrant improperly by allowing prosecutors to participate in the responsiveness review, Defendants would only be entitled to suppression of evidence beyond the scope of the warrant—*i.e.*, evidence that the Government lacks probable cause to seize.  *See id.*; *see also United States v. Sedaghaty*, 728 F.3d 885, 915 (9th Cir. 2013)("In the absence of 'flagrant disregard for the terms of the warrant,' a district court need not 'suppress all of the evidence, including evidence that was not tainted by the violation.'").[7]

Defendants identify no such evidence.  Indeed, Defendants identify no particular items of evidence from the digital devices at all.  Instead, Defendants argue that they are entitled to blanket suppression of *all* the evidence seized from Defendants' phones because the prosecutors participated in the responsiveness review.

For the reasons discussed above, the Court rejects that argument.  Rather, the Court finds that the search and seizure of the digital devices was reasonable and complied with the Fourth Amendment and the Federal Rules of Criminal Procedure.  Accordingly, Defendants' motion is DENIED.

## Dkt. 381: Motion to Dismiss the Indictment or, in the Alternative, Continue the Trial and Hold a Pre-Trial *Kastigar* Hearing

**The motion is DENIED.**  The Court cannot dismiss the indictment until it has held a *Kastigar* hearing and the Government has failed to meet its burden at that hearing.  And, as for holding a *Kastigar* hearing pre-trial and continuing the trial, the Court finds, in its discretion, that the more prudent course of action under the circumstances is to hold the *Kastigar* hearing post-trial.

As Defendants note, there is no universal practice regarding the timing of *Kastigar* hearings.  Reply at 13.  The Ninth Circuit has not addressed the issue.  Other courts have stated that, "[s]ince the advent of *Kastigar*, courts have considered it a matter of discretion whether to resolve [*Kastigar* issues] at a pretrial hearing, during trial or at a post trial hearing."  *United*

---

[7] Here, there was no flagrant disregard for the terms of the warrant.  *See supra* at 7–8, n.6.  Even if the Warrant could be read as prohibiting prosecutors from participating in the responsiveness review—it cannot, *see id.*—that prohibition would stem from ambiguities in the warrant.  But an ambiguous requirement cannot be "flagrantly"—*i.e.*, obviously—disregarded.

*States v. Deerfield Speciality Papers, Inc.*, 501 F. Supp. 796, 803 (E.D. Pa. 1980) (deferring *Kastigar* hearing post-trial); *see also United States v. Blumhagen*, 2017 WL 1243038, at *2 (W.D.N.Y. Apr. 5, 2017) ("The timing of a *Kastigar* hearing falls within the court's discretion, though the practice in the Second Circuit is to hold *Kastigar* hearings after trial.").  In *United States v. Kilroy*, the D.C. Circuit approved of a judge's use of a combination of methods: a pre-trial *Kastigar* hearing to resolve the grand jury issue, and a post-trial hearing regarding the trial record.  27 F.3d 679, 687 (D.C. Cir. 1994).  However, the court also explained that a *Kastigar* hearing could be held "pre-trial, post-trial, mid-trial (as evidence is offered), or [in] some combination of these methods."  *See id.*

Under the circumstances of this case, the Court finds that deferring the *Kastigar* hearing until after trial is the most prudent course of action.  First, although Defendants are asking for the *Kastigar* hearing to proceed before trial only on the issue of whether tainted information was used to obtain the superseding indictment, Defendants are also seeking a separate *Kastigar* hearing on non-evidentiary use of the tainted information.  This includes the Government's use of the information to interpret evidence, develop pre-trial strategy, develop trial strategy, refuse to plea bargain, prepare witnesses, and other potential uses.  And, as for the Government's use of tainted information (or its fruits) at trial, the Court noted in its prior order that a post-trial hearing on that issue will be more focused and tailored to the actual evidence presented at trial.

