TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/2424/3819
     Facsimile: (213) 894-6269/0141
     E-mail:    Scott.Paetty@usdoj.gov
                Catherine.S.Ahn@usdoj.gov
                Brian.Faerstein@usdoj.gov

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue NW, 3rd Floor
     Washington, DC 20530
     Telephone: (202) 320-0539
     Facsimile: (202) 514-0152
     E-mail:    Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD AYVAZYAN,<br>   aka "Richard Avazian" and<br>      "Iuliia Zhadko,"<br>MARIETTA TERABELIAN,<br>   aka "Marietta Abelian" and<br>      "Viktoria Kauichko,"<br>ARTUR AYVAZYAN,<br>   aka "Arthur Ayvazyan," and<br>TAMARA DADYAN,<br>MANUK GRIGORYAN,<br>   aka "Mike Grigoryan," and<br>      "Anton Kudiumov,"<br>ARMAN HAYRAPETYAN,<br>EDVARD PARONYAN, | No. CR 20-579(A)-SVW<br><br>GOVERNMENT'S SUPPLEMENT TO ITS MOTION *IN LIMINE* #2 REGARDING INEXTRICABLY INTERTWINED EVIDENCE<br><br>Hearing Date: June 11, 2021<br>Hearing Time: 1:00 p.m.<br>Trial Date:  June 15, 2021<br>Location:    Courtroom of the<br>             Hon. Stephen V.<br>             Wilson |

|   |   |
|---|---|
| aka "Edvard Paronian" and "Edward Paronyan," and VAHE DADYAN, | |
| Defendants. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, Assistant United States Attorneys Scott Paetty, Catherine Ahn, and Brian Faerstein, and Department of Justice Trial Attorney Christopher Fenton, hereby files this supplement identifying the exhibits that contain inextricably intertwined evidence, in response to the Court's June 10, 2021 Order re: Pretrial Motions (ECF 478 at 15) ("Order").

This supplemental filing is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 11, 2021         Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

       /s/
_____
CATHERINE S. AHN
SCOTT PAETTY
BRIAN FAERSTEIN
Assistant United States Attorneys
CHRISTOPHER FENTON
Department of Justice Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   Category 3 and 4: Evidence Discussed in Relation to Fraud /
     Fraud Scheme (Exhibit 1).........................................2

II.  Category 4:  Evidence Related to the Overall Scheme
     (Exhibit 3)......................................................3

III. Category 4 and Direct Use:  Evidence of the Scheme
     Collocated with Directly Used Identities Evidence (Exhibits
     2 and 4).........................................................7

IV.  Defendant's Use and Withdrawal of Hundreds of Thousands of
     Dollars in Cash from Accounts Related to the Fraud and
     Money Laundering Conspiracies...................................11

V.   Conclusion......................................................12

**MEMORANDUM OF POINTS AND AUTHORITIES**

In its June 10, 2021 Order re: Pretrial Motions (ECF 478) ("Order"), the Court ruled that "[t]he Government may satisfy its burden by showing, for example, that (1) the evidence was used in uncharged PPP and EIDL loans; (2) Defendants attempted to use the evidence in relation to PPP and EIDL loans; (3) Defendants discussed using the particular evidence in relation to PPP and EIDL loans; (4) the evidence was otherwise related to the 'overall scheme' to obtain fraudulent PPP and EIDL loans."[1]  Order at 15.

The government has identified in its attached exhibits evidence that would fall into the "reserve identities evidence" category – that is, evidence that relates to the possession or use of identities of individuals or businesses that were not directly tied to a PPP or EIDL loan or related transactions (e.g., bank accounts through which laundered funds flowed).  In general, this evidence would fall into either a combination of category #3 (Defendants discussed using the particular evidence in relation to PPP and EIDL loans) and category #4 (evidence otherwise related to the "overall scheme" to obtain

---

[1] The government generally considers evidence that falls into category #1 and #2 as "directly used identities" evidence that is not part of the evidence the government seeks to admit under an inextricably intertwined theory of admissibility. (Mot. (ECF 384) at 2.)  As such, the government's identification efforts focused on categories #3 and #4 and exhibits where there was a combination of directly used identities evidence and reserve identity evidence ("combination exhibits").  Furthermore, individuals and entities whose accounts or identities were used to transfer fraudulent PPP or EIDL funds were also considered by the government to fall into the category of "directly used" rather than "reserve identities" evidence subject to the inextricably intertwined analysis.  This includes, for example, images of the "V&D Limo" check sent by text message between "tammy" (defendant Tamara Dadyan) and "Rich New" (defendant Richard Ayvazyan) to identify where "Rich New" should send "Vahe" – likely co-defendant Vahe Dadyan – his wire.  (Mot. at 18-19 (T.D. iPhone Excerpt 7) and Exhibit 4 at 3 (filed under seal).)

fraudulent PPP and EIDL loans); category #4 on its own; or a combination of category #4 and directly used identities evidence (combination evidence).

