1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**

6              **Plaintiff,**

7        **vs.**                        **Case No. CR 20-579-SVW**

8    **RICHARD AYVAZYAN, et al,**

9              **Defendants.**
     _____/

10

11

12                    **REPORTER'S TRANSCRIPT OF**
                      **ZOOM STATUS CONFERENCE**
13                    **FRIDAY, JUNE 11, 2021**
                          **1:00 P.M.**
14                  **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22    _____

23          **TERRI A. HOURIGAN, CSR NO. 3838, CCRR**
             **FEDERAL OFFICIAL COURT REPORTER**
24          **350 WEST FIRST STREET, ROOM 4311**
             **LOS ANGELES, CALIFORNIA  90012**
25                  **(213) 894-2849**

                    **UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4
        UNITED STATE ATTORNEY'S OFFICE
 5      BY:  CATHERINE SUN AHN
             CHRISTOPHER FENTON
 6           DANIEL G. BOYLE
             SCOTT PEATTY
 7            Assistant United States Attorney
        United States Courthouse
 8      312 North Spring Street
        Los Angeles, California  90012

 9

10   FOR THE DEFENDANT:  RICHARD AYVAZYAN

11
        STEPTO and JOHNSON
12      BY: ASHWIN J. RAM
        Attorney at Law
13      633 West 5th Street, Suite 1900
        Los Angeles, California 90071

14
        STEPTO and JOHNSON
15      BY:  MEGHAN NEWCOMER
        Attorney at Law
16      1114 Avenue of the Americas
        New York, New York  10036

17
        STEPTO and JOHNSON
18      BY:  MICHAEL A. KEOUGH
        Attorney at Law
19      1 Market Street, Spear Tower, Suite 3900
        San Francisco, California  94105

20
        STEPTO and JOHNSON
21      NICHOLAS P. SILVERMAN
        Attorney at Law
22      1330 Connecticut Avenue NW
        Washington D.C.  20036

23

24

25
```

UNITED STATES DISTRICT COURT

1    Appearances (Cont.)

2    FOR THE DEFENDANT:  MARIETTA TERABELIAN

3        BINERT KATZMAN LITTRELL WILLIAMS LLP
4        BY:  JOHN LEWIS LITTRELL
         Attorney at Law
5        903 Calle Amenecer, Suite 350
         San Clemente, California  92673
6
         BIENERT KATZMAN LITTRELL WILLIAMS LLP
7        BY:  RYAN VAUGHN FRASER
         Attorney at Law
8        601 West 5th Street, Suite 720
         Los Angeles, California  90071
9
     FOR THE DEFENDANT:  ARTUR AYVAZYAN
10
         JENNIFER J. WIRSCHING
11       Attorney at Law
         1935 Alpha Road, Suite 216
12       Glendale, California  91208

13
     FOR THE DEFENDANT:  TAMARA DADYAN
14
         LAW OFFICES OF FRED G. MINASSIAN
15       BY:  FRED G. MINASSIAN
         Attorney at Law
16       101 North Brand Boulevard, Suite 197
         Glendale, California 91203
17

18   FOR THE DEFENDANT:  ARMAN HAYRAPETYAN

19       TAHMAZIAN LAW FIRM PC
         BY:  JILBERT TAHMAZIAN
20       Attorney at Law
         1518 West Glenoaks Boulevard
21       Glendale, California  91201

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1
    (Appearances cont.)
 2
    FOR THE DEFENDANT:  EDVARD PARONYAN
 3
        THE FREEDMAN FIRM
 4      BY:  MICHAEL GREGORY FREEDMAN
        Attorney at Law
 5      800 Wilshire Boulevard, Suite 1050
        Los Angeles, California  90017
 6
    FOR THE DEFENDANT:  VAHE DADYAN
 7
        LAW OFFICE OF PETER JOHNSON
 8      BY:  PETER JOHNSON
        Attorney at Law
 9      409 North Pacific Coast Highway, Suite 651
        Redondo Beach, California  90277
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1       **LOS ANGELES, CALIFORNIA; FRIDAY, JUNE 11, 2021**

2                    **1:00 P.M.**

3                    --oOo--

4

5

6       THE COURTROOM DEPUTY:  Counsel, may I have your

7   appearances?

8       MR. FENTON:  Good afternoon.  This is Christopher

9   Fenton, Scott Paetty, and Catherine Ahn for the United States.

10       THE COURTROOM DEPUTY:  I'm sorry, that was

11   Christopher, Catherine, and I didn't get the last name?

12       MR. FENTON:  Scott Paetty.

13       THE COURTROOM DEPUTY:  Thank you.

14       MR. BOYLE:  Good afternoon, Your Honor.  This is

15   AUSA Dan Boyle appearing for the United States in place of AUSA

16   Brent Whittlesey.

17       THE COURTROOM DEPUTY:  Thank you very much, counsel.

18   The Court will be joining us shortly.  Thank you.

19                    Defendants?

20       MR. RAM:  Good afternoon.  This is Ashwin Ram, Nick

21   Silverman, Meghan Newcomer, and Michael Keough on behalf of

22   defendant Richard Ayvazyan.

23       THE COURTROOM DEPUTY:  I apologize, Michael -- what

24   is his name?

25       MR. RAM:  Keough, K-e-o-u-g-h.

```
1              MR. LITTRELL:  Good afternoon.  John Littrell and
2      Ryan Fraser for Marietta Terabelian.
3              THE COURTROOM DEPUTY:  Thank you very much.
4              MS. WIRSCHING:  This is Jennifer Wirsching for Artur
5      Ayvazyan.  I am also standing in for Fred Minassian on behalf
6      of Tamara Dadyan.
7              THE COURTROOM DEPUTY:  Thank you very much.
8              MR. TAHMAZIAN:  This is Jilbert Tahmazian,
9      T-A-H-M-A-Z-I-A-N, I represent Number 6.
10             MR. FREEDMAN:  This is Michael Freedman for
11     defendant, Edvard Paronyan.
12             THE COURTROOM DEPUTY:  Thank you very much.  Is
13     there anybody else?
14                  Okay.  Just a moment please.  And the reporter
15     is also here?
16                  Thank you very much.  Counsel, are we ready to
17     begin?  Just a moment, we will wait for the Court.  Thank you.
18     Stand by, please stand by.
19                  If counsel could let me know, how do you
20     pronounce the last name for the first defendant, Richard
21     Ayvazyan; is that correct?
22             MR. RAM:  Ayvazyan.  Richard Ayvazyan, but I also
23     made that up, so hopefully that is right.
24             THE COURTROOM DEPUTY:  Thank you.
25             MR. FENTON:  The Courtroom Deputy, Catherine Ahn is
```

1    trying to get promoted.

2             THE COURTROOM DEPUTY:  Thank you very much.  Just

3    one moment.

4                  I don't see her name come up, just a moment,

5    please.

6                  Counsel, I do not see Ms. Ahn listed, if she

7    could please try again.  Oh, I see her now.

8             MR. FENTON:  You were able to find her?

9             THE COURTROOM DEPUTY:  Yes, I did.  Thank you so

10   much.

11            MR. FENTON:  Thank you.

12            THE COURTROOM DEPUTY:  Okay, is everybody in?

13            MS. AHN:  Yes.  Thank you very much.

14            MR. FENTON:  Yes.

15            THE COURTROOM DEPUTY:  Counsel, I apologize, I'm

16   covering for Paul Cruz.  I just want to make sure the

17   defendants will not be appearing, only counsel; is that

18   correct?

19            MR. FENTON:  That is correct.  Thank you for

20   confirming.

21            MR. FREEDMAN:  I have got an e-mail from Peter

22   Johnson, who represents defendant Vahe Dadyan, but he has been

23   kicked off and he's trying to get back on.

24            THE COURTROOM DEPUTY:  Okay, thank you, counsel.

25            MR. FREEDMAN:  Thanks.

1          THE COURTROOM DEPUTY:  Just a moment, please.

2          MR. JOHNSON:  This is Peter Johnson on behalf of

3    Tamara Dadyan.

4          THE COURTROOM DEPUTY:  Thank you for assisting me,

5    and making sure everyone is appearing.  This zoom business can

6    be a little tricky sometimes.

7                    Good afternoon, Your Honor.

8          THE COURT:  Is the CRD here?

9          THE COURTROOM DEPUTY:  I'm actually here on the far

10   right-hand corner, Your Honor.

11         THE COURT:  Yes.  Have you taken appearances?

12         THE COURTROOM DEPUTY:  Yes, I have, Your Honor.

13         THE COURT:  All right.  Then the Court's observation

14   is that the lawyers are here representing the parties, and

15   thank you for your cooperation in adjusting your schedules to

16   meet my schedule.

17                  I'm prepared to proceed.  Most of my questions

18   initially will be for the prosecutor.

19                  Do I see myself on the screen?  Here I am.

20         THE COURTROOM DEPUTY:  Your Honor, would you like me

21   to call the case before we go any further?

22         THE COURT:  Yes, call the case.

23         THE COURTROOM DEPUTY:  This court is now in session.

24   The Honorable Stephen V. Wilson, Judge presiding.

25                  Calling Item No. 1, criminal case 20-579,

1    *United States of America versus Richard Ayvazyan.*

2              Thank you, Your Honor.

3         THE COURT:  All right.  And as I indicated in a text

4    message, can the parties all hear me clearly enough?

5         MR. FENTON:  Yes, Your Honor.

6         M. FRASER:  Yes, Your Honor.

7         THE COURT:  Where is the prosecutor in the picture?

8    Who speaks for the prosecution here?

9         MR. FENTON:  I do, Your Honor.  This is Christopher

10   Fenton for the United States, and Catherine Ahn is here as

11   well.

12        THE COURT:  Okay.  The first thing I want to do is

13   get a narrative overview of every witness you intend to call in

14   your case in chief, so just start going down the list with a

15   name and give me a narrative overview.

16              It doesn't have to be too detailed, but it

17   should be enough for the Court to get the meat of the

18   testimony.

19        MR. FENTON:  Yes, Your Honor.  First, we will call

20   Kathleen Littwin.

21        THE COURT:  How do you spell it?

22        MR. FENTON:  L-i-t-t-w-i-n.

23        THE COURT:  Okay.

24        MR. FENTON:  Ms. Littwin is a witness from the U.S.

25   Small Business Administration.  She will testify about

background of the PPP and EIDL loan program, the purpose of the
program, and who may qualify.

She will testify about the application process
generally and the types of information that is requested of our
-- she will establish materiality of the policy statements, and
she will also --

THE COURT:  She will say that what the application
requires and why it's significant to the SBA?

MR. FENTON:  That's correct, Your Honor.

THE COURT:  Who is the next witness?

MR. FENTON:  The next witness is Mark Zebramski
(phonetic.)  He is the owner of a business called Top Quality
Contracting.  He is an ID theft -- an identity theft victim who
will testify about his identity was stolen to apply for a PPP
loan and also to open a bank account in his name.

THE COURT:  Who is the witness?

MR. FENTON:  Jack Runyon of Union Tax Service, Inc.
Mr. Runyon is also another identity theft victim who will
testify that the defendant stole the name of his business to
apply for PPP loans, and also stole his identity to prepare --

THE COURT:  When you say he will testify that the
defendants stole his ID, what do you mean?

MR. FENTON:  He will testify -- sorry, Your Honor.

THE COURT:  Go ahead.

MR. FENTON:  He will testify that he did not submit

