1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,

6              Plaintiff,

7       vs.                        Case No. CR 20-579-SVW

8   RICHARD AYVAZYAN, et al,

9              Defendants.
    _____/

10

11

12              REPORTER'S TRANSCRIPT OF
              TRIAL - DAY 5 AFTERNOON SESSION
13             TUESDAY, JUNE 22, 2021
                    1:00 P.M.
14             LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23        TERRI A. HOURIGAN, CSR NO. 3838, CCRR
            FEDERAL OFFICIAL COURT REPORTER
24         350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA  90012
25                (213) 894-2849

UNITED STATES DISTRICT COURT

1                     APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4
         UNITED STATES ATTORNEY'S OFFICE
5        BY:  CATHERINE SUN AHN
              CHRISTOPHER FENTON
6             SCOTT PAETTY
         Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California  90012

9

10   FOR THE DEFENDANT:  RICHARD AYVAZYAN

11       STEPTOE and JOHNSON
         BY:  ASHWIN J. RAM
12       Attorney at Law
         633 West 5th Street, Suite 1900
13       Los Angeles, California 90071

14       STEPTOE and JOHNSON
         BY:  MEGHAN NEWCOMER
15       Attorney at Law
         1114 Avenue of the Americas
16       New York, New York  10036

17       STEPTOE and JOHNSON
         BY:  MICHAEL A. KEOUGH
18       Attorney at Law
         1 Market Street, Spear Tower, Suite 3900
19       San Francisco, California  94105

20       STEPTOE and JOHNSON
         NICHOLAS P. SILVERMAN
21       Attorney at Law
         1330 Connecticut Avenue, NW
22       Washington, D.C.  20036

23

24

25

                   UNITED STATES DISTRICT COURT

```
1    Appearances (Cont.)

2    FOR THE DEFENDANT:  MARIETTA TERABELIAN

3        BIENERT KATZMAN LITTRELL WILLIAMS LLP
         BY:  JOHN LEWIS LITTRELL
4        Attorney at Law
         903 Calle Amenecer, Suite 350
5        San Clemente, California  92673

6        BIENERT KATZMAN LITTRELL WILLIAMS LLP
         BY:  RYAN VAUGHN FRASER
7        Attorney at Law
         601 West 5th Street, Suite 720
8        Los Angeles, California  90071

9    FOR THE DEFENDANT:  ARTUR AYVAZYAN

10       JENNIFER J. WIRSCHING
         Attorney at Law
11       1935 Alpha Road, Suite 216
         Glendale, California  91208

12

13   FOR THE DEFENDANT:  VAHE DADYAN

14       LAW OFFICE OF PETER JOHNSON
         BY:  PETER JOHNSON
15       Attorney at Law
         409 North Pacific Coast Highway, Suite 651
16       Redondo Beach, California  90277

17

18

19

20

21

22

23

24

25
```

```
1                    WITNESS INDEX

2                      * * *

3    WITNESS NAME:                          Page

4    GEOFFREY CLARK

5        Cross-Examination by Mr. Silverman     6
         Cross-Examination by Mr. Mesereau      20
6        Redirect Examination by Mr. Fenton     24
         Further Cross-Examination by Mr. Silverman  36
7
     MATTHEW PELTIER
8
         Direct Examination by Ms. Newcomer     85
9        Cross-Examination by Mr. Paetty        90

10   SHAWN STEVENS

11       Direct Examination by Mr. Silverman    91

12
     MANUEL IBANEC
13
         Direct Examination by Mr. Keough       94
14       Cross-Examination by Ms. Ahn           95
         Redirect Examination by Mr. Keough     96
15       Further Cross-Examination by Ms. Ahn   97

16   JUSTIN PALMERTON

17       Cross-Examination by Mr. Ram           99

18

19

20

21

22

23

24

25
```

UNITED  STATES  DISTRICT  COURT

**EXHIBIT INDEX**

**\* \* \***

| EXHIBIT NUMBER: | Page |
|---|---|
| Defense DX-22 | 10 |
| Defense DX-55 | 16, 92 |
| Defense 3, 4 | 143 |

**UNITED STATES DISTRICT COURT**

1          **LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 22, 2021**

2

3                          **1:00 P.M.**

4                          --oOo--

5

6          THE COURTROOM DEPUTY:  This Honorable Court is again

7   in session.  Please be seated.

8                    All rise.

9                    (Jury enters the courtroom.)

10         THE COURT:  All right.

11         MR. SILVERMAN:  May I proceed, Your Honor?

12         THE COURT:  Yes, please.

13                        GEFFREY CLARK,

14                 having been previously sworn,

15                   testified as follows:

16                   CROSS-EXAMINATION

17  BY MR. SILVERMAN:

18  Q    Good afternoon, Mr. Clark.

19  A    Good afternoon.

20  Q    When we broke for the morning, we were talking about Aysa

21  Vostanikyan?

22  A    Yes.

23  Q    Not to go into much detail, but to summarize, you had met

24  with her once?

25  A    Yes.

```
 1   Q    And you had talked to her about letters she wrote for,
 2   among others, Iuliia Zhadko and Anton Kuduimov, correct?
 3                MR. FENTON:  Objection, Your Honor.  That misstates
 4   the testimony and the evidence.
 5                THE COURT:  Well, what did you say?  I don't know.
 6   I mean, I don't know why you are summarizing things if it's
 7   only an hour ago.  Just ask questions.
 8   BY MR. SILVERMAN:
 9   Q    You went to talk to Ms. Vostanikyan about whether or not
10   she had done work for Anton Kudiumov, right?
11   A    I believe she prepared those documents.
12   Q    It was because there was a bank statement from Anton
13   Kudiumov showing that he transferred money, right?
14                MR. FENTON:  Objection, Your Honor.
15                THE COURT:  He's asking a question.  Just answer it.
16                MR. FENTON:  He's misstating the facts.
17                THE COURT:  This witness ought to straighten it out.
18   I mean, can you answer?
19                THE WITNESS:  Yes.
20                THE COURT:  What's the answer.
21                THE WITNESS:  I identified the transaction to that
22   bank statement.
23   BY MR. SILVERMAN:
24   Q    And let's pull up the bank statement, DX-35 it's in
25   evidence, page 6.
```

```
 1        So the July 30th transfer from Anton Kudiumov to KNA
 2   Consulting Group, right?
 3   A    It's a point of sale purchase.
 4   Q    But those are the correct parties?
 5   A    Yes.
 6   Q    And you conferred with Ms. Vostanikyan about this, right?
 7   A    Well, we asked her.
 8   Q    And you flagged that it was for the Zhadko house?
 9            THE COURT:  What house?
10            MR. SILVERMAN:  The Zhadko La Calle Primavera house?
11            THE WITNESS:  No.
12   BY MR. SILVERMAN:
13   Q    You asked her about it, about the transaction to be
14   precise?
15   A    Yes, specific to the transaction.
16   Q    She didn't really have an answer, did she?
17   A    I don't recall if I asked her, like, what services were
18   rendered for this fee or this charge.
19   Q    And she said she would get back to you, right?
20            MR. FENTON:  Objection.  Your Honor, hearsay.
21            MR. SILVERMAN:  Not offered for the truth, Your
22   Honor.
23            THE COURT:  All right.  He can answer.
24            THE WITNESS:  Yes.  She said she would have to
25   search her files.
```

**UNITED STATES DISTRICT COURT**

```
 1    BY MR. SILVERMAN:
 2    Q    And that they didn't have a record of Anton Kudiumov?
 3    A    Regarding the transaction?
 4    Q    Regarding him, in general, they didn't have a record,
 5    correct?
 6    A    Yes.
 7    Q    And so did you ever hear back from her?
 8    A    Yes.
 9    Q    What did she say?
10    A    But we served a subpoena on her for records related to the
11    transaction.
12    Q    And did she ever give you an explanation?
13    A    In general, it was for, I believe, tax preparation
14    services.
15    Q    So she worked for Anton Kudiumov, right?
16              MR. FENTON:  Objection, Your Honor.  Misstates the
17    witness's testimony.
18              THE COURT:  It's a question.  I don't know, he can
19    say yes, no, he doesn't know, I don't know what his response
20    is.
21              THE WITNESS:  Can you rephrase the question, please?
22    BY MR. SILVERMAN:
23    Q    Sure.  She performed tax preparation services for Anton
24    Kudiumov?
25    A    Right.  She performed tax preparations for that fee.
```

```
1    Q    And was paid by Anton Kudiumov?

2    A    Yes.

3    Q    Did you ask her about who Anton Kudiumov was?

4    A    I believe on the other documents I asked her.

5    Q    And did you ask her about who Iuliia Zhadko was?

6    A    I don't know.

7    Q    And you never interviewed Ms. Vostanikyan again, did you?

8    A    No, I believe we just -- we got the subpoena production

9    and that was the conclusion of our interaction.

10             MR. SILVERMAN:  I would like to move into evidence

11   DX-22, which I supplied at 9:02:11 to counsel during the break.

12             THE COURT:  Received.

13        (Defense Exhibit DX-22 received into evidence.)

14             MR. SILVERMAN:  If we could pull that up, please?

15   DX-22, it's a native.

16                  While we're waiting for that to come up --

17   BY MR. SILVERMAN:

18   Q    You testified on direct examination regarding Timeline

19   Transport, correct?

20   A    Yes.

21   Q    And a bank belonging to Timeline Transport?

22   A    I don't recall a bank account.

23   Q    If we can scroll to the left here.

24        I would like to direct your attention just to a couple of

25   different columns here.
```

```
 1        First Column A says customer name?
 2   A    I have never seen this before.
 3   Q    But that is what does Column A says, correct?
 4   A    Yes.
 5   Q    And Column C says date.
 6   A    Yes.
 7   Q    And Column L says IP address, right?
 8   A    Yes.
 9   Q    Now, if we could just go down to Row 285, please.
10            THE COURT:  What is this document?
11            MR. SILVERMAN:  Your Honor, it's a production from
12   Radius Bank of a Timeline Transport bank account access
13   statement showing IP addresses to access to the bank account.
14   BY MR. SILVERMAN:
15   Q    Mr. Clark, what is the date of this particular row?
16   A    In Column C?
17   Q    Yes.
18   A    October 22nd, and I believe that would represent 2020.
19   Q    And in Column A, it says Timeline Transport Inc., correct?
20   A    Yes.
21   Q    And the IP address over in Column L, that is 54.88.74.128.
22   Right?
23   A    Yes.
24   Q    Now I'm going to ask Ms. Romero to bring up Exhibit 19
25   already in evidence, and go to page 19.
```

**UNITED STATES DISTRICT COURT**

```
 1          If you look at April 2nd, it says 54.88.74.128, correct?
 2   A    Where?  Can you highlight it, please?  Yes.
 3   Q    It says M Grigoryan 7.
 4   A    Yes.
 5   Q    And that is the same number that appeared a moment ago for
 6   October 22nd with Timeline Transport, right?
 7   A    Yes.
 8   Q    And on October 22nd, Mr. Ayvazyan was in jail in Miami in
 9   connection with this case, right?
10   A    That is my understanding, yes.
11   Q    And we can take that down.
12          Agent Clark, you learned at some point that Manuk
13   Grigoryan's home was searched in December 2020, correct?
14   A    Yes.
15   Q    And that is the 10537 Dora Street home?
16   A    Yes.
17   Q    And how did you learn about that?
18   A    Prior to the arrest of Mr. Grigoryan, we traditionally --
19   well we always run criminal history.  In the criminal history
20   it indicated there was an arrest on that date.
21          So that's how we learned about the arrest.
22   Q    Was it an arrest for identity theft, among other things?
23              MR. FENTON:  Objection, Your Honor.
24              THE COURT:  Overruled.
25              THE WITNESS:  Yes.
```

**UNITED STATES DISTRICT COURT**

1    BY MR. SILVERMAN:

2    Q    Did you follow up with LAPD?

3    A    Yes.

4    Q    And did you ask them about what they seized?

5    A    No.  I didn't ask them about what they seized.

6    Q    Did they disclose to you what they seized?

7    A    Yes.

8    Q    Had they seized credit cards and licenses?

9    A    Yes.

10   Q    Passwords and identity information?

11   A    Yes.

12   Q    And had they seized from Mr. Grigoryan's home account

13   information?

14   A    Yes.

15   Q    And cell phones?

16   A    Yes.

17   Q    Four cell phones?

18   A    I believe it was four cell phones.

19   Q    Now, you didn't ask for the cell phones, correct?

20   A    No.

21   Q    You didn't receive the cell phones?

22   A    No.

23   Q    So you cannot testify to what is on the cell phones,

24   right?

25   A    No.

```
 1   Q    I would like to bring up for the witness only Defense
 2   Exhibit 55.
 3        If we can scroll through the first few pages for the
 4   witness, so we can see what this is.
 5        Agent Clark, is this document familiar to you?
 6   A    Yes.
 7   Q    What is it?
 8   A    It was what was provided to me -- well, partially what was
 9   provided to me by, I believe, Detective Stevens.
10            MR. SILVERMAN:  Move it in, Your Honor?
11            MR. FENTON:  Objection, Your Honor.  Contains
12   hearsay.
13            THE COURT:  Sustained.
14   BY MR. SILVERMAN:
15   Q    Regardless of whether the information was correct, were
16   there account numbers for Iuliia Zhadko?
17   A    I believe if you scroll down.
18   Q    Again, if we can take down the exhibit, it's not in
19   evidence.  So if you don't recall, I can refresh your
20   recollection?
21   A    I don't recall.
22   Q    If we could please show the exhibit, page number 6 to the
23   witness?
24        And if you can just read it to yourself once it's up.
25   This is not being published, correct?  It's not in evidence.
```

```
 1        If we can take down the exhibit, please, or is that enough
 2   time, I'm sorry, Agent Clark, I did not mean to rush you.
 3   A    Yeah, go ahead.
 4   Q    If we can take down the exhibit.  It's not up?
 5        Did the documents you received from LAPD contain account
 6   information for accounts belonging to Iuliia Zhadko, regardless
 7   of whether that information was correct?
 8   A    Yes.  I observed one account I was familiar with.
 9   Q    Was that the Turing Info Solutions account?
10   A    Yes.
11   Q    And did it contain identity information for Iuliia Zhadko?
12   A    I don't recall.
13   Q    If we can put the same exhibit back up and go to page 8,
14   please.
15   A    Yes.
16   Q    If we can take the exhibit down.  Thank you.
17             MR. SILVERMAN:  Your Honor, I would ask to
18   conditionally admit the exhibits subject to being linked up to
19   Officer Stevens' testimony?
20             THE COURT:  Any objection?
21             MR. FENTON:  Yes, Your Honor.  The document that is
22   objectionable is another document in that collection, which is
23   pure hearsay by somebody who doesn't exist.
24             THE COURT:  Well, I haven't carefully looked at it,
25   but don't examine on that part.  If you want to examine on the
```

```
 1    other parts, you can.
 2                    I will conditionally receive the parts of the
 3    exhibit, other than what is being objected to.
 4              MR. SILVERMAN:  Your Honor, I believe it's page 9.
 5              MR. FENTON:  Can you confirm so we can put it on the
 6    record?
 7              MR. SILVERMAN:  Absolutely.  Can you pull up DX-55,
 8    just on your screen only.
 9              MR. FENTON:  Okay.  Your Honor, we have an
10    understanding that the defense is not going to show page 9 of
11    this exhibit to the jury, subject to the Court's further
12    ruling?
13              THE COURT:  All right.  So I'm conditionally
14    receiving it because of the proffer that it will be
15    authenticated by or foundationally established by Stevens; is
16    that right?
17              MR. SILVERMAN:  Yes, Your Honor.
18                    If we could pull up page 1 of that exhibit.
19    And if we can zoom in on the card on the top left corner.
20    Permission to publish, Your Honor?
21              (Defense DX-55 received into evidence.)
22              THE COURT:  Yes.  Received.
23    BY MR. SILVERMAN:
24    Q    Is that a card in the name of Anton Kudiumov?
25    A    Yes.
```

```
 1   Q    And this was found at Mr. Grigoryan's home, correct?

 2   A    I believe so.

 3   Q    And if we go to the card next to it.

 4        Is that a card in the name of Anna Manukyan?

 5   A    Yes.

 6   Q    If we could go to page 8, please.

 7        Is that identifying information for Iuliia Zhadko you

 8   testified to seeing?

 9   A    Yes.

10   Q    And does it contain Bank of America account information?

11   A    It looks like a log-on and a password.

12   Q    Capital One account information?

13   A    Yes.

14   Q    Chase account information?

15   A    Yes.

16   Q    And the Chase account information, the log-in is Turing

17   Info 22, isn't it?

18   A    Yes.

19   Q    And Robinhood account information?

20   A    Yes.

21   Q    And if we can zoom back out?

22        Down at the bottom it contains Bluevine account

23   information, right?

24   A    It just says Bluevine.

25   Q    Next to Bluevine, does that look like an e-mail address
```

```
 1    and a password?
 2    A     It purports to be.  It doesn't say .com and .gov.  I'm
 3    unfamiliar with the ending there.
 4    Q     If we can go to page 6, please.  This is the last page I
 5    will ask you about on this document.
 6          If we can zoom into the top above the line, that
 7    particular account.
 8          And is that log-in and password and account information
 9    for Turing Info?
10    A     Yes, it is.
11    Q     And it's for a Chase account specifically, right?
12    A     Yes.  I did the seizure on that account.
13    Q     Now if we go to Government Exhibit 1-R, and can we go to
14    page 19, please?
15          Now, is this a Turing Info Solutions, Inc., account with
16    Chase?
17    A     Yes.
18    Q     And are these the transactions in December of 2020?
19    A     Yes.
20    Q     Do you see -- are there a list of six checks paid?
21    A     Yes.
22    Q     And six reversals?
23    A     Yes.
24    Q     What does that mean?
25    A     It's my understanding that the check was paid, but it
```

1    wasn't negotiated, so it basically zeroed out, I believe zeroed

2    out the account or it didn't count.

3    Q    Why does that happen?

4    A    I don't know.

5    Q    Did you look into these six checks?

6    A    I don't recall.

7    Q    Well, let's take a look.

8         Can we go to -- first of all, I'm going to point you

9    towards the top check amount, it's, I believe, 63,125.  If we

10   can zoom in, just so we grab that amount.

11        The second check account, excuse me, 63,125.  And if we

12   could go to page 34, please.  Does this appear to be a check

13   for $63,125?

14   A    Yes.

15   Q    And it's written to -- from the account we just looked at,

16   correct?

17   A    Yes.

18   Q    To Aria Technology?

19   A    Yes.

20   Q    Did you look into Aria Technology?

21   A    In process.

22   Q    Did you pull the name of the register, excuse me, strike

23   that.

24        Did you pull the name of the person who formed Aria

25   Technology?

1    A    No.

2    Q    What do you mean you are in process?

3    A    The investigation is still ongoing into additional items

4    in this investigation.

5    Q    If we can go to page 33, please.  Nationwide Supply, have

6    you looked into that one?

7    A    That is in process also.  My recollection now all of these

8    checks we are still looking into.

9    Q    And Richard Ayvazyan did not register any of these

10   companies, correct?

11   A    I don't know that.

12   Q    You have not seen his name on any of the documents?

13            MR. FENTON:  Objection.  Asked and answered.

14            THE COURT:  I mean, it's argument.  Sustained.

15            MR. SILVERMAN:  No further questions.

16            MR. MESEREAU:  May I, Your Honor.  May I

17   cross-examine, Your Honor?

18            THE COURT:  Yes.

19                       CROSS-EXAMINATION

20   BY MR. MESEREAU:

21   Q    Good afternoon, Mr. Clark.

22   A    Good afternoon, Mr. Mesereau.

23   Q    As you know I speak for Arthur Ayvazyan.  I would like to

24   just ask a few brief questions about your investigation in

25   regard to Allstate Towing and Transport Company?

```
1   A     Okay.
2   Q     Did you investigate a company called Allstate Towing and
3   Transport?
4   A     It was part of this investigation, yes.
5   Q     And did you do a background check on the company?
6   A     I did, like, a cursory, what I would call an initial
7   public record search -- database search that we have available
8   to us.
9   Q     Let me ask you about that search.  Did you ever
10  investigate to determine if the company had a certificate of
11  liability insurance?
12  A     No.
13  Q     Did you ever check any insurance company to see if they
14  covered Allstate Towing and Transport?
15  A     No.
16            MR. FENTON:  Objection, Your Honor.  Relevance.
17            THE COURT:  Overruled.
18  BY MR. MESEREAU:
19  Q     Did you ever investigate to determine if Arthur Ayvazyan
20  had a commercial driver's license?
21  A     There were several licenses seized during the search
22  warrant, I believe they have commercial license indicators on
23  there.
24  Q     Did you ever check with the Department of Motor Vehicles
25  in the state of California to see if Arthur Ayvazyan had a
```

1   motor carrier permit?

2   A     No.

3   Q     Is there any reason why you didn't?

4   A     No.  I believe from the search warrant, we seized a bunch

5   of those.

6   Q     Permits?

7   A     Permits.

8   Q     Motor carrier permits?

9   A     Or equivalent to.

10  Q     Did you ever investigate to determine if Arthur Ayvazyan

11  had done any required drug testing for a truck driver?

12  A     No.

13               MR. FENTON:  Objection, Your Honor.  Relevance.

14               THE COURT:  Overruled.

15  BY MR. MESEREAU:

16  Q     Were you aware that the state of California requires this

17  kind of testing for truck drivers?

18  A     No, I was not.

19  Q     Okay.  Did you ever check with the California Secretary of

20  State to see if the company had a corporate registration?

21  A     No.

22  Q     Why wouldn't you check that?

23  A     I don't -- I have checked many in this investigation, I

24  don't recall checking that one.

25  Q     Do you know if there are any limited liability

1    corporations, articles of organization that were filed with the

2    state of California?

3    A    No.

4    Q    Did you ever check with the California Department of Motor

5    Vehicles to see if Allstate Towing had a required medical

6    report?

7    A    No.

8    Q    Do you know what that kind of report is?

9    A    No.

10   Q    Did you do any background search to determine what kind of

11   permits or certifications or approvals a truck driver must have

12   to operate a truck?

13   A    No.

14   Q    Did you ever check to see if Arthur Ayvazyan had ever

15   leased or purchased a truck?

16   A    No.

17   Q    Did you ever attempt to look at any of his trucks?

18   A    No, I didn't know he had any trucks.

19   Q    Did you ever look at a truck with a sign on it that said

20   Allstate Towing.

21        Did you ever see a truck like that?

22   A    No.

23   Q    Okay.  Did you ever look up to determine if the state of

24   California had ever conducted inspections into any of all state

25   vehicles?

```
 1              MR. FENTON:  Objection.  Relevance.
 2              THE COURT:  I think that I'm going to sustain the
 3   objection at this point.  I think you have explored this
 4   adequately.
 5              MR. MESEREAU:  Thank you, Your Honor.  No further
 6   questions.
 7              MR. FENTON:  Thank you, Your Honor.
 8                      REDIRECT EXAMINATION
 9   BY MR. FENTON:
10   Q    Special Agent Clark, your investigation focused on real
11   companies as well as fake companies, correct?
12   A    Correct.
13   Q    In instances where real companies submitted fraudulent
14   PPP or EIDL loan applications, you investigated further,
15   correct?
16   A    Yes.
17   Q    And is one of the companies you investigated Allstate
18   Towing?
19   A    Yes.
20   Q    And did you investigate that company because it was fake?
21   A    I investigated because it received a PPP loan.
22   Q    Okay.  And is it your understanding that if a company lies
23   on a PPP loan application, a real company, that it's still a
24   crime?
25   A    Yes.
```

```
 1   Q    During the course of your investigation, you investigated
 2   the relationship between Richard Ayvazyan and Manuk Grigoryan,
 3   correct?
 4   A    Yes.
 5   Q    You investigated the things they did together as well,
 6   right?
 7   A    Yes.
 8   Q    And how would you characterize the nature of that
 9   relationship?
10             MR. MESEREAU:  Objection.  Foundation.
11             THE COURT:  Sustained.
12   BY MR. FENTON:
13   Q    Let's look at a couple of documents.  I'm going to show
14   you what has been marked Government Exhibit 19B.
15             MR. FENTON:  Mr. Cruz, can you release the exhibits
16   so they can be shown to this entire courtroom?
17   BY MR. FENTON:
18   Q    So just while we're waiting, Special Agent Clark, earlier
19   Mr. Silverman had asked you whether identification and credit
20   cards from Anna Manukyan were found in the possession of Manuk
21   Grigoryan, correct?
22   A    Yes.
23   Q    And I believe you testified that those items had been
24   found in Manuk Grigoryan's possession, correct?
25   A    Yes.
```

```
1              MR. FENTON:  I'm sorry, we're having a technical

2    issue.

3    BY MR. FENTON:

4    Q    Special Agent Clark, I'm showing you what has been

5    previously admitted as Government Exhibit 19B.  Do you see

6    this?

7    A    Yes.

8    Q    I represent to you that this identification --

9              MR. FENTON:  Mr. Cruz, I think that there is an

10   issue.  I think you need to allow the monitors in the courtroom

11   to display it.  There we go.  Thank you.

12   BY MR. FENTON:

13   Q    Agent Clark, I will represent to you that Government

14   Exhibit 19B was found on Richard Ayvazyan's phone, okay.

15        Is this the same license that Mr. Silverman pointed out to

16   you earlier?  It was found in the possession of Manuk

17   Grigoryan?

18   A    Yes.

19   Q    Is it fair to say they both possessed that license?

20   A    Yes.

21   Q    Is it fair to say that that license belonged to neither of

22   them?

23   A    They both had possession of it, so neither of them, yes.

24   Q    I'm going to show you a Government Exhibit marked 19C.

25        All right.  We're actually going to go on to Government
```

```
 1   Exhibit 10.
 2        Directing your attention to page 16, and do you recall
 3   seeing these documents earlier, Agent Clark?
 4   A    Yes.
 5   Q    These are the text messages between Rich New and Tammy?
 6   A    Yes.
 7   Q    Directing your attention to Text No. 3330.
 8   A    Yes.
 9   Q    Can you just read the text messages from 3330 to 3338?
10   A    I don't know how to pronounce that name -- but log-in for
11   a Gusto, please.
12        Richard New:  Hold on, Aziz let me find it.  I was moving
13   today.
14        Tammy:  Yeah, I confined this Moran.
15        Rich:  My office, it's all in boxes, let me find it.
16        Tammy:  Jacob, so if one have in system.  Lol Jacob.
17        Auto text.
18        Rich:  It should be MedetMurat1994@gmail.com.  Pass:  Vera
19   9317.
20   Q    Is that Medet Murat in 1994, a gmail.com the same email
21   address that Mr. Silverman showed you earlier in Manuk
22   Grigoryan's possession?
23   A    Yes.
24   Q    Let's go to page 41.  Let's look at Text Numbers 5204 to
25   5205.  Can you read these text from Rich New?
```

1  A     Rich New:  Here, use this, the owner is Iuliia.

2  Https://Turingsolution.com/contacts us.

3  Q     Is that reference the same type of corporate information

4  that Mr. Silverman pointed out was in the possession of Manuk

5  Grigoryan?

6  A     Yes.

7  Q     Let's look at Government Exhibit 10_69.

8        Do you see this handwritten note?

9  A     Yes.

10  Q     And again, I represent to you that this was found on

11  Tamara Dadyan's phone.  It's one of the text messages

12  attachments.

13        Right here it says:  Turing Info Solutions Inc., and

14  contains corporation.  Again, is this that the type of

15  corporate information regarding Turing Info Solutions that was

16  found on Manuk Grigoryan as pointed out by Mr. Silverman?

17  A     Yes.

18  Q     I'm going to show you Exhibit 10_70.

19        And, Special Agent Clark, can you read the name in the

20  lower right-hand corner?

21  A     Robinhood.

22  Q     What do you see right above the name Robinhood?

23  A     There is an account number and a routing number.

24  Q     And earlier Mr. Silverman pointed out Mr. Manuk Grigoryan

25  was in the possession of the same type information regarding

 1   Robinhood as well?

 2   A     Yes.

 3   Q     Based on your investigation and based on your documents we

 4   just reviewed, is it fair to say Manuk Grigoryan and Rich

 5   Ayvazyan shared information?

 6            MR. SILVERMAN:  Objection.

 7            THE COURT:  Sustained.

 8   BY MR. FENTON:

 9   Q     Is it your understanding, Special Agent Clark, that Manuk

10   Grigoryan and Richard Ayvazyan are both charged with

11   conspiring?

12            MR. SILVERMAN:  Objection.

13            THE COURT:  Sustained.

14            MR. FENTON:  We will move on.

15   BY MR. FENTON:

16   Q     Earlier Mr. Silverman asked you about Iuliia Zhadko,

17   Viktoria Kauichko, Timeline Transport and Top Quality

18   Contracting.

19         Do you recall that?

20   A     Yes.

21   Q     Earlier in the trial you heard testimony from Anthony

22   Farrer, the timepiece gentleman?

23   A     Yes.

24   Q     You heard him testified he received money from all of

25   these entities?

```
1              MR. SILVERMAN:  Objection, beyond the scope.

2              THE COURT:  Sustained.

3              MR. FENTON:  Your Honor, this is directly in

4    response to the testimony.

5              THE COURT:  Well, I mean, look, it's for the jury to

6    determine, but many of the questions, especially in the last

7    couple of days have been efforts by both sides to argue what

8    the evidence shows, and not principally to elicit evidence,

9    which is the part of the trial that we're now involved with.

10             But, in other words, we're trying to create

11   evidence, admissible evidence from which both sides can argue

12   the inferences that they think the jury ought to draw.

13             Many of the questions, not just your

14   questions, but some of the defendant's questions and

15   Mr. Silverman's questions have been attempting to bring out

16   inferences and not facts.

17             So, actually you should have been objecting

18   earlier on to many of the questions on those grounds.

19             You didn't, so, the question is for me, is two

20   wrongs become a right in a way.  They probably don't.

21             So don't get into any of these things, you can

22   argue them.

23             MR. FENTON:  Your Honor, I'm trying to lay a

24   foundation to elicit factual testimony that is unique to

25   Special Agent Clark.
```

```
 1              THE COURT:  If there is factual, I mean, factual is
 2  a bad word if you are able to determine what is fact.  I mean,
 3  if you are trying to lay a foundation for evidence, then you
 4  can.
 5              MR. FENTON:  Your Honor, can we have a brief sidebar
 6  regarding this?
 7              THE COURT:  No.
 8              MR. FENTON:  Okay, Your Honor.
 9  BY MR. FENTON:
10  Q    Special Agent Clark, at some point during the trial, did
11  defendant Richard Ayvazyan speak directly to you?
12              MR. SILVERMAN:  Objection.  403.
13              THE COURT:  I may not -- under what grounds?
14              MR. SILVERMAN:  Beyond the scope.
15              THE COURT:  Let's go to sidebar on this.  Approach
16  the sidebar.
17                        (Sidebar begins.)
18              MR. FENTON:  So, Your Honor, the defendant
19  approached Special Agent Clark after Anthony Farrer, the
20  timepiece gentleman testified and Agent Clark --
21              THE COURT:  Are you talking present time now?
22              MR. FENTON:  I'm talking during the trial and
23  Special Agent Clark was putting the watches and gold coins
24  away.
25              THE COURT:  Who is putting them away?
```

```
1              MR. FENTON:  Special Agent Clark.  The defendant
2    walked up to him and said, you stole those things from me.
3                    That is directly relevant to the question of
4    possession which Mr. Silverman is disputing.
5                    He is claiming that somebody else purchased
6    these things, and I'm trying to lay the foundation to establish
7    that indeed the defendant purchased those things, and that when
8    they were shown and displayed during this trial, he walked up
9    to Mr. Clark and said those things, you stole those from me.
10             THE COURT:  What's your response?
11             MR. SILVERMAN:  Yes, first 403 arguments.
12             THE COURT:  Why 403, it's not 403.  I mean, if he
13   said that it would be some circumstantial evidence that the
14   watches were his, and there is some evidence from the defense
15   to the contrary, so what is the objection?  Go ahead.
16             MR. SILVERMAN:  The objection is scope at this
17   point.  I did not bring anything up about the watches.
18             MR. FENTON:  But, Your Honor, he is claiming --
19             THE COURT:  So you are saying objection is beyond
20   the scope?
21             MR. SILVERMAN:  Yes, Your Honor.  There is not a
22   dispute as to all the watches involved, though.
23             THE COURT:  So that seems to meet with my
24   recollection that it is just some and not all that were being
25   challenged.
```

1          By the way, that reminds me of something, you

2   should not get into this return watch thing.

3          There was some motion in limine or something

4   about or somewhere about your wanting to develop some of these

5   watches were returned after the searches?  No.

6          MR. SILVERMAN:  Okay.

7          THE COURT:  What is it is point here?

8          MR. FENTON:  Your Honor, they spent the entire

9   cross-examination trying to argue that Manuk Grigoryan, not

10  Richard Ayvazyan, owned and controlled Iuliia Zhadko, Victoria

11  Kauichko, Top Quality Contracting, Timeline Transport, and

12  Fiber One Media, all of which paid to buy the watches for

13  Richard Ayvazyan.

14          My point is just to say, these entities paid

15  for the watches that went to Richard Ayvazyan and then Richard

16  Ayvazyan, and Agent Clark helped seize those watches from his

17  house.  And when they were displayed in his courtroom, he went

18  up to the agent and he said, you stole those from me.  Mr.

19  Silverman said that Grigoryan controls, not Ayvazyan.

20          THE COURT:  That is not the argument?

21          MR. SILVERMAN:  That is not the argument.

22          THE COURT:  What is the argument regarding the

23  watches?

24          MR. RAM:  Your Honor, the argument is not that

25  Mr. Ayvazyan never got watches, there is watches that

1    Mr. Ayvazyan has that undisputed, those are his watches.

2               So what is really happening here is they are

3    trying to point out Mr. Ayvazyan made a comment during trial

4    about, those are my watches, that is basically what was said.

5               THE COURT:  Wait a second.  You are saying couple of

6    things here.

7               Are you saying that your position is that the

8    watches were bought with money that he had, not before this

9    whole investigation?

10              MR. RAM:  Correct.  That is one of the things we're

11   trying to develop in this case.

12              THE COURT:  And then the government had evidence

13   that some of the monies from the PPP loans, I mean, if I

14   remember correctly, the monies that went to buy some of these

15   watches came from the accounts to which PPP loans were

16   deposited.

17              MR. FENTON:  That's correct.  Through the entities,

18   the five entities and individuals I just described.

19              THE COURT:  What?

20              MR. FENTON:  The five entities and individuals who I

21   just described, Zhadko, Kauichko, Fiber One, but they spent the

22   entire cross-examination arguing that Manuk Grigoryan

23   controlled those entities, not Richard Ayvazyan.

24              THE COURT:  What I'm hearing now, if the position is

25   that he owned some or all of the watches before this

1    investigation started, then he is saying you stole my watches.

2    It's unclear as to which watches.

3            MR. FENTON:  But there is absolutely no facts to

4    support what Mr. Ram just said.  That completely misrepresents

5    the record.  That witness sat there, and actually, you must

6    recall the testimony, Your Honor.

7            THE COURT:  I don't know what I recall.  Don't give

8    me a test.

9            MR. FENTON:  He was looking at the watches and he is

10   saying, I got this watch when I was there, I got this watch

11   when I was there, I sold this to Richard Ayvazyan on these

12   dates.  He remembered specifically the watches.

13           THE COURT:  Well, I do, so what is wrong with

14   arguing what he said?  I mean, he's a multiple criminal, right?

15           MR. FENTON:  There is no question about that.

16           THE COURT:  So, I mean it's your guy, so he said it

17   and you argue it.

18               I mean, to me, he seems reasonable, I don't

19   know, I'm not the juror, it doesn't seem like crazy testimony.

20           MR. FENTON:  No, I agree with Your Honor.

21               But the point is that they are disputing who

22   controls the entities from which that money came.

23           MR. RAM:  That is not the dispute.

24           THE COURT:  I didn't get it that way.  I got it

25   that -- I mean, I shouldn't be interpreting things.  But the

1   way it was presented was that Ayvazyan was kind of po'ed about

2   having his watches taken, and he got a little emotional,

3   spontaneous about it, and he said, you took my watches.

4                    I don't know.  Let me think about it.  Enough

5   already, okay.  Let's get back.

6                    (Sidebar ends.)

7              MR. FENTON:  All right.  Thank you, Your Honor, the

8   government has no further questions.

9              THE COURT:  Any other questions from the defense of

10  the witness here?

11             MR. SILVERMAN:  Just three questions, Your Honor.

12             THE COURT:  Okay.  Three questions.  You know there

13  was a song years and years ago, probably long before anyone

14  here was ever born, it was a hit song.  I think it ought to be

15  a song in every lawyer's heart.  I would sing it to you, but it

16  would be inappropriate.  It's called *Three Little Words*, *Three*

17  *Little Words*.  That was the hit song.

18                    What a great song for lawyers.  *Three Little*

19  *Words*.

20             MR. SILVERMAN:  I can promise three questions.

21                    FURTHER CROSS-EXAMINATION

22  BY MR. SILVERMAN:

23  Q    Agent Clark, on redirect examination, you testified

24  regarding a photograph of a driver's license belonging to Anna

25  Manukyan that was found on her phone, correct?

1    A     Yes.

2    Q     That photograph was not found on any phones belonging to

3    Tamara Dadyan, Arthur Ayvazyan or Mary Terabelian, wasn't it?

4    A     I don't know.  I didn't review those phones.

5    Q     And you are not aware of any communications between Manuk

6    Grigoryan and any of those three people, are you?

7              MR. FENTON:  Objection, Your Honor.

8              THE COURT:  Well, I mean, that is what I was, sort

9    of, hinting about.  Sustained.

10             MR. SILVERMAN:  No further questions.

11             THE COURT:  Anything further?

12             MR. FENTON:  Your Honor, at this time --

13             THE COURT:  Let's keep the witness available in case

14   we get into some other matters.  Tell him to stand by.

15             MR. FENTON:  Will do, Your Honor.  Thank you.

16             THE COURT:  All right.  Let's get going here, what

17   is next?

18             MR. FENTON:  At this time the government has two

19   factual stipulations to read into the record.

20             THE COURT:  Okay.

21             MR. FENTON:  The first stipulation as to the status

22   as FDIC-insured.  This is ECF 532.  This is stipulated to by

23   all of the parties, defendants and the government.

24                  From March 1, 2020 through August 31, 2020,

25   Web Bank was a bank with deposits insured by the Federal

1    Deposit Insurance Corporation, FDIC.

2                    From March 1st, 2020 through August 31st,

3    2020, Celtic Bank was a bank with deposits insured by the FDIC.

4                    From March 1, 2020 through August 31, 2020,

5    Cross River Bank was a bank with deposits insured by the FDIC.

6                    From March 1, 2020 through August 31, 2020,

7    Comerica Bank was a bank with deposits insured by the FDIC.

8                    From March 1, through 2020 August 31, 2020,

9    Seattle Bank was a bank with deposits insured by the FDIC.

10                   From January 1, 2021 through February 28,

11   2021, Capital One NA was a bank with deposits insured by the

12   FDIC.

13                   This stipulation is being entered into freely

14   and voluntarily by all parties.

15          THE COURT:  So when you hear a stipulation, that

16   simply means that the parties have agreed what has been

17   contained in that stipulation is fact.

18                   You can accept it as fact and it needs no

19   further evidence.

20          MR. FENTON:  The second stipulation, Your Honor, is

21   ECF 530 and 551.

22                   This is a stipulation as to interstate wires.

23                   This stipulation solely relates to the fact

24   that certain wires actually traveled in interstate commerce.

25                   It does not include an agreement regarding

whether the defendants knew these wires occurred or knew these wires traveled in interstate commerce or that either fact was foreseeable.

It also does not include an agreement regarding whether these wires were in the furtherance of the scheme alleged by the government.

A wire transfer of $182,637 sent on May 1, 2020, from Web Bank to J.P. Morgan Chase N.A. account in the name of Sabala Construction was a wire transmission that traveled in interstate commerce from Utah to California.

A wire transfer of $124,000 sent on May 5, 2020, from Cross River Bank to a U.S. Bank account in the name of Allstate Towing and Transport, LLC, was a wire transmission that traveled in interstate commerce from New Jersey, Pennsylvania, or Texas to Kansas.

A wire transfer of $130,000 sent on May 7, 2020, from Celtic Bank to a Wells Fargo Bank, NA account in the name of Iuliia Zhadko, dba Top Quality Contracting was wire transmission that transferred in interstate commerce from Utah to Minnesota.

A wire transfer of $137,500, sent on May 11th, 2020, from Comerica Bank to a Comerica Bank account, in the name of Secureline Realty and Funding, Inc., was a wire transmission that traveled in interstate commerce from Ohio to California.

1          A wire transfer of $130,187, sent on May 8,

2    2020, from Celtic Bank to JP Morgan Chase, NA account in the

3    name of Redline Auto Collision, Inc., was a wire transmission

4    that transferred in interstate commerce from Utah to

5    California.

6          A wire transfer of 157,500 sent on May 19,

7    2020, from Celtic Bank to a Wells Fargo Bank NA account in the

8    name of Voyage Limo LLC, was a wire transmission that traveled

9    in interstate commerce from Utah to Minnesota.

10          A wire transfer of $149,900 sent on June 16,

11    2020, from the United States Small Business Administration or

12    SBA to U.S. Bank account in the name of G&A Diamonds, was a

13    wire transmission that traveled in interstate commerce from

14    Colorado to Missouri, to New Jersey to Colorado.

15          A wire transfer of 150,000 sent on June 17,

16    2020, from a J.P. Morgan Chase, NA account in the name of

17    Redline Auto Collision, Inc., to a Bank of America in the name

18    of Marietta Terabelian was a wire transmission that traveled in

19    interstate commerce from California to Pennsylvania or Texas to

20    California.

21          A wire transfer of $149,900, sent on

22    June 22nd, 2020, from the SBA to a Radius Bank aka Lending Club

23    Bank account in the name of Timeline Transport, Inc., was a

24    wire transmission that traveled in interstate commerce from

25    Colorado to Missouri to New Jersey to Massachusetts.

1          A wire transfer of $384,100 sent on July 31st,

2    2020, from Capitol One, NA to a Radius Bank account in the name

3    of Mod Interiors was a wire transmission that traveled in

4    interstate commerce from Illinois, or Virgina to Arkansas to

5    Georgia to Massachusetts.

6          The submission of a PPP loan application on

7    August 13th, 2020, to NewTek Small Business Finance in name of

8    Anna Dzukaeva was a wire transmission that traveled interstate

9    commerce from California to Arizona.

10          This stipulation is being entered into freely

11   and voluntarily by all parties.  Thank you, Your Honor.

12         THE COURT:  Anything further from the government?

13         MR. FENTON:  No, Your Honor.

14         THE COURT:  Government rests.

15         MR. FENTON:  The government rests.

16         THE COURT:  At this point in the trial, that means

17   the government has presented its case.

18          Defendants may or may not present evidence and

19   are not obligated to.

20          As I said, the burden is always with the

21   government.

22          What I have to do at this point is not of

23   direct concern to you, so, what I would suggest is that you

24   take either a recess now or maybe take it for a little longer

25   than usual.

```
 1                    Let's say you take 20 minutes, 25 minutes or
 2   so, and then we will see what else remains in the case, okay?
 3                    There may be some more evidence.  Thank you.
 4              THE COURTROOM DEPUTY:  All rise.
 5                    (Jury exits the courtroom.)
 6              THE COURT:  Please be seated.  I will hear the
 7   motions.
 8              MR. SILVERMAN:  Defendant Richard Ayvazyan moves for
 9   a judgment of acquittal on all counts under Rule 29(a).
10                    We have a written motion as well that we're
11   happy to share and plan to amend to cross out a few exhibits
12   that did not come in today.
13              THE COURT:  I would like to see it.  Can you hand
14   that up?  Let me see it, Paul.  And so your motion is
15   essentially contained in this document, correct?
16              MR. SILVERMAN:  Yes, Your Honor.  And there are two
17   primary issues presented for the Court, both on the substantive
18   counts as well as we believe that trial has borne out exactly
19   our concerns that we thought would happen.
20              THE COURT:  All right.  Is the motion in part based
21   upon your concerns about casting doubts?
22              MR. SILVERMAN:  Yes.  There is one section on that
23   and then a section on --
24              THE COURT:  In light of what the Court said before
25   trial, how can -- why should the Court address that now as
```

1    contrasted to having a Castor hearing, if necessary, after the

2    trial?

3              MR. SILVERMAN:  Because to survivor a Rule 29A

4    motion, the government bears the burden of proving that

5    sufficient evidence has come in that is untainted in order to

6    reach a verdict.

7              THE COURT:  I see, okay.

8                   And now, you represent --

9              MR. FRASER:  Ryan Fraser.

10             THE COURT:  You are representing?

11             MR. FRASER:  Marietta Terabelian.

12             THE COURT:  Terabelian, right.

13             MR. FRASER:  Yes, Your Honor.  Ms. Terabelian joins

14   Richard Ayvazyan's motion and also separately moves for a

15   judgment of acquittal on all counts in which she is charged for

16   insufficient evidence of all elements, and without limitation

17   on that motion, I would like to also highlight the following,

18   particular respects in which the government's evidence is

19   insufficient to sustain a conviction of Ms. Terabelian.

20                  I will begin with the substantive bank fraud

21   counts.

22                  There was no evidence of participation by

23   Ms. Terabelian in any of the PPP or EIDL loan applications and

24   there are no such applications attributable to Ms. Terabelian.

25                  Turning to the substantive wire fraud counts,

UNITED STATES DISTRICT COURT

1    none of the wires charged in the indictment were sent from

2    Ms. Terabelian's bank account.

3              There is one wire, that is the wire in Count 9

4    that was sent to her account, but even there, there was no

5    evidence that the recipient of a wire has to take any

6    particular action in order to receive the wire transmission.

7              Of course, mere presence is not sufficient.

8         THE COURT:  But wouldn't the recipient of a wire

9    know that the wire was received in her account?

10        MR. FRASER:  No.  There is no evidence that there

11   was any kind of notification to Ms. Terabelian, and no evidence

12   that she was actively monitoring that account, and I think the

13   evidence in fact suggests the contrary of that.

14        THE COURT:  But the way I understand the government

15   is approaching defendant Terabelian is through the doctrine in

16   *Pinkerton*.

17             In other words, if she's a conspirator, if the

18   jury finds that, and under *Pinkerton*, not the exact words, but

19   the substance is that a conspirator is responsible for any

20   criminal acts that flow from the conspiracy if they understood

21   that that was going to likely happen, even if they weren't

22   involved in the specific crime that followed the conspiracy.

23        MR. FRASER:  Yes, Your Honor.  I anticipate the

24   government will rely on *Pinkerton* there, but the government has

25   no evidence to establish the scope of any conspiracy, it might

1    alleged Ms. Terabelian joined and that would be the fifth

2    element to rely on a *Pinkerton* theory on the substantive

3    counts.

4            THE COURT:  All right.

5            MR. FRASER:  In any event, as I noted, this would

6    only be with reference to I believe it was Count 9 -- let me

7    confirm that, that would be the only count that even went to

8    the Terabelian -- yeah, that is correct, Count 9 is the only

9    substantive wire fraud count that involves a transmission to

10   her account.

11           Then turning to the 1028A charging, aggravated

12   identity theft charge against Ms. Terabelian.

13           This count references alleged identity theft

14   in relation to Count 11.  And Count 11 references a

15   transmission of a wire of $384,150 into Mod Interiors bank

16   account but there is no evidence of a link to Ms. Terabelian --

17   between Ms. Terabelian and that account other than the family

18   relationship, which is not enough for a reasonable jury to find

19   beyond a reasonable doubt that she participated in aggravated

20   identity theft.

21           And of course, that is the standard that the

22   Court is applying is whether a reasonable jury could find

23   beyond a reasonable doubt all elements of each particular

24   charge.

25           When it comes to the conspiracy counts, the

concept of mere presence applies there as well.  And I think an
instructive case for the Court to take into account in this
regard would be *United States v O'Campo*.  That is 937 F.2d 485
Ninth Circuit, 1991.

In that case, the Ninth Circuit observed that
O'Campo was arrested in extremely incriminating surroundings.
But because the government failed to produce proof linking
O'Campo to the illicit activity, his mere presence at a
particular residence, even with an alleged co-conspirator
cannot sustain a Section 46(a) conspiracy conviction.

Similarly here, Ms. Terabelian shared a home
with Richard Ayvazyan.  There are some arguably incriminating
circumstances, but that alone is not enough to establish each
element of the charge beyond reasonable doubt and show that she
knowingly joined a conspiracy to commit, in particular, bank
fraud, or in particular, wire fraud when it comes to the
conspiracy that is charged against her in Count 1.

I would note, further, that the jail call
dates from October of 2020, and the dates for Count 1 that are
charged, the ending date is August of 2020.

And I think -- it gets to be a closer call
whether it comes to the conspiracy to commit money laundering.
But even there, again, I think the government really doesn't
have any evidence that allows jurors to go beyond speculation
to infer that she knowingly joined a conspiracy to commit that

```
1   offense.
2                    Thank you.
3          THE COURT:  Before you do that, sir, I would rather
4   hear back and forth, so, what the defense lawyer said, I can
5   hear in response from the government, and that is more helpful
6   to me.
7                    So let me hear the government just on the
8   defendant Terabelian.
9          MR. FENTON:  Yes, Your Honor.  I think that defense
10  counsel really downplays the significance of the jail call.
11  Immediately after she was arrested, she placed two telephone
12  calls.  She specifically cites the possession of the card, the
13  Viktoria Kauichko card as being something that is problematic.
14  She suggests that whoever speaking to knows the charges which
15  also suggests that she --
16         THE COURT:  Remind me about the first thing you
17  said.  What was that exactly?
18         MR. FENTON:  So, when she is -- when she places the
19  jail call, she places two jail calls.
20         THE COURT:  Are you saying when she placed the calls
21  she knew that the customs people had found that card?
22         MR. FENTON:  The card, which is a Viktoria
23  Kauichko's credit card, I will come back to that in a moment.
24  That credit card is referenced, albeit in general terms, but
25  the fact it was found on her in the call, she then says you
```

1  know the charges which suggest that she knows the charges.

2          THE COURT:  She said, you know -- those are her

3  words?

4          MR. FENTON:  You know the charges.

5          THE COURT:  Is that what she said on the call?

6          MR. FENTON:  Yes, Your Honor.

7          THE COURT:  Those words?

8          MR. FENTON:  Yes, Your Honor.  And she then directs

9  whomever she is speaking to, to clean the house.

10          She places a second call, where she again

11  makes a direction.  She directs somebody to clean the house.  I

12  think the fair inference to draw on the information the

13  inferences should be drawn on the government's favor at this

14  point, she knew there was evidence of the crimes with which she

15  was charged, and she was directing somebody to dispose of that

16  evidence.  That is what in fact happened in this case.

17          THE COURT:  Leaving aside just for the moment that

18  phone call, how would you argue the evidence aside from that

19  phone call against her?

20          MR. FENTON:  Well, the government's theory is that

21  Marietta Terabelian is Viktoria Kauichko, she uses that ID.

22  That the specific ID was found on her at the border, that is

23  Government Exhibit 76.

24          Fiber One Media and personal identifying

25  information relating to another individual, Susanna Mkrtchyan,

1    was found on her phone, that is Government Exhibit 16B.

2              THE COURT:  Was that the item that was placed on her

3    phone in 2018?

4              MR. FENTON:  That's correct, Your Honor, which we

5    would argue demonstrates she has knowledge of how this

6    information is being used.

7                   And then we have Richard Ayvazyan's text with

8    the watch dealer where he is telling him that his wife is named

9    Viktoria Kauichko, and that she works at Fiber One Media, and

10   he says, this is my wife's information.

11                  That is Government Exhibit 37.

12                  So there, both Richard Ayvazyan and his wife,

13   are in possession of that type of information, and Richard

14   Ayvazyan is identifying his wife as Viktoria Kauichko.

15             THE COURT:  All right.

16             MR. FENTON:  If you take that credit card and you

17   look at how that credit card was found on Marietta Terabelian

18   was used, that card was used in furtherance of the scheme.

19                  It was used to pay rent for the apartment, the

20   6150 Canoga Avenue, Unit 337, which is one of the central

21   locations that is used in this fraud.

22                  It's a location that is used as an address for

23   PPP and EIDL loan applications.

24                  It's a place from which those applications are

25   actually sent.  When you look at the IP address information,

```
 1    and there are numerous loans, not just loans that relates to

 2    other companies and individuals, but specifically loans that

 3    relates to Viktoria Kauichko and the companies that Viktoria

 4    Kauichko is purportedly the president of, including Fiber One

 5    Media.  That's the direction connection between the defendant

 6    and the scheme.

 7                    In addition, those are Government

 8    Exhibits 2-N, 5-C, 4-0, 4-Q, those are all applications that

 9    tie directly to that particular address and there are many

10    others.

11                    In addition, we see Ms. Terabelian using the

12    PPP funds for personal expenses that are unique to her.

13                    We see the Runyan Tax account gets a PPP loan,

14    for example, on July 21st, Runyan Tax is a Viktoria Kauichko

15    company.  That same day that money is used to pay for her

16    father's funeral.

17                    We see her buy furniture, which is delivered

18    to her home, and then we also see PPP money being used to buy a

19    home in the name of Iuliia Zhadko, where the evidence shows

20    Ms. Terabelian's mother pays for all of the utilities.

21                    So, not only was it used to buy furniture and

22    a funeral, it was also used to buy a home for her mother.

23                    We also see -- these are expenses unique to

24    this particular defendant.

25                    We also see if you look at Government
```

1    Exhibit 115, that is the summary exhibit prepared by Marylee

2    Robinson.  If you look at all of the funds that went to

3    purchase the house, that Richard Ayvazyan and Marietta

4    Terabelian live in with their family, that house was purchased

5    by funneling PPP funds through her bank account.

6              And if Your Honor were to look at those bank

7    records, you would see those bank records are suggestive of

8    somebody who spends their days from Central District of

9    California doing everyday consumer things, but who all of a

10   sudden got this massive inflow of money from all of these

11   strange sources, all of which -- most of which is PPP funds, it

12   gets funneled through these accounts, and then it goes to

13   purchase this $3.25 million mansion.  That is critical.

14             That not only shows her participation in the

15   1349 conspiracy, it also demonstrates, I would say,

16   overwhelmingly, her participation in the 1956(h) conspiracy as

17   well, the money laundering conspiracy.

18             For that, all we need to show is concealment

19   or spending.

20             Given the fact that she is using aliases,

21   Viktoria Kauichko; given the fact she's using the names of fake

22   or stolen companies, Runyan Tax Service, Fiber One Media, all

23   evidence of concealment, given the way she is spending the

24   money, she's easily a participant in that part of the

25   conspiracy, regardless of whether or not she knows that the

1   core source of those funds is PPP money.

2                    The final thing I will say is that with

3   respect to the aggravated identity theft count, that count is

4   very unique to those two particular defendants.

5                    The person whose identity was used was the

6   defendant's father, who was recently deceased, and then the

7   other defendant's father-in-law.

8                    And when you look at the timing, what you see

9   is that Nazar Terabelian is deceased on July 18 and within five

10  days a PPP loan is taken out in the name of -- in his name in

11  this company, Mod Interiors.

12                   Mod Interiors is a company that has long been

13  associated with Richard Ayvazyan, and that received other PPP

14  loans directly deposited into Richard Ayvazyan's bank accounts

15  alongside Arman Hayrapetyan.  They are co-signers on those

16  accounts.

17                   So when the defense repeatedly says that

18  Richard Ayvazyan does not have any direct relationship with any

19  PPP loans, that is not true.  He does through this company, and

20  that company is a major recipient of these funds.

21                   What we also see is that Richard Ayvazyan is

22  found with a Nazar Terabelian's credit card, that is Government

23  Exhibit 19C.  He's found with a Mod Interiors credit card,

24  which is Government Exhibit 19D, well, it's also 19C, and then

25  we find notes with Nazar Terabelian's personal identifying

1    information at a Government Exhibit 19D.

2                    This money that is obtained using Nazar

3    Terabelian's name after he is deceased, this money goes through

4    Viktoria Kauichko accounts.

5                    Again, it's the direct connection to the

6    defendant.

7                    It's used to buy things, again, specific to

8    the defendant, and things that are later found in the

9    defendant's home.  For example, gold coins.  We saw those gold

10   coins, there were 60.

11                   We have traced that money going from the Nazar

12   Terabelian Mod Interiors PPP loan, through to purchase jewelry,

13   diamonds, gold coins, and all of these other things, furniture,

14   that again, would be unique to that particular defendant and

15   found, some of which was found in the defendant's home, the 60

16   coins.

17                   So I think this evidence, just alone is more

18   than sufficient to find the defendant guilty beyond a

19   reasonable doubt, but I think particularly given the fact that

20   at this stage of the proceedings, we benefit from the inference

21   I think that the motion should clearly be denied.

22                   The last thing I will say is with respect to

23   the wires, the wires are of no moment.  The reason why, is

24   because the standard here is simply with respect to venue.

25                   All we need to demonstrate is that the scheme

```
 1    was orchestrated -- it was orchestrated from the Central
 2    District of California.  We have more than satisfied that.
 3              These defendants live in the Central District
 4    of California, they were committing this fraud, amidst a
 5    pandemic, there was a lockdown, they were supposed to be in
 6    their houses.
 7              THE COURT:  Is that an issue?
 8              MR. SILVERMAN:  Yes, Honor.  To be clear the scheme
 9    doesn't have to be orchestrated in the Central District of
10    California, the wires have to be orchestrated in the Central
11    District of California.
12              MR. FENTON:  That is a legal issue we have to brief.
13    I think that is legally incorrect, that is certainly not the
14    case.
15              The scheme has to be orchestrated from this
16    district.  It absolutely was.  These defendants were not
17    outside of this district during that same time period.
18              People under lockdown, the bank records shows
19    they were here, the IP address information shows they were
20    here, they were getting takeout delivery here.
21              THE COURT:  What about the wires?  Let me hear
22    briefly from Mr. Silverman, without too much elaboration, what
23    is your point?
24              MR. SILVERMAN:  The baseline for venue for wire
25    fraud is that the wire is sent to or from the district.
```

```
 1                    In the Ninth Circuit, there is dicta in the

 2    Ninth Circuit case that says or the wire can be orchestrated in

 3    the district, meaning that if a bank sends instructions to

 4    somebody to wire money to another bank, that would be

 5    sufficient.  That is not this case.

 6                    But there is significant case law talking

 7    about the fact that wire fraud venue is not based on the scheme

 8    to defraud, but rather the actus reus, which is the wire

 9    itself.

10              THE COURT:  So the wire, according to your argument,

11    has to be sent from the Central District or received in the

12    Central District?

13              MR. SILVERMAN:  Or the instructions to send the

14    wire, Your Honor.

15              THE COURT:  But isn't that what the government is

16    saying, that through the scheme the wires were directed?

17              MR. FENTON:  Yes, Your Honor.

18              MR. SILVERMAN:  No, Your Honor.  With respect, the

19    wires would be from a sort of substantive standpoint

20    foreseeable under the government's theory of the case, but if

21    that were sufficient, it would be based on where the scheme to

22    defraud is located, and not where the wires themselves are

23    located and that is the distinction.

24              THE COURT:  Have you cited cases in your memorandum

25    about that?
```

```
 1              MR. SILVERMAN:  Yes, Your Honor.

 2              THE COURT:  And does the government have any

 3    authorities that the Court should consider on that question?

 4              MR. FENTON:  Yes, Your Honor.  We can brief that if

 5    you would like.

 6                    One point I would like to make.  I was

 7    responding to Mr. Fraser's argument.

 8              THE COURT:  That is enough.  What else are you going

 9    to say?

10                    I mean, you have hit the highlights, you don't

11    have to empty your briefcase.

12              MR. FENTON:  I have nothing more.

13              THE COURT:  If I hadn't said it by now, there is

14    something wrong, why would you leave with your worst punch?

15              MR. FENTON:  I would not, Your Honor.  I'm just

16    laughing because I have nothing else to say with respect to

17    Mr. Fraser's argument.  I do have other things with respect to

18    Mr. Silverman's, but I will wait to respond further.

19              THE COURT:  All right.  You are anxious to say

20    something, Mr. Fraser?

21              MR. FRASER:  Yes, Your Honor.

22              THE COURT:  Do it briefly, I mean, this is not the

23    final argument, this is just argument on the motion, which has

24    a totally different standard.

25                    MR. FRASER:  Yes, Your Honor, addressing first the
```

**UNITED STATES DISTRICT COURT**

1    jail call.

2         THE COURT:  This can't be back and forth.  I mean,

3    is there something legally deficient about what Mr. Fenton

4    said?

5              In other words, if his argument would allow

6    the jury to adopt it by way of inferences, at this point that

7    is enough.

8              Are you saying that it's so far-fetched that

9    it can't be?

10        MR. FRASER:  If there are two reasonable inferences

11   that the jury has to choose between, and the government hasn't

12   eliminated the reasonableness of the innocent explanation --

13        THE COURT:  I have it.  Thank you, Mr. Fraser.  That

14   will be enough, sir.  Who was next to make an argument?

15        MR. JOHNSON:  I will be brief.  Peter Johnson on

16   behalf of Vahe Dadyan.

17             We move for judgment of acquittal on Rule 29

18   on all counts.  We join the co-defendant's arguments.

19   Specifically as it relates to the conspiracy count, there has

20   been no evidence of knowledge.

21             Mr. Vahe Dadyan's knowledge of participation

22   in the conspiracy counts in 1, Count 1 and 26.

23        THE COURT:  What about the -- we talked about this

24   at another point, but his only link, as far as I can remember,

25   was with his cousin, Tamara Dadyan.  But if he conspired with

1   her and didn't know about anyone else in the conspiracy, is

2   your argument that that is not enough?

3           MR. JOHNSON:  Well, I think both.  First, the

4   government has to produce evidence that he conspired with her.

5   We are arguing that that doesn't exist.

6               The second that he's not only that he had to

7   have conspired with her, but it was foreseeable that others

8   would be involved, and there is no evidence that it's in fact

9   foreseeable that others would be involved.

10          THE COURT:  I understand because what I have heard

11  your argument before.

12              Let me just hear the government on that one

13  point.  Just the question I raised, and make it as brief as you

14  can.

15          MR. PAETTY:  Yes, Your Honor.

16              As I understand Your Honor's question it was

17  regarding the conspiracy as it relates to Vahe Dadyan and his

18  cousin, Tamara Dadyan.

19          THE COURT:  Yes.

20          MR. PAETTY:  To the extent the Court is questioning

21  whether a conspiracy exists, if Vahe Dadyan conspired with

22  Tamara Dadyan, the answer to that question is, yes, Your Honor.

23              The government has introduced evidence that

24  Vahe Dadyan was the owner of Voyage Limo, a PPP loan that bore

25  a signature block with his name in that signature.

```
 1              THE COURT:  No, I remember all of that.  He made the
 2    loan.  I remember the fact that he, some months, I think, after
 3    the loan was funded, unlike some of the other transactions
 4    here, he received back about 50 percent of the loans, something
 5    around $75,000; isn't that right?
 6              MR. PAETTY:  That's correct, Your Honor.
 7              THE COURT:  So, your argument that he would have to
 8    have knowledge about the number of employees and the other
 9    information that is allegedly false on the Voyage loan, and
10    ultimately, he got the lion's share or at least half of the
11    benefit?
12              MR. PAETTY:  He got the benefit of the bargain,
13    correct Your Honor.
14                   As corroborated by text messages we have seen
15    from between Tamara Dadyan --
16              THE COURT:  One of these text messages, I think,
17    he's referred to as an idiot, right?
18              MR. PAETTY:  Those text messages refer to quite a
19    few people as idiots.
20              THE COURT:  What I thought is Vahe, the idiot, so
21    much stuff, I think I'm right on that.
22              MR. PAETTY:  That's correct, Your Honor.  The word
23    idiot is used as referring to Vahe Dadyan.  It's also used
24    regarding other people as well.
25              THE COURT:  Briefly, Mr. Johnson.
```

1          MR. JOHNSON:  Your Honor, I think this point is

2    very, very important.

3               There has been no evidence that he received

4    back $75,000 presented in this Court before this jury.

5               What the Court is referring to is the change

6    of plea.  That evidence related to a money coming back didn't

7    happen here, not in front of this jury.  And that is what we're

8    raising.

9          THE COURT:  All right.  I'm hearing your argument.

10   What is the quick --

11         MR. PAETTY:  Yes, Your Honor, it's briefly to

12   address that.  There has been evidence regarding $50,000 of

13   that that came back to V&D Limo, a company controlled by Vahe

14   Dadyan, through an account at Radius Bank from Timeline

15   Transport and there has been evidence it's in -- that is 1-N,

16   Government Exhibit 1-N at 8, page 8.

17         MR. JOHNSON:  Your Honor, that evidence is actually

18   not there.  And what the government is referring to is a

19   summary chart that was not addressed in front of this jury.

20              And they are referring to -- if the Court

21   remembers during pretrial hearing, I had this small corner of

22   money coming back, $50,000.

23         THE COURT:  I remember that chart, that wasn't used.

24         MR. JOHNSON:  That wasn't used here.  What we're

25   referring to now is the lack of evidence, and I don't want to

```
 1    conflate what happened pretrial, and what happened before this
 2    jury.
 3              THE COURT:  Well, what didn't happen here is not to
 4    be considered.  I mean, this is what counts.
 5              MR. JOHNSON:  I think that exhibit that should be
 6    stricken from the summary exhibit was not used here, that the
 7    Court should only be considering evidence before this jury at
 8    the Rule 29 stage.
 9              THE COURT:  Are you saying that that summary chart
10    that was referred to was not received in evidence in this case?
11              MR. JOHNSON:  There was a summary chart that was
12    attached to the -- I think it's 115 or 116.  I can't remember
13    Exhibit 115 or 116, that was never addressed before the Court
14    here, so there is no evidence before this jury that it was
15    money went back.  It's a summary chart.
16                    And actually the summary is wrong, so we were
17    prepared to address that issue.
18              THE COURT:  I mean, every aspect of an exhibit
19    doesn't have to be testified to before the jury if the exhibit
20    is in evidence.
21                    Lawyers sometimes wait until final argument to
22    argue what inferences the document shows.
23                    So if you are saying the exhibit is in
24    evidence, but it wasn't testified to about here, if it's in
25    evidence, it's in evidence.
```

1          MR. JOHNSON:  I understand, Your Honor.  The exhibit

2    that they are referring to in the summary chart is, and I guess

3    we can argue this before the jury, if the Court is considering

4    this a factual issue, but the 1-N does not represent that what

5    I read the way I read 1-N is not representing a return in

6    funds.

7          THE COURT:  Thank you, I have got it.

8          MR. JOHNSON:  Perhaps more fatal to the government's

9    argument here --

10          THE COURT:  Go ahead.

11          MR. JOHNSON:  Is that there is a basic tenet of the

12    due process is the identification of the specific defendant

13    that committed the crime.

14              There has been no identification of Mr. Vahe

15    Dadyan from any witness here, and under those circumstances.

16          THE COURT:  What about the cousin, Tamara?

17          MR. JOHNSON:  Tamara did not testify.

18          THE COURT:  I know, but there was text messages, was

19    he discussed?

20          MR. JOHNSON:  That is Vahe that was discussed, that

21    -- but there has been no evidence of that.

22          THE COURT:  I see what you are saying, that the

23    evidence shows that he made a loan or -- yeah, he took out a

24    loan for PPP for Voyage and that the kind of evidence that we

25    discussed earlier outside the presence of the jury; in other

```
 1  proceedings was never presented here about Tamara telling him

 2  what to do.

 3          MR. JOHNSON:  No, Your Honor.  That is not it.

 4  Perhaps it was the way I described it.

 5              Very, very -- I think it's --

 6          THE COURT:  Did I say something incorrectly?

 7          MR. JOHNSON:  No.  I think it's outlining my

 8  argument, is that for very, very basic tenent is that nobody in

 9  this room from that stand said, this is the Vahe Dadyan that is

10  on those loans.  And that is very, very basic that the person

11  sitting in the room would be identified as the person that

12  committed the offense.

13          THE COURT:  But let me make sure I'm not

14  misunderstanding.

15              As what was said at another proceeding about

16  Tamara Dadyan asking Vahe Dadyan to use Voyage for PPP loans,

17  that wasn't presented to this jury?

18          MR. JOHNSON:  I agree with that.

19          THE COURT:  That's all I wanted to know.

20          MR. JOHNSON:  I apologize.

21          THE COURT:  All right.  Any quick response from the

22  government?

23          MR. PAETTY:  Well, Your Honor, very briefly.  Voyage

24  Limo is undisputedly a Vahe Dadyan company.  That is in

25  evidence.  The text messages also refer to Vahe Dadyan.
```

```
 1                     Again, circumstantial evidence that is who his
 2     cousin is referring to.
 3               THE COURT:  What's the text message in that regard.
 4               MR. PAETTY:  Numerous references to Vahe.
 5               THE COURT:  Can you tell me without precise words
 6     essentially what is clear on those messages, if any?
 7               MR. PAETTY:  Vahe wants his money.
 8               THE COURT:  Who said that?
 9               MR. PAETTY:  Tamara Dadyan.
10               THE COURT:  I see.
11               MR. JOHNSON:  My concern that the Vahe -- someone at
12     least someone would testify that this is the Vahe Dadyan or
13     Vahe that is being referred to on these loans and in these text
14     messages.
15               THE COURT:  But in the loan application and for
16     Voyage, is that one of the few loan applications where a real
17     company and a real person identified themselves in the loan
18     application?
19               MR. JOHNSON:  Yes, that's our argument.
20               THE COURT:  So, Vahe Dadyan did identify himself as
21     Vahe Dadyan in the Voyage loan.
22               MR. JOHNSON:  In the Voyage loan.  Now is there --
23     was there evidence here that linked that loan to this man
24     sitting here?  That is the question.
25               THE COURT:  Well, I understand, okay.  Thank you.
```

1        Now, who else is going to make an argument for

2   Arthur Ayvazyan.

3        MS. WIRSCHING:  Good afternoon, Your Honor.  As you

4   mentioned, Jennifer Wirsching for Arthur Ayvazyan.

5        We will be moving Rule 29.  We will join in

6   the co-defendant's arguments to the extent that they are

7   applicable to Mr. Arthur Ayvazyan.  I would just like to very

8   briefly point to the Court's consideration for Count 24 against

9   Mr. Artur Ayvazyan, which is the aggravated identity theft

10  count as to Anna Dzukaeva, excuse me, from my mispronunciation.

11       There has been no evidence that has been

12  presented to this jury that he knowingly possessed her

13  identifying information.

14       Most importantly, there is a complete absence

15  of any evidence that Mr. Ayvazyan -- Mr. Artur Ayvazyan was

16  aware that Anna Dzukaeva was a real person.

17       There is also no evidence that he possessed

18  this Anna Dzukaeva, identifying information as charged in

19  Count 12 as the underlying felony.

20       THE COURT:  I'm going to ask you something, and I'm

21  really asking you, I'm not suggesting anything.

22       Does the law require in an aggravated identity

23  case that the defendant know that the identity the defendant is

24  possessing or using is of a real person?

25       MS. WIRCHING:  That is my understanding of the Ninth

1    Circuit jury instruction rule for 18 U.S.C. 1028A.

2              THE COURT:  I see, okay.

3              MS. WIRCHING:  Yes.  That element has been

4    completely -- nothing has been presented as to that element.

5    It's completely lacking.

6                   And at the risk of repeating myself, the final

7    element is that he possessed in relation to an underlying

8    felony.

9                   In this indictment that has been linked to

10   Count 12, which is the Anna Dzukaeva loan for Six Star Farms.

11   No evidence has been presented that Artur Ayvazyan was in any

12   way involved with the PPP loan in the name of Anna Dzukaeva or

13   Six Star Sky Farms.

14             THE COURT:  Thank you, let me hear response.  Try to

15   be a little bit more pointed here than you were with the other

16   argument.

17             MR. FENTON:  Thank you, Your Honor.  I will be

18   brief.

19                   There is evidence --

20             THE COURT:  What is the -- forget the aggravated

21   theft, for the moment, what is the -- give me the bullet points

22   regarding Artur Ayvazyan in the conspiracy.

23             MR. FENTON:  Sure.  He is right in the middle

24   between his brother, Richard Ayvazyan.

25             THE COURT:  I don't want you to give me the lineup,

```
 1   just tell me the bullet points of what evidence there is that
 2   points in the direction you will be arguing.
 3            MR. FENTON:  Artur Ayvazyan's phone had on it Anna
 4   Dzukaeva's ID, he had two Anna Dzukaeva's ID.
 5            THE COURT:  Whose ID?
 6            MR. FENTON:  Anna Dzukaeva, who is the identify
 7   theft victim.  There is two different identifications on his
 8   phone, her checkbook is on his phone.
 9                 In his home, is additional copies of the Anna
10   Dzukaeva ID.  There are PPP loan applications completed in the
11   name of Anna Dzukaeva.
12                 There are PPP loan applications in his home
13   from other individuals as well.
14                 There is evidence that him and his wife were
15   taking passports or J-1 visas, and using that information to
16   take identities that he used in connection with loan fraud.
17            THE COURT:  What other evidence is there of that?
18   In other words, is there -- are there some documents which
19   prepare which can be used to -- are there some instruments
20   which can be used to prepare false documents in the house?
21            MR. FENTON:  Absolutely, Your Honor.  They are
22   actually on his phone.  So he has templates to make licenses on
23   his phone.
24            THE COURT:  On Arthur Ayvazyan's phone?
25            MR. FENTON:  On Arthur Ayvazyan's phone.
```

 1          THE COURT:  I see.  And did he actually apply for a

 2    PPP loan?

 3          MR. FENTON:  Separate and apart from that, he

 4    applied in the name of his own company.  He lied on that

 5    application.

 6          THE COURT:  There was some questioning by counsel

 7    that the Allstate, I think it was, was a real trucking company.

 8    You agree it was, correct?

 9          MR. FENTON:  We would.

10          THE COURT:  But that the specifics of the company

11    were not true on the application?

12          MR. FENTON:  That's correct.  They are materially

13    false and materially misleading.

14          THE COURT:  Okay.  Is that everybody?

15          MS. WIRCHING:  May I just add one response?  I think

16    perhaps Mr. Fenton has mischaracterized.

17               I believe the Court was asking him whether

18    there were means of manufactured or false identification found

19    in relation --

20          THE COURT:  That's what I was asking.

21          MS. WIRCHING:  I believe Mr. Fenton, perhaps

22    inadvertently gave you an incorrect answer to that.

23               The only evidence that has been presented to

24    this Court, of any kind of false identifications is photographs

25    on a phone of -- have blank identifications with dots around

1  them.

2            THE COURT:  I see.

3            MS. WIRSCHING:  There is no computer programs.

4  There is no hard manufacturing programs.  Nothing found on

5  computers, nothing found on my client's phone.  There is no

6  means of manufactured?  Be it electronic, or physical in this

7  case weren't presented to this jury.

8            THE COURT:  But somehow, I seem to remember that at

9  some point, maybe not in this trial, I don't remember, it would

10 have to be considered, it was some kind of, like, stamp with

11 the state of California.  Was that found in his house?

12           MS. WIRCHING:  That would have been found in Tamara

13 Dadyan's office, Your Honor.  I don't believe that that has

14 been admitted into evidence, and even if so, that has nothing

15 to do with a purported California driver's license allegedly

16 for Anna Dzukaeva, who again, my client would have no means of

17 knowing was a real person, and no evidence has been presented

18 of that.

19           THE COURT:  Thank you.

20              Briefly on the aggravated theft, what is your

21 argument there?

22           MR. FENTON:  Two points, Your Honor.  Respectfully,

23 I disagree with Ms. Wirsching.

24              There are evidence showing that there were

25 instructions, requests made by people to create false IDs.

1          And evidence false IDs were created in that

2     home, in the Weddington home where Arthur lived with Tamara

3     Dadyan.  That is point one.

4          My second and final point, there is a pattern

5     of usage where Arthur Dadyan and Tamara Dadyan using J-1 Visas,

6     eastern European foreign exchange students, they are taking

7     their names and using them in connection with these frauds.

8     They're using those names because those individuals are real

9     and they know it.

10          THE COURT:  Is it Tamara Dadyan or is it Arthur?

11          MR. FENTON:  Well, it's a fair question, Your Honor.

12     If you compare the information that is contained on Arthur's

13     phone and you compare the information that is on Tamara's phone

14     it's the same.  They both have Anna Dzukaeva licenses, they

15     both have Anna Dzukaeva checkbooks.

16          THE COURT:  What about the aggravated identity

17     theft?

18          MR. FENTON:  Anna Dzukaeva is the victim of the

19     aggravated identity count.

20          THE COURT:  Let me ask you this:  It seems to me,

21     maybe I'm just not getting it, that both sides seem to agree

22     that there is no Anna -- whatever it is, or if there is someone

23     like that, she was here a long time ago, and went back to

24     Russia after her student Visa expired.

25          MR. FENTON:  That's right, Your Honor.  So what we

```
 1   have submitted to the Court and to the jury, is that there is

 2   evidence from DHS and CVP showing real company come over to

 3   this country, and these defendants steal their identities or

 4   use their identities to commit fraud after they leave.

 5            THE COURT:  So, but the identity that was allegedly

 6   stolen, was that identity created after -- what is her name,

 7   Anna --

 8            MR. FENTON:  Dzukaeva.

 9            THE COURT:  -- went back to Russia after her Visa

10   expired?

11            MR. FENTON:  Yes, Your Honor.

12            THE COURT:  Was it an identity that she had before

13   she left?

14            MR. FENTON:  Well, our understanding is Anna was a

15   real person.  After she departed, her identity was then used by

16   the defendants in connection with the fraud.

17            THE COURT:  It was used -- okay.

18            MR. FENTON:  He would --

19            THE COURT:  What about this issue that you disagree

20   with counsel that in order to -- as a matter of law -- commit

21   aggravated identity theft, you have to steal the identity of a

22   real person?

23            MR. FENTON:  No, Your Honor.  I think that is

24   legally correct.  I think we provide that evidence here.

25            THE COURT:  Do you think that is correct?
```

1          MR. FENTON:  I think that standard is correct, I

2     think we satisfy it.

3          THE COURT:  I see.

4          MR. FENTON:  It's why we presented the evidence we

5     did.  We use J-1 Visa victims, and we put in all of the

6     evidence from DHS and we put in the evidence from Artur's house

7     that shows that they were doing this with various people of

8     similar ilk.  That pattern of using the same type of person

9     cohorts, that pattern is sufficient to meet the standard of

10    knowledge.

11         THE COURT:  All right.  Thank you.  Do you have

12    anything else?

13         MS. WIRSCHING:  Just briefly, Your Honor.  Again, I

14    think I need to object to the term "pattern."

15              There is no evidence that Artur Ayvazyan was

16    involved in anything prior to this or during this of him

17    creating these identities, no matter what, how Mr. Fenton

18    chooses to read a number of less a few photographs found on a

19    phone.

20              So, to the degree that he's arguing they have

21    evidence that my client was aware that Anna Dzukaeva was a real

22    person, I think that is patently false.

23         THE COURT:  All right.  We took care of all of the

24    -- we have one more?

25              MR. LITTRELL:  A few words.  It's more to make sure

```
1   that the record is clear before we go.
2              THE COURT:  You are also Terabelian?
3              MR. LITTRELL:  That's correct.
4              THE COURT:  You are doubling up on me.
5              MR. LITTRELL:  I need to correct a few things to
6   make sure that ruling is accurate.
7                   The government did say it presented evidence
8   that Ms. Terabelian paid the rent for 6150 Canoga.  There was
9   no evidence of that at all in the record.  Nothing.
10                  And I'm concerned that, one, the Court might
11  base its ruling on part of something that is false, and two,
12  the government might actually argue for which there is no
13  evidence at the end of the case.
14             THE COURT:  Is counsel correct?
15             MR. FENTON:  They are not correct, Your Honor.
16             THE COURT:  What is the evidence that Terabelian was
17  the source of rent payments at the Canoga apartment?
18             MR. FENTON:  There is three exhibits.  Exhibit 42,
19  which is the documents from the leasing company, the apartment
20  the lease company from the apartment.  There is that exhibit.
21             THE COURT:  What does that show briefly?
22             MR. FENTON:  It shows that there are ACH payments
23  from a Viktoria Kauichko account that is paying the rent.
24             MR. LITTRELL:  There is the problem, Your Honor.
25  They have not connected Ms. Terabelian to the Viktoria
```

1     Kauichko's account.

2                    The whole debate during trial was who

3     controlled it, but it wasn't a debate about whether

4     Ms. Terabelian controlled it, there was a debate about

5     whether --

6               THE COURT:  So even if you are saying there is some

7     evidence that Terabelian had the identity of Kauichko, that is

8     insufficient to make the inference that she controlled the

9     business account where Kauichko was listed as the owner?

10              MR. LITTRELL:  That's correct.  It's overwhelmingly

11    supported by the evidence that is put in, which is Richard

12    Ayvazyan or Tamara Dadyan, or Manuk Grigoryan controlled those

13    accounts.  The only evidence that was presented whether it was

14    one of the three of them.

15              THE COURT:  Was what --

16              MR. LITTRELL:  Was whether it was one of the three

17    of them.  No evidence pointed to Ms. Terabelian actually

18    controlling.

19              THE COURT:  Let me get the quick response.

20              MR. FENTON:  The quick response is that is not

21    correct.

22                    Government Exhibit 76 is the actual debit

23    cashed, the credit card that was used that was linked to the

24    account that paid the for apartment.

25              THE COURT:  What about the credit card?

1        MR. FENTON:  That credit card was on Mary Terabelian

2   when she stopped at the border.  It was seized on her person.

3   The other exhibit that is relevant is Exhibit 88, which is the

4   Wells Fargo banks records that that account.

5            If you look at Exhibit 42, 76, and 88 that

6   shows that that card that was on her person when she was

7   stopped at the border was being used to pay for the rent for

8   that apartment.

9        THE COURT:  Give me a brief response.

10        MR. LITTRELL:  That card was possessed months after

11   the conspiracy ended, and if you look at the signature card on

12   the Viktoria Kauichko bank accounts it is obvious it is not

13   Ms. Terabelian.  It's obviously one of the three others

14   mentioned.

15            I think it might clear things up if the

16   government would actually take a position here and now whether

17   Ms. Terabelian was actually the signer for Viktoria Kauichko on

18   that bank account, whether they actually believe she signed

19   that signature card or controlled that account.

20            There is no evidence of it, I don't think the

21   government is even going to argue that.

22        THE COURT:  Well, I mean, are they going to argue

23   that she signed the opening of the account?

24        MR. FENTON:  Absolutely, we would argue that.  Yes,

25   Your Honor, we think that is her alias, it's in the indictment.

1   She is Viktoria Kauichko.

2        THE COURT:  Well, I don't have a recollection at

3   this point.

4           Counsel seems to be saying that there are

5   other examples of the signature that are obviously different

6   than the signature on the bank accounts.

7           It's more than one, isn't it?  In other words,

8   didn't Kauichko allegedly control more than one business?

9        MR. FENTON:  Yes, Your Honor.  It would be signs or

10   caused to be signed.

11           I don't know if that is a real -- I don't

12   think anybody knows if it's a real signature or an electronic

13   signature.

14        MR. LITTRELL:  That is.

15        MR. FENTON:  The point is, John, the evidence shows

16   there is a physical card that Ms. Terabelian is carrying

17   around.

18        THE COURT:  I got it.

19        MR. FENTON:  She's in control of that account.

20        THE COURT:  Go ahead, last word.

21        MR. LITTRELL:  I think no rational juror could

22   decide based on the fact she had a physical debit card

23   possessed months after the conspiracy is over that she

24   controlled every bank account associated with the name on that

25   card.  That would not be a rational inference.  I don't think a

```
 1    jury could convict her, based on that.
 2              MR. FENTON:  The one final point.  The money
 3    laundering conspiracy ends in October, when the defendants are
 4    arrested.
 5                   The 1349 wire fraud bank fraud conspiracy does
 6    in fact end in August, as Mr. Littrell represented.
 7              MR. LITTRELL:  Which is why it's at least a close
 8    call for money laundering, it's not a close call for the
 9    conspiracy.
10              MR. JOHNSON:  One point, I wanted to correct a
11    statement I made.  One is in evidence and it does say that
12    there is a wire to V&D Limo.  I misspoke.  I'm looking at the
13    exhibit right now.  I stand on my argument related to the
14    summary exhibit.
15              THE COURT:  All right.  Counsel can take a recess.
16              THE COURTROOM DEPUTY:  The Court stands in recess.
17                   (Recess.)
18              THE COURTROOM DEPUTY:  All rise.
19              THE COURT:  Before the jury comes back, I have
20    considered the motions and arguments with the applicable
21    averments at this point, and all of the motions are denied.
22                   So, bring the jury back, and we can hear from
23    the defendants as their wish.
24              MR. FENTON:  Your Honor, the government just wants
25    to make one -- just one point, which is the argument that we're
```

1   making is absolutely that Marietta Terabelian's primary alias

2   is Viktoria Kauichko.  But I also just want to clarify that our

3   position has been and continues to be that in the context of

4   this conspiracy, the coconspirators do share identifications

5   from time to time.

6           THE COURT:  All right.  Let's get the jury in.

7           THE COURTROOM DEPUTY:  Please be seated.

8               (The jury enters courtroom.)

9           THE COURT:  Members of the jury, sorry for the

10  longer than usual break, but as I told you there were matters

11  that required the Court to address outside your presence.

12              The good news is that I'm quite confident that

13  we will have the final argument tomorrow, and the case will be

14  in your hands some time tomorrow for decision, so we're a

15  little ahead of schedule, and that is due to your cooperation

16  with being punctual and it's appreciated.

17              All right.  We will now hear from the defense,

18  if they wish.

19          MS. NEWCOMER:  Your Honor, defense calls Matthew

20  Peltier.

21          THE COURT:  Have him come in.

22          MS. NEWCOMER:  Counsel would wish to approach

23  sidebar on this matter.

24          THE COURT:  Okay, please approach the sidebar.

25              (Sidebar begins.)

```
 1              THE COURTROOM DEPUTY:  Raise your right hand.
 2                  (Oath was administered.)
 3              THE WITNESS:  I do.
 4              THE COURTROOM DEPUTY:  State your full name and
 5     spell it into the microphone right there.
 6                           MATTHEW PELTIER,
 7                      having been duly sworn,
 8                        testified as follows:
 9              THE COURT:  I want to ask you some questions -- you
10     are under oath, I read -- maybe you didn't see it, what the
11     government proposed is your testimony.  It's my
12     understanding --
13              MS. NEWCOMER:  Your Honor, this is a different
14     witness.  I apologize, this is Matthew Peltier.
15              THE COURT:  This is the person where the defense is
16     claiming that Ayvazyan gave some money for start-up, and so
17     forth?
18              MS. NEWCOMER:  Yes.
19              THE COURT:  I was getting to that.
20                  So, what I'm understanding about the proffer,
21     is that you have some tech company, correct?
22              THE WITNESS:  Correct.
23              THE COURT:  Do you still have it?
24              THE WITNESS:  Correct.
25              THE COURT:  When did you form it?
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  Originally, I founded it in 2014.

 2              THE COURT:  It's the same company?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Are you the sole shareholder?

 5              THE WITNESS:  No.  It's a corporation.  We have a

 6   cap table made up of preferred and common shareholders.

 7              THE COURT:  I see.  Is Richard Ayvazyan a

 8   shareholder?

 9              THE WITNESS:  Yes.

10              THE COURT:  What percentage?

11              THE WITNESS:  I'm not sure offhand.  But I would say

12   I could give you a ballpark, but I'm not certain.

13              THE COURT:  Just ballpark.

14              THE WITNESS:  Somewhere between somewhere around .5

15   to 1 percent, I think.

16              THE COURT:  .5 to 1 percent, you said?

17              THE WITNESS:  Yes.

18              THE COURT:  What -- how long has he had that .5

19   interest?

20              THE WITNESS:  Well, actually with the start-up, it

21   dilutes overtime as we continue to raise more capital, so his

22   holdings have actually, you know, decreased as the value of the

23   company --

24              THE COURT:  Did he contribute an amount of capital

25   for the start-up?
```

81

```
 1                  THE WITNESS:  Yeah.

 2                  THE COURT:  How much?

 3                  THE WITNESS:  600,000.

 4                  THE COURT:  And I see.  Has he received

 5    distributions from your company over the years?

 6                  THE WITNESS:  As, like, dividends?

 7                  THE COURT:  Well, I mean, what is the arrangement?

 8    Was the $600,000 a capital investment or a loan?

 9                  THE WITNESS:  Capital investment, yes.

10                  THE COURT:  So, that gave him some equity interest

11    in the company?

12                  THE WITNESS:  Yes.

13                  THE COURT:  And has the company earned profits since

14    the time he placed capital in it?

15                  THE WITNESS:  We're not profitable yet.

16                  THE COURT:  So the answer is you, you don't have any

17    profits so far?

18                  THE WITNESS:  We have made money, but we're not

19    profitable.

20                  THE COURT:  I see.  What does that mean?

21                  THE WITNESS:  We are a start-up, so.

22                  THE COURT:  I mean, I'm not aware of this Silicon

23    Valley stuff.  I'm an old-fashioned guy, you make money, you

24    got money in your pocket, I mean, I don't know.

25                  THE WITNESS:  But to answer your question, we
```

1    haven't paid dividends out to any shareholders.

2              THE COURT:  Have you paid any interest on $600,000

3    that he put in?

4              THE WITNESS:  So once everyone's investments are

5    made, there is an interest and it is appreciated over time as

6    the value of the company increases.

7              THE COURT:  So are the shares publicly traded?

8              THE WITNESS:  No.  We're still a private company.

9              THE COURT:  So, to your knowledge, has he sold any

10   shares?

11             THE WITNESS:  So there have been some shares sold.

12             THE COURT:  That was a bad question.  Richard

13   Ayvazyan?

14             THE WITNESS:  Yes.

15             THE COURT:  How many?

16             THE WITNESS:  I'm not certain, offhand.

17             THE COURT:  Do you know what he received for those

18   shares?

19             THE WITNESS:  I'm not certain offhand, but it's

20   something general counsel could come with, company counsel.

21             THE COURT:  But the reason why this is here, I had

22   some suspicion what his testimony was going to be, and I know,

23   or at least I think why you are trying to introduce it, is to

24   show that as I said facetiously earlier, it was a mother and

25   father for his money, right?

UNITED STATES DISTRICT COURT

```
 1            MS. NEWCOMER:  Yes, Your Honor.
 2            THE COURT:  So, I will just end it with the
 3   $600,000, it was 2014?
 4            THE WITNESS:  No. That investment came in around
 5   2016 or something like that, 2017.
 6            THE COURT:  Anyway, that is certainly relevant.  He
 7   had $600,000 to invest in a start-up company.  And you could
 8   argue for that, I'm not telling you what to argue, if a guy has
 9   600,000 in cash laying around the house to put into a start-up
10   tech company, I mean, the inference is he has some more
11   scratch.  I mean, most people, unless they are a Las Vegas kind
12   of guy, I don't know, but you can make the argument.
13                 But don't ask him questions about, you know,
14   that infer he was getting any money from this company.  I
15   wanted to make sure of that.
16                 If he said he did, you could ask him, but he
17   has no information about that, so it's a very limited
18   examination.
19            MS. NEWCOMER:  Yes, Your Honor.
20            MR. RAM:  We're not going to ask him did he receive
21   money when he sold his shares, I think he said that.  We don't
22   need to go there.
23            THE COURT:  Just the $600,000.
24            MR. RAM:  So the shares have dramatically
25   appreciated in value.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Why is that relevant?
 2              MR. RAM:  I just wanted to correct something, he did
 3    say he sold shares, but we're not going to get into that.
 4              THE COURT:  It's irrelevant that the shares have
 5    increased, because until they are sold, he has money available,
 6    but I still don't see all of the dots connecting, but that is
 7    for another day.
 8              MR. PAETTY:  It seems like, this is a character
 9    witness who is going to be claiming because he was honest
10    business man and some other dealings.
11              THE COURT:  I didn't hear that.  I mean, like I
12    said, I'm having difficulty, but it's not, you know, maybe it's
13    not my assessment at this point.
14                   I think what the defendant is trying to do is
15    to establish that he could have believed that the money that
16    landed in his account was not from PPP loans; isn't that the
17    inference?
18              MS. NEWCOMER:  Yes, Your Honor.
19              THE COURT:  I mean, that is it, so I can't -- to me,
20    it's very sketchy, but look, you -- if there is some argument
21    to be made that way, you know, they can make it.
22                   You can argue to the contrary.  It's
23    speculation, but there is no bank records.
24              MR. PAETTY:  We don't know anything about this.
25              THE COURT:  They don't have to tell you that.
```

1          MS. NEWCOMER:  I will make it very clear, he's not a

2  character witness.  I'm going to ask about the working

3  relationship.

4          THE COURT:  That's the only possible relevance I'm

5  seeing, real problems connecting him, but I allow it on that

6  limited basis.

7                    (Sidebar ends.)

8          THE COURT:  Swear in the witness.

9          THE COURTROOM DEPUTY:  Okay, stand right here and I

10 will swear you in again.

11                   Raise your right hand.

12                   (Oath was administered.)

13         THE WITNESS:  Yes, sir.

14         THE COURTROOM DEPUTY:  Thank you.  Watch your step

15 going up.  State your full name and spell it for the record.

16         THE WITNESS:  Matthew Peltier.  M-a-t-t-h-e-w,

17 P-e-l-t-i-e-r.

18                     MATTHEW PELTIER,

19                   having been duly sworn,

20                   testified as follows:

21                   DIRECT EXAMINATION

22 BY MS. NEWCOMER:

23 Q    Good afternoon, Mr. Peltier, are you employed?

24 A    Yes.

25 Q    What do you do?

1    A    I'm the co-founder and CEO of an LA-based start-up called

2    community.com.

3    Q    What's community.com?

4    A    We are a software company, we make and sell software as a

5    service for a wide variety of customers.  Community

6    specifically allows our customers -- our community leaders to

7    engage with our audience, customers via text messaging and we

8    built a platform that supports all of that.

9    Q    How did Community get started?

10   A    So, I founded community in 2014.  It was previously known

11   as Shimmur.  That product had actually failed and we pivoted in

12   2017, starting to work on a new project.  That ultimately in

13   the same corporate entity became community in 2019.

14   Q    When you say the company pivoted, what did that entail?

15   A    Well, start-ups are kind of like a big experiment so you

16   are often trying to build something and prove one should exist,

17   but also you can build a business around it.

18        If you are fortunate to make it the first time around, you

19   don't need to pivot.

20        Our first product just not needing to exist, but we really

21   believed in the problems we are solving, so we kept working at

22   it and started to work on a new concept under the same company

23   and ultimately that is what became community.

24   Q    As part of the business aspect you were talking about, was

25   funding important to you?

**UNITED STATES DISTRICT COURT**

```
 1   A     Yeah.  Yes, so the company has more or less been funded by
 2   in angel investors, early-stage seed investors in corporations,
 3   so we're a private company, and as we grow and make progress,
 4   we look to the support of investors to keep the lights on,
 5   while I was continuing to grow, and ultimately hopefully find,
 6   you know, profitable company to build around that product.
 7   Q     Mr. Peltier, do you know Richard Ayvazyan?
 8   A     I do.
 9   Q     I want to make clear, you are not here to testify as a
10   character witness.  I'm asking only about your professional
11   relationship with Mr. Ayvazyan.
12              MR. PAETTY:  Objection.  Relevance, 403.
13              THE COURT:  Get to the point.
14              MS. NEWCOMER:  Yes, Your Honor.
15   BY MS. NEWCOMER:
16   Q     How did you meet Richard Ayvazyan?
17   A     I met Richard --
18              THE COURT:  Okay, very briefly.
19   BY MS. NEWCOMER:
20   Q     Yes, Your Honor.
21   A     I will keep it short.  So I met Richard through another LA
22   based entrepreneur, John Bradford.  We are looking for
23   investors particularly early-stage and angel investors.  John
24   knew Richard and introduced us, and ended up having a meeting
25   and that was how we met originally.
```

UNITED STATES DISTRICT COURT

1    Q    And did Mr. Ayvazyan end up investing in Community?

2    A    He did.

3    Q    Can you tell us a little bit about that?

4    A    Yeah.

5              MR. PAETTY:  Objection.  Relevance, 403.

6              THE COURT:  Objection is overruled.  Tell us what

7    his investment was.

8              THE WITNESS:  Yeah, Richard invested around

9    $600,000.

10             THE COURT:  What year?

11             THE WITNESS:  That was in 2016/17 around a closing

12   period and there were additional investors in that round from

13   other angels to venture capitalists and even a couple of

14   corporations.

15   BY MS. NEWCOMER:

16   Q    To your knowledge, has Mr. Ayvazyan worked with other

17   start-ups?

18             MR. PAETTY:  Objection.  Relevance, 403.

19             THE COURT:  Sustained.

20             THE WITNESS:  Does that mean I can continue?

21             THE COURT:  No, objection is sustained.

22             MS. NEWCOMER:  You cannot answer.

23             THE COURT:  There is no question pending.

24   BY MS. NEWCOMER:

25   Q    And you mentioned you met Richard Ayvazyan through John

```
 1   Bradford, who works at Kolab; is that right?
 2   A     Yes.
 3             MR. PAETTY:  Objection, asked and answered.
 4             THE COURT:  Sustained.
 5   BY MS. NEWCOMER:
 6   Q     What is Kolabs?
 7             MR. PAETTY:  Objection.  Foundation.
 8             THE COURT:  The objection is sustained --
 9             MS. NEWCOMER:  Your Honor --
10             THE COURT:  Objections are sustained and I have
11   explained at the sidebar.  I made it clear I'm going to give
12   you an opportunity to get to the point you made.  If you don't,
13   I'm not going to allow you to pursue it.
14             MS. NEWCOMER:  Yes, Your Honor.
15   BY MS. NEWCOMER:
16   Q     Okay.  So going back to when Community was first starting
17   you said that Mr. Ayvazyan invested in your company, right?
18   A     Yep.
19   Q     And that was the $600,000 you mentioned?
20   A     Yes.
21   Q     Was there any other investment?
22   A     From Richard, no.
23   Q     Okay.
24             MS. NEWCOMER:  Thank you, Your Honor.
25             THE COURT:  Anything further.
```

```
 1                    Thank you.  You had a question?
 2              MR. PAETTY:  Very briefly, Your Honor.
 3              THE COURT:  Well, tell me when you get up, I see
 4   people moving around and say, yes, I have other questions.
 5              MR. PAETTY:  Yes, Your Honor, very briefly.
 6              THE COURT:  All right.
 7                         CROSS-EXAMINATION
 8   BY MR. PAETTY:
 9   Q    Mr. Peltier, did you ever apply for a loan related to your
10   work with Richard Ayvazyan?
11   A    No.
12   Q    As part of your business relationship did you ever discuss
13   loans with Richard Ayvazyan?
14   A    No.
15   Q    Did you ever seek Richard Ayvazyan's advice regarding
16   applying for a loan?
17   A    No.
18   Q    And you haven't attended this trial, correct?
19   A    No.  Correct, yeah.
20   Q    Do you know the allegations in this trial?
21              MS. NEWCOMER:  Objection.  Your Honor.
22              THE COURT:  This is just getting beyond what I
23   discussed at sidebar.  So we have heard from this witness, and
24   I will sustain the objection.
25                    Thank you, sir, for being here.  Thank you.
```

```
 1                        Next witness.

 2                MR. SILVERMAN:  Your Honor, defense calls Officer

 3   Shawn Stevens.

 4                     Raise your right hand.

 5                        (Oath was administered.)

 6                THE WITNESS:  I do.

 7                THE COURTROOM DEPUTY:  Please step up here.  Watch

 8   your step going up.

 9                THE WITNESS:  Good afternoon, Your Honor.

10                THE COURT:  State your full name and spell it for

11   the record.

12                THE WITNESS:  Officer Shawn Stevens.  S-h-a-w-n,

13   S-t-e-v-e-n-s.

14                        SHAWN STEVENS,

15                     having been duly sworn,

16                     testified as follows:

17                MR. SILVERMAN:  Good afternoon, Officer Stevens.

18                THE WITNESS:  Good afternoon.

19                        DIRECT EXAMINATION

20   BY MR. SILVERMAN:

21   Q    What do you do for work?

22   A    I'm a police officer for the Los Angeles Police Department

23   currently assigned to gang and narcotics investigation detail.

24   Q    I would like to direct your attention to December 17th,

25   2020.  Did you execute a search on or about December 17th,
```

1    2020?

2    A    I did.

3    Q    And where was that?

4    A    105357 Dora Street.

5    Q    Do you know whose property that is?

6    A    Yes.

7    Q    Who?

8    A    Manuk Grigoryan.

9    Q    And I would like to bring up for the witness only, this

10   has only been conditionally admitted, DX-55.

11           MR. SILVERMAN:  Your Honor, may I approach with a

12   paper copy of the exhibit?

13           THE COURT:  Yes.

14   BY MR. SILVERMAN:

15   Q    Officer Stevens, do you recognize the 11 pages in your

16   hand?

17   A    I do.

18   Q    What are they?

19   A    Those are -- these are photo copies of the items that were

20   seized from that location during the search warrant.

21           MR. SILVERMAN:  I would offer them into evidence.

22           THE COURT:  Received.

23       (Defense Exhibit DX-55 received into evidence.)

24   BY MR. SILVERMAN:

25   Q    Officer Stevens, one last question.  Did you share those

```
1   with anybody else?

2   A     No.

3   Q     Did anybody at LAPD share them with anybody else?

4              MR. FENTON:  Objection.  Vague.

5              THE COURT:  I mean, there is no foundation.

6              MR. SILVERMAN:  Were they given to IRS Agent

7   Geoffrey Clark?

8              THE WITNESS:  Yes.

9              MR. SILVERMAN:  Thank You.  No further questions.

10             THE COURT:  Anything further?

11             MR. FENTON:  No, Your Honor.

12             THE COURT:  All right.  Thank you.  Thank you, sir.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Next witness, if there is one.

15             MR. RAM:  Richard Ayvazyan calls Manuel Ibanec,

16  probation officer.

17             THE COURT:  Okay.

18             THE COURTROOM DEPUTY:  The witness will please step

19  forward over here.

20             THE WITNESS:  Over there?

21             THE COURTROOM DEPUTY:  Raise your hand.

22                    (Oath was administered.)

23             THE WITNESS:  Yes.

24             THE COURTROOM DEPUTY:  Watch your step going up the

25  stairs.  Step over the tape.  And state your full name and
```

```
 1  spell it for the record.
 2            THE WITNESS:  Manuel Ibanec.
 3                     MANUEL IBANEC,
 4                having been duly sworn,
 5                 testified as follows:
 6            MR. KEOUGH:  Good afternoon, Mr. Ibanec.  Thanks for
 7  coming in today.
 8                   DIRECT EXAMINATION
 9  BY MR. KEOUGH:
10  Q    Can you tell us where you work?
11  A    United States probation and pretrial services for the
12  Central District of California in Los Angeles.
13  Q    And as part of your work for pretrial services, you have
14  been assigned to Richard Ayvazyan's case?
15  A    Correct.  Only to the location monitoring supervision.
16  Q    So, as part of that job, you monitor his location?
17  A    Correct.
18  Q    And since what date have you monitored his location?
19  A    Since he arrived from Miami.  It would be October 28th,
20  2020.
21  Q    And as part --
22            MS. AHN:  Objection, Your Honor.  The witness
23  appears reading from a document the government has not seen.
24            MR. KEOUGH:  I'm not sure what it is either, if you
25  can recall from your memory, Mr. Ibanec.
```

UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  Those are just my chronos,
 2   October 2020.
 3              THE COURT:  He can look at his chronological log,
 4   whatever it is.
 5              MS. AHN:  Yes, Your Honor.
 6              THE COURT:  He can read it if he wants.
 7              MS. AHN:  Thank you, Your Honor.
 8              THE COURT:  There is no question here yet, sir.  Go
 9   ahead.
10   BY MR. KEOUGH:
11   Q    So, and just so the record is clear, you said which date
12   again, that since you have been monitoring his location?
13   A    October 28th, 2020.
14   Q    And if Mr. Ayvazyan leaves his home, you know about it?
15   A    Correct.
16   Q    And since October 28th, 2020, has Mr. Ayvazyan left the
17   state of California?
18   A    No.
19              MR. KEOUGH:  No further questions, Your Honor.
20              THE COURT:  Anything further?
21              MS. AHN:  Yes, Your Honor.
22                      CROSS-EXAMINATION
23   BY MS. AHN:
24   Q    Good afternoon, Officer Ibanec.
25   A    Good afternoon.
```

```
 1  Q    You mentioned in your direct testimony you have location

 2  monitoring supervision only; is that correct?

 3  A    Correct.

 4  Q    Does that mean your sole role is to monitor his location?

 5  A    Correct, and conduct home visits, home inspections.  You

 6  know, if they request a schedule, I put it in the system and

 7  make sure they go where they are supposed to go and come home,

 8  things like that, yes.

 9  Q    Did the location monitoring call for an ankle bracelet?

10  A    Yes.

11  Q    And when was that ankle bracelet placed on Mr. Ayvazyan?

12  A    That GPS device was placed after he was cleared from COVID

13  in December 22nd, him and his wife.

14  Q    December 22nd, 2020?

15  A    Yes.  December 22nd, 2020.

16             MS. AHN:  No further questions.

17             MR. KEOUGH:  Your Honor, brief redirect?

18             THE COURT:  Yes.

19                      REDIRECT EXAMINATION

20  BY MR. KEOUGH:

21  Q    Mr. Ibanec, you just testified that the ankle bracelet was

22  applied to Mr. Ayvazyan on December 22nd, 2020.

23        Do you recall that?

24  A    Yes.

25  Q    Now you monitored his location prior to December 22nd,
```

**UNITED STATES DISTRICT COURT**

1   correct?

2   A     Yes, correct.

3   Q     Can you tell the Court and the jury how did you monitor

4   his location prior?

5   A     Yes, because when he and his wife arrived, they were sick,

6   they had COVID-19.  My supervisor made a decision to put them

7   on biometric supervision, which means they use their iPhones or

8   smartphones to check in, so basically through an app, they got

9   notifications to check in randomly throughout the day.

10        They checked in the morning, sometimes the middle of the

11  day, and then in the evening hours randomly, and that's how we

12  would get the GPS location.  It was always their home, and I

13  had no issues with that.

14              MR. KEOUGH:  Thank you.

15                    FURTHER CROSS-EXAMINATION

16  BY MS. AHN:

17  Q     Officer Ibanec, you mentioned you checked his location by

18  phone; is that correct?

19  A     They would check through their phone, but I actually would

20  check in my computer and I would get their photo which would

21  match where they are and their GPS location inside their house,

22  and I could see it was their house, you know, so yes.

23  Q     In between those random checks, did you know where he was?

24  A     Yes.

25  Q     In between those random checks, did you get a GPS location

```
 1   from where he was?
 2   A     You mean in between the time -- they check in the morning
 3   and then they check the middle of the day?
 4   Q     Yes.
 5   A     Well, no.  No.
 6   Q     Okay.
 7            MS. AHN:  No further questions, Your Honor.
 8            THE COURT:  Okay.  Thank you.  Thank you, sir, you
 9   are excused.
10            THE WITNESS:  You are welcome, Your Honor.
11            THE COURT:  Okay.  Any other witnesses?
12            MR. RAM:  Yes, Your Honor.  The government calls
13   Special Agent -- I'm sorry, the defense calls Special Agent
14   Palmerton.
15            THE COURT:  Okay.
16            THE COURTROOM DEPUTY:  Raise your right hand.
17                 (Oath was administered.)
18            THE WITNESS:  I do.
19            THE COURTROOM DEPUTY:  Please step forward and watch
20   your step going up.  Step over the tape.  State your full name
21   and spell it for the record.
22            THE WITNESS:  Okay.  Take my mask off?
23            THE COURT:  Yes.
24            THE WITNESS:  Justin Palmerton.  J-u-s-t-i-n,
25   P-a-l-m-e-r-t-o-n.
```

**UNITED STATES DISTRICT COURT**

```
 1                        JUSTIN PALMERTON,

 2                     having been duly sworn,

 3                      testified as follows:

 4           MR. RAM:  Good afternoon, Mr. Palmerton.

 5           THE WITNESS:  Good afternoon.

 6                       CROSS-EXAMINATION

 7   BY MR. RAM:

 8   Q    You testified or stated a moment ago, you were a special

 9   agents with the FBI?

10   A    Yes.

11   Q    Were you the lead FBI agent assigned to this

12   investigation?

13   A    Yes, I was.

14           MR. RAM:  Your Honor, may I have permission to

15   proceed with the witness with leading questions under

16   611(c)(2).

17           THE COURT:  You can always lead, you can lead.

18           MR. RAM:  Okay.  Thank you, Your Honor.

19   BY MR. RAM:

20   Q    Special Agent Palmerton, could you give the jury an

21   overview of your role with the investigation?

22           THE COURT:  Not to comment, after getting permission

23   you asked the most leading question I could possibly imagine,

24   which is okay.

25                   No criticism, but it does seem to come right
```

**UNITED STATES DISTRICT COURT**

1    on the heels of your asking, if you could lead.

2              MR. RAM:  Yes, Your Honor.

3              THE COURT:  Do it your way.

4              MR. RAM:  Thank you, Your Honor.

5    BY MR. RAM:

6    Q    Go ahead and give the grand jury a highlight of your role

7    what this investigation was and that of the FBI?

8    A    The grand injury?

9    Q    I'm sorry, the jury here, yes.

10   A    So I was a lead FBI agent for the investigation into

11   Richard Ayvazyan and other co-defendants.

12   Q    Okay.  And who else was part of the government

13   investigation in terms of agencies?

14   A    IRS criminal investigation, FHFA OIG and SBA OIG.

15   Q    Okay.  Would you say the IRS, FBI, and SBA OIG were the

16   three investigating agencies in this matter?

17   A    I would say the IRS and the FBI and SBA OIG were the lead

18   agencies on this matter.

19   Q    Okay.  And who were the respective lead agencies from

20   those agencies?

21   A    For the FBI, it would have been myself.  I would say for

22   IRS, it was Agent Geff Clark.  SBA would have been Tim Massino.

23   Q    Geff Clark, that is the gentleman sitting at counsel table

24   here?

25   A    Yes, sir.

1    Q    You are familiar with the two indictments in this case?

2    A    Yes, I am.

3    Q    One was roughly in November of 2020.  Do you remember

4    that?

5    A    Yes, that seems accurate.

6    Q    That charged four defendants?

7    A    Yes.

8    Q    Specifically, Richard Ayvazyan, Marietta Terabelian,

9    Arthur Ayvazyan, and Tammy Dadyan; is that right?

10   A    Yes.

11   Q    And then in roughly March of 2021, there is something

12   called a first superseding indictment; is that right?

13   A    Yes.

14   Q    And that first superseding indictment -- I will call it

15   the superseding indictment that charged an additional four

16   defendants, yes?

17   A    Yes, it did.

18   Q    Okay.  One of the three of those defendants were Manuk

19   Grigoryan, right?

20   A    Yes.

21   Q    Edward Paronyan?

22   A    Yes.

23   Q    And Arman Hayrapetyan?

24   A    Yes.

25   Q    There was also a fourth defendant charged, Vahe Dadyan; is

1    that right?

2    A    Yes, that's correct.

3    Q    Okay.  Let's talk a little bit about your investigation.

4    Is it fair to say it started based on a flow of funds analysis,

5    basically how money moved?

6    A    No.  The investigation really began from information

7    provided us from financial institutions, and a group of

8    individuals had submitted fraudulent PPP loan applications,

9    using similar, if not the exact same payroll documentation.

10   Q    Okay.  So your investigation started from basically a red

11   flag from financial institutions; is that right?

12   A    Yes.

13   Q    Okay.  And then shortly thereafter, did you proceed to

14   analyze how money moved between different accounts and people

15   potentially involved with your investigation?

16   A    Yes.  We followed the flow of the money.

17   Q    Okay.  And specifically the flow of money from what you

18   believe to be PPP loans and EIDL loans that were applied for,

19   yes?

20   A    Fraudulent PPP loans and EIDL loans.

21   Q    And that is your characterization of them as being

22   fraudulent, right?

23   A    Yes.

24   Q    Are you familiar with the concept of six degrees of

25   separation?

```
 1              MR. FENTON:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3  BY MR. RAM:

 4  Q    Okay.  You are aware -- so of the eight people we have now

 5  identified between the original indictment and the superseding

 6  indictment, you are aware they had relationship prior to March

 7  of 2020, when PPP and EIDL loans became available, yes?

 8              MR. FENTON:  Objection.  Foundation.

 9              THE COURT:  Sustained.

10  BY MR. RAM:

11  Q    So I'm asking you, are you aware of any relationships

12  between the eight defendants before COVID stimulus funds became

13  available?

14              MR. FENTON:  Objection.  Vague.

15              THE COURT:  What about foundation?

16              MR. FENTON:  And foundation.

17              THE COURT:  I mean, is that something that is the

18  basis of your objection?

19              MR. FENTON:  They were aware, yes, Your Honor.

20              THE COURT:  Sustained.

21  BY MR. RAM:

22  Q    Did you investigate how money flowed between the eight

23  people we just referenced as defendants in this case before

24  March of 2020?

25              MR. FENTON:  Objection, Your Honor.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. RAM:
 3   Q    Did you look into how money moved between individuals that
 4   were charged in this case before March of 2020?
 5              MR. FENTON:  Same objection.
 6              THE COURT:  Well, I will overrule that objection.
 7   He is saying the individuals charged in this case, this
 8   indictment, that is the operative indictment.
 9              MR. RAM:  Yes.  Let me be clear, so the eight
10   defendants we mentioned as part of the first superseding
11   indictment, right, Richard Ayvazyan, the four defendants
12   sitting here, plus Manuk Grigoryan, Edward Paronyan and Arman
13   Hayrapetyan, who is not sitting there today, those three are
14   not here?
15              THE WITNESS:  Yes.
16   BY MR. RAM:
17   Q    Did you look to see how money moved between those
18   individuals, those eight individuals before March of 2020?
19   A    No, I did not.
20   Q    Okay.  Now, throughout your investigation -- well, let me
21   ask you, take a step back.  Are you familiar with what an
22   avatar is?
23   A    I couldn't give you a textbook definition, but I have an
24   idea what it is.
25   Q    What is your understanding?
```

```
 1   A    Is that it's persona or something an individual can take
 2   to act through.
 3   Q    Okay.  As the lead investigator with the FBI, is it fair
 4   to say that your view of the case was that there was a specific
 5   avatar assigned to, for example, Manuk Grigoryan or an alias?
 6             MR. FENTON:  Objection, Your Honor.
 7             THE COURT:  Sustained.
 8   BY MR. RAM:
 9   Q    Did you understand Anton Kudiumov to be associated with
10   Manuk Grigoryan as part of your investigation?
11   A    You mean, Anton Kudiumov?
12   Q    Kudiumov, yes?
13             MR. FENTON:  Objection, Your Honor, the term
14   associated with.
15             THE COURT:  Sustained.
16   BY MR. RAM:
17   Q    Do you understand what the term alias means?
18   A    Yes.
19   Q    What does it mean?
20   A    It's a connection with the person.  It's a name or entity
21   or persona that an individual can use other than themselves.
22   Q    Did you understand as part of your investigation, that
23   Anton Kudiumov was an alias for Manuk Grigoryan?
24   A    It was -- not direct -- Anton Kudiumov, I believe was one
25   of the aliases utilized by Manuk Grigoryan.
```

```
1    Q    What were some of the other aliases utilized by Manuk
2    Grigoryan?
3              MR. FENTON:  Objection.  Your Honor.
4              THE COURT:  I mean, you are asking this witness to
5    give his opinion about the evidence.  That seems to be what
6    you're questioning, unless I have it wrong.
7              MR. RAM:  No, Your Honor.
8              THE COURT:  But that is the way it sounded.  I mean,
9    if you asked him what he thinks about certain things, then the
10   government would have a right to respond about other matters,
11   and I allow you to ask him about what he investigated or didn't
12   investigate or what he investigated thoroughly or not
13   thoroughly.
14                   But I'm not going to allow you to ask him his
15   opinion about who was -- who fit into the indictment.  That is
16   the evidence in the case, and that's for the jury to determine
17   and you can argue it.
18   BY MR. RAM:
19   Q    Is it fair to say your understanding of Iuliia Zhadko was
20   a moving target throughout your investigation?
21              MR. FENTON:  Objection.  Calls for his
22   understanding.
23              THE COURT:  The objection is sustained.
24   BY MR. RAM:
25   Q    Okay.  Let's take a look at defense -- what has been
```

UNITED STATES DISTRICT COURT

 1    admitted as Defense Exhibit 1.

 2         Okay.  Do you recognize, and there is two pages to that

 3    exhibit, let's look at the second page as well.

 4         Do you recognize the individual in Defense Exhibit 1?

 5    A    Yes, I do.

 6    Q    Who is that?

 7    A    That is -- I'm going to butcher the first name, but it is

 8    Payrur Hayrapetyan or that is who I believed to be Payrur

 9    Hayrapetyan, that is who I believe to be P Hayrapetyan.

10    Q    As part of your investigation, did you identify

11    connections between this individual, I also cannot pronounce

12    his name.  We will call him P Hayrapetyan and Manuk Grigoryan.

13              MR. FENTON:  Objection, Your Honor.  Vague with

14    respect to connections.

15              THE COURT:  Can you ask the questions more

16    specifically.

17    BY MR. RAM:

18    Q    Sure, did you identify a certain relationship that this

19    individual had with Manuk Grigoryan with this case?

20              MR. FENTON:  Same objection.

21              THE COURT:  Sustained.

22    BY MR. RAM:

23    Q    How is this individual related to this case?

24              MR. FENTON:  Objection, Your Honor, assumes facts

25    not in evidence.

```
 1              THE COURT:  Did you investigate this person you just
 2    identified in your investigation of this case, this indictment?
 3              THE WITNESS:  Yes.  We attempted to find out who
 4    this individual was.
 5              THE COURT:  And if you can follow up on that if you
 6    want.
 7    BY MR. RAM:
 8    Q    Sure, and what did you find out?
 9    A    We found out that he was depositing funds into a variety
10    of bank accounts associated -- well, bank accounts we were
11    investigating.
12    Q    And that he was committing PPP fraud?
13    A    Not that he was committing PPP, I'm not aware of that.
14    Q    Did you eventually -- let's take couple of steps back.
15         As part of your investigation you interviewed, fair to
16    say, dozens of individuals?
17    A    Yes.
18    Q    You have reviewed probably thousands of documents, right?
19    A    Yes.  That's correct.
20    Q    Bank records?
21    A    Yes.
22    Q    Text messages?
23    A    Yes.
24    Q    E-mails?
25    A    Yes.
```

```
 1   Q    Okay.  Now, when I say part of your investigation, I'm
 2   referring to that review, okay?
 3        So as part of your investigation, did you identify an
 4   association between P Hayrapetyan and any of the defendants in
 5   this case, the eight people I referred to earlier?
 6             MR. FENTON:  Objection.  It's the same objection as
 7   before.
 8             THE COURT:  Well, were you investigating this Arman
 9   Hayrapetyan -- last name I can't say.  Were you investigating
10   him in connection with this case?
11             THE WITNESS:  Yes.  Your Honor.
12             THE COURT:  And so just briefly tell us what you
13   investigated about him.
14             THE WITNESS:  Yeah.  So, we received these images
15   from, I believe, this is Bank of America, and we wanted to find
16   out who this individual was because he was, I believe,
17   withdrawing and pulling or depositing funds into variety of
18   bank accounts that we were investigating or part of the PPP
19   loan fraud, so we wanted to find out who this individual was.
20             We found out he was Paraway (phonetic)
21   Hayrapetyan, and I can't speak to this in detail, that was more
22   IRS Agent Geff Clark determined who P. Hayrapetyan was.
23             THE COURT:  I see.  Is that the extent of your
24   investigation of that person?
25             THE WITNESS:  We attempted to go find this P
```

```
 1   Hayrapetyan, I believe Agent Clark went on one occasion.
 2              THE COURT:  What did you do?
 3              THE WITNESS:  I went with Agent Clark on one
 4   instance to the two known residences for this individual, and
 5   we were unable to locate him.
 6              THE COURT:  Is that the extent of your effort?
 7              THE WITNESS:  The only other extent was once we
 8   identified his name, we requested driver's license records and
 9   background information.
10              THE COURT:  Did you get that?
11              THE WITNESS:  We did get that.
12              THE COURT:  And did you use that in this
13   investigation?
14              THE WITNESS:  Just purely for identification
15   purposes, and locating this individual to interview him.
16              THE COURT:  I see.
17   BY MR. RAM:
18   Q    As part of that investigation, did you identify any
19   connection whatsoever from P Hayrapetyan to Richard Ayvazyan?
20              MR. FENTON:  Objection, Your Honor.
21              THE COURT:  Sustained.
22   BY MR. RAM:
23   Q    So specifically, did you identify any text messages,
24   e-mails, photos that would connect P Hayrapetyan to Richard
25   Ayvazyan?
```

```
 1              MR. FENTON:  Objection.  A compound question.
 2              THE COURT:  It's compound.  Did you investigate or
 3    did you see any text message in which this -- say his name
 4    again.
 5              THE WITNESS:  P Hayrapetyan.
 6              THE COURT:  That P Hayrapetyan was a speaker?
 7              THE WITNESS:  I did not.
 8    BY MR. RAM:
 9    Q    Same question with respect to any e-mail, did you identify
10    any e-mail where he was a speaker or connected to any of the
11    original four defendants in this case?
12    A    No, I did not.
13    Q    Okay.  Now, let's talk about Arman Hayrapetyan.
14         No relation to this individual, correct, in terms of
15    family relationship?
16    A    Not as far as I'm aware.
17    Q    Okay.  Are you aware of a working relationship between
18    Arman and P Hayrapetyan?
19              MR. FENTON:  Objection, Your Honor.
20              THE COURT:  Sustained.
21    BY MR. RAM:
22    Q    Okay.  Are you aware of any connection whatsoever between
23    P Hayrapetyan, and Arman Hayrapetyan?
24              MR. FENTON:  Same objection, Your Honor.
25              THE COURT:  Sustained.
```

1    BY MR. RAM:

2    Q     Have you seen any text messages that would connect or

3    e-mails that would connect P Hayrapetyan to Arman Hayrapetyan?

4                MR. FENTON:  Objection, Your Honor.

5                THE COURT:  Overruled.

6                MR. FENTON:  That would connect.

7                THE COURT:  I mean, have you seen not to connect,

8    have you seen any e-mails involving the second person?  The

9    first person you said you didn't see any e-mails with.

10                   The second person -- what was that person's

11   name again, Arman?

12               THE WITNESS:  Arman Hayrapetyan.

13               THE COURT:  Is that the new second person, is that

14   the name of the second person you have asked about?

15   BY MR. RAM:

16   Q     Arman Hayrapetyan, a defendant in this case.

17               THE COURT:  Did you see e-mails involving him in

18   investigating this case?

19               THE WITNESS:  No, I have not, Your Honor.

20               THE COURT:  All right.

21   BY MR. RAM:

22   Q     Okay.  And specifically, as part of your investigation,

23   which includes interviews, did you learn any information about

24   P Hayrapetyan, the individual in the image here, and if you had

25   any relationship with Arman Hayrapetyan?

```
 1  A    We interviewed Arman Hayrapetyan and learned that -- well

 2  he identified P Hayrapetyan through an image that she showed

 3  him.

 4  Q    Okay.  In what capacity did he identify P Hayrapetyan?

 5  A    P Hayrapetyan would meet Arman and give him, I don't want

 6  to misquote himself, would give him checks or funds to deposit

 7  into bank accounts.

 8  Q    Okay.  What would P Hayrapetyan get in exchange for

 9  depositing those checks?

10            MR. FENTON:  Objection.  Calls for speculation.

11            THE COURT:  If you know?

12            THE WITNESS:  I don't know, and I don't recall.

13  BY MR. RAM:

14  Q    Okay.  So you mentioned a moment ago you interviewed Arman

15  Hayrapetyan, yes?

16  A    Yes.

17  Q    And he discussed P Hayrapetyan, right?

18  A    He didn't discuss P Hayrapetyan, he called him by a

19  different name.

20  Q    Sure.  Whatever name he referred to this individual

21  pictured here, you interviewed Arman and he mentioned him, yes?

22  A    No, I mentioned him then he recognized the photo.

23  Q    You testified -- let's walk that back.

24       So whether you spoke to Arman Hayrapetyan, asked him

25  questions about this individual, yes?
```

```
 1   A    I asked him if he knew his name, and that he said no, and
 2   then I showed him a photograph of P Hayrapetyan, and he
 3   recognized him.
 4   Q    So he recognized the photo?
 5   A    Yes.
 6   Q    And Arman Hayrapetyan conveyed some information to you
 7   about P Hayrapetyan, I think you said a moment ago that he
 8   would deposit checks for Arman Hayrapetyan; is that correct,
 9   right?
10            MR. FENTON:  Calls for hearsay.
11            THE COURT:  I mean, I take it examining this witness
12   about what he -- about what he should have investigated, is
13   that what you are getting at?
14            MR. RAM:  I'm not there, Your Honor.
15            THE COURT:  Is that the general thrust of this?
16            MR. RAM:  No.
17            THE COURT:  I mean, are you saying he should have
18   investigated this person further?
19            MR. RAM:  Yes, Your Honor, that is part of it.
20            THE COURT:  Well, then, go ahead.  Relate this to
21   this case, I don't know.
22   BY MR. RAM:
23   Q    Yes.  Specific to this case, did you investigate whether
24   the individual in this photo, P Hayrapetyan, was working with
25   Arman Hayrapetyan to deposit PPP and EIDL checks that came from
```

UNITED STATES DISTRICT COURT

```
 1    the Manuk Grigoryan?
 2    A     After we interviewed Arman Hayrapetyan, we did attempt
 3    that when Agent Clark and myself went to go find this
 4    individual to interview him.
 5    Q     Even with your conversation with Arman, you said you
 6    interviewed him with Mr. Clark, right?
 7    A     Yes.
 8    Q     Even, did you ask Arman Hayrapetyan what checks was he
 9    depositing for you?
10    A     I don't recall.
11    Q     Why don't you take a look for identification purposes at
12    what has been marked just -- and this is just for the witness
13    -- Defense Exhibit 60.
14          It should be on your screen.
15          Do you see it up on your screen?
16    A     I don't.  There it is.
17    Q     Let me know when you have had a chance to review the first
18    page.
19    A     Okay.
20    Q     Let's look at the second page, and finally the third page.
21          Okay.  Specifically, why don't you review the last to the
22    second paragraph on the third page, and I will ask you some
23    questions.
24    A     Okay.
25    Q     Based on your investigation, did you learn that Arman
```

**UNITED STATES DISTRICT COURT**

```
 1  Hayrapetyan was paying the individual who was in Defense
 2  Exhibit 1, P Hayrapetyan, $10,000 for each check that he
 3  deposited?
 4  A    I don't understand he was paying him, but he was giving
 5  him $10,000.
 6  Q    Giving him money, right, $10,000, a check?
 7  A    Yes.
 8  Q    In other words, P Hayrapetyan, would deposit a check just
 9  like we saw at the ATM, and he would get $10,000 from Arman
10  Hayrapetyan, yes?
11  A    My understanding was that Arman -- P Hayrapetyan would
12  bring Arman Hayrapetyan checks.  Arman Hayrapetyan would
13  deposit checks and pull funds from the bank account and then
14  provide the funds that he had pulled from the bank account to
15  P Hayrapetyan.
16  Q    Correct.  All right.
17       Now, you know who Arman Hayrapetyan is, one of the
18  defendants in this case, right?
19  A    Yes.
20  Q    Okay.  And are you familiar with Arman Hayrapetyan working
21  with Manuk Grigoryan?
22            MR. FENTON:  Objection, Your Honor.  Vague and
23  lacks foundation.
24            THE COURT:  On what ground?
25            MR. FENTON:  Vague and lacks foundation.
```

```
 1              THE COURT:  What was the first objection?

 2              MR. FENTON:  Vague and foundation.

 3              THE COURT:  Sustained.

 4  BY MR. RAM:

 5  Q    Do you understand what I mean by when I say working?

 6  A    I believe so, yes.

 7  Q    Okay.  So if someone does business together or cash checks

 8  for someone, or participates in PPP fraud, that would be the

 9  working definition of working.  So when I asked you, do you

10  know from your investigation whether Arman Hayrapetyan was

11  working with Manuk Grigoryan, what is your answer to that

12  question?

13  A    My understanding based on the interview we had with Arman

14  Hayrapetyan, is that Arman Hayrapetyan thought he would deposit

15  checks and get a percentage of the checks he was depositing.

16  Q    From who?

17  A    I believe it was -- I actually, I don't know.

18  Q    Did you try to follow up and find out who was paying Arman

19  Hayrapetyan money for checks that were deposited?

20  A    I can't think of anything specifically we did.

21  Q    Okay.  And did you do anything to investigate whether

22  Arman Hayrapetyan, a defendant in this case, was dealing in PPP

23  loan checks?

24  A    Aside from the questions we asked here.

25  Q    Here, being the interview?
```

```
 1  A     Yes.

 2  Q     Okay.

 3  A     And reviewing bank records and seeing Arman Hayrapetyan

 4  photographed depositing checks that were fraudulently obtained

 5  PPP proceeds or SBA loan proceeds, that was what we had done.

 6  Q     Okay.  And now I want to ask you about Edward Paronyan.

 7  Another one of the defendants added in the first superseding

 8  indictment, right?

 9  A     Uh-huh.

10  Q     Okay.  You based on your investigation -- are you familiar

11  with how Manuk Grigoryan and Edward Paronyan were acquainted

12  with respect to this case?

13  A     Again, we followed the money and made the initial

14  connection there.

15        We also interviewed real estate agents that put them

16  together at the same place in the same time.

17  Q     And you are aware that Manuk Grigoryan approached Edward

18  Paronyan with about applying for PPP loans?

19           MR. FENTON:  Objection, Your Honor.  Lacks

20  foundation.

21           THE COURT:  Sustained.

22  BY MR. RAM:

23  Q     Did you discover as part of this investigation that Manuk

24  Grigoryan approached Edward Paronyan to apply for a PPP loan?

25           MR. FENTON:  Same objection.
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  I'm not aware that Manuk Grigoryan
 3    approached Edward Paronyan to apply for PPP loans.
 4    BY MR. RAM:
 5    Q    Okay.  Did you investigate how it is Edward Paronyan
 6    applied for a PPP loan in connection with Manuk Grigoryan?
 7    A    Again, we followed the money and made the connection that
 8    way.
 9    Q    Okay.  So beyond following the money, did you do anything
10    to investigate the relationship between Edward Paronyan and
11    Manuk Grigoryan?
12              MR. FENTON:  Objection, to the term relationship.
13              THE COURT:  What?
14              MR. FENTON:  Objection, relationship, it's vague.
15              THE COURT:  Sustained.
16    BY MR. RAM:
17    Q    So, people can have a connection, right?
18              THE COURT:  Just -- I mean, did you investigate any
19    money trail between Paronyan and Hayrapetyan.  Any financial
20    transactions, banking transactions between the two?
21              THE WITNESS:  Paronyan and Manuk Grigoryan?
22    BY MR. RAM:
23    Q    Yes.
24              THE COURT:  I think the answer is between Paronyan
25    and Manuk Grigoryan.
```

```
 1                    THE WITNESS:  Yes, Your Honor.
 2                    THE COURT:  But not Paronyan and P Hayrapetyan.
 3                    THE WITNESS:  Yes.
 4    BY MR. RAM:
 5    Q     So, for example, as part of your investigation, did you
 6    look at social media to see if Edward Paronyan and Manuk
 7    Grigoryan were friends?
 8    A     I don't recall looking into social media.
 9    Q     Did you do anything to establish how it is Manuk Grigoryan
10    is connected or related to Edward Paronyan?
11    A     Well, what we did, we did trash pools on a variety of
12    residences to include Edward Paronyan's residence.
13    Q     Did you find anything in the trash pools that would
14    connect Edward Paronyan to Manuk Grigoryan?
15    A     Not that I recall from the top of my head.
16    Q     Are you aware that Edward Paronyan had a company called
17    Redline Auto Collision; is that right?
18    A     Yes.
19    Q     That he applied for a loan on behalf of Redline Auto
20    Collision, a PPP loan?
21    A     Yes.
22    Q     Okay.  And now did you learn how people working with Manuk
23    Grigoryan got paid related to the PPP loans?
24                    MR. FENTON:  Objection, Your Honor.
25                    THE COURT:  Sustained.  If you substitute learn for
```

UNITED STATES DISTRICT COURT

1    investigate, I will allow the question.

2    BY MR. RAM:

3    Q    Okay.  Did you investigate how specifically Edward

4    Paronyan, Arman Hayrapetyan, got paid in connection with

5    working with Manuk Grigoryan?

6    A    I mean, the investigation we did was again following the

7    money and seeing funds flowing from Redline Auto Collision to

8    Manuk Grigoryan.

9    Q    Okay.  So as part of your investigation you saw transfers

10   from Redline Auto Collision to Manuk Grigoryan, one of his

11   accounts?

12   A    We also saw funds going from Redline Auto Mechanics, which

13   I don't believe has been discussed, and that back to Redline

14   Auto Collision.

15   Q    Oh, okay.  You understood that to be a connection between

16   Edward Paronyan and Manuk Grigoryan?

17   A    I would say that, and the other connection to the other

18   defendants was unemployment cards in the name of Mark Zindroski

19   that were mailed to Redline Auto Collision.

20   Q    Let's talk about that as part of your investigation.  Are

21   you aware that Manuk Grigoryan was committing EDD fraud?

22   A    No, I was not.

23   Q    Okay.  Why don't we take a look at what has been admitted?

24               THE COURT:  The issue, I mean.

25               MR. FENTON:  Just to clarify, did Mr. Ram just say

UNITED STATES DISTRICT COURT

```
 1   EDD or PPP?
 2            THE COURT:  EDD.
 3            MR. FENTON:  Objection, Your Honor.  Lacks
 4   foundation.
 5            THE COURT:  He said he didn't, and I want to just
 6   indicate again, that the overarching examination is with regard
 7   to what this witness didn't do or didn't do thoroughly enough
 8   and that is not -- I'm not saying he did it -- that that is
 9   fact, but that is where I'm allowing the investigation to go,
10   not what he was aware of or what he's familiar with.
11                If you ask questions about what he should have
12   done that he didn't do, in your judgment, or what he should
13   have done more thoroughly, than he did do, then it would seem
14   more appropriate.
15   BY MR. RAM:
16   Q    Okay.
17            THE COURT:  But you are asking him to what he's
18   aware of, what he's not aware of, maybe that has a place
19   somewhere, but the direction should be what did he do that he
20   shouldn't have done.
21            MR. RAM:  Let me lay a foundation.
22            THE COURT:  Or what he did that wasn't adequate.  I
23   mean, that is why I'm allowing the questioning.
24   BY MR. RAM:
25   Q    Sure, I can lay a foundation on the EDD side of the house,
```

1    Your Honor.

2        So fair to say, it would be pretty important to you in

3    your investigation in this case if some of the defendants added

4    in the first superseding indictment were operating an EDD

5    scheme at the same time they were applying for PPP loans using

6    the same identities you were investigating as part of the PPP

7    loans.  The question is simply would that be important to you

8    to know and investigate?

9                MR. FENTON:  Objection.  This is argument.

10               THE COURT:  Well, he's asking -- but he didn't know

11   about the EDD investigation, is that what you said?

12               THE WITNESS:  Yes, Your Honor.

13               THE COURT:  So, I mean, it's a hypothetical

14   question.  He said he didn't know, so the objection is

15   sustained.

16   BY MR. RAM:

17   Q    So the follow-up question was, Your Honor, was would it be

18   important to obtain evidence about something like that in

19   connection with this case.

20               THE COURT:  Well, assuming that -- well, I mean

21   objection is sustained.

22   BY MR. RAM:

23   Q    Okay.  Now, one of the people you investigated in this

24   case was Manuk Grigoryan, yes?

25   A    Yes.

```
1    Q    Okay.  You mentioned, sorry, let me go back to answer to

2    an earlier question.  You found an EDD card, right?

3    A    No.  That's not what I said.

4    Q    What were you saying about an EDD card?

5    A    We had received subpoena results from the Unemployment

6    Development Department, that card for Mark Zindroski, one of

7    the identity thefts was mailed to the Redline Auto Collision

8    business address.

9    Q    Okay.  So the identity from Zindroski was used by Redline

10   Collision, is that what you learned from this?

11            MR. FENTON:  That is misstating the witness's

12   testimony.

13            THE COURT:  He can say yes or no.  I don't know.

14            THE WITNESS:  No.  The return always showed was that

15   that card had been mailed to that address.

16            THE COURT:  Keep your voice up.

17            THE WITNESS:  Yes, sir.

18   BY MR. RAM:

19   Q    Specifically what was mailed to Redline Collision?

20   A    My understanding from reading the results that we had

21   obtained from EDD was that a card had been mailed for

22   unemployment benefits in the name of Mark Zindroski to the

23   business address of Redline Auto Collision.  I can't recall it

24   off the top of my head.

25   Q    Okay.  Did you investigate whether anyone was committing
```

```
 1   EDD fraud related to this case?
 2              MR. FENTON:  Objection, Your Honor.
 3              THE COURT:  Sustained.
 4              MR. FENTON:  Your Honor, could we have a sidebar?
 5              THE COURT:  No.
 6   BY MR. RAM:
 7   Q    Now, let's talk about Manuk Grigoryan.  As part of your
 8   investigation, did you learn that he was arrested for
 9   aggravated identity theft in 2017?
10              MR. FENTON:  Objection, Your Honor.
11              THE COURT:  Sustained.
12   BY MR. RAM:
13   Q    This is a foundation to the next question, Your Honor.
14              THE COURT:  Ask the next question.
15   BY MR. RAM:
16   Q    Okay.  Did you investigate what that 2017 arrest was --
17              THE COURT:  I sustained the objection.  There is no
18   evidence of that.
19   BY MR. RAM:
20   Q    I see.  Can I lay a foundation to the 2017 conduct?
21              THE COURT:  Go ahead.
22   BY MR. RAM:
23   Q    Okay.  So, the eight defendants in this case, they are
24   including specifically Manuk Grigoryan, Edward Paronyan, and
25   Arman Hayrapetyan, they existed before March of 2020, right,
```

```
1    they were alive existing people before March of 2020?

2    A    To the best of my knowledge.

3    Q    Okay.  Meaning they weren't born after March of 2020,

4    right?

5    A    Yes.

6    Q    So they had histories?

7    A    Yes.

8    Q    So one specific to Manuk Grigoryan, he had a history

9    before March of 2020, just like everybody else, right?

10             MR. FENTON:  Objection, Your Honor.

11             THE COURT:  Well, the question is.

12             MR. FENTON:  Does he have a history?

13             THE COURT:  Well, in general, did you investigate

14   any of the defendants in this case in terms of what their past

15   conduct may have been?

16             THE WITNESS:  Your Honor, do you mean, like we

17   commonly refer to as background checks?

18             THE COURT:  Yes.

19             THE WITNESS:  Yes, we did.

20             THE COURT:  I see.  Was that relevant to your

21   investigation in this case?

22             THE WITNESS:  Yes.  Yes, it was Your Honor.

23             THE COURT:  In what way?

24             THE WITNESS:  Just that someone with a criminal

25   history, especially with identity theft, in this case, we're
```

```
 1  attempting to identify who the identities were of these
 2  individuals -- it was an important piece of information, yes.
 3              THE COURT:  Then go ahead and ask the questions.
 4  BY MR. RAM:
 5  Q    Okay.  As part of that investigation you just described to
 6  the Court, did you look into a 2017 identity theft arrest from
 7  the Manuk Grigoryan?
 8  A    Can you clarify what you mean, "looked into?"
 9  Q    Sure.  So let's just -- telling the jury what you would
10  typically do, right, so when you see someone has a criminal
11  history you could see arrests on it?
12              THE COURT:  Let's get more to the point.
13                  Did you investigate a criminal history of
14  Grigoryan?
15              THE WITNESS:  I looked at the report, that was the
16  extent of me looking into it.
17                  I didn't speak to or contact like any other
18  officers.
19              THE COURT:  You looked at that report?
20  BY MR. RAM:
21  Q    Okay.  Part of this case, in your investigation, involves
22  the purchase of watches and other expensive items, yes?
23  A    Yes.
24  Q    Okay.  Did you investigate whether the same Manuk
25  Grigoryan, for example, was buying watches and other expensive
```

```
 1   items on credit cards, not in his name before March of 2020?
 2              MR. FENTON:  Foundation.
 3              THE COURT:  Sustained.
 4   BY MR. RAM:
 5   Q    Did you investigate was the question?
 6        Did you investigate whether Manuk Grigoryan was purchasing
 7   watches and other expensive items prior to March of 2020?
 8              MR. FENTON:  Objection, Your Honor.  We previously
 9   discussed how it was not appropriate to ask questions about the
10   pre-2020 time period, which Mr. Ram keeps returning to that.
11              THE COURT:  Let's not argue the point in that way
12   now.
13                   The question is, did he, he can say yes or no
14   and that's it.
15              MR. RAM:  Correct.  Do you understand the question.
16              THE WITNESS:  Could you repeat it, please?
17   BY MR. RAM:
18   Q    Sure.  Did you -- so, my last question before was about
19   this 20?
20              THE COURT:  Ask the question.
21                   Let's not back up, let's go forward.
22   BY MR. RAM:
23   Q    After seeing a 2017 arrest to Manuk Grigoryan for identity
24   theft --
25              THE COURT:  You are loading up the questions.  Let's
```

1    just get to the question.  Ask the question.

2    BY MR. RAM:

3    Q    Yes, Your Honor.

4           THE COURT:  From a few words.

5    BY MR. RAM:

6    Q    Did you investigate whether Manuk Grigoryan was doing the

7    same things you are accusing him of that the government charged

8    him with this case before March of 2020?  That is a simple

9    question.

10          MR. FENTON:  Objection, 403.

11          THE COURT:  Objection sustained.  I don't know what

12   the same things mean, you start out with watches and we never

13   got an answer to that.  If you want the answer --

14   BY MR. RAM:

15   Q    Yes, I will stick to watches.

16          THE COURT:  Ask the question.

17   BY MR. RAM:

18   Q    Did you investigate whether Manuk Grigoryan was purchasing

19   watches from the same people or in similar patterns before

20   March of 2020?

21          MR. FENTON:  Objection.  Foundation.

22          THE COURT:  Sustained.  I mean the question -- same

23   patterns.  Objection is sustained.

24   BY MR. RAM:

25   Q    I will ask the very simplest question.

```
 1              THE COURT:  You started to ask where you saw him
 2   purchasing expensive watches on a credit card.  I thought that
 3   was the question.
 4              MR. RAM:  Yes.
 5              THE COURT:  So the question is did you or did you
 6   not investigate any purchases of watches by Manuk Grigoryan on
 7   his credit card?
 8              THE WITNESS:  No, I did not.
 9              THE COURT:  The answer is no.
10   BY MR. RAM:
11   Q    Okay.  What about the credit cards of other people not in
12   his name?
13   A    Pre-2020 again?
14   Q    Pre-March of 2020, yes.
15   A    No.
16   Q    And why didn't you conduct that investigation?
17   A    We were investigating PPP and SBA loan fraud from
18   March 2020 onward.
19   Q    But you testified earlier, that the flow of funds was one
20   of the early analyses you did in this case, right, like how
21   money moved between people and accounts?
22   A    Related to the PPP loan proceeds.
23   Q    Okay.  Did you not find it important to see how money
24   moved between those same people before PPP loans existed to
25   explain other?
```

```
 1              THE COURT:  Just ask the question.
 2   BY MR. RAM:
 3   Q    Did you not find it important?
 4   A    To look at pre-2020 flow of funds?
 5   Q    Yes.  Pre-March 2020?
 6              MR. FENTON:  Objection, this is argument.
 7              THE COURT:  He can answer the question.  All these
 8   questions are, you know, ultimately for the jury.  I mean was
 9   the investigation in this case complete enough or not, I don't
10   know.  And he is asking him what he did.  That's all.
11                   Did you do that?
12              THE WITNESS:  No, Your Honor, we did not.
13              THE COURT:  The answer is no.
14   BY MR. RAM:
15   Q    That includes bank accounts and statements, right?
16   A    Yes.
17   Q    Okay.  Now, let's talk about your investigation of Tamara
18   Dadyan.
19   A    Okay.
20   Q    Through your investigation of this case, did you learn of
21   any pre-PPP identities that Tamara Dadyan or those that she is
22   connected with used pre-PPP?
23              MR. FENTON:  Objection, Your Honor.  It's a
24   confusing question.  It's vague, there is no foundation.
25              THE COURT:  Well, learn is the part of it.  Did he
```

```
 1    investigate Tamara Dadyan's prior use of false identities.  You
 2    could answer that.
 3    BY MR. RAM:
 4    Q    Okay.  Did you investigate?
 5              THE COURT:  I asked the question.  He can answer it,
 6    I mean, the jury should understand, of course, they do, that
 7    lawyers' questions are not evidence, no lawyers' questions are
 8    evidence, they are just a way to get evidence.
 9                   The evidence is the answer, not the question.
10                   So okay, I asked the question.  Do you
11    remember the questions and the answer?
12              THE WITNESS:  Could you clarify?
13              THE COURT:  I forgot the question.  I don't know
14    what the question was.  Ask it as simply as you can.
15    BY MR. RAM:
16    Q    Okay.  I liked how Your Honor phrased it, but I also
17    forgot.  I think the question was --
18              THE COURT:  I mean, I will step in for a second.
19                   Did you investigate any financial
20    relationships that may have existed between the defendants in
21    this case prior to your investigation of the PPP loans?
22              THE WITNESS:  No, I did not.
23              THE COURT:  The answer is no.
24    BY MR. RAM:
25    Q    Okay.  And specifically did you identify any synthetic
```

1   identities prior to -- pre-PPP -- prior to March 2020 that were

2   associated with Tamara Dadyan?

3           MR. FENTON:  Objection.  Confusing.

4           THE COURT:  I mean, again, the question is did you

5   investigate any identities used by defendant Tamara Dadyan, not

6   in connection with this case?

7           THE WITNESS:  Not prior to March 2020.

8           THE COURT:  I think he answered.

9           MR. RAM:  Your Honor, he may have misunderstand the

10  question.  The question is not when you looked into it, I know

11  you didn't look into it until after March 2020, because your

12  investigation didn't start yet.

13              I'm asking you, did your investigation reveal

14  that Tamara Dadyan was using synthetic identities prior to

15  March of 2020?  I can give you a specific --

16          THE COURT:  Let him answer.

17          MR. RAM:  Sure.

18          THE WITNESS:  Yes.

19  BY MR. RAM:

20  Q    All right.  Specifically, one of those names was Rosa

21  Avakyan; is that right?

22          MR. FENTON:  Objection.  Assumes facts not in

23  evidence.  He's telling him what his answer should be.

24          THE COURT:  Well, you can lead him, that is what

25  leading is.  Leading means the examiner can suggest the answer

1    and it's up to the witness to say nay or yay.

2    BY MR. RAM:

3    Q    You understand my question.  Was one of those -- so you

4    the answer to the prior question, was yes, you did identify

5    certain names.  Then my question was to you was Rosa Avakyan

6    one of those names that you identified as Tamara Dadyan using

7    prior to March of 2020?

8    A    Yes.  Well sorry, Rosa Avakyan -- I'm still not certain if

9    she was a synthetic ID or a stolen identity.

10             THE COURT:  Let me hopefully clarify.  Did you

11   investigate the use of false identities by any of the

12   defendants in this case in a time period that predated the PPP

13   loans?

14             THE WITNESS:  No.  I didn't investigate them, no.

15             THE COURT:  Did anyone in your supervision do that?

16             THE WITNESS:  No.

17             THE COURT:  Okay.

18   BY MR. RAM:

19   Q    All right.  Why don't we show the witness Defense

20   Exhibit 13, for identification purposes.

21        Can we go to the next page?

22        Okay.  Now, if we could go back to page 1.

23             THE COURT:  Is this exhibit in evidence?

24             MR. RAM:  It is not, Your Honor.

25             THE COURT:  So you are going to ask some questions

```
 1   about it.
 2               MR. RAM:  Okay.
 3               THE COURT:  Well first, is this a document that you
 4   have seen before?
 5               THE WITNESS:  It appears to be an e-mail from --
 6   yes, with my name on it.
 7               THE COURT:  So you saw this document before?
 8               THE WITNESS:  Yes.
 9               THE COURT:  Go ahead.
10   BY MR. RAM:
11   Q    I will ask the question again.  Is Rosa Avakyan one of the
12   names you have identified as being associated with Tamara
13   Dadyan that she used prior to any pre-PPP loans?  A synthetic
14   identity?
15   A    Synthetic or possibly stolen, yes.
16   Q    Same question with respect to Luidmyla Kopytova.
17   A    Not that I recall with specificity.
18   Q    Sure.  This is just for the witness again, would it
19   refresh your memory if showed you where her name is referenced?
20   A    Yes.
21   Q    Why don't you look at -- let's go to page, as an example,
22   page 3, four lines down.
23   A    Yes.  The name is there, but I don't recall, like,
24   reviewing the document in detail.
25   Q    Okay.  So you received this e-mail, but you didn't review
```

```
 1  it?
 2  A    I reviewed it, but like I mean, I don't have a
 3  photographic memory.
 4  Q    Fair enough.  So let's put the e-mail away.  The question
 5  is do you recognize -- I apologize for butchering her name,
 6  Luidmyla Kopytova, whether real or synthetic, an identity that
 7  was used by Tamara Dadyan prior to March of 2020?
 8  A    I don't know if she was using it prior to 2020.
 9  Q    Okay.  So, your testimony is that you are not aware?
10            THE COURT:  Let's not repeat his testimony.  It is
11  question and answer.  He can answer the question.  Next
12  question.
13  BY MR. RAM:
14  Q    Same question with respect to Diana Saakyan.
15  A    Prior to 2020, no.
16  Q    Not prior to March 2020, or not prior to 2020?
17  A    Just March 2020.
18  Q    Okay.  And who sent you that e-mail that we just
19  referenced in Defense Exhibit 13?
20  A    Could you pull it back up?
21  Q    Sure.  Just for the witness, Defense Exhibit 13.
22  A    Well, it looks like I sent it, but this was Agent Geff
23  Clark must have forwarded it to me on January 7th, 2021.
24  Q    Okay.  You initially sent it September 2nd, 2020?
25  A    Yes.
```

```
 1   Q     Before the indictment from this case?
 2   A     Yes.
 3   Q     Okay.  Now, come back to your investigation of this case,
 4   did you learn through your investigation how the original four
 5   defendants that were charged in this case, how any compensation
 6   was shared or at least allegedly shared amongst the defendants?
 7              MR. FENTON:  Objection.  Vague with respect to
 8   compensation.
 9              THE COURT:  Sustained.
10   BY MR. RAM:
11   Q     Sure.  I will lay a quick foundation.
12         So typically you investigate fraud, right?
13   A     Yes.
14   Q     And the object of fraud is to make money?
15   A     Object of fraud is to steal money.
16   Q     Okay.  Steal money.  And did you investigate how people
17   were paid allegedly related to the original four defendants
18   charged in this case?
19              MR. FENTON:  Objection to paid.
20   BY MR. RAM:
21   Q     How did they make money?
22              MR. FENTON:  Objection to make money.  That isn't
23   his testimony.
24              THE COURT:  Sustained.
25   BY MR. RAM:
```

```
 1    Q    Let's start with Government Exhibit 10 -- actually, let me
 2    do this before we go to the exhibit.
 3         Are you aware if participants charged in this case were
 4    paid a percentage of checks deposited, for example.
 5         This shouldn't been up on the screen.  That is Defense
 6    Exhibit 13, and nothing should be on the screen right now.
 7         Okay.  So did you hear my question?
 8    A    Could you restate it, please?
 9    Q    As part of your investigation, did you learn how any of
10    the alleged coconspirators related to Tamara Dadyan were paid
11    or earned funds through the depositing of checks?
12              MR. FENTON:  Objection, Your Honor to paid, and
13    earned.
14              THE COURT:  How about received?
15              MR. RAM:  Sure.  Received.
16              THE COURT:  You can ask that.
17              MR. FENTON:  Your Honor, the government also
18    objects, because it's a vague question, it's confusing.  It's
19    not clear what he is referring to.
20              THE COURT:  The question regarding, as I understand
21    it, is just generally did he investigate the flow of money
22    between the defendants in this case?
23                   Did you do that?
24              THE WITNESS:  Yes, Your Honor.
25              THE COURT:  All right.
```

```
 1  BY MR. RAM:
 2  Q     Yes.  So what is the answer to that question?
 3  A     Yes.  We followed the flow of money between the
 4  defendants.
 5  Q     Okay.  And did you identify how participants related to
 6  Tamara Dadyan were -- how they received funds from checks that
 7  were deposited?
 8              MR. FENTON:  Objection, Your Honor.  The
 9  participants is related to Tamara Dadyan.
10              THE COURT:  I don't know what that means.
11              MR. RAM:  I will restate that.  I will ask it from a
12  leading way.
13  BY MR. RAM:
14  Q     Are you aware that participants allegedly connected to
15  Tamara Dadyan, specifically received a percentage of a check
16  deposited related to the loans underlying this case?
17              MR. FENTON:  Same objection, Your Honor.  Conspiracy
18  is alleged here, that includes his client.
19              THE COURT:  But could you ask the question a
20  different way?
21              MR. RAM:  Sure.  Let me do this.
22              THE COURT:  When you say participants, you mean the
23  defendants, right?
24              MR. RAM:  Sure.  I could ask it in a different way.
25              THE COURT:  Well, I mean that is the way people have
```

```
 1   been described here.  Participants is a new word.  There is
 2   enough documents in the case to not use new words
 3   unnecessarily.  You are talking about the other defendants,
 4   right?
 5              MR. RAM:  Yes.  Let me strike the question, Your
 6   Honor.  I will do it this way.
 7   BY MR. RAM:
 8   Q    As part of your investigation, did you identify how one
 9   group of defendants received funds or were compensated
10   differently than another group of defendants?  In other
11   words --
12              THE COURT:  Let him answer.  You are saying "in
13   other words" like he didn't understand the question.  If he
14   says he doesn't understand the question, you could ask it a
15   different way.
16              Do you understand the question?
17              THE WITNESS:  If you could restate it.
18   BY MR. RAM:
19   Q    Okay.  So, as part of your investigation did you learn
20   how -- whether one group much defendants, for example, the
21   original four defendants, received funds on a percentage basis
22   of checks deposited, for example, versus another group of
23   defendants that are related to Manuk Grigoryan, who received a
24   flat fee amount per check.
25              MR. FENTON:  Objection.  This assumes facts not in
```

```
1    evidence.  This is argument.
2                THE COURT:  Objection sustained.
3                MR. RAM:  Okay.
4                THE COURT:  If you just ask questions from a more
5    simplified form, we would make more progress.
6    BY MR. RAM:
7    Q    Okay.  So the basic question would be, did you investigate
8    any differences in how groups of defendants were compensated in
9    this case?
10   A    No.
11   Q    Okay.  An identity that you investigated in this case was
12   July Zhadko; is that correct?
13   A    Yes, that's correct.
14   Q    Are you familiar with the property located at 834 Calle La
15   Primavera in Glendale?
16   A    Yes.
17   Q    Let's take a look at what has been admitted as Government
18   Exhibit 30-I on the screen.
19        Do you recognize this document, which is in evidence?
20   A    Yes.  It looks like records received from Beverly Hills
21   Escrow.
22   Q    Related to the 834 Calle La Primavera house?
23   A    Yes.
24   Q    And it say that the -- it purports to be by Iuliia Zhadko;
25   is that right?
```

```
 1   A     Yes.
 2   Q     You conducted -- you personally conducted a trash pool at
 3   this address; is that right?
 4   A     Yes.
 5   Q     And why don't you tell the jury what a trash pool is?
 6   A     So a trash pool, for lack of a better word, us going in
 7   and looking through individual's trash, recycling and refuse
 8   that has been placed on the curb, and not getting too legal,
 9   it's abandoned property and gives us the opportunity to look
10   for evidence or leads.
11   Q     Okay.  You did that at this property, right?
12   A     Yes.
13   Q     And you collected evidence from that trash pool, yes?
14   A     Yes.
15   Q     Why don't you take a look, just for you for now, at
16   Government Exhibits 3 and 4.
17         I'm sorry, Defense Exhibit 3 and 4, to make it easy, I can
18   give you a binder.
19   A     Okay.
20   Q     Did you look at both Defense Exhibits 3 and 4?
21   A     Yes.
22   Q     All right.  Do you recognize them?
23   A     I do.
24   Q     What is depicted in Defense Exhibits 3 and 4?
25   A     Defense Exhibit 3 looks like it's an empty box addressed
```

1   to Hripsik Grigoryan.

2   Q    Before you get into the details, I'm going to get it into

3   evidence.  But what is depicted there?

4   A    Yeah, it's pieces of trash we pooled from 834 Calle La

5   Primavera.

6            MR. RAM:  Your Honor, I move to admit Defense

7   Exhibit 3 and 4.

8            THE COURT:  Received.

9        (Defense Exhibits 3 and 4 received into evidence.)

10  BY MR. RAM:

11  Q    Go ahead, tell us what is in Defense Exhibit 3.

12  A    Yes, Defense Exhibit 3.

13           MR. RAM:  May we publish, Your Honor?

14           THE COURT:  Yes.

15           THE WITNESS:  It's an empty package addressed to

16  Hripsik Grigoryan, for Valley View Elementary, 6921 Woodrow

17  Wilson Drive, Los Angeles, California.

18           MR. RAM:  The next page?

19           THE COURT:  Can you keep your voice up?

20           THE WITNESS:  Yes, Your Honor.  The next are two

21  pieces of trash.  Yeah, it appears to be a medicine label

22  addressed to Hripsik Grigoryan, and also a receipt for Kale

23  Slaw for Rita Grigoryan.

24  BY MR. RAM:

25  Q    Okay.  The next page?  There is only one page in there?

1   A     Yes.

2   Q     And as you sit here today, or from the exhibit, do you see

3   any evidence from the trash pool that relates to any of the

4   four original defendants charged in this case?

5   A     No, I do not.

6   Q     Specifically, do you recognize the last name Grigoryan?

7   A     I see it is Grigoryan, yes.

8   Q     Okay.  And there is a defendant charged in this case with

9   that same last name, yes?

10  A     Yes.

11  Q     Who is that?

12  A     Manuk Grigoryan.

13  Q     Did you investigate what the relationship is between these

14  individuals you just read their names, Hripsik, I will defer to

15  your pronunciations, but the individual's names you saw in

16  Exhibits 3 and 4, did you investigate if there was any

17  relationship to Manuk Grigoryan?

18  A     Not that I recall, no.

19  Q     Okay.  What one of the reasons us conducted a trash pool

20  at, we will call it, the Primavera address, was to identify who

21  was living at the house or controlling it, right?

22  A     Yes.

23  Q     Okay.  All right.  Now, you had mentioned earlier in your

24  testimony about reviewing e-mails, text messages, and other

25  evidence along those lines; is that right?

1   A     Yes.

2   Q     Okay.  Did you see any communications -- I'm going to

3   define two groups of people.

4        So on the one hand, did you see any communications at all

5   between Edward Paronyan, Manuk Grigoryan, and Arman

6   Hayrapetyan, three of the defendants in this case on the one

7   hand, and on the other hand, Mary Terabelian, Tamara Dadyan,

8   and Vahe Dadyan?

9           MR. FENTON:  Objection, Your Honor.  Confusing and

10   foundation.

11           THE COURT:  Communication, is that the word?  What

12   is confusing?

13           MR. FENTON:  Well, the question is phrased in a

14   confusing way.  But he's also talked about communication which

15   is vague.

16           THE COURT:  I will sustain the objection on that

17   ground.

18   BY MR. RAM:

19   Q     Okay.  Let me define communications, again, so as part of

20   your investigation, you said you reviewed text messages,

21   e-mails, and thousands and thousands of pages of documents,

22   yes?

23   A     Yes.

24   Q     Let's call those things communications.

25           THE COURT:  Let me suggest the question might be in

1   any of those categories you just asked about, did he see any

2   exchanges between whoever you want to ask him about.

3   BY MR. RAM:

4   Q    Fair.  So that is the preface of my question here is the

5   two groups.

6        On the one hand, you have Manuk Grigoryan, Edward

7   Paronyan, and Arman Hayrapetyan, okay?

8        That is one group.

9        On the other hand, you have the Mary Terabelian, Arthur

10  Ayvazyan, and Vahe Dadyan.  Did you see any communications with

11  whatsoever between those two groups?

12  A    I didn't specifically see any communications, but my

13  analyst did run call log records and they did see communication

14  between Manuk Grigoryan and Marietta Terabelian.

15  Q    And what communications did your analyst identify?

16  A    I couldn't specifically state.  My understanding is that

17  they ran text messages and/or numbers of text messages and

18  numbers of calls that were made because we received subscriber

19  and subpoena results of a variety of mobile providers.

20  Q    So to be clear, your testimony -- and we will put that

21  aside for a second, but other than -- do you know if that was

22  one call, two calls, three calls, is it a text?  What was it?

23  A    I couldn't tell you what it was, all I recall my analyst

24  provide me a document that had a number of contacts or hits

25  which could be calls or text messages between Marietta

1    Terabelian and Manuk Grigoryan, the numbers associated with

2    them.

3    Q    Okay.  I will use your terminology, any hits from analyst

4    or otherwise between Arman Hayrapetyan and let's say, Richard

5    Ayvazyan?

6    A    Not that I recall, not off the top of my head.

7    Q    Did you receive any hits from Edward Paronyan and Richard

8    Ayvazyan?

9    A    No, not that I recall.

10   Q    Okay.  Did you see any hits with respect to any of the

11   other defendants sitting here between those same individuals?

12        So, in other words, Edward Paronyan, Arman Hayrapetyan,

13   and any of the defendants sitting here?

14   A    Not without reviewing that report.

15   Q    So, as you sit here today, you don't recall any other

16   hits?

17   A    I don't recall, no.

18   Q    Beyond hits from your analyst as you have defined it, did

19   you identify any social connection, so any knowledge whatsoever

20   that Arman Hayrapetyan knew, for example, Richard Ayvazyan?

21   A    No, not that I can recall.

22   Q    Okay.  And as part of your investigation, you have the

23   ability to search online, social media, Facebook, Twitter,

24   photos, right, that are online?

25   A    Yes.

1    Q    And you didn't see anything that would connect, for

2    example, about Arman Hayrapetyan and Richard Ayvazyan?

3    A    No, not that I recall.

4    Q    Same question with respect to Arman Hayrapetyan, and

5    anyone sitting here in the courtroom as a defendant?

6    A    No, not off the top of my head, I don't recall.

7    Q    Same question with respect to Edward Paronyan and any of

8    the defendants sitting here?

9    A    No, I can't recall.

10   Q    Okay.

11            THE COURT:  It's five o'clock, isn't it?

12            THE COURTROOM DEPUTY:  Yes, Your Honor.

13            THE COURT:  Yes, it is.  Let's take the recess, and

14   again the admonition that I previously gave to you, and we will

15   start again tomorrow at 9 o'clock promptly.

16                  Have a nice evening.

17            THE COURTROOM DEPUTY:  All rise.

18                (Jury exits the courtroom.)

19            THE COURTROOM DEPUTY:  Please be seated.

20            THE COURT:  How much longer do you intend to be?

21            MR. RAM:  Another 15 minutes, Your Honor.  We also

22   just received a production of some materials related to this

23   witness.  It may be slightly longer, depending on what is in

24   the production.

25            THE COURT:  Where did the production come from?

1          MR. FENTON:  Your Honor, I don't believe that is

2    true.  What production are you talking about?

3          MR. RAM:  We received from -- I will let my

4    colleague speak to it.  We received some related to this, this

5    morning.

6          MR. FENTON:  So, Your Honor, just to be clear, what

7    we provided to Mr. Ram were the exhibits that we were going to

8    use during cross-examination with the witness we did not

9    produce late discovery.

10         THE COURT:  Cross-examination of what witness?

11         MR. FENTON:  This witness.

12         THE COURT:  But this is not cross-examination, this

13   is direct examination.

14         MR. FENTON:  Your Honor, I am saying the government

15   anticipates that they will cross-examine -- they will

16   cross-examine Special Agent Palmerton and to give disclosure in

17   advance of that cross-examination, we produced exhibits that he

18   we were going to use during that cross-examination.

19         THE COURT:  Who are you going to cross-examine?

20         MR. FENTON:  So, Mr. Ram is doing the direct

21   examination.

22         THE COURT:  I know, no, he's not.  I overruled that

23   he can consider Palmerton as an adverse witness.  So,

24   Palmerton, if you call him, it would be on direct examination.

25         MR. FENTON:  We understood we would have the

```
 1   opportunity to ask questions of Special Agent Palmerton as
 2   well.
 3              THE COURT:  Yes, you will, but on direct
 4   examination.
 5              I mean, it will be in response to this
 6   examination, but the form of the questions will have to be non
 7   leading.
 8              MR. FENTON:  Understood, Your Honor.  The point I'm
 9   trying to make, we did not just produce discovery to the
10   defense with respect to Special Agent Palmerton.
11              THE COURT:  I am understanding.
12              MR. FENTON:  We produced those exhibits in advance.
13              MR. LITTRELL:  I want to make a objection and motion
14   to strike.  During that examination, Mr. Ram asked the witness
15   questions about contacts with various defendants.  I did not
16   know the answer to that.  But one of the answers offered was
17   there was some sort of communication with Manuk Grigoryan and
18   Ms. Terabelian.  So that actually calls for hearsay and
19   violates the confrontation clause.
20              THE COURT:  You didn't object at the time.
21              MR. LITTRELL:  I didn't see it coming, I didn't know
22   the answer.
23              THE COURT:  It was not out of the sky.  I mean, it
24   was a question, answer, question answer, and the question was a
25   broad one, and he answered.  There was nothing.
```

1          MR. LITTRELL:  Well, the answer was actually quite

2     harmful to Ms. Terabelian, I didn't have any discovery on that.

3          THE COURT:  He saw something.  I don't know how

4     would the government argue that, how harmful that would be?

5          MR. LITTRELL:  He said it was hits associated with

6     them, it wasn't really clear.

7          THE COURT:  Who is speaking here?

8          MR. LITTRELL:  This is Mr. Littrell.

9          MR. RAM:  Your Honor, the witness is still in the

10    courtroom.

11         THE COURT:  You keep in the courtroom.

12         MR. LITTRELL:  Don't go to far.  I would like to

13    explore with the government what he was referring to, and to

14    the extent that it would be a 403 objection because the hits he

15    was referring to or the communication don't really exist, I

16    would like to revisit that, and potentially preserve a

17    potential motion to strike that answer.

18         THE COURT:  All right.  But here is what I

19    understood from the question and answer.

20              He was asked about generally what contacts or

21    exchanges existed between one group of defendants and another.

22              And then the questions became a little bit

23    more specific about any particular defendant and one group and

24    another defendant and another group and then the -- and then I

25    think he actually -- I don't know if he was asked or

```
 1  volunteered that there was -- I think he said his analyst said
 2  that there were certain hits between them and the iPhones, I
 3  guess, of Terabelian and the iPhones or maybe I'm using -- I
 4  take it that is what hits are?
 5            MR. LITTRELL:  He said it was --
 6            THE COURT:  Between Terabelian and Grigoryan.  And
 7  he said that the analyst told him that there were some hits and
 8  he limited the hits to meaning that there was a recording of
 9  one phone connecting to another.  That was the extent of it.
10            MR. LITTRELL:  What he said there were hits to
11  numbers associated with him, so it's not clear, but either way
12  it was very harmful and --
13            THE COURT:  How would the government -- does the
14  government intend to argue that point in final argument?
15            MR. FENTON:  No, Your Honor.  Not with respect to --
16  not with respect to the communications.  But there is no
17  question that there are financial transfers.
18            THE COURT:  Don't argue more than my question.
19            MR. FENTON:  I wants to be clear.
20            THE COURT:  Everything is to me clear.  I'm getting
21  it.  If I'm unclear, I will tell you.
22                 The question is do you intend to make any kind
23  of argument in your final argument regarding Palmerton's
24  testimony about what his an analyst told him?
25            MR. FENTON:  No.
```

```
 1              THE COURT:  All right.  It's not going to be argued.
 2   You didn't make an objection, it's not going to be argued.  If
 3   you want to get into it, maybe they will belatedly wake up to
 4   that evidence.
 5              MR. LITTRELL:  Understood.
 6              THE COURT:  Do you want to get into it?  If you get
 7   into it, maybe they will go back and find what they might have
 8   looked at earlier.  I mean, you know, you tell me.
 9              MR. LITTRELL:  It's a very difficult position to be
10   in.
11              THE COURT:  I would let it be.
12              MR. LITTRELL:  I may well do that, what I'm going to
13   do is investigate what he actually saw, determine if I can
14   establish if it's false or misleading.
15              THE COURT:  What is that?
16              MR. LITTRELL:  I'm going to inquire with the
17   government and Special Agent Palmerton about what he's
18   referring to.  To the extent, you know, I will go from there.
19              THE COURT:  Anything you want.  But, you know, if
20   you get into this some further way, it may allow the government
21   to recover something that it might have overlooked.  I don't
22   know.
23              MR. RAM:  I would like to request any Jencks to the
24   extent the government plans on questioning Agent Palmerton,
25   and I want to front for the Court that we plan on objecting to
```

**UNITED STATES DISTRICT COURT**

```
 1    any examination beyond the scope.

 2                    We understand that some of the documents we

 3    received relate to, like, an Internet service provider, GoDaddy

 4    and I did not get into anything to do with VPNs or anything of

 5    that stuff with Agent Palmerton.  So if there is any questions

 6    on that front, we would object.

 7                    THE COURT:  Let me find out.  Are there any

 8    questions about that?

 9                    MR. FENTON:  Yes Your Honor.  There will be

10    questions about some of the exhibits that further establish the

11    link between Richard Ayvazyan and Iuliia Zhadko, that is the

12    thrust, that's what they are calling into question.

13                    THE COURT:  But then why don't didn't you call

14    Palmerton it your case?

15                    MR. FENTON:  We chose do call other agents.

16                    THE COURT:  But apparently what you are trying to

17    develop only can be developed through Palmerton?

18                    MR. FENTON:  That is not correct.

19                    THE COURT:  Then why are you calling him?

20                    MR. FENTON:  We're not calling him -- we're going to

21    ask questions of Special Agent Palmerton only because Mr. Ram

22    had asked questions of Special Agent Palmerton.

23                    THE COURT:  But the questions that I have allowed

24    come unto the general category of you didn't investigate this

25    or you didn't investigate that, and some questions about trying
```

```
1    to allude to the significance of investigating something or

2    not.

3                    I mean, if you want to ask him why he didn't

4    investigate what Mr. Ram is asking, you can.

5                    That would be a proper questioning within the

6    scope.

7                    But why -- if there is something that is

8    different than that, why didn't you call him in your case?

9            MR. FENTON:  Your Honor, I'm simply planning to

10   question him about what he did investigate in order to respond

11   to Mr. Ram's questions about what he did not investigate.

12           THE COURT:  I see.  And so you are trying to

13   establish that what he didn't investigate was adequate for this

14   investigation?

15           MR. FENTON:  Absolutely.  And had Mr. --

16           THE COURT:  Just wait until I finish.

17                    Then I think that if it's within that scope,

18   it's proper.

19           MR. FENTON:  Thank you, Your Honor.

20           MR. RAM:  We would still request the Jencks, Your

21   Honor.

22           THE COURT:  But Jencks meaning generally that is the

23   interview of a witness.  This witness wasn't interviewed, was

24   he?

25           MR. FENTON:  No, Your Honor, he's not.
```

```
 1              THE COURT:  How does Jencks come in?

 2              MR. RAM:  If he testified in the grand jury, we

 3    would ask request the grand jury transcript.

 4              MR. FENTON:  Your Honor, he's not our witness.  When

 5    Mr. Ram goes down this path, it suggests to me, the reason he

 6    called him in the first place was to get the grand jury

 7    transcript to which he was not otherwise entitled, and which he

 8    is not entitled now.

 9              THE COURT:  Well, I'm assuming, but, I will ask for

10    your representation.

11                   Is there anything in the grand jury transcript

12    or questions that were asked about why he didn't investigate

13    this or that?

14              MR. FENTON:  No.  No, Your Honor.

15              THE COURT:  All right.  Then I don't understand

16    there to be any Jencks material.  You have the report.  Has the

17    report of the agent been turned over in discovery?

18              MR. FENTON:  There is no report.  I mean, he's just

19    our agent.

20              THE COURT:  I see.

21              MR. FENTON:  We didn't call him.

22              THE COURT:  I know, but was there any -- I mean,

23    what agents do is they prepare 302s, right, when they

24    interview, correct?

25              MR. FENTON:  All of Special Agent Palmerton's 302s
```

```
 1    have been produced in discovery.
 2              THE COURT:  The 302s could relate to interviewing a
 3    witness or observing some other event?
 4              MR. FENTON:  Yes, Your Honor.  That has all been
 5    produced.
 6              MR. LITTRELL:  I will say I have seen nothing in the
 7    discovery to suggest what he has testified about, so I
 8    respectfully request --
 9              THE COURT:  Suggest what?
10              MR. LITTRELL:  This contact between Mr. Terabelian,
11    and Mr. Grigoryan.  I ask that the government produce anything
12    in its possession related to that alleged communication.
13              THE COURT:  You mean about the analyst stuff?
14              MR. LITTRELL:  What he said on the stand about
15    Manuk Grigoryan communicating with Ms. Terabelian.  I would ask
16    that under Jencks, Rule 16.
17              THE COURT:  I may have to -- I take it there isn't
18    anything, because if there was something, I would think the
19    government would have introduced it.
20              MR. FENTON:  Your Honor, there are telephone records
21    produced in discovery long, long ago and has been in
22    Mr. Littrell's possession a long time.
23              THE COURT:  Are you saying there are telephone
24    records which show the contacts between a phone number, which
25    is linked to defendant Grigoryan and a phone number that is
```

1   linked to defendant Terabelian?

2            MR. FENTON:  Yes, Your Honor.

3            THE COURT:  And are those phone records in evidence?

4            MR. FENTON:  I believe there are phone records in

5   evidence, I believe those particular records are indeed in

6   evidence, yes.

7            THE COURT:  Well, would you verify that overnight?

8            MR. FENTON:  I will verify them overnight, yes.  The

9   phone records.

10           MR. LITTRELL:  The phone records that are in

11  evidence in this case?

12           MR. FENTON:  Yes.  I don't have the trial exhibit

13  list in front of me.

14           MR. LITTRELL:  Was this is a phone that was

15  registered under the alias you claim was hers, Viktoria

16  Kauichko?

17           MR. FENTON:  We should ask Special Agent Palmerton.

18  We produced telephone records in this case.  All the telephone

19  records have been produced to Mr. Littrell.

20           THE COURT:  What you are saying is that the

21  telephone records that you have produced show hits or contacts

22  between Terabelian and Grigoryan?

23           MR. FENTON:  Yes, Your Honor, that is my

24  understanding.  The exhibits are 59A through 72.

25           THE COURT:  All right.  Well, everybody take a look

```
 1   at those.  How much longer do you think you are going to be?
 2             MR. RAM:  About 15 or 20 minutes, Your Honor.
 3             THE COURT:  Now, Mr. Mesereau said he was going to
 4   call a witness or two.
 5                  I thought you said you thought that would take
 6   about an hour?
 7             MR. MESEREAU:  I'm talking about my client.
 8             THE COURT:  You are talking about your client?
 9             MR. MESEREAU:  Yes, Your Honor.  I may have a few
10   questions of this witness, too.
11             THE COURT:  And then you are going to call your
12   client?
13             MR. MESEREAU:  If there aren't any other witnesses.
14             THE COURT:  Maybe I'm not understanding this.  It's
15   getting late in the day, probably my fault.  Did you say you
16   are going to call your client as a witness?
17             MR. MESEREAU:  Yes, Your Honor.
18             MR. RAM:  Your Honor, I would like to revisit the
19   scope issue tomorrow.
20                  It's one thing to say you didn't conduct an
21   investigation looking into bank records, and then it's another
22   thing to say, oh, we're going to bring information about VPNs.
23   The VPNs are not the answer to why someone driver's license
24   like Rita Grigoryan wasn't -- there was no investigation
25   towards her.
```

```
 1              THE COURT:  All right.  Briefly, what is the -- now
 2    the VPNs, I'm not at all expert in this, but the VPNs in my own
 3    shorthand way is some way you can use some sort of provider, I
 4    guess, to allow you to make it appear that the phone you are
 5    using is not emanating from the actual location, but some other
 6    location.
 7                   Is that the general idea?
 8              MR. FENTON:  That is correct, Your Honor.  But
 9    Mr. Ram is incorrect.  We're not planning to -- we're not
10    planning to ask Special Agent Palmerton about VPN.
11              THE COURT:  What you going to ask him?
12              MR. FENTON:  Whatever Mr. Ram's says he didn't
13    investigate, we're going to talk about what he did investigate
14    to establish that he investigated the -- he covered the
15    relevant basis.
16              THE COURT:  You should be able to do that quickly.
17              MR. FENTON:  I will.
18              MR. LITTRELL:  I will look at this further, I think
19    I will address it when I'm more informed.
20              THE COURT:  Let's wait to that point.
21              MR. LITTRELL:  I may be asking for a curative
22    instruction, Your Honor.
23              THE COURT:  Whatever, yeah.
24                   The Court has been reviewing the jury
25    instructions as the case has been proceeding, but I'm not in a
```

1   position yet to give you my proposed jury instructions, what I

2   plan to do is give you, what I think are the appropriate jury

3   instructions are and then give you some time to look at them

4   and then have a hearing and get your objections or thoughts or

5   corrections or whatever.

6                    But what I hope to do is by some time

7   tomorrow, give you the proposed jury instructions so if the

8   case does wind down, hopefully by lunch or shortly thereafter,

9   we can you have a little hearing about the jury instructions.

10                   Let me ask you something, just ballpark from

11  the government, in your final argument, how long do you think

12  you are going to argue in your opening?

13           MR. FENTON:  One and a half to two hours.

14           THE COURT:  Okay.  You know something, my experience

15  is -- it's just my experience -- that after a certain period of

16  time you are talking to the wall, but lawyers have their way.

17                   So, what about the defendants, just a general

18  estimate?

19           MR. JOHNSON:  This is Peter Johnson.  We still have

20  it available to call Mr. Vahe Dadyan, and --

21           THE COURT:  Do you think you will?

22           MR. JOHNSON:  I might.

23           THE COURT:  All right.  And what about -- just, you

24  know, the Ayvazyan people, how lengthy do you think you are

25  going to argue?

```
 1            MR. MESEREAU:  45 minutes probably, Your Honor.

 2            THE COURT:  45 minutes or less?

 3            MR. MESEREAU:  Yes.

 4            THE COURT:  What about the other Ayvazyan?

 5            MR. RAM:  Probably an hour, Your Honor.

 6            THE COURT:  And Terabelian?

 7            MR. LITTRELL:  Certainly probably 45 minutes or

 8   less.

 9            THE COURT:  Less probably.  Usually it comes up

10   less -- I mean, there is a lot of documents, but you are all

11   very, you know, seasoned lawyers, and, you know that it's a

12   mistake to use final argument to walk the jury through all of

13   the exhibits.

14                 I mean, you know it's selective and it's

15   schematic, so I mean do it however you believe is best for your

16   clients.

17                 So what I'm thinking is, and tell me if this

18   is kind of ballpark, that we finish the case, the evidence some

19   time in the early afternoon; is that a reasonable

20   approximation?  Does that sound right?  Does it sound right?

21            MR. RAM:  Yes, Your Honor.  We're not calling any

22   more witnesses.

23            THE COURT:  Okay.

24            MR. RAM:  We do have one witness we're going to call

25   after this.
```

```
1              THE COURT:  Short?

2              MR. RAM:  Short.

3              THE COURT:  Who is that?

4              MR. KEOUGH:  Just briefly, it's a summary witness

5   who prepared some charts about IP addresses that we believe

6   will be helpful to the jury, and summarize voluminous records

7   under 1006.

8              THE COURT:  I see.  Has that been shown it to

9   government?

10             MR. KEOUGH:  Yes.  We prepared it this morning and

11  we gave it to them at lunchtime shortly after it was prepared.

12             THE COURT:  What is your reaction to the exhibit?

13             MR. FENTON:  I'm a little surprised.  I have not yet

14  seen it.

15             THE COURT:  Well, 1006 requires an exchange of

16  summary documents in advance, such that the opposing party has

17  a chance to comprehend the underlying data.

18             MR. KEOUGH:  Two points, Your Honor.  One is that I

19  can represent at 12:47 is when we sent it to the government

20  today.

21             THE COURT:  What was that?

22             MR. KEOUGH:  At 12:47 p.m. is when we provided a

23  copy of the chart.

24             THE COURT:  Is that today?

25             MR. KEOUGH:  Yes.  And everything referenced in the
```

```
 1    summary charts is an exhibit.  I believe they have all been
 2    admitted into evidence.  If not, they have been produced in
 3    discovery, but I am fairly certain they are into evidence.
 4              MR. FENTON:  We have not seen the chart.
 5              THE COURT:  Well, look at it overnight.
 6              MR. FENTON:  We reserve our right to move to exclude
 7    it.
 8              THE COURT:  Well, I will hear it, if you have some
 9    reason to.  Read it tonight, stay up light late.  Don't watch
10    TV.
11              MR. FENTON:  Will do.  Thank you, Your Honor.
12              THE COURT:  And if the schedule gets too late in the
13    day, what I may do is tell the jury to go home, and we will
14    start fresh with the arguments on Thursday morning, so that the
15    arguments are -- the arguments follow one another, and we can
16    get it all done.
17              THE COURTROOM DEPUTY:  All rise.  This Honorable
18    Court is now adjourned.
19                  (The proceedings concluded at 5:22 p.m.)
20                              *  *  *
21
22
23
24
25
```

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  June 23, 2021

17

18

19                          /s/ TERRI A. HOURIGAN

20         _____
                TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                  Federal Official Court Reporter

22

23

24

25

## $

**$10,000** [4] - 116:4, 116:7, 116:8, 116:11
**$124,000** [1] - 39:12
**$130,000** [1] - 39:17
**$130,187** [1] - 40:2
**$137,500** [1] - 39:22
**$149,900** [2] - 40:11, 40:22
**$182,637** [1] - 39:8
**$3.25** [1] - 51:14
**$384,100** [1] - 41:2
**$384,150** [1] - 45:16
**$50,000** [2] - 60:13, 60:23
**$600,000** [7] - 81:9, 82:3, 83:4, 83:8, 83:24, 88:10, 89:20
**$63,125** [1] - 19:14
**$75,000** [2] - 59:6, 60:5

## /

**/s** [1] - 165:19

## 1

**1** [18] - 2:18, 16:19, 37:25, 38:5, 38:7, 38:9, 38:11, 39:8, 46:18, 46:20, 57:23, 80:16, 80:17, 107:3, 107:6, 116:4, 134:24
**1-N** [4] - 60:16, 60:17, 62:5, 62:6
**1-R** [1] - 18:14
**10** [3] - 5:4, 27:2, 138:3
**10036** [1] - 2:16
**1006** [2] - 163:9, 163:17
**1028A** [2] - 45:12, 66:2
**105357** [1] - 92:5
**10537** [1] - 12:16
**10_69** [1] - 28:8
**10_70** [1] - 28:19
**11** [3] - 45:15, 92:16
**1114** [1] - 2:15
**115** [3] - 51:2, 61:13, 61:14
**116** [2] - 61:13, 61:14
**11th** [1] - 39:22
**12** [2] - 65:20, 66:11
**12:47** [2] - 163:21, 163:24
**13** [4] - 134:22, 136:21, 136:23, 138:8

## 2

**2-N** [1] - 50:9
**20** [4] - 4:5, 42:2, 128:21, 159:4
**20-579-SVW** [1] - 1:7
**20036** [1] - 2:22
**2014** [3] - 80:2, 83:4, 86:11
**2016** [1] - 83:6
**2016/17** [1] - 88:12
**2017** [7] - 83:6, 86:13, 125:11, 125:18, 125:22, 127:8, 128:25
**2018** [1] - 49:4
**2019** [1] - 86:14
**2020** [63] - 11:19, 12:14, 18:19, 37:25, 38:3, 38:4, 38:5, 38:7, 38:9, 39:9, 39:13, 39:18, 39:23, 40:3, 40:8, 40:12, 40:17, 40:23, 41:3, 41:8, 46:20, 46:21, 92:1, 92:2, 94:21, 95:3, 95:14, 95:17, 96:15, 96:16, 96:23, 101:5, 103:9, 104:1, 104:6, 104:20, 126:2, 126:3, 126:5, 126:11, 128:3, 128:9, 129:10,

129:22, 130:16, 130:20, 131:7, 133:3, 133:9, 133:13, 133:17, 134:9, 136:9, 136:10, 136:17, 136:18, 136:19, 137:1
**2021** [7] - 1:13, 6:1, 38:11, 38:12, 101:13, 136:25, 165:16
**213** [1] - 1:25
**216** [1] - 3:11
**21st** [1] - 50:15
**22** [3] - 1:13, 6:1, 17:18
**22nd** [9] - 11:19, 12:7, 12:9, 40:23, 96:14, 96:15, 96:16, 96:23, 97:1
**23** [1] - 165:16
**24** [2] - 4:6, 65:9
**25** [1] - 42:2
**26** [1] - 57:23
**28** [2] - 38:11, 165:9
**285** [1] - 11:10
**28th** [3] - 94:20, 95:14, 95:17
**29** [3] - 57:18, 61:9, 65:6
**29(a)** [1] - 42:10
**29A** [1] - 43:4
**2nd** [2] - 12:2, 137:1

## 3

**3** [12] - 5:6, 135:24, 142:18, 142:19, 142:22, 143:1, 143:2, 143:9, 143:11, 143:13, 143:14, 144:18
**30-I** [1] - 141:20
**302s** [3] - 156:25, 157:2, 157:4
**30th** [1] - 8:1
**31** [4] - 37:25, 38:5, 38:7, 38:9
**312** [1] - 2:7
**31st** [2] - 38:3, 41:2
**33** [1] - 20:6
**3330** [2] - 27:8, 27:10
**3338** [1] - 27:10
**337** [1] - 49:21
**34** [1] - 19:13
**350** [2] - 1:24, 3:4
**36** [1] - 4:6
**37** [1] - 49:12
**3838** [2] - 1:23, 165:20
**3900** [1] - 2:18

## 4

**4** [8] - 5:6, 142:18, 142:19, 142:22, 143:1, 143:9, 143:11, 144:18
**4-0** [1] - 50:9
**4-Q** [1] - 50:9
**403** [9] - 31:13, 32:12, 32:13, 87:13, 88:6, 88:19, 129:12, 151:16
**409** [1] - 3:15
**41** [1] - 27:25
**42** [2] - 73:19, 75:6
**4311** [1] - 1:24
**45** [3] - 162:3, 162:4, 162:9
**46(a** [1] - 46:11
**485** [1] - 46:4

## 5

**5** [5] - 1:12, 39:12, 80:15, 80:17, 80:19
**5-C** [1] - 50:9
**50** [1] - 59:5
**5204** [1] - 27:25
**5205** [1] - 28:1
**530** [1] - 38:22
**532** [1] - 37:23
**54.88.74.128** [2] - 11:22, 12:2
**55** [1] - 14:3
**551** [1] - 38:22
**59A** [1] - 159:1
**5:22** [1] - 164:21
**5th** [2] - 2:12, 3:7

## 6

**6** [4] - 4:5, 7:25, 14:23, 18:5
**60** [3] - 53:11, 53:16, 115:15
**600,000** [2] - 81:4, 83:10
**601** [1] - 3:7
**611(c)(2)** [1] - 99:17
**6150** [2] - 49:21, 73:9
**63,125** [2] - 19:10, 19:12
**633** [1] - 2:12
**651** [1] - 3:15
**6921** [1] - 143:18

## 7

**7** [2] - 12:4, 39:17
**72** [1] - 159:1

## 8

**8** [5] - 15:14, 17:7, 40:2, 60:17
**834** [3] - 141:16, 141:24, 143:6
**85** [1] - 4:8
**88** [2] - 75:4, 75:6
**894-2849** [1] - 1:25

## 9

**9** [6] - 16:5, 16:11, 44:4, 45:7, 45:9, 148:17
**90** [1] - 4:9
**90012** [2] - 1:24, 2:8
**90071** [2] - 2:13, 3:8
**90277** [1] - 3:16
**903** [1] - 3:4
**91** [1] - 4:11
**91208** [1] - 3:11
**92** [1] - 5:5
**92673** [1] - 3:5
**9317** [1] - 27:20
**937** [1] - 46:4
**94** [1] - 4:13
**94105** [1] - 2:19
**95** [1] - 4:14
**96** [1] - 4:14
**97** [1] - 4:15
**99** [1] - 4:17
**9:02:11** [1] - 10:12

## A

**abandoned** [1] - 142:11
**ability** [1] - 147:25
**able** [2] - 31:3, 160:18
**above-entitled** [1] - 165:12
**absence** [1] - 65:15
**absolutely** [4] - 16:8, 35:4, 54:17, 67:22, 75:25, 78:2, 155:17
**accept** [1] - 38:19
**access** [2] - 11:13, 11:14
**according** [1] - 55:11
**account** [57] - 10:23, 11:13, 11:14, 13:13, 14:17, 15:6, 15:9,

15:10, 17:11, 17:13, 17:15, 17:17, 17:20, 17:23, 18:8, 18:9, 18:12, 18:13, 18:16, 19:3, 19:12, 19:16, 28:24, 39:9, 39:13, 39:18, 39:23, 40:3, 40:8, 40:13, 40:17, 40:24, 41:3, 44:3, 44:5, 44:10, 44:13, 45:11, 45:17, 45:18, 46:3, 50:14, 51:6, 60:15, 73:24, 74:2, 74:10, 74:25, 75:5, 75:19, 75:20, 75:24, 76:20, 76:25, 84:17, 116:15, 116:16

**accounts** [17] - 15:7, 34:16, 51:13, 52:15, 52:17, 53:5, 74:14, 75:13, 76:7, 102:16, 108:12, 109:20, 113:9, 121:13, 130:23, 131:17

**accurate** [2] - 73:7, 101:7

**accusing** [1] - 129:9

**ACH** [1] - 73:23

**acquainted** [1] - 118:13

**acquittal** [3] - 42:10, 43:16, 57:18

**act** [1] - 105:4

**action** [1] - 44:7

**actively** [1] - 44:13

**activity** [1] - 46:9

**acts** [1] - 44:21

**actual** [2] - 74:23, 160:7

**actus** [1] - 55:9

**add** [1] - 68:16

**added** [2] - 118:9, 123:5

**addition** [2] - 50:8, 50:12

**additional** [4] - 20:4, 67:10, 88:13, 101:17

**address** [18] - 11:8, 11:22, 18:1, 27:22, 43:1, 49:23, 50:1, 50:10, 54:20, 60:13, 61:18, 78:12, 124:10, 124:17, 124:25, 142:5, 144:22, 160:21

**addressed** [5] - 60:20, 61:14, 143:2, 143:17, 143:24

**addresses** [2] - 11:14, 163:7

**addressing** [1] - 57:1

**adequate** [2] - 122:24, 155:15

**adequately** [1] - 24:5

**adjourned** [1] - 164:20

**administered** [5] - 79:3, 85:13, 91:6, 93:23, 98:18

**Administration** [1] - 40:12

**admissible** [1] - 30:12

**admit** [2] - 15:19, 143:8

**admitted** [7] - 26:6, 69:15, 92:11, 107:3, 121:25, 141:19, 164:4

**admonition** [1] - 148:16

**adopt** [1] - 57:7

**advance** [3] - 149:19, 150:14, 163:18

**adverse** [1] - 149:25

**advice** [1] - 90:16

**AFTERNOON** [1] - 1:12

**afternoon** [5] - 6:18, 6:19, 20:22, 20:23, 65:4, 85:24, 91:10, 91:18, 91:19, 94:7, 95:25, 96:1, 99:5, 99:6, 162:21

**agencies** [5] - 100:14, 100:17, 100:19, 100:20, 100:21

**agent** [5] - 33:19, 99:12, 100:11, 156:19, 156:21

**Agent** [39] - 12:13, 14:6, 15:3, 24:11, 25:19, 26:5, 26:14, 27:4, 28:20, 29:10, 31:1, 31:11, 31:20, 31:21, 31:24, 32:2, 33:17, 36:24, 93:7, 98:14, 99:21, 100:23, 109:24, 110:3, 110:5, 115:5, 136:24, 149:18, 150:3, 150:12, 153:19, 154:1, 154:7, 154:23, 154:24, 157:2, 158:19, 160:12

**agents** [4] - 99:10, 118:17, 154:17, 156:25

**aggravated** [11] - 45:12, 45:20, 52:4,

65:10, 65:23, 66:21, 69:21, 70:17, 70:20, 71:22, 125:11

**ago** [8] - 7:7, 12:6, 36:14, 70:24, 99:9, 113:16, 114:9, 157:23

**agree** [4] - 35:21, 63:19, 68:9, 70:22

**agreed** [1] - 38:17

**agreement** [2] - 39:1, 39:5

**ahead** [12] - 15:4, 32:16, 62:11, 76:21, 78:16, 95:10, 100:7, 114:22, 125:23, 127:5, 135:11, 143:13

**AHN** [9] - 2:5, 94:23, 95:6, 95:8, 95:22, 95:24, 96:17, 97:17, 98:8

**Ahn** [1] - 4:14

**ahn** [1] - 4:15

**aka** [1] - 40:23

**al** [1] - 1:8

**albeit** [1] - 47:25

**alias** [6] - 76:1, 78:2, 105:7, 105:19, 105:25, 158:17

**aliases** [3] - 51:21, 106:2, 106:3

**alive** [1] - 126:3

**allegations** [1] - 90:21

**alleged** [7] - 39:7, 45:2, 45:14, 46:10, 138:12, 139:20, 157:14

**allegedly** [7] - 59:10, 69:16, 71:6, 76:9, 137:8, 137:19, 139:16

**allow** [9] - 26:11, 57:6, 85:6, 89:14, 106:13, 106:16, 121:3, 153:22, 160:6

**allowed** [1] - 154:25

**allowing** [2] - 122:11, 122:25

**allows** [2] - 46:25, 86:7

**Allstate** [8] - 21:1, 21:3, 21:15, 23:6, 23:21, 24:18, 39:14, 68:8

**allude** [1] - 155:3

**alone** [2] - 46:14, 53:18

**alongside** [1] - 52:16

**Alpha** [1] - 3:11

**amend** [1] - 42:12

**Amenecer** [1] - 3:4

**AMERICA** [1] - 1:5

**America** [3] - 17:11, 40:18, 109:17

**Americas** [1] - 2:15

**amidst** [1] - 54:5

**amount** [4] - 19:10, 19:11, 80:25, 141:1

**analyses** [1] - 130:22

**analysis** [1] - 102:6

**analyst** [9] - 146:15, 146:17, 146:25, 147:5, 147:20, 152:3, 152:9, 153:1, 157:15

**analyze** [1] - 102:16

**angel** [2] - 87:3, 87:24

**Angeles** [6] - 2:8, 2:13, 3:8, 91:23, 94:13, 143:19

**ANGELES** [4] - 1:14, 1:24, 6:1, 165:3

**angels** [1] - 88:14

**ankle** [3] - 96:10, 96:12, 96:22

**Anna** [22] - 17:5, 25:21, 36:25, 41:9, 65:11, 65:17, 65:19, 66:11, 66:13, 67:4, 67:5, 67:7, 67:10, 67:12, 69:17, 70:15, 70:16, 70:19, 70:23, 71:8, 71:15, 72:22

**answer** [39] - 7:15, 7:18, 7:20, 8:17, 8:24, 58:23, 68:23, 81:17, 82:1, 88:23, 117:13, 120:1, 124:3, 129:15, 130:11, 131:9, 131:15, 132:4, 132:7, 132:11, 132:13, 132:25, 133:18, 133:25, 134:2, 134:6, 136:13, 139:4, 140:14, 150:18, 150:24, 151:1, 151:3, 151:19, 151:21, 159:25

**answered** [4] - 20:14, 89:4, 133:10, 151:2

**answers** [1] - 150:18

**Anthony** [2] - 29:22, 31:20

**anticipate** [1] - 44:24

**anticipates** [1] - 149:17

**Anton** [14] - 7:2, 7:10, 7:12, 8:1, 9:3, 9:16, 9:24, 10:2, 10:4, 16:25, 105:11,

105:13, 105:25, 106:1

**anxious** [1] - 56:20

**anyway** [1] - 83:7

**apart** [1] - 68:4

**apartment** [6] - 49:20, 73:18, 73:20, 73:21, 74:25, 75:9

**apologize** [3] - 63:21, 79:15, 136:7

**app** [1] - 97:9

**appear** [2] - 19:13, 160:6

**APPEARANCES** [1] - 2:1

**Appearances** [1] - 3:1

**appeared** [1] - 12:6

**applicable** [2] - 65:8, 77:21

**application** [6] - 24:24, 41:7, 64:16, 64:19, 68:6, 68:12

**applications** [10] - 24:15, 43:24, 43:25, 49:24, 49:25, 50:9, 64:17, 67:11, 67:13, 102:10

**applied** [5] - 68:5, 96:23, 102:20, 119:8, 120:21

**applies** [1] - 46:2

**apply** [4] - 68:2, 90:10, 119:1, 119:5

**applying** [4] - 45:23, 90:17, 118:20, 123:7

**appreciated** [3] - 78:17, 82:6, 84:1

**approach** [4] - 31:16, 78:23, 78:25, 92:12

**approached** [4] - 31:20, 118:19, 119:1, 119:5

**approaching** [1] - 44:16

**appropriate** [3] - 122:16, 128:11, 161:4

**approvals** [1] - 23:12

**approximation** [1] - 162:22

**April** [1] - 12:2

**arguably** [1] - 46:13

**argue** [23] - 30:8, 30:12, 30:23, 33:10, 35:18, 48:19, 49:6, 61:23, 62:4, 73:13, 75:22, 75:23, 75:25, 83:9, 84:23, 106:19, 128:13, 151:6, 152:16, 152:20, 161:14, 162:2

**argued** [2] - 153:3, 153:4
**arguing** [5] - 34:23, 35:15, 58:6, 67:3, 72:21
**argument** [36] - 20:15, 33:21, 33:22, 33:23, 33:25, 55:11, 56:8, 56:18, 56:24, 57:6, 57:15, 58:3, 58:12, 59:8, 60:10, 61:22, 62:10, 63:9, 64:20, 65:2, 66:17, 69:22, 77:14, 78:1, 78:14, 83:13, 84:21, 123:11, 131:8, 141:3, 152:16, 152:25, 161:13, 162:14
**arguments** [7] - 32:12, 57:19, 65:7, 77:21, 164:16, 164:17
**Aria** [3] - 19:19, 19:21, 19:25
**Arizona** [1] - 41:10
**Arkansas** [1] - 41:5
**Arman** [45] - 52:16, 101:25, 104:14, 109:10, 111:15, 111:20, 111:25, 112:5, 112:13, 112:14, 112:18, 113:2, 113:3, 113:7, 113:16, 113:23, 114:1, 114:8, 114:10, 115:2, 115:4, 115:7, 115:10, 116:2, 116:11, 116:13, 116:14, 116:19, 116:22, 117:12, 117:15, 117:16, 117:20, 117:24, 118:5, 121:6, 126:2, 145:7, 146:9, 147:6, 147:14, 147:22, 148:4, 148:6
**arrangement** [1] - 81:8
**arrest** [7] - 12:19, 12:21, 12:22, 12:23, 125:18, 127:8, 128:25
**arrested** [4] - 46:7, 47:12, 77:5, 125:10
**arrests** [1] - 127:13
**arrived** [2] - 94:20, 97:6
**Arthur** [16] - 20:24, 21:20, 22:1, 22:11, 23:15, 37:4, 65:3, 65:5, 65:8, 67:25, 68:1, 70:3, 70:6,

70:11, 101:11, 146:11
**Arthur's** [1] - 70:13
**articles** [1] - 23:2
**Artur** [6] - 65:10, 65:16, 66:12, 66:23, 67:4, 72:16
**ARTUR** [1] - 3:9
**Artur's** [1] - 72:7
**ASHWIN** [1] - 2:11
**aside** [4] - 48:18, 48:19, 118:1, 146:23
**aspect** [2] - 61:19, 86:25
**assessment** [1] - 84:14
**assigned** [4] - 91:24, 94:15, 99:12, 105:7
**Assistant** [1] - 2:6
**associated** [10] - 52:14, 76:25, 105:11, 105:16, 108:12, 133:4, 135:14, 147:3, 151:7, 152:13
**association** [1] - 109:6
**assumes** [3] - 108:1, 133:24, 141:2
**assuming** [2] - 123:22, 156:11
**ATM** [1] - 116:11
**attached** [1] - 61:13
**attachments** [1] - 28:13
**attempt** [2] - 23:18, 115:4
**attempted** [2] - 108:5, 110:2
**attempting** [2] - 30:16, 127:3
**attended** [1] - 90:19
**attention** [4] - 10:25, 27:3, 27:8, 91:25
**Attorney** [8] - 2:12, 2:15, 2:18, 2:21, 3:4, 3:7, 3:10, 3:15
**ATTORNEY'S** [1] - 2:4
**Attorneys** [1] - 2:6
**attributable** [1] - 43:25
**audience** [1] - 86:8
**August** [8] - 37:25, 38:3, 38:5, 38:7, 38:9, 41:8, 46:21, 77:7
**Ausia** [1] - 6:20
**authenticated** [1] - 16:16
**authorities** [1] - 56:4
**auto** [1] - 27:18
**Auto** [11] - 40:4,

40:18, 120:19, 120:21, 121:9, 121:12, 121:14, 121:16, 121:21, 124:9, 124:25
**available** [6] - 21:8, 37:14, 84:6, 103:9, 103:15, 161:22
**Avakyan** [4] - 133:23, 134:7, 134:10, 135:13
**avatar** [2] - 104:24, 105:7
**Avenue** [3] - 2:15, 2:21, 49:21
**averments** [1] - 77:22
**aware** [23] - 22:17, 37:6, 65:17, 72:22, 81:23, 103:6, 103:8, 103:13, 103:21, 108:15, 111:18, 111:19, 111:24, 118:19, 119:4, 120:18, 121:23, 122:12, 122:20, 136:11, 138:5, 139:16
**AYVAZYAN** [3] - 1:8, 2:10, 3:9
**Ayvazyan** [73] - 12:9, 20:10, 20:24, 21:20, 22:1, 22:11, 23:15, 25:3, 29:6, 29:11, 31:12, 33:11, 33:14, 33:16, 33:17, 33:20, 34:1, 34:2, 34:4, 34:24, 35:12, 36:2, 37:4, 42:9, 46:13, 49:13, 49:15, 51:4, 52:14, 52:19, 52:22, 65:3, 65:5, 65:8, 65:10, 65:16, 66:12, 66:23, 66:25, 72:16, 74:13, 79:17, 80:8, 82:14, 87:8, 87:12, 87:17, 88:2, 88:17, 89:1, 89:18, 90:11, 90:14, 93:16, 95:15, 95:17, 96:12, 96:23, 100:12, 101:10, 101:11, 104:13, 110:21, 111:2, 146:12, 147:7, 147:10, 147:22, 148:4, 154:13, 162:1, 162:6
**Ayvazyan's** [9] - 26:15, 43:15, 49:8, 52:15, 67:4, 67:25, 68:1, 90:16, 94:15

**Aziz** [1] - 27:13

# B

**background** [4] - 21:6, 23:11, 110:11, 126:19
**bad** [2] - 31:3, 82:13
**ballpark** [4] - 80:13, 80:14, 161:12, 162:20
**bank** [40] - 7:12, 7:22, 7:24, 10:22, 10:23, 11:13, 11:14, 38:1, 38:4, 38:6, 38:8, 38:10, 38:12, 43:21, 44:3, 45:16, 46:16, 51:6, 51:7, 51:8, 52:15, 54:19, 55:4, 55:5, 75:13, 75:19, 76:7, 76:25, 77:6, 84:24, 108:12, 108:22, 109:20, 113:9, 116:15, 116:16, 118:5, 131:17, 159:23
**Bank** [24] - 11:13, 17:11, 38:1, 38:4, 38:6, 38:8, 38:10, 39:9, 39:13, 39:18, 39:23, 40:3, 40:8, 40:13, 40:18, 40:23, 40:24, 41:3, 60:15, 109:17
**banking** [1] - 119:22
**banks** [1] - 75:5
**bargain** [1] - 59:13
**base** [1] - 73:12
**based** [13] - 29:4, 42:21, 55:8, 55:22, 76:23, 77:2, 86:2, 87:23, 102:6, 116:2, 117:15, 118:12
**baseline** [1] - 54:25
**basic** [4] - 62:12, 63:9, 63:11, 141:9
**basis** [4] - 85:7, 103:20, 140:23, 160:17
**Basnikyan** [4] - 6:21, 7:9, 8:6, 10:8
**Beach** [1] - 3:16
**bears** [1] - 43:5
**became** [5] - 86:14, 86:24, 103:9, 103:14, 151:24
**become** [1] - 30:21
**began** [1] - 102:8
**begin** [1] - 43:21
**begins** [2] - 31:18, 79:1

**behalf** [2] - 57:17, 120:21
**belatedly** [1] - 153:5
**belonged** [1] - 26:22
**belonging** [4] - 10:22, 15:7, 36:25, 37:3
**benefit** [3] - 53:21, 59:12, 59:13
**benefits** [1] - 124:24
**best** [2] - 126:4, 162:17
**better** [1] - 142:8
**between** [47] - 25:3, 27:6, 37:6, 45:18, 50:6, 57:12, 59:16, 66:25, 80:15, 97:24, 98:1, 98:3, 102:16, 103:7, 103:14, 103:24, 104:5, 104:19, 107:13, 109:6, 111:19, 111:24, 119:12, 119:21, 119:22, 120:1, 121:17, 130:23, 131:1, 132:22, 138:24, 139:5, 144:15, 145:7, 146:4, 146:13, 146:16, 147:2, 147:6, 147:13, 151:23, 152:4, 152:8, 154:13, 157:12, 158:1, 158:24
**Beverly** [1] - 141:22
**beyond** [11] - 30:2, 32:20, 45:20, 45:24, 46:15, 46:25, 53:19, 90:23, 119:11, 147:20, 154:3
**Beyond** [1] - 31:15
**BIENERT** [2] - 3:3, 3:6
**big** [1] - 86:16
**binder** [1] - 142:20
**biometric** [1] - 97:8
**bit** [4] - 66:16, 88:4, 102:5, 151:24
**blank** [1] - 69:1
**block** [1] - 59:1
**Bluevine** [3] - 17:23, 17:25, 18:1
**border** [3] - 48:23, 75:3, 75:8
**bore** [1] - 58:25
**born** [2] - 36:15, 126:5
**borne** [1] - 42:19
**bottom** [1] - 17:23
**bought** [1] - 34:9
**box** [1] - 143:2

**boxes** [1] - 27:16
**bracelet** [3] - 96:10, 96:12, 96:22
**Bradford** [2] - 87:23, 89:2
**break** [2] - 10:12, 78:11
**brief** [9] - 20:25, 31:6, 54:13, 56:5, 57:16, 58:14, 66:19, 75:10, 96:18
**briefcase** [1] - 56:12
**briefly** [15] - 54:23, 56:23, 60:1, 60:12, 63:24, 65:9, 69:21, 72:14, 73:22, 87:19, 90:3, 90:6, 109:14, 160:3, 163:6
**bring** [8] - 11:25, 14:2, 30:16, 32:18, 77:23, 92:10, 116:14, 159:24
**broad** [1] - 151:2
**broke** [1] - 6:20
**brother** [1] - 66:25
**build** [3] - 86:17, 86:18, 87:7
**built** [1] - 86:9
**bullet** [2] - 66:22, 67:2
**bunch** [1] - 22:5
**burden** [2] - 41:21, 43:5
**Business** [2] - 40:12, 41:8
**business** [9] - 74:10, 76:9, 84:11, 86:18, 86:25, 90:13, 117:9, 124:10, 124:25
**butcher** [1] - 107:9
**butchering** [1] - 136:7
**buy** [7] - 33:13, 34:15, 50:18, 50:19, 50:22, 50:23, 53:8
**buying** [1] - 128:2
**BY** [120] - 2:5, 2:11, 2:14, 2:17, 3:3, 3:6, 3:14, 6:17, 7:8, 7:23, 8:13, 9:2, 9:23, 10:18, 11:15, 13:2, 14:15, 16:24, 20:21, 21:19, 22:16, 24:10, 25:13, 25:18, 26:4, 26:13, 29:9, 29:16, 31:10, 36:23, 85:23, 87:16, 87:20, 88:16, 88:25, 89:6, 89:16, 90:9, 91:21, 92:15, 92:25, 94:10, 95:11, 95:24,

96:21, 97:17, 99:8, 99:20, 100:6, 103:5, 103:12, 103:23, 104:4, 104:18, 105:10, 105:18, 106:20, 107:1, 107:19, 107:24, 108:9, 110:19, 110:24, 111:10, 111:23, 112:3, 112:17, 112:23, 113:15, 114:24, 117:6, 118:24, 119:6, 119:18, 119:24, 120:6, 121:4, 122:17, 123:1, 123:18, 123:24, 124:20, 125:8, 125:14, 125:17, 125:21, 125:24, 127:6, 127:22, 128:6, 128:19, 128:24, 129:4, 129:7, 129:16, 129:19, 130:1, 130:12, 131:4, 131:16, 132:5, 132:17, 133:1, 133:21, 134:4, 134:20, 135:12, 136:15, 137:12, 137:22, 138:2, 139:3, 139:15, 140:9, 140:20, 141:8, 143:12, 144:1, 145:20, 146:5

**C**

**CALIFORNIA** [5] - 1:2, 1:14, 1:24, 6:1, 165:4
**California** [30] - 2:8, 2:13, 2:19, 3:5, 3:8, 3:11, 3:16, 22:1, 22:17, 22:20, 23:3, 23:5, 23:25, 39:11, 40:1, 40:6, 40:20, 40:21, 41:10, 51:10, 54:3, 54:5, 54:11, 54:12, 69:12, 69:16, 94:13, 95:18, 143:19, 165:8
**Calle** [5] - 3:4, 8:11, 141:16, 141:24, 143:6
**cannot** [4] - 13:24, 46:11, 88:23, 107:13
**Canoga** [3] - 49:21, 73:9, 73:18
**cap** [1] - 80:7
**capacity** [1] - 113:6
**Capital** [1] - 38:12

**capital** [6] - 17:13, 80:22, 80:25, 81:9, 81:10, 81:15
**capitalists** [1] - 88:14
**Capitol** [1] - 41:3
**card** [32] - 16:20, 16:25, 17:4, 17:5, 47:13, 47:14, 47:22, 47:23, 47:24, 47:25, 49:17, 49:18, 49:19, 52:23, 52:24, 74:24, 75:1, 75:2, 75:7, 75:11, 75:12, 75:20, 76:17, 76:23, 77:1, 124:4, 124:6, 124:8, 124:17, 124:23, 130:4, 130:9
**cards** [5] - 13:9, 25:21, 121:20, 128:3, 130:13
**care** [1] - 72:24
**carefully** [1] - 15:25
**carrier** [2] - 22:2, 22:9
**carrying** [1] - 76:17
**case** [74] - 12:10, 34:12, 37:14, 41:18, 42:3, 46:3, 46:6, 48:17, 54:15, 55:3, 55:6, 55:7, 55:21, 61:11, 65:24, 69:7, 73:14, 78:14, 94:15, 101:3, 103:25, 104:6, 104:9, 105:6, 106:18, 107:21, 107:25, 108:4, 109:7, 109:12, 111:13, 112:18, 112:20, 114:23, 114:25, 116:20, 117:24, 118:14, 123:5, 123:21, 124:1, 125:3, 125:25, 126:16, 126:23, 127:2, 127:23, 129:10, 130:22, 131:11, 131:22, 132:23, 133:8, 134:14, 137:3, 137:5, 137:7, 137:20, 138:5, 138:24, 139:18, 140:4, 141:11, 141:13, 144:6, 144:10, 145:8, 154:16, 155:10, 158:13, 158:20, 161:2, 161:10, 162:20
**Case** [1] - 1:7
**cases** [1] - 55:25
**cash** [2] - 83:10,

117:9
**cashed** [1] - 74:24
**casting** [1] - 42:22
**Castor** [1] - 43:2
**categories** [1] - 146:3
**category** [1] - 155:1
**CATHERINE** [1] - 2:5
**caused** [1] - 76:11
**CCRR** [1] - 1:23
**cell** [6] - 13:16, 13:18, 13:19, 13:20, 13:22, 13:24
**Celtic** [4] - 38:4, 39:18, 40:3, 40:8
**central** [1] - 49:21
**CENTRAL** [1] - 1:2
**Central** [5] - 51:9, 54:2, 54:4, 54:10, 54:11, 55:12, 55:13, 94:13, 165:8
**CEO** [1] - 86:2
**certain** [11] - 38:25, 80:13, 82:17, 82:20, 106:11, 107:20, 134:7, 134:10, 152:4, 161:17, 164:5
**certainly** [3] - 54:14, 83:7, 162:9
**certificate** [1] - 21:11
**CERTIFICATE** [1] - 165:1
**certifications** [1] - 23:12
**certify** [1] - 165:8
**challenged** [1] - 33:1
**chance** [2] - 115:19, 163:19
**change** [1] - 60:6
**character** [3] - 84:9, 85:3, 87:11
**characterization** [1] - 102:23
**characterize** [1] - 25:9
**charge** [4] - 8:19, 45:13, 45:25, 46:15
**charged** [18] - 29:11, 43:16, 44:2, 46:18, 46:21, 48:16, 65:19, 101:8, 101:17, 102:2, 104:6, 104:9, 129:9, 137:7, 137:20, 138:5, 144:6, 144:10
**charges** [4] - 47:15, 48:2, 48:5
**charging** [1] - 45:12
**chart** [8] - 60:20, 60:24, 61:10, 61:12, 61:16, 62:3, 163:25,

164:6
**charts** [2] - 163:7, 164:3
**chase** [1] - 17:15
**Chase** [6] - 17:17, 18:12, 18:17, 39:9, 40:3, 40:17
**check** [22] - 19:1, 19:10, 19:12, 19:13, 21:6, 21:14, 21:25, 22:20, 22:23, 23:5, 23:15, 97:9, 97:10, 97:20, 97:21, 98:3, 98:4, 116:4, 116:8, 116:10, 139:17, 141:1
**checkbook** [1] - 67:9
**checkbooks** [1] - 70:16
**checked** [3] - 22:24, 97:11, 97:18
**checking** [1] - 22:25
**checks** [23] - 18:21, 19:6, 20:9, 97:24, 98:1, 113:8, 113:11, 114:10, 115:2, 115:10, 116:14, 116:15, 117:9, 117:17, 117:21, 117:25, 118:6, 126:19, 138:6, 138:13, 139:8, 140:24
**choose** [1] - 57:12
**chooses** [1] - 72:19
**chose** [1] - 154:17
**CHRISTOPHER** [1] - 2:5
**chronological** [1] - 95:4
**chronos** [1] - 95:2
**Circuit** [5] - 46:5, 46:6, 55:2, 55:3, 66:2
**circumstances** [2] - 46:14, 62:16
**circumstantial** [2] - 32:14, 64:2
**cited** [1] - 55:25
**cites** [1] - 47:13
**claim** [1] - 158:17
**claiming** [1] - 32:6, 32:19, 79:17, 84:10
**clarify** [5] - 78:3, 122:2, 127:10, 132:14, 134:12
**CLARK** [2] - 4:4, 6:13
**clark** [1] - 20:22
**Clark** [30] - 6:18, 11:16, 12:13, 14:6, 15:3, 24:11, 25:19, 26:5, 26:14, 27:4,

28:20, 29:10, 31:1,
31:11, 31:20, 31:21,
31:24, 32:2, 32:10,
33:17, 36:24, 93:8,
100:23, 100:25,
109:24, 110:3, 110:5,
115:5, 115:8, 136:25
   **clause** [1] - 150:21
   **clean** [2] - 48:10,
48:12
   **clear** [16] - 54:9,
64:7, 73:2, 75:16,
85:2, 87:10, 89:12,
95:12, 104:11,
138:21, 146:22,
149:8, 151:8, 152:13,
152:21, 152:22
   **cleared** [1] - 96:13
   **clearly** [1] - 53:22
   **Clemente** [1] - 3:5
   **client** [7] - 69:17,
72:22, 139:20, 159:9,
159:10, 159:14,
159:18
   **client's** [1] - 69:6
   **clients** [1] - 162:18
   **close** [2] - 77:8, 77:9
   **closer** [1] - 46:22
   **closing** [1] - 88:12
   **Club** [1] - 40:23
   **co** [6] - 46:10, 52:16,
57:19, 65:7, 86:2,
100:12
   **co-conspirator** [1] -
46:10
   **co-defendant's** [2] -
57:19, 65:7
   **co-defendants** [1] -
100:12
   **co-founder** [1] - 86:2
   **co-signers** [1] -
52:16
   **Coast** [1] - 3:15
   **coconspirators** [2] -
78:5, 138:12
   **Code** [1] - 165:9
   **cohorts** [1] - 72:10
   **coins** [5] - 31:24,
53:10, 53:11, 53:14,
53:17
   **colleague** [1] - 149:6
   **collected** [1] -
142:15
   **collection** [1] - 15:23
   **Collision** [12] - 40:4,
40:18, 120:19,
120:22, 121:9,
121:12, 121:16,
121:21, 124:9,
124:12, 124:21,

124:25
   **Colorado** [3] - 40:15,
41:1
   **Column** [7] - 11:2,
11:4, 11:6, 11:8,
11:17, 11:20, 11:22
   **columns** [1] - 11:1
   **com** [1] - 18:3
   **Comerica** [3] - 38:8,
39:23
   **coming** [4] - 60:7,
60:23, 94:8, 150:23
   **comment** [2] - 34:4,
99:23
   **commerce** [13] -
38:25, 39:3, 39:11,
39:15, 39:20, 39:25,
40:5, 40:10, 40:14,
40:20, 40:25, 41:5,
41:10
   **commercial** [2] -
21:21, 21:23
   **commit** [5] - 46:16,
46:23, 47:1, 71:5,
71:21
   **committed** [2] -
62:14, 63:13
   **committing** [5] -
54:5, 108:14, 108:15,
121:23, 125:2
   **common** [1] - 80:7
   **commonly** [1] -
126:19
   **communicating** [1] -
157:17
   **communication** [6] -
145:13, 145:16,
146:15, 150:19,
151:17, 157:14
   **communications** [9]
- 37:6, 145:4, 145:6,
145:21, 146:1,
146:12, 146:14,
146:17, 152:18
   **Community** [3] -
86:10, 88:2, 89:17
   **community** [5] -
86:6, 86:7, 86:11,
86:14, 86:24
   **community.com** [2]
- 86:3, 86:4
   **companies** [8] -
20:11, 24:12, 24:14,
24:18, 50:3, 50:4,
51:23
   **Company** [1] - 21:1
   **company** [42] - 21:3,
21:6, 21:11, 21:14,
22:21, 24:21, 24:23,
24:24, 50:16, 52:12,

52:13, 52:20, 52:21,
60:14, 63:25, 64:18,
68:5, 68:8, 68:11,
71:3, 73:20, 73:21,
79:22, 80:3, 80:24,
81:6, 81:12, 81:14,
82:7, 82:9, 82:21,
83:8, 83:11, 83:15,
86:5, 86:15, 86:23,
87:2, 87:4, 87:7,
89:18, 120:18
   **compare** [2] - 70:13,
70:14
   **compensated** [2] -
140:11, 141:10
   **compensation** [2] -
137:7, 137:10
   **complete** [2] - 65:15,
131:11
   **completed** [1] -
67:11
   **completely** [3] -
35:5, 66:5, 66:6
   **compound** [2] -
111:3, 111:4
   **comprehend** [1] -
163:19
   **computer** [2] - 69:4,
97:21
   **computers** [1] - 69:5
   **concealment** [2] -
51:19, 51:24
   **concept** [3] - 46:2,
86:23, 103:1
   **concern** [2] - 41:24,
64:12
   **concerned** [1] -
73:11
   **concerns** [2] - 42:20,
42:22
   **concluded** [1] -
164:21
   **conclusion** [1] -
10:10
   **conditionally** [4] -
15:19, 16:3, 16:14,
92:11
   **conduct** [5] - 96:6,
125:22, 126:17,
130:18, 159:22
   **conducted** [4] -
23:25, 142:4, 144:21
   **conference** [1] -
165:13
   **conferred** [1] - 8:6
   **confident** [1] - 78:13
   **confined** [1] - 27:15
   **confirm** [2] - 16:6,
45:8
   **conflate** [1] - 61:2

   **conformance** [1] -
165:13
   **confrontation** [1] -
150:21
   **confusing** [6] -
132:1, 133:5, 138:20,
145:11, 145:14,
145:16
   **connect** [7] - 111:1,
112:4, 112:5, 112:8,
112:9, 120:16, 148:3
   **connected** [5] - 74:1,
111:12, 120:12,
131:24, 139:16
   **Connecticut** [1] -
2:21
   **connecting** [3] -
84:7, 85:6, 152:11
   **connection** [20] -
12:10, 50:6, 53:6,
67:17, 70:8, 71:17,
105:22, 109:12,
110:21, 111:24,
118:16, 119:8, 119:9,
119:19, 121:6,
121:17, 121:19,
123:21, 133:8, 147:21
   **connections** [2] -
107:13, 107:16
   **consider** [2] - 56:4,
149:25
   **consideration** [1] -
65:9
   **considered** [3] -
61:5, 69:11, 77:21
   **considering** [2] -
61:8, 62:4
   **conspiracy** [26] -
44:21, 44:23, 45:1,
46:1, 46:11, 46:16,
46:18, 46:23, 47:1,
51:16, 51:17, 51:18,
52:1, 57:20, 57:23,
58:2, 58:18, 58:22,
66:23, 75:12, 76:24,
77:4, 77:6, 77:10,
78:5, 139:19
   **conspirator** [3] -
44:18, 44:20, 46:10
   **conspired** [4] - 58:1,
58:5, 58:8, 58:22
   **conspiring** [1] -
29:12
   **Construction** [1] -
39:10
   **Consulting** [1] - 8:2
   **consumer** [1] - 51:10
   **Cont** [1] - 3:1
   **contact** [2] - 127:19,
157:12

   **contacts** [5] - 147:1,
150:17, 151:22,
158:1, 158:23
   **contain** [3] - 15:6,
15:12, 17:11
   **contained** [3] -
38:18, 42:16, 70:13
   **contains** [3] - 14:12,
17:23, 28:15
   **context** [1] - 78:4
   **continue** [2] - 80:22,
88:21
   **continues** [1] - 78:4
   **continuing** [1] - 87:6
   **Contracting** [3] -
29:19, 33:12, 39:19
   **contrary** [2] - 32:16,
44:14, 84:23
   **contrasted** [1] - 43:2
   **contribute** [1] -
80:25
   **control** [2] - 76:9,
76:20
   **controlled** [9] -
33:11, 34:24, 60:14,
74:4, 74:5, 74:9,
74:13, 75:20, 76:25
   **controlling** [2] -
74:19, 144:23
   **controls** [2] - 33:20,
35:23
   **conversation** [1] -
115:7
   **conveyed** [1] - 114:8
   **convict** [1] - 77:2
   **conviction** [2] -
43:20, 46:11
   **cooperation** [1] -
78:16
   **copies** [2] - 67:10,
92:20
   **copy** [2] - 92:13,
163:25
   **core** [1] - 52:2
   **corner** [3] - 16:20,
28:21, 60:22
   **corporate** [4] -
22:21, 28:4, 28:16,
86:14
   **Corporation** [1] -
38:2
   **corporation** [2] -
28:15, 80:6
   **corporations** [3] -
23:2, 87:3, 88:15
   **correct** [69] - 7:2,
8:4, 9:6, 10:20, 11:4,
11:20, 12:2, 12:14,
13:20, 14:16, 15:1,
15:8, 17:2, 19:17,

6

20:11, 24:12, 24:13,
24:16, 25:4, 25:22,
25:25, 34:11, 34:18,
37:1, 42:16, 45:9,
49:5, 59:7, 59:14,
59:23, 68:9, 68:13,
71:25, 72:1, 72:2,
73:4, 73:6, 73:15,
73:16, 74:11, 74:22,
77:11, 79:22, 79:23,
79:25, 84:3, 90:19,
90:20, 94:16, 94:18,
95:16, 96:3, 96:4,
96:6, 97:2, 97:3,
97:19, 102:4, 108:21,
111:16, 114:10,
116:18, 128:17,
141:14, 141:15,
154:20, 157:1,
160:10, 165:10
  **corrections** [1] -
161:7
  **correctly** [1] - 34:15
  **corroborated** [1] -
59:15
  **COUNSEL** [1] - 2:1
  **counsel** [11] - 10:12,
47:11, 68:7, 71:21,
73:15, 76:5, 77:16,
78:23, 82:21, 100:25
  **Count** [11] - 44:4,
45:7, 45:9, 45:15,
46:18, 46:20, 57:23,
65:9, 65:20, 66:11
  **count** [9] - 19:3,
45:8, 45:10, 45:14,
52:4, 57:20, 65:11,
70:20
  **country** [1] - 71:4
  **counts** [10] - 42:10,
42:19, 43:16, 43:22,
44:1, 45:4, 46:1,
57:19, 57:23, 61:5
  **COUNTY** [1] - 165:3
  **couple** [6] - 10:25,
25:14, 30:8, 34:6,
88:14, 108:16
  **course** [4] - 25:2,
44:8, 45:22, 132:8
  **Court** [28] - 6:6,
42:18, 42:25, 43:1,
45:23, 46:3, 56:4,
58:21, 60:5, 60:6,
60:21, 61:8, 61:14,
62:4, 68:18, 68:25,
71:2, 73:11, 77:17,
78:12, 97:4, 127:8,
154:2, 161:1, 164:20,
165:7, 165:20
  **COURT** [440] - 1:1,

1:23, 6:10, 6:12, 7:5,
7:15, 7:17, 7:20, 8:10,
8:24, 9:19, 10:13,
11:11, 12:25, 14:14,
15:21, 15:25, 16:14,
16:23, 20:15, 20:19,
21:18, 22:15, 24:3,
25:12, 29:8, 29:14,
30:3, 30:6, 31:2, 31:8,
31:14, 31:16, 31:22,
32:1, 32:11, 32:13,
32:20, 32:24, 33:8,
33:21, 33:23, 34:6,
34:13, 34:20, 34:25,
35:8, 35:14, 35:17,
35:25, 36:10, 36:13,
37:9, 37:12, 37:14,
37:17, 37:21, 38:16,
41:13, 41:15, 41:17,
42:7, 42:14, 42:21,
42:25, 43:8, 43:11,
43:13, 44:9, 44:15,
45:5, 47:4, 47:17,
47:21, 48:3, 48:6,
48:8, 48:18, 49:3,
49:16, 54:8, 54:22,
55:11, 55:16, 55:25,
56:3, 56:9, 56:14,
56:20, 56:23, 57:3,
57:14, 57:24, 58:11,
58:20, 59:2, 59:8,
59:17, 59:21, 60:1,
60:10, 60:24, 61:4,
61:10, 61:19, 62:8,
62:11, 62:17, 62:19,
62:23, 63:7, 63:14,
63:20, 63:22, 64:4,
64:6, 64:9, 64:11,
64:16, 64:21, 65:1,
65:21, 66:3, 66:15,
66:21, 67:1, 67:6,
67:18, 67:25, 68:2,
68:7, 68:11, 68:15,
68:21, 69:3, 69:9,
69:20, 70:11, 70:17,
70:21, 71:6, 71:10,
71:13, 71:18, 71:20,
72:1, 72:4, 72:12,
72:24, 73:3, 73:5,
73:15, 73:17, 73:22,
74:7, 74:16, 74:20,
75:1, 75:10, 75:23,
76:3, 76:19, 76:21,
77:16, 77:20, 78:7,
78:10, 78:22, 78:25,
79:10, 79:16, 79:20,
79:24, 80:1, 80:3,
80:5, 80:8, 80:11,
80:14, 80:17, 80:19,
80:25, 81:3, 81:5,
81:8, 81:11, 81:14,

81:17, 81:21, 81:23,
82:3, 82:8, 82:10,
82:13, 82:16, 82:18,
82:22, 83:3, 83:7,
83:24, 84:2, 84:5,
84:12, 84:20, 85:1,
85:5, 85:9, 87:14,
87:19, 88:7, 88:11,
88:20, 88:22, 88:24,
89:5, 89:9, 89:11,
90:1, 90:4, 90:7,
90:23, 91:11, 92:14,
92:23, 93:6, 93:11,
93:13, 93:15, 93:18,
95:4, 95:7, 95:9,
95:21, 96:19, 98:9,
98:12, 98:16, 98:24,
99:18, 99:23, 100:4,
103:4, 103:11,
103:17, 103:19,
103:22, 104:3, 104:8,
105:9, 105:17, 106:6,
106:10, 106:25,
107:17, 107:23,
108:3, 108:7, 109:10,
109:14, 109:25,
110:4, 110:8, 110:12,
110:14, 110:18,
110:23, 111:4, 111:8,
111:22, 112:2, 112:7,
112:9, 112:15,
112:19, 112:22,
113:13, 114:13,
114:17, 114:19,
114:22, 117:1, 117:3,
117:5, 118:23, 119:3,
119:15, 119:17,
119:20, 120:1, 120:4,
121:2, 122:1, 122:4,
122:7, 122:19,
122:24, 123:12,
123:15, 123:22,
124:15, 124:18,
125:5, 125:7, 125:13,
125:16, 125:19,
125:23, 126:13,
126:15, 126:20,
126:22, 126:25,
127:5, 127:14,
127:21, 128:5,
128:13, 128:22,
129:2, 129:6, 129:13,
129:18, 129:24,
130:3, 130:7, 130:11,
131:3, 131:9, 131:15,
132:2, 132:7, 132:15,
132:20, 132:25,
133:6, 133:10,
133:18, 134:1,
134:12, 134:17,
134:19, 134:25,

135:2, 135:5, 135:9,
135:11, 136:12,
137:11, 138:1,
138:16, 138:18,
138:22, 139:2,
139:12, 139:21,
139:24, 140:2,
140:14, 141:4, 141:6,
143:10, 143:16,
143:21, 145:13,
145:18, 146:2,
148:13, 148:15,
148:22, 149:2,
149:12, 149:14,
149:21, 149:24,
150:5, 150:13,
150:22, 150:25,
151:5, 151:9, 151:13,
151:20, 152:8,
152:15, 152:20,
152:22, 153:3, 153:8,
153:13, 153:17,
153:21, 154:9,
154:15, 154:18,
154:21, 154:25,
155:14, 155:18,
155:24, 156:3,
156:11, 156:17,
156:22, 156:24,
157:4, 157:11,
157:15, 157:19,
157:25, 158:5, 158:9,
158:22, 159:2, 159:5,
159:10, 159:13,
159:16, 160:3,
160:13, 160:18,
160:22, 160:25,
161:16, 161:23,
161:25, 162:4, 162:6,
162:8, 162:11,
162:25, 163:3, 163:5,
163:10, 163:14,
163:17, 163:23,
164:1, 164:7, 164:10,
164:14
  **Court's** [2] - 16:12,
65:9
  **Courthouse** [1] - 2:7
  **COURTROOM** [19] -
6:6, 42:5, 77:17,
77:19, 78:8, 79:2,
79:5, 85:10, 85:15,
91:8, 93:19, 93:22,
93:25, 98:17, 98:20,
148:14, 148:19,
148:21, 164:19
  **courtroom** [10] - 6:9,
25:17, 26:11, 33:18,
42:6, 78:9, 148:7,
148:20, 151:12,
151:13

  **cousin** [4] - 58:1,
58:19, 62:17, 64:3
  **covered** [2] - 21:15,
160:16
  **COVID** [2] - 96:13,
103:14
  **COVID-19** [1] - 97:7
  **cR** [1] - 1:7
  **crazy** [1] - 35:20
  **create** [2] - 30:11,
70:1
  **created** [2] - 70:2,
71:7
  **creating** [1] - 72:18
  **credit** [15] - 13:9,
25:20, 47:24, 47:25,
49:17, 49:18, 52:23,
52:24, 74:24, 75:1,
75:2, 128:3, 130:4,
130:9, 130:13
  **crime** [3] - 24:25,
44:23, 62:14
  **crimes** [1] - 48:15
  **criminal** [8] - 12:20,
35:15, 44:21, 100:15,
127:1, 127:12, 127:15
  **critical** [1] - 51:14
  **criticism** [1] - 100:1
  **cross** [12] - 20:18,
33:10, 34:23, 42:12,
149:10, 149:12,
149:14, 149:17,
149:18, 149:19,
149:20, 149:21
  **Cross** [9] - 4:5, 4:5,
4:6, 4:9, 4:14, 4:15,
4:17, 38:6, 39:13
  **CROSS** [7] - 6:16,
20:20, 36:22, 90:8,
95:23, 97:16, 99:7
  **cross-examination**
[7] - 33:10, 34:23,
149:10, 149:12,
149:14, 149:19,
149:20
  **CROSS-**
**EXAMINATION** [7] -
6:16, 20:20, 36:22,
90:8, 95:23, 97:16,
99:7
  **Cross-Examination**
[7] - 4:5, 4:5, 4:6, 4:9,
4:14, 4:15, 4:17
  **cross-examine** [4] -
20:18, 149:17,
149:18, 149:21
  **CRR** [1] - 165:20
  **Cruz** [2] - 25:16,
26:10
  **CSR** [2] - 1:23,

165:20
**curative** [1] - 160:23
**curb** [1] - 142:10
**cursory** [1] - 21:7
**customer** [1] - 11:2
**customers** [3] - 86:6, 86:7, 86:8
**customs** [1] - 47:22
**CVP** [1] - 71:3

**D**

**D.C** [1] - 2:22
**DADYAN** [1] - 3:13
**Dadyan** [44] - 37:4, 57:17, 58:1, 58:18, 58:19, 58:22, 58:23, 58:25, 59:16, 59:24, 60:15, 62:16, 63:10, 63:17, 63:25, 64:1, 64:10, 64:13, 64:21, 64:22, 70:4, 70:6, 70:11, 74:13, 101:11, 102:2, 131:20, 131:23, 133:4, 133:7, 133:16, 134:8, 135:15, 136:9, 138:12, 139:8, 139:11, 139:17, 145:9, 145:10, 146:12, 161:22
**Dadyan's** [4] - 28:12, 57:22, 69:14, 132:3
**data** [1] - 163:19
**database** [1] - 21:8
**Date** [1] - 165:16
**date** [6] - 11:6, 11:16, 12:21, 46:21, 94:19, 95:12
**dates** [3] - 35:13, 46:20
**DAY** [1] - 1:12
**days** [3] - 30:8, 51:9, 52:11
**dba** [1] - 39:19
**dealer** [1] - 49:9
**dealing** [1] - 117:24
**dealings** [1] - 84:11
**debate** [3] - 74:3, 74:4, 74:5
**debit** [2] - 74:23, 76:23
**deceased** [3] - 52:7, 52:10, 53:4
**December** [9] - 12:14, 18:19, 91:25, 92:1, 96:14, 96:15, 96:16, 96:23, 97:1
**decide** [1] - 76:23
**decision** [2] - 78:15,

97:7
**decreased** [1] - 80:23
**defendant** [27] - 31:12, 31:19, 32:2, 32:8, 42:9, 44:16, 47:9, 50:6, 50:25, 53:7, 53:9, 53:15, 53:19, 62:13, 65:24, 84:15, 102:2, 112:18, 117:24, 133:7, 144:10, 148:7, 151:25, 152:1, 158:2, 158:3
**DEFENDANT** [4] - 2:10, 3:2, 3:9, 3:13
**defendant's** [7] - 30:15, 52:7, 52:8, 53:10, 53:16, 57:19, 65:7
**defendants** [49] - 37:24, 39:2, 41:19, 52:5, 54:4, 54:17, 71:4, 71:17, 77:4, 77:24, 100:12, 101:8, 101:18, 101:20, 103:14, 103:25, 104:12, 104:13, 109:6, 111:13, 116:20, 118:9, 121:20, 123:5, 125:25, 126:16, 132:22, 134:14, 137:7, 137:8, 137:19, 138:24, 139:6, 139:25, 140:5, 140:11, 140:12, 140:22, 140:23, 140:25, 141:10, 144:6, 145:8, 147:13, 147:15, 148:10, 150:17, 151:23, 161:19
**Defendants** [1] - 1:9
**defense** [1] - 16:11, 32:15, 36:10, 47:5, 47:10, 52:18, 78:18, 78:20, 79:16, 91:3, 98:14, 107:2, 150:12
**Defense** [23] - 5:4, 5:5, 5:6, 10:14, 14:2, 16:22, 92:24, 107:3, 107:6, 115:15, 116:3, 134:21, 136:21, 136:23, 138:7, 142:19, 142:22, 143:1, 143:2, 143:8, 143:11, 143:13, 143:14
**defer** [1] - 144:16

**deficient** [1] - 57:4
**define** [2] - 145:5, 145:21
**defined** [1] - 147:20
**definition** [2] - 104:25, 117:11
**defraud** [2] - 55:9, 55:23
**degree** [1] - 72:21
**degrees** [1] - 103:1
**delivered** [1] - 50:18
**delivery** [1] - 54:21
**demonstrate** [1] - 54:1
**demonstrates** [2] - 49:6, 51:16
**denied** [2] - 53:22, 77:22
**departed** [1] - 71:16
**Department** [4] - 21:25, 23:5, 91:23, 124:8
**depicted** [2] - 143:1, 143:5
**deposit** [6] - 113:8, 114:10, 115:2, 116:10, 116:15, 117:16
**Deposit** [1] - 38:2
**deposited** [8] - 34:17, 52:15, 116:5, 117:21, 138:6, 139:9, 139:18, 140:24
**depositing** [7] - 108:11, 109:19, 113:11, 115:11, 117:17, 118:6, 138:13
**deposits** [6] - 38:1, 38:4, 38:6, 38:8, 38:10, 38:12
**DEPUTY** [19] - 6:6, 42:5, 77:17, 77:19, 78:8, 79:2, 79:5, 85:10, 85:15, 91:8, 93:19, 93:22, 93:25, 98:17, 98:20, 148:14, 148:19, 148:21, 164:19
**described** [5] - 34:19, 34:22, 63:5, 127:7, 140:3
**detail** [4] - 6:23, 91:24, 109:23, 136:1
**details** [1] - 143:4
**Detective** [1] - 14:10
**determine** [9] - 21:11, 21:20, 22:11, 23:11, 23:24, 30:7, 31:3, 106:18, 153:15
**determined** [1] -

109:24
**develop** [3] - 33:5, 34:12, 154:19
**developed** [1] - 154:19
**Development** [1] - 124:8
**device** [1] - 96:13
**DHS** [2] - 71:3, 72:7
**diamonds** [1] - 53:14
**Diamonds** [1] - 40:13
**Diana** [1] - 136:16
**dicta** [1] - 55:2
**differences** [1] - 141:10
**different** [11] - 11:1, 56:25, 67:8, 76:6, 79:14, 102:16, 113:21, 139:22, 140:1, 140:17, 155:10
**differently** [1] - 140:12
**difficult** [1] - 153:11
**difficulty** [1] - 84:13
**dilutes** [1] - 80:22
**direct** [12] - 10:19, 10:25, 41:24, 52:19, 53:6, 91:25, 96:2, 106:1, 149:15, 149:22, 150:1, 150:5
**Direct** [3] - 4:8, 4:11, 4:13
**DIRECT** [3] - 85:22, 91:20, 94:9
**directed** [1] - 55:17
**directing** [3] - 27:3, 27:8, 48:16
**direction** [4] - 48:12, 50:6, 67:3, 122:21
**directly** [5] - 30:4, 31:12, 32:4, 50:10, 52:15
**directs** [2] - 48:9, 48:12
**disagree** [2] - 69:24, 71:20
**disclose** [1] - 13:7
**disclosure** [1] - 149:18
**discover** [1] - 118:25
**discovery** [8] - 149:11, 150:11, 151:4, 156:19, 157:3, 157:9, 157:23, 164:5
**discuss** [2] - 90:13, 113:20
**discussed** [7] - 62:20, 62:21, 63:1, 90:24, 113:19,

121:15, 128:11
**display** [1] - 26:12
**displayed** [2] - 32:9, 33:18
**dispose** [1] - 48:16
**dispute** [2] - 32:23, 35:24
**disputing** [2] - 32:5, 35:22
**distinction** [1] - 55:24
**distributions** [1] - 81:6
**DISTRICT** [3] - 1:1, 1:2, 1:3
**district** [4] - 54:17, 54:18, 55:1, 55:4
**District** [10] - 51:9, 54:3, 54:4, 54:10, 54:12, 55:12, 55:13, 94:13, 165:7, 165:8
**dividends** [2] - 81:7, 82:2
**DIVISION** [1] - 1:2
**doctrine** [1] - 44:16
**document** [13] - 11:11, 14:6, 15:22, 15:23, 18:6, 42:16, 61:23, 94:24, 135:5, 135:9, 136:1, 141:21, 147:1
**documentation** [1] - 102:11
**documents** [16] - 7:11, 10:5, 15:6, 20:13, 25:14, 27:4, 29:4, 67:19, 67:21, 73:20, 108:20, 140:4, 145:23, 154:4, 162:12, 163:18
**done** [7] - 7:10, 22:12, 118:7, 122:14, 122:15, 122:22, 164:18
**Dora** [2] - 12:16, 92:5
**dots** [2] - 69:1, 84:7
**doubling** [1] - 73:5
**doubt** [4] - 45:20, 45:24, 46:15, 53:20
**doubts** [1] - 42:22
**down** [11] - 11:10, 12:12, 14:18, 14:19, 15:2, 15:5, 15:17, 17:23, 135:24, 156:7, 161:10
**downplays** [1] - 47:11
**dozens** [1] - 108:18
**dramatically** [1] - 83:25

draw [2] - 30:13, 48:13
drawn [1] - 48:14
Drive [1] - 143:19
driver [2] - 22:12, 23:12
driver's [5] - 21:21, 36:25, 69:16, 110:10, 159:25
drivers [1] - 22:18
drug [1] - 22:12
due [2] - 62:13, 78:16
duly [5] - 79:8, 85:20, 91:16, 94:5, 99:3
during [15] - 10:12, 21:22, 25:2, 31:11, 31:23, 32:9, 34:4, 54:18, 60:22, 72:17, 74:3, 92:21, 149:10, 149:20, 150:16
DX-22 [4] - 5:4, 10:12, 10:14, 10:16
DX-35 [1] - 7:24
DX-55 [5] - 5:5, 16:8, 16:22, 92:11, 92:24
Dzukaeva [15] - 41:9, 65:11, 65:17, 65:19, 66:11, 66:13, 67:7, 67:11, 67:12, 69:17, 70:15, 70:16, 70:19, 71:9, 72:22
Dzukaeva's [2] - 67:5

**E**

e-mail [7] - 18:1, 111:11, 111:12, 135:7, 136:2, 136:6, 136:20
e-mails [8] - 109:1, 111:1, 112:5, 112:10, 112:11, 112:19, 145:1, 145:23
early [4] - 87:3, 87:24, 130:22, 162:21
early-stage [2] - 87:3, 87:24
earned [3] - 81:14, 138:13, 138:15
easily [1] - 51:25
eastern [1] - 70:7
easy [1] - 142:19
ECF [2] - 37:23, 38:22
EDD [10] - 121:23, 122:3, 122:4, 123:2, 123:6, 123:13, 124:4,

124:6, 124:23, 125:3
Edward [22] - 101:23, 104:14, 118:8, 118:13, 118:19, 119:1, 119:5, 119:7, 119:12, 120:8, 120:12, 120:14, 120:16, 120:18, 121:5, 121:18, 126:1, 145:7, 146:8, 147:9, 147:14, 148:9
effort [1] - 110:8
efforts [1] - 30:8
EIDL [7] - 24:15, 43:24, 49:24, 102:20, 102:22, 103:9, 115:2
eight [1] - 103:6, 103:14, 103:24, 104:11, 104:20, 109:7, 125:25
either [4] - 39:3, 41:25, 94:25, 152:13
elaboration [1] - 54:23
electronic [2] - 69:7, 76:13
element [5] - 45:3, 46:15, 66:4, 66:5, 66:8
Elementary [1] - 143:18
elements [2] - 43:17, 45:24
elicit [2] - 30:9, 30:25
eliminated [1] - 57:13
email [1] - 27:21
emanating [1] - 160:7
emotional [1] - 36:3
employed [1] - 85:24
employees [1] - 59:9
empty [3] - 56:12, 143:2, 143:17
end [4] - 73:14, 77:7, 83:3, 88:2
ended [2] - 75:12, 87:25
ending [2] - 18:4, 46:21
ends [3] - 36:7, 77:4, 85:8
engage [1] - 86:8
entail [1] - 86:15
entered [2] - 38:14, 41:11
enters [2] - 6:9, 78:9
entire [3] - 25:17, 33:9, 34:23
entities [7] - 30:1,

33:15, 34:18, 34:19, 34:21, 34:24, 35:23
entitled [3] - 156:9, 156:10, 165:12
entity [2] - 86:14, 105:22
entrepreneur [1] - 87:23
equity [1] - 81:11
equivalent [1] - 22:10
Escrow [1] - 141:23
especially [2] - 30:7, 127:2
essentially [2] - 42:16, 64:7
establish [9] - 32:7, 45:1, 46:14, 84:16, 120:11, 153:16, 154:12, 155:15, 160:16
established [1] - 16:16
estate [1] - 118:17
estimate [1] - 161:20
et [1] - 1:8
European [1] - 70:7
evening [2] - 97:12, 148:18
event [2] - 45:6, 157:5
eventually [1] - 108:16
everyday [1] - 51:10
evidence [119] - 7:4, 7:25, 10:11, 10:14, 12:1, 14:20, 15:1, 16:22, 30:9, 30:12, 31:4, 32:14, 32:15, 34:13, 38:20, 41:19, 42:4, 43:6, 43:17, 43:19, 43:23, 44:6, 44:11, 44:12, 44:14, 45:1, 45:17, 46:25, 48:15, 48:17, 48:19, 50:20, 51:24, 53:18, 57:21, 58:5, 58:9, 58:24, 60:4, 60:7, 60:13, 60:16, 60:18, 61:1, 61:8, 61:11, 61:15, 61:21, 61:25, 62:1, 62:22, 62:24, 62:25, 64:1, 64:2, 64:24, 65:12, 65:16, 65:18, 66:12, 66:20, 67:2, 67:15, 67:18, 68:24, 69:15, 69:18, 69:25, 70:2, 71:3, 71:25, 72:5, 72:7, 72:16, 72:22, 73:8,

73:10, 73:14, 73:17, 74:8, 74:12, 74:14, 74:18, 75:21, 76:16, 77:12, 92:22, 92:24, 106:7, 106:18, 108:2, 123:20, 125:20, 132:9, 132:10, 132:11, 133:25, 134:25, 141:3, 141:21, 142:12, 142:15, 143:5, 143:11, 144:5, 145:2, 153:6, 158:5, 158:7, 158:8, 158:13, 162:20, 164:4, 164:5
exact [2] - 44:19, 102:11
exactly [2] - 42:19, 47:18
examination [18] - 10:19, 33:10, 34:23, 36:24, 83:19, 122:8, 149:10, 149:12, 149:14, 149:15, 149:19, 149:20, 149:23, 150:1, 150:6, 150:8, 150:16, 154:3
EXAMINATION [12] - 6:16, 20:20, 24:9, 36:22, 85:22, 90:8, 91:20, 94:9, 95:23, 96:20, 97:16, 99:7
Examination [12] - 4:5, 4:5, 4:6, 4:6, 4:8, 4:9, 4:11, 4:13, 4:14, 4:14, 4:15, 4:17
examine [6] - 16:1, 20:18, 149:17, 149:18, 149:21
examiner [1] - 134:2
examining [1] - 114:13
example [11] - 50:15, 53:10, 105:7, 120:7, 128:2, 135:23, 138:6, 140:22, 140:24, 147:22, 148:4
examples [1] - 76:6
exchange [3] - 70:7, 113:10, 163:17
exchanges [2] - 146:4, 151:23
exclude [1] - 164:8
excuse [3] - 19:12, 19:23, 65:11
excused [1] - 98:10
execute [1] - 92:1
exhibit [28] - 14:19, 14:23, 15:2, 15:5, 15:14, 15:17, 16:4,

16:12, 16:19, 51:2, 61:6, 61:7, 61:19, 61:20, 61:24, 62:2, 73:21, 75:4, 77:14, 77:15, 92:13, 107:5, 134:25, 138:4, 144:4, 158:14, 163:14, 164:3
Exhibit [40] - 10:14, 11:25, 14:3, 18:14, 25:15, 26:6, 26:15, 26:25, 27:2, 28:8, 28:19, 48:24, 49:2, 49:12, 51:2, 52:24, 52:25, 53:2, 60:17, 61:14, 73:19, 74:23, 75:4, 75:6, 92:24, 107:3, 107:6, 115:15, 116:4, 134:22, 136:21, 136:23, 138:3, 138:8, 141:20, 142:19, 143:2, 143:9, 143:13, 143:14
EXHIBIT [2] - 5:1, 5:3
exhibits [10] - 15:19, 25:16, 42:12, 73:19, 149:9, 149:19, 150:14, 154:12, 159:1, 162:15
Exhibits [6] - 50:9, 142:18, 142:22, 143:1, 143:11, 144:18
exist [5] - 15:24, 58:6, 86:17, 86:21, 151:17
existed [4] - 126:2, 131:1, 132:22, 151:23
existing [1] - 126:3
exists [1] - 58:22
exits [2] - 42:6, 148:20
expenses [2] - 50:13, 50:24
expensive [4] - 127:24, 128:2, 128:9, 130:4
experience [2] - 161:16, 161:17
experiment [1] - 86:16
expert [1] - 160:4
expired [2] - 70:25, 71:11
explain [1] - 131:2
explained [1] - 89:12
explanation [2] - 9:13, 57:13
explore [1] - 151:15
explored [1] - 24:4
extent [10] - 58:21, 65:7, 109:25, 110:8,

**110**:9, 127:18, 151:16, 152:11, 153:20, 154:1
**extremely** [1] - 46:7

**F**

**F.2d** [1] - 46:4
**Facebook** [1] - 147:25
**facetiously** [1] - 82:25
**fact** [17] - 31:3, 38:18, 38:19, 38:24, 39:3, 44:14, 48:1, 48:17, 51:21, 51:22, 53:20, 55:8, 58:9, 59:3, 76:23, 77:7, 122:11
**facts** [6] - 7:16, 30:17, 35:4, 108:1, 133:24, 141:2
**factual** [5] - 30:25, 31:2, 37:20, 62:5
**failed** [2] - 46:8, 86:12
**fair** [12] - 26:20, 26:22, 29:5, 48:13, 70:12, 102:6, 105:5, 106:21, 108:17, 123:4, 136:6, 146:6
**fairly** [1] - 164:5
**fake** [3] - 24:12, 24:21, 51:22
**false** [12] - 59:10, 67:21, 68:14, 68:19, 68:25, 70:1, 70:2, 72:23, 73:12, 132:3, 134:13, 153:16
**familiar** [9] - 14:6, 15:9, 101:3, 103:1, 104:23, 116:22, 118:12, 122:12, 141:16
**family** [3] - 45:18, 51:5, 111:17
**far** [5] - 57:9, 57:25, 81:18, 111:18, 151:14
**far-fetched** [1] - 57:9
**Fargo** [3] - 39:18, 40:8, 75:5
**Farms** [2] - 66:11, 66:14
**Farrer** [2] - 29:23, 31:20
**fashioned** [1] - 81:24
**fatal** [1] - 62:9
**father** [3] - 52:7, 52:8, 83:1
**father's** [1] - 50:17

**father-in-law** [1] - 52:8
**fault** [1] - 159:17
**favor** [1] - 48:14
**FBI** [8] - 99:10, 99:12, 100:8, 100:11, 100:16, 100:18, 100:22, 105:5
**FDIC** [7] - 37:23, 38:2, 38:4, 38:6, 38:8, 38:10, 38:13
**FDIC-insured** [1] - 37:23
**February** [1] - 38:11
**FEDERAL** [1] - 1:23
**Federal** [3] - 38:1, 165:6, 165:20
**fee** [3] - 8:19, 10:1, 141:1
**felony** [2] - 65:20, 66:9
**Fenton** [5] - 4:6, 57:4, 68:17, 68:22, 72:18
**FENTON** [197] - 2:5, 7:3, 7:14, 7:16, 8:21, 9:17, 12:24, 14:12, 15:22, 16:6, 16:10, 20:14, 21:17, 22:14, 24:2, 24:8, 24:10, 25:13, 25:16, 25:18, 26:2, 26:4, 26:10, 26:13, 29:9, 29:15, 29:16, 30:4, 30:24, 31:6, 31:9, 31:10, 31:19, 31:23, 32:2, 32:19, 33:9, 34:18, 34:21, 35:4, 35:10, 35:16, 35:21, 36:8, 37:8, 37:13, 37:16, 37:19, 37:22, 38:21, 41:14, 41:16, 47:10, 47:19, 47:23, 48:5, 48:7, 48:9, 48:21, 49:5, 49:17, 54:13, 55:18, 56:5, 56:13, 56:16, 66:18, 66:24, 67:4, 67:7, 67:22, 68:1, 68:4, 68:10, 68:13, 69:23, 70:12, 70:19, 71:1, 71:9, 71:12, 71:15, 71:19, 71:24, 72:2, 72:5, 73:16, 73:19, 73:23, 74:21, 75:2, 75:25, 76:10, 76:16, 76:20, 77:3, 77:25, 93:5, 93:12, 103:3, 103:10, 103:16, 103:18, 103:21, 104:2, 104:7,

105:8, 105:15, 106:5, 106:23, 107:15, 107:22, 108:1, 109:8, 110:22, 111:3, 111:21, 112:1, 112:6, 112:8, 113:12, 114:12, 116:24, 117:2, 117:4, 118:21, 119:2, 119:14, 119:16, 121:1, 122:2, 122:5, 123:11, 124:13, 125:4, 125:6, 125:12, 126:12, 126:14, 128:4, 128:10, 129:12, 129:23, 131:8, 131:25, 133:5, 133:24, 137:9, 137:21, 137:24, 138:14, 138:19, 139:10, 139:19, 141:2, 145:11, 145:15, 149:3, 149:8, 149:13, 149:16, 149:22, 150:2, 150:10, 150:14, 152:17, 152:21, 153:2, 154:11, 154:17, 154:20, 154:22, 155:11, 155:17, 155:21, 156:2, 156:6, 156:16, 156:20, 156:23, 157:2, 157:6, 157:22, 158:4, 158:6, 158:10, 158:14, 158:19, 158:25, 160:10, 160:14, 160:19, 161:15, 163:15, 164:6, 164:8, 164:13
**fetched** [1] - 57:9
**few** [10] - 14:4, 20:25, 42:12, 59:20, 64:17, 72:19, 73:1, 73:6, 129:6, 159:11
**FHFA** [1] - 100:15
**Fiber** [6] - 33:13, 34:22, 48:25, 49:10, 50:5, 51:23
**fifth** [1] - 45:2
**filed** [1] - 23:2
**files** [1] - 9:1
**final** [11] - 52:3, 56:24, 61:22, 66:7, 70:5, 77:3, 78:14, 152:16, 152:25, 161:13, 162:14
**finally** [1] - 115:22
**Finance** [1] - 41:8
**financial** [5] - 102:9,

102:13, 119:21, 132:21, 152:19
**finish** [2] - 155:18, 162:20
**first** [22] - 11:2, 14:4, 19:9, 32:12, 37:22, 47:17, 57:1, 58:4, 86:19, 86:21, 89:17, 101:14, 101:16, 104:12, 107:9, 112:11, 115:19, 117:3, 118:9, 123:6, 135:5, 156:8
**FIRST** [1] - 1:24
**fit** [1] - 106:17
**five** [4] - 34:19, 34:21, 52:10, 148:13
**flag** [1] - 102:13
**flagged** [1] - 8:8
**flat** [1] - 141:1
**flow** [8] - 44:21, 102:6, 102:18, 102:19, 130:21, 131:6, 138:23, 139:5
**flowed** [1] - 103:24
**flowing** [1] - 121:9
**focused** [1] - 24:11
**follow** [5] - 13:3, 108:7, 117:20, 123:19, 164:17
**follow-up** [1] - 123:19
**followed** [5] - 44:23, 102:18, 118:15, 119:9, 139:5
**following** [3] - 43:18, 119:11, 121:8
**follows** [6] - 6:15, 79:9, 85:21, 91:17, 94:6, 99:4
**FOR** [5] - 2:3, 2:10, 3:2, 3:9, 3:13
**foregoing** [1] - 165:10
**foreign** [1] - 70:7
**foreseeable** [4] - 39:4, 55:21, 58:8, 58:10
**forget** [1] - 66:21
**forgot** [2] - 132:15, 132:19
**form** [3] - 80:1, 141:7, 150:8
**format** [1] - 165:12
**formed** [1] - 19:25
**forth** [3] - 47:5, 57:3, 79:18
**fortunate** [1] - 86:19
**forward** [3] - 93:20, 98:20, 128:23

**forwarded** [1] - 136:25
**foundation** [23] - 25:11, 30:25, 31:4, 32:7, 89:8, 93:6, 103:10, 103:17, 103:18, 116:25, 117:2, 117:4, 118:22, 122:6, 122:23, 123:2, 125:15, 125:22, 128:4, 129:23, 132:1, 137:13, 145:12
**foundationally** [1] - 16:16
**founded** [2] - 80:2, 86:11
**founder** [1] - 86:2
**four** [19] - 13:18, 13:19, 101:8, 101:17, 104:13, 111:13, 135:24, 137:6, 137:19, 140:23, 144:6
**fourth** [1] - 102:2
**Francisco** [1] - 2:19
**Fraser** [3] - 43:10, 56:21, 57:14
**FRASER** [10] - 3:6, 43:10, 43:12, 43:14, 44:11, 44:24, 45:6, 56:22, 57:1, 57:11
**Fraser's** [2] - 56:8, 56:18
**fraud** [23] - 43:21, 44:1, 45:10, 46:17, 49:22, 54:5, 55:1, 55:8, 67:17, 71:5, 71:17, 77:6, 108:14, 109:21, 117:10, 121:23, 125:3, 130:19, 137:14, 137:16, 137:17
**frauds** [1] - 70:8
**fraudulent** [4] - 24:14, 102:10, 102:22, 102:24
**fraudulently** [1] - 118:6
**freely** [2] - 38:14, 41:11
**fresh** [1] - 164:16
**friends** [1] - 120:9
**front** [5] - 60:8, 60:20, 154:2, 154:8, 158:15
**full** [5] - 79:5, 85:16, 91:11, 94:1, 98:21
**funded** [2] - 59:4, 87:2
**funding** [1] - 87:1
**Funding** [1] - 39:24

**funds** [22] - 50:13, 51:3, 51:6, 51:12, 52:2, 52:21, 62:7, 102:6, 103:14, 108:11, 109:19, 113:8, 116:15, 116:16, 121:9, 121:14, 130:21, 131:6, 138:13, 139:8, 140:11, 140:23
**funeral** [2] - 50:17, 50:23
**funneled** [1] - 51:4
**funneling** [1] - 51:6
**furniture** [3] - 50:18, 50:22, 53:14
**FURTHER** [2] - 36:22, 97:16
**furtherance** [2] - 39:6, 49:19

## G

**G&A** [1] - 40:13
**gang** [1] - 91:24
**general** [9] - 9:5, 9:14, 47:25, 82:21, 114:17, 126:15, 155:1, 160:9, 161:19
**generally** [3] - 138:23, 151:22, 155:24
**gentleman** [3] - 29:23, 31:21, 100:25
**Geoff** [4] - 100:23, 100:25, 109:24, 136:24
**GEOFFREY** [2] - 4:4, 6:13
**Geoffrey** [1] - 93:8
**Georgia** [1] - 41:6
**given** [5] - 51:21, 51:22, 51:24, 53:20, 93:7
**Glendale** [2] - 3:11, 141:17
**gmail.com** [1] - 27:21
**GoDaddy** [1] - 154:5
**gold** [4] - 31:24, 53:10, 53:14
**gov** [1] - 18:3
**government** [52] - 34:13, 36:9, 37:19, 37:24, 39:7, 41:13, 41:15, 41:16, 41:18, 41:22, 43:5, 44:15, 44:25, 46:8, 46:24, 47:6, 47:8, 55:16, 56:3, 57:12, 58:5,

58:13, 58:24, 60:19, 63:23, 73:8, 73:13, 74:23, 75:17, 75:22, 77:25, 79:12, 94:24, 98:13, 100:13, 106:12, 129:9, 138:19, 149:16, 151:6, 151:15, 152:15, 152:16, 153:19, 153:22, 154:1, 157:13, 157:21, 161:13, 163:11, 163:21
**Government** [19] - 18:14, 25:15, 26:6, 26:14, 26:25, 27:1, 28:8, 48:24, 49:2, 49:12, 50:8, 51:1, 52:23, 52:25, 53:2, 60:17, 138:3, 141:19, 142:18
**government's** [5] - 43:19, 48:14, 48:21, 55:21, 62:9
**GPS** [4] - 96:13, 97:13, 97:22, 98:1
**grab** [1] - 19:11
**grand** [6] - 100:7, 100:9, 156:4, 156:5, 156:8, 156:13
**great** [1] - 36:19
**Grigoryan** [77] - 12:4, 12:19, 25:3, 25:22, 26:18, 28:6, 28:17, 28:25, 29:5, 29:11, 33:10, 33:20, 34:23, 37:7, 74:13, 92:9, 101:21, 104:14, 105:7, 105:12, 105:25, 106:2, 106:4, 107:14, 107:21, 115:3, 116:23, 117:13, 118:13, 118:19, 119:1, 119:4, 119:8, 119:13, 119:23, 120:2, 120:9, 120:11, 120:16, 120:25, 121:7, 121:10, 121:12, 121:18, 121:23, 124:1, 125:9, 126:1, 126:10, 127:9, 127:16, 128:2, 128:8, 128:25, 129:8, 129:20, 130:8, 140:25, 143:3, 143:18, 143:24, 143:25, 144:8, 144:9, 144:14, 144:19, 145:7, 146:8, 146:16,

147:3, 150:19, 152:8, 157:13, 157:17, 158:2, 158:24, 160:1
**Grigoryan's** [5] - 12:14, 13:13, 17:2, 25:25, 27:23
**ground** [2] - 117:1, 145:19
**grounds** [2] - 30:19, 31:14
**group** [9] - 102:9, 140:11, 140:12, 140:22, 140:24, 146:10, 151:23, 151:25, 152:1
**Group** [1] - 8:2
**groups** [4] - 141:10, 145:5, 146:7, 146:13
**grow** [2] - 87:4, 87:6
**guess** [3] - 62:3, 152:5, 160:9
**guilty** [1] - 53:19
**Gusto** [1] - 27:12
**guy** [4] - 35:17, 81:24, 83:9, 83:13

## H

**half** [2] - 59:11, 161:15
**hand** [13] - 28:21, 42:14, 79:2, 85:12, 91:5, 92:17, 93:22, 98:17, 145:6, 145:9, 146:8, 146:11
**hands** [1] - 78:15
**handwritten** [1] - 28:9
**happy** [1] - 42:12
**hard** [1] - 69:5
**harmful** [3] - 151:4, 151:6, 152:14
**Hayrapetyan** [70] - 52:16, 101:25, 104:15, 107:10, 107:11, 107:14, 109:6, 109:11, 109:23, 109:24, 110:3, 110:21, 111:1, 111:7, 111:8, 111:15, 111:20, 111:25, 112:5, 112:14, 112:18, 113:1, 113:2, 113:3, 113:4, 113:6, 113:7, 113:10, 113:17, 113:19, 113:20, 114:1, 114:4, 114:8, 114:9, 114:10, 115:1, 115:2, 115:4, 115:10, 116:3, 116:4,

116:10, 116:12, 116:13, 116:14, 116:17, 116:19, 116:22, 117:12, 117:16, 117:21, 117:24, 118:5, 119:21, 120:4, 121:6, 126:2, 145:8, 146:9, 147:6, 147:14, 147:22, 148:4, 148:6
**head** [4] - 120:17, 125:1, 147:8, 148:8
**hear** [14] - 9:8, 38:16, 42:7, 47:5, 47:6, 47:8, 54:22, 58:13, 66:15, 77:23, 78:18, 84:12, 138:9, 164:10
**heard** [4] - 29:22, 29:25, 58:11, 90:24
**hearing** [6] - 34:25, 43:2, 60:10, 60:22, 161:6, 161:11
**hearsay** [5] - 8:21, 14:13, 15:24, 114:12, 150:20
**heart** [1] - 36:16
**heels** [1] - 100:2
**held** [1] - 165:11
**helped** [1] - 33:17
**helpful** [2] - 47:6, 163:8
**hereby** [1] - 165:8
**highlight** [2] - 12:3, 43:18, 100:7
**highlights** [1] - 56:11
**Highway** [1] - 3:15
**Hills** [1] - 141:22
**himself** [2] - 64:21, 113:8
**hinting** [1] - 37:10
**histories** [1] - 126:8
**history** [7] - 12:20, 126:10, 126:14, 127:2, 127:13, 127:15
**hit** [3] - 36:15, 36:18, 56:11
**hits** [14] - 147:1, 147:5, 147:9, 147:12, 147:18, 147:20, 151:7, 151:16, 152:4, 152:6, 152:9, 152:10, 152:12, 158:23
**hold** [1] - 27:13
**holdings** [1] - 80:23
**home** [20] - 12:14, 12:16, 13:13, 17:2, 46:12, 50:19, 50:20, 50:23, 53:10, 53:16, 67:10, 67:13, 70:3, 95:15, 96:6, 96:8,

97:13, 164:15
**honest** [1] - 84:10
**Honor** [194] - 6:11, 7:3, 7:14, 8:21, 8:23, 9:17, 11:12, 12:24, 14:11, 14:12, 15:18, 15:22, 16:5, 16:10, 16:18, 16:21, 20:17, 20:18, 21:17, 22:14, 24:6, 24:8, 30:4, 30:24, 31:6, 31:9, 31:19, 32:19, 32:22, 33:9, 33:25, 35:7, 35:21, 36:8, 36:12, 37:8, 37:13, 37:16, 38:21, 41:12, 41:14, 42:17, 43:14, 44:24, 47:10, 48:7, 48:9, 49:5, 51:7, 54:9, 55:15, 55:18, 55:19, 56:2, 56:5, 56:16, 56:22, 57:1, 58:16, 58:23, 59:7, 59:14, 59:23, 60:2, 60:12, 60:18, 62:2, 63:4, 63:24, 65:4, 66:18, 67:22, 69:14, 69:23, 70:12, 71:1, 71:12, 71:24, 72:14, 73:16, 73:25, 76:1, 76:10, 77:25, 78:20, 79:14, 83:2, 83:20, 84:19, 87:15, 87:21, 89:10, 89:15, 89:25, 90:3, 90:6, 90:22, 91:3, 91:10, 92:12, 93:12, 93:14, 94:23, 95:6, 95:8, 95:20, 95:22, 96:18, 98:8, 98:11, 98:13, 99:15, 99:19, 100:3, 100:5, 103:3, 103:21, 104:2, 105:8, 105:15, 106:5, 106:9, 107:15, 108:1, 109:13, 110:22, 111:21, 112:1, 112:6, 112:21, 114:16, 114:21, 116:24, 118:21, 120:3, 121:1, 122:5, 123:3, 123:14, 123:19, 125:4, 125:6, 125:12, 125:15, 126:12, 126:18, 126:24, 128:10, 129:5, 131:14, 131:25, 132:18, 133:11, 135:1, 138:14, 138:19, 139:1, 139:10, 139:19, 140:8, 143:8, 143:15, 143:22,

145:11, 148:14, 148:23, 149:3, 149:8, 149:16, 150:10, 151:11, 152:17, 154:11, 155:11, 155:21, 155:23, 156:2, 156:6, 156:16, 157:6, 157:22, 158:4, 158:25, 159:4, 159:11, 159:19, 159:20, 160:10, 160:24, 162:3, 162:7, 162:23, 163:20, 164:13

**Honor's** [1] - 58:17

**HONORABLE** [1] - 1:3

**Honorable** [2] - 6:6, 164:19

**hope** [1] - 161:8

**hopefully** [3] - 87:6, 134:12, 161:10

**hour** [3] - 7:7, 159:8, 162:7

**HOURIGAN** [4] - 1:23, 165:6, 165:19, 165:20

**hours** [2] - 97:12, 161:15

**house** [17] - 8:9, 8:10, 8:11, 33:18, 48:10, 48:12, 51:4, 51:5, 67:21, 69:12, 72:7, 83:10, 97:22, 97:23, 123:2, 141:24, 144:23

**houses** [1] - 54:7

**Hripsik** [4] - 143:3, 143:18, 143:24, 144:16

**https://Turingsolution.com/contacts** [1] - 28:3

**hypothetical** [1] - 123:15

**I**

**IBANEC** [2] - 4:12, 94:4

**Ibanec** [7] - 93:16, 94:3, 94:7, 95:1, 95:25, 96:22, 97:18

**ID** [7] - 48:22, 48:23, 67:5, 67:6, 67:11, 134:11

**idea** [2] - 105:1, 160:9

**identification** [8] - 25:20, 26:9, 62:13,

62:15, 68:19, 110:16, 115:13, 134:22

**identifications** [4] - 67:8, 68:25, 69:1, 78:5

**identified** [9] - 7:21, 63:12, 64:18, 103:7, 108:4, 110:10, 113:4, 134:8, 135:14

**identify** [17] - 64:21, 67:7, 107:12, 107:20, 109:5, 110:20, 110:25, 111:11, 113:6, 127:3, 133:2, 134:6, 139:7, 140:10, 144:22, 146:17, 147:21

**identifying** [6] - 17:8, 48:25, 49:15, 53:1, 65:14, 65:19

**identities** [12] - 67:17, 71:4, 71:5, 72:18, 123:8, 127:3, 131:23, 132:3, 133:3, 133:7, 133:16, 134:13

**identity** [30] - 12:23, 13:11, 15:12, 45:13, 45:14, 45:21, 52:4, 52:6, 65:10, 65:23, 65:24, 70:17, 70:20, 71:6, 71:7, 71:13, 71:16, 71:22, 74:8, 124:9, 124:11, 125:11, 127:2, 127:8, 128:25, 134:11, 135:16, 136:8, 141:13

**idiot** [3] - 59:18, 59:21, 59:24

**idiots** [1] - 59:20

**IDs** [2] - 70:1, 70:2

**ilk** [1] - 72:9

**illicit** [1] - 46:9

**Illinois** [1] - 41:5

**image** [2] - 113:1, 113:4

**images** [1] - 109:16

**imagine** [1] - 99:24

**immediately** [1] - 47:12

**important** [6] - 60:3, 87:1, 123:4, 123:9, 123:20, 127:4, 130:25, 131:5

**importantly** [1] - 65:15

**inadvertently** [1] - 68:23

**inappropriate** [1] - 36:17

**Inc** [7] - 11:20, 18:16,

28:14, 39:24, 40:4, 40:18, 40:24

**include** [3] - 39:1, 39:5, 120:14

**includes** [3] - 112:25, 131:17, 139:20

**including** [2] - 50:5, 126:1

**incorrect** [1] - 54:14, 68:23, 160:11

**incorrectly** [1] - 63:7

**increased** [1] - 84:6

**increases** [1] - 82:7

**incriminating** [2] - 46:7, 46:13

**indeed** [2] - 32:8, 158:7

**INDEX** [2] - 4:1, 5:1

**indicate** [1] - 122:8

**indicated** [1] - 12:21

**indicators** [1] - 21:23

**indictment** [16] - 44:2, 66:10, 76:1, 101:14, 101:16, 101:17, 103:7, 103:8, 104:10, 104:13, 106:17, 108:4, 118:10, 123:6, 137:3

**indictments** [1] - 101:3

**individual** [19] - 49:1, 105:3, 105:23, 107:6, 107:13, 107:21, 107:25, 108:6, 109:18, 109:21, 110:6, 110:17, 111:16, 113:1, 113:22, 114:2, 115:1, 115:6, 116:3

**individual's** [2] - 142:9, 144:17

**individuals** [14] - 34:19, 34:21, 50:3, 67:14, 70:9, 102:10, 104:5, 104:9, 104:20, 108:18, 127:4, 144:16, 147:13

**infer** [2] - 47:1, 83:15

**inference** [6] - 48:13, 53:21, 74:9, 77:1, 83:11, 84:18

**inferences** [6] - 30:13, 30:17, 48:14, 57:7, 57:11, 61:23

**inflow** [1] - 51:11

**Info** [6] - 15:10, 17:18, 18:10, 18:16, 28:14, 28:16

**information** [39] -

13:11, 13:14, 14:16, 15:7, 15:8, 15:12, 17:8, 17:11, 17:13, 17:15, 17:17, 17:20, 17:24, 18:9, 28:4, 28:16, 29:1, 29:6, 48:13, 49:1, 49:7, 49:11, 49:14, 50:1, 53:2, 54:20, 59:10, 65:14, 65:19, 67:16, 70:13, 70:14, 83:18, 102:8, 110:11, 112:25, 114:8, 127:4, 159:24

**informed** [1] - 160:21

**initial** [2] - 21:7, 118:15

**injury** [1] - 100:9

**innocent** [1] - 57:13

**inquire** [1] - 153:18

**inside** [1] - 97:22

**inspections** [2] - 23:25, 96:6

**instance** [1] - 110:6

**instances** [1] - 24:14

**institutions** [2] - 102:9, 102:13

**instruction** [2] - 66:2, 160:24

**instructions** [8] - 55:4, 55:14, 70:1, 161:2, 161:3, 161:5, 161:9, 161:11

**instructive** [1] - 46:3

**instruments** [1] - 67:20

**insufficient** [3] - 43:17, 43:20, 74:9

**insurance** [2] - 21:12, 21:14

**Insurance** [1] - 38:2

**insured** [7] - 37:23, 38:1, 38:4, 38:6, 38:8, 38:10, 38:12

**intend** [3] - 148:22, 152:16, 152:24

**interaction** [1] - 10:10

**interest** [4] - 80:20, 81:11, 82:3, 82:6

**Interiors** [6] - 41:4, 45:16, 52:12, 52:13, 52:24, 53:13

**Internet** [1] - 154:5

**interpreting** [1] - 36:1

**interstate** [14] - 38:23, 38:25, 39:3, 39:11, 39:15, 39:20,

39:25, 40:5, 40:10, 40:14, 40:20, 40:25, 41:5, 41:9

**interview** [6] - 110:17, 115:6, 117:15, 118:2, 155:25, 157:1

**interviewed** [9] - 10:8, 108:17, 113:3, 113:16, 113:23, 115:4, 115:8, 118:17, 155:25

**interviewing** [1] - 157:4

**interviews** [1] - 112:25

**introduce** [1] - 82:24

**introduced** [3] - 58:24, 87:25, 157:21

**invest** [1] - 83:8

**invested** [2] - 88:9, 89:18

**investigate** [49] - 21:3, 21:11, 21:20, 22:11, 24:21, 103:24, 106:14, 108:3, 111:4, 114:25, 117:23, 119:7, 119:12, 119:20, 121:3, 121:5, 123:10, 125:2, 125:18, 126:15, 127:15, 128:1, 128:7, 128:8, 129:8, 129:20, 130:8, 132:3, 132:6, 133:7, 134:13, 134:16, 137:14, 137:18, 138:23, 141:9, 144:15, 144:18, 153:15, 155:1, 155:2, 155:6, 155:12, 155:13, 155:15, 156:14, 160:15

**investigated** [13] - 24:15, 24:18, 24:22, 25:2, 25:6, 106:13, 106:14, 109:15, 114:14, 114:20, 123:25, 141:13, 160:16

**investigating** [9] - 100:17, 108:13, 109:10, 109:11, 109:20, 112:20, 123:8, 130:19, 155:3

**investigation** [66] - 20:4, 20:5, 20:25, 21:5, 22:24, 24:11, 25:2, 29:4, 34:10, 35:2, 91:24, 99:13,

99:22, 100:8, 100:11, 100:14, 100:15, 102:5, 102:8, 102:12, 102:17, 104:22, 105:12, 105:24, 106:22, 107:12, 108:4, 108:17, 109:3, 109:5, 110:1, 110:15, 110:20, 112:24, 116:2, 117:12, 118:12, 118:25, 120:7, 121:8, 121:11, 121:22, 122:11, 123:5, 123:13, 127:7, 127:23, 130:18, 131:11, 131:19, 131:22, 132:23, 133:14, 133:15, 137:5, 137:6, 138:11, 140:10, 140:21, 145:22, 147:24, 155:16, 159:23, 160:1

**investigator** [1] - 105:5

**investing** [1] - 88:2

**investment** [5] - 81:9, 81:10, 83:5, 88:8, 89:22

**investments** [1] - 82:5

**investors** [6] - 87:3, 87:5, 87:24, 88:13

**involved** [8] - 30:10, 32:23, 44:23, 58:9, 58:10, 66:13, 72:17, 102:17

**involves** [2] - 45:10, 127:23

**involving** [2] - 112:10, 112:19

**IP** [6] - 11:8, 11:14, 11:22, 50:1, 54:20, 163:7

**iPhones** [3] - 97:8, 152:4, 152:5

**irrelevant** [1] - 84:5

**IRS** [6] - 93:7, 100:15, 100:16, 100:18, 100:23, 109:24

**issue** [9] - 26:3, 26:11, 54:8, 54:13, 61:18, 62:5, 71:20, 122:1, 159:21

**issues** [2] - 42:18, 97:14

**item** [1] - 49:3

**items** [6] - 20:4,

25:24, 92:20, 127:24, 128:3, 128:9

**itself** [1] - 55:10

**Iuliia** [14] - 7:2, 10:6, 14:17, 15:7, 15:12, 17:8, 28:2, 29:17, 33:11, 39:19, 50:20, 106:21, 142:1, 154:13

## J

**J-1** [3] - 67:16, 70:6, 72:6

**J.P** [2] - 39:9, 40:17

**Jacob** [2] - 27:17

**jail** [6] - 12:9, 46:19, 47:11, 47:20, 57:2

**January** [2] - 38:11, 136:25

**Jencks** [6] - 153:25, 155:22, 155:24, 156:3, 156:18, 157:18

**Jennifer** [1] - 65:5

**JENNIFER** [1] - 3:10

**Jersey** [3] - 39:15, 40:15, 41:1

**jewelry** [1] - 53:13

**job** [1] - 94:17

**Jodko** [2] - 8:8, 8:11

**JOHN** [1] - 3:3

**John** [4] - 76:16, 87:23, 87:24, 89:1

**Johnson** [3] - 57:16, 60:1, 161:21

**JOHNSON** [28] - 2:11, 2:14, 2:17, 2:20, 3:14, 3:14, 57:16, 58:4, 60:2, 60:18, 60:25, 61:6, 61:12, 62:2, 62:9, 62:12, 62:18, 62:21, 63:4, 63:8, 63:19, 63:21, 64:12, 64:20, 64:23, 77:11, 161:21, 161:24

**join** [2] - 57:19, 65:6

**joined** [3] - 45:2, 46:16, 47:1

**joins** [1] - 43:14

**JP** [1] - 40:3

**JUDGE** [1] - 1:3

**judgment** [4] - 42:10, 43:16, 57:18, 122:14

**judicial** [1] - 165:13

**July** [5] - 8:1, 41:2, 50:15, 52:10, 141:14

**JUNE** [1] - 1:13, 6:1

**June** [4] - 40:11, 40:16, 40:23, 165:16

**juror** [2] - 35:20, 76:22

**jurors** [1] - 46:25

**jury** [50] - 6:9, 16:12, 30:6, 30:13, 44:19, 45:19, 45:23, 57:7, 57:12, 60:5, 60:8, 60:20, 61:3, 61:8, 61:15, 61:20, 62:4, 63:1, 63:18, 65:13, 66:2, 69:8, 71:2, 77:2, 77:20, 77:23, 78:7, 78:9, 78:10, 97:4, 99:21, 100:7, 100:10, 106:18, 127:11, 131:10, 132:8, 142:7, 156:4, 156:5, 156:8, 156:13, 161:1, 161:3, 161:4, 161:9, 161:11, 162:14, 163:8, 164:15

**Jury** [2] - 42:6, 148:20

**Justin** [1] - 98:25

**JUSTIN** [3] - 4:16, 98:25, 99:2

## K

**Kale** [1] - 143:24

**Kansas** [1] - 39:16

**KATZMAN** [2] - 3:3, 3:6

**Kauichko** [21] - 29:18, 33:12, 34:22, 47:14, 48:22, 49:10, 49:15, 50:4, 50:5, 50:15, 51:22, 53:5, 73:24, 74:8, 74:10, 75:13, 75:18, 76:2, 76:9, 78:3, 158:18

**Kauichko's** [2] - 47:24, 74:2

**keep** [6] - 37:14, 87:5, 87:22, 124:18, 143:21, 151:13

**keeps** [1] - 128:12

**Keough** [2] - 4:13, 4:14

**KEOUGH** [14] - 2:17, 94:7, 94:10, 94:25, 95:11, 95:20, 96:18, 96:21, 97:15, 163:6, 163:12, 163:20, 163:24, 164:2

**kept** [1] - 86:22

**kind** [12] - 22:18, 23:9, 23:11, 36:2, 44:12, 62:25, 68:25, 69:11, 83:12, 86:16, 152:24, 162:20

**KNA** [1] - 8:1

**knowing** [1] - 69:18

**knowingly** [3] - 46:16, 47:1, 65:13

**knowledge** [9] - 49:6, 57:21, 57:22, 59:9, 72:11, 82:10, 88:17, 126:4, 147:21

**known** [2] - 86:11, 110:6

**knows** [4] - 47:15, 48:2, 52:1, 76:13

**Kolab** [1] - 89:2

**Kolabs** [1] - 89:7

**Kopytova** [2] - 135:18, 136:8

**Kudiumov** [14] - 7:10, 7:13, 8:1, 9:3, 9:16, 9:25, 10:2, 10:4, 16:25, 105:11, 105:13, 105:14, 105:25, 106:1

**Kuduimov** [1] - 7:2

## L

**LA** [2] - 86:2, 87:22

**LA-based** [1] - 86:2

**label** [1] - 143:23

**lack** [2] - 61:1, 142:8

**lacking** [1] - 66:6

**lacks** [4] - 116:25, 117:2, 118:21, 122:5

**landed** [1] - 84:17

**LAPD** [3] - 13:3, 15:6, 93:4

**Las** [1] - 83:12

**last** [10] - 18:5, 30:7, 53:23, 76:21, 93:1, 109:11, 115:23, 128:20, 144:8, 144:11

**late** [4] - 149:11, 159:17, 164:11, 164:14

**laughing** [1] - 56:17

**laundering** [4] - 46:23, 51:18, 77:4, 77:9

**law** [4] - 52:8, 55:7, 65:23, 71:21

**Law** [8] - 2:12, 2:15, 2:18, 2:21, 3:4, 3:7, 3:10, 3:15

**LAW** [1] - 3:14

**lawyer** [1] - 47:5

**lawyer's** [1] - 36:16

**lawyers** [4] - 36:19, 61:22, 161:18, 162:13

**lawyers'** [2] - 132:9

**lay** [7] - 30:24, 31:4, 32:7, 122:23, 123:2, 125:22, 137:13

**laying** [1] - 83:10

**lead** [9] - 99:12, 99:18, 100:2, 100:11, 100:18, 100:20, 105:5, 134:1

**leaders** [1] - 86:7

**leading** [6] - 99:16, 99:24, 134:2, 139:14, 150:9

**leads** [1] - 142:12

**learn** [11] - 12:18, 112:25, 116:2, 120:24, 121:2, 125:10, 131:22, 132:2, 137:6, 138:11, 140:21

**learned** [4] - 12:13, 12:22, 113:3, 124:12

**lease** [1] - 73:21

**leased** [1] - 23:16

**leasing** [1] - 73:20

**least** [5] - 59:11, 64:13, 77:8, 82:24, 137:8

**leave** [2] - 56:15, 71:5

**leaves** [1] - 95:15

**leaving** [1] - 48:18

**left** [4] - 10:24, 16:20, 71:14, 95:17

**legal** [2] - 54:13, 142:10

**legally** [2] - 54:14, 57:4, 71:25

**Lending** [1] - 40:23

**lengthy** [1] - 162:1

**less** [6] - 72:19, 87:2, 162:4, 162:10, 162:11, 162:12

**letters** [1] - 7:1

**LEWIS** [1] - 3:3

**liability** [2] - 21:12, 23:1

**license** [9] - 21:21, 21:23, 26:16, 26:20, 26:22, 36:25, 69:16, 110:10, 159:25

**licenses** [4] - 13:9, 21:22, 67:23, 70:15

**lied** [1] - 68:5

**lies** [1] - 24:23

**light** [2] - 42:25, 164:11

**lights** [1] - 87:5

**likely** [1] - 44:22

**limine** [1] - 33:4

**limitation** [1] - 43:17

**limited** [4] - 23:1, 83:18, 85:7, 152:10

**Limo** [5] - 40:9,

58:25, 60:14, 63:25, 77:13

**line** [1] - 18:7

**lines** [2] - 135:24, 145:2

**lineup** [1] - 67:1

**link** [3] - 45:17, 57:25, 154:13

**linked** [6] - 15:19, 64:24, 66:10, 74:24, 158:2, 158:3

**linking** [1] - 46:8

**lion's** [1] - 59:11

**list** [2] - 18:21, 158:15

**listed** [1] - 74:10

**LITTRELL** [33] - 3:3, 3:3, 3:6, 73:1, 73:4, 73:6, 73:25, 74:11, 74:17, 75:11, 76:15, 76:22, 77:8, 150:15, 150:23, 151:3, 151:7, 151:10, 151:14, 152:7, 152:12, 153:7, 153:11, 153:14, 153:18, 157:8, 157:12, 157:16, 158:12, 158:16, 160:20, 160:23, 162:9

**Littrell** [3] - 77:7, 151:10, 158:21

**Littrell's** [1] - 157:24

**live** [2] - 51:5, 54:4

**lived** [1] - 70:3

**living** [1] - 144:23

**LLC** [2] - 39:14, 40:9

**LLP** [2] - 3:3, 3:6

**loading** [1] - 129:2

**loan** [40] - 24:15, 24:22, 24:24, 41:7, 43:24, 49:24, 50:14, 52:11, 53:13, 58:25, 59:3, 59:4, 59:10, 62:24, 62:25, 64:16, 64:17, 64:18, 64:22, 64:23, 64:24, 66:11, 66:13, 67:11, 67:13, 67:17, 68:3, 81:9, 90:10, 90:17, 102:10, 109:21, 117:25, 118:7, 119:1, 119:8, 120:21, 120:22, 130:19, 130:24

**loans** [28] - 34:14, 34:16, 50:2, 50:3, 52:15, 52:20, 59:5, 63:11, 63:17, 64:14, 84:17, 90:14, 102:20, 102:22, 103:9, 118:20, 119:5,

120:25, 123:7, 123:9, 131:1, 132:23, 134:15, 135:15, 139:18

**locate** [1] - 110:7

**located** [3] - 55:23, 55:24, 141:16

**locating** [1] - 110:17

**location** [17] - 49:23, 92:21, 94:16, 94:17, 94:19, 95:13, 96:2, 96:5, 96:10, 97:1, 97:5, 97:13, 97:18, 97:22, 98:1, 160:7, 160:8

**locations** [1] - 49:22

**lockdown** [2] - 54:6, 54:19

**log** [6] - 17:12, 17:17, 18:9, 27:11, 95:4, 146:15

**log-in** [3] - 17:17, 18:9, 27:11

**log-on** [1] - 17:12

**lol** [1] - 27:17

**look** [43] - 12:2, 18:1, 19:6, 19:8, 19:21, 23:18, 23:20, 23:24, 25:14, 27:25, 28:8, 30:6, 49:18, 50:1, 51:1, 51:3, 51:7, 52:9, 75:6, 75:12, 84:21, 87:5, 95:4, 104:5, 104:19, 107:2, 107:5, 115:13, 115:22, 120:8, 121:25, 127:8, 131:6, 133:13, 135:23, 141:19, 142:11, 142:17, 142:22, 159:2, 160:20, 161:5, 164:7

**looked** [8] - 15:25, 19:16, 20:7, 127:10, 127:17, 127:21, 133:12, 153:10

**looking** [8] - 20:9, 35:10, 77:13, 87:23, 120:10, 127:18, 142:9, 159:23

**looks** [4] - 17:12, 136:24, 141:22, 143:2

**Los** [6] - 2:8, 2:13, 3:8, 91:23, 94:13, 143:19

**LOS** [4] - 1:14, 1:24, 6:1, 165:3

**lower** [1] - 28:21

**Luidmyla** [2] - 135:18, 136:8

**lunch** [1] - 161:10

**lunchtime** [1] - 163:13

# M

**mail** [7] - 18:1, 111:11, 111:12, 135:7, 136:2, 136:6, 136:20

**mailed** [5] - 121:21, 124:9, 124:17, 124:21, 124:23

**mails** [8] - 109:1, 111:1, 112:5, 112:10, 112:11, 112:19, 145:1, 145:23

**major** [1] - 52:21

**man** [2] - 64:24, 84:11

**mansion** [1] - 51:14

**MANUEL** [2] - 4:12, 94:4

**Manuel** [2] - 93:16, 94:3

**manufactured** [2] - 68:19, 69:7

**manufacturing** [1] - 69:5

**Manuk** [65] - 12:13, 25:3, 25:21, 25:25, 26:17, 27:22, 28:5, 28:17, 28:25, 29:5, 29:10, 33:10, 34:23, 37:6, 74:13, 92:9, 101:20, 104:14, 105:7, 105:12, 105:25, 106:2, 106:3, 107:14, 107:21, 115:3, 116:23, 117:13, 118:13, 118:19, 118:25, 119:4, 119:8, 119:13, 119:23, 120:2, 120:8, 120:11, 120:16, 120:24, 121:7, 121:10, 121:12, 121:18, 121:23, 124:1, 125:9, 126:1, 126:10, 127:9, 128:1, 128:8, 128:25, 129:8, 129:20, 130:8, 140:25, 144:14, 144:19, 145:7, 146:8, 146:16, 147:3, 150:19, 157:17

**Manukyan** [3] - 17:5, 25:21, 37:1

**March** [29] - 37:25, 38:3, 38:5, 38:7, 38:9, 101:13, 103:8, 104:1,

104:6, 104:20, 126:2, 126:3, 126:5, 126:11, 128:3, 128:9, 129:10, 129:22, 130:16, 130:20, 131:7, 133:3, 133:9, 133:13, 133:17, 134:9, 136:9, 136:18, 136:19

**MARIETTA** [1] - 3:2

**Marietta** [9] - 40:19, 43:12, 48:22, 49:18, 51:4, 78:2, 101:10, 146:16, 147:2

**Mark** [3] - 121:20, 124:8, 124:24

**marked** [3] - 25:15, 26:25, 115:14

**Market** [1] - 2:18

**Mary** [4] - 37:4, 75:2, 145:9, 146:11

**Marylee** [1] - 51:2

**mask** [1] - 98:23

**Massachusetts** [2] - 41:1, 41:6

**Massino** [1] - 100:24

**massive** [1] - 51:11

**match** [1] - 97:22

**material** [1] - 156:18

**materially** [2] - 68:13, 68:14

**materials** [1] - 148:24

**matter** [6] - 71:21, 72:18, 78:24, 100:17, 100:19, 165:12

**matters** [3] - 37:15, 78:11, 106:12

**Matthew** [3] - 78:20, 79:15, 85:17

**MATTHEW** [4] - 4:7, 79:7, 85:17, 85:19

**mean** [70] - 7:6, 7:18, 15:3, 18:25, 20:3, 20:15, 30:6, 31:2, 31:3, 32:13, 34:14, 35:15, 35:17, 35:19, 36:1, 37:9, 56:11, 56:23, 57:3, 61:5, 61:19, 75:23, 81:8, 81:21, 81:23, 81:25, 83:11, 83:12, 84:12, 84:20, 88:21, 93:6, 96:5, 98:3, 103:19, 105:13, 105:21, 106:6, 106:10, 112:9, 114:13, 114:19, 117:7, 119:20, 121:8, 122:1, 122:25, 123:15, 123:22, 126:18, 127:10,

129:14, 129:24, 131:10, 132:8, 132:20, 133:6, 136:4, 139:24, 140:2, 150:7, 150:25, 153:10, 155:5, 156:20, 156:24, 157:15, 162:12, 162:16, 162:17

**meaning** [4] - 55:4, 126:5, 152:10, 155:24

**means** [9] - 38:17, 41:17, 68:19, 69:6, 69:17, 97:8, 105:19, 134:2, 139:12

**Mechanics** [1] - 121:14

**Medet** [1] - 27:21

**MedetMurat1994@ gmail.com** [1] - 27:19

**Media** [5] - 33:13, 48:25, 49:10, 50:6, 51:23

**media** [3] - 120:8, 120:10, 147:25

**medical** [1] - 23:6

**medicine** [1] - 143:23

**meet** [4] - 32:24, 72:10, 87:17, 113:7

**meeting** [1] - 87:25

**MEGHAN** [1] - 2:14

**members** [1] - 78:10

**memorandum** [1] - 55:25

**memory** [3] - 95:1, 135:21, 136:5

**mentioned** [12] - 65:5, 75:15, 89:1, 89:20, 96:2, 97:18, 104:12, 113:16, 113:23, 113:24, 124:3, 144:25

**mere** [3] - 44:8, 46:2, 46:9

**Mesereau** [3] - 4:5, 20:23, 159:5

**MESEREAU** [12] - 20:17, 20:21, 21:19, 22:16, 24:6, 25:11, 159:9, 159:11, 159:15, 159:19, 162:3, 162:5

**message** [2] - 64:4, 111:5

**messages** [18] - 27:6, 27:10, 28:12, 59:15, 59:17, 59:19, 62:19, 64:1, 64:7, 64:15, 108:24,

110:25, 112:4, 145:1, 145:22, 146:19, 147:2
**messaging** [1] - 86:8
**met** [5] - 6:23, 87:18, 87:22, 88:1, 89:1
**Miami** [2] - 12:9, 94:20
**MICHAEL** [1] - 2:17
**microphone** [1] - 79:6
**middle** [3] - 66:24, 97:11, 98:4
**might** [8] - 45:1, 73:11, 73:13, 75:16, 146:2, 153:9, 153:23, 161:24
**million** [1] - 51:14
**Minnesota** [2] - 39:21, 40:10
**minutes** [7] - 42:2, 148:23, 159:4, 162:3, 162:4, 162:9
**mischaracterized** [1] - 68:17
**misleading** [2] - 68:14, 153:16
**mispronunciation** [1] - 65:11
**misquote** [1] - 113:8
**misrepresents** [1] - 35:5
**Missouri** [2] - 40:15, 41:1
**misspoke** [1] - 77:13
**misstates** [2] - 7:3, 9:17
**misstating** [2] - 7:16, 124:13
**mistake** [1] - 162:14
**misunderstand** [1] - 133:11
**misunderstanding** [1] - 63:15
**Mkrtchyan** [1] - 49:1
**mobile** [1] - 146:21
**Mod** [6] - 41:4, 45:16, 52:12, 52:13, 52:24, 53:13
**moment** [8] - 12:6, 47:24, 48:18, 53:24, 66:22, 99:9, 113:16, 114:9
**money** [53] - 7:13, 29:25, 34:9, 35:23, 46:23, 50:16, 50:19, 51:11, 51:18, 51:25, 52:2, 53:3, 53:4, 53:12, 55:5, 60:7, 60:23, 61:16, 64:8, 77:3, 77:9, 79:17,

81:19, 81:24, 81:25, 83:1, 83:15, 83:22, 84:6, 84:16, 102:7, 102:16, 102:18, 102:19, 103:24, 104:5, 104:19, 116:8, 117:21, 118:15, 119:9, 119:11, 119:21, 121:9, 130:23, 130:25, 137:16, 137:17, 137:18, 137:23, 137:24, 138:23, 139:5
**monies** [2] - 34:14, 34:15
**monitor** [3] - 94:17, 96:5, 97:4
**monitored** [2] - 94:19, 97:1
**monitoring** [5] - 44:13, 94:16, 95:13, 96:3, 96:10
**monitors** [1] - 26:11
**months** [3] - 59:3, 75:11, 76:24
**Moran** [1] - 27:15
**Morgan** [3] - 39:9, 40:3, 40:17
**morning** [6] - 6:20, 97:11, 98:3, 149:7, 163:12, 164:16
**most** [4] - 51:12, 65:15, 83:12, 99:24
**mother** [3] - 50:21, 50:23, 82:25
**motion** [11] - 33:4, 42:11, 42:15, 42:21, 43:5, 43:15, 43:18, 53:22, 56:24, 150:15, 151:19
**motions** [3] - 42:8, 77:21, 77:22
**Motor** [2] - 21:25, 23:5
**motor** [2] - 22:2, 22:9
**move** [6] - 10:11, 14:11, 29:15, 57:18, 143:8, 164:8
**moved** [6] - 102:7, 102:16, 104:5, 104:19, 130:23, 131:1
**moves** [2] - 42:9, 43:15
**moving** [4] - 27:13, 65:6, 90:5, 106:22
**MR** [478] - 6:11, 6:17, 7:3, 7:8, 7:14, 7:16, 7:23, 8:11, 8:13, 8:21, 8:22, 9:2, 9:17, 9:23, 10:11, 10:15, 10:18,

11:12, 11:15, 12:24, 13:2, 14:11, 14:12, 14:15, 15:18, 15:22, 16:5, 16:6, 16:8, 16:10, 16:18, 16:24, 20:14, 20:16, 20:17, 20:21, 21:17, 21:19, 22:14, 22:16, 24:2, 24:6, 24:8, 24:10, 25:11, 25:13, 25:16, 25:18, 26:2, 26:4, 26:10, 26:13, 29:7, 29:9, 29:13, 29:15, 29:16, 30:2, 30:4, 30:24, 31:6, 31:9, 31:10, 31:13, 31:15, 31:19, 31:23, 32:2, 32:12, 32:17, 32:19, 32:22, 33:7, 33:9, 33:22, 33:25, 34:11, 34:18, 34:21, 35:4, 35:10, 35:16, 35:21, 35:24, 36:8, 36:12, 36:21, 36:23, 37:8, 37:11, 37:13, 37:16, 37:19, 37:22, 38:21, 41:14, 41:16, 42:9, 42:17, 42:23, 43:4, 43:10, 43:12, 43:14, 44:11, 44:24, 45:6, 47:10, 47:19, 47:23, 48:5, 48:7, 48:9, 48:21, 49:5, 49:17, 54:9, 54:13, 54:25, 55:14, 55:18, 55:19, 56:2, 56:5, 56:13, 56:16, 56:22, 57:1, 57:11, 57:16, 58:4, 58:16, 58:21, 59:7, 59:13, 59:19, 59:23, 60:2, 60:12, 60:18, 60:25, 61:6, 61:12, 62:2, 62:9, 62:12, 62:18, 62:21, 63:4, 63:8, 63:19, 63:21, 63:24, 64:5, 64:8, 64:10, 64:12, 64:20, 64:23, 66:18, 66:24, 67:4, 67:7, 67:22, 68:1, 68:4, 68:10, 68:13, 69:23, 70:12, 70:19, 71:1, 71:9, 71:12, 71:15, 71:19, 71:24, 72:2, 72:5, 73:1, 73:4, 73:6, 73:16, 73:19, 73:23, 73:25, 74:11, 74:17, 74:21, 75:2, 75:11, 75:25, 76:10, 76:15, 76:16, 76:20, 76:22, 77:3, 77:8, 77:11,

77:25, 83:21, 83:25, 84:3, 84:9, 84:25, 87:13, 88:6, 88:19, 89:4, 89:8, 90:3, 90:6, 90:9, 91:3, 91:18, 91:21, 92:12, 92:15, 92:22, 92:25, 93:5, 93:7, 93:10, 93:12, 93:16, 94:7, 94:10, 94:25, 95:11, 95:20, 96:18, 96:21, 97:15, 98:13, 99:5, 99:8, 99:15, 99:19, 99:20, 100:3, 100:5, 100:6, 103:3, 103:5, 103:10, 103:12, 103:16, 103:18, 103:21, 103:23, 104:2, 104:4, 104:7, 104:11, 104:18, 105:8, 105:10, 105:15, 105:18, 106:5, 106:9, 106:20, 106:23, 107:1, 107:15, 107:19, 107:22, 107:24, 108:1, 108:9, 109:8, 110:19, 110:22, 110:24, 111:3, 111:10, 111:21, 111:23, 112:1, 112:3, 112:6, 112:8, 112:17, 112:23, 113:12, 113:15, 114:12, 114:16, 114:18, 114:21, 114:24, 116:24, 117:2, 117:4, 117:6, 118:21, 118:24, 119:2, 119:6, 119:14, 119:16, 119:18, 119:24, 120:6, 121:1, 121:4, 122:2, 122:5, 122:17, 122:23, 123:1, 123:11, 123:18, 123:24, 124:13, 124:20, 125:4, 125:6, 125:8, 125:12, 125:14, 125:17, 125:21, 125:24, 126:12, 126:14, 127:6, 127:22, 128:4, 128:6, 128:10, 128:17, 128:19, 128:24, 129:4, 129:7, 129:12, 129:16, 129:19, 129:23, 130:1, 130:6, 130:12, 131:4, 131:8, 131:16, 131:25, 132:5, 132:17, 133:1, 133:5,

133:11, 133:19, 133:21, 133:24, 134:4, 134:20, 135:1, 135:4, 135:12, 136:15, 137:9, 137:12, 137:21, 137:22, 137:24, 138:2, 138:14, 138:17, 138:19, 139:3, 139:10, 139:13, 139:15, 139:19, 139:23, 140:1, 140:7, 140:9, 140:20, 141:2, 141:5, 141:8, 143:8, 143:12, 143:15, 143:20, 144:1, 145:11, 145:15, 145:20, 146:5, 148:23, 149:3, 149:5, 149:8, 149:13, 149:16, 149:22, 150:2, 150:10, 150:14, 150:15, 150:23, 151:3, 151:7, 151:10, 151:11, 151:14, 152:7, 152:12, 152:17, 152:21, 153:2, 153:7, 153:11, 153:14, 153:18, 153:25, 154:11, 154:17, 154:20, 154:22, 155:11, 155:17, 155:21, 155:22, 156:2, 156:4, 156:6, 156:16, 156:20, 156:23, 157:2, 157:6, 157:8, 157:12, 157:16, 157:22, 158:4, 158:6, 158:10, 158:12, 158:14, 158:16, 158:19, 158:25, 159:4, 159:9, 159:11, 159:15, 159:19, 159:20, 160:10, 160:14, 160:19, 160:20, 160:23, 161:15, 161:21, 161:24, 162:3, 162:5, 162:7, 162:9, 162:23, 163:1, 163:4, 163:6, 163:12, 163:15, 163:20, 163:24, 164:2, 164:6, 164:8, 164:13
**MS** [37] - 65:4, 66:1, 66:4, 68:16, 68:22, 69:4, 69:13, 72:14, 78:20, 78:23, 79:14, 79:19, 83:2, 83:20, 84:19, 85:2, 85:23,

87:15, 87:16, 87:20, 88:16, 88:23, 88:25, 89:6, 89:10, 89:15, 89:16, 89:25, 90:22, 94:23, 95:6, 95:8, 95:22, 95:24, 96:17, 97:17, 98:8
**multiple** [1] - 35:15
**Murat** [1] - 27:21
**must** [3] - 23:12, 35:6, 136:25

## N

**N.A** [1] - 39:9
**NA** [6] - 38:12, 39:18, 40:3, 40:8, 40:17, 41:3
**name** [57] - 11:2, 16:25, 17:5, 19:23, 19:25, 20:13, 27:11, 28:20, 28:23, 39:10, 39:13, 39:19, 39:24, 40:4, 40:9, 40:13, 40:17, 40:18, 40:24, 41:3, 41:8, 50:20, 52:11, 53:4, 59:1, 66:13, 67:12, 68:5, 71:7, 76:25, 79:5, 85:16, 91:11, 94:1, 98:21, 105:22, 107:9, 107:14, 109:11, 110:10, 111:5, 112:13, 112:16, 113:21, 113:22, 114:3, 121:20, 124:24, 128:3, 130:14, 135:8, 135:21, 135:25, 136:7, 144:8, 144:11
**NAME** [1] - 4:3
**named** [1] - 49:9
**names** [9] - 51:22, 70:8, 70:9, 133:22, 134:7, 134:8, 135:14, 144:16, 144:17
**narcotics** [1] - 91:24
**Nationwide** [1] - 20:6
**native** [1] - 10:16
**nature** [1] - 25:9
**nay** [1] - 134:3
**Nazar** [5] - 52:10, 52:23, 53:1, 53:3, 53:12
**necessary** [1] - 43:2
**need** [7] - 26:11, 51:19, 54:1, 72:15, 73:6, 83:23, 86:20
**needing** [1] - 86:21
**needs** [1] - 38:19

**negotiated** [1] - 19:2
**never** [6] - 10:8, 11:3, 34:1, 61:14, 63:2, 129:14
**New** [9] - 2:16, 27:6, 27:13, 28:1, 28:2, 39:15, 40:15, 41:1
**new** [5] - 86:13, 86:23, 112:15, 140:3, 140:4
**Newcomer** [1] - 4:8
**NEWCOMER** [22] - 2:14, 78:20, 78:23, 79:14, 79:19, 83:2, 83:20, 84:19, 85:2, 85:23, 87:15, 87:16, 87:20, 88:16, 88:23, 88:25, 89:6, 89:10, 89:15, 89:16, 89:25, 90:22
**news** [1] - 78:13
**NewTek** [1] - 41:8
**next** [13] - 17:4, 18:1, 37:18, 57:15, 91:2, 93:15, 125:15, 125:16, 134:23, 136:13, 143:20, 143:22, 144:2
**nice** [1] - 148:18
**NICHOLAS** [1] - 2:20
**Ninth** [5] - 46:5, 46:6, 55:2, 55:3, 66:1
**NO** [2] - 1:23, 165:20
**nobody** [1] - 63:9
**non** [1] - 150:8
**none** [1] - 44:2
**North** [2] - 2:7, 3:15
**note** [2] - 28:9, 46:19
**noted** [1] - 45:6
**notes** [1] - 53:1
**nothing** [10] - 56:13, 56:17, 66:5, 69:5, 69:6, 69:15, 73:10, 138:8, 151:2, 157:8
**notification** [1] - 44:12
**notifications** [1] - 97:10
**November** [1] - 101:5
**NUMBER** [1] - 5:3
**number** [9] - 12:6, 14:23, 28:24, 59:9, 72:19, 147:1, 158:1, 158:2
**Numbers** [1] - 27:25
**numbers** [5] - 14:17, 146:19, 146:20, 147:3, 152:13
**numerous** [2] - 50:2,

64:5
**NW** [1] - 2:21

## O

**O'Campo** [3] - 46:4, 46:7, 46:9
**o'clock** [2] - 148:13, 148:17
**Oath** [3] - 79:3, 85:13, 93:23
**oath** [3] - 79:11, 91:6, 98:18
**object** [5] - 72:15, 137:16, 137:17, 150:22, 154:8
**objected** [1] - 16:4
**objecting** [2] - 30:18, 154:2
**objection** [93] - 7:3, 7:14, 8:21, 9:17, 12:24, 14:12, 15:21, 20:14, 21:17, 22:14, 24:2, 24:4, 25:11, 29:7, 29:13, 30:2, 31:13, 32:16, 32:17, 32:20, 37:8, 87:13, 88:6, 88:7, 88:19, 88:22, 89:4, 89:8, 89:9, 90:22, 90:25, 93:5, 94:23, 103:3, 103:10, 103:16, 103:20, 104:2, 104:7, 104:8, 105:8, 105:15, 106:5, 106:23, 106:25, 107:15, 107:22, 108:1, 109:8, 110:22, 111:3, 111:21, 112:1, 112:6, 113:12, 116:24, 117:3, 118:21, 119:2, 119:14, 119:16, 121:1, 122:5, 123:11, 123:16, 123:23, 125:4, 125:12, 125:19, 126:12, 128:10, 129:12, 129:13, 129:23, 129:25, 131:8, 131:25, 133:5, 133:24, 137:9, 137:21, 137:24, 138:14, 139:10, 139:19, 141:2, 141:4, 145:11, 145:18, 150:15, 151:16, 153:4
**objectionable** [1] - 15:23
**objections** [2] - 89:11, 161:6

**objects** [1] - 138:20
**obligated** [1] - 41:20
**observed** [2] - 15:9, 46:6
**observing** [1] - 157:5
**obtain** [1] - 123:20
**obtained** [2] - 53:3, 118:6, 124:23
**obvious** [1] - 75:13
**obviously** [2] - 75:14, 76:6
**occasion** [1] - 110:3
**occurred** [1] - 39:2
**October** [9] - 11:19, 12:7, 12:9, 46:20, 77:4, 94:20, 95:3, 95:14, 95:17
**OF** [8] - 1:2, 1:5, 1:12, 2:1, 3:14, 165:1, 165:3, 165:4
**offense** [2] - 47:2, 63:13
**offer** [1] - 92:22
**offered** [2] - 8:22, 150:18
**offhand** [3] - 80:12, 82:17, 82:20
**office** [2] - 27:16, 69:14
**OFFICE** [2] - 2:4, 3:14
**officer** [6] - 91:13, 91:23, 92:16, 93:1, 93:17, 97:18
**Officer** [4] - 15:20, 91:3, 91:18, 95:25
**officers** [1] - 127:20
**Official** [2] - 165:6, 165:20
**OFFICIAL** [2] - 1:23, 165:1
**often** [1] - 86:17
**Ohio** [1] - 39:25
**OIG** [4] - 100:15, 100:16, 100:18
**old** [1] - 81:24
**old-fashioned** [1] - 81:24
**once** [4] - 6:24, 14:25, 82:5, 110:9
**one** [66] - 15:9, 20:7, 22:25, 24:18, 27:17, 28:12, 34:11, 42:23, 44:4, 49:21, 56:7, 58:13, 59:17, 64:17, 68:16, 70:4, 72:25, 73:11, 74:15, 74:17, 75:14, 76:8, 76:9, 77:3, 77:11, 77:12, 78:1, 86:17, 93:1,

93:15, 101:5, 101:20, 106:1, 110:3, 110:5, 116:19, 118:9, 121:12, 123:25, 124:8, 126:10, 130:21, 133:22, 134:5, 134:8, 135:13, 140:10, 140:22, 144:2, 144:21, 145:6, 145:8, 146:8, 146:10, 146:24, 150:18, 151:2, 151:23, 151:25, 152:11, 159:22, 161:15, 163:1, 163:20, 164:17
**One** [9] - 17:13, 33:13, 34:22, 38:12, 41:3, 48:25, 49:10, 50:5, 51:23
**ongoing** [1] - 20:4
**online** [2] - 147:25, 148:1
**onward** [1] - 130:20
**oOo** [1] - 6:4
**opening** [2] - 75:24, 161:14
**operate** [1] - 23:13
**operating** [1] - 123:6
**operative** [1] - 104:10
**opinion** [2] - 106:7, 106:17
**opportunity** [3] - 89:13, 142:11, 150:3
**opposing** [1] - 163:18
**orchestrated** [6] - 54:2, 54:10, 54:11, 54:16, 55:3
**order** [4] - 43:6, 44:7, 71:21, 155:12
**organization** [1] - 23:2
**original** [6] - 103:7, 111:13, 137:6, 137:19, 140:23, 144:6
**originally** [2] - 80:2, 88:1
**otherwise** [2] - 147:6, 156:9
**ought** [3] - 7:17, 30:13, 36:15
**outlining** [1] - 63:8
**outside** [3] - 54:18, 63:1, 78:12
**overarching** [1] - 122:8
**overlooked** [1] - 153:23
**overnight** [3] -

158:9, 158:10, 164:7
**overrule** [1] - 104:8
**overruled** [7] - 12:25, 21:18, 22:15, 88:7, 112:7, 119:3, 149:24
**overtime** [1] - 80:22
**overview** [1] - 99:22
**overwhelmingly** [2] - 51:17, 74:11
**own** [2] - 68:5, 160:4
**owned** [2] - 33:11, 35:1
**owner** [3] - 28:2, 58:25, 74:10

### P

**P-a-l-m-e-r-t-o-n** [1] - 99:1
**P-e-l-t-i-e-r** [1] - 85:18
**P.M** [2] - 1:13, 6:3
**p.m** [2] - 163:24, 164:21
**Pacific** [1] - 3:15
**package** [1] - 143:17
**PAETTY** [22] - 2:6, 58:16, 58:21, 59:7, 59:13, 59:19, 59:23, 60:12, 63:24, 64:5, 64:8, 64:10, 84:9, 84:25, 87:13, 88:6, 88:19, 89:4, 89:8, 90:3, 90:6, 90:9
**Paetty** [1] - 4:9
**Page** [1] - 5:3
**page** [30] - 4:3, 7:25, 12:1, 14:23, 15:14, 16:5, 16:11, 16:19, 17:7, 18:5, 18:15, 19:13, 20:6, 27:3, 27:25, 60:17, 107:5, 115:20, 115:22, 115:24, 134:23, 134:24, 135:23, 135:24, 143:20, 144:2, 165:12
**pages** [4] - 14:4, 92:16, 107:4, 145:23
**paid** [16] - 10:2, 18:21, 19:1, 33:13, 33:15, 73:9, 74:25, 82:2, 82:3, 120:25, 121:6, 137:19, 137:21, 138:6, 138:12, 138:14
**PALMERTON** [2] - 4:16, 99:2
**Palmerton** [18] -

98:15, 98:25, 99:5, 99:21, 149:18, 149:25, 150:1, 150:3, 150:12, 153:19, 154:1, 154:7, 154:16, 154:19, 154:23, 154:24, 158:19, 160:12
**Palmerton's** [2] - 152:25, 157:2
**pandemic** [1] - 54:6
**paper** [1] - 92:13
**paragraph** [1] - 115:24
**Paraway** [1] - 109:22
**Paronyan** [25] - 101:23, 104:14, 118:8, 118:13, 118:20, 119:1, 119:5, 119:7, 119:12, 119:21, 119:23, 120:1, 120:4, 120:8, 120:12, 120:16, 120:18, 121:6, 121:18, 126:1, 145:7, 146:9, 147:9, 147:14, 148:9
**Paronyan's** [1] - 120:14
**Parowa** [2] - 107:10
**part** [37] - 16:1, 21:5, 30:10, 42:21, 51:25, 73:12, 86:25, 90:13, 94:14, 94:17, 94:22, 100:13, 104:12, 105:12, 105:24, 107:12, 108:17, 109:3, 109:5, 109:20, 110:20, 112:24, 114:21, 118:25, 120:7, 121:11, 121:22, 123:8, 125:9, 127:7, 127:23, 132:2, 138:11, 140:10, 140:21, 145:21, 147:24
**partially** [1] - 14:9
**participant** [1] - 51:25
**participants** [6] - 138:5, 139:7, 139:11, 139:16, 139:24, 140:3
**participated** [1] - 45:20
**participates** [1] - 117:10
**participation** [4] - 43:23, 51:15, 51:17, 57:22
**particular** [14] -

11:16, 18:8, 43:19, 44:7, 45:24, 46:10, 46:16, 46:17, 50:10, 50:25, 52:5, 53:15, 151:25, 158:7
**particularly** [2] - 53:20, 87:24
**parties** [5] - 8:4, 37:24, 38:15, 38:17, 41:12
**parts** [2] - 16:2, 16:3
**party** [1] - 163:18
**pass** [1] - 27:19
**passports** [1] - 67:16
**password** [3] - 17:12, 18:2, 18:9
**passwords** [1] - 13:11
**past** [1] - 126:16
**patently** [1] - 72:23
**path** [1] - 156:7
**pattern** [4] - 70:5, 72:9, 72:10, 72:15
**patterns** [2] - 129:21, 129:25
**Paul** [1] - 42:15
**pay** [3] - 49:20, 50:16, 75:8
**paying** [4] - 73:24, 116:3, 116:6, 117:20
**payments** [2] - 73:18, 73:23
**payroll** [1] - 102:11
**pays** [1] - 50:21
**PELTIER** [3] - 4:7, 79:7, 85:19
**Peltier** [6] - 78:21, 79:15, 85:17, 85:24, 87:8, 90:10
**pending** [1] - 88:24
**Pennsylvania** [2] - 39:16, 40:20
**people** [25] - 37:7, 47:22, 54:19, 59:20, 59:25, 70:1, 72:8, 83:12, 90:5, 102:16, 103:6, 103:25, 109:7, 119:19, 120:24, 123:25, 126:3, 129:21, 130:13, 130:23, 131:1, 137:18, 140:2, 145:5, 162:1
**per** [1] - 141:1
**percent** [3] - 59:5, 80:16, 80:17
**percentage** [5] - 80:11, 117:17, 138:6, 139:17, 140:23
**performed** [2] - 9:24,

10:1
**perhaps** [4] - 62:9, 63:5, 68:17, 68:22
**period** [5] - 54:18, 88:13, 128:12, 134:14, 161:17
**permission** [3] - 16:21, 99:15, 99:23
**permit** [1] - 22:2
**permits** [4] - 22:7, 22:8, 22:9, 23:12
**person** [24] - 19:25, 52:6, 63:11, 63:12, 64:18, 65:17, 65:25, 69:18, 71:16, 71:23, 72:9, 72:23, 75:3, 75:7, 79:16, 105:22, 108:3, 110:1, 112:10, 112:11, 112:12, 112:15, 112:16, 114:20
**person's** [1] - 112:12
**persona** [2] - 105:3, 105:23
**personal** [3] - 48:25, 50:13, 53:1
**personally** [1] - 142:4
**Peter** [2] - 57:16, 161:21
**PETER** [2] - 3:14, 3:14
**phone** [30] - 26:15, 28:12, 37:1, 48:19, 48:20, 49:2, 49:4, 67:4, 67:9, 67:23, 67:24, 67:25, 68:1, 69:1, 69:6, 70:14, 72:20, 97:19, 97:20, 152:11, 158:1, 158:2, 158:5, 158:6, 158:11, 158:12, 158:16, 160:6
**phones** [8] - 13:16, 13:18, 13:19, 13:20, 13:22, 13:24, 37:3, 37:5
**phonetic** [3] - 6:21, 8:8, 109:22
**photo** [5] - 92:20, 97:21, 113:24, 114:6, 115:1
**photograph** [3] - 36:25, 37:3, 114:4
**photographed** [1] - 118:6
**photographic** [1] - 136:5
**photographs** [2] - 68:25, 72:19
**photos** [2] - 111:1,

148:1
**phrased** [2] - 132:18, 145:15
**physical** [3] - 69:7, 76:17, 76:23
**pictured** [1] - 113:23
**piece** [1] - 127:4
**pieces** [2] - 143:6, 143:23
**Pinkerton** [4] - 44:17, 44:19, 44:25, 45:3
**pivot** [1] - 86:20
**pivoted** [2] - 86:12, 86:15
**place** [4] - 49:25, 118:18, 122:20, 156:8
**placed** [7] - 47:12, 47:21, 49:3, 81:15, 96:12, 96:13, 142:10
**places** [2] - 47:19, 47:20, 48:11
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:3
**plan** [3] - 42:12, 154:2, 161:4
**planning** [3] - 155:11, 160:11, 160:12
**plans** [1] - 154:1
**platform** [1] - 86:9
**plea** [1] - 60:7
**plus** [1] - 104:14
**PO'ed** [1] - 36:2
**pocket** [1] - 81:25
**point** [37] - 8:3, 12:13, 19:9, 24:4, 31:11, 32:18, 33:8, 33:15, 34:4, 35:22, 41:17, 41:23, 48:15, 54:24, 56:7, 57:7, 57:25, 58:14, 60:2, 65:9, 69:10, 70:4, 70:5, 76:4, 76:16, 77:3, 77:11, 77:22, 78:1, 84:14, 87:14, 89:13, 127:14, 128:13, 150:10, 152:16, 160:22
**pointed** [6] - 26:16, 28:5, 28:17, 28:25, 66:16, 74:18
**points** [5] - 66:22, 67:2, 67:3, 69:23, 163:20
**police** [1] - 91:23
**Police** [1] - 91:23
**pool** [6] - 142:4, 142:7, 142:8, 142:15, 144:5, 144:21

pooled [1] - 143:6
pools [2] - 120:13, 120:15
position [6] - 34:8, 34:25, 75:17, 78:4, 153:11, 161:3
possessed [6] - 26:20, 65:13, 65:18, 66:8, 75:11, 76:24
possessing [1] - 65:25
possession [12] - 25:21, 25:25, 26:17, 26:24, 27:23, 28:5, 29:1, 32:5, 47:13, 49:14, 157:14, 157:24
possible [1] - 85:5
possibly [2] - 99:24, 135:17
potential [1] - 151:19
potentially [2] - 102:17, 151:18
PPP [55] - 24:15, 24:22, 24:24, 34:14, 34:16, 41:7, 43:24, 49:24, 50:13, 50:14, 50:19, 51:6, 51:12, 52:2, 52:11, 52:14, 52:20, 53:13, 58:25, 62:25, 63:17, 66:13, 67:11, 67:13, 68:3, 84:17, 102:10, 102:20, 102:22, 103:9, 108:14, 108:15, 109:20, 115:2, 117:10, 117:24, 118:7, 118:20, 119:1, 119:5, 119:8, 120:22, 120:25, 122:3, 123:7, 123:8, 130:19, 130:24, 131:1, 131:23, 131:24, 132:23, 133:3, 134:14, 135:15
pre [6] - 130:16, 131:7, 131:23, 131:24, 133:3, 135:15
pre-2020 [3] - 128:12, 130:15, 131:6
pre-March [2] - 130:16, 131:7
pre-PPP [4] - 131:23, 131:24, 133:3, 135:15
precise [2] - 8:15, 64:6
predated [1] - 134:14
preface [1] - 146:6
preferred [1] - 80:7
preparation [2] -

9:14, 9:24
preparations [1] - 10:1
prepare [3] - 67:20, 67:21, 156:25
prepared [6] - 7:11, 51:2, 61:18, 163:7, 163:12, 163:13
presence [5] - 44:8, 46:2, 46:9, 63:1, 78:12
present [2] - 31:22, 41:19
presented [15] - 36:2, 41:18, 42:18, 60:5, 63:2, 63:18, 65:13, 66:5, 66:12, 68:24, 69:8, 69:18, 72:5, 73:8, 74:14
preserve [1] - 151:18
president [1] - 50:5
pretrial [4] - 60:22, 61:2, 94:12, 94:14
pretty [1] - 123:4
previously [5] - 6:14, 26:6, 86:11, 128:10, 148:16
primary [2] - 42:18, 78:2
Primavera [5] - 8:11, 141:17, 141:24, 143:7, 144:22
principally [1] - 30:9
private [2] - 82:9, 87:4
probation [2] - 93:17, 94:12
problem [1] - 73:25
problematic [1] - 47:14
problems [2] - 85:6, 86:22
proceed [3] - 6:11, 99:16, 102:15
proceeding [2] - 63:16, 161:2
proceedings [4] - 53:21, 63:2, 164:21, 165:11
proceeds [3] - 118:7, 130:24
process [4] - 19:22, 20:3, 20:8, 62:13
produce [5] - 46:8, 58:5, 149:11, 150:11, 157:13
produced [9] - 149:19, 150:14, 157:3, 157:7, 157:23, 158:20, 158:21,

158:23, 164:4
product [3] - 86:12, 86:21, 87:7
production [6] - 10:9, 11:12, 148:24, 149:1, 149:2, 149:4
professional [1] - 87:11
proffer [2] - 16:15, 79:21
profitable [3] - 81:16, 81:20, 87:7
profits [2] - 81:14, 81:18
programs [2] - 69:4, 69:5
progress [2] - 87:4, 141:7
project [1] - 86:13
promise [1] - 36:21
promptly [1] - 148:17
pronounce [2] - 27:11, 107:13
pronunciations [1] - 144:17
proof [1] - 46:8
proper [2] - 155:7, 155:20
property [4] - 92:6, 141:16, 142:11, 142:13
proposed [2] - 79:12, 161:3, 161:9
prove [1] - 86:17
provide [3] - 71:25, 116:16, 147:1
provided [5] - 14:9, 14:10, 102:9, 149:9, 163:24
provider [2] - 154:5, 160:5
providers [1] - 146:21
proving [1] - 43:5
public [1] - 21:8
publicly [1] - 82:8
publish [2] - 16:21, 143:15
published [1] - 15:1
pull [8] - 7:24, 10:15, 16:8, 16:19, 19:23, 19:25, 116:15, 136:22
pulled [1] - 116:16
pulling [1] - 109:19
punch [1] - 56:15
punctual [1] - 78:17
purchase [5] - 8:3, 51:4, 51:14, 53:13, 127:24

purchased [4] - 23:16, 32:6, 32:8, 51:5
purchases [1] - 130:8
purchasing [3] - 128:8, 129:20, 130:4
pure [1] - 15:24
purely [1] - 110:16
purported [1] - 69:16
purportedly [1] - 50:5
purports [2] - 18:3, 142:1
purposes [3] - 110:17, 115:13, 134:22
pursuant [1] - 165:9
pursue [1] - 89:14
put [12] - 15:14, 16:6, 72:6, 72:7, 74:12, 82:4, 83:10, 96:7, 97:7, 118:17, 136:6, 146:22
putting [2] - 31:24, 32:1

Q

Quality [3] - 29:18, 33:12, 39:19
questioning [6] - 58:21, 68:7, 106:8, 122:25, 154:1, 155:7
questions [52] - 7:7, 20:16, 20:25, 24:7, 30:7, 30:14, 30:15, 30:16, 30:19, 36:9, 36:10, 36:12, 36:13, 36:21, 37:11, 79:10, 83:14, 90:5, 93:10, 95:20, 96:17, 98:8, 99:16, 107:17, 114:2, 115:25, 118:1, 122:13, 127:5, 128:11, 129:2, 131:10, 132:9, 132:13, 135:2, 141:6, 150:3, 150:8, 150:17, 151:24, 154:7, 154:10, 154:12, 154:23, 154:24, 154:25, 155:2, 155:13, 156:14, 159:12
quick [5] - 60:11, 63:22, 74:20, 74:21, 137:13
quickly [1] - 160:18
quite [3] - 59:19,

78:13, 151:3

R

Radius [4] - 11:13, 40:23, 41:3, 60:15
raise [6] - 79:2, 80:22, 85:12, 91:5, 93:22, 98:17
raised [1] - 58:14
raising [1] - 60:9
ram [9] - 35:5, 122:2, 128:12, 149:9, 149:22, 154:23, 155:6, 156:7, 160:11
Ram [2] - 4:17, 150:16
RAM [121] - 2:11, 33:25, 34:11, 35:24, 83:21, 83:25, 84:3, 93:16, 98:13, 99:5, 99:8, 99:15, 99:19, 99:20, 100:3, 100:5, 100:6, 103:5, 103:12, 103:23, 104:4, 104:11, 104:18, 105:10, 105:18, 106:9, 106:20, 107:1, 107:19, 107:24, 108:9, 110:19, 110:24, 111:10, 111:23, 112:3, 112:17, 112:23, 113:15, 114:16, 114:18, 114:21, 114:24, 117:6, 118:24, 119:6, 119:18, 119:24, 120:6, 121:4, 122:17, 122:23, 123:1, 123:18, 123:24, 124:20, 125:8, 125:14, 125:17, 125:21, 125:24, 127:6, 127:22, 128:6, 128:17, 128:19, 128:24, 129:4, 129:7, 129:16, 129:19, 130:1, 130:6, 130:12, 131:4, 131:16, 132:5, 132:17, 133:1, 133:11, 133:19, 133:21, 134:4, 134:20, 135:1, 135:4, 135:12, 136:15, 137:12, 137:22, 138:2, 138:17, 139:3, 139:13, 139:15, 139:23, 140:1, 140:7, 140:9, 140:20, 141:5, 141:8, 143:8, 143:12,

143:15, 143:20, 144:1, 145:20, 146:5, 148:23, 149:5, 151:11, 153:25, 155:22, 156:4, 159:4, 159:20, 162:7, 162:23, 163:1, 163:4

**ram's** [2] - 155:13, 160:14

**ran** [1] - 146:19

**random** [2] - 97:24, 98:1

**randomly** [2] - 97:10, 97:12

**rather** [2] - 47:4, 55:9

**rational** [2] - 76:22, 77:1

**reach** [1] - 43:7

**reaction** [1] - 163:14

**read** [12] - 14:25, 27:10, 28:1, 28:20, 37:20, 62:6, 72:19, 79:11, 95:7, 144:16, 164:11

**reading** [2] - 94:24, 124:22

**real** [19] - 24:11, 24:14, 24:24, 64:17, 64:18, 65:17, 65:25, 68:8, 69:18, 70:9, 71:3, 71:16, 71:23, 72:22, 76:12, 76:13, 85:6, 118:17, 136:8

**really** [9] - 8:17, 34:3, 46:24, 47:11, 65:22, 86:21, 102:8, 151:8, 151:17

**Realtime** [1] - 165:6

**Realty** [1] - 39:24

**reason** [5] - 22:4, 53:24, 82:22, 156:7, 164:11

**reasonable** [9] - 35:19, 45:19, 45:20, 45:23, 45:24, 46:15, 53:20, 57:11, 162:21

**reasonableness** [1] - 57:13

**reasons** [1] - 144:21

**receipt** [1] - 143:24

**receive** [5] - 13:22, 16:3, 44:7, 83:21, 147:9

**received** [35] - 10:13, 10:14, 15:6, 16:22, 16:23, 24:22, 29:25, 44:10, 52:14, 55:12, 59:5, 60:4, 61:11, 81:5, 82:18, 92:23, 92:24, 109:16, 124:7,

136:2, 138:16, 138:17, 139:8, 139:17, 140:11, 140:23, 140:25, 141:22, 143:10, 143:11, 146:20, 148:24, 149:5, 149:6, 154:5

**receiving** [1] - 16:15

**recently** [1] - 52:7

**recess** [5] - 41:25, 77:16, 77:17, 77:18, 148:15

**recipient** [3] - 44:6, 44:9, 52:21

**recognize** [7] - 92:16, 107:4, 107:6, 139:17, 142:11, 142:24, 144:8

**recognized** [3] - 113:24, 114:5, 114:6

**recollection** [4] - 14:21, 20:8, 32:25, 76:3

**record** [13] - 9:3, 9:5, 16:7, 21:8, 35:6, 37:20, 73:2, 73:10, 85:16, 91:12, 94:2, 95:12, 98:22

**recording** [1] - 152:10

**records** [23] - 9:11, 51:8, 54:19, 75:5, 84:24, 108:22, 110:10, 118:5, 141:22, 146:15, 157:22, 158:1, 158:5, 158:6, 158:7, 158:11, 158:12, 158:20, 158:21, 158:23, 159:23, 163:8

**recover** [1] - 153:23

**recycling** [1] - 142:9

**red** [1] - 102:12

**REDIRECT** [2] - 24:9, 96:20

**Redirect** [2] - 4:6, 4:14

**redirect** [2] - 36:24, 96:18

**Redline** [13] - 40:4, 40:18, 120:19, 120:21, 121:9, 121:12, 121:14, 121:15, 121:21, 124:9, 124:11, 124:21, 124:25

**Redondo** [1] - 3:16

**refer** [3] - 59:19, 64:1, 126:19

**reference** [2] - 28:4, 45:7

**referenced** [5] - 47:25, 103:25, 135:21, 136:21, 164:2

**references** [3] - 45:14, 45:15, 64:5

**referred** [5] - 59:18, 61:11, 64:14, 109:7, 113:22

**referring** [12] - 59:24, 60:6, 60:19, 60:21, 61:1, 62:3, 64:3, 109:4, 138:21, 151:15, 151:17, 153:20

**refresh** [2] - 14:20, 135:21

**refuse** [1] - 142:9

**regard** [4] - 21:1, 46:4, 64:4, 122:8

**regarding** [17] - 9:4, 9:5, 10:19, 28:16, 29:1, 31:7, 33:23, 36:25, 39:1, 39:6, 58:18, 59:25, 60:13, 66:23, 90:16, 138:22, 152:25

**regardless** [3] - 14:16, 15:7, 52:1

**register** [2] - 19:23, 20:10

**registered** [1] - 158:17

**registration** [1] - 22:21

**regulations** [1] - 165:13

**relate** [3] - 114:22, 154:5, 157:4

**related** [19] - 9:11, 60:7, 77:14, 90:10, 107:25, 120:12, 120:25, 125:3, 130:24, 137:19, 138:12, 139:7, 139:11, 139:18, 140:24, 145:24, 148:24, 149:6, 157:14

**relates** [6] - 38:24, 50:2, 50:4, 57:20, 58:18, 144:5

**relating** [1] - 49:1

**relation** [4] - 45:15, 66:8, 68:20, 111:16

**relationship** [17] - 25:3, 25:10, 45:19, 52:19, 85:4, 87:12, 90:13, 103:8, 107:20, 111:17, 111:19,

113:2, 119:12, 119:14, 119:16, 144:15, 144:19

**relationships** [2] - 103:13, 132:22

**release** [1] - 25:16

**relevance** [7] - 21:17, 22:14, 24:2, 85:5, 87:13, 88:6, 88:19

**relevant** [6] - 32:4, 75:4, 83:7, 84:2, 126:22, 160:17

**rely** [2] - 44:25, 45:3

**remains** [1] - 42:3

**remember** [10] - 34:15, 57:25, 59:2, 59:3, 60:24, 61:13, 69:9, 69:10, 101:5, 132:13

**remembered** [1] - 35:13

**remembers** [1] - 60:22

**remind** [1] - 47:17

**reminds** [1] - 33:2

**rendered** [1] - 8:19

**rent** [5] - 49:20, 73:9, 73:18, 73:24, 75:8

**repeat** [2] - 128:18, 136:12

**repeatedly** [1] - 52:18

**repeating** [1] - 66:7

**rephrase** [1] - 9:22

**report** [8] - 23:7, 23:9, 127:17, 127:21, 147:16, 156:18, 156:19, 156:20

**reported** [1] - 165:11

**REPORTER** [2] - 1:23, 165:1

**Reporter** [2] - 165:7, 165:20

**REPORTER'S** [1] - 1:12

**represent** [7] - 11:19, 26:9, 26:14, 28:11, 43:9, 62:5, 163:21

**representation** [1] - 156:12

**represented** [1] - 77:7

**representing** [2] - 43:11, 62:6

**request** [5] - 96:7, 153:25, 155:22, 156:5, 157:10

**requested** [1] -

110:10

**requests** [1] - 70:1

**require** [1] - 65:23

**required** [3] - 22:12, 23:6, 78:12

**requires** [2] - 22:17, 163:17

**reserve** [1] - 164:8

**residence** [2] - 46:10, 120:14

**residences** [2] - 110:6, 120:14

**respect** [18] - 52:4, 53:23, 53:25, 55:19, 56:17, 56:18, 107:16, 111:11, 118:14, 135:18, 136:16, 137:9, 147:12, 148:6, 148:9, 150:12, 152:17, 152:18

**respectfully** [2] - 69:23, 157:10

**respective** [1] - 100:20

**respects** [1] - 43:19

**respond** [2] - 56:19, 106:12, 155:12

**responding** [1] - 56:8

**response** [11] - 9:20, 30:5, 32:11, 47:6, 63:22, 66:15, 68:16, 74:20, 74:21, 75:10, 150:7

**responsible** [1] - 44:20

**restate** [3] - 138:10, 139:13, 140:19

**rests** [2] - 41:15, 41:16

**results** [3] - 124:7, 124:22, 146:21

**return** [3] - 33:3, 62:6, 124:16

**returned** [1] - 33:6

**returning** [1] - 128:12

**reus** [1] - 55:9

**reveal** [1] - 133:15

**reversals** [1] - 18:23

**review** [5] - 37:5, 109:4, 115:19, 115:23, 136:2

**reviewed** [4] - 29:5, 108:20, 136:4, 145:22

**reviewing** [5] - 118:5, 136:1, 145:1, 147:16, 161:1

**revisit** [2] - 151:18, 159:20

**Rich** [5] - 27:6, 27:16, 28:1, 28:2, 29:5
**rich** [1] - 27:19
**RICHARD** [2] - 1:8, 2:10
**Richard** [50] - 20:10, 25:3, 26:15, 27:13, 29:11, 31:12, 33:11, 33:14, 33:16, 34:24, 35:12, 42:9, 43:15, 46:13, 49:8, 49:13, 49:14, 51:4, 52:14, 52:15, 52:19, 52:22, 66:25, 74:12, 80:8, 82:13, 87:8, 87:17, 87:18, 87:22, 87:25, 88:9, 89:1, 89:23, 90:11, 90:14, 90:16, 93:16, 94:15, 100:12, 101:10, 104:13, 110:21, 111:1, 147:6, 147:9, 147:22, 148:4, 154:13
**right-hand** [1] - 28:21
**rise** [5] - 6:8, 42:5, 77:19, 148:19, 164:19
**risk** [1] - 66:7
**Rita** [2] - 143:25, 160:1
**River** [2] - 38:6, 39:13
**Road** [1] - 3:11
**Robinhood** [4] - 17:20, 28:22, 28:23, 29:2
**Robinson** [1] - 51:3
**role** [3] - 96:5, 99:22, 100:7
**Romero** [1] - 11:25
**room** [2] - 63:10, 63:12
**ROOM** [1] - 1:24
**Rosa** [4] - 133:22, 134:7, 134:10, 135:13
**roughly** [2] - 101:5, 101:13
**round** [1] - 88:13
**routing** [1] - 28:24
**Row** [1] - 11:10
**row** [1] - 11:16
**RPR** [1] - 165:20
**Rule** [6] - 42:10, 43:4, 57:18, 61:9, 65:6, 157:18
**rule** [1] - 66:2
**ruling** [3] - 16:13, 73:7, 73:12
**run** [2] - 12:20,

146:15
**Runyan** [3] - 50:14, 50:15, 51:23
**rush** [1] - 15:3
**Russia** [2] - 70:25, 71:10
**RYAN** [1] - 3:6
**Ryan** [1] - 43:10

**S**

**S-t-e-v-e-n-s** [1] - 91:14
**Saakyan** [1] - 136:16
**Sabala** [1] - 39:10
**sale** [1] - 8:3
**San** [2] - 2:19, 3:5
**sat** [1] - 35:6
**satisfied** [1] - 54:3
**satisfy** [1] - 72:3
**saw** [9] - 53:10, 116:11, 121:11, 121:14, 130:3, 135:9, 144:17, 151:5, 153:15
**SBA** [8] - 40:13, 40:23, 100:15, 100:16, 100:18, 100:23, 118:7, 130:19
**schedule** [3] - 78:16, 96:7, 164:14
**schematic** [1] - 162:17
**scheme** [10] - 39:7, 49:19, 50:7, 54:1, 54:9, 54:16, 55:8, 55:17, 55:22, 123:7
**scope** [9] - 30:2, 31:15, 32:17, 32:21, 45:1, 154:3, 155:8, 155:19, 159:21
**SCOTT** [1] - 2:6
**scratch** [1] - 83:12
**screen** [6] - 16:9, 115:16, 115:17, 138:7, 138:8, 141:20
**scroll** [3] - 10:24, 14:4, 14:18
**search** [6] - 9:1, 21:8, 21:10, 21:22, 22:5, 23:11, 92:1, 92:21, 147:25
**searched** [1] - 12:14
**searches** [1] - 33:6
**seasoned** [1] - 162:13
**seated** [4] - 6:7, 42:7, 78:8, 148:21
**Seattle** [1] - 38:10
**second** [15] - 19:12, 34:6, 38:21, 48:11,

58:7, 70:5, 107:5, 112:10, 112:12, 112:15, 112:16, 115:22, 115:24, 132:20, 146:23
**Secretary** [1] - 22:20
**Section** [2] - 46:11, 165:9
**section** [2] - 42:23, 42:24
**Secureline** [1] - 39:24
**see** [64] - 14:5, 18:21, 21:14, 22:1, 22:21, 23:6, 23:15, 23:22, 26:6, 28:9, 28:23, 42:3, 42:14, 42:15, 43:8, 50:12, 50:14, 50:18, 50:19, 50:24, 51:1, 51:8, 52:9, 52:22, 62:23, 64:11, 66:3, 68:2, 69:3, 72:4, 79:11, 80:8, 81:5, 81:21, 84:7, 90:4, 97:23, 104:19, 109:25, 110:18, 111:5, 112:11, 112:19, 115:17, 120:8, 125:22, 126:22, 127:12, 127:13, 130:25, 144:4, 144:9, 145:4, 145:6, 146:3, 146:12, 146:14, 146:15, 147:12, 148:3, 150:23, 155:14, 156:22, 163:10
**seed** [1] - 87:3
**seeing** [6] - 17:9, 27:4, 85:6, 118:5, 121:9, 128:25
**seek** [1] - 90:16
**seem** [5] - 35:20, 69:9, 70:22, 100:1, 122:15
**seize** [1] - 33:17
**seized** [9] - 13:5, 13:6, 13:7, 13:9, 13:13, 21:22, 22:5, 75:3, 92:21
**seizure** [1] - 18:13
**selective** [1] - 162:16
**sell** [1] - 86:5
**send** [1] - 55:14
**sends** [1] - 55:4
**sent** [19] - 39:8, 39:12, 39:17, 39:22, 40:2, 40:7, 40:11, 40:16, 40:22, 41:2,

44:2, 44:5, 50:1, 55:1, 55:12, 136:20, 136:24, 137:1, 163:21
**separate** [1] - 68:4
**separately** [1] - 43:15
**separation** [1] - 103:2
**September** [1] - 137:1
**served** [1] - 9:11
**service** [2] - 86:6, 154:5
**Service** [1] - 51:23
**services** [5] - 8:18, 9:15, 9:24, 94:12, 94:14
**session** [1] - 6:7
**SESSION** [1] - 1:12
**several** [1] - 21:22
**share** [5] - 42:12, 59:11, 78:5, 93:1, 93:4
**shared** [4] - 29:6, 46:12, 137:8
**shareholder** [2] - 80:5, 80:9
**shareholders** [2] - 80:7, 82:2
**shares** [8] - 82:8, 82:11, 82:12, 82:19, 83:22, 83:25, 84:4, 84:5
**Shawn** [2] - 91:4, 91:13
**SHAWN** [3] - 4:10, 91:13, 91:15
**Shimmur** [1] - 86:12
**short** [3] - 87:22, 163:3, 163:4
**shorthand** [1] - 160:5
**shortly** [3] - 102:15, 161:10, 163:13
**show** [12] - 14:23, 16:11, 25:14, 26:25, 28:19, 46:15, 51:19, 73:22, 82:25, 134:21, 158:1, 158:23
**showed** [5] - 27:22, 113:4, 114:4, 124:16, 135:21
**showing** [5] - 7:13, 11:14, 26:5, 69:25, 71:3
**shown** [3] - 25:17, 32:9, 163:10
**shows** [11] - 30:9, 50:20, 51:15, 54:19, 54:20, 61:23, 62:24,

72:8, 73:23, 75:7, 76:16
**sick** [1] - 97:6
**side** [1] - 123:2
**sidebar** [12] - 31:6, 31:16, 31:17, 31:18, 36:7, 78:24, 78:25, 79:1, 85:8, 89:12, 90:24, 125:6
**sides** [3] - 30:8, 30:12, 70:22
**sign** [1] - 23:20
**signature** [8] - 59:1, 75:12, 75:20, 76:6, 76:7, 76:13, 76:14
**signed** [2] - 75:19, 75:24, 76:11
**signer** [1] - 75:18
**signers** [1] - 52:16
**significance** [2] - 47:11, 155:3
**significant** [1] - 55:7
**signs** [1] - 76:10
**Silicon** [1] - 81:23
**Silverman** [8] - 4:5, 4:6, 4:11, 28:25, 29:17, 32:5, 33:20, 54:23
**silverman** [5] - 25:20, 26:16, 27:22, 28:5, 28:17
**SILVERMAN** [56] - 2:20, 6:11, 6:17, 7:8, 7:23, 8:11, 8:13, 8:22, 9:2, 9:23, 10:11, 10:15, 10:18, 11:12, 11:15, 13:2, 14:11, 14:15, 15:18, 16:5, 16:8, 16:18, 16:24, 20:16, 29:7, 29:13, 30:2, 31:13, 31:15, 32:12, 32:17, 32:22, 33:7, 33:22, 36:12, 36:21, 36:23, 37:11, 42:9, 42:17, 42:23, 43:4, 54:9, 54:25, 55:14, 55:19, 56:2, 91:3, 91:18, 91:21, 92:12, 92:15, 92:22, 92:25, 93:7, 93:10
**Silverman's** [2] - 30:16, 56:19
**similar** [3] - 72:9, 102:11, 129:21
**similarly** [1] - 46:12
**simple** [1] - 129:10
**simplest** [1] - 130:2
**simplified** [1] - 141:7
**simply** [5] - 38:17, 53:25, 123:9, 132:16,

155:11
**sing** [1] - 36:16
**sit** [2] - 144:4, 147:17
**sitting** [9] - 63:12, 64:25, 100:25, 104:14, 104:15, 147:13, 147:15, 148:7, 148:10
**six** [4] - 18:21, 18:23, 19:6, 103:1
**Six** [2] - 66:11, 66:14
**sketchy** [1] - 84:21
**Sky** [1] - 66:14
**sky** [1] - 150:25
**Slaw** [1] - 143:25
**slightly** [1] - 148:25
**small** [1] - 60:22
**Small** [2] - 40:12, 41:8
**smartphones** [1] - 97:9
**social** [4] - 120:8, 120:10, 147:21, 147:25
**software** [2] - 86:5
**sold** [6] - 35:12, 82:10, 82:12, 83:22, 84:4, 84:6
**sole** [2] - 80:5, 96:5
**solely** [1] - 38:24
**Solutions** [4] - 15:10, 18:16, 28:14, 28:16
**solving** [1] - 86:22
**someone** [8] - 64:12, 64:13, 70:23, 117:9, 117:10, 127:1, 127:12, 159:25
**sometimes** [2] - 61:22, 97:11
**somewhere** [4] - 33:5, 80:15, 122:21
**song** [5] - 36:14, 36:15, 36:16, 36:18, 36:19
**sorry** [8] - 15:3, 26:2, 78:10, 98:14, 100:10, 124:3, 134:10, 142:19
**sort** [4] - 37:9, 55:20, 150:19, 160:5
**sound** [2] - 162:22
**sounded** [1] - 106:10
**source** [2] - 52:2, 73:18
**sources** [1] - 51:12
**speaker** [2] - 111:8, 111:12
**speaking** [3] - 47:15, 48:10, 151:9
**Spear** [1] - 2:18

**Special** [21] - 24:11, 25:19, 26:5, 28:20, 29:10, 31:1, 31:11, 31:20, 31:24, 98:14, 99:21, 149:18, 150:3, 150:12, 153:19, 154:23, 154:24, 157:2, 158:19, 160:12
**special** [2] - 32:2, 99:9
**specific** [10] - 8:16, 44:23, 48:23, 53:8, 62:13, 105:6, 114:25, 126:10, 133:17, 151:25
**specifically** [22] - 18:12, 35:13, 47:13, 50:3, 57:20, 86:7, 101:10, 102:19, 107:18, 110:25, 112:24, 115:23, 117:22, 121:5, 124:21, 126:1, 133:2, 133:22, 139:17, 144:8, 146:14, 146:18
**specificity** [1] - 135:19
**specifics** [1] - 68:11
**speculation** [3] - 46:25, 84:24, 113:12
**spell** [5] - 79:6, 85:16, 91:11, 94:2, 98:22
**spending** [2] - 51:20, 51:24
**spends** [1] - 51:9
**spent** [2] - 33:9, 34:22
**spontaneous** [1] - 36:4
**Spring** [1] - 2:7
**stage** [4] - 53:21, 61:9, 87:3, 87:24
**stairs** [1] - 94:1
**stamp** [1] - 69:11
**stand** [5] - 37:15, 63:10, 77:14, 85:10, 157:16
**standard** [5] - 45:22, 53:25, 56:25, 72:2, 72:10
**standpoint** [1] - 55:20
**stands** [1] - 77:17
**Star** [2] - 66:11, 66:14
**start** [14] - 79:17, 80:21, 81:1, 81:22, 83:8, 83:10, 86:2, 86:16, 88:18, 129:14,

133:14, 138:3, 148:17, 164:16
**start-up** [7] - 79:17, 80:21, 81:1, 81:22, 83:8, 83:10, 86:2
**start-ups** [2] - 86:16, 88:18
**started** [6] - 35:2, 86:10, 86:23, 102:6, 102:12, 130:3
**starting** [2] - 86:13, 89:17
**state** [13] - 22:1, 22:17, 23:3, 23:24, 23:25, 69:12, 79:5, 85:16, 91:11, 94:1, 95:18, 98:21, 146:18
**STATE** [1] - 165:4
**State** [1] - 22:21
**statement** [5] - 7:12, 7:22, 7:24, 11:14, 77:12
**statements** [1] - 131:17
**STATES** [3] - 1:1, 1:5, 2:4
**States** [8] - 2:6, 2:7, 40:12, 46:4, 94:12, 165:7, 165:9, 165:14
**status** [1] - 37:22
**stay** [1] - 164:11
**steal** [4] - 71:4, 71:22, 137:17, 137:18
**stenographically** [1] - 165:11
**step** [11] - 85:15, 91:8, 91:9, 93:19, 93:25, 94:1, 98:20, 98:21, 104:23, 132:20
**STEPHEN** [1] - 1:3
**steps** [1] - 108:16
**STEPTOE** [4] - 2:11, 2:14, 2:17, 2:20
**STEVENS** [2] - 4:10, 91:15
**Stevens** [7] - 14:10, 16:16, 91:4, 91:13, 91:18, 92:16, 93:1
**Stevens'** [1] - 15:20
**stick** [1] - 129:17
**still** [10] - 20:4, 20:9, 24:24, 79:24, 82:9, 84:7, 134:10, 151:11, 155:22, 161:21
**stimulus** [1] - 103:14
**stipulated** [1] - 37:23
**stipulation** [8] - 37:22, 38:14, 38:16, 38:18, 38:21, 38:23, 38:24, 41:11

**stipulations** [1] - 37:20
**stole** [4] - 32:3, 32:10, 33:19, 35:2
**stolen** [4] - 51:23, 71:7, 134:11, 135:17
**stopped** [2] - 75:3, 75:8
**straighten** [1] - 7:17
**strange** [1] - 51:12
**Street** [6] - 2:7, 2:12, 2:18, 3:7, 12:16, 92:5
**STREET** [1] - 1:24
**stricken** [1] - 61:7
**strike** [4] - 19:23, 140:7, 150:16, 151:19
**student** [1] - 70:25
**students** [1] - 70:7
**stuff** [4] - 59:22, 81:24, 154:7, 157:15
**subject** [2] - 15:19, 16:12
**submission** [1] - 41:7
**submitted** [3] - 24:14, 71:2, 102:10
**subpoena** [4] - 9:11, 10:9, 124:7, 146:21
**subscriber** [1] - 146:20
**substance** [1] - 44:20
**substantive** [6] - 42:18, 43:21, 44:1, 45:3, 45:10, 55:20
**substitute** [1] - 121:2
**sudden** [1] - 51:11
**sufficient** [6] - 43:6, 44:8, 53:19, 55:6, 55:22, 72:10
**suggest** [6] - 41:24, 48:2, 134:2, 146:2, 157:9, 157:11
**suggesting** [1] - 65:22
**suggestive** [1] - 51:8
**suggests** [4] - 44:14, 47:15, 47:16, 156:7
**Suite** [6] - 2:12, 2:18, 3:4, 3:7, 3:11, 3:15
**summarize** [2] - 6:23, 163:8
**summarizing** [1] - 7:6
**summary** [12] - 51:2, 60:20, 61:7, 61:10, 61:12, 61:16, 61:17, 62:3, 77:15, 163:6, 163:18, 164:3
**SUN** [1] - 2:5

**superseding** [7] - 101:14, 101:16, 101:17, 103:7, 104:12, 118:9, 123:6
**supervision** [4] - 94:16, 96:3, 97:8, 134:17
**supervisor** [1] - 97:7
**supplied** [1] - 10:12
**Supply** [1] - 20:6
**support** [2] - 35:5, 87:5
**supported** [1] - 74:12
**supports** [1] - 86:9
**supposed** [2] - 54:6, 96:8
**surprised** [1] - 163:15
**surroundings** [1] - 46:7
**survivor** [1] - 43:4
**Susanna** [1] - 49:1
**suspicion** [1] - 82:23
**sustain** [5] - 24:3, 43:20, 46:11, 90:25, 145:18
**sustained** [39] - 14:14, 20:15, 25:12, 29:8, 29:14, 30:3, 37:10, 88:20, 88:22, 89:5, 89:9, 89:11, 103:4, 103:11, 103:22, 104:3, 105:9, 105:17, 106:25, 107:23, 110:23, 111:22, 112:2, 117:5, 118:23, 119:17, 121:2, 123:17, 123:23, 125:5, 125:13, 125:19, 128:5, 129:13, 129:24, 129:25, 137:11, 138:1, 141:4
**swear** [2] - 85:9, 85:11
**sworn** [6] - 6:14, 79:8, 85:20, 91:16, 94:5, 99:3
**synthetic** [6] - 133:2, 133:16, 134:11, 135:15, 135:17, 136:8
**system** [2] - 27:17, 96:7

# T

**table** [2] - 80:7, 101:1
**takeout** [1] - 54:21

**Tamara** [30] - 28:12, 37:4, 58:1, 58:19, 58:23, 59:16, 62:17, 62:18, 63:2, 63:17, 64:10, 69:13, 70:3, 70:6, 70:11, 74:13, 131:19, 131:23, 132:3, 133:4, 133:7, 133:16, 134:8, 135:14, 136:9, 138:12, 139:8, 139:11, 139:17, 145:9
**Tamara's** [1] - 70:14
**Tammy** [4] - 27:6, 27:15, 27:17, 101:11
**tape** [2] - 94:1, 98:21
**target** [1] - 106:22
**tax** [3] - 9:14, 9:24, 10:1
**Tax** [3] - 50:14, 50:15, 51:23
**tech** [2] - 79:22, 83:11
**technical** [1] - 26:2
**Technology** [3] - 19:19, 19:21, 20:1
**telephone** [6] - 47:12, 157:22, 157:25, 158:20, 158:23
**templates** [1] - 67:23
**tenent** [1] - 63:9
**tenet** [1] - 62:12
**Terabelian** [48] - 37:4, 40:19, 43:12, 43:13, 43:14, 43:20, 43:24, 43:25, 44:12, 44:16, 45:2, 45:9, 45:13, 45:17, 45:18, 46:12, 47:9, 48:22, 49:18, 50:12, 51:5, 52:10, 53:13, 73:3, 73:9, 73:17, 74:1, 74:5, 74:8, 74:18, 75:2, 75:14, 75:18, 76:17, 101:10, 145:9, 146:11, 146:16, 147:3, 150:20, 151:4, 152:5, 152:8, 157:12, 157:17, 158:3, 158:24, 162:8
**TERABELIAN** [1] - 3:2
**Terabelian's** [6] - 44:3, 50:21, 52:23, 53:1, 53:4, 78:2
**term** [4] - 72:15, 105:15, 105:19, 119:14
**terminology** [1] -

147:5
**terms** [4] - 47:25, 100:14, 111:16, 126:16
**TERRI** [4] - 1:23, 165:6, 165:19, 165:20
**test** [1] - 35:9
**testified** [20] - 6:15, 10:19, 17:9, 25:24, 29:25, 31:21, 36:24, 61:20, 61:25, 79:9, 85:21, 91:17, 94:6, 96:22, 99:4, 99:9, 113:25, 130:21, 156:4, 157:9
**testify** [4] - 13:24, 62:18, 64:13, 87:10
**testimony** [18] - 7:4, 9:18, 15:20, 29:22, 30:5, 30:25, 35:7, 35:20, 79:12, 82:23, 96:2, 124:14, 136:11, 136:12, 137:25, 145:1, 146:22, 153:1
**testing** [2] - 22:12, 22:18
**Texas** [2] - 39:16, 40:20
**text** [24] - 27:6, 27:10, 27:18, 28:1, 28:12, 49:8, 59:15, 59:17, 59:19, 62:19, 64:1, 64:4, 64:14, 86:8, 108:24, 110:25, 111:5, 112:4, 145:1, 145:22, 146:19, 146:24, 147:2
**Text** [2] - 27:8, 27:25
**textbook** [1] - 104:25
**THE** [555] - 2:3, 2:10, 3:2, 3:9, 3:13, 6:6, 6:10, 6:12, 7:5, 7:15, 7:17, 7:19, 7:20, 7:21, 8:10, 8:12, 8:24, 8:25, 9:19, 9:22, 10:13, 11:11, 12:25, 13:1, 14:14, 15:21, 15:25, 16:14, 16:23, 20:15, 20:19, 21:18, 22:15, 24:3, 25:12, 29:8, 29:14, 30:3, 30:6, 31:2, 31:8, 31:14, 31:16, 31:22, 32:1, 32:11, 32:13, 32:20, 32:24, 33:8, 33:21, 33:23, 34:6, 34:13, 34:20, 34:25, 35:8, 35:14, 35:17, 35:25, 36:10, 36:13, 37:9, 37:12, 37:14, 37:17,

37:21, 38:16, 41:13, 41:15, 41:17, 42:5, 42:7, 42:14, 42:21, 42:25, 43:8, 43:11, 43:13, 44:9, 44:15, 45:5, 47:4, 47:17, 47:21, 48:3, 48:6, 48:8, 48:18, 49:3, 49:16, 54:8, 54:22, 55:11, 55:16, 55:25, 56:3, 56:9, 56:14, 56:20, 56:23, 57:3, 57:14, 57:24, 58:11, 58:20, 59:2, 59:8, 59:17, 59:21, 60:1, 60:10, 60:24, 61:4, 61:10, 61:19, 62:8, 62:11, 62:17, 62:19, 62:23, 63:7, 63:14, 63:20, 63:22, 64:4, 64:6, 64:9, 64:11, 64:16, 64:21, 65:1, 65:21, 66:3, 66:15, 66:21, 67:1, 67:6, 67:18, 67:25, 68:2, 68:7, 68:11, 68:15, 68:21, 69:3, 69:9, 69:20, 70:11, 70:17, 70:21, 71:6, 71:10, 71:13, 71:18, 71:20, 72:1, 72:4, 72:12, 72:24, 73:3, 73:5, 73:15, 73:17, 73:22, 74:7, 74:16, 74:20, 75:1, 75:10, 75:23, 76:3, 76:19, 76:21, 77:16, 77:17, 77:19, 77:20, 78:7, 78:8, 78:10, 78:22, 78:25, 79:2, 79:4, 79:5, 79:10, 79:16, 79:20, 79:23, 79:24, 79:25, 80:1, 80:2, 80:3, 80:4, 80:5, 80:6, 80:8, 80:10, 80:11, 80:12, 80:14, 80:15, 80:17, 80:18, 80:19, 80:21, 80:25, 81:2, 81:3, 81:4, 81:5, 81:7, 81:8, 81:10, 81:11, 81:13, 81:14, 81:16, 81:17, 81:19, 81:21, 81:22, 81:23, 82:1, 82:3, 82:5, 82:8, 82:9, 82:10, 82:12, 82:13, 82:15, 82:16, 82:17, 82:18, 82:20, 82:22, 83:3, 83:5, 83:7, 83:24, 84:2, 84:5, 84:12, 84:20, 85:1, 85:5, 85:9, 85:10,

85:14, 85:15, 85:17, 87:14, 87:19, 88:7, 88:9, 88:11, 88:12, 88:20, 88:21, 88:22, 88:24, 89:5, 89:9, 89:11, 90:1, 90:4, 90:7, 90:23, 91:7, 91:8, 91:10, 91:11, 91:13, 91:19, 92:14, 92:23, 93:6, 93:9, 93:11, 93:13, 93:14, 93:15, 93:18, 93:19, 93:21, 93:22, 93:25, 94:3, 95:2, 95:4, 95:7, 95:9, 95:21, 96:19, 98:9, 98:11, 98:12, 98:16, 98:17, 98:19, 98:20, 98:23, 98:24, 98:25, 99:6, 99:18, 99:23, 100:4, 103:4, 103:11, 103:17, 103:19, 103:22, 104:3, 104:8, 104:17, 105:9, 105:17, 106:6, 106:10, 106:25, 107:17, 107:23, 108:3, 108:5, 108:7, 109:10, 109:13, 109:14, 109:16, 109:25, 110:2, 110:4, 110:5, 110:8, 110:9, 110:12, 110:13, 110:14, 110:16, 110:18, 110:23, 111:4, 111:7, 111:8, 111:9, 111:22, 112:2, 112:7, 112:9, 112:14, 112:15, 112:19, 112:21, 112:22, 113:13, 113:14, 114:13, 114:17, 114:19, 114:22, 117:1, 117:3, 117:5, 118:23, 119:3, 119:4, 119:15, 119:17, 119:20, 119:23, 120:1, 120:3, 120:4, 120:5, 121:2, 122:1, 122:4, 122:7, 122:19, 122:24, 123:12, 123:14, 123:15, 123:22, 124:15, 124:16, 124:18, 124:19, 125:5, 125:7, 125:13, 125:16, 125:19, 125:23, 126:13, 126:15, 126:18, 126:20, 126:21, 126:22, 126:24, 126:25, 127:1, 127:5, 127:14,

127:17, 127:21, 128:5, 128:13, 128:18, 128:22, 129:2, 129:6, 129:13, 129:18, 129:24, 130:3, 130:7, 130:10, 130:11, 131:3, 131:9, 131:14, 131:15, 132:2, 132:7, 132:14, 132:15, 132:20, 132:24, 132:25, 133:6, 133:9, 133:10, 133:18, 133:20, 134:1, 134:12, 134:16, 134:17, 134:18, 134:19, 134:25, 135:2, 135:5, 135:7, 135:9, 135:10, 135:11, 136:12, 137:11, 138:1, 138:16, 138:18, 138:22, 139:1, 139:2, 139:12, 139:21, 139:24, 140:2, 140:14, 140:19, 141:4, 141:6, 143:10, 143:16, 143:17, 143:21, 143:22, 145:13, 145:18, 146:2, 148:13, 148:14, 148:15, 148:19, 148:21, 148:22, 149:2, 149:12, 149:14, 149:21, 149:24, 150:5, 150:13, 150:22, 150:25, 151:5, 151:9, 151:13, 151:20, 152:8, 152:15, 152:20, 152:22, 153:3, 153:8, 153:13, 153:17, 153:21, 154:9, 154:15, 154:18, 154:21, 154:25, 155:14, 155:18, 155:24, 156:3, 156:11, 156:17, 156:22, 156:24, 157:4, 157:11, 157:15, 157:19, 157:25, 158:5, 158:9, 158:22, 159:2, 159:5, 159:10, 159:13, 159:16, 160:3, 160:13, 160:18, 160:22, 160:25, 161:16, 161:23, 161:25, 162:4, 162:6, 162:8, 162:11, 162:25, 163:3, 163:5,

163:10, 163:14, 163:17, 163:23, 164:1, 164:7, 164:10, 164:14, 164:19
**theft** [15] - 12:23, 45:13, 45:14, 45:21, 52:4, 65:10, 66:22, 67:8, 69:21, 70:18, 71:22, 125:11, 127:2, 127:8, 129:1
**thefts** [1] - 124:9
**themselves** [3] - 55:23, 64:18, 105:23
**theory** [3] - 45:3, 48:21, 55:21
**thereafter** [2] - 102:15, 161:10
**thinking** [1] - 162:19
**thinks** [1] - 106:11
**third** [2] - 115:22, 115:24
**thoroughly** [4] - 106:14, 106:15, 122:9, 122:15
**thoughts** [1] - 161:6
**thousands** [3] - 108:20, 145:23
**three** [13] - 36:12, 36:13, 36:21, 37:7, 73:19, 74:15, 74:17, 75:14, 100:17, 101:20, 104:15, 145:8, 146:24
**Three** [3] - 36:17, 36:19
**throughout** [3] - 97:10, 104:22, 106:22
**thrust** [2] - 114:17, 154:14
**Thursday** [1] - 164:16
**tie** [1] - 50:10
**Tim** [1] - 100:23
**Timeline** [9] - 10:19, 10:22, 11:13, 11:20, 12:7, 29:18, 33:12, 40:24, 60:15
**timepiece** [2] - 29:23, 31:21
**timing** [1] - 52:9
**Title** [1] - 165:9
**today** [8] - 27:14, 42:13, 94:8, 104:15, 144:4, 147:17, 163:22, 164:1
**together** [3] - 25:6, 117:9, 118:18
**tomorrow** [5] - 78:14, 78:15, 148:17, 159:21, 161:9

**tonight** [1] - 164:11
**took** [3] - 36:4, 62:24, 72:24
**Top** [3] - 29:18, 33:12, 39:19
**top** [7] - 16:20, 18:7, 19:10, 120:17, 125:1, 147:8, 148:8
**totally** [1] - 56:25
**towards** [2] - 19:10, 160:2
**Tower** [1] - 2:18
**Towing** [7] - 21:1, 21:3, 21:15, 23:6, 23:21, 24:19, 39:14
**traced** [1] - 53:12
**traded** [1] - 82:8
**traditionally** [1] - 12:19
**trail** [1] - 119:21
**transaction** [2] - 7:21, 8:14, 8:16, 9:4, 9:12
**transactions** [4] - 18:19, 59:4, 119:22
**transcript** [5] - 156:5, 156:9, 156:13, 165:10, 165:12
**TRANSCRIPT** [1] - 1:12
**transfer** [11] - 8:1, 39:8, 39:12, 39:17, 39:22, 40:2, 40:7, 40:11, 40:16, 40:22, 41:2
**transferred** [3] - 7:13, 39:20, 40:5
**transfers** [2] - 121:11, 152:19
**transmission** [14] - 39:10, 39:14, 39:20, 39:25, 40:4, 40:9, 40:14, 40:19, 40:25, 41:4, 41:9, 44:7, 45:10, 45:16
**Transport** [13] - 10:20, 10:22, 11:13, 11:20, 12:7, 21:1, 21:4, 21:15, 29:18, 33:12, 39:14, 40:24, 60:16
**trash** [11] - 120:13, 120:15, 142:4, 142:7, 142:8, 142:9, 142:15, 143:6, 143:23, 144:5, 144:21
**traveled** [11] - 38:25, 39:3, 39:11, 39:15, 39:25, 40:9, 40:14, 40:19, 40:25, 41:4,

41:9
**trial** [15] - 29:22, 30:10, 31:11, 31:23, 32:9, 34:4, 41:17, 42:19, 43:1, 43:3, 69:10, 74:3, 90:19, 90:21, 158:14
**TRIAL** [1] - 1:12
**truck** [7] - 22:12, 22:18, 23:12, 23:13, 23:16, 23:20, 23:22
**trucking** [1] - 68:8
**trucks** [2] - 23:18, 23:19
**true** [4] - 52:20, 68:12, 149:4, 165:10
**truth** [1] - 8:22
**try** [2] - 66:15, 117:20
**trying** [14] - 30:11, 30:24, 31:14, 32:7, 33:10, 34:4, 34:12, 82:24, 84:15, 86:17, 150:11, 154:18, 155:2, 155:14
**TUESDAY** [1] - 1:13, 6:1
**Turing** [6] - 15:10, 17:17, 18:10, 18:16, 28:14, 28:16
**turned** [1] - 156:19
**turning** [2] - 44:1, 45:12
**TV** [1] - 164:12
**Twitter** [1] - 147:25
**two** [23] - 30:20, 37:19, 42:17, 47:12, 47:20, 52:5, 57:11, 67:5, 67:8, 69:23, 73:12, 101:3, 107:4, 110:6, 119:22, 143:22, 145:5, 146:7, 146:13, 146:24, 159:6, 161:15, 163:20
**type** [5] - 28:4, 28:15, 29:1, 49:14, 72:9
**typically** [2] - 127:12, 137:14

**U**

**U.S** [3] - 1:3, 39:13, 40:13
**U.S.C** [1] - 66:2
**ultimately** [5] - 59:11, 86:13, 86:24, 87:6, 131:10
**unable** [1] - 110:7
**unclear** [2] - 35:3,

152:23
**under** [12] - 31:14, 42:10, 44:19, 54:19, 55:21, 62:16, 79:11, 86:23, 99:16, 157:18, 158:17, 163:9
**underlying** [4] - 65:20, 66:8, 139:18, 163:19
**understood** [6] - 44:21, 121:17, 150:2, 150:10, 151:21, 153:7
**undisputed** [1] - 34:2
**undisputedly** [1] - 63:25
**unemployment** [2] - 121:20, 124:24
**Unemployment** [1] - 124:7
**unfamiliar** [1] - 18:4
**unique** [5] - 30:25, 50:13, 50:24, 52:5, 53:15
**Unit** [1] - 49:21
**United** [8] - 2:6, 2:7, 40:12, 46:4, 94:12, 165:7, 165:9, 165:14
**UNITED** [3] - 1:1, 1:5, 2:4
**unless** [2] - 83:12, 106:8
**unlike** [1] - 59:4
**unnecessarily** [1] - 140:5
**untainted** [1] - 43:6
**unto** [1] - 155:1
**up** [51] - 7:24, 10:15, 10:17, 11:25, 13:3, 14:2, 14:25, 15:5, 15:14, 15:19, 16:8, 16:19, 23:24, 32:3, 32:9, 32:18, 33:19, 42:15, 73:5, 75:16, 79:17, 80:7, 80:21, 81:1, 81:22, 83:8, 83:10, 85:16, 86:2, 87:25, 88:2, 90:4, 91:8, 91:9, 92:10, 93:25, 98:21, 108:7, 115:17, 117:20, 123:19, 124:18, 128:23, 129:2, 134:3, 136:22, 138:7, 143:21, 153:5, 162:11, 164:11
**ups** [2] - 86:16, 88:18
**usage** [1] - 70:6
**uses** [1] - 48:22

**usual** [2] - 42:1, 78:11
**Utah** [4] - 39:11, 39:20, 40:5, 40:10
**utilities** [1] - 50:21
**utilized** [2] - 106:2, 106:3

**V**

**V&D** [2] - 60:14, 77:13
**vague** [11] - 93:5, 103:16, 107:15, 116:24, 117:2, 117:4, 119:16, 132:1, 137:9, 138:20, 145:17
**VAHE** [1] - 3:13
**Vahe** [25] - 57:17, 57:22, 58:18, 58:22, 58:25, 59:21, 59:24, 60:14, 62:15, 62:21, 63:10, 63:17, 63:25, 64:1, 64:5, 64:8, 64:12, 64:13, 64:14, 64:21, 64:22, 102:2, 145:10, 146:12, 161:22
**Valley** [2] - 81:24, 143:18
**value** [3] - 80:23, 82:7, 84:1
**variety** [5] - 86:6, 108:11, 109:19, 120:13, 146:21
**various** [2] - 72:8, 150:17
**VAUGHN** [1] - 3:6
**Vegas** [1] - 83:12
**vehicles** [1] - 24:1
**Vehicles** [2] - 21:25, 23:6
**venture** [1] - 88:14
**venue** [3] - 53:25, 54:25, 55:8
**Vera** [1] - 27:19
**verdict** [1] - 43:7
**verify** [2] - 158:9, 158:10
**versus** [1] - 140:24
**via** [1] - 86:8
**victim** [2] - 67:8, 70:19
**victims** [1] - 72:6
**Victoria** [1] - 33:11
**view** [1] - 105:6
**View** [1] - 143:18
**Viktoria** [18] - 29:18, 47:14, 47:23, 48:22, 49:10, 49:15, 50:4,

50:15, 51:22, 53:5,
73:24, 74:1, 75:13,
75:18, 76:2, 78:3,
158:17
  **violates** [1] - 150:21
  **Virgina** [1] - 41:5
  **Visa** [3] - 70:25,
71:10, 72:6
  **visas** [1] - 67:16
  **Visas** [1] - 70:6
  **visits** [1] - 96:6
  **voice** [2] - 124:18,
143:21
  **voluminous** [1] -
163:8
  **voluntarily** [2] -
38:15, 41:12
  **volunteered** [1] -
152:3
  **Voyage** [9] - 40:9,
58:25, 59:10, 62:25,
63:17, 63:24, 64:17,
64:22, 64:23
  **VPN** [1] - 160:12
  **VPNs** [5] - 154:6,
159:24, 159:25, 160:4
  **vs** [1] - 1:7

## W

  **wait** [5] - 34:6, 56:19,
61:22, 155:18, 160:22
  **waiting** [2] - 10:17,
25:19
  **wake** [1] - 153:5
  **walk** [2] - 113:25,
162:14
  **walked** [2] - 32:3,
32:9
  **wall** [1] - 161:18
  **wants** [4] - 64:8,
77:25, 95:7, 152:21
  **warrant** [3] - 21:23,
22:5, 92:21
  **Washington** [1] -
2:22
  **watch** [9] - 33:3,
35:11, 49:9, 85:15,
91:8, 93:25, 98:20,
164:11
  **watches** [30] - 31:24,
32:15, 32:18, 32:23,
33:6, 33:13, 33:16,
33:17, 33:24, 34:1,
34:2, 34:5, 34:9,
34:16, 35:1, 35:2,
35:3, 35:10, 35:13,
36:3, 36:4, 127:24,
128:2, 128:9, 129:14,
129:17, 129:21,

130:4, 130:8
  **Web** [2] - 38:1, 39:9
  **Weddington** [1] -
70:3
  **welcome** [1] - 98:11
  **Wells** [3] - 39:18,
40:8, 75:5
  **WEST** [1] - 1:24
  **West** [2] - 2:12, 3:7
  **WESTERN** [1] - 1:2
  **whatsoever** [4] -
110:21, 111:24,
146:13, 147:21
  **whole** [2] - 34:10,
74:3
  **wide** [1] - 86:6
  **wife** [6] - 49:9, 49:13,
49:15, 67:15, 96:14,
97:6
  **wife's** [1] - 49:11
  **WILLIAMS** [2] - 3:3,
3:6
  **Wilson** [1] - 143:19
  **WILSON** [1] - 1:3
  **wind** [1] - 161:10
  **WIRCHING** [8] -
65:4, 66:1, 66:4,
68:16, 68:22, 69:4,
69:13, 72:14
  **Wirching** [2] - 65:5,
69:24
  **wire** [41] - 39:8,
39:10, 39:12, 39:14,
39:17, 39:19, 39:22,
39:24, 40:2, 40:4,
40:7, 40:9, 40:11,
40:14, 40:16, 40:19,
40:22, 40:25, 41:2,
41:4, 41:9, 44:1, 44:4,
44:6, 44:7, 44:9,
44:10, 45:10, 45:16,
46:17, 54:25, 55:1,
55:3, 55:5, 55:8, 55:9,
55:11, 55:15, 77:6,
77:13
  **wires** [13] - 38:23,
38:25, 39:2, 39:3,
39:6, 44:2, 53:24,
54:11, 54:22, 55:17,
55:20, 55:23
  **WIRSCHING** [1] -
3:10
  **wish** [3] - 77:24,
78:19, 78:23
  **withdrawing** [1] -
109:19
  **WITNESS** [96] - 4:1,
4:3, 7:19, 7:21, 8:12,
8:25, 9:22, 13:1, 79:4,
79:23, 79:25, 80:2,

80:4, 80:6, 80:10,
80:12, 80:15, 80:18,
80:21, 81:2, 81:4,
81:7, 81:10, 81:13,
81:16, 81:19, 81:22,
82:1, 82:5, 82:9,
82:12, 82:15, 82:17,
82:20, 83:5, 85:14,
85:17, 88:9, 88:12,
88:21, 91:7, 91:10,
91:13, 91:19, 93:9,
93:14, 93:21, 93:24,
94:3, 95:2, 98:11,
98:19, 98:23, 98:25,
99:6, 104:17, 108:5,
109:13, 109:16,
110:2, 110:5, 110:9,
110:13, 110:16,
111:7, 111:9, 112:14,
112:21, 113:14,
119:4, 119:23, 120:3,
120:5, 123:14,
124:16, 124:19,
126:18, 126:21,
126:24, 127:1,
127:17, 128:18,
130:10, 131:14,
132:14, 132:24,
133:9, 133:20,
134:16, 134:18,
135:7, 135:10, 139:1,
140:19, 143:17,
143:22
  **witness** [44] - 7:17,
14:2, 14:5, 14:24,
35:6, 36:11, 37:14,
62:16, 79:15, 84:10,
85:3, 85:9, 87:11,
90:24, 91:2, 92:10,
93:15, 93:19, 94:23,
99:16, 106:6, 114:13,
115:14, 122:9, 134:3,
134:21, 135:20,
136:23, 148:25,
149:10, 149:12,
149:13, 149:25,
150:16, 151:11,
155:25, 156:6, 157:5,
159:6, 159:12,
159:18, 163:1, 163:6
  **witness's** [2] - 9:18,
124:13
  **witnesses** [3] -
98:12, 159:15, 162:24
  **Woodrow** [1] -
143:18
  **word** [6] - 31:3,
59:23, 76:21, 140:3,
142:8, 145:13
  **Words** [3] - 36:17,

36:18, 36:20
  **words** [16] - 30:11,
44:18, 44:19, 48:4,
48:8, 57:6, 64:6,
67:19, 73:1, 76:8,
116:10, 129:6, 140:4,
140:13, 140:15,
147:14
  **works** [2] - 49:10,
89:2
  **worst** [1] - 56:15
  **written** [2] - 19:16,
42:11
  **wrongs** [1] - 30:21
  **wrote** [1] - 7:1

## Y

  **year** [1] - 88:11
  **years** [3] - 36:14,
81:6
  **York** [2] - 2:16
  **yourself** [1] - 14:25

## Z

  **zeroed** [2] - 19:2
  **Zhadko** [15] - 7:2,
10:6, 14:17, 15:7,
15:12, 17:8, 29:17,
33:11, 34:22, 39:19,
50:20, 106:21,
141:14, 142:1, 154:13
  **Zindrosky** [4] -
121:20, 124:8,
124:11, 124:24
  **zoom** [4] - 16:20,
17:22, 18:7, 19:11