1  TRACY L. WILKISON
   Acting United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   SCOTT PAETTY (Cal. Bar No. 274719)
4  CATHERINE AHN (Cal. Bar No. 248286)
   BRIAN FAERSTEIN (Cal. Bar No. 274850)
5  Assistant United States Attorneys
   Major Frauds/Environmental and Community Safety Crimes Sections
6       1100/1300 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone: (213) 894-6527/2424/3819
8       Facsimile: (213) 894-6269/0141
        E-mail:   Scott.Paetty@usdoj.gov
9                 Catherine.S.Ahn@usdoj.gov
                  Brian.Faerstein@usdoj.gov
10
   JOSEPH BEEMSTERBOER
11 Acting Chief, Fraud Section
   Criminal Division, U.S. Department of Justice
12 CHRISTOPHER FENTON
   Trial Attorney, Fraud Section
13 Criminal Division, U.S. Department of Justice
        1400 New York Avenue NW, 3rd Floor
14      Washington, DC 20530
        Telephone: (202) 320-0539
15      Facsimile: (202) 514-0152
        E-mail:   Christopher.Fenton@usdoj.gov
16
   Attorneys for Plaintiff
17 UNITED STATES OF AMERICA

18              UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20 UNITED STATES OF AMERICA,          No. CR 20-579(A)-SVW

21          Plaintiff,                GOVERNMENT'S NOTICE OF MOTION AND
                                      MOTION FOR AN ORDER TO: (1) DISMISS
22          v.                        DEFENDANTS RICHARD AYVAZYAN'S AND
                                      MARIETTA TERABELIAN'S *KASTIGAR*
23 RICHARD AYVAZYAN,                  CLAIMS BASED ON ARGUMENTS MADE AND
     aka "Richard Avazian" and        EVIDENCE ELICITED AT TRIAL AND
24      "Iuliia Zhadko," and          (2) VACATE THE *KASTIGAR* HEARING;
   MARIETTA TERABELIAN,               [PROPOSED] ORDER
25   aka "Marietta Abelian" and
        "Viktoria Kauichko,"
26 ARTUR AYVAZYAN,
     aka "Arthur Ayvazyan,"
27 TAMARA DADYAN,
   MANUK GRIGORYAN,
28   aka "Mike Grigoryan," and
     "Anton Kudiumov,"

                    1

1  ARMAN HAYRAPETYAN,
   EDVARD PARONYAN,
2      aka "Edvard Paronian" and
       "Edward Paronyan," and
3  VAHE DADYAN,

4  Defendants.

5          Defendants.

6

7          Plaintiff United States of America, by and through its counsel

8  of record, the Acting United States Attorney for the Central

9  District of California, Assistant United States Attorneys Scott

10 Paetty, Catherine Ahn, and Brian Faerstein, and Department of

11 Justice Trial Attorney Christopher Fenton, hereby files the

12 government's motion seeking an order by this Court that: (1) finds

13 that defendants Richard Ayvazyan and Marietta Terabelian each waived

14 their Kastigar claims based on the arguments defendants made and the

15 evidence defendants elicited at trial, and (2) based on that waiver,

16 dismisses defendants' Kastigar claims and vacates the hearing

17 currently scheduled for July 26, 2021.

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28 //

1        This motion is based upon the attached memorandum of points and

2   authorities, the files and records in this case, and such further

3   evidence and argument as the Court may permit.

4    Dated: July 1, 2021              Respectfully submitted,

5                                     TRACY L. WILKISON
                                      Acting United States Attorney
6
                                      SCOTT M. GARRINGER
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8
                                           /s/
9                                     _____
                                      CATHERINE AHN
10                                    SCOTT PAETTY
                                      BRIAN FAERSTEIN
11                                    Assistant United States Attorneys
                                      CHRISTOPHER FENTON
12                                    Department of Justice Trial Attorney

13                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...............................................i

TABLE OF AUTHORITIES...........................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...........................1

I.   INTRODUCTION..............................................1

II.  RELEVANT PROCEDURAL HISTORY...............................2

III. STATEMENT OF FACTS........................................4

    A.   Defendant Richard Ayvazyan Selectively Elicited Facts
        to Argue the Government Purportedly Failed to
        Investigate a Cellphone Defendant Knew was Seized
        from Him in Miami.....................................4

    B.   Defendant Richard Ayvazyan Affirmatively Introduced
        Evidence and Made Arguments at Trial Using
        Information He Previously Asserted Was Tainted Under
        Kastigar..............................................6

        1.   Defendant's Repeated References to the 151 Loans
            Redacted from Trial Indictment.................6

        2.   Evidence Regarding Jon Bradford..............11

    C.   Defendant Terabelian Repeatedly Argued the Government
        Had Not Obtained Certain Evidence from a Cellphone
        Belonging to Her Despite Knowing the Government Had
        Obtained Such Evidence from the Cellphone Seized from
        Her in Miami.......................................12xii

IV.  ARGUMENT.................................................14

    A.   Using the Fifth Amendment as Both Sword and Shield
        Constitutes Waiver...................................14

    B.   Defendant Richard Ayvazyan Distorted the Record at
        Trial by Using the Government's Inability to
        Introduce Contrary Evidence as a Sword and Shield..17

