UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.   2:20-cr-579-SVW                                    Date: July 2, 2021

Present: The Honorable:   Stephen V. Wilson, U.S. District Judge

Interpreter   NA

| Paul M. Cruz | N/A | N/A |
|---|---|---|
| *Deputy Clerk* | *Court Reporter / Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s) | Present | Cust | Bond | Attorneys for Defendants: | Present | App | Ret |
|---|---|---|---|---|---|---|---|
| Richard Ayvazyan | | | X | N/A | | | |
| Marietta Terabelian | | | X | N/A | | | |
| Artur Ayvazyan | | | X | N/A | | | |
| Vahe Dadyan | | | X | N/A | | | |

**Proceedings:  ORDER EXCLUDING TESTIMONY OF LYLE BARNES, ADMITTING GEX 16(b), OVERRULING DEFENDANT TERABELIAN'S CONFRONTATION OBJECTION, EXCLUDING DEFENDANT TERABELIAN'S HEARSAY STATEMENT, EXCLUDING DEFENDANT R. AVAZYAN'S SUMMARY CHART, AND REJECTING PROPOSED MULTIPLE CONSPIRACIES INSTRUCTION.**

The Court issues this order to provide its reasoning regarding (1) a number of evidentiary rulings during the recently completed trial, and (2) its ruling on the proposed multiple conspiracies instruction.

**Testimony of Lyle Barnes**

As to the proffered testimony of Lyle Barnes, the Court excludes that testimony on the basis of FRE 403. The probative value of the testimony is substantially outweighed by a number of dangers.

**First, the probative value is substantially outweighed by a danger of unfair prejudice to Artur Ayvazyan** ("A. Ayvazyan"). During the *in camera* hearing on June 21, 2021, Defendant A. Ayvazyan objected to the proffered testimony of Lyle Barnes on the grounds that the evidence was unduly prejudicial to him. The Court agrees. There is no way to admit Barnes's testimony without allowing the Government to probe into R. Ayvazyan and A. Ayvazyan's involvement in the case.[1]

---

[1] If the Court were to prevent Detective Barnes from mentioning Artur Ayvazyan's name, that would be misleading. Specifically, if the Government asked Detective Barnes if any of the defendants at trial were involved in the state mortgage fraud case—and the Court would have to allow that—and if Detective Barnes said Richard Ayvazyan, the jury may think that Richard Ayvazyan was the *only* defendant involved in the state mortgage fraud case.

Even if the Court could somehow limit the Government's rebuttal to R. Ayvazyan's involvement in the case, that would not cure the prejudice. The jury is already aware that Tamara Dadyan is A. Ayvazyan's wife. A. Ayvazyan lives at the same home as Tamara Dadyan and was referenced in Tamara Dadyan's text messages. Under these circumstances, there is a high probability that the jury will infer that A. Ayvazyan was involved in the state mortgage fraud case, even if Detective Barnes is prohibited from saying his name.

**Second, the probative value is substantially outweighed by a danger of cumulative presentation of evidence.** There is already substantial evidence in the record that Tamara Dadyan was using synthetic identities and companies to perpetrate a fraud. This includes but is not limited to text messages, loan applications, bank records, and the extensive amount of evidence discovered at the Weddington residence.

**Third, the probative value is substantially outweighed by a danger of confusing the issues and misleading the jury.** This case is about Defendants' alleged involvement in PPP and EIDL fraud, not mortgage fraud. Accordingly, allowing testimony about the details of an unrelated state mortgage fraud conspiracy risks confusing the jury.

Moreover, it also risks misleading the jury. Specifically, jurors may believe that, because a defendant conceded to being involved in an unrelated state mortgage fraud case, he or she was not involved in the instant PPP/EIDL conspiracy. But that is not the law of multiple conspiracies. Proof that a defendant was involved in the mortgage fraud conspiracy would not be relevant to determining whether the defendant was *also* involved in the PPP/EIDL conspiracy. *See, e.g.*, *United States v. Torres*, 869 F.3d 1089, 1102 (9th Cir. 2017); *United States v. Eubanks*, 591 F.2d 513, 518 (9th Cir. 1979) ("[T]he existence of other conspiracies would not preclude the jury from finding that defendants were involved in the overall conspiracy charged in the indictment."); *United States v. Moe*, 781 F.3d 1120, 1129 (9th Cir. 2015) ("That Ellifritt might have had dealings with others did not tend to disprove the possibility of the alleged conspiracy between Moe and Ellifritt.").

**Finally, the probative value is substantially outweighed by a danger of undue delay and wasting time.** If Detective Barnes's testimony were admitted, the Court would have to allow the Government to rebut the testimony with evidence of R. Ayvayzyan's involvement in the scheme. This is especially true for the purposes of the money laundering conspiracy. Specifically, the Court would have to allow the Government to establish how much money R. Ayvazyan received as part of the mortgage fraud conspiracy and explain why R. Ayvazyan could not reasonably believe he was receiving mortgage fraud proceeds. The Court would then be holding a mini-trial about the state mortgage fraud case. And, because the Government has represented that it has not taken possession of or reviewed the discovery maintained by the State of California in the mortgage fraud case, the Government would need an opportunity to investigate and review the evidence in that case. Accordingly, the probative value of the evidence is substantially outweighed by a danger of a collateral mini-trial and undue delay associated with that mini-trial.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

For the foregoing reasons, the testimony of Lyle Barnes is inadmissible. *See* FRE 403.

**Government Exhibit 16(b)**

During trial, the Court also concluded that the Government's exhibit 16(b) was admissible. That exhibit is a photograph discovered on Defendant Terabelian's phone.

First, the evidence is relevant. The photograph contains a handwritten note, which includes the business name "Fiber One Media." That business name was used to submit PPP and EIDL loan applications in the instant conspiracy. It also appears in text messages on Tamara Dadyan's phone.

