Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Michael A. Keough (SBN 327037)
*mkeough@steptoe.com*
Meghan L. Newcomer (*pro hac vice*)
*mnewcomer@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

*Counsel for Defendant Richard Ayvazyan*

John L. Littrell (SBN 221601)
*jlittrell@bklwlaw.com*
Ryan V. Fraser (SBN 272196)
*rfraser@bklwlaw.com*
**BIENERT KATZMAN LITTRELL
WILLIAMS, LLP**
601 W. 5th Street, Suite 720
Los Angeles, CA 90071
Telephone: (213) 528-3400
Facsimile: (949) 369-3701

*Counsel for Defendant Marietta Terabelian*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>RICHARD AYVAZYAN,<br>MARIETTA TERABELIAN,<br>*et al.*,<br><br>*Defendants*. | Case No.  20-cr-579 (SVW)<br><br>**JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER TO DISMISS *KASTIGAR* CLAIMS AND VACATE *KASTIGAR* HEARING**<br><br>Hon. Stephen V. Wilson |

# <u>TABLE OF CONTENTS</u>

I.    THE GOVERNMENT'S REQUEST IS INCONSISTENT WITH THE
      LAW REGARDING WAIVER OF FIFTH AMENDMENT RIGHTS.................2

      A.    There Was No Waiver of Fifth Amendment Rights ....................................2

      B.    Arguing the Weakness of the Government's Evidence Is Not a
            Waiver (Much Less a Retroactive Cure of Fifth Amendment
            Violations) ...................................................................................................6

      C.    Even If the Government Had Proved a Waiver of a Fifth
            Amendment Right at Trial, the Remedy Would Not Include
            Dismissing a Separate Post-Trial Proceeding Regarding Non-
            Evidentiary Use and Pre-Trial Violations of the Fifth Amendment ...........8

II.   THE DEFENDANTS DID NOT INTENTIONALLY RELINQUISH OR
      ABANDON THEIR FIFTH AMENDMENT RIGHTS BY
      ACCURATELY IDENTIFYING FLAWS IN THE GOVERNMENT'S
      CASE ................................................................................................................10

      A.    Ayvazyan Did Not Intentionally Relinquish or Abandon His Fifth
            Amendment Rights by Asking Questions and Making Argument
            About the Possibility that Richard Ayvazyan Was Not the Only
            Person to Use the Zhadko Phone Between March 12, 2020 and
            October 15, 2020 ........................................................................................10

      B.    Ayvazyan Did Not Intentionally Relinquish or Abandon His Fifth
            Amendment Rights by Asking Questions About the Superseding
            Indictment or a Witness's Introduction to Ayvazyan ...............................14

      C.    Terabelian Did Not Intentionally Relinquish or Abandon Her Fifth
            Amendment Rights By Highlighting Shortcomings in the
            Government's Evidence ..............................................................................16

III.  CONCLUSION.................................................................................................18

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                              **Page(s)**

*Bittaker v. Woodford,*
   331 F.3d 715 (9th Cir. 2003) ................................................................. 5, 8

*Brady v. United States,*
   397 U.S. 742 (1970) ................................................................................ 3

*Brecht v. Abrahamson,*
   507 U.S. 619 (1993) .......................................................................... 11, 13

*Brown v. United States,*
   356 U.S. 148 (1958) ............................................................................ 3, 5

*California v. Trombetta,*
   467 U.S. 479 (1984) .............................................................................. 16

*Conant v. McCoffey,*
   No. 97-cv-139, 1998 WL 164946 (N.D. Cal. Mar. 16, 1998) .................................. 9

*Crane v. Kentucky,*
   476 U.S. 683 (1986) .............................................................................. 16

*Emspak v. United States,*
   349 U.S. 190 (1955) ............................................................................ 1, 3

*Enriquez v. United States,*
   293 F.2d 788 (9th Cir. 1961) ..................................................................... 9

*Estelle v. Williams,*
   425 U.S. 501 (1976) ............................................................................... 1

*Groshart v. United States,*
   392 F.2d 172 (9th Cir. 1968) .................................................................... 13

*Jackson v. Cnty. of San Bernardino,*
   No. 13-cv-1650-JGB-dtb, 2016 WL 7495816 (C.D. Cal. Apr. 21, 2016) .............. 1, 2

*Jackson v. Virginia,*
   443 U.S. 307 (1979) ............................................................................... 6

*Johnson v. Zerbst,*
   304 U.S. 458 (1938) ............................................................................... 2

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

*Kansas v. Cheever,*
   571 U.S. 87 (2013)................................................................4

*Kastigar v. United States,*
   406 U.S. 441 (1972)..............................................................7

*Klein v. Harris,*
   667 F.2d 274 (2d Cir. 1981)...............................................4, 5

*Martin v. United States,*
   400 F.2d 149 (9th Cir. 1968) .............................................13

*Mitchell v. United States,*
   526 U.S. 314 (1999)...........................................................5, 8

*New Jersey v. Portash,*
   440 U.S. 450 (1979)..............................................................7

*Patterson v. Illinois,*
   487 U.S. 285 (1988)..............................................................2

*Powell v. Texas,*
   492 U.S. 680 (1989)..............................................................8

*Simmons v. United States,*
   390 U.S. 377 (1968)............................................................16

*Smith v. United States,*
   337 U.S. 137 (1949).......................................................1, 3, 8

*United States v. $133,420.00,*
   672 F.3d 629 (9th Cir. 2012) ............................................5, 9

*United States v. $31,000,*
   774 F. App'x 288 (6th Cir. 2019) ........................................5

*United States v. Benson,*
   No. 12-cr-00480-YGR-1, 2016 WL 215233 (N.D. Cal. Jan. 19, 2016)...........5, 6

