1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE STEPHEN V. WILSON

4       UNITED STATES DISTRICT JUDGE PRESIDING

5                   - - -

6
United States of America,          )
7                    PLAINTIFF,     )
                                    )
8  VS.                              )   NO. CR 20-579 SVW
                                    )
9  Richard Ayvazyan, et al.,        )
                      DEFENDANT,    )
10  _____)

11

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          LOS ANGELES, CALIFORNIA

15        KASTIGAR MOTIONS - DAY ONE

16        WEDNESDAY, JULY 28, 2021

17

18

19   _____

20         KATIE E. THIBODEAUX, CSR 9858
           U.S. Official Court Reporter
21               Suite 4311
            350 West 1st Street
22          Los Angeles, CA  90012

23

24

25

```
1    APPEARANCES OF COUNSEL:

2

3    ON BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:

4    U.S. DEPARTMENT OF JUSTICE
     U.S. ATTORNEY'S OFFICE
5    BY: RANEE KATZENSTEIN, AUSA
     -and- ALLISON WESTFAHL KONG, AUSA
6    -and- NIALL O'DONNELL
     -and- CATHERINE SUN AHN, AUSA
7    -and- SCOTT PAETTY, AUSA
     312 North Spring Street
8    Twelfth Floor
     Los Angeles, CA  90012
9
     -and-
10
     Christopher Fenton
11   US Department of Justice
     1400 New York Avenue, NW
12   Washington, DC 20530

13

14
     FOR DEFENDANT R. AYVAZYAN:
15
     Ashwin J. Ram
16   Steptoe and Johnson LLP
     633 West 5th Street
17   Suite 1900
     Los Angeles, CA 90071
18

19   Michael A. Keough
     Steptoe and Johnson LLP
20   One Spear Tower Suite 3900
     San Francisco, CA 94105
21
     Nicholas P. Silverman
22   Steptoe and Johnson LLP
     1330 Connecticut Avenue NW
23   Washington, DC 20036

24

25
```

```
 1   APPEARANCES (Cont'd):

 2

 3   FOR DEFENDANT TERABELIAN:

 4   John Lewis Littrell
     Bienert Katzman Littrell Williams LLP
 5   903 Calle Amanecer
     Suite 350
 6   San Clemente, CA 92673

 7   Ryan Vaughan Fraser
     Bienert Katzman Littrell Williams LLP
 8   601 West 5th Street
     Suite 720
 9   Los Angeles, CA 90071

10

11   FOR DEFENDANT ARTUR AYVAZYAN:

12   Jennifer J. Wirsching
     1935 Alpha Road
13   Suite 216
     Glendale, CA 91208
14
     Thomas A. Mesereau, Jr.
15   Mesereau Law Group
     10100 Santa Monica Boulevard
16   Suite 300
     Los Angeles, CA 90067
17

18
     FOR DEFENDANT VAHE DADYAN:
19
     Peter Johnson
20   Law Office of Peter Johnson
     409 North Pacific Coast Highway
21   Suite 651
     Redondo Beach, CA 90277
22

23

24

25
```

```
1                          I N D E X

2

3    WITNESS NAME                        PAGE

4    CHRISTOPHER FENTON
     Cross-Examination by Mr. Ram           18
5    Cross-Examination by Mr. Littrell     170

6    SCOTT PAETTY
     Cross-Examination by Mr. Keough       232
7    Cross-Examination by Mr. Fraser       255

8

9    EXHIBIT                    I.D.    IN EVID.

10   (None.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 28, 2021

 2                       10:24 A.M.

 3                       - - - - -

 4

 5

 6          THE CLERK:  Item 2, CR 20-579-SVW, United States

 7   of America versus Richard Ayvazyan, et al.

 8              Counsel, please state your appearances.

 9          MR. FENTON:  Good morning, your Honor.

10   Christopher Fenton, Niall O'Donnell, Mark Cipoletti,

11   Ranee Katzenstein and Allison Westfahl for the

12   government.

13          MR. JOHNSON:  Good morning, your Honor.  Peter

14   Johnson on behalf of Vahe Dadyan, who is present and

15   assisted by the court's Armenian-speaking interpreter.

16          MS. WIRSCHING:  Good morning, your Honor.

17   Jennifer Wirsching for Mr. Artur Ayvazyan, who is

18   present.

19          MR. MESEREAU:  Good morning, your Honor.  Thomas

20   Mesereau for Artur Arvazyan.

21          MR. LITTRELL:  Good morning, your Honor.  John

22   Littrell for Mary Terabelian, who is present.

23          MR. RAM:  Good morning, your Honor.  Ashwin Ram on

24   behalf of Richard Ayvazyan, along with Michael Keough and

25   Nick Silverman.
```

```
 1              MR. LITTRELL:  Yes.  And I also have Ryan Frasier

 2    with me for Ms. Terabelian.

 3              THE COURT:  Okay.  This is the time for hearing on

 4    the defense motions regarding Kastigar.  And let me ask

 5    the defense, whoever -- I guess it would be Mr. Ram and

 6    Mr. Littrell; correct?  Are you going to be the principal

 7    participants?

 8              MR. LITTRELL:  Yes, your Honor, for the Kastigar

 9    portion.

10              THE COURT:  And is that your co-counsel?

11              MR. LITTRELL:  This is Ashwin Ram.

12              THE COURT:  Okay.  I didn't see you.

13              MR. RAM:  Sorry about that.

14              THE COURT:  Wearing different glasses today;

15    right?

16              MR. RAM:  Yes.

17              THE COURT:  In any event, what I want to do in

18    light of the briefing and the government's presentation

19    inquiry as to whether the defense believes there is a

20    credibility issue with regard to any of the government

21    parties who responded with affidavits, I will ask you

22    first, Mr. Littrell; in other words, is anyone lying on

23    these affidavits, and if so can you give me some idea of

24    where they are lying and what you would propose to

25    cross-examine?
```

1            MR. LITTRELL:  I will say for Ms. Terabelian, and

2    I speak only for her, there are portions of the

3    declarations that are inaccurate and I think misleading,

4    and so I do want to cross-examine on those.

5            However, I will say this.  I do think that

6    there are enough undisputed facts in the record right now

7    for the Court to rule in the defense's favor.

8            THE COURT:  I see.  All right.  Well, that is part

9    of what I was inquiring about.

10            Let me ask you more specifically before I

11    leave you, Mr. Littrell, which of the lawyers or agents

12    would you want to cross-examine regarding your position

13    that they were inaccurate or misleading?

14            MR. LITTRELL:  I would want to preserve the option

15    to cross-examine all the declarants.  I think the focus

16    will be on Mr. Fenton, Mr. Paetty, Mr. Palmerton, but I

17    think depending on the answers to their questions I am

18    going to need to follow-up with the rest.  So right now I

19    am prepared to cross-examine all of them.

20            THE COURT:  I see.  And the same questions of you,

21    Mr. Ram.

22            MR. RAM:  Yes, your Honor.  We believe

23    cross-examination is necessary of both the attorneys and

24    the agents.

25            We do not plan on calling or cross-examining

 1  Mr. Julian Andre, who has left the U.S. Attorney's office

 2  I believe in February 2021.  He submitted a declaration.

 3  We do not intend to cross-examine him unless something

 4  dramatic --

 5      THE COURT:  But in your cross-examination, are you

 6  going to take the same general position that Mr. Littrell

 7  announced?  In other words, are you going to

 8  cross-examine with the aim of showing that some or all of

 9  the witnesses are lying or that their declarations are

10  inaccurate or misleading?

11      MR. RAM:  It is certainly not necessary to show

12  that they are lying.  There are misleading statements.

13  For example, I didn't directly review -- may I take this

14  off, your Honor?

15      THE COURT:  May you take what off?

16      MR. RAM:  This plastic thing.

17      THE COURT:  No.  Keep it.

18      MR. RAM:  Okay.

19      THE COURT:  All right.  I get the point.  So let's

20  begin.  Please make the examinations pointed.  I mean,

21  the Court of course has sifted through these motions, the

22  pretrial motions, and of course paid close attention to

23  the trial.  So the Court is familiar with the subject

24  matter.

25          Is there any decision between you as to who

1    would go first?

2            Let me ask, you are the only lawyers

3    representing parties directly concerned; correct?   I

4    mean, the only defendants who had standing on this issue

5    or defendant Richard Ayvazyan; correct?

6        MR. RAM:  That's correct.  The reason we weren't

7    sitting at counsel table is we were under the impression

8    your Honor was going to do the other motions first prior

9    to the Kastigar hearing.

10       THE COURT:  No.  Of course I have considered the

11   other post trial motions.  I didn't think they required

12   any examination.  They were based upon the record.  The

13   arguments were clear to me.

14           I don't think that I need further argument on

15   those motions unless one of the lawyers feels that there

16   was something in the exchange of briefs that wasn't made

17   clear or wasn't presented properly.  And I will hear from

18   that lawyer if that is the basis of argument.

19           Do any of the defense lawyers want to be herd

20   on that basis?

21       MS. WIRSCHING:  Your Honor, no.  We believe we

22   would submit.

23       THE COURT:  I thought that both sides did a very

24   adequate job.

25       MS. WIRSCHING:  I think there was nothing new for

```
 1    us.  So I would ask the Court since we are not parties
 2    for -- since Mr. Artur Ayvazyan is not a party to the
 3    Kastigar, I would like to clarify that we are not
 4    required to remain for that hearing.
 5         THE COURT:  Okay.
 6         MS. WIRSCHING:  Thank you, your Honor.
 7         MR. JOHNSON:  Peter Johnson on behalf of Vahe
 8    Dadyan.  I just have brief comments.  Two minutes.
 9         THE COURT:  Go ahead.  You can take the lectern if
10    you would like.
11         MR. JOHNSON:  Your Honor, this is related to the
12    Rule 29 motion and the motion to related to new trial,
13    Rule 33.  I would just like to highlight for the Court
14    that the government started to discuss facts that were in
15    the guilty plea, not during trial, not evidence that was
16    offered during trial.
17              I would like to focus the Court on footnote 3
18    in the government's brief, where the government makes
19    clear that the evidence that it talked about related to
20    Mr. Dadyan's personal benefit, $75,000, was discussed
21    during the guilty plea phase, where the Court, as the
22    Court knows, rejected that plea, not during trial.
23              In addition to that, the government asked
24    the -- well, the Court asked the government to focus its
25    attention in the brief related to U.S. v. Brown.
```

```
1           The government offered four reasons why U.S.
2   v. Brown was distinguishable.  They referenced facts that
3   were really not referenced in this particular case.  They
4   argued that Mr. Vahe Dadyan had a personal benefit in
5   this case.
6           That evidence was not introduced in this
7   trial.  If the Court recalls, the personal benefit that
8   Vahe Dadyan spoke about was $75,000.
9           That benefit was referenced during the guilty
10  plea, not during the trial.  The trial evidence was that
11  the -- I guess an inference that Mr. Dadyan received
12  $50,000, but there was no evidence of how that money was
13  spent, and no evidence related to the V&D bank records.
14          Brown is applicable, your Honor, and I am
15  asking the Court for the judgment of acquittal or for a
16  new trial.  Thank you.
17          MR. FENTON:  Briefly, your Honor.  What
18  Mr. Johnson said is not correct.  Government Exhibit 1-N,
19  as in Nancy, is the bank record documentation featured
20  during the government's closing argument that shows that
21  Mr. Dadyan did receive a personal benefit of at least
22  $50,000 that was front and center presented to the jury.
23          In addition, government Exhibit No. 10 is a
24  series of text messages also featured during closing and
25  during Special Agent Massino's testimony and extensively
```

1    covered, during which it was demonstrated that

2    Mr. Dadyan, who took a loan out in the name of Voyage

3    Limo, did not -- he transferred that in a different way

4    and he received it in the name of a different entity that

5    he created called V&D Limo, which is a second separate

6    entity created presumably for the purpose of receiving

7    that money.  And it is certainly an inference that the

8    jury could have drawn reasonably based on the evidence

9    presented at trial.  But the personal benefit is clearly

10   supported by evidence that was before the jury during the

11   trial.

12            Thank you, your Honor.

13       MR. JOHNSON:  Just to respond, your Honor, Exhibit

14   1-N does not contain the bank records of V&D Limo.  I

15   would ask the Court to look at that exhibit.  What the

16   government did was use Exhibit 115, and if the Court

17   recalls, Exhibit 115 was the bubble diagram that

18   defendant Vahe Dadyan objected to from the beginning of

19   the case at pretrial, objected to it going back to the

20   jury because no witness took the stand and described that

21   exhibit.  But what the Court should do is look at that.

22            There is money going over from the one

23   company, $50,000 to V&D Limo.  The government has asked

24   the jury for an inference to say that V&D Limo belonged

25   to Vahe Dadyan.

```
 1              That inference may or may not be acceptable,
 2    but there is no evidence that that money was for personal
 3    gain.  Not in 1-N, not in 115, and no testimony from any
 4    witness.
 5              MR. FENTON:  Your Honor, again, just briefly, what
 6    Mr. Johnson just said is not true.  The bank records at
 7    Exhibit 1-N are for Timeline Transport, the company that
 8    belonged to Richard Ayvazyan that made two wire transfers
 9    on July 10 and July 15 respectively, each for $25,000, to
10    V&D Limo.
11              The reason why we know that that was
12    transferred to Vahe Dadyan is because government Exhibit
13    10, which is a series of text messages that discusses in
14    painstaking, detailed efforts to get Mr. Dadyan his cut
15    of the fraudulent stolen proceeds, says in order to pay
16    Mr. Dadyan you need to send the money to V&D Limo.
17    Please pay him.  He is driving me crazy, calling me every
18    single morning.
19              It is right before the jury.  It is evidence
20    that reasonably supports the inference that he had a
21    personal benefit.
22              In addition I would say, just to repeat, the
23    loan was taken out in the name of Voyage Limo.  The money
24    was sent to a separate company called V&D Limo after
25    being routed through a series of fake companies, Runyan
```

```
1    Tax Service and Timeline Transport companies, that
2    belonged to the co-conspirators Tamara Dadyan and Richard
3    Ayvazyan, all of which shows that Mr. Dadyan knew that he
4    was participating in a conspiracy, knew that there were
5    players beyond Tamara Dadyan, and knew that he was
6    laundering the funds in addition to the fact that he was
7    taking out fraudulent money that he was using not for the
8    stated purpose but his own personal benefit.
9         THE COURT:  Okay.  So the parties who made the
10   motions for new trial or directed verdict, they have been
11   heard; correct?
12        MS. WIRSCHING:  Yes, your Honor.
13        THE COURT:  So they can remain or not depending
14   upon their inclination, but I would suggest that maybe
15   the parties that are not involved in the Kastigar allow
16   the parties who are going to be in the Kastigar to take
17   the counsel table.
18             Thank you.
19             And I have no preference on any order of
20   things.  Mr. Littrell, do you want to go forward first?
21   I would suggest you begin with Fenton.
22        MR. LITTRELL:  Here is my suggestion.  I do have a
23   couple of motions before we begin.
24        THE COURT:  Yes.
25        MR. LITTRELL:  First I would move to strike
```

1    portions of the declarations that are hearsay and lack

2    foundation.  In particular, the declarations of Julian

3    Andre and Mr. Clark are loaded with hearsay and

4    statements that lack foundation.  So I would move to

5    strike those entirely.

6         Second, I would move for production of in

7    camera documents that were submitted only to the Court.

8    I think we have objected to those, but as we prepare to

9    cross-examine witnesses it is vital that we have the

10   documents that they submitted to the Court so we can test

11   their credibility, for example, with the grand jury

12   transcripts, the prosecution memo and other items.

13        Third, depending on the rulings of those, I

14   would ask the Court to rule in the defendants' favor

15   right now just based on the undisputed documents that are

16   in the record.

17        And just to preview where I think we are

18   going, I think the government's declarations potentially

19   confess that they were all exposed to tainted evidence.

20   Nearly all of them used it most directly, some

21   indirectly.

22        The independent sources that they cite for the

23   same evidence either aren't independent because they

24   didn't predate -- they're tainted evidence or they are

25   just not the same type of evidence.  I don't think they

1    have met their burden on harmless error either.

2              I think most of the cross-examination today is

3    going to be directed at conclusory statements by them,

4    statements like I didn't develop any leads based on that

5    evidence.  My trial strategy was not influenced by that

6    evidence.

7              Those are the types of statements that case

8    law supports the idea that they don't really have any

9    value in a Kastigar analysis.  There are self-serving,

10   conclusory, just declarations that they didn't do

11   anything wrong.  And the really Court can't rely on

12   those.

13             So the purpose of today's hearing is to test

14   those conclusory allegations, but if the Court excludes

15   those conclusory allegations we win.

16        THE COURT:  I am not going to at this time.  So

17   let's begin, and I suggest we begin with Mr. Fenton as

18   the first witness.

19        MR. LITTRELL:  Just before we do that, I would ask

20   for Jencks material for this witness.  That would include

21   any texts or e-mails or other statements he has made that

22   relate to his testimony today, which is a pretty broad

23   category of documents.

24        THE COURT:  I don't know of any Jencks material.

25   Let's begin.

1          MR. LITTRELL:  And also ask to exclude witnesses,

2     your Honor.  Witnesses that may testify after Mr. Fenton.

3          THE COURT:  I see.  So that would be Agent

4     Palmerton.  It could be Clark, Massino and --

5          MR. LITTRELL:  Ms. Ahn and Mr. Andre.

6          THE COURT:  And Mr. Paetty.  And those witnesses

7     can come back as --

8          MR. LITTRELL:  And Mr. Faerstein, just to clarify

9     also.  Also I believe Ms. Katzenstein, who is at counsel

10    table, she may be a witness in this hearing also,

11    depending on how the testimony from the other witnesses.

12          She was involved in the trial.  I think she

13    consulted strategically throughout.  So we may want to

14    call her as a witnesses also.

15          THE COURT:  But in terms of directing the

16    examination from the defense side of Mr. Fenton, if all

17    the lawyers are gone, who will do that?

18          MR. LITTRELL:  I think there is a number of fine

19    lawyers left at the table here.

20          THE COURT:  I mean, is that satisfactory?  In

21    other words, are the lawyers remaining in a position to

22    ask questions of Fenton if necessary?

23          MS. KATZENSTEIN:  Your Honor, Ranee Katzenstein

24    speaking.  They are, your Honor.  We have other lawyers

25    present at counsel table.  I would note that there has

 1   been no indication to me that I would be called as a
 2   witness, and that in correspondence from defendants
 3   seeking prior materials, e-mails, et cetera, of
 4   individuals involved in this case, a list of individuals
 5   was provided.
 6              My name was never included in that list, even
 7   though my role as the chief of major frauds has been
 8   known all along to defense counsel.
 9         THE COURT:  All right.  Let's begin.
10              (The witness was sworn.)
11         THE CLERK:  Thank you.  Please be seated.
12              State your full name and spell it for the
13   record.
14         THE WITNESS:  Christopher Fenton.  F, as in fox,
15   E-N-T-O-N.
16
17                   DIRECT EXAMINATION
18   BY MR. RAM:
19   Q    Good morning, Mr. Fenton.  You have been on this
20   case since its inception; is that right?
21   A    Yes.
22   Q    And that is roughly in June of 2020?
23   A    June 12, '20.
24   Q    Okay.  And in your capacity as actually the only
25   attorney currently on the case from the inception, you

1    have made thousands -- or hundreds of decisions related

2    to the investigation and prosecution of this case; is

3    that true?

4    A    I have not quantified the number of decisions that

5    I have made in this case.

6    Q    Let's talk about some of the decisions you made.

7    At the start of the case, did you come up with an

8    investigation plan?

9    A    Yes.

10   Q    Okay.  And what did that investigation plan look

11   like?

12   A    We initially received a tip from a suspicious

13   activity report that was routed through our consultants

14   and --

15        THE COURT:  Why is that relevant?  The relevant

16   part of this examination is not how the case began, but

17   how the case may or may not have been influenced by the

18   Kastigar allegation.

19        So I don't know that we ought to -- and it is

20   going to be less productive if we approach things that

21   way.  That is why I said to the extent it can be done,

22   the questions ought to be pointed.

23        MR. RAM:  Okay.

24   Q    Let's break it up this way.  So you have made fair

25   to say significant volume of decisions before

```
 1    October 20th in exposure to the Miami phones and
 2    information therefrom; true?
 3    A     I'm sorry?
 4    Q     Just to divide up -- if you were to break up
 5    periods, so let's take the period of the inception.
 6           THE COURT:  I don't know -- I don't want to
 7    interrupt as you begin, but of course he has.  I mean,
 8    why wouldn't he?  He said as much.  So how does that help
 9    me.  I am here to be helped.
10           MR. RAM:  Yes, your Honor.  It is all for you.  I
11    want to highlight that --
12           THE COURT:  I know that he was the Department of
13    Justice lawyer.  He made a lot of decisions both before
14    and after.
15           MR. RAM:  Okay.  And that is the question.
16    Q     And after October 20th -- October of 2020, there
17    were hundreds of decisions made on this case involving
18    its building a case, its investigation and prosecution;
19    true?
20    A     I'm sorry.  Can you just repeat the question?
21    Q     After October 20th -- you know October 20th.  That
22    date is the arrest and the initial information coming
23    from CBP about information on the Miami phones; right?
24    That date October 20th, you understand what that is?
25    A     I know that on October 19th the defendants were
```

 1   stopped in Miami, and on October 20th they were arrested

 2   and taken into custody.  Yes.

 3   Q     Okay.  And after October 20th of 2020, you made

 4   several investigative decisions, including issuing

 5   subpoenas, interviewing witnesses, reviewing documents;

 6   right?

 7   A     I made decisions after October 20th with respect to

 8   the investigation, correct.

 9   Q     And your investigation continued all the way up

10   through -- frankly, up through the trial; is that right?

11   A     We continued to investigate after October 20th.

12   Q     And in fact at trial you are aware that one of the

13   agents testified that the investigation is still ongoing

14   now?

15   A     My understanding of what the agent was saying was

16   that there were certain -- there was such voluminous

17   amounts of money that the defendants stole in this case

18   that we were not able to trace all of that money.

19         The investigative strategy from the beginning

20   was to follow the money from day one.  We followed the

21   money before, we followed the Monday after October 20th.

22   Q     Mr. Fenton, did you understand my question?  It was

23   simply do you remember at trial Agent Clark testified

24   that the investigation --

25         THE COURT:  I remember that.  So far you haven't

```
 1   asked a question, Mr. Ram, which is helpful to me trying

 2   to make a correct decision here.  I am listening closely

 3   and you are just -- you know in the stratosphere.  Let's

 4   get down to the meat of this.

 5          MR. RAM:  Okay.

 6   Q    After October 20th, did you institute any type of

 7   procedural safeguards to protect against agent or

 8   prosecutorial exposure to information from the Miami

 9   phones?

10          MR. CIPOLLETTI:  Objection.  Basis.

11          THE COURT:  Overruled.

12          MR. CIPOLLETTI:  Objection -- well, first of all,

13   lack of foundation and relevance.

14          THE COURT:  Overruled.

15   Q    BY MR. RAM:  Go ahead, Mr. Fenton.

16   A    Can you repeat the question?

17   Q    Sure.  After October 20th, did you institute or

18   anybody in the prosecution team institute any type of

19   procedural safeguards regarding exposure to information

20   from the Miami phones?

21   A    Can you be more specific?

22   Q    Sure.  Did you, for example, start regulating

23   access to information from the Miami phones after

24   October 20th?

25   A    Access to the information was always regulated.  We
```

1   understood this to be an issue where there was Fourth

2   Amendment issue and Miranda issue, and we treated it as

3   such because at the time the defendants had not raised a

4   Kastigar claim, and did not until May.

5           What we tried do with respect to the

6   information was reviewed it but we kept it segregated and

7   we did not rely on it for the purpose of any of the grand

8   jury proceedings or developing investigative strategy or

9   trial strategy with whatever limited exceptions we put

10  into my declaration.

11  Q    And then so the obvious question I am asking you is

12  what procedural safeguards did you take.  What did you do

13  to segregate it, to track use or access?  Did you do

14  anything along those lines?

15  A    Mr. Ram, I don't understand.  What do you mean by

16  procedural safeguards?

17  Q    Sure.  Did you track who would access the

18  information and when and what they reviewed?

19          MR. CIPOLLETTI:  Objection, your Honor.  This

20  assumes facts not in evidence.

21          THE COURT:  Overruled.

22          THE WITNESS:  So we have a shared space on our

23  Department of Justice fraud section site that shared

24  space.  It's only limited to members of the case team.

25  That is where the information resided throughout.

```
 1              So there was limited access to that.  We did
 2   not log or otherwise record who would access the folder
 3   that that information was contained in, no.
 4   Q    BY MR. RAM:  So anyway, there is no access who
 5   accessed the Zhadko phone or information on it at any
 6   time
 7   A    Well, the Zhadko phone was not contained on the
 8   S drive, or at least not in the S drive in the location
 9   where I was aware of it.
10   Q    My question is not about the S drive, Mr. Fenton.
11   It's about the Miami phones that have been suppressed.
12   The question is is there any type of log or tracking; who
13   accessed that information and when and for how long, for
14   example?
15   A    No.  The Cellebrite reports do not have any sort of
16   function that allows us to do that.  The Cellebrite
17   reports, the software that was used to open and access
18   that information, as far as I am aware they did not have
19   any feature that allowed you to record whether it was
20   accessed or for how long the program was open.
21   Q    Is it your position that the Department of Justice
22   and U.S. Attorney's office do not have access to
23   technology that would allow such tracking of use?
24        MR. CIPOLLETTI:  Objection.  Foundation.
25        THE COURT:  Overruled.
```

```
 1          THE WITNESS:  I don't understand the question.  Is
 2   it my position --
 3   Q    BY MR. RAM:  Sure.  Do you understand that there are
 4   mechanisms that could have been instituted to track who
 5   is accessing this information and when?
 6   A    I did not look into whether or not there was a
 7   mechanism to track or record access to that because at
 8   the time we had no reason to believe that there was a
 9   need to do so.
10   Q    Okay.  And in fact, you had I think you testified
11   earlier you had no idea that the information on the Miami
12   phones was tainted in any way until May; right?
13   A    That is not the testimony.  That is not my earlier
14   testimony, no.  What I said --
15   Q    Is that accurate?  You had no idea the information
16   on the Miami phones was tainted until at least May of
17   2021; correct?
18   A    Defendants did not provide notice of a Kastigar
19   claim until May 7, 2021.
20   Q    Okay.  I am not asking about the defendants'
21   notice.  I am simply asking you did you have any reason
22   to believe -- and I think the answer to this question is
23   no, but so let me ask it again.
24          Did you have any reason to believe that the
25   evidence on the Miami phones was tainted and subject to
```

```
1    Kastigar restrictions prior to May?

2    A     If by tainted you mean potentially subject to a

3    Kastigar claim, no.  It was our understanding that there

4    was not a Kastigar issue, but that this was a Fourth

5    Amendment and Miranda issue.

6    Q     So the answer to my question would be no.  Prior to

7    May of 2021, you had no understanding whatsoever that the

8    information on the Miami phones would be treated as

9    compelled testimony?

10          MR. CIPOLLETTI:  Objection.  Asked and answered.

11          THE COURT:  Overruled.

12   Q     BY MR. RAM:  What is the answer?

13   A     Can you repeat the question?

14   Q     Sure.  I will do it again.  Prior to May of 2021,

15   did you have any understanding or belief that the

16   information on the Miami phones was tainted and subject

17   to Kastigar protections?

18   A     No.  We did not believe that there was a Kastigar

19   claim.  After the Court --

20   Q     Mr. Fenton, it is a very simple question.

21          THE COURT:  He answered the question.  Move on.

22          MR. RAM:  And was the answer no?

23          THE COURT:  I understood the answer.  If you don't

24   understand it.  Then you will have to rethink it.  He

25   answered the question.
```

```
1              MR. RAM:  Okay.

2  Q     And you understand in general if information is

3  compelled under the Fifth Amendment then it could --

4  basically it cannot be used against the defendant in any

5  way.  You understand that as a basic framework?

6  A     Are you asking me for a legal conclusion?

7  Q     You are an attorney, aren't you, Mr. Fenton?  You

8  are one of the lead attorneys in this case?

9              THE COURT:  I don't find that to be a helpful

10  question.  So move on to something that hopefully is more

11  helpful.

12  Q     BY MR. RAM:  Do you understand that there is

13  information on the Miami phones.  You can't use that in

14  any way if it is subject to Kastigar protections.  Do you

15  understand that?

16  A     I understand that there is a -- there is an

17  applicable standard and that that standard prohibits use

18  and that if it is used there are certain other standards

19  that apply to determine whether or not that use harmed

20  the defendants in any way.  Yes.

21  Q     Okay.  Let's walk through your access to what we

22  have been calling the Miami phones.  First of all, do you

23  understand what I am referring to when I say the Miami

24  phones as a shorthand?

25  A     I think it would be helpful if you could specify it
```

```
 1    for me.
 2    Q     Okay.  Why don't we pull up our demonstrative.
 3          THE COURT:  I don't need demonstratives.  Just ask
 4    questions.
 5    Q     BY MR. RAM:  You understand it is five phones
 6    seized from the defendants in Miami, right, Mary
 7    Terabelian and Richard Ayvazian?
 8    A     Yes.
 9    Q     Now, let's talk about the Cellebrites.  You
10    mentioned the word Cellebrites.  What does the Cellebrite
11    of one of the Miami phones represent?  What is on a
12    Cellebrite?
13    A     What do you mean by represent?
14    Q     So what is on the Cellebrites for the Miami phones?
15    A     What is a Cellebrite report?
16    Q     Yes.
17    A     So a Cellebrite report, there is software that
18    generates a viewing platform for the user to view the
19    data that is contained on the phone.  And the interface
20    divides the data or attempts to divide the data into
21    various different categories, which it does with some
22    success and some lack of success.
23    Q     Okay.  Let's pull up Kastigar Exhibit 20.  When did
24    you first review the phones from the first three phones
25    that Cellebrites were created for for Miami?
```

```
 1              Do you remember that off the top of your head?

 2  A     So my recollection is that I reviewed them on or

 3  around February 11th, 12th and 19th or thereabouts.

 4              And let me just clarify that point.  I

 5  received access on those particular days and I attempted

 6  to review those Cellebrite reports on those particular

 7  dates.

 8  Q     Okay.  And the first phone you reviewed on

 9  February 11th, you said -- which phone was that?

10  A     I am not sure.  It is the phone that was released

11  on February 11th.

12  Q     I see.  And that is the phone for Anton ending in

13  4579?

14  A     I don't know where this description came from.

15  Q     Okay.  Do you have any reason to doubt that it was

16  the phone -- Anton's iPhone that ends in 4579?

17  A     I have a reason not to know where that description

18  came from.

19  Q     Okay.  Well, let's take a look at Exhibit 31 of

20  your declaration, page 7.  Okay.

21              Exhibit 31, page 7.

22              Okay.  So on page 7 of Exhibit 31 -- first of

23  all, Exhibit 31, for the Court, that is an e-mail chain

24  between you and a Michael Morley and a Annamelda Paul. Do

25  you recognize that from your declaration?
```

```
1   A      I don't have a copy of Exhibit 31 in front of me.

2   Q      Okay.  Do you remember what Exhibit 31 is to your

3   declaration?

4   A      No.

5   Q      Okay.  So let me read you an e-mail.

6   A      Mr. Ram, if you could provide me a copy I think it

7   would be very helpful.

8   Q      I think we are going to put it up on the screen for

9   you.

10  A      Okay.

11  Q      And while we are doing that, let me just move on

12  here.  You mentioned you received Cellebrite reports on

13  February 11th, February 12th and February 19th; is that

14  right?  The first three?

15  A      Yes.

16  Q      Okay.  And do you know what phones were represented

17  by those Cellebrite reports?

18  A      The phones that were represented by those

19  Cellebrite reports are contained in the exhibit to my

20  declaration, the e-mail correspondence with the members

21  of the filter review team.

22  Q      And I will represent to you that on February 11th

23  that phone was 1B4, and on February 12th it was 1B123,

24  which is the Zhadko phone.

25         MR. CIPOLLETTI:  Objection, your Honor.  That is
```

1   not even a question.

2        MR. RAM:  This is just foundation for the witness.

3   Since the screen is not working, your Honor, I am just

4   letting him know that is in his declaration.

5        MR. CIPOLLETTI:  Your Honor, he can show him the

6   declaration and he can show him the exhibit.

7        THE WITNESS:  Can I see a copy of the exhibit

8   because I can answer the question very easily if I just

9   have a copy?

10        MR. RAM:  Sure.

11        MR. CIPOLLETTI:  Your Honor, the government can

12   provide Mr. Ram a copy of the exhibit he wants to show

13   him and to Mr. Fenton.  May I approach?

14        THE COURT:  Yes.

15        MR. RAM:  Your Honor, it looks like the screens

16   aren't working.  Can we take a two-minute recess to get

17   them working?

18        THE COURT:  No.

19   Q    BY MR. RAM:  All right.  Mr. Fenton, if you turn to

20   page 7 of Exhibit 31.  It is actually page 5 of the

21   document in your binder.

22   A    Page 5 of the exhibit?

23   Q    Yes.

24   A    Okay.

25   Q    Okay.  So you see on February 11th there is an

```
 1   e-mail to you, and with the first Cellebrite.  It says,
 2   "The first one should be loaded in the folder phones."
 3          And you write back two minutes later, it looks
 4   like, at 7:34 p.m. -- and ask him, "How do I open this on
 5   my computer?"  Is that right?
 6   A     Yes.
 7   Q     Okay.  Now, for the first three phones that we are
 8   talking about here, the Zhadko phone, the phone that you
 9   received on February 11th and the phone you received on
10   February 19th, did you review those phones -- those
11   Cellebrite reports for those phones?
12   A     What do you mean by the Zhadko phone?
13   Q     The Zhadko phone is the phone you received the
14   Cellebrite report on February 12th.  And we can look at
15   that in the e-mail if you want to see it.
16          It is on page 4 at the bottom.  And on top of
17   page 5, "Chris, the next one is loaded," and you can see
18   the 1B number on it.  It is 1B123?
19   A     Yes.
20   Q     And you know from trial that 1B123 is the Zhadko
21   phone; right?
22   A     I do not know that from trial, no.
23   Q     You are not familiar with the -- not from trial?
24   From this investigation.
25          THE COURT:  You know, Mr. Ram, I am trying to give
```

1    you a full opportunity, but it is very worrying and we

2    are not getting to a point of reference here.  You are

3    asking him whether he received the Cellebrite reports for

4    three phones.

5              You didn't make clear until now that on

6    February 12th -- your question is that the Cellebrite

7    report relates to what you call the Zhadko phone.  Let's

8    not use those types of terms.

9              Let's just call it something else because that

10   could be an argument one way or the other.  Let's

11   identify phones.  Some were taken from Mr. Ayvazyan, some

12   from Terabelian; correct?

13        MR. RAM:  Yes, your Honor.  And I apologize.  This

14   would have taken 30 seconds, but the screens aren't

15   working so I can't put up the exhibits.

16        THE COURT:  Are they working now?

17        MR. RAM:  Can we take just like a two-minute

18   recess to get the screens working, your Honor?

19        THE WITNESS:  I think I can --

20             (Clerk and court confer.)

21        THE COURT:  Let's keep going.  We will get a tech

22   up here and see if we can help it.

23        THE WITNESS:  Based on this e-mail -- I'm sorry,

24   Mr. Ram.  I'll let you ask.

25   Q    BY MR. RAM:  Go ahead.  The question was on the

```
 1   first three phones, can you identify them for the judge,
 2   for your Honor?
 3   A     So my understanding based on Exhibit 31 is that the
 4   phone that was uploaded on February 19th was QLA1B126-RK.
 5   Q     Okay.
 6   A     I'm sorry, sir.
 7   Q     So 1B126, what phone is that?
 8   A     Well, the number is the number that I just referred
 9   to.
10   Q     And does that have an owner name associated with
11   the phone that you are aware of?
12   A     I am not aware of the owner name based on this
13   e-mail, no.
14   Q     Okay.  Well, let's look at Exhibit 2 to your reply
15   because it breaks down the different phones and has the
16   names on them.  Okay.  Well, you know what -- just I want
17   to identify for the record the first three phones.
18              So 1B126, what date did you get that phone,
19   the Cellebrite for that phone from your Exhibit 31 you
20   just read?
21   A     What date did I receive -- what date was it
22   released to the filter team?
23   Q     Correct.
24   A     February 19, 2021.
25   Q     So now looking at these first three phones --
```

1    Cellebrites?

2    A     So that is the first phone.

3    Q     On February 11th; correct?

4          MR. CIPOLLETTI:  Objection.  That misstates the

5    testimony.

6    Q     BY MR. RAM:  When you received the Cellebrite.

7    A     I'm sorry, sir, I am not following.

8          THE COURT:  I can't follow the questions precisely

9    either.  They are very herky-jerky.  There shouldn't be

10   any dispute what the records show.  Why are we getting

11   into that?

12          The records show on what date Cellebrite's

13   reports were received and what the numbers of the phones

14   were as identified.  And there should be some correlation

15   between those numbers and the phones used at trial.

16          MR. RAM:  That's right.  I think that is clear for

17   the record, your Honor.

18          THE COURT:  Why did we spend the last 15 minutes

19   going over that?

20          MR. RAM:  Because the screen wasn't working, your

21   Honor.  It's an exhibit.

22          THE COURT:  All right.  Go ahead.

23   Q     BY MR. RAM:  Okay.  So for those first three phones

24   that we have just described, you reviewed those

25   Cellebrite reports?

```
 1   A      I don't know what specific phones you are referring
 2   to.
 3   Q      We just established that.  So the phones you
 4   received -- the Cellebrite reports you received on
 5   February 11th, February 12th and February 19th.  Those
 6   are what I am calling the first three phones you
 7   received.
 8   A      Yes.  So the filter team released Cellebrite
 9   reports for three telephones, one was February 11th, one
10   was on 12th and one was on 19th.  The documentation
11   showing what phones were released on which particular
12   date is reflected in Exhibit 31 to the Fenton
13   declaration.
14   Q      Correct.
15   A      And that is the first Fenton declaration.
16   Q      Correct.  And so now my question is focusing on
17   those first three phones -- we're clear what phones we're
18   talking about now -- the Cellebrite reports for those
19   phones, did you review those Cellebrite reports?
20   A      So yes.  Yes.  I reviewed portions.  I reviewed
21   portions of those -- I reviewed some of the data that was
22   on each of those three phones.
23   Q      So in plain English, you reviewed portions of those
24   Cellebrite reports?
25          THE COURT:  Why do you repeat his answer?  Don't
```

1  you think I am listening to his answer?

2        MR. RAM:  Okay.

3        THE COURT:  He said he reviewed certain parts of

4  those Cellebrite reports.

5  Q   BY MR. RAM:  okay.  And as you sit here today, do

6  you remember which portions or messages you reviewed on

7  those first three Cellebrite reports?

8  A    So based on my recollection and my review of

9  documentation in preparation for my testimony --

10        THE COURT:  You are awful wordy.

11        THE WITNESS:  I'm sorry, your Honor.

12        THE COURT:  You don't have to give us a windup.

13  He asked whether you remember what portions of the

14  Cellebrite reports you reviewed.  And you first can

15  answer yes or no.

16        THE WITNESS:  Yes.

17        THE COURT:  And then depending on your answer he

18  can ask another question and we can get into more detail.

19        MR. RAM:  Yes, your Honor.

20  Q    Is the answer yes to that question?

21  A    Can you repeat the question?

22  Q    Sure.  Did you review -- well, the first question

23  was did you review those first three Cellebrites.  I

24  believe you answered yes.  The second question was do you

25  remember, as you sit here today, what portions of those

1    three Cellebrites that you reviewed?

2    A     Yes.

3    Q     What portions did you review?

4    A     So in particular I have a memory of reviewing an

5    e-mail correspondence between somebody using the

6    Victoria Kauichko e-mail and Greystar, which is the

7    leasing management company for the apartment Unit 337 at

8    6150 Canoga Avenue.

9    Q     Okay.  And apart from that example, do you

10   specifically recall reviewing any other -- any of the

11   other text messages or e-mails or information on the

12   first three Cellebrites that you reviewed?

13   A     No.

14   Q     Let's talk about how you reviewed the phones.  The

15   Cellebrites are large documents; right?  I mean it's a

16   large document with multiple pages?

17   A     No.  I would not agree with that characterization.

18   Q     How would you describe the Cellebrite?

19   A     So the Cellebrite report, as I said earlier, is a

20   viewing platform.  It's a platform for viewing data.  And

21   when did you onto the platform, you are able to -- it is

22   an interface, and you are able to view certain data based

23   on choices that you make.

24         So it is not, for example, like a 1,000-page

25   document.  The Cellebrite report is an interface where

```
 1   the user can choose different data to look at or not

 2   choose.

 3   Q     And what you did is you used search terms when you

 4   were on the Cellebrite interface to review the phones?

 5   A     Yes.

 6   Q     And some of the search terms you used included

 7   names and telephone numbers of known subjects and

 8   aliases; right?

 9   A     Well, definitely names.  Yes.

10   Q     As opposed to?

11   A     As opposed to -- what were the other types of -- if

12   we break it down and take it piece by piece, yes, I

13   looked for names that I knew.

14           So, for example, I put in the name Victoria

15   Kauichko and I looked to see -- I searched the Cellebrite

16   report to see if there are so.

17   Q     And did you search for the defendants' names in the

18   case?

19   A     I believe that I probably did.  Yes.

20   Q     Okay.  So that would include, for example, Tammy

21   Dadyan.  Did you search for her name?

22           MR. CIPOLLETTI:  Objection to the relevance.

23           THE COURT:  Overruled.

24           THE WITNESS:  Yes.  Yes, I likely would have.  I

25   don't have a specific recollection, but based on my
```

```
 1    general recollection, that is exactly what I did.  Yes.
 2    Q     BY MR. RAM:  Okay.  And if you ran that name Tammy
 3    Dadyan, it would come back with results basically using
 4    the Cellebrite interface; is that right?
 5    A     No.  Not necessarily.  So it depends on whether or
 6    not there are results hit for those search terms.  So if
 7    I put in the name Tammy Dadyan and there was no data that
 8    used the phrase "Tamara Dadyan," then I would not get a
 9    hit.  That's how the Cellebrite works.
10    Q     And did you search for the name Tammy as well?
11    A     I don't recall.  I don't recall.
12    Q     Is that something you would have done knowing she
13    is referred to as Tammy?
14    A     Well, I don't necessarily know that she is referred
15    to as Tammy.
16    Q     You don't know that from this investigation?
17    A     I don't know if I knew that at the time.
18    Q     And at the time we are talking is February of 2021;
19    correct?
20    A     At the time that I first received a copy of the
21    phones?
22    Q     Yes.
23    A     Yes.  It was February 11th, February 12th and
24    February 19th, 2021.
25    Q     Okay.  And your testimony is that your
```

1   investigation had not revealed at that point that Tamara

2   Dadyan went by the name Tammy?

3   A      No, sir.  That is not my testimony.

4   Q      So you were familiar that she used the name Tammy

5   then?

6   A      That's also not my testimony.  I don't recall

7   either way if I knew that she used the name Tammy.  I

8   don't have a specific recollection of searching for that

9   nickname.  What I can say is I definitely searched for

10  names, and other information that I had relating to the

11  targets of the investigation.  Yes.

12  Q      Okay.  But your demurrer you stated that regardless

13  of what you may have reviewed on the Cellebrites, you

14  believed everything you saw as a result of the search

15  terms was cumulative to evidence you already had or knew?

16  A      Yes.

17  Q      And what does cumulative mean in that context?

18  A      Redundant.

19  Q      So nothing new?

20  A      Nothing new in a substance, correct.

21  Q      So if you did enter Tamara Dadyan or Tamara's name

22  or her phone that you may have known from her from

23  subscriber records, you would have seen text messages

24  talking about PPP fraud; right?

25  A      I don't know that to be the case.

```
1    Q      So as you sit here today, you have never -- even in
2    preparation for this Kastigar hearing you have never
3    queried a Cellebrite report for any of those first three
4    phones and searched for Tammy?  Is that what you are
5    saying or you just don't remember doing that?
6    A      I don't understand the specific question you are
7    asking me.  You are asking me a couple -- several
8    questions at one time.
9           THE COURT:  And the timing should be made clear.
10   What he did now and what he did in February.
11   Q    BY MR. RAM:  Okay.  So let's focus on February 1st.
12   You testified a moment ago that anything you found, you
13   believed it was cumulative to what you already knew;
14   right?
15   A      Yes.  And the reason why was because at that
16   point --
17          THE COURT:  Don't answer the reason why.  Let him
18   ask a question.
19   Q      BY MR. RAM:  So my question to you was if you
20   searched for Tamara Dadyan or Tammy because you knew her
21   last name that is something -- you may have seen messages
22   relating to her then; right?
23          MR. CIPOLLETTI:  Objection.  Speculation.  He just
24   said he doesn't remember doing it.
25          THE COURT:  Well, I mean, that is a proper
```

1    objection.  He doesn't remember.

2          MR. RAM:  That is fair, your Honor.  I can move

3    on.

4          THE COURT:  Let's move on.

5    Q    BY MR. RAM:  Did the information you reviewed on

6    those first three Cellebrite reports expand your

7    knowledge of the case in any way?

8    A    No.  Not materially.

9    Q    So your testimony is it did not add any information

10   to the investigatory basis?

11   A    Not in any material sense, no.

12   Q    Let's look at a few examples from the February --

13   the Cellebrite report you received on February 12th, and

14   just so we can clearly talk about the same phone, can we

15   pull up Kastigar Exhibit 20?

16          So the Cellebrite report you received on

17   February 12th is here.  It is 1B123, is that right?  And

18   that is consistent with your Exhibit 31 that you just

19   reviewed a few moments ago?

20   A    I am not familiar.

21          MR. CIPOLLETTI:  I am going to -- obviously I

22   don't think I have ever even seen this document or the --

23   Q    BY MR. RAM:  There are exhibits cited to the

24   declaration here, Mr. Fenton, if you want to look at the

25   screen.

```
 1   A     I am not familiar with this document.  I think this

 2   document is difficult to follow.  If you want to go back

 3   to Exhibit 31 I can certainly take a look and try to

 4   answer.

 5   Q     So I am going to represent you to that you told us

 6   earlier the February 12th Cellebrite that you received

 7   was 1B123; right?

 8   A     I don't believe that I testified to that earlier,

 9   no.

10   Q     Do you want to go back to Exhibit 31 and confirm

11   that?

12   A     I am just trying to be precise, Mr. Ram.  I really

13   -- I don' --

14         THE COURT:  Why all these questions about which

15   phone relates to what date?  I mean, that should be a

16   matter that's in the record.  Why are we falling on that.

17              As I understand it, you are now questioning

18   what parts of the report relating to those three phones

19   he remembers looking at.  Isn't that where we are?

20         MR. RAM:  Yes, your Honor.

21         THE COURT:  So let's keep on track with that.

22   Q     BY MR. RAM:  All right.  Why don't we look at a few

23   examples of information that is on 1B123 and I am going

24   to ask you some questions about it.  So let's look first

25   at what has been marked as Kastigar Exhibit 22.
```

```
 1              This is an excerpt from 1B123.  My question to
 2     you is did you come across this image in your review of
 3     the Zhadko phone?
 4     A     No.  I am not familiar with this document.
 5     Q     Okay.  Well, the document I am representing to you
 6     is from what we are calling the Zhadko phone, 1B123.
 7     What I'm asking you is, when you reviewed -- this is
 8     extracted from the Cellebrite, to be clear for the
 9     record.  So my question --
10              THE COURT:  Why do you keep calling it the Zhadko
11     phone?
12              MR. RAM:  Sorry, the 1B123 phone, which was
13     registered to Iulia Zhadko.  Is that a better way of
14     saying it, your Honor?
15              THE COURT:  All right.
16     Q    BY MR. RAM:  So to be clear, I am representing to
17     you that this comes from the Iulia Zhadko Cellebrite that
18     you received on February 12th.
19              So my simple question to you right now is only
20     do you remember as you sit here today reviewing this
21     image on the Zhadko cell phone, on the Cellebrite for the
22     Iulia Zhadko cell phone?
23     A     I'm sorry.  Can you repeat the question?
24     Q     Sure.  When you were reviewing 1B123, which was
25     registered to Iulia Zhadko -- you are familiar with that
```

```
 1   phone from your participation in this case; right?
 2         MR. CIPOLLETTI:  Your Honor, I really don't
 3   understand the multiple questions being asked or the
 4   relevance of any of this.
 5         THE COURT:  All right.  Try to understand it
 6   better.  Objection is overruled.
 7   Q    BY MR. RAM:  Okay.  So let me ask you the basic
 8   question again.  So you are familiar with the phone
 9   registered to Iulia Zhadko that was labeled 1B123 as part
10   of the investigation; right?
11   A    Yes, I am familiar with a phone that was labeled
12   1B123; correct.
13   Q    Okay.  And you are familiar that there was a
14   Cellebrite, which you just testified you reviewed from
15   that phone, that was given to you on February 12th of
16   2021; correct?
17   A    The Cellebrite, yes.
18   Q    So now we are moving to the next point.  I am
19   representing to you that this image marked as Kastigar
20   Exhibit 22 is from that Cellebrite report.  And my
21   question was did you see this when you reviewed the
22   Cellebrite report for the Iulia Zhadko phone?
23   A    No.
24   Q    Okay.  Now, would you agree with me that this image
25   supports your trial narrative of an assembly line of
```

```
 1   fraud?
 2   A     Sir, I have never seen this document before.  I
 3   don't -- I mean, I don't know what those attachments are.
 4   Q     So you don't recognize -- how about this
 5   projecttype30@yahoo.com.  Do you recognize that e-mail
 6   address?
 7   A     Yes.
 8   Q     Okay.  And what is the significance of that e-mail
 9   address?
10   A     At this point in time, it is cumulative information
11   I already if knew.  We saw that e-mail address multiple
12   times.
13   Q     And what is it.  What does that address represent?
14   A     It is an e-mail address that defendant Richard
15   Ayvazyan used in furtherance of the fraud.
16   Q     And this message was sent to
17   Tamaradadyan@hotmail.com; right?
18   A     That is what this document purports to show, yes.
19   Q     And your testimony is you don't recall seeing this
20   when you did a search of the Iulia Zhadko Cellebrite
21   report; correct?
22   A     My testimony is that I do not recall seeing this
23   document when I did -- when I reviewed this particular
24   Cellebrite report.
25            THE COURT:  Now, we are in the timeframe of
```

```
 1    February 12th; correct?
 2          THE WITNESS:  Yes.  Yes, your Honor.  As of
 3    February 12th we were familiar with this Tamara Dadyan
 4    Hotmail account so this information was known to us.
 5    Q     BY MR. RAM:  And did you know that there were
 6    e-mail exchanges between Iulia Zhadko from that e-mail
 7    address and from Tammy Dadyan at that e-mail address
 8    concerning Gusto employee reports?
 9    A     It was our assumption that that was the case.  That
10    is what we put into our search warrant affidavits back in
11    November.
12    Q     Maybe I wasn't clear with the question.  Did you
13    know that there was e-mails -- not your assumption.  Did
14    you know this e-mail existed when you prepared your
15    search warrant?
16    A     I never seen this e-mail before.
17    Q     Okay.  And you don't know whether you saw this
18    image because as you testified a moment ago your only
19    specific recollection that stands out to you is the --
20    was one example.  What was that?  What's the one, just
21    remind me, the one specific image you remember from
22    reviewing the Cellebrite reports?
23    A     I'm sorry, I am having a difficult time following
24    the question.  What question are you asking me in
25    particular?
```

```
 1   Q      So you said you reviewed the first three Cellebrite
 2   reports, but only one document or image stood out to you
 3   that you specifically recollect today.  And what was
 4   that?
 5   A      So the one piece of data that I do recall seeing
 6   was a communication from the Victoria Kauichko e-mail to
 7   Greystar, which is a lease management company for the
 8   apartment rented at Canoga, Unit 337 at 6154 Canoga
 9   Avenue.
10   Q      Okay.  And as you sit here today, you don't know
11   whether you saw this image or not when you reviewed the
12   Cellebrite report for the Iulia Zhadko phone, correct?
13   A      I believe I told you I did not see this image.
14   Q      Well, look, do you remember not seeing it or do you
15   not remember?
16   A      Sir, you asked me if I saw this image and my
17   response was no.
18   Q      So your declaration states you only have a specific
19   recollection of seeing the Victoria Kauichko lease image
20   that you just referred to.  Are you saying you don't --
21   you know that you didn't see any other images on the
22   Cellebrites or are you just saying that you don't
23   remember seeing any other images on the Cellebrites?
24   A      I am trying to be very precise here.  I know this
25   is important here.  I don't understand the question.
```

1   Q    So let me turn to your declaration, page 29,

2   paragraph 47.

3   A    Do you have a copy for my reference?

4   Q    We are going to put it up on the screen for you.

5        Okay, so now we are on -- it is coming up on

6   the screen.

7        Before we do that, why don't we go to the

8   Kastigar exhibit.

9        MR. CIPOLLETTI:  Your Honor, if it is easier the

10  government can provide Mr. Fenton a copy of his

11  declaration.

12       THE COURT:  All right.

13       THE WITNESS:  Thank you.  All right.  I believe I

14  have a copy of the declaration.  This is the first Fenton

15  declaration; correct?

16  Q    BY MR. RAM:  Correct.

17  A    Which paragraph are you referring to?

18  Q    Paragraph 50?

19  A    5-0?

20  Q    Yes.  You say, "I have a recollection of accessing

21  and reviewing the first three filtered Cellebrite reports

22  that the independent filter team released to me.

23  However, aside from the example I provided" -- and I

24  think you were referring to the Kauichko leasing image --

25  "I do not have a specific recollection of the information

```
 1   that I saw."
 2           Do you see that?
 3   A     Yes.
 4   Q     "I do not have a recollection as to whether I
 5   accessed or reviewed the last two filtered Cellebrites."
 6           So before we go there, when you say I do not
 7   have a specific recollection of the information that I
 8   saw, that means that as you sit here today or when you
 9   prepared this declaration, you don't remember the other
10   images you saw; right?
11           You are not suggesting in your declaration
12   that you didn't see any other images on these three
13   Cellebrites?
14   A     Was the timeframe you are inquiring about?
15   Q     February through May.
16   A     Are you inquiring about as I sit here today or are
17   you inquiring about when I prepared this declaration?
18   Q     Great question.  So in your declaration you say I
19   do not have a recollection as to whether I accessed or
20   reviewed -- sorry.  Strike that.
21           The sentence before that, where you say you
22   only have a specific recollection of the Kauichko leasing
23   image; right?
24   A     I don't believe that is the text in my declaration,
25   no.
```

```
1   Q      I'm sorry.  What?

2   A      What you are reading is not what I wrote.

3   Q      Okay.  So put aside the declaration for a second.

4   I am saying when you say -- or let me just quote it.  You

5   reference "specific recollection."  Do you see that word?

6   A      Mr. Ram, I don't know what you are specifically

7   asking me about.  If you point me in the declaration and

8   read it to me I can answer the question.

9   Q      Okay.  Paragraph 50, lines 15 and 16, where you say

10  I do not have a specific recollection of the information

11  that I saw, and then you are referring to the three

12  Cellebrites.  And my question to you is you are not

13  suggesting that you didn't review any other documents or

14  images on those three Cellebrites.  You are just saying

15  as you sat here at the time you wrote this declaration

16  you don't remember the other images and documents you

17  saw; correct?

18  A      Well, yes.  I think the declaration speaks for

19  itself.  On July 11th, 2021, I wrote, "I have a

20  recollection of accessing and reviewing the first three

21  filter Cellebrite reports that the independent filter

22  team released to me and the other members of the

23  investigative team.  However, aside from the example I

24  provided above, I do not have a specific recollection of

25  the information that I saw."
```

```
 1            And that was accurate at the time that I wrote
 2   it.
 3   Q     Correct.  And now, let me restate my question so it
 4   is clear.  You are not saying what that sentencing you
 5   didn't review any other images or documents on the
 6   Cellebrite; correct?  You are just saying that the only
 7   image or document that you recall at this time when you
 8   wrote the declaration?
 9   A     What I -- I'm sorry.  Can you -- can you repeat it
10   again because here it says -- the first part I think
11   says --
12   Q     I'm not asking you --
13   A     Let me answer the question.  The first part says,
14   "I have a recollection of accessing and reviewing the
15   first three filtered Cellebrite reports that the
16   independent filter team released."
17   Q     Let me just make it simple.  Did you only review a
18   single image on or document on those three Cellebrites?
19   A     No.
20   Q     So you reviewed more images and documents, but you
21   just don't specifically recall them; is that fair to say?
22   A     Yes.
23   Q     Okay.  All right.  So now let's go back to Kastigar
24   I think we were at Kastigar Exhibit 22.  Let's look at
25   Kastigar Exhibit 23.
```

```
 1               Okay.  If we can blow up 251.
 2               Based on your earlier testimony, you don't
 3    recall seeing this image on the Iulia Zhadko phone;
 4    correct?
 5    A     I'm sorry, are you asking me if I recall -- are you
 6    asking me if this is familiar to me?
 7    Q     No.  I am asking you when you reviewed the
 8    Cellebrite for Iulia Zhadko, as you sit here now, you
 9    don't recall seeing this image because you just testified
10    you only recall seeing a single image?
11               THE COURT:  Why do you add your conclusion to a
12    question?  That makes things less clear.  Just ask the
13    question.  You do that with some frequency and it doesn't
14    help.
15               MR. RAM:  Understood, your Honor.
16    Q     So the question to you is when you reviewed the
17    Iulia Zhadko Cellebrite, did you see this image or do you
18    recall seeing this image?
19    A     When you say Iulia Zhadko Cellebrite, are you
20    referring to 1B123?
21    Q     Yes.
22    A     I have no recollection.  I have never seen this
23    image before.
24    Q     As you sit here now, do you recognize what it is?
25    A     Sir, you I just told you I have never seen this
```

1    image before.  I have no idea what this is.

2          THE COURT:  Let me just -- see if I can direct the

3    questions as I understand them.  The questions seem to be

4    regarding what you said in your declaration about having

5    a specific recollection about this, what was it,

6    Greystone [sic]?

7          THE WITNESS:  Yes, your Honor.  Greystar.

8          THE COURT:  And the questions are along the lines

9    of when you talk about Graystone, is that the only image

10   you specifically remember now or do you just not have a

11   recollection of what you did see on the phone in

12   February?

13         THE WITNESS:  I don't have a recollection of what

14   I saw on the phone in February other than the Greystar

15   e-mail.

16         THE COURT:  Then with regard to this Exhibit 23 in

17   particular, you said you have never seen that before,

18   that image?

19         THE WITNESS:  That's correct, your Honor.  I have

20   never seen this image.

21         THE COURT:  So when you say that it doesn't sound

22   like you don't have a -- it doesn't sound like it is a

23   recollection problem.  You are saying categorically you

24   did not see that image before.

25         THE WITNESS:  Yes, your Honor.  And this does not

1    refresh my recollection.

2         THE COURT:  Are you saying that this image that's

3    being shown to you now on Exhibit 23, you never saw

4    before today?

5         THE WITNESS:  That's correct, your Honor.

6         THE COURT:  And what the question seemed to be is

7    that there may be some contradiction between your having

8    a specific recollection about Greystone and not a clear

9    recollection about other things.

10            Notwithstanding those types of questions, are

11   you saying that the image on Exhibit 23 you have never

12   seen before?

13        THE WITNESS:  That's correct, your Honor.

14        THE COURT:  That is not something you don't

15   remember or do remember -- I mean, that is something you

16   clearly remember not seeing?

17        THE WITNESS:  That's correct, your Honor.  And can

18   I explain?

19        THE COURT:  Yes.

20        THE WITNESS:  So when I look at this image, the

21   images that are on the Cellebrite reports can be

22   presented in various formats.  This format in particular,

23   this is a file name that's original to an MP4 and there

24   is a picture there to the right.

25            I just -- I don't recall ever seeing anything

 1   like this.  And I don't have a recollection of seeing

 2   that photograph of Richard Ayvazyan's face.

 3        MR. RAM:  So, your Honor asked the exact question

 4   I was going to.

 5   Q    Just to be clear, as you sit here now you do

 6   recognize that to be Richard Ayvazyan's face?

 7   A    Yes.

 8   Q    Okay.  And if you had seen this -- scratch that.

 9        This would have evidentiary significance to

10   you if there is a selfie of someone on the Iulia Zhadko

11   phone; yes?

12   A    Evidentiary significance meaning what exactly?

13   Q    It was important to your investigation?

14   A    That there is a picture of him on the phone?  The

15   phone was found in his possession.

16   Q    Correct.  And now do you know what a selfie is?

17        THE COURT:  Everybody knows.  Even I know what

18   that is.  And I don't know much about any of this stuff.

19        THE WITNESS:  I don't know that this is a selfie.

20   I don't know what this is.

21   Q    BY MR. RAM:  Okay.  Why don't we look at Kastigar

22   Exhibit 24.  In fact, given the witness' last comment,

23   let's pull it up at Palmerton Exhibit O.

24        Have you read Agent Palmerton's declaration

25   submitted in connection with this hearing?

```
 1   A      Yes.

 2   Q      So you know Exhibit O -- do you know what Exhibit O

 3   is to his declaration?

 4   A      I wouldn't know it until you show it to me but --

 5   Q      Take a look at the scene?

 6   A      Yes.

 7   Q      Okay.  Is this the extract that Agent Palmerton

 8   referred to in his declaration that he pulled from the

 9   Iulia Zhadko phone?

10   A      If you are representing to me that is what this is,

11   then I will accept that representation.

12   Q      It is also Exhibit O to his declaration, to be

13   clear.

14   A      Now I am confused.

15   Q      I am showing you who is Exhibit O to Palmerton's

16   declaration.

17   A      Yes, and I am saying I will accept that

18   representation.

19   Q      And you understand Exhibit O is the excerpts that

20   Agent Palmerton talked about in his declaration that he

21   pulled of text messages from the Iulia Zhadko phone;

22   correct?

23   A      I understand that these are text messages from one

24   of the three phones, yes.  I don't know if they are

25   excerpts and I don't know which particular phone this
```

```
 1  came from.
 2  Q     Okay.
 3  A     But it could be -- it's from one of those three
 4  phones.  It could be 1B123, yes.
 5  Q     Why don't we look at page 601 as an example.  And
 6  by the way, did you receive this, what is reflected in
 7  Exhibit O from Agent Palmerton at some point?
 8  A     Yes.
 9  Q     When did you receive it from Agent Palmerton?
10  A     I believe I received it on April 27th at -- I think
11  it was in the early to midafternoon Eastern.
12  Q     And just to it is clear for the Court, Agent
13  Palmerton extracted the text messages at Exhibit 0 from
14  the Cellebrite of one of the first three phones that you
15  reviewed; correct?
16        MR. CIPOLLETTI:  Objection?
17        THE COURT:  Overruled.
18        THE WITNESS:  I don't know.  He represented to me
19  that these were text messages from one of the three
20  phones, yes.
21  Q     BY MR. RAM:  Okay.  So now let's look at the text
22  message appearing on page 601 of this 918-page PDF
23  document.
24           And again, you are clear that this is from one
25  of the three Cellebrites that you reviewed.  You do know
```

```
1    that; right?  Exhibit 0 is derived from one of the three
2    Cellebrites that you reviewed?
3    A    Yes.
4         MR. CIPOLLETTI:  Objection, your Honor.  These are
5    compound questions.
6         THE COURT:  Overruled.
7         THE WITNESS:  Yes.  I think I testified earlier my
8    understanding was -- and I think your representation was
9    these were text messages that was taken from one of those
10   three phones.
11   Q    BY MR. RAM:  Correct.  So let's blow up the top half
12   of page 601 of Exhibit O.  Okay.  Do you recognize the
13   phone number ending in 5533 labeled T?
14   A    Yes.
15   Q    What is that?
16   A    Tamara Dadyan.
17   Q    Okay.  And the subject -- or the text of the text
18   says, "Rich for Vahe, we are going to send his part
19   here," and there is an image of a check attached to that
20   text message; correct?
21   A    That is not what the text message but -- it says,
22   "Rich for Vahe, we going to send his part here," yes.
23   Q    Okay.  And you see that there is an image of the
24   check as well?
25   A    I can't see the image but I believe it is a check,
```

```
 1    yes.
 2    Q     Let's look at page 432 of Exhibit O.
 3              Oh, I'm sorry.  And Vahe, do you know a Vahe
 4    in this case?
 5    A     I'm sorry, sir?
 6    Q     Is there a Vahe Dadyan as one of the defendants in
 7    this case; is that right?
 8    A     Yes.  He has been convicted.
 9    Q     Okay.  Which means he is also a defendant in the
10    case; right?
11    A     Mr. Ram, yes, he went to trial.  He was convicted
12    by a jury on all counts.
13    Q     So let's look at page 432.
14              Let's look at the top half of this.  And then
15    we will scroll down in a second.  So at the top here, the
16    phone number ends in 4170; correct?
17    A     Yes.
18    Q     And that is the Iulia Zhadko phone we have been
19    referring to?
20    A     That phone number is associated with Iulia Zhadko;
21    correct.
22    Q     I apologize.  That is a better way of stating it.
23    And the message -- go ahead and read that text message.
24    A     You want me to reed the text message out loud?
25    Q     Yes.
```

```
 1   A      "Tam, I just got response on one.  They are asking
 2   for payroll register for the full 2019 year, payroll
 3   register for all available months in 2020.  You think
 4   Nvard can do the calculations?"
 5   Q      Let's scroll down on the same page.  Okay.  And
 6   then the Iulia Zhadko -- I'm sorry.  The Tamara Dadyan
 7   phone is saying, "Send me the Fiber One Media WIN
 8   number," and then she corrects, EIN number; is that
 9   right?
10   A      Yes.
11   Q      And Fiber One Media is one of the companies that
12   you investigated in this case; correct?
13   A      One of the fake companies.  Yes.
14   Q      And if you saw this image when you reviewed the
15   Iulia Zhadko's phone, this would have evidentiary value,
16   or value to your investigation.  Would you agree with
17   that?
18   A      I don't -- so I didn't see this image, and we knew
19   well in advance of this that Fiber One Media was a
20   company that was being used by the defendants in
21   furtherance of the fraud.
22   Q      Well, you don't know if you saw this image, do you?
23   You don't recall seeing this image one way or the other.
24   Or are you saying you definitively did not see any text
25   messages from Tammy Dadyan's phone to Iulia Zhadko's
```

```
1    phone?
2    A     You are showing me page 432 of 918 of a text
3    message that was sent to me on April 27th in the middle
4    of the afternoon.  I don't have an independent
5    recollection of looking at page 432 of 918 on that
6    particular day or before or afterwards.
7    Q     And I am asking you a different question.  When you
8    reviewed the Iulia Zhadko Cellebrite where this was
9    extracted from?
10   A     Yes.
11         THE COURT:  Now you are going back to February.
12         MR. RAM:  Yes.  Yes, your Honor.
13         THE COURT:  Let's keep the chronology and the
14   timeframes clear.
15         MR. RAM:  Yes, your Honor.
16   Q     So in the February of 2021 timeframe, when you
17   reviewed the Iulia Zhadko Cellebrite, as you sit here you
18   don't specifically recall seeing any text messages from
19   Tamara Dadyan -- between Tamara Dadyan and the Iulia
20   Zhadko phone; correct
21   A     That's correct.  I don't have a specific
22   recollection of that.  It is possible, but I don't have a
23   specific recollection of that.
24   Q     And my question to you was this would have had
25   value to your investigation, period; right?  This text
```

```
1  message was valuable to your investigation?
2  A     Value meaning what exactly?  Because I really think
3  it depends.  I am just trying to be helpful, but I just
4  don't understand your question.  Value meaning what.  For
5  what purpose.
6  Q     To further your investigation into Fiber One Media,
7  into Tamara Dadyan, into Iulia Zhadko or Richard
8  Ayvazyan.
9  A     So at this point in the investigation, I was aware
10 that Fiber One Media was being used by the defendants in
11 furtherance of the fraud and I think we in fact traced
12 payments back and forth to them.
13       THE COURT:  I can't understand what you are
14 saying.
15       THE WITNESS:  We were aware of this company, your
16 Honor, and we were tracing, you know, money to and from
17 this company, and we had run searches with this company's
18 name back in I think August or September to identify
19 whether or not it had taken out PPP or EIDL loans.
20            We learned at that time that they had.  And
21 then we ran a bunch of searches.  We served subpoenas
22 looking for these bank records, I believe, and trying to
23 find this money.  And that all happened before we got
24 this phone.
25            THE COURT:  But the question was framed in terms
```

```
 1   of valuable.  And you answered that valuable is too
 2   general a term.
 3        THE WITNESS:  Right.
 4        THE COURT:  And I agreed.  So valuable is not the
 5   term we should use.  Was it new information?  Did it lead
 6   to new information?  Did it effect some strategy?  Those
 7   things would be more on point.
 8        MR. RAM:  Correct.
 9   Q    And so would the fact that the person you believed
10   to be Richard Ayvazyan using the Iulia Zhadko phone,
11   would him texting Tamara Dadyan about Fiber One Media
12   under investigation assist or further your investigation
13   in any way?
14   A    This is something that if it had not been
15   suppressed we might consider using something like this as
16   evidence at a trial.
17   Q    Okay.  Would it surprise you if some of these same
18   text messages were in fact used at trial?
19   A    No.
20   Q    And they were used at trial because they are
21   valuable or had significant value in helping prove your
22   case against Richard Ayvazyan and Tamara Dadyan?
23   A    So the reason -- and I just explained this.  The
24   reason why they would have been used as evidence at trial
25   was because they had a use as evidence at trial to help
```

1    prove our case; that is correct.

2    Q    And typically as a prosecutor you use evidence that

3    helps prove your case; right?

4    A    Always.

5    Q    Why don't we take a look at one more example on

6    page 561 of Exhibit O.

7              All right.  So this is this again is

8    conversation with the Iulia Zhadko phone you recognized,

9    and it is with Tamara Dadyan, correct, the Tammy Dadyan

10   phone?

11   A    I'm sorry, can you repeat the first part of that

12   question?

13   Q    Sure.  The first image you see -- you understand

14   Exhibit O is a text message from Iulia Zhadko's phone,

15   just like the other examples we saw?

16   A    Iulia Zhadko is defendant Richard Ayvazyan.

17   Q    So the Iulia Zhadko phone, the phone registered to

18   Iulia Zhadko?

19   A    1B123?

20   Q    Ye.

21   A    You are representing it me that this is a text

22   message that was taken from that phone.  I have told you

23   before I am accepting that representation.

24   Q    And if you had seen this text message --

25   A    But I don't have independent knowledge of that.  I

1   am accepting that representation.

2   Q      Okay.  Did you -- but you also received this

3   Exhibit O from Agent Palmerton; right?

4   A      Yes.  And I believe I testified to that.

5   Q      Okay.  So you have no reason to dispute that this

6   is a text message excerpted from Iulia Zhadko's phone;

7   right?

8   A      No.

9   Q      Now, if you look at the message here, it is talking

10  about --

11  A      Well, Iulia Zhadko is not a person.  So I mean,

12  that is the issue that I am having.  So this is from

13  1B123.  If that is in fact your representation, yes.

14  Q      Correct.  And it is the phone registered to Iulia

15  Zhadko as the owner; correct?

16  A      I don't know.

17  Q      You don't know that this phone was registered to

18  Iulia Zhadko?

19  A      It is my understanding there is data that goes with

20  this phone.  I don't have that data in front of me.

21  Q      Okay.

22  A      If you are representing to me that that is what

23  that says, that is fine, but you keep asking me about

24  Iulia Zhadko's phone.  Iulia Zhadko is defendant Richard

25  Ayvazyan.

```
 1   Q      Okay.  And this text message on the screen, would
 2   you agree talking about -- it is a conversation -- under
 3   your own testimony just now, it is from Richard Ayvazyan
 4   to Tamara Dadyan; correct?  That is your understanding of
 5   this?
 6   A      That is my understanding.  Yes.
 7   Q      And they are talking about if any funding places
 8   are still accepting applications?
 9   A      Yes.
10   Q      All right.  So the fact that there is text messages
11   talking about seeking or submitting applications would be
12   helpful to your investigation, correct, especially if you
13   knew that Tamara Dadyan and Richard Ayvazyan were
14   e-mailing or text messaging about PPP loan applications
15   in February of 2021?
16   A      We already knew that.  The value of this --
17   Q      Well, let me pause you.  You said we already knew
18   that.  My specific question is did you know that Richard
19   Ayvazyan and Tamara Dadyan were testing about PPP loan
20   applications and submitting them fraudulently under your
21   view of the case in February of 2021?
22   A      I don't understand the question.
23   Q      Sure.  The question is did you know in February,
24   2021 that Richard Ayvazyan and Tamara Dadyan were sending
25   text messages back and forth to each other about
```

```
 1   committing PPP loan fraud under your theory of the case?

 2   A      No.  We believed that they were submitting the

 3   fraudulent applications and we believed --

 4   Q      I'm sorry, my question is really simple.

 5   A      Sir --

 6   Q      When you say no, what are you saying no to?

 7   A      I am trying to answer your question.

 8   Q      So did you know they were sending text messages

 9   back and forth or not.  That is really the question.

10   A      Who.

11   Q      Did you -- Richard Ayvazyan.

12          THE COURT:  Let's get through this.  The questions

13   are you are looking at the phone that has been

14   identified -- identifying it as the February 12th phone.

15   And you are being shown some excerpts of what appear to

16   be e-mail or text exchanges between defendant Richard

17   Ayvazyan and defendant Tamara Dadyan.

18            And the question is before receiving this

19   Cellebrite report, understanding that you don't have a

20   complete recollection of what you looked at or not, but

21   assuming that you did look at this excerpt that he is now

22   referencing, is that something that you learned for the

23   first time?  And let me make this a little more

24   straightforward.

25            You seem to be answering that you knew by the
```

```
1    time you got the Cellebrite report in February that there
2    were fraudulent loans, that Tamara Dadyan and Richard
3    Ayvazyan were very involved in fraudulent activity, but
4    the question specifically is did you know that in
5    connection with their fraud they were texting each other
6    and discussing the fraud?
7              THE WITNESS:  No.
8              MR. RAM:  Okay.  Thank you, your Honor.
9    Q    And moving on now -- we can take this exhibit down.
10   Is it fair to say you were eager to get the Cellebrites
11   from the Miami phones to review them as part of your
12   investigation and to build your case?
13   A    So we were eager to get the phones so we could
14   potentially use the Cellebrite reports for evidence at
15   trial.  And we were eager to get them produced to defense
16   counsel as soon as possible.  But the eagerness was with
17   respect to potential trial evidence.  At this point, the
18   investigation was basically done.
19   Q    And you said that the investigation was basically
20   done.  That is not true, though, and you have never said
21   that in any of your briefing until your reply brief
22   yesterday is the first time you said the investigation
23   was done.
24              So your testimony under oath today is that
25   your investigation concluded in February of 2021?
```

```
 1    A      That is not what I said, sir.

 2    Q      So your investigation did not conclude in February

 3    of 2021; correct?

 4    A      No I said the investigation.  It was basically at

 5    the end at that point.

 6    Q      And what do you mean by at the end?

 7    A      We were preparing to supersede and then we were

 8    preparing to go to trial.

 9    Q      So your investigation could not be at the end if

10    you hadn't even superseded yet; correct?

11    A      That is incorrect.

12    Q      You had a superseding indictment that came out in

13    March 9th of 2021; correct?

14    A      Right.

15           THE COURT:  We are getting nowhere with this.  I

16    mean, what he is saying is that the investigation was

17    essentially complete before February 11, 12, 19.  And you

18    are saying it wasn't.

19           MR. RAM:  That was a bad question.

20           THE COURT:  So if it wasn't complete, what was the

21    additional evidence between February 11th, February 10th,

22    let's say, and the date of the superseding indictment,

23    which was what, March?

24           MR. RAM:  March 9th.

25    Q      Well, frankly, you continued -- let's talk about
```

```
 1    interviews.  Let's just take an example from your Honor's
 2    question.  How many interviews did you conduct before
 3    February 11th of 2021?
 4    A     How many interviews did I personally conduct?
 5    Q     The prosecution team.
 6    A     I don't have a recollection.
 7    Q     Do you have a recollection of conducting interviews
 8    in February of 2021?
 9    A     I don't recall the dates.  I don't recall the
10    specific dates that we conducted any particular
11    interviews, but I know that all this information is
12    documented in the MOI's and the 302's, the documents that
13    we produced to the defense, and also in the indexes that
14    we produced.  So if I could see that I could refresh my
15    recollection.
16    Q     So let me ask, is there any question in your mind
17    that you continued interviewing witnesses all the way up
18    through, frankly, April or May of 2021, a month before
19    trial?
20    A     Are you asking me did we?
21          THE COURT:  You are jumping around.  You started
22    out by referencing the superseding indictment.  That was
23    March 9th.  Let's get through that before we go to a
24    different timeframe.
25    Q     BY MR. RAM:  Actually, the original question was
```

```
 1    you were eager to review the Cellebrite reports to build
 2    your case; is that true or not?
 3            MR. CIPOLLETTI:  Objection.  Asked and answered.
 4            THE COURT:  Overruled.
 5            THE WITNESS:  We were eager to get the Cellebrite
 6    reports for two primary purposes.  One, to find evidence
 7    that we could potentially use at trial.  Two, to produce
 8    them to counsel for the defendants.
 9    Q    BY MR. RAM:  Okay.  So fair to say the Cellebrite
10    reports were important to you in your investigation?
11    A    Yes.
12    Q    All right.  In fact, as a fraud prosecutor you know
13    that some of the best evidence of intent and fraud comes
14    from targets and defendants' phones; right?
15    A    Yes.  There is a belief that some -- good evidence
16    can come from phones.  That is why we invest the time to
17    try to get the team search warrants and review that
18    evidence.  Yes.
19    Q    Okay.  Now, let's go to the next series of --
20    actually let me just skip ahead here in the essence of
21    time.
22            The one exception you mentioned that you
23    remember -- you specifically recall from the Cellebrite
24    review that you did was about the Victoria Kauichko and
25    her taking over the lease at Canoga; right?
```

```
 1   A     Yes.
 2   Q     All right.  Why don't we look at Kastigar Exhibit
 3   21.
 4   A     Okay.  Can we blow up the top half?
 5   Q     All right.  Can you look really closely at your
 6   screen?  In sum and substance, is this the message or
 7   e-mail that you remember from your Cellebrite review
 8   relating to Kauichko and taking over the lease at Canoga?
 9   A     Yes.  This either is the e-mail or is very similar
10   to the e-mail that I recall.  And I believe there was
11   additional correspondence as well.
12         THE COURT:  Is this different than Greystone?
13         MR. FENTON:  It is difficult for me to see what
14   this is -- no, it says Greystar here.  So if you look at
15   the point EMGR@Greystar.com, the point at Warner Center,
16   and Warner Center I believe, your Honor, is the building
17   where the apartment was.
18   Q     BY MR. RAM:  Okay.
19   A     So yes, this is it, I believe, or similar to the
20   correspondence.
21   Q     Okay.  And you specifically saw that on the -- do
22   you remember which phone?
23   A     No.
24   Q     Okay.  And you noted in your declaration that this
25   e-mail was just cumulative of the lease application you
```

1    received from the lease company; is that right?

2    A      Yes.

3    Q      And let's pull up the lease application that you

4    actually received from the management company.  That is

5    at government Exhibit 42-99.  Page 99.

6              This is part of the subpoenaed materials you

7    received from the leasing management company; right?

8    A      I believe so, yes.

9    Q      Okay.  And why don't we just do a comparison.  We

10   can put it side-by-side.  What we have up now government,

11   Exhibit 42-99, side-by-side with the Kauichko image from

12   the Cellebrite report, which is Kastigar Exhibit 21,

13   which we just saw.

14             Well, we can't get it side-by-side, but is it

15   fair to say that the lease application letter that you

16   see on your screen does not highlight, unlike Kastigar

17   Exhibit 21, which we just saw, Richard Ayvazyan's role in

18   the transfer of the lease to Kauichko?

19   A      You are asking me about this page out of -- I guess

20   I don't understand the question.

21   Q      Sure.  And we can put it back up for you, but on

22   the screen a second ago was Exhibit 42.  That is a

23   government exhibit; right?

24   A      Are you asking me why I believed it was cumulative?

25   Q      I didn't ask you that question but we are getting

1    there.  So what I am specifically asking you is the

2    materials you got from the leasing office don't reference

3    Richard Ayvazyan at all; correct?

4    A    I don't -- I haven't reviewed 160 pages.  I don't

5    believe they do.  I don't believe they mention his name,

6    no.

7    Q    In any way they don't expect to Richard Ayvazyan?

8    A    That is not correct, no.  That is incorrect.

9    Q    Okay.  The actual text of the information you

10   received from the leasing management office references

11   Richard Ayvazyan in some way?

12   A    That is a different question.

13   Q    And the answer to that question is no; right?

14   A    I don't know which question you are asking me.

15   Q    That wasn't my question.

16   A    No, that was.

17   Q    Just to be clear, you said the leasing office

18   information was cumulative of the image -- let's go ahead

19   and pull it up.

20   A    The answer --

21   Q    Hang on one second.

22   A    Would you like me to explain why it's cumulative?

23   Q    I'm going to pull up Kastigar Exhibit 21 first and

24   let me ask you this.  If we could blow up the top half.

25   See if it blows up now.

1              Okay.  This Cellebrite is for a phone that was

2     found in Richard Ayvazyan's possession at the Miami

3     airport in October of 20; correct?

4     A     That is what you have represented.

5     Q     Well, actually this is the image you remember

6     reviewing from the Cellebrite, so is that what you are

7     representing?

8     A     This is an image from one of the phones that was

9     seized in Miami.

10    Q     Correct.  And it was found in connection with

11    Richard Ayvazyan; yes?

12    A     What do you mean, in connection with?

13    Q     He possessed it?

14    A     Yes.

15    Q     Okay.  Now, the management documents we just saw at

16    government Exhibit 42, you did not find that information

17    on Richard Ayvazyan's -- in his possession throughout the

18    course of your investigation; correct?

19    A     Did we find the leasing file for this apartment in

20    Richard Ayvazyan's possession?

21    Q     Correct.

22    A     We did not.

23    Q     Okay.  So in other words, you had a search warrant

24    at 4910 Topeka, his residence.  There wasn't there, was

25    it, government Exhibit 42?

1   A      I don't believe so.  If it was there, it was not

2   seized.

3   Q      Okay.  So, in that sense, the fact that government

4   Exhibit 21 -- actually, let me scratch that.

5          You know from trial that one of the defense

6   arguments in this case was that Manuk Grigoryan

7   independently ran and controlled the Canoga apartment to

8   get PPP loans in a separate conspiracy or scheme

9   independent of Richard Ayvazyan and Mary.  You understand

10  that was one of the defenses in fact?

11  A      I understand that that is an argument that you made

12  at trial.  Yes.

13  Q      Okay.  And this e-mail that comes from the

14  Cellebrite at Kastigar Exhibit 21, that directly connects

15  Richard Ayvazyan to the Canoga apartment lease; true?

16  A      Yes.

17  Q      Okay.  Did you uncover any other document that

18  specifically connects Richard Ayvazyan to the Canoga

19  apartment lease?

20  A      Multiple.

21  Q      There is a --

22  A      Mean.

23  Q      You found a document in Richard Ayvazyan's

24  possession that showed a link between Ayvazyan and the

25  lease?

```
 1    A      That is a separate question.
 2    Q      Okay.
 3    A      Did I find it in his possession?
 4    Q      Yes.  In the way that the phone was in his
 5    possession; right?
 6    A      I am not following.
 7    Q      Which part do you not follow?
 8    A      Any of it.
 9    Q      The phone -- the Cellebrite is a depiction of the
10    phone, one of the three phones seized from Richard
11    Ayvazyan, right, that was in his possession?
12    A      Yes.
13    Q      Step one.  Step two, the image you recall seeing on
14    a Cellebrite from one of those phones was this image
15    regarding the Kauichko lease at Greystar, Greystone,
16    whatever it is called?
17    A      Yes.  Greystar.
18    Q      And you said that the management company subpoena
19    returned to you conveyed the same information; right?  It
20    was cumulative is what you said.
21    A      Yes.  And I can explain why if you let me.
22    Q      Well, my question is very specific.  But you did
23    not find any document in Richard Ayvazyan's possession
24    that directly connects him to this Canoga apartment
25    lease; correct?
```

1    A    I wouldn't agree with that.  What do you mean by

2    possession.  I guess I don't understand the concept that

3    you are asking.

4    Q    Okay.  Well, I think that answers it then.  If you

5    don't understand the concept of possession, I will move

6    on.

7         Let's go to -- well actually before we close

8    off on this point, this was a significant issue in the

9    investigation, right, whether Richard Ayvazyan possessed

10   or controlled the Canoga -- control is a better word --

11   Canoga apartment at all; right?  That was a real issue

12   that underlined your investigation?

13   A    I don't understand that question.

14   Q    Sure.  Whether or not Richard Ayvazyan controlled

15   the Canoga apartment.

16   A    Yes.

17   Q    That was a significant issue in the case and in

18   your investigation to prove; right?

19   A    Yes, and we know that he did.

20   Q    But my question to you was --

21   A    Because --

22        THE COURT:  Don't do that, Mr. Fenton.  Just let

23   the questions come, answer them, and if you need to

24   explain, you will have that opportunity.

25   Q    BY MR. RAM:  The only question was that was a

```
 1   significant fact in the case; correct?

 2   A     Yes.

 3   Q     Okay.  In fact, if we pull up docket 4613, which is

 4   Manuk Grigoryan's plea agreement.  Okay?

 5         THE COURT:  He said it was significant.  What more

 6   do you need?

 7         MR. RAM:  Okay.

 8   Q     Let's go to your declaration at page 31,

 9   paragraph 52.

10   A     Which paragraph?

11   Q     Page 31, paragraph 52 -- sorry, it's page 29,

12   paragraph 52.  The Kauichko lease e-mail was important

13   enough that you actually identified it in your

14   prosecution memo for the first superseding indictment;

15   true?

16   A     Yes.  We identified it in the prosecution memo.

17   Q     Okay.  And that was the question.  So the answer is

18   yes, you did?

19   A     Yes, we identified.

20         THE COURT:  The answer is yes.  Just say yes or

21   no.  Some of the questions are straightforward.  Some are

22   convoluted, but when they are straightforward answer yes

23   or no.  The answer is yes.

24   Q     BY MR. RAM:  Okay.  And your declaration says that

25   the grand jury exhibits did not include any evidence from
```

```
 1   the phone seized in Miami; true?

 2   A      Correct.  Yes.  Correct.

 3   Q      But these statements in your declaration, they

 4   don't address potential indirect or derivative use of

 5   information from the Miami phones; right?

 6   A      No.  You are wrong.  That is not correct.

 7   Q      So, for example, the 151 loans, there is

 8   information?

 9          THE COURT:  One minute.  You say declaration.

10   What declaration are you talking about?

11          MR. RAM:  It is on the screen, your Honor

12   paragraph 52.

13          THE COURT:  You mean the declaration of this

14   witness in connection with this hearing?

15          MR. RAM:  Yes.  Yes, your Honor.  Let me highlight

16   it.

17          THE COURT:  And is that the reply declaration or

18   the opposition declaration?

19          MR. RAM:  It is the opening declaration.

20          THE COURT:  All right.  Go ahead.

21   Q      BY MR. RAM:  And just so it's clear, I underlined it

22   on the screen so you can see it.  The first statement is,

23   "The prosecution memo did not reference any information

24   seized in Miami."  Do you see that?

25   A      Yes.  It says aside from the single piece of
```

```
 1   cumulative evidence mentioned above, yes, the prosecution
 2   memo did not reference any information from in Miami.
 3   Q     And just below that, it says, "I did not include a
 4   reference to any information found on the phones in the
 5   grand jury."
 6   A     Yes.
 7   Q     Okay.  And my question to you is that that
 8   declarative statement does not account for derivative
 9   information that may have come from the Miami phones;
10   true?
11   A     Not true.
12   Q     Okay.  So, for example, if you look at the 151
13   loans that are referenced -- just as an example -- we
14   will come back to this in a little bit, but there is 151
15   loans referenced in the indictment the grand jury
16   returned; correct?
17   A     The number 151, yes, is referenced in the grand
18   jury.
19   Q     And some of those 151 loans, evidence for them came
20   from the Miami phones?
21   A     So, we explained this in the declaration.
22         THE COURT:  First of all, the question was calling
23   for a yes-or-no answer.  So if you can answer -- if you
24   can answer yes-or-no, answer yes or no, and then if you
25   want to explain you can explain.
```

```
 1              Let's get your answer to the question.  Then I
 2   will give you the opportunity to explain your answer.
 3              THE WITNESS:  Yes, your Honor.
 4              THE COURT:  Go ahead.  What is your answer?
 5              THE WITNESS:  Can you repeat the question?
 6   Q    BY MR. RAM:  You know what I will do.  I am going
 7   to come back to this segment on 151 loans and we can talk
 8   about it in detail.  Let me just close out this segment.
 9   It is really the last question I have about the
10   Cellebrites, I think.
11              You know you received and had access to the
12   other two Cellebrites; right?  There were five
13   Cellebrites from the Miami phones total.  And we talked
14   about the first three just now.
15              Is it fair to say that you had access to and
16   received the other two Cellebrites for the remaining two
17   Miami phones?
18   A    Yes.  At some point.
19   Q    Okay.  And specifically, one of those you received
20   on March 19th, 2021; right?
21   A    That sounds correct.  Yes.
22   Q    And that was, for the record, 1B124.  And you
23   received the fifth Cellebrite on April 8th, 2021.
24              THE COURT:  The record shows these things.  Let's
25   assume they are correct, and I will give the government
```

```
 1    an opportunity if any of these references are

 2    questionable to bring that to the Court's attention.

 3              Let's assume that you are referencing accurate

 4    exhibits.

 5         MR. RAM:  Okay.

 6    Q    On the three Cellebrites you did review, is it fair

 7    to say you reviewed them multiple times?

 8    A    I definitely tried to access them multiple times.

 9    The difficulty was trying to get them open.  So there

10    were definitely many times I tried to get them open and

11    it often took several hours, but I may have reviewed

12    them -- yes, I think I reviewed them more than once.

13    Some of them, not all of them.

14    Q    There is three.  Is there one in particular did you

15    not review multiple times?

16    A    I really don't recall.

17    Q    You don't recall?

18    A    I remember trying to open them multiple times and

19    they crashed my computer and it would take sometimes

20    hours to get them open.

21    Q    Okay.  And you didn't track or -- the prosecution

22    team or the government didn't track your access to those

23    three Cellebrite reports?

24    A    That is not correct.

25    Q    So there is a -- is there a log of when you
```

1    accessed the Cellebrite reports?

2    A     No.  There was e-mail correspondence that was

3    submitted in my exhibit -- my declaration as an exhibit

4    that shows when I received and tried to access the

5    reports.

6    Q     And does it show each time of the multiple times --

7    A     No.

8    Q     Let me just finish the question for the record.

9    What you just referred to, does it show each time that

10   you accessed those three Cellebrite reports and the days

11   you reviewed them?

12   A     No.

13   Q     Does it show what you reviewed on the Cellebrite

14   reports?

15   A     No.

16   Q     Okay.  Was there any other record other than

17   Exhibit 31, which we talked about, that shows when you

18   accessed or reviewed information on the Cellebrite

19   reports that you reviewed?

20   A     No.  I don't believe so.

21   Q     Okay.  And the Cellebrite reports wasn't the first

22   time that you reviewed the contents of the Miami phones;

23   is that right?

24   A     Can you just be more specific?

25   Q     Sure.  We have just been talking about the

```
 1   Cellebrite reports from the period of February 11th.
 2           THE COURT:  Why don't you just ask him -- are you
 3   referring to this, I think it was a telephone
 4   communication or some communication where the contents of
 5   the phone was generally described.
 6           MR. RAM:  Yes, your Honor.  Exactly where I was
 7   going.
 8           THE COURT:  Why don't you just go for it?  Why all
 9   of this shadow boxing?
10           MR. RAM:  All right.  I just want to be clear.
11           THE COURT:  I listen to all of this, you know,
12   closely.  There is no jury here.  And I am thoroughly
13   prepared based upon the pleadings.  So you can get to the
14   point.
15           MR. RAM:  Yes, your Honor.
16   Q     Let's just get to it.  So the October 20th --
17   19/20th Miami airport stop.  You received information at
18   approximately October 20th about some of the contents on
19   the Miami phones orally; correct?
20   A     Yes.
21   Q     Okay.  And did you request that -- how did it come
22   about that Richard Ayvazyan and Marietta Terabelian were
23   stopped at the Miami airport?
24   A     My understanding is Special Agent Palmerton put up
25   a text hit to track whether or not --
```

```
 1          THE COURT:  That is beyond the scope of this
 2   hearing.
 3          MR. RAM:  It is really just going to be the
 4   motive.  Why were they stopped.
 5          THE COURT:  That is beyond the scope of the
 6   hearing.
 7          MR. RAM:  Okay.
 8   Q    Do you know if part of the reason Agent Palmerton
 9   or you wanted to stop Richard or Mary was to get their
10   cell phones?
11          MR. CIPOLLETTI:  Objection as to what Agent
12   Palmerton thought.
13          THE COURT:  Well, I mean the purpose of the
14   hearing is not to revisit the motions that were made with
15   regard to suppression.  The purpose of the hearing is now
16   that we know they have the phones, what use, if any, was
17   made of them.  So I am not going to revisit that
18   suppression hearing.
19          MR. RAM:  That is not my goal, your Honor.
20          THE COURT:  As the fact finder, what is on phones
21   is generally something that is relevant to any
22   investigator, especially these days.
23              So move on from there.
24   Q    BY MR. RAM:  Okay.  The CBP, the Customs and Border
25   Protection, they were exposed to information on the Miami
```

1    phones; yes?

2    A     Yes.

3    Q     And some of the information they were exposed to

4    they orally shared with members of the prosecution team?

5    A     Yes.

6    Q     Who did they share that information with?

7    A     My understanding was that they shared it with

8    Special Agent Palmerton, who then shared it with AUSA

9    Julian Andre and myself.

10   Q     Okay.  And how was that information shared both to

11   Agent Palmerton and then to you and Mr. Andre?

12   A     By telephone.

13   Q     Okay.  And when was it shared?

14   A     I believe it was shared on October 20th after

15   midnight.

16   Q     October 20th after midnight?

17   A     So my recollection is that we got that information

18   after midnight Eastern time.  I was on the East coast,

19   and I believe I was on the telephone after midnight

20   talking to folks.  And that information was at that time

21   conveyed to me.  I don't know when it was conveyed by CBP

22   to Special Agent Palmerton, but I would imagine sometime

23   around then.

24   Q     And three pieces or categories of information was

25   shared orally?

```
 1    A      At that time I think it was to two or three, yes.
 2    Q      Okay.  One is that there were photos of a
 3    California driver's license for Iulia Zhadko on the Miami
 4    phones?
 5    A      That there was at least one.  Yes.
 6    Q      Okay.  And that there were texts on the Miami
 7    phones in which it appeared that Marietta Terabelian
 8    appeared to be using Kauichko's identity to communicate
 9    with others?
10    A      Yes.
11    Q      And third, that there were digital photos of credit
12    cards and driver's license in other people's names on the
13    Miami phones?
14    A      Yes.
15    Q      Okay.  And that was -- that was the information
16    conveyed to you around midnight on October 20th?
17    A      Yes.
18    Q      All right.  Let's take a look at the complaint,
19    which is docket 1.  Okay.  We don't even need to pull it
20    up.  I think this is high-level enough.  Let's keep it
21    streamlined.
22           In the complaint, do you remember -- did you
23    draft the complaint?
24    A      Yes.  With assistance from other members of the
25    team.
```

```
1    Q      And who would that be?
2           THE COURT:  Are you talking about the criminal
3    complaint?
4           MR. RAM:  Yes, your Honor.
5           THE COURT:  I mean, that related to the arrest in
6    Miami?
7           MR. RAM:  Yes, your Honor.
8           THE COURT:  All right.  Well, make it clear.
9           MR. RAM:  Yes, your Honor.
10          THE WITNESS:  Your Honor, may I just ask may I
11   just get some water.  Would it be possible.  I just have
12   a bottle of water that's on counsel table.  Would it be
13   possible for me to get some water?
14          THE COURT:  What time is it now, Paul?
15          THE CLERK:  12:30.
16          THE COURT:  What we will do is we will take 45
17   minutes for lunch and come back at 1:15.
18          (Luncheon recess from 12:28 p.m. to 1:16 p.m.)
19          THE COURT:  Let's continue.
20          MR. RAM:  Your Honor, for the record as the
21   witness is seating we just wanted to note that we joined
22   all of Mr. Littrell's prehearing requests.
23          THE COURT:  Okay.
24          MR. RAM:  Thank you.
25   Q    Mr. Fenton, before we return to the complaint, I
```

```
 1   want to just flip back to the Cellebrite discussion we

 2   had.

 3              During the time period you were reviewing the

 4   Cellebrites, roughly in February of 2021 onwards, did you

 5   compare notes, so to speak, with Agent Palmerton based on

 6   what he was reviewing on those same Cellebrites?

 7   A    It is possible, but I don't have a specific

 8   recollection.

 9   Q    Okay.  Do you have a recollection of Agent

10   Palmerton discussing anything he was finding on the phone

11   on the Cellebrites of particular interest?

12   A    I don't have a -- I don't, no.

13   Q    How about generally.  Do you remember him saying,

14   hey, I found something on the Cellebrites.  You should

15   look at this?

16   A    He may have.  I just don't have a specific

17   recollection.  At some point he did call my attention to

18   the text messages, and I do have a recollection of

19   learning about them generally at some point.  And then on

20   April 27th he actually sent them to me, and I believe

21   that that is what you showed me earlier.

22   Q    Okay.  And before April 27th, when he generally

23   called your attention to the text messages, what did he

24   say to you?

25   A    So on April 27th he didn't generally call my
```

1  attention to the text messages.  On April 27th he sent me

2  a copy of the text messages.

3  Q    Understood.  So my question was before April 27.

4  So back in February, March timeframe, did he call your

5  attention to the text messages?

6  A    I believe he may have mentioned that and mentioned

7  that they existed.  Yes.

8  Q    Okay.  Anything else you recall from that

9  conversation with Agent Palmerton?

10 A    Not anything specific, no.

11 Q    All right.  Back to the complaint.  Last question I

12 think we were on is is it fair to say that the

13 information that was orally conveyed from CBP ended up in

14 the complaint?

15 A    I believe the document speaks for itself.  Yes, I

16 believe there is a reference in that document to that

17 information.

18 Q    Okay.  And if you look at -- there is a portion of

19 the complaint that says something to the effect that

20 Palmerton had multiple discussions with CBP officers and

21 other law enforcement agents.  Do you recall that

22 paragraph or should I pull it up on the screen for you?

23 A    It would be helpful if you could show it to me.

24 Q    Of course.  If we could take a look, and this is

25 the complaint, which is docket 1, at page 17, paragraph

```
 1   41.
 2            Okay.  And this is the affidavit of Agent
 3   Palmerton; is that right?  Looking at page 15 on the
 4   screen specifically.
 5   A     Yes.  It appears to be.
 6   Q     Okay.  And I stand corrected.  Paragraph 41 is on
 7   page 15.  It says, "Based on my discussions with CBP
 8   officers and other federal law enforcement agents in
 9   Miami, Florida," and then it goes onto detail some
10   information there in paragraph 41.
11            Do you see that?
12   A     I do.
13   Q     Okay.  Did Agent Palmerton, to your knowledge,
14   reduce to writing any of his conversations that he
15   contemporaneously had with CBP officials and other law
16   enforcement agents?
17   A     No.
18   Q     Did you instruct Agent Palmerton to avoid any
19   written communications on those topics?
20   A     No.
21   Q     Did you instruct him not to memorialize what he was
22   told about the Miami phones?
23   A     No.
24   Q     Any idea why he didn't memorialize those
25   conversations?
```

```
1   A     No.

2   Q     Let's look at the search warrants.  Very quickly,

3   the search warrants have the same Miami phone-related

4   information in the affidavits as the complaint did; is

5   that generally accurate?

6   A     I don't know, and I don't believe so.  I can take a

7   look at the copy of the affidavit.

8   Q     Okay.  Just to be clear, you don't believe

9   specifically that the search warrant affidavits

10  referenced that the Miami phone has a digital photograph

11  of Iulia Zhadko's California driver's license?

12  A     That is not my testimony.

13  Q     Okay.  So let me ask it that way.  Are you aware

14  that the search warrant affidavits include a reference to

15  that information?

16  A     I believe that they do.

17  Q     Okay.  And the second category as well about the

18  Miami phones had text message exchanges that made it

19  appear that Mary Tarabelian was taking the identity of

20  Victoria Kauichko?

21  A     I don't recall, but if you show me a copy of the

22  affidavit I would be happy to take a look at it.

23  Q     If we could pull up -- well, it is in the record

24  anyway, but to be clear, your testimony is as you sit

25  here right now, you don't know whether the search warrant
```

```
 1    affidavits reference that information from Miami?

 2    A     Mr. Ram, the search warrant affidavit incorporates

 3    by reference a copy of the complaint and all the

 4    allegations set forth therein.  I don't recall what

 5    specific allegations are re-alleged, but I do recall that

 6    there is at least one with respect to the digital

 7    photograph of Mr. Zhadko's license.

 8              I think it is possible that he also references

 9    the text messagings, but I don't specifically know.  And

10    if I could see a copy of the affidavit it would refresh

11    my recollection.

12    Q     Understood.  And my question now is what you

13    remember as you sit here right now.  So the answer to

14    that question is you don't know for sure whether the

15    search warrant affidavit includes references to Mary

16    Terabelian assuming the identity of Victoria Kauichko; is

17    that right?

18    A     I believe that it does, but I would like to see a

19    copy of it to refresh my recollection for certain.

20    Q     Okay.  Let's move on to November 2020 and the Agent

21    Palmerton 65 photos.  Do you know what I am referring to

22    when I say the 65 photos?

23    A     No.

24    Q     You are not familiar with Agent Palmerton taking 65

25    photos after his review of the Miami phones?
```

1    A      I am not familiar with him doing that on

2    November 20th.

3    Q      I'm sorry, in November of 2020.

4    A      Okay.  What is the question?

5    Q      Are you familiar with Agent Palmerton taking 65

6    photos from the Miami phones, in general?

7    A      Yes.  My understanding is that he took pictures of

8    informations on those phones or of those phones.

9    Q      Specifically on November 13th of 2020, you are

10   aware Agent Palmerton reviewed the Miami phones with

11   another agent assisting him; right?

12   A      Yes.

13   Q      And he took photographs of what he thought were the

14   most relevant materials from those phones?

15        MR. CIPOLLETTI:  Objection.  Found.

16        THE COURT:  Overruled.

17        THE WITNESS:  I don't know that Agent Palmerton

18   took the photos of what he believes to be the best pieces

19   of information from that phone.  I know that he took 65

20   photos and that he thought that those photos -- my

21   understanding is that they were relevant in some respect.

22   Q      Relevant meaning useful to the investigation?

23   A      Potentially.  Potentially relevant.  Yes.

24   Q      Okay.  And the grand jury indictment was four days

25   after that, right, on November 17th?

```
 1    A      Yes.
 2    Q      Four days after Agent Palmerton takes the 65
 3    photos?
 4    A      It was on November 17th.  Yes.
 5    Q      And the photos that were taken on November 13th
 6    were immediately shared with the prosecution team;
 7    correct?
 8    A      Yes.
 9    Q      In fact, Agent Palmerton e-mailed you and the rest
10    of the prosecution team saying please take a look through
11    the photos I uploaded into USAFX; correct?
12    A      Yes.
13    Q      And what is USAFX?
14    A      It is a share file that's used by the Department of
15    Justice so that the Department of Justice can share
16    information internally and sometimes with external
17    parties as well.
18    Q      And does USAFX have the ability to log when someone
19    accesses a particular record on the system?
20    A      I do not.
21    Q      Did you inquire as part of the Kastigar hearing?
22    A      No.
23    Q      Did anybody else in the prosecution team, to your
24    knowledge, inquire into the logging and tracking
25    capabilities of USAFX?
```

```
1    A      I wouldn't know.  I didn't ask.

2    Q      You didn't ask anyone; right?

3    A      Didn't ask anyone what?

4    Q      About the tracking and logging capabilities of

5    USAFX?

6    A      No.

7    Q      Okay.  Moments after Agent Palmerton shared the 65

8    photos with the prosecution team, there was immediate

9    investigative activity that occurred in relation to those

10   photos; true?

11   A      Moments?  What time --

12   Q      On the same day.

13   A      I believe so, yes, but it was not by me.

14   Q      Correct.  Let's take a look at Exhibit 18.  If we

15   could pull it up.  Let's go to the last page of the

16   exhibit and we will work our way back to the front.

17          Let's go to page 203.

18          So Agent Palmerton sends the 65 photos to you,

19   Mr. Julian Andre, Mr. Jeffrey Clark, and Agent Tim

20   Massino, is that right, based on this record at

21   4:05 p.m.?

22   A      Yes.

23   Q      Okay.  We can scroll up.  All right.  And the same

24   day -- it looks like a little before midnight -- Tim

25   Massino writes back in response to Agent Palmerton's
```

```
 1   e-mail; correct?

 2   A      Yes.

 3   Q      All right.  We can zoom out of that.  And

 4   specifically Agent Palmerton -- I'm sorry, Agent Massino

 5   says, "I ran all the unfamiliar names and entities,

 6   Social Security numbers ad/addresses observed in the

 7   photos and identified the following additional loan

 8   applications, ten total."  Do you see that?

 9   A      Yes.

10   Q      And you understand the reference to observed in the

11   photos to be a reference to the 65 photos Agent Palmerton

12   had shared in the e-mail chain right below that?

13   A      Yes.

14   Q      And the ten different entities' names, personal

15   identifiers, that is list the here in the e-mail 1

16   through, if we can scroll down to page 2, 7; correct?

17   A      No.

18   Q      It is not listed there at 1 through 7?

19   A      No.  Not that information you just described.  That

20   is not listed.  There are ten loans that are listed here,

21   yes.

22   Q      Correct.  Okay.  All right.  And there was some

23   follow-up based on Agent Massino's e-mail as well; right?

24   A      Can you be more specific?

25   Q      Sure.  For example, after Agent Massino shared this
```

1    e-mail, you took some investigative activity as well;

2    right?

3    A      Yes.

4    Q      For one, you reviewed the 65 photos that Agent

5    Palmerton shared?

6    A      Yes.

7    Q      You then had some follow-up based on those 65

8    totals that you wanted to conduct related to the

9    investigation; correct?

10   A      Yes.

11   Q      So as a result of Agent Palmerton's sending those

12   65 photos to the prosecution team in Exhibit 18, page

13   1 -- if you could scroll up to page 1, very top.

14          That is an e-mail from you to Annamelda Paul.

15   Who is Annamelda Paul?

16   A      Annamelda Paul is the paralegal/law clerk who is a

17   member of our team.

18   Q      Is she a lawyer?

19   A      She actually is.

20   Q      Okay.

21   A      In the sense that she is -- she has gone to law

22   school.  I believe that there is a member of the bar.

23   Her position at Department of Justice is not a

24   position -- it is not a position where she is a

25   practicing lawyer.  She is not practicing law.

```
 1   Q      Understood.  And you asked on November 15th,
 2   Sunday, in the same e-mail chain from Agent Palmerton, 65
 3   photos, you ask Annamelda, "Here are new loans tied to
 4   our ring."  What are you referring to there, new loans
 5   tied to our ring?
 6   A      The Richard Ayvazyan, PPP/EIDL loan fraud ring.
 7   Q      And you identified that these loans in Agent
 8   Massino's e-mail were tied to the ring.  That is what you
 9   wrote there; right?
10   A      Yes.
11   Q      And how did you conclude they were tied to the
12   ring?
13   A      Because they were loans that were taken out in
14   names of people other than Mr. Richard Ayvazyan.
15   Q      And they were found on a phone in the possession of
16   Mr. Ayvazyan; right?
17   A      Yes.
18   Q      And you say, "Please add these two other chart."
19   Do you see that?
20   A      Yes.
21   Q      What chart are you referring to?
22   A      So for the purpose of tracking the particular
23   subjects that we were following, we maintained a chart.
24   It was used for deconfliction purposes to make sure that
25   other law enforcement agencies weren't investigating the
```

```
 1    ring at the same time that we were to avoid other law

 2    enforcement agencies stepping on our toes.

 3    Q     So is it a chart that tracks the loans that are

 4    relevant to your investigation?

 5    A     Yes.  And just to be clear, there are two charts.

 6    So this -- the chart that I just described is the chart

 7    that is used for internal purposes, for deconfliction

 8    purposes, and that is a chart that was included --

 9    versions of it were attached to my declaration, the first

10    Fenton declaration.  I believe it was Exhibit 7A and 7B.

11              There is an additional chart that we

12    maintained internally that tracked the various loans that

13    we were investigating that we initially started, and then

14    that was later maintained and updated by contractors.

15    Q     Okay.  And that is the chart that has 51 loans on

16    it?  I believe was one of your exhibits.

17    A     No.

18    Q     22, is it?

19    A     It is not Exhibit 22.

20    Q     Okay.  What is Exhibit 22 to your declaration?

21    A     So I would have to see a copy of it.  Do you have a

22    copy of it?

23    Q     And we can get there.  I just didn't know if it was

24    the same thing.

25    A     It is not.
```

```
1    Q      And then next you tell her, "Prepare subpoenas for
2    loan files to" -- and then you identify the four
3    different banks.  Do you see that?
4    A      Yes.
5    Q      And again, all of this follow-up investigative
6    activity is related to the 65 photos that Agent Palmerton
7    shared with the prosecution team?
8    A      Yes.
9    Q      And yous will say "We should try to get the
10   subpoenas out to CDCA."  That this district here; right?
11   A      Right.
12   Q      On Monday, which is the next day, November 16th.
13   A      That's correct.
14   Q      Why should we try to get those out by Monday?
15   A      Because I like to move my cases quickly.  So we
16   were pursuing leads as we got them.
17   Q      And this was an important lead to pursue in your
18   mind at the time?
19   A      No.
20   Q      It wasn't?
21   A      No.
22   Q      But you still asked for subpoenas to these banks
23   and to add this to the loan ring and to add this to the
24   other chart that you just described?
25   A      That's correct.
```

1    Q    Okay.

2    A    In my particular view, this was ancillary.  We were

3    looking to try to ascertain how big the loan fraud ring

4    was because it was our understanding that Mr. Ayvazyan,

5    Tamara Dadyan and Mary Terabelian and the other members

6    of the loan ring had taken out, you know, hundreds of

7    loans.

8    Q    What question do you think you are responding to

9    right now?

10   A    The question as to whether or not I thought that it

11   was important to pursue this.

12   Q    So your testimony under oath is you did not think

13   it was important to your investigation to follow up on

14   these loans identified by Agent Palmerton from the Miami

15   phones?

16   A    I thought that it was relevant.  You are ascribing

17   a level of significance that I would not ascribe.  I

18   thought it was relevant, and we issued these subpoenas so

19   that we could see if there were additional loans.  But

20   the purpose was not to ascertain whether they were guilty

21   or innocent of the crimes that we anticipated that we

22   would charge them with.  It was to see how big the fraud

23   ring was.

24   Q    Mr. Fenton, I asked you a simple question.  The

25   answer is -- you didn't think they were important is the

```
 1   answer?
 2   A     The answer is I am not ascribing the significance
 3   to them that I think you are trying to describe to them.
 4   Q     At the time did you ascribe any significance to
 5   them?
 6   A     Yes.
 7         THE COURT:  He said they were relevant.
 8         MR. RAM:  Okay.
 9         THE COURT:  And relevant means it had some
10   significance.  I mean, that is almost definitional.
11   Q     BY MR. RAM:  Okay.  And after you sent this
12   instruction to Annamelda, were in fact grand jury
13   subpoenas issued to the identified banks?
14   A     Yes.
15   Q     And were those subpoenaed returned to the grand
16   jury as part of this investigation?
17   A     My recollection is that they were.
18   Q     Okay.  Is it fair to say you knew that the 65
19   photos were hand picked by Agent Palmerton during his
20   review of the Miami phones?
21   A     Yes.
22   Q     And would you agree that these 65 totals advanced
23   your investigation?
24   A     In what respect?
25   Q     Moving it forward, so you helped identify issues of
```

1   interest in the investigation, additional loans, building

2   up to 151 loans, et cetera?

3   A      They provided some information.  I think that

4   largely the information that was contained in the 65

5   photos was cumulative of information that we already

6   knew.

7   Q      Cumulative again meaning you didn't believe it

8   added to the mix of information available to the

9   investigation?

10  A      Cumulative meaning that it was redundant.  We

11  already knew the substance of the information.  And this

12  information was more of the same.

13  Q      So your testimony is you already knew -- for

14  example, let's pull up Kastigar Exhibit 1, page 30.

15         MR. RAM:  Can we share with you?  Kastigar Exhibit

16  1 to our submission that was filed.

17  Q      So now the time period we are talking about is

18  November 13th, and your e-mail was on November 15th.

19  That is the time period for these questions.  And I asked

20  you if those photos added to the investigatory mix, and

21  you said they were cumulative.  It didn't add new

22  information; correct?

23  A      That's right.  I think there was an independent

24  source for that information which was listed in this

25  chart.

```
1    Q      That wasn't my question, though.  So my question is
2    prior to November 15th, had you seen this image of what
3    appears -- image 30A, so page 30 of Exhibit Kastigar
4    Exhibit 1?
5    A      Yes.
6    Q      And when had you seen this image prior to
7    November 15th?
8    A      So we had seen this driver's license in PPP loan
9    files.
10   Q      No, no.  My question is this exact image.  Let's
11   back up one step.  You understand that image -- and this
12   is from your own chart -- image 30A is one of the 65
13   photographs that Agent Palmerton took a picture of when
14   he was reviewing the Miami films; correct?
15   A      Yes.
16   Q      So you understood that is a photo of a Iulia Zhadko
17   California driver's license with a certain photo, like a
18   picture of it?
19   A      Right.
20   Q      This is actually a picture of the Miami phone that
21   Agent Palmerton took, yes?
22   A      Yes.
23   Q      And you understand that this phone and hence the
24   image on it was in Richard Ayvazyan's possession in the
25   Miami airport, yes?
```

1   A      Yes.

2   Q      Now, if we scroll ahead two pages, to page 32,

3   image 32A -- we want 32A.  Okay.  So image 32A is another

4   California driver's license for Iulia Zhadko, but this

5   time with a different picture with it; right?

6   A      Yes.

7   Q      Okay.  And again you received this image as one of

8   the 65 photos from Agent Palmerton?

9   A      Yes.

10  Q      So is this the first time that you saw two

11  different driver's licenses for Iulia Zhadko on a phone

12  that was in the possession of Richard Ayvazyan?

13  A      Yes.

14  Q      Would you agree with me as a prosecutor that has

15  significant value to your investigation in terms of

16  identifying potential fraudulent use of these driver's

17  licenses and the person who is controlling them?

18  A      I think it is no doubt relevant.  I think we looked

19  to it relative to the other information.  And we already

20  knew that Mr. Ayvazian was controlling this identity.  So

21  this was cumulative of evidence that we already had, but

22  it is no doubt relevant information for sure.

23  Q      You thought it was a particularly important fact;

24  right?

25  A      Yes.  I think that this is important evidence, but

```
 1    it is cumulative of other better evidence that we had.

 2    Q    Okay.  Your testimony is you already had -- well,

 3    you are not testifying that you already had this phone

 4    with the driver's licenses on it?

 5    A    No.  Right.

 6    Q    This is the first time you were seeing that;

 7    correct?

 8    A    Yes.

 9    Q    Okay.  Now, let's go to page 37.  Kastigar Exhibit

10    37.  Okay.  And here, again, this is one of the 65 photos

11    taken by Agent Palmerton.  It concerns a Olaf Landsgaard

12    and his obituary; correct?

13    A    Yes.

14    Q    And this would be evidence that whoever possessed

15    this phone and took this photo knows that Olaf Landsgaard

16    is deceased?

17    A    Yes.

18    Q    And at this time, when you are reviewing this on

19    November 13th or the 15th of November, were you aware

20    that Richard Ayvazyan or anyone who possessed this phone

21    had information that Olaf Landsgaard, was dead?

22    A    I'm sorry.  Can you repeat the question?

23    Q    Yes.  So prior to seeing this photo, were you able

24    to attribute knowledge to the possessor of this phone,

25    Richard Ayvazyan, based on your evidence that he knew
```

```
1    that Olaf Landsgaard was dead?
2    A    I understand that question less than the first
3    question.
4    Q    So one of the things that you would have to prove
5    to show fraud is that in your case you proved that
6    this -- this was an attorney that had died, but that was
7    how purported to be connected to closing for mortgages,
8    right, for real estate deals, Olaf Landsgaard?
9    A    That is not how I would put it, no.
10   Q    How would you put it?
11   A    So defendant Richard Ayvazyan was using the name
12   Olaf Landsgaard in real estate transactions, and Olaf
13   Landsgaard was not his name.  It was somebody else's
14   name.
15   Q    Correct.  And this image is evidence that Richard
16   Ayvazyan, under your theory, knows Olaf Landsgaard is
17   dead?
18   A    Yes.
19   Q    Did you have any proof prior to this November 15th
20   date or 13th date when you reviewed this image that
21   Richard Ayvazyan knew that Olaf Landsgaard was dead?
22   A    No.  But I knew that Richard Ayvazyan knew that
23   Olaf Landsgaard was not his name.
24        THE COURT:  Don't say, but just answer the
25   question.  You didn't know?
```

```
 1              THE WITNESS:  No.
 2    Q    BY MR. RAM:  Great.  Let's look at page 40 now, at
 3    image 39A.  Okay.  Prior to your review of these 65
 4    photos on November 13th, did you know that Richard
 5    Ayvazyan possessed on image of the Social Security
 6    card -- a Social Security card for Iulia Zhadko?
 7    A    No.
 8    Q    Okay.  Let's go to image 50.  I'm sorry, 49A on
 9    page 50.  This appears to be some account information
10    relating to Kauichko, Victoria Kauichko; is that right?
11    A    That is what it appears -- yes that is what it
12    appears to be.
13    Q    Is it fair to say prior to your review of these 65
14    photos on November 13th or 15th you were not aware that
15    Richard Ayvazyan possessed this document with handwritten
16    notes relating to accounts regarding Victoria Kauichko?
17    A    That's correct.
18    Q    All right.  Now let's look at page 61, image 57A.
19    This is a Social Security card for a Camilo Amaya.  Do
20    you see that?
21    A    Yes.
22    Q    You actually didn't know anything about Camilo
23    Amaya?
24    A    That's correct.
25    Q    More generally speaking, the images that we just
```

```
 1   covered in the 65 phones is it fair to say that part of
 2   their significance to your investigation is that it
 3   connects a loan to the specific conspiracy or scheme that
 4   you were investigating?
 5   A      Yes.
 6   Q      Now, let's look at -- let's go to the grand jury.
 7   On Tuesday, November 17th, correct, in when you -- were
 8   you in the grand jury presenting?
 9   A      No.
10   Q      Who was presenting to the grand jury on Tuesday,
11   November 17th?
12   A      AUSA Julian Andre.
13   Q      Was there any other AUSA with him?
14   A      No.  Not to my knowledge.
15   Q      And who was the agent in the grand jury?
16   A      Special Agent Justin Palmerton.
17   Q      Were there any other agents that testified to the
18   grand jury?
19   A      No.
20   Q      And who prepared the prosecution memo, or you might
21   call it indictment memo, related to the indictment that
22   took place on November 17th?
23   A      It was prepared by myself and AUSA Julian Andre.
24   Q      Who reviewed that prosecution memo?
25   A      For what purpose?
```

1    Q      As part of your supervisory chain, or frankly

2    anybody who came into contact with the prosecution memos

3    is the question.  But the most immediate question would

4    be who reviewed it to approve it?

5    A      Can you just ask me the specific question you would

6    like me to answer.

7    Q      Sure.  Start with the general.  Who reviewed the

8    prosecution memo, to your knowledge?

9    A      So the only people that I can speak to are the

10   people from Department of Justice Criminal Division Fraud

11   Section.  Ryan Kidd, who was the chief of my unit, the

12   market integrity and major fraud unit at the Fraud

13   Section.  Henry Van Dyke, who was the principal deputy

14   chief.  Rush Atkinson, who was an assistant chief.  His

15   real first name is Lawrence.  William Johnson, who is an

16   assistant chief in my unit.

17   Q      Anyone else?

18   A      I circulated it to other assistant chiefs,

19   including, I believe, Mark Cipolletti, Anna Kaminska,

20   Kaitlin Cunningham.  And I think that that is it, though

21   it is possible that there was another person included on

22   that distribution.

23   Q      Okay.  And is it fair to say your prosecution memo

24   for at least the original indictment included references

25   to information found on the Miami phones?

```
1    A     I believe that it includes some references, yes.

2    Q     Okay.  And specifically one that there was a

3    digital photograph of a fake Iulia Zhadko license; right?

4    That is one of the things?

5    A     I believe so, yes.

6    Q     And that there were Victoria Kauichko text messages

7    on one of the Miami phones that appeared that Mary

8    Terabelian was assuming the identity of Victoria

9    Kauichko?

10   A     Yes.

11   Q     Okay.  So you would agree that that information was

12   important enough to share with your supervisors?

13   A     Yes.  To represent a complete picture of the

14   evidence.

15   Q     And part of that complete picture was information

16   from the Miami phones; correct?

17   A     Part of that complete picture was the information

18   you just described.

19   Q     And that is information from the Miami phones; yes?

20   A     Yes.

21   Q     All right.  You say in your declaration that you

22   didn't have access to the seized phones when drafting the

23   indictment.  Do you remember that?

24   A     Yes.

25   Q     But Agent Palmerton had already told you that the
```

```
 1   seized phones had some of that same categories of
 2   information that we talked about, the three categories;
 3   the fake Zhadko driver's license image, the Terabelian
 4   phone text messages and other people's licenses and
 5   credit cards; correct?
 6   A     Those three specific pieces of information, yes.
 7   They were conveyed to us on October 20th after midnight.
 8   Q     And you discussed those pieces of evidence with
 9   Agent Palmerton, didn't you?
10   A     He conveyed them to us.
11   Q     Were you speaking when he was conveying information
12   to you?
13   A     I was listening.
14   Q     Okay.  And that information was in your head
15   basically when you were preparing the indictment memo; is
16   that fair to say?  You knew that at the time?
17   A     I would say I knew it, yes.
18   Q     Okay.  Would you agree that you had been exposed to
19   information from the Miami phones even by October 20th,
20   then?
21   A     What do you mean by exposed?  I knew the three
22   pieces of information that you just said.
23   Q     Right.  And that was information from Miami phones;
24   yes?
25   A     Yes.
```

```
1    Q     All right.  And you received the tainted 65 notes
2    from Palmerton's review on -- roughly four days before
3    the grand jury presentation, I believe; right?
4    A     We did not believe them to be tainted, but we
5    received the 65 photos that we just discussed on
6    November 13th.
7    Q     And you spent the weekend reviewing those photos?
8    A     No.
9    Q     You didn't review those photos over the weekend?
10   A     No, I did.  But I did in the spend the entire
11   weekend reviewing the photos.
12   Q     How long did it take to you review the photos?
13   A     20 minutes.
14   Q     The 65 photos in 20 minutes?
15   A     Yes.
16   Q     Did you take notes about your review?
17   A     No.
18   Q     Did you memorialize your review in any way?
19   A     No.  And it is about 20 minutes.  I don't remember
20   the exact period of time.  I flipped through the photos,
21   I looked at them and then I moved on with the rest of my
22   week end.
23   Q     Do you remember any of the photos standing out to
24   you in particular?
25   A     I do remember seeing the California driver's
```

```
 1   license, the fake driver's license of Iulia Zhadko.  I
 2   remember seeing -- well, the two different versions.
 3   Those stood out.  The other photos, I don't have any
 4   specific recollection of them standing out, but I do
 5   recall reviewing all 65.
 6   Q    And you mentioned you and Mr. Andre prepared for
 7   the grand jury?
 8   A    I did not mention that, no.
 9   Q    Okay.  Let me ask it.  Did you and Mr. Andre
10   prepare for the grand jury presentation together?
11   A    No.  So Mr. Andre --
12        THE COURT:  The answer is no; right?  You started
13   to say no, then you said yes.
14        THE WITNESS:  I'm sorry, your Honor.  I am trying
15   to be specific.  We discussed it, but he prepared it.  He
16   prepared the presentation and he gave the presentation.
17   Q    BY MR. RAM:  Okay.  And when you discussed it, did
18   you discuss a script that Mr. Andrew would use before the
19   grand jury?
20   A    I don't have a recollection of discussing or
21   reviewing a script.  Though it is possible that we did.
22   Q    And both you and Mr. Andrew had reviewed these 65
23   photos in connection with any script that would have been
24   prepared by Mr. Andre; is that fair to say?
25   A    I don't know that that is fair to say, no.  I don't
```

```
 1    know that it was in connection with, no.

 2    Q      At the same time?

 3    A      No.  I don't know when Mr. Andrew prepared his

 4    script.

 5    Q      I see.

 6    A      Because he prepared it.

 7    Q      So he didn't share it with you, I guess is a better

 8    question.  Did he share the grand jury script with you?

 9    A      I don't have a recollection of him sharing the

10    script with me, and I don't have a recollection of him

11    discussing it with me in detail.  Agent Andre is an

12    experienced --

13         THE COURT:  Cut it.  Next question.

14    Q    BY MR. RAM:  The next question.  In paragraph 12 of

15    your declaration state something to the effect you --

16    even without the digital photograph or the Kauichko text

17    messages that were conveyed to you from the Miami phones,

18    you still would have charged the defendants with the same

19    crimes at the same time essentially.  Is that an accurate

20    statement?

21    A      Yes.

22    Q      And you are familiar with the justice manual

23    general requirement for prosecutors, that an attorney for

24    the government should commence or recommend federal

25    prosecution if he or she believes that the person's
```

```
 1    conduct constitutes a federal offense and that the
 2    admissible evidence will probably be sufficient to obtain
 3    conviction.  You are familiar with that general
 4    requirement, yes?  Or not.  Yes or no?
 5    A      I don't know what you are quoting from.
 6    Q      Okay.  You are aware that generally that --
 7           THE COURT:  What is the point of all this?  It
 8    seems so far afield.  Of course a prosecutor regardless
 9    of what is in a manual or not has to be assured that
10    there is a basis for conviction before indicting someone.
11           MR. RAM:  And the question is going to be that --
12           THE COURT:  So why get into all this unnecessary
13    gibberish?  Get to your point.
14           MR. RAM:  Yes, your Honor.
15    Q      When you filed the -- when you were preparing the
16    indictment, you believed you would be able to use the
17    phone seized in Miami as evidence in your case; yes?
18    A      No.
19    Q      You did not believe you would be able to use the
20    evidence on the phone seized in Miami?
21    A      We did not know.
22    Q      Okay.  Did you think it was more likely than not
23    you would be able to use the evidence?
24    A      We didn't know.
25    Q      Did you assume it would be suppressed?
```

```
 1  A      No.  So we -- your Honor, if I may.

 2         THE COURT:  All right.  Briefly.

 3         THE WITNESS:  We understood that you were going to

 4  make a motion to suppress.  And we believed that that

 5  motion would be made under the Fourth Amendment and

 6  Miranda.  We took note of that litigation risk and we

 7  acted accordingly, but we did not count on using that

 8  evidence at trial.

 9  Q      Are you aware that the motion that was ultimately

10  made specifically referenced Kastigar and cited to it?

11  A      It is my understanding it did not.

12  Q      So you are not --

13         THE COURT:  Are you referring to the motion to

14  suppress?

15         MR. RAM:  Yes, your Honor.

16         THE COURT:  All right.

17         MR. RAM:  We can move on.  That was just in

18  response to the last answer.

19         THE WITNESS:  My recollection is it did not.  I

20  think there was a case cite in the reply brief but that

21  the basis -- my understanding was that the basis of that

22  motion was the Fourth Amendment and Miranda, and not

23  Kastigar.

24  Q      BY MR. RAM:  Lets get back to the focus on the

25  indictment.  Is it fair to say you believed you would be
```

```
 1    able to use the digital devices you obtained from the

 2    November 5th search warrants when you indicted the case?

 3    A     Yes.

 4    Q     Okay.  And but ultimately the phones from Miami

 5    were suppressed and you were only able to use a fraction

 6    of the 49 digital devices or so seized from the

 7    November 5 search warrants; is that true?

 8    A     No.

 9    Q     What is not true about that statement?

10    A     I was able to use all 49 if I chose to.

11    Q     Well, they weren't ready in time for trial, were

12    they?

13    A     The ones that I chose could have been.  We made

14    decisions about which ones to use.  I could have chosen

15    any number of them.

16    Q     So your testimony under oath --

17          THE COURT:  Why do you keep saying under oath.  Is

18    he not under oath now?

19          MR. RAM:  It is a fair point.

20          THE COURT:  What is the point?  I mean, is that

21    implying that he is not telling the truth?  Maybe that's

22    the point, but I know he is under oath.  Everybody in

23    this courtroom knows he is under oath.

24          MR. RAM:  Understood.

25    Q     There was over 50 digital devices seized in the
```

 1  November search warrants; correct?

 2  A      Yes.

 3  Q      And as of May of 2021, or the month before trial,

 4  only -- not including the Miami phones, only four digital

 5  devices were filtered, reviewed and presented to you for

 6  use as trial evidence out of the 50 plus devices;

 7  correct?

 8  A      Can you repeat that question.

 9  Q      Sure.

10         THE COURT:  Why can't you understand the question?

11  He says there were 50 phones.

12         MR. RAM:  You got it, your Honor.  That's all that

13  matters.  I can move on.

14         THE COURT:  Well, no, let's not move on.  You said

15  there were 50 phones seized.

16         MR. RAM:  Correct.  So there were over 50

17  phones -- let's break it up.

18         THE COURT:  Not just phones from the Miami search

19  but from everything.

20         MR. RAM:  Correct, so independent of the Miami

21  search.

22         THE COURT:  So why are you bringing up the 50

23  phones?

24         MR. RAM:  Just in response to his last answer that

25  he could have had all the digital devices ready for trial

```
 1   in June.
 2        THE COURT:  But I am understanding that that
 3   couldn't be because they had to make decisions as to
 4   which phones they would filter and which they wouldn't,
 5   and they didn't have enough time to do all 50.
 6        MR. RAM:  Correct.  And that was my question.
 7        THE COURT:  So what is the point?
 8   Q    BY MR. RAM:  They didn't have enough time; correct?
 9        THE WITNESS:  Your Honor, the point is that there
10   weren't 50 phones.  And so that is why I'm trying to
11   track what Mr. Ram was asking.  There weren't 50 phones.
12   Q    BY MR. RAM:  Digital devices.
13   A    And that is a significant different.  So over 50
14   digital devices, yes.  And the point that I was making
15   was we had to make decisions about which ones we wanted
16   to pursue before trial.  We had the option to pursue any
17   of those 50.  I could have made that decision to choose
18   only one.
19        THE COURT:  I understand.
20        THE WITNESS:  That is my point.
21        THE COURT:  All right.
22   Q    BY MR. RAM:  Okay.  Your investigation continued
23   even postexposure to the Miami phones; true?
24   A    Yes.
25   Q    And you didn't limit the investigating team, so any
```

```
 1   of the agents or even the other prosecutors, from

 2   investigating after the exposure to the Miami phones?

 3   A      I don't understand the question.

 4          THE COURT:  Make your questions more clear.  Are

 5   you saying there was no instruction to the agents in the

 6   course of their investigation to not follow leads from

 7   Miami phones?

 8          MR. RAM:  Correct, or at all.  There were no

 9   restrictions on the investigation related to Miami

10   phones.

11          THE COURT:  That is not what my question is.  He

12   may have made an instruction or not, I don't know.  What

13   is the answer?

14          THE WITNESS:  I did not direct the agents to not

15   pursue leads from the Miami phones.

16          THE COURT:  All right.  That is the answer.

17          MR. RAM:  Okay.

18   Q      And independent of the Miami phones, at least

19   not -- well, let me strike that question.  Let's take a

20   look at docket 278-9.  Page 9.  So 278-9.

21          And for the record this is the government's

22   opposition to a motion to dismiss or enforce the

23   discovery deadline.

24          Did I write this opposition, Mr. Fenton?

25   A      Yes, I did.
```

```
 1   Q    Okay.  And on page 9 -- I am just going to read it
 2   as we get there -- you write, "The government continued
 3   its investigation."  Do you see that sentence?
 4   A    I do not.  Can you direct me to it?
 5   Q    It is 9 of the PDF?
 6   A    I see page 9.
 7   Q    I'm sorry, it's 9 of the access, so it's not
 8   actually page 9, I think.
 9        Okay.  Well, I am going to read it to you and
10   tell me if this sounds familiar.  It is something you
11   wrote?
12   A    Sir, if you could just direct me to the line.  So,
13   okay, PDF page 9, which line?
14   Q    Page 4.
15   A    Okay.
16   Q    Line 4, I'm sorry, on page 9.
17   A    Line 4.  Yes.  "The government continues its
18   investigation into the pandemic fraud ring, which proved
19   to be massive."
20   Q    "The government identified hundreds of additional
21   fraudulent loans and new members potentially associated
22   with the ring.  The government also learned that while on
23   release -- pretrial release defendant violated his
24   conditions and committed new crimes.  The government
25   continued its investigation even as grand juries were
```

```
 1   suspended in this district."
 2   A     Yes.
 3   Q     And this was a filing you made on April 12th
 4   describing the first superseding indictment which
 5   occurred on March 9th; is that right?
 6   A     It describes the investigation that preceded the
 7   first superseding indictment.
 8   Q     Okay.  And why don't we take a look at docket 307,
 9   page 14.  Okay.  And in fact we don't need to read it
10   again.  Fine.  Let's go to the next topic.
11             How many subpoenas did the government issue
12   after October 19th, 2020?
13   A     I don't know.  Hundreds.
14   Q     Okay.  And those subpoenas were issued to witnesses
15   and financial institutions and others.  Yes?
16   A     Yes.
17   Q     Okay.  Part of the subpoenas were to identity
18   evidence for trial?
19   A     Yes.
20   Q     Do you know -- could you put a number on exactly
21   how many subpoenas were issued after October 19th, 2020?
22   A     I could.
23   Q     How would you do that?
24   A     If I were to have the subpoena log, I would be able
25   to look at it and basically count them up.
```

```
1    Q      And where is the subpoena log?

2    A      Exhibit 2.  It was submitted in camera to the

3    Court.

4    Q      Okay.  So the defense doesn't have that subpoena

5    log?

6    A      It was submitted in camera to the court.

7    Q      And it wasn't otherwise produced in discovery.

8    A      No.  We did not produce the subpoena log to the

9    defendants.

10   Q      Are you willing to produce the subpoena log now to

11   the defendants?

12   A      It is secret grand jury material.

13   Q      With a court order would you be willing to produce

14   it?

15   A      I will always comply with a court order.

16   Q      Would you support a court order to produce that

17   information to the defense?

18   A      No because it is secret grand jury material.

19   Q      Okay.  How many witnesses did you interview after

20   October 19th, 2020?

21   A      I believe earlier I testified that I do not recall.

22   Q      Has your investigation concluded as to Mr. Ayvazian

23   and Mary Terabelian?

24   A      I would say yes.

25   Q      Your investigation has concluded as to them, but
```

```
 1    you wouldn't be willing to share grand jury information
 2    related to their case?
 3    A     The investigation is ongoing with respect to other
 4    individuals.
 5    Q     Have you shared grand jury information as part of
 6    an investigation with the court authorization before?
 7          MR. CIPOLLETTI:  Objection, your Honor, to the
 8    relevance of this.
 9          MR. RAM:  I will move on.
10    Q     My last question is how many people did you
11    interview after October 19th.  Did you have a ballpark
12    for that number?
13    A     I don't.  I think that we can figure it out if we
14    looked at the MOI's that we produced.
15          THE COURT:  What is MOI?
16          THE WITNESS:  Memorandum of interviews or 302
17    reports.  All of that information has been produced to
18    the defense.
19    Q     BY MR. RAM:  And you produced it; right?
20    A     My team.  The government, yes.
21    Q     Do you have a sense of how many interviews took
22    place over the course of the case, ballpark?
23          THE COURT:  If you received all those 302's or
24    MOI's, as he called them, why can't you count them up?
25          MR. RAM:  Well, that is part of the problem, your
```

```
 1    Honor.  I don't think we've received all the interview
 2    summaries in this case.  There's interviews and
 3    conversations that have taken place that either aren't
 4    memorialized or weren't shared with the defense.
 5         THE COURT:  I don't know that to be the case.  I
 6    mean, the 302's produced were for witnesses testifying at
 7    trial or any person interviewed.
 8         THE WITNESS:  Yes, your Honor.  The government
 9    produced all the 302's and MOI's.
10         THE COURT:  Does that mean for the witnesses who
11    testified at the trial, or were there 302's and MOI's
12    that were produced or made that were for witnesses who
13    weren't called at trial?
14         THE WITNESS:  We produced everything.
15         THE COURT:  In other words, all the 302's for
16    anyone who was interviewed?
17         THE WITNESS:  Yes.  In connection with this case,
18    yes.
19         THE COURT:  When you say in connection with this
20    case, what is the qualifying word?
21         THE WITNESS:  We produced all of the interview
22    reports for this case to the defendants.
23         THE COURT:  Well, why did you say in this case?
24    What other case is there?
25         THE WITNESS:  I'm sorry.  I am saying we produced
```

```
 1   everything.  We produced everything to the defendants.
 2         THE COURT:  So every interview that was conducted
 3   by the government was produced to the defendant?
 4         THE WITNESS:  Yes.
 5         THE COURT:  And do you know of any interviews that
 6   were conducted for which there wasn't a 302 or
 7   memorandum?
 8         THE WITNESS:  No.
 9   Q    BY MR. RAM:  In fact you do.  There is one cited in
10   the declaration of Mr. Faerstein, isn't there?
11   A    No, sir, I don't believe that there is.
12   Q    There isn't a writeup.  Your Honor just asked you
13   are you aware of any interview or discussion with the
14   witness that was not memorialized.  And you said, no, you
15   are not.  But in fact you are.
16         Do you want to go through an example?
17   A    Mr. Ram, I do not know what you are talking about.
18   Q    Do you know who owns Piccadilly Jewelers?
19   A    I do.
20   Q    What is his name?
21   A    I don't know his name.  I think he is referred to
22   as B-E-R-J, Berj?
23   Q    Berj?
24   A    Yes.
25   Q    You had a conversation with Mr. Berj, with frankly
```

```
 1   Mr.  Faerstein participating on the line, and you

 2   specifically were seeking enforcement of one of your

 3   grand jury subpoenas.  Do you remember that conversation?

 4   A     That conversation never took place.

 5   Q     So you are saying Mr.  Faerstein was lying about it

 6   in his declaration?

 7   A     Mr. Faerstein was -- Mr. Berj was represented by

 8   James Spertas.  He was represented by counsel.  My

 9   understanding was that Mr. Ayvazian was paying for

10   Mr. Spertas to represent Berj.  We asked if Mr. Spertas

11   would make Berj available for an interview.  And I was

12   told by Mr. Spertas that he would if we were willing to

13   grant Mr. Berj immunity, which we were not willing to do.

14            I have never spoken to Berj directly.  I have

15   only spoken to his counsel, who I understand Mr. Richard

16   Ayvazyan paid for.

17   Q     And that is relevant to what?

18   A     I'm sorry, sir?

19   Q     You said that Mr. Ayvazian paid for counsel,

20   Mr. Spertas.  What is that relevant to?

21   A     I am just answering your question.

22   Q     So your testimony is you never had a conversation

23   with Mr. Berj?

24        THE COURT:  He said that.  Why do you keep getting

25   back to it?
```

1    Q    BY MR. RAM:  Did you have a conversation with his

2    attorney where you specifically highlighted evidence from

3    the Miami phones and said text messages exist?  You

4    haven't produced them, you are not in compliance.  We are

5    going to call you to testify at trial?

6    A    No.

7    Q    That conversation never happened is your testimony?

8    A    Your characterization of the conversation never

9    happened.  So the conversation that I had with

10   Mr. Spertas as I asked him whether or not his --

11   Q    When was that?  Which conversation are you

12   referring to?  There were many; right?  Did you only have

13   up with conversation with Mr. Spertas?

14   A    I am trying to answer your question.  You're not

15   giving me the opportunity to answer.

16   Q    I apologize.  I'm just clarifying for the record.

17   Which timeframe or conversation are you referring to?

18   A    I don't recall specifically when we had this

19   conversation.  So Mr. Spertas produced information on

20   behalf of his client.  I had a telephone call with him

21   following up, asking him if there was any additional

22   information.  He said that there was not.  I asked him if

23   there were any text messages.

24        He said that he did not believe that there

25   were.  I told him that I found that difficult to believe

1   because they were transacting business, you know, during

2   the pandemic and I thought that they would have had

3   communications as well.

4        THE COURT:  Let's get back to the thrust of the

5   initial question.  The point was that the witness,

6   according to the question, did not memorialize all the

7   interviews, and now you are bringing up the subject of

8   whether he memorialized this conversation he is

9   discussing with this lawyer Spertas.

10       And if your question is did he memorialize

11   that.  I will ask that.  Did you or not?

12       THE WITNESS:  No.

13       THE COURT:  So that is the record.  Okay?

14   Q   BY MR. RAM:  And that is just one example.  There

15   were additional conversations like that that were never

16   memorialized; correct?

17       THE COURT:  Conversations with counsel, with other

18   lawyers?

19       MR. RAM:  Excuse me?

20       THE COURT:  With other lawyers?

21       MR. RAM:  Sure.  With other lawyers, witnesses.

22       THE COURT:  Well, there are differences.  If the

23   prosecutor, in my mind, is talking to a lawyer the

24   conversation would not necessarily be memorialized, but

25   if there is discussion with a witness, in most instances

1   it would be memorialized unless it was for something not

2   significant.  So you can't lump them together.

3   Q    BY MR. KIM:  Let's break that down.  So with

4   respect to John Bradford, have you ever spoken to

5   Mr. Bradford?

6   A    No.

7   Q    You spoke to his attorney, though; right?

8   A    Yes.

9   Q    And you spoke to his attorney about potentially Mr.

10  Bradford being a trial witness?

11  A    Yes.

12  Q    Did you memorialize your conversation?

13       THE COURT:  Is this the same thing as this Berz?

14       MR. RAM:  No.  Completely different, your Honor.

15       THE COURT:  Okay.  Then get to it.

16  Q    BY MR. RAM:  Who is Mr. Bradford?  John Bradford.

17  A    Who is John Bradford?

18  Q    Correct.

19  A    My understanding is that John Bradford is an

20  associate of defendant Richard Ayvazyan who owns a

21  company named CBD COM, LLC.

22  Q    And when you spoke to his attorney, was that

23  conversation memorialized in any way?

24  A    No.

25  Q    And the purpose of his call was to seek his

```
 1    presence at a trial witness, true?

 2    A     No.  The purpose of the call was to discuss the

 3    document production --

 4          THE COURT:  I am finding this not to be terribly

 5    helpful.

 6          MR. RAM:  Let me move on, then, your Honor.

 7          THE COURT:  So what is at stake here?  So get on

 8    to something that will may help me further.

 9          MR. RAM:  Yes.  Thank you, your Honor.

10    Q     As the investigation continued into December of

11    2020, both agents and prosecutors continued to use

12    information from the Miami phones; is that true?

13    A     I don't know what you are referring to.

14    Q     You are familiar with the Miami phones, yes?  What

15    I am referring to when you say the Miami phones?

16    A     I am.

17    Q     So the question was -- we were talking about

18    November.  So now moving into December, did agents and

19    prosecutors continue to use information from the Miami

20    phones?

21    A     I can only speak to myself -- I can only speak for

22    myself.  I do not have a recollection of using that

23    information in December.

24    Q     Okay.  Let's take a look at Exhibit 20 to your

25    original declaration.  Let's go one more page.  It is a
```

```
 1   two-page e-mail.  Start with the last page and work our
 2   way forward.
 3            This is an e-mail from Tim Massino, right, to
 4   you -- we'll go back to page 1.  Pause there.
 5            Go down a little bit.
 6            It is an e-mail from Tim Massino to Mr. Andre,
 7   you and Agent Palmerton and IRS Agent Anton Chu and Jeff
 8   Clark; is that right?
 9   A     Yes.
10   Q     These are all people part of the prosecution team,
11   yes?
12   A     Yes.
13        THE COURT:  You are wasting time.  Why did you --
14   I don't want to harp on this but, you know, this is not
15   the second trial.
16        MR. RAM:  That's right, your Honor.
17        THE COURT:  This is supposed to be an evidentiary
18   hearing to probe a specific questions.  And at this pace
19   it will be a second trial.  You are asking him whether
20   his colleagues were part of the prosecution team.  That
21   is wasteful.
22        MR. RAM:  I apologize, your Honor.  Let me get to
23   the point.
24   Q     So this is another example in this e-mail of
25   December 3rd, 2020, of the prosecution team using
```

1    information from the Miami phones; yes?

2    A     No.  This is a continuation of the e-mail exchange

3    from November 13th.  So what had happened was

4    Mr. Massino --

5         THE COURT:  Answer -- let him ask more questions,

6    and then if it becomes necessary to provide an

7    explanation, you can do that.

8    Q     BY MR. RAM:  So just looking at the screen, this is

9    nine loan files that Agent Massino uploaded and shared

10   with the prosecution; yes?

11        THE COURT:  Is there a date on this?

12   Q     BY MR RAM:  December 3rd, 2020; correct?

13        THE COURT:  Okay.  So what is the question?

14   Q     BY MR. RAM:  And you understand that these nine

15   loans were derived from the Miami phones; correct?

16   A     No.

17   Q     That is not your understanding?

18   A     The nine loans were not all derived from Miami

19   phones.

20   Q     No.  This information here that Agent Massino is

21   sharing from the prosecution team.  You don't understand

22   that --

23        THE COURT:  The information here.  What does that

24   mean?

25        MR. RAM:  Let me block it out to you.

1   Q      I received -- on the screen, I received and

2   uploaded the files for the following EIDL's.

3   A      Yes.

4   Q      That is a type of loan; right?

5          THE COURT:  We know that.

6          MR. RAM:  Yes.

7   Q      So he is sharing these nine loan files; correct?

8   A      He is saying I have obtained a copy of these nine

9   EIDL loan filings, yes.

10  Q      Okay.  And if you look at page 2, he says, "These

11  entities' loans were identified based on my review of the

12  phone photos."  Do you see that?

13  A      I do.

14  Q      Okay.  And he says that Justin had uploaded on

15  November 13th, 2020?

16  A      Yes.

17  Q      Those were the Miami -- the Miami 65 photos;

18  correct?

19  A      I mean, that is not -- yes, there were 65 photos

20  that Special Agent Palmerton took from the Miami phones.

21  Q      Correct.  So he is saying they were identified

22  based on those 65 photos?

23          THE COURT:  Let me ask it this way.  You intend to

24  call Massino; correct?

25          MR. RAM:  Yes, we are calling Massino.

THE COURT: Why don't you ask him those questions? You are arguing your case through this witness, and that is not helpful to me because I have all the pleadings and the exhibits, and that is what --

MR. RAM: Understood, your Honor.

THE COURT: Now, if you are asking him to show me that he is not credible because of this document -- is that your point?

MR. RAM: It is part of it. He is having a hard time admitting this was derived from the 65 photos, so I do want you to see that, your Honor.

THE WITNESS: Your Honor, can I just explain?

THE COURT: Yes.

THE WITNESS: I am having difficulty with Mr. Ram's questions because of the way they are phrased. The nine loans -- and I can't move this document, but these nine loans were not derived from the Miami phones.

Seven of the loans were. Two of the loans -- and I can tell you which ones they are. Well, actually six were, but not all nine.

THE COURT: You are saying that some of them were derived, some of them weren't?

THE WITNESS: Right. And Mr. Ram is grouping them together and saying they were all derived from the phones. And I'm saying only six were and three were not.

```
 1            THE COURT:  All right.  I have that answer.  Let's
 2    move on.
 3            MR. RAM:  Thank you for that clarification.
 4    Q    So let's go back up to the top of the page and just
 5    focus on the --
 6    A    The difficulty, your Honor, is I'm not -- I can't
 7    clarify --
 8            THE COURT:  I am not interested in the difficulty.
 9    Q    BY MR. RAM:  Thank you, Mr. Fenton.  So now I am
10    looking at the top e-mail on Exhibit 20.  This is a
11    Friday, December 4th e-mail from Mr. Andre to you.  There
12    are no other agents on this e-mail; correct?
13    A    There are no agents on this e-mail.
14    Q    Correct.  All right.  So I want to focus in on two
15    pieces of this.  Mr. Andre reviewed New World Trading,
16    Long Canyon Nursery, Lilia Turkan, Camille Amaya, Amara
17    and Annandale Nursery, and as a result of this he said,
18    quote, "We definitely need to subpoena all of the
19    relevant bank records for these ASAP."
20            Did the prosecution team end up subpoenaing
21    bank records based on this information?
22    A    Yes, I believe so.
23    Q    And then next, in bullet two Mr. Andre says, "We
24    should contact and interview the actual owner."  And he
25    is referring to Long Canyon Nursery.  You assigned that
```

```
 1   to Massino and then that interview took place?
 2   A     I'm sorry, are you asking if I assigned that to
 3   Special Agent Massino?
 4   Q     No, no.  Based on your role in the prosecution
 5   team, are you aware if that interview happened?
 6   A     Yes.  My understanding is Mr. Kelly reported fraud
 7   and we followed up on it.
 8   Q     And then lastly in bullet three, and I want to
 9   focus on this, Mr. Andre says, "We should look into Lilia
10   Turkan soon.  Her information was found in multiple
11   locations and RA had a photo of an ID in her name."  Do
12   you see that?
13   A     I do.
14   Q     So Turkan, if we could pull up Kastigar Exhibit 1,
15   page 62, we have seen her ID today, I believe.  That's
16   image 68A.  Actually, to save time I will just tell you
17   that's her Social Security card that was on one of the 65
18   totals that Agent Palmerton took.
19         Do you remember that -- I will just pull it
20   up.  Lilia Turkan.  There you go.
21         You have reviewed this image before, yes?
22   A     Yes.
23   Q     Okay.  And you list as an independent source in
24   your chart here the EIDL application discovered at
25   Weddington Street and a November 5th request for
```

1   information.  Do you see that?

2   A     Yes.

3   Q     Okay.  But let's go back to bullet three in the

4   e-mail, which is Exhibit 20.  Exhibit 20 from Fenton's

5   declaration.

6            But Mr. Andre is suggesting additional

7   investigation here.  He is suggesting the additional

8   investigation based in part on taking information from

9   one of the Miami phones, yes?

10       MR. CIPOLLETTI:  I am objecting to what Mr. Andre

11  was suggesting.  He is available as a witness.

12       THE COURT:  Well, I mean, are you asking the

13  witness to interpret a memo that Andre sent?  You can

14  call Andre.

15  Q   BY MR. RAM:  Well, let me ask it this way.  What did

16  you understand when you said --

17       THE COURT:  What he understood I don't think is

18  that important.

19       MR. RAM:  Your Honor, I would rather not have to

20  call Mr. Andre just for this one point.

21       THE COURT:  All right.  You have been at this

22  almost four hours now.  How much longer do you expect to

23  go?

24       MR. RAM:  I have just three pages of the outline.

25  Four, sorry.

1    Q    Okay.  So the big picture question is did you

2    understand RA had a photo to mean the photo on a Miami

3    phone?

4    A    I don't know what I understood.  He says her

5    information was found in multiple locations and RA had a

6    photo of an ID in her name.  So I think that you could

7    infer that, yes, he had a photo, but what I think he is

8    saying here too is that that photo or that information

9    from Lilia Turkan was also found in other places.

10             One of the places, I believe, is the

11   Weddington house that we searched on November 5th.

12   Q    Correct.  And it's the fact that it is found in

13   multiple locations plus the RA phone is part of the

14   reason he is saying we should focus on that.  It is in

15   multiple cases?

16        MR. CIPOLLETTI:  Objection to what Mr. Andre

17   meant.  Mr. Andre is available as a witness.  You can

18   call him.

19   Q    BY MR. KIM:  What did you understand?

20        MR. CIPOLLETTI:  Objection, your Honor.  You

21   literally just ruled on that.

22        THE COURT:  You don't have to remind me about

23   that.  Do you think I forgot?

24        MR. CIPOLLETTI:  No, the basis of the objection

25   was that it was already sustained.

```
 1            THE COURT:  All right.

 2            MR. RAM:  I will move on, your Honor.

 3   Q    Okay.  Some of the loans were shared with -- sorry,

 4   when I say some of the loans, I am referring to the

 5   loans -- if you scroll down here.  These EIDL loans, the

 6   nine different loan applications that were uploaded by

 7   Agent Massino.  Some of these same loans were shared with

 8   summary trial witness Marylee Robinson; is that correct?

 9            THE COURT:  Some of what loans?

10   Q    BY MR. RAM:  The loans that we see on the screen

11   here, Proactive Home Health Services, New World Trading,

12   Long Canyon Nursery, Lilia Turkan, and they are

13   identified by loan number there.

14            THE COURT:  So your point is that some of those

15   loans, are those the nine loans?  Eight.  Is that the

16   group of loans that you said some were from the phone and

17   some are not?

18            THE WITNESS:  Yes, your Honor.  And I can tell you

19   which ones were and which ones weren't.

20            THE COURT:  I understand some were and weren't.

21   But didn't you say seven of them were from the phones, or

22   most of them?

23            THE WITNESS:  No.  So five of them were identified

24   as a result of the phone and three of them were

25   identified through other sources.
```

```
 1          THE COURT:  But the question is were these loans
 2   part of what the summary witness received to make her
 3   analysis?
 4          THE WITNESS:  No.  Not to my knowledge.  These
 5   were not shared with Marylee Robinson.  I do believe they
 6   were shared from with members of the Stout Team who were
 7   performing the clerical functioning, the administrative
 8   work of compiling the chart that we had requested.
 9   Q    BY MR. RAM:  Okay.  And so the Stout firm is where
10   Marylee Robinson works, though; right?
11   A    Right.  And I am saying that this information was
12   provided to other members of that team for a very
13   discrete project and the specific information that we
14   provided to Marylee Robinson for the tracing exercise
15   that resulted in summary chart exhibits.  She did not
16   receive these files as part of that work.
17          So I don't know that Marylee Robinson received
18   copies of these or ever reviewed them.
19   Q    Well, you actually don't know that, do you?  So
20   this information, five of these loans you said are from
21   the Miami phones.  So those loans were sent to the Stout
22   law firm, where Marylee Robinson works; correct?
23   A    Stout is not a law firm.
24   Q    I'm sorry, the Stout accounting firm or consulting
25   firm.
```

```
 1   A    It wasn't sent to the firm.  It was sent to

 2   specific people for a specific purpose.  And the

 3   instruction was not to share that information with

 4   Ms. Robinson.  She had a very discrete role.

 5   Q    Oh, so you restricted the members of the Stout law

 6   firm -- or sorry, the Stout firm that received this

 7   information from sharing it with Ms. Robinson?

 8   A    We tried to give Ms. Robinson the information that

 9   was relevant to the task at hand because she was going to

10   prepare a certain set of summary charts.

11         So we only gave her the information that was

12   relevant to that effort.  We did not share with her the

13   hundreds of loan files or hundreds of bank records

14   outside of that because it wasn't pertinent to the work

15   that she was doing.

16         Her firm was doing many different things, but

17   she was only focused on a discrete set of tasks.

18   Q    So your testimony is you don't know whether or not

19   Mrs. Robinson ever received information from about these

20   loans that you sent to the Stout firm?

21   A    That is not my testimony.

22   Q    Is that accurate, you don't know whether

23   Ms. Robinson ever received the information that you sent

24   to the Stout firm?

25   A    My testimony is that I never sent it to her.
```

1    Q      Correct.  And my question now is you have now

2    testified that you did send this information?

3           THE COURT:  We are getting nowhere here.  His

4    answer is he doesn't know -- he can't know anything more

5    than what he sent to her and what he sent to the firm,

6    the Stout firm.  And he is saying that they were discrete

7    tasks.  Whether there was some overlap, he doesn't know.

8    Q     BY MR. RAM:  Let's do it this way

9           THE COURT:  No.  That is enough of this.

10   Q     BY MR. RAM:  Okay.  Can we look at defense Exhibit

11   28-6 which was displayed at trial.  Trial Exhibit DX28,

12   page 6.  I want to focus about a third of the way down.

13            It is already in the record, but this is an

14   e-mail exchange shared between a member of the Stout firm

15   and Marylee Robinson, this entire packet.

16            And now we are going to focus on page 6.

17            I think is it 28 or 29?  29, I apologize.

18            DX29.

19            And it's also KX29.

20            A third of the way down on KX29, it is page 6.

21            You see some of those same loans that we just

22   discussed Ms. -- doing business as New World Trading.  Do

23   you see that?

24   A      These are bank records.  Yeah.  I don't know why --

25   can I see the e-mail up on top?

```
 1   Q      Yes.  Of course.  Can we go to the first page,
 2   please.
 3   A      Can we just start at the bottom?
 4   Q      Actually you can go to the very top.
 5          You can see who is receiving this.
 6   A      Right.  But if we start at the bottom it is
 7   chronologically accurate.
 8   Q      Okay.  Right there.  First of all, Marylee Robinson
 9   is all over this e-mail chain; correct?  Every single one
10   of these chains?
11   A      I have not yet had an opportunity to review the
12   exhibit.
13   Q      All right.  Let's do it together.  So on page 2 of
14   Exhibit 29, Tom Landwermeyer, who is that?
15   A      Tom Landwermeyer works at Stout.
16   Q      And he is sending this document KX29/DX28 to
17   Marylee Robinson; yes?
18   A      I am trying to read the e-mails.  I just haven't
19   had an opportunity to do that.  Can you just give me a
20   moment to review the exhibit before I answer questions
21   about it?
22   Q      Sure.  And I only have one, which is Marylee
23   received this?
24   A      Then the answer is yes.
25   Q      Okay.  Let's move on.  Go back to Exhibit 20 to the
```

```
 1   Fenton declaration.
 2              Okay.  These same, I guess we're calling them
 3   eight or nine -- I didn't count them properly.  I think
 4   there is nine here because it says nine, but it could be
 5   eight.  So referring to the loans on Exhibit 20, page 1,
 6   and 2 -- oh, there is one on the next page.  That is why.
 7              These same nine loans were included in your
 8   151 loan chart; is that correct?
 9   A    I cannot be certain.  I think that they probably
10   were.
11   Q    Okay.
12   A    But I am not sure.
13   Q    Let's do it really quickly.  Just pick a couple of
14   names.  Maybe Lilia Turkan.
15              Let's go to Exhibit 22 of the Fenton
16   declaration.
17              And while she is doing that, as part of your
18   declaration did you review the list of 151 loans at
19   Exhibit 22?
20   A    Yes.
21   Q    Did you review -- well, before we move on I just
22   wanted you to confirm -- if we can show him the chart --
23   any one of those names from Exhibit 21 appear here?
24   A    I'm sorry, sir.  What is the question?
25   Q    Do any of the nine loans from Exhibit 20 appear in
```

```
1    your chart of 151?

2    A     Certainly.

3    Q     All of them do, in fact; right?

4    A     That I do not know.  And that is why I said I don't

5    know.

6    Q     Okay.

7    A     All of those ones.  Some of those loans -- several

8    of them were identified as a result of looking at the

9    phones.  Some of them were not.  And I think it is likely

10   that those were on the chart, but I don't know if all of

11   them are.  Some of them definitely are.

12   Q     Now, focusing still on this chart, Exhibit 22 here,

13   you reviewed both the company and application columns of

14   this chart; correct?

15   A     You are asking if I personally reviewed this?

16   Q     Yes.  Like you looked at it and you read it?

17   A     Yes.  Yes.

18   Q     Did you check how many of the 151 loans have either

19   a company or an applicant referenced in the photographs

20   taken from the Miami phones?

21   A     No.  I looked to see how many of the new names that

22   were on that list that Special Agent Massino had

23   compiled -- I looked to see how many of those were on

24   this chart.

25   Q     Okay.  So good point.  So to clarify the timeframe,
```

1    back in December, when you are communicating with Massino

2    and others on that chain, you looked here to see how many

3    of those loans were on the 151 chart?

4    A      This chart did not exist at that time.

5    Q      Okay.  So what time period are you referring to?

6    A      So there was some point in time after you sent out

7    your letter on May 7th and after you sought the Kastigar

8    motion where we went to look and see if any of the loans

9    that were on this list were also the loans that Special

10   Agent Massino had followed up on as a result of the

11   photos.

12           When we undertook that comparison, we noted

13   that there were a very small number.  And I don't

14   remember what it is, but I think it is ten or less than

15   ten.

16   Q      Great point.  There is actually two different photo

17   sets, though.  There is the 65 up photos and then there

18   is 141 photos from CBP that came in February 2nd.

19   A      Right.

20   Q      Did you do that exercise with respect to all 206

21   photos or just with respect to the ones you received from

22   Palmerton?

23   A      I did it with respect to neither.  So my testimony

24   is that I only looked -- so Special Agent Massino said

25   here are the names that I am unfamiliar with, based on my

1    review of the photos.  I am following up on these names.

2              He looked at the unfamiliar names, identified

3    some additional loans, and that is memorialized in that

4    e-mail correspondence.  I took the names that he followed

5    up on and the loans he identified -- I think he

6    identified ten total -- and I looked to see if any of

7    those ten loans were on this list of 151.  And I

8    determined that ten or less than ten of those loans were.

9    Q    Okay.  And you reviewed -- you mentioned a May

10   filing from the defense.  You also reviewed the motion to

11   disqualify or dismiss based upon Kastigar violations.

12   Just by way of background, you reviewed that document?

13   A    Is that the document that the defense filed on

14   May 17th?

15   Q    I believe so.

16   A    If it's the May 17th motion, I reviewed the

17   May 17th motion, yes.

18   Q    Okay.  Let's just pull it up.  Document 381, page

19   10, dash 10.

20              I will represent to you that the motion

21   highlights that 83 loans, and it breaks down the names of

22   the companies and individuals, were linked to 58

23   different entities and individuals who are referenced in

24   the Miami phones.

25              Did you follow up and inquire as to which --

1    as to those 83 loans?

2    A     At what point in time?

3    Q     Anytime since we followed, I guess.

4    A     No, because a majority of those names were not --

5    anything but the ones that Massino identified as

6    unfamiliar were already familiar to us, as far as I

7    understand.

8    Q     So the answer to my question is, no, you didn't

9    look to cross-reference whether the 83 loans that we

10   identified as linked to 58 different people and entities

11   were on the photos from Palmerton and from CBP?

12          MR. CIPOLLETTI:  Objection, your Honor.  The

13   answer speaks for itself.

14          THE COURT:  Overruled.  You can answer.

15          THE WITNESS:  Can you repeat the question?

16   Q     BY MR. KIM:  Sure.  The answer to the question is

17   no, then -- I was just clarifying -- that you did not do

18   the exercise of looking at the 83 loans that were

19   identified in that filing to be linked to 58 different

20   people and entities?

21   A     Did I look at the 83 loans that were linked to the

22   53 [sic] different entities and do what?

23   Q     So 58 different people, entities to identify

24   whether they actually appear in the 141 CBP photos and

25   the 65 Palmerton photos.

1    A      You said that they appeared in those photos.

2    Q      Correct.  The question is did you do that exercise?

3    A      Did I look to verify if your representation was

4    accurate?

5    Q      Correct.

6    A      No.

7    Q      Similarly, did you do any exercise where not just

8    the 206 photos we have been referring to, but any

9    information on the Cellebrite -- as part of your Kastigar

10   preparation, did you check the Cellebrites to see

11   whether, for example, all 151 loans are referenced on the

12   Cellebrites?

13   A      So, no.  What did I was -- no.

14   Q      So the answer is no?  I can move on if the answer

15   is no.

16   A      I guess I don't understand the question.

17   Q      Sure.  So in the government's possession right now,

18   you have access to the five Cellebrites from the Miami

19   phones, yes?  Well, you physically have access to them,

20   yes?

21   A      I personally do not have access, but -- no, I

22   personally do not have access to the Cellebrite reports I

23   do not believe at this time.

24   Q      When did you lose access?

25   A      I didn't lose anything.

```
 1          THE COURT:  We are going to have to wrap this up.

 2   I am giving you quite a bit of an opportunity, but you

 3   have got to bring this to a head.

 4          MR. RAM:  I will wrap it up in the next ten

 5   minutes, your Honor.

 6   Q    Let's jump to another use of information from the

 7   Miami phone.  And that is Kastigar Exhibit 1 at page 36.

 8              And while we are pulling that up, that is a

 9   profile from Ray Deboise (ph.), a notary.  Are you

10   familiar with this image?

11   A    Yes.

12   Q    Okay.  This image from the 65 photos that Agent

13   Palmerton took was showed to a witness that was

14   interviewed in this case; true?

15   A    That is my understanding.

16   Q    The actual image from the phone, not from some

17   other source?

18   A    Yes.  My understanding is this photo was showed to

19   Ray Deboise.

20   Q    Okay.  Let's jump ahead.  And we referenced the CBP

21   141 photos.  You received those photos and the

22   prosecution team received them on February 2nd of 2021;

23   correct?

24   A    Yes.

25   Q    And you immediately reviewed those photos?
```

```
 1   A      I don't know if I immediately did.  I believe I
 2   looked at them.  Yes, I believe I looked at them soon
 3   after I received them.
 4   Q      Okay.  And in fact you had a follow-up for John
 5   Bradford from those 141 totals the very next day, by
 6   February 3rd, yes?
 7   A      Yes, I believe so.
 8   Q      Okay.  And you used the 141 CBP photos to develop
 9   at least that investigatory lead with respect to John
10   Bradford, yes?
11   A      Yes.
12   Q      You even suggested that Agent Palmerton should
13   interview John Bradford based on the photo you saw in the
14   141 photos related to Bradford?
15   A      Yes.
16   Q      And specifically you saw some text messages, yes?
17   A      Text messages with whom?
18   Q      Between Bradford and Richard Ayvazyan.
19   A      Yes.
20   Q      And you thought that was "great evidence," closed
21   quote?
22   A      I said something along those lines to somebody else
23   at some later point in time, yes, when we were trying to
24   consider what evidence to introduce at trial if that
25   evidence was not suppressed.  And this was prior to
```

```
 1    April 27th, when the Court entered the order.  I said if
 2    this is not suppressed it is evidence we could
 3    potentially use.
 4    Q    Yes.  The answer is, yes, you called it great
 5    evidence?
 6    A    It don't remember if it's the exact quote, but it
 7    was -- definitely I used the word great, yes.
 8    Q    Okay.  Let's jump ahead.  As you prepared your
 9    declaration, you did not specifically recall using any of
10    the other 140 photos from CBP in your investigation; is
11    that true?
12    A    That's right.  And I reviewed my e-mails in
13    preparation of the declaration.  I went through, I
14    reviewed e-mails, documents and correspondence, and I did
15    not find any other evidence of me personally going
16    through using this information to develop investigatory
17    leads.
18    Q    Okay.  Finally, let's talk about the selection
19    of -- let's talk about the Dadyan phone, Tamara Dadyan's
20    phone.
21    A    Which phone is that?
22    Q    It is going to be 1B21.
23    A    Okay.
24    Q    You were responsible for coordinating with the
25    filter team?
```

```
 1   A      Yes.

 2   Q      And when did that coordination start?

 3   A      Well, from the beginning of the case.

 4   Q      Okay.  So roughly June 2020?

 5   A      No.  I think that they were -- I don't recall

 6   specifically when they were added.  I think that it was

 7   after -- I think it was after we arrested the defendants.

 8   Q      Correct.  I'm sorry, so you started coordinating

 9   with the filter team in November of 2020 or later;

10   correct?

11   A      I believe that that's correct, yes.

12   Q      All right.  And how did you communicate with the

13   filter team?

14   A      Via e-mail and over telephone.

15   Q      Okay.  Any in-person meetings?

16   A      No.

17   Q      Did Agent Palmerton participate in some of these

18   communications you had with the filter team?

19   A      I believe that he may have in very limited

20   instances.

21   Q      Okay.  So, for example, an April 18th meeting

22   request -- April 8th, sorry, meeting request, which is in

23   your declaration, Exhibit 10, page 11, if you want to

24   pull it up.  You were inviting Palmerton to join you in a

25   meeting with the filter team agents.  Would that surprise
```

1    you?

2    A       I would not be surprised.

3    Q       Okay.  And did you memorialize all your

4    communications with the filter team?

5    A       No.

6    Q       Okay.  And to the extent you have any memorialized

7    communications with the filter team, did you produce all

8    of those to the defense?

9    A       No.

10   Q       Are you planning on producing all of those

11   communications with the filter team?

12   A       To you?

13   Q       To the defense, yes.

14   A       No.

15   Q       You understand you have a Jencks obligation as

16   well?

17           Okay.  We will come back to that.  All right.

18           Let's look at what was the filter team's job?

19   A       To conduct a filter to -- a filter review to

20   identify the potentially privileged communications and

21   basically set that aside so that that potentially

22   privileged communications did not go to the prosecution

23   team.

24           Potentially privileged includes spousal

25   privilege as well as attorney-client privilege or

```
1    attorney work product.
2    Q     So fast forward a little bit.  Is it fair it say in
3    April of 2020 there were too many digital devices and too
4    little time to review them all for purposes of trial so
5    you had to coordinate with the filter team to establish
6    priorities?
7    A     Yes.
8    Q     Okay.  One of the priorities is you identified four
9    digital devices that you wanted to use that were obtained
10   from the November 5 search warrants; yes?
11   A     That depends on the period of time that you are
12   talking about.
13   Q     Sure, in April of 2020.
14   A     And it depends on what point in April.  So I
15   identified devices that I asked the filter team to
16   prioritize.
17         The number of devices and the devices that I
18   identified changed over time.
19   Q     Okay.  And --
20   A     If I could provide some additional explanation.
21   Q     Just to keep this streamlined, I am going to try to
22   ask you quick questions if I can.
23   A     Sure.
24   Q     You kept -- two Dadyan phones were on that priority
25   list of four depending on the time period in April of
```

1    2020, yes?

2    A      Yes.  We identified two phones that were directly

3    tied to Tamara Dadyan.

4    Q      Okay.

5    A      Those were the only phones tied to her in her name.

6    Q      And between those two Dadyan phones, you initially

7    prioritized 1B130?

8    A      That's correct.

9    Q      And the Zhadko phone that we talked about, the

10   Iulia Zhadko phone was 1B21; correct?  I'm sorry.  The

11   other Tamara Dadyan phone was 1B121, yes?

12   A      Yes.

13   Q      And you were aware in April of 2020 that the Iulia

14   Zhadko phone that we have been addressing is 1B123 -- had

15   text messages with the 1B21 Tamara Dadyan phone; right?

16   A      No.  I said I was not aware of that fact.

17   Q      You weren't aware in April of 2020?

18   A      I didn't know which phone 1B123 had communicated

19   with.

20   Q      Did you learn that fact from your review of the

21   Zhadko Cellebrite back in February of 2021?

22   A      No.

23   Q      And you testified you don't even recall if you saw

24   any text messages back in February of 2021 on the Zhadko

25   phone; right?

```
 1   A     Correct.  I saw the text messages on April 27th,
 2   when Special Agent Palmerton sent them to me.
 3   Q     But you do remember learning that 1B21 was the
 4   Dadyan phone on the other side of the message with
 5   messages with the Zhadko phone around the time of your
 6   April prioritization request for 1B130?
 7   A     No.
 8   Q     Let's take a look at your second declaration.
 9             Page 6, paragraph 18.
10             Page 6.  Sorry, scroll down, scroll down.
11             Sorry, paragraph 18.
12             Yes.  Second declaration.
13             Paragraph 18.  Stop there.
14             Oh, is this the second declaration?  Second
15   declaration.
16             This is actually the last main point.  It is
17   pretty important.
18             Specifically there is a paragraph that says,
19   "While around this time, I became generally aware" -- do
20   you see that?
21   A     Would it be possible to get a copy of my
22   declaration?
23   Q     Okay.  We will just give you a clean paper copy.
24             It is up.  Okay?
25             Paragraph 18, all right.
```

```
 1              The previous paragraph says, "On April 21st,
 2   2020" -- scroll down -- "I sent an e-mail to the filter
 3   team requesting they prioritize filter review of 1B17,
 4   1B21 and 1B30, beginning with 1B30."
 5              We just covered that.
 6              And then beginning on paragraph 18, you say,
 7   "While around this time I became generally aware that the
 8   text messages between Ayvazian and Dadyan had been found
 9   on the Zhadko phone, I did not use that information to
10   identify which of the November 5 phones to prioritize."
11   Do you see that?
12   A     Yes.
13   Q     Okay.  It is fair to say at this time, prior to
14   April 27th, the Zhadko phone, which we have identified as
15   1B123, was still in evidence.  For all purposes, you
16   could use it for trial?
17   A     Yes.
18   Q     Okay.  So frankly, as a prosecutor it makes sense
19   to prioritize 1B130 because that is a different phone.
20   You already had the other side of the Dadyan's
21   conversations from 1B123; right?
22   A     No.
23   Q     As a matter of logic.
24   A     That is not my logic.
25   Q     Okay.  Let's move on.
```

```
 1              MR. RAM:  What is your answer?
 2              THE WITNESS:  So I didn't know what the telephone
 3    number was for the phone that was used.  And I didn't use
 4    that telephone to identify the --
 5              THE COURT:  What phone?
 6              THE WITNESS:  -- the Dadyan phone.
 7              THE COURT:  Are you talking about 121?
 8              THE WITNESS:  Yes, I didn't know whether 1B21 or
 9    1B130 was the phone that had communicated with 1B123, and
10    the decision I made was to prioritize 1B130 because I
11    believed that that phone was a newer model and I thought
12    that it would have better information.
13              THE COURT:  That is in your declaration.
14              THE WITNESS:  Yes.  But I didn't look to try to
15    find the mirror image.
16              THE COURT:  Last question.
17    Q    BY MR. RAM:  So if I heard you correctly, you said
18    at this time, so April 21st, when you prioritized those
19    phones, 1B17, 1B21 and 1B30.  you didn't know which
20    Dadyan phone was which, meaning which one communicated
21    with the Zhadko phone.  You didn't know that?
22    A    That's correct.
23    Q    Okay.  Take a look at page 12 of Exhibit 31.
24              THE COURT:  The court reporter needs to break so
25    you have to bring this to a head.
```

```
 1          MR. RAM:  We are on the final topic, your Honor.
 2   Should we just take a break?
 3          THE COURT:  Let's take a break for 10 minutes and
 4   then come back.
 5          (Recess from 2:52 p.m. to 3:11 p.m.)
 6          MR. RAM:  May I proceed, your Honor?
 7          THE COURT:  Yes.
 8   Q    BY MR. RAM:  On April 27, the Zhadko phone was
 9   suppressed, Mr. Fenton?
10   A    B123?
11   Q    Yes.
12   A    Yes.
13   Q    And that same day Agent Palmerton sent you the 918
14   pages of text excerpts that we saw at Palmerton
15   Exhibit O?
16   A    Yes.  He had sent it prior to the time the court
17   issued the order.
18   Q    And you know from the time stamp of his e-mail?
19   A    Yes.
20   Q    And did you produce that e-mail to the defense?
21   A    I don't know if that e-mail was produced.  I think
22   that Agent Palmerton had attached it to his declaration
23   as Exhibit O, I believe you said.
24   Q    And do you know if there is an e-mail in the record
25   anywhere that shows when that was sent to you?
```

```
 1    A      I do not.

 2    Q      Okay.  Do you have that e-mail?

 3    A      Yes.

 4    Q      The very next morning, on April 28th, you set up a

 5    call with the filter team, yes?

 6    A      Yes.

 7    Q      And you asked them to identify the text messages

 8    between Tamara Dadyan and Richard Ayvazyan?

 9    A      Yes.

10    Q      And you made this request using the information

11    from Palmerton's Exhibit O?

12    A      Not exactly, no.  So we -- I knew that there were

13    text messages at that point, and I wanted to make sure

14    that I asked them whether or not they had found text

15    messages on the Tamara Dadyan phone that they had

16    filtered.

17           And I asked them -- because it was going to

18    take them some time to complete that filter review, and I

19    believe that those text messages between Mr. Ayvazyan and

20    Ms. Dadyan were not privileged and I knew the defense

21    would want to see them immediately, I asked them to

22    prioritize the release of those particular text messages.

23           So I said if there are any text messages

24    between those two individuals, please prioritize them for

25    release so we can get them to defense counsel right away.
```

1  The defense counsel will want to know about those.

2  Q    Did you ever make a production to the defense of

3  any follow-up that you got from the filter team with

4  respect to a usable text from Dadyan and Ayvazyan?

5  A    I definitely produced the Cellebrite report.

6  Q    And that was produced to the defense even before;

7  right?

8  A    We produced a forensic image of that phone back in

9  December.  I believe it is December.  But we produced the

10 Cellebrite report as soon as it became available.

11 Q    Correct.  But I am saying on April 28th you

12 followed up to get a usable text form of the Dadyan

13 Ayvazyan text messages; right?

14 A    I asked the filter team to do that, yes.  I don't

15 recall whether or not they actually did.  But I also

16 asked them to prioritize 1B130 and they didn't.  They

17 prioritized 1B21.

18 Q    On April 28?  Or were you talking about in the

19 past?

20 A    I am talking about from the week prior.

21 Q    Right.  Okay.  But on April 28th, with Fenton's

22 Exhibit O in your hand, right, you reach out to the

23 filter team and say I need useable text of the Dadyan

24 Ayvazyan text chain, in substance?

25 A    No, that is not what I said.

1   Q      Not what you said to the filter team?

2   A      That is not what I said.  The filter team is also

3   not my testimony.

4   Q      Did you ask the filter team for useable text

5   between Dadyan and Ayvazyan?

6   A      I asked the filter team to prioritize the release

7   of any text messages that they found to Richard Ayvazyan

8   and Tamara Dadyan from whatever phone they had they were

9   filtering at that time.  It turned out to be 1B121.

10          And the reason why was so that can he could

11  produce it to the defense so that you would be aware that

12  even those text messages had been suppressed that there

13  were additional text messages as well.

14  Q      But in fact nothing was produced to the defense

15  following that request?

16  A      That is not a fact.

17  Q      With respect to the Dadyan Ayvazyan text, there was

18  an additional production?

19  A      The Cellebrite report for that phone 1B121 was

20  produced.

21  Q      And it was produced prior to that time as well,

22  right, the Cellebrite for 1B21?

23  A      I don't recall.  It is possible.  But we produced

24  it timely.

25  Q      And then this was after you received Exhibit O from

1    Palmerton?

2    A       No -- now, I don't follow.

3    Q       April 28th is when he you made make the request to

4    the filter team?

5    A       Yes.

6    Q       You had received Exhibit O from Palmerton on

7    April 27.

8    A       Yes.

9           MR. RAM:  No further questions.

10          THE COURT:  All right.  Mr. Littrell, I can't

11   allow you to go through this same turf.  I want to direct

12   you to ask questions that are most pertinent to your

13   client.

14          MR. LITTRELL:  That is my intention, your Honor.

15          THE COURT:  And hopefully you will be to the

16   point.

17          MR. LITTRELL:  That is also my intention, your

18   Honor.

19

20                  CROSS-EXAMINATION

21   BY MR. LITTRELL:

22   Q       Good afternoon, Mr. Fenton.

23   A       Good afternoon.

24   Q       You have been on this case since June 12, 2020; is

25   that correct?

```
 1   A      Yes.

 2   Q      And you are the lead prosecutor; correct?

 3   A      One of the lead prosecutors, yes.

 4   Q      And your job was to identity evidence that would

 5   support a conviction of guilty in this case; right?

 6   A      Yes.

 7   Q      And you weren't looking for just sufficient

 8   evidence for a guilty verdict.  You were looking for all

 9   relevant evidence; right?

10   A      We were looking for evidence that would prove guilt

11   beyond a reasonable doubt.

12   Q      Right.  Which is more than just sufficiency; right?

13   A      Yes.

14   Q      So once you had sufficient evidence to convict, you

15   didn't just stop there; right?

16   A      That's correct.

17   Q      And the way an investigation works is often the

18   meaning of a piece of evidence isn't clear until you put

19   it together with later evidence that you find; right?

20   A      That is right.

21   Q      And that was true in this case; correct?

22   A      In some respects.  It really depends on the piece

23   of evidence that you are talking about.

24   Q      Now, your theory of this case with respect to Ms.

25   Terabelian specifically was that she assumed the identity
```

```
1    of a Victoria Kauichko; right?

2    A      That she -- yes, that she used that identity.  Yes.

3    Q      And just as you sit here today, how can you explain

4    how they actually used Victoria Kauichko's identify?

5    What did she do?

6    A      Are you asking me what evidence led us to believe

7    that she was using Victoria Kauichko's identity?

8    Q      Yes.

9    A      Yes.  I can explain that.  So we became aware of

10   Iulia Zhadko on June 12, 2020.  We traced the money and

11   realized that Richard Ayvazyan had used the stolen PPP

12   funds to buy a house in the name of him and his wife.

13           We continued to follow the money.  And this is

14   really a key point for us.  And what we realized was that

15   the money was being funneled through Richard's account at

16   Inception Ventures, in the name of Inception Ventures,

17   and also Marietta Terabelian's personal bank account at

18   Bank of America as well.

19           We continued to follow the money, and we

20   learned that additional money was being -- that

21   additional loans were being taken out in the names of

22   family members, like, for example Nazar Terabelian.

23           We followed that money and saw that it was

24   being used by the family to make purchases, including

25   purchases that would be traditionally associated with a
```

1    woman, like jewelry or furniture.  We also --

2    Q     Let me stop you there. I want to be efficient.  And

3    we will get to the rest because I do want you to explain.

4              Your focus was tracing the money; right?

5    A     Yes.

6    Q     But you also traced at that money to purchases;

7    right?

8    A     Yes.

9    Q     And those purchases you just said were purchased

10   that would be associated with a woman?

11   A     Yes.

12   Q     What do you mean by that?

13   A     Furniture, jewelry, things of that nature that

14   would typically be associated be somebody, you know who

15   is female.

16   Q     Why do you say that would be typically associated

17   with somebody who is female?

18   A     Well, in this instance we understood that Marietta

19   Terabelian did not work outside the home, that she was --

20   Q     How did you learn that?

21   A     That was our understanding.

22   Q     And where did that understanding come from?

23   A     She didn't have a job.

24   Q     How did you know?

25   A     Background reports.  Things of that nature.

1   Q     When did you get a background report that said that

2   she didn't have a job?

3   A     We didn't have any reason to believe she worked

4   outside the home.

5   Q     So you assumed, because you didn't know, that she

6   didn't work outside the home?

7   A     I'm sorry?

8   Q     You assumed she didn't work outside the home but

9   you didn't have any evidence of that.  I am talking about

10  prior to the Miami stop.

11  A     We had no reason to believe that she had a job.

12  Q     But you didn't have any reason to believe that she

13  didn't have a job?

14  A     That is not true.  When we looked at her bank

15  records, typically what we would see if somebody is

16  employed is that they would receive a pay stub, that they

17  would receive checks from ADP or other payroll

18  processers.

19        We saw no evidence of that.  All we saw was

20  money coming in from illegitimate sources and being spent

21  on -- you know, spent in and around where she lived.

22  Q     I want to stop you here and I want to ask you about

23  what you did and what you know.  You looked at her bank

24  account yourself?

25  A     Yes.

```
1    Q      When did do you that?

2    A      I don't recall, but it was early on.

3    Q      It was prior to October 20th of 2020?

4    A      Yes.

5    Q      And you looked at her bank account and from that

6    bank account you concluded she didn't have a job?

7    A      Yes.

8    Q      And why was that important to you?

9    A      Because I wanted to know if she was gainfully

10   employed.  I wanted to know what she did.

11   Q      Why did that matter to you?

12   A      Because we try to learn information from our

13   subjects that is potentially relevant to the

14   investigation.  She lives in a 3.25 million mansion.  She

15   is buying all these things.  We want to understand who

16   she is.  And whether or not she is gainfully employed is

17   relevant.  Looking to see if she has a paycheck matters

18   and where she gets that paycheck from.

19            So that is something at that we learned.  But

20   we also were able to trace -- we saw that stolen PPP

21   funds went into bank accounts -- a bank account in

22   Richard Ayvazyan's name and that he was transferring that

23   money out to Terabelian.  There are many transfers to

24   Terabelian, payments on Nazar Terabelian's credit cards.

25            We then looked at her criminal history --
```

```
1    Q     I want to make sure the record is clear.  So let me
2    just stop you and ask you some questions to try to focus
3    this.  Okay.  I want to ask but what you knew prior to
4    October 20th, 2020.
5    A     And everything I just said stuff that we knew prior
6    to October 20th.
7    Q     I understand that.  And you have a lot to say and I
8    want you to have a chance to say it, but I need to ask
9    you some questions to focus you.  Okay.  Is that okay?
10   A     I hadn't finished my answer to the previous
11   question, but if you want to move to the next one.
12   Q     Why don't we do this?  We have limited time.  I
13   want you to just tell me everything you have to say right
14   now and then I'll start asking questions.  So go ahead.
15   A     So at that point we then looked at the criminal
16   history for Mr. Ayvazyan and Ms. Terabelian, and what we
17   realized is that they have a pattern a history back in
18   2012 of working together to commit loan fraud.
19              So that was something else that was relevant
20   to us as well.
21              So we continued to follow the money and we
22   continued to look to see who was taking out those loans
23   and how the money was spent and where it was funneled and
24   what names and identities were being used.
25              The two names and identities that seemed to be
```

1    used quite frequently were Victoria Kauichko and Iulia

2    Zhadko.  We assumed that they were male and female

3    identities that were --

4    Q    Let me stop you there.  Why did you assume that

5    they were male and female?

6         MR. CIPOLLETTI:  Objection, your Honor.  Could the

7    witness just finish his answer?

8         THE COURT:  No.  He can answer the question.

9         THE WITNESS:  So we saw the licenses.  Iulia, we

10   understood, could be a female as well.  But we saw the

11   licenses in the loan files that had pictures of men.

12   Victoria Kauichko, we thought that Victoria was a female

13   name and then when we saw an actual license in one of the

14   loan files we saw that she was indeed a woman.

15   Q    So you had made the assumption that therefore the

16   person using that identity was a woman because the ID had

17   a woman on it?

18   A    That is not the assumption that we made.

19   Q    So you understood -- you got to let me ask

20   questions here, and I promise I will give you a chance.

21   Your conclusion was that it was a woman?

22   A    No.  My conclusion was that Richard Ayvazyan and

23   his wife were working together to commit the same type of

24   fraud that they had committed together back in 2012.

25   Q    So this was based on an assumption because of their

```
 1   prior conviction?

 2   A     It was based on the prior conviction, following the

 3   money, and all the things that I just described; how the

 4   money is being spent, who was using it, the different

 5   identities.  And then eventually we find out October 19

 6   that they were in possession of physical credit cards,

 7   you know, in these different identities.

 8   Q     Okay.  Let me see if I have this right then.  Prior

 9   to October 20th, 2020, you traced the money to properties

10   owned jointly by Richard Ayvazyan and Marietta

11   Terabelian; right?

12   A     One property owned by them jointly, yes.

13   Q     You traced also that money to properties that were

14   purchased by Richard Ayvazyan, at least so you believed?

15   A     Using aliases, yes.

16         THE COURT:  Using what?

17         THE WITNESS:  Aliases.

18   Q     BY MR. LITTRELL:  And the property that was

19   purchased jointly by Richard Ayvazyan and Marietta

20   Terabelian, you saw some e-mails related to that

21   purchase; right?

22   A     Yes.  The investigative team did, yes.

23   Q     But there were no e-mails by Marietta Terabelian

24   related to that purchase right?

25   A     Not as far as I am aware.
```

1   Q     So you traced the money to properties owned jointly

2   by Marietta Terabelian and Richard Ayvazyan; right?

3   A     Property, yes.

4   Q     You looked at Marietta Terabelian's bank account

5   and inferred that she didn't have a job; right?

6   A     And that her personal account was being used to

7   funnel stolen PPP loan funds to pay for that house.

8   Q     Okay.  So you traced the money.  You saw her bank

9   account.  You saw that money flowed through her bank

10  accounts to a house that she jointly owned with Richard

11  Ayvazyan?

12  A     Yes.

13  Q     And from that evidence alone you concluded that she

14  was taking on the identity of Victoria Kauichko?

15  A     No.  There was additional evidence as well.

16  Q     What other evidence was there prior to October

17  20th, 2020, that Marietta Terabelian assumed the identity

18  of Victoria Kauichko?

19  A     There was the additional evidence of our

20  participation in the scheme and the fact that there were

21  two identities --

22  Q     I mean specifically, what actual facts.

23  A     The actual fact that she was funneling and received

24  and spending stolen PPP and EIDL loan money.

25  Q     I mean specific facts tying her to the identity of

1   Victoria Kauichko.

2   A     The use of her father's name, the fact that that

3   money would then be funneled to --

4   Q     What evidence did you have that she was using her

5   father's name?  What evidence did you have?

6         THE COURT:  The question is very specific.  What

7   evidence did you have prior to October 20th that

8   Terabelian was using the name Kauichko.  You are

9   describing what you believe to be her involvement in a

10  fraudulent PPP scheme.  But the question is more

11  specific.  Is that right, Mr.Littrell?

12        MR. LITTRELL:  That is exactly right.

13        THE WITNESS:  The criminal history is coupled with

14  the bank records.

15  Q     BY MR. LITTRELL:  Let me stop you.  What about her

16  criminal history tied her to the identity of Victoria

17  Kauichko?

18  A     The fact that her and her husband had previously

19  been -- previously plead guilty to working together to

20  commit loan fraud.

21  Q     Okay.  Does the name Victoria Kauichko appear

22  anywhere in the records related to her prior conviction?

23  A     From 2012, no.

24  Q     It was related in any way to that prior conviction

25  in 2012.

```
1   A      No.

2   Q      Did the name Victoria Kauichko appear anywhere in

3   her bank records?

4   A      No.  They were her bank records in her name.

5   Q      That's right.  And so you had no evidence prior to

6   October 20th, 2020 that Marietta Terabelian was use the

7   identity of Victoria Kauichko, did you?

8   A      That is not correct.

9   Q      Okay.  What did you know.  Tell me.  Facts?

10  A      The money.  We followed the money.

11  Q      What about the money tied Marietta Terabelian to

12  Victoria Kauichko?

13  A      The fact that the Iulia Zhadko and Victoria

14  Kauichko funds are being used for the benefit of her and

15  her family.

16  Q      Is that it?

17         THE COURT:  Describe that answer a little more

18  fully.  I didn't understand your answer completely.

19         THE WITNESS:  We see loan money being taken out in

20  the name of Nazar Terabelian and being transferred to --

21         THE COURT:  Loan money from where?

22         THE WITNESS:  PPP and EIDL loan money that was

23  coming from -- that is being put into these bank

24  accounts, taken out in the name of Victoria Kauichko or

25  taken out in the name of Iulia Zhadko, and then used for
```

```
 1   the benefit of defendant Richard Ayvazyan.
 2        THE COURT:  You say that you saw PPP loans taken
 3   out in the name of Kauichko -- and what is the other
 4   guy's name?
 5        THE WITNESS:  Zhadko.
 6        THE COURT:  Zhadko.  And that the proceeds of
 7   those loans went into the bank account of Terabelian?
 8        THE WITNESS:  Stolen, no.  The money is going and
 9   being used by Victoria Kauichko identity for various
10   purchases that go back to the family for the benefit of
11   of the Ayvazyan family or the Terabelian family.
12        THE COURT:  When you say for for the benefit of
13   the family, can you give me an example?
14        THE WITNESS:  Sure.  If you look at the -- you
15   know, we see the money from Runyan Tax Service, for
16   example, so a PPP loan will be taken out by Victoria
17   Kauichko, Runyan Tax Service, and then the money will be
18   used to pay for Marietta Terabelian's father's funeral.
19        THE COURT:  From what account?
20        THE WITNESS:  From the Runyan Tax Service account,
21   where Victoria Kauichko is the cosigner.  That is one
22   example.
23        THE COURT:  So in other words, you are saying that
24   loan proceeds, PPP loan proceeds went into the Runyan
25   account.  Of course I remember that from the trial.
```

```
 1              THE WITNESS:  Right.
 2              THE COURT:  And then the examining that account,
 3    monies from the Runyan account were used to pay for
 4    things that were associated with the name Kauichko?
 5              THE WITNESS:  Yes.
 6              THE COURT:  But how did you at that point know
 7    that Kauichko was Terabelian?
 8              THE WITNESS:  Because we are seeing the way that
 9    this money is being used.
10              THE COURT:  In other words, it was being used like
11    for funeral of Terabelian's father?
12              THE WITNESS:  Right.  Or to buy furniture.
13              THE COURT:  So your thinking was that Runyan Tax
14    account, business account is being used to pay for
15    Terabelian's father's funeral, and that is an indication
16    that Kauichko is Terabelian?
17              THE WITNESS:  Yes.  That is an example.
18    Q    BY MR. LITTRELL:  Is there anything else?
19    A    Other thans to types of examples?  No.  I think
20    that those are -- those are -- I think that that is the
21    best evidence at that time.  And then --
22    Q    And you assumed that the person that used the
23    Victoria Kauichko identity was a woman; right?
24    A    Right.  We think --
25    Q    You said right; right?  And so that means you ruled
```

```
 1   out Richard Ayvazyan as being the one that paid for that
 2   funeral, for example?
 3   A      No.  And the next thing I was going to say, I mean,
 4   we understood that it was being used by them, we thought
 5   together.
 6   Q      What do you mean, used together?
 7   A      That they were working together to perpetuate this
 8   fraud, that there were a team.
 9   Q      Did you have any evidence that they were working
10   together prior to October 20th, 2020?
11   A      Just the way they were handling the money and the
12   way that the money -- it's going through her account.
13   Q      It is the same evidence you just referred to?
14   A      Yes.  It is being spend by her.  It is the criminal
15   history plus the bank records plus her possession of the
16   credit card, the physical credit card.
17   Q      And based on that, and that alone, you were
18   convinced at that point that defendant Mary Terabelian
19   had assumed the identity of Victoria Kauichko to apply
20   for many loans and moved and spent the criminal proceeds?
21   A      Yes.
22   Q      What evidence did you have prior to October 20th,
23   2020 that Mary Terabelian assumed the identity of
24   Victoria Kauichko to apply for a loan?
25   A      As I said before, it is following the money.
```

1   Q       But Mary Terabelian never applied for a loan;

2   right?

3   A       In her own name?

4   Q       What evidence was there that she used the Victoria

5   Kauichko identity to apply for a loan?

6   A       We thought that there was ample evidence.

7   Q       I am not asking what you thought.  I am asking what

8   evidence did you actually know of prior to October 20th,

9   2020?

10  A       The bank records and the application.

11  Q       And that was it?

12  A       Yes.

13  Q       Okay.  So you would have actually indicted Mary

14  Terabelian based on that evidence alone as being someone

15  who actually assumed the identity of Victoria Kauichko;

16  is that true?

17  A       Yes, and we also have had the physical credit card

18  as well.  Her possession of the physical credit card that

19  was seized from her person or from her luggage on

20  October 19th.

21  Q       Now, prior to October 20th of 2020, you also had

22  evidence indicating that other people were using and

23  assuming the identity of Victoria Kauichko; right?

24  A       You mean in addition to Richard Ayvazyan?

25  Q       Well, including him.  Well, one of them was Richard

1    Ayvazyan; right?

2    A      Yes.

3    Q      But also you had evidence that Manuk Grigoryan was

4    using that identity prior to October 20, 2020; right?

5    A      We believed that he was a co-conspirator, yes.  He

6    was identified as a subject at that point.

7    Q      But you had ruled out the possibility that Manuk

8    Grigoryan had assumed the identity of Victoria Kauichko?

9    A      We thought that he was playing -- no, we had not

10   ruled out the possibility that he was also playing -- a

11   conspiracy.

12   Q      Did you rule out the possibility that Richard

13   Ayvazyan had assumed the identity of Victoria Kauichko?

14   A      No.  We thought that he was using the identity as

15   well.

16   Q      Okay.  So you thought she was one of many people

17   that had assumed the identity of Victoria Kauichko?

18   A      We thought she was one of several people working

19   together using that identity, yes.

20   Q      What do you think now?

21   A      I think that's right.

22   Q      So October 20th you were informed -- so okay.  Let

23   me see.  So October 20th, 2020, that is when you learned

24   that the CBP officers had stopped Ms. Terabelian at the

25   Miami airport; right?

1    A       Right after -- well, yes.  We learned on

2    October 19.  We learned on October 19.

3    Q       In October 20th -- and just past midnight on

4    October 20th?

5    A       Yes.

6    Q       That is when you received a call from CBP officers?

7    A       Yes.

8    Q       And they were calling to tell you what they found

9    on Ms. Terabelian's phone at the airport; right?

10   A       Just as a point of clarification.  That is when

11   Special Agent Palmerton received that telephone call from

12   the CBP, but yes, that is when we found out the

13   information that CBP had learned.

14   Q       And one of the reasons for having the airport stop

15   was to gather evidence to prove or to establish that Mary

16   Terabelian and Richard Ayvazyan were responsible for the

17   loan fraud; right?

18   A       I think it was an investigative step.  It wasn't

19   for that specific purpose.  It was an investigative step.

20   Q       It was for the purpose of gathering evidence?

21   A       It was an investigative step.  Yes.  It was to

22   investigate the crime including to potentially gather

23   evidence.

24   Q       Right.  And the evidence you hoped to gather were

25   going to be based on an interview of Richard Ayvazyan,

```
 1   and Mary Terabelian; right?
 2   A      There could be a variety of different types of
 3   information that we could learn that could potentially
 4   have been, you know, relevant to the investigation.
 5   Q      But you certainly knew prior to that stop that it
 6   was likely they would be carrying cell phones with them;
 7   right?
 8   A      I did not know -- I did not know what they would be
 9   carrying.
10   Q      You certainly hoped they would be carrying a cell
11   phone; right?
12   A      It was not something that was really planned by the
13   investigative team.
14          THE COURT:  The point of this is they did get the
15   credit card on her person on that day, and I am losing
16   track of where you are going.  Are you referencing what
17   he included in the criminal complaint?
18          MR. LITTRELL:  The point I am after is the
19   intention in having the stop done was to get evidence
20   most likely from their phones.
21          THE COURT:  I mean, so what in terms of this
22   hearing.
23          MR. LITTRELL:  Well, that make it is much more
24   likely that when he did get that evidence he looked at it
25   very carefully.
```

```
 1          THE COURT:  So you are saying that when the
 2   witness testified before that he didn't get the phone
 3   information until it was relayed to him by -- was it the
 4   FBI agent?  Is that how you got it?
 5          THE WITNESS:  Yes.
 6          THE COURT:  And in terms of the timeframe, was
 7   that November sometime?
 8          THE WITNESS:  So -- yes.  Special Agent
 9   Palmerton --
10          THE COURT:  What date was that?
11          THE WITNESS:  November 13.
12          THE COURT:  And at that point, just to put the
13   chronology straight for me, Palmerton had taken 65 photos
14   from that phone?
15          THE WITNESS:  Yes.
16          MR. LITTRELL:  We are not there yet, though.
17          THE COURT:  I know.  I am just trying to get the
18   chronology straight.  And then when he phoned you, your
19   testimony is that he generally described what was on the
20   phone or specifically?
21          THE WITNESS:  Generally.
22          THE COURT:  The answer is generally.
23          THE WITNESS:  Yes.  Generally.
24          THE COURT:  Now, the questions are designed to
25   show that that is not true?
```

1           MR. LITTRELL:  He has minimized the importance of

2     the information from the phones.

3           THE COURT:  But this is what he said, and the

4     purpose of the hearing, in part, is to see whether the

5     witnesses are credible.  And what you are implying is

6     that it didn't happen that way, that as soon as the

7     phones were seized -- and we know the customs agent did

8     some kind of looking at them -- the implication is that

9     that was shared immediately with this witness.

10          MR. LITTRELL:  Exactly.

11          THE COURT:  That is what I am understanding the

12    import of your question is.  And he is saying that that

13    didn't happen, that -- let me just get one fact straight.

14    Did you know -- when was the first time you knew that the

15    phones were seized after the October 19th search?

16          THE WITNESS:  After midnight on October 20th.

17          THE COURT:  And you say that was communicated not

18    to you, but to Palmerton?

19          THE WITNESS:  I believe it was communicated to

20    Palmerton, who communicated it to me.

21          THE COURT:  And we don't know at this point what

22    Palmerton received, but what did he tell you about what

23    he heard from the customs agent?

24          THE WITNESS:  So we heard three pieces of

25    information.  One was that there was a California

```
 1    driver's license in the name of Iulia Zhadko.
 2              Second, that there were text messages that
 3    suggested that Marietta Terabelian had -- was using the
 4    identity of Victoria Kauichko.
 5              And third, that there appeared to be other
 6    driver's licenses and credit cards in the names of people
 7    other than the defendants.
 8         THE COURT:  All right.  Then you can pick up from
 9    there.
10    Q    BY MR. LITTRELL:  You learned this from Special
11    Agent Palmerton; correct?
12    A    I believe so yes.
13    Q    But you also learned this directly from CBP
14    officers; right?
15    A    I don't recall them being on the phone at the time,
16    but it was possible they were on the phone at the time as
17    well, but I don't think so.
18    Q    And this was after midnight on October 20th?
19    A    Yes.
20    Q    And you wanted to take that call because you didn't
21    think it could wait until the next day?
22    A    No, sir.  What happened was we didn't plan this
23    operation.
24         THE COURT:  Wait a second.  Answer the question.
25    The question was you took that call at a late hour
```

1    because you were very anxious to find out who was on the

2    phone.  And you can answer that yes or no.

3           THE WITNESS:  No.  The answer is no.

4           THE COURT:  The answer is no.  Let him ask another

5    question.  That is the way it goes.

6           THE WITNESS:  I'm sorry, your Honor.

7    Q    BY MR. LITTRELL:  So why couldn't it wait until the

8    next day?  Why did you pick up the phone after midnight?

9    A     Because we were going to arrest then.

10   Q     And why were you going to arrest them?

11   A     For committing PPP loan fraud.

12   Q     And that was based on evidence that had nothing do

13   with what CBP found at the airport?

14   A     We were planning to charge them.  And then once we

15   learned that they were found with the credit cards which

16   I believe we learned on the 19th, like later that

17   evening, we started talking about doing probable cause

18   arrests.

19   Q     So let's back up for a minute.  So you learned

20   about the fact that they were caught with the credit

21   cards at the same time that you learned that Mary

22   Terabelian had texts on her phone suggesting that she was

23   using the identity of Victoria Kauichko?

24   A     Yes.

25   Q     So it's the same exact time?

```
 1    A      I don't know if it is the same minute, but it was
 2    the same --
 3    Q      Same conversation?
 4    A      The same evening, yes.
 5    Q      And you were not previously planning to do a
 6    probable cause arrest just based on the fact that they
 7    might be encountered at the airport?
 8    A      No.  We were not planning to arrest them at the
 9    airport.
10    Q      So the decision to arrest was based on information
11    learned during the airport stop?
12    A      It was based on the fact that they possessed those
13    credit cards.
14    Q      Now, you -- three things?
15    A      We didn't know what was on the phone at that time.
16    Q      Well, one thing that was communicated to you that
17    you just acknowledged is that on the phone possessed by
18    Mary Terabelian were text messages suggesting that she
19    was using the identity of Victoria Kauichko?
20    A      Yes.
21    Q      And after you learned that, you decided to do a
22    probable cause arrest?
23    A      That is not my testimony.
24    Q      The decision to make the probable cause arrest
25    happened after you learned --
```

```
 1   A     No.  No.

 2   Q     Let's back up.

 3         THE COURT:  Don't.

 4         THE WITNESS:  I'm sorry, your Honor.

 5         THE COURT:  Let him ask the question and answer

 6   the question.  And if your answer requires some

 7   explanation we will consider it.

 8   Q     BY MR. LITTRELL:  What was the point in time where

 9   you decided do a probable cause arrest?

10   A     I don't remember the specific point in time.  I

11   remember that this was unfolding over the course of an

12   evening.

13   Q     You just said it did not happen after you found out

14   that she had the Victoria Kauichko texts.  So either you

15   know are or you don't know.

16   A     So what I am saying is that this unfolded over the

17   course of the evening.  And we were in touch with our

18   supervisors about doing this arrest.  And as we were

19   having these discussions, additional information was

20   coming in.

21   Q     And the additional information was those three

22   things you just told us; right?

23   A     Yes.

24   Q     Based on those three bits of informations, that is

25   why you did the probable cause arrest?
```

```
 1    A     No.  I started calling people about doing a

 2    potential probable cause arrest around 10:00 p.m.  I

 3    called three individuals, Brian Kidd, Henry van Dyke,

 4    Rush Atkinson.

 5              To my chagrin no one answered the telephone.

 6    I was surprised because it was only 10:00 p.m.  Typically

 7    people are available at that time of the evening.

 8              I continued to call to try to get in touch

 9    with them because we thought that we were going to do

10    this arrest.

11    Q     Why did you think you were going to do the arrest?

12    A     Because they showed up at the airport and they had

13    these credit cards in the names of the people --

14    Q     You didn't know that.

15    A     My understanding we did know that.

16    Q     What did you know before they showed up to the

17    airport about their possession of credit cards?

18    A     No, we knew -- no, until that happened.  So they

19    initially did their interviews.  My understanding is that

20    they started doing their interviews around 4 or 5:00 p.m.

21    And then the first time that I learned about it was after

22    dinner because I was trying to prepare dinner and then

23    trying to clean up the dishes and I had gotten a phone

24    call and it was Special Agent Palmerton.

25              And it was dark out, and I remember having
```

```
 1   this conversation with him -- I mean, I remember as clear
 2   as day having this conversation with him and learning
 3   these things were unfolding.
 4   Q    So it wasn't just the text messages found on Mary
 5   Terabelian's phone.  It was other things you learned
 6   during that day; right?
 7   A    It was primarily the credit -- the credit cards.
 8   Because they had these credit cards and we had been
 9   doing -- conducting this investigation.  We had followed
10   the money.  We were a starting to prepare charges,
11   starting to prepare search warrants.  And then they show
12   up at the airport and they had these physical credit
13   cards in the names of these individuals who submitted
14   these loan applications.
15          And at that point we felt like we needed to
16   make a probable cause arrest so that they did not flee
17   the country.  We were concerned about flight.
18   Q    So it was in that that period of time after you
19   learned about the credit cards in their possession but
20   before you learned about the text messages, that is the
21   moment where you made the decision that you were going to
22   seek a probable cause arrest?
23   A    I am saying that this was unfolding over the course
24   of the evening.  So I --
25   Q    If you don't know, you don't know.
```

```
 1    A      What I am telling you, Mr. Littrell, is that I was
 2    trying to get in touch with my supervisors because we had
 3    made a decision, Mr. Andre and I, that we wanted to do a
 4    probable cause arrest, which is something that we don't
 5    typically do in the fraud section.
 6         THE COURT:  Was this decision made before you
 7    learned that Terabelian was found with the Kauichko
 8    credit card on her person or after?
 9         THE WITNESS:  I believe it was after we learned
10    about that, the possession of the card.
11         THE COURT:  And it was after you learned that
12    there were some text messages on the phone?
13         THE WITNESS:  No, we didn't learn about the text
14    messages I believe until later because it took some time
15    for CBP to open those phones and look at them.  I believe
16    it took several hours for them to do that, which is why
17    they were working late into the evening.
18         THE COURT:  So are you testifying that the -- that
19    when you learned that the Kauichko credit card was on
20    this person, that is what triggered the probable cause
21    arrest?
22         THE WITNESS:  That is the point at which we felt
23    we needed to make a probable cause arrest.
24         THE COURT:  But before you seemed to indicate that
25    in the course of events you didn't know which came first,
```

```
 1    the credit card on her possession or the text messages.

 2         THE WITNESS:  No, I believe that the credit card

 3    was learned first because that was something that they

 4    found during a physical search and they were able to

 5    convey sooner rather than later.

 6              And they were doing the search on the phone,

 7    the manual search, which took time, and recording the

 8    information.  And then we had been told at some point

 9    that the information had been conveyed.

10    Q    BY MR. LITTRELL:  So you and Mr. Andre were

11    communicating regularly that evening about the decision

12    to make a probably cause arrest?

13    A    We had several phone calls.

14    Q    And did you tech or e-mail each other about that

15    decision?

16    A    No.

17    Q    You had phone calls?

18    A    We had telephone calls, yes.

19    Q    No e-mails or other written communications?

20    A    We had e-mailed.  We had sent some e-mails.

21    Q    About this decision to make a probable cause

22    arrest?

23    A    They were e-mails to -- we were just trying to get

24    in touch with our supervisors.  We were e-mailing about

25    that.
```

```
1    Q      And have you produced those to the defense?

2    A      No.

3    Q      Okay.  Would you produce them?

4           MR. LITTRELL:  I would the Court to order that the

5    witness produce these e-mails related to this decision.

6           THE COURT:  Have they been produced to the court

7    in camera?

8           THE WITNESS:  No, your Honor.

9           THE COURT:  Then produce them to the Court in

10   camera first.

11          THE WITNESS:  Now, just so I understand the scope

12   of production, you want all communications between AUSA

13   Andre and I from that evening?

14          THE COURT:  The question related to the e-mails on

15   that evening that you sent to your supervisors to seek

16   approval for a probable cause arrest.

17          THE WITNESS:  I will look.  I don't know that

18   there are e-mails.  I believe that those conversations

19   happened by telephone.

20          THE COURT:  Maybe e-mails between and you Andre.

21   Q      BY MR. LITTRELL:  I believe you just testified

22   there were e-mails.  Is that not true?

23   A      So what I testified was that e-mails were sent.  I

24   believe that the e-mails were nonsubstantive in nature.

25   Q      I am asking for e-mails both substantive and
```

1    nonsubstantive that happened on October 19th and 20th

2    related to the decision to make a probable cause arrest.

3            Now, another thing that you learned from the

4    airport stop is that Ms. Terabelian had made statements;

5    right?

6    A    Yes.

7    Q    And they conveyed the substance of those statements

8    to you; right?

9    A    Yes.  I believe so.

10   Q    And some of the statements that she made were about

11   her family; right?

12   A    Yes.

13   Q    For example, she admitted to CBP Nazar Terabelian

14   was her father; correct?

15   A    I believe that she provided basic biographical

16   information, but we already knew that.

17   Q    And she also told CBP that he had died recently?

18   A    That is something I don't know.

19   Q    Well, would it refresh your recollection if I

20   showed you a copy of the CBP report?

21   A    Yes.  We received that on October 23rd.

22   Q    So this is actually -- I believe this is Exhibit 13

23   to your declaration.  And this is a report that you

24   received; correct?

25   A    On October 23rd.

```
1    Q      But this information had been conveyed to you by
2    CBP as it happened?
3    A      No.  I do not recall that.
4    Q      So on the 23rd October, you received a report that
5    not only she admitted her father was Nazar Terabelian but
6    that he had recently passed away?
7    A      I received this report on that date.
8    Q      You didn't know that he had died prior to getting
9    this report?
10   A      No.  I knew that he was her father.  I did not know
11   that he was deceased.
12   Q      And that was important to your investigation?
13   A      Well, hold on a second.
14   Q      You charged Ms. Terabelian with aggravated identity
15   theft for using her dead father's ID; right?
16   A      Yes.
17   Q      And you didn't know prior to getting this report on
18   October 23rd that her father had died?
19   A      I believe that we learned the fact that he had died
20   on October 22nd, and I don't believe it was from this
21   report.
22   Q      So that is a crazy coincidence.  The day before you
23   got this report, that is the day you learn that her
24   father died?
25   A      That is based on my review of e-mails.
```

1   Q      Have you produced those e-mails to the defense?

2   A      I'm sorry?

3   Q      Have you produced those e-mails to the defense?

4   A      We have not produced that e-mail to the defense.

5          MR. LITTRELL:  I would ask the Court order that

6   Mr. Fenton produce e-mails indicating --

7          THE COURT:  Let me see those e-mails also.

8          THE WITNESS:  Yes, your Honor.

9   Q      BY MR.LITTRELL:  But it was the day before you got

10  this report from CBP?

11  A      I believe so.  Yes.

12  Q      And this factor was not communicated to you or to

13  Mr. Andre or to Mr. Palmerton during the events of

14  October 19th or 20th?

15  A      No, I don't believe so it was.

16  Q      You don't believe so or it definitely was not?

17  A      I do not have a recollection of the fact being

18  discussed.

19  Q      She also told CBFP that Gohar Terabelian was her

20  sister; right?

21  A      That is written in the report, yes.

22  Q      And that is a report that was sent to you on

23  October 23rd?

24  A      Yes.

25  Q      And you didn't know that before?

1    A     I don't know if that is something that we knew

2    before.

3          No, actually I believe that we did know that

4    before, because we understood that Gohar had been married

5    to somebody named Arthur Penmegyian (ph.), who had an

6    association with an organized criminal group.  And I

7    believe that surveillance had been done on one of the

8    houses and found that a car registered in his name was at

9    one of the houses that we were --

10   Q     And you knew that was her sister?

11   A     Well, we tried to determine what the relation --

12   Q     I am just asking, did you know it was her sister

13   before you got this report?

14   A     I think we may have, yes.

15   Q     But you don't know?

16   A     I don't have a specific recollection, but I think

17   we may have.

18   Q     I want you to take a look at what has been marked

19   as Mr. Wong's declaration, Exhibit KX2.  Do you see that

20   on your screen?

21   A     Yes.

22   Q     Now, this is a compilation of 141 photographs that

23   you received on or about February 2nd, 2021; correct?

24   A     Yes.

25   Q     And these photographs were taken from the Miami

1  phones; correct?

2  A     Yes.

3  Q     And when you received these photographs on

4  February 2nd, 2021, you looked at them; right?

5  A     Yes.  I don't know if I looked at them

6  February 2nd, but I looked at them shortly thereafter.

7  Q     And you looked at all 141 of them?

8  A     Yes.

9  Q     Now, the Court indicated that some of the best

10 evidence comes from cell phones.  Is that your

11 understanding also in fraud cases?

12 A     Yes.  I think that good evidence can come from cell

13 phones, yes.

14 Q     So when you received these 141 digital photographs

15 you knew they had been taken by the CBP from the cell

16 phones that were seized from Mary Terabelian and Richard

17 Ayvazyan; right?

18 A     Yes.

19 Q     So they were of interest to you?

20 A     Yes.  They are they were of interest.

21 Q     They were a priority for you?

22 A     I wanted to review them.

23 Q     And you did?

24 A     And I did, yes.

25 Q     And one of the things you saw, just starting

```
 1   from -- this particular image helps you identify the

 2   phone seized from Mary Terabelian because it was one that

 3   actually belonged to her; right?

 4   A     Yes.  Because her e-mail address is there.

 5   Q     Same for this image here too?

 6   A     That I don't know.

 7   Q     Skipping to what has been marked as image 4B.

 8            You recognize that image; right?

 9   A     Yes.

10   Q     That was actually one of your trial exhibits?

11   A     Yes.

12   Q     And that was found on Mary Terabelian's phone

13   produced to you on November 22nd, 2021?

14   A     Yes.

15   Q     And that immediately piqued your interest; right?

16   A     I don't think that this particular piece of

17   evidence immediately piqued my interest but --

18   Q     Well, you testified earlier that she had already

19   been investigating Fiber One Media.

20   A     Yes.  Yes, that's right.

21   Q     And you see where it says Fiber One Media down at

22   the bottom here; right?

23   A     Yes.

24   Q     And these are handwritten notes with names and

25   identifying information on them; right?
```

```
 1    A      Yes.

 2    Q      So that did not immediately pique your interest?

 3    A      This is evidence of her link to Fiber One Media.

 4    Q      That's right.  And you got it from her tainted

 5    phone from Miami?

 6           THE COURT:  Will you keep your voice up a little

 7    bit, Mr. Littrell?

 8           MR. LITTRELL:  I will just try to speak up, your

 9    Honor.

10    Q      So this evidence that piqued your interest came

11    from Mary Terabelian's phone that was seized from her in

12    Miami; right?

13    A      This piece of evidence is from that phone.  Yes.

14    Q      And it later became a trial exhibit for you; right?

15    A      Yes.

16    Q      And the way it became a trial exhibit is that you

17    got it from a different phone; right?

18    A      That's correct.

19    Q      So you did a search warrant for 4910 Topeka; right?

20    A      Yes.

21    Q      And you seized a phone that was also associated

22    with Mary Terabelian; right?

23    A      Right.

24    Q      And that phone had over 44,000 images on it.

25    Remember?
```

1    A      I don't know if it had over 44,000.  I know it had

2    44,000 -- I don't know if they were user-generated

3    images.

4    Q      Good point.

5    A      Right. so a lot of that could have been like images

6    from the Internet or from applications, things of that

7    nature, that would be -- on anybody's phone.

8    Q      Sure.

9    A      But there were a lot of photos.

10   Q      And yet you were able to identify this exact one

11   from that new phone?

12   A      Yes.

13   Q      How did you do that?

14   A      So when we review the cell phones we look for a

15   couple of different things.  One is driver's licenses,

16   Social Security cards, things that are identification

17   documents.

18           We also looked for PPP and EIDL loan

19   applications.  And then we also look for handwritten

20   documents.  And this was one of the handwritten documents

21   that we found -- one of the few that we found on her

22   phone.

23   Q      And when you saw it, you immediately recognized it

24   from one that you had seen before from the Miami phone?

25   A      I was not the person who conducted the review of

```
 1   the phone to select that.
 2   Q    I am not asking about the selection.  I am saying
 3   when you saw it you recognized it as the same picture
 4   that was previously on the Miami phone?
 5   A    I did not look at this and compare it back to that
 6   phone, but it looks familiar.  It looks like something
 7   similar to what we had seen before.
 8   Q    Is this the first time you have actually compared
 9   this image and drawn the connection to the image found
10   on --
11   A    I don't know.  We may have done that before.
12   Q    Now, you also found -- and you knew when you were
13   doing your closing argument that you had first seen this
14   image on Ms. Terabelian's Miami phone; right?
15   A    No.
16   Q    You did not?
17   A    No.
18   Q    I am going to direct your attention to a portion of
19   your closing argument.  So in front of the jury you said,
20   "On a phone that was seized elsewhere, not at the airport
21   but someone else, at her home on November 5th, there was
22   an image that was discovered on Marietta Terabelian's
23   phone of Fiber One Media with the name Susanna
24   Mrkrtchyan.  Do you see that?
25   A    Yes.
```

1   Q      That is what you said to the jury?

2   A      Yes.

3   Q      Why did you specify to the jury that this was not

4   found at the airport but somewhere else?

5   A      It was reflex to just ensure that I was being clear

6   where the phone was being seized because I didn't want

7   there to be an issue down the road when we got to this

8   hearing that I had suggested that this phone had been --

9   that this information came from a phone that had been

10  seized at the airport.

11  Q      So as you were arguing to the jury, you were

12  thinking about the fact that you had first seen this

13  image on a phone that was seized at the Miami airport?

14  A      No.  I was thinking about the fact that I wanted to

15  be clear that this information came from a phone that was

16  seized from her home, and that it did not come from a

17  phone that was seized from the airport.

18           But I don't know -- I mean, I didn't recall

19  that this particular image was on that phone.  It was a

20  general precaution.

21  Q      Why would you need to take a precaution?

22  A      Mr. Littrell, we have been subject to several

23  motions alleging prosecutorial misconduct based on

24  statements that had been made that Mr. Ram alleged were

25  false and misleading because we failed to draw specific

1    distinctions between digital photographs and

2    identification documents and credit cards and physical

3    possession of credit cards.

4            So we were being extra careful to make sure

5    that there was no doubt where this information came from.

6    Q    But in fact it would have been true to say that

7    this was seized at the airport?

8    A    In hindsight, yes.

9    Q    Well, that is what you were thinking about when you

10   were arguing to the jury?

11   A    No.

12   Q    No.  You just decided when you got to this image

13   that you wanted to specify that it was not found at the

14   airport?

15   A    I wanted to be clear for the record that this was

16   something that came from their house and not from the

17   airport because I didn't want to have this come up with

18   in a post trial motion and be accused of basically making

19   some sort of false and misleading statement.

20   Q    Let me be really clear what I am saying.  I am

21   saying you were thinking about it, and maybe that's what

22   you should have done, but had you recused yourself from

23   this case, you never would have had to try to --

24           MR. CIPOLLETTI:  Objection.  Argumentative.

25           THE COURT:  Sustained.

```
 1   Q     BY MR. LITTRELL:  Now, so you are trying to
 2   compartmentalize the information in your head based on
 3   what you knew before October 20th and what you knew
 4   after, even as you argued it to the jury?
 5   A     No.  That is not -- that is absolutely not what
 6   happened.
 7   Q     Okay.  Going back to your declaration -- I'm sorry.
 8         Okay.  Moving through these messages.
 9         You looked at all 141 of these images after
10   you received them on February 2nd, 2021; right?
11   A     Yes.
12   Q     Now, this image right here, you had drawn the
13   conclusion that Mary Terabelian had assumed the identity
14   of Victoria Kauichko even before she was stopped at the
15   airport; right?
16   A     Yes.
17   Q     And that was just based on the bank records and the
18   fact that money was purchased for things that might
19   interest a woman?
20   A     No.
21   Q     Okay.  You didn't have any actual evidence prior to
22   looking at these photographs that Mary Terabelian
23   actually had a telephone with Victoria Kauichko's name,
24   Social Security number and address on it; right?
25   A     That's correct.
```

```
 1   Q     This was far more powerful than any evidence that
 2   you had before for the proposition that Mary Terabelian
 3   was actually using the Victoria Kauichko identity; right?
 4   A     Yes.  There are certainly links here.  I don't
 5   think it is far more powerful than the physical credit
 6   cards.
 7   Q     Looking at page --
 8   A     And, Mr. Littrell, just to be clear it did not
 9   change our decision.  We had planned to charge her
10   before.
11   Q     I am not asking about your decision to charge.  I
12   am asking about what you were thinking about and whether
13   you developed leads or theories of the case or
14   corroborated other evidence that you already had.
15   A     This didn't change the way they were thinking about
16   Marietta Terabelian or her role in the conspiracy.
17   Q     So for you as a fraud investigator, the fact that
18   she had text messages on her phone and Victoria
19   Kauichko's name, Social Security and address on her phone
20   was no more relevant or probative than any of the
21   evidence that you already had on that point?
22   A     What I am saying is we were going to charge her
23   before.
24   Q     I'm not asking --
25   A     Not that this was good evidence that we could
```

1  use --

2      THE COURT:  Answer the question.  He asked you a

3  question.  You can answer.

4      THE WITNESS:  Yes.  Yes.  This information is --

5  these -- this photo that you just showed, that is a photo

6  that had in information not been suppressed it could have

7  been an exhibit used during the trial.

8      THE COURT:  That is not the question.  The

9  question was looking at the information that had her name

10  and her credit card and other information, was that more

11  probative of the fact that she was -- Terabelian was

12  Kauichko than the circumstantial evidence that you

13  described before.

14      THE WITNESS:  Setting aside the physical credit

15  card.

16      THE COURT:  What?

17      THE WITNESS:  You are saying the bank records and

18  the other --

19      THE COURT:  I said looking aside from the

20  circumstantial evidence that you described about how the

21  bank accounts were used or where the money went and the

22  Runyan account and all of that, is the fact that you got

23  this information from the phone, was that more telling or

24  convincing that Terabelian was using the name Kauichko

25  than the previous information you had that led you to

```
 1   also think that?

 2          THE WITNESS:  Yes.

 3          THE COURT:  All right.  The answer is yes.

 4   Q     BY MR. LITTRELL:  And you mentioned that she was

 5   found with a credit card in the name of Victoria Kauichko

 6   at the airport; right?

 7   A     Yes.  A physical credit card.

 8   Q     But she denied that that was her credit card;

 9   right?

10   A     That is my understanding.

11   Q     And she said her husband put it in her luggage;

12   right?

13   A     Yes.

14   Q     And you didn't believe that?

15   A     No.

16   Q     But she didn't have any evidence to disprove it?

17   A     I think that the 2012 conviction and all the bank

18   records show that they were working together.

19          THE COURT:  You know something, I am the fact

20   finder here, so my memory is that credit cards were found

21   in Richard Ayvazyan's luggage and there was this credit

22   card found in her person, and to my way of thinking, a

23   reasonable person could certainly reach the conclusion

24   that she had the credit card in her person because she

25   was identified with that credit card.
```

```
 1   Q       BY MR. LITTRELL:  Is that your understanding,
 2   Mr. Fenton?
 3   A       Yes.
 4   Q       On her phone, however, you found more direct
 5   evidence that she was using that card; right?
 6   A       Not more direct than the card.
 7   Q       Really?  I'm showing you what has been marked, what
 8   is I guess image 9B, and that is a text message string
 9   between Mary Terabelian and someone named rich; right?
10   A       Yes.
11   Q       And that says, "If you need to pay anything, use
12   that Wells card you have"; right?
13   A       I don't -- oh.  Yes, I see him saying that.
14   Q       And that is not more persuasive than the fact that
15   it is actually just found in the luggage and she denied
16   that she put it there?
17   A       I don't know what this -- what card this is in
18   reference to.
19   Q       Well, the Victoria Kauichko credit card found in
20   Ms. Terabelian's possession was a Wells Fargo credit
21   card; right?
22   A       Yes.
23   Q       So now you have a text message between her and her
24   husband who you believe were working together where he
25   tells her if you need to pay anything use that Wells card
```

1    you have?

2    A      I don't know if that Wells card you have is the

3    card that you are referring to.

4    Q      Is this persuasive to you at all as a fraud

5    prosecutor on the subject that she was actually using the

6    Wells Fargo card that was found in her possession?

7    A      No.  I looked at the bank records.

8    Q      This is not meaningful to you?

9    A      I didn't associate this with that card.  I still

10   don't know if this is associated with that card.

11   Q      So you would not have put this in front of a jury

12   as contemporaneous evidence that she was using the Wells

13   Fargo credit card despite her claim that she didn't know

14   that it was there?  You wouldn't have used this as

15   evidence?

16   A      I don't know that this is associated with that.  I

17   don't know that this refers to that card.

18   Q      Okay.  So do you think it would have been

19   admissible to prove that point?

20   A      I don't know if this has anything do with the card

21   that was seized from her.

22   Q      I understand you don't know -- yeah.  What other

23   Wells Fargo cards did she have?

24   A      I don't know if she had other -- you mean in her

25   possession?

1    Q      Yes.

2    A      I don't know what other cards she had in her

3    possession in her own name.

4    Q      Okay.  You are a fraud prosecutor and you are

5    trying to build a case that Mary Terabelian is working

6    with her husband to perpetuate a massive fraud; right?

7    A      Right.

8    Q      And you believe that she is using the identity of

9    Victoria Kauichko; right?

10   A      Yes.

11   Q      And you find a credit card in her carry-on luggage

12   that says Victoria Kauichko on it?

13   A      Right.

14   Q      And she is also carrying a cell phone in which she

15   is testing with her husband, Rich, and he says if you

16   need to pay anything use that Wells card you have.  You

17   don't think that's relevant?

18   A      I don't know if this is a reference to that card.

19   If it were a reference to that card, then it would be

20   relevant.  I didn't look to see whether or not it would

21   be.  But if it was, it would be relevant.  Yes.

22   Q      So without making that connection, it is not

23   relevant to you?

24   A      He could be referring to a Wells Fargo card that

25   she had in her own name.  I have no idea.  I didn't look

1    into this particular digital -- and the reason why was we

2    had mountains of evidence and this was not one of the

3    ones that stood out.

4    Q      Did you have any evidence of Mary Terabelian

5    actually texting with her husband about PPP loan fraud?

6    A      No.

7    Q      So now you have evidence from a phone found on her

8    possession of her texting with her husband about the use

9    of a Wells Fargo card and you think that the evidence you

10   had prior to that is more persuasive than this?

11   A      I don't know that that has anything do with the PPP

12   fraud or with the card that was found.

13   Q      And you don't think that you could argue to the

14   jury or draw a conclusion as a fraud prosecutor -- you

15   don't have enough information?

16   A      I don't know if it is related to the Wells Fargo

17   card that was found on her person.  I just don't.

18   Q      Moving on to image 10B, this is also found in Mary

19   Terabelian's phone; right?

20   A      Yes.

21   Q      And that is a credit card in the name of Nazar

22   Terabelian; right?

23   A      Yes.

24   Q      And your theory of the case was that Mary

25   Terabelian actually used and possessed the identity of

```
 1   Nazar Terabelian commit PPP loan fraud; right?
 2            You have no evidence that Mary Terabelian
 3   applied for a loan on behalf of Nazar Terabelian; right?
 4   A     I'm sorry.  We don't have evidence that she --
 5   Q     Applied for for a loan on behalf of Nazar
 6   Terabelian?
 7   A     That she was actually the person who submitted it?
 8   Q     Right.
 9   A     No.
10   Q     What other evidence do you have that she actually
11   possessed or used his identity other than this?
12   A     The use of Nazar Terabelian -- there were PPP loan
13   funds that were going to Nazar Terabelian accounts that
14   were then being transferred out to Victoria Kauichko and
15   other individuals and being spent on various things that
16   went back to her house.
17            THE COURT:  I think it is this glass thing.
18            THE WITNESS:  I'm sorry, your Honor.
19            THE COURT:  Give your answer again, the last
20   answer.
21            THE WITNESS:  Sure.  So the evidence was in the
22   use of the PPP funds and her relationship to Nazar
23   Terabelian.
24   Q   BY MR. LITTRELL:  So the fact that it is her father
25   and the fact that the money from the Nazar Terabelian
```

1    loans ultimately went to purposes that benefited her.

2    That is what you knew before; right?

3    A      It is the fact -- yes, as soon as he dies they used

4    his name to apply for these loans.

5    Q      When you saw say they, who did that?

6    A      The theory of the case was that Richard Ayvazyan

7    and Marietta Terabelian did, and then the money, the

8    fraudulent funds went into the Nazar Terabelian bank

9    account that was opened and then they went out to

10   Victoria Kauichko and then got spent on furniture,

11   jewelry, gold coins that we found at their house, things

12   of that nature.

13   Q      Right.  And that was your evidence.  In the first

14   indictment, did you not charge Mary Terabelian with

15   aggravated identity theft in relation to the use or

16   possession of Nazar Terabelian's identity; right?

17   A      That is correct.  We only charged one individual

18   with aggravated identify theft.

19   Q      And it was not Mary Terabelian.

20   A      It was Richard Ayvazyan.

21   Q      But the second superceding indictment added a count

22   of aggravated identity theft against Mary Terabelian for

23   using and possessing her father's identify documents;

24   right?

25   A      Right.

```
 1   Q      And that happened after you saw this image of the
 2   credit card belonging to Nazar Terabelian on Mary
 3   Terabelian's phone; right?
 4   A      Are you just asking --
 5   Q      Just asking did it happened afterward.
 6   A      Chronologically, yes.
 7   Q      Turning to page 18.  This was an image found in
 8   Mary Terabelian's phone at the Miami airport; right?
 9   A      Yes.
10   Q      And it was a list of entities.  And it says,
11   Belgium, LLC and Piccadilly; right?
12   A      Right.
13   Q      You also saw text messages between that person that
14   you refer to as Berj Jeweler.
15          THE COURT:  When you say he saw these messages on
16   the phone, what timeframe are we talking about?
17   Q      BY MR. LITTRELL:  Well he saw them shortly after
18   February 12th, 2021?
19   A      February 2nd.
20   Q      Sorry, February 2nd, 2021?
21   A      That's right.  So that we had subpoenaed this
22   information back in December.  So three months before I
23   saw this photograph, we had already subpoenaed
24   information from these retailers.
25   Q      And one of these retailers was Piccadilly Jewelers,
```

1  right?

2  A     Yes.

3  Q     So you had subpoenaed information from them, but

4  you thought their production to you was incomplete?

5  A     Yes.

6  Q     And it was incomplete because it didn't include

7  text messages; right?

8  A     We thought there would be communications.

9  Q     And you thought there would be communications

10 because you actually saw those communications on Marietta

11 Terabelian's phone that was seized at the Miami airport;

12 right?

13 A     That was one of the reasons.  Yes.  But --

14 Q     What other evidence did you have of communications

15 between Mary Terabelian and Piccadilly Jewelers?

16 A     We thought that they were --

17 Q     I am not asking what you thought.  I am asking what

18 evidence you had.

19 A     There was no other evidence.  The reason why we

20 asked for those communications was because they were

21 transacting business during the pandemic and we thought

22 that they were probably not transacting business in

23 person but by via e-mail or text message or telephone.

24 So we thought it look likely that there would be some

25 sort of record to go along with these purchases.

```
 1   Q     And you were surprised when Mr. Spertas didn't
 2   provide any text messages to you; right?
 3   A     Yes.  I was surprised.
 4   Q     It wasn't just because you thought they might have
 5   exchanged text messages.  In fact you knew that; right?
 6   A     Yes.
 7   Q     Which is why when you called Mr. Spertas you
 8   actually referred to the specific text messages that you
 9   got from Ms. Terabelian's phone; right?
10   A     I don't know if I referred to them specifically,
11   but I definitely had them in my mind at the time.
12   Q     And that is how you knew that his production was
13   incomplete?
14   A     That is one of the reasons I believed it was
15   incomplete.  Yes.  But we never got text messages and we
16   never interviewed Mr. Berj.
17   Q     And yet you still argued to the jury that purchases
18   from Piccadilly Jewelers were made by any Mary
19   Terabelian.
20   A     Right, because the receipts were all to Victoria
21   Kauichko and then the proceeds were found in her house.
22   Q     But this corroborated your theory of the case, did
23   it not?
24   A     I think it is cumulative evidence.
25   Q     I didn't ask you if it is cumulative.  It
```

```
 1   corroborated your theory of the case?

 2   A      I viewed it as cumulative.

 3   Q      Again, did it corroborate your theory of the case

 4   or not?

 5          MR. CIPOLLETTI:  Objection.  Asked and answered.

 6          THE COURT:  You are debating cumulative versus

 7   corroborative.  I mean, it depends upon how you define

 8   the term.  They can be overlapping.  I mean, something is

 9   cumulative.  If it is relevant, it is always

10   corroborative.  So I don't know how else I can understand

11   the difference.

12          MR. LITTRELL:  Well, if it is cumulative, it adds

13   no value.

14          THE COURT:  It doesn't mean it has no value.

15   Cumulative is just a description to describe additional

16   evidence.  Corroborative I guess just means that without

17   this evidence the point would not be proven.  Is that

18   what you are getting at?

19          MR. LITTRELL:  No, what I am getting at is it is a

20   much stronger point and it would embolden someone to make

21   that argument.  But I think the Court can draw its own

22   conclusion about that.

23   Q      Now, turning to your declaration, Mr. Fenton, at

24   paragraph 50.  Let's see if I can get it up here.

25   A      Is this the first declaration?
```

```
 1   Q      Yes.

 2   A      Paragraph 50?

 3   Q      Yes.  Regarding the review of the Cellebrites.  You

 4   recall accessing and reviewing the first three filtered

 5   Cellebrite reports, but you do not have a specific

 6   recollection of the information that you saw; is that

 7   true?

 8   A      With the exception of the example that I identify

 9   above, that is correct.

10   Q      And you don't recall at all whether you accessed or

11   reviewed the last two filtered Cellebrite reports?

12   A      Yes, that's right.

13   Q      However, you still believe that the review of those

14   reports was cumulative.

15   A      The information that I saw was cumulative.

16   Q      How can you say that the information is cumulative

17   if you don't even recall looking at it?

18   A      Well, I explained it in the declaration.  I was

19   running search terms for things that I was already aware

20   of.  And one of the examples I gave was like Victoria

21   Kauichko.

22          So there is a search function which to the

23   extent that Cellebrite is useful and it's not, the search

24   function is the most useful thing.  So I would put in

25   like Kauichko and then run a search and then I would put
```

1   in Zhadko and run a search and I would see whatever hit.

2   Q    But you don't recall doing any of that for the

3   second two Cellebrites?

4   A    For the last two?

5   Q    Right.

6   A    No.  Because at that point we had so much

7   difficulty and frustration opening these things and using

8   them they crashed the computer.

9        THE COURT:  You say the first two and the last

10  two.  Are you talking about February 12th and 19th?

11       MR. LITTRELL:  I am referring to the last two --

12       THE COURT:  Oh, no.  March 19th and April 8th?

13       THE WITNESS:  Exactly.  Yes.

14  Q    BY MR. LITTRELL:  Those are the ones you testified

15  you have no recollection of whether you looked at them at

16  all?

17  A    Right.  Right.  At that point we were focused on

18  other things.  And they were extremely difficult to open

19  and navigate and use and they kept crashing my computer.

20  So we were, you know, spending our limited time on other

21  case demands on other projects.

22  Q    And part of the reason you could do that is because

23  you had already seen photographs from the Miami phones so

24  you could predict what would be on the later phones;

25  right?

```
1    A      No.

2    Q      Now, looking at your declaration at paragraph 51,

3    you and Mr. Faerstein decided in the first superseding

4    indictment that would you not reference any of the

5    information found on the phones seized in Miami in the

6    first superseding indictment or the presentation to the

7    grand jury; right?

8    A      That's correct.

9    Q      Why did you decide that?

10   A      Because we didn't need to and because we thought

11   that you know, we didn't want to present any issues down

12   the road.

13   Q      What kind of issues?

14   A      We saw this as being a potential Fourth Amendment

15   issue and Miranda issue and we just didn't want to -- we

16   didn't need to put that into the indictment or the

17   presentation because we had mountains of other evidence.

18          And this is a case about following the money,

19   so we just made an affirmative decision do not put that

20   information there because it's not -- you know, we don't

21   need to.

22   Q      But even if it had been suppressed later, it

23   wouldn't have caused any problem for your indictment;

24   right.  You can present evidence that's seized illegally

25   to the grand jury, can't you?
```

1    A       At that time, I think that is correct.  But it just

2    want worth any -- you know, any litigation risk because

3    it was totally unnecessary risk.

4    Q       Okay.  Understand.  Now, you recall we had some

5    plea discussions; correct?

6    A       Yes.  Very preliminary.  Yes.

7    Q       And when we discussed a potential plea, I indicated

8    to you -- let me actually see if I can get this.  I

9    indicated to you that I was looking for an opportunity to

10   somehow make a deal with you to keep Mary Terabelian out

11   of jail; right?

12   A       Yes.

13   Q       That was my goal; right?

14   A       Yes.

15   Q       And you objected to that; right?

16   A       I did.

17   Q       And the reason you objected to that is because of

18   this theory that Mary Terabelian and her husband were

19   working together and they were peas in a pod; right?

20   A       That's correct.

21   Q       And you have reviewed the declaration of Ryan

22   Fraser submitted as part of our joint submission;

23   correct?

24   A       Yes, I did.

25   Q       Are any of the facts in that declaration incorrect?

```
 1   A      I don't agree with the characterization.

 2              Let me take a moment to look at it again.

 3              Okay.  Can you turn to the next page, please?

 4              All right.  Can you turn the page?

 5              Based on my recollection I think that is

 6   generally accurate.  Yes.

 7   Q      Now, when you first learned that there was going to

 8   be a Kastigar hearing in this case, you spoke with your

 9   supervisors about it; right?

10   A      Yes.  We spoke to a supervisor, yes.

11   Q      And you spoke to your co-counsel about it; right?

12   A      To Ms. Ahn and Mr. Paetty?

13   Q      Yes.

14   A      About the fact that there might be a Kastigar

15   hearing?

16   Q      The fact that there was in fact going to be a

17   Kastigar hearing.

18   A      Yes.

19   Q      And you discussed the possibility that one or more

20   of you might have to recuse yourselves; right?

21   A      No.

22   Q      It never occurred to you to discuss that

23   possibility?

24   A      I don't think that we thought there was a risk that

25   we were going to have to recuse ourselves, no.  I don't
```

```
 1    recall discussing recusal.

 2    Q    At any point.  Have you discussed it with your

 3    colleagues between then and now?

 4    A    As a broad concept that that is one of the things

 5    that might happen in a Kastigar setting, yes.  But I

 6    don't have any recollection specifically of discussing

 7    who would be recused or why or anything like.

 8    Q    But did you at least consider the possibility that

 9    you might avoid some of these problems if you recused

10    yourself prior to trial?

11         THE COURT:  What problems?

12         MR. LITTRELL:  A Kastigar hearing and the fact

13    that he would have to explain and reconstruct hundreds of

14    decisions.

15         THE COURT:  I don't understand the relationship

16    between recusal and a Kastigar hearing.

17         MR. LITTRELL:  Well, the case law essentially says

18    that when the government knows there is a Kastigar

19    problem, the proper course of action is to identity

20    prosecutors who are tainted or been exposed to tainted

21    information.

22         They can recuse themselves, summarize the

23    information they had up to that point, and if necessary

24    start over.  That way you don't have a situation where

25    you have to retrospectively explain every decision you
```

1  made and affirmatively prove that it is not based on

2  tainted information.

3      THE COURT:  I follow what you are saying.  Go

4  ahead.

5  Q   BY MR. LITTRELL:  So you never considered doing

6  that?

7  A     Absolutely not.  No.

8  Q     And I guess looking back now, is there anything you

9  would have done differently?

10      MR. CIPOLLETTI:  Objection.  Calls for

11  speculation.

12      THE COURT:  I think that is too open-ended a

13  question.  So thank you, Mr. Littrell.

14          All right.  You can step down.

15      THE WITNESS:  Thank you, your Honor.

16      THE COURT:  Now, is Palmerton here?

17          Is he the next person?

18      MR. RAM:  We were going to call Paetty because he

19  has a trial he is preparing for so he asked us if he

20  could go next.

21      THE COURT:  All right.  Paetty.

22          The questions should be more pointed as we

23  progress with these other witnesses because we have the

24  broad outline.  That is why I wanted Fenton to be the

25  first witness.

```
 1              Unless it becomes important, let's be a little
 2   more laser-like with these other witnesses.
 3              MR. KEOUGH:  Yes, your Honor.  I think everything
 4   I am going to cover is specific to Mr. Paetty, and not
 5   repetitive of what we just did with Mr. Fenton.
 6              THE COURT:  All right.  That will be good.  Thank
 7   you.
 8              THE CLERK:  The witness will please step forward
 9   and stand behind the court reporter.
10         (The witness was sworn.)
11              THE CLERK:  Please be seated.
12              THE COURT:  Who is coughing there?  Who is
13   coughing?
14              MR. RAM:  I did.
15              (Discussion off the record.)
16              THE CLERK:  State your name for the record.
17              THE WITNESS:  Scott Paetty, S-C-O-T-T,
18   P-A-E-T-T-Y.
19                     CROSS-EXAMINATION
20   BY MR. KEOUGH:
21   Q    Good afternoon, Mr. Paetty.
22   A    Good afternoon.
23   Q    You were assigned to this case on February 10th,
24   2021; correct?
25   A    Yes.
```

```
 1  Q    And when you joined the team were you given any
 2  background materials to review?
 3  A    At the time I joined, no.  I was shortly thereafter
 4  given access to a share drive folder that contained the
 5  prosecution materials and various other things related to
 6  the investigation.
 7  Q    And can you give us a summary as best you can of
 8  what was on that share drive when you joined the team and
 9  you were given access to it?
10  A    From my memory, there were quite a few folders on
11  it, populated with loan files, I think, populated with
12  documents related to the original indictment in the case.
13  There were some charging instruments in there.
14           I think there were information related to the
15  complaint.  I think there were several -- a couple of
16  complaints in this case for defendants.  And then search
17  warrant information.  There were search warrants that
18  were executed prior to me joining the case.  And there
19  was those materials on there as well.
20  Q    And in addition to that share drive, did you meet
21  with anybody for, say, a download about what had happened
22  on the case up to the point when you joined?
23  A    I had phone calls with various members.  I had
24  phone calls with the prior prosecutor on the case, prior
25  AUSA on the case, Julian Andre.  I spoke to supervisors
```

```
 1   who were checking in with me regarding scheduling
 2   concerns about the case and other projects I was working
 3   on and whether this was a case that scheduling -- that my
 4   schedule would permit me to join.
 5   Q      And at the time that you had access to the share
 6   drive or had those phone calls to discuss with the
 7   prosecutors who were there before you, were you aware at
 8   the time that any of them had reviewed information that
 9   related to the phones that were seized in Miami?
10   A      Was I -- repeat that question?
11   Q      Sure.  So you joined the case.  You have those
12   phone calls.  You have access to the share drive.  And at
13   any point during those communications were you aware at
14   the time that any of those people had had access to
15   information from the Miami phones?
16   A      Not that I recall.
17   Q      And as part of the phone calls or as part of
18   explaining the share drive to you, did anybody identify
19   to you any information that might have been related to or
20   seized or derived from or related to in any way the Miami
21   phones?
22   A      On the share drive?
23   Q      On the share drive or as part of those phone calls.
24   A      On the share drive, no.  It was made clear to me
25   that there was a border search and that I would be
```

1  joining the team, and that part of what my

2  responsibilities would be is addressing what was imagined

3  to be -- in fact it wasn't imagined to be -- my

4  understanding is that through conversations with counsel

5  for Mr. Ayvazian, your colleague Mr. Ram had made it

6  clear to the prosecutors that a motion to suppress was

7  forthcoming related to searches at the border.

8  Q     And we will get to the motion to suppress in just a

9  second.  But just thinking about when you joined the

10 case, you looked at the share drive, you had those phone

11 calls.  And if I were to ask you today to tell me if any

12 of that stuff wasn't formed by other prosecutors having

13 access to the Miami phones, you wouldn't be able to tell

14 me because at the time you just didn't know?

15 A     Correct.

16 Q     Now, as you just said, you joined the team.  Your

17 first role was to respond to motions to suppress?

18 A     Correct.

19 Q     And that was your primary focus on the team from

20 about February 10th until March 15th?

21 A     Correct.

22 Q     And to prepare for the responses to those motions

23 to suppress, you reviewed CBP reports that were prepared

24 as part of the stop in Miami?

25 A     Correct.

```
 1   Q       CBP reports contained approximately eight pages of
 2   statements and other evidence related to stop of
 3   Mr. Ayvazyan and Ms. Terabelian?
 4   A       As far as the page number goes, I don't recall
 5   exactly, but I remember there were two sets of reports,
 6   one for Mr. Ayvazian and one for Ms. Terabelian.
 7   Q       And we are just going to look at that report real
 8   quick here.  It is Fenton Exhibit 13.
 9           Okay.  If we could, let's go it page 5 of the
10   PDF.
11           Actually, let's start on page 2.
12           Okay.  So, Mr. Paetty, you recognize this as
13   the CBP report that you reviewed as part of your work
14   responding to those suppression motions?
15   A       It appears to be.
16   Q       Okay.  Now let's go to page 5.
17           When you reviewed this report, as part of that
18   work you saw the statement there where it reads,
19   "Information revealed during the basic electronic media
20   inspection confirmed that the subject was taken on the
21   identity of Victoria Kauichko.  This was evident via
22   messages where the subject was referred to as Victoria
23   Kauichko."
24   A       That is what this states.  Which report is this
25   again?
```

```
1    Q       This is one of the two CBP reports that were
2    provided after the Miami stops that were attached as the
3    Exhibit 13 in the Fenton declaration.
4    A       Is this related to Ms. Terabelian?
5    Q       Yes.  And you recall that you reviewed this report
6    as part of your work preparing for those motions?
7    A       Correct.
8    Q       Now, if we could go to page 8 of the PDF.
9            So now this is the -- as you mentioned, there
10   are two reports, right, one about Terabelian, one about
11   Ayvazian.  This is the Ayvazian report.  And you see
12   there midway through the page where it says, "Examination
13   of phone revealed a California identification card with
14   the name Iulia Zhadko with a picture of a male and
15   Ayvazian home address on it.  In addition conversations
16   regarding possible fraud were also discovered."  Do you
17   see that?
18   A       Can you point me to where that is, please?
19   Q       Yeah.  Let's find it together.
20           It is in the bottom paragraph.
21           There it is.  Okay.  Fourth line from the
22   bottom if you want to highlight it there.  Okay.
23           So the line begins on the left side
24   approximately -- there we go.
25           "Examination of the phone revealed a
```

```
 1    California identification card with the name Iulia Zhadko

 2    with a picture of a male and Ayvazian home address on it.

 3    In addition conversations involving possible fraud were

 4    also discovered."  Do you see that there?

 5    A      Yes.

 6    Q      And do you recall reviewing this report?

 7    A      I do.

 8    Q      Do you recall that section of the report?

 9    A      I do.

10    Q      Now, when you reviewed these reports -- go ahead

11    and take that down.  When you reviewed these reports, I

12    believe in your declaration you said it was

13    February 16th, so you had been on the case for less than

14    a week?

15    A      Correct.

16    Q      And did seeing those statements about assuming or

17    taking on the identity of Victoria Kauichko and finding a

18    California identification card with the name Iulia Zhadko

19    on a phone in Richard Ayvazyan's possession, did those

20    references affect your opinion about the case at that

21    early stage?

22    A      I am not sure what you mean.

23    Q      Did it change the way that you thought about how --

24    for example, how persuasive the evidence was against

25    these two defendants?
```

1    A    I mean at that stage, I really didn't know anything

2    about the case.  I was learning as I went, so I am not

3    sure I would think of it in those terms.

4    Q    How would you think of it?

5    A    As information that I am gathering in getting up to

6    speed on the case.

7    Q    And certainly based on the time you reviewed it,

8    this was early information you received; that is fair to

9    say?

10   A    Correct.

11   Q    Now, if we could pull up what was marked Kastigar

12   Exhibit 2 attached to the defendant's submission.  And

13   let's go to PDF page 109.

14        So you reviewed the CBP report that referenced

15   California identification cards and then two days later

16   you received access to 141 photographs that had been

17   taken of the phones by the CBP officers in Miami.  Do you

18   recall that?

19   A    Yes.

20   Q    And you reviewed those photographs?

21   A    Yes, I did.

22   Q    And you saw as one of those photographs that is

23   here in exhibit KX2 -- this is image 107B, which is a

24   California identification in the name of Iulia Zhadko;

25   correct?

```
 1   A      That is what appears here; correct.

 2   Q      And if we go to two pages down, page 111 of the

 3   PDF, this is image 108B, and again, in that second

 4   review, we have got another identification of Iulia

 5   Zhadko, a California driver's license that is here on the

 6   phone; correct?

 7   A      That is what appears here; correct.

 8   Q      And then let's go one more, to page PDF page 127.

 9   And here is one more, image 123B.  It is a California

10   identification in the name of Iulia Zhadko found on that

11   same phone from Miami; correct?

12   A      It is.  I am not sure if those are the same photos

13   or not.  It is -- this is another identification card

14   similar to the other one.

15   Q      And these images were in the set of 141 photos

16   right?  That is not in dispute?

17   A      I can't recall whether there were three separate

18   photos in there.  I know I have seen this before, and I

19   know it was on the phone, but I don't know if it was

20   three times or one time.  I can't recall.

21   Q      But you reviewed it and you do recall seeing an

22   identification even if you don't remember all three of

23   these admittedly similar pictures?

24   A      That's correct.

25   Q      So now let's bring up the trial transcript from
```

```
 1   June 24th, and let's go to page 136.  Okay.

 2              And if you could just do the zoom thing on the

 3   top paragraph and in that first small line right there.

 4              So, Mr. Paetty, you recall that you gave the

 5   rebuttal summation as part of the government's case at

 6   trial?

 7   A    Yes.

 8   Q    And this is a transcript of that rebuttal

 9   summation.  And you see here where you said on line 3,

10   "In fact, the only sloppiness in this investigation, the

11   only sloppiness here is Richard Ayvazyan when he got

12   caught carrying those IDs.  We will talk about it in a

13   minute.  He got caught with his hand in the cookie jar in

14   Miami."

15              That was something you said to the jury during

16   the trial; correct?

17   A    That is what appears on these transcript.

18   Q    And no reason to believe that this is an inaccurate

19   transcript of what you said?

20   A    Doesn't appear to be.

21   Q    And as we just saw you reviewed a CBP report that

22   mentioned finding a California identification on the

23   phone in Richard Ayvazyan's possession; correct?  You

24   reviewed that CBP report as part of your work in this

25   case?
```

```
 1   A      Yes, I did.

 2   Q      And we saw that as part of those 141 images you

 3   reviewed at least one -- potentially three pictures -- of

 4   California identifications found on Richard Ayvazyan's

 5   phone in his possession; correct?

 6   A      I did.  I don't think those are what I am talking

 7   about here, but yes, I did see those and that is not what

 8   I am talking about here.

 9   Q      What other IDs was Richard Ayvazyan carrying?

10   A      He was carrying credit cards.

11   Q      Why didn't you say credit cards?

12   A      I'm not sure, but I'm sure if we go down and say to

13   we'll talk about it in a minute I am referring to the

14   credit cards.

15   Q      But you didn't say credit cards; right?  You said

16   IDs?

17   A      I said IDs.

18   Q      We can go ahead and take that down.  So you were

19   notified on February 23rd, 2021 that two Cellebrite

20   reports had been uploaded to USAFX; correct?

21   A      Repeat that.

22   Q      In your declaration you said that you were notified

23   on February 23rd, 2021 that two Cellebrite reports had

24   been uploaded to USAFX?

25   A      Correct.
```

1    Q      And USAFX is a system that lets people at the
2    Department of Justice share files?
3    A      Correct.
4    Q      And in your declaration you wrote that you did not
5    access those Cellebrite reports?
6    A      I did not.
7    Q      And do you recall why you did not try to access
8    them?
9    A      Why I did try to access them?  It was my
10   understanding at the time there were technical issues
11   with it.  They were large files that were not easy to
12   access.  They were jamming up computers, et cetera.  And
13   I was busy working on other things.  So it wasn't worth
14   my time.
15   Q      Other people on the team, though, you understand
16   did look at the Cellebrites?
17   A      I'm not sure if they looked at them.  I don't know
18   the answer to that.  I know that there was people who
19   were trying to either transfer them or perform some sort
20   of a technical something on them.  And it was not
21   working.
22   Q      Are you aware if anybody on the team was able to
23   review Cellebrite reports or information from Cellebrite
24   reports for the phones that were seized in Miami?
25   A      I don't recall.

```
1    Q      So also fair to say then that you can't tell us
2    whether or not a particular piece of information that
3    those people who, if they did review the Cellebrite,
4    shared with, you wouldn't know if it was from the Miami
5    phone because you are not sure if they reviewed it?
6    A      That is a confusing question.
7    Q      Let me ask it a different way.  You can't tell us
8    whether or not anybody reviewed the Cellebrite; correct?
9    A      Yeah.  I don't know whether they did or didn't.
10   Q      Because you personally didn't review it?
11   A      That's correct.
12   Q      And you are not sure if anybody else did?
13   A      That's correct.
14   Q      But if people did review the Cellebrite and perhaps
15   developed a lead or shared a piece of information for
16   you, unless they directly told you that it was from the
17   Miami phone Cellebrite, because you yourself didn't
18   review it, you wouldn't really know whether or not --
19          MS. WESTFAHL KONG:  Objection.  Calls for
20   speculation.
21          THE COURT:  It is a long question.  Can you
22   shorten it up?
23          MR. KEOUGH:  Sure.
24   Q      Let me ask it this way.  Are you aware whether or
25   not any information from the Miami Cellebrite reports
```

```
 1   reviewed by anyone was shared with you?
 2   A    I couldn't -- again, I can't guess as to that.
 3   Q    You also stated in your declaration that you
 4   reviewed the prosecution memorandum prior to the
 5   superseding indictment; correct?
 6   A    Yes.
 7   Q    And that contained a reference to information from
 8   one of the Miami phones; correct?
 9   A    It did.
10   Q    You mentioned an example of evidence of Richard
11   Ayvazyan's ties to the Canoga Avenue apartment as
12   something that was in the prosecution memo that you saw
13   when you reviewed it?
14   A    It was in a footnote, as I recall.
15   Q    But it was in the prosecution memo?
16   A    Correct.
17   Q    And there was another reference in there as well,
18   correct, to Ayvazyan's control over his alias Iulia
19   Zhadko, that was established by, among other things, the
20   search of the Miami phones?
21   A    I don't have a recollection of that.
22   Q    Okay.  Let's pull up the Faerstein declaration.
23        MS. WESTFAHL KONG:  Objection.  Foundation.  I
24   don't think this witness has reviewed the Faerstein
25   declaration.
```

```
1          THE COURT:  He can be asked about it now, if he
2   did or not.  Maybe you should ask whether he ever
3   reviewed this declaration.
4          MR. KEOUGH:  So, your Honor, the question is -- it
5   is not about whether he reviewed the declaration.  It is
6   to see if it refreshes his memory of another reference in
7   the prosecution memo, which he has testified he reviewed.
8          THE COURT:  I don't understand the point.  I mean,
9   you are attempting to show that through looking at a
10  memo -- did you see this memo before?
11         THE WITNESS:  No, your Honor.
12         THE COURT:  A memo that he never saw before, that
13  that will refresh his memory as to something in the
14  prosecution memo?
15         MR. KEOUGH:  So I think the witness has testified
16  he saw the prosecution memo.  This declaration contains a
17  statement about another piece of information included in
18  that memo, and I want to know if he recalls whether or
19  not that same piece of information was in the memo that
20  he reviewed.  They are both looking at the same document.
21         THE COURT:  In other words, your question is
22  whether the prosecution memo included information that
23  was in the Faerstein report?
24         MR. KEOUGH:  A little bit different, your Honor.
25         THE COURT:  Who authored the prosecution memo?
```

```
 1          MR. KEOUGH:  Well, my understanding is that it was
 2   the prosecutors on this case.
 3          THE COURT:  I mean, did you author it?
 4          THE WITNESS:  No, your Honor.
 5          THE COURT:  Do you know who did?
 6          MR. KEOUGH:  I --
 7          THE COURT:  I'm asking him.
 8          THE WITNESS:  Your Honor, I am not sure who the
 9   principal author was.
10          THE COURT:  So, I am not seeing the point here.  I
11   don't understand how his reviewing the prosecution memo
12   would be influenced by showing him a document he never
13   saw.  I mean, I don't see the connection.
14          MR. KEOUGH:  Let me try asking it a different way.
15   Q    Do you recall whether or not there was a reference
16   to Ayvazian's control over his alias Iulia Zhadko in the
17   prosecution memo that you reviewed?
18   A    I don't recall.
19   Q    And if you saw a summary of that memo written by
20   the person who did author it, would that refresh your
21   recollection?
22   A    I am not sure.  I mean, I don't know who -- that is
23   asking me to speculate on a document that I have never
24   seen and information that I am not exactly sure about.
25   Q    Well, let's show it to you.  It is the Faerstein
```

```
1    declaration.
2          MS. WESTFAHL KONG:  Objection.  Improper
3    refreshing.  He hasn't said it would refresh his
4    recollection.
5          THE COURT:  Well, I mean, the examiner is allowed
6    to make an effort to refresh his memory, and the law is
7    kind of liberal on what can or can't be used to refresh
8    your memory, but let him look at it.
9    Q    BY MR. KEOUGH:  So let's put -- back up.  We just
10   had up -- there it is.  The Faerstein declaration,
11   paragraph 31.
12         Take a second and read it and let us know when
13   you are ready.
14   A    Okay.
15   Q    Now, do you recall whether the prosecution memo
16   included a sentence saying that Ayvazian's control over
17   his alias Iulia Zhadko was established by, among other
18   things, a search of his mobile devices?
19   A    I don't recall seeing that.
20   Q    We can go ahead and take it down.
21         In your declaration you said that there were
22   conversations in advance of the grand jury presentation
23   about avoiding using evidence from the Miami cell phones.
24   Do you recall that?
25   A    Yes.
```

1   Q      Now, as part of those conversations did you recall

2   anyone saying that you shouldn't include loans that were

3   investigated as a result of information from the Miami

4   cell phones?

5   A      Repeat that.

6   Q      As part of those conversations about avoiding using

7   evidence from Miami in the grand jury presentation or the

8   superseding indictment, do you recall anybody saying in

9   part of those conversations we shouldn't include loans

10  that were investigated as a result of the information you

11  found on the Miami phones?  Did anybody say anything like

12  that during those conversations?

13  A      I recall having conversations about not including

14  loans.  And I think it was about ten of them.

15          I can't recall when that took place.  I can't

16  recall exactly whether it was in relation to grand jury

17  or trial, but I recall that conversation being had.

18  Q      Do you recall who was part of that conversation?

19  A      I can't recall specifically by but you I know

20  members of the prosecution team, the trial team.

21  Q      Do you recall whether it was agents, prosecutors,

22  mix of both?

23  A      It may have been a mix of both.  I can't recall

24  specifically.

25  Q      And do you recall what was the reasoning behind, as

1    I think you just described, not using those ten loans

2    that may have been related to evidence from Miami?

3    A      That was the reason.

4    Q      That -- sorry, say that again?

5    A      The question that you just asked was whether that

6    information was potentially related to the cell phones in

7    Miami.

8    Q      Sorry.  The question was what was the discussion

9    around that?  What was the reason why they didn't want to

10   use that information?

11   A      Well, at the time it was -- and again, I am not

12   sure when that conversation took place.  If it would have

13   taken place at the time of the superseding indictment,

14   there was pending litigation.  If it would have taken

15   place later, after the Court's ruling, which I believe

16   was in late April on the motions to suppress, we knew

17   that that evidence was -- had been suppressed.

18          So we were not going to use it.

19   Q      But you are not sure whether or not -- I guess you

20   are saying it could have taken place one of those two

21   times.  You are not quite sure which one.

22   A      Correct.

23   Q      Okay.  And do you recall what was the resolution

24   that was reached at the end of this discussion?

25   A      We weren't going to use anything related to those

1    ten loans.

2    Q    As part of now thinking back to the discussions

3    around the grand jury presentation in the superceding

4    indictment, do you recall anybody saying that you

5    shouldn't use evidence that was based on an investigation

6    from either a lead or a case theory or something else

7    that came from the Miami phones?  Was that part of the

8    discussion?

9    A    That is a compound question.  Can you break it up,

10   please.

11   Q    Sure.  Let's start with leads.  Did anybody say as

12   part of that discussion we shouldn't use any evidence

13   that came from a lead that we got from the Miami phone.

14   Was that part of the discussion?

15   A    Prior to the indictment -- again, that discussion I

16   can't place in time.  So I think the way you frame that

17   question is related to the superseding indictment.  I

18   can't place that conversation at that time.

19            So if the question is related to that, I can't

20   answer -- I can't answer it related to a timeframe.  I

21   can answer it more generally.

22   Q    So then, let's talk about, then, the conversation

23   that you describe about the ten loans, the one that you

24   are not quite sure when it took place in time, but as

25   part of that conversation did anybody say we shouldn't

```
 1   use any evidence related to case lead that we got from
 2   the Miami phone?
 3   A     They didn't put it in those terms, but that is what
 4   was understood by me to be the result of that
 5   conversation.
 6   Q     And was there any discussion about whether or not
 7   they should use case theories or a formulation of the
 8   case related to those loans?
 9   A     I am not sure what that means.
10   Q     I will strike the question.  Thinking back to the
11   grand jury, even though you can't place that
12   conversation, you would agree that the government
13   obtained a name of a potential witness from the Miami
14   cell phones that you didn't realize at the time?
15   A     Repeat that.
16   Q     So thinking back before the grand jury for the
17   superseding indictment right to February, you said in
18   your declaration that the government obtained a potential
19   witness' name from the Miami cell phones and you didn't
20   realize it at the time.
21   A     Are you talking about John Bradford.
22   Q     Is that the witness that was taken from the Miami
23   cell phones?
24   A     I know that John Bradford's name was on the cell
25   phones.  And that I can -- that is my answer, is that
```

1    that name, John Bradford, was on the cell phone.

2    Q      And you were part of the discussion with

3    Mr. Bradford's counsel?

4    A      Correct.

5    Q      Okay.  And you learned after that discussion that

6    John Bradford and that lead had been developed from

7    evidence that was taken from the Miami phones?

8    A      That's correct.

9    Q      But nobody told you that ahead of time?

10   A      Correct.

11   Q      So there were leads that other people developed on

12   the case, and it wasn't necessarily shared with you that

13   that was from the Miami cell phone, and this is an

14   example of that?

15   A      Yeah.  I am not sure I think of it -- I am not sure

16   I would say it that way.  You know, John Bradford's name

17   was on the cell phones.  Took a meeting with John

18   Bradford's attorneys, I had a conversation with him on

19   the phone, and then subsequently decided that we were not

20   going to go any further with that because it was related

21   to the cell phones.

22   Q      Something you found out after the fact, after you

23   participated in a call with Mr. Bradford's attorney?

24   A      You know, I can't recall the timing of that.

25   Q      So let's pull up Mr. Paetty's declaration.  And it

```
 1    is paragraph 14.  I am not sure what page of the PDF.

 2               Is if we zoom in on lines 16 to 20.

 3               So this is from the declaration you submitted

 4    in this case, and you said, "At the time I reviewed the

 5    e-mail chain between Mr. Bradford and defendant Ayvazian

 6    and attended the telephonic meeting with Mr. Bradford's

 7    counsel, I was unaware that the government had obtained

 8    John Bradford's name from the Miami cell phones."

 9               Do you recall writing that in your

10    declaration?

11    A     Yes.

12    Q     And that is accurate?

13    A     Yes.

14    Q     So you learned at some point later because you

15    wrote it in this declaration that indeed John Bradford's

16    name was found on the Miami cell phones?

17    A     Correct.

18    Q     But at the time you took those steps, reviewing the

19    e-mail chain, having this telephonic meeting, you didn't

20    actually know that somebody else had taken that lead from

21    the Miami evidence and then cautioned you to take those

22    actions?

23    A     Correct.

24         MR. KEOUGH:  Do have no further questions?

25         THE COURT:  Anything from you, Mr. Littrell.
```

```
 1           Let's try and complete this witness this

 2    afternoon if we can.

 3

 4                     CROSS-EXAMINATION

 5    BY MR. FRASER

 6    Q     Mr. Paetty, the sentencing in this case of Richard

 7    Ayvazyan and Marietta Terabelian has been scheduled by

 8    the Court.  You are aware of that; correct?

 9    A     Yes.

10    Q     Scheduled for September 13th?

11    A     I think that's right.

12    Q     And in preparation for sentencing, as a prosecutor

13    you routinely provide information to the United States

14    probation office; correct?

15    A     Correct.

16    Q     And has probation reached out to the U.S.

17    Attorney's office in this case?

18    A     Yes.

19    Q     Have you provided information to the United States

20    probation?

21    A     I have not personally but our office has.  Yes.

22    Q     Okay.  And you understand that you can't use the

23    information from the Miami phones in sentencing; correct?

24    A     My understanding is I am not using anything from

25    the Miami phones.
```

1    Q      Okay.  And if the government did use information

2    from the Miami phones in sentencing, that would be

3    illegal; correct?

4           MS. WESTFAHL KONG:  Objection.  Argumentative.

5           THE COURT:  I don't know.  Answer the question.

6           THE WITNESS:  Illegal, I am not sure.  Illegal?

7           THE COURT:  You are asking a legal question

8    whether evidence that has been suppressed can be

9    considered at sentencing.  I mean, I don't know why you

10   are asking this witness that question.  That is a legal

11   matter.

12          MR. FRASER:  Yes, your Honor.  And whether

13   Mr. Paetty can remain on the case for sentencing should

14   depend on his understanding of his obligations under

15   Kastigar.  So it is pertinent what he understands as he

16   sits here today what he can and cannot do with regard to

17   sentencing and information from the Miami phones.

18          THE COURT:  All right.  Go ahead.

19   Q      BY MR. FRASER:  So you understand that you can't use

20   any information from the Miami phones at sentencing;

21   correct?

22   A      It is -- since the information from the Miami

23   phones has been suppressed, I am not using it, and I am

24   not aware of its se.

25   Q      Could you use it?

```
 1   A      I will not us it.

 2   Q      Could you legally use it?

 3   A      That was not part --

 4          MS. WESTFAHL KONG:  Objection.  Calls for a legal

 5   conclusion.

 6          THE COURT:  You can answer.

 7          THE WITNESS:  I'm sorry.  I didn't --

 8   Q   BY MR. FRASER:  Could you use information from the

 9   Miami phones at sentencing?

10   A      I am not aware of whether I could or couldn't.

11   Q   BY MR. FRASER:  Thank you.   You are aware of the

12   Department of Justice Criminal Resource Manual; correct?

13   A      Off the top of my head, I am not sure.

14   Q      Have you heard of the Criminal Justice Resource

15   Manual?

16   A      If you show me a copy of the face page, I can tell

17   you.

18   Q      I am displaying a page from the DOJ archives.  Are

19   you able to see that?

20   A      Can you blow it up a little, please?

21   Q      I have zoomed in.  For the record, this is an

22   exhibit to the declaration of Mr. Ram.  Are you able to

23   see the document now?

24   A      Yes.

25   Q      And do you see that it represents the Criminal
```

```
 1    Resource Manual of the Department of Justice?

 2    A     That is what it says.

 3    Q     And underneath that there is a heading that has

 4    "Steps to Avoid Taint."  Do you see that?

 5    A     That is what it says.

 6    Q     Okay.  So you acknowledge that the Department of

 7    Justice has promulgated guidance to prosecutors on how to

 8    avoid using tainted evidence?

 9         MS. WESTFAHL KONG:  Objection.  Mischaracterizes

10    the document.

11         MR. FRASER:  I am asking whether he acknowledges

12    that DOJ has done that.

13         THE COURT:  He can answer the question.

14         THE WITNESS:  I have never seen this document so I

15    am not sure.

16    Q     BY MR. FRASER:  So you have not in fact reviewed the

17    DOJ criminal manual's steps to avoid taint?

18    A     Correct.

19    Q     Thank you.  Did you review the government's reply

20    brief that was submitted yesterday?

21    A     No.

22    Q     Okay.  Would it surprise you to know that the

23    government asserted that it first became aware of

24    Kastigar issues in May?

25    A     I haven't seen it, so I don't know.
```

```
 1   Q      Would that -- if that is true, would you be

 2   surprised?

 3          MS. WESTFAHL KONG:  Objection.  Relevance.

 4          THE COURT:  Well, surprised is not relevant.

 5          MR. FRASER:  I can ask it in many other ways.

 6          THE COURT:  IT doesn't come into the picture.  If

 7   you want to ask another question, you can.

 8          MR. FRASER:  Sure.  Thank you.

 9   Q      And let's just back up.  It may take a few more

10   questions but I think it will be quick.  You of course

11   came onto the case in February?

12   A      Yes.

13   Q      Discuss it with the other prosecutors in the case

14   at that time.

15   A      I've discussed it.  What do you mean?

16   Q      The case?

17   A      Yes.

18   Q      Legal issues?

19   A      Yes.

20   Q      Evidence?

21   A      Yes.

22   Q      Theories of prosecution?

23   A      I am not sure what you mean by theories of

24   prosecution.

25   Q      Okay.  In any event, in February you and your team
```

```
 1    were not discussing Kastigar issues; is that correct?
 2    A     Correct.
 3    Q     Not in March either?
 4    A     Correct.
 5    Q     Not in April either?
 6    A     I don't think so.  Yeah, correct.  I think the
 7    first time Kastigar came across my radar was a filing by
 8    defense.  I am not sure when that was but it was after
 9    the motions to suppress.
10    Q     Okay.  And in fact you were tasked with preparing
11    the government's opposition to the motions to suppress
12    the evidence from the Miami stop; correct?
13    A     Correct.
14    Q     And so you reviewed all the briefing pertinent to
15    that motion; correct?
16    A     Correct.
17    Q     When you first came on the case, let's be specific
18    about the prosecutors you were speaking with about the
19    case.  Those would be at first, for one, Julian Andre?
20    A     Briefly, yes, until he left the office.
21    Q     Right.  In fact, that is why you were brought on to
22    the case; right?
23    A     Correct.
24    Q     And you discussed the case with Brian Faerstein?
25    A     Correct.
```

```
1    Q     Christopher Fenton?

2    A     Correct.

3    Q     And you discussed the case with Justin Palmerton?

4    A     Yes.

5    Q     Jeffrey Clark?

6    A     Yes.

7    Q     Other agents as well?

8    A     Yes.

9    Q     Okay.  In February, did you ever -- who would be

10   your most direct supervisor?

11   A     At that time, when I joined the case, my deputy

12   chief in major frauds was Poonan Kumar.  It changed

13   shortly thereafter -- I can't remember the time -- to

14   Kristin Williams.

15   Q     Ranee Katzenstein, she ranks above Mr. Kumar and

16   Ms. Williams; is that correct?

17   A     It is Ms. Kumar and Ms. Williams, and, yes, she

18   does.

19   Q     Okay.  Did you speak with any of the three of them

20   in February about this case?

21   A     Yes.

22   Q     What was the nature of those discussions?

23   A     It was describing in general terms the case, what

24   the case was, where it was procedurally and my scheduling

25   regarding the ability to join the prosecution team.
```

1    Q     Did you discuss suppression issues with them in
2    February?
3    A     The issue was raised to me, as I stated before,
4    that based on conversations with counsel for Mr. Ayvazian
5    that certain motions to suppress would likely be filed.
6    Q     Okay.  Did you discuss Kastigar with any of the
7    three supervisors that we have mentioned in February?
8    A     No.
9    Q     In March?
10   A     No.
11   Q     In April?
12   A     No.
13   Q     In May?
14   A     I am not sure about May.  I am not sure when the
15   first issue was raised regarding Kastigar by the defense.
16   And at that point it would have been part of -- it would
17   have come onto my radar.
18   Q     But at some point you did discuss Kastigar issues
19   with the supervisor?
20   A     At some point I discussed it with the trial team,
21   and I am not -- I can't recall when supervisors were
22   looped into that conversation.
23   Q     Okay.  I am asking do you know as you sit here
24   today whether you ever discussed Kastigar issues with the
25   supervisor; not the trial team, a supervisor?

```
1    A      Yes.

2    Q      And you did?

3    A      Yes.

4    Q      And it was after April; correct?

5    A      It would have been after the first time it was

6    raised in a filing by the defense.

7    Q      And your position is that that was in May; correct?

8    A      I am not sure exactly when that was.  I don't know

9    off the top of my head when that was.

10   Q      Could it have been in March?

11   A      I don't think so because I think that that was

12   predicated on the court's order regarding motions to

13   suppress.

14   Q      Okay.  So as far as -- you reviewed the filings in

15   March and you don't remember Kastigar being raised then;

16   is that correct?

17   A      That's correct.

18   Q      But at some later time you saw it raised in a

19   filing by the defendants and followed up with a

20   supervisor; correct?

21   A      I can't recall the exact --

22   Q      Did you follow up with a supervisor?

23   A      We discussed it amongst team, and then at certain

24   points supervisors were also involved in that discussion.

25   Q      So that is a yes; correct?
```

```
 1   A      Could you repeat your question?

 2   Q      Did you discuss --

 3          THE COURT:  His answer is what he said.  It is not

 4   a yes or no.  He answered the question completely.

 5   Q    BY MR. FRASER:  Okay.  Is it possible that the first

 6   time you discussed Kastigar with a supervisory prosecutor

 7   was in June, 2021?

 8   A    I don't recall.

 9   Q    Did any of the supervisors you spoke with refer to

10   the DOJ Criminal Resource Manual?

11   A    Are you asking me if any of the supervisors

12   referred me to the page that you are showing me that is

13   on the screen right now?

14   Q    No.

15   A    Okay.  Could you repeat your question, please.

16   Q    Did any of the supervisors refer to the Criminal

17   Resource Manual in your discussions with them?

18   A    I did not hear the phrase Criminal Resource Manual

19   raised in a discussion with anyone that I can recall.

20          THE COURT:  Are you aware of something called a

21   Criminal Resource Manual before today?

22          THE WITNESS:  No, your Honor.

23   Q    BY MR. FRASER:  Did it seem like the supervisors

24   knew what to do with the Kastigar situation?

25          THE COURT:  I don't know what that question means.
```

```
 1              MR. FRASER:  I will rephrase my question.
 2    Q     When you spoke to the supervisors, did they
 3    recommend that you take any particular course of action?
 4    A     I am not sure how to answer that.
 5    Q     Did they say I don't care what do you with about
 6    Kastigar?
 7    A     No.
 8    Q     Did they tell you to do anything Kastigar?
 9    A     That is very broad.  Tell me to do anything
10    Kastigar?  I am just -- I'm not sure.
11              MS. WESTFAHL KONG:  Objection.  Vague.
12              THE COURT:  About what?
13    Q   BY MR. FRASER:  Yeah.  Did your supervisors
14    recommend that you take some action to teal deal with the
15    Kastigar issue?
16              THE COURT:  What is "some action"?
17              MR. FRASER:  Any action.
18              THE COURT:  There was a motion pending at the
19    time, and obviously the government responded, so what is
20    the nature of the question?  There was action taken.  The
21    government responded to the Kastigar motion.
22    Q   BY MR. FRASER:  Okay.  Did the government ever
23    prepare any log of access to the Miami phones?
24    A     A log of access.  What are you referring to?
25    Q     Keeping track of who accessed information about the
```

1    Miami phones.  Did the government do that?

2    A       In what form?

3    Q       Any.  Can you name anything that the government did

4    to track who accessed information about the Miami phones

5    and when?

6    A       I am only aware of myself.

7    Q       Please go ahead and name actions that the

8    government took to track access to the Miami phones.

9        MS. WESTFAHL KONG:  Objection.  Foundation as to

10   what the government did.

11       THE COURT:  He can answer what he did, and he can

12   answer if he knows what other people did, but that is the

13   way the question should be phrased.

14   Q       BY MR. FRASER:  So what did you do?

15   A       I laid that out in my declaration as to what my

16   interaction with that evidence with the material from the

17   cell phones was and what I did in response to it.

18   Q       Everything that you did to track your access to the

19   Miami phones you included in your declaration; correct?

20   A       To the best of my knowledge, I included what was

21   relevant and material to my interaction with that

22   evidence.  Yes.

23   Q       Okay.  And you didn't include information about

24   anything anyone else did to track access to the Miami

25   phones?

1    A    I am not sure what anyone else did.

2    Q    Okay.  So in your declaration you referenced not

3    recalling, seeing or relying on tainted Miami evidence

4    other than as described in your declaration; correct?

5    A    I would have to look and see how I worded it.

6    Q    Okay.  Showing you paragraph 17 from your

7    declaration:  "Other than the instances described above,

8    I do not recall seeing and reviewing the evidence seized

9    from the Miami cell phones or relying on such evidence in

10   preparation for trial, including in connection with

11   preparing witnesses or exhibits, drafting direct or

12   cross-examinations or outlining arguments, including

13   rebuttal, except to make the conscious choice not to use

14   that evidence at trial and not to pursue exhibits or

15   testimony at trial that was derived from that evidence."

16            In other words, your declaration covered

17   everything; correct?

18   A    Correct.

19   Q    Okay.  And as you indicated in this paragraph, you

20   were relying on your memory; correct?

21   A    I also did a review of e-mails and other -- but the

22   motions to suppress, that I was involved in.

23   Q    Okay.  But you didn't keep a document in which you

24   logged each time that you viewed evidence from the Miami

25   phones, did you?

```
1   A     No.

2   Q     Let's talk about your exposure to the tainted

3   evidence from the Miami phones.  You were exposed to the

4   statements that were made at the Miami airport and the

5   cell phone contents already in February when you first

6   came on the case; correct?

7   A     Would you repeat that, please?

8   Q     Within a week of joining this case, you received

9   reports of interviews on Richard Ayvazyan and Marietta

10  Terabelian; correct?

11  A     At the border, correct.

12  Q     And also within a week of joining the case, you

13  reviewed descriptions of information that CBP had

14  reviewed while searching the phones; correct?

15  A     I reviewed the reports.

16  Q     And you knew that the Terabelian phone in CBP's

17  words, quote, "confirmed that the subject was taking on

18  the identity of Victoria Kauichko," unquote; correct.

19  A     I recall, I think that was in a report.

20  Q     And in fact, that is an exhibit to your declaration

21  from your March filing; correct?

22  A     I would have to look at it again, but I believe

23  that was.  I think the report -- the entire report was an

24  exhibit.

25  Q     Yes, it was.  Okay.  And you personally selected
```

```
1    images from the phones for use in opposing suppression
2    back in March; correct?
3    A     Yes.  The team reviewed the filing, but I proposed
4    the exhibits; correct.
5    Q     Okay.  And these were from among the images in
6    Exhibit 1 to your declaration in opposition to the -- in
7    the Kastigar briefing; correct?
8    A     Yes.
9    Q     And the Exhibit 1 contains those 141 photographs
10   that have been in the briefing; correct?
11   A     Yes.
12   Q     Okay.  That evidence, you recognized it to be
13   helpful to the government in this case; correct?
14   A     I needed to look at that evidence to respond to the
15   motion.
16   Q     And it was if not suppressed, it would have been
17   helpful evidence to the government; correct?
18   A     If not suppressed, it was evidence, yes.  I mean,
19   it was evidence that was found on phones that were
20   possessed by Richard Ayvazyan and Marietta Terabelian.
21   Q     It might have been central to the government's
22   case --
23         THE COURT:  I am allowing the questions, but I am
24   really interested at the hearing in hearing something
25   more than what is obvious.  So many of the questions are
```

```
 1    obvious from reports or records, and it almost seems like

 2    the questions are more designed to argue than anything

 3    else.

 4              I mean, I am trying to think of what new

 5    information I am getting from the hearing that I didn't

 6    already know.  Is there something about this witness that

 7    you think is not truthful?  Is he lying in some way?

 8        MR. FRASER:  I don't believe that he is lying, but

 9    I think that the declaration, as my colleague pointed

10    out, there are certain things that it deemphasizes that

11    actually are essentially.

12        THE COURT:  I get the point you are making that

13    the messages on the phone and the other things on the

14    phone could have been used by the government had they not

15    been suppressed, and they would have been helpful.  I

16    mean, that is what I am getting from hours and hours of

17    this.  And so what other point has to be made?

18        MR. FRASER:  I think that is the central point.

19    If I may --

20        THE COURT:  Then let's end this now.  It is 20

21    after 5.  We have been at this for almost six-and-a-half

22    hours, unless there is something important that you

23    haven't gone through.

24        MR. FRASER:  I think there is a point that

25    Mr. Paetty is unlikely to dispute but should be brought
```

```
 1    to the Court's attention.

 2           THE COURT:  Well, go ahead and ask.

 3           MR. FRASER:  Okay.

 4    Q     Just going straight to that, when you were

 5    selecting the images, many of them came from the

 6    Terabelian Miami phone; correct?

 7           MS. WESTFAHL KONG:  Objection.  Vague as to what

 8    images he is selecting and what context this is.

 9           THE COURT:  Well, the images that came from the

10    Terabelian phone ceased at the airport?

11           MR. FRASER:  Correct.  And I am referring to the

12    images that Mr. Paetty selected in opposing the motions

13    to suppress the Miami evidence.

14           THE COURT:  You can answer if you know.

15           THE WITNESS:  I am not sure whose phone it came

16    from.  I know it came from the phones in Miami.

17    Q     BY MR. FRASER:  Okay.  But you were keen to know

18    whose phone each image came from?

19    A     Yes.

20    Q     You asked about that repeatedly in e-mails with

21    your colleagues?

22    A     I am not sure about repeatedly.

23    Q     Do you want me to show you?

24    A     I -- if you want.

25    Q     Okay.  And I noticed that you didn't attach all of
```

```
 1    these to your declaration, so I will have to show you
 2    from Mr. Faerstein's declaration.  It is Exhibit 2 here.
 3              Okay.  This is an e-mail looking at the screen
 4    from Exhibit 2 to Faerstein's declaration.  It's an
 5    e-mail that you sent on March 11th at 9:09 a.m.  Do you
 6    recognize that as the e-mail you sent?
 7    A    Yes.
 8    Q    Okay.  And let me ask a question.  It is the last
 9    sentence that is in blue text.  Is there a way to
10    determine whose phone the images came from?
11    A    Yes.
12    Q    And then below that we have separate paragraphs
13    that you have kind of made a list with capital letters.
14    Do you see that?
15    A    Yes.
16    Q    Okay.  And just as an example, on point K it says,
17    "Whose phone," in all capitals; correct?
18    A    Yes.
19    Q    And point N, all capitals, it says, "Whose phone";
20    correct?
21    A    Yes.
22    Q    Okay.  And after your 9:09 a.m. e-mail,
23    Mr. Faerstein sent you a response e-mail at 9:22 a.m.  Do
24    you see that?
25    A    Yes.
```

```
1    Q       And then in your next e-mail at 9:33 a.m., you say
2    "It will be helpful going forward.  Let's see whether
3    Annamelda or maybe Justin can assist in determining whose
4    phone the images came from."
5    A       Yes.
6    Q       Okay.
7            MR. FRASER:  Thank you.  No further questions.
8            THE COURT:  All right.  Thank you, sir.
9            MS. WESTFAHL KONG:  Your Honor, may I ask one
10   thing?
11           THE COURT:  You want to ask me one thing?
12           MS. WESTFAHL KONG:  May I ask the witness one
13   question?
14           THE COURT:  All right.  Go ahead, one question.
15
16                      CROSS-EXAMINATION
17   BY MS. WESTFAHL KONG
18   Q       You were asked about the Criminal Resource Manual,
19   but do you understand that that is part of the Justice
20   Manual?
21   A       I am not sure where that came from.  I really don't
22   know where that -- the Criminal Resource Manual is
23   located.
24   Q       Are you generally familiar with the Justice Manual?
25           THE COURT:  That was one question.
```

```
 1                Thank you.

 2           THE WITNESS:  Thank you, your Honor.

 3           THE COURT:  We are going to end now.  It is almost

 4    5:30.  And I want to finish this tomorrow.  We have

 5    Palmerton and Massino.  Those are the two that are seem

 6    most prominent.  What are you intending to ask Palmerton

 7    that hasn't already been asked?  Is it a long answer?

 8           MR. LITTRELL:  Your Honor, I want to review the

 9    answers we got today and then determine how we can cut it

10    down, but we do have questions for them.

11           THE COURT:  All right.  Let's leave it at that.

12    We will pick up tomorrow at 10:00 o'clock.

13           MR. LITTRELL:  Your Honor, I do want to raise an

14    issue.  Sentencing is scheduled pretty quickly and the

15    probation officer wants to interview our clients.  I am

16    going to propose continuing sentencing, at least giving

17    the Court time some time to rule on this motion.  I can

18    propose some dates.

19           THE COURT:  What is the date for sentencing now?

20           MR. LITTRELL:  I think it is in September.

21           THE COURT:  September is a long way off.  I am not

22    going to postpone it now.

23           MS. KATZENSTEIN:  Your Honor, Mr. Andre was

24    present here today.  Both Mr. Littrell and Mr. Ram had

25    have said they do not want to cross-examine him.
```

1          THE COURT:  Then he doesn't have to be here.

2          MS. KATZENSTEIN:  We just wanted to ensure that

3     the Court didn't have questions for him.

4               Thank you.

5          (Proceedings concluded.)

```
1                          CERTIFICATE

2

3

4    I hereby certify that pursuant to Section 753, Title 28,

5    United States Code, the foregoing is a true and correct

6    transcript of the stenographically reported proceedings held

7    in the above-entitled matter and that the transcript page

8    format is in conformance with the regulations of the

9    Judicial Conference of the United States.

10   Date:  August 1, 2021

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MR. CIPOLLETTI: [29] 22/9
22/11 23/18 24/23 26/9 30/4
31/4 31/10 35/3 39/21 42/22
43/20 46/1 50/8 59/15 60/3
73/2 88/10 97/14 129/6 143/9
144/15 144/19 144/23 154/11
177/5 210/23 224/4 231/9
MR. FENTON: [4] 5/8 11/16
13/4 74/12
MR. FRASER: [12] 256/11
258/10 259/4 259/7 264/25
265/16 270/7 270/17 270/23
271/2 271/10 273/6
MR. JOHNSON: [4] 5/12 10/6
10/10 12/12
MR. KEOUGH: [9] 232/2
244/22 246/3 246/14 246/23
246/25 247/5 247/13 254/23
MR. LITTRELL: [32] 5/20
5/25 6/7 6/10 6/25 7/13
14/21 14/24 16/18 16/25 17/4
17/7 17/17 170/13 170/16
180/11 188/17 188/22 189/15
189/25 190/9 199/3 202/4
206/7 224/11 224/18 226/10
230/11 230/16 274/7 274/12
274/19
MR. MESEREAU: [1] 5/18
MR. RAM: [90] 5/22 6/12
6/15 7/21 8/10 8/15 8/17 9/5
19/22 20/9 20/14 22/4 26/21
26/25 31/1 31/9 31/14 33/12
33/16 35/15 35/19 37/1 37/18
43/1 44/19 45/11 54/14 57/2
63/11 63/14 65/7 70/7 71/18
71/23 81/6 82/10 82/14 82/18
85/4 87/5 87/9 87/14 88/2
88/6 88/18 91/3 91/6 91/8
91/19 91/23 106/7 107/14
120/10 120/13 121/14 121/16
122/18 122/23 123/11 123/15
123/19 123/23 124/5 125/7
125/16 129/8 129/24 134/18
134/20 135/13 136/5 136/8
137/15 137/21 138/24 139/5
139/24 140/4 140/8 141/2
143/18 143/23 145/1 156/3
164/25 165/25 166/5 170/8
231/17 232/13
MS. KATZENSTEIN: [3] 17/22
274/22 275/1
MS. WESTFAHL KONG: [12]
244/18 245/22 248/1 256/3
257/3 258/8 259/2 265/10
266/8 271/6 273/8 273/11
MS. WIRSCHING: [5] 5/15
9/20 9/24 10/5 14/11
THE CLERK: [6] 5/3 18/10
91/14 232/7 232/10 232/15
THE COURT: [294]
THE WITNESS: [109] 18/13
23/21 24/25 31/6 33/18 33/22
37/10 37/15 39/23 48/1 50/12
55/6 55/12 55/18 55/24 56/4
56/12 56/16 56/19 57/18
59/17 60/6 64/14 65/2 70/6
73/4 84/2 84/4 91/9 97/16
111/25 118/13 121/2 121/18
124/8 124/19 125/13 129/15
130/7 130/13 130/16 130/20
130/24 131/3 131/7 134/11
140/11 140/13 140/22 145/17
145/22 146/3 154/14 165/1
165/5 165/7 165/13 177/8
178/16 180/12 181/18 181/21
182/4 182/7 182/13 182/19
182/25 183/4 183/7 183/11
183/16 189/4 189/7 189/10
190/15 190/18 191/4 191/19
190/18 190/23 192/2 192/5
194/3 197/8 197/12 197/21
198/1 199/7 199/10 199/16
202/7 213/3 213/13 213/16
214/1 219/17 219/20 226/12
231/14 232/16 246/10 247/3
247/7 256/5 257/6 258/13
264/21 271/14 274/1

$

$25,000 [1] 13/9
$50,000 [3] 11/12 11/22
12/23
$75,000 [2] 10/20 11/8

'

'20 [1] 18/23

_

-and [5] 2/5 2/6 2/6 2/7 2/9

/

/s [1] 276/12

1

1,000-page [1] 38/24
1-N [4] 11/18 12/14 13/3
13/7
10 [7] 11/23 13/9 13/13
153/19 153/19 159/23 166/3
10100 [1] 3/15
107B [1] 239/23
108B [1] 240/3
109 [1] 239/13
10:00 o'clock [1] 274/12
10:00 p.m [2] 195/2 195/6
10:24 [1] 5/2
10B [1] 218/18
10th [3] 71/21 232/23 235/20
11 [2] 71/17 159/23
111 [1] 240/2
115 [3] 12/16 12/17 13/3
11th [16] 29/3 29/9 29/11
30/13 30/22 31/25 32/9 35/3
36/5 36/9 40/23 52/19 71/21
72/3 87/1 272/5
12 [6] 18/23 71/17 119/14
165/23 170/24 172/10
121 [1] 165/7
123B [1] 240/9
127 [1] 240/8
12:28 [1] 91/18
12:30 [1] 91/15
12th [19] 29/3 30/13 30/23
32/14 33/6 36/5 36/10 40/23
43/13 43/17 44/6 45/18 46/15
48/1 48/3 69/14 127/3 221/18
226/10
13 [4] 189/11 200/22 236/8
237/3
1330 [1] 2/22
136 [1] 241/1
13th [11] 97/9 98/5 107/18
110/19 111/20 112/4 112/14
117/6 138/3 139/15 255/10
14 [2] 127/9 254/1
140 [1] 158/10
1400 [1] 2/11
141 [14] 152/18 154/24
156/21 157/5 157/8 157/14
203/22 204/7 204/14 211/9
239/16 240/15 242/2 269/9
15 [5] 13/9 35/18 52/9 94/3
94/7
151 [14] 82/7 83/12 83/14
83/17 83/19 84/7 107/2 150/8

150/18 151/1 151/18 152/3
154/5 155/24 204/19
15th [8] 102/1 107/18 108/2
108/7 110/19 111/19 112/14
235/20
16 [2] 52/9 254/2
160 [1] 76/4
16th [2] 104/12 238/13
17 [2] 93/25 267/6
170 [1] 4/5
17th [8] 97/25 98/4 113/7
113/11 113/22 153/14 153/16
153/17
18 [9] 4/4 99/14 101/12
163/9 163/11 163/13 163/25
164/6 221/7
18th [1] 159/21
19 [5] 34/24 71/17 178/5
187/2 187/2
19/20th [1] 87/17
1900 [1] 2/17
1935 [1] 3/12
19th [20] 20/25 29/3 30/13
32/10 34/4 36/5 36/10 40/24
84/20 127/12 127/21 128/20
129/11 185/20 190/15 192/16
200/1 202/14 226/10 226/12
1:15 [1] 91/17
1:16 [1] 91/18
1B [1] 32/18
1B121 [3] 162/11 169/9
169/19
1B123 [21] 30/23 32/18 32/20
43/17 44/7 44/23 45/1 45/6
45/12 45/24 46/9 46/12 54/20
59/4 66/19 67/13 162/14
162/18 164/15 164/21 165/9
1B124 [1] 84/22
1B126 [2] 34/7 34/18
1B130 [6] 162/7 163/6 164/19
165/9 165/10 168/16
1B17 [2] 164/3 165/19
1B21 [9] 158/22 162/10
162/15 163/3 164/4 165/8
165/19 168/17 169/22
1B30 [3] 164/4 164/4 165/19
1B4 [1] 30/23
1st [2] 1/21 42/11

2

20 [16] 28/23 43/15 77/3
117/13 117/14 117/19 136/24
141/10 143/4 143/4 149/25
150/5 150/25 186/4 254/2
270/20
20-579 [1] 1/8
20-579-SVW [1] 5/6
20036 [1] 2/23
2012 [5] 176/18 177/24
180/23 180/25 214/17
2019 [1] 62/2
2020 [35] 18/22 20/16 21/3
62/3 96/20 97/3 97/9 127/12
127/21 128/20 136/11 137/25
138/12 139/15 159/4 159/9
161/3 161/13 162/1 162/13
162/17 164/2 170/24 172/10
175/3 176/4 178/9 179/17
181/6 184/10 184/23 185/9
185/21 186/4 186/23
2021 [40] 1/16 5/1 8/2 25/17
25/19 26/7 26/14 34/24 40/18
40/24 46/16 52/19 63/16
68/15 68/21 68/24 70/25 71/3
71/13 72/3 72/8 72/18 84/20
84/23 92/4 123/3 156/22
162/21 162/24 203/23 204/4
205/13 211/10 221/18 221/20
232/24 242/19 242/23 264/7

**2**

**2021...** **[1]** 276/10
**203** **[1]** 99/17
**20530** **[1]** 2/12
**206** **[2]** 152/20 155/8
**20th** **[42]** 20/1 20/16 20/21
  20/21 20/24 21/1 21/3 21/7
  21/11 21/21 22/6 22/17 22/24
  87/16 87/17 87/18 89/14
  89/16 90/16 97/2 116/7
  116/19 175/3 176/4 176/6
  178/9 179/17 180/7 181/6
  184/10 184/22 185/8 185/21
  186/22 186/23 187/3 187/4
  190/16 191/18 200/1 202/14
  211/3
**21** **[7]** 74/3 75/12 75/17
  76/23 78/4 78/14 150/23
**216** **[1]** 3/13
**21st** **[2]** 164/1 165/18
**22** **[9]** 44/25 46/20 53/24
  103/18 103/19 103/20 150/15
  150/19 151/12
**22nd** **[2]** 201/20 205/13
**23** **[4]** 53/25 55/16 56/3
  56/11
**232** **[1]** 4/6
**23rd** **[7]** 200/21 200/25 201/4
  201/18 202/23 242/19 242/23
**24** **[1]** 57/22
**24th** **[1]** 241/1
**251** **[1]** 54/1
**255** **[1]** 4/7
**27** **[3]** 93/3 166/8 170/7
**278-9** **[2]** 125/20 125/20
**27th** **[9]** 59/10 63/3 92/20
  92/22 92/25 93/1 158/1 163/1
  164/14
**28** **[5]** 1/16 5/1 148/17
  168/18 276/4
**28-6** **[1]** 148/11
**28th** **[4]** 167/4 168/11 168/21
  170/3
**29** **[6]** 10/12 50/1 81/11
  148/17 148/17 149/14
**2:52** **[1]** 166/5
**2nd** **[8]** 152/18 156/22 203/23
  204/4 204/6 211/10 221/19
  221/20

**3**

**3.25 million** **[1]** 175/14
**30** **[3]** 33/14 107/14 108/3
**300** **[1]** 3/16
**302** **[2]** 129/16 131/6
**302's** **[6]** 72/12 129/23 130/6
  130/9 130/11 130/15
**307** **[1]** 127/8
**30A** **[2]** 108/3 108/12
**31** **[18]** 29/19 29/21 29/22
  29/23 30/1 30/2 31/20 34/3
  34/19 36/12 43/18 44/3 44/10
  81/8 81/11 86/17 165/23
  248/11
**312** **[1]** 2/7
**32** **[1]** 109/2
**32A** **[3]** 109/3 109/3 109/3
**33** **[1]** 10/13
**337** **[2]** 38/7 49/8
**350** **[2]** 1/21 3/5
**36** **[1]** 156/7
**37** **[2]** 110/9 110/10
**381** **[1]** 153/18
**3900** **[1]** 2/20
**39A** **[1]** 112/3
**3:11** **[1]** 166/5
**3rd** **[3]** 137/25 138/12 157/6

**4**

**40** **[1]** 112/2
**409** **[1]** 3/20
**41** **[3]** 94/1 94/6 94/10
**4170** **[1]** 61/16
**42** **[3]** 75/22 77/16 77/25
**42-99** **[2]** 75/5 75/11
**4311** **[1]** 1/21
**432** **[4]** 61/2 61/13 63/2 63/5
**44,000** **[3]** 206/24 207/1
  207/2
**45** **[1]** 91/16
**4579** **[2]** 29/13 29/16
**4613** **[1]** 81/3
**47** **[1]** 50/2
**49** **[2]** 122/6 122/10
**4910** **[2]** 77/24 206/19
**49A** **[1]** 112/8
**4:05 p.m** **[1]** 99/21
**4B** **[1]** 205/7
**4th** **[1]** 141/11

**5**

**5-0** **[1]** 50/19
**50** **[17]** 50/18 52/9 112/8
  112/9 122/25 123/6 123/11
  123/15 123/16 123/22 124/5
  124/10 124/11 124/13 124/17
  224/24 225/2
**51** **[2]** 103/15 227/2
**52** **[4]** 81/9 81/11 81/12
  82/12
**53** **[1]** 154/22
**5533** **[1]** 60/13
**561** **[1]** 66/6
**579** **[1]** 1/8
**57A** **[1]** 112/18
**58** **[4]** 153/22 154/10 154/19
  154/23
**5:00 p.m** **[1]** 195/20
**5:30** **[1]** 274/4
**5th** **[6]** 2/16 3/8 122/2
  142/25 144/11 208/21

**6**

**601** **[4]** 3/8 59/5 59/22 60/12
**61** **[1]** 112/18
**6150** **[1]** 38/8
**6154** **[1]** 49/8
**62** **[1]** 142/15
**633** **[1]** 2/16
**65** **[37]** 96/21 96/22 96/24
  97/5 97/19 98/2 99/7 99/18
  100/11 101/4 101/7 101/12
  102/2 104/6 106/18 106/22
  107/4 108/12 109/8 110/10
  112/3 112/13 113/1 117/1
  117/5 117/14 118/5 118/22
  139/17 139/19 139/22 140/10
  142/17 152/17 154/25 156/12
  189/13
**651** **[1]** 3/21
**68A** **[1]** 142/16

**7**

**720** **[1]** 3/8
**753** **[1]** 276/4
**7:34 p.m** **[1]** 32/4
**7A** **[1]** 103/10
**7B** **[1]** 103/10
**7th** **[1]** 152/7

**8**

**83** **[5]** 153/21 154/1 154/9
  154/18 154/21
**8th** **[3]** 84/23 159/22 226/12

**9**

**90012** **[2]** 1/22 2/8
**90067** **[1]** 3/16
**90071** **[2]** 2/17 3/9
**90277** **[1]** 3/21
**903** **[1]** 3/5
**91208** **[1]** 3/13
**918** **[3]** 63/2 63/5 166/13
**918-page** **[1]** 59/22
**92673** **[1]** 3/6
**94105** **[1]** 2/20
**9858** **[2]** 1/20 276/12
**99** **[3]** 75/5 75/5 75/11
**9:09 a.m** **[2]** 272/5 272/22
**9:22 a.m** **[1]** 272/23
**9:33 a.m** **[1]** 273/1
**9B** **[1]** 215/8
**9th** **[4]** 71/13 71/24 72/23
  127/5

**A**

**a.m** **[5]** 5/2 272/5 272/22
  272/23 273/1
**ability** **[2]** 98/18 261/25
**able** **[18]** 21/18 38/21 38/22
  110/23 120/16 120/19 120/23
  122/1 122/5 122/10 127/24
  175/20 198/4 207/10 235/13
  243/22 257/19 257/22
**about** **[161]**
**above** **[6]** 52/24 83/1 225/9
  261/15 267/7 276/7
**above-entitled** **[1]** 276/7
**absolutely** **[2]** 211/5 231/7
**accept** **[2]** 58/11 58/17
**acceptable** **[1]** 13/1
**accepting** **[3]** 66/23 67/1
  68/8
**access** **[40]** 22/23 22/25
  23/13 23/17 24/1 24/2 24/4
  24/17 24/22 25/7 27/21 29/5
  84/11 84/15 85/8 85/22 86/4
  115/22 126/7 155/18 155/19
  155/21 155/22 155/24 233/4
  233/9 234/5 234/12 234/14
  235/13 239/16 243/5 243/7
  243/9 243/12 265/23 265/24
  266/8 266/18 266/24
**accessed** **[11]** 24/5 24/13
  24/20 51/5 51/19 86/1 86/10
  86/18 225/10 265/25 266/4
**accesses** **[1]** 98/19
**accessing** **[5]** 25/5 50/20
  52/20 53/14 225/4
**according** **[1]** 134/6
**accordingly** **[1]** 121/7
**account** **[23]** 48/4 83/8 112/9
  172/15 172/17 174/24 175/5
  175/6 175/21 179/4 179/6
  179/9 182/7 182/19 182/20
  182/25 183/2 183/3 183/14
  183/14 184/12 213/22 220/9
**accounting** **[1]** 146/24
**accounts** **[6]** 112/16 175/21
  179/10 181/24 213/21 219/13
**accurate** **[10]** 25/15 53/1
  85/3 95/5 119/19 147/22
  149/7 155/4 229/6 254/12
**accused** **[1]** 210/18
**acknowledge** **[1]** 258/6
**acknowledged** **[1]** 193/17
**acknowledges** **[1]** 258/11
**acquittal** **[1]** 11/15
**across** **[2]** 45/2 260/7
**acted** **[1]** 121/7
**action** **[6]** 230/19 265/3
  265/14 265/16 265/17 265/20
**actions** **[2]** 254/22 266/7

A

**activity [5]**   19/13 70/3 99/9
101/1 104/6
**actual [7]**   76/9 141/24
156/16 177/13 179/22 179/23
211/21
**actually [45]**   18/24 31/20
72/25 73/20 75/4 77/5 78/4
80/7 81/13 92/20 101/19
108/20 112/22 126/8 140/19
142/16 146/19 149/4 152/16
154/24 163/16 168/15 172/4
185/8 185/13 185/15 200/22
203/3 205/3 205/10 208/8
211/23 212/3 215/15 216/5
218/5 218/25 219/7 219/10
222/10 223/8 228/8 236/11
254/20 270/11
**ad [1]**   100/6
**ad/addresses [1]**   100/6
**add [6]**   43/9 54/11 102/18
104/23 104/23 107/21
**added [4]**   107/8 107/20 159/6
220/21
**addition [8]**   10/23 11/23
13/22 14/6 185/24 233/20
237/15 238/3
**additional [22]**   71/21 74/11
100/7 103/11 105/19 107/1
126/20 133/21 134/15 143/6
143/7 153/3 161/20 169/13
169/18 172/20 172/21 179/15
179/19 194/19 194/21 224/15
**address [13]**   47/6 47/9 47/11
47/13 47/14 48/7 48/7 82/4
205/4 211/24 212/19 237/15
238/2
**addresses [1]**   100/6
**addressing [2]**   162/14 235/2
**adds [1]**   224/12
**adequate [1]**   9/24
**administrative [1]**   146/7
**admissible [2]**   120/2 216/19
**admitted [2]**   200/13 201/5
**admittedly [1]**   240/23
**admitting [1]**   140/10
**ADP [1]**   174/17
**advance [2]**   62/19 248/22
**advanced [1]**   106/22
**affect [1]**   238/20
**affidavit [6]**   94/2 95/7
95/22 96/2 96/10 96/15
**affidavits [7]**   6/21 6/23
48/10 95/4 95/9 95/14 96/1
**affirmative [1]**   227/19
**affirmatively [1]**   231/1
**afield [1]**   120/8
**after [63]**   13/24 17/2 20/14
20/16 20/21 21/3 21/7 21/11
21/21 22/6 22/17 22/23 26/19
89/14 89/16 89/18 89/19
96/25 97/25 98/2 99/7 100/25
106/11 116/7 125/2 127/12
127/21 128/19 129/11 152/6
152/7 157/3 159/7 159/7
169/25 187/1 188/18 190/15
190/16 191/18 192/8 193/21
193/25 194/13 195/21 196/18
197/8 197/9 197/11 211/4
211/9 221/1 221/17 237/2
250/15 253/5 253/22 253/22
260/8 263/4 263/5 270/21
272/22
**afternoon [6]**   63/4 170/22
170/23 232/21 232/22 255/2
**afterward [1]**   221/5
**afterwards [1]**   63/6
**again [22]**   13/5 25/23 26/14

48/8 53/10 59/24 66/7 104/5
219/19 224/3 229/2 236/25
240/3 245/2 250/4 250/11
251/15 268/22
**against [5]**   22/7 27/4 65/22
220/22 238/24
**agencies [2]**   102/25 103/2
**agent [81]**   11/25 17/3 21/15
21/23 22/7 57/24 58/7 58/20
59/7 59/9 59/12 67/3 87/24
88/8 88/11 89/8 89/11 89/22
92/5 92/9 93/9 94/2 94/13
94/18 96/20 96/24 97/5 97/10
97/11 97/17 98/2 98/9 99/7
99/18 99/19 99/25 100/4
100/4 100/11 100/23 100/25
101/4 101/11 102/2 102/7
104/6 105/14 106/19 108/13
108/21 109/8 110/11 113/15
113/16 115/25 116/9 119/11
137/7 137/7 138/9 138/20
139/20 142/3 142/18 145/7
151/22 152/10 152/24 156/12
157/12 159/17 163/2 166/13
166/22 187/11 189/4 189/8
190/7 190/23 191/11 195/24
**agents [17]**   7/11 7/24 21/13
93/21 94/8 94/16 113/17
125/1 125/5 125/14 136/11
136/18 141/12 141/13 159/25
249/21 261/7
**aggravated [4]**   201/14 220/15
220/18 220/22
**ago [4]**   42/12 43/19 48/18
75/22
**agree [11]**   38/17 46/24 62/16
68/2 80/1 106/22 109/14
115/11 116/18 229/1 252/12
**agreed [1]**   65/4
**agreement [1]**   81/4
**ahead [22]**   10/9 22/15 33/25
35/22 61/23 73/20 76/18
82/20 84/4 109/2 156/20
158/8 176/14 231/4 238/10
242/18 248/20 253/9 256/18
266/7 271/2 273/14
**AHN [3]**   2/6 17/5 229/12
**aim [1]**   8/8
**airport [29]**   77/3 87/17
87/23 108/25 186/25 187/9
187/14 192/13 193/7 193/9
193/11 195/12 195/17 196/12
200/4 208/20 209/4 209/10
209/13 209/17 210/7 210/14
210/17 211/15 214/6 221/8
222/11 268/4 271/10
**al [2]**   1/9 5/7
**alias [3]**   245/18 247/16
248/17
**aliases [3]**   39/8 178/15
178/17
**all [131]**   7/8 7/15 7/19 8/8
8/19 14/3 15/19 15/20 17/16
18/8 18/9 20/10 21/9 21/18
22/12 27/22 29/23 31/19
35/22 44/14 44/22 45/15 46/5
50/12 50/13 53/23 61/12 62/3
64/23 66/7 68/10 72/11 72/17
73/12 74/2 74/5 76/3 80/11
82/20 83/22 85/13 87/8 87/10
87/11 90/18 91/8 91/22 93/11
96/3 99/23 100/3 100/5
100/22 104/5 112/18 115/21
117/1 118/5 120/7 120/12
121/2 121/16 122/10 123/12
123/25 124/5 124/21 125/8
125/16 129/17 129/23 130/1
130/9 130/15 130/21 134/6

137/19 138/18 140/3 140/20
143/21 145/1 149/8 149/9
149/13 151/3 151/7 151/10
152/20 155/11 159/12 160/3
160/7 160/10 160/17 161/4
163/25 164/15 170/10 171/8
174/19 175/15 178/3 191/8
199/12 204/7 211/9 213/22
214/3 214/17 216/4 223/20
225/10 226/16 229/4 231/14
231/21 232/6 240/22 256/18
260/14 271/25 272/17 272/19
273/8 273/14 274/11
**all 206 [1]**   152/20
**allegation [1]**   19/18
**allegations [4]**   16/14 16/15
96/4 96/5
**alleged [2]**   96/5 209/24
**alleging [1]**   209/23
**ALLISON [2]**   2/5 5/11
**allow [3]**   14/15 24/23 170/11
**allowed [2]**   24/19 248/5
**allowing [1]**   269/23
**allows [1]**   24/16
**almost [5]**   106/10 143/22
270/1 270/21 274/3
**alone [3]**   179/13 184/17
185/14
**along [6]**   5/24 18/8 23/14
55/8 157/22 222/25
**Alpha [1]**   3/12
**already [27]**   41/15 42/13
47/11 68/16 68/17 107/5
107/11 107/13 109/19 109/21
110/2 110/3 115/25 144/25
148/13 154/6 164/20 200/16
205/18 212/14 212/21 221/23
225/19 226/23 268/5 270/6
274/7
**also [50]**   6/1 11/24 17/1
17/9 17/9 17/10 17/14 41/6
58/12 61/9 67/2 72/13 96/8
126/22 144/9 148/19 152/9
153/10 168/15 169/2 170/17
172/17 173/1 173/6 175/20
178/13 185/17 185/21 186/3
186/10 191/13 200/17 202/7
202/19 204/11 206/21 207/18
207/19 208/12 214/1 217/14
218/18 221/13 237/16 238/4
244/1 245/3 263/24 267/21
268/12
**always [4]**   22/25 66/4 128/15
224/9
**am [148]**
**Amanecer [1]**   3/5
**Amara [1]**   141/16
**Amaya [3]**   112/19 112/23
141/16
**Amendment [6]**   23/2 26/5 27/3
121/5 121/22 227/14
**America [4]**   1/6 2/3 5/7
172/18
**among [3]**   245/19 248/17
269/5
**amongst [1]**   263/23
**amounts [1]**   21/17
**ample [1]**   185/6
**analysis [2]**   16/9 146/3
**ancillary [1]**   105/2
**Andre [33]**   8/1 15/3 17/5
89/9 89/11 99/19 113/12
113/23 118/6 118/9 118/11
118/24 119/11 137/6 141/11
141/15 141/23 142/9 143/6
143/10 143/13 143/14 143/20
144/16 144/17 197/3 198/10
199/13 199/20 202/13 233/25

**A**
Andre... [2]   260/19 274/23
**Andrew [3]**   118/18 118/22
119/3
**ANGELES [7]**   1/14 1/22 2/8
2/17 3/9 3/16 5/1
**Anna [1]**   114/19
**Annamelda [7]**   29/24 101/14
101/15 101/16 102/3 106/12
273/3
**Annandale [1]**   141/17
**announced [1]**   8/7
**another [14]**   37/18 97/11
109/3 114/21 137/24 156/6
192/4 200/3 240/4 240/13
245/17 246/6 246/17 259/7
**answer [87]**   25/22 26/6 26/12
26/22 26/23 31/8 36/25 37/1
37/15 37/17 37/20 42/17 44/4
52/8 53/13 69/7 76/13 76/20
80/23 81/17 81/20 81/22
81/23 83/23 83/23 83/24
83/24 84/1 84/2 84/4 96/13
105/25 106/1 106/2 111/24
114/6 118/12 121/18 123/24
125/13 125/16 133/14 133/15
138/5 141/1 148/4 149/20
149/24 154/8 154/13 154/14
154/16 155/14 155/14 158/4
165/1 176/10 177/7 177/8
181/17 181/18 189/22 191/24
192/2 192/3 192/4 194/5
194/6 213/2 213/3 214/3
219/19 219/20 243/18 251/20
251/20 251/21 252/25 256/5
257/6 258/13 264/3 265/4
266/11 266/12 271/14 274/7
**answered [9]**   26/10 26/21
26/25 37/24 65/1 73/3 195/5
224/5 264/4
**answering [2]**   69/25 132/21
**answers [3]**   7/17 80/4 274/9
**anticipated [1]**   105/21
**Anton [2]**   29/12 137/7
**Anton's [1]**   29/16
**anxious [1]**   192/1
**any [137]**   6/17 6/20 8/25
9/12 9/19 13/3 14/19 16/4
16/8 16/21 16/24 22/6 22/18
23/7 24/5 24/12 24/15 24/19
25/12 25/21 25/24 26/15 27/4
27/14 27/20 29/15 35/10
38/10 38/10 42/3 43/7 43/9
43/11 46/4 49/21 49/23 51/12
52/13 53/5 57/18 62/24 63/18
65/13 68/7 70/21 72/10 72/16
76/7 78/17 79/8 79/23 81/25
82/23 83/2 83/4 85/1 86/16
88/16 88/21 94/14 94/18
94/24 106/4 111/19 113/13
113/17 117/18 117/23 118/3
118/23 122/15 124/16 124/25
130/7 131/5 131/13 133/21
133/23 135/23 150/23 150/25
152/8 153/6 155/7 155/8
158/9 158/15 159/15 160/6
162/24 167/23 168/3 169/7
174/3 174/9 174/12 180/24
184/9 211/21 212/1 212/20
214/16 218/4 223/2 223/18
226/2 227/4 227/11 227/23
228/2 228/2 228/25 230/2
230/6 233/1 234/8 234/13
234/14 234/19 234/20 235/11
244/25 251/12 252/1 252/6
253/20 256/20 259/25 261/19
262/6 264/9 264/11 264/16
265/3 265/17 265/23 266/3
**anybody [13]**   22/19 98/23
181/4 214/23 242/1 244/7
244/8 244/12 249/8 249/11
251/4 251/11 251/25
**anybody's [1]**   207/7
**anyone [11]**   6/22 99/2 99/3
110/20 114/17 130/16 245/1
249/2 264/19 266/24 267/1
**anything [29]**   16/11 23/14
42/12 56/25 92/10 93/8 93/10
112/22 148/4 154/5 155/25
183/18 215/11 215/25 216/20
217/16 218/11 230/7 231/8
239/1 249/11 250/25 254/25
255/24 265/8 265/9 266/3
266/24 270/2
**Anytime [1]**   154/3
**anyway [2]**   24/4 95/24
**anywhere [3]**   166/25 180/22
181/2
**apart [1]**   38/9
**apartment [11]**   38/7 49/8
74/17 77/19 78/7 78/15 78/19
79/24 80/11 80/15 245/11
**apologize [5]**   33/13 61/22
133/16 137/22 148/17
**appear [8]**   69/15 95/19
150/23 150/25 154/24 180/21
181/2 241/20
**appearances [3]**   2/1 3/1 5/8
**appeared [5]**   90/7 90/8 115/7
155/1 191/5
**appearing [1]**   59/22
**appears [9]**   94/5 108/3 112/9
112/11 112/12 236/15 240/1
240/7 241/17
**applicable [2]**   11/14 27/17
**applicant [1]**   151/19
**application [6]**   74/25 75/3
75/15 142/24 151/13 185/10
**applications [10]**   68/8 68/11
68/14 68/20 69/3 100/8 145/6
196/14 207/6 207/19
**applied [3]**   185/1 219/3
219/5
**apply [5]**   27/19 184/19
184/24 185/5 220/4
**approach [2]**   19/20 31/13
**approval [1]**   199/16
**approve [1]**   114/4
**approximately [3]**   87/18
236/1 237/24
**April [36]**   59/10 63/3 72/18
84/23 92/20 92/22 92/25 93/1
93/3 127/3 158/1 159/21
159/22 161/3 161/13 161/14
161/25 162/13 162/17 163/1
163/6 164/1 164/14 165/18
166/8 167/4 168/11 168/18
168/21 170/3 170/7 226/12
250/16 260/5 262/11 263/4
**April 12th [1]**   127/3
**April 18th [1]**   159/21
**April 21st [2]**   164/1 165/18
**April 27 [3]**   93/3 166/8
170/7
**April 27th [9]**   59/10 63/3
92/20 92/22 92/25 93/1 158/1
163/1 164/14
**April 28 [1]**   168/18
**April 28th [4]**   167/4 168/11
168/21 170/3
**April 8th [3]**   84/23 159/22
226/12
**archives [1]**   257/18
**are [289]**
**aren't [5]**   15/23 27/7 31/16
33/14 130/3
**argue [2]**   218/13 270/2
**argued [3]**   11/4 211/4 223/17
210/10
**argument [8]**   9/14 9/18 11/20
33/10 78/11 208/13 208/19
224/21
**Argumentative [2]**   210/24
256/4
**arguments [3]**   9/13 78/6
267/12
**Armenian [1]**   5/15
**Armenian-speaking [1]**   5/15
**around [12]**   29/3 72/21 89/23
90/16 163/5 163/19 164/7
174/21 195/2 195/20 250/9
251/3
**arrest [24]**   20/22 91/5 192/9
192/10 193/6 193/8 193/10
193/22 193/24 194/9 194/18
194/25 195/2 195/10 195/11
196/16 196/22 197/4 197/21
197/23 198/12 198/22 199/16
200/2
**arrested [2]**   21/1 159/7
**arrests [1]**   192/18
**Arthur [1]**   203/5
**ARTUR [4]**   3/11 5/17 5/20
10/2
**Arvazyan [1]**   5/20
**as [217]**
**ASAP [1]**   141/19
**ascertain [2]**   105/3 105/20
**ascribe [2]**   105/17 106/4
**ascribing [2]**   105/16 106/2
**Ashwin [3]**   2/15 5/23 6/11
**aside [7]**   50/23 52/3 52/23
82/25 160/21 213/14 213/19
**ask [60]**   6/4 6/21 7/10 9/2
10/1 12/15 15/14 16/19 17/1
17/22 25/23 28/3 32/4 33/24
37/18 42/18 44/24 46/7 54/12
72/16 75/25 76/24 87/2 91/10
95/13 99/1 99/2 99/3 102/3
114/5 118/9 134/11 138/5
139/23 140/1 143/15 161/22
169/4 170/12 174/22 176/2
176/3 176/8 177/19 192/4
194/5 202/5 223/25 235/11
244/7 244/24 246/2 259/5
259/7 271/2 272/8 273/9
273/11 273/12 274/6
**asked [35]**   10/23 10/24 12/23
22/1 26/10 37/13 46/3 49/16
57/3 73/3 102/1 104/22
105/24 107/19 131/12 132/10
133/10 133/22 161/15 167/7
167/14 167/17 167/21 168/14
168/16 169/6 213/2 222/20
224/5 231/19 246/1 250/5
271/20 273/18 274/7
**asking [53]**   11/15 23/11
25/20 25/21 27/6 33/3 42/7
42/7 45/7 48/24 52/7 53/12
54/5 54/6 54/7 62/1 63/7
67/23 72/20 75/19 75/24 76/1
76/14 80/3 124/11 133/21
137/19 140/6 142/2 143/12
151/15 172/6 176/14 185/7
185/7 199/25 203/12 208/2
212/11 212/12 212/24 221/4
221/5 222/17 222/17 247/7
247/14 247/23 256/7 256/10
258/11 262/23 264/11
**assembly [1]**   46/25
**asserted [1]**   258/23
**assigned [3]**   141/25 142/2
232/23
**assist [2]**   65/12 273/3
**assistance [1]**   90/24

**A**

**assistant [3]** 114/14 114/16 114/18

**assisted [1]** 5/15

**assisting [1]** 97/11

**associate [2]** 135/20 216/9

**associated [11]** 34/10 61/20 126/21 172/25 173/10 173/14 173/16 183/4 206/21 216/10 216/16

**association [1]** 203/6

**assume [4]** 84/25 85/3 120/25 177/4

**assumed [13]** 171/25 174/5 174/8 177/2 179/17 183/22 184/19 184/23 185/15 186/8 186/13 186/17 211/13

**assumes [1]** 23/20

**assuming [5]** 69/21 96/16 115/8 185/23 238/16

**assumption [5]** 48/9 48/13 177/15 177/18 177/25

**assured [1]** 120/9

**Atkinson [2]** 114/14 195/4

**attach [1]** 271/25

**attached [5]** 60/19 103/9 166/22 237/2 239/12

**attachments [1]** 47/3

**attempted [1]** 29/5

**attempting [1]** 246/9

**attempts [1]** 28/20

**attended [1]** 254/6

**attention [9]** 8/22 10/25 85/2 92/17 92/23 93/1 93/5 208/18 271/1

**attorney [11]** 18/25 27/7 111/6 119/23 133/2 135/7 135/9 135/22 160/25 161/1 253/23

**ATTORNEY'S [4]** 2/4 8/1 24/22 255/17

**attorney-client [1]** 160/25

**attorneys [3]** 7/23 27/8 253/18

**attribute [1]** 110/24

**August [2]** 64/18 276/10

**AUSA [10]** 2/5 2/5 2/6 2/7 89/8 113/12 113/13 113/23 199/12 233/25

**author [3]** 247/3 247/9 247/20

**authored [1]** 246/25

**authorization [1]** 129/6

**available [7]** 62/3 107/8 132/11 143/11 144/17 168/10 195/7

**Avenue [5]** 2/11 2/22 38/8 49/9 245/11

**avoid [6]** 94/18 103/1 230/9 258/4 258/8 258/17

**avoiding [2]** 248/23 249/6

**aware [35]** 21/12 24/9 24/18 34/11 34/12 64/9 64/15 95/13 97/10 110/19 112/14 120/6 121/9 131/13 142/5 162/13 162/16 162/17 163/19 164/7 169/11 172/9 178/25 225/19 234/7 234/13 243/22 244/24 255/8 256/24 257/10 257/11 258/23 264/20 266/6

**away [2]** 167/25 201/6

**awful [1]** 37/10

**Ayvazian [14]** 28/7 109/20 128/22 132/9 132/19 164/8 235/5 236/6 237/11 237/11 237/15 238/2 254/5 262/4

**Ayvazian's [2]** 247/16 248/16

**Ayvazyan [85]** 1/9 2/14 3/11

5/7 5/17 5/24 9/5 10/2 13/8 60/9 63/23 64/3 64/13 65/16 65/22 66/16 67/25 68/3 68/13 68/19 68/24 69/11 69/17 70/3 76/3 76/7 76/11 77/11 78/9 78/15 78/18 78/24 79/11 80/9 80/14 87/22 102/6 102/14 102/16 105/4 109/12 110/20 110/25 111/11 111/16 111/21 111/22 112/5 112/15 132/16 135/20 157/18 167/8 167/19 168/4 168/13 168/24 169/5 169/7 169/17 172/11 176/16 177/22 178/10 178/14 178/19 179/2 179/11 182/1 182/11 184/1 185/24 186/1 186/13 187/16 187/25 204/17 220/6 220/20 236/3 241/11 242/9 255/7 268/9 269/20

**Ayvazyan's [16]** 57/2 57/6 75/17 77/2 77/17 77/20 78/23 79/23 108/24 175/22 214/21 238/19 241/23 242/4 245/11 245/18

**B**

**B-E-R-J [1]** 131/22

**B123 [1]** 166/10

**back [52]** 12/19 17/7 32/3 40/3 44/2 44/10 48/10 53/23 63/11 64/12 64/18 68/25 69/9 75/21 83/14 84/7 91/17 92/1 93/4 93/11 99/16 99/25 108/11 121/24 132/25 134/4 137/4 141/4 143/3 149/25 152/1 160/17 162/21 162/24 166/4 168/8 176/17 177/24 182/10 192/19 194/2 208/5 211/7 219/16 221/22 231/8 248/9 251/2 252/10 252/16 259/9 269/2

**background [4]** 153/12 173/25 174/1 233/2

**bad [1]** 71/19

**ballpark [2]** 129/11 129/22

**bank [33]** 11/13 11/19 12/14 13/6 64/22 141/19 141/21 147/13 148/24 172/17 172/18 174/14 174/23 175/5 175/6 175/21 175/21 179/4 179/8 179/9 180/14 181/3 181/4 181/23 182/7 184/15 185/10 211/17 213/17 213/21 214/17 216/7 220/8

**banks [3]** 104/3 104/22 106/13

**bar [1]** 101/22

**based [45]** 9/12 12/8 15/15 16/4 33/23 34/3 34/12 37/8 38/22 39/25 54/2 87/13 92/5 94/7 99/20 100/23 101/7 110/25 139/11 139/22 141/21 142/4 143/8 152/25 153/11 157/13 177/25 178/2 184/17 185/14 187/25 192/12 193/6 193/10 193/12 194/24 201/25 209/23 211/2 211/17 229/5 231/1 239/7 251/5 262/4

**basic [4]** 27/5 46/7 200/15 236/19

**basically [9]** 27/4 40/3 70/18 70/19 71/4 116/15 127/25 160/21 210/18

**basis [8]** 9/18 9/20 22/10 43/10 120/10 121/21 121/21 144/24

**be [174]**

**Beach [1]** 3/21

**became [7]** 163/19 164/7

168/1 172/9 206/14 206/16

**because [82]** 12/20 13/12 15/23 23/3 25/7 31/8 33/9 34/15 35/20 42/15 42/20 48/18 53/10 54/9 64/2 65/20 65/25 80/21 102/13 104/15 105/4 119/6 124/3 128/18 134/1 140/3 140/7 140/15 147/9 147/14 150/4 154/4 164/19 165/10 167/17 173/3 174/5 175/9 175/12 177/16 177/25 183/8 191/20 192/1 192/9 195/6 195/9 195/12 195/22 196/8 197/2 197/14 198/3 203/4 205/2 205/4 209/6 209/25 210/17 214/24 222/6 222/10 222/20 223/4 223/20 226/6 226/22 227/10 227/10 227/17 227/20 228/2 228/17 231/18 231/23 235/14 244/5 244/10 244/17 253/20 254/14 263/11

**becomes [2]** 138/6 232/1

**been [73]** 14/10 18/1 18/7 18/19 19/17 24/11 25/4 27/22 44/25 61/8 61/18 65/14 65/24 69/13 86/25 116/18 118/23 122/13 129/17 143/21 155/8 162/14 164/8 169/12 170/24 180/19 188/4 196/8 198/8 198/9 199/6 201/1 203/4 203/7 203/18 204/15 205/7 205/19 207/5 209/8 209/9 209/22 209/24 210/6 213/6 213/7 215/7 216/18 227/22 230/20 234/19 238/13 239/16 242/20 242/24 249/23 250/2 250/17 253/6 255/7 256/8 256/23 262/16 263/5 263/10 269/10 269/16 269/21 270/14 270/15 270/15 270/21 274/7

**before [72]** 7/10 12/10 13/19 14/23 16/19 19/25 20/13 21/21 47/2 48/16 50/7 51/6 51/21 54/23 55/1 55/17 55/24 56/4 56/12 63/6 64/23 66/23 69/18 71/17 72/2 72/18 72/23 80/7 91/25 92/22 93/3 99/24 117/2 118/18 120/10 123/3 124/16 129/6 142/21 149/20 150/21 168/6 184/25 189/2 195/16 196/20 197/6 197/24 201/22 202/9 202/25 203/2 203/4 203/13 207/24 208/7 208/11 211/3 211/14 212/2 212/10 212/23 213/13 220/2 221/22 234/7 240/18 246/10 246/22 252/16 262/3 264/21

**began [1]** 19/16

**begin [8]** 8/20 14/21 14/23 16/17 16/17 16/25 18/9 20/7

**beginning [5]** 12/18 21/19 159/3 164/4 164/6

**begins [1]** 237/23

**behalf [7]** 2/3 5/14 5/24 10/7 13/20 219/3 219/5

**behind [2]** 232/9 249/25

**being [37]** 13/25 46/3 56/3 62/20 64/10 69/15 135/10 172/15 172/20 172/21 172/24 174/20 176/24 178/4 179/6 181/14 181/19 181/20 181/23 182/9 183/9 183/10 183/14 184/1 184/4 184/14 185/14 191/15 202/17 209/5 209/6 210/4 219/14 219/15 227/14 249/17 263/15

**Belgium [1]** 221/11

**B**

**belief [2]** 26/15 73/15
**believe [99]** 7/22 8/2 9/21
17/9 25/8 25/22 25/24 26/18
37/24 39/19 44/8 49/13 50/13
51/24 59/10 60/25 64/22 67/4
74/10 74/16 74/19 75/8 76/5
76/5 78/1 86/20 89/14 89/19
92/20 93/6 93/15 93/16 95/6
95/8 95/16 96/18 99/13
101/22 103/10 103/16 107/7
114/19 115/1 115/5 117/3
117/4 120/19 128/21 131/11
133/24 133/25 141/22 142/15
144/10 146/5 153/15 155/23
157/1 157/2 157/7 159/11
159/19 166/23 167/19 168/9
172/6 174/3 174/11 174/12
180/9 190/19 191/12 192/16
197/9 197/14 197/15 198/2
199/18 199/21 199/24 200/9
200/15 200/22 201/19 201/20
202/11 202/15 202/16 203/3
203/7 214/14 215/24 217/8
225/13 238/12 241/18 250/15
268/22 270/8
**believed [13]** 41/14 42/13
65/9 69/2 69/3 75/24 120/16
121/4 121/25 165/11 178/14
186/5 223/14
**believes [3]** 6/19 97/18
119/25
**belonged [4]** 12/24 13/8 14/2
205/3
**belonging [1]** 221/2
**below [3]** 83/3 100/12 272/12
**benefit [12]** 10/20 11/4 11/7
11/9 11/21 12/9 13/21 14/8
181/14 182/1 182/10 182/12
**benefited [1]** 220/1
**Berj [11]** 131/22 131/23
131/25 132/7 132/10 132/11
132/13 132/14 132/23 221/14
223/16
**Berz [1]** 135/13
**best [6]** 73/13 97/18 183/21
204/9 233/7 266/20
**better [7]** 45/13 46/6 61/22
80/10 110/1 119/7 165/12
**between [28]** 8/25 29/24
35/15 38/5 48/6 56/7 63/19
69/16 71/21 78/24 148/14
157/18 162/6 164/8 167/8
167/19 167/24 169/5 199/12
199/20 210/1 215/9 215/23
221/13 222/15 230/3 230/16
254/5
**beyond [4]** 14/5 88/1 88/5
171/11
**Bienert [2]** 3/4 3/7
**big [3]** 105/3 105/22 144/1
**binder [1]** 31/21
**biographical [1]** 200/15
**bit [6]** 83/14 137/5 156/2
161/2 206/7 246/24
**bits [1]** 194/24
**block [1]** 138/25
**blow [5]** 54/1 60/11 74/4
76/24 257/20
**blows [1]** 76/25
**blue [1]** 272/9
**border [4]** 88/24 234/25
235/7 268/11
**both [12]** 7/23 9/23 20/13
89/10 118/22 136/11 151/13
199/25 246/20 249/22 249/23
274/24
**bottle [1]** 91/12

**bottom [6]** 32/16 149/3 149/6
149/9 149/11 149/13 149/24
**Boulevard [1]** 3/15
**boxing [1]** 87/9
**Bradford [16]** 135/4 135/5
135/10 135/16 135/16 135/17
135/19 157/5 157/10 157/13
157/14 157/18 252/21 253/1
253/6 254/5
**Bradford's [8]** 252/24 253/3
253/16 253/18 253/23 254/6
254/8 254/15
**break [9]** 19/24 20/4 39/12
123/17 135/3 165/24 166/2
166/3 251/9
**breaks [2]** 34/15 153/21
**Brian [2]** 195/3 260/24
**brief [6]** 10/8 10/18 10/25
70/21 121/20 258/20
**briefing [5]** 6/18 70/21
260/14 269/7 269/10
**briefly [4]** 11/17 13/5 121/2
260/20
**briefs [1]** 9/16
**bring [4]** 85/2 156/3 165/25
240/25
**bringing [2]** 123/22 134/7
**broad [4]** 16/22 230/4 231/24
265/9
**brought [2]** 260/21 270/25
**Brown [3]** 10/25 11/2 11/14
**bubble [1]** 12/17
**build [3]** 70/12 73/1 217/5
**building [3]** 20/18 74/16
107/1
**bullet [3]** 141/23 142/8
143/3
**bunch [1]** 64/21
**burden [1]** 16/1
**business [5]** 134/1 148/22
183/14 222/21 222/22
**busy [1]** 243/13
**buy [2]** 172/12 183/12
**buying [1]** 175/15

**C**

**CA [9]** 1/22 2/8 2/17 2/20
3/6 3/9 3/9 3/13 3/16 3/21
**calculations [1]** 62/4
**CALIFORNIA [18]** 1/2 1/14 5/1
90/3 95/11 108/17 109/4
117/25 190/25 237/13 238/1
238/18 239/15 239/24 240/5
240/9 241/22 242/4
**call [24]** 17/14 33/7 33/9
92/17 92/25 93/4 113/21
133/5 133/20 135/25 136/2
139/24 143/14 143/20 144/18
167/5 187/6 187/11 191/20
191/25 195/8 195/24 231/18
253/23
**Calle [1]** 3/5
**called [11]** 12/5 13/24 18/1
79/16 92/23 129/24 130/13
158/4 195/3 223/7 264/20
**calling [11]** 7/25 13/17
27/22 36/6 45/6 45/10 83/22
139/25 150/2 187/8 195/1
**calls [13]** 198/13 198/17
198/18 231/10 233/23 233/24
234/6 234/12 234/17 234/23
235/11 244/19 257/4
**came [27]** 29/14 29/18 59/1
71/12 83/19 114/2 152/18
197/25 206/10 209/9 209/15
210/5 210/16 251/7 251/13
259/11 260/7 260/17 268/6
271/5 271/9 271/15 271/16
271/18 272/10 273/4 273/21

**camera [5]** 15/7 128/2 128/6
128/7 128/10
**Camille [1]** 141/16
**Camilo [2]** 112/19 112/22
**can [144]**
**can't [36]** 16/11 27/13 33/15
35/8 60/25 64/13 75/14
123/10 129/24 135/2 140/16
141/6 148/4 170/10 227/25
240/17 240/20 244/1 244/7
245/2 248/7 249/15 249/15
249/19 249/23 251/16 251/18
251/19 251/20 252/11 253/24
255/22 256/19 261/13 262/21
263/21
**cannot [3]** 27/4 150/9 256/16
**Canoga [13]** 38/8 49/8 49/8
73/25 74/8 78/7 78/15 78/18
79/24 80/10 80/11 80/15
245/11
**Canyon [3]** 141/16 141/25
145/12
**capabilities [2]** 98/25 99/4
**capacity [1]** 18/24
**capital [1]** 272/13
**capitals [2]** 272/17 272/19
**car [1]** 203/8
**card [51]** 112/6 112/6 112/19
142/17 184/16 184/16 185/17
185/18 188/15 197/8 197/10
197/19 198/1 198/2 213/10
213/15 214/5 214/7 214/8
214/22 214/24 214/25 215/5
215/6 215/12 215/17 215/19
215/21 215/25 216/2 216/3
216/6 216/9 216/10 216/13
216/17 216/20 217/11 217/16
217/18 217/19 217/24 218/9
218/12 218/17 218/21 221/2
237/13 238/1 238/18 240/13
**cards [26]** 90/12 116/5
175/24 178/6 191/6 192/15
192/21 193/13 195/13 195/17
196/7 196/8 196/13 196/19
207/16 210/2 210/3 212/6
214/20 216/23 217/2 239/15
242/10 242/11 242/14 242/15
**care [1]** 265/5
**careful [1]** 210/4
**carefully [1]** 188/25
**carry [1]** 217/11
**carry-on [1]** 217/11
**carrying [7]** 188/6 188/9
188/10 217/14 241/12 242/9
242/10
**case [112]** 11/3 11/5 12/19
16/7 18/4 18/20 18/25 19/2
19/5 19/7 19/16 19/17 20/17
20/18 21/7 23/24 27/8 39/18
41/25 43/7 46/1 48/9 61/4
61/7 61/10 62/12 65/22 66/1
66/3 68/21 69/1 70/12 73/2
78/6 80/7 81/1 111/5 120/17
121/20 122/2 129/2 129/22
130/2 130/5 130/17 130/20
130/22 130/23 130/24 140/2
156/14 159/3 170/24 171/5
171/21 171/24 210/23 212/13
217/5 218/24 220/6 223/22
224/1 224/3 226/21 227/18
229/8 230/17 232/23 233/12
233/16 233/18 233/22 233/24
233/25 234/2 234/3 234/11
235/10 238/13 238/20 239/2
239/6 241/5 241/25 247/2
251/6 252/1 252/7 252/8
253/12 254/4 255/6 255/17
256/13 259/11 259/13 259/16
260/17 260/19 260/22 260/24

**C**

**case... [10]** 261/3 261/11 261/20 261/23 261/24 268/6 268/8 268/12 269/13 269/22
**cases [3]** 104/15 144/15 204/11
**categorically [1]** 55/23
**categories [4]** 28/21 89/24 116/1 116/2
**category [2]** 16/23 95/17
**CATHERINE [1]** 2/6
**caught [3]** 192/20 241/12 241/13
**cause [16]** 192/17 193/6 193/22 193/24 194/9 194/25 195/2 196/16 196/22 197/4 197/20 197/23 198/12 198/21 199/16 200/2
**caused [1]** 227/23
**cautioned [1]** 254/21
**CBD [1]** 135/21
**CBFP [1]** 202/19
**CBP [35]** 20/23 88/24 89/21 93/13 93/20 94/7 94/15 152/18 154/11 154/24 156/20 157/8 158/10 186/24 187/6 187/12 187/13 191/13 192/13 197/15 200/13 200/17 200/20 201/2 202/10 204/15 235/23 236/1 236/13 237/1 239/14 239/17 241/21 241/24 268/13
**CBP's [1]** 268/16
**CDCA [1]** 104/10
**ceased [1]** 271/10
**cell [26]** 45/21 45/22 88/10 188/6 188/10 204/10 204/12 204/15 207/14 217/14 248/23 249/4 250/6 252/14 252/19 252/23 252/24 253/1 253/13 253/17 253/21 254/8 254/16 266/17 267/9 268/5
**Cellebrite [104]** 24/15 24/16 28/10 28/12 28/15 28/17 29/6 30/12 30/17 30/19 32/1 32/11 32/14 33/3 33/6 34/19 35/6 35/25 36/4 36/8 36/18 36/19 36/24 37/4 37/7 37/14 38/18 38/19 38/25 39/4 39/15 40/4 40/9 42/3 43/6 43/13 43/16 44/6 45/8 45/17 45/21 46/14 46/17 46/20 46/22 47/20 47/24 48/22 49/1 49/12 50/21 52/21 53/6 53/15 54/8 54/17 54/19 56/21 59/14 63/8 63/17 69/19 70/1 70/14 73/1 73/5 73/9 73/23 74/7 75/12 77/1 77/6 78/14 79/9 79/14 84/23 85/23 86/1 86/10 86/13 86/18 86/21 87/1 92/1 155/9 155/22 162/21 168/5 168/10 169/19 169/22 225/5 225/11 225/23 242/19 242/23 243/5 243/23 243/23 244/3 244/8 244/14 244/17 244/25
**Cellebrite's [1]** 35/12
**Cellebrites [35]** 28/9 28/10 28/14 28/25 35/1 37/23 38/1 38/12 38/15 41/13 49/22 49/23 51/5 51/13 52/12 52/14 53/18 59/25 60/2 70/10 84/10 84/12 84/13 84/16 85/6 92/4 92/6 92/11 92/14 155/10 155/12 155/18 225/3 226/3 243/16
**center [3]** 11/22 74/15 74/16
**central [3]** 1/2 269/21 270/18
**certain [11]** 21/16 27/18
37/3 38/22 96/19 108/17 270/10
**certainly [9]** 8/11 12/7 44/3 151/2 188/5 188/10 212/4 214/23 239/7
**CERTIFICATE [1]** 276/1
**certify [1]** 276/4
**cetera [3]** 18/3 107/2 243/12
**chagrin [1]** 195/5
**chain [9]** 29/23 100/12 102/2 114/1 149/9 152/2 168/24 254/5 254/19
**chains [1]** 149/10
**chance [2]** 176/8 177/20
**change [3]** 212/9 212/15 238/23
**changed [2]** 161/18 261/12
**characterization [3]** 38/17 133/8 229/1
**charge [6]** 105/22 192/14 212/9 212/11 212/22 220/14
**charged [3]** 119/18 201/14 220/17
**charges [1]** 196/10
**charging [1]** 233/13
**chart [24]** 102/18 102/21 102/23 103/3 103/6 103/6 103/8 103/11 103/15 104/24 107/25 108/12 142/24 146/8 146/15 150/8 150/22 151/1 151/10 151/12 151/14 151/24 152/3 152/4
**charts [2]** 103/5 147/10
**check [5]** 60/19 60/24 60/25 151/18 155/10
**checking [1]** 234/1
**checks [1]** 174/17
**chief [6]** 18/7 114/11 114/14 114/14 114/16 261/12
**chiefs [1]** 114/18
**choice [1]** 267/13
**choices [1]** 38/23
**choose [3]** 39/1 39/2 124/17
**chose [2]** 122/10 122/13
**chosen [1]** 122/14
**Chris [1]** 32/17
**Christopher [5]** 2/10 4/4 5/10 18/14 261/1
**chronologically [2]** 149/7 221/6
**chronology [3]** 63/13 189/13 189/18
**Chu [1]** 137/7
**Cipoletti [1]** 5/10
**Cipolletti [1]** 114/19
**circulated [1]** 114/18
**circumstantial [2]** 213/12 213/20
**cite [2]** 15/22 121/20
**cited [3]** 43/23 121/10 131/9
**claim [5]** 23/4 25/19 26/3 26/19 216/13
**clarification [2]** 141/3 187/10
**clarify [5]** 10/3 17/8 29/4 141/7 151/25
**clarifying [2]** 133/16 154/17
**Clark [6]** 15/3 17/4 21/23 99/19 137/8 261/5
**clean [2]** 163/23 195/23
**clear [36]** 9/13 9/17 10/19 33/5 35/16 36/17 42/9 45/8 45/16 48/12 53/4 54/12 56/8 57/5 58/13 59/12 59/24 63/14 76/17 82/21 87/10 91/8 95/8 95/24 103/5 125/4 171/18 176/1 196/1 209/5 209/15 210/15 210/20 212/8 234/24
235/6
**Clemente [1]** 3/6
**clerical [1]** 146/7
**clerk [2]** 33/20 101/16
**client [3]** 133/20 160/25 170/13
**clients [1]** 274/15
**close [3]** 8/22 80/7 84/8
**closed [1]** 157/20
**closely [3]** 22/2 74/5 87/12
**closing [5]** 11/20 11/24 111/7 208/13 208/19
**co [4]** 6/10 14/2 186/5 229/11
**co-conspirator [1]** 186/5
**co-conspirators [1]** 14/2
**co-counsel [2]** 6/10 229/11
**coast [2]** 3/20 89/18
**Code [1]** 276/5
**coincidence [1]** 201/22
**coins [1]** 220/11
**colleague [2]** 235/5 270/9
**colleagues [3]** 137/20 230/3 271/21
**columns [1]** 151/13
**COM [1]** 135/21
**come [19]** 17/7 19/7 40/3 45/2 73/16 80/23 83/9 83/14 84/7 87/21 91/17 160/17 166/4 173/22 204/12 209/16 210/17 259/6 262/17
**comes [4]** 45/17 73/13 78/13 204/10
**coming [5]** 20/22 50/5 174/20 181/23 194/20
**commence [1]** 119/24
**comment [1]** 57/22
**comments [1]** 10/8
**commit [4]** 176/18 177/23 180/20 219/1
**committed [2]** 126/24 177/24
**committing [2]** 69/1 192/11
**communicate [2]** 90/8 159/12
**communicated [8]** 162/18 165/9 165/20 190/17 190/19 190/20 193/16 202/12
**communicating [2]** 152/1 198/11
**communication [3]** 49/6 87/4 87/4
**communications [16]** 94/19 134/3 159/18 160/4 160/7 160/11 160/20 160/22 198/19 199/12 222/8 222/9 222/10 222/14 222/20 234/13
**companies [5]** 13/25 14/1 62/11 62/13 153/22
**company [15]** 12/23 13/7 13/24 38/7 49/7 62/20 64/15 64/17 75/1 75/4 75/7 79/18 135/21 151/13 151/19
**company's [1]** 64/17
**compare [2]** 92/5 208/5
**compared [1]** 208/8
**comparison [2]** 75/9 152/12
**compartmentalize [1]** 211/2
**compelled [2]** 26/9 27/3
**compilation [1]** 203/22
**compiled [1]** 151/23
**compiling [1]** 146/8
**complaint [13]** 90/18 90/22 90/23 91/3 91/25 93/11 93/14 93/19 93/25 95/4 96/3 188/17 233/15
**complaints [1]** 233/16
**complete [8]** 69/20 71/7 71/20 115/13 115/15 115/17 167/18 255/1

C

**completely [3]**   135/14 181/18 264/4
**compliance [1]**   133/4
**comply [1]**   128/15
**compound [2]**   60/5 251/9
**computer [4]**   32/5 85/19 226/8 226/19
**computers [1]**   243/12
**concept [3]**   80/2 80/5 230/4
**concerned [2]**   9/3 196/17
**concerning [1]**   48/8
**concerns [2]**   110/11 234/2
**conclude [2]**   71/2 102/11
**concluded [6]**   70/25 128/22 128/25 175/6 179/13 275/5
**conclusion [9]**   27/6 54/11 177/21 177/22 211/13 214/23 218/14 224/22 257/5
**conclusory [4]**   16/3 16/10 16/14 16/15
**conditions [1]**   126/24
**conduct [5]**   72/2 72/4 101/8 120/1 160/19
**conducted [4]**   72/10 131/2 131/6 207/25
**conducting [2]**   72/7 196/9
**confer [1]**   33/20
**Conference [1]**   276/9
**confess [1]**   15/19
**confirm [2]**   44/10 150/22
**confirmed [2]**   236/20 268/17
**conformance [1]**   276/8
**confused [1]**   58/14
**confusing [1]**   244/6
**connected [1]**   1/12
**Connecticut [1]**   2/22
**connection [13]**   57/25 70/5 77/10 77/12 82/14 118/23 119/1 130/17 130/19 208/9 217/22 247/13 267/10
**connects [4]**   78/14 78/18 79/24 113/3
**conscious [1]**   267/13
**consider [4]**   65/15 157/24 194/7 230/8
**considered [3]**   9/10 231/5 256/9
**consistent [1]**   43/18
**conspiracy [5]**   14/4 78/8 113/3 186/11 212/16
**conspirator [1]**   186/5
**conspirators [1]**   14/2
**constitutes [1]**   120/1
**consultants [1]**   19/13
**consulted [1]**   17/13
**consulting [1]**   146/24
**Cont'd [1]**   3/1
**contact [2]**   114/2 141/24
**contain [1]**   12/14
**contained [8]**   24/3 24/7 28/19 30/19 107/4 233/4 236/1 245/7
**contains [2]**   246/16 269/9
**contemporaneous [1]**   216/12
**contemporaneously [1]**   94/15
**contents [4]**   86/22 87/4 87/18 268/5
**context [2]**   41/17 271/8
**continuation [1]**   138/2
**continue [2]**   91/19 136/19
**continued [14]**   21/9 21/11 71/25 72/17 124/22 126/2 126/25 136/10 136/11 172/13 172/19 176/21 176/22 195/8
**continues [1]**   126/17
**continuing [1]**   274/16
**contractors [1]**   103/14

**contradiction [1]**   56/7
**control [1]** 95/7 245/16 247/16 248/16
**controlled [3]**   78/7 80/10 80/14
**controlling [2]**   109/17 109/20
**conversation [32]**   66/8 68/2 93/9 131/25 132/3 132/4 132/22 133/1 133/7 133/8 133/9 133/11 133/13 133/17 133/19 134/8 134/24 135/12 135/23 193/3 196/1 196/2 249/17 249/18 250/12 251/18 251/22 251/25 252/5 252/12 253/18 262/22
**conversations [17]**   94/14 94/25 130/3 134/15 134/17 164/21 199/18 235/4 237/15 238/3 248/22 249/1 249/6 249/9 249/12 249/13 262/4
**convey [1]**   198/5
**conveyed [11]**   79/19 89/21 89/21 90/16 93/13 116/7 116/10 119/17 198/9 200/7 201/1
**conveying [1]**   116/11
**convict [1]**   171/14
**convicted [2]**   61/8 61/11
**conviction [8]**   120/3 120/10 171/5 178/1 178/2 180/22 180/24 214/17
**convinced [1]**   184/18
**convincing [1]**   213/24
**convoluted [1]**   81/22
**cookie [1]**   241/13
**coordinate [1]**   161/5
**coordinating [2]**   158/24 159/8
**coordination [1]**   159/2
**copies [1]**   146/18
**copy [22]**   30/1 30/6 31/7 31/9 31/12 40/20 50/3 50/10 50/14 93/2 95/7 95/21 96/3 96/10 96/19 103/21 103/22 139/8 163/21 163/23 200/20 257/16
**correct [221]**
**corrected [1]**   94/6
**correctly [1]**   165/17
**corrects [1]**   62/8
**correlation [1]**   35/14
**correspondence [8]**   18/2 30/20 38/5 74/11 74/20 86/2 153/4 158/14
**corroborate [1]**   224/3
**corroborated [3]**   212/14 223/22 224/1
**corroborative [3]**   224/7 224/10 224/16
**cosigner [1]**   182/21
**coughing [2]**   232/12 232/13
**could [64]**   12/8 17/4 25/4 27/3 27/25 30/6 33/10 59/3 59/4 70/13 71/9 72/14 72/14 73/7 76/24 93/23 93/24 95/23 96/10 99/15 101/13 105/19 122/13 122/14 123/25 124/17 126/12 127/20 127/22 142/14 144/6 150/4 158/2 161/20 164/16 169/10 177/6 177/10 188/2 188/3 188/3 191/21 207/5 212/25 213/6 214/23 217/24 218/13 226/22 226/24 231/20 236/9 237/8 239/11 241/2 250/20 256/25 257/2 257/8 257/10 263/10 264/1 264/15 270/14
**couldn't [4]**   124/3 192/7

245/2 257/10
**counsel [22]** 1/22 4/18 9/7 14/17 17/9 17/25 18/8 70/16 73/8 91/12 132/8 132/15 132/19 134/17 167/25 168/1 229/11 235/4 253/3 254/7 262/4
**count [5]**   121/7 127/25 129/24 130/3 220/21
**country [1]**   196/17
**counts [1]**   61/12
**couple [5]**   14/23 42/7 150/13 207/15 233/15
**coupled [1]**   180/13
**course [18]**   8/21 8/22 9/10 20/7 77/18 93/24 120/8 125/6 129/22 149/1 182/25 194/11 194/17 196/23 197/25 230/19 259/10 265/3
**court [44]**   1/1 1/20 7/7 8/21 8/23 10/1 10/13 10/17 10/21 10/22 10/24 11/7 11/15 12/15 12/16 12/21 15/7 15/10 15/14 16/11 16/14 26/19 29/23 33/20 59/12 128/3 128/6 128/13 128/15 128/16 129/6 158/1 165/24 166/16 199/4 199/6 199/9 202/5 204/9 224/21 232/9 255/8 274/17 275/3
**court's [5]**   5/15 85/2 250/15 263/12 271/1
**courtroom [1]**   122/23
**cover [1]**   232/4
**covered [4]**   12/1 113/1 164/5 267/16
**CR [2]**   1/8 5/6
**crashed [2]**   85/19 226/8
**crashing [1]**   226/19
**crazy [2]**   13/17 201/22
**created [3]**   12/5 12/6 28/25
**credibility [2]**   6/20 15/11
**credible [2]**   140/7 190/5
**credit [46]**   90/11 116/5 175/24 178/6 184/16 184/16 185/17 185/18 188/15 191/6 192/15 192/20 193/13 195/13 195/17 196/7 196/7 196/8 196/12 196/19 197/8 197/19 198/1 198/2 210/2 210/3 212/5 213/10 213/14 214/5 214/7 214/8 214/20 214/21 214/24 214/25 215/19 215/20 216/13 217/11 218/21 221/2 242/10 242/11 242/14 242/15
**crime [1]**   187/22
**crimes [3]**   105/21 119/19 126/24
**criminal [20]**   91/2 114/10 175/25 176/15 180/13 180/16 184/14 184/20 188/17 203/6 257/12 257/14 257/25 258/17 264/10 264/16 264/18 264/21 273/18 273/22
**cross [23]**   4/4 4/5 4/6 4/7 6/25 7/4 7/12 7/15 7/19 7/23 7/25 8/3 8/5 8/8 15/9 16/2 154/9 170/20 232/19 255/4 267/12 273/16 274/25
**cross-examination [11]**   4/4 4/5 4/6 4/7 7/23 8/5 16/2 170/20 232/19 255/4 273/16
**cross-examinations [1]**   267/12
**cross-examine [9]**   6/25 7/4 7/12 7/15 7/19 8/3 8/8 15/9 274/25
**cross-examining [1]**   7/25
**cross-reference [1]**   154/9

**C**
CRIT [1]   276/12
CSR [2]   1/20 276/12
cumulative [26]   41/15 41/17
 42/13 47/10 74/25 75/24
 76/18 76/22 79/20 83/1 107/5
 107/7 107/10 107/21 109/21
 110/1 223/24 223/25 224/2
 224/6 224/9 224/12 224/15
 225/14 225/15 225/16
Cunningham [1]   114/20
currently [1]   18/25
custody [1]   21/2
customs [3]   88/24 190/7
 190/23
cut [3]   13/14 119/13 274/9

**D**
DADYAN [61]   3/18 5/14 10/8
 11/4 11/8 11/11 11/21 12/2
 12/18 12/25 13/12 13/14
 13/16 14/2 14/3 14/5 39/21
 40/3 40/7 40/8 41/2 41/21
 42/20 48/3 48/7 60/16 61/6
 62/6 63/19 63/19 64/7 65/11
 65/22 66/9 66/9 68/4 68/13
 68/19 68/24 69/17 70/2 105/5
 158/19 161/24 162/3 162/6
 162/11 162/15 163/4 164/8
 165/6 165/20 167/8 167/15
 167/20 168/4 168/12 168/23
 169/5 169/8 169/17
Dadyan's [4]   10/20 62/25
 158/19 164/20
dark [1]   195/25
dash [1]   153/19
data [11]   28/19 28/20 28/20
 36/21 38/20 38/22 39/1 40/7
 49/5 67/19 67/20
date [16]   20/22 20/24 34/18
 34/21 34/21 35/12 36/12
 44/15 71/22 111/20 111/20
 138/11 189/10 201/7 274/19
 276/10
dates [4]   29/7 72/9 72/10
 274/18
day [16]   1/15 21/20 63/6
 99/12 99/24 104/12 157/5
 166/13 188/15 191/21 192/8
 196/2 196/6 201/22 201/23
 202/9
days [7]   29/5 86/10 88/22
 97/24 98/2 117/2 239/15
DC [2]   2/12 2/23
dead [5]   110/21 111/1 111/17
 111/21 201/15
deadline [1]   125/23
deal [2]   228/10 265/14
deals [1]   111/8
debating [1]   224/6
Deboise [2]   156/9 156/19
deceased [2]   110/16 201/11
December [10]   136/10 136/18
 136/23 137/25 138/12 141/11
 152/1 168/9 168/9 221/22
December 3rd [2]   137/25
 138/12
December 4th [1]   141/11
decide [1]   227/9
decided [5]   193/21 194/9
 210/12 227/3 253/19
decision [18]   8/25 22/2
 124/17 165/10 193/10 193/24
 196/21 197/3 197/6 198/11
 198/15 198/21 199/5 200/2
 212/9 212/11 227/19 230/25
decisions [12]   19/1 19/4
 19/6 19/25 20/13 20/17 21/4

21/7 122/14 124/3 124/15
declarants [1]   7/15
declaration [107]   8/2 23/10
 29/20 29/25 30/3 30/20 31/4
 31/6 36/13 36/15 43/24 49/18
 50/1 50/11 50/14 50/15 51/9
 51/11 51/17 51/18 51/24 52/3
 52/7 52/15 52/18 53/8 55/4
 57/24 58/3 58/8 58/12 58/16
 58/20 74/24 81/8 81/24 82/3
 82/9 82/10 82/13 82/17 82/18
 82/19 83/21 86/3 103/9
 103/10 103/20 115/21 119/15
 131/10 132/6 136/25 143/5
 150/1 150/16 150/18 158/9
 158/13 159/23 163/8 163/12
 163/14 163/15 163/22 165/13
 166/22 200/23 203/19 211/7
 224/23 224/25 225/18 227/2
 228/21 228/25 237/3 238/12
 242/22 243/4 245/3 245/22
 245/25 246/3 246/5 246/16
 248/1 248/10 248/21 252/18
 253/25 254/3 254/10 254/15
 257/22 266/15 266/19 267/2
 267/4 267/7 267/16 268/20
 269/6 270/9 272/1 272/2
 272/4
declarations [6]   7/3 8/9
 15/1 15/2 15/18 16/10
declarative [1]   83/8
deconfliction [2]   102/24
 103/7
deemphasizes [1]   270/10
defendant [21]   1/9 2/14 3/3
 3/11 3/18 9/5 12/18 27/4
 47/14 61/9 66/16 67/24 69/16
 69/17 111/11 126/23 131/3
 135/20 182/1 184/18 254/5
defendant's [1]   239/12
defendants [22]   9/4 18/2
 20/25 21/17 23/3 25/18 27/20
 28/6 61/6 62/20 64/10 73/8
 119/18 128/9 128/11 130/22
 131/1 159/7 191/7 233/16
 238/25 263/19
defendants' [4]   15/14 15/20
 39/17 73/14
defense [33]   6/4 6/5 6/19
 9/19 17/16 18/8 70/15 72/13
 78/5 128/4 128/17 129/18
 130/4 148/10 153/10 153/13
 160/8 160/13 166/20 167/20
 167/25 168/1 168/2 168/6
 169/11 169/14 199/1 202/1
 202/3 202/4 260/8 262/15
 263/6
defense's [1]   7/7
defenses [1]   78/10
define [1]   224/7
definitely [10]   39/9 41/9
 85/8 85/10 141/18 151/11
 158/7 168/5 202/16 223/11
definitional [1]   106/10
definitively [1]   62/24
demands [1]   226/21
demonstrated [1]   12/1
demonstrative [1]   28/2
demonstratives [1]   28/3
demurrer [1]   41/12
denied [2]   214/8 215/15
DEPARTMENT [13]   2/4 2/11
 20/12 23/23 24/21 98/14
 98/15 101/23 114/10 243/2
 257/12 258/1 258/6
depend [1]   256/14
depending [6]   7/17 14/13
 15/13 17/11 37/17 161/25

depends [6]   40/5 64/3 161/11
 161/17 161/18 262/12
depiction [1]   79/9
deputy [2]   114/13 261/11
derivative [2]   82/4 83/8
derived [9]   60/1 138/15
 138/18 140/10 140/17 140/22
 140/24 234/20 267/15
describe [5]   38/18 106/3
 181/17 224/15 251/23
described [14]   12/20 35/24
 87/5 100/19 103/6 104/24
 115/18 178/3 189/19 213/13
 213/20 250/1 267/4 267/7
describes [1]   127/6
describing [3]   127/4 180/9
 261/23
description [3]   29/14 29/17
 224/15
descriptions [1]   268/13
designed [2]   189/24 270/2
despite [1]   216/13
detail [4]   37/18 84/8 94/9
 119/11
detailed [1]   13/14
determine [4]   27/19 203/11
 272/10 274/9
determined [1]   153/8
determining [1]   273/3
develop [3]   16/4 157/8
 158/16
developed [4]   212/13 244/15
 253/6 253/11
developing [1]   23/8
devices [14]   122/1 122/6
 122/25 123/5 123/6 123/25
 124/12 124/14 161/3 161/9
 161/15 161/17 161/17 248/18
diagram [1]   12/17
did [306]
didn't [107]   6/12 8/13 9/11
 15/24 16/4 16/10 33/5 49/21
 51/12 52/13 53/5 62/18 75/25
 85/21 85/22 92/25 94/24 99/1
 99/2 99/3 103/23 105/25
 107/7 107/21 111/25 112/22
 115/22 116/9 117/9 119/7
 120/24 124/5 124/8 124/25
 145/21 150/3 154/8 155/25
 162/18 165/2 165/3 165/8
 165/14 165/19 165/21 168/16
 171/15 173/23 174/2 174/3
 174/5 174/6 174/8 174/9
 174/12 174/13 175/6 179/5
 181/18 189/2 190/6 190/13
 191/20 191/22 193/15 195/14
 197/13 197/25 201/8 201/17
 202/25 209/6 209/18 210/17
 211/21 212/15 214/14 214/16
 216/9 216/13 217/20 217/25
 222/6 223/1 223/25 227/10
 227/11 227/15 227/16 235/14
 239/1 242/11 242/15 244/9
 244/10 244/17 250/9 252/3
 252/14 252/19 254/19 257/7
 266/23 267/23 270/5 271/25
 275/3
died [6]   111/6 200/17 201/8
 201/18 201/19 201/24
dies [1]   220/3
difference [1]   224/11
differences [1]   134/22
different [34]   6/14 12/3
 12/4 28/21 34/15 39/1 63/7
 72/24 74/12 76/12 104/10
 104/3 109/5 109/11 118/2
 124/13 135/14 145/6 147/16
 152/16 153/23 154/10 154/19
 154/22 154/23 164/19 178/4

**D**

**different... [7]** 178/7 188/2 206/17 207/15 244/7 246/24 247/14
**differently [1]** 231/9
**difficult [5]** 44/2 48/23 74/13 133/25 226/18
**difficulty [5]** 85/9 140/14 141/6 141/8 226/7
**digital [17]** 90/11 95/10 96/6 115/3 119/16 122/1 122/6 122/25 123/4 123/25 124/12 124/14 161/3 161/9 204/14 210/1 218/1
**dinner [2]** 195/22 195/22
**direct [11]** 18/17 55/2 125/14 126/4 126/12 170/11 208/18 215/4 215/6 261/10 267/11
**directed [2]** 14/10 16/3
**directing [1]** 17/15
**directly [9]** 8/13 9/3 15/20 78/14 79/24 132/14 162/2 191/13 244/16
**discovered [4]** 142/24 208/22 237/16 238/4
**discovery [2]** 125/23 128/7
**discrete [4]** 146/13 147/4 147/17 148/6
**discuss [10]** 10/14 118/18 136/2 229/22 234/6 259/13 262/1 262/6 262/18 264/2
**discussed [17]** 10/20 116/8 117/5 118/15 118/17 148/22 202/18 228/7 229/19 230/2 259/15 260/24 261/3 262/20 262/24 263/23 264/6
**discusses [1]** 13/13
**discussing [8]** 70/6 92/10 118/20 119/11 134/9 230/1 230/6 260/1
**discussion [15]** 92/1 131/13 134/25 232/15 250/8 250/24 251/8 251/12 251/14 251/15 252/6 253/2 253/5 263/24 264/19
**discussions [7]** 93/20 94/7 194/19 228/5 251/2 261/22 264/17
**dishes [1]** 195/23
**dismiss [2]** 125/22 153/11
**displayed [1]** 148/11
**displaying [1]** 257/18
**disprove [1]** 214/16
**dispute [4]** 35/10 67/5 240/16 270/25
**disqualify [1]** 153/11
**distinctions [1]** 210/1
**distinguishable [1]** 11/2
**distribution [1]** 114/22
**district [5]** 1/1 1/2 1/4 104/10 127/1
**divide [2]** 20/4 28/20
**divides [1]** 28/20
**DIVISION [2]** 1/2 114/10
**do [232]**
**docket [5]** 81/3 90/19 93/25 125/20 127/8
**document [35]** 31/21 38/16 38/25 43/22 44/1 44/2 45/4 45/5 47/2 47/18 47/23 49/2 53/7 53/18 59/23 78/17 78/23 79/23 93/15 93/16 112/15 136/3 140/7 140/16 149/16 153/12 153/13 153/18 246/20 247/12 247/23 257/23 258/10 258/14 267/23
**documentation [3]** 11/19

**documented [1]** 11/4
**documents [19]** 15/7 15/10 15/15 16/23 21/5 38/15 52/13 52/16 53/5 53/20 72/12 77/15 158/14 207/17 207/20 207/20 210/2 220/23 233/12
**does [19]** 12/14 20/8 28/10 28/21 34/10 41/17 47/13 55/25 75/16 83/8 86/6 86/9 86/13 96/18 98/18 130/10 138/23 180/21 261/18
**doesn't [12]** 42/24 43/1 54/13 55/21 55/22 128/4 148/4 148/7 224/14 241/20 259/6 275/1
**doing [17]** 30/11 42/5 42/24 97/1 147/15 147/16 148/22 150/17 192/17 194/18 195/1 195/20 196/9 198/6 208/13 226/2 231/5
**DOJ [4]** 257/18 258/12 258/17 264/10
**don' [1]** 44/13
**don't [247]**
**done [11]** 19/21 40/12 70/18 70/20 70/23 188/19 203/7 208/11 210/22 231/9 258/12
**doubt [5]** 29/15 109/18 109/22 171/11 210/5
**down [26]** 22/4 34/15 39/12 61/15 62/5 70/9 100/16 135/3 137/5 145/5 148/12 148/20 153/21 163/10 163/10 164/2 205/21 209/7 227/11 231/14 238/11 240/2 242/12 242/18 248/20 274/10
**download [1]** 233/21
**draft [1]** 90/23
**drafting [2]** 115/22 267/11
**dramatic [1]** 8/4
**draw [3]** 209/25 218/14 224/21
**drawn [3]** 12/8 208/9 211/12
**drive [13]** 24/8 24/8 24/10 233/4 233/8 233/20 234/6 234/12 234/18 234/22 234/23 234/24 235/10
**driver's [16]** 90/3 90/12 95/11 108/8 108/17 109/4 109/11 109/16 110/4 116/3 117/25 118/1 191/1 191/6 207/15 240/5
**driving [1]** 13/17
**during [24]** 10/15 10/16 10/21 10/22 11/9 11/10 11/20 11/24 11/25 12/1 12/10 92/3 106/19 134/1 193/11 196/6 198/4 202/13 213/7 222/21 234/13 236/19 241/15 249/12
**DX28 [2]** 148/11 149/16
**DX29 [1]** 148/18
**Dyke [2]** 114/13 195/3

**E**

**e-mail [70]** 29/23 30/5 30/20 32/1 32/15 33/23 34/13 38/5 38/6 47/5 47/8 47/11 47/14 48/6 48/6 48/7 48/14 48/16 49/6 55/15 69/16 74/7 74/9 74/10 74/25 78/13 81/12 86/2 100/1 100/12 100/15 100/23 101/1 101/14 102/2 102/8 107/18 137/1 137/3 137/6 137/24 138/2 141/10 141/11 141/12 141/13 143/4 148/14 148/25 149/9 153/4 159/14 164/2 166/18 166/20 166/21 166/24 167/2 198/14 202/4

**E** (column 3)

205/4 222/23 254/5 254/19 272/23 273/1
**e-mailed [2]** 98/9 198/20
**e-mailing [2]** 68/14 198/24
**e-mails [27]** 16/21 18/3 38/11 48/13 149/18 158/12 158/14 178/20 178/23 198/19 198/20 198/23 199/5 199/14 199/18 199/20 199/22 199/23 199/24 199/25 201/25 202/1 202/3 202/6 202/7 267/21 271/20
**E-N-T-O-N [1]** 18/15
**each [9]** 13/9 36/22 68/25 70/5 86/6 86/9 198/14 267/24 271/18
**eager [5]** 70/10 70/13 70/15 73/1 73/5
**eagerness [1]** 70/16
**earlier [10]** 25/11 25/13 38/19 44/6 44/8 54/2 60/7 92/21 128/21 205/18
**early [4]** 59/11 175/2 238/21 239/8
**easier [1]** 50/9
**easily [1]** 31/8
**East [1]** 89/18
**Eastern [2]** 59/11 89/18
**easy [1]** 243/11
**effect [3]** 65/6 93/19 119/15
**efficient [1]** 173/2
**effort [2]** 147/12 248/6
**efforts [1]** 13/14
**EIDL [8]** 64/19 102/6 139/9 142/24 145/5 179/24 181/22 207/18
**EIDL's [1]** 139/2
**eight [4]** 145/15 150/3 150/5 236/1
**EIN [1]** 62/8
**either [12]** 15/23 16/1 35/9 41/7 74/9 130/3 151/18 194/14 243/19 251/6 260/3 260/5
**electronic [1]** 236/19
**else [16]** 33/9 93/8 98/23 114/17 157/22 176/19 183/18 208/21 209/4 224/10 244/12 251/6 254/20 266/24 267/1 270/3
**else's [1]** 111/13
**elsewhere [1]** 208/20
**embolden [1]** 224/20
**EMGR [1]** 74/15
**employed [3]** 174/16 175/10 175/16
**employee [1]** 48/8
**encountered [1]** 193/7
**end [8]** 71/5 71/6 71/9 117/22 141/20 250/24 270/20 274/3
**ended [2]** 93/13 231/12
**ending [2]** 29/12 60/13
**ends [2]** 29/16 61/16
**enforce [1]** 125/22
**enforcement [6]** 93/21 94/8 94/16 102/25 103/2 132/2
**English [1]** 36/23
**enough [8]** 7/6 81/13 90/20 115/12 124/5 124/8 148/9 218/15
**ensure [2]** 209/5 275/2
**enter [1]** 41/21
**entered [1]** 158/1
**entire [3]** 117/10 148/15 268/23
**entirely [1]** 15/5
**entities [7]** 100/5 153/23

**E**

**entities... [5]** 154/10
154/20 154/22 154/23 221/10
**entities' [2]** 100/14 139/11
**entitled [1]** 276/7
**entity [2]** 12/4 12/6
**error [1]** 16/1
**especially [2]** 68/12 88/22
**essence [1]** 73/20
**essentially [4]** 71/17 119/19
230/17 270/11
**establish [2]** 161/5 187/15
**established [3]** 36/3 245/19
248/17
**estate [2]** 111/8 111/12
**et [5]** 1/9 5/7 18/3 107/2
243/12
**even [22]** 18/6 31/1 42/1
43/22 57/17 71/10 90/19
116/19 119/16 124/23 125/1
126/25 157/12 162/23 168/6
169/12 211/4 211/14 225/17
227/22 240/22 252/11
**evening [10]** 192/17 193/4
194/12 194/17 195/7 196/24
197/17 198/11 199/13 199/15
**event [2]** 6/17 259/25
**events [2]** 197/25 202/13
**eventually [1]** 178/5
**ever [11]** 43/22 56/25 135/4
146/18 147/19 147/23 168/2
246/2 261/9 262/24 265/22
**every [4]** 13/17 131/2 149/9
230/25
**Everybody [2]** 57/17 122/22
**everything [10]** 41/14 123/19
130/14 131/1 131/1 176/5
176/13 232/3 266/18 267/17
**EVID [1]** 4/9
**evidence [157]**
**evident [1]** 236/21
**evidentiary [4]** 57/9 57/12
62/15 137/17
**exact [7]** 57/3 108/10 117/20
158/6 192/25 207/10 263/21
**exactly [13]** 40/1 57/12 64/2
87/6 127/20 167/12 180/12
190/10 226/13 236/5 247/24
249/16 263/8
**examination [17]** 4/4 4/5 4/6
4/7 7/23 8/5 9/12 16/2 17/16
18/17 19/16 170/20 232/19
237/12 237/25 255/4 273/16
**examinations [2]** 8/20 267/12
**examine [9]** 6/25 7/4 7/12
7/15 7/19 8/3 8/8 15/9
274/25
**examiner [1]** 248/5
**examining [2]** 7/25 183/2
**example [36]** 8/13 15/11
22/22 24/14 38/9 38/24 39/14
39/20 48/20 50/23 52/23 59/5
66/5 72/1 82/7 83/12 83/13
100/25 107/14 131/16 134/14
137/24 155/11 159/21 172/22
182/13 182/16 182/22 183/17
184/2 200/13 225/8 238/24
245/10 253/14 272/16
**examples [5]** 43/12 44/23
66/15 183/19 225/20
**except [1]** 267/13
**exception [2]** 73/22 225/8
**exceptions [1]** 23/9
**excerpt [2]** 45/1 69/21
**excerpted [1]** 67/6
**excerpts [4]** 58/19 58/25
69/15 166/14
**exchange [3]** 9/16 138/2

148/14
**exchanged [1]** 9/23
**exchanges [3]** 48/6 69/16
95/18
**exclude [1]** 17/1
**excludes [1]** 16/14
**Excuse [1]** 134/19
**executed [1]** 233/18
**exercise [5]** 146/14 152/20
154/18 155/2 155/7
**exhibit [125]** 4/9 11/18
11/23 12/13 12/15 12/16
12/17 12/21 13/7 13/12 28/23
29/19 29/21 29/22 29/23 30/1
30/2 30/19 31/6 31/7 31/12
31/20 31/22 34/3 34/14 34/19
35/21 36/12 43/15 43/18 44/3
44/10 44/25 46/20 50/8 53/24
53/25 55/16 56/3 56/11 57/22
57/23 58/2 58/2 58/12 58/15
58/19 59/7 59/13 60/1 60/12
61/2 66/6 66/14 67/3 70/9
74/2 75/5 75/11 75/12 75/17
75/22 75/23 76/23 77/16
77/25 78/4 78/14 86/3 86/3
86/17 99/14 99/16 101/12
103/10 103/19 103/20 107/14
107/15 108/3 108/4 110/9
128/2 136/24 141/10 142/14
143/4 143/4 148/10 148/11
149/12 149/14 149/20 149/25
150/5 150/15 150/19 150/23
150/25 151/12 156/7 159/23
165/23 166/15 166/23 167/11
168/22 169/25 170/6 200/22
203/19 206/14 206/16 213/7
236/8 237/3 239/12 239/23
257/22 268/20 268/24 269/6
269/9 272/2 272/4
**Exhibit O [1]** 166/15
**exhibits [11]** 33/15 43/23
81/25 85/4 103/16 140/4
146/15 205/10 267/11 267/14
269/4
**exist [2]** 133/3 152/4
**existed [2]** 48/14 93/7
**expand [1]** 43/6
**expect [5]** 76/7 143/22
**experienced [1]** 119/12
**explain [13]** 56/18 76/22
79/21 80/24 83/25 83/25 84/2
140/12 172/3 172/9 173/3
230/13 230/25
**explained [3]** 65/23 83/21
225/18
**explaining [1]** 234/18
**explanation [3]** 138/7 161/20
194/7
**exposed [7]** 15/19 88/25 89/3
116/18 116/21 230/20 268/3
**exposure [5]** 20/1 22/8 22/19
125/2 268/2
**extensively [1]** 11/25
**extent [3]** 19/21 160/6
225/23
**external [1]** 98/16
**extra [1]** 210/4
**extract [1]** 58/7
**extracted [3]** 45/8 59/13
63/9
**extremely [1]** 226/18

**F**

**face [3]** 57/2 57/6 257/16
**fact [63]** 14/6 21/12 25/10
57/22 64/11 65/9 65/18 67/13
68/10 73/12 78/3 78/10 81/1
81/3 88/20 98/9 106/12
109/23 127/9 131/9 131/15

144/12 151/3 157/4 162/16
176/7 176/10 177/9 178/20
179/23 180/2 180/18 181/13
190/13 192/20 193/6 193/12
201/19 202/17 209/12 209/14
210/6 211/18 212/17 213/11
213/22 214/19 215/14 219/24
219/25 220/3 223/5 229/14
229/16 229/16 230/12 235/3
241/10 253/22 258/16 260/10
260/21 268/20
**factor [1]** 202/12
**facts [8]** 7/6 10/14 11/2
23/20 179/22 179/25 181/9
228/25
**Faerstein [13]** 17/8 131/10
132/1 132/5 132/7 227/3
245/22 245/24 246/23 247/25
248/10 260/24 272/23
**Faerstein's [2]** 272/2 272/4
**failed [1]** 209/25
**fair [22]** 19/24 43/2 53/21
70/10 73/9 75/15 84/15 85/6
93/12 106/18 112/13 113/1
114/23 116/16 118/24 118/25
121/25 122/19 161/2 164/13
239/8 244/1
**fake [5]** 13/25 62/13 115/3
116/3 118/1
**falling [1]** 44/16
**false [2]** 209/25 210/19
**familiar [23]** 8/23 32/23
41/4 43/20 44/1 45/4 45/25
46/8 46/11 46/13 48/3 54/6
96/24 97/1 97/5 119/22 120/3
126/10 136/14 154/6 156/10
208/6 273/24
**family [8]** 172/22 172/24
181/15 182/10 182/11 182/11
182/13 200/11
**far [9]** 21/25 24/18 120/8
154/6 178/25 212/1 212/5
236/4 263/14
**Fargo [7]** 215/20 216/6
216/13 216/23 217/24 218/9
218/16
**fast [1]** 161/2
**father [7]** 183/11 200/14
201/5 201/10 201/18 201/24
219/24
**father's [6]** 180/2 180/5
182/18 183/15 201/15 220/23
**favor [2]** 7/7 15/14
**FBI [1]** 189/4
**feature [1]** 24/19
**featured [2]** 11/19 11/24
**February [81]** 8/2 29/3 29/9
29/11 30/13 30/13 30/13
30/22 30/23 31/25 32/9 32/10
32/14 33/6 34/4 34/24 35/3
36/5 36/5 36/5 36/9 40/18
40/23 40/23 40/24 42/10
42/11 43/12 43/13 43/17 44/6
45/18 46/15 48/1 48/3 51/15
55/12 55/14 63/11 63/16
68/15 68/21 68/23 69/14 70/1
70/25 71/2 71/17 71/21 71/21
72/3 72/8 87/1 92/4 93/4
152/18 156/22 157/6 162/21
162/24 203/23 204/4 204/6
211/10 221/18 221/19 221/20
226/10 232/23 235/20 238/13
242/19 242/23 252/17 259/11
259/25 261/9 261/20 262/2
262/7 268/5
**February 10th [3]** 71/21
232/23 235/20
**February 11 [1]** 71/17
**February 11th [13]** 29/3 29/9

**F**

**February 11th... [11]**  29/11
30/13 30/22 31/25 32/9 35/3
36/5 36/9 40/23 72/3 87/1
**February 12th [16]**  30/13
30/23 32/14 33/6 36/5 40/23
43/13 43/17 44/6 45/18 46/15
48/1 48/3 69/14 221/18
226/10
**February 16th [1]**  238/13
**February 19 [1]**  34/24
**February 19th [5]**  30/13
32/10 34/4 36/5 40/24
**February 2021 [1]**  8/2
**February 23rd [2]**  242/19
242/23
**February 2nd [8]**  152/18
156/22 203/23 204/4 204/6
211/10 221/19 221/20
**February 3rd [1]**  157/6
**federal [3]**  94/8 119/24
120/1
**feels [1]**  9/15
**felt [2]**  196/15 197/22
**female [6]**  173/15 173/17
177/2 177/5 177/10 177/12
**Fenton [41]**  2/10 4/4 5/10
7/16 14/21 16/17 17/2 17/16
17/22 18/14 18/19 21/22
22/15 24/10 26/20 27/7 31/13
31/19 36/12 36/15 43/24
50/10 50/14 80/22 91/25
103/10 105/24 125/24 141/9
150/1 150/15 166/9 170/22
202/6 215/2 224/23 231/24
232/5 236/8 237/3 261/1
**Fenton's [2]**  143/4 168/21
**few [6]**  43/12 43/19 44/22
207/21 233/10 259/9
**Fiber [10]**  62/7 62/11 62/19
64/6 64/10 65/11 205/19
205/21 206/3 208/23
**fifth [2]**  27/3 84/23
**figure [1]**  129/13
**file [3]**  56/23 77/19 98/14
153/13 262/5
**filed [4]**  107/16 120/15
153/13 262/5
**files [12]**  104/2 108/9 138/9
139/2 139/7 146/16 147/13
177/11 177/14 233/11 243/2
243/11
**filing [8]**  127/3 153/10
154/19 260/7 263/6 263/19
268/21 269/3
**filings [2]**  139/9 263/14
**films [1]**  108/14
**filter [33]**  30/21 34/22 36/8
50/22 52/21 52/21 53/16
124/4 158/25 159/9 159/13
159/18 159/25 160/4 160/7
160/11 160/18 160/19 160/19
161/5 161/15 164/2 164/3
167/5 167/18 168/3 168/14
168/23 169/1 169/2 169/4
169/6 170/4
**filtered [7]**  50/21 51/5
53/15 123/5 167/16 225/4
225/11
**filtering [1]**  169/9
**final [1]**  166/1
**Finally [1]**  158/18
**financial [1]**  127/15
**find [14]**  27/9 64/23 73/6
77/16 77/19 79/3 79/23
158/15 165/15 171/19 178/5
192/1 217/11 237/19
**finder [2]**  88/20 214/20
**finding [4]**  92/10 136/4

238/17 241/22
**finish [3]**  86/8 177/7 274/4
**finished [1]**  176/10
**firm [14]**  146/9 146/22
146/23 146/24 146/25 147/1
147/6 147/6 147/16 147/20
147/24 148/5 148/6 148/14
**first [86]**  6/22 9/1 9/8
14/20 14/25 16/18 22/12
27/22 28/24 28/24 29/8 29/22
30/14 32/1 32/2 32/7 34/1
34/17 34/25 35/2 35/23 36/6
36/15 36/17 37/7 37/14 37/22
37/23 38/12 40/20 42/3 43/6
44/24 49/1 50/14 50/21 52/20
53/10 53/13 53/15 59/14
66/11 66/13 69/23 70/22
76/23 81/14 82/22 83/22
84/14 86/21 103/9 109/10
110/6 111/2 114/15 127/4
127/7 149/1 149/8 190/14
195/21 197/25 198/3 199/10
208/8 208/13 209/12 220/13
224/25 225/4 226/9 227/3
227/6 229/7 231/25 235/17
241/3 258/23 260/7 260/17
260/19 262/15 263/5 264/5
268/5
**five [5]**  28/5 84/12 145/23
146/20 155/18
**flee [1]**  196/16
**flight [1]**  196/17
**flip [1]**  92/1
**flipped [1]**  117/20
**Floor [1]**  2/8
**Florida [1]**  94/9
**flowed [1]**  179/9
**focus [15]**  7/15 10/17 10/24
42/11 121/24 141/5 141/14
142/9 144/14 148/12 148/16
173/4 176/2 176/9 235/19
**focused [2]**  147/17 226/17
**focusing [2]**  36/16 151/12
**folder [3]**  24/2 32/2 233/4
**folders [1]**  233/10
**folks [1]**  89/20
**follow [19]**  7/18 21/20 35/8
44/2 79/7 100/23 101/7 104/5
105/13 125/6 153/25 157/4
168/3 170/2 172/13 172/19
176/21 231/3 263/22
**follow-up [6]**  7/18 100/23
101/7 104/5 157/4 168/3
**followed [11]**  21/20 21/21
142/7 152/10 153/4 154/3
168/12 172/23 181/10 196/9
263/19
**following [12]**  35/7 48/23
79/6 100/7 102/23 133/21
139/2 153/1 169/15 178/2
184/25 227/18
**footnote [2]**  10/17 245/14
**foregoing [1]**  276/5
**forensic [1]**  168/8
**forgot [1]**  144/23
**form [2]**  168/12 266/2
**format [2]**  56/22 276/8
**formats [1]**  56/22
**formed [1]**  235/12
**formulation [1]**  252/7
**forth [4]**  64/12 68/25 69/9
96/4
**forthcoming [1]**  235/7
**forward [6]**  14/20 106/25
137/2 161/2 232/8 273/2
**found [55]**  42/12 57/15 77/2
77/10 78/23 83/4 92/14 97/15
102/15 114/25 133/25 142/10

144/5 144/9 144/12 164/8
169/25 169/25 169/25 189/25
192/13 192/15 194/13 196/4
197/7 198/4 203/8 205/12
207/21 207/21 208/9 208/12
209/4 210/13 214/5 214/20
214/22 215/4 215/15 215/19
216/6 218/7 218/12 218/17
218/18 220/11 221/7 223/21
227/5 240/10 242/4 249/11
253/22 254/16 269/19
**foundation [7]**  15/2 15/4
22/13 24/24 31/2 245/23
266/9
**four [10]**  11/1 97/24 98/2
104/2 117/2 123/4 143/22
143/25 161/8 161/25
**Fourth [6]**  23/1 26/4 121/5
121/22 227/14 237/21
**fox [1]**  18/14
**fraction [1]**  122/5
**frame [1]**  251/16
**framed [1]**  64/25
**framework [1]**  27/5
**Francisco [1]**  2/20
**frankly [6]**  21/10 71/25
72/18 114/1 131/25 164/18
**Fraser [4]**  3/7 4/7 228/22
271/17
**Frasier [1]**  6/1
**fraud [38]**  23/23 41/24 47/1
47/15 62/21 64/11 69/1 70/5
70/6 73/12 73/13 102/6 105/3
105/22 111/5 114/10 114/12
114/12 126/18 142/6 176/18
177/24 180/20 184/8 187/17
192/11 197/5 204/11 212/17
216/4 217/4 217/6 218/5
218/12 218/14 219/1 237/16
238/3
**frauds [2]**  18/7 261/12
**fraudulent [9]**  13/15 14/7
69/3 70/2 70/3 109/16 126/21
180/10 220/8
**fraudulently [1]**  68/20
**frequency [1]**  54/13
**frequently [1]**  177/1
**Friday [1]**  141/11
**front [6]**  11/22 30/1 67/20
99/16 208/19 216/11
**frustration [1]**  226/7
**full [3]**  18/12 33/1 62/2
**fully [1]**  181/18
**function [3]**  24/16 225/22
225/24
**functioning [1]**  146/7
**funding [1]**  68/7
**funds [8]**  14/6 172/12 175/21
179/7 181/14 219/13 219/22
220/8
**funeral [4]**  182/18 183/11
183/15 184/2
**funnel [1]**  179/7
**funneled [3]**  172/15 176/23
180/3
**funneling [1]**  179/23
**furniture [4]**  173/1 173/13
183/12 220/10
**further [8]**  9/14 64/6 65/12
136/8 170/9 253/20 254/24
273/7
**furtherance [3]**  47/15 62/21
64/11

**G**

**gain [1]**  13/3
**gainfully [2]**  175/9 175/16
**gather [3]**  187/15 187/22
187/24

**G**

gathering [2] 187/20 239/5
gave [4] 118/16 147/11
225/20 241/4
general [10] 8/6 27/2 40/1
65/2 97/6 114/7 119/23 120/3
209/20 261/23
generally [18] 87/5 88/21
92/13 92/19 92/22 92/25 95/5
112/25 120/6 163/19 164/7
189/19 189/21 189/22 189/23
229/6 251/21 273/24
generated [1] 207/2
generates [1] 28/18
get [56] 8/19 13/14 22/4
31/16 33/18 33/21 34/18
37/18 40/8 69/12 70/10 70/13
70/15 72/23 73/5 73/17 75/14
78/8 84/1 85/9 85/10 85/20
87/13 87/16 88/9 91/11 91/13
103/23 104/9 104/14 120/12
120/13 121/24 126/2 134/4
135/15 136/7 137/22 163/21
167/25 168/12 173/3 174/1
188/14 188/19 188/24 189/2
189/17 190/13 195/8 197/2
198/23 224/24 228/8 235/8
270/12
gets [1] 175/18
getting [13] 33/2 35/10
71/15 75/25 132/24 148/3
201/8 201/17 224/18 224/19
239/5 270/5 270/16
gibberish [1] 120/13
give [12] 6/23 32/25 37/12
84/2 84/25 147/8 149/19
163/23 177/20 182/13 219/19
233/7
given [5] 46/15 57/22 233/1
233/4 233/9
giving [3] 133/15 156/2
274/16
glass [1] 219/17
glasses [1] 6/14
Glendale [1] 3/13
go [63] 9/1 10/9 14/20 22/15
33/25 35/22 44/2 44/10 50/7
51/6 53/23 61/23 71/8 72/23
73/19 76/18 80/7 81/8 82/20
84/4 87/8 99/15 99/17 110/9
112/8 113/6 127/10 131/16
136/25 137/4 137/5 141/4
142/20 143/3 143/23 149/1
149/4 149/25 150/15 160/22
170/11 176/14 182/10 222/25
231/3 231/20 236/9 236/16
237/8 237/24 238/10 239/13
240/2 240/8 241/1 242/12
242/18 248/20 253/20 256/18
266/7 271/2 273/14
goal [2] 88/19 228/13
goes [4] 67/19 94/9 192/5
236/4
Gohar [2] 202/19 203/4
going [68] 6/6 7/18 8/6 8/7
9/8 12/19 12/22 14/16 15/18
16/3 16/16 19/20 30/8 33/21
35/19 43/21 44/5 44/23 50/4
57/4 60/18 60/22 63/11 76/23
84/6 87/7 88/3 88/17 120/11
121/3 126/1 126/9 133/5
147/9 148/16 156/1 158/15
158/22 161/21 167/17 182/8
184/3 184/12 187/25 188/16
192/9 192/10 195/9 195/11
196/21 208/18 211/7 212/22
219/13 229/7 229/16 229/25
231/18 232/4 236/7 250/18

250/25 253/20 271/4 273/2
gold [1] 220/11
gone [3] 17/17 101/21 270/25
good [17] 5/9 5/13 5/16 5/19
5/21 5/23 18/19 73/15 151/25
170/22 170/23 204/12 207/4
212/25 232/6 232/21 232/22
got [28] 62/1 64/23 70/1
76/2 89/17 104/16 123/12
156/3 168/3 177/19 189/4
201/23 202/9 203/13 206/4
206/17 209/7 210/12 213/22
220/10 223/9 223/15 240/4
241/11 241/13 251/13 252/1
274/9
gotten [1] 195/23
government [48] 5/12 6/20
10/14 10/18 10/23 10/24 11/1
11/18 11/23 12/16 12/23
13/12 31/11 50/10 75/5 75/10
75/23 77/16 77/25 78/3 84/25
85/22 119/24 126/2 126/17
126/20 126/22 126/24 127/11
129/20 130/8 131/3 230/18
252/12 252/18 254/7 256/1
258/23 265/19 265/21 265/22
266/1 266/3 266/8 266/10
269/13 269/17 270/14
government's [10] 6/18 10/18
11/20 15/18 125/21 155/17
241/5 258/19 260/11 269/21
grand [33] 15/11 23/7 81/25
83/5 83/15 83/17 97/24
106/12 106/15 113/6 113/8
113/10 113/15 113/18 117/3
118/7 118/10 118/19 119/8
126/25 128/12 128/18 129/1
129/5 132/3 227/7 227/25
248/22 249/7 249/16 251/3
252/11 252/16
grant [1] 132/13
Graystone [1] 55/9
great [6] 51/18 112/2 152/16
157/20 158/4 158/7
Greystar [9] 38/6 49/7 55/7
55/14 74/14 79/15 79/17
Greystar.com [1] 74/15
Greystone [4] 55/6 56/8
74/12 79/15
Grigoryan [3] 78/6 186/3
186/8
Grigoryan's [1] 81/4
group [3] 3/15 145/16 203/6
grouping [1] 140/23
guess [13] 6/5 11/11 75/19
80/2 119/7 150/2 154/3
155/16 215/8 224/16 231/8
245/2 250/19
guidance [1] 258/7
guilt [1] 171/10
guilty [7] 10/15 10/21 11/9
105/20 171/5 171/8 180/19
Gusto [1] 48/8
guy's [1] 182/4

**H**

had [200]
had reviewed [1] 234/8
hadn't [2] 71/10 176/10
half [5] 60/11 61/14 74/4
76/24 270/21
hand [4] 106/19 147/9 168/22
241/13
handling [1] 184/11
handwritten [4] 112/15
205/24 207/19 207/20
Hang [1] 76/21
happen [4] 190/6 190/13

194/13 230/5
happened [13] 15/11
133/9 138/3 142/5 191/22
193/25 195/18 199/19 200/1
201/2 211/6 221/1 221/5
233/21
happy [1] 95/22
hard [1] 140/9
harmed [1] 27/19
harmless [1] 16/1
harp [1] 137/14
has [40] 8/1 8/21 12/23
16/21 17/25 18/7 20/7 34/15
44/25 61/8 69/13 95/10
101/21 103/15 109/14 120/9
128/22 128/25 129/17 175/17
190/1 203/18 205/7 215/7
216/20 218/11 224/14 231/19
245/24 246/7 246/15 255/7
255/16 255/21 256/8 256/23
258/3 258/7 258/12 270/17
hasn't [2] 248/3 274/7
have [282]
haven't [6] 21/25 76/4 133/4
149/18 258/25 270/23
having [14] 48/23 55/4 56/7
67/12 140/9 140/14 187/14
188/19 194/19 195/25 196/2
235/12 249/13 254/19
he [194]
head [7] 29/1 116/14 156/3
165/25 211/2 257/13 263/9
heading [1] 258/3
Health [1] 145/11
hear [2] 9/17 264/18
heard [5] 14/11 165/17
190/23 190/24 257/14
hearing [26] 6/3 9/9 10/4
16/13 17/10 42/2 57/25 82/14
88/2 88/6 88/14 88/15 88/18
98/21 137/18 188/22 190/4
209/8 229/8 229/15 229/17
230/12 230/16 269/24 269/24
270/5
hearsay [2] 15/1 15/3
held [1] 276/6
help [5] 20/8 33/22 54/14
65/25 136/8
helped [2] 20/9 106/25
helpful [14] 22/1 27/9 27/11
27/25 30/7 64/3 68/12 93/23
136/5 140/3 269/13 269/17
270/15 273/2
helping [1] 65/21
helps [2] 66/3 205/1
hence [1] 108/23
Henry [2] 114/13 195/3
her [112] 7/2 17/14 39/21
41/22 41/22 42/20 42/22
73/25 101/23 104/1 142/10
142/11 142/15 142/17 144/4
144/6 146/2 147/11 147/12
147/16 147/25 148/5 162/5
162/5 174/14 174/23 175/5
175/25 179/6 179/8 179/9
179/25 180/2 180/4 180/9
180/15 180/16 180/18 180/18
180/22 181/3 181/4 181/4
181/14 181/15 184/12 184/14
184/15 185/3 185/18 185/19
185/19 188/15 192/22 197/8
198/1 200/11 200/14 201/5
201/10 201/15 201/18 201/23
202/19 203/10 203/12 205/3
205/4 206/3 206/4 206/11
207/21 208/21 209/16 212/9
212/16 212/18 212/19 212/22
213/9 213/10 214/8 214/11
214/11 214/22 214/24 215/4

**H**

**her...  [25]**   215/23 215/23
215/25 216/6 216/13 216/21
216/24 217/2 217/3 217/6
217/11 217/15 217/25 218/5
218/7 218/8 218/8 218/17
219/16 219/22 219/24 220/1
220/23 223/21 228/18
**herd [1]**   9/19
**here [79]**   14/22 17/19 20/9
22/2 30/12 32/8 33/2 33/22
37/5 37/25 42/1 43/17 43/24
45/20 49/10 49/24 49/25 51/8
51/16 52/15 53/10 54/8 54/24
57/5 60/19 60/22 61/15 63/17
67/9 73/20 74/14 87/12 95/25
96/13 100/15 100/20 102/3
104/10 110/10 136/7 138/20
138/23 142/24 143/7 144/8
145/5 145/11 148/3 150/4
150/23 151/12 152/2 152/25
172/3 174/22 177/20 205/5
205/22 211/12 212/4 214/20
224/24 231/16 236/8 239/23
240/1 240/5 240/7 240/9
241/9 241/11 242/7 242/8
247/10 256/16 262/23 272/2
274/24 275/1
**hereby [1]**   276/4
**herky [1]**   35/9
**herky-jerky [1]**   35/9
**hey [1]**   92/14
**high [1]**   90/20
**high-level [1]**   90/20
**highlight [5]**   10/13 20/11
75/16 82/15 237/22
**highlighted [1]**   133/2
**highlights [1]**   153/21
**Highway [1]**   3/20
**him [45]**   8/3 13/17 31/4 31/5
31/6 31/13 32/4 33/3 42/17
57/14 65/11 79/24 87/2 92/13
94/21 97/1 97/11 113/13
119/9 119/10 133/10 133/20
133/21 133/22 133/25 137/19
138/5 140/1 140/6 144/18
150/22 172/12 185/25 189/3
192/4 194/5 196/1 196/2
215/13 247/7 247/12 248/8
253/18 274/25 275/3
**hindsight [1]**   210/8
**his [67]**   13/14 14/8 16/22
31/4 36/25 37/1 50/10 57/15
58/3 58/8 58/12 58/20 60/18
60/22 76/5 77/17 77/24 79/3
79/4 79/11 94/14 96/25
106/19 110/12 111/13 111/23
114/14 119/3 123/24 126/23
131/20 131/21 132/6 132/15
133/1 133/10 133/20 135/7
135/9 135/22 135/25 135/25
137/20 148/3 166/18 166/22
172/12 177/7 177/23 203/8
219/11 220/4 223/12 241/13
242/5 245/18 246/6 246/13
247/11 247/16 248/3 248/6
248/17 248/18 256/14 256/14
264/3
**history [6]**   175/25 176/16
176/17 180/13 180/16 184/15
**hit [4]**   40/6 40/9 87/25
226/1
**hold [1]**   201/13
**home [9]**   145/11 173/19 174/4
174/6 174/8 208/21 209/16
237/15 238/2
**Honor [117]**   5/9 5/13 5/16
5/19 5/21 5/23 6/8 7/22 8/14

9/8 9/21 10/6 10/11 11/14
12/18 16/22 17/11 17/11
17/2 17/23 17/24 20/10 23/19
30/25 31/3 31/5 31/11 31/15
33/13 33/18 34/2 35/17 35/21
37/11 37/19 43/2 44/20 45/14
46/2 48/2 50/9 54/15 55/7
55/19 55/25 56/5 56/13 56/17
57/3 60/4 63/12 63/15 64/16
70/8 74/16 82/11 82/15 84/3
87/6 87/15 88/11 91/4 91/7
91/9 91/10 91/20 118/14
120/14 121/1 121/15 123/12
124/9 129/7 130/1 130/8
131/12 135/14 136/6 136/9
137/16 137/22 140/5 140/11
140/12 141/6 143/19 144/20
145/2 145/18 154/12 156/5
166/1 166/6 170/14 170/18
177/6 192/6 194/4 199/8
202/8 206/9 219/18 231/15
232/3 246/4 246/11 246/24
247/4 247/8 256/12 264/22
273/9 274/2 274/8 274/13
274/23
**Honor's [1]**   72/1
**HONORABLE [1]**   1/3
**hoped [2]**   187/24 188/10
**hopefully [2]**   27/10 170/15
**Hotmail [1]**   48/4
**hotmail.com [1]**   47/17
**hour [1]**   191/25
**hours [7]**   85/11 85/20 143/22
197/16 270/16 270/16 270/22
**house [8]**   144/11 172/12
179/7 179/10 210/16 219/16
220/11 223/21
**houses [2]**   203/8 203/9
**how [58]**   11/12 17/11 19/16
19/17 20/8 24/13 24/20 32/4
38/14 38/18 40/9 47/4 72/2
72/4 87/21 89/10 92/13
102/11 105/3 105/22 111/7
111/9 111/10 117/12 127/11
127/21 127/23 128/19 129/10
129/21 143/22 151/18 151/21
151/23 152/2 159/12 172/3
172/4 173/20 173/24 176/23
178/3 183/6 189/4 207/13
213/20 223/12 224/7 224/10
225/16 238/23 238/24 239/4
247/11 258/7 265/4 267/5
274/9
**however [5]**   7/5 50/23 52/23
215/4 225/13
**hundreds [8]**   19/1 20/17
105/6 126/20 127/13 147/13
147/13 230/13
**husband [8]**   180/18 214/11
215/24 217/6 217/15 218/5
218/8 228/18

**I**

**I'll [2]**   33/24 176/14
**I'm [52]**   20/3 20/20 33/23
34/6 35/7 37/11 45/7 45/23
48/23 52/1 53/9 53/12 54/5
61/3 61/5 62/6 66/11 69/4
76/23 97/3 100/4 110/22
112/8 118/14 124/10 126/7
126/16 130/25 132/18 133/16
140/25 141/6 142/2 146/24
150/24 159/8 162/10 174/7
192/6 194/4 202/2 211/7
212/24 215/7 219/4 219/18
242/12 242/12 243/17 247/7
257/7 265/10
**I've [1]**   259/15
**I.D [1]**   4/9

**ID [5]**   142/11 142/15 144/6
301/20 302/1
**idea [7]**   6/23 16/8 25/11
25/15 55/1 94/24 217/25
**identification [12]**   207/16
210/2 237/13 238/1 238/18
239/15 239/24 240/4 240/10
240/13 240/22 241/22
**identifications [1]**   242/4
**identified [29]**   35/14 69/14
81/13 81/16 81/19 100/7
102/7 105/14 106/13 126/20
139/11 139/21 145/13 145/23
145/25 151/8 153/2 153/5
153/6 154/5 154/10 154/19
161/8 161/15 161/18 162/2
164/14 186/6 214/25
**identifiers [1]**   100/15
**identify [18]**   33/11 34/1
34/17 64/18 104/2 106/25
154/23 160/20 164/10 165/4
167/7 172/4 205/1 207/10
220/18 220/23 225/8 234/18
**identifying [3]**   69/14 109/16
205/25
**identities [6]**   176/24 176/25
177/3 178/5 178/7 179/19
**identity [45]**   90/8 95/19
96/16 109/20 115/8 127/17
171/4 171/25 172/2 172/7
177/16 179/14 179/17 179/25
180/16 181/7 182/9 183/23
184/19 184/23 185/5 185/15
185/23 186/4 186/8 186/13
186/14 186/17 186/19 191/4
192/23 193/19 201/14 211/13
212/3 217/8 218/25 219/11
220/15 220/16 220/22 230/19
236/21 238/17 268/18
**IDs [4]**   241/12 242/9 242/16
242/17
**illegal [3]**   256/3 256/6
256/6
**illegally [1]**   227/24
**illegitimate [1]**   174/20
**image [87]**   45/2 45/21 46/19
46/24 48/18 48/21 49/2 49/11
49/13 49/16 49/19 50/24
51/23 53/7 53/18 54/3 54/9
54/10 54/17 54/18 54/23 55/1
55/9 55/18 55/20 55/24 56/2
56/11 56/20 60/19 60/23
60/25 62/14 62/18 62/22
62/23 66/13 75/11 76/18 77/5
77/8 79/13 79/14 108/2 108/3
108/6 108/10 108/11 108/12
108/24 109/3 109/3 109/7
111/15 111/20 112/3 112/5
112/8 112/18 116/3 142/16
142/21 156/10 156/12 156/16
165/15 168/8 205/1 205/5
207/5 205/8 208/9 208/9
208/14 208/22 209/13 209/19
210/12 211/12 215/8 218/18
221/1 221/7 239/23 240/3
240/9 271/18
**images [24]**   49/21 49/23
51/10 51/12 52/14 52/16 53/5
53/20 56/21 112/25 206/24
207/3 207/5 211/9 240/15
242/2 269/1 269/5 271/5
271/8 271/9 271/12 272/10
273/4
**imagine [1]**   89/22
**imagined [2]**   235/2 235/3
**immediate [2]**   99/8 114/3
**immediately [9]**   98/6 156/25
157/1 167/21 190/9 205/15
205/17 206/2 207/23

## I

**immunity [1]** 132/13
**implication [1]** 190/8
**implying [2]** 122/21 190/5
**import [1]** 190/12
**importance [1]** 190/1
**important [17]** 49/25 57/13
73/10 81/12 104/17 105/11
105/13 105/25 109/23 109/25
115/12 143/18 163/17 175/8
201/12 232/1 270/22
**impression [1]** 9/7
**Improper [1]** 248/2
**in-person [1]** 159/15
**inaccurate [4]** 7/3 7/13 8/10
241/18
**inception [5]** 18/20 18/25
20/5 172/16 172/16
**inclination [1]** 14/14
**include [9]** 16/20 39/20
81/25 83/3 95/14 222/6 249/2
249/9 266/23
**included [12]** 18/6 39/6
103/8 114/21 114/24 150/7
188/17 246/17 246/22 248/16
266/19 266/20
**includes [3]** 96/15 115/1
160/24
**including [9]** 21/4 114/19
123/4 172/24 185/25 187/22
249/13 267/10 267/12
**incomplete [4]** 222/4 222/6
223/13 223/15
**incorporates [1]** 96/2
**incorrect [3]** 71/11 76/8
228/25
**indeed [2]** 177/14 254/15
**independent [12]** 15/22 15/23
50/22 52/21 53/16 63/4 66/25
78/9 107/23 123/20 125/18
142/23
**independently [1]** 78/7
**indexes [1]** 72/13
**indicate [1]** 197/24
**indicated [4]** 204/9 228/7
228/9 267/19
**indicating [2]** 185/22 202/6
**indication [2]** 18/1 183/15
**indicted [2]** 122/2 185/13
**indicting [1]** 120/10
**indictment [29]** 71/12 71/22
72/22 81/14 83/15 97/24
113/21 113/21 114/24 115/23
116/15 120/16 121/25 127/4
127/7 220/14 220/21 227/4
227/6 227/16 227/23 233/12
245/5 249/8 250/13 251/4
251/15 251/17 252/17
**indirect [1]** 82/4
**indirectly [1]** 15/21
**individual [1]** 220/17
**individuals [9]** 18/4 18/4
129/4 153/22 153/23 167/24
195/3 196/13 219/15
**infer [1]** 144/7
**inference [5]** 11/11 12/7
12/24 13/1 13/20
**inferred [1]** 179/5
**influenced [3]** 16/5 19/17
247/12
**information [192]**
**informations [2]** 97/8 194/24
**informed [1]** 186/22
**initial [2]** 20/22 134/5
**initially [4]** 19/12 103/13
162/6 195/19
**innocent [1]** 105/21
**inquire [3]** 98/21 98/24

153/25
**inquiring [1]** 98/8
**inquiry [1]** 6/19
**inspection [1]** 236/20
**instance [1]** 173/18
**instances [3]** 134/25 159/20
267/7
**institute [3]** 22/6 22/17
22/18
**instituted [1]** 25/4
**institutions [1]** 127/15
**instruct [2]** 94/18 94/21
**instruction [4]** 106/12 125/5
125/12 147/3
**instruments [1]** 233/13
**integrity [1]** 114/12
**intend [2]** 8/3 139/23
**intending [1]** 274/6
**intent [1]** 73/13
**intention [3]** 170/14 170/17
188/19
**interaction [2]** 266/16
266/21
**interest [9]** 92/11 107/1
204/19 204/20 205/15 205/17
206/2 206/10 211/19
**interested [2]** 141/8 269/24
**interface [5]** 28/19 38/22
38/25 39/4 40/4
**internal [1]** 103/7
**internally [2]** 98/16 103/12
**Internet [1]** 207/6
**interpret [1]** 143/13
**interpreter [1]** 5/15
**interrupt [1]** 20/7
**interview [13]** 128/19 129/11
130/1 130/21 131/2 131/13
132/11 141/24 142/1 142/5
157/13 187/25 274/15
**interviewed [4]** 130/7 130/16
156/14 223/16
**interviewing [2]** 21/5 72/17
**interviews [13]** 72/1 72/2
72/4 72/7 72/11 129/16
129/21 130/2 131/5 134/7
195/19 195/20 268/9
**introduce [1]** 157/24
**introduced [1]** 11/6
**invest [1]** 73/16
**investigate [2]** 21/11 187/22
**investigated [3]** 62/12 249/3
249/10
**investigating [6]** 102/25
103/13 113/4 124/25 125/2
205/19
**investigation [69]** 19/2 19/8
19/10 20/18 21/8 21/9 21/13
21/24 32/24 40/16 41/1 41/11
46/10 57/13 62/16 63/25 64/1
64/6 64/9 65/12 65/12 68/12
70/12 70/18 70/19 70/22
70/25 71/2 71/4 71/9 71/16
73/10 77/18 80/9 80/12 80/18
97/22 101/9 103/4 105/13
106/16 106/23 107/1 107/9
109/15 113/2 124/22 125/6
125/9 126/3 126/18 126/25
127/6 128/22 128/25 129/3
129/6 136/10 143/7 143/8
158/10 171/17 175/14 188/4
196/9 201/12 233/6 241/10
251/5
**investigative [12]** 21/4
21/19 23/8 52/23 99/9 101/1
104/5 178/22 187/18 187/19
187/21 188/13
**investigator [2]** 88/22
212/17

**investigatory [4]** 43/10
43/11
**inviting [1]** 159/24
**involved [6]** 14/15 17/12
18/4 70/3 263/24 267/22
**involvement [1]** 180/9
**involving [2]** 20/17 238/3
**iPhone [1]** 29/16
**IRS [1]** 137/7
**is [908]**
**isn't [4]** 44/19 131/10
131/12 171/18
**issue [19]** 6/20 9/4 23/1
23/2 23/2 26/4 26/5 67/12
80/8 80/11 80/17 127/11
209/7 227/15 227/15 262/3
262/15 265/15 274/14
**issued [5]** 105/18 106/13
127/14 127/21 166/17
**issues [10]** 106/25 227/11
227/13 243/10 258/24 259/18
260/1 262/1 262/18 262/24
**issuing [1]** 21/4
**it [666]**
**it's [20]** 23/24 24/11 35/21
38/15 38/20 59/3 76/22 81/11
82/21 126/7 126/7 144/12
148/19 153/16 158/6 184/12
192/25 225/23 227/20 272/4
**Item [1]** 5/6
**items [1]** 15/12
**its [9]** 10/24 18/20 20/18
20/18 126/3 126/17 126/25
224/21 256/24
**itself [3]** 52/19 93/15
154/13
**Iulia [62]** 45/13 45/17 45/22
45/25 46/9 46/22 47/20 48/6
49/12 54/3 54/8 54/17 54/19
57/10 58/9 58/21 61/18 61/20
62/6 62/15 62/25 63/8 63/17
63/19 64/7 65/10 66/8 66/14
66/16 66/17 66/18 67/6 67/11
67/14 67/18 67/24 67/24 90/3
95/11 108/16 109/4 109/11
112/6 115/3 118/1 162/10
162/13 172/10 177/1 177/9
181/13 181/25 191/1 237/14
238/1 238/18 239/24 240/4
240/10 245/18 247/16 248/17

## J

**jail [1]** 228/11
**James [1]** 132/8
**jamming [1]** 243/12
**jar [1]** 241/13
**Jeff [1]** 137/7
**Jeffrey [2]** 99/19 261/5
**Jencks [3]** 16/20 16/24
160/15
**Jennifer [2]** 3/12 5/17
**jerky [1]** 35/9
**Jeweler [1]** 221/14
**Jewelers [4]** 131/18 221/25
222/15 223/18
**jewelry [3]** 173/1 173/13
220/11
**job [9]** 9/24 160/18 171/4
173/23 174/2 174/11 174/13
175/6 179/5
**John [17]** 3/4 5/21 135/4
135/16 135/17 135/19 157/4
157/9 157/13 252/21 252/24
253/1 253/6 253/16 253/17
254/8 254/15
**Johnson [10]** 2/16 2/19 2/22
3/19 3/20 5/14 10/7 11/18
13/6 114/15
**join [3]** 159/24 234/4 261/25

**J**

**joined [9]**   91/21 233/1 233/3
233/8 233/22 234/11 235/9
235/16 261/11
**joining [4]**   233/18 235/1
268/8 268/12
**joint [1]**   228/22
**jointly [5]**   178/10 178/12
178/19 179/1 179/10
**Jr [1]**   3/14
**judge [2]**   1/4 34/1
**judgment [1]**   11/15
**Judicial [1]**   276/9
**Julian [8]**   8/1 15/2 89/9
99/19 113/12 113/23 233/25
260/19
**JULY [5]**   1/16 5/1 13/9 13/9
52/19
**July 10 [1]**   13/9
**July 11th [1]**   52/19
**July 15 [1]**   13/9
**jump [3]**   156/6 156/20 158/8
**jumping [1]**   72/21
**June [8]**   18/22 18/23 124/1
159/4 170/24 172/10 241/1
264/7
**June 12 [3]**   18/23 170/24
172/10
**June 2020 [1]**   159/4
**June 24th [1]**   241/1
**juries [1]**   126/25
**jury [50]**   11/22 12/8 12/10
12/20 12/24 13/19 15/11 23/8
61/12 81/25 83/5 83/15 83/18
87/12 97/24 106/12 106/16
113/6 113/8 113/10 113/15
113/18 117/3 118/7 118/10
118/19 119/8 128/12 128/18
129/1 129/5 132/3 208/19
209/1 209/3 209/11 210/10
211/4 216/11 218/14 223/17
227/7 227/25 241/15 248/22
249/7 249/16 251/3 252/11
252/16
**just [189]**
**justice [17]**   2/4 2/11 20/13
23/23 24/21 98/15 98/15
101/23 114/10 119/22 243/2
257/12 257/14 258/1 258/7
273/19 273/24
**Justin [4]**   113/16 139/14
261/3 273/3

**K**

**Kaitlin [1]**   114/20
**Kaminska [1]**   114/19
**KASTIGAR [69]**   1/15 6/4 6/8
9/9 10/3 14/15 14/16 16/9
19/18 23/4 25/18 26/1 26/3
26/4 26/17 26/18 27/14 28/23
42/2 43/15 44/25 46/19 50/8
53/23 53/24 53/25 57/21 74/2
75/12 75/16 76/23 78/14
98/21 107/14 107/15 108/3
110/9 121/10 121/23 142/14
152/7 153/11 155/9 156/7
229/8 229/14 229/17 230/5
230/12 230/16 230/18 239/11
256/15 258/24 260/1 260/7
262/6 262/15 262/18 262/24
263/15 264/6 264/24 265/6
265/8 265/10 265/15 265/21
269/7
**KATIE [2]**   1/20 276/12
**KATZENSTEIN [5]**   2/5 5/11
17/9 17/23 261/15
**Katzman [2]**   3/4 3/7
**Kauichko [73]**   38/6 39/15

49/6 49/19 50/24 51/22 73/24
74/25 79/18 80/15 82/25 95/19
95/20 96/16 112/10 112/10
112/16 115/6 115/9 119/16
172/1 177/1 177/12 179/14
179/18 180/1 180/8 180/17
180/21 181/2 181/7 181/12
181/14 181/24 182/3 182/9
182/17 182/21 183/4 183/7
183/16 183/23 184/19 184/24
185/5 185/15 185/23 186/8
186/13 186/17 191/4 192/23
193/19 194/14 197/7 197/19
211/14 212/3 213/12 213/24
214/5 215/19 217/9 217/12
219/14 220/10 223/21 225/21
225/25 236/21 236/23 238/17
268/18
**Kauichko's [5]**   90/8 172/4
172/7 211/23 212/19
**keen [1]**   271/17
**keep [13]**   8/1 33/21 44/21
45/10 63/13 67/23 90/20
122/17 132/24 161/21 206/6
228/10 267/23
**Keeping [1]**   265/25
**Kelly [1]**   142/6
**Keough [4]**   2/19 4/6 5/24
248/9
**kept [3]**   23/6 161/24 226/19
**key [1]**   172/14
**Kidd [2]**   114/11 195/3
**KIM [3]**   135/3 144/19 154/16
**kind [4]**   190/8 227/13 248/7
272/13
**knew [48]**   14/3 14/4 14/5
39/13 40/17 41/7 41/15 42/13
42/20 47/11 62/18 68/13
68/16 68/17 69/25 106/18
107/6 107/11 107/13 109/20
110/25 111/21 111/22 111/22
116/16 116/17 116/21 167/12
167/20 176/3 176/5 188/5
190/14 195/18 200/16 201/10
203/1 203/10 204/15 208/12
211/3 211/3 220/2 223/5
223/12 250/16 264/24 268/16
**know [213]**
**knowing [1]**   40/12
**knowledge [9]**   43/7 66/25
94/13 98/24 110/24 113/14
114/8 146/4 266/20
**known [4]**   18/8 39/7 41/22
48/4
**knows [7]**   10/22 57/17 110/15
111/16 122/23 230/18 266/12
**KONG [1]**   2/5
**Kristin [1]**   261/14
**Kumar [3]**   261/12 261/15
261/17
**KX2 [2]**   203/19 239/23
**KX29 [3]**   148/19 148/20
149/16
**KX29/DX28 [1]**   149/16

**L**

**labeled [3]**   46/9 46/11 60/13
**lack [4]**   15/1 15/4 22/13
28/22
**laid [1]**   266/15
**Landsgaard [10]**   110/11
110/15 110/21 111/1 111/8
111/12 111/13 111/16 111/21
111/23
**Landwermeyer [2]**   149/14
149/15
**large [3]**   38/15 38/16 243/11
**largely [1]**   107/4
**laser [1]**   232/2

**laser-like [1]**   232/2
**last [35]**   10/22 11/15 34/12
57/22 84/9 93/11 99/15
121/18 123/24 129/10 137/1
163/16 165/16 219/19 225/11
226/4 226/9 226/11 272/8
**lastly [1]**   142/8
**late [3]**   191/25 197/17
250/16
**later [31]**   32/3 103/14
157/23 159/9 171/19 192/16
197/14 198/5 206/14 226/24
227/22 239/15 250/15 254/14
263/18
**laundering [1]**   14/6
**law [16]**   3/15 3/20 16/8
93/21 94/8 94/15 101/16
101/21 101/25 102/25 103/1
146/22 146/23 147/5 230/17
248/6
**Lawrence [1]**   114/15
**lawyer [6]**   9/18 20/13 101/18
101/25 134/9 134/23
**lawyers [11]**   7/11 9/2 9/15
9/19 17/17 17/19 17/21 17/24
134/18 134/20 134/21
**lead [12]**   27/8 65/5 104/17
157/9 171/2 171/3 244/15
251/6 251/13 252/1 253/6
254/20
**leads [8]**   16/4 104/16 125/6
125/15 158/17 212/13 251/11
253/11
**learn [6]**   162/20 173/20
175/12 188/3 197/13 201/23
**learned [32]**   64/20 69/22
126/22 172/20 175/19 186/23
187/1 187/2 187/13 191/10
191/13 192/15 192/16 192/19
192/21 193/11 193/21 193/25
195/21 196/5 196/19 196/20
197/7 197/9 197/11 197/19
198/3 200/3 201/19 229/7
253/5 254/14
**learning [4]**   92/19 163/3
196/2 239/2
**lease [15]**   49/7 49/19 73/25
74/8 74/25 75/11 75/3 75/15
75/18 78/15 78/19 78/25
79/15 79/25 81/12
**leasing [8]**   38/7 50/24 51/22
75/7 76/2 76/10 76/17 77/19
**least [12]**   11/21 24/8 25/16
90/5 96/6 114/24 125/18
157/9 178/14 230/8 242/3
274/16
**leave [2]**   7/11 274/11
**lectern [1]**   10/9
**led [2]**   172/6 213/25
**left [4]**   8/1 17/19 237/23
260/20
**legal [5]**   27/6 256/7 256/10
257/4 259/18
**legally [1]**   257/2
**less [6]**   19/20 54/12 111/2
152/14 153/8 238/13
**let [56]**   6/4 7/10 9/2 25/23
29/4 30/5 30/11 33/24 42/17
46/7 50/1 52/4 53/3 53/13
53/17 55/2 68/17 69/23 72/16
73/20 76/24 78/4 79/21 80/22
82/15 84/8 86/8 95/13 118/9
125/19 136/6 137/22 138/5
138/25 139/23 143/15 173/2
176/1 177/4 177/19 178/8
180/15 186/22 190/13 192/4
194/5 202/7 210/20 228/8
229/2 244/7 244/24 247/14
248/8 248/12 272/8

let's [114]   8/19 16/17 16/25
18/9 19/6 19/24 20/5 22/3
27/21 28/9 28/23 29/19 33/7
33/9 33/10 33/21 34/14 38/14
42/11 43/4 43/12 44/21 44/24
53/23 53/24 57/23 59/21
60/11 61/2 61/13 61/14 62/5
63/13 69/12 71/22 71/25 72/1
72/23 73/19 75/3 76/18 80/7
81/8 84/1 84/24 85/3 87/16
90/18 90/20 91/19 95/2 96/20
99/14 99/15 99/17 107/14
108/10 110/9 112/2 112/8
112/18 113/6 113/6 123/14
123/17 125/19 127/10 134/4
135/3 136/24 136/25 141/1
141/4 143/3 148/8 149/13
149/25 150/13 150/15 153/18
156/6 156/20 158/8 158/18
158/19 160/18 163/8 164/25
166/3 192/19 194/2 224/24
232/1 236/9 236/11 236/16
237/19 239/13 240/8 240/25
241/1 245/22 247/25 248/9
251/11 251/22 253/25 255/1
259/9 260/17 268/2 270/20
273/2 274/11
lets [2]   121/24 243/1
letter [2]   75/15 152/7
letters [1]   272/13
letting [1]   31/4
level [2]   90/20 105/17
Lewis [1]   3/4
liberal [1]   248/7
license [14]   90/3 90/12
95/11 96/7 108/8 108/17
109/4 115/3 116/3 118/1
118/1 177/13 191/1 240/5
licenses [8]   109/11 109/17
110/4 116/4 177/9 177/11
191/6 207/15
light [1]   6/18
like [37]   10/3 10/10 10/13
10/17 16/4 19/11 31/15 32/4
33/17 38/24 55/22 55/22 57/1
65/15 66/15 76/22 96/18
99/24 104/15 108/17 114/6
134/15 151/16 172/22 173/1
183/10 192/16 196/15 207/5
208/6 225/20 225/25 230/7
232/2 249/11 264/23 270/1
likely [8]   39/24 120/22
151/9 188/6 188/20 188/24
222/24 262/5
Lilia [6]   141/16 142/9
142/20 144/9 145/12 150/14
limit [1]   124/25
limited [6]   23/9 23/24 24/1
159/19 176/12 226/20
Limo [9]   12/3 12/5 12/14
12/23 12/24 13/10 13/16
13/23 13/24
line [10]   46/25 126/12
126/13 126/16 126/17 132/1
237/21 237/23 241/3 241/9
line 3 [1]   241/9
Line 4 [1]   126/16
lines [5]   23/14 52/9 55/8
157/22 254/2
lines 16 [1]   254/2
link [2]   78/24 206/3
linked [4]   153/22 154/10
154/19 154/21
links [1]   212/4
list [11]   18/4 18/6 100/15
142/23 150/18 151/22 152/9
153/7 161/25 221/10 272/13

listed [4]   100/13 100/20
100/20 120/20
listen [1]   87/11
listening [3]   22/2 37/1
116/13
literally [1]   144/21
litigation [3]   121/6 228/2
250/14
little [11]   69/23 83/14
99/24 137/5 161/2 161/4
181/17 206/6 232/1 246/24
257/20
Littrell [24]   3/4 3/4 3/7
4/5 5/22 6/6 6/22 7/11 8/6
14/20 170/10 170/21 194/8
197/1 198/10 199/21 206/7
209/22 212/8 215/1 221/17
231/13 254/25 274/24
Littrell's [1]   91/22
lived [1]   174/21
lives [1]   175/14
LLC [2]   135/21 221/11
LLP [5]   2/16 2/19 2/22 3/4
3/7
loaded [3]   15/3 32/2 32/17
loan [46]   12/2 13/23 68/14
68/19 69/1 100/7 102/6 104/2
104/23 105/3 105/6 108/8
113/3 138/9 139/4 139/7
139/9 145/6 145/13 147/13
150/8 176/18 177/11 177/14
179/7 179/24 180/20 181/19
181/21 181/22 182/16 182/24
182/24 184/24 185/1 185/5
187/17 192/11 196/14 207/18
218/5 219/1 219/3 219/5
219/12 233/11
loans [77]   64/19 70/2 78/8
82/7 83/13 83/15 83/19 84/7
100/20 102/3 102/4 102/7
102/13 103/3 103/12 103/15
105/7 105/14 105/19 107/1
107/2 126/21 138/15 138/18
139/11 140/16 140/17 140/18
140/18 145/3 145/4 145/5
145/5 145/7 145/9 145/10
145/15 145/15 145/16 146/1
146/20 146/21 147/20 148/21
150/5 150/7 150/18 150/25
151/7 151/18 152/3 152/8
152/9 153/3 153/5 153/7
153/8 153/21 154/1 154/9
154/18 154/21 155/11 172/21
176/22 182/2 182/7 184/20
220/1 220/4 249/2 249/9
249/14 250/1 251/1 251/23
252/8
located [1]   273/23
location [1]   24/8
locations [3]   142/11 144/5
144/13
log [11]   24/2 24/12 85/25
98/18 127/24 128/1 128/5
128/8 128/10 265/23 265/24
logged [1]   267/24
logging [2]   98/24 99/4
logic [2]   164/23 164/24
long [9]   24/13 24/20 117/12
141/16 141/25 145/12 244/21
274/7 274/21
longer [1]   143/22
look [75]   12/15 12/21 19/10
25/6 29/19 32/14 34/14 39/1
43/12 43/24 44/3 44/22 44/24
49/14 53/24 56/20 57/21 58/5
59/5 59/21 61/2 61/13 61/14
66/5 67/9 69/21 74/2 74/5
74/14 83/12 90/18 92/15
93/18 93/24 95/2 95/7 95/22

98/1 99/14 112/2 112/18
112/20 135/5 135/9 136/20
136/24 139/10 142/9 148/10
152/8 154/9 154/21 155/3
160/18 163/8 165/14 165/23
176/22 182/14 197/15 199/17
203/18 207/14 207/19 208/5
217/20 217/25 222/24 229/2
236/7 243/16 248/8 267/5
268/22 269/14
looked [32]   39/13 39/15
69/20 109/18 117/21 129/14
151/16 151/21 151/23 152/2
152/24 153/2 153/6 157/2
157/2 174/14 174/23 175/5
175/25 176/15 179/4 188/24
204/4 204/5 204/6 204/7
207/18 211/9 216/7 226/15
235/10 243/17
looking [27]   34/25 44/19
63/5 64/22 69/13 94/3 105/3
138/8 141/10 151/8 154/18
171/7 171/8 171/10 175/17
190/8 211/22 212/7 213/9
213/19 225/17 227/2 228/9
231/8 246/9 246/20 272/3
looks [5]   31/15 32/3 99/24
208/6 208/6
looped [1]   262/22
LOS [7]   1/14 1/22 2/8 2/17
3/9 3/16 5/1
lose [2]   155/24 155/25
losing [1]   188/15
lot [4]   20/13 176/7 207/5
207/9
loud [1]   61/24
luggage [5]   185/19 214/11
214/21 215/15 217/11
lump [1]   135/2
lunch [1]   91/17
Luncheon [1]   91/18
lying [7]   6/22 6/24 8/9 8/12
132/5 270/7 270/8

## M

made [43]   9/16 13/8 14/9
16/21 19/1 19/5 19/6 19/24
20/13 20/17 21/3 21/7 42/9
78/11 88/14 88/17 95/18
121/5 121/10 122/13 124/17
125/12 127/3 130/12 165/10
167/10 170/3 177/15 177/18
196/21 197/3 197/6 200/4
200/10 209/24 223/18 227/19
231/1 234/24 235/5 268/4
270/17 272/13
mail [70]   29/23 30/5 30/20
32/1 32/15 33/23 34/13 38/5
38/6 47/5 47/8 47/11 47/14
48/6 48/6 48/7 48/14 48/16
49/6 55/15 69/16 74/7 74/9
74/10 74/25 78/13 81/12 86/2
100/1 100/12 100/15 100/23
101/1 101/14 102/2 102/8
107/18 137/1 137/3 137/6
137/24 138/2 141/10 141/11
141/12 141/13 143/4 148/14
148/25 149/9 153/4 159/14
164/2 166/18 166/20 166/21
166/24 167/2 198/14 202/4
205/4 222/23 254/5 254/19
272/3 272/5 272/6 272/22
272/23 273/1
mailed [2]   98/9 198/20
mailing [2]   68/14 198/24
mails [27]   16/21 18/3 38/11
48/13 149/18 158/12 158/14
178/20 178/23 198/19 198/20
198/23 199/5 199/14 199/18

**M**

mails... **[12]**  199/20 199/22 199/23 199/24 199/25 201/25 202/1 202/3 202/6 202/7 267/21 271/20
**main [1]**  163/16
**maintained [3]**  102/23 103/12 103/14
**major [3]**  18/7 114/12 261/12
**majority [1]**  154/4
**make [31]**  8/20 22/2 33/5 38/23 53/17 69/23 91/8 102/24 121/4 124/3 124/15 125/4 132/11 146/2 167/13 168/2 170/3 172/24 176/1 188/23 193/24 196/16 197/23 198/12 198/21 200/2 210/4 224/20 228/10 248/6 267/13
**makes [3]**  10/18 54/12 164/18
**making [4]**  124/14 210/18 217/22 270/12
**male [4]**  177/2 177/5 237/14 238/2
**management [7]**  38/7 49/7 75/4 75/7 76/10 77/15 79/18
**mansion [1]**  175/14
**manual [14]**  119/22 120/9 198/7 257/12 257/15 258/1 264/10 264/17 264/18 264/21 273/18 273/20 273/22 273/24
**manual's [1]**  258/17
**Manuk [4]**  78/6 81/4 186/3 186/7
**many [21]**  72/2 72/4 85/10 127/11 127/21 128/19 129/10 129/21 133/12 147/16 151/18 151/21 151/23 152/2 161/3 175/23 184/20 186/16 259/5 269/25 271/5
**March [16]**  71/13 71/23 71/24 72/23 84/20 93/4 127/5 226/12 235/20 260/3 262/9 263/10 263/15 268/21 269/2 272/5
**March 11th [1]**  272/5
**March 15th [1]**  235/20
**March 19th [2]**  84/20 226/12
**March 9th [4]**  71/13 71/24 72/23 127/5
**Marietta [21]**  87/22 90/7 172/17 173/18 178/10 178/19 178/23 179/2 179/4 179/17 181/6 181/11 182/18 191/3 208/22 212/16 220/7 222/10 255/7 268/9 269/20
**Mark [2]**  5/10 114/19
**marked [6]**  44/25 46/19 203/18 205/7 215/7 239/11
**market [1]**  114/12
**married [1]**  203/4
**Mary [41]**  5/22 28/6 78/9 88/9 95/19 96/15 105/5 115/7 128/23 184/18 184/23 185/1 185/13 187/15 188/1 192/21 193/18 196/4 204/16 205/2 205/12 206/11 206/22 211/13 211/22 212/2 215/9 217/5 218/4 218/18 218/24 219/2 220/14 220/19 220/22 221/2 221/8 222/15 223/18 228/10 228/18
**Marylee [10]**  145/8 146/5 146/10 146/14 146/17 146/22 148/15 149/8 149/17 149/22
**Massino [21]**  17/4 99/20 99/25 100/4 100/25 137/3 137/6 138/4 138/9 138/20 139/24 139/25 142/1 142/3

145/7 151/22 152/1 152/10
**Massino's [3]**  11/25 100/23 102/8
**massive [2]**  126/19 217/6
**material [7]**  16/20 16/24 43/11 128/12 128/18 266/16 266/21
**materially [1]**  43/8
**materials [7]**  18/3 75/6 76/2 97/14 233/2 233/5 233/19
**matter [6]**  8/24 44/16 164/23 175/11 256/11 276/7
**matters [2]**  123/13 175/17
**may [53]**  8/13 8/15 13/1 13/1 17/2 17/10 17/13 19/17 19/17 23/4 25/12 25/16 25/19 26/1 26/7 26/14 31/13 41/13 41/22 42/21 51/15 56/7 72/18 83/9 85/11 91/10 91/10 92/16 93/6 121/1 123/3 125/12 136/8 152/7 153/9 153/14 153/16 153/17 159/19 166/6 203/14 203/17 208/11 249/23 250/2 258/24 259/9 262/13 262/14 263/7 270/19 273/9 273/12
**May 17th [3]**  153/14 153/16 153/17
**May 7 [1]**  25/19
**May 7th [1]**  152/7
**maybe [8]**  14/14 48/12 122/21 150/14 199/20 210/21 246/2 273/3
**me [139]**
**mean [58]**  8/20 9/4 17/20 20/7 23/15 26/2 28/13 32/12 38/15 41/17 42/25 44/15 47/3 56/15 67/11 71/6 71/16 77/12 78/22 80/1 82/13 88/13 91/5 106/10 116/21 122/20 130/6 130/10 138/24 139/19 143/12 144/2 173/12 179/22 179/25 184/3 184/6 185/24 188/21 196/1 209/18 216/24 224/7 224/8 224/14 238/22 239/1 246/8 247/3 247/13 247/22 248/5 256/9 259/15 259/23 269/18 270/4 270/16
**meaning [8]**  57/12 64/2 64/4 97/22 107/7 107/10 165/20 171/18
**meaningful [1]**  216/8
**means [7]**  51/8 61/9 106/9 183/25 224/16 252/9 264/25
**meant [1]**  144/17
**meat [1]**  22/4
**mechanism [1]**  25/7
**mechanisms [1]**  25/4
**media [11]**  62/7 62/11 62/19 64/6 64/10 65/11 205/19 205/21 206/3 208/23 236/19
**meet [1]**  233/20
**meeting [6]**  159/21 159/22 159/25 253/17 254/6 254/19
**meetings [1]**  159/15
**member [3]**  101/17 101/22 148/14
**members [13]**  23/24 30/20 52/22 89/4 90/24 105/5 126/21 146/6 146/12 147/5 172/22 233/23 249/20
**memo [28]**  15/12 81/14 81/16 82/23 83/2 113/20 113/21 113/24 114/8 114/23 116/15 143/13 245/12 245/15 246/7 246/10 246/10 246/12 246/14 246/16 246/18 246/19 246/22 246/25 247/11 247/17 247/19 248/15

**memorandum [3]**  129/16 131/7 131/8
**memorialize [7]**  94/21 94/24 117/18 134/6 134/10 135/12 160/3
**memorialized [9]**  130/4 131/14 134/8 134/16 134/24 135/1 135/23 153/3 160/6
**memory [8]**  38/4 214/20 233/10 246/6 246/13 248/6 248/8 267/20
**memos [1]**  114/2
**men [1]**  177/11
**mention [2]**  76/5 118/8
**mentioned [13]**  28/10 30/12 73/22 83/1 93/6 93/6 118/6 93/9 214/4 237/9 241/22 245/10 262/7
**Mesereau [3]**  3/14 3/15 5/20
**message [21]**  47/16 59/22 60/20 60/21 61/23 61/23 61/24 63/3 64/1 66/14 66/22 66/24 67/6 67/9 68/1 74/6 95/18 163/4 215/8 215/23 222/23
**messages [62]**  11/24 13/13 37/6 38/11 41/23 42/21 58/21 58/23 59/13 59/19 60/9 62/25 63/18 65/18 68/10 68/25 69/8 92/18 92/23 93/1 93/2 93/5 115/6 116/4 119/17 133/3 133/23 157/16 157/17 162/15 162/24 163/1 163/5 164/8 167/7 167/13 167/15 167/19 167/22 167/23 168/13 169/7 169/12 169/13 191/2 193/18 196/4 196/20 197/12 197/14 198/1 211/8 212/18 221/13 221/15 222/7 223/2 223/5 223/8 223/15 236/22 270/13
**messaging [1]**  68/14
**messagings [1]**  96/9
**met [1]**  16/1
**Miami [158]**
**Michael [3]**  2/19 5/24 29/24
**midafternoon [1]**  59/11
**middle [1]**  63/3
**midnight [11]**  89/15 89/16 89/18 89/19 90/16 99/24 116/7 187/3 190/16 191/18 192/8
**midway [1]**  237/12
**might [11]**  65/15 113/20 193/7 211/18 223/4 229/14 229/20 230/5 230/9 234/19 269/21
**million [1]**  175/14
**mind [4]**  72/16 104/18 134/23 223/11
**minimized [1]**  190/1
**minute [7]**  31/16 33/17 82/9 192/19 193/1 241/13 242/17
**minutes [9]**  10/8 32/3 35/18 91/17 117/13 117/14 117/19 156/5 166/3
**Miranda [5]**  23/2 26/5 121/6 121/22 227/15
**mirror [1]**  165/15
**Mischaracterizes [1]**  258/9
**misconduct [1]**  209/23
**misleading [6]**  7/3 7/13 8/10 8/12 209/25 210/19
**misstates [1]**  35/4
**mix [4]**  107/8 107/20 249/22 249/23
**mobile [1]**  248/18
**model [1]**  165/11
**MOI [1]**  129/15
**MOI's [5]**  72/12 129/14

**M**

**MOI's... [3]**  129/24 130/9
130/11
**moment [5]**  42/12 48/18
149/20 196/21 229/2
**moments [3]**  43/19 99/7 99/11
**Monday [3]**  21/21 104/12
104/14
**money [53]**  11/12 12/7 12/22
13/2 13/16 13/23 14/7 21/17
21/18 21/20 21/21 64/16
64/23 72/10 172/13 172/15
172/19 172/20 172/23 173/4
173/6 174/20 175/23 176/21
176/23 178/3 178/4 178/9
178/13 179/1 179/8 179/9
179/24 180/3 181/10 181/10
181/11 181/19 181/21 181/22
182/8 182/15 182/17 183/9
184/11 184/12 184/25 196/10
211/18 213/21 219/25 220/7
227/18
**Monica [1]**  3/15
**monies [1]**  183/3
**month [2]**  72/18 123/3
**months [2]**  62/3 221/22
**more [41]**  7/10 22/21 27/10
37/18 53/20 65/7 66/5 69/23
81/5 85/12 86/24 100/24
107/12 112/25 120/22 125/4
136/25 138/5 148/4 171/12
180/10 181/17 188/23 212/1
212/5 212/20 213/10 213/23
215/4 215/6 215/14 218/10
229/19 231/22 232/2 240/8
240/9 251/21 259/9 269/25
270/2
**Morley [1]**  29/24
**morning [9]**  5/9 5/13 5/16
5/19 5/21 5/23 13/18 18/19
167/4
**mortgages [1]**  111/7
**most [11]**  15/20 16/2 97/14
114/3 134/25 145/22 170/12
188/20 225/24 261/10 274/6
**motion [21]**  10/12 10/12
121/4 121/5 121/9 121/13
121/22 125/22 152/8 153/10
153/16 153/17 153/20 210/18
235/6 235/8 260/15 265/18
265/21 269/15 274/17
**motions [22]**  1/15 6/4 8/21
8/22 9/8 9/11 9/15 14/10
14/23 88/14 209/23 235/17
235/22 236/14 237/6 250/16
260/9 260/11 262/5 263/12
267/22 271/12
**motive [1]**  88/4
**mountains [2]**  218/2 227/17
**move [25]**  14/25 15/4 15/6
26/21 27/10 30/11 43/2 43/4
80/5 88/23 96/20 104/15
121/17 123/13 123/14 129/9
136/6 140/16 141/2 145/2
149/25 150/21 155/14 164/25
176/11
**moved [2]**  117/21 184/20
**moving [6]**  46/18 70/9 106/25
136/18 211/8 218/18
**MP4 [1]**  56/23
**Mr [58]**  4/4 4/5 4/6 4/7 6/22
7/21 17/8 22/15 23/15 26/12
28/5 33/11 33/24 33/25 35/6
40/2 42/19 43/23 48/5 72/25
84/6 124/8 124/11 124/22
131/10 132/1 132/5 132/7
132/7 132/10 132/12 132/13
132/23 133/13 133/19 135/3

135/9 135/16 138/12 141/11
170/10 170/21 194/8 198/10
199/21 206/7 215/1 221/17
223/1 223/7 227/3 232/5
248/9 271/17
**Mr. [135]**  5/17 6/5 6/6 7/11
7/16 7/16 7/16 8/1 8/6 10/2
10/20 11/4 11/11 11/18 11/21
12/2 13/6 13/14 13/16 14/3
14/20 15/3 16/17 17/2 17/5
17/6 17/16 18/19 21/22 22/1
22/15 24/10 26/20 27/7 30/6
31/12 31/13 31/19 32/25
43/24 44/12 50/10 52/6 61/11
80/22 89/11 91/22 91/25 96/2
96/7 99/19 99/19 102/14
102/16 105/4 105/24 109/20
118/6 118/9 118/11 118/18
118/22 118/24 119/3 125/24
128/22 131/17 131/25 132/9
132/10 132/15 132/19 132/20
133/10 135/15 136/13 137/6
138/4 140/15 140/23 141/9
141/15 141/23 142/6 142/9
143/6 143/10 143/20 144/16
144/17 166/9 167/19 170/22
176/16 197/1 197/3 198/10
202/6 202/13 202/13 203/19
209/22 209/24 212/8 215/2
223/16 224/23 229/12 231/13
232/4 232/21 235/5 235/5
236/3 236/6 236/12 241/4
253/3 253/23 253/25 254/5
254/6 254/25 255/6 256/13
257/22 261/15 262/4 270/25
271/12 272/2 272/23 274/23
274/24 274/24
**Mr. Andre [19]**  17/5 89/11
118/6 118/9 118/11 118/24
137/6 141/15 141/23 142/9
143/6 143/10 143/20 144/16
144/17 197/3 198/10 202/13
274/23
**Mr. Andrew [3]**  118/18 118/22
119/3
**Mr. Artur [2]**  5/17 10/2
**Mr. Ayvazian [7]**  109/20
128/22 132/9 132/19 235/5
236/6 262/4
**Mr. Ayvazyan [5]**  102/16
105/4 167/19 176/16 236/3
**Mr. Berj [2]**  131/25 223/16
**Mr. Bradford [3]**  135/5
135/16 254/5
**Mr. Bradford's [3]**  253/3
253/23 254/6
**Mr. Clark [1]**  15/3
**Mr. Dadyan [6]**  11/11 11/21
12/2 13/14 13/16 14/3
**Mr. Dadyan's [1]**  10/20
**Mr. Faerstein [1]**  272/23
**Mr. Faerstein's [1]**  272/2
**Mr. Fenton [24]**  7/16 16/17
17/2 17/16 18/19 21/22 22/15
24/10 26/20 27/7 31/13 31/19
43/24 50/10 80/22 91/25
105/24 125/24 141/9 166/9
170/22 202/6 215/2 224/23
**Mr. Jeffrey [1]**  99/19
**Mr. Johnson [2]**  11/18 13/6
**Mr. Julian [2]**  8/1 99/19
**Mr. Kelly [1]**  142/6
**Mr. Kumar [1]**  261/15
**Mr. Littrell [10]**  6/6 7/11
8/6 14/20 197/1 209/22 212/8
231/13 254/25 274/24
**Mr. Littrell's [1]**  91/22
**Mr. Massino [1]**  138/4

**Mr. Paetty [11]**  7/16 17/6
17/16 118/18 202/13 223/1
241/4 255/6 256/13 270/25
271/12
**Mr. Paetty's [1]**  253/25
**Mr. Palmerton [2]**  7/16
202/13
**Mr. Ram [15]**  6/5 22/1 30/6
31/12 32/25 44/12 52/6 61/11
96/2 131/17 140/23 209/24
235/5 257/22 274/24
**Mr. Ram's [1]**  140/15
**Mr. Richard [2]**  102/14
132/15
**Mr. Spertas [3]**  132/10
132/20 133/10
**Mr. Vahe [1]**  11/4
**Mr. Wong's [1]**  203/19
**Mr. Zhadko's [1]**  96/7
**Mr.Littrell [2]**  180/11 202/9
**Mrkrtchyan [1]**  208/24
**Mrs [1]**  147/19
**Ms [13]**  17/5 17/9 147/8
148/22 171/24 176/16 187/9
201/14 208/14 215/20 237/4
261/16 261/17
**Ms. [13]**  6/2 7/1 147/4 147/7
147/23 167/20 186/24 200/4
223/9 229/12 236/3 236/6
261/17
**Ms. Ahn [1]**  229/12
**Ms. Dadyan [1]**  167/20
**Ms. Robinson [3]**  147/4 147/7
147/23
**Ms. Terabelian [6]**  6/2 7/1
186/24 200/4 236/3 236/6
**Ms. Terabelian's [1]**  223/9
**Ms. Williams [1]**  261/17
**much [6]**  20/8 57/18 143/22
188/23 224/20 226/6
**multiple [14]**  38/16 46/3
47/11 78/20 85/7 85/8 85/15
85/18 86/6 93/20 142/10
144/5 144/13 144/15
**my [138]**  14/22 16/5 18/6
18/7 21/15 21/22 23/10 24/10
25/2 25/13 26/6 29/2 30/19
32/5 34/3 36/16 37/8 37/8
37/9 39/25 41/3 41/6 42/19
45/1 45/9 45/19 46/20 47/22
49/16 50/3 51/24 52/12 53/3
56/1 60/7 63/24 67/19 68/6
68/18 69/4 72/14 76/15 79/22
80/20 83/7 85/19 86/3 86/3
87/24 88/19 89/7 89/17 92/17
92/25 93/3 94/7 95/12 96/11
96/12 96/19 97/7 97/20 103/9
104/15 105/2 106/17 108/1
108/1 108/10 113/14 114/11
114/16 117/21 121/11 121/19
121/21 124/6 124/20 125/11
129/10 129/20 132/8 134/23
135/19 139/11 142/6 146/4
147/21 147/25 148/1 152/23
152/25 154/8 156/15 156/18
158/12 163/21 164/24 169/3
170/14 170/17 176/10 177/22
193/23 195/5 195/15 195/19
197/2 201/25 205/17 214/10
214/20 214/22 223/11 226/19
228/13 229/5 233/10 234/3
235/1 235/3 243/9 243/14
247/1 252/25 255/24 257/13
260/7 261/11 261/24 262/17
263/9 265/1 266/15 266/15
266/20 266/21 270/9
**myself [5]**  89/9 113/23
136/21 136/22 266/6

**N**

**named [3]**   135/21 203/5 215/9
**names [26]**   34/16 39/7 39/9
39/13 39/17 41/10 90/12
100/5 100/14 102/14 150/14
150/23 151/21 152/25 153/1
153/2 153/4 153/21 154/4
172/21 176/24 176/25 191/6
195/13 196/13 205/24
**Nancy [1]**   11/19
**narrative [1]**   46/25
**nature [7]**   173/13 173/25
199/24 207/7 220/12 261/22
265/20
**navigate [1]**   226/19
**Nazar [16]**   172/22 175/24
181/20 200/13 201/5 218/21
219/1 219/3 219/5 219/12
219/13 219/22 219/25 220/8
220/16 221/2
**Nearly [1]**   15/20
**necessarily [4]**   40/5 40/14
134/24 253/12
**necessary [5]**   7/23 8/11
17/22 138/6 230/23
**need [19]**   7/18 9/14 13/16
25/9 28/3 80/23 81/6 90/19
127/9 141/18 168/23 176/8
209/21 215/11 215/25 217/16
227/10 227/16 227/21
**needed [3]**   196/15 197/23
269/14
**needs [1]**   165/24
**neither [1]**   152/23
**never [29]**   18/6 42/1 42/2
47/2 48/16 54/22 54/25 55/17
55/20 56/3 56/11 70/20 132/4
132/14 132/22 133/7 133/8
134/15 147/25 185/1 210/23
223/15 223/16 229/22 231/5
246/12 247/12 247/23 258/14
**new [20]**   2/11 9/25 10/12
11/16 14/10 41/19 41/20 65/5
65/6 102/3 102/4 107/21
126/21 126/24 141/15 145/11
148/22 151/21 207/11 270/4
**newer [1]**   165/11
**next [21]**   32/17 46/18 73/19
104/1 104/12 119/13 119/14
127/10 141/23 150/6 156/4
157/5 167/4 176/11 184/3
191/21 192/8 229/3 231/17
231/20 273/1
**NIALL [2]**   2/6 5/10
**Nicholas [1]**   2/21
**Nick [1]**   5/25
**nickname [1]**   41/9
**nine [15]**   138/9 138/14
138/18 139/7 139/8 140/16
140/17 140/20 145/6 145/15
150/3 150/4 150/4 150/7
150/25
**no [240]**
**No. [1]**   11/23
**No. 10 [1]**   11/23
**nobody [1]**   253/9
**None [1]**   4/10
**nonsubstantive [2]**   199/24
200/1
**North [2]**   2/7 3/20
**not [404]**
**notary [1]**   156/9
**note [3]**   17/25 91/21 121/6
**noted [2]**   74/24 152/12
**notes [5]**   92/5 112/16 117/1
117/16 205/24
**nothing [5]**   9/25 41/19 41/20
169/14 192/12

**notice [2]**   25/18 25/21
**noticed [1]**   44/8
**notified [2]**   242/19 242/22
**Notwithstanding [1]**   56/10
**November [38]**   48/11 96/20
97/2 97/3 97/9 97/25 98/4
98/5 102/1 104/12 107/18
107/18 108/2 108/7 110/19
110/19 111/19 112/4 112/14
113/7 113/11 113/22 117/6
122/2 122/7 123/1 136/18
138/3 139/15 142/25 144/11
159/9 161/10 164/10 189/7
189/11 205/13 208/21
**November 13 [1]**   189/11
**November 13th [9]**   97/9 98/5
107/18 110/19 112/4 112/14
117/6 138/3 139/15
**November 15th [5]**   102/1
107/18 108/2 108/7 111/19
**November 16th [1]**   104/12
**November 17th [3]**   98/4 113/7
113/22
**November 2020 [1]**   96/20
**November 20th [1]**   97/2
**November 22nd [1]**   205/13
**November 5 [2]**   122/7 161/10
**November 5th [2]**   142/25
208/21
**now [102]**   7/6 7/18 15/15
21/14 28/9 32/7 33/5 33/16
34/25 36/16 36/18 42/10
44/17 45/19 46/18 46/24
47/25 50/5 53/3 53/23 54/8
54/24 55/10 56/3 57/5 57/16
58/14 59/21 63/11 67/9 68/3
69/21 70/9 73/19 75/10 76/25
77/15 84/14 88/15 91/14
95/25 96/12 96/13 105/9
107/17 109/2 110/9 112/2
112/18 113/6 122/18 128/10
134/7 136/18 140/6 141/9
143/22 148/1 148/1 148/16
151/12 155/17 170/2 171/24
176/14 185/21 186/20 189/24
193/14 199/11 200/3 203/22
204/9 208/12 211/1 211/12
215/23 218/7 224/23 227/2
228/4 229/7 230/3 231/8
231/16 235/16 236/16 237/8
237/9 238/10 239/11 240/25
246/1 248/15 249/1 251/2
257/23 264/13 270/20 274/3
274/19 274/22
**nowhere [2]**   71/15 148/3
**number [20]**   17/18 19/4 32/18
34/8 34/8 60/13 61/16 61/20
62/8 62/8 83/17 122/15
127/20 129/12 145/13 152/13
161/17 165/3 211/24 236/4
**numbers [4]**   35/13 35/15 39/7
100/6
**Nursery [4]**   141/16 141/17
141/25 145/12
**Nvard [1]**   62/4
**NW [2]**   2/11 2/22

**O**

**o'clock [1]**   274/12
**O'DONNELL [2]**   2/6 5/10
**oath [7]**   70/24 105/12 122/16
122/17 122/18 122/22 122/23
**obituary [1]**   110/12
**objected [5]**   12/18 12/19
15/8 228/15 228/17
**objecting [1]**   143/10
**objection [35]**   22/10 22/12
23/19 24/24 26/10 30/25 35/4
39/22 42/23 43/1 46/6 59/16

60/4 73/3 88/11 97/15 129/7
144/14 144/16 177/6 178/12
177/6 210/24 224/5 231/10
244/19 245/23 248/2 256/4
257/4 258/9 259/3 265/11
266/9 271/7
**obligation [1]**   160/15
**obligations [1]**   256/14
**observed [2]**   100/6 100/10
**obtain [1]**   120/2
**obtained [6]**   122/1 139/8
161/9 252/13 252/18 254/7
**obvious [3]**   23/11 269/25
270/1
**obviously [2]**   43/21 265/19
**occurred [3]**   99/9 127/5
229/22
**October [59]**   20/1 20/16
20/16 20/21 20/21 20/24
20/25 21/1 21/3 21/7 21/11
21/21 22/6 22/17 22/24 77/3
87/16 87/18 89/14 89/16
90/16 116/7 116/19 127/12
127/21 128/20 129/11 175/3
176/4 176/6 178/5 178/9
179/16 180/7 181/6 184/10
184/22 185/8 185/20 185/21
186/4 186/22 186/23 187/2
187/2 187/3 187/4 190/15
190/16 191/18 200/1 200/21
200/25 201/4 201/18 201/20
202/14 202/23 211/3
**October 19 [3]**   178/5 187/2
187/2
**October 19th [8]**   20/25
127/12 127/21 128/20 129/11
185/20 190/15 200/1
**October 20 [1]**   186/4
**October 20th [34]**   20/1 20/16
20/21 20/21 20/24 21/1 21/3
21/7 21/11 21/21 22/6 22/17
22/24 87/16 87/18 89/14
89/16 90/16 116/7 116/19
175/3 176/4 178/9 180/7
181/6 184/22 185/8 185/21
186/22 186/23 187/3 187/4
190/16 211/3
**October 22nd [1]**   201/20
**October 23rd [4]**   200/21
200/25 201/18 202/23
**off [8]**   8/14 8/15 29/1 80/8
232/15 257/13 263/9 274/21
**offense [1]**   120/1
**offered [2]**   10/16 11/1
**office [11]**   2/4 3/20 8/1
24/22 76/2 76/10 76/17
255/14 255/17 255/21 260/20
**officer [1]**   274/15
**officers [6]**   93/20 94/8
186/24 187/6 191/14 239/17
**Official [1]**   1/20
**officials [1]**   94/15
**often [2]**   85/11 171/17
**oh [6]**   61/3 147/5 150/6
163/14 215/13 226/12
**okay [262]**
**Olaf [10]**   110/11 110/15
110/21 111/1 111/8 111/12
111/12 111/16 111/21 111/23
**once [3]**   85/12 171/14 192/14
**one [136]**   1/15 2/20 9/15
12/22 21/12 21/20 27/8 28/11
32/2 32/17 33/10 36/9 36/9
36/10 42/8 48/20 48/20 48/21
49/2 49/5 58/23 59/3 59/14
59/19 59/24 60/1 60/9 61/6
62/1 62/17 62/11 62/11 62/13
62/19 62/23 64/6 64/10 65/11
66/5 73/6 73/22 76/21 77/8

one... **[93]** 78/5 78/10 79/10
79/13 79/14 82/9 84/19 85/14
90/2 90/5 96/6 101/4 103/16
108/11 108/12 109/7 110/10
111/4 115/2 115/4 115/7
124/18 131/9 132/2 134/14
136/25 142/17 143/9 143/20
144/10 149/9 149/22 150/6
150/23 161/8 165/20 171/3
176/11 177/13 178/12 182/21
184/1 185/25 186/16 186/18
187/14 190/13 190/25 193/16
195/5 203/7 203/9 204/25
205/2 205/10 205/19 205/21
206/3 207/10 207/15 207/20
207/21 207/24 208/23 218/2
220/17 221/25 222/13 223/14
225/20 229/19 230/4 236/6
236/6 237/1 237/10 237/10
239/22 240/8 240/9 240/14
240/20 242/3 245/8 250/20
250/21 251/23 260/19 273/9
273/11 273/12 273/14 273/25

ones **[11]** 122/13 122/14
124/15 140/19 145/19 145/19
151/7 152/21 154/5 218/3
226/14

ongoing **[2]** 21/13 129/3

only **[37]** 7/2 9/2 9/4 15/7
18/24 23/24 45/19 48/18 49/2
49/18 51/22 53/6 53/17 54/10
55/9 80/25 114/9 122/5 123/4
123/4 124/18 132/15 133/12
136/21 136/21 140/25 147/11
147/17 149/22 152/24 162/5
195/6 201/5 220/17 241/10
241/11 266/6

onwards **[1]** 92/4

open **[10]** 24/17 24/20 32/4
85/9 85/10 85/18 85/20
197/15 226/18 231/12

open-ended **[1]** 231/12

opened **[1]** 220/9

opening **[2]** 82/19 226/7

operation **[1]** 191/23

opinion **[1]** 238/20

opportunity **[9]** 33/1 80/24
84/2 85/1 133/15 149/11
149/19 156/2 228/9

opposed **[2]** 39/10 39/11

opposing **[2]** 269/1 271/12

opposition **[5]** 82/18 125/22
125/24 260/11 269/6

option **[2]** 7/14 124/16

orally **[4]** 87/19 89/4 89/25
93/13

order **[10]** 13/15 14/19
128/13 128/15 128/16 158/1
166/17 199/4 202/5 263/12

organized **[1]** 203/6

original **[5]** 56/23 72/25
114/24 136/25 233/12

other **[121]** 6/22 8/7 9/8
9/11 15/12 16/21 17/11 17/21
17/24 27/18 33/10 38/10
38/11 39/11 41/10 49/21
49/23 51/9 51/12 52/13 52/16
52/22 53/5 55/14 56/9 62/23
66/15 68/25 70/5 77/23 78/17
84/12 84/16 86/16 86/16
90/12 90/24 93/21 94/8 94/15
102/14 102/18 102/25 103/1
104/24 105/5 109/19 110/1
113/13 113/17 114/18 116/4
118/3 125/1 129/3 130/15
130/24 134/17 134/20 134/21
141/12 144/9 145/25 146/12

156/17 158/10 158/15 162/11
176/17 180/3 180/7 182/23
182/3 182/23 183/10 183/19
185/22 191/5 191/7 196/5
198/14 198/19 212/14 213/10
213/18 216/22 216/24 217/2
219/10 219/11 219/15 222/14
222/19 226/18 226/20 226/21
227/17 231/23 232/2 233/5
234/2 235/12 236/2 240/14
242/9 243/13 243/15 245/19
246/21 248/17 253/11 259/5
259/13 261/7 266/12 267/4
267/7 267/16 267/21 270/13
270/17

others **[3]** 90/9 127/15 152/2

otherwise **[2]** 24/2 128/7

ought **[2]** 19/19 19/22

our **[25]** 19/13 23/22 26/3
28/2 48/9 48/10 66/1 99/16
101/17 102/4 102/5 103/2
105/4 107/16 137/1 173/21
175/12 179/19 194/17 198/24
212/9 226/20 228/22 255/21
274/15

ourselves **[1]** 229/25

out **[50]** 12/2 13/23 14/7
48/19 49/2 61/24 64/19 71/12
72/22 75/19 84/8 100/3
102/13 104/10 104/14 105/6
117/23 118/3 118/4 123/6
129/13 138/25 152/6 168/22
169/9 172/21 175/23 176/22
178/5 181/19 181/24 181/25
182/3 182/16 184/1 186/7
186/10 186/12 187/12 192/1
194/13 195/25 218/3 219/14
220/9 228/10 253/22 255/16
266/15 270/10

outline **[2]** 143/24 231/24

outlining **[1]** 267/12

outside **[5]** 147/14 173/19
174/4 174/6 174/8

over **[21]** 12/22 35/19 73/25
74/8 117/9 122/25 123/16
124/13 129/22 149/9 159/14
161/18 194/11 194/16 196/23
206/24 207/1 230/24 245/18
247/16 248/16

overlap **[1]** 148/7

overlapping **[1]** 224/8

overruled **[12]** 22/11 22/14
23/21 24/25 26/11 39/23 46/6
59/17 60/6 73/4 97/16 154/14

own **[7]** 14/8 68/3 108/12
185/3 217/3 217/25 224/21

owned **[4]** 178/10 178/12
179/1 179/10

owner **[4]** 34/10 34/12 67/15
141/24

owns **[2]** 131/18 135/20

**P**

P-A-E-T-T-Y **[1]** 232/18

p.m **[9]** 32/4 91/18 91/18
99/21 166/5 166/5 195/2
195/6 195/20

pace **[1]** 137/18

Pacific **[1]** 3/20

packet **[1]** 148/15

PAETTY **[16]** 2/7 4/6 7/16
17/6 229/12 231/18 231/21
232/4 232/17 232/21 236/12
241/4 255/6 256/13 270/25
271/12

Paetty's **[1]** 253/25

page **[89]** 4/3 29/20 29/21
29/22 31/20 31/20 31/22
32/16 32/17 38/24 50/1 59/5

59/22 59/22 60/12 61/2 61/13
72/6 73/2 74/22 74/25 75/2
75/19 81/8 81/11 81/11 93/25
94/3 94/7 99/15 99/17 100/16
101/12 101/13 107/14 108/3
109/2 110/9 112/2 112/9
112/18 125/20 126/1 126/6
126/8 126/13 126/14 126/16
127/9 136/25 137/1 137/1
137/4 139/10 141/4 142/15
148/12 148/16 148/20 149/1
149/13 150/5 150/6 153/18
156/7 159/23 163/9 163/10
165/23 212/7 221/7 229/3
229/4 236/4 236/9 236/11
236/16 237/8 237/12 239/13
240/2 240/8 240/8 241/1
254/1 257/16 257/18 264/12
276/7

pages **[7]** 38/16 76/4 109/2
143/24 166/14 236/1 240/2

paid **[4]** 8/22 132/16 132/19
184/1

painstaking **[1]** 13/14

Palmerton **[74]** 7/16 17/4
57/23 58/7 58/20 59/7 59/9
59/13 67/3 87/24 88/8 88/12
89/8 89/11 89/22 92/5 92/10
93/9 93/20 94/3 94/13 94/18
96/21 96/24 97/5 97/10 97/17
98/2 98/9 99/7 99/18 100/4
100/11 101/5 102/2 104/6
105/14 106/19 108/13 108/21
109/8 110/11 113/16 115/25
116/9 137/7 139/20 142/18
152/22 154/11 154/25 156/13
157/12 159/17 159/24 163/2
166/13 166/14 166/22 170/1
170/6 187/11 189/9 189/13
190/18 190/20 190/22 191/11
195/24 202/13 231/16 261/3
274/5 274/6

Palmerton's **[6]** 57/24 58/15
99/25 101/11 117/2 167/11

pandemic **[3]** 126/18 134/2
222/21

paper **[1]** 163/23

paragraph **[30]** 50/2 50/17
50/18 52/9 81/9 81/10 81/11
81/12 82/12 93/22 93/25 94/6
94/10 119/14 163/9 163/11
163/13 163/18 163/25 164/1
164/6 224/24 225/2 227/2
237/20 241/3 248/11 254/1
267/6 267/19

paragraph 12 **[1]** 119/14

paragraph 17 **[1]** 267/6

paragraph 18 **[5]** 163/9
163/11 163/13 163/25 164/6

paragraph 31 **[1]** 248/11

paragraph 41 **[2]** 94/6 94/10

paragraph 47 **[1]** 50/2

paragraph 50 **[4]** 50/18 52/9
224/24 225/2

paragraph 51 **[1]** 227/2

paragraph 52 **[4]** 81/9 81/11
81/12 82/12

paragraphs **[1]** 272/12

paralegal **[1]** 101/16

paralegal/law **[1]** 101/16

part **[57]** 7/8 19/16 46/9
53/10 53/13 60/18 60/22
66/11 70/11 75/6 79/7 88/8
98/21 106/16 113/1 114/1
115/15 115/17 127/17 129/5
129/25 137/10 137/20 140/9
143/8 144/13 146/2 146/16
150/17 155/9 190/4 226/22
228/22 234/17 234/17 234/23

**P**

**part... [21]** 235/1 235/24 236/13 236/17 237/6 241/5 241/24 242/2 249/1 249/6 249/9 249/18 251/2 251/7 251/12 251/14 251/25 253/2 257/3 262/16 273/19
**participants [1]** 6/7
**participate [1]** 159/17
**participated [1]** 253/23
**participating [2]** 14/4 132/1
**participation [2]** 46/1 179/20
**particular [26]** 11/3 15/2 29/5 29/6 36/11 38/4 47/23 48/25 55/17 56/22 58/25 63/6 72/10 85/14 92/11 98/19 102/22 105/2 117/24 167/22 205/1 205/16 209/19 218/1 244/2 265/3
**particularly [1]** 109/23
**parties [7]** 6/21 9/3 10/1 14/9 14/15 14/16 98/17
**parts [2]** 37/3 44/18
**party [1]** 10/2
**passed [1]** 201/6
**past [2]** 168/19 187/3
**pattern [1]** 176/17
**Paul [5]** 29/24 91/14 101/14 101/15 101/16
**pause [2]** 68/17 137/4
**pay [10]** 13/15 13/17 174/16 179/7 182/18 183/3 183/14 215/11 215/25 217/16
**paycheck [2]** 175/17 175/18
**paying [1]** 132/9
**payments [2]** 64/12 175/24
**payroll [3]** 62/2 62/2 174/17
**PDF [9]** 59/22 126/5 126/13 236/10 237/8 239/13 240/3 240/8 254/1
**peas [1]** 228/19
**pending [2]** 250/16 265/18
**Penmegyian [1]** 203/5
**people [24]** 102/14 114/9 114/10 129/10 137/10 147/2 154/10 154/20 154/23 185/22 186/16 186/18 191/6 195/1 195/7 195/13 234/14 243/1 243/15 243/18 244/3 244/14 253/11 266/12
**people's [2]** 90/12 116/4
**perform [1]** 243/19
**performing [1]** 146/7
**perhaps [1]** 244/14
**period [11]** 20/5 63/25 87/1 92/3 107/17 107/19 117/20 152/5 161/11 161/25 196/18
**periods [1]** 20/5
**permit [1]** 234/4
**perpetuate [2]** 184/7 217/6
**person [22]** 65/9 67/11 109/17 114/21 130/7 159/15 177/16 183/22 185/19 188/15 197/8 197/20 207/25 214/22 214/23 214/24 218/17 219/7 221/13 222/23 231/17 247/20
**person's [1]** 119/25
**personal [11]** 10/20 11/4 11/7 11/21 12/9 13/2 13/21 14/8 100/14 172/17 179/6
**personally [8]** 72/4 151/15 155/21 155/22 158/15 244/10 255/21 268/25
**persuasive [4]** 215/14 216/4 218/10 238/24
**pertinent [4]** 147/14 170/12 256/15 260/14

**Peter [4]** 3/19 3/20 5/13
**ph [2]** 156/9 203/5
**phase [1]** 10/21
**phone [217]**
**phone-related [1]** 95/3
**phoned [1]** 189/18
**phones [191]**
**photo [15]** 108/16 108/17 110/15 110/23 142/11 144/2 144/2 144/6 144/7 144/8 152/16 156/18 157/13 213/5 213/5
**photograph [6]** 57/2 95/10 96/7 115/3 119/16 221/23
**photographs [14]** 97/13 108/13 151/19 203/22 203/25 204/3 204/14 210/1 211/22 226/23 239/16 239/20 239/22 269/9
**photos [66]** 90/2 90/11 96/21 96/22 96/25 97/6 97/18 97/20 97/20 98/3 98/5 98/11 99/8 99/10 99/18 100/7 100/11 100/11 101/4 101/12 102/3 104/6 106/19 107/5 107/20 109/8 110/10 112/4 112/14 117/5 117/7 117/9 117/11 117/12 117/14 117/20 117/23 118/3 118/23 139/12 139/17 139/19 139/22 140/10 152/11 152/17 152/18 152/21 153/1 154/11 154/24 154/25 155/1 155/8 156/12 156/21 156/21 156/25 157/8 157/14 158/10 189/13 207/9 240/12 240/15 240/18
**phrase [2]** 40/8 264/18
**phrased [2]** 140/15 266/13
**physical [10]** 178/6 184/16 185/17 185/18 196/12 198/4 210/2 212/5 213/14 214/7
**physically [1]** 155/19
**Piccadilly [5]** 131/18 221/11 221/25 222/15 223/18
**pick [4]** 150/13 191/8 192/8 274/12
**picked [1]** 106/19
**picture [14]** 56/24 57/14 108/13 108/18 108/20 109/5 115/13 115/15 115/17 141/1 208/3 237/14 238/2 259/6
**pictures [4]** 97/7 177/11 240/23 242/3
**piece [12]** 39/12 39/12 49/5 82/25 171/18 171/22 205/16 206/13 244/2 244/15 246/17 246/19
**pieces [7]** 89/24 97/18 116/6 116/8 116/22 141/15 190/24
**pique [1]** 206/2
**piqued [3]** 205/15 205/17 206/10
**place [14]** 113/22 129/22 130/3 132/4 142/1 249/15 250/12 250/13 250/15 250/20 251/16 251/18 251/24 252/11
**places [3]** 68/7 144/9 144/10
**plain [1]** 36/23
**PLAINTIFF [2]** 1/7 2/3
**plan [4]** 7/25 19/18 19/10 191/22
**planned [2]** 188/12 212/9
**planning [4]** 160/10 192/14 193/5 193/8
**plastic [1]** 8/16
**platform [4]** 28/18 38/20 38/20 38/21
**players [1]** 14/5

**playing [2]** 186/8 186/10
**plea [1]** 180/19
**plead [1]** 180/19
**pleadings [2]** 87/13 140/3
**please [17]** 5/8 8/20 13/17 18/11 98/10 102/18 149/2 167/24 229/3 232/8 232/11 237/18 251/10 257/20 264/15 266/7 268/7
**plus [4]** 123/6 144/13 184/15 184/15
**pod [1]** 228/19
**point [82]** 8/19 29/4 33/2 41/1 42/16 46/18 47/10 52/7 59/7 64/9 65/7 70/17 71/5 74/15 74/15 80/8 84/18 87/14 92/17 92/19 120/7 120/13 122/19 122/20 122/22 124/7 124/9 124/14 124/20 134/5 137/23 140/8 143/20 145/14 151/25 152/6 152/16 154/2 157/23 161/14 163/16 167/13 170/16 172/14 176/15 183/6 184/18 186/6 187/10 188/14 188/18 189/12 190/21 194/8 194/10 196/15 197/22 198/8 207/4 212/21 216/19 224/17 224/20 226/6 226/17 230/2 230/23 233/22 234/13 237/18 246/8 247/10 254/14 262/16 262/18 262/20 270/12 270/17 270/18 270/24 272/16 272/19
**pointed [4]** 8/20 19/22 231/22 270/9
**points [1]** 263/24
**Poonan [1]** 261/12
**populated [2]** 233/11 233/11
**portion [3]** 6/9 93/18 208/18
**portions [9]** 7/2 15/1 36/20 36/21 36/23 37/6 37/13 37/25 38/3
**position [9]** 7/12 8/6 17/21 24/21 25/2 101/23 101/24 101/24 263/7
**possessed [11]** 77/13 80/9 110/14 110/20 112/5 112/15 193/12 193/17 218/25 219/11 269/20
**possessing [1]** 220/23
**possession [32]** 57/15 77/2 77/17 77/20 78/24 79/3 79/5 79/11 79/23 80/2 80/5 102/15 108/24 109/12 155/17 178/6 184/15 185/18 195/17 196/19 197/10 198/1 210/3 215/20 216/6 216/25 217/3 218/8 220/16 238/19 241/23 242/5
**possessor [1]** 110/24
**possibility [6]** 186/7 186/10 186/12 229/19 229/23 230/8
**possible [14]** 63/22 70/16 91/11 91/13 92/7 96/8 114/21 118/21 163/21 169/23 191/16 237/16 238/3 264/5
**post [2]** 9/11 210/18
**postexposure [1]** 124/23
**postpone [1]** 274/22
**potential [8]** 70/17 82/4 109/16 195/2 227/14 228/7 252/13 252/18
**potentially [17]** 15/18 26/2 70/14 73/7 97/23 97/23 126/21 135/9 158/3 160/20 160/21 160/24 175/13 187/22 188/3 242/3 250/6
**powerful [2]** 212/1 212/5
**PPP [24]** 41/24 64/19 68/14 68/19 69/1 78/8 102/6 108/8

## P

PPP... [16]   172/11 175/20
  179/7 179/24 180/10 181/22
  182/2 182/16 182/24 192/11
  207/18 218/5 218/11 219/1
  219/12 219/22
PPP/EIDL [1]   102/6
practicing [2]   101/25 101/25
precaution [2]   209/20 209/21
preceded [1]   127/6
precise [2]   44/12 49/24
precisely [1]   35/8
predate [1]   15/24
predicated [1]   263/12
predict [1]   226/24
preference [1]   14/19
prehearing [1]   91/22
preliminary [1]   228/6
preparation [6]   37/9 42/2
  155/10 158/13 255/12 267/10
prepare [9]   15/8 104/1
  118/10 147/10 195/22 196/10
  196/11 235/22 265/23
prepared [15]   7/19 48/14
  51/9 51/17 87/13 113/20
  113/23 118/6 118/15 118/16
  118/24 119/3 119/6 158/8
  235/23
preparing [8]   71/7 71/8
  116/15 120/15 231/19 237/6
  260/10 267/11
presence [1]   136/1
present [7]   5/14 5/18 5/22
  17/25 227/11 227/24 274/24
presentation [10]   6/18 117/3
  118/10 118/16 118/16 227/6
  227/17 248/22 249/7 251/3
presented [5]   9/17 11/22
  12/9 56/22 123/5
presenting [2]   113/8 113/10
preserve [1]   7/14
PRESIDING [1]   1/4
presumably [1]   12/6
pretrial [3]   8/22 12/19
  126/23
pretty [3]   16/22 163/17
  274/14
preview [1]   15/17
previous [3]   164/1 176/10
  213/25
previously [4]   180/18 180/19
  193/5 208/4
primarily [1]   196/7
primary [2]   73/6 235/19
principal [3]   6/6 114/13
  247/9
prior [44]   9/8 18/3 26/1
  26/6 26/14 108/2 108/6
  110/23 111/19 112/3 112/13
  157/25 164/13 166/16 168/20
  169/21 174/10 175/3 176/3
  176/5 178/1 178/2 178/8
  179/16 180/7 180/22 180/24
  181/5 184/10 184/22 185/8
  185/21 186/4 188/5 201/8
  201/17 211/21 218/10 230/10
  233/18 233/24 233/24 245/4
  251/15
priorities [2]   161/6 161/8
prioritization [1]   163/6
prioritize [9]   161/16 164/3
  164/10 164/19 165/10 167/22
  167/24 168/16 169/6
prioritized [3]   162/7 165/18
  168/17
priority [2]   161/24 204/21
privilege [2]   160/25 160/25
privileged [4]   160/20 160/22

160/24 167/20
Proactive [1]   41/15
probable [15]   192/17 193/6
  193/22 193/24 194/9 194/25
  195/2 196/16 196/22 197/4
  197/20 197/23 198/21 199/16
  200/2
probably [2]   39/19 120/2
  150/9 198/12 222/22
probation [4]   255/14 255/16
  255/20 274/15
probative [2]   212/20 213/11
probe [1]   137/18
problem [4]   55/23 129/25
  227/23 230/19
problems [2]   230/9 230/11
procedural [4]   22/7 22/19
  23/12 23/16
procedurally [1]   261/24
proceed [1]   166/6
proceedings [4]   1/13 23/8
  275/5 276/6
proceeds [6]   13/15 182/6
  182/24 182/24 184/20 223/21
processers [1]   174/18
produce [12]   73/7 128/8
  128/10 128/13 128/16 160/7
  166/20 169/11 199/3 199/5
  199/9 202/6
produced [32]   70/15 72/13
  72/14 128/7 129/14 129/17
  129/19 130/6 130/9 130/12
  130/14 130/21 130/25 131/1
  131/3 133/4 133/19 166/21
  168/5 168/6 168/8 168/9
  169/14 169/20 169/21 169/23
  199/1 199/6 202/1 202/3
  202/4 205/13
producing [1]   160/10
product [1]   161/1
production [7]   15/6 136/3
  168/2 169/18 199/12 222/4
  223/12
productive [1]   19/20
profile [1]   156/9
program [1]   24/20
progress [1]   231/23
prohibits [1]   27/17
project [1]   146/13
projects [2]   226/21 234/2
projecttype30 [1]   47/5
prominent [1]   274/6
promise [1]   177/20
promulgated [1]   258/7
proof [1]   111/19
proper [2]   42/25 230/19
properly [2]   9/17 150/3
properties [3]   178/9 178/13
  179/1
property [3]   178/12 178/18
  179/3
propose [3]   6/24 274/16
  274/18
proposed [1]   269/3
proposition [1]   212/2
prosecution [48]   15/12 19/2
  20/18 22/18 72/5 81/14 81/16
  82/23 83/1 85/21 89/4 98/6
  98/10 98/23 99/8 101/12
  104/7 113/20 113/24 114/2
  114/8 114/23 119/25 137/10
  137/20 137/25 138/10 138/21
  141/20 142/4 156/22 160/22
  233/5 245/4 245/12 245/15
  246/7 246/14 246/16 246/22
  246/25 247/11 247/17 248/15
  249/20 259/22 259/24 261/25
prosecutor [13]   66/2 73/12
  109/14 120/8 134/23 164/18

171/2 216/5 217/4 218/14
  225/13 255/9 257/8
prosecutorial [2]   22/8
  209/23
prosecutors [14]   119/23
  125/1 136/11 136/19 171/3
  230/20 234/7 235/6 235/12
  247/2 249/21 258/7 259/13
  260/18
protect [1]   22/7
Protection [1]   88/25
protections [2]   26/17 27/14
prove [9]   65/21 66/1 66/3
  80/18 111/4 171/10 187/15
  216/19 231/1
proved [2]   111/5 126/18
proven [1]   224/17
provide [8]   25/18 30/6 31/12
  50/10 138/6 161/20 223/2
  255/13
provided [9]   18/5 50/23
  52/24 107/3 146/12 146/14
  200/15 237/2 255/19
pull [20]   28/2 28/23 43/15
  57/23 75/3 76/19 76/23 81/3
  90/19 93/22 95/23 99/15
  107/14 142/14 142/19 153/18
  159/24 239/11 245/22 253/25
pulled [2]   58/8 58/21
pulling [1]   156/8
purchase [2]   178/21 178/24
purchased [4]   173/9 178/14
  178/19 211/18
purchases [7]   172/24 172/25
  173/6 173/9 182/10 222/25
  223/17
purported [1]   111/7
purports [1]   47/18
purpose [16]   12/6 14/8 16/13
  23/7 64/5 88/13 88/15 102/22
  105/20 113/25 135/25 136/2
  147/2 187/19 187/20 190/4
purposes [7]   73/6 102/24
  103/7 103/8 161/4 164/15
  220/1
pursuant [1]   276/4
pursue [6]   104/17 105/11
  124/16 124/16 125/15 267/14
pursuing [1]   104/16
put [26]   23/9 30/8 33/15
  39/14 40/7 48/10 50/4 52/3
  75/10 75/21 87/24 111/9
  111/10 127/20 171/18 181/23
  189/12 214/11 215/16 216/11
  225/24 225/25 227/16 227/19
  248/9 252/3

## Q

QLA1B126 [1]   34/4
QLA1B126-RK [1]   34/4
qualifying [1]   130/20
quantified [1]   19/4
queried [1]   42/3
question [173]
questionable [1]   85/2
questioning [1]   44/17
questions [42]   7/17 7/20
  17/22 19/22 28/4 35/8 42/8
  44/14 44/24 46/3 55/3 55/3
  55/8 56/10 60/5 69/12 80/23
  81/21 107/19 125/4 137/18
  138/5 140/1 140/15 149/20
  161/22 170/9 170/12 176/2
  176/9 176/14 177/20 189/24
  231/22 254/24 259/10 269/23
  269/25 270/2 273/7 274/10
  275/3
quick [3]   161/22 236/8
  259/10

**Q**

**quickly [4]** 95/2 104/15
150/13 274/14
**quite [5]** 156/2 177/1 233/10
250/21 251/24
**quote [5]** 52/4 141/18 157/21
158/6 268/17
**quoting [1]** 120/5

**R**

**RA [4]** 142/11 144/2 144/5
144/13
**radar [2]** 260/7 262/17
**raise [1]** 274/13
**raised [7]** 23/3 262/3 262/15
263/6 263/15 263/18 264/19
**Ram [40]** 2/15 4/4 5/23 6/5
6/11 7/21 22/1 22/15 23/15
26/12 28/5 30/6 31/12 32/25
33/24 33/25 35/6 40/2 42/19
43/23 44/12 48/5 52/6 61/11
72/25 84/6 96/2 124/8 124/11
124/22 131/17 135/16 138/12
140/23 146/9 166/8 209/24
235/5 257/22 274/24
**Ram's [1]** 140/15
**ran [4]** 40/2 64/21 78/7
100/5
**RANEE [4]** 2/5 5/11 17/23
261/15
**ranks [1]** 261/15
**rather [2]** 143/19 198/5
**Ray [2]** 156/9 156/19
**re [1]** 96/5
**re-alleged [1]** 96/5
**reach [2]** 168/22 214/23
**reached [2]** 250/24 255/16
**read [11]** 30/5 34/20 52/8
57/24 61/23 126/1 126/9
127/9 149/18 151/16 248/12
**reading [1]** 52/2
**reads [1]** 236/18
**ready [3]** 122/11 123/25
248/13
**real [5]** 80/11 111/8 111/12
114/15 236/7
**realize [2]** 252/14 252/20
**realized [3]** 172/11 172/14
176/17
**really [22]** 11/3 16/8 16/11
44/12 46/2 64/2 69/4 69/9
74/5 84/9 85/16 88/3 150/13
171/22 172/14 188/12 210/20
215/7 239/1 244/18 269/24
273/21
**reason [25]** 9/6 13/11 25/8
25/21 25/24 29/15 29/17
42/15 42/17 65/23 65/24 67/5
88/8 144/14 169/10 174/3
174/11 174/12 218/1 222/19
226/22 228/17 241/18 250/3
250/9
**reasonable [2]** 171/11 214/23
**reasonably [2]** 12/8 13/20
**reasoning [1]** 249/25
**reasons [4]** 11/1 187/14
222/13 223/14
**rebuttal [3]** 241/5 241/8
267/13
**recall [86]** 38/10 40/11
40/11 41/6 47/19 47/22 49/5
53/7 53/21 54/3 54/5 54/9
54/10 54/18 56/25 62/23
63/18 72/9 72/9 73/23 74/10
79/13 85/16 85/17 93/8 93/21
95/21 96/4 96/5 118/5 128/21
133/18 158/9 159/5 162/23
168/15 169/23 175/2 191/15

201/3 209/18 225/4 225/10
215/7 225/7 225/22 230/10
234/16 236/4 237/5 238/6
238/8 239/18 240/17 240/20
240/21 241/4 243/7 243/25
245/14 247/15 247/18 248/15
248/19 248/24 249/1 249/8
249/13 249/15 249/16 249/17
249/18 249/19 249/21 249/23
249/25 250/23 251/4 253/24
254/9 262/21 263/21 264/8
264/19 267/8 268/19
**recalling [1]** 267/3
**recalls [3]** 11/7 12/17
246/18
**receipts [1]** 223/20
**receive [7]** 11/21 34/21 59/6
59/9 146/16 174/16 174/17
**received [65]** 11/11 12/4
19/12 29/5 30/12 32/9 32/9
32/13 33/3 33/5 36/13 36/4
36/4 36/7 40/20 43/13 43/16
44/6 45/18 59/10 67/2 75/1
75/4 75/7 76/10 84/11 84/16
84/19 84/23 86/4 87/17 109/7
117/1 117/5 129/23 130/1
139/1 139/1 146/2 146/17
147/6 147/19 147/23 149/23
152/21 156/21 156/22 157/3
169/25 170/6 179/23 187/6
187/11 190/22 200/21 200/24
201/4 201/7 203/23 204/3
204/14 211/10 239/8 239/16
268/8
**receiving [3]** 12/6 69/18
149/5
**recently [2]** 200/17 201/6
**recess [4]** 31/16 33/18 91/18
166/5
**recognize [9]** 29/25 47/4
47/5 54/24 57/6 60/12 205/8
236/12 272/6
**recognized [4]** 66/8 207/23
208/3 269/12
**recollect [1]** 49/3
**recollection [58]** 29/2 37/8
39/25 40/1 41/8 48/19 49/19
50/20 50/25 51/4 51/7 51/19
51/22 52/5 52/10 52/20 52/24
53/14 54/22 55/5 55/11 55/13
55/23 56/1 56/8 56/9 57/1
63/5 63/22 63/23 69/20 72/6
72/7 72/15 89/17 92/8 92/9
92/17 92/18 96/11 96/19
106/17 118/4 118/20 119/9
119/10 121/19 136/22 200/19
202/17 203/16 225/6 226/15
229/5 230/6 245/21 247/21
248/4
**recommend [3]** 119/24 265/3
265/14
**reconstruct [1]** 230/13
**record [31]** 7/6 9/12 11/19
15/16 18/13 24/2 24/19 25/7
34/17 35/17 44/16 45/9 84/22
84/24 86/8 86/16 91/20 95/23
98/19 99/20 125/21 133/16
134/13 148/13 166/24 176/1
210/15 222/25 232/15 232/16
257/21
**recording [1]** 198/7
**records [23]** 11/13 12/14
13/6 35/10 35/12 41/23 64/22
141/19 141/21 147/13 148/24
174/15 180/14 180/22 181/3
181/4 184/15 185/10 211/17
213/17 214/18 216/7 270/1
**recusal [2]** 230/1 230/16
**recuse [3]** 229/20 229/25

230/22
**recused [3]** 230/2 230/8
230/9
**Redondo [1]** 3/21
**reduce [1]** 94/14
**redundant [2]** 41/18 107/10
**reed [1]** 61/24
**refer [3]** 221/14 264/9
264/16
**reference [22]** 33/2 50/3
52/5 76/2 82/23 83/2 83/4
93/16 95/14 96/1 96/3 100/10
100/11 154/9 215/18 217/18
217/19 227/4 245/7 245/17
246/6 247/15
**referenced [14]** 11/2 11/3
11/9 83/13 83/15 83/17 95/10
121/10 151/19 153/23 155/11
156/20 239/14 267/2
**references [7]** 76/10 85/1
96/8 96/15 114/24 115/1
238/20
**referencing [4]** 69/22 72/22
85/3 188/16
**referred [12]** 34/8 40/13
40/14 49/20 58/8 86/9 131/21
184/13 223/8 223/10 236/22
264/12
**referring [27]** 27/23 36/1
50/17 50/24 52/11 54/20
61/19 87/3 96/21 102/4
102/21 121/13 133/12 133/17
136/13 136/15 141/25 145/4
150/5 152/5 155/8 216/3
217/24 226/11 242/13 265/24
271/11
**refers [1]** 216/17
**reflected [2]** 36/12 59/6
**reflex [1]** 209/5
**refresh [10]** 56/1 72/14
96/10 96/19 200/19 246/13
247/20 248/3 248/6 248/7
**refreshes [1]** 246/6
**refreshing [1]** 248/3
**regard [4]** 6/20 55/16 88/15
256/16
**regarding [12]** 6/4 7/12
22/19 55/4 79/15 112/16
225/3 234/1 237/16 261/25
262/15 263/12
**regardless [2]** 41/12 120/8
**register [2]** 62/2 62/3
**registered [7]** 45/13 45/25
46/9 66/17 67/14 67/17 203/8
**regularly [1]** 198/11
**regulated [1]** 22/25
**regulating [1]** 22/22
**regulations [1]** 276/8
**rejected [1]** 10/22
**relate [1]** 16/22
**related [40]** 10/11 10/12
10/19 10/25 11/13 19/1 91/5
95/3 101/8 104/6 113/21
125/9 129/2 157/14 178/20
178/24 180/22 180/24 199/5
199/14 200/2 218/16 233/5
233/12 233/14 234/9 234/19
234/20 235/7 236/2 237/4
250/2 250/6 250/25 251/17
251/19 251/20 252/1 252/8
253/20
**relates [2]** 33/7 44/15
**relating [6]** 41/10 42/22
44/18 74/8 112/10 112/16
**relation [4]** 99/9 203/11
220/15 249/16
**relationship [2]** 219/22
230/15
**relative [1]** 109/19

**R**

relayed [1]   189/3
release [5]   126/23 126/23
 167/22 167/25 169/6
released [7]   29/10 34/22
 36/8 36/11 50/22 52/22 53/16
relevance [5]   22/13 39/22
 46/4 129/8 259/3
relevant [32]   19/15 19/15
 88/21 97/14 97/21 97/22
 97/23 103/4 105/16 105/18
 106/7 106/9 109/18 109/22
 132/17 132/20 141/19 147/9
 147/12 171/9 175/13 175/17
 176/19 188/4 212/20 217/17
 217/20 217/21 217/23 224/9
 259/4 266/21
rely [2]   16/11 23/7
relying [3]   267/3 267/9
 267/20
remain [3]   10/4 14/13 256/13
remaining [2]   17/21 84/16
remember [49]   21/23 21/25
 29/1 30/2 37/6 37/13 37/25
 42/5 42/24 43/1 45/20 48/21
 49/14 49/15 49/23 51/9 52/16
 55/10 56/15 56/15 56/16
 73/23 74/7 74/22 77/5 85/18
 90/22 92/13 96/13 115/23
 117/19 117/23 117/25 118/2
 132/3 142/19 152/14 158/6
 163/3 182/25 194/10 194/11
 195/25 196/1 206/25 236/5
 240/22 261/13 263/15
remembers [1]   44/19
remind [2]   48/21 144/22
rented [1]   49/8
repeat [20]   13/22 20/20
 22/16 26/13 36/25 37/21
 45/23 53/9 66/11 84/5 110/22
 123/8 154/15 234/10 242/21
 249/5 252/15 264/1 264/15
 268/7
repeatedly [2]   271/20 271/22
repetitive [1]   232/5
rephrase [1]   265/1
reply [5]   34/14 70/21 82/17
 121/20 258/19
report [51]   19/13 28/15
 28/17 32/14 33/7 38/19 38/25
 39/16 42/3 43/13 43/16 44/18
 46/20 46/22 47/21 47/24
 49/12 69/19 70/1 75/12 168/5
 168/10 169/19 174/1 200/20
 200/23 201/4 201/7 201/9
 201/17 201/21 201/23 202/10
 202/21 202/22 203/13 236/7
 236/13 236/17 236/24 237/5
 237/11 238/6 238/8 239/14
 241/21 241/24 246/23 268/19
 268/23 268/23
reported [2]   142/6 276/6
reporter [3]   1/20 165/24
 232/9
REPORTER'S [1]   1/13
reports [61]   24/15 24/17
 29/6 30/12 30/17 30/19 32/11
 33/3 35/13 35/25 36/4 36/9
 36/18 36/19 36/24 37/4 37/7
 37/14 43/6 48/8 48/22 49/2
 50/21 52/21 53/15 56/21
 70/14 73/1 73/6 73/10 85/23
 86/1 86/5 86/10 86/14 86/19
 86/21 87/1 129/17 130/22
 155/22 173/25 225/5 225/11
 225/14 235/23 236/1 236/5
 237/1 237/10 238/10 238/11
 242/20 242/23 243/5 243/23

 243/24 244/25 268/9 268/15
 268/18
represent [8]   28/11 28/13
 30/22 44/5 47/13 115/13
 132/10 153/20
representation [7]   58/11
 58/18 60/8 66/23 67/1 67/13
 155/3
represented [6]   30/16 30/18
 59/18 77/4 132/7 132/8
representing [8]   9/3 45/5
 45/16 46/19 58/10 66/21
 67/22 77/7
represents [1]   257/25
request [8]   87/21 142/25
 159/22 159/22 163/6 167/10
 169/15 170/3
requested [1]   146/8
requesting [1]   164/3
requests [1]   91/22
required [2]   9/11 10/4
requirement [2]   119/23 120/4
requires [1]   194/6
resided [1]   23/25
residence [1]   77/24
resolution [1]   250/23
Resource [9]   257/12 257/14
 258/1 264/10 264/17 264/18
 264/21 273/18 273/22
respect [15]   21/7 23/5 70/17
 96/6 97/21 106/24 129/3
 135/4 152/20 152/21 152/23
 157/9 168/4 169/17 171/24
respectively [1]   13/9
respects [1]   171/22
respond [3]   12/13 235/17
 269/14
responded [3]   6/21 265/19
 265/21
responding [2]   105/8 236/14
response [7]   49/17 62/1
 99/25 121/18 123/24 266/17
 272/23
responses [1]   235/22
responsibilities [1]   235/2
responsible [2]   158/24
 187/16
rest [4]   7/18 98/9 117/21
 173/3
restate [1]   53/3
restricted [1]   147/5
restrictions [2]   26/1 125/9
result [9]   41/14 101/11
 141/17 145/24 151/8 152/10
 249/3 249/10 252/4
resulted [1]   146/15
results [2]   40/3 40/6
retailers [2]   221/24 221/25
rethink [1]   26/24
retrospectively [1]   230/25
return [1]   91/25
returned [3]   79/19 83/16
 106/15
revealed [4]   41/1 236/19
 237/13 237/25
review [58]   8/13 28/24 29/6
 30/21 32/10 36/19 37/8 37/22
 37/23 38/3 39/4 45/2 52/13
 53/5 53/17 70/11 73/1 73/17
 73/24 74/7 85/6 85/15 96/25
 106/20 112/3 112/13 117/2
 117/9 117/12 117/16 117/18
 139/11 149/11 149/20 150/18
 150/21 153/1 160/19 161/4
 162/20 164/3 167/18 201/25
 204/22 207/14 207/25 225/3
 225/13 233/2 240/4 243/23
 244/3 244/10 244/14 244/18
 258/19 267/21 274/8

reviewed [99]   23/6 23/18
 36/21 36/23 37/3 37/6 37/14
 38/1 38/12 38/14 41/13 43/5
 43/19 45/7 46/14 46/21 47/23
 49/1 49/11 51/5 51/20 53/20
 54/7 54/16 59/15 59/25 60/2
 62/14 63/8 63/17 76/4 85/7
 85/11 85/12 86/11 86/13
 86/18 86/19 86/22 97/10
 101/4 111/20 113/24 114/4
 114/7 118/22 123/5 141/15
 142/21 146/18 151/13 151/15
 153/9 153/10 153/12 153/16
 156/25 158/12 158/14 225/11
 228/21 234/8 235/23 236/13
 236/17 237/5 238/10 238/11
 239/7 239/14 239/20 240/21
 241/21 241/24 242/3 244/5
 244/8 245/1 245/4 245/13
 245/24 246/3 246/5 246/7
 246/20 247/17 254/4 258/16
 260/14 263/14 268/13 268/14
 268/15 269/3
reviewing [23]   21/5 38/4
 38/10 45/20 45/24 48/22
 50/21 52/20 53/14 77/6 92/3
 92/6 108/14 110/18 117/7
 117/11 118/5 118/21 225/4
 238/6 247/11 254/18 267/8
revisit [2]   88/14 88/17
rich [4]   60/18 60/22 215/9
 217/15
Richard [85]   1/9 5/7 5/24
 9/5 13/8 14/2 28/7 47/14
 57/2 57/6 64/7 65/10 65/22
 66/16 67/24 68/3 68/13 68/18
 68/24 69/11 69/16 70/2 75/17
 76/3 76/7 76/11 77/2 77/11
 77/17 77/20 78/9 78/15 78/18
 78/23 79/10 79/23 80/9 80/14
 87/22 88/9 102/6 102/14
 108/24 109/12 110/20 110/25
 111/11 111/15 111/21 111/22
 112/4 112/15 132/15 135/20
 157/18 167/8 169/7 172/11
 175/22 177/22 178/10 178/14
 178/19 179/2 179/10 182/1
 184/1 185/24 185/25 186/12
 187/16 187/25 204/16 214/21
 220/6 220/20 238/19 241/11
 241/23 242/4 242/9 245/10
 255/6 268/9 269/20
Richard's [1]   172/15
right [284]
ring [12]   102/4 102/5 102/6
 102/8 102/12 103/1 104/23
 105/3 105/6 105/23 126/18
 126/22
risk [4]   121/6 228/2 228/3
 229/24
RK [1]   34/4
road [3]   3/12 209/7 227/12
Robinson [14]   145/8 146/5
 146/10 146/14 146/17 146/22
 147/4 147/7 147/8 147/19
 147/23 148/15 149/8 149/17
role [6]   18/7 75/17 142/4
 147/4 212/16 235/17
roughly [4]   18/22 92/4 117/2
 159/4
routed [2]   13/25 19/13
routinely [1]   255/13
RPR [1]   276/12
rule [6]   7/7 10/12 10/13
 15/14 186/12 274/17
ruled [4]   144/21 183/25
 186/7 186/10
ruling [1]   250/15

**R**

**rulings [1]**  15/13
**run [3]**  64/17 225/25 226/1
**running [1]**  225/19
**Runyan [8]**  13/25 182/15
182/17 182/20 182/24 183/3
183/13 213/22
**Rush [2]**  114/14 195/4
**Ryan [4]**  3/7 6/1 114/11
228/21

**S**

**S drive [1]**  24/8
**S-C-O-T-T [1]**  232/17
**safeguards [4]**  22/7 22/19
23/12 23/16
**said [74]**  11/18 13/6 19/21
20/8 25/14 29/9 37/3 38/19
42/24 49/1 55/4 55/17 68/17
70/19 70/20 70/22 71/1 71/4
76/17 79/18 79/20 81/5 106/7
107/21 116/22 118/13 123/14
131/14 132/19 132/24 133/3
133/22 133/24 141/17 143/16
145/16 146/20 151/4 152/24
155/1 157/22 158/1 162/16
165/17 166/23 167/23 168/25
169/1 169/2 173/9 174/1
176/5 183/25 184/25 190/3
194/13 208/19 209/1 213/19
214/11 235/16 238/12 241/9
241/15 241/19 242/15 242/17
242/22 248/3 248/21 252/17
254/4 264/3 274/25
**same [41]**  7/20 8/6 15/23
15/25 43/14 62/5 65/17 79/19
92/6 95/3 99/12 99/23 102/2
103/1 103/24 107/12 116/1
119/2 119/18 119/19 135/13
145/7 148/21 150/2 150/7
166/13 170/11 177/23 184/13
192/21 192/25 193/1 193/2
193/3 193/4 205/5 208/3
240/11 240/22 246/19 246/20
**San [2]**  2/20 3/6
**Santa [1]**  3/15
**sat [1]**  52/15
**satisfactory [1]**  17/20
**save [1]**  142/16
**saw [61]**  41/14 47/11 48/17
49/11 49/16 51/1 51/8 51/10
52/11 52/17 52/25 55/14 56/3
62/14 62/22 66/15 74/21
75/13 75/17 77/15 109/10
157/13 157/16 162/23 163/1
166/14 172/23 174/19 174/19
175/20 177/9 177/10 177/13
177/14 178/20 179/8 179/9
182/2 204/25 207/23 208/3
220/5 221/1 221/13 221/15
221/17 221/23 222/10 225/6
225/15 227/14 236/18 239/22
241/21 242/2 245/12 246/12
246/16 247/13 247/19 263/18
**say [78]**  7/1 7/5 12/24 13/22
19/25 27/23 41/9 50/20 51/6
51/18 51/21 52/4 52/9 53/21
54/19 55/21 69/6 70/10 71/22
73/9 75/15 81/20 82/9 84/15
85/7 92/24 93/12 96/22
102/18 104/9 106/18 111/24
112/13 113/1 114/23 115/21
116/16 116/17 118/13 118/24
118/25 121/25 128/24 130/19
130/23 136/15 145/4 145/21
161/2 164/6 164/13 168/23
173/16 176/7 176/8 176/13
182/2 182/12 184/3 190/17

**saying [52]**  21/15 42/5 45/14
49/20 49/22 52/4 52/14 53/4
53/6 55/23 56/2 56/11 58/17
62/7 62/24 64/14 69/6 71/16
71/18 92/13 98/10 122/17
125/5 130/25 132/5 139/8
139/21 140/21 140/24 140/25
144/8 144/14 146/11 148/6
168/11 182/23 189/1 190/12
194/16 196/23 208/2 210/20
210/21 212/22 213/17 215/13
231/3 248/16 249/2 249/8
250/20 251/4
**says [35]**  13/15 32/1 53/10
53/11 53/13 60/18 60/21
67/23 74/14 81/24 82/25 83/3
93/19 94/7 100/5 123/11
139/10 139/14 141/23 142/9
144/4 150/4 163/18 164/1
205/21 215/11 217/12 217/15
221/10 230/17 237/12 258/2
258/5 272/16 272/19
**scene [1]**  58/5
**schedule [1]**  234/4
**scheduled [3]**  255/7 255/10
274/14
**scheduling [3]**  234/1 234/3
261/24
**scheme [4]**  78/8 113/3 179/20
180/10
**school [1]**  101/22
**scope [3]**  88/1 88/5 199/11
**SCOTT [3]**  2/7 4/6 232/17
**scratch [2]**  57/8 78/4
**screen [20]**  30/8 31/3 35/20
43/25 50/4 50/6 68/1 74/6
75/16 75/22 82/11 82/22
93/22 94/4 138/8 139/1
145/10 203/20 264/13 272/3
**screens [3]**  31/15 33/14
33/18
**script [6]**  118/18 118/21
118/23 119/4 119/8 119/10
**scroll [10]**  61/15 62/5 99/23
100/16 101/13 109/2 145/5
163/10 163/10 164/2
**se [1]**  256/24
**search [41]**  39/3 39/6 39/17
39/21 40/6 40/10 41/14 47/20
48/10 48/15 73/17 77/23 95/2
95/3 95/9 95/14 95/25 96/2
96/15 122/2 122/7 123/1
123/18 123/21 161/10 190/15
196/11 198/4 198/6 198/7
206/19 225/19 225/22 225/23
225/25 226/1 233/16 233/17
234/25 245/20 248/18
**searched [5]**  39/15 41/9 42/4
42/20 144/11
**searches [3]**  64/17 64/21
235/7
**searching [2]**  41/8 268/14
**seated [2]**  18/11 232/11
**seating [1]**  91/21
**second [22]**  12/5 15/6 37/24
52/3 61/15 75/22 76/21 95/17
137/15 137/19 163/8 163/12
163/14 163/14 191/24 194/24
201/13 220/21 226/3 235/9
240/3 248/12
**seconds [1]**  33/14
**secret [2]**  128/12 128/18
**section [6]**  23/23 114/11
114/13 197/5 238/8 276/4

**Security [8]**  100/6 112/5
209/2 209/11 211/22 211/24
211/24 212/19
**see [97]**  6/12 7/8 7/20 17/3
29/12 31/7 31/25 32/15 32/17
33/22 39/15 39/16 46/21
49/13 49/21 51/2 51/12 52/5
54/17 55/2 55/11 55/24 60/23
60/25 62/18 62/24 66/13
72/14 74/13 75/16 76/25
82/22 82/24 94/11 96/10
96/18 100/8 102/19 103/21
104/3 105/19 105/22 112/20
119/5 126/3 126/6 139/12
140/11 142/12 143/1 145/10
148/21 148/23 148/25 149/5
151/21 151/23 152/2 152/8
153/6 155/10 163/20 164/11
167/21 174/15 175/17 176/22
178/8 181/19 182/15 186/23
190/4 202/7 203/19 205/21
208/24 215/13 217/20 224/24
226/1 228/8 237/11 237/17
238/4 241/9 242/7 246/6
246/10 247/13 257/19 257/23
257/25 258/4 267/5 272/14
272/24 273/2
**seeing [27]**  47/19 47/22 49/5
49/14 49/19 49/23 54/3 54/9
54/10 54/18 56/16 56/25 57/1
62/23 63/18 79/13 110/6
110/23 117/25 118/2 183/8
238/16 240/21 247/10 248/19
267/3 267/8
**seek [3]**  135/25 196/22
199/15
**seeking [3]**  18/3 68/11 132/2
**seem [4]**  55/3 69/25 264/23
274/5
**seemed [3]**  56/6 176/25
197/24
**seems [2]**  120/8 270/1
**seen [25]**  41/23 42/21 43/22
47/2 48/16 54/22 54/25 55/17
55/20 56/12 57/8 66/24 108/2
108/6 108/8 142/15 207/24
208/7 208/13 209/12 226/23
240/18 247/24 258/14 258/25
**segment [2]**  84/7 84/8
**segregate [1]**  23/13
**segregated [1]**  23/6
**seized [35]**  28/6 77/9 78/2
79/10 82/1 82/24 115/22
116/1 120/17 120/20 122/6
122/25 123/15 185/19 190/7
190/15 204/16 205/2 206/11
206/21 208/20 209/6 209/10
209/13 209/16 209/17 210/7
216/21 222/11 227/5 227/24
234/9 234/20 243/24 267/8
**select [1]**  208/1
**selected [2]**  268/25 271/12
**selecting [2]**  271/5 271/8
**selection [2]**  158/18 208/2
**self [1]**  16/9
**self-serving [1]**  16/9
**selfie [3]**  57/10 57/16 57/19
**send [5]**  13/16 60/18 60/22
62/7 148/2
**sending [4]**  68/24 69/8
101/11 149/16
**sends [1]**  99/18
**sense [5]**  43/11 78/3 101/21
129/21 164/18
**sent [28]**  13/24 47/16 63/3
92/20 93/1 106/11 143/13
146/21 147/1 147/1 147/20
147/23 147/25 148/5 148/5
152/6 163/2 164/2 166/13

**s**

**sent...** **[9]** 166/16 166/25 198/20 199/15 199/23 202/22 272/5 272/6 272/23

**sentence** **[4]** 51/21 126/3 248/16 272/9

**sentencing** **[13]** 53/4 255/6 255/12 255/23 256/2 256/9 256/13 256/17 256/20 257/9 274/14 274/16 274/19

**separate** **[6]** 12/5 13/24 78/8 79/1 240/17 272/12

**September** **[4]** 64/18 255/10 274/20 274/21

**September 13th** **[1]** 255/10

**series** **[4]** 11/24 13/13 13/25 73/19

**served** **[1]** 64/21

**Service** **[4]** 14/1 182/15 182/17 182/20

**Services** **[1]** 145/11

**serving** **[1]** 16/9

**set** **[6]** 96/4 147/10 147/17 160/21 167/4 240/15

**sets** **[2]** 152/17 236/5

**setting** **[2]** 213/14 230/5

**seven** **[2]** 140/18 145/21

**several** **[9]** 21/4 42/7 85/11 151/7 186/18 197/16 198/13 209/22 233/15

**shadow** **[1]** 87/9

**share** **[21]** 89/6 98/14 98/15 107/15 115/12 119/7 119/8 129/1 147/3 147/12 233/4 233/8 233/20 234/5 234/12 234/18 234/22 234/23 234/24 235/10 243/2

**shared** **[28]** 23/22 23/23 89/4 89/7 89/8 89/10 89/13 89/14 89/25 98/6 99/7 100/12 100/25 101/5 104/7 129/5 130/4 138/9 145/3 145/7 146/5 146/6 148/14 190/9 244/4 244/15 245/1 253/12

**sharing** **[4]** 119/9 138/21 139/7 147/7

**she** **[90]** 17/10 17/12 17/12 40/12 40/14 41/4 41/7 62/8 101/18 101/19 101/21 101/21 101/24 101/25 119/25 146/15 147/4 147/9 147/15 147/17 150/17 171/25 172/2 172/2 172/5 172/7 173/19 173/23 174/2 174/3 174/5 174/8 174/11 174/12 174/21 175/6 175/9 175/10 175/14 175/14 175/16 175/16 175/17 175/18 177/14 179/5 179/10 179/13 179/23 180/4 185/4 186/16 186/18 192/22 193/18 194/14 200/10 200/13 200/15 200/17 201/5 202/19 205/18 211/14 212/18 213/11 214/4 214/8 214/11 214/16 214/24 214/24 215/5 215/15 215/16 216/5 216/12 216/13 216/23 216/24 217/2 217/8 217/14 217/14 217/25 219/4 219/7 219/10 261/15 261/17

**shorten** **[1]** 244/22

**shorthand** **[1]** 27/24

**shortly** **[4]** 204/6 221/17 233/3 261/13

**should** **[23]** 12/21 32/2 35/14 42/9 44/15 65/5 92/14 93/22 104/9 104/14 119/24 141/24 142/9 144/14 157/12 166/2 210/22 231/22 246/2 252/7

**shouldn...** **[9]** 20/1 100/24 249/9 251/5 251/12 251/25

**show** **[24]** 8/11 31/5 31/6 31/12 35/10 35/12 47/18 58/4 86/6 86/9 86/13 93/23 95/21 111/5 140/6 150/22 189/25 196/11 214/18 246/9 247/25 257/16 271/23 272/1

**showed** **[8]** 78/24 92/21 156/13 156/18 195/12 195/16 200/20 213/5

**showing** **[8]** 8/8 36/11 58/15 63/2 215/7 247/12 264/12 267/6

**shown** **[2]** 56/3 69/15

**shows** **[6]** 11/20 14/3 84/24 86/4 86/17 166/25

**sic** **[2]** 55/6 154/22

**side** **[10]** 17/16 75/10 75/10 75/11 75/11 75/14 75/14 163/4 164/20 237/23

**side-by-side** **[3]** 75/10 75/11 75/14

**sides** **[1]** 9/23

**sifted** **[1]** 8/21

**significance** **[8]** 47/8 57/9 57/12 105/17 106/2 106/4 106/10 113/2

**significant** **[9]** 19/25 65/21 80/8 80/17 81/1 81/5 109/15 124/13 135/2

**Silverman** **[2]** 2/21 5/25

**similar** **[5]** 74/9 74/19 208/7 240/14 240/23

**Similarly** **[1]** 155/7

**simple** **[5]** 26/20 45/19 53/17 69/4 105/24

**simply** **[2]** 21/23 25/21

**since** **[7]** 10/1 10/2 18/20 31/3 154/3 170/24 256/22

**single** **[5]** 13/18 53/18 54/10 82/25 149/9

**sir** **[15]** 34/6 35/7 41/3 47/2 49/16 54/25 61/5 69/5 71/1 126/12 131/11 132/18 150/24 191/22 273/8

**sister** **[3]** 202/20 203/10 203/12

**sit** **[15]** 37/5 37/25 42/1 45/20 49/10 51/8 51/16 54/8 54/24 57/5 63/17 95/24 96/13 172/3 262/23

**site** **[1]** 23/23

**sits** **[1]** 256/16

**sitting** **[1]** 9/7

**situation** **[2]** 230/24 264/24

**six** **[3]** 140/20 140/25 270/21

**six-and-a-half** **[1]** 270/21

**skip** **[1]** 73/20

**Skipping** **[1]** 205/7

**sloppiness** **[2]** 241/10 241/11

**small** **[2]** 152/13 241/3

**so** **[390]**

**Social** **[8]** 100/6 112/5 112/6 112/19 142/17 207/16 211/24 212/19

**software** **[2]** 24/17 28/17

**some** **[93]** 6/23 8/8 15/20 19/6 28/21 28/22 33/11 33/11 35/14 36/21 39/6 44/24 54/13 56/7 59/7 65/6 65/17 69/15 73/13 73/15 76/11 81/21 81/21 83/19 84/18 85/13 87/4 87/18 89/3 91/11 91/13 92/17 92/19 94/9 97/21 100/22 101/1 101/7 106/9 107/3 112/9 115/1 116/1 140/21 140/22 145/3 145/4 145/7

**145/9 145/14 145/16 145/17 151/9 151/11 152/6 153/3 156/16 157/16 157/23 159/17 161/20 167/18 171/22 176/2 176/9 178/20 190/8 194/6 197/12 197/14 198/8 198/20 200/10 204/9 210/19 222/24 228/4 230/9 233/13 243/19 254/14 262/18 262/20 263/18 265/14 265/16 270/7 274/17 274/18**

**somebody** **[8]** 38/5 111/13 157/22 173/14 173/17 174/15 203/5 254/20

**somehow** **[1]** 228/10

**someone** **[7]** 57/10 98/18 120/10 185/14 208/21 215/9 224/20

**something** **[40]** 8/3 9/16 27/10 33/9 40/12 42/21 56/14 56/15 65/14 65/15 69/22 88/21 92/14 93/19 119/15 126/10 135/1 136/8 157/22 175/19 176/19 188/12 197/4 198/3 200/18 203/1 208/6 210/16 214/19 224/8 241/15 243/20 245/12 246/13 251/6 253/22 264/20 269/24 270/6 270/22

**sometime** **[2]** 89/22 189/7

**sometimes** **[2]** 85/19 98/16

**somewhere** **[1]** 209/4

**soon** **[6]** 70/16 142/10 157/2 168/10 190/6 220/3

**sooner** **[1]** 198/5

**sorry** **[51]** 6/13 20/3 20/20 33/23 34/6 35/7 37/11 45/12 45/23 48/23 51/20 52/1 53/9 54/5 61/3 61/5 62/6 66/11 69/4 81/11 97/3 100/4 110/22 112/8 118/14 126/7 126/16 130/25 132/18 142/2 143/25 145/3 146/24 147/6 150/24 159/8 159/22 162/10 163/10 163/11 174/7 192/6 194/4 202/2 211/7 219/4 219/18 221/20 250/4 250/8 257/7

**sort** **[4]** 24/15 210/19 222/25 243/19

**sought** **[1]** 152/7

**sound** **[2]** 55/21 55/22

**sounds** **[2]** 84/21 126/10

**source** **[3]** 107/24 142/23 156/17

**sources** **[3]** 15/22 145/25 174/20

**space** **[2]** 23/22 23/24

**speak** **[7]** 7/2 92/5 114/9 136/21 136/21 206/8 261/19

**speaking** **[5]** 5/15 17/24 112/25 116/11 260/18

**speaks** **[3]** 52/18 93/15 154/13

**Spear** **[1]** 2/20

**Special** **[15]** 11/25 87/24 89/8 89/22 113/16 139/20 142/3 151/22 152/9 152/24 163/2 187/11 189/8 191/10 195/24

**specific** **[47]** 22/21 36/1 39/25 41/8 42/6 48/19 48/21 49/18 50/25 51/7 51/22 52/5 52/10 52/24 55/5 56/8 63/21 63/23 68/18 72/10 79/22 86/24 92/7 92/16 93/10 96/5 100/24 113/3 114/5 116/6 118/4 118/15 137/18 146/13 147/2 147/2 179/25 180/6

**S**

**specific...** **[9]** 180/11
187/19 194/10 203/16 209/25
223/8 225/5 232/4 260/17
**specifically** **[34]** 7/10 38/10
49/3 52/6 53/21 55/10 63/18
70/4 73/23 74/21 76/1 78/18
84/19 94/4 95/9 96/9 97/9
100/4 115/2 121/10 132/2
133/2 133/18 157/16 158/9
159/6 163/18 171/25 179/22
189/20 223/10 230/6 249/19
249/24
**specify** **[3]** 27/25 209/3
210/13
**speculate** **[1]** 247/23
**speculation** **[3]** 42/23 231/11
244/20
**speed** **[1]** 239/6
**spell** **[1]** 18/12
**spend** **[3]** 35/18 117/10
184/14
**spending** **[2]** 179/24 226/20
**spent** **[9]** 11/13 117/7 174/20
174/21 176/23 178/4 184/20
219/15 220/10
**Spertas** **[11]** 132/8 132/10
132/10 132/12 132/20 133/10
133/13 133/19 134/9 223/1
223/7
**spoke** **[10]** 11/8 135/7 135/9
135/22 229/8 229/10 229/11
233/25 264/9 265/2
**spoken** **[3]** 132/14 132/15
135/4
**spousal** **[1]** 160/24
**Spring** **[1]** 2/7
**stage** **[2]** 238/21 239/1
**stake** **[1]** 136/7
**stamp** **[1]** 166/18
**stand** **[3]** 12/20 94/6 232/9
**standard** **[2]** 27/17 27/17
**standards** **[1]** 27/18
**standing** **[3]** 9/4 117/23
118/4
**stands** **[1]** 48/19
**start** **[11]** 19/7 22/22 114/7
137/1 149/3 149/6 159/2
176/14 230/24 236/11 251/11
**started** **[8]** 10/14 72/21
103/13 118/12 159/8 192/17
195/1 195/20
**starting** **[3]** 196/10 196/11
204/25
**state** **[4]** 5/8 18/12 119/15
232/16
**stated** **[4]** 14/8 41/12 245/3
262/3
**statement** **[7]** 82/22 83/8
119/20 122/9 210/19 236/18
246/17
**statements** **[14]** 8/12 15/4
16/3 16/4 16/7 16/21 82/3
200/4 200/7 200/10 209/24
236/2 238/16 268/4
**states** **[11]** 1/1 1/4 1/6 2/3
5/6 49/18 236/24 255/13
255/19 276/5 276/9
**stating** **[1]** 61/22
**stenographically** **[1]** 276/6
**step** **[8]** 79/13 79/13 108/11
187/18 187/19 187/21 231/14
232/8
**STEPHEN** **[1]** 1/3
**stepping** **[1]** 103/2
**steps** **[3]** 254/18 258/4
258/17
**Steptoe** **[3]** 2/16 2/19 2/22

**still** **[9]** 21/13 68/9 104/22
147/8 172/10 172/10 172/24
223/17 225/13
**stole** **[1]** 21/17
**stolen** **[6]** 13/15 172/11
175/20 179/7 179/24 182/8
**stood** **[3]** 49/2 118/3 218/3
**stop** **[18]** 87/17 88/9 163/13
171/15 173/2 174/10 174/22
176/2 177/4 180/15 187/14
188/5 188/19 193/11 200/4
235/24 236/2 260/12
**stopped** **[5]** 21/1 87/23 88/4
186/24 211/14
**stops** **[1]** 237/2
**Stout** **[12]** 146/6 146/9
146/21 146/23 146/24 147/5
147/6 147/20 147/24 148/6
148/14 149/15
**straight** **[4]** 189/13 189/18
190/13 271/4
**straightforward** **[3]** 69/24
81/21 81/22
**strategically** **[1]** 17/13
**strategy** **[5]** 16/5 21/19 23/8
23/9 65/6
**stratosphere** **[1]** 22/3
**streamlined** **[2]** 90/21 161/21
**Street** **[5]** 1/21 2/7 2/16 3/8
142/25
**strike** **[5]** 14/25 15/5 51/20
125/19 252/10
**string** **[1]** 215/8
**stronger** **[1]** 224/20
**stub** **[1]** 174/16
**stuff** **[3]** 57/18 176/5 235/12
**subject** **[13]** 8/23 25/25 26/2
26/16 27/14 60/17 134/7
186/6 209/22 216/5 236/20
236/22 268/17
**subjects** **[3]** 39/7 102/23
175/13
**submission** **[3]** 107/16 228/22
239/12
**submit** **[1]** 9/22
**submitted** **[12]** 8/2 15/7
15/10 57/25 86/3 128/2 128/6
196/13 219/7 228/22 254/3
258/20
**submitting** **[3]** 68/11 68/20
69/2
**subpoena** **[7]** 79/18 127/24
128/1 128/4 128/8 128/10
141/18
**subpoenaed** **[5]** 75/6 106/15
221/21 221/23 222/3
**subpoenaing** **[1]** 141/20
**subpoenas** **[12]** 21/5 64/21
104/1 104/10 104/22 105/18
106/13 127/11 127/14 127/17
127/21 132/3
**subscriber** **[1]** 41/23
**subsequently** **[1]** 253/19
**substance** **[5]** 41/20 74/6
107/11 168/24 200/7
**substantive** **[1]** 199/25
**success** **[2]** 28/22 28/22
**such** **[4]** 21/16 23/3 24/23
267/9
**sufficiency** **[1]** 171/12
**sufficient** **[3]** 120/2 171/7
171/14
**suggest** **[3]** 14/14 14/21
16/17
**suggested** **[3]** 157/12 191/3
209/8
**suggesting** **[7]** 51/11 52/13
143/6 143/7 143/11 192/22
193/18

**suggestion** **[1]** 14/22
**suite** **[9]** 2/4 2/8 2/14 2/17 3/5
3/8 3/13 3/16 3/21
**sum** **[1]** 74/6
**summaries** **[1]** 130/2
**summarize** **[1]** 230/22
**summary** **[6]** 145/8 146/2
146/15 147/10 233/7 247/19
**summation** **[2]** 241/5 241/9
**SUN** **[1]** 2/6
**Sunday** **[1]** 102/2
**superceding** **[2]** 220/21 251/3
**supersede** **[1]** 71/7
**superseded** **[1]** 71/10
**superseding** **[13]** 71/12 71/22
72/22 81/14 127/4 127/7
227/3 227/6 245/5 249/8
250/13 251/17 252/17
**supervisor** **[7]** 229/10 261/10
262/19 262/25 262/25 263/20
263/22
**supervisors** **[16]** 115/12
194/18 197/2 198/24 199/15
229/9 233/25 262/7 262/21
263/24 264/9 264/11 264/16
264/23 265/2 265/13
**supervisory** **[2]** 114/1 264/6
**support** **[2]** 128/16 171/5
**supported** **[1]** 12/10
**supports** **[3]** 13/20 16/8
46/25
**supposed** **[1]** 137/17
**suppress** **[13]** 121/4 121/14
235/6 235/8 235/17 235/23
250/16 260/9 260/11 262/5
263/13 267/22 271/13
**suppressed** **[16]** 24/11 65/15
120/25 122/5 157/25 158/2
166/9 169/12 213/6 227/22
250/17 256/8 256/23 269/16
269/18 270/15
**suppression** **[5]** 88/15 88/18
236/14 262/1 269/1
**sure** **[70]** 22/17 22/22 23/17
25/3 26/14 29/10 31/10 37/22
45/24 66/13 68/23 75/21
80/14 86/25 96/14 100/25
102/24 109/22 114/7 123/9
134/21 149/22 150/12 154/16
155/17 161/13 161/23 167/13
176/1 182/14 207/8 210/4
219/21 234/11 238/22 239/3
240/12 242/12 242/12 243/17
244/5 244/12 244/23 247/8
247/22 247/24 250/12 250/19
250/21 251/11 251/24 252/9
253/15 253/15 254/1 256/6
257/13 258/15 259/8 259/23
260/8 262/14 262/14 263/8
265/4 265/10 267/1 271/15
271/22 273/21
**surprise** **[3]** 65/17 159/25
258/22
**surprised** **[6]** 160/2 195/6
223/1 223/3 259/2 259/4
**surveillance** **[1]** 203/7
**Susanna** **[1]** 208/23
**suspended** **[1]** 127/1
**suspicious** **[1]** 19/12
**sustained** **[2]** 144/25 210/25
**SVW** **[2]** 1/8 5/6
**sworn** **[2]** 18/10 232/10
**system** **[2]** 98/19 243/1

**T**

**table** **[6]** 9/7 14/17 17/10
17/19 17/25 91/12
**taint** **[2]** 258/4 258/17
**tainted** **[16]** 15/19 15/24

**T**

**tainted... [14]** 25/12 25/16
25/25 26/2 26/16 117/1 117/4
206/4 230/20 230/20 231/2
258/8 267/3 268/2
**take [46]** 8/6 8/13 8/15 10/9
14/16 20/5 23/12 29/19 31/16
33/17 39/12 44/3 58/5 66/5
70/9 72/1 85/19 90/18 91/16
93/24 95/6 95/22 98/10 99/14
117/12 117/16 125/19 127/8
136/24 163/8 165/23 166/2
166/3 167/18 191/20 203/18
209/21 229/2 238/11 242/18
248/12 248/20 254/21 259/9
265/3 265/14
**takes [1]** 98/2
**taken [31]** 13/23 21/2 33/11
33/14 60/9 64/19 66/22 98/5
102/13 105/6 110/11 130/3
151/20 172/21 181/19 181/24
181/25 182/2 182/16 189/13
203/25 204/15 236/20 239/17
250/13 250/14 250/20 252/22
253/7 254/20 265/20
**takes [1]** 98/2
**taking [11]** 14/7 73/25 74/8
95/19 96/24 97/5 143/8
176/22 179/14 238/17 268/17
**talk [13]** 19/6 28/9 38/14
43/14 55/9 71/25 84/7 158/18
158/19 241/12 242/13 251/22
268/2
**talked [6]** 10/19 58/20 84/13
86/17 116/2 162/9
**talking [28]** 32/8 36/18
40/18 41/24 67/9 68/2 68/7
68/11 82/10 86/25 89/20 91/2
107/17 131/17 134/23 136/17
161/12 165/7 168/18 168/20
171/23 174/9 192/17 221/16
226/10 242/6 242/8 252/21
**Tam [1]** 62/1
**Tamara [29]** 14/2 14/5 40/8
41/1 41/21 42/20 48/3 60/16
62/6 63/19 63/19 64/7 65/11
65/22 66/9 68/4 68/13 68/19
68/24 69/17 70/2 105/5
158/19 162/3 162/11 162/15
167/8 167/15 169/8
**Tamara's [1]** 41/21
**Tamaradadyan [1]** 47/17
**Tammy [14]** 39/20 40/2 40/7
40/10 40/13 40/15 41/2 41/4
41/7 42/4 42/20 48/7 62/25
66/9
**Tarabelian [1]** 95/19
**targets [2]** 41/11 73/14
**task [1]** 147/9
**tasked [1]** 260/10
**tasks [2]** 147/17 148/7
**Tax [5]** 14/1 182/15 182/17
182/20 183/13
**teal [1]** 265/14
**team [71]** 22/18 23/24 30/21
34/22 36/8 50/22 52/22 52/23
53/16 72/5 73/17 85/22 89/4
90/25 98/6 98/10 98/23 99/8
101/12 101/17 104/7 124/25
129/20 137/10 137/20 137/25
138/21 141/20 142/5 146/6
146/12 156/22 158/25 159/9
159/13 159/18 159/25 160/4
160/7 160/11 160/23 161/5
161/15 164/3 167/5 168/3
168/14 168/23 169/1 169/2
169/4 169/6 170/4 178/22
184/8 188/13 233/1 233/8
235/1 235/16 235/19 243/15

243/22 249/20 249/20 259/25
269/3
**team's [1]** 160/18
**tech [2]** 33/21 198/14
**technical [2]** 243/10 243/20
**technology [1]** 24/23
**telephone [14]** 39/7 87/3
89/12 89/19 133/20 159/14
165/2 165/4 187/11 195/5
198/18 199/19 211/23 222/23
**telephones [1]** 36/9
**telephonic [2]** 254/6 254/19
**tell [16]** 104/1 126/10
140/19 142/16 145/18 176/13
181/9 187/8 190/22 235/11
235/13 244/1 244/7 257/16
265/8 265/9
**telling [3]** 122/21 197/1
213/23
**tells [1]** 215/25
**ten [14]** 100/8 100/14 100/20
152/14 152/15 153/6 153/7
153/8 153/8 156/4 249/14
250/1 251/1 251/23
**TERABELIAN [90]** 3/3 5/22 6/2
7/1 28/7 33/12 87/22 90/7
96/16 105/5 115/8 116/3
128/23 171/25 172/22 173/19
175/23 175/24 176/16 178/11
178/20 178/23 179/2 179/17
180/8 181/6 181/11 181/20
182/7 182/11 183/7 183/16
184/18 184/23 185/1 185/14
186/24 187/16 188/1 191/3
192/22 193/18 197/7 200/4
200/13 201/5 201/14 202/19
204/16 205/2 206/22 211/13
211/22 212/2 212/16 213/11
213/24 215/9 217/5 218/4
218/22 218/25 219/1 219/2
219/3 219/6 219/12 219/13
219/23 219/25 220/7 220/8
220/14 220/19 220/22 221/2
222/15 223/19 228/10 228/18
236/3 236/6 237/4 237/10
255/7 268/10 268/16 269/20
271/6 271/10
**Terabelian's [19]** 172/17
175/24 179/4 182/18 183/11
183/15 187/9 196/5 205/12
206/11 208/14 208/22 215/20
218/19 220/16 221/3 221/8
222/11 223/9
**term [3]** 65/2 65/5 224/8
**terms [14]** 17/15 33/8 39/3
39/6 40/6 41/15 64/25 109/15
188/21 189/6 225/19 239/3
252/3 261/23
**terribly [1]** 136/4
**test [2]** 15/10 16/13
**testified [22]** 21/13 21/23
25/10 42/12 44/8 46/14 48/18
54/9 60/7 67/4 113/17 128/21
130/11 148/2 162/23 189/2
199/21 199/23 205/18 226/14
246/7 246/15
**testify [2]** 17/2 133/5
**testifying [3]** 110/3 130/6
197/18
**testimony [34]** 11/25 13/3
16/22 17/11 25/13 25/14 26/9
35/5 37/9 40/25 41/3 41/6
43/9 47/19 47/22 54/2 68/3
70/24 95/12 95/24 105/12
107/13 110/2 122/16 132/22
133/7 147/18 147/21 147/25
152/23 169/3 189/19 193/23
267/15

**testing [2]** 68/19 217/15
**text [39]** 65/8 65/11 65/11
41/23 51/24 58/21 58/23
59/13 59/19 59/21 60/9 60/17
60/17 60/20 60/21 61/23
61/24 62/24 63/2 63/18 63/25
65/18 66/14 66/21 66/24 67/6
68/1 68/10 68/14 68/25 69/8
69/16 76/9 87/25 92/18 92/23
93/1 93/2 93/5 95/18 96/9
115/6 116/4 119/16 133/3
133/23 157/16 157/17 162/15
162/24 163/1 164/8 166/14
167/7 167/13 167/14 167/19
167/22 167/23 168/4 168/12
168/13 168/23 168/24 169/4
169/7 169/12 169/13 169/17
191/2 193/18 196/4 196/20
197/12 197/13 198/1 212/18
215/8 215/23 221/13 222/7
222/23 223/2 223/5 223/8
223/15 272/9
**texting [4]** 65/11 70/5 218/5
218/8
**texts [4]** 16/21 90/6 192/22
194/14
**than [27]** 55/14 74/12 85/12
86/16 102/14 111/2 120/22
148/5 152/14 153/8 171/12
191/7 198/5 212/1 212/5
212/20 213/12 213/25 215/6
215/14 218/10 219/11 238/13
267/4 267/7 269/25 270/2
**thank [22]** 10/6 11/16 12/12
14/18 18/11 50/13 70/8 91/24
136/9 141/3 141/9 231/13
231/15 232/6 257/11 258/19
259/8 273/7 273/8 274/1
274/2 275/4
**thans [1]** 183/19
**that [1844]**
**that's [48]** 9/6 35/16 40/9
41/6 44/16 55/19 56/2 56/5
56/13 56/17 56/23 63/21
91/12 98/14 104/13 104/25
107/23 112/17 112/24 122/21
123/12 137/16 142/15 142/17
158/12 159/11 162/8 165/22
171/16 181/5 186/21 205/20
206/4 206/18 210/21 211/25
217/17 221/21 225/12 227/8
227/24 228/20 240/24 244/11
244/13 253/8 255/11 263/17
**theft [4]** 201/15 220/15
220/18 220/22
**their [19]** 7/17 8/9 14/14
15/11 16/1 70/5 88/9 113/2
125/6 129/2 177/25 188/20
195/17 195/19 195/20 196/19
210/16 220/11 222/4
**them [117]** 7/19 15/20 16/3
29/2 31/17 34/1 34/16 53/21
55/3 64/12 68/20 70/11 70/15
73/8 80/23 83/19 85/7 85/8
85/9 85/10 85/12 85/12 85/13
85/13 85/18 85/20 86/11
88/17 92/19 92/20 104/16
105/22 106/3 106/3 106/5
109/17 116/10 117/4 117/21
118/4 122/15 127/25 128/25
129/24 129/24 133/4 135/2
140/21 140/22 140/23 145/21
145/22 145/23 145/24 146/18
150/2 150/3 151/3 151/8
151/9 151/11 151/11 155/19
156/22 157/2 157/2 157/3
161/4 163/2 167/7 167/14
167/17 167/18 167/21 167/21
167/24 167/25 168/16 178/12

**them... [38]** 184/4 185/25
188/6 190/8 191/15 192/10
192/14 193/8 195/9 197/15
197/16 199/3 199/9 204/4
204/5 204/6 204/7 204/22
205/25 211/10 221/17 222/3
223/10 223/11 226/8 226/15
234/8 243/8 243/9 243/17
243/19 243/20 249/14 261/19
262/1 264/17 271/5 274/10
**themselves [1]** 230/22
**then [87]** 23/11 26/24 27/3
37/17 40/8 41/5 42/22 52/11
55/16 58/11 61/14 62/6 62/8
64/21 71/7 80/4 83/24 84/1
89/8 89/11 89/23 92/19 94/9
101/7 103/13 104/1 104/2
116/20 117/21 118/13 135/15
136/6 138/6 141/23 142/1
142/8 149/24 152/17 154/17
164/6 166/4 169/25 175/25
176/14 176/15 177/13 178/5
178/8 180/3 181/25 182/17
183/2 183/21 189/18 191/8
192/9 192/14 195/21 195/22
196/11 198/8 199/9 207/19
217/19 219/14 220/7 220/9
220/10 223/21 225/25 225/25
230/3 233/16 239/15 240/8
244/1 251/22 251/22 253/19
254/21 263/15 263/23 270/20
272/12 273/1 274/9 275/1
**theories [4]** 212/13 252/7
259/22 259/23
**theory [10]** 69/1 111/16
171/24 218/24 220/6 223/22
224/1 224/3 228/18 251/6
**there [232]**
**There's [1]** 130/2
**thereabouts [1]** 29/3
**thereafter [3]** 204/6 233/3
261/13
**therefore [1]** 177/15
**therefrom [1]** 20/2
**therein [1]** 96/4
**these [83]** 6/23 8/21 34/25
44/14 51/12 58/23 59/19 60/4
60/9 64/22 65/17 82/3 84/24
85/1 88/22 102/7 102/18
104/22 105/14 105/18 106/22
107/19 109/16 112/3 112/13
118/22 137/10 138/14 139/7
139/8 139/10 140/17 141/19
145/5 145/7 146/1 146/4
146/16 146/18 146/20 147/19
148/24 149/10 150/2 150/7
153/1 159/17 175/15 178/7
181/23 194/19 195/13 196/3
196/8 196/12 196/13 196/14
199/5 203/25 204/3 204/14
205/24 211/8 211/9 211/22
213/5 220/4 221/15 221/24
221/25 222/25 226/7 230/9
231/23 232/2 238/10 238/11
238/25 240/15 240/23 241/17
269/5 272/1
**they [169]**
**they're [1]** 15/24
**THIBODEAUX [2]** 1/20 276/12
**thing [11]** 8/16 103/24
135/13 184/3 193/16 200/3
219/17 225/24 241/2 273/10
273/11
**things [35]** 14/20 19/20
54/12 56/9 65/7 84/24 111/4
115/4 147/16 173/13 173/25
175/15 178/3 183/4 193/14

194/22 196/3 196/5 204/25
219/15 220/11 225/19 226/7
226/18 230/4 233/5 243/13
245/19 248/18 270/10 270/13
**think [127]** 7/3 7/5 7/15
7/17 9/11 9/14 9/25 15/8
15/17 15/18 15/25 16/2 17/12
17/18 25/10 25/22 27/25 30/6
30/8 33/19 35/16 37/1 43/22
44/1 50/24 52/18 53/10 53/24
59/10 60/7 60/8 62/3 64/2
64/11 64/18 80/4 84/10 85/12
87/3 90/1 90/20 93/12 96/8
105/8 105/12 105/25 106/3
107/3 107/23 109/18 109/18
109/25 114/20 120/22 121/20
126/8 129/13 130/1 131/21
143/17 144/6 144/7 144/23
148/17 150/3 150/9 151/9
152/14 153/5 159/5 159/6
159/7 166/21 183/19 183/20
183/24 186/20 186/21 187/18
191/17 191/21 195/11 203/14
203/16 204/12 205/16 212/5
214/1 214/17 216/18 217/17
218/9 218/13 219/17 223/24
224/21 228/1 229/5 229/24
231/12 232/3 233/11 233/14
233/15 239/3 239/4 242/6
245/24 246/15 249/14 250/1
251/16 253/15 255/11 259/10
260/6 260/6 263/11 263/11
268/19 268/23 270/4 270/7
270/9 270/18 270/24 274/20
**thinking [12]** 183/13 209/12
209/14 210/9 210/21 212/12
212/15 214/22 235/9 251/2
252/10 252/16
**third [5]** 15/13 90/11 148/12
148/20 191/5
**this [473]**
**Thomas [2]** 3/14 5/19
**thoroughly [1]** 87/12
**those [159]**
**though [11]** 18/7 70/20 108/1
114/20 118/21 135/7 146/10
152/17 189/16 243/15 252/11
**thought [31]** 9/23 88/12
97/13 97/20 105/10 105/16
105/18 109/23 134/2 157/20
165/11 177/12 184/4 185/6
185/7 186/9 186/14 186/16
186/18 195/9 222/4 222/8
222/9 222/16 222/17 222/21
222/24 223/4 227/10 229/24
238/23
**thousands [1]** 19/1
**three [63]** 28/24 30/14 32/7
33/4 34/1 34/17 34/25 35/23
36/6 36/9 36/17 36/22 37/7
37/23 38/1 38/12 42/3 43/6
44/18 49/1 50/21 51/12 52/11
52/14 52/20 53/15 53/18
58/24 59/3 59/14 59/19 59/25
60/1 60/10 79/10 84/14 85/6
85/14 85/23 86/10 89/24 90/1
116/2 116/6 116/21 140/25
142/8 143/3 143/24 145/24
190/24 193/14 194/21 194/24
195/3 221/22 225/4 240/17
240/20 240/22 242/3 261/19
262/7
**through [28]** 8/21 13/25
19/13 21/10 21/10 27/21
51/15 69/12 72/18 72/23
98/10 100/16 100/18 117/20
131/16 140/2 145/25 158/13
158/16 170/11 172/15 179/9

184/12 211/8 235/4 237/12
241/21 258/24 271/21 275/4
**throughout [3]** 17/13 23/25
77/17
**thrust [1]** 134/4
**tied [8]** 102/3 102/5 102/8
102/11 162/3 162/5 180/16
181/11
**ties [1]** 245/11
**Tim [4]** 99/19 99/24 137/3
137/6
**time [117]** 6/3 16/16 23/3
24/6 25/8 40/17 40/18 40/20
42/8 47/10 48/23 52/15 53/1
53/7 64/20 69/23 70/1 70/22
73/16 73/21 86/6 86/9 86/22
89/18 89/20 90/1 91/14 92/3
99/11 103/1 104/18 106/4
107/17 107/19 109/5 109/10
110/6 110/18 116/16 117/20
119/2 119/19 122/11 124/5
124/8 137/13 140/10 142/16
152/4 152/5 152/6 154/2
155/23 157/23 161/4 161/11
161/18 161/25 163/5 163/19
164/7 164/13 165/18 166/16
166/18 167/18 169/9 169/21
176/12 183/21 190/14 191/15
191/16 192/21 192/25 193/15
194/8 194/10 195/7 195/21
196/18 197/14 198/7 208/8
223/11 226/20 228/1 233/3
234/5 234/8 234/14 235/14
239/7 240/20 243/10 243/14
250/11 250/13 251/16 251/18
251/24 252/14 252/20 253/9
254/4 254/18 259/14 260/7
261/11 261/13 263/5 263/18
264/6 265/19 267/24 274/17
274/17
**timeframe [10]** 47/25 51/14
63/16 72/24 93/4 133/17
151/25 189/6 221/16 251/20
**timeframes [1]** 63/14
**Timeline [2]** 13/7 14/1
**timely [1]** 169/24
**times [9]** 47/12 85/7 85/8
85/10 85/15 85/18 86/6
240/20 250/21
**timing [2]** 42/9 253/24
**tip [1]** 19/12
**Title [1]** 276/4
**today [21]** 6/14 16/2 16/22
37/5 37/25 42/1 45/20 49/3
49/10 51/8 51/16 56/4 70/24
142/15 172/3 235/11 256/16
262/24 264/21 274/9 274/24
**today's [1]** 16/13
**toes [1]** 103/2
**together [18]** 118/10 135/2
140/24 149/13 171/19 176/18
177/23 177/24 180/19 184/5
184/6 184/7 184/10 186/19
214/18 215/24 228/19 237/19
**told [14]** 44/5 49/13 54/25
66/22 94/22 115/25 132/12
133/25 194/22 198/8 200/17
202/19 244/16 253/9
**Tom [2]** 149/14 149/15
**tomorrow [2]** 274/4 274/12
**too [6]** 65/1 144/8 161/3
161/3 205/5 231/12
**took [30]** 12/2 12/20 85/11
97/7 97/13 97/18 97/19 101/1
108/13 108/21 110/15 113/22
121/6 129/21 132/4 139/20
142/1 142/18 153/4 156/13
191/25 197/14 197/16 198/7
249/15 250/12 251/24 253/17

**T**

took... **[2]** 254/18 266/8
**top [15]** 29/1 32/16 60/11
61/14 61/15 74/4 76/24
101/13 141/4 141/10 148/25
149/4 241/3 257/13 263/9
**Topeka [2]** 77/24 206/19
**topic [2]** 127/10 166/1
**topics [1]** 94/19
**total [3]** 84/13 100/8 153/6
**totally [1]** 228/3
**totals [4]** 101/8 106/22
142/18 157/5
**touch [4]** 194/17 195/8 197/2
198/24
**Tower [1]** 2/20
**trace [2]** 21/18 175/20
**traced [7]** 64/11 172/10
173/6 178/9 178/13 179/1
179/8
**tracing [3]** 64/16 146/14
173/4
**track [15]** 23/13 23/17 25/4
25/7 44/21 85/21 85/22 87/25
124/11 188/16 265/25 266/4
266/8 266/18 266/24
**tracked [1]** 103/12
**tracking [5]** 24/12 24/23
98/24 99/4 102/22
**tracks [1]** 103/3
**Trading [3]** 141/15 145/11
148/22
**traditionally [1]** 172/25
**transacting [1]** 134/1 222/21
222/22
**transactions [1]** 111/12
**transcript [7]** 1/13 240/25
241/8 241/17 241/19 276/6
276/7
**transcripts [1]** 15/12
**transfer [2]** 75/18 243/19
**transferred [4]** 12/3 13/12
181/20 219/14
**transferring [1]** 175/22
**transfers [2]** 13/8 175/23
**Transport [2]** 13/7 14/1
**treated [2]** 23/2 26/8
**trial [76]** 8/23 9/11 10/12
10/15 10/16 10/22 11/7 11/10
11/10 11/16 12/9 12/11 14/10
16/5 17/12 21/10 21/12 21/23
23/9 32/20 32/22 32/23 35/15
46/25 61/11 65/16 65/18
65/20 65/24 65/25 70/15
70/17 71/8 72/19 73/7 78/5
78/12 121/8 122/11 123/3
123/6 123/25 124/16 127/18
130/7 130/11 130/13 133/5
135/10 136/1 137/15 137/19
145/8 148/11 148/11 157/24
161/4 164/16 182/25 205/10
206/14 206/16 210/18 213/7
230/10 231/19 240/25 241/6
241/16 249/17 249/20 262/20
262/25 267/10 267/14 267/15
**tried [6]** 23/5 85/8 85/10
86/4 147/8 203/11
**triggered [1]** 197/20
**true [28]** 13/6 19/3 20/2
20/19 70/20 73/2 78/15 81/15
82/1 83/10 83/11 99/10 122/7
122/9 124/23 136/1 136/12
156/14 158/11 171/21 174/14
185/16 189/25 199/22 210/6
225/7 259/1 276/5
**truth [1]** 122/21
**truthful [1]** 270/7
**try [17]** 44/3 46/5 73/17

104/9 104/14 105/3 161/21
195/16 200/17 201/14 202/4
206/8 210/23 243/7 243/9
247/14 255/1
**trying [24]** 22/1 32/25 44/12
49/24 64/3 64/22 69/7 85/9
85/18 106/3 118/14 124/10
133/14 149/18 157/23 189/17
195/22 195/23 197/2 198/23
211/1 217/5 243/19 270/4
**Tuesday [2]** 113/7 113/10
**turf [1]** 170/11
**Turkan [7]** 141/16 142/10
142/14 142/20 144/9 145/12
150/14
**turn [4]** 31/19 50/1 229/3
229/4
**turned [1]** 169/9
**turning [2]** 221/7 224/23
**Twelfth [1]** 2/8
**two [45]** 10/8 13/8 31/16
32/3 33/17 51/5 73/6 73/7
79/13 84/12 84/16 84/16 90/1
102/18 103/5 109/2 109/10
118/2 137/1 140/18 141/14
141/23 152/16 161/24 162/2
162/6 167/24 176/25 179/21
225/11 226/3 226/4 226/9
226/10 226/11 236/5 237/1
237/10 238/25 239/15 240/2
242/19 242/23 250/20 274/5
**two-minute [2]** 31/16 33/17
**two-page [1]** 137/1
**tying [1]** 179/25
**type [6]** 15/25 22/6 22/18
24/12 139/4 177/23
**types [6]** 16/7 33/8 39/11
56/10 183/19 188/2
**typically [6]** 66/2 173/14
173/16 174/15 195/6 197/5

**U**

**U.S [8]** 1/20 2/4 2/4 8/1
10/25 11/1 24/22 255/16
**ultimately [3]** 121/9 122/4
220/1
**unaware [1]** 254/7
**uncover [1]** 78/17
**under [16]** 9/7 27/3 65/12
68/2 68/20 69/1 70/24 105/12
111/16 121/5 122/16 122/17
122/18 122/22 122/23 256/14
**underlined [2]** 80/12 82/21
**underneath [1]** 258/3
**understand [62]** 20/24 21/22
23/15 25/1 25/3 26/24 27/2
27/5 27/12 27/15 27/16 27/23
28/5 42/6 44/17 46/3 46/5
49/25 55/3 58/19 58/23 64/4
64/13 66/13 68/22 75/20 78/9
78/11 80/2 80/5 80/13 100/10
108/11 108/23 111/2 123/10
124/19 125/3 132/15 138/14
138/21 143/16 144/2 144/19
145/20 154/7 155/16 160/15
175/15 176/7 181/18 199/11
216/22 224/10 228/4 230/15
243/15 246/8 247/11 255/22
256/19 273/19
**understanding [37]** 21/15
26/3 26/7 26/15 34/3 60/8
67/19 68/4 68/6 69/19 87/24
89/7 97/7 97/21 105/4 121/11
121/21 124/2 132/9 135/19
138/17 142/6 156/15 156/18
173/21 173/22 190/11 195/15
195/19 204/11 214/10 215/1
235/4 243/10 247/1 255/24
256/14

**understands [1]** 256/15
**understood [39]** 16/9
54/15 93/3 96/12 102/1
108/16 121/3 122/24 140/5
143/17 144/4 173/18 177/10
177/19 184/4 203/4 252/4
**undertook [1]** 152/12
**undisputed [2]** 7/6 15/15
**unfamiliar [4]** 100/5 152/25
153/2 154/6
**unfolded [1]** 194/16
**unfolding [3]** 194/11 196/3
196/23
**unit [5]** 38/7 49/8 114/11
114/12 114/16
**UNITED [9]** 1/1 1/4 1/6 2/3
5/6 255/13 255/19 276/5
276/9
**unless [6]** 8/3 9/15 135/1
232/1 244/16 270/22
**unlike [1]** 75/16
**unlikely [1]** 270/25
**unnecessary [2]** 120/12 228/3
**unquote [1]** 268/18
**until [15]** 23/4 25/12 25/16
25/19 33/5 58/4 70/21 171/18
189/3 191/21 192/7 195/18
197/14 235/20 260/20
**up [100]** 7/18 19/7 19/24
20/4 20/4 21/9 21/10 28/2
28/23 30/8 33/15 33/22 43/15
50/4 50/5 54/1 57/23 60/11
72/17 74/4 75/3 75/10 75/21
76/19 76/23 76/24 76/25 81/3
87/24 90/20 93/13 93/22
95/23 99/15 99/23 100/23
101/7 101/13 104/5 105/13
107/2 107/14 108/11 123/17
123/22 127/25 129/24 133/13
133/21 134/7 141/4 141/20
142/7 142/14 142/20 148/25
152/10 152/17 153/1 153/5
153/18 153/25 156/1 156/4
156/8 157/4 159/24 163/24
167/4 168/3 168/12 191/8
192/8 192/19 194/2 195/12
195/16 195/23 196/12 206/6
206/8 210/17 224/24 230/23
233/22 239/5 239/11 240/25
243/12 244/22 245/22 248/9
248/10 251/9 253/25 257/20
259/9 263/19 263/22 274/12
**updated [1]** 103/14
**uploaded [8]** 34/4 98/11
138/9 139/2 139/14 145/6
242/20 242/24
**upon [5]** 9/12 14/14 87/13
153/11 224/7
**us [19]** 2/11 10/1 24/16
37/12 44/5 48/4 116/7 116/10
154/6 172/6 172/14 176/20
194/22 231/19 233/7 244/1
244/7 248/12 257/1
**usable [2]** 168/4 168/12
**USAFX [8]** 98/11 98/13 98/18
98/25 99/5 242/20 242/24
243/1
**use [58]** 12/16 23/13 24/23
27/13 27/17 27/19 33/8 65/5
65/25 66/2 70/14 73/7 82/4
88/16 109/16 118/18 120/16
120/19 120/23 122/1 122/5
122/10 122/14 123/6 136/11
136/19 156/6 158/3 161/9
164/9 164/16 165/3 180/2
181/6 213/1 215/11 215/25
217/16 218/8 219/12 219/22
220/15 226/19 250/10 250/18
250/25 251/5 251/12 252/1

## U

use... [9]   252/7 255/22
256/1 256/19 256/25 257/2
257/8 267/13 269/1
useable [2]   168/23 169/4
used [49]   15/20 24/17 27/4
27/18 35/15 39/3 39/6 40/8
41/4 41/7 47/15 62/20 64/10
65/18 65/20 65/24 98/14
102/24 103/7 157/8 158/7
165/3 172/2 172/4 172/11
172/24 176/24 177/1 179/6
181/14 181/25 182/9 182/18
183/3 183/9 183/10 183/14
183/22 184/4 184/6 185/4
213/7 213/21 216/14 218/25
219/11 220/3 248/7 270/14
useful [3]   97/22 225/23
225/24
user [3]   28/18 39/1 207/2
user-generated [1]   207/2
using [42]   14/7 38/5 40/3
65/10 65/15 90/8 111/11
121/7 136/22 137/25 158/9
158/16 167/10 172/7 177/16
178/4 178/15 178/16 180/4
180/8 185/22 186/4 186/14
186/19 191/3 192/23 193/19
201/15 212/3 213/24 215/5
216/5 216/12 217/8 220/23
226/7 248/23 249/6 250/1
255/24 256/23 258/8

## V

Vague [2]   265/11 271/7
VAHE [13]   3/18 5/14 10/7
11/4 11/8 12/18 12/25 13/12
60/18 60/22 61/3 61/3 61/6
valuable [5]   64/1 65/1 65/1
65/4 65/21
value [11]   16/9 62/15 62/16
63/25 64/2 64/4 65/21 68/16
109/15 224/13 224/14
van [2]   114/13 195/3
variety [1]   188/2
various [7]   28/21 56/22
103/12 182/9 219/15 233/5
233/23
Vaughan [1]   3/7
Ventures [2]   172/16 172/16
verdict [2]   14/10 171/8
verify [1]   155/3
versions [2]   103/9 118/2
versus [2]   5/7 224/6
very [24]   9/23 26/20 30/7
31/8 33/1 35/9 49/24 70/3
74/9 79/22 95/2 101/13
146/12 147/4 149/4 152/13
157/5 159/19 167/4 180/6
188/25 192/1 228/6 265/9
via [3]   159/14 222/23 236/21
Victoria [59]   38/6 39/14
49/6 49/19 73/24 95/20 96/16
112/10 112/16 115/6 115/8
172/1 172/4 172/7 177/1
177/12 177/12 179/14 179/18
180/1 180/16 180/21 181/2
181/7 181/12 181/13 181/24
182/9 182/16 182/21 183/23
184/19 184/24 185/4 185/15
185/23 186/8 186/13 186/17
191/4 192/23 193/19 194/14
211/14 211/23 212/3 212/18
214/5 215/19 217/9 217/12
219/14 220/10 223/20 225/20
236/21 236/22 238/17 268/18
view [4]   28/18 38/22 68/21
105/2

viewed [2]   224/2 267/24
viewing [1]   98/25
38/20
violated [1]   126/23
violations [1]   153/11
vital [1]   15/9
voice [1]   206/6
volume [1]   19/25
voluminous [1]   21/16
Voyage [2]   12/2 13/23

## W

wait [3]   191/21 191/24 192/7
walk [1]   27/21
want [57]   6/17 7/4 7/12 7/14
9/19 14/20 17/13 20/6 20/11
32/15 34/16 43/24 44/2 44/10
61/24 83/25 87/10 92/1 109/3
131/16 137/14 140/11 141/14
142/8 148/12 159/23 167/21
168/1 170/11 173/2 173/3
174/22 174/22 175/15 176/1
176/3 176/8 176/11 176/13
199/12 203/18 209/6 210/17
227/11 227/15 228/2 237/22
246/18 250/9 259/7 271/23
271/24 273/11 274/4 274/8
274/13 274/25
wanted [17]   88/9 91/21 101/8
124/15 150/22 161/9 167/13
175/9 175/10 191/20 197/3
204/22 209/14 210/13 210/15
233/24 275/2
wants [2]   31/12 274/15
Warner [2]   74/15 74/16
warrant [10]   48/10 48/15
77/23 95/9 95/14 95/25 96/2
96/15 206/19 233/17
warrants [9]   73/17 95/2 95/3
122/2 122/7 123/1 161/10
196/11 233/17
was [679]
Washington [2]   2/12 2/23
wasn't [22]   9/16 9/17 35/20
48/12 71/18 71/20 76/15
77/24 86/21 104/20 108/1
128/7 131/6 147/1 147/14
187/18 196/4 223/4 235/3
235/12 243/13 253/12
wasteful [1]   137/21
wasting [1]   137/13
water [3]   91/11 91/12 91/13
way [54]   12/3 19/21 19/24
21/9 25/12 27/5 27/14 27/20
33/10 41/7 43/7 45/13 59/6
61/22 62/23 65/13 72/17 76/7
76/11 79/4 95/13 99/16
117/18 135/23 137/2 139/23
140/15 143/15 148/8 148/12
148/20 153/12 171/17 180/24
183/8 184/11 184/12 190/6
192/5 206/16 212/15 214/22
230/24 234/20 238/23 244/7
244/24 247/14 251/16 253/16
266/13 270/7 272/9 274/21
ways [1]   259/5
we [464]
we'll [2]   137/4 242/13
we're [3]   36/17 36/17 150/2
we've [1]   130/1
Wearing [1]   6/14
Weddington [2]   142/25 144/11
WEDNESDAY [2]   1/16 5/1
week [5]   117/22 168/20
238/14 268/8 268/12
weekend [3]   117/7 117/9
117/11
well [89]   7/8 10/24 22/12
24/7 29/19 34/8 34/14 34/16

37/22 38/9 40/10 40/14 42/25
44/15 56/5 59/2 59/12 60/19
62/22 67/11 68/17 71/25
74/11 75/14 77/5 79/22 80/4
80/7 88/13 91/8 95/17 95/23
98/17 100/23 101/1 110/2
118/2 122/11 123/14 125/19
126/9 129/25 130/23 134/3
134/22 140/19 143/12 143/15
146/19 150/21 155/19 159/3
160/16 160/25 169/13 169/21
172/18 173/18 176/20 177/10
179/15 185/18 185/25 185/25
186/15 187/1 188/23 191/17
193/16 200/19 201/13 203/11
205/18 210/9 215/19 221/17
224/12 225/18 230/17 233/19
245/17 247/1 247/25 248/5
250/11 259/4 261/7 271/2
271/9
Wells [11]   215/12 215/20
215/25 216/2 216/6 216/12
216/23 217/16 217/24 218/9
218/16
went [13]   41/2 61/11 152/8
158/13 175/21 182/7 182/24
213/21 219/16 220/1 220/8
220/9 239/2
were [349]
weren't [13]   9/6 102/25
122/11 124/10 124/11 130/4
130/13 140/22 145/19 145/20
162/17 171/7 250/25
West [3]   1/21 2/16 3/8
WESTERN [1]   1/2
WESTFAHL [2]   2/5 5/11
what [333]
What's [1]   48/20
whatever [4]   23/9 79/16
169/8 226/1
whatsoever [1]   26/7
when [126]   23/18 24/13 25/5
27/23 28/23 35/6 38/21 39/3
45/7 45/24 46/21 47/20 47/23
47/23 48/14 49/11 51/6 51/8
51/17 52/4 53/7 54/7 54/16
54/19 55/9 55/21 56/20 59/9
62/14 63/7 63/16 69/6 81/22
85/25 86/4 86/17 89/13 89/21
92/22 96/22 98/18 108/6
108/13 110/18 111/20 113/7
115/22 116/11 116/15 118/17
119/3 120/15 120/15 122/2
130/19 133/11 133/18 135/22
136/15 143/16 145/4 152/1
152/12 155/24 157/23 158/1
159/2 159/6 163/2 165/18
166/25 170/3 174/1 174/14
175/1 177/13 182/12 186/23
187/6 187/10 187/12 188/24
189/1 189/18 190/14 197/19
204/3 204/14 207/14 207/23
208/3 208/12 209/7 210/9
210/12 220/5 221/15 223/1
223/7 228/7 229/7 230/18
233/1 233/8 233/22 235/9
236/17 238/10 238/11 241/11
245/13 248/12 249/15 250/12
251/24 260/8 260/17 261/11
262/14 262/21 263/8 263/9
265/2 266/5 268/5 271/4
where [47]   6/24 10/18 10/21
15/17 23/1 23/25 24/9 29/14
29/17 38/25 44/19 51/21 52/9
63/8 74/17 87/4 87/6 101/24
128/1 133/2 146/9 146/22
152/8 155/7 173/22 174/21
175/18 176/23 181/21 182/21
188/16 194/8 196/21 205/21

**W**

**where...** [13]  209/6 210/5
213/21 215/24 230/24 236/18
236/22 237/12 237/18 241/9
261/24 273/21 273/22
**whether** [61]  6/19 24/19 25/6
27/19 33/3 37/13 40/5 48/17
49/11 51/4 51/19 64/19 80/9
80/14 87/25 95/25 96/14
105/10 105/20 133/10 134/8
137/19 147/18 147/22 148/7
154/9 154/24 155/11 165/8
167/14 168/15 175/16 190/4
212/12 217/20 225/10 226/15
234/3 240/17 244/2 244/8
244/9 244/18 244/24 246/2
246/5 246/18 246/22 247/15
248/15 249/16 249/21 250/5
250/19 252/6 256/8 256/12
257/10 258/11 262/24 273/2
**which** [78]  7/11 12/1 12/5
13/13 14/3 16/22 22/1 28/21
29/9 30/24 36/11 37/6 38/6
44/14 45/12 45/24 46/14 49/7
50/17 58/25 61/9 71/23 74/22
75/12 75/13 75/17 76/14 79/7
81/3 81/10 86/17 90/7 90/19
93/25 104/12 107/24 122/14
124/4 124/4 124/15 126/13
126/18 127/4 131/6 132/13
133/11 133/17 140/19 143/4
145/19 145/19 148/11 149/22
153/25 158/21 159/22 162/18
164/10 164/14 165/19 165/20
165/20 171/12 192/15 197/4
197/16 197/22 197/25 198/7
217/14 223/7 225/22 236/24
239/23 246/7 250/15 250/21
267/23
**while** [7]  30/11 126/22
150/17 156/8 163/19 164/7
268/14
**who** [80]  5/14 5/17 5/22 6/21
8/1 8/25 9/4 12/2 14/9 14/16
17/9 17/17 23/17 24/2 24/4
24/12 25/4 58/15 69/10 89/6
89/8 91/1 101/15 101/16
109/17 110/20 113/10 113/15
113/20 113/24 114/2 114/4
114/7 114/11 114/13 114/14
114/15 130/10 130/12 130/16
131/18 132/15 135/16 135/17
135/20 146/6 149/5 149/14
153/23 173/14 173/17 175/15
176/22 178/4 185/15 190/20
192/1 196/13 203/5 207/25
215/24 219/7 220/5 230/7
230/20 232/12 232/12 234/1
234/7 243/18 244/3 246/25
247/5 247/8 247/20 247/22
249/18 261/9 265/25 266/4
**whoever** [2]  6/5 110/14
**whom** [1]  157/17
**whose** [6]  271/15 271/18
272/10 272/17 272/19 273/3
**why** [73]  11/1 13/11 19/15
19/21 20/8 28/2 35/10 35/18
36/25 42/15 42/17 44/14
44/16 44/22 45/10 50/7 54/11
57/21 59/5 65/24 66/5 73/16
74/2 75/9 75/24 76/22 79/21
87/2 87/8 87/8 88/4 94/24
104/14 120/12 122/17 123/10
123/22 124/10 127/8 129/24
130/23 132/24 137/13 140/1
148/24 150/6 151/4 169/10
173/16 175/8 175/11 176/12
177/4 192/7 192/8 192/10

194/25 195/11 197/16 209/3
197/1 201/7 202/22 204/8
227/9 230/7 231/24 242/11
243/7 243/9 250/9 256/9
260/21
**wife** [2]  172/12 177/23
**will** [58]  6/21 7/1 7/5 7/16
9/17 17/17 26/14 26/24 30/22
33/21 58/11 58/17 61/15 80/5
80/24 83/14 84/2 84/6 84/25
91/16 91/16 99/16 104/9
120/2 128/15 129/9 134/11
136/8 137/19 142/16 142/19
145/2 153/20 156/4 160/17
163/23 168/1 170/15 173/3
177/20 182/16 182/17 194/7
199/17 206/6 206/8 232/6
232/8 235/8 241/12 246/13
252/10 257/1 259/10 265/1
272/1 273/2 274/12
**William** [1]  114/15
**Williams** [5]  3/4 3/7 261/14
261/16 261/17
**willing** [5]  128/10 128/13
129/1 132/12 132/13
**WILSON** [1]  1/3
**win** [2]  16/15 62/7
**windup** [1]  37/12
**wire** [1]  13/8
**Wirsching** [2]  3/12 5/17
**within** [2]  268/8 268/12
**without** [3]  119/16 217/22
224/16
**witness** [38]  4/3 12/20 13/4
16/18 16/20 17/10 18/2 18/10
31/2 82/14 91/21 131/14
134/5 134/25 135/10 136/1
140/2 143/11 143/13 144/17
145/8 146/2 156/13 177/7
189/2 190/9 199/5 231/25
232/8 232/10 245/24 246/15
252/13 252/22 255/1 256/10
270/6 273/12
**witness'** [2]  57/22 252/19
**witnesses** [19]  8/9 15/9 17/1
17/2 17/6 17/11 17/14 21/5
72/17 127/14 128/19 130/6
130/10 130/12 134/21 190/5
231/23 232/2 267/11
**woman** [8]  173/1 173/10
177/14 177/16 177/17 177/21
183/23 211/19
**Wong's** [1]  203/19
**word** [5]  28/10 52/5 80/10
130/20 158/7
**worded** [1]  267/5
**words** [10]  6/22 8/7 17/21
77/23 130/15 182/23 183/10
246/21 267/16 268/17
**wordy** [1]  37/10
**work** [13]  99/16 137/1 146/8
146/16 147/14 161/1 173/19
174/6 174/8 236/13 236/18
237/6 241/24
**worked** [1]  174/3
**working** [21]  31/3 31/16
31/17 33/15 33/16 33/18
35/20 176/18 177/23 180/19
184/7 184/9 186/18 197/17
214/18 215/24 217/5 228/19
234/2 243/13 243/21
**works** [5]  40/9 146/10 146/22
149/15 171/17
**World** [3]  141/15 145/11
148/22
**worrying** [1]  33/1
**worth** [2]  228/2 243/13
**would** [170]
**wouldn't** [11]  20/8 58/4 80/1

99/1 124/4 129/1 216/14
133/2 163/9 167/20 172/8
**wrap** [2]  156/1 156/4
**write** [3]  32/3 125/24 126/2
**writes** [1]  99/25
**writeup** [1]  131/12
**writing** [2]  94/14 254/9
**written** [4]  94/19 198/19
202/21 247/19
**wrong** [6]  16/11 82/6
**wrote** [9]  52/2 52/15 52/19
53/1 53/8 102/9 126/11 243/4
254/15

**Y**

**yahoo.com** [1]  47/5
**Ye** [1]  66/20
**yeah** [7]  148/24 216/22
237/19 244/9 253/15 260/6
265/13
**year** [1]  62/2
**yes** [464]
**yes-or-no** [2]  83/23 83/24
**yesterday** [2]  70/22 258/20
**yet** [5]  71/10 149/11 189/16
207/10 223/17
**York** [1]  2/11
**you** [1628]
**You're** [1]  133/14
**your** [351]
**yourself** [4]  174/24 210/22
230/10 244/17
**yourselves** [1]  229/20
**yous** [1]  104/9

**Z**

**Zhadko** [79]  24/5 24/7 30/24
32/8 32/12 32/13 32/20 33/7
45/3 45/6 45/10 45/13 45/17
45/21 45/22 45/25 46/9 46/22
47/20 48/6 49/12 54/3 54/8
54/17 54/19 57/10 58/9 58/21
61/18 61/20 62/6 63/8 63/17
63/20 64/7 65/10 66/8 66/16
66/17 66/18 67/11 67/15
67/18 67/24 90/3 108/16
109/4 109/11 112/6 115/3
116/3 118/1 162/9 162/10
162/14 162/21 162/24 163/5
164/9 164/14 165/21 166/8
172/10 177/2 181/13 181/25
182/5 182/6 191/1 226/1
237/14 238/1 238/18 239/24
240/5 240/10 245/19 247/16
248/17
**Zhadko's** [7]  62/15 62/25
66/14 67/6 67/24 95/11 96/7
**zoom** [3]  100/3 241/2 254/2
**zoomed** [1]  257/21