In other words, there will likely be a post-trial *Kastigar* hearing in this case regardless of whether the Court holds a pre-trial *Kastigar* hearing on the grand jury issue specifically.  Given that reality, the most efficient use of this Court's resources is to allow Defendants to challenge all of the following at the same hearing: (1) any evidentiary use of the tainted information before the grand jury; (2) non-evidentiary use prior to trial; and (3) any evidentiary use of the tainted information or its fruits at trial.  Addressing all of those potential uses at a single hearing is the most efficient course of action, and that can only be done if the Court holds the *Kastigar* hearing after trial.[8]

Second, although Defendants are entitled to a *Kastigar* hearing where the Government bears the burden, the foundation laid by Defendants thus far—*i.e.*, the evidence presented by Defendants in support of their claim that a *Kastigar* violation actually occurred—is not so compelling as to continue the trial in order to hold a pre-trial *Kastigar* hearing.  Indeed, some courts deny *Kastigar* hearings and resolve the issue on the papers unless a defendant lays "a firm foundation resting on more than suspicion" that a *Kastigar* violation occurred.  *United States v. Connolly*, 2019 WL 2120523, at *20 (S.D.N.Y. May 2, 2019) (cleaned up).

---

[8] The Court also notes, as it did in the prior order, *see* Dkt. 356 at 4 n.3, that Defendants waited three weeks after the Court's finding of actual coercion to file their motion for a *Kastigar* hearing.  This delay occurred despite the fact that Defendants were already on notice of the June 15 trial date.

Of course, as discussed in the Court's prior order, the law in this circuit requires a *Kastigar* hearing simply by virtue of the fact that the tainted information was compelled in violation of the Fifth Amendment. *See* Dkt. 356. Nevertheless, the Defendants' showing thus far counsels against continuing the entire trial for a *Kastigar* hearing that only two defendants are entitled to.

Accordingly, Defendants' motion to dismiss the indictment or, alternatively, continue the trial and hold a *Kastigar* hearing pre-trial is DENIED.[9]

## Dkt. 384: Motion to Admit Evidence Inextricably Intertwined With the Charged Offenses

The Court defers ruling on this motion.

The Government argues that the evidence is inextricably intertwined with the charged offenses. Defendants disagree and also argue that the evidence is substantially outweighed by a danger of unfair prejudice.

The Court finds that the evidence may be inextricably intertwined with the charged offenses. In *United States v. Loftis*, the Ninth Circuit explained that, "[i]n the context of mail and wire fraud . . . uncharged transactions that are part of an overall scheme are 'part of the same transaction' as the charged transactions, such that evidence of the uncharged transactions falls under the first inextricably intertwined exception. 843 F.3d 1173, 1178 (9th Cir. 2016); *see also id.* (evidence of uncharged wire transfers inextricably intertwined with charged wire transfers because uncharged transfers "'part of the same transaction' as the charged transactions'"); *United States v. Mundi*, 892 F.2d 817, 818 (9th Cir. 1989) (evidence inextricably intertwined with charged offense where defendant charged with wire fraud arising from scheme to defraud one travel agency and proffered evidence related to several other travel agencies not named in indictment).

To rely on the "inextricably intertwined" exception, the Government must show "a sufficient contextual or substantive connection between the proffered evidence and the alleged crime to justify exempting the evidence from the strictures of Rule 404(b)." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995). Here, to the extent any of the reserve

---

[9] Defendants argue that they will be prejudiced by proceeding to trial without a *Kastigar* hearing regarding the indictment because they will be forced to choose between "(a) giv[ing] up the element of surprise and present[ing] their best defense while the government uses tainted information, or (b) hop[ing] that they are correct that the vacatur of any conviction will be necessary and hold[ing] back their defense for a potential second trial." Reply at 14. Yet, if the difficulty of that choice were sufficient to require a pre-trial *Kastigar* hearing, courts would not have discretion to defer the hearing and would instead be *required* to hold a pre-trial *Kastigar* hearing. After all, every time a court chooses to hold a *Kastigar* hearing post-trial, the defendant is faced with the very choice Defendants describe. Yet, no court has ever held that choice sufficient to require a pre-trial *Kastigar* hearing.