## I. Category 3 and 4: Evidence Discussed in Relation to Fraud / Fraud Scheme (Exhibit 1)

There are two items of evidence that fall into this category. First, images of cashier's checks being paid to the order of "AM & AM Financial Services, Inc." that were found on defendant Tamara Dadyan's phone (1B21) in the Media/Images section of her device and are part of the Government's Trial Exhibit ("GEX") 13c. (See Exhibit 1 at 1 (all attached exhibits filed under seal).) This falls into the category #3 because – in the text messages also obtained from that phone – "tammy" texts "Rich New" a series of images that include references to PPP processor Bluevine and attachments containing the California Secretary of State Articles of Incorporation for AM & AM Financial, as well as a newly obtained IRS Employer Identification Number for AM & AM at an address associated with defendants. (See Exhibit 2 at 34, Images 50 and 51[2] (GEX 10, T.D. iPhone Text Messages with "Rich New").) Since the co-conspirators would obtain public records for business entities and then use or alter EIN documents for those entities, evidence related to AM & AM Financial falls into category #4, while the discussion of that evidence falls into category #3, rendering the cashier's check a combination of the two.

Second, handwritten notes were found at the Weddington address associated with defendant Tamara Dadyan and Artur Ayvazyan. (See

---

[2] The government has not included all the GEX 10 attachments due to their size, but has included the text message chain and described those attachments when appropriate.

2

Exhibit 1 at 2 (included as part of GEX 57).) In this note, it references "[individual name] Disaster loan with her bank account" along with a phone number, a possible bank account, and some notes regarding that individual's relative. Because of the discussion in relation to the EIDL program, it falls into category #3, but given the similarity it has to the overall scheme and conspiracy to defraud – the use by defendants of a name and identity not their own, with personal information as well as an account through which EIDL funds could flow, this also falls into category #4.

## II.   Category 4:   Evidence Related to the Overall Scheme (Exhibit 3)

There are four types of scheme-related evidence from the residential searches[3] that fall into category #4. (See Exhibit 3 at 1-4 (filed under seal).) These include physical evidence of the ways in which defendants created voided checks to use in PPP or EIDL applications; the use of numerous different business identities all tying back to the same address associated with defendants; defendant's extensive fake identification manufacturing process and their use of foreign visitor identities; and their use of online accounts to corroborate and open new accounts.

From GEX 54 (Canoga Residence Search), there are rows of checks printed on check paper, including a misprinted set of checks, which corroborate the discussion between "tammy" and "Rich New" in which the co-conspirators discuss: (1) the need to provide a copy of a

---

[3] The government's evidence will show that the Canoga residence was rented in the name of defendant Manuk Grigoryan, and had the synthetic identity "Viktoria Kauichko" on the lease. Applications were also submitted in the name of the synthetic identity "Anton Kudiumov" that identified the Canoga address as his residence. The Topeka residence was identified as Richard Ayvazyan and Marietta Terabelian's address, and the Weddington residence was identified as Tamara Dadyan and Artur Ayvazyan's address.

3

voided check with an application; and (2) when "tammy" asks how she can make a voided check, "Rich New" tells her how to print one.  (See Exhibit 2 at 4 (text message 2468) and 26 (text messages 3988-3990).)

From GEX 56 (Topeka Residence Search), agents found stacks of financial offers directed to the Topeka address and a Genesta address where defendants Richard Ayvazyan and Marietta Terabelian lived, but the offers are directed to numerous different companies all at the same address.  (See Exhibit 3 at 2-3.)  As the PPP and EIDL loan applications will show, defendants repeatedly used the same address across numerous, purportedly different business applicants.