```
 1    the applications at issue and that his ID --
 2              THE COURT:  When you use the word "stolen," you were
 3    using it in the shorthand way, correct?  You are not going to
 4    ask him whether the defendant stole his ID, are you?
 5              MR. FENTON:  Your Honor?
 6              THE COURT:  You are not going to ask him whether the
 7    defendants stole his ID, are you?
 8              MR. FENTON:  No, Your Honor.
 9              THE COURT:  Go ahead.
10              MR. FENTON:  The next witness is Briana Fitzgerald.
11    She is with the California Department of Motor Vehicles.  And
12    she will testify about certain licenses that were submitted in
13    support of the PPP and EIDL loan applications at issue in the
14    first superseding indictment.
15              THE COURT:  And what fashion will she say that these
16    are genuine licenses issued by the DMV or what is it about her
17    testimony that is relevant to your case?
18              MR. FENTON:  She will testify that the driver's
19    license numbers do not tie back to these individuals.  She will
20    establish there is an absence of records with respect to these
21    individuals.
22              THE COURT:  Okay.  Individuals, meaning the
23    borrowers, the named borrowers?
24              MR. FENTON:  That is correct, Your Honor.  The
25    synthetic identities, so Iulliia Zhadko, Viktoria Kauichko, and
```

1    Anton Kudiumov, for example.

2              THE COURT:  Okay.  Who is the next one?

3              MR. FENTON:  Victoria Hernandez, from the Internal

4    Revenue Service.  She will testify that she ran a search for

5    employer -- I'm using the employer identification numbers for

6    the applicants who submitted loans who were identified in the

7    first superseding indictment, and that search revealed there

8    was an absence of records with respect to this and this will

9    establish that the tax forms that were filed in support of the

10   applications are fake.

11             THE COURT:  You mean that is your argument, that is

12   the relevance of her testimony?

13             MR. FENTON:  Yes, Your Honor.

14             THE COURT:  So, who is Number 6?

15             MR. FENTON:  The next witness is Alexander Fard.

16   Mr. Fard is an identity theft victim.  He's a tax preparer

17   whose identity was used without his authorization on various

18   tax forms that were filed in support of PPP loan applications.

19             THE COURT:  Okay.  Who is next?

20             MR. FENTON:  Next witness is Penal Modi.  She is

21   with the California Employment Development Department.  She

22   will testify that she ran searches for unemployment tax filings

23   for the applicants at issue and that those searches revealed an

24   absence of records.

25             THE COURT:  How does that relate to your case?  The

1   unemployment tax?

2          MR. FENTON:  One of the false misleading statements

3   that is alleged in the indictment is that certain applicants

4   made certain allegations in the previous year, they had

5   employees for whom they paid employment taxes, including

6   unemployment taxes.

7          THE COURT:  Right.

8          MR. FENTON:  The next witness is Marylee Robinson.

9   She's a summary witness who will explain the -- first, she will

10  identify the accounts in various banks.

11         THE COURT:  Just one moment.  One moment,

12  Mr. Fenton, it's hard to manage on the zoom.  But that has to

13  do with the summary charts, correct?

14         MR. FENTON:  That's correct.

15         THE COURT:  That is a topic I want to get into

16  later, but for the moment, her description is adequate.

17         MR. FENTON:  The next witness, Your Honor, is Shelly

18  Avril.  She is an employee at Gusto, which is a payroll

19  processer.  And Gusto is a company that typically generates the

20  type of payroll reports that were used in support of the

21  fraudulent applications, fraudulent PPP applications.

22         THE COURT:  What will she say?

23         MR. FENTON:  She will explain that the companies

24  whose reports were submitted do not actually have Gusto

25  accounts and were therefore unable to generate such reports.

```
 1                THE COURT:  Okay.

 2                MR. FENTON:  The next witness is Nicholas Felando.

 3   He is with the United States Department of Homeland Security.

 4                THE COURT:  How would you spell his last name?

 5                MR. FENTON:  His last name is spelled FELANDO.

 6                THE COURT:  Okay.

 7                MR. FENTON:  Felando.  He will provide some

 8   background information regarding pieces regarding foreign

 9   exchange students, then he will testify about the reports of

10   searches that he conducted into the names at issue in the first

11   superseding agreement such as Iuliia Zhadko, Viktoria Kauichko,

12   Anton Kudiumov, who is an identity theft victim.

13                     The next witness, Your Honor, is Michael Hart.

14   He's a local business owner of Hart Construction.  He's an

15   identity theft victim.  He will testify he did not submit the

16   PPP loan application at issue in support of his company in the

17   name of his company.

18                Then the next witness is Theodora Louissant.

19                THE COURT:  Who?

20                MR. FENTON:  L-O-U-I-S-S-A-N-T.

21                THE COURT:  Okay.

22                MR. FENTON:  She's the United States Custom and

23   Border Protection officer and she will authenticate the credit

24   cards that were -- the credit card, the physical credit card,

25   in the name of Viktoria Kauichko that was seized from Marietta
```

```
 1    Terabelian at Miami International Airport.

 2                    The next witness is Adrian Rosado.  Mr. Rosado

 3    is also a CBP officer.

 4              THE COURT:  CBB?

 5              MR. FENTON:  Customs and Border Protection.  He will

 6    authenticate the physical credit cards that were seized from

 7    defendant, Richard Ayvazyan, at Miami International Airport.

 8                    The next witness is Arthur Hakopyan.  He is a

 9    linguist, and he will testify about the accuracy of a foreign

10    language translation from certain jail calls made by defendant

11    Marietta Terabelian, some of which were in Armenian and some of

12    which were in English.

13                    Next witness is Andrew Jaung, J-a-u-n-g.  He

14    is a member of the FBI computer analytics resource team and he

15    will authenticate an iPhone that was seized from defendant

16    Artur Ayvazyan.

17              THE COURT:  This is at the search of the home?

18              MR. FENTON:  That's correct, Your Honor.

19              THE COURT:  Okay.

20              MR. FENTON:  He will also testify about virtual

21    private networks, VPN and how VPN can be used by an Internet

22    user to conceal their identity.

23              THE COURT:  Is there going to be evidence that those

24    types of networks were used to conceal identity?

25                    MR. FENTON:  Well, there will be evidence that those
```

1   types of networks were used.  Yes, Your Honor.

2        THE COURT:  I see.  What is that?  Physical virtual?

3   Go ahead.

4        MR. FENTON:  Virtual private network.  The next

5   witness is Greg Parr.  He is also a member of the FBI computer

6   analytics response team, and he will also authenticate iPhones

7   seized from defendants at their homes including Richard

8   Ayvazyan, Marietta Terabelian, and Tamara Dadyan.

9            The next witness is Tim Masseno.  He's a

10  special agent with a Small Business Administration Office of

11  Inspector General.  Mr. Masseno -- Agent Masseno will testify

12  about the contents of the phone, the phones relating to the PPP

13  and EIDL loan programs and applications.

14       THE COURT:  Can you describe that a little clearer

15  for me?

16       MR. FENTON:  Yes, Your Honor.  So, Agent Masseno has

17  knowledge of the various loans that were submitted in this case

18  as a result of, you know, his work an agent at the SBA.  And he

19  will testify about the text messages on the phone and the

20  relationship to the PPP and EIDL loans and about some of the

21  digital photographs on the phones as well.

22       THE COURT:  How so?  I'm not getting a full idea of

23  what this is going to say?  He's going to look at text messages

24  and testify regarding those text messages in terms of his

25  duties as Inspector General?

```
 1              MR. FENTON:  Well, no.  He will relate those text
 2   messages to the application process.
 3              THE COURT:  You mean?
 4              MR. FENTON:  The text messages that were used -- so
 5   defendant, Richard Ayvazyan and Tamara Dadyan to submit to
 6   fraudulent information to submit the report of PPP loan
 7   applications.  And Agent Masseno will help walk through that
 8   evidence and explain how it relates to the application process,
 9   as to the applications that were submitted in this particular
10   case.
11              THE COURT:  I'm still not understanding why his
12   testimony is important to the government, but are you saying
13   the text messages themselves are not self-evident?
14              MR. FENTON:  I think the Agent Masseno will be able
15   to help introduce those text messages into evidence because
16   that is not something that the card examiners can do.
17                   They are going to be authenticating the phones
18   as those text messages relate -- as those communications relate
19   to the loans that were submitted in furtherance of the
20   conspiracy.
21              THE COURT:  I'm not following what you are saying.
22   It may be some inadequate background knowledge I have of the
23   technology, but the phones were seized, they were analyzed.
24   There are text messages on the phones.
25                   If, on the text messages, there are
```

```
 1    discussions about the loans in question, which the government
 2    contends were fraudulent, what can this Agent Masseno add to
 3    it?
 4              MR. FENTON:  So, the text messages discuss -- the
 5    text messages specifically discuss the loans and the loan
 6    application.  The loans that were submitted and the loan
 7    application process.
 8                   So, Agent Masseno, who is responsible for
 9    helping to conduct the investigation on behalf of the SBA and
10    prosecution team is going to be able to provide some additional
11    information and context to help the jury understand those text
12    messages, and the digital photos, how they relate to the
13    applications at issue.
14              THE COURT:  But you are saying that there is
15    something opaque about the messages that he has to clarify for
16    the jury?
17              MR. FENTON:  No, Your Honor.  Just that he will help
18    to tie -- he will help to tie the text messages to the actual
19    applications that were submitted here.
20              THE COURT:  Well, why can't you argue that at the
21    appropriate time?  Why do you need that witness?
22              MR. FENTON:  Well, he's also going to testify -- he
23    will also testify about the summary chart exhibits for the SBA
24    loans.
25              THE COURT:  Well, did he prepare the summary charts?
```

1   Did he prepare the summary charts?

2          MR. FENTON:  He helped to prepare the summary

3   charts.  Yes, Your Honor.

4          THE COURT:  But that -- I don't want to get into

5   this at this moment, I will in a short while, but that gets me

6   to a discussion about the witness in the summary chart.

7                My understanding, and we can get it later, is

8   that that witness is not going to tell the jury that she has

9   any knowledge of the case other than her examination of some

10  records, and she is going to do some tracing from accounts that

11  the government will eventually argue tell some kind of story.

12               But what input would Agent Masseno have to

13  that chart.  Can you explain that?

14         MR. FENTON:  I can, Your Honor.  The input he would

15  have to help explain it to the jury, the charge is based on

16  admissible evidence which include loan files that Agent Masseno

17  helped us identify.

18         THE COURT:  Why can't you explain it to the jury?

19         MR. FENTON:  We certainly could explain it to the

20  jury at the appropriate time, Your Honor.

21               I think he would be summarizing voluminous

22  information in the form of these many loan files.

23         THE COURT:  But they are in the summary chart.

24         MR. FENTON:  He would be providing, right, Your

25  Honor, but he would be able to help the jury understand the

1   significance of the facts, for example, that one individual is

2   applying for multiple loans across various different companies,

3   and also about the supporting documentation commonalities

4   amongst the supporting documentation.

5           THE COURT:  It sounds like that witness is going to

6   say that what he has observed in the documents constitute

7   certain batches of fraud.

8           MR. FENTON:  Well, he's going to testify to the fact

9   that certain individuals made multiple applications or that the

10  documents that he used were documents that --

11          THE COURT:  Go to the next witness.

12          MR. FENTON:  Yes, Your Honor.  The next witness is

13  Justin Masterman.  He's with Celtic Bank.

14          THE COURT:  You are breaking up a little bit.  Hold

15  on one second.  What is the name of the courtroom deputy?

16          THE COURTROOM DEPUTY:  What can I do for you, Your

17  Honor?

18          THE COURT:  Mr. Fenton keeps breaking up.  Is there

19  anything that -- this zoom is very erratic, and I have been

20  using it for a long time now, it's all we have, but people

21  break up on it.

22              Is there anything you can do to correct that?

23          THE COURTROOM DEPUTY:  Unfortunately, there isn't,

24  Your Honor.  Let me follow up with the IT Department in the

25  meantime, and see what we can do on our end.