    C.   Defendant Terabelian Distorted the Record at Trial by
        Using Suppressed Evidence as both a Sword and Shield
        ....................................................20

V.   CONCLUSION...............................................22

1

**TABLE OF AUTHORITIES**

2

**CASES**

3  <u>Bittaker v. Woodford</u>, 331 F.3d 715 (9th Cir. 2003)................15

4  <u>Brown v. United States</u>, 356 U.S. 148 (1958)...................15, 18

5  <u>Emspak v. United States</u>, 349 U.S. 190 (1955)......................16

6  <u>Klein v. Harris</u>, 667 F.2d 274 (2d Cir. 1981)..................passim

7  <u>Mitchell v. United States</u>, 526 U.S. 314 (1999)...............14, 21

8  <u>Rogers v. United States</u>, 340 U.S. 367 (1951)......................14

9  <u>Smith v. United States</u>, 337 U.S. 137 (1949).......................16

10 <u>United States v. $133,420.00 in U.S. Currency</u>, 672 F.3d 629 (9th
      Cir. 2012).......................................................15

11
   <u>United States v. $31,000.00 in U.S. Currency</u>, 774 F. App'x 288
12    (6th Cir. 2019)..................................................15

13 <u>United States v. Benson</u>, 2016 WL 215233 (N.D. Cal. Jan. 19, 2016).15

14 <u>United States v. Helina</u>, 549 F.2d. 713 (9th Cir. 1977)....16, 17, 20

15 <u>United States v. Mercado-Moreno</u>, 869 F.3d 942 (9th Cir. 2017).....16

16 <u>United States v. O'Henry's Filmworks, Inc.,</u> 598 F.2d 313 (2d Cir.
      1979)............................................................16
17
   <u>United States v. Olano</u>, 507 U.S. 725 (1993)......................16
18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Throughout the trial, defendants Richard Ayvazyan and Marietta Terabelian deliberately, and repeatedly, used this Court's order suppressing evidence obtained from cellphones seized at the Miami International Airport as both a sword and a shield.  In so doing, counsel for defendants Richard Ayvazyan and Terabelian selectively disclosed facts in a manner that left the jury with a distorted view of the truth.  For example, counsel for defendant Richard Ayvazyan told the jury that the government had failed to take certain investigative steps to confirm his use of a cellphone registered to "Iuliia Zhadko," which counsel knew was not true.  As counsel knew, that cellphone had been seized from defendant Richard Ayvazyan at Miami, confirming defendant's use and possession of the cellphone.  Similarly, counsel for defendant Terabelian told the jury that the government had not found certain evidence in her possession, when, in reality, it had found such evidence on the cellphone seized from her in Miami.  In both cases, defendants used their Fifth Amendment privilege as both sword and shield by relying on this Court's suppression order to present an incomplete and distorted view of the facts to the jury.

Defendants have the right to raise a vigorous defense, but they do not have a constitutional right to use the Court's suppression order to affirmatively mislead the jury.  Under analogous Supreme Court, Ninth Circuit, and other Circuit precedents, defendants cannot use their privilege as both a sword and shield to deceive the fact finder.  For these reasons, the Court should issue an order finding that defendants Richard Ayvazyan and Terabelian waived their

1    Kastigar claims through the arguments and evidence they presented at

2    trial, dismiss their Kastigar claims, and vacate the Kastigar

3    hearing scheduled for July 26, 2021. (ECF 605 at 2.)

4    **II.  RELEVANT PROCEDURAL HISTORY**

5         In April 2021, the Court suppressed, as coerced statements

6    obtained in violation of the Fifth Amendment, the cellphone

7    passcodes defendants Richard Ayvazyan and Terabelian provided to

8    Customs and Border Protection ("CBP") officers at the Miami

9    International Airport.  (ECF 296 at 18.)  Specifically, in October

10   2020, defendants were stopped by CBP officers and cellphones were

11   seized from their possession; defendants' provision of the passcodes

12   to those cellphones and the evidence obtained from the cellphones

13   were suppressed by this Court.  (Id. at 17-18.)

14        Approximately three weeks after the suppression order,

15   defendants Richard Ayvazyan and Terabelian moved for a pre-trial

16   Kastigar hearing premised on the Court's suppression of the

17   passcodes and cellphones seized from defendants in Miami.  (ECF

18   338.)  The scope of the Kastigar hearing initially ordered by this

19   Court required the government to "explain, with specificity, whether

20   and how it used the evidence seized from [defendant Richard Ayvazyan

21   and defendant Marietta Terabelian's] phones at the Miami airport."

22   (ECF 341.)  The Court later deferred the Kastigar hearing to "a date

23   to be determined after trial," noting that "a post-trial Kastigar

24   hearing will be more focused and tailored to the actual evidence in

25   this case than a pre-trial hearing would be."  (Id. at 4.)  The

26   Court further reasoned that holding the Kastigar hearing after trial

27   would allow "the record [to become] concrete and not merely

28   predictive."  (Id. (quotations omitted).)