Additionally, the PPP and EIDL loan applications for "Fiber One Media" were submitted by Viktoria Kauichko, and, in text messages with witness Anthony Farrer, an individual described as "Richard Ayvazyan" identified Kauichko as his "wife." Customs agents also discovered a credit card in the name of Viktoria Kauichko in Terabelian's purse at the Miami airport. Under these circumstances, the photograph is relevant. *See* FRE 401, 402; *see also United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) ("To be 'relevant,' evidence need not be conclusive proof of a fact sought to be proved, or even strong evidence of the same. All that is required is a 'tendency' to establish the fact at issue.").

Defendant Terabelian argues that the evidence is irrelevant because there is no evidence that Terabelian took the photograph or knowingly received the photograph. Yet, that issue goes to weight, not admissibility. Indeed, accepting Defendant's argument would mean that a photograph discovered on a suspect's phone would never be relevant unless there is also evidence that the suspect took the photograph or knowingly received it. The Court rejects that argument.

Second, the Court finds that FRE 403 does not require exclusion. Defendant Terabelian argues that the evidence is confusing and unfairly prejudicial because the exhibit itself does not show "what the name [Fiber One Media] would have meant to her." Mot. at 5. Yet, there is other evidence in the case that the jury could use—in connection with the photograph—to find that the name Fiber One Media did, in fact, have meaning to Defendant Terabelian. In text messages with witness Anthony Ferrer, an individual described "Richard Ayvazyan" identified Kauichko as his "wife." Customs agents also discovered a credit card in the name of Viktoria Kauichko in Terabelian's purse at the Miami airport. That name—*i.e.*, Viktoria Kauichko—was used to submit PPP and EIDL loan applications for Fiber One Media. Under these circumstances, the probative value is not substantially outweighed by a danger of confusion or unfair prejudice. *See* FRE 403.

Finally, the Court concludes that this is not "prior acts" evidence under FRE 404(b). Defendant Terabelian argues that the evidence is "prior acts" evidence because it is evidence that Terabelian took the photograph herself or at least knowingly received the photograph. Mot. at 5. However, the Court held that the

evidence could not be used to argue that Terabelian took the photograph or knowingly received it.[2] The photograph is only admissible for the purpose for which it is relevant: showing that Terabelian possessed the photo on her phone.

**Confrontation Objection**

During trial, Defendants objected to Agent Massino's testimony regarding the contents of digital devices. Defendants' objection was based on the Confrontation Clause. In response, the Court ordered the Government to recall the FBI CART examiners who produced the Cellebrite reports for the relevant digital devices. Defendants then maintained their objection under the Confrontation Clause, arguing that, while the FBI CART examiners could not testify as to the contents of the Cellebrite reports, Agent Massino could not.

At the outset, the Court is not certain whether the Cellebrite reports are testimonial. It appears from the exhibits that the Cellebrite report contain (a) raw extracted data, and (b) a summary of the extracted data. The report does not appear to be a sworn affidavit in which an agent affirmatively characterizes the results of the Cellebrite analysis. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (affidavits that attested to results of forensic testing were testimonial). Nor is the report a signed certification that included affirmations and characterizations by Government agents. *See Bullcoming v. New Mexico*, 564 U.S. 647, 653 (2011) (signed but unsworn certifications were testimonial where they included affirmations of arresting officer and affirmations by forensic analyst).

Rather, the report is more akin to "machine-generated results, such as a printout from a gas chromatograph," or "raw data generated by a machine." *See id.* at 673–74 (Sotomayor, J., concurring). The Supreme Court's opinion in *Bullcoming* "d[id] not address" those particular scenarios. *Id.* Accordingly, the Court is not certain whether the Cellebrite reports are testimonial.

However, the Court need not make any finding on that issue because, even assuming the Cellebrite report is testimonial, the FBI CART examiners who produced those reports appeared in court and were subject to cross-examination. That is all that the Confrontation Clause requires. *See id.* at 659 (majority opinion); *see also Melendez-Diaz*, 557 U.S. at 309.

Defendants argue that Agent Massino could not testify as to the contents of the Cellebrite report. Specifically, they argue that the Confrontation Clause prohibits Agent Massino from testifying that he

---

[2] The Court also finds that the evidence is inextricably intertwined because the Government has laid a foundation establishing "a sufficient contextual or substantive connection between the proffered evidence and the alleged crime to justify exempting the evidence from the strictures of Rule 404(b)." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995). Accordingly, FRE 404(b) is inapplicable. *See id.*

compared the Cellebrite report to certain Government exhibits, and that those exhibits, absent formatting, were a true and correct copy of some of the contents of the Cellebrite report.

The Court is not persuaded by this argument. At the point that Agent Massino testified about the contents of the Cellebrite report, the FBI CART examiners who prepared those reports had already appeared in Court, attested to the authenticity of the report, and been subjected to cross-examination. There is no support for the premise that, once that procedure has occurred, another witness cannot testify about his or her review of the allegedly testimonial report. Under Defendants' theory, a case agent would never be able to testify about the contents of a Cellebrite report, and only the FBI CART examiners—forensic analysts who are not involved with the substance of an investigation—can do so. The Court rejects that argument.

Indeed, in her concurring opinion in *Bullcoming*, Justice Sotomayor expressed her opinion that the case did not apply to a somewhat analogous situation. Specifically, Justice Sotomayor explained that *Bullcoming* was "not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *See* 564 U.S. at 673 (Sotomayor, J., concurring); *see also id.* ("We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.").