*United States v. Bringier,*
   405 F.3d 310 (5th Cir. 2005) ..............................................3

*United States v. Curry,*
   No. 05-cr-10, 2005 WL 2100651 (E.D. Tenn. July 14, 2005) ...................3

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

*United States v. Danielson*,
   325 F.3d 1054 (9th Cir. 2003) ...................................................................8

*United States v. Donovan*,
   No. 08-cr-002-RRB-jdr, 2008 WL 11399012 (D. Alaska July 8, 2008).....................1

*United States v. Dudden*,
   65 F.3d 1461 (9th Cir. 1995) ...................................................................1

*United States v. Green*,
   272 F.3d 748 (5th Cir. 2001) .................................................6, 7, 13, 16

*United States v. Hampton*,
   775 F.2d 1479 (11th Cir. 1985) ..............................................................15

*United States v. Helina*,
   549 F.2d 713 (9th Cir. 1977) ...........................................................12, 13

*United States v. Hernandez*,
   574 F.2d 1362 (5th Cir. 1978) ...................................................................1

*United States v. Licavoli*,
   604 F.2d 613 (9th Cir. 1979) ...............................................................1, 8

*United States v. Lujan*,
   No. cr-92-91-1-M, 2001 WL 274845 (D.N.H. Feb. 15, 2001)................................3

*United States v. Martinez*,
   2020 WL 5405781 (S.D. Ga. Mar. 23, 2020) ............................................3

*United States v. Mercado-Moreno*,
   869 F.3d 942 (9th Cir. 2017) ...................................................................2

*United States v. North*,
   910 F.2d 843 ...........................................................................................15

*United States v. Olano*,
   507 U.S. 725 (1993)...................................................................................2

*United States v. Oruche*,
   257 F. Supp. 2d 230 (D.D.C. 2003)...........................................................3

*United States v. Peel*,
   No. 06-cr-30049, 2006 WL 3804846 (S.D. Ill. Dec. 22, 2006)...........................3

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

*United States v. Robbins,*
    No. 10-cr-268A, 2012 WL 12946877 (W.D.N.Y. Feb. 17, 2012) ..............................3

*United States v. Schwartz,*
    541 F.3d 1331 (11th Cir. 2008) ...........................................................................3

*United States v. Sine,*
    493 F.3d 1021 (9th Cir. 2007) ..........................................................................16

*United States v. Williams,*
    731 F. Supp. 2d 1012 (D. Haw. 2010)................................................................9

**Other Authorities**

Fed. R. Crim. P. 12(b) .......................................................................................16

McCormick on Evidence § 129 ............................................................................4

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

The government's motion to vacate the *Kastigar* hearing should be denied because Richard Ayvazyan and Marietta Terabelian could not and did not waive the protections of *Kastigar* through their presentations at trial.  As the Court previously ruled, the hearing is required "simply by virtue of the fact that … tainted information was compelled in violation of the Fifth Amendment."  Dkt. 478 at 14; *see also United States v. Dudden*, 65 F.3d 1461, 1469 (9th Cir. 1995) (remanding to determine whether the government used tainted statements "directly or in developing [its] case," in which event, the "conviction must be set aside").  It is unsurprising, then, that the government's motion fails to identify a single precedent in which a court vacated a *Kastigar* hearing in response to a defense presented at trial.

The government has not come close to carrying the burden to prove waiver of a constitutional right—a substantial burden[1] subject to the Supreme Court's directive that courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights."[2]  Moreover, while the question of waiver is not a close call, even a waiver would not result in the remedy requested by the government's motion.  The remedy for Fifth Amendment waivers at trial is to permit limited and directly responsive evidence or testimony within the trial proceeding itself.  *See United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979).  Vacating a post-trial Kastigar hearing has never been held to be a remedy for a waiver of Fifth Amendment rights that occurred at trial, nor should it be.

The fact that topics at trial related to information the government obtained by violating the defendants' Fifth Amendment rights (e.g., referencing an individual's

---

[1] "A 'heavy burden' rests on the government to prove that [the defendants] waived [their] privilege against self-incrimination," and "implied waivers are clearly disfavored."  *United States v. Hernandez*, 574 F.2d 1362, 1371 (5th Cir. 1978); *accord United States v. Donovan*, No. 08-cr-002-RRB-jdr, 2008 WL 11399012, at *3 (D. Alaska July 8, 2008); *see also Estelle v. Williams*, 425 U.S. 501, 515 (1976) (Powell, J., concurring) ("We generally disfavor inferred waivers of constitutional rights.").

[2] *Emspak v. United States*, 349 U.S. 190, 197 (1955); *Jackson v. Cnty. of San Bernardino*, No. 13-cv-1650-JGB-dtb, 2016 WL 7495816, at *2 (C.D. Cal. Apr. 21, 2016) (quoting *Smith v. United States*, 337 U.S. 137, 150 (1949) (waivers are "not lightly to be inferred") and *Emspak*, 349 U.S. at 197).

1

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

name who happened to appear in one of the tainted phones) is a testament to the breadth of the government's violation, not a sign the defendants intentionally abandoned their constitutional rights.  The defendants made efforts to preserve their rights at every turn and have not voluntarily waived them.  The government's motion demonstrates no cause for the Court to change course from its previous rulings that a *Kastigar* hearing is justified by the government's constitutional violations.

## I.   THE GOVERNMENT'S REQUEST IS INCONSISTENT WITH THE LAW REGARDING WAIVER OF FIFTH AMENDMENT RIGHTS

At the outset, it is worth pausing to consider the breadth of the rule that the government asks the Court to adopt.  By the government's logic, defendants who involuntarily confess should be prohibited from introducing exculpatory evidence or arguing innocence because the government could rebut such evidence or argument with the tainted confession.  This would transform the Fifth Amendment protection against use of involuntary statements into a straitjacket on the defense at trial.  The government's request is inconsistent with the law regarding the intentional action necessary to implicitly waive a constitutional right and the limited scope of any such waiver.