identities have "a sufficient contextual or substantive connection" to the charged offenses, the Court will admit the evidence.  *Id.*

Specifically, the Government must show that the proffered piece of evidence was part of the "overall scheme" at issue here—*i.e.*, a scheme to submit fraudulent PPP and EIDL loans.  *See Loftis*, 843 F.3d at 1178.  The Government may satisfy its burden by showing, for example, that (1) the evidence was used in uncharged PPP and EIDL loans; (2) Defendants attempted to use the evidence in relation to PPP and EIDL loans; (3) Defendants discussed using the particular evidence in relation to PPP and EIDL loans; (4) the evidence was otherwise related to the "overall scheme" to obtain fraudulent PPP and EIDL loans.[10]

The Court cannot issue a blanket order admitting or excluding all of the evidence that may be inextricably intertwined with the charged offenses.  Such an order would inhibit the Court's ability to determine whether each piece of proffered evidence has "a sufficient contextual or substantive connection" to the charged offenses.  *Vizcarra-Martinez*, 66 F.3d 1006, 1013.

**Accordingly, the Government is ORDERED to identify the particular pieces of evidence—aside from the bag containing $450,000 in cash—that it seeks to admit as inextricably intertwined with the charged offenses.  The Government's filing should identify how each piece of evidence was part of the "overall scheme" to obtain fraudulent PPP and EIDL loans.  The Government's filing is due by 9:00 a.m. on June 11, 2021.**  Additionally, the Government should be prepared to discuss the evidence and establish its connection to the overall scheme during the conference scheduled for 11:00 a.m. on June 11, 2021.

As to the bag containing $450,000 of cash, the Court will also defer ruling on that evidence.  As of now, however, the Court is reluctant to admit it.  The only evidence provided by the Government in support of its claim that Defendants "took possession of money from tainted accounts in cash" is 3 checks totaling $4,500.  *See* Dkt. 188, Ex. 8 (showing 3 checks made out to cash totaling $4,500).  Although the Government previously represented that one of the co-conspirators withdrew $120,010 in cash, *see In the Matter of the Search of [REDACTED] Tarzana, California 91356*, 2:20-mj-05282, Dkt. 1 at 19, the Government does not mention that representation in its briefing and provides no documentary evidence to support it.  Accordingly, while cash may be part of the "overall scheme" to obtain fraudulent PPP and EIDL funds, *Loftis*, 843 F.3d at 1178, the Government has not yet presented "a sufficient contextual or substantive connection" between the bag of cash and the charged offenses, *Vizcarra-Martinez*, 66 F.3d 1006, 1013.

---

[10] The mere fact that the evidence was found at a defendant's home is insufficient to satisfy the Government's burden.

The Court notes that the bag of cash—and the particular manner in which it was discovered, *i.e.*, hidden in the bushes outside of Terabelian's home after she threw the bag there before the search team arrived—may also be independently admissible under FRE 404(b) as evidence of consciousness of guilt.  *See, e.g.*, *United States v. Montas*, 41 F.3d 775, 778 (1st Cir. 1994) (evidence that defendant threw away incriminating luggage tags was "highly probative that he was conscious of his own guilt"); *United States v. Kossak*, 275 F.Supp.2d 525, 529 (D. Del. 2003), *aff'd*, 178 F. App'x 183 (3d Cir. 2006) (evidence of defendants' efforts to hide money by routing it to different bank accounts "shows consciousness of guilt"); *United States v. Walters*, 775 F. App'x 25, 28 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 668, 205 L. Ed. 2d 443 (2019) ("Walters's attempts to conceal the killing by attempting to hide the gun and his bicycle indicate 'consciousness of guilt'").