From GEX 57 (Weddington Residence Search), there are handwritten notes referencing Nerses N. and law enforcement recovered a physical California Driver's License ("CADL") purportedly belonging to Nerses N.  (See Exhibit 3 at 4.)  However, the individual on this version of the Nerses N. CADL looks strikingly different from other versions of the Nerses N. CADL also found on Artur Ayvazyan's iPhone and seized from the Weddington residence.  Notably, law enforcement further found notes on Artur Ayvazyan's phone with instructions to "please use a (sic) old Armenian guy" along with a version of the CADL that shows an older Armenian gentleman.  (See Exhibit 3 at 9.)  Although Nerses N. is not an identity that the government has identified on PPP or EIDL loans or associated financial transactions; this provides critical and uniquely detailed and concrete insight into the way the co-conspirators were able to obtain the purportedly official but actually fake identification cards found in PPP applications submitted in furtherance of the charged conspiracy (e.g., the synthetic "Anton Kudiumov" CADL).  There is additional evidence of false identification card manufacturing that was found at the

4

Weddington residence (see Exhibit 4 at 1-5), which will be further discussed below. Law enforcement also seized a large number of foreign visitor identification documents (visas and work-related social security cards) at the Weddington residence. The government's evidence will show that defendants used synthetic identities composed of real information about foreign students who visited the United States but left and fake information. These identities included "Iulia Zhadko," "Viktoria Kauichko," and "Anton Kudiumov." Defendant's possession of an unusually large amount of foreign visitor identification cards in many different names is proof of the scheme.

Law enforcement also found at the Weddington residence images of additional identification cards with hand-written notes that appear to document the defendant-associated address that was used on the CADL, along with notes regarding how defendants intended to use the identity and account information. (See Exhibit 3 at 7 ("currently has personal and business / need to add this new business account / use all current email and all same contact info & give us online access").) These notes mirror the ways in which defendants used the false or synthetic identities they discussed in the T.D. iPhone text messages (GEX 10); one even used the same exact password "Pookie1031" used to access the deceased attorney Olaf Landsgaard's purported email (used in the charged real estate transaction, among others) and other email accounts apparently used in PPP applications. (See Exhibit 2 at 14 (text messages 3209-3217) and 20 (text messages 3616-3626).)

The digital evidence obtained from devices seized during the residential searches generally fall into the following categories:

5

- Possession of more checks in individual names and businesses not of defendants (Exhibit 3 at 8);
- Indicia of software to manufacture new identification and instructions on how to alter identification cards found in Artur Ayvazyan's iPhone (id. at 9-14);
- The creation and use of false records, to include false 940 and 941s in the name of Corrine B. but fraudulently showing it had been prepared by A.F., one of the aggravated identity theft victims in this case and screenshots on how to apply for an EIN online, which we know defendants frequently did for entities they used in PPP and EIDL applications (id. at 15-16);
- Photographs of wire receipts and deposit receipts for transactions, which we know from the T.D. iPhone messages were sent to other co-conspirators as proof a transaction had been made (id. at 17);
- The possession of images of numerous CADL and social security cards in other people's names, including Corrine B., whose 940 and 941s that were also found in Artur Ayvazyan's phone fraudulently included the name of A.F., a tax preparer identity theft victim of the fraud conspiracy (id. at 18-19;
- An image of a CADL, social security card, and financial debit or credit card all in the name of Grigor P. found on Richard Ayvazyan's iPhone (1B85), representing the trifecta of information the conspirators needed to execute their scheme (identities and accounts in those names to receive or transfer fraudulent proceeds) (id. at 20);

6

- The use and possession of identities other than those of defendants, as shown by a photographed stack of California Employment Development Department envelopes with names other than her own on Tamara Dadyan's iPhone (id. at 21);
- The sharing of access to and use of databases like TLOxp with images from "tammy" to "Rich New" explicitly showing that it contains personal identifying information, which was used in furtherance of the PPP and EIDL scheme (id. at 22; see also Mot. at 9); and
- Evidence of defendant's use of a Virtual Private Network ("VPN"), which would enable defendants to hide or change their purported location when accessing the internet (see Exhibit 3 at 23).