```
 1            THE COURT:  He's not breaking up all of the time,
 2   but I am missing some things that have to be important.
 3                 Can you make a quick effort here, I don't want
 4   to delay things.
 5            THE COURTROOM DEPUTY:  Absolutely, Your Honor.  Just
 6   a moment, please.
 7            MR. JOHNSON:  This is Peter Johnson, it would help
 8   if each person that is not speaking can turn off their video.
 9   It actually sometimes assists if the Court and I could turn off
10   my video now.
11            THE COURT:  Thank you, Mr. Johnson.
12            THE COURTROOM DEPUTY:  Actually, I apologize, Your
13   Honor.  One other thing is for everyone to mute their phone
14   unless they are speaking.
15            THE COURT:  Let's try to do what Mr. Johnson said.
16   Let's try to see if it works, and everyone take their part when
17   some other person speaks.
18                 Now, I see you, you are now moved to the
19   left-hand corner of my screen.
20                 Okay.  Try again.  Let's see what happens.
21            MR. FENTON:  Yes, Your Honor.  Are you able to hear
22   me now?
23            THE COURT:  Yes, I hear you better.
24            MR. FENTON:  The next witness is Justin Masterman.
25   M-A-S-T-E-R-M-A-N.  He is with Celtic Bank.
```

```
 1              THE COURT:  Okay.
 2              MR. FENTON:  Celtic Bank is an SBA approved lender
 3  who was the lender for four PPP loans referenced in the first
 4  superseding indictment.
 5              THE COURT:  Okay.  What is he going to say in brief?
 6              MR. FENTON:  He's going to testify to the
 7  information that is requested on the borrower applications and
 8  why that information -- truthful information is significant to
 9  the bank, so he will help to establish materiality for the
10  false misleading statements.
11              THE COURT:  Okay.  Next?
12              MR. FENTON:  The next witness is Madison McDonald,
13  who is a special agent with the FBI.  She was the seizing agent
14  for evidence seized at defendants Artur Ayvazyan and Tamara
15  Dadyan's residence.
16                   The next witness is --
17              THE COURT:  She will testify to what was seized?
18              MR. FENTON:  She will testify as to what was seized.
19  Yes, Your Honor.
20              THE COURT:  Okay.
21              MR. FENTON:  The next witness is Caitlin Bowdler.
22  She is a special agent with the FBI.  She is the seizing agent
23  for evidence that was seized from defendant Richard Ayvazyan
24  and Marietta Terabelian's residence.  She will authenticate --
25  testify about what was seized from that residence.
```

```
1              The next witness is Spencer Kim, K-I-M.
2  Mr. Kim is the special agent with the FBI.  He was the seizing
3  agent for evidence seized at an apartment on Canoga Street,
4  Canoga Avenue, which was an apartment that was rented by
5  defendant Manuk Grigoryan and Richard Ayvazyan.
6              The next witness is special agent, Jeff Clark.
7         THE COURT:  FBI agent also?
8         MR. FENTON:  He's an agent with IRS CI.
9         THE COURT:  Is that criminal investigations?
10        MR. FENTON:  Yes, Your Honor.
11        THE COURT:  What did that person say?
12        MR. FENTON:  He will be a summary witness who will
13 testify about the investigation that was conducted by the
14 government with respect to work out in the field including
15 investigation into Iuliia Zhadko and Zhadko's various
16 businesses, Viktoria Kauichko and he will testify about some of
17 the surveillance that was conducted by the agents.
18        THE COURT:  Let me better understand that witness.
19 What will he be summarizing?
20        MR. FENTON:  He will be providing a summary of the
21 field investigation that was conducted.
22        THE COURT:  What field investigation and how does it
23 relate to the government's case?
24        MR. FENTON:  Special Agent Clark will testify, for
25 example, that he conducted an investigation into the identity
```

```
 1   of Iuliia Zhadko and the businesses that Iuliia Zhadko had
 2   purported to own.  He will talk, for example, about the fact
 3   that he went to the locations where Iuliia Zhadko purportedly
 4   lived.
 5             THE COURT:  Which witness is that?
 6                  Who are you talking about now?  Is this Clark
 7   you are talking about?
 8             MR. FENTON:  Special Agent Clark.
 9             THE COURT:  So you are saying Clark is going to say
10   that he tracked down certain addresses or whatever relating to
11   some of the borrowers and found they weren't at the addresses
12   and things like that.  Is that it?
13             MR. FENTON:  Yes, Your Honor.
14             THE COURT:  So I mean it isn't a summary, it's what
15   he did to track down some information?
16             MR. FENTON:  That is correct, Your Honor.
17             THE COURT:  Is there something else he's going to
18   testify about?
19             MR. FENTON:  Similarly, he would testify about the
20   investigation conducted into Viktoria Kauichko, one of the
21   other synthetic identities, and Anton Kudiumov.  He would
22   testify about some of the surveillance that he had conducted in
23   connection with the government's investigation.
24             THE COURT:  When you say "surveillance," what kind
25   of surveillance?
```

1    MR. FENTON:  The surveillance could include, for

2  example, some of the trash bowls that we had discussed in the

3  search warrant affidavit that Your Honor had reviewed.

4    THE COURT:  Why is the surveillance -- was that part

5  of the search, right?

6    MR. FENTON:  No.  That field work was done before

7  the search warrants were executed.

8    THE COURT:  I see.  All right.  Next?

9    MR. FENTON:  The next witness is Amira Halum

10  H-A-L-U-M.  She is a real estate agent and she will testify

11  that defendant Richard Ayvazyan had introduced her to someone

12  that he maintained was Anton Kudiumov, which is a synthetic

13  identity.

14    And she will testify about communications that

15  she had through Mr. Ayvazyan relating to Anton Kudiumov, the

16  synthetic.

17    THE COURT:  So were these contacts, person to person

18  or in some other way?

19    MR. FENTON:  Some of the contacts that -- yes, Your

20  Honor.  Some of the contacts were person to person, some of the

21  contacts were by text message.

22    THE COURT:  And so she will say that defendant

23  Ayvazyan introduced her to Kudimov, and for what purpose?

24    MR. FENTON:  Well, this is just to establish the

25  defendant Richard Ayvazyan's relationship with this synthetic

1     identity, Anton Kudimov.

2              THE COURT:  I see, that is the purpose of her

3     testimony?

4              MR. FENTON:  Yes, Your Honor.

5              THE COURT:  I see.  Okay.

6              MR. FENTON:  The next witness is named Anthony

7     Farrer.  He will testify about the fact that he had telephone

8     and text message communications with defendant Richard Ayvazyan

9     using a specific phone number, which is relevant because the

10    government will otherwise show that that phone number that the

11    subscriber for that phone was Iuliia Zhadko.

12              And Mr. Farrer will testify about the fact

13    that defendant Richard Ayvazyan purchased watches from him --

14    luxury watches and that he used certain Zhadko related bank

15    accounts, and Viktoria Kauichko related bank accounts to pay

16    for those luxury watches.

17              THE COURT:  Okay.  Next?

18              MR. FENTON:  And then the next witness is Debbie

19    Mitschke.  She works at the bank, Capital One.  And her

20    testimony is going to be related to Count 33, which is

21    attempted bank fraud count against defendant Tamara Dadyan.

22              THE COURT:  Tamara Dadyan, is that it?

23              MR. FENTON:  That's correct.

24              THE COURT:  Is that Defendant Number 5?

25              MR. FENTON:  That is Defendant Number 4, Your Honor.

```
 1              THE COURT:  So that is that the wife of Artur
 2    Ayvazyan?
 3              MR. FENTON:  Yes, Your Honor.
 4              THE COURT:  Okay.  And let me ask any of the lawyers
 5    a question, and it may have to do -- this is just -- don't give
 6    me a long answer if you have one, is it part of the Armenian
 7    culture for women to keep their maiden name or why are the
 8    names of the wives different than the husbands?  I mean, it's
 9    part of the current culture too, but is it peculiar to Armenian
10    culture -- short answer, anybody?
11              MR. TAHMAZIAN:  This is Jilbert Tahmazian.  I can
12    tell you that the Armenians who come from Armenia, when they
13    marry, the females keep their maiden name.  It's very common.
14              THE COURT:  All right.  Go on now, who is next?
15              MR. FENTON:  Yes, Your Honor.  The only other types
16    of witnesses that we would anticipate to call in our case in
17    chief might be either custodians of record, if we're not able
18    to get a ruling or stipulation about self-authenticating
19    business records, then we would be required to call some
20    custodians of record with respect to loan files, bank files,
21    and other categories set forth in Motion in Limine No. 4 that
22    we recently filed.
23              THE COURT:  I see.
24              MR. FENTON:  It could be possibly --
25              THE COURT:  Go ahead.
```

1          MR. FENTON:  I'm sorry, Your Honor.

2          THE COURT:  Go ahead.

3          MR. FENTON:  The second category is potentially

4   witnesses to establish the interstate nature of the wires

5   underlying the wire fraud claims.  We have a stipulation, some

6   of the defendants have agreed to that stipulation.  We do not

7   yet have a complete stipulation.

8               We will continue to try to get those facts

9   stipulated to, but to the extent we're unable to with respect

10  to a wire or two or more, we may need to introduce a couple of

11  witnesses to testify about that.

12         THE COURT:  Now, these so-called self-authenticating

13  documents, you are seeking to admit them pursuant to Rule 902?

14  Rule 902 is, of course, different than the business record

15  exception.  It doesn't require a witness, so are you saying

16  that in the absence of a stipulation, you would move to have

17  those exhibits admitted as self-authenticating records?

18         MR. FENTON:  Yes, Your Honor.  And the government

19  has filed that motion with the Court.

20         THE COURT:  And I haven't looked at it closely yet,

21  but if a document is self-authenticating, generally the format

22  is custodian of the record of the agency or whatever entity

23  says probably these are all agency records?

24         MR. FENTON:  So these records came from financial

25  institutions, lenders, retail banks, escrow companies.