On June 25, 2021, following an eight-day trial, a jury found defendant Richard Ayvazyan guilty of counts one through twenty-two and twenty-six (conspiracy to commit wire fraud and bank fraud, wire fraud and bank fraud, aggravated identity theft, and conspiracy to commit money laundering), and defendant Terabelian guilty of counts one through twenty and twenty-six (conspiracy to commit wire fraud and bank fraud, wire fraud and bank fraud, and conspiracy to commit money laundering).[1]

Following the return of defendants' guilty verdicts, the government applied ex parte for an expedited briefing schedule on the question of whether defendants waived their Kastigar claims during trial. (ECF 600.)  The Court granted in part the relief sought and ordered the government to submit its moving brief in three days, by July 1, 2021.  The Court also issued an order scheduling the post-trial Kastigar hearing for July 26, 2021.  (ECF 605.)  The scope of the hearing remains, as before, focused on the government's use, if any, of information and evidence obtained from the cellphones that were accessed pursuant to the passcodes defendants provided to CBP at the Miami International Airport.  (ECF 605 at 2.)

---

[1] The jury found defendant Richard Ayvazyan not guilty as to counts twenty-eight through thirty-two, charging him with committing concealment money laundering while on pre-trial release, and found defendant Terabelian not guilty of count twenty-two, charging her with aggravated identity theft.

3

### III. STATEMENT OF FACTS

   **A.   Defendant Richard Ayvazyan Selectively Elicited Facts to Argue the Government Purportedly Failed to Investigate a Cellphone Defendant Knew was Seized from Him in Miami**

In Miami, the government seized from defendant Richard Ayvazyan a cellphone purportedly belonging to "Iuliia Zhadko" with a telephone number ending in 4170 (the "4170 cellphone").  This was the same phone number defendant Tamara Dadyan used to text "Rich New" using the phone seized from her home on Weddington Street. (Government's Trial Exhibit ("GEX") 10.)  Based on the Court's order suppressing evidence from the "Iuliia Zhadko" 4170 cellphone, the government was not able to introduce, at trial, the fact that defendant Richard Ayvazyan physically possessed and had control over the "Iuliia Zhadko" 4170 cellphone at the time of his arrest. Throughout the trial, however, defendant Richard Ayvazyan's counsel relied on the absence of this evidence to argue and elicit testimony regarding the government's purported failure to obtain evidence of defendant Richard Ayvazyan's actual possession and use of the "Iuliia Zhadko" 4170 cellphone.

Defendant Richard Ayvazyan's arguments began with counsel's opening statement, during which counsel asserted that, "The government is going to present to you a tiny sliver of those text messages in which Tammy refers to the person on the other end of the phone as Rich.  Based on that tiny sliver of text messages at the beginning of their investigation, the evidence will show that the government assumed that Zhadko was Rich and did not investigate further."  (06/15/21 P.M. Tr. at 161:18-24.)

During trial, defendant Richard Ayvazyan's counsel affirmatively elicited testimony to attack the government's

4

1  purportedly unfounded assumption that defendant Richard Ayvazyan
2  possessed and controlled the "Iuliia Zhadko" 4170 cellphone.  For
3  example, when cross-examining Small Business Administration-Office
4  of the Inspector General ("SBA-OIG") Special Agent Timothy Massino,
5  counsel elicited testimony about the government's purported failure
6  to use cell towers to triangulate or "ping" the physical location of
7  the "Iuliia Zhadko" 4170 cellphone:

8      Q:   Now, Agent Massino, did you ever attempt to investigate
9           whether more than one person had used the 4170 phone?
10     A:   I personally did not.
11     Q:   And are you familiar with a practice of using cell
12          towers to triangulate a phone's location in realtime?
13     A:   I certainly am.
14     Q:   Is it fair to say that pinging is another word for that
15          practice?
16     A:   That is correct.
17     Q:   Are you aware if anyone tried to ping the 4170 phone in
18          realtime during the course of the investigation in this
19          case?
20     A:   I do not know the answer to that question.
21     Q:   Are you aware if anybody attempted to ping the phone and
22          determine whether it was located within an apartment at
23          6150 Canoga Avenue?
24     A:   I don't believe I'm aware.  I don't believe I know the
25          answer to that question.
26  (06/21/21 P.M. Tr. at 100:2-100:18.)  Of course, as counsel knew,
27  the government knew that defendant Richard Ayvazyan had actual
28  control and possession over the "Iuliia Zhadko" 4170 cellphone at

the time of his October 2020 arrest, and further knew the location
of that cellphone afterwards.  The 4170 cellphone was in the
government's possession because it had been seized from defendant
Richard Ayvazyan at the Miami International Airport.

During closing, defendant Richard Ayvazyan's counsel once again
emphasized the government's purportedly premature assumption that
defendant Richard Ayvazyan possessed and used the "Iuliia Zhadko"
4170 cellphone:

- "You also heard, this would be Agent Massino answered this
  question pretty straightforward, did you get location
  information on where the 4170, that is the Zhadko phone, right,
  where that phone was being used to determine its location at
  any given time?  The answer was, no, they didn't.   They just
  assumed, as they do at trial here, that Rich Ayvazyan is the
  only person who is Iuliia Zhadko, and that Rich Ayvazyan is the
  only person who ever used that phone.  That is not common
  sense.  That is not reasonable based on the number of
  identities, cards, phones you heard about in this case. That is
  not reasonable.  That is not evidence to convict someone beyond
  a reasonable doubt.  It is not." (06/24/21 P.M. Tr. at 46:16 –
  47:4.)