Here, unlike in Justice Sotomayor's hypothetical, there is no expert; instead, the relevant witness is Agent Massino. Moreover, the allegedly testimonial statements here *were* admitted into evidence. Accordingly, given Justice Sotomayor's language suggesting *Bullcoming* may be inapplicable to a case where an expert's testimony relies on testimonial statements not admitted into evidence, the Court concludes that *Bullcoming* certainly does not apply to an agent's testimony where the testimonial statements *were* admitted into evidence.

Finally, Defendants argued that, because the FBI CART examiners were asked to produce a second Cellebrite report containing only a subset of the materials in the original, full Cellebrite report, Defendants were not adequately able to cross-examine any Government witness about the process of selecting what materials would be contained in the second report.

This argument is unpersuasive. The FBI CART examiner who produced the subset report testified that the materials in the subset report were all contained within the original, full Cellebrite report. To the extent that Defendants believed cross-examination was necessary to test that premise, they had an adequate opportunity to do so. Once the subset report was admitted into evidence, Agent Massino could properly testify as to his review of that report, his comparison of the report to the Government exhibits, and the fact that the Government exhibits were a true and correct copy of the materials contained in the Cellebrite report.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Accordingly, Defendants' Confrontation objections are overruled.

**Hearsay Evidence from Defendant Terabelian**

Defendant Terabelian offered a hearsay statement from a report authored by customs officers. In the report, the customs officer states as follows: "During a baggage examination conducted on TERABELIAN's luggage, a Credit Card with the name 'Viktoria Kauichko,' was discovered inside of her wallet. When asked about why she was in possession of the Credit Card TERABELIAN stated that her husband placed it in her wallet." *See* Dkt. 187 at 22. Defendant offered the statement not for the truth of the matter asserted, but rather for the effect on the listener—*i.e.*, that the Government was aware Terabelian claimed the card did not belong to her and therefore was obligated to fingerprint the card.[3]

The Court finds that the evidence is inadmissible. First, although it is a close call, the Court concludes that the statement was not properly offered for its effect on the listener. The case *United States v. Lis* is illustrative. 120 F.3d 28, 31 (4th Cir. 1997). There, a defendant charged with embezzlement argued that the money she was accused of embezzling actually came from her deceased husband's business. *Id.* at 30. In support of this theory, the defendant testified that, after her husband died, she discovered a large sum of money in one of her husband's briefcases. *Id.* The briefcase contained strips of paper on which the husband had written various numbers and the sums of those numbers. *Id.* The defendant offered those strips of paper and the numbers on them into evidence. *Id.*

The Fourth Circuit found that the numbers on the strips of papers were not hearsay. *Id.* However, in doing so, they explained as follows:

> There was no writing from Mr. Lis explicitly stating, for example, that "The money in this briefcase, currently exceeding $40,000, belongs to me." Had the defense attempted to introduce such a naked assertion, it would have been properly excluded under the hearsay rule. The statements that Lis instead attempted to place before the jury *would have required it to draw an inference*, *i.e.*, that the numbers on the strips somehow related to the contents of the briefcase, *as a prerequisite to arriving at the conclusion manifest in the hypothetical example*.

*Id.* at 31 (emphasis added). The court further noted that the statements were admissible because "the probative value of the statements set forth on the strips did not depend on their being particularly accurate or reliable." *Id.*

---

[3] It is not clear to the Court whether Defendant Terabelian offered the statement for its effect on the customs officer specifically or the Government and its investigating agents more broadly. The Court will assume the latter, however, because the customs officer testified that she does not examine evidence for fingerprints and, accordingly, Defendant's statement would be irrelevant if offered for its effect on the customs officer. *See* June 16 PM Trial Transcript ("Tran.") at 111:1-3 ("The only time I fingerprint is when I'm fingerprinting a passenger. I never fingerprinted an item before.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Here, the probative value of Defendant Terabelian's statement—*i.e.*, that the Government was on notice of its obligation to fingerprint the card—does in fact depend on the accuracy or reliability of Defendant's statement. After all, if Terabelian's statement was not "particularly accurate or reliable," the Government likely would not feel obliged to fingerprint the card. *Id.*

Moreover, the jury here would not be required to "draw an inference . . . as a prerequisite to arriving at" the truth of the matter asserted. *Id.* Indeed, there is only one inference that the jury would have to draw to reach the conclusion in Defendant's statement: Defendant was telling the truth. Accordingly, the statement by Terabelian is far more akin to the hypothetical "naked assertion" in *Lis* that "would have been properly excluded under the hearsay rule." *Id.*

Even assuming *arguendo* that the statement was not hearsay, the Court would still exclude the evidence under FRE 403. First, the evidence is minimally probative. Defendant introduced the surveillance video that captures the moment the customs officer asked Defendant about the credit card. The video shows Defendant pointing to the door both times that the officer asks about the card. The inference is clear: the card belongs to someone outside the door.[4] Accordingly, the statement has minimal probative value because there is other evidence in the record through which Defendant could demonstrate that the Government was on notice of its obligation to fingerprint the card. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (explaining probative value of evidence "may be calculated by comparing evidentiary alternatives").

Moreover, the evidence at trial was clear that the Government never fingerprinted the card, and the Government never even attempted to explain or justify that failure. Nor did the Government attempt to elicit testimony that it was *not* on notice of Defendant's claim. Accordingly, Defendant was more than adequately able to present evidence of the Government's failure to fingerprint the card.

Second, that minimal probative value is substantially outweighed by a risk of misleading and confusing the jury. One of Defendant's primary arguments at trial is that she was not Kauichko and the credit card did not belong to her. Given the primacy of that argument, it would be virtually impossible for the Court to instruct the jury—without confusing or misleading them—that they should not use the statement as evidence that the credit card did not belong to Defendant.