### A.    There Was No Waiver of Fifth Amendment Rights

An effective waiver requires the "intentional relinquishment or abandonment of a known right or privilege."  *United States v. Mercado-Moreno*, 869 F.3d 942, 959 (9th Cir. 2017) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)); *accord* Gov't Mot. for Order at 16 (Dkt. 663) ("Gov't Motion").[3]  Consequently, "[a] waiver of constitutional rights 'is not lightly to be inferred,' and courts must 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'"  *Jackson v. San Bernardino*, No. 13-cv-1650-JGB-dtb, 2016 WL 7495816, at *2 (C.D. Cal. Apr.

---

[3] Notably, this test has its roots in the standard for waiving the constitutional right to counsel, *Olano*, 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458 (1938)), and the Supreme Court has rejected the idea that it is any easier to waive Fifth Amendment rights than Sixth Amendment rights. *Patterson v. Illinois*, 487 U.S. 285, 297-98 (1988)).

21, 2016) (quoting *Smith v. United States*, 337 U.S. 137, 150 (1949) and *Emspak v. United States*, 349 U.S. 190, 197 (1955)). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see United States v. Oruche*, 257 F. Supp. 2d 230, 243-44 (D.D.C. 2003) ("[B]ecause the Court finds that the defendant's waiver of his Fifth Amendment privilege against self-incrimination was not a knowing or intelligent act, and as a result the Court must conclude that the government's informal grant of immunity included derivative use immunity, the Court holds that it must conduct a *Kastigar* hearing ….").

The government cites no case in which a court held that a defendant waived the right to a *Kastigar* hearing implicitly rather than expressly, and the defendants are aware of none. To the contrary, waiver of *Kastigar* rights appears to be effected through explicit written agreements signed by the defendants personally. *See, e.g.*, *United States v. Martinez*, 2020 WL 5405781, at *1 (S.D. Ga. Mar. 23, 2020) (written agreement signed by defendant waived rights against derivative use and right to *Kastigar* hearing); *United States v. Curry*, No. 05-cr-10, 2005 WL 2100651, at *4 (E.D. Tenn. July 14, 2005) (same); *United States v. Schwartz*, 541 F.3d 1331, 1357 (11th Cir. 2008) (same); *United States v. Peel*, No. 06-cr-30049, 2006 WL 3804846, at *3 (S.D. Ill. Dec. 22, 2006) (same); *United States v. Lujan*, No. cr-92-91-1-M, 2001 WL 274845, at *2 (D.N.H. Feb. 15, 2001) (same); *United States v. Bringier*, 405 F.3d 310, 313 (5th Cir. 2005) (same); *United States v. Robbins*, No. 10-cr-268A, 2012 WL 12946877, at *2 (W.D.N.Y. Feb. 17, 2012) (same).

There appear to be only two ways to waive the constitutional privilege against self-incrimination implicitly. *First*, if a defendant testifies, then he or she waives privilege as to any matter subject to cross examination. *Brown v. United States*, 356

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

U.S. 148, 155 (1958).[4]  This is known as a "testimonial waiver" and has been applied to non-defendant witness testimony as well.  *See Klein v. Harris*, 667 F.2d 274, 288 (2d Cir. 1981).[5]  *Second*, if the defendant advances an affirmative defense of extreme emotional disturbance or certain other mental status defenses (e.g., insanity), the prosecution may present psychiatric evidence "only for a 'limited rebuttal purpose.'" *Kansas v. Cheever*, 571 U.S. 87, 97 (2013) (noting that this would open the door only at the guilt stage, not to a later stage of proceedings about future dangerousness).  Neither of these circumstances applies here: neither Defendant testified, nor did either advance a defense related to their mental condition.

Instead, the government's "sword and shield" argument is an assertion of implied waiver—that Defendants supposedly gave up their Fifth Amendment rights against self-incrimination by affirmatively putting at issue contentions that require piercing their privilege and examining protected information because failure to do so would deny the government information vital to its case.  That "implied waiver" doctrine has developed in the area of non-constitutional privileges, principally the attorney-client privilege.

---

[4]  "The extensive protection afforded by the privilege to one who is the accused in a criminal case is diminished by the act of the accused in testifying during the trial. Unlike the situation of a witness, who loses the privilege only by testifying to incriminating facts, the accused suffers this reduction in his rights merely by testifying[,] regardless of the incriminatory content of his testimony." McCormick on Evidence § 129.  "The diminution of the accused's rights under the privilege occurs only if the accused testifies in the criminal case itself." *Id.*

[5]  The government appears to advocate for the Court to create a new type of implied waiver by expanding *Klein* from testimonial waivers based upon testimony by the privilege holder to all evidence and all argument from the defense.  *Klein*'s two prong test is that "a court should only infer a waiver of the fifth amendment's privilege against self-incrimination from a witness' prior statements if (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination."  667 F.2d at 287.  *Klein* described its test as "the test for a testimonial waiver" and identified the test's origins as a synthesis of the prior decisions on waiver inferred "from a witness' prior statements."  667 F.2d at 287, 288.  This is not a case involving a witness's testimony or waiver inferred from the witness's prior statements.  Although no waiver would be proper even under *Klein*, see infra Section II, the Court need not reach that question because it is simply inapplicable to a purported waiver of personal constitutional rights based solely on the evidence and argument—particularly evidence and argument that does not contradict the underlying compelled information.

1   *See, e.g.*, *Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) (claim of ineffective

2   assistance of counsel waives attorney-client privilege as far as necessary to litigate the

3   claim).