However, all of the cases cited above involve Defendants who threw away or hid evidence of the *charged crime*.  Here, by contrast, the Government has not established a sufficient connection between the charged crime and the bag of cash such that the bag should be admitted at trial.  The mere fact that Defendant Terabelian threw away the bag of cash as the search team approached is insufficient.

The Government may provide additional support for its assertion that the $450,000 of cash is evidence related to the scheme to obtain fraudulent PPP and EIDL loans.  However, absent such evidence, the Court will not admit the bag of cash, even as evidence of consciousness of guilt.

For the foregoing reasons, the Court defers ruling on the motion.

## Dkt. 390: Motion to Exclude Evidence or Argument Regarding Miami Airport Search on October 19-20, 2020 and Search of Residences on November 5, 2020

**The motion is GRANTED.**  Defendants argue that evidence regarding the Miami airport search and the search of Defendants' residences is relevant to "the government's investigation, including mistakes, mishaps, and misconduct."  Opp. at 3.

The case law does not support Defendants' position.   The Ninth Circuit has explained that evidence about the Government's investigation or the credibility of its case agents must be "immediately relevant to the question of guilt."  *United States v. Reed*, 575 F.3d 900, 919 (9th Cir. 2009).  Put differently, the proffered testimony must undermine "the credibility or validity of any of the documentary evidence produced during the government's investigation," or "the quality of the government's *investigation*."  *United States v. Yagman*, 345 F. App'x 312, 314, n.1 (9th Cir. 2009) (emphasis added).

16

Indeed, the cases Defendants rely on all share a common thread: the proffered evidence directly undermined the Government's evidence or witnesses and was therefore "immediately relevant to the question of guilt." *Reed*, 575 F.3d at 919. For example, in *United States v. Howell*, the evidence at issue constituted a "glaring mistake" in two officers' separate police reports. 231 F.3d 615, 623 (9th Cir. 2000). The court explained that "the fact that not one, but two separate police reports contained an identical error as to a critical piece of evidence certainly raises the opportunity to attack the thoroughness, and even good faith, of the investigation." *Id.* at 625. In *United States v. Sager*, the case agent in charge of the investigation had presented inconsistent accounts regarding his interviews of a key witness in the case. 227 F.3d 1138, 1142 (9th Cir. 2000). The court described those inconsistencies as "a highly damaging flaw" in the case agent's testimony and found that the district court erred by prohibiting from defense counsel from cross-examining the agent about that flaw. *Id.* at 1146. Similarly, evidence of an officer's inconsistent statements was relevant in *United States v. Hanna* because such evidence "would reflect on his credibility." *United States v. Hanna*, 55 F.3d 1456, 1460 (9th Cir. 1995).

Unlike the evidence in these cases, the evidence related to the Miami search and the searches of Defendants' residence does not undermine the thoroughness of the Government's investigation, the credibility of the Government's witnesses, or any of the documentary evidence in the case. This includes evidence that the Government used a "military-style raid" in searching Defendants' homes; evidence that agents used national security as a pretext for the search in Miami; and evidence that customs agents lied to Defendants regarding their right to have a lawyer present. Indeed, Defendants identify no evidence related to the Miami search or the search of Defendants' residences that is similar to the evidence discussed in *Sager*, *Howell*, and *Hanna*.

Even if such evidence were somehow relevant, FRE 403 would require exclusion. This is because the minimal probative value of such evidence is substantially outweighed by a danger of misleading the jury and confusing the issues. *See* FRE 403.

To be clear, Defendants are not precluded from attacking the Government's investigation at all. Such a ruling would be flatly inconsistent with the Ninth Circuit's guidance in *Sager*. Defendants may present evidence regarding a witness's inconsistent statements, the Government's failure to investigate leads, or other evidence that is "immediately relevant to the question of guilt." *Reed*, 575 F.3d at 919. For example, Defendants may present evidence or argument that the Government failed to investigate purchases made by a "Iuliia Zhadko" at Lamps Plus in California. *See* Opp. at 2–3. If Defendants choose to do so, the Government may present evidence rebutting that argument. *See* Reply at 7 n.1.