**III. Category 4 and Direct Use:  Evidence of the Scheme Collocated with Directly Used Identities Evidence (Exhibits 2 and 4)**

The text message conversation between "tammy" and "Rich New" is a classic example of inextricably intertwined evidence.  (See Exhibit 2[4].)  In this discussion, co-defendants Tamara Dadyan and Richard Ayvazyan can be seen learning about the PPP and EIDL programs, learning how to apply, learning how to fraudulently alter numbers in order to obtain approved loans, and then discussing how much and to whom the proceeds of the fraud should be distributed.  (See Exhibit 2.)  Sprinkled throughout this discussion, however, are references to additional identities for use or possible use, references to methods by which the fraud could be conducted, and attempts to further the

---

[4] Although the government did not attach all of the files or images exchanged between the coconspirators, those files would include reserve identities evidence falling into this combined category and the government seeks its inclusion.

7

scheme by lying to bank or loan officers in order to induce them to release proceeds. It shows evidence of the scheme in the same context as directly used identities evidence, and one cannot be clearly understood without the other for context.

The government also seized evidence that was located in the same location – the office - at defendant Tamara Dadyan and Artur Ayvazyan's residence. The government's emphasis on their collocation is not to note that mere possession inside a home is evidence that the directly used and the reserve identities evidence is intertwined; rather, it is to show that defendants themselves considered these to be similar in use or possession enough to keep them in the same place. The fact that it was found in the office – where presumably business is conducted – is telling.

This evidence, which is part of GEX 57, includes numerous identification cards, including CADLs that are obviously fraudulent due to the multiple versions with different photographs being possessed. (See Exhibit 4 at 1-5.) Significantly, the seized evidence included passport-style photographs of individuals who are repeatedly depicted in the seized CADLs, further proving these materials as defendants' literal instruments of fraud in furtherance of PPP and EIDL scheme and conspiracies, which rely on the availability of false identification documents. (Id. at 6.) As discussed above, their possession in the same place is indicative of their use as a common scheme or fraud. Furthermore, as indicated in the government's exhibit (marked with a red check), many of these identities are for individuals who were directly used by the coconspirators in PPP and EIDL loan applications. As extensively discussed above and in its motion and reply (ECF 384 and 441),

8

defendant's ready access to a supply of individual and business identities, with the relevant documentation to support their existence, was critical to maintaining the fraud and money laundering conspiracies.

This is also the basis for the government's argument that the email accounts, checks and checkbooks, calendar notes, and additional notes are inextricably intertwined. (See Exhibit 4 at 7-18.) A close review shows that defendants – not the government – included the email and online user accounts of directly used identities and instruments of fraud, such as Alak M., First Class Property, and the TLO account, on a sheet titled "EMAILS" that contained a large number of accounts associated with names other than defendants. (Id. at 11.) The same is true of the accounts noted in the "EMAILS FOR BORROWERS" sheet found at Tamara Dadyan's and Artur Ayvazyan's residence. (Id. at 8-10.) Notably, the passwords for these accounts were often repeats of the password shared by "tammy" to "Rich New" for accounts to access emails used for PPP or EIDL applications and "Olaf," the deceased lawyer. (See Exhibit 2 at 14 and 20 ("pookie1031").) Similarly, the checkbooks include accounts in the names of entities that were directly used in the fraud and conspiracies, including "Medet Murat," EM Construction Co., and First Class Property Management. (See Exhibit 4 at 12-13.) They also include a checkbook for Nerses N., completing the trifecta of defendant's scheme by which defendants used business and individual identities to apply for and obtain fraudulent PPP and EIDL proceeds (identification card, social security, and financial account). (Id. at 19.) The Nerses N. reserve identity evidence is a critical piece to enabling the government to prove the manufacturing of fraudulent

identities as part of the scheme.  Unlike the other identities, the data on Artur Ayvazyan's phone shows explicit instructions on what kind of photograph to use, proving the deliberate creation of false CADLs by the coconspirators.

The calendar pages and notes, however, are even more probative of the defendants' method of manufacturing these individual identities and financial profiles to execute the PPP and EIDL fraud and money laundering conspiracies.  Peppered throughout these pages are notes referencing directly used identities and the coconspirators' methods of fraud.  For example, one calendar page alone appears to have a "to do" list of items, including: "Anna Dzukaeva – Bluevine / Liberty / Fundbox"; "Send Richard Bluevine paper that guy send"; and "do the Alak paper dl / Spyglass Wells [ ] mail it in to the Edd". (See Exhibit 4 at 14.)  Every page in the government's exhibit contains numerous references to directly used identities that are literally on the same page as reserve identities evidence in which PPP or EIDL applications are referenced. (See, e.g., "Kopytova DL upload to Bank of West" and the reference to Jack Runyan, one of the identity theft victims in this case (Exhibit 4 at 23-24).)  The "Driscoll" notes are even more explicit, reminding the author to "all our EDD – Eoncie / Alak," "Fix W2 Heros / ABC legal," and "Fix DL I emailed him date on Victoria Babetska and maybe a bank statement I tell Ronna her to print 2 one with Victoria name one with VOVK US Bank." (See Exhibit 4 at 18.)  ABC Legal, Koptoyva, and Alak are all names associated with or used for PPP or EIDL applications.