```
 1   Providers --
 2            THE COURT:  Okay.  We have to get into this on my
 3   own, but why would the records of a non-government entity be
 4   self-authenticating?
 5                 I was of the view, perhaps mistaken, that 902
 6   applied mainly to the records of a government or government
 7   agency and the custodian of the record in the agency would say
 8   this is a record I maintain, this is a true and correct copy of
 9   a record I maintain, and then someone else in the agency would
10   say, I am an officer of some category of the agency and it is
11   true that person who said he or she maintains the records, does
12   maintain the records.  It's a little bit double certification.
13                 It may apply to a private entity, but I was
14   always of the view that with a private entity you have to lay a
15   business record exception.
16                 Is your position otherwise, and it could be
17   that I'm wrong?
18            MR. FENTON:  Yes, Your Honor, so the position of the
19   government --
20            THE COURT:  You faded out a little bit there, sorry
21   again.
22            MR. FENTON:  I'm sorry, Your Honor.  Can you hear me
23   now?
24            THE COURT:  Yes.
25            MR. FENTON:  Thank you, Your Honor.  We would
```

 1    establish that we think that the certifications established

 2    that these are records of 306, and the certifications

 3    established the requirements set forth under the rule and

 4    therefore satisfies 306.

 5              THE COURT:  You are breaking up, you are breaking up

 6    here.

 7                   Let's leave that issue for the moment, but

 8    there is, of course, a difference between -- I'm looking at the

 9    screen now, I see is it Katzinstine?  Is there someone there by

10    that name?

11                   I want to see who that is.

12              THE COURTROOM DEPUTY:  Just a moment,

13    Ms. Katzinstine, could you please appear for the Court?

14              MS. AHN:  Your Honor, this is AUSA Catherine Ahn.  I

15    believe Ms. Katzinstine, she is the chief of the major fraud

16    section.  She was actually only intending to appear as an

17    observer of the that.

18              THE COURT:  The reason I mentioned her name, and

19    this is off the topic here, is that, you know, you get to a

20    certain point where there are a lot of names floating in your

21    memory, but I seem to remember -- generally, I have a pretty

22    good memory, notwithstanding my dotage, that she was an extern

23    for me, maybe 25 or 30 years ago; is that correct?

24              VOICE:  Well, I'm not sure if that is correct, Your

25    Honor.  I believe 35 years or so she was working in the Getty,

```
 1   the art museum.
 2          THE COURT:  I have the wrong person.  I seem to
 3   remember, but it seems like an odd name, and it seemed very
 4   similar to that.  Did she go to UCLA Law School?
 5          MS. AHN:  I'm not sure, Your Honor, I believe she
 6   did.
 7          MR. RAM:  She went to Stanford.
 8          THE COURT:  I probably have the wrong person.  We
 9   have enough to do here without my getting into the side tracks
10   so, ignore what I said.
11          Okay.  So, there is on your list some other
12   names here.  Are you going to call those witnesses or are those
13   witnesses canceled?
14          MR. FENTON:  No, Your Honor.  We are no longer going
15   to call those witnesses.
16          THE COURT:  I see.  All right.  So why don't you
17   look at what I had on the agenda here.
18          Okay.  Let me turn next to the summary charts.
19   And first, let me offer my inclination about the rulings on the
20   summary charts.
21          I don't know how to describe them, but I will
22   describe the summary chart that has seven columns, SBA loan
23   number, company, applicant so forth.
24          Before I do that, in this case the government
25   outsourced the person who is going to be the summary witness
```

1     and that firm or person is a CPA.

2                      What relevance, if any, does that status have

3     with regard to the witness?

4          MR. FENTON:  None, Your Honor, with respect to the

5     testimony that she would offer here.

6          THE COURT:  So, the witness will have to testify

7     that she had familiarity and experience with these kinds of

8     bank documents, correct?

9          MR. FENTON:  That's correct, Your Honor.

10         THE COURT:  And will she say that her experience was

11    based on the function she performs as a CPA?

12         MR. FENTON:  No.  No, Your Honor.  I think it would

13    be based on what the work she was asked to do by the government

14    in connection with the government's investigation.

15         THE COURT:  But, I mean, usually the government has

16    an agent -- usually an agent with the agency or another agency

17    do that type of analysis.  I don't see anything inherently

18    wrong about outsourcing it, but why was it done in this case?

19         MR. FENTON:  Well, the consulting firm, Stout had

20    helped the government in connection with this investigation of

21    PPP fraud, so, they had familiarity with the PPP loan

22    applications, and with the process of tracing the use of funds.

23                      Marylee Robinson, who is the government

24    intends to use as a summary witness was part of that team.

25                      THE COURT:  And they informed an investigation in

```
 1    this case?
 2            MR. FENTON:  They assisted the investigation in this
 3    case.  Yes, Your Honor.
 4            THE COURT:  How did they assist the investigation
 5    beyond the summary of the documents which are in the charts?
 6            MR. FENTON:  Well, this was their primary function.
 7    They also helped us -- yes, Your Honor.
 8            THE COURT:  Go ahead.
 9            MR. FENTON:  And she also helped the government to
10    organize the voluminous data that the government obtained as a
11    result of its investigation because there are many, many loan
12    files that were being looked at and they helped to analyze and
13    organize that information and then conduct this type of
14    descriptive work, this tracing.
15            THE COURT:  When the witness testifies, my
16    understanding prior to today was that the witness would just
17    have experience and familiarity with these bank records in
18    which they are not unusual.  I mean wire transfers and bank
19    accounts and things like that, and do you intend to ask her
20    whether she assisted generally in your investigation beyond
21    preparing the charts?
22            MR. FENTON:  I'm not planning to ask her about that
23    additional work.  No, Your Honor.
24                I think I would --
25            THE COURT:  Well, the point is my inclination was to
```

**UNITED STATES DISTRICT COURT**

1   conclude that this type of summary chart and witness is

2   appropriate when there is voluminous amount of bank

3   transactions that need some colation.

4           But my understanding was this witness will be

5   making the analysis solely on the bank records.

6           In other words, it would be the same as though

7   some person who knew nothing about this investigation and had

8   no prior contact with the government was asked to do the same

9   thing.

10          And is she in a position to say that that is

11  the way she looked at it in terms of the summary chart?

12      MR. FENTON:  Yes.  She is in a position to testify

13  that she reviewed the voluminous records set forth in the chart

14  and this is the chart with respect to tracing, the summary

15  exhibits with respect to tracing.  She reviewed those specific.

16      THE COURT:  Yes, but what does her prior experience

17  with SBA investigations fraud have to do with what she did?

18      MR. FENTON:  Well, Your Honor, you had asked us why

19  we chose to have Ms. Robinson testify to do this work and

20  testify instead of an agent.

21          I'm simply responding that the reason why we

22  did that was because her firm had assisted the government with

23  this type of work, just generally, and she had done some of

24  that work as well.

25          But that doesn't bear specifically on the

1   descriptive tracing work that we asked her to do here, her task

2   here is discreet.

3          THE COURT:  Okay.  But if I admit her charts it has

4   to be clear that her basis for the charts is simply mechanical

5   examination of exhibits that were presented to her and she was

6   asked to perform certain tasks, and she did that solely based

7   upon the records that she examined.

8             Will she be saying that?

9          MR. FENTON:  Absolutely, Your Honor.

10          THE COURT:  In other words, there is no

11   interpretation or offer besides her testimony as to what the

12   transfers were directed to?

13          MR. FENTON:  That's correct, Your Honor.

14          THE COURT:  Okay.  Now, in looking at the -- why

15   have you color-coded some columns and not others?

16             I'm beginning -- I'm looking at EIDL PPP

17   applications submitted using Zhadko, Kauichko and Kudimov

18   names.  I see there is red and black.  Why the red and the

19   black?

20          MR. FENTON:  So, Your Honor, just to be clear here,

21   the charts that you are looking at these summary charts are not

22   the summary charts that Ms. Robinson would testify about.  She

23   would only testify about the loan files, the bank account

24   records, and the tracing of the funds, that is the other set of

25   summary chart exhibits.

1          THE COURT:  Who's going to testify as to -- I don't

2     know how to identify these charts, but there is a chart which

3     has smallish type in it.  It starts out the first column, SBA

4     loan number, and second left to right is company and applicant,

5     and then approximate amount of loan, and then lender, and then

6     approximate amount of advance, and approximate date of

7     applications.

8                    Who is going to be the witness for that chart?

9          MR. FENTON:  That would not be Ms. Robinson, that

10    would be Agent Masseno.

11         THE COURT:  Masseno.  Then turning to the next

12    chart, which had that pending application submitted using

13    Zhadko, Kauichko, et cetera, who was going to be the witness to

14    lay a foundation for that chart?

15         MR. FENTON:  That would be Masseno as well.

16         THE COURT:  Now, why the red and the black?

17         MR. FENTON:  So the red and the black does not have

18    any special significance, Your Honor.  It's really just

19    designed to make the text more distinguishable, so you can see

20    differences between the columns.

21         THE COURT:  Make it all black.

22         MR. FENTON:  Okay.  Yes, Your Honor.

23         THE COURT:  Now, on the next chart, this chart has

24    the column bank accounts, bank accounts records reviewed 1 and

25    2.  I take it that is the summary prepared by the accountant,

1  correct?

2          MR. FENTON:  Yes, Your Honor.

3          THE COURT:  And now, I'm turning to -- is that the

4  only chart -- what is that witness's name again, what is her

5  name?

6          MR. FENTON:  Marylee Robinson.

7          THE COURT:  Okay.  Is that the only chart that

8  Marylee Robinson prepared or did she prepare the chart that is

9  captioned use of EIDL and PPP funds to purchase the property?

10         MR. FENTON:  She helped to prepare this set of

11 charts.

12         THE COURT:  I see.  And there is an objection by the

13 defendants to this chart regarding the pictures and there are

14 pictures for the next page, the purchase of the Topeka Drive,

15 and so forth.

16              I don't know if there is a specific objection,

17 but my position is that the pictures are unnecessary and they

18 ought to be taken out.

19              The other thing is that I notice you have a

20 picture for apparently one of the defendants, but when it comes

21 to Kauichko, you have an image of just what appears to be the

22 head of someone in black, and the implication could be that

23 that is a synthetic person.  That shouldn't be so, don't use

24 that image either, just use the information.

25         MR. FENTON:  Yes, Your Honor.

1          THE COURT:  Now, at the chart, which is the next

2     one, it says Ana Zukava -- how do you say her name; is that

3     correct.  Zukava is that her name?

4          MR. FENTON:  Zukava, Ana Zukava.

5          THE COURT:  Is she an alleged synthetic person?

6          MR. FENTON:  Yes, Your Honor.

7          THE COURT:  And who prepared this chart?

8          MR. FENTON:  This would be Marylee Robinson as well.

9     This set of charts is what Ms. Robinson would testify about.

10          THE COURT:  And why is the yellow highlighted?

11          MR. FENTON:  So the yellow depicts one of the loans

12     that is charged in the first superseding indictment.

13          THE COURT:  Then finally there is the chart of

14     transactions between the identified parties, April, 2020 to

15     October 2020.  Who prepared that chart?

16          MR. FENTON:  This is Ms. Robinson as well.

17          THE COURT:  And what does this chart purport to

18     represent?

19          MR. FENTON:  So this chart shows the transfer of

20     money between and amongst certain identified entities and

21     individuals who are tied to the defendants during the relevant

22     time period.

23          THE COURT:  But how would you describe this chart to

24     the jury?

25          MR. FENTON:  I think that this chart would start

1    with a couple of transactions and show how these entities were

2    transferring money between and amongst themselves.

3              THE COURT:  Well, let's go through one transaction

4    and reference the chart, so I can see your approach.

5              MR. FENTON:  Sure.  So, if you look in the lower

6    left-hand corner, we have the company Info Solutions.

7              THE COURT:  Where is this?  I see Turner Info

8    Solutions.  Yes, I see that.

9              MR. FENTON:  So that company is associated with

10   Iuliia Zhadko and is a company that obtained a PPP loan as

11   alleged in the first superseding indictment, and we would have

12   Ms. Robinson explain to the jury how money was transferred,

13   these PPP proceeds to a different entity through a timeline

14   transport, which is also an Iuliia Zhadko company and then

15   transferred to V&D Limo, which belongs to Vahe Dadyan.

16              This type of evidence, when coupled with the

17   text messages that we will be introducing will show that this

18   payment is being made by Iuliia Zhadko which is Ayvazyan's

19   alias to Vahe Dadyan in connection with the conspiracy.

20             THE COURT:  There is an argument by the defendant

21   that in transferring some of these funds from the different

22   accounts in that chart, that, although, PPP, right along may

23   have been initially deposited into those accounts, at the time

24   some of the transfers were made, there were funds in those

25   accounts that were beyond which were greater -- I'm not saying