- "Bottom line, the government ... didn't [get] location
  information, they didn't investigate anything by their own
  tunnel vision theory of this case.  And you have now heard that
  tunnel vision at this trial.  And despite limiting themselves
  to a tunnel vision trial, they had the audacity to stand up and
  tell you at the beginning of their closing argument that
  Richard Ayvazyan is the leader, not just a participant, but a

1    leader of this one giant conspiracy."  (06/24/21 P.M. Tr. at

2    47:22 – 48:7 (emphasis added).)

3        In compliance with this Court's suppression order, the

4    government did not introduce evidence or arguments at trial

5    regarding the basis for its actual knowledge that defendant Richard

6    Ayvazyan's possessed and had control over the "Iuliia Zhadko" 4170

7    cellphone.  (ECF 296 at 18.)

8

9        **B.    Defendant Richard Ayvazyan Affirmatively Introduced
         Evidence and Made Arguments at Trial Using Information He
         Previously Asserted Was Tainted Under <u>Kastigar</u>**

10

11            1.    <u>Defendant's Repeated References to the 151 Loans
                  Redacted from Trial Indictment</u>

12        In the First Superseding Indictment, the government alleged

13   that, as part of the conspiracy to commit bank fraud and wire fraud,

14   defendants submitted and caused the submission of at least 151

15   fraudulent Paycheck Protection Program ("PPP") and Economic Injury

16   Disaster Loan ("EIDL") loan applications.  (ECF 154 ¶ 32.)  Prior to

17   trial, in furtherance of his <u>Kastigar</u> arguments, defendant Richard

18   Ayvazyan argued that the 151 loan applications included loans

19   identified by the government as a result of leads based on

20   purportedly tainted digital evidence obtained from the cellphones

21   seized from him at Miami International Airport.  (ECF 381 at 5-6;

22   ECF 440 at 1, 3-4.)

23        Prior to trial, the government filed a motion to redact from

24   the First Superseding Indictment the allegation regarding the 151

25   loans. (ECF 422.)  Defendant Richard Ayvazyan opposed the

26   government's motion, arguing that:

27            To the extent the government is attempting to cure the effects
              of tainted evidence by redacting the indictment before trial,
28            their request should be denied . . .  The government has made
              its bed and must now sleep in it; it cannot escape the effects

                                         7

1    of the tainted evidence simply by redacting the allegations
2    related to the conspiracy charged in the Superseding
     Indictment.

3    (ECF 426 at 5-6.)  In its reply, the government explained that, in

4    addition to streamlining its presentation at trial, "redacting

5    paragraph 32 will streamline the Kastigar hearing by putting in

6    issue at trial only the subset of loans that the government plans to

7    present to the jury, not each of the 151 loans mentioned in the

8    indictment."  (ECF 450.)  The Court granted the government's motion

9    and the government submitted a redacted trial indictment to the

10   jury.  (ECF 478 at 21-23.)

11       At trial, despite previously alleging that a large number of

12   the 151 loans were based on purportedly "tainted evidence,"

13   defendant Richard Ayvazyan deliberately referenced and introduced

14   evidence of the 151 loans throughout the proceedings.  These

15   references began with the very first few sentences of counsel's

16   opening statement:

17       The overwhelming majority of what you just heard is not in
         dispute.  We are here because the core of the government's case
18       is a single joint venture between at least eight defendants
         involving the submission of -- involving the submission of
19       fraudulent PPP loans numbers over 150.  In reality, the
         evidence will show multiple joint ventures and multiple and
20       separate schemes not one scheme.

21   (06/15/21 P.M. Tr. at 158:18 – 158:25.)

22       Defendant Richard Ayvazyan also elicited evidence – over the

23   government's objection - of the 151 loans through cross-examination

24   questions seeking to highlight the government's alleged failure to

25   offer evidence regarding all 151 loans.  During the cross-

26   examination of Special Agent Massino, counsel for defendant Richard

27

28

1    Ayvazyan elicited testimony about the 151 loans over the
2    government's objection (06/21/21 P.M. Tr. at 111:18-111:24):

3         Q:   You just agreed there were 151 loans referenced in the
4              first superseding indictment?
5         A:   I believe so.
6         Q:   We just went through pages 5, 6, and 7, you check my
7              math, we have got 20 loans between Groups 1, 2 and 3?
8         A:   That's correct.
9         Q:   By definition then, you would agree that Groups 1, 2,
10             and 3 don't account for 130 loans that were charged in
11             the indictment?
12        A:   There are not 130 loans reflected on these charts.
13   (06/21/21 P.M. Tr. at 112:4-112:14.)