Accordingly, Defendant Terabelian's statement is inadmissible.[5]

---

[4] Indeed, that is precisely how defense counsel argued the issue in closing: "[Defendant Terabelien] is just making a very straightforward statement to that officer, this is not my card. Now, that is the moment where the government had an obligation to find out whether she was telling the truth." June 24 AM Tran. at 105:9-12.

[5] Defendant also offered an alternative theory of admissibility. Specifically, Defendant points to an allegedly inconsistent statement made by customs officer Loussaint. In an interview with Agent Palmerton, officer Loussaint stated that Terabelian "claimed ownership o[f] everything that was in her purse and suitcase." DOJ_PROD_0000165472. Yet, Loussaint never testified

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**Defendant R. Ayvazyan's Summary Chart**

Defendant Richard Ayvazyan offered into evidence a summary chart under FRE 1006. The summary charts provided examples of online activity from various IP addresses. For example, the summary charts showed that certain IP addresses—some associated with Manuk Grigoryan, and others without any subscriber information—were used to access finance related accounts (*e.g.*, bank, Venmo, etc.) and engage in other activity. The summary charts did not include the dates of the activity.

The Court finds that the chart does not satisfy FRE 1006 because the chart and the underlying documents were not made available at a "reasonable time." "The purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial." *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996) (quotations omitted). This allows the opposing party to "prepare for cross examination, or to offer exhibits of its own as rebuttal evidence." *United States v. Jamieson*, 427 F.3d 394, 410 (6th Cir. 2005). And it is the *identification of underlying documents* that is critical to this task—*i.e.*, even if the Government possessed the documents before trial, it could not have been aware that those documents would form the basis of a specific chart until Defendants provided the requisite notice under FRE 1006. *See Air Safety, Inc. v. Roman Cath. Archbishop of Bos.*, 94 F.3d 1, 8–9 (1st Cir. 1996) (affirming district court's exclusion of summary chart under FRE 1006 and agreeing with district court's reasoning that "it is [not] enough to say that the documents have been available or could have been available or were available when they were not identified as the source for these summaries. . . . [O]nce the discovery comes down to trial and somebody prepares a summary, it seems to me that the person providing the summary must say now these documents, this summary is a summary of the following documents . . . .").

Here, Defendants did not provide the summary chart to the Government until 12:47 PM on June 22, 2021.[6] Although Defendant did not seek to call the witness until the morning of June 23, 2021, there was a substantial possibility the witness could have been called on the afternoon of June 22, 2021. Either way, Defendants provided the Government with the summary chart and identified the relevant underlying documents less than twenty-four hours before the summary witness would testify.

That failed to satisfy FRE 1006's "reasonable time" requirement. "What is reasonable is, of course, always a matter to be determined in light of the circumstances." 31 Fed. Prac. & Proc. Evid. § 8045 (1st ed.). Given the circumstances here—*i.e.*, a hotly contested case with extensive pretrial motion practice directed at

---

inconsistently with that statement. And the statement in the report is not inconsistent because the statement in the report was not made by officer Loussaint; rather, the report was written by either one of officers Theodora Brewster or David Gates. *See* Dkt. 187 at 20.

[6] The Government represents that it did not see the chart until approximately 6:00 p.m. in the evening, after it returned to its office from trial. The Court makes no finding as to when the Government actually saw the charts or had notice. Rather, the Court assumes for the sake of argument that the notice occurred as soon as Defendants sent the chart to the Government—*i.e.*, 12:47 p.m.

numerous evidentiary issues—twenty-four hours does not satisfy the "reasonable time" requirement of FRE 1006.  *See In re E.I. du Pont de Nemours and Co.*, 918 F.Supp. 1524, 1546 (M.D. GA 1995) *order reversed on other grounds* 99 F.3d 363, 365 (11th Cir. 1996) ("In court, after the opposing party has rested and just prior to an effort to introduce the summaries . . . is not a reasonable time and place.").[7]

Moreover, the Court finds that a balancing under FRE 403 requires exclusion of the charts.  First, the chart is minimally probative because the Court is not precluding Defendant's argument or the underlying evidence.  The chart simply identifies specific instances where IP addresses belonging to Manuk Grigoryan or others were used to access finance related accounts (*e.g.*, bank, Venmo, etc.) belonging to the synthetic identities at issue in this case, and engage in other online activity associated with those identities.  *See* Dkts. 562-2, 562-3.  There are not an extensive number of instances of online activity, and the underlying exhibits that identify the IP addresses associated with that activity were in evidence.  Accordingly, Defendants could make the same argument that the charts reflect, and Defendant's counsel did so throughout trial.

Second, the minimal probative value of the charts is substantially outweighed by a risk of confusing or misleading the jury.  None of the charts include the date that the online activity occurred.  Moreover, half of the charts lack subscriber info, which further reduces the probative value and renders the charts confusing.

Accordingly, the charts are inadmissible under FRE 1006 and FRE 403.

**Richard Ayvazyan's Proposed Multiple Conspiracies Instruction**

At the jury instruction conference, Defendant Richard Ayvazyan requested an instruction on multiple conspiracies.  Dkt. 372, at 9.  Throughout trial, Defendant Richard Ayvazyan attempted to develop evidence that the eight-defendant conspiracy alleged in the indictment was comprised of two different groups – with one group led by Manuk Grigoryan and another group led by Tamara Dadyan.

"A multiple conspiracies instruction is required only if the defendants' theory of the charged conspiracy or conspiracies 'is supported by law and has some foundation in the evidence.'"  *United States v. Job*, 871 F.3d 852, 867 (9th Cir. 2017) (quoting *United States v. Fernandez*, 388 F.3d 1199, 1247 (9th Cir. 2004)).  Here, the Court concludes that a multiple conspiracies instruction is inconsistent with the law and unsupported by the evidence at trial.