4        The government does not cite any authority, and we are aware of none, extending

5   that "implied waiver" doctrine to abrogate the self-incrimination right of a non-

6   testifying defendant in a criminal case.  In its Motion, the government instead relies

7   principally on cases involving testimonial waiver[6] (and cherry-picked quotations from

8   civil cases about adverse inferences or standing[7]).  But Defendants here did not testify;

9   nor does the government contend they made any prior testimonial statements that

10  waived their self-incrimination rights.

11       The only recent criminal case referenced in the government's brief is *United*

12  *States v. Benson*, from which the government cherry-picks the phrase "sword and

13  shield" and describes only as "denying defendant dismissal relief."  Gov't Motion at 15.

14  In reality, the *Benson* court ***rejected*** the government's attempt to escape a *Kastigar*

15  hearing and its consequences.  Even though the (allegedly malingering) defendant had

16  caused the compelled statements by invoking a mental-state defense, the court held that

17  he had a continuing right against non-evidentiary use.  *See* No. 12-cr-480-YGR, 2016

18  WL 215233 at *1, 4 (N.D. Cal. Jan. 19, 2016).  **A *Kastigar* hearing was conducted,**

19  **the government failed to disprove non-evidentiary use such as "adjustments to**

20  **trial strategy in light of knowledge of [compelled] statements," and the entire**

21  **government trial team was disqualified.**  *Id.* at *4.  The "sword and shield" statement

22  the government cherry-picks came only in the final sentence as to remedy.  The court

23  did not hold that any waiver occurred, and instead held that "trial cannot proceed with

---

24  [6] *See* Gov't Motion at 14-16 (relying on *Mitchell v. United States*, 526 U.S. 314 (1999); *Brown*, 356

25  U.S. at 155; *Klein*, 667 F.2d at 287).

26  [7] *See id.* at 15 (relying on *United States v. $133,420.00*, 672 F.3d 629, 640-41 (9th Cir. 2012) (holding

27  that the remedy for sword-and-shield concern was striking the privilege-holder's statement, not waiver of privilege); *United States v. $31,000*, 774 F. App'x 288, 292 (6th Cir. 2019) (unpublished and out of circuit case holding that civil claim could be struck for "refusing to answer even non-incriminating

28  questions")).

the current trial team" because of their exposure to tainted information, and that while the trial team had to be disqualified, it could be replaced with untainted prosecutors. *Id.* The *Benson* defendant's Fifth Amendment rights remained intact and the government remained prohibited from making non-evidentiary use of compelled statements or derivative information.

### B. Arguing the Weakness of the Government's Evidence Is Not a Waiver (Much Less a Retroactive Cure of Fifth Amendment Violations)

Relying on tainted evidence even in attempting to shed the *Kastigar* burden, the government ironically premises its motion on the defendants "assert[ing] claims [at trial] that the government was unable to rebut without triggering post-trial *Kastigar* concerns." Gov't Motion at 17. The government's premise inverts the burden of proof: the accused is not the claimant in a criminal trial, and the government does not have a fundamental right to defend against the accused's claims. Rather, the government has the burden to prove its charges against the defendant beyond a reasonable doubt, while the defendant has no obligation to prove anything. The defendant is absolutely entitled to challenge whether the government has met its burden, and to point out insufficiencies in the government's proof, as defendants did here. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 314-16 (1979).

But even accepting the government's inaccurate legal standard, challenging the sufficiency of the government's evidence does not create a false impression or open the door to otherwise inadmissible evidence that would bolster the government's case. *See United States v. Green*, 272 F.3d 748, 755 (5th Cir. 2001) ("Green did not open the door to [his own compelled self-incriminating testimony] and did not create a false impression by challenging whether the government had any evidence to satisfy the knowing possession element," even though the government *had* obtained such evidence—by compelling him, in violation of the Fifth Amendment, to unlock a briefcase and safe that contained guns). The defense is entitled to attack the sufficiency of the government's admissible evidence even if the government also possesses tainted,

inadmissible evidence.  *See id.* at 755-56 (holding that defense's statements "regarding whether the government had 'any evidence'" on various points "mean[t] 'any admissible evidence'" and did not open the door to admission of otherwise inadmissible rebuttal evidence).

Indeed, the very purpose of *Kastigar* is to ensure a "total" prohibition against government use of evidence obtained in violation of the Fifth Amendment.  *Kastigar*, 406 U.S. at 460–61 ("total prohibition on use" means "very substantial protection, commensurate with that resulting from invoking the privilege itself" (footnote omitted)); *see also New Jersey v. Portash*, 440 U.S. 450, 458–60 (1979) (confirming that prosecutors may not impeach defendants with their coerced statements).  That is why *Kastigar* places the parties in the positions they would have had, but for the Fifth Amendment violation.  *See* 406 U.S. at 462 ("substantially the same position as if the witness had claimed the Fifth Amendment privilege").  That prohibition does not evaporate merely because the defendants direct the jury to failures in the government's proof.

In this case, the Court ruled that the government coerced the defendants into unlocking the phones seized in Miami in violation of the Fifth Amendment.  As a result, *Kastigar* requires placing the parties in the positions they would have had if the government had not accessed those phones.  *See Kastigar*, 406 U.S. at 462.  Thus, Ayvazyan and Terabelian were entitled to build their trial defenses around the limited universe of evidence that did not include the suppressed phones.

It should be obvious that deferring the *Kastigar* hearing until after trial did not entitle the government to hamstring the defendants from arguing that reasonable doubt arose from gaps in the government's evidence that were wider because the government violated the Fifth Amendment.  The fact that accessing the Miami phones through constitutionally permissible means would have helped the government rebut the defense more effectively does not matter, because that is not how the government obtained the evidence.  Rather, the government violated the Fifth Amendment, and so, "the

7

government must introduce evidence and show by a preponderance of that evidence that … all of the evidence it introduced at trial was derived from independent sources, and that all of its pre-trial and trial strategy was based on independent sources." *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003). (The government's reliance on the content of the suppressed phones in its motion already foretells the government's inability to carry that burden.)