However, the evidence identified by Defendants regarding the Miami search and the searches of Defendants' homes is inadmissible.  Accordingly, the Government's motion is GRANTED.

## Dkt. 393: Motion to Exclude Evidence of Jail Calls

**The motion is DENIED.**  First, without deciding any particular *Kastigar* issues, the Court notes that it reviewed the criminal complaint against Defendant Terabelian.[11]  *See* Dkt. 1. No tainted information from Defendant Terabelian's phone was referenced in the criminal complaint.  And, although a single tainted photograph from Defendant Ayvazyan's phone was referenced in the complaint, that photograph (of a California driver's license belonging to Iuliia Zhadko) provides the same information as untainted information in the complaint: a credit card in Iuliia Zhadko's name found in Ayvazyan's luggage.

Second, the Court finds that FRE 403 balancing does not require excluding the calls. This is because the calls' highly probative value is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Third, the Court finds that any concerns raised by Defendant regarding *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), can be ameliorated by redacting Defendant's references to finding an attorney.

Finally, after a careful review of the law, the Court concludes that admitting the calls does not violate the *McNabb-Mallory* rule.  This is so for three reasons.

First, even assuming that the calls occurred after the six-hour safe harbor window identified in 18 U.S.C. § 3501(c),[12] any delay in presenting Defendant to a magistrate was

---

[11] Given that the complaint was filed the day of the arrest, it provides a general understanding of the Government's basis for probable cause to arrest Defendant Terabelian.

[12] The parties dispute the precise time at which Defendant was "arrested."  The Government argues that Defendant's formal arrest occurred at 3:00 a.m.  *See* Dkt. 418, Ex. 1 (FBI 302 report stating agents "executed a probable cause arrest of [Defendant] at approximately 3:00 a.m.").  By contrast, Defendant argues that she was subject to custodial interrogation the evening before and, accordingly, the arrest occurred well before 3 a.m.  Reply at 8.  Defendant makes that argument by relying, in part, on the following statement from the Court's prior order: "Defendants were then detained until approximately 1:45 a.m., when they were informed that they were being arrested."  Dkt. 296 at 2; *see also* Reply at 8.

The Court rejects Defendants' reliance on that statement.  In the prior order, the Court expressly stated that "nothing in [the factual background]"—the section from which Defendant pulls that statement—"should be construed as a factual finding by the Court."  *Id.* at 1 n.1.  The Court explained that the facts in that section were sourced, in part, from "the parties' briefs."  *Id.*  Indeed, the statement identified by Defendant was sourced from Defendant R. Ayvazyan's brief.  *See* Dkt. 135 at 9 ("At approximately 1:45 a.m., Ayvazyan and Terabelian were informed that

reasonable.  The Ninth Circuit has expressly held that "administrative delays due to the unavailability of government personnel and judges necessary to completing the arraignment process are reasonable and necessary and therefore do not violate the prompt-presentment requirement of Rule 5(a)."  *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009).  That holding is "dictated by the complex procedures needed to arraign a defendant.  An arraignment requires court personnel to randomly select a judge, requires pretrial services to process the defendant, and often requires an interpreter; this is simply not a task that can be performed in a magistrate's living room."  *United States v. Van Poyck*, 77 F.3d 285, 289 (9th Cir. 1996).

Here, the Government presented evidence that, on October 20, 2020—the date of Defendant's arrest—no magistrate judge was on duty or available to arraign Defendant.  *See* Dkt. 418, Ex. 2.  Defendant does not offer evidence that federal arraignments were, in fact, occurring on October 20, 2020.  Instead, Defendant argues that it was unreasonable for the Southern District of Florida to plan a day without arraignments.  *See* Reply at 10.