The government further seized a yellow notepad from the Canoga residence, which forms a part of GEX 54, that appears to have a list of company names and phone numbers. (See Exhibit 4 at 19.)  As shown

in the text messages in GEX 10 (Exhibit 2), defendants Richard Ayvazyan and Tamara Dadyan assigned a phone number to a synthetic individual or business identity and relied on coordination to ensure that the correct number was answered in the event someone called to check the account.  (See Exhibit 2 at 13 (text message 3170), 18 (text message 3526).)  The coconspirators had numerous phone numbers and had to keep track of which number was identified to which synthetic, false, or stolen identity.  (Id. at 34 (text messages 4647-4665).)  Although some of the companies listed were not identified by the government as associated with an EIDL or PPP loan ("Hupp"), many of the names listed were ("Sabala") and the sheet provides further evidence of the manner in which defendants were able to conspire to perpetrate their fraud.  As such, it is inextricably intertwined with the fraud and money laundering conspiracies.

**IV. Defendant's Use and Withdrawal of Hundreds of Thousands of Dollars in Cash from Accounts Related to the Fraud and Money Laundering Conspiracies**

The government has identified numerous bank accounts in the names of defendants and the synthetic identities used by them in the PPP and EIDL fraud and money laundering conspiracies.  As shown in the table below, defendants likely made significant cash withdrawals from these accounts, totaling more than $300,000, during the relevant timeframe.  The column noted as "cash" shows direct cash withdrawals from these accounts; the casino/gaming column shows withdrawals from ATMs at gaming facilities or the conversion cash to gaming chips; and the "withdrawals" column indicate withdrawals that were accompanied by a withdrawal slip, indicating a likely cash withdrawal.  Based on these figures, it appears that the defendants likely withdrew in cash

11

or cash equivalents totaling more than $300,000 between April and October of 2020.

| Account Holder/Controller | Start Date | End Date | Cash | Casino/Gaming | Withdrawals | Total |
|---|---|---|---|---|---|---|
| Anton Kudiumov | 07/06/20 | 09/14/20 | $ 8,500.00 | $ 3,126.98 | | $ 11,626.98 |
| Arman Hayrapetyan | 04/22/20 | 09/28/20 | 19,500.00 | | 225,000.00 | 244,500.00 |
| Artashes Grigoryan | 05/01/20 | 10/19/20 | 1,504.00 | | 2,900.00 | 4,404.00 |
| Artur Ayvazyan | 08/21/20 | 09/17/20 | 142.99 | | | 142.99 |
| Edvard Paronyan | 04/27/20 | 09/29/20 | 8,708.00 | 17,662.85 | | 26,370.85 |
| Iuliia Zhadko | 04/23/20 | 05/19/20 | 11,750.00 | | | 11,750.00 |
| Marietta Terabelian | 06/03/20 | 06/03/20 | 500.00 | | | 500.00 |
| Richard Ayvazyan | 09/14/20 | 09/14/20 | | 3,217.50 | | 3,217.50 |
| Tamara Dadyan | 08/24/20 | 08/24/20 | 500.00 | | | 500.00 |
| Viktoria Kauichko | 07/06/20 | 07/06/20 | 1,000.00 | | | 1,000.00 |
| Total | 04/22/20 | 10/19/20 | $ 52,104.99 | $ 24,007.33 | $ 227,900.00 | $ 304,012.32 |

As such, the government believes there is a sufficient contextual or substantive connection between the bag of cash and the charged offenses, and respectfully requests admittance of the photographs of cash found at defendant Richard Ayvazyan and Marietta Terabelian's residence.

**V. Conclusion**

For the reasons described above, the reserve identities evidence the government seeks to admit at trial is inextricably intertwined with the fraud and money laundering conspiracies and should be admitted.  The government respectfully requests the Court grant its motion in limine and admit the evidence described and attached to this supplement to the government's motion in limine.