```
 1   this correctly.
 2              They were funds in those accounts from sources
 3   other than the PPP loans that could have been the source of the
 4   transfers.
 5              How do you respond to that argument?
 6        MR. FENTON:  Well, Your Honor, I think that that is
 7   a ground that is ripe for cross-examination.
 8              I think that that is really limited to very
 9   few instances here, since most of these are fake companies, and
10   Ms. Robinson would be able to speak to what money was in those
11   various accounts and was not in the various accounts at the
12   time the PPP proceeds and EIDL proceeds were deposited.
13        THE COURT:  Let me now address the defendant.  One,
14   there are more lawyers who speaks for the defendant, it won't
15   be necessary to reargue the points you made in your motion
16   because I do find it to be proper summary testimony with the
17   caveat that are outlined as we have gone along.
18              Are there any other comments or arguments you
19   want the Court to consider about these summary charts?
20        MS. NEWCOMER:  My name is Meghan Newcomer.  I
21   represent Richard Ayvazyan.
22              First of all, we received the government's
23   opposition to our motion in limine today.
24              And in that motion, they said for the first
25   time that Ms. Robinson was part of the investigation team along
```

1   with Stout, Riseas and Ross (phonetic.)  That is not

2   information that the defendants were aware of, and the

3   defendants have no discovery or any documents related to

4   Ms. Robinson and her team's involvement in the investigation

5   which is something we would have expected if she was part of

6   the investigation team before simply being hired to make this

7   chart.

8          THE COURT:  Well, the government has told you that

9   what I received from their answer that she and the firm she's

10  with, helped the government in analyzing various bank accounts

11  and transfers such as what she did here and nothing more.

12             First of all; is that correct, Mr. Fenton?

13          MR. FENTON:  Yes, Your Honor.  This is a type of

14  work that they did for the investigative team.

15          THE COURT:  So that's what they did.  What is your

16  next comment?

17          MS. NEWCOMER:  If I may follow up on that.

18             When Mr. Fenton says the type of work they

19  did, our question is what was the scope of that work.

20             Did Ms. Robinson consider other loans that are

21  not included in her summary chart?  We don't have a sense of

22  what she was considering and so information like that is --

23          THE COURT:  That is a fair question.  Let me ask, in

24  other words, did Ms. Robinson make any decision as to which

25  loans to investigate or not or was she just told these are the

1    documents or loans we want you to look at?

2              In other words, did she have any role at all

3    in deciding which records to conduct a full money loan

4    investigation?

5              MR. FENTON:  No, Your Honor, so the starting point.

6              THE COURT:  Just answer the question first, so we

7    have it clearly.  You are saying no, meaning that as I said

8    before the government told her what to do and what records to

9    examine?

10             MR. FENTON:  That's right, Your Honor.

11             THE COURT:  She had no independent role in that?

12             MR. FENTON:  That's correct, Your Honor.

13             THE COURT:  And she didn't decide which loans to

14   investigate and which not to?

15             MR. FENTON:  That's right, Your Honor.

16             THE COURT:  All right.  Who is the next witness?

17             MS. NEWCOMER:  Well, Your Honor, if I may on that

18   point, if Ms. Robinson was given the information chosen by the

19   government and then paid a fee to analyze that information and

20   write the summary charts, she is operating in the role of an

21   expert witness.

22             THE COURT:  No, she's not.  You can make the next

23   point.  She's not operating in the role of an expert witness.

24   She's just looking at bank records and there could be many,

25   many people, including a lay person, who could do the same

1     thing with the time management.

2                     I don't see anything in these bank records

3     which is different than any other bank records.

4                     She's not using any expertise, and I don't

5     think that argument is a valid argument.

6                     What is your next point?

7          MS. NEWCOMER:  Yes, Your Honor.  We had raised a

8     motion the government did not respond to, the amount whether or

9     not Ms. Robinson is being paid.  We think that goes to her

10    bias.

11         THE COURT:  Yes, it does.  That is a valid point.

12    What amount of money was Ms. Robinson paid?

13         MR. FENTON:  Your Honor, the government will make a

14    disclosure with respect to that, we can do that today.

15         THE COURT:  Please do it today.

16         MR. FENTON:  We will do it today, Your Honor.

17         THE COURT:  You will have that information today.

18                     What else is -- what else do you want to bring

19    to the Court's attention?

20         MS. NEWCOMER:  Your Honor, you had mentioned the

21    sort of glossy boxes, we also had asked for the pictures of the

22    defendants, and we don't think those are particularly right.

23         THE COURT:  I think you misunderstood.  I agreed

24    with you, I will order the government to get rid of the

25    pictures of the defendant.

```
 1            MS. NEWCOMER:  The pictures of the defendants and
 2   their homes.
 3            THE COURT:  All pictures are off the charts.
 4            MS. NEWCOMER:  The last one you raised at the end of
 5   Mr. Fenton's argument with the chart with the green bubble,
 6   would not be accurate.
 7                 Mr. Fenton says we can cross-examine
 8   Ms. Robinson about whether or not the funds were in fact from
 9   PPP loan fraud, but if the chart is inaccurate, that -- the
10   chart should then not be admitted.  It's not just grounds for
11   cross-examination, it is --
12            THE COURT:  I don't think the Court is inaccurate in
13   the sense you are contending.
14                 I think that if there are instances, and I
15   don't know how many, because I haven't gotten to the
16   intricacies of these details, but the government says it's not
17   a common thing, and to the extent it is there, the
18   circumstantial evidence would support the government's use of
19   the chart.
20                 Similarly, it would support cross-examination
21   on the point you made, so that is the way I'm ruling on that.
22   Okay.
23            MS. NEWCOMER:  Your Honor, if I may just one final
24   point.
25                 In the government's disclosure today, would it
```

1  also be possible to get information about when Ms. Robinson was

2  hired and what the government communicated to her, and what the

3  scope of her role was.  We believe all of that would be

4  relevant.

5          THE COURT:  I agree with you.  You are to inform

6  defense what Ms. Newcomer requested today.

7          MR. FENTON:  Yes, Your Honor.

8          MR. JOHNSON:  This is Peter Johnson.

9          THE COURT:  All right, yes.

10         MR. JOHNSON:  On behalf of Dadyan.  I have one

11 objection related to one of the charts that has Mr. Dadyan's

12 picture.  I know the Court has excluded the picture, but there

13 is argument that inside of this chart --

14         THE COURT:  Let's see, they are all numbered.  I

15 will get to it.  Is that -- is that the company, is that Voyage

16 Limo?

17         MR. JOHNSON:  That's correct.

18         THE COURT:  I see that he's the only person in that

19 chart, the picture along with some home on the right.  Do I

20 have the right chart?

21         MR. JOHNSON:  That is correct, Your Honor.

22         THE COURT:  So what is your point?

23         MR. JOHNSON:  The point is that it's argument.

24 Mr. Vahe Dadyan is only accused of opening or taking out a PPP

25 loan.  He did not take out an EIDL loan.  The top of the chart

```
 1  says that otherwise.
 2               Also, the $434,153 as argued by the
 3  government.  In the indictment, Mr. Dadyan is the only person
 4  that opened up a single loan in his own name and his own
 5  business.
 6               The 434,153, is the government's argument as
 7  to what he -- I guess, as a closing argument as to how these
 8  funds were pooled together.
 9               Of course, this is okay for the government to
10  argue in closing.
11               It's unnecessarily -- it's unfair and
12  prejudicial to present it in an exhibit when this witness
13  doesn't have any -- doesn't know anything as to what was going
14  on in Mr. Dadyan's mind.
15          THE COURT:  How do you respond to that?
16          MR. FENTON:  Your Honor, before this hearing this
17  morning, we introduced a corrected version that removed the
18  word "EIDL" from the title.
19               It now says use of PPP funds, which is
20  appropriate, given the only loans described in the slides are
21  indeed PPP funds, so that issue has been resolved.
22          THE COURT:  Now, let me make sure I understand
23  Mr. Johnson's point.
24               The way I understood it was that this
25  defendant Dadyan -- is that his name, Dadyan?
```

**UNITED STATES DISTRICT COURT**

1          MR. JOHNSON:  Yes, Your Honor.

2          THE COURT:  Yes.  He only opened a bank account in

3    the name of Voyage Limo in Wells Fargo, is that what you said?

4          MR. JOHNSON:  Yes, Your Honor.  This is a legitimate

5    business.  Voyage Limo existed well before this, the PPP loan

6    program, so he opened the bank account in the legitimate

7    business, Voyage Limo.  He applied for the loan in his own name

8    and the loan was the one single loan.

9              What the government is placing is that

10   additional loans and making its argument as if he's loaning or

11   he actually applied for those loans.

12         THE COURT:  I'm not digesting this.  Maybe I should

13   ask, what is the government's evidence against Mr. Dadyan?

14         MR. FENTON:  The government's evidence shows

15   Mr. Dadyan did indeed apply for one loan.

16             He misrepresented the number of employees he

17   had by a lot, and that he then took that money and transferred

18   it to a fictitious company called Union Tax Services run by a

19   synthetic identity, Viktoria Kauichko, and misrepresented there

20   was a payroll.

21             Now, Mr. Johnson is saying, that, you know, we

22   somehow misrepresent that Mr. Dadyan did anything more than

23   take out one loan, and I would disagree with that.

24             I think this chart clearly shows that the only

25   loan that Mr. Dadyan is responsible for is directly taking out

1    in his own name is that one loan, that is clear in the

2    indictment, and clear in the slide.

3          THE COURT:  But it appears that it is undisputed

4    that Voyage Limo was a company that Mr. Dadyan had, and it was

5    a real company, and he had it prior to -- it wasn't an account

6    set up at Wells Fargo prior to the inception of the alleged

7    conspiracy, and that during the time frame of the alleged

8    conspiracy, he made one PPP loan for 434,000.

9                And looking at the chart, it shows that he --

10   of that amount, he transferred 155,000 to this Union Tax

11   Service, which the government alleges is a front, for I guess,

12   Ayvazyan because of the man that -- and funds from that run

13   Union Tax Service went to Beverly Hills escrow to purchase

14   $1 million house in the name of Sockey (phonetic); is that what

15   the chart shows?

16         MR. FENTON:  Yes, Your Honor.  With one minor

17   modification.  The chart is intended to show that Mr. Dadyan

18   applied for one loan in the amount of $157,500, and then took

19   155,000 of that and transferred it to Union Tax Service.

20         THE COURT:  Does that explain the 434?

21         MR. FENTON:  So the 434, this is not to the extent

22   -- this is confusing that we can resolve this by taking it out.

23   This is the total amount of EIDL and PPP loans that were then

24   transferred to Union Tax Services, that amount is the addition

25   of these two loans here.