14        Counsel similarly elicited testimony from Internal Revenue
15   Service-Criminal Investigations ("IRS-CI") Special Agent Geffrey
16   Clark about the 151 loans, once again aimed at highlighting the
17   evidence the government was not offering at trial:

18        Q:   You are familiar with the indictment in this case;
19             correct?
20        A:   Yes.
21        Q:   And the superseding indictment charges a conspiracy
22             involving 151 loans; right?
23        A:   Yes.  150.
24        Q:   And as part of the government's investigation, it
25             looked at far more loans than that, didn't it?
26        A:   Yes.
27        Q:   Approximately 250?
28        A:   I don't know the number.

                                    9

1     Q:    The government produced discovery on about 250 loans?

2     A:    I don't know the number that was produced.

3     Q:    And then after the indictment with 151 loans, you

4           heard Ms. Robinson testify that she was given 53

5           loans; right?

6     A:    Yes.

7     Q:    And you saw her charts that had 24 loans; right?

8     A:    Yes.

9     (06/22/21 A.M. Tr. at 78:12-79:6.)

10         During closing argument, counsel for defendant Richard Ayvazyan

11    again referenced the redacted allegation concerning the 151 loans,

12    focused on the government's alleged failure to present evidence of

13    all 151 loans.  For example:

14    •  "[A]gain, the government has to prove – as they told you, they

15       claimed it, but they have to prove it that there is one overall

16       conspiracy and scheme to establish a conviction of anyone in

17       this case on Counts 1 through 20 -- anyone.  They have got to

18       show it was one overall conspiracy and one overall scheme.  But

19       what did you actually hear?  And they said we charged one

20       conspiracy of eight-plus people, right.  And at trial you heard

21       that purported one conspiracy consisted of something like 151

22       loans."  (06/23/21 P.M. Tr. at 17:16-18:2.)

23    •  "So ask yourself, did the government prove an overall agreement

24       between the Dadyan and the Grigoryan crew, the answer is, no,

25       they did not. ...  You heard Agent Massino and a couple of

26       other government agents, they told you the indictment

27       references 151 loans, as part of this mysterious big

28       conspiracy.  How many of those loans were identified as fitting

                                      10

1    into any patterns in this case, Agent Massino's group 1[,] 2

2    and 3?  20, 20 out of 151 loans.  That is not an agreement or a

3    joint venture, even on that testimony alone." (06/23/21 P.M.

4    Tr. at 38:21-39:10.)

5  • "The government also told you that this conspiracy that they

6    charged, it came out many times, was 150 loans -- 151 loans,

7    and the evidence you heard at trial talks about maybe 20 loans,

8    maybe 24 accounts, right; <u>you never heard about these 151</u>

9    <u>loans</u>.  And the evidence they showed you about the patterns

10   here, the summary chart with the Group 1, the Group 2, that did

11   not prove the one conspiracy the government told you that they

12   proved, it didn't, the one agreement that they told you they

13   proved." (06/23/21 P.M. Tr. at 92:3-92:16 (emphasis added).)

14       The government did not offer evidence or make arguments related

15   to all 151 loans referenced by defendants at trial.

16            2.   <u>Evidence Regarding Jon Bradford</u>

17       In addition to the 151 loans, defendant Richard Ayvazyan

18   introduced evidence about an individual, Jon Bradford, that he knew

19   was related to purportedly "tainted evidence" obtained from the

20   cellphones seized in Miami.  (ECF 338, Exhibit A, at 2.)  Defendant

21   elicited testimony about Mr. Bradford during counsel's cross-

22   examination of real estate agent Amirah Halum, again over the

23   government's objection:

24   Q:   We saw on your phone you saved Mr. Ayvazyan's phone

25        number as Rich, Jon's friend?

26   A:   Correct.

27   Q:   Who is Jon?

28   A:   Jon is a past client.

                                11

1    Q:   What is his full name?

2    A:   Jon Bradford.

3    Q:   Do you know what Jon Bradford does?

4    A:   No.

5    Q:   Do you know how Jon Bradford and Rich knew each other?

6    MR. PAETTY: Objection, relevance.

7    THE WITNESS: No.

8    THE COURT: She said no.

9  (06/17/21 P.M. Tr. at 121:10-121:22.)  Notably, the government

10  offered no evidence regarding Jon Bradford – the only references to

11  that individual were elicited during defense questioning.

12          **C.   Defendant Terabelian Repeatedly Argued the Government Had
            Not Obtained Certain Evidence from a Cellphone Belonging
13          to Her Despite Knowing the Government Had Obtained Such
            Evidence from the Cellphone Seized from Her in Miami**

14          The government seized a cellphone from defendant Terabelian at

15  the Miami International Airport that contained text messages showing

16  that she used the alias "Viktoria Kauichko."  (See, e.g., ECF 338 at

17  13-14.)  As a result of the Court's suppression order, the

18  government was not able to introduce evidence relating to that

19  particular cellphone at trial.  Instead, the government introduced

20  evidence found on a different phone seized from her two weeks later

21  at her residence on Topeka Drive.  Throughout the trial, however,

22  defendant Terabelian's counsel contended that the absence of the

23  type of evidence that had been found on the suppressed cellphone

24  demonstrated reasonable doubt.