"A defendant is entitled to a multiple conspiracies instruction 'where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that

---

[7] The Court notes that the Government produced its summary chart and identified underlying documents on June 1, 2021—*i.e.*, two weeks before trial.  *See* Dkt. 451-8; *see also United States v. Messino*, 855 F. Supp. 955, 966 (N.D. Ill.) (finding provision of charts and identification of underlying documents two weeks before trial was sufficient).

some of the defendants were *only* involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment.'" *United States v. Torres*, 869 F.3d 1089, 1101 (9th Cir. 2017) (emphasis in original) (quoting *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989)).

Crucially, the case law is clear that subagreements or subgroups by themselves do not amount to separate conspiracies. *See United States v. Singh*, 979 F.3d 697, 722 (9th Cir. 2020) ("[A] single conspiracy may involve several subagreements or subgroups of conspirators." (quoting *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984))); *Torres*, 869 F.3d at 1102 (same); *Job*, 871 F.3d at 868 (same); *United States v. Mincoff*, 574 F.3d 1186, 1196 (9th Cir. 2009) (same); *Fernandez*, 388 F.3d at 1248 n.34 (same). "To suggest that defendants should be acquitted of the general conspiracy charge just because some of them met singly with other defendants and conspired with them to carry out the overall ... plan is a misapplication of the law of conspiracy." *United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977) (citation omitted). This follows logically from a black-letter statement of the law of conspiracy, that a person "may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." Ninth Circuit Crim. Model Jury Instructions 8.23 (Conspiracy—Knowledge of and Association with other Coconspirators).

A defendant may be a member of multiple subgroups within a conspiracy, or serve multiple roles within the same conspiracy, without thereby becoming part of multiple unrelated conspiracies. *See Job*, 871 F.3d at 867-68 (multiple conspiracy construction properly denied where defendant was fronted drugs for sale and cut drugs for distribution); *See Mincoff*, 574 F.3d at 1197 ("It is irrelevant that [seller's] suppliers and [defendant's] buyers did not know each other or may not have been aware of every act committed in furtherance of the conspiracy, because '[a] single conspiracy can include subgroups or subagreements....'" (quoting *United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996))); *see also United States v. Moe*, 781 F.3d 1120, 1129 (9th Cir. 2015) ("That [alleged coconspirator] might have had dealings with others did not tend to disprove the possibility of the alleged conspiracy between [defendant] and [alleged coconspirator].").

In light of this principle, even if the evidence only established that the charged conspiracy was comprised of a Grigoryan subgroup and a Dadyan subgroup, such proof by itself would not allow a reasonable jury to find the defendants were only involved in multiple conspiracies and not the larger conspiracy charged in the indictment.

What differentiates subagreements and subgroups from multiple conspiracies is how the subagreements or subgroups relate to the charged conspiracy. A multiple conspiracies instruction is only required when a reasonable jury could find the trial evidence showed conspiracies that are "separate from" and "unrelated to" the conspiracy charged in the indictment. *See Job*, 871 F.3d at 868; *Torres*, 869 F.3d at 1101; *Fernandez*, 388 F.3d at 1247. Moreover, a reasonable jury must be able to find that "some of the defendants were *only* involved" in those separate conspiracies and were not part of the conspiracy charged in the indictment. *Id.* (emphasis added). In other words, there must be some evidence tending to undermine the government's inference of the single overall conspiracy charged in the indictment. *See Torres*, 869 F.3d at 1102 (affirming denial of multiple

conspiracy instruction where defendant "did not adduce any testimony or other evidence at trial that undercut the government's evidence regarding [defendant's] activities in furtherance of [charged conspiracy's] objectives"); *Moe*, 781 F.3d at 1129 ("multiple conspiracy theory of defense did not apply ... [where evidence] did not tend to disprove the possibility of the alleged conspiracy").

Turning to the evidence, the Court concludes that no reasonable jury could reasonably find that Richard Ayvazyan was only a member of separate and unrelated conspiracies.

A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation. Typically, the inference of an overall agreement is drawn from proof of a single objective ... or from proof that the key participants and the method of operation remained constant throughout the conspiracy. The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the coconspirators knew of each other's participation or actually benefitted from the activities of his coconspirators.

*Fernandez*, 388 F.3d at 1226; *see also United States v. Singh*, 979 F.3d 697, 721-22 (9th Cir. 2020) (quoting same *Fernandez* standard).

Additional relevant factors include "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

The evidence described in Richard Ayvazyan's Notice of Record Support does not warrant a multiple conspiracies instruction.

Richard Ayvazyan primarily argues that there is evidence that the alleged Grigoryan group did not know about or communicate with the alleged Tamara Dadyan group. FBI Agent Justin Palmerton, who was called by Richard Ayvazyan, testified that he could not recall whether phone records reflected communication between members of the alleged Grigoryan group and members of the alleged Tamara Dadyan group. June 22 PM Tr. at 146-47. Defendant Artur Ayvazyan, who was allegedly part of the Tamara Dadyan group, also testified that he did not know members of the alleged Grigoryan group, including Arman Hayrapetyan, Payrur Hayrapetyan, and Edvard Paronyan. June 23 AM Tr. at 113. Likewise, Richard Ayvazyan points to the fact that text messages between Tamara Dadyan and Richard Ayvazyan do not reference Manuk Grigoryan or his alleged associates, Arman Hayrapetyan, Payrur Hayrapetyan, or Edvard Paronyan. *See generally* GX 10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

None of this evidence tends to show multiple unrelated conspiracies. The law is clear that the members of a conspiracy need not know each other or have communicated with each other in order to be part of a single overarching conspiracy. *See Mincoff*, 574 F.3d at 1196; *Perry*, 550 F.2d at 533.