### C. Even If the Government Had Proved a Waiver of a Fifth Amendment Right at Trial, the Remedy Would Not Include Dismissing a Separate Post-Trial Proceeding Regarding Non-Evidentiary Use and Pre-Trial Violations of the Fifth Amendment

Even if there had been an implicit waiver at trial, the effect would have been "limited to the particular proceeding in which the waiver occurs." *United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979). Indeed, that was the holding of the government's principal "implied waiver" case. In *Bittaker*, the Ninth Circuit held that although a habeas petitioner's ineffective-assistance-of-counsel claim waived attorney-client privilege, the waiver was limited to that proceeding—it did not extend to subsequent proceedings or other purposes, such as any potential re-trial or distribution to law enforcement for other investigations. *See Bittaker*, 331 F.3d at 717, 720-25. Any implied waiver must be "no broader than needed to ensure the fairness of the proceedings before it." *Id.* at 720.[8]

---

[8] For example, "voluntary testimony before a grand jury does not waive the privilege against self-incrimination at trial." *Id.* (holding that witness who testified before the grand jury maintained the right to invoke privilege against self-incrimination during trial). Similarly, the Supreme Court has held that waiving the right to self-incrimination at trial by virtue of a guilty plea and plea colloquy did not waive privilege as to sentencing. *Mitchell v. United States*, 526 U.S. 314, 324 (1999) ("A waiver of a right to trial with its attendant privileges is not a waiver of the privileges which exist beyond the confines of the trial."); *see also Powell v. Texas*, 492 U.S. 680, 685 n.3 (1989) ("[E]ven if counsel had anticipated the Smith decision, he would only have been on notice that by raising a mental-status defense he might open the door to use of psychological evidence by the prosecution in rebuttal. Nothing in *Smith*, or any other decision of this Court, suggests that a defendant opens the door to the admission of psychiatric evidence on future dangerousness by raising an insanity defense at the guilt stage of trial." (internal citations and quotation marks omitted)).

Thus, assuming *arguendo* that the doctrine of implied waiver applied and that a claimed waiver occurred, the government's remedy would have been to adduce directly responsive testimony or evidence at trial.[9]  It would not have included a retroactive cure of past Fifth Amendment violations.  For example, a defendant who raised evidence and argument related to borderline intellectual function opened the door to the government's evidence and argument that he did not have borderline intellectual function, but it did not open the door to alternative explanations of his symptoms such as psychosis or anti-social personality disorder.  *See United States v. Williams*, 731 F. Supp. 2d 1012, 1020 (D. Haw. 2010) (holding that the defendant had not waived his Fifth Amendment rights as to those alternative diseases); *see also Conant v. McCoffey*, No. 97-cv-139, 1998 WL 164946, at *6 (N.D. Cal. Mar. 16, 1998) (holding litigants failed to carry "substantial burden" of showing that waiver extended beyond the "the precise information contained in plaintiffs' declarations"); *Enriquez v. United States*, 293 F.2d 788 (9th Cir. 1961) (reversing convictions because cross-examination of defendants went beyond scope of direct testimony).

Accepting everything the government claims as true—which it is not—the government had, at most, a right to introduce the underlying details necessary to correct any misrepresentation at trial.  There is no retroactive, global waiver of Fifth Amendment rights.

---

[9] Alternatively, as noted in a case cited by the government, the Ninth Circuit has "long held that a district court may strike the testimony of a witness in a criminal proceeding to avoid a witness's improper use of the Fifth Amendment privilege against self-incrimination as a sword as well as a shield."  *$133,420.00*, 672 F.3d at 640.  The government made no such motion to strike.

## II. THE DEFENDANTS DID NOT INTENTIONALLY RELINQUISH OR ABANDON THEIR FIFTH AMENDMENT RIGHTS BY ACCURATELY IDENTIFYING FLAWS IN THE GOVERNMENT'S CASE

### A. Ayvazyan Did Not Intentionally Relinquish or Abandon His Fifth Amendment Rights by Asking Questions and Making Argument About the Possibility that Richard Ayvazyan Was Not the Only Person to Use the Zhadko Phone Between March 12, 2020 and October 15, 2020

The government injected into trial the question of who was using the Zhadko phone to send text messages dated March 12, 2020 to October 15, 2020 (GX10). To argue that Richard Ayvazyan was the person using the Zhadko phone, the government:

- argued that he was related to Dadyan and the Zhadko phone was labeled by Dadyan "Rich New,"[10]

- put on a witness who testified that he communicated with Ayvazyan via the Zhadko phone,[11]

- introduced the subscriber records of the Zhadko phone which it argued matched credit cards found on Ayvazyan's personal phone,[12]

- had witnesses read text messages from Dadyan in which she called the Zhadko phone's user "Rich,"[13]

- had a witness testify that he found no text messages in which Dadyan addressed the Zhadko phone in another name,[14] and

---

[10] *See* 6/15/2021 Tr. at 156 (opening statement that relevant text message would come from the phone of "Tamara Dadyan, the … sister-in-law of Richard Ayvazyan. You will see messages sent to a person identified as Rich New … that discuss how to [commit the alleged fraud]"); *id.* ("In one exchange, on co-conspirator Tamara Dadyan's phone, Rich New describes….").

[11] *See* 6/17/2021 PM Tr. at 25-27 (testimony of Anthony Farrer that Ayvazyan used Zhadko phone number to contact him); 6/21/2021 PM Tr. at 61 (testimony of Special Agent Massino that the same phone number was "associated [with] Rich New").