Yet, "[t]he prompt presentment requirement does not require a magistrate to be available twenty-four hours a day."  *United States v. Boche-Perez*, 755 F.3d 327, 338 (5th Cir. 2014).  Indeed, "[a] magistrate can be considered unavailable due to a host of reasons including . . . a closed court . . . ."  *Id.*  Moreover, Defendant's argument runs counter to *Van Poyk*, where the Ninth Circuit held that "[a]n overnight or weekend delay in arraignment due to the *unavailability of a magistrate* does not by itself render the delay unreasonable under § 3501(c)."  77 F.3d at 289 (emphasis added).  In light of this case law, the Court declines to hold that the Southern District of Florida's decision not to hold arraignment on a single day was "unreasonable."

Second, even assuming that it was unreasonable for the Southern District of Florida to hold no arraignments on October 20, 2020—it was not—Defendant's jail calls still would not be suppressed because they were made *before* the unreasonable delay.  This is confirmed by *United States v. Mitchell*, a case decided less than a year after *McNabb*.  322 U.S. 65 (1944).  There,

---

they were being arrested.").  In fact, in a different, brief, Defendants stated the time of arrest as 3:00 a.m.  *See* Dkt. 130 at 11.

Nevertheless, Defendant's argument is not entirely unavailing.  In *Gowadia*, the Ninth Circuit "reject[ed] th[e] formulation" that the "right to presentment may attach even absent formal arrest."  760 F.3d at 995.  But the court ultimately "reserve[d] judgment on whether the term 'other detention' might have independent meaning from 'arrest' upon formal charges *in an extraordinary situation*."  *Id.* at 995 (emphasis added).

Here, the Court need not determine whether Defendant's custodial interrogation at the Miami airport constitutes an "extraordinary situation" or "other detention" warranting attachment—prior to formal arrest—of the right to presentment.  This is because, as discussed in this section, any delay was reasonable.  However, the Court does note that accepting Defendant's argument would result in the attachment of the right to presentment at nearly every custodial interrogation that ends with a formal arrest.  This would undermine Congress's "inten[t] to limit *McNabb–Mallory*, not to expand it."  *Gowadia*, 760 F.3d at 994.

relying on *McNabb*, the court of appeals excluded a confession made shortly after the
defendant's arrest because, after the confession, the defendant was detained for eight more days
until he finally appeared before a magistrate judge. *See id.* at 69–70. The Supreme Court
accepted the case in light of the "importance to federal criminal justice of *proper application* of
the *McNabb* doctrine." *Id.* at 66 (emphasis added).

In clarifying the "proper application" of *McNabb*, the Supreme Court reversed the court
of appeals. The Supreme Court explained that "the illegality of Mitchell's detention"—*i.e.*, the
unreasonable eight-day delay—"*does not retroactively change the circumstances under which he
made the disclosures.*" *Id.* at 70 (emphasis added). In other words, regardless of the
unreasonable delay, the confession was still admissible because it occurred *prior* to that delay.
*See United States v. Carter*, 484 F.App'x 449, 455 (11th Cir. 2012) ("[The] confession [in
*Mitchell*], otherwise voluntary, was not made during a period of unreasonable delay and illegal
detention as in *McNabb*. . . . The extended detention after his confession was simply not relevant
to the admission of the confession given before the detention became tainted.").

This reading of the *McNabb-Mallory* rule—*i.e.*, that it does not bar admission of
confessions made before any unreasonable delay begins—is consistent with other courts'
interpretation of the rule, including the Supreme Court. *See Corley*, 556 U.S. 303, 308 (2009)
(noting that under *McNabb-Mallory* "confessions [are] inadmissible if given *after* an
unreasonable delay in presentment") (emphasis added); *see also Boche-Perez*, 755 F.3d at 338
("[In *McNabb-Mallory*], the Supreme Court established a remedy for violations of the prompt-
presentment requirement: suppression of any confession obtained *during a period* of
unreasonable delay.") (emphasis added).