```
 1          THE COURT:  I now understand your point, and I agree
 2   with Mr. Johnson.  Take it out.
 3          MR. FENTON:  We will take that out, Your Honor.
 4          MR. JOHNSON:  Your Honor, this is just one glimpse
 5   with the problems with these charts.  The charts -- the charts
 6   prevents the government's argument not based on facts.  If the
 7   Court can get confused about one line in the government's
 8   charts, I'm sure that the jury will as well.
 9          THE COURT:  I'm not confused.  I mean, I just asked
10   for a clarification, and I haven't been involved like you have,
11   and ultimately, it seems to me that the events here are
12   explainable to people of reasonable intelligence.
13              It's the government's job to make it
14   understandable, and if there are doubts to be raised about what
15   they are arguing, then, that is why we have the trial.  I mean,
16   you know, okay, I understand.  Thank you.
17          MR. JOHNSON:  Your Honor, I was just referring to
18   the idea that I was pointing to 453,000, my understanding that
19   would be removed.
20          THE COURT:  Yes, it will.
21          MR. JOHNSON:  The second part that I had is a
22   similar problem.  It's with this chart with the round circles.
23   Your Honor, if the Court recalls --
24          THE COURT:  Let me turn to it.  That is the last
25   page, and tell me what your argument is here?
```

**UNITED STATES DISTRICT COURT**

1          MR. JOHNSON:  It's that -- I don't have any kind of

2    roadmap as to how this connects.  There are no bank account

3    numbers or exhibits to reference to find whether this is in

4    fact correct.

5               If the Court recalls, I moved for a

6    continuance to examine these charts and the exhibits.

7               I understand the Court's ruling, but behind

8    that is to look at Vahe Dadyan as a defendant who didn't have

9    -- really, that I could see -- any contact with any of these

10   bank accounts.  And the only time that I begin to see the

11   roadmap was when the government disclosed Ms. Robinson.

12              What I expected to receive after the May 21st

13   hearing was some type of exhibits that would explain that draft

14   exhibits is for -- that would explain how this relates to

15   Mr. Dadyan.

16              What I learned on June 1st, is that there are

17   60 additional loans, but there is nothing now to connect these

18   bank accounts here.

19              So I'm left to wait until I hear the testimony

20   of Ms. Robinson to figure out what is on the -- what the

21   government's theory is.  I appreciate the Court asking about

22   one part of the chart, but there are still questions that

23   remain as to the remainder of the chart.

24              I'm asking that the Court either exclude the

25   exhibit, No. 1, or require the government to provide testimony

1  of Ms. Robinson as it relates to the entire chart, because we

2  have to go through all kinds of bank account records to get

3  ready for the June 15th trial.

4          THE COURT:  I think this last page is sort of a

5  summary of a summary.  Isn't that what it is?

6              Doesn't this summarize what the government

7  contends is contained in all of the preceding charts, or am I

8  wrong about that, Mr. Fenton?

9          MR. FENTON:  No.  These are additional examples of

10 transfers between the various entities.

11         THE COURT:  Well, hold on, you say "additional."  I

12 mean, are these intertwined transactions?

13         MR. FENTON:  Yes, Your Honor.  So these are supposed

14 to be --

15         THE COURT:  All right.  I'm getting the focus a

16 little better, so the intertwined transactions are the

17 transactions where the government contends that there were

18 reserve -- that is the term you use -- false identification

19 found which -- while not used for a loan in the indictment were

20 used -- were intended or discussed to be used for a loan in the

21 indictment based upon other circumstantial evidence such as

22 e-mails and things like that; is that right?

23         MR. FENTON:  No, Your Honor.  I apologize.

24         THE COURT:  What is it?

25         MR. FENTON:  This is separate and apart.  This is

1    not related to that issue.

2                    This chart is simply designed to show

3    additional transactions in addition to the prior slides between

4    these various parties.

5              THE COURT:  I see.  Now, I have it.  There are

6    actually, I want to make sure I have it correct.  There are

7    three categories.  The first category are the charged

8    transactions in the indictment.

9                    The second category would be loans that were

10   actually applied for which the government contends were

11   fraudulent, but not specifically made in the indictment.

12                   And the third category would be the category I

13   referenced just a moment ago, the intertwined ID things.  Is

14   that a fair summary of the categories?

15             MR. FENTON:  I think that is a fair summary, Your

16   Honor, but that is an issue that is separate and apart from

17   this chart.

18             THE COURT:  So what about -- now, what about this

19   chart.

20                   In other words, this chart does not relate

21   then to the loans that were the subject of the indictment that

22   were named in the indictment.

23             MR. FENTON:  Well, that is not correct.

24                   So this chart, Your Honor, is an analysis of

25   the closed universe.  We showed all of the different loan

```
 1   files, we showed the bank records that Marylee Robinson looked

 2   at when she was describing the flow of funds.

 3              The slides walk through some examples of some

 4   transactions but this last light and is just designed --

 5              THE COURT:  Hold it.  I'm not following what you are

 6   saying.

 7              Let me just give you what I think you are

 8   saying, and test if I'm on the right track.

 9              You are saying this chart represents the loans

10   that were identified in the indictment and the loans that the

11   government contends were fraudulent, but not specifically

12   mentioned in the indictment.

13              Is that what you are saying?

14         MR. FENTON:  Yes, Your Honor.

15         THE COURT:  Okay.  So, with regard to the loans that

16   were not for entities not in the indictment, not borrowers in

17   the indictment, what I'm understanding Mr. Johnson's argument

18   is that how does he verify or analyze the accuracies of this

19   chart?

20              Isn't that what you are saying, Mr. Johnson?

21         MR. JOHNSON:  That is, Your Honor.

22         THE COURT:  Let's stop there.  I will let you talk

23   in a minute, but I want to hear Mr. Fenton.  When did he get

24   this chart?

25         MR. FENTON:  So, Your Honor, we provided this chart
```

1    on June 1st.

2                    The document that is underlying this chart,

3    this is based on a closed universe of documents.

4               THE COURT:  That universe, you know, look, what time

5    is it now?  What time is it now?

6               THE COURTROOM DEPUTY:  It is three o'clock, Your

7    Honor.

8               THE COURT:  Let's take about ten minutes, then we

9    will come back.  Will you be ready to do a little bit more of

10   this, okay?

11              MR. FENTON:  Yes, Your Honor.

12              THE COURT:  I have more topics.  Thanks.

13                        (Recess.)

14              THE COURT:  We're back?

15              THE COURTROOM DEPUTY:  Yes, Your Honor.  The Court

16   is again in session.

17              THE COURT:  Yes.  Good, thank you.

18                    Getting back to the charts, unlike the charts

19   preceding the last page, which is captioned transactions

20   between identified parties, April 2020 to October 2020, the

21   other charts do have specific detail.  They may not be

22   catalogued on the chart to the exhibit number, but the

23   information in the chart is very specific, and of course, the

24   defendants have had the underlying information for all of the

25   charts since March.

```
1                    But I think there is an argument from
2    Mr. Johnson that might be solved this way.
3                    I do notice that at the bottom of the chart --
4    actually, I missed that -- its source and then it has exhibit
5    numbers, but not a specific number for each arrow on the chart.
6    Where is Mr. Fenton?
7              MR. FENTON:  He is here.
8              THE COURT:  Yes, so, I think what ought to be done,
9    you want to put an exhibit number on every arrow, specific
10   exhibit number on every arrow.
11                   I think that may -- I'm sure it will assist
12   Mr. Johnson in -- I mean, he could look at exhibits you have
13   produced, but it would make it a lot easier for him if you had
14   a specific number on every arrow, so I'm ordering you to do
15   that.
16             MR. FENTON:  Yes, Your Honor.
17             THE COURT:  I want to turn to another topic here.
18             MR. JOHNSON:  May I just have one additional point
19   added to that?
20             THE COURT:  Yes.
21             MR. JOHNSON:  His point we just received those
22   exhibits referenced on the bottom about 12 hours ago, if I'm
23   not mistaken, and my only concern --
24             THE COURT:  You did get them in March.  I mean, you
25   had them in March.
```

1          MR. JOHNSON:  We received a lot of documents with

2    bank records, but not -- most specific direction as to how this

3    was broken down to 60 loans now.  But I wanted to see how this

4    would be presented instead of going through documents that may

5    not look like they don't have anything to do with Mr. Dadyan.

6               I just want to be able to say besides that

7    small circle, are there any circles, documents, connected to

8    Mr. Dadyan that the government is referencing in this chart.

9    That is my concern.

10          THE COURT:  Let me ask them that, are there -- in

11   other words, Mr. Johnson is sort of making his argument here

12   and -- I mean, it could be his final argument too, but is there

13   anything in this chart other than relating to Mr. Dadyan, other

14   than -- I will get back to that other chart here.

15               Oh yeah, so, on the chart that has

16   Mr. Dadyan's picture, it has him making a loan from Voyage, I

17   guess, that is to his Wells Fargo account.  And then he is

18   wiring that money to the Union Tax Service.

19               The question is, is that the only evidence in

20   the case against Mr. Dadyan?

21          MR. FENTON:  So, Your Honor, that is the only loan

22   that is at issue in the case.

23               We have told Mr. Johnson that before.  With

24   respect to the evidence, there is evidence, text messages

25   between Mr. Dadyan's coconspirators that show that Mr. Dadyan

```
 1   requested and received a cut of the loan, the fraudulently
 2   obtained loan.  Those text messages have been produced to
 3   Mr. Johnson and we pointed Mr. Johnson to those text messages.
 4           THE COURT:  One minute, so we're still talking about
 5   the $157,000 loan?
 6           MR. FENTON:  Yes, Your Honor.
 7           THE COURT:  Understood.
 8           MR. FENTON:  That's it.
 9           THE COURT:  All right.
10           MR. FENTON:  That's it.  We told Mr. Johnson that.
11           THE COURT:  You have the answer, the chart doesn't
12   affect your client in any way.
13           MR. FENTON:  That's right.
14           MR. JOHNSON:  No, Your Honor.  The government just
15   summarized that was down in this right-hand corner, I'm
16   referring to the circles that this is the only circle that
17   connects to Mr. Dadyan in those bank records that are
18   summarized here in this chart.
19           THE COURT:  What circle are you referring to?
20           MR. JOHNSON:  I'm referring to the chart that has
21   these circles.
22           THE COURT:  Is it on this chart?  Give me a physical
23   description so I can focus.  Right, left, middle?
24           MR. JOHNSON:  Bottom left-hand corner, it says.
25           THE COURT:  I see.  Is that the only reference to
```

1  Dadyan?

2          MR. FENTON:  Yes, Your Honor.  We told Mr. Johnson

3  that before.

4          THE COURT:  That's your answer, Mr. Johnson.

5          MR. JOHNSON:  Thank you, Your Honor.

6          THE COURT:  Now, let me just --

7          MS. NEWCOMER:  Your Honor, I apologize, I have one

8  more point on the exhibits cited in the summary charts.

9              There are duplicate exhibits where a loan file

10  has been made an exhibit under two different numbers.

11              So there are duplicate exhibits where the

12  range of Bates numbers that the government gave us are exactly

13  the same thing.  It makes it look like there are more loan

14  applications at issue than there actually are.

15              We asked the government yesterday if they

16  would correct that issue and they have not responded.

17          THE COURT:  I remember that being raised.  I think

18  so many things have been raised in the last couple of weeks,

19  it's like taking bonus -- it's not just the lawyers are working

20  hard, it's the Court too.  I mean, we have to read all of this

21  and we will try and resolve it.

22              So, it's a lot of work for us too, but that is

23  why I guess -- anyway.  What about that?

24              I did see that range, and I noticed -- I did

25  look at the stuff, and it's not pleasure reading at night, but

1    I have looked at it.

2                    There are different ranges in those exhibits.

3    Some are very small, some are 10, 12 pages, less, some of them

4    are 80 or 90 pages in the exhibit.

5                    I guess I'm not fully understanding, but I

6    guess tell me again, what is the question?

7                    MS. NEWCOMER:  So, Your Honor, there are exhibits

8    where Bates numbers for the documents concluded with that

9    exhibit as Your Honor said, it could be 90 pages to 10.  They

10   are the exact same set of pages; for example, Exhibit 4P is an

11   exact duplicate of Exhibit 3E, and the point is that it makes

12   it look like there are two different loan applications, but in

13   fact, they are exactly the same.

14                   THE COURT:  But I mean, who is going to know about

15   this?

16                   MS. NEWCOMER:  It's in the summary charts, Your

17   Honor, so the fact they are duplicates -- it makes it look like

18   more loans are at issue than actually are.

19                   THE COURT:  Can you sort of respond at the same

20   time?  Tell me what your interpretation of what Ms. Newcomer is

21   saying?

22                   MR. FENTON:  Yes, Your Honor.  That was done

23   intentionally to try to organize the exhibits so there would be

24   a set of exhibits with respect to each of the sets of charts.

25   The government was trying to make it simpler, and

```
 1   unfortunately, it appears that that may not have been so for

 2   defense counsel.

 3                 The number is the number, the Number 60, those

 4   charts describe 60 loans.  The government will make that a

 5   representation in trial and will not deviate from that

 6   reputation.  The number is the number.

 7                 I don't think that the jury is going to be

 8   confused because they aggregate the same information in

 9   different ways.