25          During opening statement, defendant Terabelian's counsel told

26  the jury that it would not see evidence of her using the "Viktoria

27  Kauichko" identity:  "Manuk Grigoryan was handling, running

28

                                    12

1   administering the Viktoria Kauichko identity.  You don't see

2   evidence of activity like that by Ms. Terabelian."  (06/15/21 P.M.

3   Tr. at 194:1 – 194:4.)  Counsel, however, knew that such evidence

4   was found on the suppressed phone because the government produced

5   copies and data from that phone to counsel.  (<u>See</u> ECF 281 (Under

6   Seal).)

7        During his cross-examination of Special Agent Massino,

8   defendant Terabelian's counsel elicited testimony suggesting – in

9   contradiction with evidence counsel knew the government had seized

10  from defendant Terabelian in Miami - that the government had only

11  found a single piece of evidence on a single cellphone belonging to

12  defendant Terabelian:

13       Q:   In this case, you determined that there was one exhibit

14            from Ms. Terabelian's phone you could show to the jury?

15       A:   We determined to show them one.

16       Q:   One so, there were no relevant text messages on Ms.

17            Terabelian's phone?

18       A:   Not on the report that I reviewed.

19       Q:   There was no relevant e-mails on her phone?

20       A:   Not on the report that I reviewed.

21                          *      *      *

22       Q:   There were no photographs of driver's license on the

23            phone?

24       A:   No.  I saw a photograph of a handwritten note with a

25            company in the name we were investigating.

26       Q:   That was it?

27       A:   That's what I saw on that phone.

28  (06/21/21 P.M. Tr. at 128:2 – 128:23.)

                              13

And in closing argument, counsel again deliberately focused the jury's attention on the inaccurate premise that the government had seized only one cellphone from defendant Terabelian, despite knowing that the government had, in fact, seized a cellphone from defendant in Miami with direct evidence of her use of the "Victoria Kauichko" identity:

> What I view as a desperate attempt to find some evidence to prove that Mary Terabelian is Victoria Kauichko, which remember, is the government's theory.  They seize her phone. Now, they seize Richard Ayvazyan's phone, and they find all kinds of stuff on there.  On Mary Terabelian's phone, we see from this image there are 44,000 images.  There are tons of text messages, tons of passwords.  There is a vast trove of evidence on this phone.  And they are looking for something to pin Mary Terabelian to this conspiracy.  What they find is one image that was taken on October 28th, 2018, two-and-a-half years before this conspiracy began.

(06/24/21 A.M. Tr. at 109:4 – 109:17.)

## IV.   ARGUMENT

### A.   Using the Fifth Amendment as Both Sword and Shield Constitutes Waiver

The Supreme Court described the general rule as to a defendant's waiver of their Fifth Amendment privileges in <u>Mitchell v. United States</u>, 526 U.S. 314 (1999).  In <u>Mitchell</u>, the Court found that "[a] witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry . . .  A contrary rule would open the way to <u>distortion of facts</u> . . . [and] make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to <u>mutilate the truth a party offers to tell</u>."  <u>Id.</u> at 322 (internal quotations omitted, citing <u>Rogers v. United States</u>, 340 U.S. 367, 373 (1951), and <u>Brown v. United States</u>, 356

14

U.S. 148, 154-55 (1958) (emphasis added)).  The scope of a
defendant's waiver is determined by the scope of any cross-
examination the government would offer to contest "the matters
[defendant] has himself put in dispute."  <u>Brown</u>, 356 U.S. at 155-56.

In light of these general principles, numerous courts have
found that defendants are not entitled to distort the record through
the assertion of facts that the government could not otherwise rebut
or respond to – in essence, using the protections of the Fifth
Amendment as both a sword and a shield.  <u>See, e.g.</u>, <u>Bittaker v.
Woodford</u>, 331 F.3d 715, 718-21 (9th Cir. 2003) ("The court thus
gives the holder of the privilege a choice: If you want to litigate
this claim, then you must waive your privilege to the extent
necessary to give your opponent a fair opportunity to defend against
it."); <u>United States v. Benson</u>, No. 12-cr-00480-YGR-1, 2016 WL
215233, at *4 (N.D. Cal. Jan. 19, 2016) (denying defendant dismissal
relief on <u>Kastigar</u> claim where he sought to use his judicially-
compelled statements "as both sword and shield"); <u>United States v.
$133,420.00 in U.S. Currency</u>, 672 F.3d 629, 640-41 (9th Cir. 2012)
("The purpose of this rule is to protect the integrity and truth-
seeking function of the judicial system from the distortions that
could occur if a witness could testify and then use the Fifth
Amendment privilege to prevent any adversarial testing of the truth
of that testimony."); <u>United States v. $31,000.00 in U.S. Currency</u>,
774 F. App'x 288, 292 (6th Cir. 2019) ("The Fifth Amendment operates
as a shield against compulsory self-incrimination, not a sword used
to make one's assertions of ownership impervious to attack").

In <u>Klein v. Harris</u>, the Second Circuit articulated a two-
pronged test to determine if and when a defendant has waived his

15

Fifth Amendment privilege based on its interpretation of relevant Supreme Court and Second Circuit precedent.  667 F.2d 274, 287 (2d Cir. 1981) (citing Smith v. United States, 337 U.S. 137 (1949), Emspak v. United States, 349 U.S. 190 (1955), and United States v. O'Henry's Filmworks, Inc., 598 F.2d 313, 318-19 (2d Cir. 1979)). According to Klein, a court may infer a defendant's waiver of his or her Fifth Amendment privilege if:  "(1) [his or her] prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) [he or she] had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination."  Klein, 667 F.2d at 287.