Notwithstanding a lack of communication, the government's evidence of a single overarching conspiracy was overwhelming and unrebutted. As an initial matter, Richard Ayvazyan never disputed that both the alleged Grigoryan and Tamara Dadyan groups were advancing the same goal: obtaining fraudulent PPP and EIDL loans. Both alleged groups used the same means to accomplish that goal: a collection of fake and synthetic identities to apply for loans and conceal the proceeds. And both alleged groups executed their schemes around the same time: between March 2020 and August 2020. *See Bibbero*, 749 F.2d at 587. Most saliently, many of the loans associated with both alleged subgroups used the exact same payroll reports, GX 116, at 5-7, and text messages show Richard Ayvazyan sharing this payroll information with Tamara Dadyan, GX 10, at 15-16.

The government's summary financial charts make abundantly clear that, beyond the aforementioned commonalities, a primary aim of the conspiracy was to transfer fraudulent loan proceeds for the benefit of Richard Ayvazyan and his wife, Defendant Marietta Terabelian. For example, Richard Ayvazyan and Terabelian purchased a $3.25 million property at Topeka Drive using proceeds of loans obtained by both alleged subgroups. *See* GX 115, at 7. Robinson traced $639,807 in PPP and EIDL funds to the purchase of the Topeka property, including loans submitted by individuals associated with Grigoryan – Artashes Grigoryan and Edvard Paronyan – as well as individuals and entities associated with Tamara Dadyan – including Artur Ayvazyan and Secureline Realty and Funding Inc. *Id.*[8] Given that Richard Ayvazyan actually benefited from loans submitted by members of both alleged groups, no reasonable juror could reasonably conclude that Richard Ayvazyan's benefits were not derived from the success of the entire scheme.[9]

The evidence that Richard Ayvazyan points to as showing that the alleged Grigoryan group used distinct methods in fact demonstrates the common methods used across the alleged conspiracy. For example, Richard Ayvazyan claims that Grigoryan operated out of an apartment at 6150 Canoga Ave., but the evidence reflected extensive use of that address by the other alleged subgroup. Tamara Dadyan discusses this address with Richard Ayvazyan in text messages. Documents recovered from the search of Artur Ayvazyan and Tamara Dadyan's home included checks in the name of Viktoria Kauichko at 6150 Canoga Ave. Artur Ayvazyan's

---

[8] Richard Ayvazyan also pointed to evidence connecting the Calle La Primavera Property to the Grigoryan group – namely, that IRS Agent Clark found documents referencing Hripsik Grigoryan and Rita Grigoryan in a trash pull at that address. June 22 AM Transcript at 77-78. That property in fact reveals the overlapping activities of the groups. Part of the purchase price for the Calle La Primavera Property came from the loan to Voyage Limo, which is associated with Tamara Dadyan's cousin, Defendant Vahe Dadyan. GX 115, at 5. Agent Palmerton also observed through surveillance that Marietta Terabelian's sister was living at the Calle La Primavera property. June 23 AM Transcript at 55.

[9] There are funds interchanged between the two alleged groups beyond those identified in GEX 115. For example, on June 19, 2020, Edvard Paronyan transferred $50,000 to Marietta Terabelian, and Manuk Grigoryan—the leader of an allegedly separate and unrelated group—transferred $25,000 to Marietta Terabelian. *See* GEX 89 at BOA-13673-DOJ-0000117.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

phone included images of a Bank of America statement addressed to Viktoria Kauichko at 6150 Canoga Ave. *See* GEX 24.e at 7. And in text messages with witness Anthony Farrer, an individual described as "Richard Ayvazyan" told Farrer to send watches to the Canoga address.

Similarly, while Richard Ayvazyan points to IP addresses showing that Grigoryan used the Iuliia Zhadko, Viktoria Kauichko, and Anton Kudiumov identities, the text messages between Richard Ayvazyan and Tamara Dadyan reflect that all of these identities are also used by the alleged Tamara Dadyan group. The same goes for entities Top Quality Contracting, Timeline Transport, and Fiber One Media. *See generally* GX 10. Indeed, at the Miami airport, Richard Ayvazyan's luggage contained credit cards in the name of Viktoria Kauichko, Iuliia Zhadko, and Top Quality Contracting/Iuliia Zhadko. Accordingly, the IP address evidence simply shows that *both* of the alleged groups were using the exact same fake and synthetic identities and entities.

Richard Ayvazyan further argues that the alleged Grigoryan group operated in a distinct manner because they primarily used construction companies to apply for fraudulent loans. Yet, there is significant evidence that the alleged Tamara Dadyan group also used construction companies. Top Quality Contracting and Sabala Construction are both mentioned in the text messages between Richard Ayvazyan and Tamara Dadyan. A Sabala Construction checkbook was found at Artur Ayvazyan and Tamara Dadyan's residence, as was a note referencing both Sabala and EM Construction.

Richard Ayvazyan also points to evidence that, after an application for a loan on behalf of Fiber One Media was approved, two later applications for loans on behalf of Fiber One Media submitted from different IP addresses were cancelled. All three loans were submitted by Viktoria Kauichko. Even if a jury accepted the inference that this series of applications reflected a lack of coordination or even rivalry, it has no tendency to show that the conspiracies were separate and unrelated. The applications involved the same fictitious applicant and company, were submitted within a two-month period, and were all designed to achieve the common objective of the conspiracy – to obtain fraudulent PPP and EIDL loans.

Indeed, the overlapping methods are further demonstrated by the very same applications that Ayvazyan argues were submitted by Grigoryan. Specifically, Ayvazyan points to four loans submitted from the IP address 104.34.75.188: (1) Fiber One Media, GEX 3.e; (2) Mod Interiors, GEX 3.m; (3) G&A Diamonds, GEX 2.h; and (4) Hart Construction GEX 3.i.