[12] GX 61; 6/21/2021 PM Tr. at 61-62.

[13] 6/21/2021 PM Tr. at 70, 82, 86, 92.

[14] 6/21/2021 PM Tr. at 62-63.

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

- offered evidence that the phone was with Ayvazyan in Turks & Caicos on or about October 14, 2020.[15]

Against this backdrop, the idea that Ayvazyan created an issue requiring evidence that the phone was in his possession on October 19, 2020 is absurd.  The government successfully argued that Ayvazyan had possession of the phone at times including the final text messages in October 2020.[16]

In response, Ayvazyan did **not** argue that he never had possession of the phone or that he was not found in possession of the phone.  Instead, Ayvazyan argued that (a) the government's theory relied on the proposition that "[i]t's never anyone else using the Zhadko phone," and that "Rich New" is "always" Richard Ayvazyan, and that (b) if the government were correct, this would mean that Ayvazyan was a member of two separate conspiracies cross-pollinating them in such a way that any appearance of the existence of the one overall charged conspiracy was merely superficial and coincidental.  6/24/2021 Tr. at 43, 44.  While Ayvazyan adduced evidence and argument related to whether others *also* used the Zhadko phone, he did not address the issue of whether he too used or possessed the phone.  This was consistent with the government's pretrial statements that alleged coconspirators "pass[ed] around these phones," Dkt. 289-3 ¶ 4, and did not distort the truth in any way.[17]

---

[15] GX 10-65; GX 10 at 40.

[16] The government misrepresents the defendants' argument by pointing to the inability to adduce evidence that "Ayvazyan had actual control and possession over the … cellphone at the time of his October 2020 arrest, and further knew the location of that cellphone afterwards."  Gov't Motion at 5.  There was no evidence or argument related to control, possession, or location of the Zhadko phone during that time period.

Just as prosecutors are permitted to use a defendant's silence prior to arrest without implicating constitutionally protected post-arrest silence, *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993), so too are defendants permitted to ask about investigative activities preceding an unconstitutional interrogation.  Contesting the government's narrative does not open the door to all evidence or argument the government can muster in support of its narrative.  *See Brecht*, 507 U.S. at 628-29 (testimony that shooting was an accident did not permit government evidence or argument that defendant did not disclose this fact after being given *Miranda* warning).

[17] The government did not object to the questions or argument that it now claims was improper.

11

Most importantly, Ayvazyan never offered evidence or argument about the government's investigation that would have required examination of the contents of any tainted phone. Counsel asked about pinging the Zhadko "phone's location in realtime," meaning during the March 12, 2020 to October 15, 2020 time period during which the phone was used, *see* 6/21/2021 PM Tr. at 100.

Similarly, counsel noted in opening statements that the government would only present "a tiny sliver of those text messages in which Tammy refers to the other person on the other end of the phone as Rich," and that these were insufficient to conclude that Zhadko was always Richard Ayvazyan. Gov't Motion at 4 (quoting 6/15/21 PM Tr. at 161). From this statement, the government argues that counsel was alluding to other text messages on Zhadko's phone, but to make that argument, the government willfully omits the preceding sentence: "The government told you about *text messages between Tamara Dadyan and a phone that was registered to [Iuliia] Zhadko*. The government is going to present to you a tiny sliver of *those* text messages in which Tammy refers to the person on the other end of the phone as Rich." 6/15/21 PM Tr. at 161 (emphasis added). Ayvazyan's counsel was urging the jury to hear evidence about the broader set of text messages between Dadyan and the Zhadko phone, *not* any other text messages on the Zhadko phone. Defense counsel diligently avoided questions about other contents on the Zhadko phone, even forgoing text messages with third parties that could support the fact that others used the Zhadko phone. To put it simply, defense counsel went to great lengths to exercise caution to avoid even the most surface-level questions about waiver.[18]

In this respect, the government's cited split-panel decision in *United States v. Helina*, 549 F.2d 713 (9th Cir. 1977) (reviewing for plain error) supports the defendants, not the government. In *Helina*, the defendant invoked his act of production

---

[18] Counsel advocated for a pre-trial *Kastigar* hearing, filed a standing objection on the first day of trial regarding tainted evidence, and avoided any argument about the contents of the most directly tainted evidence despite being under no constitutional obligation to do so. It also bears mention that counsel was not authorized by the defendants to waive privilege on their behalf.

1   immunity to withhold business records including cancelled checks from customers.

2   There are three key distinctions between *Helina* and this case. *First*, defense counsel in

3   *Helina* did not exercise the same caution and restraint as counsel in this case. Counsel

4   specifically and repeatedly asked whether it would have been helpful to the testifying

5   agent to have the *specific cancelled checks that were withheld*. *Id.* at 719 ("[W]ould it

6   really perhaps be helpful if you had the customers' cancelled checks?"). In contrast,

7   defense counsel in this case asked questions and made argument about the admissible

8   evidence that the government did have and did not direct the jury's attention to

9   evidence unavailable to the government by virtue of the Fifth Amendment. Counsel

10  followed the practice addressed by the court in *Green*¸ not *Helina*. *Second*, in *Helina*,

11  the defendant testified and responded to questions that "could have been answered by

12  'Yes' or 'No'" by "volunteer[ing] the information that legal counsel advised him to use

13  the fifth amendment and withhold his records" including the "cancelled checks" in

14  question. *Id.* at 718. *Third*, the *Helina* court did not hold that this effected a retroactive

15  waiver curing past violations. Instead, it affirmed the trial court's decision not "to

16  prevent cross-examination and rebuttal on the issue."[19]

17        This makes sense. If raising the thoroughness of the government's investigation

18  were sufficient to waive Fifth Amendment privilege as to the evidence

19

20  [19] *Id.* at 715. Moreover, in holding that *Helina* had opened the door to cross-examination and rebuttal