Here, at the time Defendant was arrested—whether that means in the late evening of
October 19, 2020, or at 3:00 a.m. on October, 2020—there was no possibility that she could have
been immediately presented to a magistrate. This is because, under normal circumstances,[13] a
defendant is not entitled to an arraignment overnight. *See Van Poyck*, 77 F.3d at 289. Rather,
the right to presentment is generally limited to the right to appear before a magistrate "during
normal court hours." *Id.* at 290 n.7. Accordingly, any period of unreasonable delay could only
have begun after the mid-morning of October 20, 2020.

Yet, that is precisely when the jail calls at issue here were made. Specifically, one call
was made at 8:29 a.m., and the other was made at 8:35 a.m. *See* Paetty Decl. ¶ 6. Accordingly,
because any unreasonable delay could not have even begun at the time Defendant made the
challenged jail calls, *McNabb-Mallory* does not require suppression of those calls.

---

[13] Defendant does not argue that she was entitled to an emergency appearance before a magistrate judge or an
immediate arraignment in the middle of the night, and the Court is not aware of any basis for that argument.

Finally, suppression here would not promote the principles underlying the *McNabb-Mallory* rule.  In *Garcia-Hernandez*, the Ninth Circuit explained that "delay *for the purpose of interrogation* is the epitome of 'unnecessary delay.'"  569 F.3d 1100, 1106 (9th Cir. 2009) (emphasis in original) (quoting *Corley*, 556 U.S. at 308).  "The *McNabb–Mallory* rule was designed to deter police from engaging in lengthy prearraignment detentions for the purpose of further interrogating a defendant.  Accordingly, a delay is unreasonable and unnecessary when it is 'of a nature to give opportunity for the extraction of a confession.'"  *Id.* (quoting *Mallory v. United States*, 354 U.S. 449, 455 (1957)).  For those reasons, the Ninth Circuit has been "careful not to overextend *McNabb–Mallory*'s prophylactic rule in cases where there was a reasonable delay unrelated to any prolonged interrogation of the arrestee."  *Id.*

Here, there is no indication that any alleged delay occurred for the purpose of interrogation.  Indeed, Defendant was not interrogated by agents at all after she was arrested.  Rather, Defendant voluntarily made the jail calls at issue and then was presented to a magistrate the next day that the Southern District of Florida held arraignments: October 21, 2021.  Accordingly, there was a "reasonable delay unrelated to any prolonged interrogation of the arrestee," and suppression under *McNabb-Mallory* is not warranted.  *Garcia-Hernandez*, 569 F.3d at 1106.

For the foregoing reasons, Defendant's motion to suppress the jail calls is DENIED.[14]

## **Dkts. 422 and 426: Government's Motion to Redact First Superseding Indictment and Defendants' Opposition and Cross-Motion to Redact First Superseding Indictment**

**The Government's motion is GRANTED, and Defendants' motion is DENIED.**   The Government seeks to redact the indictment by removing paragraphs 32 and 61.  Defendants do

---

[14] In her Reply, Defendant Terabelian suggests—contrary to this Court's finding, *see* Dkt. 296 at 17 n.14—that she moved to suppress the Kauichko card found in her possession on Fifth Amendment grounds.  The basis of that assertion is Dkt. 153, wherein Terabelian joined two of co-defendant R. Ayvazyan's motions: (1) Dkt. 130; and (2) Dkt. 146.

Neither supports Terabelian's assertion.  Both of those motions moved for suppression on Fourth Amendment grounds.  *See* Dkts. 130, 146.  Terabelian did not join R. Ayvazyan's motion to suppress under the Fifth Amendment.  *See* Dkt. 135.  Instead, she filed her own motion to suppress under the Fifth Amendment.  *See* Dkt. 136.  And that Fifth Amendment motion, Terabelian did not move to suppress the Kauichko card found in her possession.  *See id.* ("Terabelian respectfully requests the Court suppress her *statements* at Miami International Airport on Miranda and voluntariness grounds and suppress all *evidence obtained from her smartphone* . . . .").  It was not until Terabelian filed a joint reply with R. Ayvazyan that she requested suppression of "any evidence" from the Miami airport on Fifth Amendment grounds.  Dkt. 209.