10                 MS. NEWCOMER:  Your Honor, if I may briefly respond.

11   For an exhibit to be admissible as part of the summary charts,

12   the underlying exhibit is duplicate, there is a check, there

13   should only be one citation to each exhibit, there hasn't been

14   that.  There are duplicate copies, cumulative copies,

15   especially, 32,000 pages, the government has marked, and if we

16   could cut that down even a little, it would be very useful.

17                 THE COURT:  All right.  I think the government has

18   responded.  Let me think about that.

19                 MS. NEWCOMER:  Thank you, Your Honor.

20                 THE COURT:  I'm asking this of Mr. Fenton, Agent

21   Masseno -- is that his name, Masseno?

22                 MR. FENTON:  Yes, Your Honor.

23                 THE COURT:  Masseno, is he in effect the lead agent

24   in the case?

25                 MR. FENTON:  No, Your Honor.  Agent Masseno is the
```

```
 1   SBA OIG agent.  He took a lead with respect to certain parts of
 2   the investigation, but not others, like field work.
 3              THE COURT:  Now, is he going to -- we didn't talk to
 4   about who is going to testify about the text messages.  Maybe
 5   we did, who is going to testify about the text messages?
 6              MR. FENTON:  Agent Masseno.
 7              THE COURT:  I see.
 8              MR. SILVERMAN:  Your Honor, if the defense may be
 9   heard for one moment?
10              THE COURT:  Yes.
11              MR. SILVERMAN:  Nicholas Silverman on behalf of
12   Mr. Ayvazyan.
13              THE COURT:  Yes.
14              MR. SILVERMAN:  I wanted to inquire about one thing
15   related to your question.
16                   We have asked the government to make the lead
17   agent in the case, Justin Palmerton available.  We would like
18   to call him as a defense witness, he was left off of the
19   government's list.
20                   We would ask the Court that he be available to
21   testify in this case as part of the defense case.
22              THE COURT:  He will be available, won't he?
23              MS. AHN:  Your Honor, if I may?
24              THE COURT:  One moment, who is that?
25              MS. AHN:  This is Catherine Ahn on behalf of the
```

 1   United States, Your Honor.

 2             THE COURT:  Yes.

 3             MS. AHN:  We have been in communication with

 4   Mr. Silverman.  We agreed to accept service of the subpoena for

 5   Special Agent Palmerton.

 6                  We did provide for a summary that was

 7   provided, and I think it was somewhat sufficient, but we are

 8   still considering -- we have accepted service.  We are

 9   considering whether or not the scope of the proposed testimony

10   would raise 403 questions.

11             THE COURT:  That's a different matter.

12             MS. AHN:  Yes, Your Honor.

13             THE COURT:  If -- let's take that up on Monday.

14             MS. AHN:  Yes, Your Honor.

15             THE COURT:  Or maybe later, the simple answer is

16   from Mr. Silverman, he will be available?

17             MS. AHN:  Yes, Your Honor.  We have accepted

18   service.  The question is really the scope of the testimony,

19   Your Honor.

20             THE COURT:  Okay.

21             MR. SILVERMAN:  Thanks, Your Honor.

22             THE COURT:  One minute.  There is one thing I'm

23   looking through my notes here that I didn't fully understand

24   and that was the virtual private network testimony.

25                  I understand generally that that is something

1    that parties can do to keep, what, their communications from

2    the providers; is that what that is?

3              MS. AHN:  Some -- the testimony about private

4    networks, this would be the forensic expert, Andrew Jaung, and

5    he is expected to testify that virtual private networks allow

6    the users to obscure their physical location.

7                   I think the most common use of it has been,

8    for example, if you wish to watch shows from the United Kingdom

9    and it's limited to UK users, you can set your VPN and make it

10   look like you are located in the United Kingdom and you can get

11   access to it.

12             THE COURT:  So what is the relevance of it to this

13   case?

14                  In other words, why would -- what is your

15   theory about using the virtual private networks as it relates

16   to the conspiracy?

17             MS. AHN:  Yes, Your Honor.  In many of these

18   documentary cases, the question is where was the application

19   submitted from, the location from which the application was

20   submitted can be probative of who submitted the application.

21             THE COURT:  So, bring it down to earth for me, give

22   me an example.

23             MS. AHN:  So, Your Honor, for example, some of the

24   applications were submitted from a location that was connected

25   on the Canoga apartment, so we know that whoever submitted the

```
 1   application was physically at the Canoga apartment.

 2                Other applications appeared to have been

 3   submitted overseas, and so the question is was the application

 4   actually submitted from overseas or did the individual use it

 5   to make it appear that they were overseas.

 6                THE COURT:  Why would someone do that -- what would

 7   be the motive here?

 8                MS. AHN:  To hide your location, Your Honor.  To

 9   obscure where you are actually submitting the application from.

10                In fact, we did find at least one of the

11   phones web searches on the best VPN to use, and there is some

12   information on another, I think, another device that VPN could

13   have been used.

14                THE COURT:  Okay.  Let me turn to a new topic before

15   the $450,000 that was allegedly thrown by one of the defendants

16   to the search.

17                The evidence that I have reviewed in terms of

18   what the document shows for cash doesn't equal the 450,000,

19   it's a shade over 300,000.  And the $300,000 is actually cash

20   that came from different sources including casinos, and it is

21   attributed to all of the defendants.

22                So, in order for -- I lose track of the names

23   of the defendants, but the wife was basically of Richard.

24                MR. SILVERMAN:  Terabelian, Your Honor.

25                THE COURT:  To the extent of that the argument, she
```

1    discarded the 50,000 in the bushes prior to the search is

2    relevant.  I mean, look anyone who throws away that much money

3    sure is suspicious.  But the question is is the time sufficient

4    to miss the conspiracy since there was no evidence other than

5    what I have mentioned, that would be a source of cash.  You

6    would have to believe that all of the other defendants obtained

7    cash and that immediately or soon thereafter gave the cash to

8    Terabelian and even distribute that amount to 450.  I think

9    it's very questionable.

10                  How would -- what are your views beyond what I

11   have said?

12          MS. AHN:  Well, Your Honor, the $300,000 that we

13   presented in our supplemental filings this morning, you know,

14   that only can be directly tied through the financial system.

15                  As Your Honor knows, there have been many

16   other uses of the funds, luxury watches, other purchases that

17   themselves can also be converted to cash in a manner that

18   wouldn't necessarily be detected.

19          THE COURT:  Why is there converting to watches and

20   similar things to cash?

21          MS. AHN:  We don't have any particular documentation

22   on that point, Your Honor.  It's just that it's a note that the

23   financial transactions that the government can see through the

24   banking system and it may not be a complete picture of all of

25   the sources of funds.

1          THE COURT:  Thank you for the answer.

2              Now --

3          MR. LITTRELL:  Just to be clear, I'm sorry, to barge

4    in.  We had a discussion yesterday and the government

5    represented it was not going to represent to the jury that

6    Mr. Terabelian threw the money into the bushes.  I want to be

7    clear that is still the case.

8          THE COURT:  I didn't -- I didn't know that.  That is

9    why I'm raising the question.  I didn't know about that

10   conversation that you had.

11         MR. LITTRELL:  Yes, I had that.

12         THE COURT:  Thank you, Mr. Littrell.

13         MS. AHN:  With respect, Your Honor --

14         THE COURT:  Were you the public defender,

15   Mr. Littrell?

16         MR. LITTRELL:  Yes, I was.

17         THE COURT:  I remember that you were a very good

18   lawyer.

19         MR. LITTRELL:  Thank you, Your Honor.

20         THE COURT:  In the recess, I did reexamine the 902

21   issue and my suspicion was wrong.  There is authority that

22   supports the authority that 902 can be used for bank records.

23              Look, it's up to the defendants, I can't

24   strong-arm anyone.

25              If they don't agree -- I would think under the

1    circumstances, they should, but it's up to them, but I can make

2    a ruling on the 902 motion on Monday.

3              MR. SILVERMAN:  Thank you, Your Honor.  The

4    defendants intend to put in an opposition by tomorrow night on

5    the night of two motions explaining the failure to meet the

6    government's burden on that motion.

7              THE COURT:  All right.  Then I will await that.

8    Thank you.

9              MR. SILVERMAN:  Thank you, Your Honor.

10             THE COURT:  Now, the next thing is, explain to me

11   the category of evidence that is labeled intertwined evidence.

12   That is, it relates to the alleged false identification that

13   was found during the searches that wasn't used in any of the

14   loans in question, even those in the indictment or loans that

15   were allegedly fraudulent that were not used in the indictment.

16             MS. AHN:  Yes, Your Honor.

17             THE COURT:  How do you intend to show that false

18   identification had a nexus to this fraud, this conspiracy?

19             MS. AHN:  Yes, Your Honor.  So the Court identified,

20   I believe, four categories of evidence that it would consider

21   to be consistent with an intertwined theory, and the government

22   has essentially categorized its evidence that would fall into

23   this reserve and identities evidence into one of those buckets

24   primarily, the third category, where defendants discussed using

25   the particular evidence in relation to PPP and EIDL loans, and

```
 1   the fourth category where the evidence was related to the
 2   overall scheme to obtain these loans.
 3                   There is also a third category where
 4   essentially evidence related to the overall scheme is literally
 5   on the same document or found in the same location as --
 6              THE COURT:  The general discussion is not as helpful
 7   as examples.  Give me examples.
 8              MS. AHN:  So, for example, Your Honor, if the one
 9   category in the Category 4 is we found printed checks or rather
10   misprinted checks so we found in the Canoga residence paper
11   where the printing had been on the wrong side of the check
12   paper.
13              THE COURT:  I saw that, that was something in the
14   exhibits, yes.  Go ahead.
15              MS. AHN:  Yes, Your Honor.
16              THE COURT:  So what about that?
17              MS. AHN:  The text message discussion you can see
18   defendants Tamara Dadyan about the need to submit copies of
19   voided checks with PPP applications, that is part of the
20   application process.  So they're looking for copies of voided
21   checks, and Richard Dadyan advises Tamara Dadyan to print them,
22   print them at this website.  And then she says, okay.
23                   And what we find, in the Canoga residence is
24   these printed checks on paper.
25              THE COURT:  Give me another example.
```

1          MS. AHN:  Another example, Your Honor, is the

2   NERSES.

3          THE COURT:  Say that again.

4          MS. AHN:  NERSES, and I'm just abbreviating the last

5   name to N, but I believe the last name, I apologize, I am

6   butchering this name, I believe it's Knockchewyan (phonetic.)

7   But it's an identity that was found physically.

8                There is a version of the California driver's

9   license with this name on it that was physically found at the

10  Weddington location which is residence of Artur Dadyan and

11  Tamara Dadyan.  The same image was found on Artur Dadyan's

12  telephone, and then we also found at the residence a different

13  version of that identity bearing again the same name.

14         THE COURT:  You say that identity, what do you mean?

15         MS. AHN:  A different version of the California

16  driver's license.

17         THE COURT:  Okay.  I understand.  And you are saying

18  that all of the reserve identities, you intend to introduce

19  have that sort of foundation?

20         MS. AHN:  Yes, Your Honor.  Yes, Your Honor.

21         THE COURT:  Okay.  Now, I'm going to -- we have

22  another hearing Monday.

23                I received a proposed voir dire from the

24  government.  I received a proposed voir dire from, I think, it

25  was Mr. Littrell sent one.

**UNITED STATES DISTRICT COURT**

```
 1              MR. LITTRELL:  Yes, Your Honor.

 2              THE COURT:  Is that correct, Mr. Littrel?

 3              MR. LITTRELL:  Yes.

 4              THE COURT:  Then I haven't received any other from

 5    anyone else.

 6                   Do the other defendants intend to propose

 7    questions?

 8              MR. SILVERMAN:  Your Honor, I'm -- we intend to file

 9    a joinder, a Terabelian request, but we do not intend to impose

10    additional questions beyond Ms. Terabelian.

11              THE COURT:  Is that a proposed instruction?

12              MR. SILVERMAN:  Yes, Your Honor.

13              MR. JOHNSON:  On behalf of Mr. Vahe Dadyan, we asked

14    for attorney voir dire.

15              THE COURT:  Well, I'm not going to allow that, I

16    understand your joinder.

17                   Now, let me make some parting, okay -- just

18    make some parting comments, which we will get into more on

19    Monday.

20                   But I want you to think about these things

21    because I'm sure you are preparing for the trial, the opening

22    statements.

23                   Different Courts have different views of

24    opening statements, and it has become, in my view, commonplace

25    now for people to even not refer to what is opening statement
```

1  but opening argument.

2             In my view, it should not be an argument for a

3  couple of reasons.

4             First, I don't think that is what is

5  envisioned in the format; and second, all of these trial

6  seminars and top lawyers know that in psychology, the

7  principles of primacy and recency are very strong.

8             Various jury studies have shown that

9  unfortunately many jurors make up their minds about cases after

10 an opening statement, which makes the trial a travesty.

11            So, I am cautioning you as you make your

12 preparation, that in my view the opening statement is not a

13 five-hour marathon as they sometimes read, it's sort of an

14 opportunity to briefly acquaint the jury with the evidence.

15            I will allow the government with the proper

16 caveat to read parts of the indictment, not all of the

17 indictment, not all of the overt acts, and not all of the

18 counts, but the conspiracy, and maybe the bank fraud and the

19 money laundering, but not other things.

20            And so it is very important -- I know all of

21 the means by which lawyers attempt to argue, but the evidence

22 will show that is argument.

23            And I promise you at the -- these are my

24 promises to you, no argument.  It should be an outline of the

25 evidence you intend to introduce and not an opportunity to

1    comment on the other side's evidence.  That is for argument.

2                    Now, I want to address the government on this

3    because sometimes I hear an opening statement something like

4    this:  The first line -- the first sentence is, this case is

5    about fraud and deceit, and about misuse of a government

6    program or whatever you do.

7                    And then the government thinks that it can say

8    that and then move on.

9                    That is argument.  You can't do that.

10                   You can say what the government's evidence is

11   and what the government -- and not line and verse.  This is not

12   an opportunity for us to go through this maze of evidence.

13   There is a lot of evidence.

14                   And you are to just sort of give the jury a

15   taste, like talking about food and taste or an appetizer.  This

16   is not, you know, the main course or any other such metaphor.

17                   So when you are preparing, think about what

18   I'm saying because I do enforce that, and I don't want the

19   government abusing that in any way.

20                   I don't want them characterizing something

21   where you will see the evidence here was fraudulent and

22   whatever, you just tell them what the evidence -- the outline

23   of what the evidence will be as you introduce it, not what it

24   means or shows.

25                   And if you do that skillfully; in other words,

1  any lawyer does that skillfully you can use the facts to tell a

2  story, if you arrange them in a meaningful way.

3            That goes for the defense equally as well.

4            Think about what I'm saying, because I know

5  the "but" words, and I'm going to be strict about it, because I

6  think both sides are entitled to a fair trial, and I do believe

7  in this notion of primacy that there are studies which support

8  that.

9            I don't want either side attempting to poison

10  the well or get the jury leaning one way or the other.  It's

11  just an effort to give the jury some general understanding of

12  what the evidence will be.

13            Second, what is the parties -- generally, I

14  don't pre-instruct.  What is the position of the parties

15  regarding pre-instruction here?  I will ask defense first, do

16  you want me to or not?

17            MR. JOHNSON:  Your Honor, this is Peter Johnson.  I

18  would ask the Court to pre-instruct as the Court would be

19  talking about preliminary instructions in advance of the trial.

20            THE COURT:  Yes.  I would do that more or less in

21  the pattern of the Ninth Circuit manual on jury instructions,

22  and what about the elements of the offenses?

23            MR. JOHNSON:  Well, particularly relate to the

24  presumption of innocence and the standard beyond a reasonable

25  doubt.

1          But the elements of the offenses don't

2   necessarily have to be raised, but I have no position on that

3   either way.

4          THE COURT:  Well, what is your position, Mr. Ahn?

5   It's my call.

6          MS. AHN:  Yes, Your Honor.

7          We would go along with the practice of the

8   Court, Your Honor.

9          THE COURT:  All right.  And oh, yes, something I

10  forgot to ask about.  The bill of particulars are regarding the

11  criminal forfeiture.  I need some help on that.

12          The indictment does list properties that the

13  government wants to seize pursuant to the indictment.

14          Does the jury have to make a finding as to

15  each property?

16          MR. BOYLER:  Your Honor, this is AUSA Dan Boyler.  I

17  can address that.

18          THE COURT:  Yes.

19          MR. BOYLER:  The answer is yes.  Criminal forfeiture

20  following a conviction, assuming the defendants are convicted

21  on any related count, the jury will have to make a finding as

22  to each individual specific property, and specifically, the

23  jury will be finding whether there is a nexus between the

24  convicted offense and that property.

25          THE COURT:  I see, so it seems to me the most

efficient way to do that would not to get into the question of

criminal forfeiture in the case until the jury has reached the

determination about guilt or innocence?

MR. BOYLER:  Absolutely, Your Honor.  Any question

about the forfeiture will await the jury verdict, so this may

be moot in the event that --

THE COURT:  If defendants are acquitted, we never

get to go there.

MR. BOYLER:  The only caveat to that in the

forfeiture phase, so the defendants have been convicted.  The

government can rely on evidence it submitted in the guilt phase

or add evidence.

THE COURT:  I see.  Something -- I heard a voice, is

there a voice?  No?

MR. KEOUGH:  If Your Honor would allow the defense

to comment, we have a brief comment on that.

This is Mr. Keough for Richard Ayvazyan.

THE COURT:  Hello, Mr. Keough.

MR. KEOUGH:  So the government has shared copies of

most of the trial exhibits.  We, by our count, are still

missing Exhibits 30 to 43, which are the trial exhibits that

the government has labeled as being relevant to money

laundering and misuse of funds.

So we would ask the government to share with

us today so we have a complete set of the trial exhibits.

1          THE COURT:  Can the government do that?

2          MS. AHN:  Yes, Your Honor.  I apologize, I thought

3    we had completed that.

4          THE COURT:  I have to end this thing, so I

5    instructed you to do a few things, but at the end of the day,

6    one of the things earlier is to give the defense the exhibits

7    that Ms. Robinson received, and this should also be a part of

8    what you do this afternoon.

9          MR. KEOUGH:  Sorry.  One point related to that, Your

10   Honor, the *ex parte* application related to the trial exhibits.

11   One thing we had asked for was the government's expectation of

12   which exhibits each witness might testify to.

13              Today during the summary, for the first time

14   we learned that Agent Masseno is used to plan the summary

15   charts, and characterize witnesses, I think knowing what

16   exhibits -- the government exhibits with each witness would

17   help us streamline the preparation or help streamline the

18   exhibits next week if that would be possible for the

19   government.

20          THE COURT:  If you can do that, that would be very

21   helpful.

22              Let me make a last comment, estimating the

23   length of trial with precision is not possible, but one of the

24   things I went through this narrative was to get some idea of

25   what would be a reasonable time limit on the government's case.

1          In other words, I can't fully estimate the
2    total length of the case, because I can't compel the defendants
3    to tell me who they are going to cross-examine or what they are
4    going to cross-examine on.
5          But I can make a reasonable prediction based
6    upon this narrative that was given to me today, and as you know
7    I think trials should be as efficient as possible without
8    sacrificing any parties' interest.
9          So, I am going to, on Monday, after reviewing
10   carefully what has been said today, give you an estimate for
11   only your case in chief; in other words, only what you would be
12   asking the witnesses.
13         I can't make a trial estimate for the length
14   of the witness because I don't know what the cross-examination
15   will be, and there may be some reason for that, but only the
16   direct examination.
17         As I went through the list, many of the
18   witnesses have very specific things to say, which would be very
19   brief.
20         The lengthy witnesses that come to mind would
21   be Ms. Masseno and Robinson.  They may take more -- they will
22   take more time.
23         But I'm just giving you a heads-up on Monday,
24   I will try to refine it if I give it some more thought.
25         MR. KEOUGH:  One last point with Agent Masseno who

```
 1    is going to be one of the witnesses, having heard today now the
 2    summary of what they expect Agent Masseno to testify to, it
 3    does seem that testimony is both unnecessary because there is
 4    nothing about the text that the jurors can't themselves read,
 5    and to the extent that the texts are being admitted through a
 6    separate witness, it's also cumulative.  We would ask the Court
 7    to exclude Ms. Masseno's testimony as it touches on those.
 8             MR. JOHNSON:  I join with that.
 9             MS. AHN:  The text messages are being brought in
10    through Special Agent Masseno.  The examiners only rule with
11    respect to the digital evidence is with respect to
12    authenticity.
13             THE COURT:  I'm not hearing you.
14             MS. AHN:  Can you hear me now, Your Honor?
15             THE COURT:  Yes.
16             MS. AHN:  The text messages and other digital
17    evidence are being brought in through Special Agent Masseno.
18    The card examiners are only testifying as is as to
19    authenticity.
20                  Special Agent Masseno will then make the
21    connection between the product the card examiners provided,
22    which is something called a Cellebrite report to the trial
23    exhibits.
24                  Of course, we could avoid having to call the
25    card examiners if authenticity was stipulated to, but we
```

1   understand that is not a requirement, and so we're prepared to

2   bring the card examiners to trial.

3          THE COURT:  I understand.  I understand your

4   position.

5                I'm going to order the parties to meet and

6   confer about this 902 issue.  Apparently, it will be an issue

7   because I think it was Mr. Silverman who said that he intends

8   to file some objections.

9                So I guess the Court's interpretation is at

10  this point, it is not something that will be agreed to.

11         MS. AHN:  We have been doing our best, Your Honor, I

12  think the parties have been having discussions, Your Honor.

13         THE COURT:  Well, I don't know, it's something you

14  have to decide.

15         MR. LITTRELL:  On this point we also add an

16  objection.  It sounds like they are going to call him as an

17  expert without sufficient notice.

18                If I heard the government, he was going to

19  draw connections and explain the relevance of the text by

20  applying PPP loans, that sounds like expert testimony to me.

21         THE COURT:  It's not expert testimony, Mr. Littrell.

22  It certainly isn't.  But -- well, I mean, but it shouldn't be

23  offered in an argument form.

24                In other words, it isn't expert testimony but

25  this witness should not be as he goes through it saying this

1    connects to that.

2              He should just say what it is, and how the

3    documents relate to each other, nothing more than that.

4              MS. AHN:  Yes, Your Honor.  That is the government's

5    plan.

6              THE COURT:  All right.  We have another conference

7    on Monday.  Even though we're making this effort, I'm sure

8    there will be things at trial which always come up, but in a

9    case like this, I think it's wise to at least try and go

10   through as many issues as you can.

11             We will see you 11 o'clock, is it Monday

12   11 o'clock on Monday?  1:30 on Monday.  Thank you.

13             MR. LITTRELL:  Thank you, Your Honor.

14             THE COURTROOM DEPUTY:  This Court is in recess.

15

16             (The proceedings concluded at 4:11 p.m.)

17                            * * *

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

        I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  June 14, 2021


                /s/ TERRI A. HOURIGAN
          _____
           TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
             Federal Official Court Reporter