The principles described above, including the two-pronged test from Klein, are instructive here.  The Ninth Circuit has adopted the Supreme Court's definition of waiver, defining it as "the intentional relinquishment or abandonment of a known right."  United States v. Mercado-Moreno, 869 F.3d 942, 959 (9th Cir. 2017) (citing United States v. Olano, 507 U.S. 725, 733 (1993) (quotation marks omitted)).  Such a waiver can occur when counsel opens the door to, for example, evidence that was not previously introduced pursuant to the assertion of a Fifth Amendment privilege.  In United States v. Helina, defendant withheld production of certain records based on his assertion of a Fifth Amendment privilege.  549 F.2d. 713, 716-719 (9th Cir. 1977).  However, during cross-examination of a government witness, defense counsel elicited testimony regarding the government's purported failure to obtain those records.  The Ninth Circuit found that defendant had thereby waived his privilege:

16

By this colloquy, defense counsel, at best, sought to discredit the Government's case by suggesting to the jury that the Government had failed to document its case and, at worst, was intimating to the jury that [defendant] had fully cooperated with the Government agents.  Having thus raised the subject of the Government's documentation of its case, [defendant] <u>opened the door to a full and not just a selective development of that subject</u>.  He cannot be heard now to complain of discussion of a subject he introduced into the proceedings.

Helina, 549 F.2d at 719 (internal citations omitted) (emphasis added).

As explained further below, defendants Richard Ayvazyan and Terabelian deliberately used the Court's suppression of their Miami-seized cellphones at trial as a sword and a shield, distorting the jury's view of the truth with full knowledge of the impact of their deceptive use of the Court's suppression order and their Fifth Amendment privilege in this case.  Defendants knew the scope of this Court's suppression order and the <u>Kastigar</u> hearing, but nevertheless relied on that suppression to assert claims that the government was unable to rebut without triggering post-trial <u>Kastigar</u> concerns.  The Court should therefore find that both defendants waived their right to a <u>Kastigar</u> hearing under the Fifth Amendment because the government would have been permitted to introduce the suppressed evidence at trial.

**B.    Defendant Richard Ayvazyan Distorted the Record at Trial by Using the Government's Inability to Introduce Contrary Evidence as a Sword and Shield**

Defendant Richard Ayvazyan attempted to distort the record at trial by relying on this Court's suppression order as both a sword and a shield – knowingly and deliberately presenting misleading facts based on evidence that defendant himself previously argued was tainted.  In so doing, defendant satisfied both prongs of the <u>Klein</u> analysis by: (1) distorting the facts; and (2) knowingly waiving his

claims to the suppression of the evidence seized from defendants' cellphones in Miami.

With respect to the first prong, defendant Richard Ayvazyan knowingly distorted the facts as to the government's investigation into, and proof of, defendant Richard Ayvazyan's actual possession and control over the "Iuliia Zhadko" 4170 cellphone seized from him in Miami.  Defendant relied on this Court's suppression order to argue and elicit testimony regarding the government's allegedly premature assumption that defendant Richard Ayvazyan possessed and controlled the "Iuliia Zhadko" 4170 cellphone.  Defendant's argument was an attempt to rebut the evidence obtained from defendant Tamara Dadyan's text messages to and from "Rich New," who used the 4170 phone number (GEX 10), and highlight the government's alleged "tunnel vision" with respect to defendant Richard Ayvazyan's actual possession or control of the "Iuliia Zhadko" identity, as compared to co-defendant Manuk Grigoryan's -- a central pillar of his defense.  (See, e.g., 06/15/21 Tr. at 161:16-161:24.)  The jury was thus left with a distorted record as to a hotly-disputed issue in the case – defendant Richard Ayvazyan's use of the synthetic identity "Iuliia Zhadko" and the actual identity of "Rich New" in GEX 10.  (See, e.g., 06/21/21 P.M. Tr. 104:16-104:25 (cross-examination regarding whether Manuk Grigoryan was directly referenced in GEX 10, implying that Manuk may have been "Rich New").)

Supreme Court precedent makes clear that a privilege cannot be relied on by a defendant to distort the record on "matters [defendant] has himself put in dispute."  Brown, 356 U.S. at 155-56. Here, defendant Richard Ayvazyan's knowing and deliberate strategy

18

1   placed the government in an untenable position, and left the jury

2   with a "distorted view of the truth." Klein, 667 F.2d at 287.  The

3   government was forced to choose between either allowing defendant to

4   attack its investigation and evidence without adequate response, or

5   to engage the false premises defendant asserted by correcting the

6   record and risking the introduction of evidence related to the

7   suppressed cellphones at trial.

8       Similarly, defendant Richard Ayvazyan distorted the record by

9   affirmatively arguing and introducing evidence that he himself had

10  asserted was derived from purportedly "tainted evidence" at trial.

11  This was particularly egregious with respect to the 151 loans

12  redacted from the trial indictment, which defendant himself argued

13  was based on suppressed evidence.  By repeatedly contending, through

14  witness examinations and argument, that the government had failed to

15  meet its burden of proving a single conspiracy by failing to

16  introduce evidence of all 151 loans, defendant relied on the

17  government's silence to either (a) distort the record of the

18  government's actual investigation and basis for redacting the 151

19  loans from the trial indictment; or (b) invite, from the government,

20  what defendant himself asserted was tainted evidence into the record

21  at trial.

22      With respect to the second prong of the Klein analysis, there

23  is no question that defendant Richard Ayvazyan knew that the

24  arguments and evidence he elicited at trial were subject to this

25  Court's suppression motion.  Defendant asserted as much himself in

26  pre-trial litigation and understood the scope of the Court's post-

27  trial Kastigar inquiry.  As discussed above, defendant understood

28  that the "Iuliia Zhadko" 4170 cellphone was, in fact, seized from

him at Miami and described evidence related to the 151 loans and Jon Bradford as within the category of purportedly "tainted evidence" subject to suppression. As in <u>Helina</u>, defendant sought to introduce evidence, through cross-examination, of the government's purportedly inadequate investigation and presentation of evidence at trial, which relied on the absence of affirmative evidence created by defendant's Fifth Amendment privilege. <u>Helina</u>, 549 F.2d at 719. As such, defendant "opened the door to a full and not just a selective development of that subject" and "cannot be heard now to complain of discussion of a subject he introduced into the proceedings." <u>Id.</u> Defendant Richard Ayvazyan knowingly and deliberately introduced evidence he himself identified as subject to suppression and cannot now assert the benefits of that suppression at a post-trial <u>Kastigar</u> hearing.

### C. Defendant Terabelian Distorted the Record at Trial by Using Suppressed Evidence as both a Sword and Shield

Similarly, defendant Terabelian's theory of defense at trial focused on the government's purported failure to investigate and the alleged lack of evidence regarding her use of and connection to the "Viktoria Kauichko" identity. Defendant Terabelian's counsel specifically pointed to the government's alleged failure to find sufficient evidence of defendant's use or connection to that identity in the cellphone the government seized from her at the Topeka Drive residence, going so far as to characterize the government's use of an incriminating image found in that cellphone as a "desperate attempt" to prove her link to "Viktoria Kauichko" and her involvement in the conspiracy. (06/24/21 A.M. Tr. at 109:5.)

1    In reality, of course, counsel was fully aware that defendant

2    Terabelian's use and connection to the "Viktoria Kauichko" identity

3    was found on the cellphone that was seized from her in Miami.

4    Again, to effectively rebut these arguments, the government would

5    have had to rely on evidence that the Court had suppressed.  By

6    introducing the alleged lack of evidence into the record at trial,

7    defendant Terabelian opened the door to such evidence and cannot now

8    hide behind this Court's suppression order.  Permitting such tactics

9    would permit defendants to impermissibly use the Fifth Amendment "to

10   mutilate the truth a party offers to tell."  Mitchell, 526 U.S. at

11   322.  As with defendant Richard Ayvazyan, defendant Terabelian

12   "created a significant likelihood that the finder of fact w[ould] be

13   left with and prone to rely on a distorted view of the truth."

14   Klein, 667 F.2d at 287.

15        Moreover, during trial, the government and defendant Terabelian

16   litigated the issue of whether she should be entitled to elicit

17   evidence regarding her previously-suppressed statements to CBP in

18   Miami, with the Court determining she could not.  (06/16/21 P.M. Tr.

19   at 7:4 – 9:11; 78:20 – 95:9.).)  The parties also litigated the

20   admissibility and significance of the image found on the phone

21   seized from defendant's residence that was not suppressed.  (ECF

22   545, 549.)  Thus, defendant "had reason to know" that her positions

23   at trial drawing focus upon the lack of evidence existing on the

24   suppressed phone "would be interpreted as a waiver of the fifth

25   amendment's privilege against self-incrimination."  Klein, 667 F.2d

26   at 287.  By arguing and eliciting testimony related to the

27   government's purported lack of evidence – when, in reality,

28   defendant knew the government possessed but was unable to introduce

                                    21

such evidence pursuant to defendant Terabelian's Fifth Amendment privilege – defendant Terabelian opened the door to the use of that evidence.  As such, defendant Terabelian has waived her claims to a Kastigar hearing, as well.

**V.   CONCLUSION**

At trial, the defendants decided to distort the evidentiary record in reliance on government's compliance with the Court's suppression order.  In doing so, they made an informed, tactical decision to improve their position at trial knowing that it risked opening the door to such evidence and waived any relief predicated on this Court's suppression order.  Based on the precedents of the Supreme Court, the Ninth Circuit, and other Circuits, the government respectfully requests that this Court issue an order: (1) finding that defendants Richard Ayvazyan and Terabelian respectively waived their Kastigar claims based on the arguments defendants made and the evidence defendants elicited at trial, and (2) dismissing their Kastigar claims and vacating the Kastigar hearing currently scheduled for July 26, 2021.