These loans weigh against a multiple conspiracies instruction. First, they were all submitted from the Canoga apartment—*i.e.*, an apartment associated with both of the alleged subgroups. *See supra* at 4.

Second, the loans all contain elements that were used by the alleged Tamara Dadyan group. For example, the voided check at the end of the Fiber One Media application is from BBVA Compass Bank for account number 6782815502 and routing number 062001186. In text messages between Ayvazyan and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Dadyan, Ayvazyan sends Dadyan the information for a Fiber One Media account at BBVA Compass Bank with the exact same account number and routing number.

Similarly, the Mod Interiors application was submitted to Celtic Bank in the name of Armen Injijian. In text messages between Ayvazyan and Dadyan, the two discuss a loan submitted to Celtic Bank for "Armen." *See* GEX 10 at 10, 14.

Further, the bank statements submitted along with the G&A Diamonds application were from a US Bank account ending in 1964. On June 19, 2020, that account transferred $100,000 to Marietta Terabelian.

Finally, the Hart Construction application check included a voided check from a JP Morgan Chase account ending in 1511. On May 4, 2020, that account transferred $200,000 to a different JP Morgan Chase account belonging to Hart Construction. And that same day, Arman Hayrapetyan—the signatory on the Hart Construction accounts, and a member of the alleged Grigoryan group—remitted a cashier's check to "Fiber One Media," which was endorsed by Viktoria Kauichko. As discussed above, the alleged Tamara Dadyan group extensively used the Fiber One Media entity and Viktoria Kauichko identity. That alleged group applied for loans in the name of Fiber One Media, discussed the entity and the Viktoria Kauichko identity in text messages, used the Viktoria Kauichko identity in association with the Canoga address, and possessed credit cards in the name of Viktoria Kauichko.

Under the foregoing circumstances, no reasonable juror could reasonably find two separate and unrelated conspiracies. Rather, the overwhelming evidence shows that (1) the two alleged groups had the exact same objective (*i.e.*, obtaining fraudulent PPP and EIDL loans); (2) both alleged groups accomplished that goal using the exact same methods (*i.e.*, the same set of fake and synthetic identities and entities); and (3) all of the defendants – in particular Richard Ayvazyan and Marietta Terabelian – obtained and concealed their benefits through their coconspirators' use of these methods. Accordingly, the evidence presented at trial is insufficient to warrant a multiple conspiracies instruction. *See Torres*, 869 F.3d at 1101.

Two other considerations are relevant to the Court's analysis.

First, the proponent of the multiple conspiracies instruction was Richard Ayvazyan, who argued at trial that, if he conspired at all, he was a member of both a conspiracy with the alleged Grigoryan group and a conspiracy with the alleged Tamara Dadyan group.[10] The multiple conspiracies instruction has two limited purposes, neither of which would be served given Richard Ayvazyan's membership in both conspiracies.

---

[10] While the other three defendants joined Richard Ayvazyan's proposed jury instructions, Dkt. 372, only Richard Ayvazyan elicited and presented the evidence allegedly supporting the multiple conspiracies instruction, and no Defendant argued for a theory of multiple conspiracies distinct from Richard Ayvazyan's theory. *See United States v. Hofus*, 598 F.3d 1171, 1175 (9th Cir. 2010)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

As the Ninth Circuit has explained, the purpose of a multiple conspiracies instruction is 1) "to minimize any 'prejudicial variance' between the indictment and the proof at trial" and 2) "to protect a defendant from a 'spillover of guilt' from one defendant to another." *United States v. Chen Chiang Liu*, 631 F.3d 993, 999 (9th Cir. 2011) (quoting *Anguiano*, 873 F.3d at 1317).

Here, there was little to no risk of prejudicial variance or spillover of guilt to Richard Ayvazyan. Because he argued that he was a member of two different conspiracies encompassed by the allegations in the indictment, the indictment put him on notice of all the evidence against him, *see United States v. Antonakeas*, 255 F.3d 714, 722 (9th Cir. 2001), and there was no danger that Richard Ayvazyan would be convicted "on the basis of evidence that related only to a conspiracy of which he was not a part," *United States v. Moore*, 522 F.2d 1068, 1074 (9th Cir. 1974) (variance was not prejudicial where appellant argued that the evidence proved that "he was a central figure in [e]ach of the alleged three smaller conspiracies"). As for spillover of guilt, the Eighth Circuit put the point concisely – "[t]he chance of a 'prejudicial spillover effect' from one conspiracy to another if the defendant is a member of both conspiracies is minimal, if not nonexistent." *United States v. Buckley*, 525 F.3d 629, 634 (8th Cir. 2008) (citation omitted). Any such finding of prejudicial spillover would be particularly inappropriate here, because the evidence purportedly establishing multiple conspiracies was elicited by Defendant Richard Ayvazyan on cross-examination and through his own witnesses.

Second, given the argument advanced by Richard Ayvazyan throughout the trial, the multiple conspiracies instruction posed a serious risk of confusion to jurors. Richard Ayvazyan's counsel repeatedly suggested that the defendants on trial should be acquitted if the government could not provide evidence that Grigoryan, or his associates, had not conspired with Tamara Dadyan, or her associates. However, a jury may convict a defendant of conspiracy even if the evidence is insufficient to convict every individual charged with joining the conspiracy in the indictment. *See United States v. Laney*, 881 F.3d 1100, 1109 (9th Cir. 2018) (evidence was sufficient to support defendant's conspiracy conviction although evidence at trial did not establish every charged conspirator was a member of the same conspiracy); *United States v. Lapier*, 796 F.3d 1090, 1095 (9th Cir. 2015) (evidence was sufficient to support conspiracy conviction although it showed multiple conspiracies); *see also United States v. Willis*, 868 F.3d 549, 556 (7th Cir. 2017) (concluding variance was not fatal where government proved "a subset" of the conspiracy charged in the indictment because "it was equally illegal for two to conspire together as for three or more to do so." (citation omitted)); *Buckley*, 525 F.3d at 634 n.2 ("Failure to prove the single drug conspiracy charged in an indictment results only in a variance ... and 'a prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged." (citation omitted)); *United States v. Richardson*, 532 F.3d 1279, 1288-89 (11th Cir. 2008) ("The prosecution need not prove exactly what the indictment alleges. It is sufficient for the government to prove a subset of the allegations in the indictment, as long as the allegations that are proved support a conviction for the charged offense." (citation omitted)).

---

(explaining that a proposed instruction is insufficient to constitute an objection to an instruction or the lack thereof, and that parties must have a "discussion with the court about the need for such language or the failure of the court's instruction to include it").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

When the proof at trial indicates a conspiracy different from the one charged in the indictment, the question is one of variance. *See Laney*, 881 F.3d at 1109 ("Although '[t]he issue of whether a single conspiracy has been proved is a question of the sufficiency of the evidence,' the issue becomes one of variance where the evidence at trial tends to show the existence of two conspiracies rather than one ongoing conspiracy as alleged in the indictment." (citation omitted)). But the variance will only be fatal if the conspiracies are "unrelated." *Fernandez*, 388 F.3d at 1226-27. For the reasons discussed above, no reasonable jury could find "unrelated" conspiracies, *id.,* and no reasonable jury could reasonably conclude that the "evidence at trial tend[ed] to show the existence of two conspiracies rather than one ongoing conspiracy as alleged in the indictment," *Laney*, 881 F.3d at 1109.

Finally, Ayvazyan argues that he is entitled to the multiple conspiracies instruction because he built his entire case at trial around that theory. Ayvazyan notes that the Court explained it was familiar with the Ninth Circuit's "theory of the defense" case law. Dkt. 579 at 2 n.1.

Ayvazyan misconstrues the Court's comments. The Court agrees that, in order to present evidence of his or her theory, a defendant "needn't have a good faith belief in the factual validity of a defense. So long as the defendant doesn't perjure himself or present evidence he knows to be false . . . he's entitled to exploit weaknesses in the prosecution's case . . . ." *United States v. Hernandez-Meza*, 720 F.3d 760, 765 (9th Cir. 2013); *see also United States v. Espinoza*, 880 F.3d 506, 517 (9th Cir. 2018) ("That the defense's theory may be speculative is not a valid reason to exclude evidence of third-party culpability.").

Yet, once all the evidence is presented,[11] the inquiry is different. Indeed, the mere presentation of evidence regarding a particular theory does not automatically entitle a defendant to an instruction on that theory. Rather, the question in determining whether to issue a proposed instruction is whether the evidence that was *actually presented* warrants that instruction. Specifically, the Court must determine whether "the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment.'" *Torres*, 869 F.3d 1089, 1101 (9th Cir. 2017). For the reasons discussed above, no reasonable jury could so find based on the evidence actually presented at trial.

The Court observes that Defendant Vahe Dadyan may be differently situated from the other defendants on trial. However, Vahe Dadyan only generally joined Richard Ayvazyan's request for a multiple conspiracies

---

[11] Here, the Court gave Defendant R. Ayvazyan ample latitude to present evidence regarding his theory of the case. The primary pieces of evidence the Court excluded were (1) the testimony of Lyle Barnes; and (2) the summary charts. However, the testimony of Lyle Barnes would not have supported a multiple conspiracies instruction. *See supra* at 2. And, as for the summary charts, Defendant R. Ayvazyan was not precluded from arguing the simple and straightforward point presented in those charts: IP addresses associated with Manuk Grigoryan were used to access accounts belonging to fake and synthetic identities used by the alleged Tamara Dadyan group. Indeed, the Court considered that evidence in determining whether a multiple conspiracies instruction was warranted and explained that the IP address evidence simply shows that *both* alleged groups were using the same fake and synthetic identities and entities. *See supra* at 13.

instruction, and did not offer any argument pertaining to his position in the case.[12] *See Hofus*, 598 F.3d at 1175 (explaining that defendant must "state with adequate specificity the grounds for an objection to a jury instruction"). Moreover, as the above discussion indicates, the evidence presented at trial did not warrant a multiple conspiracies instruction.

In any event, the jury was given general instructions on what constitutes a conspiracy from the Ninth Circuit's Model Instructions. Those instructions were sufficient for Vahe Dadyan or any other defendant to advance an argument that they did not join the conspiracy alleged in the indictment because they did not have "reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture." Ninth Circuit Model Crim. Jury Instructions 8.23.

For the foregoing reasons, the Court DENIES the request for a multiple conspiracies instruction.[13]

**IT IS SO ORDERED.**

Initials of Deputy Clerk ⎯pg⎯

---

[12] The Court further notes that, at the jury instruction conference, Defendant Artur Ayvazyan did not even object to the lack of a multiple conspiracies instruction. *See* Dkt. 637 at 16:3 (asserting "we have no other issues" after clarifying that *Jewell* instruction will not be given).

[13] Defendants also requested a unanimity instruction. Such an instruction is only appropriate where "there is a 'genuine possibility of jury confusion' or a possibility 'that a conviction may occur as the result of different jurors concluding that the defendant committed different acts.'" *Lapier*, 796 F.3d at 1096 (citation omitted). As discussed in detail above, no reasonable jury could find multiple unrelated conspiracies, and there was consequently no genuine possibility of jury confusion about the conspiracy on which they had to agree and no possibility of a conviction based on jurors finding different facts.