21  testimony about the topic, the court explicitly invoked "the *Martin* rule" that permits evidence to
    "contradict [the] *defendant's testimony*." *Id.* at 719 (citing *Martin v. United States*, 400 F.2d 149, 153

22  (9th Cir. 1968)) (emphasis added). The *Martin* rule was that "when [the defendant] himself testified"
    to an exculpatory story, the government could introduce the fact that the defendant had *not* made any

23  similar statements to his arresting officer to impeach him. 400 F.2d at 153. The *Martin* court
    explicitly carved out a previous Ninth Circuit holding that "statements that had actually been made by

24  the appellant" could not be used if they were obtained in violation of the Fifth Amendment. *Id.* (citing
    *Groshart v. United States*, 392 F.2d 172, 178 (9th Cir. 1968) ("[W]e hold that if statements are

25  obtained from a defendant in violation of the Miranda rules and if the interrogation relates to an
    offense for which the defendant is ultimately brought to trial, those statements, as well as any portions

26  thereof, may not be used against the defendant at the trial for any purpose whatsoever.")). Whether or
    not the *Martin* rule is still good law, *but see Brecht*, 507 U.S. at 628-29 (focusing on whether the

27  defendant claims to have told the police and whether the witness is testifying to pre-invocation or
    post-invocation statements), this case would be governed by *Groshart*, not *Martin*.

28

13

unconstitutionally obtained during that investigation, then it would be impossible to hold *Kastigar* hearings after trial.  It is commonplace for defendants to attack the reliability of government investigations, and this is particularly true when the government relies on two of its three lead investigators (Special Agents Massino and Clark) at trial.  But the government has not cited to a single example of a court holding that this common defense argument resulted in a waiver of a post-trial *Kastigar* hearing. The relief requested by the government is unprecedented and unfounded.

### B.   Ayvazyan Did Not Intentionally Relinquish or Abandon His Fifth Amendment Rights by Asking Questions About the Superseding Indictment or a Witness's Introduction to Ayvazyan

The government's argument that the defendants could not reference the indictment against him or the names of people that also happen to appear in the tainted phones is without support in precedent or common sense.  The defendants' knowledge of these subjects was not tainted, and the government has even argued that its own knowledge of these subjects is not tainted.  It is not defendants' constitutional prerogative to assume that the government is wrong and avoid mentioning arguably tainted names.  Such a requirement would be nonsensical, unworkable, and fundamentally unfair.  Moreover, contrary to the government's motion, the government did not object on Fifth Amendment grounds to either inquiry.[20]

The First Superseding Indictment on which the defendants were convicted, in part, alleged a conspiracy to defraud through the submission of at least 151 fraudulent PPP and EIDL loans.  Dkt. 154 ("As part of the conspiracy … [the] coconspirators, submitted and caused the submission of at least 151 fraudulent PPP and EIDL loan applications ….").  Whether the government must prove each of the 151 loans at trial or

---

[20] The government objected to referencing that the grand jury indicted a conspiracy involving at least 151 loans on the sole grounds that the prosecutors had submitted a redacted trial indictment that neither erased nor undid the actual superseding indictment on which the defendants were tried.  *See* 6/21/2021 PM Tr. at 111 (cited but not quoted by Gov't Motion at 9).  The government objected to the final question regarding Bradford on relevance grounds, not that the evidence would inject Fifth Amendment issues.  Gov't Motion at 12.

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

whether the government could send a trial indictment to the petit jury, this was the conspiracy charged by the grand jury.  The fact that the government excised most of the loans (and redacted the pertinent paragraph just days after the defendants proposed a multiple conspiracies instruction and hours after the defendants filed that instruction) shows that the government was casting aside loans that cut against its allegation of one overarching conspiracy.  The defendants were entitled to adduce evidence on that point. The claim that the grand jury considered tainted information in returning the First Superseding Indictment—a claim the government has disputed, Dkt. 416 at 1; *id.* at 2-3—has no bearing on whether the defense could adduce evidence challenging the existence (or lack thereof) of one overall conspiracy.  If the government is wrong, and it did in fact make use of tainted information, then the proper remedy is dismissal, not waiver.[21]  Regardless of whether the government is wrong, however, the fact remains that the First Superseding Indictment's contents are not in dispute and could not give rise to any waiver under any of the tests proposed by the government, much less the retroactive, all-encompassing waiver the government seeks.

The government perplexingly argues that by "introduc[ing] evidence about an individual, Jon Bradford, that he knew was related to purportedly 'tainted evidence' obtained from the cellphones seized in Miami," Ayvazyan somehow waived his Fifth Amendment rights.  That is nonsensical.  If introducing any evidence "related to" a person mentioned in the tainted phones—regardless of source—is the standard for implicating Fifth Amendment violations or waivers, then the defendants respectfully request that the Court apply that standard to the government.  As summarized in the

---

[21] *United States v. North*, 910 F.2d 843, 868-69 (North I), *on pet. for reh'g*, 910 F.2d 940 (D.C. Cir. 1990) (presentation of compelled testimony to grand jury is a violation of Fifth Amendment making the indictment itself "indistinguishable from the constitutional and statutory transgression"); *id.* at 872 ("For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the [prosecutor] in questioning the witness."); *United States v. Hampton*, 775 F.2d 1479 (11th Cir. 1985) ("[I]n order to sustain Hampton's indictment, the government had the burden of establishing that all of the evidence presented to the grand jury[] … was derived from legitimate, independent sources.").

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER

1   defendants' Motion to Dismiss Under Fed. R. Crim. P. 12(b) or Continue the Trial to

2   Hold a Pre-Trial *Kastigar* Hearing, the government photographed or otherwise saved

3   tainted information regarding at least 58 individuals or entities related to the indictment

4   including Anton Kudiumov, Manuk Grigoryan, Nazar Terabelian, and Anna

5   Manukyan.  Dkt. 381 at 6 & nn.2-3.  It would not have been possible for the defendants

6   to go through a trial without mentioning those names.[22]  Setting aside those facts, the

7   questions and testimony referenced by the government were based on information

8   independently obtained by Ayvazyan before any tainted phone was produced to him.

   **C.    Terabelian Did Not Intentionally Relinquish or Abandon Her Fifth
           Amendment Rights By Highlighting Shortcomings in the
           Government's Evidence**

   The government's motion claims that Terabelian distorted the truth by

   highlighting shortcomings in the government's evidence of a connection between her

   and the Viktoria Kauichko identity.  *See* Gov't Motion at 20-22.  "By introducing the

   alleged lack of evidence into the record at trial, defendant Terabelian opened the door

   to such evidence and cannot now hide behind this Court's suppression order."  *Id.* at 21.

   In a perverse irony, the government would effectively gag Terabelian from attacking

   the evidentiary weaknesses in its case because of the government's own violation of her

   Fifth Amendment rights.

   This cannot be the law, and it is not the law.  "Presenting a theory of the case that

   can be effectively rebutted by otherwise-inadmissible evidence … does not by itself

   open the door to using such evidence; only partial, misleading use of the evidence itself

   can do so."  *United States v. Sine*, 493 F.3d 1021, 1038 (9th Cir. 2007); *see also Green*,

   272 F.3d at 755 ("Green did not open the door to [his own compelled self-incriminating

   ---

   [22] "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete
   defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S.
   479, 485 (1984)).  If the defendants were not permitted to mention these names and others in Dkt. 381,
   then they could not possibly provide the "meaningful adversarial testing" this entails.  *See id.* at 691.
   At the very least it would put the defendants in the intolerable position of choosing between two
   fundamental constitutional rights.  *See Simmons v. United States*, 390 U.S. 377, 394 (1968).

testimonial act] and did not create a false impression by challenging whether the government had any evidence to satisfy the knowing possession element," even though the government had obtained such evidence from him in violation of the Fifth Amendment).  Terabelian made no references before the jury to her suppressed cellphone; she only identified, demonstrated, and argued the limitations of the government's admissible evidence against her.  This did not open the door to admitting any otherwise inadmissible evidence against her—least of all evidence that was inadmissible because the government obtained it by coercing her in violation of the Fifth Amendment.

The government's motion also conveniently ignores that it was the government that elected to argue repeatedly to the jury that Terabelian was guilty because Viktoria Kauichko was Terabelian's alias and because Terabelian used the Kauichko identity.[23] Terabelian could not receive a fair trial without a full opportunity to attempt to refute the government's argument that its admissible evidence proved the Terabelian-Kauichko theory.  And deferring the *Kastigar* hearing until after trial cannot have meant that Terabelian was forced to choose between (1) the right to identify gaps in the government's supporting evidence, on the one hand, and (2) maintaining her Fifth Amendment protections, on the other.

Because Terabelian did not testify; did not present a defense related to her mental condition; and neither referenced nor elicited evidence from or concerning her suppressed phone; her reasonable doubt-based defense at trial did nothing to relieve the government of its Kastigar burden.

---

[23] *See* 6/24/21 AM Tr. at 39 (government closing argument: "As we explained during our opening statements, the defendants each played very different roles. We previewed this for you, and this bears out in the evidence. …Defendant Marietta Terabelian assumed the identity of Victoria Kauichko to apply for many loans and moved and spent the criminal proceeds."); *id.* at 57 ("[T]he Canoga apartment … was … leased by Victoria Kauichko, it ties back to that card that was found on Marietta Terabelian's person …."); 6/24/21 PM Tr. at 138 (government rebuttal: "Marietta Terabelian, same boat. Same boat. She was caught with a card, a card in an alias in an identity that was used over and over and over again in the scheme, by her, by others.").

1

## III.   CONCLUSION

2      The government's motion cites incorrect law, argues for an inapplicable remedy,

3  and misstates material facts.  It should be denied in every respect.

4

5      Dated:   July 8, 2021           Respectfully submitted,

6                                       */s/ Ashwin J. Ram*
                                        Ashwin J. Ram (SBN 227513)
7                                       *aram@steptoe.com*
                                        Michael A. Keough (SBN 327037)
8                                       *mkeough@steptoe.com*
                                        Meghan L. Newcomer (*pro hac vice*)
9                                       *mnewcomer@steptoe.com*
                                        Nicholas P. Silverman (*pro hac vice*)
10                                      *nsilverman@steptoe.com*
                                        **STEPTOE & JOHNSON LLP**
11                                      633 West Fifth Street, Suite 1900
12                                      Los Angeles, CA 90071
                                        Telephone: (213) 439-9400
13                                      Facsimile: (213) 439-9599
14
15                                      *Counsel for Defendant Richard Ayvazyan*
16
17                                      */s/ John L. Littrell*
                                        John L. Littrell (SBN 221601)
18                                      *jlittrell@bklwlaw.com*
                                        Ryan V. Fraser (SBN 272196)
19                                      *rfraser@bklwlaw.com*
20                                      **BIENERT KATZMAN LITTRELL
                                        WILLIAMS, LLP**
21                                      601 W. 5th Street, Suite 720
22                                      Los Angeles, CA 90071
                                        Telephone: (213) 528-3400
23                                      Facsimile: (949) 369-3701
24
25                                      *Counsel for Defendant Marietta Terabelian*
26

27

28

## **SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(i), the filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

19

1

JOINT OPPOSITION TO GOVERNMENT MOTION FOR ORDER