Regardless, the Court notes that any request to suppress the physical Kauichko card on Fifth Amendment grounds would be denied for the same reasons the Court denied R. Ayvazyan's motion to suppress the physical evidence in his luggage on Fifth Amendment grounds.  *See* Dkt. 296 at 18.

not challenge the proposed redactions to paragraph 61.  Instead, Defendants challenge the redactions to paragraph 32.  Paragraph 32 reads as follows:

> As part of the conspiracy, between in or around March 2020 and in or around August 2020, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, T. DADYAN, GRIGORYAN, HAYRAPETYAN, PARONYAN, and V. DADYAN, together with other coconspirators, submitted and caused the submission of at least 151 fraudulent PPP and EIDL loan applications seeking a total of at least $21.9 million in PPP and EIDL proceeds from the SBA and at least 11 financial institutions, and received a total of at least $18 million in PPP and EIDL loan proceeds from the SBA and financial institutions.

Dkt. 154.  Redacting this paragraph does not in any way change the charged offenses, the overt acts and objects of the conspiracy, or any of the allegations in the indictment other than the total number of alleged fraudulent loans and their value.

For those reasons, the proffered redaction does not constitute a constructive amendment. The Government does not seek to prove, at trial, a set of facts "distinctly different from those set forth in the charging instrument."  *United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017). Nor does the Government's proposal "substantially alter[]" the crimes charged in the indictment or an "essential element" of those crimes such that it is "impossible to know whether the grand jury would have indicted for the crime actually proved."  *Id.* at 603, 605.

Rather, the Government's proposal—removing a paragraph that broadly describes the scope of the alleged scheme—simply "narrow[s] the indictment's charges without adding any new offenses."  *United States v. Miller*, 471 U.S. 130, 138 (1985).  Defendants' characterizations of the Government's redactions as "represent[ing] fundamentally different charges" and a "new conspiracy" are without merit.  Opp. at 3–4.

Indeed, the Defendants' own description of permissible amendments confirms the Court's conclusion.  Defendants state that "the government could meet its burden of proof on a narrower conspiracy than the one originally charged without returning to the grand jury first, so long as the narrower conspiracy was 'completely contained' within the charged conspiracy."  *Id.* at 4 (quoting *Miller*, 471 U.S. at 144).  That is precisely what the Government proposes to do.

Accordingly, the Government's proposed amendment constitutes a variance, not a constructive amendment.  *See Davis*, 854 F.3d at 605.

A variance is only prohibited if it "prejudices a defendant's substantial rights."  *Id.* at 605.  Here, Defendants' substantial rights are not prejudiced.  Defendants argue that they are prejudiced because they cannot present a multiple conspiracies defense.  *See* Opp. at 4–5.  Yet,

courts routinely permit amendments far more substantive than the one proposed by the Government, even where said amendments narrow the scope of the conspiracy. *See United States v. Jones*, 14 F.3d 597 n.4 (4th Cir. 1993) (collecting cases). The Government's decision to narrow the allegations it intends to prove up at trial does not prejudice Defendants.

      Accordingly, the Court will allow the Government's proposed redactions.

      Finally, the Court denies Defendants' motion to strike paragraphs 10–18 of the indictment, which provide background information about the PPP and EIDL loans. "The purpose of a motion to strike under Fed. R. Crim P. 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988). The Court reviewed paragraphs 10–18 and concludes that there is nothing inflammatory or prejudicial about them.

      Defendants also argue that the paragraphs are "immaterial" and "irrelevant." *See* Opp. at 7 n.2. Defendants are charged with fraudulently obtaining PPP and EIDL loans. Background information about those programs is plainly relevant.

      For the foregoing reasons, the Government's motion is GRANTED, and Defendants' motion is DENIED.

Date: June 10, 2021

HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE