1            UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE STEPHEN V. WILSON

4         UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
United States of America,        )
7                    PLAINTIFF,   )
                                  )
8  VS.                           )    NO. CR 20-579 SVW
                                  )
9  Richard Ayvazyan, et al.,     )
                    DEFENDANT,    )
10 _____)

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            LOS ANGELES, CALIFORNIA

15          KASTIGAR MOTIONS - DAY TWO

16           THURSDAY, JULY 29, 2021

17

18

19     _____

20        KATIE E. THIBODEAUX, CSR 9858
          U.S. Official Court Reporter
21                Suite 4311
            350 West 1st Street
22        Los Angeles, CA  90012

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2

 3   ON BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:

 4   U.S. DEPARTMENT OF JUSTICE
     U.S. ATTORNEY'S OFFICE
 5   BY: RANEE KATZENSTEIN, AUSA
     -and- ALLISON WESTFAHL KONG, AUSA
 6   -and- NIALL O'DONNELL
     -and- CATHERINE SUN AHN, AUSA
 7   -and- SCOTT PAETTY, AUSA
     312 North Spring Street
 8   Twelfth Floor
     Los Angeles, CA  90012
 9
     -and-
10
     Christopher Fenton
11   US Department of Justice
     1400 New York Avenue, NW
12   Washington, DC 20530

13

14
     FOR DEFENDANT R. AYVAZYAN:
15
     Ashwin J. Ram
16   Steptoe and Johnson LLP
     633 West 5th Street
17   Suite 1900
     Los Angeles, CA 90071
18

19   Michael A. Keough
     Steptoe and Johnson LLP
20   One Spear Tower Suite 3900
     San Francisco, CA 94105
21
     Nicholas P. Silverman
22   Steptoe and Johnson LLP
     1330 Connecticut Avenue NW
23   Washington, DC 20036

24

25
```

```
 1   APPEARANCES (Cont'd):

 2

 3   FOR DEFENDANT TERABELIAN:

 4   John Lewis Littrell
     Bienert Katzman Littrell Williams LLP
 5   903 Calle Amanecer
     Suite 350
 6   San Clemente, CA 92673

 7   Ryan Vaughan Fraser
     Bienert Katzman Littrell Williams LLP
 8   601 West 5th Street
     Suite 720
 9   Los Angeles, CA 90071

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS NAME                            PAGE

 4   JUSTIN PALMERTON
     Cross-Examination by Mr. Ram             5
 5   Cross-Examination by Mr. Fraser         47

 6   CATHERINE AHN
     Cross-Examination by Mr. Silverman      67
 7   Cross-Examination by Mr. Littrell       88

 8   TIMOTHY MASSINO
     Cross-Examination by Mr. Keough         93
 9
     BRIAN FAERSTEIN
10   Cross-Examination by Mr. Silverman     104

11   GEFFREY CLARK
     Cross-Examination by Mr. Keough        125
12

13

14   EXHIBIT                        I.D.    IN EVID.

15   Court Exhibit 1                143

16

17

18

19

20

21

22

23

24

25
```

```
 1          LOS ANGELES, CALIFORNIA; THURSDAY, JULY 29, 2021

 2                          10:03 A.M.

 3                          - - - - -

 4

 5

 6

 7          THE COURT:  We are ready to proceed with the

 8    second day of the hearing on the Kastigar motions.  The

 9    same parties and lawyers who were here yesterday are here

10    today; correct?

11          MR. CIPOLLETTI:  Yes, your Honor.

12          THE COURT:  Your appearances are noted.

13              We are ready for another witness.  Who is

14    that?

15          MR. RAM:  Justin Palmerton.

16        (The witness was sworn.)

17          THE CLERK:  State your full name, and spell it for

18    the record.

19          THE WITNESS:  My name is Justin Palmerton,

20    J-U-S-T-I-N, P-A-L-M-E-R-T-O-N.

21

22                       CROSS-EXAMINATION

23    BY MR. RAM:

24    Q     Good morning, Agent Palmerton.

25    A     Good morning.
```

```
 1    Q      You prepared a declaration in this case?

 2    A      I did.

 3    Q      You spent some time drafting it?

 4    A      I did.

 5    Q      Did anyone help with you the drafting or review?

 6    A      No, it was me.

 7    Q      No one reviewed your draft before it was finalized?

 8    A      No.

 9    Q      And what was the process you underwent to prepare

10    your declaration?

11    A      I reviewed e-mails, primarily e-mails, grand jury

12    subpoena returns, and then just try to go back in my mind

13    to recreate what my mind or my thought process was at the

14    time.

15    Q      Okay.  And did you attempt to identify every direct

16    and indirect use of information from the Miami phones you

17    made related to this case?

18    A      I tried to, yes, pursuant to the Court's order.

19    Q      And you did not include your -- well, before I go

20    there, your declaration doesn't include any testimony you

21    gave at the October 22nd detention hearing in this case;

22    right?

23    A      No, it does not.

24    Q      And the October 22nd detention hearing, that was

25    within a day or two of the Miami arrest; is that right?
```

```
 1   A     Yes.  Yes.

 2   Q     And that was approximately within two months of the

 3   August investigation activity that you did describe in

 4   your declaration?

 5   A     Yes.

 6   Q     Okay.  Part of your testimony at the October 22nd

 7   detention hearing was that the -- the information about

 8   Iullia Zhadko on the Miami phones confirmed that Richard

 9   Ayvazyan was using Iullia Zhadko as an alias; is that

10   true?

11   A     I don't think I would use the word confirm.

12   Q     Okay.  Why don't we look at the statement from your

13   detention hearing including the context.  Do you remember

14   the context for a statement about Iullia Zhadko, what you

15   were asked?

16   A     Yes.  It was a detention hearing and Mr. Trontz, I

17   believe was Ayvazian's attorney at the time, was

18   basically trying to confirm identity.  It was essentially

19   an identity question.

20   Q     Let's take a look at Kastigar Exhibit 15, pages 23

21   to 24.  Let's highlight the question first.  So

22   Mr. Trontz at the top of Exhibit 15, top of page 23.

23         First, he asked you, if you remember this from

24   your memory to, you were generally asked how -- these

25   loans were submitted on a computer I think is the word he
```

1   used?

2   A      Yes.

3   Q      Right.  So he is asking you what evidence do you

4   have linking Richard Ayvazyan and Mary Terabelian to the

5   loans that were actually submitted on those computers;

6   right?

7   A      Correct.

8   Q      And then let's look at the actual transcript,

9   bottom half, right after he said -- I think you respond

10  or he asked, were these all submitted via computer.  You

11  say, yes, to the best of my knowledge yes; right?

12  A      Yes.

13  Q      Then the question is -- my question, quote, my

14  question is how do you know that Mr. Ayvazian and

15  Ms. Terabelian were the ones who actually filed these

16  applications through the computer.

17          And then you respond, for some of the

18  applications filed under the name Iullia Zhadko, the

19  funds were deposited into a bank account.  From there,

20  the funds float into an escrow account, and in reviewing

21  the records from that escrow company, there was an e-mail

22  from a Richard Ayvazyan that appeared to be directing the

23  flow of funds from the bank account.  And then, once the

24  CBP stopped for the secondary inspection, we learned that

25  there was a photograph of Iullia Zhadko on the digital

```
 1    device, and we made the connection that Iullia Zhadko was
 2    in fact an alias of Richard Ayvazyan.
 3             Correct?  Did I read that correctly?
 4    A    Yes.
 5    Q    And when you say we made the connection that Iullia
 6    Zhadko was, in fact, an alias of Richard Ayvazyan, you
 7    are saying Richard Ayvazyan was Iullia Zhadko?
 8    A    That he was using the alias, yes.
 9    Q    Okay.  And then he asked you -- since we are here,
10    why don't we just finish it.  So other than the
11    possession of that identification and that e-mail, there
12    is no other connection between my client and the alias
13    that is listed; correct?
14             And you understand he is referring to Richard
15    Ayvazyan as his client?
16    A    Yes.
17    Q    And then you answer, other connections that I can
18    note are open source research in the case that they had
19    shared.  Who.  And you answer Richard Ayvazyan and Iullia
20    Zhadko.  Sorry.  That they had shared addresses.
21             And then he asked you, any other connections
22    between these applications and my clients.  And then you
23    refer back again, aside from money transfers -- meaning
24    what you have been calling flow of funds; is that right?
25    A    Yes.  That is accurate.
```

1   Q     So aside from money transfers into bank accounts

2   owned by Mr. Ayvazian, that is all I have.

3         Do you see that?

4   A     Yes.

5   Q     And he asked you, and you are the lead investigator

6   in this case.  And you said, that's correct; right?

7   A     Yes.

8   Q     And this testimony, I think I have asked you this

9   is on October 22nd?

10  A     Yes.

11  Q     And the investigation started June, roughly in June

12  of 2020?

13  A     End of June, 2020, yes.

14  Q     Okay.  And so this would be within roughly three to

15  four months of the start of the investigation?

16  A     Yes.

17  Q     Okay.  Would you agree that part -- sorry.  Would

18  you agree that Richard Ayvazyan's possession of the phone

19  registered in the name of Iullia Zhadko and the contents

20  of that phone were powerful evidence that Richard

21  Ayvazyan controlled Iullia Zhadko identity as an alter

22  ego essentially?

23  A     I think it was a piece of evidence, relevant

24  evidence.  Sure.

25  Q     Would you agree that it is powerful evidence?

```
 1   A     I mean --
 2         MR. O'DONNELL:  Objection.  Asked and answered,
 3   your Honor.
 4         THE COURT:  Overruled.
 5         THE WITNESS:  I wouldn't say it was necessarily
 6   powerful.
 7   Q    BY MR. RAM:  Okay.  And let's talk about the Miami
 8   stop and the 65 photographs you took after that stop.
 9   A     Uh-huh.
10   Q     When you learned that Mary Terabelian would be
11   traveling to the United States on October 16th, you asked
12   CBP officers to initiate a secondary inspection; is that
13   right?
14   A     I made the request, yes.
15   Q     And just a few hours after she, in fact, arrived at
16   Miami, you e-mailed CBP officers in Miami to check in and
17   see how this went; is that right?
18   A     I believe it was a few, four or five hours after.
19   Q     Okay.  But you e-mailed to check in to see how it
20   was going essentially?
21   A     I did because I had not heard anything from them.
22   Q     Okay.  And, after that, you spoke to a CBP officer
23   on the telephone; right?
24   A     Yes.
25   Q     And at that time, you learned that multiple phones
```

1    were seized?

2    A     Multiple phones and multiple credit cards.

3    Q     So the answer to my question would be, yes, you did

4    learn that multiple phones were seized?

5    A     I did.

6    Q     And you learned that CBP had reviewed those phones

7    in some fashion?

8    A     Well, I learned about the credit cards first, and,

9    then, subsequent to that, I learned about the phones,

10   yes.

11   Q     So you did, in fact, learn from CBP that they had

12   reviewed the phones?

13   A     Yes.  That they had I guess looked through them.

14         THE COURT:  Keep your voice up, agent.  I can't

15   hear you.

16         THE WITNESS:  Yes, your Honor.

17   Q     BY MR. RAM:  And, as part of that review of the

18   phones, you learned that CBP had found at least one image

19   of a driver's license in the name of Iullia Zhadko on one

20   of the Miami phones?

21   A     Yes.

22   Q     You ultimately memorialized the events of your

23   October 19th interactions with CBP in a Form 302;

24   correct?

25   A     I did not.  The FBI Miami agents wrote a 302 on the

1   arrest.

2   Q    Okay.  Why don't we pull up Palmerton Exhibit J

3   from your declaration.

4         Do you see that on the screen there, Agent

5   Palmerton.

6   A    I do.

7   Q    The date of entry is November 16th, 2020?

8   A    Yup.

9   Q    And it details -- actually -- sorry.  Before we get

10  to this, did you prepare any other 302 related to the

11  interaction at Miami in your conversations with CBP

12  officers?

13  A    Not that I recall.

14  Q    So your memory of your phone calls and interactions

15  with CBP is really all we have to evaluate what you

16  discussed with the CBP officers at this point?

17  A    Yes.  That and the complaint.  And the complaint

18  was written shortly after those discussions.

19  Q    Okay.  Now, let's take a look at KX60.  This is

20  actually what I meant to pull up earlier?

21  A    Okay.

22  Q    And this is date of entry November 24th, 2020;

23  right?

24  A    Correct.

25  Q    And this is roughly a little more than a month

1    after the Miami stop?

2    A    Yes.

3    Q    And it says on October 19th, 2020, CBP performed a

4    secondary inspection on Marietta Terabelian and Richard

5    Ayvazyan subsequent to their arrival from Turks and

6    Caicos Islands at Miami International Airport?

7    A    Yes.

8    Q    So this was your documenting the Miami stop on your

9    part?

10    A    It was actually just documenting the reports I

11    received from CBP.

12    Q    Okay.  And those are in the record.

13    A    They are.

14    Q    But you did not otherwise specify any content of

15    your conversations with CBP or the information you

16    learned on October 19th and October 20th in an FBI 302;

17    correct?

18    A    No.  Just I believe it was in the complaint.

19    Q    But you didn't do it in an FBI 302?

20    A    I did not.

21    Q    And did you personally draft the complaint?

22    A    I did.

23    Q    Did you draft it with prosecutors Fenton and Julian

24    Andre?

25    A    Yes.  With their assistance.

1  Q     Is there a document that you solely drafted that

2  reflects the contents of your communications with CBP?

3  A     Likely one of the first drafts that we were

4  writing.

5  Q     And do you have a first draft of that?

6  A     I might.  I would have to look.  Yes.

7  Q     And can you produce that to the defense?

8  A     I can.  Yes.

9  Q     Okay.  Thank you.  Or I should say will you produce

10 that to the defense?

11 A     Yes.  Yes, I can?

12       MR. RAM:  Your Honor, we make that request for

13 Agent Palmerton's first draft or all drafts of the

14 complaint affidavit in this case.

15       THE COURT:  I don't know that that is necessary.

16       MR. RAM:  How about the first draft?

17       THE COURT:  I said I don't think that is

18 necessary.

19       MR. RAM:  Okay.

20 Q   BY MR. RAM:  All right.  Now, let's go to your

21 November 13th review of the Miami phones.  First off, you

22 spent about two hours reviewing the Miami phones?

23 A     Yes.  Approximately.

24 Q     And you brought in another agent to assist you?

25 A     Yes.  FBI Agent Lynne Zellhart.

1   Q      And you ultimately took photos from three of those

2   five phones you reviewed; is that right?

3   A      Yes, I believe so.

4   Q      Did you review all of the photos on the five

5   phones?

6   A      No, I don't think so, no.

7   Q      How many of the photos did you review?

8   A      I couldn't give you a specific figure.

9   Q      How did you know that you didn't review all of the

10  photos?

11  A      Really because we didn't look at any deleted photos

12  or anything like that.  It was strictly going into the

13  images folder and scrolling through.  I mean, there was

14  multiple, multiple images on the phones, and, as I

15  detailed in my declaration, I was just looking for PPP

16  applications, driver's licenses, credit card photos,

17  things of that nature.

18  Q      All phones(sic) that were available on the main

19  folder; right?  Like when you go into a phone, you see --

20  not talking about deleted items, but you see phones when

21  you open up -- you see photos when you open up someone's

22  phone; right?

23  A      Yes.

24  Q      Did you avert your eyes from any of those photos

25  that would have been in the same main folder you were

1    viewing?

2    A      There was a lot of pornographic material that I

3    averted my eyes from.

4    Q      But you saw there was some pornographic material?

5    A      Yes, I did.

6    Q      And then you took some select photos from those,

7    approximately three of the phones; right?

8    A      Yes.

9    Q      And that was a total of 65 photographs?

10   A      Yes.

11   Q      Let's take a look at Image 23A from your

12   declaration.  I'm sorry.  Image 23A from KX1 which is on

13   page 23, Kastigar Exhibit 1.

14          So as part of you taking the 65 photos, you

15   also took a photo of the phone itself that you were --

16   that you took photos from; is that right?

17   A      Yes.  I think I took three photos.

18   Q      And that is how you know that you actually took

19   photos from three phones?

20   A      Yes.  That was my process of documenting which

21   phone we took the photos from.

22   Q      Okay.  Is it fair to say that the images you

23   reviewed on the five phones but did not take a picture of

24   aren't addressed in your declaration?

25   A      Yes.  I believe so.

1    Q      Okay.  And then let's jump ahead to later in the

2    investigation.  Actually, let's look at the next image

3    first.  Image 46A which is on page 47 of Kastigar Exhibit

4    1.  That is another phone that you photographed; right?

5    A      Yes.

6    Q      And, then, finally, that is the second phone, and,

7    then, the third phone is Image 66A which is page 60 of

8    this exhibit.

9           Same question, this is the third phone that

10   you photographed?

11   A      Yes.

12   Q      All right.  We can take that down.

13          So now jumping ahead to May 21st or so.

14   A      Okay.

15   Q      Roughly be -- how many -- how far after

16   November 13th is that?

17   A      Seven months approximately.

18   Q      Okay.  Five or six months, let's say?

19   A      Sure.

20      MR. O'DONNELL:  Objection.

21      MR. RAM:  Sorry.  I was just doing math.  Sorry.

22   December, January, February, March, April, May.  So seven

23   months.  You were right.

24   Q      Seven months later, May 21 or so, you reviewed a

25   phone that was seized from Weddington which you

```
 1    associated with Tamara Dadyan.

 2    A     Yes.

 3    Q     And that phone was seized roughly on November 5?

 4    A     On November 5th, yes.

 5    Q     And when you were reviewing that phone, you

 6    recognized, to kind of shorthand this, you recognized or

 7    connected back some of the images you saw on that phone

 8    to the 65 photographs that you took?

 9          MR. O'DONNELL:  Objection.  Form of the question.

10    Recognize or connected back.  There is two questions

11    pending.

12          THE COURT:  Objection sustained.

13          MR. RAM:  Sure.  Let me clarify.

14    Q     So on May 21st or so, when you are reviewing a

15    phone associated with Tamara Dadyan, you recognized some

16    of the same images that you took photos of back on

17    November 13th; correct?

18    A     No, I don't recall specifically.

19    Q     Well, let's pull up an example.  For example, you

20    recognized a contact for Misak Arakelyan with the e-mail

21    address Misak at NWtradings.com.  Do you remember that

22    one?

23    A     Yeah.  That was a contact not a photo?

24          THE COURT:  Not what?

25          THE WITNESS:  Not a photo, your Honor.
```

1  Q     BY MR. RAM:  Correct.  So you recognized that

2  contact, but you had taken photos of information relating

3  to Northwest Tradings; right?

4  A     Yes.  I believe so.  I was confused.  I thought you

5  were -- that I saw two of the same photos or that is what

6  I was looking for but --

7  Q     So let's do another example.  Let's stay with Misak

8  Arkalian.  And we can pull it up actually.  Why don't we

9  go to Kastigar Exhibit 1, page 70.  This is Image 65A of

10  Kastigar Exhibit 1, what are we looking at here?

11  A     It looks like an e-mail from Fountainhead which is

12  one of the lenders, and it looks like an e-mail to Misak

13  Arkalian.  Two documents were missing from the previous

14  files, the Gusto report, 29 W2s and proof of payroll.

15  Essentially, he is asking what appears to be Misak

16  information for presumably a PPP loan.

17  A     Okay.

18  Q     And when you reviewed this, you saw the contact,

19  the e-mail address contact name.  It is to Misak

20  Arkalian.  That is one of the individuals you saw

21  information for on the phones when you took the 65

22  photographs; is that right?

23  A     Yes.

24  Q     And that was, again, roughly seven months before

25  you saw this image on the phone associated with Tamara

1    Dadyan?

2    A     Yes.

3    Q     Okay.  Let's jump back to February 2nd of 2021 now.

4    That is when you get the 141 photos from CBP?

5    A     Yes.

6    Q     Okay.  And why don't we take a look at one of those

7    141 photos at Kastigar Exhibit 2, page 140 which is Image

8    134B.

9          Is this a text between John Bradford and

10   Richard Ayvazyan?

11   A     Yes.

12   Q     And it references a loan for CBD?

13   A     Yes.

14   Q     And Prosecutor Fenton asked you to take a look at

15   the image, didn't he, that we see on the screen here.

16   A     I think he asked me to look into the CBD.com loan.

17   I may have looked at the image, but I just don't recall

18   specifically.  But I do remember Mr. Fenton asking me to

19   look into John Bradford and this loan.

20   Q     Do you remember him asking you to take a look at

21   these text messages and see if we should interview this

22   guy meaning John Bradford?

23   A     I mean, yeah, no.  We wanted to interview John

24   Bradford, yes.

25   Q     And do you remember the premise for that was take a

1  look at these text messages?

2  A    It likely was, yes.  I just don't recall

3  specifically.

4  Q    Okay.  And it is in the record so we don't need to

5  go over it here, but, big picture, the question is -- the

6  question for you is after he asked you to do some type of

7  follow-up here whether it is interviewing him or

8  otherwise -- or do you remember that?  Did he ask you

9  should we interview this guy?

10  A    I think we wanted to serve him with a subpoena and

11  get records for the CBD.  I think this text message

12  references CBD and we didn't know if there is a PPP loan

13  or not so we were going to look into whether or not

14  CBD.com had received a PPP loan and what records they

15  had.

16  Q    And you, ultimately, the prosecution team drafted a

17  subpoena and served it; is that right?

18  A    Yes.  After a few different efforts.

19  Q    And you eventually got materials in response to

20  that subpoena?

21  A    We did.

22  Q    And about three months later, after reviewing the

23  141 photos from CBP, so March, April, May, roughly in

24  May, you reviewed a Cellebrite for a phone associated

25  with Richard Ayvazyan that was seized from 4910 Topeka on

1  November 5th?

2  A     Yes.

3  Q     And on that phone, when you reviewed it, you

4  observed a text message chain between Ayvazian and

5  Bradford; is that right?

6  A     Yes.

7  Q     And you attached that text message chain as Exhibit

8  N to your declaration; is that right?

9  A     I believe so, yes.

10  Q     And those text messages we can look at them if we

11  need to, but, big picture, those text messages talked

12  about Ayvazian getting Covid and the 2020 presidential

13  election.

14  A     Yes.  Yes.  From what I recall.

15  Q     And they did not cover or talk about CBD or a PPP

16  loan for CBD?

17  A     Not that I recall.

18  Q     Okay.  Let's talk about your review of the

19  Cellebrites in this case.

20          On November 20th of 2020, you submitted a

21  request to CART for forensic review of phones and an iPad

22  seized in Miami; is that right?

23  A     Yes.

24  Q     And CART's job is to do what with those digital

25  devices?

```
 1   A      Take them and make forensic copies of them for
 2   either agent review or discovery.
 3   Q      And how did you communicate with the CART lab in
 4   general?  Is it in person, on the phone, e-mails?
 5   A      Sometimes e-mails, but I think generally over the
 6   phone if they have questions.
 7   Q      Okay.  And you physically sent the digital devices
 8   from Miami to the CART lab?
 9   A      No.  No.  They have access to go pick up the
10   devices from our evidence facility.
11   Q      Okay.  Because CART is part of the FBI?
12   A      They are, yes.  They are either agents or
13   technicians.
14   Q      And after CART processes the phone, at least in
15   this case, they were sent to a filter team; is that
16   right?
17   A      Yes.  I think we took -- they made forensic copies,
18   and, then, the first copies were sent to defense for
19   discovery.  And then we did send them to a filter team
20   for review.
21   Q      And, after the filter team gets the forensic
22   copies, what happens next?
23   A      The filter team generally goes through it, looks --
24   does searches for words such as attorney, any attorney
25   names that we are aware of.  In this instance, it was
```

```
 1    also marital privilege so communications between married

 2    persons, and then they filter all of that out and then

 3    generally provide the investigative team with filtered

 4    copies of the forensic copies of the digital devices.

 5    Q      In fact, in this case, the Cellebrite reports from

 6    the digital devices for Miami were released to you from

 7    the filter team on February 23rd, 2021; is that right?

 8    A      That is when the paralegal that was helping us

 9    upload it into USAFX.  So I am not exactly sure when they

10    were released to the investigative team, but that is when

11    I would have first had access to them.

12    Q      Okay.  And you conducted a review of the

13    Cellebrites?

14    A      I did.

15    Q      And those Cellebrites contain essentially the

16    forensic image of the digital devices in question?

17    A      Yes.

18    Q      Fair to say those are large repositories of

19    information?

20    A      Yes, there is a lot of data on them.

21    Q      Okay.  Would you agree that the Cellebrite reports

22    from the Miami phones seized from Miami cover the

23    equivalent of thousands and thousands of pages of

24    information?

25    A      Yes, I would say that.
```

1  Q      And between February 24th and April 27th of 2021,

2  you reviewed the Cellebrites less than a dozen times; is

3  that right?

4  A      Yes.  Yes.  To the best of my knowledge.

5  Q      When you say less than a dozen times, does that

6  mean -- did you review it ten times, then, for sure?

7  A      I couldn't tell you.  I just recall it was likely

8  less than a dozen.  It wasn't a lot of time.

9  Q      A lot of times?

10 A      Yes.  Yes.

11 Q      Even if it was let's say eight times during that

12 time period, that would still average reviewing once per

13 week; is that fair to say?

14        MR. O'DONNELL:  Objection.  A hypothetical.

15        THE COURT:  Overruled.

16        THE WITNESS:  Likely.  Some of the weeks leading

17 up to March when we effected the March 11th arrest.

18 Q   BY MR. RAM:  I want to make sure you understood my

19 question.  I said even if it was just eight times; right?

20 The relevant time period for your review you said was

21 February 24th and April 27th, in that time period; right?

22 That would average once per week.

23 A      Again, that would be the average.

24 Q      Okay.  And let's talk about what was on the

25 Cellebrites that you reviewed.  By the way, is it

1    Cellebrites or Cellebrites?

2    A    Cellebrite.

3    Q    Okay.  And you focused on two devices in

4    particular; is that right?

5    A    Yes.

6    Q    One was 1B123 which was registered to a Iullia

7    Zhadko?

8    A    Yes.

9    Q    And the other was 1B126 which was registered to a

10   Victoria Kauichko?

11   A    Yes.

12   Q    And you took some screen shots of relevant items

13   that you found on these devices; right?

14   A    Yes.

15   Q    You also -- and we will come back to this word --

16   but exported what you thought were relevant text messages

17   into a PDF format; is that right?

18   A    Yes.

19   Q    And can you explain to the court what does that

20   entail when you export from the Cellebrite into a PDF?

21   A    So, in this instance, we were looking at text

22   messages, and there is different ways to export the text

23   messages.  You can do them in -- you can export them in

24   Excel format, or you can export them in PDF format and it

25   essentially takes the text messages from the report, puts

```
 1   it in a multi-page PDF that looks like a smart phone
 2   chat.
 3   Q     A what?
 4   A     A smart phone, like a chat.  Like an iPhone.  It
 5   just makes it easier to read.
 6   Q     Okay.  All right.  Is it fair to say you took some
 7   screen shots and exported text messages from the Zhadko
 8   phone, but you didn't take screen shots or export text
 9   messages from the Kauichko phone?
10   A     No.  I don't think I exported text messages from
11   Kauichko, the Kauichko phone.
12   Q     Okay.  And you didn't otherwise take notes of your
13   review, did you?
14   A     No.  Not while I was reviewing.
15   Q     So as you sit here, you would have no way of
16   knowing what you did and didn't look at on the Kauichko
17   phone?
18   A     No, I don't think so.
19   Q     Now, you found four relevant text message strings
20   on the Zhadko phone; is that right?
21   A     Yes.  I think that's right.
22   Q     And you attached them to your declaration as
23   Exhibit O?
24   A     Yes.
25   Q     But they were so voluminous you actually had to
```

1    attach a CD; is that right?

2    A     Yes.

3    Q     And one of those four text message strings involved

4    test messages with Tamara Dadyan; is that right?

5    A     Yes.

6    Q     Just so we can see what we are talking about, why

7    don't we pull up Kastigar Exhibit 19 which is your

8    Exhibit O or Exhibit O to your declaration, or part of it

9    I should say.

10          In short, this is the contents it of the CD

11   that you attached to your declaration; correct?

12   A     Yes.  This looks accurate.

13   Q     Like a folder level view?

14   A     Yes.  Of the images.  There is the photos and,

15   then, yeah, the zip file which contained the exported

16   text messages.

17   Q     And in that zip file which was the bottom file we

18   see there, that had excerpted PDFs as you described from

19   four different text message strings; correct?

20   A     Correct.

21   Q     Go to the next page.  Go to page 2 of Exhibit 19.

22   Let's go one more page.  Sorry.  Go back up.  So this is

23   the folder structure on the CD just so we can see it;

24   right?  So then after you open the zip file folder, it

25   says zhadko.richard phone; right?

1   A    Yes.

2   Q    Next page.  And these are the four subfolders in

3   your Exhibit O?

4   A    Yes.  The subfolders containing, yeah, the PDF

5   export.

6   Q    And can you explain to the court the significance

7   of the folder names, specifically, the numbers before

8   2021?

9   A    Those are the dates that they were exported, I

10  believe.

11  Q    I'm sorry.  Before the date.  So where it says 2LA?

12  A    Yes.  1B123 is the FBI's evidence number for the

13  digital device.

14  Q    Okay.  So and that is the phone registered to a

15  Iullia Zhadko; correct?

16  A    Yes.

17  Q    All right.  Scroll down if there is anything else.

18  I don't think there is.  One more.

19        Okay.  So as you can see from the screen shot,

20  this is when you click on the particular subfolder

21  labeled QLA1232021-04 -- sorry -- 26.15-26-59?

22  A    Yes.

23  Q    And then, specifically, there is a report, PDF

24  report I think which you described, and this is going to

25  represent the text message exchange between the Iullia

1    Zhadko phone and a phone associated with Tamara Dadyan;

2    is that right?

3    A     I don't know.  I would have to see that report

4    opened.

5    Q     In fact, we can go to Exhibit O I think.  We will

6    just go to Exhibit O, and I am going to represent to you

7    that that report here, when you click on it, this is what

8    is in the Exhibit O that we are pulling up.

9    A     Okay.

10   Q     All right.  So do you recognize what this is?

11   A     Yes.  These are the text messages between Tamara

12   Dadyan and Richard.

13   Q     And Richard Ayvazyan?

14   A     Yes.

15   Q     And, specifically, it is actually from the Iullia

16   Zhadko, the phone registered to Iullia Zhadko?

17   A     Yes.

18   Q     So when you say it is with Richard Ayvazyan, that

19   is based on your investigation; correct?

20   A     Yes.  It was from the 1B123 phone.

21   Q     Okay.  And, at the very top, we see conversation,

22   instant messages, 4,911; is that right?

23   A     Yes.

24   Q     What does that mean?

25   A     I believe that -- I mean, to the best of my

1  knowledge, that is each instance of a chat that occurs in

2  this text string.

3  Q     Okay.  And the participants of this text string --

4  can we blow up the top part here so there is no doubt.  A

5  person labeled as T; right?  And with a phone number

6  ending in 5533; is that right?

7  A     Yes.

8  Q     And that is, as you know from the investigation,

9  from the phone at 1B21?

10  A     Yes, I believe so.

11  Q     In other words, one of the Tamara Dadyan phones?

12  A     I believe so, yes.

13  Q     And, again, 4170, that is the Iullia Zhadko phone?

14  A     Yes.

15  Q     1B123.  The actual Cellebrite from the phone we are

16  actually looking at; right?

17  A     Yes.

18  Q     I won't have Ms. Romero scroll through, but is it

19  fair to say this excerpted PDF is 918 pages just by

20  itself?

21  A     Yeah.  I recall it was fairly long.

22  Q     Any doubt that it is 918 pages?

23  A     No.  That seems accurate.

24  Q     Okay.  Let's just look at three examples of the

25  text messages that you excerpted from the Iullia Zhadko

```
 1   phone, 1B123.  Let's start with -- and we will do it
 2   right from this PDF.  Let's start with page 391.  Let's
 3   look at the text message on the very top of the page.
 4           It says -- and this is from the Zhadko phone;
 5   right?
 6   A    Yes.
 7   Q    IE4170?
 8   A    Yes.
 9   Q    That is the end of the phone number basically?
10   A    Yes.
11   Q    And it says, Tam, escrow sent two forms, need to be
12   filled out to that Zhadko e-mail you have.  Can you
13   forward to me or give me password.
14           And then there is a response to that text
15   message; right?  From the 5533 Dadyan phone which is at
16   1B21?
17   A    Yes.
18   Q    And she says, send me; right?
19   A    Yes.
20   Q    Okay.  Let's zoom out.  Now, let's go to, actually,
21   before we do that, can we blow up the text messages right
22   below it, two text messages.
23           And the next text message says, what is the
24   password for forwardtoprojecthype30@yahoo.com; right?
25   A    Yes.
```

1    Q      And the Dadyan phone responds, I will forward you

2    now, I send to your project e-mail; right?

3    A      Yes.

4    Q      Let's take a look at page 474 of the same exhibit.

5    Okay.  In the middle of the page, it says, I did seven

6    apps last night, and four of them got e-mail that it is

7    funded.  Do you see that?

8    A      Yes.

9    Q      And you reviewed this text message?

10   A      I reviewed it.  I couldn't recall every little text

11   message.

12   Q      Of course.  Do you understand that they are talking

13   about -- what are they talking about here?

14   A      To me it appears that they are talking about at

15   least from the investigation PPP or EIDL applications.

16   Q      And let's go to one last example, page 561?

17          THE COURT:  What is the point of all this?  I

18   remember these text messages from the trial.  It seems

19   undisputed that the agent did look at this Cellebrite

20   report.  Why are you reviewing certain communications or

21   exchanges in the report?

22          MR. RAM:  Two reasons, your Honor.  One, I was

23   just doing these three examples.  I don't want to waste

24   the court's time.

25          THE COURT:  But I remember -- the seven app thing

1    I remember distinctly.  He said something, I was up all

2    night or something, working hard with that.

3            I have a memory of all of these things.  So I

4    don't want to restrict you but I don't see the point to

5    this.

6        MR. RAM:  Just to highlight these were reviewed

7    back --

8        THE COURT:  Well, I know that.

9        MR. RAM:  And they were particularly powerful --

10       THE COURT:  That is your view.  I know the factual

11   backdrop.

12       MR. RAM:  Okay.  I don't need to show the last

13   example, then.

14   Q    Is it fair to say that you exported these 119 pages

15   because you thought they were relevant to your

16   investigation?

17   A    Yes.

18   Q    And you are aware that a subset of these text

19   messages in some form or the other were used at trial as

20   part of Government Exhibit 10 as the court just pointed

21   out, I think.

22   A    When you say -- can you clarify when you say

23   subset?

24   Q    You are familiar with Government Exhibit 10?

25   A    Yes, but that was from a separate phone.

1    Q     Correct.  But that separate phone reflected the

2    other side of the conversations that I just showed you.

3          Do you see that?

4    A     Yes, I did.  I just wanted to clarify that it

5    wasn't these text messages that were shown at trial.

6    Q     Right.  Because these text messages were on the

7    Zhadko phone which was suppressed; right?

8    A     Correct.

9    Q     Who else reviewed the text messages you exported

10   from the Zhadko phone, from the Zhadko Cellebrite?

11   A     I don't know.

12   Q     Well, who else did you send it to?

13   A     I don't recall specifically.  I possibly uploaded

14   this to USAFX which is our share file for the

15   investigative team to review, but I don't recall

16   specifically.  And, as you noted, it is a large file so I

17   don't think I would have e-mailed it.

18   Q     Okay.  And who had access to the USAFX platform

19   that you loaded these text messages to?

20   A     At that time, it would have been myself, IRS Agent

21   Clark, SBA OIG Agent Tim Massino, Christopher Fenton,

22   Brian Faerstein, Catherine Ahn and the paralegals as

23   well.

24   Q     And did you discuss the text messages we just saw,

25   excerpted Exhibit O, with anybody else on the prosecution

1  team?

2  A     Like via e-mail or just in general?

3  Q     In any way.  Did you have any communications with

4  the prosecution team?  Let me just take a step back.

5  These are obviously relevant text messages to your

6  investigation.  I think you said that; right?

7  A     Yes.

8  Q     Did you discuss these relevant text messagings with

9  others on the prosecution team?

10  A     Yes, we did.

11  Q     And do you remember who you discussed them with on

12  the prosecution team?

13  A     I think with Mr. Fenton, Mr. Clark, I mean, maybe

14  some of the others, but not in substance.  I just

15  recall -- the majority of my conversations would have

16  been with Mr. Fenton or Mr. Clark surrounding these

17  message.

18  Q     And that was roughly in your review timeframe of

19  February to March of 2021?

20  A     Yes.  I exported these at end of April.  So I think

21  likely, yeah, it would have been some time in April, mid

22  April maybe.

23  Q     Exhibit O, you exported in April?  You sure about

24  that?

25  A     It was April 26, I think was the date.

1    Q      When you sent them to attorney Fenton?

2    A      I couldn't tell you when I uploaded them, no.

3    Q      Okay.  But you reviewed the Cellebrites back in

4    February, in March of 2021; right?  I guess, so there is

5    no confusion.  As part of your review -- I think your

6    declaration says, to make it easier to review, you

7    created an excerpt, a PDF excerpt of some of the relevant

8    text messages; right?

9    A      Yes.  But I don't know if that was in February,

10   March or April.  I couldn't tell you the timeline, but

11   just based on those folders we were going through, it has

12   the date of April 26 that is reflecting the export date.

13   Q      I see.  So you don't know when you reviewed the

14   excerpted PDF specifically, the Exhibit O PDF?

15   A      Yes.  I likely reviewed the text messages, but,

16   then, they were exported on April 26 and 27th, I think

17   were the dates.

18   Q      Correct.  And then the next day, actually, on

19   April 27th, you send Exhibit O, the excerpted PTF's to

20   Mr. Fenton; right?

21   A      I don't recall.

22   Q      You don't recall sending Exhibit O to attorney

23   Fenton?

24   A      Sorry.  On April 27?

25   Q      On April 27th.

```
1   A     I don't recall.

2   Q     Okay.  Should we take a look at your declaration on

3   page -- And have you reviewed any other witness'

4   declarations in this case, Agent Palmerton?

5   A     No.

6   Q     Okay.  Let's take a look at page -- internal page

7   21 of 22, Paragraph 27.  If we can just blow it up.

8               And when did you prepare this declaration,

9   sir?

10  A     This would have been on July 7th.

11  Q     Okay.  So it says on the morning of April 27, 2021,

12  I sent the Gentleman Timepieces and Tamara Dadyan text

13  messages referenced above to Mr. Fenton.

14  A     Okay.  Yes.  So I guess I did.  There must have

15  been an e-mail that I sent that I reviewed.

16  Q     And, as you pointed out, the folders looked like

17  they were created April 26 from the stamp; right?

18  A     Uh-huh.

19  Q     Did you create these folders to send to Mr. Fenton?

20  A     No.  I don't recall.  I think I just -- like I said

21  in my declaration, I was unfamiliar with Cellebrite so I

22  was -- I don't want to say playing around, but learning

23  how to use the export functions, exporting them to PDF on

24  this date and, then, yeah, I guess I sent it to

25  Mr. Fenton because I did they were relevant.  I just
```

```
 1    don't recall specifically like this day.

 2    Q      And how did you send it to Mr. Fenton?

 3    A      It was -- it must have been either e-mail or I

 4    uploaded it to USAFX and then noted in an e-mail that I

 5    had uploaded it.

 6    Q      And did you attach that e-mail to your declaration?

 7    A      I did not.

 8    Q      Do you remember that there is an e-mail?

 9    A      I don't, but there must be based on my declaration.

10           MR. RAM:  Your Honor, may we get a copy of that

11    e-mail?

12           THE COURT:  No.  It is not sufficiently relevant.

13           MR. RAM:  The timing of it, your Honor?

14           THE COURT:  I gave you my ruling.

15    Q    BY MR. RAM:  The prosecution was actively

16    investigating and prepping the first superseding

17    indictment around the same time you were reviewing the

18    information on the Miami Cellebrites; correct?

19           MR. O'DONNELL:  Objection.  Assumes facts not

20    testified to by this witness.

21           THE COURT:  He has asked the question.  He can

22    answer if he knows.

23    Q    BY MR. RAM:  Let me ask you one predicate question.

24    You are part of the prosecution team; right?

25    A      Yeah.  The investigative team?
```

1    Q      Sure.

2    A      Yes.

3    Q      And the question is was the prosecution team which

4    includes the investigative team and the prosecutors in

5    case it wasn't clear, were they actively investigating

6    and prepping to present a first superseding indictment at

7    the same time, around the same time you were reviewing

8    and exporting the -- or reviewing the messages on the

9    Miami Cellebrites?

10   A      No.  Because, like I said in my declaration, I

11   didn't have a lot of time.  I don't even think I reviewed

12   it prior to us going to grand jury, or, if I did, it was

13   very brief.

14   Q      So your testimony is you received the Cellebrites

15   on February 24th, but you didn't review them until after

16   March?

17   A      No.  I think I said I had access to the Cellebrite

18   reports when they were uploaded.  I just can't recall

19   specifically when I would have looked at them, but, in my

20   declaration, I note that we were preparing for the first

21   superseding indictment and I did not have a lot of time

22   to open up the Cellebrite reports.  And, again, I was

23   unfamiliar with them.

24   Q      Let's go to your declaration, paragraph 25.  Okay.

25   First sentence, from February 24th, 2021 to April 27th,

1    2021, I recall accessing the Cellebrite reports less than

2    a dozen times.  Do you see that?

3    A    Uh-huh.

4    Q    And, separately, you point out that you were busy

5    with preparing for the first superseding indictment;

6    right?

7    A    Yes.

8    Q    And my question to you was you were reviewing the

9    Cellebrites for Miami around the same time that the

10   prosecution team was preparing the first superseding

11   indictment.  The answer to that question is "yes" or

12   "no"?

13   A    Well, I had reviewed them, but I was not actively

14   reviewing them.  As I noted, I just -- I didn't have a

15   lot of time.

16   Q    When you say you had reviewed them --

17   A    I possibly opened them up.  So, earlier, when you

18   mentioned that if I had reviewed it eight times, the

19   average was once a week, it was more like back loaded

20   after the indictment and we effected the arrest, I had

21   more time to review the Cellebrite reports.  So more of

22   my time would have been spent after the indictment.

23   Q    Is your testimony that you did not review the

24   Cellebrites before the March 9th first superseding

25   indictment?

1    A      I did review them, yes, but not in detail.

2    Q      Understood.  So very simple question.  So if you

3    reviewed the Cellebrites before March 9th, you knew the

4    information from the Cellebrites leading up to the

5    March 9th first superseding indictment; yes?

6    A      When you say knew the information?

7    Q      You had this information in your mind?

8    A      I had some information.  Yes.

9    Q      Okay.  Your declaration mentioned several

10   communications with the prosecution team but doesn't

11   attach them.  And I want to highlight a couple and

12   maybe -- well, let's start with your declaration,

13   paragraph 26.

14           You say you sent an e-mail to AUSA Faerstein

15   that contained a summary of loans related to Redline Auto

16   Collision, Edward Paronyan.

17           Did you attach that e-mail to your

18   declaration?

19   A      I did not.

20   Q      Why not?

21   A      It was I think it was a very minor reference to the

22   phone.  It did not seem relevant to attach, and, from

23   what I recall reading the summary, it wasn't even clear

24   that the information came from the phone.  But I included

25   this just to make sure I was including as much as I

1    could.

2    Q    Because it may have come from the phones?

3    A    Yes.  Possibly.

4    Q    You just don't know, do you?

5    A    From that reference not particularly, but it was

6    possible, yes.

7         MR. RAM:  Your Honor, we would request a copy of

8    that e-mail as well.

9         THE COURT:  I don't think it is sufficiently

10   relevant under the circumstances of this hearing.

11        MR. RAM:  Can we request it under Jencks, your

12   Honor?

13        THE COURT:  No.  I mean, you can, but I don't

14   think it is necessary either.

15        MR. RAM:  Okay.

16        THE COURT:  I think you are getting answers to

17   questions as this witness remembers them, and some of the

18   questions in my view aren't that relevant to the ultimate

19   issues.

20   Q    BY MR. RAM:  To be clear, this paragraph 26 in the

21   e-mail relates to whether or not information from the

22   Miami phones was used and shared with the prosecutors;

23   right?

24   A    Yes.

25   Q    Okay.  Let's look at Paragraph 27 of your

```
 1  declaration.  You didn't include this e-mail either from
 2  the relating to the Dadyan and Gentleman Timepieces text
 3  messages; correct?
 4  A    No.
 5       MR. RAM:  We make that same request, your Honor.
 6  We understand the court's ruling.
 7       THE COURT:  He said he didn't do it, and I don't
 8  see that to be a point of particular importance in
 9  assessing this motion.
10  Q    BY MR. RAM:  Why were these -- I'm sorry.  So let's
11  go to -- did you review Mr. Fenton's second declaration
12  related to this case, to the Kastigar hearing?
13  A    I didn't review any other declarations related to
14  the Kastigar hearing.
15  Q    Okay.  Now, focusing back in on the April 27th
16  transfer of Exhibit O to Mr. Fenton which I believe you
17  were refreshed by your declaration?
18  A    Yes.
19  Q    Did Mr. Fenton ask you to send him those text
20  messages?
21  A    I don't recall.
22  Q    Did you have a conversation with Mr. Fenton on
23  April 26th or April 27th about the text messages?
24  A    We likely did.  I just -- I don't recall.
25  Q    And this is approximately two months ago?
```

```
1    A      Yes.

2    Q      Or three.

3    A      Three, yeah.

4    Q      And did you send all 100 -- I'm sorry -- all 918

5    pages of Exhibit O to Mr. Fenton?

6    A      Again, I would have to look at the e-mail.  It

7    could have been excerpts, but it was possible I sent just

8    the PDF as opposed to that entire folder.

9    Q      And when you say you have to look at the e-mail,

10   that is the one you didn't attach to your declaration;

11   correct?

12   A      Yes.

13   Q      Lastly, let's talk about any procedural safeguards

14   or mechanisms put in place about reviewing Miami phone

15   information.  I believe you said your investigation

16   started late June of 2020; correct?

17   A      Yes.

18   Q      In October of 2020, when the Miami phones were

19   seized, were there any type of additional or new

20   restrictions or tracking of access put on any of the

21   files or information in this case?

22   A      No.  Aside from just our chain of custody.

23   Q      And that is routine chain of custody in every case;

24   correct?

25   A      Yes.
```

```
 1   Q       But any mechanisms to track, for example, when
 2   someone accesses Cellebrite for one of the phones or
 3   anything along those lines, any type of protocols
 4   instituted that you were aware of?
 5   A       No.
 6           MR. RAM:  Okay.  No further questions.
 7
 8                       CROSS-EXAMINATION
 9   BY MR. FRASER:
10   Q       Agent Palmerton, do you have a copy of your
11   declaration available to you there?
12   A       Not in front of me, no.
13   Q       Okay.
14           MR. FRASER:  With leave of the court, I will give
15   a copy to Agent Palmerton.
16           MR. FRASER:  Your Honor, may I approach Agent
17   Palmerton?
18           THE COURT:  Yes.
19           MR. FRASER:  Thank you.
20   Q       Good morning, Agent Palmerton.
21   A       Good morning.
22   Q       Since 10:00 a.m. yesterday, have you spoken with
23   anyone about this case whether in person or via phone or
24   e-mail, through any medium?
25   A       Can you clarify?
```

```
 1   Q    I intended it to be to be a broad question.  Have
 2   you spoken with anyone about this case?
 3        THE COURT:  And that would include his wife or?
 4        MR. FRASER:  Okay.
 5   Q    Anyone who works for the United States government?
 6   A    Yes, we did talk about the case, but nothing
 7   substantive.
 8   Q    Okay.  Who are the people who work for the
 9   government that you have spoken with about the case since
10   yesterday at 10:00 a.m.?
11        MR. O'DONNELL:  Objection as to relevance, your
12   Honor, as well as any intrusion into privileged
13   communications.
14        THE COURT:  He didn't ask for what was said.  He
15   asked for whether he spoke to other people.
16        MR. O'DONNELL:  Understood, your Honor.
17        THE COURT:  Credibility may be an issue.  So I
18   will allow the question.
19        THE WITNESS:  Yes, we did speak about the case.
20   Q    BY MR. FRASER:  So with whom did you speak?
21   A    As we were in the back with some of the other
22   witnesses, Niall, Mr. Cipolletti and Mr. Fenton.
23   Q    Okay.  You spoke to Mr. Fenton about yesterday's
24   proceedings?
25   A    Yes, but nothing substantive, nothing related to
```

```
 1   his testimony.
 2   Q    Did you discuss with Mr. Fenton the events with CBP
 3   on October 19th through 20th, 2020?
 4   A    Yes.
 5   Q    What did you all talk about in that regard?
 6   A    We talked about the timeline of what had happened.
 7   Q    And you talked about -- you were in communication
 8   with Mr. Fenton on the night of October 19th into 20th,
 9   2020; correct?
10   A    Yes.
11   Q    And, yesterday, you and Mr. Fenton talked about
12   those communications?
13   A    No.  It was this morning.
14   Q    Okay.  And you also talked with Mr. Fenton since
15   yesterday morning about the order in which CBP found
16   evidence; correct?
17   A    He asked me.
18   Q    And you answered, of course.
19   A    Yes.  What my recollection was.
20   Q    Okay.  And that includes the sequence of CBP
21   finding credit cards versus CBP's review of the phones;
22   correct?
23   A    Yes.
24   Q    So tell me about that conversation you had with
25   Mr. Fenton I guess it was this morning?
```

1    A     He asked what my recollection was of that day, and

2    I said basically what the timeline was.  And it was -- it

3    was a hectic day, and it was some time in the evening

4    receiving a call from CBP letting me know that they had

5    stopped Ms. Terabelian and Mr. Ayvazian, found credit

6    cards, and then we had a subsequent call where they

7    discussed the phones.  He was just asking what my

8    recollection was of the timeline.

9    Q     And, in the answer you just gave, you are

10   describing communication you had with Mr. Fenton this

11   morning; is that right?

12   Q     Did you also have communication with Mr. Fenton

13   yesterday?

14   A     Yes, but not regarding the case.

15   Q     Okay.  So returning to the conversation you had

16   with Mr. Fenton this morning, how did that conversation

17   begin?

18   A     I think he asked me, he was like when we -- we were

19   discussing when we did the stop, what was the timeline,

20   what do you recall from that day?  Like, when did they

21   discuss the credit cards versus the phones?

22   Q     And did he talk about why he was asking you that?

23   A     I think he said that there was like a concern about

24   what the timeline of evidence was.

25   Q     Thank you.  Agent Fenton(sic), how many years have

```
 1   you been an FBI agent?

 2   A     Agent Palmerton.

 3   Q     Excuse me.  Agent Palmerton?

 4   A     Approximately three-and-a-half years.

 5   Q     And your job is to investigate cases?

 6   A     Primarily white collar cases, yes.

 7   Q     And you want to build the strongest case you can

 8   against each suspect?

 9   A     Yes.  I want to investigate all the facts.

10   Q     You don't stop when you have probable cause against

11   a particular suspect?

12   A     No.  No.  We try not to.

13   Q     You continue investigating the case until you are

14   told not to?

15   A     No.  I think we keep doing what we do per FBI

16   policy, just keep collecting facts.

17   Q     Okay.  You just keep collecting facts to build as

18   much information as you can?

19   A     Yes.

20   Q     And as you are doing that, things that you find

21   help explain things that you found earlier in your

22   investigation; correct?

23   A     Yes.

24   Q     And sometimes, the meaning of something that you

25   found becomes clear only later when you find other
```

```
 1   evidence; correct?

 2   A     Yes.

 3   Q     You also have training on the constitution?

 4   A     Yes.

 5         MR. O'DONNELL:  Objection.  This is argument, your

 6   Honor.

 7         THE COURT:  Sustained.

 8   Q   BY MR. FRASER:  Okay.  Before your work on this

 9   case, had you ever heard of Kastigar?

10   A     I had not.

11   Q     And you never had to trace taint through an

12   investigation before this case; correct?

13   A     Define taint.

14   Q     You never had to trace the use of particular items

15   of evidence through the course of investigation before

16   this case, did you?

17         THE COURT:  Items that were suppressed.

18   Q   BY MR. FRASER:  Items that were suppressed.

19   A     In this instance, are you referring to the phones?

20         THE COURT:  Just generally.  I mean, did you ever

21   have an investigation where you had to avoid some

22   evidence because the evidence was suppressed?

23         THE WITNESS:  Not that it was suppressed.  I'm

24   just thinking of --

25         THE COURT:  Well, that is the question.
```

```
 1            THE WITNESS:  No.
 2   Q    BY MR. FRASER:  Okay.  And have you ever traced the
 3   use of compelled testimony?
 4   A    No.
 5   Q    Okay.  And so, in June of 2020, you had no
 6   knowledge of what Kastigar is?
 7            THE COURT:  He said that.
 8            MR. FRASER:  Okay.  Thank you.
 9   Q    When did you first become aware of the Kastigar
10   issue?
11   A    I don't recall specifically.  Sometime in April or
12   May possibly.
13   Q    Okay.  And in preparation for today's hearings, you
14   mentioned you prepared a declaration?
15   A    Yes.
16   Q    And the purpose of the declaration was to follow
17   the court's order for this Kastigar hearing; correct?
18   A    Yes.
19   Q    And you understood that to mean showing the
20   evidence that the government had at various times in the
21   investigation; correct?
22   A    Yes.  Related to the two phones.
23   Q    Yes.  And so you were as thorough as possible in
24   preparing that declaration; correct?
25   A    Yes, I tried to be.
```

```
 1   Q      And you reviewed it after you wrote it before
 2   signing it; correct?
 3   A      Yes.
 4   Q      And, again, did you review it in preparation for
 5   your testimony today?
 6   A      I did.
 7   Q      Did you leave anything significant out of your
 8   declaration?
 9   A      No, not that I recall.
10   Q      Please take as much time as you need to review it
11   and let me know if there is anything significant that you
12   left out?
13          THE COURT:  That is such a broad question that you
14   will have to address that more specifically.
15   Q      BY MR. FRASER:  Of course, the phone evidence in
16   Miami has evidence related to Marietta Terabelian.
17              You would agree with that; correct?
18   A      The phone, yes.  The Victoria Kauichko phone I
19   believe.
20   Q      And does your declaration thoroughly document what
21   you knew of Marietta Terabelian as of October 19th?
22   A      Hang on.  Let me --
23          THE COURT:  What he knew as of October 19th.  Do
24   you mean before the search or after the search?
25          MR. FRASER:  As of Ms. Terabelian's arrival at the
```

```
 1   Miami airport.
 2           THE COURT:  Well, then, that is before the search.
 3           MR. FRASER:  Yes.
 4           THE COURT:  Why don't ask you it that way and be
 5   clearer.
 6           MR. FRASER:  My apologies.
 7           THE COURT:  You are asking him what he knew about
 8   his investigation regarding the PPP fraud and any
 9   connection to Marietta Terabelian.  That is the question.
10           MR. FRASER:  Yes.
11           THE COURT:  Then answer.
12           THE WITNESS:  Yes.  No.  I mean, there were items
13   left off about the investigation, but --
14           THE COURT:  Well, that is not the question now.
15   He wants to know what you knew before the search about
16   any evidence that would relate to Mary Terabelian's role
17   if any in your investigation.
18           THE WITNESS:  Correct.  I suppose looking at this
19   now I talked about the flow of funds from the Iullia
20   Zhadko bank account into the escrow account, but I don't
21   talk about the flow of funds from Marietta Terabelian's
22   bank account into the escrow account for the purchase of
23   the 4910 Topeka property.
24   Q   BY MR. FRASER:  Okay.  So as far as the evidence
25   that you had before the Miami search about Marietta
```

```
 1   Terabelian's role, you had, for one thing, you had the
 2   flow of funds; correct?
 3   A     Yes.  And, then, I think later I mentioned that
 4   Gohar Terabelian was living at the 1834 Calle La
 5   Primavera property.
 6   Q     Yes.  And your declaration states that you learned
 7   subsequently that that was Marietta Terabelian's sister?
 8   A     Correct.
 9   Q     Subsequently means after the stop; correct?
10   A     Correct.
11   Q     And that is part of what was referred to in CBP's
12   report of interviewing Ms. Terabelian, isn't it?
13   A     Yes.
14   Q     Okay.  And you also knew that Marietta Terabelian
15   was married to Richard Ayvazyan before the Miami search;
16   correct?
17   A     Yes.
18   Q     And, now, we have covered what you knew about
19   Marietta Terabelian as of the Miami searches, everything;
20   correct?
21   A     Yes.  In addition to I think that we knew that she
22   had been previously convicted for mortgage fraud.
23   Q     Okay.  Thank you.  And the Victoria Kauichko
24   identity was not involved in the 2012 conviction;
25   correct?
```

1    A      No, it was not.

2    Q      And so on October 16th, 2020, you learned that

3    Ms. Terabelian would be traveling to the United States on

4    the 19th?

5    A      Yes.

6    Q      And how did you learn that?

7    A      That was through the detect system which is the

8    system that notifies law enforcement when people that are

9    placed in the system are traveling over the borders.

10   Q      And you had set up text alerts for Ms. Terabelian?

11   A      Ms. Terabelian and Mr. Ayvazyan and numerous other

12   individuals, yes.

13   Q      And so you instructed the officers to stop --

14          THE COURT:  You know, you are going over territory

15   that was thoroughly explored at the motion to suppress,

16   and these things are not disputed.  So let's get to

17   things that are important.  You are taking up unnecessary

18   time.

19   Q      BY MR. FRASER:  Agent Palmerton, the government

20   argued that Ms. Terabelian was guilty because in part

21   that she assumed the identity of Victoria Kauichko.  You

22   are aware of that; correct?

23   A      Yes.

24   Q      So evidence of her doing that was important in your

25   investigation; correct?

1    A    Yes.

2    Q    Evidence of her doing that from her phones could be

3    powerful evidence in the case against her; correct?

4    A    It would be relevant evidence.

5    Q    And certainly not evidence you would want to miss;

6    isn't that right?

7    A    Yes.

8    Q    Okay.  So you knew that a credit card -- actually,

9    it was a debit card -- in the name of Victoria Kauichko

10   was found with Ms. Terabelian at the Miami airport?

11   A    Yes.  I believe it was found in her purse.

12   Q    Okay.  She denied that she had put it there;

13   correct?

14   A    I think that is from the CBP statement or report;

15   yeah.

16   Q    Okay.  And she disclaimed knowledge of that card;

17   correct?

18        MR. O'DONNELL:  Objection as to argumentative,

19   cumulative, your Honor.

20        THE COURT:  I don't see the point to that.  That

21   was an issue that the jury had to consider, and she

22   denied it.

23           What is your view of the evidence that if she

24   denied it that the custom should accept it?

25        MR. FRASER:  Quite the opposite.

```
 1   Q       It is that because she denied it, Agent Palmerton,

 2   you would want to be in a position to disprove that;

 3   correct?

 4           THE COURT:  Well, I don't know where this is

 5   going.  I mean, that is what happened.  She was found

 6   with a credit card on her person at the same time six

 7   other cards or some other number were found in the

 8   luggage of her husband.  That is what the record shows.

 9   So, when she was found with the card, she denied it.

10   That is well established.  Let's go to something that

11   helps me more than that.

12   Q    BY MR. FRASER:  You understand how people use smart

13   phones.  You are trained on that; correct?

14   A       Yes.

15   Q       And you understood that the contents of the phone

16   could help refute her denial of responsibility for the

17   card; correct?

18   A       Possibly.

19   Q       And, in fact, the contents of her phone did just

20   that?

21   A       I believe there were text messages where it was her

22   representing to be Victoria Kauichko, and that is based

23   on my review of the complaint.

24   Q       Okay.  You discussed with Mr. Fenton on

25   February 2nd this set of 141 photos that CBP had taken
```

```
 1    from the phones in Miami; correct?

 2    A     Can you clarify?

 3          THE COURT:  What is unclear about that question?

 4          THE WITNESS:  I guess --

 5          THE COURT:  He asked you whether you discussed on

 6    February 2nd the 141 phones that were found on the

 7    phones?

 8          THE WITNESS:  I believe we did.  We likely did,

 9    yes, discuss the images.

10          THE COURT:  So why were you hesitant to answer?

11          THE WITNESS:  I guess I wasn't sure if it was on

12    that date or not.

13    Q    BY MR. FRASER:  Okay.  Would reviewing your

14    declaration refresh your memory?

15          THE COURT:  Why is that date important?  It was

16    February 2nd.

17          MR. FRASER:  It is not critical.

18          THE COURT:  So why are we doing it?

19          MR. FRASER:  Okay.  I will move on.

20    Q    But I would like to review those images with you,

21    Agent Fenton -- Agent Palmerton, excuse me.

22             For the record this is Exhibit 1 to the

23    declaration of Scott Paetty.

24          MR. O'DONNELL:  Yes.  Scott Paetty.  Or are you

25    trying to show him the Palmerton declaration?
```

```
 1          MR. FRASER:  No.  That was not an instance of

 2   dispute.

 3   Q      Okay.  I am just going to flip through some of

 4   those photographs.  You recognize these as being CBP

 5   photographs of the Miami phones; correct?

 6   A      They appear to be, yes.

 7   Q      Okay.  And do you recall that the set of

 8   photographs is bookended with images that indicate which

 9   phone we are looking at?  Do you recall that?

10   A      Yes.

11   Q      So, here, for instance, this is the first

12   photograph in the set.  We are looking at a screen that

13   says Apple ID, and, underneath that, it shows an e-mail

14   address; correct?

15   A      Yes.

16   Q      And that is mary.abelian@yahoo.com?

17   A      Yes.

18   Q      So this image would help show that Ms. Terabelian

19   was the user of this phone; correct?

20   A      I mean, yes.  Yes.

21   Q      And, now, we are moving on to the second image here

22   which shows the model of phone; correct?

23   A      Yes.

24   Q      And there is another image which has here in the

25   middle an IMEI number.  Do you see that?
```

1   A      Yes.

2   Q      And that is the number that you use in identifying

3   the smart phones; correct?

4   A      Yes.  One of them, yes.

5   Q      So it is a unique number for a particular cell

6   phone; correct?

7   A      Yes, I believe so.

8   Q      And, now, we are looking at an image from the Miami

9   phone, and it says at the top Susanna Mkrtchyan.  See

10  that?

11  A      Yes.

12  Q      That name had significance in your investigation;

13  correct?

14  A      It did, yes.  And that is a name that a vehicle was

15  registered in that you came to know of in your

16  investigation; correct?

17  A      Yes.

18  Q      Associated with the residences that you believe

19  were purchased with fraudulently obtained disaster relief

20  loan funds?

21  A      Yes.

22  Q      And it has apparent personal identifying

23  information written on it by hand; correct?

24  A      It does.

25  Q      And an e-mail address?

```
1    A     Yes.

2    Q     And not only that, it has right here, Fiber One

3    Media?

4    A     Yes.

5    Q     That name has significance in your investigation

6    too; correct?

7    A     Yes.

8    Q     When you had CBP stop Ms. Terabelian, you e-mailed

9    them giving them some information about information you

10   were looking for; correct?  You suspected Ms. Terabelian

11   of involvement in a fraud scheme that involved the use of

12   fake ID's; correct?

13   A     Yes.

14   Q     Synthetic ID's?

15   A     Yes.

16   Q     Fake businesses?

17   A     Yes.

18   Q     And, here, we have an image of a driver's license.

19   Do you see that?

20   A     Yes.

21   Q     And whose name is on that driver's license?

22   A     Norayr Vardanian.

23   Q     Not Marietta Terabelian, of course?

24   A     No.

25   Q     This is the kind of thing you told CBP you were
```

```
 1   looking for; right?

 2   A     I would have to look at the e-mails specifically,

 3   but I think I said that she could be traveling with --

 4         THE COURT:  I can't hear what you are saying.  Why

 5   can't you speak more clearly.  I have asked you that

 6   three or four more times, and, during the trial, it was

 7   the same thing.

 8         THE WITNESS:  Yes.  I'm sorry, your Honor.

 9         THE COURT:  You mumble.

10         THE WITNESS:  Sorry, your Honor.

11         I don't recall specifically what I asked.  I

12   would have to look at the e-mail, but I did ask them, I

13   believe, that she might have been traveling with fake

14   stolen synthetic identities and cash, gold.  I believe

15   that was the substance of my e-mail.

16   Q     BY MR. FRASER:  And you are right about that.  Your

17   memory is correct so I won't take the court's time with

18   showing that e-mail.  Let's go to the next image.

19         Here is a picture of that driver's license;

20   correct?

21   A     Yes.

22   Q     And here is the next image this one is interesting,

23   isn't it?

24   A     Yes.

25   Q     Whose name is at the top of that image?
```

```
 1   A      Victoria Kauichko.

 2   Q      Okay.  And whose name is at the top of the screen

 3   indicating that it is the contact that this came from?

 4   A      Rich.

 5   Q      And that is the first name of Ms. Terabelian's

 6   husband; correct?

 7   A      Yes.

 8   Q      Defendant 1 in this indictment?

 9   A      Yes.

10   Q      And what do you see underneath the name Victoria

11   Kauichko?

12   A      It looks like a Social Security number, a date of

13   birth, an address, phone number and then a house address

14   and then some notes on what appear to be calling about

15   utilities.

16   Q      Not just any house address; right?

17   A      Yes.  The 74203 Anastasia Lane.

18   Q      That is one of the subject properties in this case;

19   correct?

20   A      Yes.

21   Q      And you also did investigation on that 6150 Canoga

22   Avenue address; correct?

23   A      Yes.  We executed a search warrant.

24   Q      And this wasn't just sent to Ms. Terabelian's

25   phone, was it?  She responded; correct?
```

```
 1   A      Yes.
 2   Q      She responded not a minute after receiving it.
 3          Do you see that?
 4   A      Yes.
 5   Q      This is powerful evidence, wouldn't you agree?
 6          MR. O'DONNELL:  Objection as to argument, your
 7   Honor.
 8          THE COURT:  I mean, I am the fact finder here,
 9   and, as I said yesterday, the label on the evidence and
10   its significance, my view is that all these things on the
11   phone are certainly relevant and so I am accepting that.
12   I am not questioning that for the moment.
13          Whether it was powerful, confirming,
14   cumulative or whatever, those are other questions, but it
15   certainly is relevant.  And any investigator would want
16   to know about these things.  So to the extent that you
17   think I am not perceiving that, I perceive that.
18          MR. FRASER:  Yes, your Honor.
19   Q      And, more to the point, you were not asking CBP
20   before Ms. Terabelian got to the airport for evidence by
21   her of use of the Victoria Kauichko identity
22   specifically, were you?
23   A      Not specifically, no.
24   Q      That is a theory that was adopted based on the
25   Miami airport evidence; correct?
```

```
 1   A     Yes.  The credit card and the phone.

 2         MR. FRASER:  No further questions.  Thank you.

 3         THE COURT:  Thank you.

 4         THE WITNESS:  Thank you, your Honor.

 5         MR. SILVERMAN:  We call Ms. Catherine Ahn next.

 6         (The witness was sworn.)

 7         THE CLERK:  State your full name, and spell it for

 8   the record.

 9         THE WITNESS:  Catherine Ahn.  C-A-T-H-E-R-I-N-E,

10   A-H-N.

11

12                     CROSS-EXAMINATION

13   BY MR. SILVERMAN:

14   Q     Good morning, Ms. Ahn.

15   A     Good morning.

16   Q     You were assigned the case on May 7th, 2021?

17   A     Yes.

18   Q     And trial was scheduled at that time for June 15th;

19   correct?

20   A     Yes.  That is correct.  2021.

21   Q     And you had to get up to speed quickly?

22   A     Yes.  Yes.

23   Q     Do you recall what sort of background materials you

24   read to get up to speed?

25   A     I read the first superseding indictment.  I read
```

1  the prosecution memo.  I read portions of the grand jury

2  transcripts.  I spoke with trial attorney Fenton and AUSA

3  Paetty.  I mean, those were the basics.

4  Q     Would it be fair to say that trial attorney Fenton

5  and the investigating agents on the case had more

6  experience with the case than you did at that time?

7  A     Yes.  They were on the case before I joined the

8  case.

9  Q     And would it be fair to say that you had to lean on

10 their understanding of the case?

11 A     I am not sure what you mean by lean.  Do you mind

12 clarifying.

13 Q     When you had questions about evidence or

14 interpreting documents, did you ever turn to them?

15 A     So I did ask questions about, for example -- it is

16 a pretty broad question so I am trying to be specific.

17          Do you mind narrowing it down a little so I

18 make sure to answer your question?

19 Q     Sure.  I am going to change directions slightly.

20 In addition to the materials that you mentioned, did you

21 review any internal work product, written work product?

22 A     The prosecution memo.

23 Q     And did you review additional materials that have

24 been up loaded to the USAFX?

25 A     Yes.  So there was a key for the first superseding

1   indictment.  So, like, what is lender A.  The indictment

2   doesn't say.  So I looked for a key that had what lender

3   A was.

4   Q    Did you review any text messages that had been

5   uploaded to USAFX?

6   A    Do you mean as part of work product, like attorney

7   text messages or messages that were obtained as evidence

8   as a result of, for example, the residential search

9   warrant?

10   Q    Did you review any text messages between Tamara

11   Dadyan and the 1B123 phone that had been uploaded to

12   USAFX?

13   A    I don't know what the 1B123 phone is.

14   Q    I will represent to you that the 1B123 phone is

15   registered in Iullia Zhadko's name and was one of the

16   phones suppressed in late April.

17         Did you review any text messages between

18   Tamara Dadyan and that phone that had been uploaded to

19   USAFX?

20   A    So I reviewed messages from Tamara Dadyan's phone

21   1B21, and I understand that 1B21 contained text messages

22   between that phone and a 4170 phone number.  I do not

23   recall ever reviewing a 1B123 phone.

24   Q    And have you read the submissions to this court

25   including the declarations from other witnesses?

1    A      I very briefly scanned the filings to look for

2    sensitive personal or financial information that could be

3    the basis for a sealing request.  I didn't review them in

4    detail or try and digest the content of what happened.

5    It was a review for sealing purposes only.

6    Q      And, specifically, Agent Palmerton's Exhibit O that

7    was filed on a disk, did you review that in preparation

8    for this hearing?

9    A      I looked at Exhibit O, and I saw that it could not

10   be turned into a PDF because it appeared to contain a

11   Cellebrite report.  I didn't try to open the Cellebrite

12   report.  I didn't try to open it.  I just saw that it was

13   something that could not be submitted through a normal

14   paper filing, and so I, then, took steps to submit it as

15   a disk, as a manually lodged disk.

16   Q      And the last question about what you reviewed,

17   before trial, was there any time when you reviewed a set

18   of text messages between Tamara Dadyan and Richard

19   Ayvazyan that had been selected by Agent Palmerton?

20   A      The 1B21 text messages were selected by Agent

21   Palmerton, yes.  Well, I should clarify that.  The 1B21

22   text messages had been uploaded to USAFX, I don't know if

23   Agent Palmerton actually extracted only selected messages

24   that he selected.  My impression is that he uploaded what

25   he understood or what he had access to as the text

1    message conversation between those two phone numbers.

2    However, the stuff that we received had already been

3    filtered for privilege.

4    Q     And when you say that he uploaded the text messages

5    between those two phone numbers, which two phone numbers

6    are you referencing here?

7    A     The 1B21 Tamara Dadyan phone that was found at

8    Weddington and the 4170 phone number with the contact

9    identified as Rich New.

10          MR. SILVERMAN:  Can we please pull up Ms. Ahn's

11   Exhibit B as in boy, and if we could go to page 3.

12   Q     Ms. Ahn, I am showing you what you attached to your

13   declaration.  Is this an e-mail from Mr. Paetty on your

14   first day on the case?

15   A     Yes.

16   Q     And does this e-mail assign you some level of

17   responsibility over certain categories?

18   A     We were trying to figure out trial exhibits, and

19   AUSA Paetty mentioned that we were asked that he and I

20   should be looking at categories 2 and 4 I believe which

21   are identified in the exhibit.

22   Q     And, specifically, under category 4, one of the

23   subcategories is phones; correct?

24   A     Yes, that's correct.

25   Q     It was one way in which you intended to prove

1    linkage.

2    A     Yes.  Like linking the defendants to the

3    applications.

4    Q     And would that also include linking the defendants

5    to the overall conspiracy?

6    A     Yes.  The applications were charged as part of the

7    bank and wire fraud conspiracy.

8    Q     And Mr. Paetty's e-mail in the second paragraph

9    states that the agents would be pulling docs over the

10   weekend and uploading to USAFX; correct?

11   A     Yes, that's correct.

12   Q     And were those the documents that were pulled by

13   Agent Palmerton and uploaded to USAFX?

14   A     Yes.

15   Q     Specifically, he pulled documents from the phones

16   and uploaded them for your review?

17   A     Not just for my review, but for potential use as

18   trial exhibits at trial.

19   Q     And so, on Monday, May 10th, you began reviewing

20   the documents he had uploaded; correct?

21   A     Sometime around then.  Probably May 10th.  I can't

22   recall specifically.  Definitely, yeah, I think it is

23   likely Monday, May 10th because we later had an e-mail

24   conversation on May 11th, and I recalled reviewing the

25   text messages almost all night.  So it would have been

1    May 10th.

2    Q    Do you know if Agent Palmerton had uploaded all of

3    the text messages that were on the 1B21 phone

4    specifically?

5    A    Like every single text message found on the phone?

6    Q    Correct.

7    A    I don't know what he did.  I did not see something

8    that would look like every single text message on the

9    phone.

10   Q    Do you remember approximately how many files you

11   did see?

12   A    Files is a pretty, like -- so, for example, just

13   the text message, even the exhibit, Government Exhibit 10

14   has, like, a large number of files because of the

15   attachments, et cetera.  So I really can't give you a

16   good faith number.

17   Q    I can rephrase to get at what I am trying to get

18   at.

19         Do you remember approximately how many text

20   messages or pages worth of text messages, either of

21   those, that you did see?

22   A    I can tell you that the initial text message

23   conversation between Tammy and Rich New was almost a

24   thousand pages.  I think it was 941 pages, and it

25   contained a broad range.  So it was like, I think, late

1    2019 through October, 2020.

2    Q     And had Agent Palmerton uploaded additional text

3    message conversations from 1B21 other than the

4    conversation you just referenced?

5    A     I don't remember.  It is possible, but I just don't

6    remember.

7    Q     So it is possible that the only text message

8    conversation that had been uploaded was between Tammy and

9    Rich New?

10   A     I honestly don't remember.  I do remember seeing

11   specifically the text message conversation between Tammy

12   and Rich New, and I focused on that.  I just -- I don't

13   recall whether or not there were other text messages.

14   Q     The text message conversation between Tammy and

15   Rich New, was it in a PDF format?

16   A     The actual messages themselves like the literal

17   text was in PDF format, but there were attachments like

18   images and files I think they sent to each other, and

19   those were in a variety of formats, you know, JPEG, PDF,

20   whatever format it was sent in.

21   Q     Fair to say that you did not now how Agent

22   Palmerton selected these text messages?

23   A     I don't know if that's correct.  My understanding

24   is he took them from the Cellebrite report.

25   Q     And do you know what criteria he used to select

```
 1    these specifically from the Cellebrite report as opposed
 2    to other text messages on the Cellebrite report?
 3    A       Well, the contact name was Rich New.  I mean, I
 4    didn't speak with him, you know, why did you select this
 5    one versus the other one.  It was sort of self evident
 6    that this was between Tamara Dadyan and Rich because of
 7    the contact name.  But I didn't have a specific
 8    conversation interrogate him about it.  It seemed pretty
 9    obvious to me why it would be important.
10    Q       Around that time, you also spoke with Mr. Fenton
11    about the cell phones; correct?
12    A       Yes.  Yes.
13    Q       And did he suggest which phones you might want to
14    start with in your review?
15    A       No.
16    Q       What did he say about the cell phones?
17    A       I remember there was a discussion, hey, there is --
18    they are uploading stuff to USAFX.  I remember him saying
19    don't look at 1B85 yet, we are going to make sure that it
20    doesn't have any stuff on it, stuff being potentially
21    privileged things.  And so I did not look at 1B85.
22    Q       And 1B85 is Richard Ayvazyan's phone?
23    A       Yes.  Yes.  It was one of the phones found at the
24    Topeka residence in November, 2020.
25    Q       Did he comment upon or relay the contents -- I'm
```

```
 1    sorry.  Strike that.  Did he comment upon the contents of
 2    any of the phones in your recollection?
 3    A     The things that I recall specifically is him
 4    telling me not to look at 1B85.
 5    Q     So you referenced that on approximately -- on or
 6    about Tuesday, May 11th, you sent an e-mail updating
 7    people about your review; correct?
 8    A     Are you referring to Exhibit --
 9    Q     Exhibit A to your declaration?
10    A     Exhibit A.  Oh.  Yes.  I don't know if that was an
11    update about my review.  It was a response to an e-mail
12    sent by trial attorney Fenton about loans.
13          MR. SILVERMAN:  Could we please pull up Exhibit A,
14    Ms. Romero.
15    Q     And so your e-mail is the bottom one here?
16    A     Oh.  Yes.  Sorry.  I was confusing this with I
17    think Exhibit E.  So thank you.
18    Q     I apologize.  I didn't mean it to be a pop quiz?
19    A     No.  I appreciate you showing it to me.
20    Q     So you had begun reviewing phone 1B21 at this
21    point; correct.
22    A     Yes, that is correct.  Well, to be clear, I started
23    reviewing the text messages that I understood to be
24    obtained from 1B21.
25    Q     Correct.  And the subject line is Tamara and
```

```
1    Richard text messages, part 2; correct?

2    A      Yes.

3    Q      And can you tell me what part 2 means?

4    A      So there were two sets of text messages, both

5    between Tamara Dadyan and what we understood to be

6    Richard Ayvazyan.  There was one that was just a -- I

7    don't remember exactly the filing, but it didn't have a

8    part 2 like, Tamara and Richard --

9         THE COURT:  I didn't hear a word of what you just

10   said.

11        THE WITNESS:  My apologies.

12             So there were two sets of text messages

13   between Tamara Dadyan and we assumed to be Richard

14   Ayvazyan.  One set, I don't specifically recall the file

15   names associated with it, but it did not have like a part

16   1 or anything like that.  It just, you know, Tamara and

17   Richard text messages, for example, and there was a

18   second one that said part 2 on it.

19             I looked at the one that didn't have part 2 on

20   it, and it was a smaller, smaller file.  The PDF of the

21   actual text messages was a smaller file.  I then looked

22   at part 2 and recognized that the first set was actually

23   a subset of part 2, and you can kind of see that I am

24   referencing that in my last sentence of my first

25   paragraph which says text chain is here, it is labeled as
```

```
 1    part 2 but basically has all of the other text chain
 2    between the two of them found and more.  And so, then,
 3    because I realized that part 2 is actually the larger
 4    set, I worked off of part 2.
 5    Q    Now, fair to say that you recognized the relevance
 6    and persuasive value of the text messages selected by
 7    Agent Palmerton?
 8    A    I recognized the relevance and persuasive value of
 9    the text messages.  Again, I am not -- it is not my
10    understanding that he sent out select individual messages
11    for my review.  It is my understanding that this was the
12    text message conversation, but, again, I didn't have a
13    specific conversation with him about it.
14    Q    But there were some things where you still needed
15    help understanding the text messages that had been
16    uploaded; correct?
17    A    Yes.  Yes.
18    Q    And, specifically, you thought that Agent Massino
19    might be able to help; correct?
20    A    Yes.  Because he was familiar with the
21    applications.
22    Q    And do you recall whether you did reach out to
23    Agent Massino for help understanding or interpreting the
24    text messages?
25    A    I remember telling him over the phone that I would
```

```
 1    give him a call to follow up with questions about the

 2    applications, but I ended up getting so busy that I

 3    didn't.  And it wasn't until later when we were thinking

 4    about the witness list that it -- I thought that he would

 5    be a good witness to present whatever would end up as the

 6    trial exhibit related to the text messages which ended up

 7    becoming Government Exhibit 10.

 8              And, at that point, I reached out to him to

 9    start looking through and help me essentially create

10    Government Exhibit 10 out of the much more extensive text

11    message conversation that we originally had.  So that was

12    my conversation with Agent Massino as to the text

13    messages.

14         THE COURT:  How much longer do you expect to go?

15         MR. SILVERMAN:  10 to 15 minutes at most, your

16    Honor.

17         THE COURT:  I have another matter now, and it is

18    approaching the noon hour.  So let's take the recess, and

19    come back at a quarter to 1:00.

20         (Luncheon recess from 11:48 a.m. to 12:45 p.m.)

21         THE COURT:  We are going to finish up with

22    Ms. Ahn; right?

23         MR. SILVERMAN:  Yes, your Honor.

24    Q    Good afternoon, Ms. Ahn.

25    A    Good afternoon.
```

1  Q      On May 7th, you received, the trial team received a

2  letter regarding exposure to tainted evidence; correct?

3  A      We received a letter from I believe your firm

4  regarding -- two letters, a discovery letter and a letter

5  describing tainted evidence.

6  Q      And the letter flagged as what we consider to be

7  tainted evidence, information about Iullia Zhadko, Nazar

8  Terabelian, Olaf Lansgaard, Mary Smbatian, Picadilly

9  Jewelers and others; correct?

10 A      Yes.  I think it was ECF 338, Exhibit A.

11 Q      And did the trial team enact any prophylactic

12 measures in response to this letter?

13 A      What do you mean by prophylactic measures?

14 Q      Did the trial team engage in a review of where

15 their evidence regarding each of those topics had come

16 from.

17 A      Like the entirety of Iullia Zhadko?  The entirety

18 of Nazar Terabelian?  Is that your question?

19 Q      Correct.

20 A      My understanding is -- I wouldn't say it is as a

21 response to the letter.  There was a discussion after --

22 as far as I know, that I participated in, after May 13th

23 which I describe in my declaration about the potential

24 Kastigar issue, but I wouldn't say there was a flurry of

25 activity as a result of the letter.

```
1   Q      And so there was no sort of systematic examination

2   of where evidence regarding each of those topics had come

3   from; correct.

4   Q      At that time?

5   A      Not that I participated in.  I can't speak to

6   others.  I know that, for example, I am aware that after

7   May 13th because I participated in those discussions,

8   that there was an analysis, a pretty systematic analysis

9   regarding the potential scope of the Kastigar issue, its

10  potential impact on trial evidence, et cetera, and trial

11  attorney Fenton was from my observation pretty deeply

12  engaged in that.  I did not participate in that analysis.

13  Q      Now --

14  A      Well, I didn't directly participate in the

15  analysis.  Obviously, I was part of those conversations.

16  Q      Up until this point, Mary Simbatyan had previously

17  been a potential witness for the government; is that

18  correct?

19  A      Which point?

20  Q      Up until May 7th, 2001, mary Simbatyan had been

21  listed as a potential witness for the government;

22  correct?

23  A      Listed where?  Was there a list?  I am not aware of

24  a witness list that was created with Mary Simbatyan's

25  name on it.
```

1   Q     When you came on to the case, did you receive any

2   communications or work product regarding potential

3   witnesses?

4   A     We had a discussion, I remember, about evidence,

5   and trial attorney Fenton mentioned Ms. Simbatyan as a

6   potential witness.

7   Q     And was the argument that she had been selected

8   based on tainted information a contributing factor to the

9   decision not to call Ms. Simbatyan?

10  A     I can only speak to what I participated in, like

11  the conversations that I participated in, and I actually

12  discouraged calling her as a witness because I was

13  concerned the defense theory of the case would be

14  extracted from her through her testimony on

15  cross-examination.  It was more of a trial strategy

16  issue.  I wasn't really -- Kastigar was not something on

17  my mind when I made that recommendation.

18  Q     After this May 7th letter, there was a May 13th

19  telephone call between the defense counsel for

20  Mr. Ayvazian and the trial team; correct?

21  A     Yes.

22  Q     And you attended that phone call?

23  A     Yes.  I was a participant.

24  Q     And you mentioned some May 13th telephone calls

25  involving you, Mr. Paetty and Mr. Fenton.  Was that in

1    response to the call or as a result of the call with

2    defense counsel?

3    A      Yes.  That's correct.

4    Q      On the call with defense counsel, defense counsel

5    broached the subject of a possible plea bargain; correct?

6    A      Yes.

7    Q      And was the possibility of a plea bargain discussed

8    in any telephone calls that occurred on May 13th

9    involving you, Mr. Paetty and Mr. Fenton?

10   A      I think it was -- it is not so much -- I am trying

11   to answer your question.  If your question is did we

12   discuss the proposal that was raised by Mr. Ram, yes, we

13   did discuss that proposal.

14   Q      And on those same telephone calls you also

15   discussed at least in general terms the evidence seized

16   at the Miami stop; correct?

17   A      Yes.  Because there was a question as to the

18   likelihood of the Kastigar motion prevailing, and what

19   exposure if any we had with respect to the trial evidence

20   that was being discussed, and my recollection is that

21   there was no exposure.

22   Q      In addition to Mr. Paetty and Mr. Fenton, did you

23   speak with anybody else regarding the proposed plea

24   bargain offer?

25   A      Yes.  So I wanted a better understanding of the

1    likelihood --

2           THE COURT:  Who did you speak to?  That was the

3    question.

4           THE WITNESS:  Yes.  Bram Alden, the appeals chief,

5    Brian Young who I understand handled fraud related

6    appeals at main DOJ.  I think -- I think likely also

7    Cathy Ostiller.  Although, I think -- it is not a

8    concrete recollection, but she was part of some of the

9    thornier issues that were being discussed.  So it was

10   likely she was invited to the conversation.

11   Q     In relation to the conversations that you do have a

12   concrete recollection of, were the Kastigar issues

13   referenced in those discussions?

14   A     Yes.  Yes.  That was the purpose of the calls, and

15   also Ms. Katzenstein.

16   Q     And were the contents of the Miami phones discussed

17   in general or specific terms during those calls?

18   A     Only in very general terms.

19   Q     And can you give me an idea of what you mean by

20   very general terms?

21   A     For example -- and I am raising a hypothetical

22   question, I don't specifically recall the question being

23   asked in this specific way, but I recall a general

24   question being asked are we using any of the evidence

25   from the Miami cell phones at trial, and the answer was

```
 1   no.  Did we use the evidence from Miami cell phones in
 2   grand jury for the first superseding indictment.  The
 3   answer was no.  Like those types of -- that level of
 4   generality.
 5   Q     So there was no reference to the fact that the
 6   Miami cell phones contained information tying one of the
 7   defendants to one of the synthetic identities in the
 8   case?
 9   A     There was a discussion about that Nazar Terabelian.
10   I recall there was something found related to
11   Ms. Terabelian, related to that Nazar Terabelian.  I
12   don't specifically recall what the evidence was.  I
13   remember there was something there.  I don't know if that
14   came up in the context of the Kastigar discussion after
15   May 13th or some other discussion, but I do remember that
16   being noted.
17   Q     And, ultimately, the government decided not to
18   proceed any further with discussions about a potential
19   plea bargain with Mr. Ayvazyan; correct?
20   A     Mr. Richard Ayvazyan?
21   Q     Correct.
22   A     Yes.  We declined to engage in further discussions
23   amongst other reasons besides the Kastigar issue, there
24   is a general policy in our office not to engage in plea
25   discussions when there is pending misconduct motions.
```

1  Q     And around this same time your team was engaged in

2  discussions for counsel for Ms. Tamara Dadyan; correct?

3       MS. WESTFAHL KONG:  Objection.  Relevance.

4       THE COURT:  I don't know where this -- let's say

5  they were, what is the import?  I am trying to gather

6  what is significant to my decision.

7       MR. SILVERMAN:  Yes, your Honor.

8       THE COURT:  What should I take away from the fact

9  that there may have been discussions with Tamara Dadyan

10 about pleas while a motion was pending and her answer

11 that they -- that one of the reasons they didn't continue

12 the plea negotiations for Richard Ayvazyan was because of

13 a policy.

14      MR. SILVERMAN:  It is actually in response to

15 another reason that the government has argued which is

16 that the evidence against Mr. Richard Ayvazyan was

17 overwhelming and therefore they did not wish to engage in

18 plea discussions.

19           I believe that Ms. Ahn is likely to agree that

20 the evidence against Ms. Dadyan was overwhelming, but at

21 the same time they were engaged in plea negotiations with

22 Ms. Dadyan.

23      THE COURT:  So what should I take from that in

24 terms of deciding the issue favorably to your motion?

25      MR. SILVERMAN:  That the decision to engage in --

1    or not to engage in plea negotiations with Mr. Ayvazyan

2    was based at least in part on exposure to tainted

3    evidence and not to the belief that the evidence against

4    him was overwhelming.

5         THE COURT:  I see.  Okay.  Thank you.

6         MR. SILVERMAN:  And I believe I have already sort

7    of foreshadowed each of my questions so that will be it.

8    Q    Around this time, was the government engaged in

9    plea negotiations with counsel for Ms. Dadyan?

10   A    Her counsel reached out and asked if we would be

11   willing to provide a reverse proffer.  This was separate

12   from any Kastigar-related discussion.  It was just a

13   separate conversation.  I spoke about it with trial

14   attorney Fenton and AUSA Paetty.  I suggested that we do

15   so.

16             They agreed to go along with my suggestion,

17   and I started preparing information for the reverse

18   proffer.  Then, Mr. Minasian, her counsel, joined in I

19   forget which one of the motions but one of the motions

20   that alleged in the substance some misconduct on behalf

21   of the government.  And then we stopped the discussion

22   because of the policy.

23   Q    So up until the motion to exclude digital devices

24   perhaps, the government was intending to meet with

25   counsel for Tamara Dadyan at least to engage in a reverse

```
 1   proffer; correct?
 2   A     I don't remember if it was that specific motion.
 3   It may have been.  There were a lot of motions being
 4   filed around that time, but it was because of a motion
 5   that alleged some government misconduct in the substance.
 6   And so we reached out to counsel and let them know that
 7   per the policy we were unable to continue our
 8   conversation.
 9   Q     And would you agree that the evidence against
10   Ms. Dadyan was overwhelming?
11   A     Yes.  Yes.
12         MR. SILVERMAN:  No further questions.
13         MR. LITTRELL:  Just a few, your Honor.
14         THE COURT:  Yes.
15
16                   CROSS-EXAMINATION
17   BY MR. LITTRELL:
18   Q     Ms. Ahn, you joined the prosecution team in May,
19   2020 -- I'm sorry -- 2021; correct?
20   A     Yes.
21   Q     And that was right around the same time that the
22   Kastigar issue had been raised; right?
23   A     It was May 7th, and then the call was May 13th.
24   Yes.  So around that time.
25   Q     So, at that point when you joined the prosecution
```

1  team, you had not been exposed to any tainted evidence?

2  A    You mean at literally the moment I was assigned the

3  case?

4  Q    That's right?

5  A    I had no exposure to the case.

6  Q    But you knew Kastigar was an issue at that point?

7  A    Not --

8       MS. WESTFAHL KONG:  Objection.  Misstates the

9  testimony.

10      THE WITNESS:  No.  It didn't really actually -- I

11  didn't realize that Kastigar would be an issue until the

12  May 13th call.  I recognize having rereviewed the taint

13  letter that was attached as 338, Exhibit A, that it cites

14  Kastigar, but I only reviewed it very briefly in and

15  around May 7th.  And I didn't catch that as an issue.

16           I was trying to catch up to speed on the case.

17  There was a lot of information being thrown my way, and

18  it didn't really crystallize in my mind as an issue until

19  May 13th with the phone call.

20  Q    That was shortly after you joined the prosecution

21  team?

22  A    Yes.

23  Q    And you engaged in discussions with supervisors and

24  appellate people about what to do about it; right?

25  A    About  -- about the potential merits and likelihood

1    of success and appellate risk related to the Kastigar

2    issue.

3    Q    And I believe you testified that the conclusion was

4    that there was no exposure?

5    A    I mean in very general terms.  So if you were

6    looking at, like, what are you planning to present at

7    trial, are you planning on presenting information from

8    Miami cell phones at trial, no.  That has been

9    suppressed.  Did you rely upon it for the grand jury

10   indictment, did you present evidence from the Miami cell

11   phones to the grand jury, no.

12            I mean, those were the types of conversations

13   to determine whether or not, for example, we needed the

14   suppressed evidence to proceed at trial, but, obviously,

15   at that point it had already been suppressed so we

16   weren't going to use it anyway.

17   Q    And who was asking those questions?

18   A    My understanding is -- I don't specifically

19   remember who it was.  It wasn't me.  I believe it may

20   have included Mr. Young.  I mean, it probably included

21   Mr. Young, but I don't specifically recall.

22   Q    And based on the responses to those questions,

23   somebody concluded that there was no exposure?

24        MS. WESTFAHL KONG:  Objection.  Vague as to

25   exposure, whether it is exposure to evidence, appellate

1   exposure.

2        THE COURT:  Okay.  The objection is correct.  I

3   mean, I don't know what exposure means.

4        MR. LITTRELL:  Okay.  Maybe I will probe that.

5   Q    In your testimony, you said the conclusion was

6   that, quote, there was no exposure?

7   A    Uh-huh.

8   Q    What did you mean by that?

9   A    We didn't -- well, we didn't think that the trial

10  evidence would rely upon the evidence that was

11  suppressed.

12  Q    And that is based on the questions that you just

13  recited?

14  A    Yes.

15  Q    Was there any discussion about derivative use of

16  evidence from the tainted phones and whether that should

17  be considered in determining whether there was exposure?

18  A    Can you clarify what you mean by derivative use?

19  Q    For example, did anyone ask whether you or anyone

20  on the team had used evidence from the tainted phones to

21  formulate trial strategy?

22  A    That question wasn't asked.  I don't remember that

23  question being asked.  I remember there being a

24  discussion as to when we received access to the phones.

25  Q    But nobody asked whether tainted evidence from the

```
 1   phones was used to develop trial strategy?
 2   A    My recollection of the conversation is it didn't
 3   reach that point because other questions were asked that
 4   obviated the need for that question, but, again, that is
 5   my recollection.  I am not the questioner so I can't be
 6   in the mind of the questioner.
 7   Q    Nobody asked whether tainted evidence from the
 8   Miami phones was used to develop leads for further
 9   investigation?
10   A    Again, my recollection is it was obviated by a
11   different part of the discussion.
12   Q    Okay.  And nobody asked whether evidence from the
13   tainted phones was used to determine which witnesses to
14   call?
15   A    No.  Again, because it was obviated by a different
16   part of the discussion where it was informed that we
17   really didn't have access to the phones until quite late.
18   Q    And no one asked whether information from the
19   tainted phones was used to corroborate evidence that you
20   already had?
21   A    I don't recall that question.  And just to be
22   clear, when I say we, I mean the government.  I never
23   accessed the phones.
24   Q    In those discussions, did anyone suggest the
25   possibility that you as a new prosecutor could take over
```

```
 1    the prosecution and that you could recuse Mr. Fenton and

 2    others who had greater exposure to the tainted phones?

 3    A      That was never raised, no.

 4    Q      It was never raised to you or it was never raised

 5    by anybody?

 6    A      It was never raised to me.

 7          MR. LITTRELL:  No further questions.

 8          THE COURT:  All right.  Call the next witness.

 9              Thank you, Ms. Ahn.

10          MR. KEOUGH:  Your Honor, we we are going to call

11    Agent Massino, next.

12          THE COURT:  Okay.

13          (The witness was sworn.)

14          THE CLERK:  Please take a seat.  State your full

15    name and spell it for the record.

16          THE WITNESS:  Timothy Massino, T-I-M-O-T-H-Y,

17    M-A-S-S-I-N-O.

18

19                      CROSS-EXAMINATION

20    BY MR. KEOUGH:

21    Q      Good afternoon, Agent Massino.

22    A      Good afternoon, sir.

23    Q      You would agree that in any big case like this one,

24    you would have lots of potential leads that you might

25    want to follow?
```

1    A     I would agree with that statement.

2    Q     And you would also agree that part of your job is

3    being able to focus your investigation on the leads that

4    are most relevant?

5    A     Yes.

6    Q     Okay.  Let's pull up what has been marked Kastigar

7    Exhibit 13.

8              Okay.  Now, Agent Massino, I am showing you an

9    e-mail that you sent.  You can see on the top

10   October 8th, 2020.  Do you recognize this e-mail?

11   A     I do.

12   Q     And you see that you sent it to Kenneth Welch.

13             Can you tell us who he is?

14   A     He is an investigative analyst that works for my

15   agency.

16   Q     And the subject of the e-mail is Jobe assist,

17   narrowing the scope; correct?

18      THE COURT:  What is that?

19   Q     BY MR. KEOUGH:  The subject line of the e-mail reads

20   Jobe assist, narrowing the scope; is that correct?  We

21   can highlight it there at the top.

22   A     Yes.

23   Q     And you recall you testified at trial that Jobe

24   Construction was an early name in the investigation that

25   lead to the case that we are all talking about right now?

```
1    A      That's correct.

2    Q      And in the e-mail you say, hey, Ken, before you

3    delve into Jobe too much, I wanted to advise you to just

4    focus on the following three items.  And you list three

5    SBA loan numbers there.  Do you see that?

6    A      Yes, I do.

7    Q      And the second line after the three loans, you say

8    so we don't want you to get bogged down with the list I

9    sent you earlier.  Some of those may be connected, but

10   let's not concern ourselves with that unless you uncover

11   the connections through your EIDL database searches,

12   slash, queries.  Do you see that there?

13   A      I do.

14   Q      So, on October 8th, it is fair to say you had

15   several leads and Kenneth Welch was going to hopefully

16   help you narrow the scope as to which leads you were

17   going to follow?

18   A      We had a lot of leads.  There were a number of

19   loans involved in this investigation.  And naming Jobe,

20   that was a loan.  It was a company, or, rather, at least,

21   it was an application.  It was a company.  And Ken serves

22   all SBA OIG agents in the Western Region which is

23   basically anything west of Denver.  He was extremely

24   business as the rest of our agency was during this time

25   and still are.  So this was my way of letting him know
```

1   that this is what we wanted -- that I needed him to

2   immediately focus on these.  I believe I had tasked him

3   or had asked him for assistance looking at some other

4   information that I had received from the investigative

5   team members, but this, on this date, this is what I

6   wanted to get to the bottom of.

7   Q     So fair to say that you had a number of leads and

8   you asked for help with these three specific ones from

9   Ken Welch?

10  A     I am pretty sure I asked for help on others at

11  other times.

12  Q     And in this e-mail, though, we have got three leads

13  here?

14  A     That's correct.

15  Q     And if that work, say, had led to a connection to

16  Richard Ayvazyan or Mary Terabelian, that would be a

17  relevant information for your investigation that you were

18  conducting?

19  A     Did you say relevant or irrelevant?

20  Q     Relevant.

21  A     Yes.

22  Q     Now, this e-mail was sent on October 8th, narrowing

23  the scope, and you would agree that 11 days after this

24  e-mail is when the Miami border stop occurred that is at

25  issue today?

1   A      Yes.

2   Q      And, after that stop, you learned via phone from

3   Special Agent Palmerton that the stop had taken place?

4   A      That's correct.

5   Q      And that phones had been discovered on the persons

6   of defendants in this case?

7   A      That is correct.

8   Q      And, later, you then reviewed those phones, at

9   least 65 images from those phones that you had received

10  from Special Agent Palmerton?

11  A      On November 13th.

12  Q      Correct.  And you reviewed those images?

13  A      I did look at them.

14  Q      And you identified, I believe you said in your

15  declaration 10 loans that you were previously unaware of,

16  at least, previously didn't know there was a connection

17  to this investigation based on the review of those

18  photos?

19  A      That's correct.  That is what I recall.

20  Q      And, with those ten loans, there were a couple of

21  things you used it for; correct?

22  A      I requested loan files, and I subsequently did

23  interview one individual that we believed -- that we had

24  determined was the victim of identity theft.

25  Q      So you requested loan files you said, you conducted

1   an interview; correct?

2   A      Correct.

3   Q      And you shared some of this information with

4   prosecutors in the case; correct?

5   A      Yes.

6   Q      If we could pull up Massino Exhibit C, and if we

7   could scroll down to page 3.

8             So there was an e-mail that you attached to

9   your exhibit.  Do you agree that you recognize this

10  e-mail?

11  A      Yes.

12  Q      And there in the e-mail that you sent to members of

13  the prosecution team, you listed a number of loans, and

14  you said that these were the ones identified based on my

15  review of the phone photos that Justin had uploaded;

16  correct?  That is what the e-mail says?

17  A      That is what the e-mail says, but it wasn't

18  accurate.

19  Q      And that was my next question.  So you later

20  realized and you note in your declaration that a couple

21  of these loans were not ones that you investigated

22  because of the 65 photos from the Miami phones; correct?

23  A      That's correct.

24  Q      And do you recall which ones those were?

25  A      I believe they are Byraya, Byraya Management and

1    Proactive Home Health Services.  It is in another e-mail,

2    or actually they are listed in the declaration.

3    Q     So you may have listed the loans for the Miami

4    phones.  You included those, but they weren't actually

5    from those phones?

6    A     That's correct.

7    Q     You would agree there were a lot of loans that were

8    a part of this investigation; correct?

9    A     Yes.

10   Q     And as we see here, sometimes it was hard to keep

11   them all straight as to which ones came from where?

12         MR. O'DONNELL:  Objection as argumentative and

13   relevance.

14         THE COURT:  Well, I don't know.  I mean, he can

15   answer if he can.  If he doesn't have an answer --

16         THE WITNESS:  My answer to that question would be

17   that is precisely why it is good to have e-mails like

18   this.  Based on reviewing this e-mail, it was pretty

19   clear to me what had occurred.

20   Q     BY MR. KEOUGH:  And so the answer to my question is

21   yes, though, that it was hard to keep them straight.  You

22   looked at the e-mail and you realized that you had

23   included ones that weren't supposed to be on the list?

24   A     They were supposed to be on the list.  My job was

25   to provide information that I obtained based on leads

1    from the team.  The simple mistake of not distinguishing

2    the three down at the bottom or, rather, the Byraya

3    Management, the Byraya and the Proactive Home Health

4    Services, I didn't view that as very relevant at the time

5    at all.

6              They simply came in a different e-mail, or,

7    rather, the information came in a different e-mail.  I

8    combined it with my request to SBA's Office of Disaster

9    Assistance for the loan files that I had identified based

10   on the review of the phones, and I received them all on

11   the same date.

12   Q    So to ask the question a different way, you

13   describe these loans in this list as coming from the

14   phone photos.  Upon reviewing it later, you realized they

15   had actually come from somewhere else?

16   A    Three of them came in a different e-mail than I

17   received from Special Agent Palmerton.

18   Q    So the answer is, yes, those three loans did not

19   come from the Miami phones?

20   A    I believe that is correct.  Yes.

21   Q    Okay.  And you said that they had come from a

22   separate e-mail from Special Agent Palmerton.  If we can

23   pull up Massino Exhibit E and just scroll down to the

24   third page there.

25              And this is that e-mail; right?  The

 1   attachment to your declaration is Exhibit E.  You

 2   recognize it?

 3   A     Yes.  That is one of them.  I believe there were

 4   two.

 5   Q     Is one of the other uses of that information from

 6   the ten loans, are you aware if any of that was used to

 7   obtain evidence that was used at trial?

 8   A     I'm sorry.  That was difficult for me to follow.

 9   Could you repeat that.

10   Q     Sure.  I will ask it again.  So you have discussed

11   that you reviewed the 65 photos, you identified those ten

12   loans; correct?

13   A     Correct.

14   Q     And are you aware if evidence related to those ten

15   loans was used as part of the trial in this case?

16   A     I don't know the answer.  I don't believe so, but I

17   do not know the answer.

18   Q     Okay.  Do you recall as part of your investigation

19   reviewing the responses to requests from the Internal

20   Revenue Service?

21   A     Could you clarify?

22   Q     Sure.  Do you recall reviewing -- do you recall

23   asking the IRS for any records as part of this case?

24   A     I don't believe I did personally, no.

25   Q     Did the investigation team ask the IRS for records?

```
 1   A      Yes.

 2   Q      And do you recall if any were received?

 3   A      I believe they were.

 4   Q      Let's bring up what was marked at trial as

 5   Government Exhibit 48.

 6           And while we are loading that, do you recall

 7   that one of the ten loans that you identified based on

 8   the 65 photos was for a company called Annandale Nursery.

 9           Does that sound familiar?

10   A      Yes.

11   Q      And if we go to page 5 of 16 of this exhibit --

12   actually, stay on the first page for a second.  So this

13   was Government Exhibit 48 at trial.

14           Do you recognize the document?

15   A      I don't recognize the document.

16   Q      But I will represent to you this was part of the

17   government's trial evidence, and, now, go to page 5 if we

18   can.  Okay.  And if we can just zoom in on the bottom six

19   lines or so.  Yes.  That is good enough.

20           Okay.  So we are on page 5 of this records

21   request from the IRS, and my only question for you is do

22   you see that Annandale Nursery appears on a line there

23   about halfway down the page?

24   A      I do.

25   Q      We can go ahead and take that down.
```

1          Now, Agent Massino, in your declaration, you

2    discuss the Cellebrite reports for the cell phones that

3    were seized in Miami.

4          Do you recall that?

5    A    No.

6    Q    Maybe I should ask it a different way.  You

7    discussed the fact that you didn't review the Cellebrites

8    from the phones that were seized in Miami?

9    A    I don't believe I said that.  I believe I stated

10   very clearly that I viewed photos that were derived in a

11   sense from the phones seized in Miami.  I never saw a

12   Cellebrite report to my knowledge.

13   Q    Okay.  Thank you.  And do you know if you discussed

14   the Cellebrite reports with anybody who might have

15   reviewed them?

16   A    I do not recall ever having a discussion about

17   Cellebrite reports regarding the Miami phones.

18   Q    And as part of the investigation in the case, after

19   February, 2020, when somebody shared a piece of evidence

20   with you, do you ever recall somebody saying, by the way,

21   this is from the Cellebrite for the Miami phone?

22   A    I don't recall.

23   Q    So fair to say, if they did share something with

24   you from the Miami Cellebrite, they didn't tell you about

25   it?

```
 1          MR. O'DONNELL:  Assumes facts not in evidence.
 2     Speculation.  Argumentative.
 3          THE COURT:  Sustained.
 4          MR. KEOUGH:  No further questions.
 5          THE COURT:  Okay.  Anything else?
 6          MR. LITTRELL:  No, your Honor.
 7          THE COURT:  Thank you, sir.
 8              Call the next witness.
 9          MR. SILVERMAN:  We would like to call Mr.
10     Faerstein.
11          THE CLERK:  Please be seated.
12              State your full name and spell it for the
13     record.
14          THE WITNESS:  Should I remove my mask, your Honor?
15          THE COURT:  Yes.  Are you vaccinated?
16          THE DEFENDANT:  Yes, your Honor.
17              Brian Faerstein, B-R-I-A-N, F-A-E-R-S-T-E-I-N.
18          MR. SILVERMAN:  May I proceed, your Honor?
19          THE COURT:  Yes.
20
21                      CROSS-EXAMINATION
22     BY MR. SILVERMAN:
23     Q    Good afternoon, Mr. Faerstein.
24     A    Good afternoon.
25     Q    You were assigned to this case on February 9th,
```

1    2021; is that correct?

2    A     That's correct.

3    Q     And you were one of two AUSA's assigned to make up

4    for the loss of AUSA Andre; correct?

5    A     I was one of two AUSAs assigned.

6    Q     And you reviewed a number of materials in getting

7    up to speed on the case; right?

8    A     That's right.

9    Q     And one of these materials was a set of 141

10   photographs from Customs and Border Patrol; right?

11   A     As I stated in my declaration, I scanned those

12   photographs.

13   Q     And that was at the same time you were getting up

14   to speed on the case; right?

15   A     That's correct.

16   Q     And specifically the first time you reviewed those

17   photographs was your very first week on the case; right?

18   A     I don't know if that is -- I don't know if that is

19   accurate.

20   Q     If we could bring up Mr. Faerstein's declaration

21   and go to paragraph 5, please.  I'm sorry.

22           If not in the first week in or about mid

23   February?

24   A     That's correct.

25   Q     And you joined the case on February 9th?

1    A      That's correct.

2    Q      And in those photographs, did you see any

3    information that ultimately was related to the topics in

4    the first superseding indictment?

5    A      I don't know.

6    Q      Was one of the topics in the first superseding

7    indictment Turing Info Solutions?

8    A      That was a company described in the first

9    superseding indictment.

10   Q      And the first superseding indictment alleged in

11   part that Mr. Ayvazian was responsible for using the

12   Iullia Zhadko identify to obtain loans in Turing Info

13   Solutions' name; correct?

14   A      I believe in the money laundering counts 28 through

15   32, that was an allegation.

16   Q      And he used Turing Info Solutions to transfer that

17   money in December of 2020; correct?

18   A      That -- that's correct.

19   Q      And if we could please bring up KX2 or -- actually,

20   we don't need testimony on that.  We have the record

21   already made.

22          About a week or two later on or about

23   February 24th, you reviewed the phones again; correct?

24   Or, excuse me, the photographs, not the phones.

25   A      It was either the 24th or the 25th.

1  Q      And what was the event that led to you reviewing

2  the phones again?

3  A      Can I just clarify real quick?

4  Q      Absolutely.

5  A      When you say the photographs, I am referring

6  specifically to the CBP photographs of one or more of the

7  Miami cell phones.

8  Q      Correct.  And you have never reviewed the set of 65

9  photographs taken by Agent Palmerton; right?

10 A      That is not correct.  I said in my declaration, to

11 the best of my recollection, I did not review all of

12 those.  However, there were nine that were sent to me

13 that is described in my declaration.

14 Q      So on or about February 24th, you reviewed the 141

15 CBP photographs; correct?

16 A      I wouldn't characterize it as having reviewed the

17 141 CBP photographs.  As I stated in my declaration, I

18 was looking for specific text message exchanges that were

19 described in my declaration.

20 Q      What led you to look for those text message

21 exchanges?

22 A      A phone call that I participated in with attorney

23 Fenton and counsel to Picadilly Jewelers.

24 Q      And to the best of your recollection, what

25 transpired in that phone call?

1   A      I do not have a clear recollection of everything we

2   discussed.  What I do recall is that during the phone

3   call, attorney Fenton was asking counsel to Picadilly

4   Jewelers to make sure there were no additional documents

5   that were responsive to a subpoena that had been issued

6   to that company.

7   Q      How did that lead you to review the CBP

8   photographs?

9   A      During the call, attorney Fenton indicated to

10  counsel to Picadilly Jewelers that he had seen text

11  message exchanges between the owner of Picadilly Jewelers

12  and defendants in this case.  I took that to mean that

13  there was evidence of text messages, and I thought to

14  myself, I believe -- this is to the best of my

15  recollection -- I thought to myself, well, maybe I should

16  look in these CBP photographs.

17  Q      So did you ask Mr. Fenton whether those were the

18  text message conversations he was referencing?

19  A      When?

20  Q      On or about February 24th, did you ask him whether

21  the text message conversations he just referenced came

22  from the 141 CBP photographs?

23  A      I do not recall whether I asked him or I did not

24  ask him.

25  Q      Around that time, the government was receiving

```
 1   production of Cellebrites as well; correct?
 2   A     I -- that is -- I believe that is accurate.  I
 3   believe it could have been the first two phones, but I
 4   don't recall specifically the dates.
 5   Q     So is it possible that Mr. Fenton was referencing
 6   information he reviewed in the Cellebrite reports as
 7   opposed to the 141 CBP photographs?
 8         MS. WESTFAHL KONG:  Objection.  Calls for
 9   speculation.
10         THE COURT:  Sustained.  I lost some frame of
11   reference here.  When did you -- when were you assigned
12   the case?
13         THE WITNESS:  February 9th, your Honor.
14         THE COURT:  I see.  Okay.  Go ahead.
15   Q     BY MR. SILVERMAN:  Now, in reviewing the CBP
16   photographs regarding Picadilly Jewelers, did you see a
17   check that was made -- that was made out to Picadilly
18   Jewelers?
19   A     I don't know what you mean by a check made out to
20   Picadilly Jewelers.
21   Q     Did you see a check with Picadilly Jewelers'
22   account information on it?
23   A     I believe so.  I believe that is attached.  I
24   believe a screen shot of that text message is attached to
25   my declaration.
```

1  Q      And do you know whether the government subpoenaed

2  the bank records for that account?

3  A      I believe we did, but that was before I joined the

4  case.

5  Q      That wasn't the last time -- there is a third time

6  that you also reviewed the CBP photographs or some subset

7  thereof; correct?

8  A      Some subset thereof, correct.

9  Q      And, specifically, about two weeks later around

10 March 11th, 2021, you reviewed the photographs again;

11 correct?

12 A      No.  That is not accurate.  In my declaration on

13 March 11th, I received an e-mail from AUSA Paetty that

14 described certain photographs from the CBP photographs,

15 but I did not review them at that time.

16 Q      Was there some time that you reviewed them in

17 preparation for the motion to suppress?

18 A      In connection with the motion to suppress, AUSA

19 Paetty submitted a declaration to which he attached a

20 subset of photographs from the CBP photographs.  And I

21 believe I reviewed that subset in connection with

22 reviewing the filing.

23 Q      And in your declaration you refer to these as

24 primary reviews; correct?  These three reviews?

25 A      I don't believe I described it as that.

1    Q      Were there any other times that you may have

2    accessed the CBP photos for less intensive review?

3    A      To the best of my recollection, I don't recall

4    those other times.  Is it possible?  I suppose, but I do

5    not recall.

6    Q      Now, you printed a binder for organizational

7    purposes on April 24th; right?

8    A      I printed out the CBP photographs on April 24th,

9    and put them in a binder.

10   Q      And what was -- what happened to that binder next?

11   A      What happened to it?

12   Q      Where did it end up?

13   A      In my office.

14   Q      And is it possible that anybody else could have had

15   access to it thereafter?

16   A      Probably not.  No.

17   Q      Now, how did you know that it was April 24th?

18   A      Because in the folder on our internal system that

19   has the CBP photographs, there is a combined PDF document

20   that combined all of the JPEG images that were the CBP

21   photographs into one large PDF, and that is date stamped

22   April 24th which leads me to believe that I created that

23   and printed it out on April 24th.

24   Q      Now, around this time, your primary or one of your

25   primary responsibilities was the superseding indictment;

1  correct?

2  A      When I first joined the case in mid February, one

3  of my primary focuses was the first superseding

4  indictment and, in particular, potential additional

5  defendants.

6  Q      And were you or case agents participating in

7  investigatory activities at the time?

8  A      Can you describe -- what do you mean by

9  investigatory activities?

10 Q      Were you interviewing witnesses?

11 A      Was I personally interviewing witnesses?

12 Q      I apologize.  I will rephrase.  Were you or case

13 agents interviewing witnesses?

14 A      I believe case agents may have been interviewing

15 witnesses at the time, but I can't tell you with any

16 certainty right now.

17 Q      Did they discuss with you who they would interview?

18 A      I don't recall.

19 Q      So case agents, in general on this case, case

20 agents would go out and do interviews without discussing

21 it with the attorneys at times?

22 A      I didn't say that.

23 Q      But you don't recall whether or not they ever

24 discussed interviewing witnesses with you?

25 A      You asked me in -- when we were preparing the first

1     superseding indictment whether case agents were

2     conducting interviews and asking and talking to me about

3     those interviews, and I said I do not recall that.

4     Q     Mr. Faerstein, have you reviewed the discovery

5     correspondence in this case?

6     A     What discovery correspondence?

7     Q     Have you reviewed the production letters in this

8     case?

9     A     Yes.  Generally.

10    Q     And is it accurate to say that a substantial

11    portion of the witness interviews took place in 2021?

12    A     I don't know the answer to that sitting here right

13    now.

14          MR. SILVERMAN:  Can we please put up KX30.

15          MS. WESTFAHL KONG:  Objection.  Improper

16    refreshment of recollection.

17          THE COURT:  I don't know.  Let's see it.

18    Q     BY MR. SILVERMAN:  Mr. Faerstein, does the column

19    labeled description look like the descriptions that the

20    case team used in their production letters in this case?

21    A     Generally, yes.

22    Q     And I will go ahead and represent to you that this

23    is pasted straight from the production letters.  Looking

24    through that column, can we go to the next page as well,

25    please, and scroll through.  And scroll through.

```
 1              Is it fair to say that more than half of the
 2   witness interviews that were produced to the defense have
 3   dates beginning with 2021?
 4   A    I can't say that.  I noticed on the first page and
 5   the second page many interviews that were conducted
 6   before I was even on this case in mid February.
 7   Q    Right.  There are 125 interviews that were produced
 8   to the defense; right?  And 13 of them took place in
 9   2020?
10   A    You are scrolling through very quickly.  I don't
11   know the answer to that.
12   Q    We will submit this with the declaration and make
13   the record that way.
14              So for the first superseding indictment, you
15   helped prepare the prosecution memorandum; right?
16   A    Correct.
17   Q    And you worked with case agents to synthesize large
18   amounts of evidence obtained during the course of the
19   investigation?
20   A    Correct.
21   Q    Which agents did you work with?
22   A    FBI Special Agent Justin Palmerton, IRS Criminal
23   Investigation Special Agent Geffrey Clark.  Those were
24   the primary two agents I was working with.
25              THE COURT:  What was the date of the prosecution
```

```
 1   memo?
 2          MR. SILVERMAN:  I don't know the answer to that.
 3   Q     What was the date of the prosecution memo for the
 4   superseding indictment?
 5   A     It would have been in early March, 2021, your
 6   Honor.
 7          THE COURT:  Okay.
 8   Q     BY MR. SILVERMAN:  And at that point, you didn't ask
 9   them whether any of their synthesized facts were based on
10   tainted evidence; correct?
11   A     I did not -- first of all, what do you mean by
12   tainted evidence?
13   Q     You didn't ask them whether any of their
14   synthesized facts were based on the Miami phones in
15   particular; right?
16   A     I -- I don't recall asking them that specific
17   question.
18   Q     And did you ask about how their investigation had
19   unfolded and ask them to trace back each piece of
20   evidence that they were sharing with you?
21   A     No, I did not ask them to do that.
22   Q     Besides the CBP photographs and the summaries you
23   received from case agents, what other sources of evidence
24   did you review for the prosecution memorandum?
25   A     Could you repeat that question?
```

1   Q      Besides the CBP photographs and the case agent

2   summaries, what other sources of evidence did you review

3   when preparing to draft the prosecution memorandum?

4   A      I reviewed significant additional sources of

5   information.  I reviewed the loan files, the payroll

6   reports, the Gusto payroll reports, the Form 940s and

7   other tax forms.  I reviewed bank records including both

8   the records reflecting the way the money was spent and

9   bank opening account information, public filings, IRS

10  fact of filing letters, EDD letters reflecting the

11  nonexistence of synthetic identities that were used in

12  this case, Secretary of State filings.  That is what I

13  can remember right now, but I know there was more as

14  well.

15  Q      Who compiled those materials for you?

16  A      Who compiled them where?

17  Q      Who directed you to those materials?

18  A      So I worked with the agents or the agents, one of

19  the things they were doing, is compiling this information

20  in folders that I would have access to.

21  Q      So, specifically, the agents, Agent Clark and Agent

22  Palmerton were the two you mentioned, or was it Agent

23  Clark and Agent Massino?

24  A      No.  I mentioned Special Agent Palmerton and

25  Special Agent Clark.

1    Q      So they were the ones who compiled it in folders

2    that you would have access to?

3    A      That is -- that is correct.

4    Q      Now, the draft prosecution memo contained a

5    reference to information from the Miami phones; correct?

6    A      That is correct.

7    Q      Now, specifically, information regarding a Canoga

8    apartment?

9    A      Yes.  It is stated in my declaration.

10   Q      And that was not the only reference to tainted

11   information -- correct -- or to information from the

12   Miami phones; correct?

13   A      I believe that was the only specific reference or

14   the only reference, direct reference, I should say, to

15   Miami, to information from a Miami phone.

16   Q      There was a reference to Mr. Ayvazyan's control

17   over his alias Iullia Zhadko being established by, among

18   other things, a search of his mobile devices; correct?

19   A      I don't know where you are getting that from.  Are

20   you quoting something?

21   Q      I am attempting to quote paragraph 31 of your

22   declaration.

23   A      I would have to see that.

24   Q      Can we bring up his declaration, go to

25   paragraph 31.  Make sure I am quoting it correctly?

```
 1          MS. WESTFAHL KONG:  Your Honor, may I pass up a
 2   copy of the declaration?
 3          THE COURT:  Yes.
 4          MR. SILVERMAN:  Thank you.
 5          THE WITNESS:  Is there a question?
 6   Q    BY MR. SILVERMAN:  So there is a reference to Iullia
 7   Zhadko and, specifically, the search of Mr. Ayvazian's
 8   mobile devices; correct?
 9   A    Yes.  It says a search of his mobile devices.
10   Q    And in your declaration you note that other --
11   another cell phone had been seized from Mr. Ayvazyan on
12   November 5th; correct?
13   A    That's correct.
14   Q    Do you know whether that other cell phone had been
15   searched when this prosecution memorandum was written?
16   A    I recall that on November 5th, agents had done a,
17   as I understood it, a cursory review of the phone not for
18   information that would potentially be privileged but
19   photographs I believe.
20   Q    And had that information been produced to you by
21   that point?
22   A    What do you mean produced?
23   Q    Had those photographs been produced to you?
24   A    I don't know at that time whether they had been
25   produced, but I believe I knew -- through conversation,
```

1   but I can't recall specifically that there was other

2   evidence from the phone from November 5th.

3   Q    And you believe that you knew that by the time of

4   the initial prosecution memorandum?

5   A    I can't say that sitting here right now.

6   Q    Now, in your declaration, you talk about the

7   recitation of evidence; correct?

8   A    Where specifically?

9   Q    If we could go to paragraph 27, lines 26 through

10   the next page.

11   A    Yes.

12   Q    And I want to clarify this because I think that we

13   have misunderstood it.  This is referring to the

14   prosecution memorandum; correct?

15   A    It is not.

16   Q    What is it referring to?

17   A    It is referring to factual summaries that, written

18   factual summaries regarding Redline Auto Collision, and

19   that is defendant Edward Paronyan and, separately,

20   defendant Arman Hayrapetyan and Hart Construction, Sabala

21   Construction.

22   Q    And for whom were those written factual summaries

23   provided?

24   A    To whom were they provided?

25   Q    To whom.

1    A      I received them.

2    Q      For what purpose?

3    A      For purposes of preparing, understanding the

4    evidence and preparing superseding charges against these

5    additional defendants.

6    Q      And how did you use this information?

7    A      I read it, and some of it was significant enough

8    that I put it into -- put in the prosecution memo as part

9    of our supporting evidence.

10   Q      And these two particular lines were provided to you

11   but were not included in the prosecution memo, fair to

12   say?

13   A      The information in these lines -- and let me just

14   be specific.  When you are referring to these two lines,

15   what specifically are you referring to?

16   Q      These two references were not included in the

17   prosecution memorandum?

18   A      I just want to make sure the record is clear what

19   references are you referring to?

20   Q      The reference to photographs on Richard Ayvazyan's

21   phone containing a photo of Arman Injijian's California

22   driver's license and photographs on Richard Ayvazyan's

23   cell phone containing PII associated with Anton Kudamov?

24   A      I did not add those, and those were not in the

25   prosecution memo, that information.

1   Q     And there was also a reference to two different

2   photographs belonging to -- excuse me -- two different

3   photos of the California driver's license C8924483;

4   correct?

5   A     That was in the summary regarding Hart Construction

6   and Arman Harapetyan; that's correct.

7   Q     And that is a reference to Iullia Zhadko's license;

8   correct?

9   A     What you just quoted was a reference to Iullia

10  Zhadko's license on one of the Miami phones.

11  Q     And you used this particular piece of information;

12  correct?

13  A     No.  I don't think that that's correct.

14  Q     You didn't quote this piece of information in a

15  hearing in this case?

16  A     I don't think I quoted this particular piece of

17  information.

18  Q     Well, at the April 2nd hearing, you stated that

19  there were -- I'm sorry.  Let me make sure I get the

20  exact language.  That there were licenses belonging to

21  Iullia Zhadko found on Richard Ayvazyan's phone; correct?

22  A     I know what you are referring to.  It would be

23  helpful to see the transcript to make sure that you are

24  stating my words accurately.

25  Q     If we could go to docket 299 and go to page 10.

```
 1              Can you see at the bottom of the page you were
 2   asked for the evidence that there was that they are not
 3   real, and do you recall that the "they" in that sentence
 4   is Iullia Zhadko and Victoria Kauichko.
 5   A     Yes, that's correct.
 6   Q     And the evidence that you say, among other things,
 7   is Iullia Zhadko and the driver's licenses, plural, that
 8   were on defendant Ayvazyan's -- and if we can scroll down
 9   to the next page -- phone; correct?
10   A     I said that.  Yes.
11   Q     And this was a reference to the multiple driver's
12   licenses that you had received in that internal fact
13   summary; correct?
14              THE COURT:  The last part of your sentences trail
15   off.  I remember that from the trial.
16              MR. SILVERMAN:  Yes, your Honor.  I will continue
17   to try to get better at that.
18              THE COURT:  The words seem to get grounded
19   somewhere in your throat.  I don't know where, but they
20   are not coming out as clearly as they should.
21              MR. SILVERMAN:  Yes, your Honor.
22   Q     This reference to multiple Iullia Zhadko licenses
23   was taken from the information you were given in that
24   internal fact summary; right?
25   A     No.  The reference to the Iullia Zhadko licenses
```

1    was taken from the fact that, yes, there were Iullia

2    Zhadko driver's licenses on the phones which was set

3    forth in other sources as well.

4    Q    And the CBP photographs that you looked at, there

5    was only one Iullia Zhadko license; right?

6    A    I don't recall that.

7    Q    So fair to say that there was so much tainted

8    information flowing around that you did not know --

9         MS. WESTFAHL KONG:  Objection.  Argumentative.

10        THE COURT:  He can answer the question.  Go ahead.

11        THE WITNESS:  So, in connection with this hearing,

12   this hearing was on the modified protective order.  We

13   filed an ex parte application to modify the protective

14   order.  I filed a declaration in support of that ex parte

15   application to which we attached two photographs of

16   Iullia Zhadko driver's licenses.  My understanding is

17   those photographs were from the FBI photographs which

18   attorney Fenton sent to me prior to the hearing, prior to

19   us filing that ex parte application.

20   Q    BY MR. SILVERMAN:  This case is not your first

21   experience with a Kastigar-related issue; correct?

22        MS. WESTFAHL KONG:  Objection.  Relevance.

23        THE COURT:  I don't know where it is going.  I

24   will allow you a couple of questions to see if it becomes

25   relevant.

```
 1          THE WITNESS:  What do you mean by Kastigar-related
 2    issue?
 3    Q    BY MR. SILVERMAN:  You were brought in as counsel on
 4    Benson after trial counsel was disqualified; correct?
 5    A    That's correct.  When I was an AUSA at the Northern
 6    District of California US Attorney's Office.
 7    Q    During your time on this case, did anybody suggest
 8    the possibility of recusing or replacing counsel who had
 9    been exposed to tainted information?
10    A    What timeframe are you talking about?
11    Q    At any point prior to trial, did anybody discuss
12    that possibility?
13    A    First of all, as I mentioned in my declaration, I
14    was not -- I was on leave in May prior to trial.  In
15    terms of whether I was involved in a conversation where
16    we discussed recusing the prosecution team, I don't
17    recall that.
18          MR. SILVERMAN:  Thank you.  No further questions.
19          THE COURT:  Anything further?
20          MR. LITTRELL:  No, your Honor.
21          THE COURT:  All right.  Thank you, Mr. Faerstein.
22              Who is the next?
23          MR. KEOUGH:  Your Honor, I believe Agent Clark is
24    the last witness.
25          (Recess from 1:53 to 2:09 p.m.)
```

```
 1           (The witness was sworn.)

 2            THE CLERK:  Please be seated.

 3              State your full name and spell it for the

 4    record.

 5            THE WITNESS:  Geffrey Clark, G-E-F-F-R-E-Y,

 6    C-L-A-R-K.

 7

 8                       CROSS-EXAMINATION

 9    BY MR. KEOUGH:

10    Q     Good afternoon, Agent Clark.

11    A     Good afternoon.

12    Q     Since 10:00 a.m. yesterday, have you spoken with

13    anyone on the prosecution team about this case?

14    A     Yes.

15    Q     And who have you spoken with?

16    A     Probably everybody.

17    Q     Who is that?

18    A     Everybody at the table and agents sitting in the

19    back.

20    Q     Let's go ahead and name them all for the record so

21    that we have them all down.  Tell us each person that you

22    spoke with on the prosecution about the case since

23    10:00 a.m. yesterday?

24    A     Chris Fenton, a gentleman Niall, I don't know his

25    last name, Ranee Katzenstein, Allison, Mark Cipoletti.  I
```

 1   don't know the gentlemen's name here.  Agent Justin

 2   Palmerton, Agent Timothy Massino, Agent Faerstein, I

 3   mean, AUSA Faerstein and AUSA Catherine Ahn.

 4   Q     Okay.  And let's take those one at a time.  What

 5   did you discuss about the case with Mr. Fenton since

 6   10:00 a.m. yesterday?

 7   A     Nothing specific.

 8   Q     But you did discuss the case with him; correct?

 9   A     Just in a general sense.

10   Q     And what, in a general sense, did you discuss?

11   A     I don't recall.  Everything was so general.

12   Q     Did you discuss the Miami phones with Mr. Fenton?

13   A     Say that -- I didn't hear.

14   Q     Did you discuss anything related to the Miami

15   phones with Mr. Fenton?

16   A     The what phones?

17   Q     The Miami phones, the phones that were seized in

18   Miami during the stop that I am sure you are aware of?

19   A     I don't recall, no.

20   Q     You don't recall, or you didn't discuss them?

21   A     I don't recall discussing anything about the phones

22   with them.

23   Q     Did you discuss this investigation generally?

24   A     Yeah.

25   Q     And what did you discuss about it?

1    A    We discussed what happened in trial, humorous

2    things that happened in trial.

3    Q    What were the things that happened in trial that

4    you discussed?

5         MR. O'DONNELL:  Objection.  Relevance?

6         THE COURT:  Sustained.

7    Q    BY MR. KEOUGH:  Did you discuss your testimony today

8    with Mr. Fenton?

9    A    No.

10   Q    Did you discuss Mr. Fenton's testimony that he gave

11   yesterday?

12   A    No.

13   Q    With Ms. Katzenstein, did you discuss this case

14   since 10:00 a.m. yesterday?

15   A    The case was discussed in general.

16   Q    And I appreciate that you are trying to describe it

17   generally, but, specifically, what did you talk about

18   related to this case?

19   A    I don't recall specifics.

20   Q    But you did discuss the case?

21   A    Yes.

22   Q    And do you recall whether you discussed the phones

23   that were seized in Miami?

24   A    No, we didn't.

25   Q    And did you discuss any other part of the

```
 1   investigation?

 2   A      Not that I recall.

 3   Q      Did you discuss the substance of the testimony that

 4   you were to give today?  No?

 5   A      Just to be clear and audible.

 6   Q      And what did you understand that was meant by to be

 7   clear?

 8   A      Short, distinct answers.

 9   Q      And did you discuss any of the testimony with

10   Ms. Katzenstein that was given yesterday at the hearing?

11   A      No.

12   Q      And have you discussed with anyone any testimony

13   that was given during the morning session today?

14   A      No.

15   Q      Did you talk with anybody at the lunch break about

16   this case?

17   A      Did I talk?  No.

18   Q      Did you have lunch with anybody on the prosecution

19   team during the lunch break today?

20         MR. O'DONNELL:  Objection.  Relevance.

21         THE COURT:  You can ask.

22         THE DEFENDANT:  Yes, I had lunch.

23   Q      BY MR. KEOUGH:  But you didn't discuss the case?

24   A      Not in specifics, general terms.

25   Q      And what did you talk about?
```

```
 1   A      I don't recall.  I had a bunch of personal calls I
 2   was taking during the lunch break.
 3   Q      So returning to the list of people that you have
 4   discussed this case with since 10:00 a.m. yesterday, you
 5   mentioned Mr. Cipolletti.  What did you discuss about the
 6   case with him?
 7   A      Nothing.
 8   Q      But you did discuss the case with him, you said?
 9   A      He was in the room.  I don't recall actually having
10   a conversation directly with him.
11   Q      Did you discuss the Miami phones with him?
12   A      No.
13   Q      Did you discuss any of the testimony that had been
14   given at this hearing with him?
15   A      No.
16   Q      Same question for Mr. Faerstein.  You said you
17   discussed the case with him.  What did you talk about?
18          You can answer.
19   A      Okay.  I was waiting.  We discussed like what
20   happened in trial.
21   Q      And what specifically about the trial did you
22   discuss with Mr. Faerstein?
23       THE COURT:  When you mean the trial, do you mean
24   this hearing or the trial that occurred a month ago?
25       THE WITNESS:  A month ago.
```

```
 1            THE COURT:  Oh.  I see.
 2   Q    BY MR. KEOUGH:  And what specifiably about that
 3   trial a month ago did you discuss with Mr. Faerstein?
 4   A    I don't remember specifics just like general stuff.
 5   We didn't talk about the phones or anything like that.
 6   Q    And these were all, just to be clear, these were
 7   all discussions that have happened since yesterday;
 8   correct?
 9   A    Yeah.
10   Q    That you can't recall what was discussed as we sit
11   here today.
12   A    Just general.
13   Q    And how about Agent Massino, do you recall what you
14   discussed about the case with him?
15   A    We discussed things that were humorous about the
16   trial.
17   Q    And what was humorous about the trial if you could
18   share with us?
19            MR. O'DONNELL:  Objection as to relevance, your
20   Honor.
21            THE COURT:  I mean, I don't think things that are
22   humorous is sufficiently relevant unless you can relate
23   it to something that is germane to the hearing.
24   Q    BY MR. KEOUGH:  Yes, your Honor.  I will ask it a
25   different way.  Did the humorous things about the trial
```

1   you discussed relate to the Miami phones?

2   A      No.

3   Q      Did the humurous things you discussed relate to the

4   investigation generally?

5   A      No.

6   Q      Did they relate to defendant Richard Ayvazyan?

7   A      No.

8   Q      How about defendant Marietta Terabelian?

9   A      No.

10  Q      Did they relate to any of the testimony that was

11  given yesterday at this hearing?

12  A      No.

13  Q      Or any of the testimony given earlier today before

14  you came into the courtroom?

15  A      No.

16  Q      Last person on your list was Catherine Ahn.  Do you

17  recall discussing the case with her since 10:00 a.m.

18  yesterday?

19  A      In general sense, yes, we spoke.

20  Q      And what did you speak about with regards to this

21  case?

22  A      I don't recall the specifics.  About the trial and

23  what occurred and humorous things that happened during

24  the trial.

25  Q      And did you discuss the Miami phones with Ms. Ahn?

```
 1    A      No.
 2    Q      Did you discuss any part of this investigation with
 3    Ms. Ahn?
 4    A      I am sure I talked about the investigation with
 5    her.
 6    Q      With any of the people on your list that you named
 7    that you discussed this case with since 10:00 a.m.
 8    yesterday, did you discuss the substance of your
 9    testimony?
10    A      No.
11    Q      Did you discuss the testimony of any other witness
12    who has testified in this hearing?
13    A      No.
14    Q      Agent Clark, you recall submitting a declaration as
15    part of this hearing; correct?
16    A      Yes.
17    Q      And you recall stating that you reviewed 65 images
18    from Agent Palmerton that you received on or around
19    November 13th, 2020; correct?
20    A      Yes.
21    Q      And you recall you said you reviewed the set of
22    images approximately five times?
23    A      Yes.  That was a total approximation.  I don't know
24    how many times.  It was very few.
25    Q      But it was approximately five?
```

```
 1   A      That is what I said in the declaration.

 2   Q      And you would agree that those images were taken

 3   from cell phones seized from the defendants in Miami.

 4   A      That is what I was told.

 5   Q      And, in your declaration, you also mentioned that

 6   you interviewed a notary by the name of DuBos in

 7   January 2021.  Do you recall that?

 8   A      Debois, yes.

 9   Q      Debois.  Thank you.  And you interviewed him in

10   January, 2021?

11   A      Yes.  Mid January.

12   Q      So let's pull up Kastigar Exhibit 4.

13              2021; correct?

14              Agent Clark, you interviewed Mr. Debois in

15   January of 2021; correct?

16   A      Yes.

17   Q      And I have put here in front of what you has been

18   marked as Kastigar Exhibit 4 which was part of a

19   submission that the defendants made in this case, and do

20   you recognize this document?

21   A      Yes, I do.

22   Q      And it is a memorandum of interview that describes

23   your meeting with Mr. Debois; correct?

24   A      Correct.

25   Q      And if we could scroll down one more page, one more
```

```
 1   page, and here is an image you showed of Mr. Debois with
 2   his notary Rotary profile; correct?
 3   A    I showed him this image, and he later verified that
 4   it was his.
 5   Q    And would you agree this image was one of the 65
 6   that you reviewed -- that you reviewed as part of that
 7   set that Special Agent Palmerton provided you; correct?
 8   A    I believe that is where I got it from, yes.
 9   Q    You can take it down.  Actually, leave it there.
10   Scroll up to the first page.
11            Now, the investigation name you see there at
12   the top says Artur Ayvazian.  Do you see that?
13   A    Yes.
14   Q    When was the investigation first titled Artur
15   Ayvazian?
16   A    I don't know because that case number is under
17   another agent's name.
18   Q    Okay.  We can take that down.  Now, let's pull up
19   what has been marked as Kastigar Exhibit 8.
20   A    Now, what you see here, as you can see from the
21   top, is an e-mail.  It was sent by you.  Do you see that?
22   A    Yes.
23   Q    And it was sent to members of this investigation
24   team including Mr. Fenton, Mr. Faerstein, Mr. Paetty and
25   others; correct?
```

```
 1    A      Yes.

 2    Q      And if we start with the bottom e-mail which is

 3    from Mr. Fenton to you and those same people, the subject

 4    is, you see is witnesses, and it says here is a list of

 5    potential witnesses we are planning to subpoena for

 6    trial, please let us know if there is anyone else you

 7    think we should add to the list so we can get subpoenas

 8    out next week.  Do you see that?

 9    A      Yes.

10    Q      And you responded to this e-mail at the top;

11    correct?

12    A      Yes.  That would be my general response.

13    Q      And you said, just thinking, and then you say,

14    United Wholesale Mortgage.  And then you say, notaries

15    for mortgage documents, stamps and pictures on phones.

16    Did I read that accurately?

17    A      Yes.

18    Q      And the pictures on phones is a reference to the

19    phones that were seized in Miami; correct?

20    A      I don't know if I am referencing those phones that

21    are in Miami.

22    Q      What phones could you have referenced, pictures on

23    phones could you have referenced on April 27th?

24    A      Well, there was other phones seized.

25    Q      Are you aware of whether or not you had been
```

1    provided information from those phones from the filter

2    team by April 27th?

3    A    The filter team, I never spoke with the filter

4    team.

5    Q    Did anybody provide with you information from other

6    phones beside the Miami phones prior to April 27th?

7    A    I am sure there was conversations among the

8    investigative team about what they had reviewed on the

9    phone.

10   Q    I will ask the question a different way.  Did you

11   review information from a phone as part of this case

12   besides the 65 photographs prior to April 27th, 2021?

13   A    Which phone are you referring to?

14   Q    Pick any phone in the case.  Had you reviewed them

15   prior to April 27th, 2021, other than the Miami phones?

16   A    Other than -- I don't know when we had access to

17   the other phones, but I know that I reviewed Tamara

18   Dadyan phone.

19   Q    And you are referring to the Tamara Dadyan phone

20   that was seized from the search of the Weddington

21   residence; right?

22   A    Yes.

23   Q    And are you aware that as of April 26 that phone

24   had not been released from the filter team to the

25   government team?

```
1    A      I don't know when those phones were released.

2    Q      But fair to say that prior to April 27, you had

3    received phones from Special Agent Palmerton; correct?

4    A      The 65.

5    Q      Go ahead and take that down.

6             In your declaration, you mentioned on the

7    second page in a footnote that you provided the

8    prosecutors with a summary that referenced a loan for

9    Hart Construction.  Do you recall that?

10   A      Yes.

11   Q      Okay.  And let's go ahead and put the declaration

12   up just so that you don't have to guess, we can show it

13   to you.  Let's put the Clark declaration up.  Let's go to

14   page 2 of the declaration.  Scroll down one more.  Okay.

15   And if we can just blow up the footnote so that we can

16   all see it.

17             Now, in the footnote, you say that in

18   February, late February, 2021, a summary related to

19   Celtic Bank issued to Hart Construction was provided to

20   the prosecutors.  Do you see that there?

21   A      Yes.

22   Q      And you prepared that summary?

23   A      Yes.

24   Q      And you also mentioned the footnote that among

25   other sources of evidence, the summary makes reference to
```

1   two different photos of a California's driver's license

2   ending in 83 observed on Richard Ayvazyan's phone during

3   the CBP stop.  Do you see that?

4   A     Yes.

5   Q     Now, you are aware that Hart Construction was

6   mentioned several times at trial; correct?

7   A     Yes.

8   Q     And if we could pull up -- so just to go back to

9   the reference to the photos, sorry, observed on Richard

10  Ayvazyan's phone.  If we could pull up KX1, and let's go

11  to page 30.

12            So on the left-hand side, I will represent to

13  you are the 65 photos that appear in this exhibit that

14  Agent Palmerton provided.  Again, do you recognize this

15  photo?

16  A     Yes.  That is one of the phones in one of the loan

17  documents.

18  Q     And is this, the photograph here, is that one of

19  the driver's licenses you were referencing in the

20  footnote when you said two that were taken from the phone

21  in Miami?

22  A     Yes.

23  Q     Now, if we can go to page 32 which is two pages

24  down, and here is a picture from the 65 of a second

25  driver's license which you see is in the name Iullia

1   Zhadko; correct?

2   A      Yes.

3   Q      And is this the other driver's license that you

4   referenced when you prepared that summary about Hart

5   Construction?

6   A      Yes.

7   Q      And if we return now two pages up to the first

8   photo.  You would agree that, first of all, this driver's

9   license also has the name Iullia Zhadko on it?

10  A      Yeah.  I ran them.  They are fake.

11  Q      My question was simply is the name Iullia Zhadko on

12  the driver's license?

13  A      Yes.

14  Q      Thank you.  And you would agree that the two

15  driver's licenses that we just looked at from the photos

16  that Agent Palmerton gave you, the two licenses that you

17  referenced in the Hart Construction summary, they have

18  different pictures of the people; correct?

19  A      Yes.

20  Q      And was the fact that the two driver's licenses

21  with the same name having two different pictures on them,

22  was that fact part of that summary that you provided?

23  A      I don't recall the summary.  Do you have the

24  summary?  Can you show me the summary?

25  Q      Well, would you be able to produce it to the

1   defense?  We haven't seen it.  I would be happy to show

2   it to you if you provided us with a copy?

3   A     I haven't looked at those summaries since I

4   submitted them.  I don't know how I referenced them in

5   the summary.

6   Q     Do you agree that seeing the summary would be

7   helpful to you to answer this question?

8   A     Yes.

9        MR. KEOUGH:  Your Honor, we would ask that a copy

10   be produced, or, if the government has a copy with them

11   now, we can provide it to the witness.

12        THE COURT:  What is the significance?

13        MR. KEOUGH:  The significance, your Honor, is that

14   the declaration states that the two licenses were

15   mentioned in the summary or the fact that there were two

16   copies of a license in the summary were mentioned, and we

17   would like to establish that, in fact, they bore two

18   different pictures which was one of the most powerful

19   piece of evidence that was seized from the phone,

20   something that is omitted from the declaration.

21        THE COURT:  You already know that two likenesses

22   of the same person were found?

23        MR. KEOUGH:  Yes, your Honor.  But the question

24   that we have asked is whether or not the fact that the

25   pictures are different, if that was part of the summary

```
 1    that was prepared, beyond just the fact that there were
 2    two licenses.
 3            THE COURT:  But if he -- do you know the answer to
 4    that?
 5            THE WITNESS:  I think I can recall.  I just note
 6    that there were the two licenses on the phone.  I don't
 7    think I describe anything about the licenses.
 8            THE COURT:  Do you have the summary here?  What
 9    does it say?
10            MS. WESTFAHL KONG:  Could AUSA Faerstein approach
11    to help us find it?
12            MR. KEOUGH:  Just for the record, attorneys for
13    government at the table I believe were trying to figure
14    out what this summary is so that we can show it to the
15    witness.
16                I think that is what they are trying to figure
17    out.  And, your Honor, we request a copy of the document
18    that the government is reviewing now.
19            THE COURT:  I would like to see it first.
20            MR. O'DONNELL:  Sorry, your Honor.  I can't hear
21    you?
22            THE COURT:  I would like to see it first.
23            MR. O'DONNELL:  Yes, your Honor.
24            THE COURT:  Hand it up.  While you are at it, I
25    would also like to see that exhibit that was mentioned
```

```
 1   this morning.  I think it was the e-mail in the Palmerton

 2   affidavit.

 3        MR. KEOUGH:  Is your Honor referring to the cover

 4   e-mail to exhibit O?

 5        THE COURT:  What?

 6        MR. KEOUGH:  The April 27th e-mail with the text

 7   messages?

 8        THE COURT:  I am referring to what was referenced

 9   this morning which was part of -- it was Exhibit -- I

10   think it was an e-mail in Palmerton's affidavit that was

11   referenced, Paragraph 21, was it.  Maybe 26.  Maybe

12   paragraph 26.

13        MR. KEOUGH:  Yes, your Honor.  I see what you are

14   saying here.

15        THE COURT:  Okay.  Just let me see it.

16        MR. O'DONNELL:  Your Honor, we don't have that

17   e-mail now.  We will look for it and try to get a copy

18   for the court, but we have a copy of the summary that we

19   discussed.  We have highlighted the portion.

20        THE COURT:  Yes.

21        MR. O'DONNELL:  May I approach?

22        THE COURT:  And get me the other thing quickly.

23        MR. KEOUGH:  And, your Honor, we request that a

24   copy of this also be provided to the defense.

25        THE COURT:  I have handed up to me what is called
```

```
 1    "Working Draft for Superseding Indictment."
 2              Is this what you prepared?
 3         THE WITNESS:  If it is -- if it says Hart
 4    Construction on top, yes.  The format looks familiar.
 5         THE COURT:  Why is it undated?  Does not have a
 6    date on it.  There is no date on this.  How does this
 7    relate to the prosecution memo that was submitted?  What
 8    is this document?
 9         MR. O'DONNELL:  AUSA Faerstein testified that this
10    was a summary that was provided to him when he joined the
11    case by the agents summarizing evidence.  It is not the
12    actual working draft of the superseding indictment.  That
13    is a little misleading.  What it is meant to suggest is
14    this is a summary to be used to help prepare the working
15    draft for the superseding indictment.  So this is a
16    summary of facts provided by agents.
17         THE COURT:  How does this compare to the actual
18    prosecution memo?
19         MR. O'DONNELL:  It is a completely different
20    document.  This was prepared at the request of the AUSA
21    from the agents.
22         THE COURT:  I am going to mark this as whatever
23    the court's number is, Exhibit 1, I guess.  And the
24    government has already tabbed for you the part that you
25    may think relevant.
```

```
 1            MR. KEOUGH:  May I approach, your Honor?

 2            MR. CIPOLLETTI:  Your Honor, Mr. Faerstein is

 3    going to attempt to connect his computer to the Internet

 4    downstairs and get a copy of the e-mail.

 5            MR. O'DONNELL:  Your Honor, I just want to lodge

 6    an objection based on work product.  This was prepared at

 7    the direction of attorneys.

 8            THE COURT:  I am just -- I don't think there is a

 9    work product issue here.  We are in a different format.

10    But, in any event, look at that part that was highlighted

11    by the government.

12            MR. KEOUGH:  Your Honor, could I just have a

13    second to confer with my co-counsel?

14            THE COURT:  Yes.

15            (Counsel confer.)

16            THE COURT:  The part that is relevant, I gave you.

17    Don't look through the rest of it, and return it to

18    the -- that part of it can be marked as an exhibit.  The

19    rest of it should be returned to the government.

20            MR. KEOUGH:  With your Honor's permission just

21    because there is only one copy, if I could just put it on

22    the Elmo.

23            THE COURT:  Read it to him.  Why does everybody

24    have to see things?  Can't people understand a sentence?

25    There is only a couple of sentences.
```

1       MR. KEOUGH:  Yes, your Honor.

2   Q     So, Agent Clark, I have what is in front of me that

3   has been marked Court's Exhibit 1, a document that the

4   government handed up just now, and the title says

5   "Working Draft for Superseding Indictment, Heart

6   Construction, PPP loan, Celtic Bank, 4363847301."

7         Does that sound familiar?

8         THE COURT:  How can that sound familiar to him?  I

9   mean, come on.  You don't want to ask a question like

10  that.

11        MR. KEOUGH:  I apologize, your Honor.  That was a

12  bad question.

13  Q     Agent Clark, the Court showed you this document.

14        THE COURT:  He knows it.  He saw it.  He says that

15  is the one he prepared.  So let's turn to what you think

16  is relevant.

17  Q     BY MR. KEOUGH:  On page 5 of the document, I will

18  read it to you so you can hear what it says.  It says,

19  "during a CBP stop in Miami Florida, four Florida debit

20  cards in the name of Iullia Zhadko which included one in

21  the name of Top Quality Contracting in the possession of

22  Richard Ayvazyan, two different photos of a California

23  driver's license, C8924483 was observed on Richard

24  Ayvazyan's phone.  DL C8924483 does not exist in

25  California DMV records."

1           And my question for you, Agent Clark, is the

2     reference to two different photos of the driver's license

3     that I just read to you from this document, are those the

4     two photos that we saw here from the 65 provided to you

5     by Agent Palmerton?

6     A     Yes.

7           MR. KEOUGH:  Okay.  Thank you.  And, your Honor,

8     you would like us to return this to the government.

9           THE COURT:  Yes.

10          MR. KEOUGH:  Thank you.

11    Q     Okay.  Now, returning to the 65 photos that we just

12    discussed, two of those photos also included references

13    to someone named Olaf Lansgaard.

14          Do you recall that?

15    A     The photo of Olaf Lansgaard, no, I don't.

16    Q     So we are here in KX1 which is the 65 photos, and

17    if we can go to PDF, page 37.  And you see image 37A

18    which is depicted here which was part of the set of 65

19    photos from the Miami phones is a picture of what appears

20    to be a website or web search and the first entry there

21    says Olaf Lansgaard obituary.

22          Do you see that?

23    A     Yes.

24    Q     And Olaf Lansgaard, you recall was an attorney who

25    we will say whose name was involved in some of the real

1  estate transactions in this case; correct?

2  A     Yes.  He is on the e-mail indicating he is the

3  attorney for the purchase of the property.

4  Q     And do you recall which property specifically?

5  A     I think, well, there is the Calle La Primavera.

6  There is the Anastasia and the Imperial.

7  Q     And fair to say that Mr. Lansgaard died in 2019;

8  correct?

9  A     April 23rd, I believe, 2019.

10 Q     And if we look closely here at image 37A, we can

11 actually see that here on that first line.  It says

12 May 2nd, 2019, Olaf Lansgaard of Rosamond, CA, passed

13 away on April 23rd, 2019.

14 A     Yes.

15 Q     And fair to say that the person that had this phone

16 whoever completed this web search also had that

17 information in front of them too?

18 A     I don't know who had the phone.

19 Q     But whoever had this phone and did this web search

20 would have seen this; right?  That is what the photo

21 shows?

22 A     Is there a question?

23 Q     You would agree with that; right?  That whoever had

24 this phone and performed that web search, they saw that

25 Olaf Lansgaard was dead.

1    A      It is a photo of that web search.

2    Q      Including an obituary for Olaf Lansgaard --

3    correct -- as one of the first hits?

4    A      I don't know if that is an obituary that is from

5    some other website.

6    Q      The fact that he passed away on April 23rd, 2019,

7    is right there in the photo; correct?

8           THE COURT:  Why are you asking him whether someone

9    who saw this would have noticed it?

10          MR. KEOUGH:  The question is whether or not seeing

11   these photos informed Agent Clark that the person who

12   possessed the phone which, here, is the defendant had

13   this information about Olaf Lansgaard's death in front of

14   them.

15          THE COURT:  Whether Richard Ayvazyan had the

16   information in front of him?

17          MR. KEOUGH:  Correct, your Honor.

18          THE COURT:  So you are asking did he make that

19   connection when he saw what you are referencing and

20   Richard Ayvazyan?

21          MR. KEOUGH:  Yes, your Honor.  Or if he would

22   agree with me that Olaf Lansgaard's death is noted here

23   in the image.

24          THE COURT:  Well, I mean, it is.  Isn't it there?

25          MR. KEOUGH:  That is the question, your Honor.  If

```
 1    the witness would answer, I think we can move on to the
 2    next.
 3          THE COURT:  It is there right?  It is on the
 4    screen.  Is that what you saw?
 5          THE WITNESS:  I don't recall seeing that.
 6          THE COURT:  I see.  So what exactly, again, are
 7    you referencing?  What is this?
 8    Q    BY MR. KEOUGH:  Agent Clark, you did review the 65
 9    photographs from Agent Palmerton?
10    A     Yes.
11          THE COURT:  Is this one of the 65 photographs?
12          MR. KEOUGH:  Yes, your Honor.  This screen shot of
13    a web search for the obituary.
14          THE COURT:  That is on the 65 photos?
15          MR. KEOUGH:  Correct, your Honor.
16          THE COURT:  Well, if he reviewed them, then he
17    probably saw it.  Whether he remembers it or not is
18    another question.  But if he says he saw them, and it is
19    there, he saw them.
20          MR. KEOUGH:  Thank you, your Honor.
21    Q     As part of your investigation, you reviewed escrow
22    files; correct?
23    A     Correct.
24    Q     And as you testified just now you recall reviewing
25    escrow files that had Olaf Lansgaard's name on them?
```

```
1    A      Correct.

2    Q      And did the escrow files themselves indicate

3    whether or not Olaf Lansgaard was alive or dead?

4    A      Not that I recall.

5    Q      And if we could pull up KX28.

6    A      Could I correct that, your Honor?

7           THE COURT:  All right.  What were you going to

8    say?

9           THE WITNESS:  The author of the e-mails indicated

10   Olaf Lansgaard was basically alive, that he is my

11   attorney and he will be reviewing these documents.

12          THE COURT:  That was in the escrow?

13          THE WITNESS:  Yes.  Several.

14   Q    BY MR. KEOUGH:  But, fair to say, that escrow

15   records didn't inform you that he was dead?

16   A      They didn't say he was dead.

17   Q      And if the escrow records didn't do that, how did

18   you learn that Olaf Lansgaard had died?

19   A      I had done some investigative steps.  I know I

20   talked to his legal assistant.

21   Q      And so your testimony is that not before you talked

22   to the legal assistant, you would have learned that he

23   had passed away?

24   A      I believe I learned that he had passed away before

25   that.  I just don't know how.
```

```
 1   Q      Did you learn from the 65 photographs that Olaf
 2   Lansgaard had died?
 3   A      I don't recall that from that, that he had died.
 4   Q      Or did somebody else who had reviewed the 65
 5   photographs tell you that Olaf Lansgaard was dead?
 6   A      I don't recall somebody telling me that he died.
 7   Q      So what we have here is KX28 which do you recognize
 8   this as a memorandum of interview that you conducted?
 9   A      Yes.
10   Q      And this is the legal assistant to Olaf Lansgaard
11   the one you just referenced; correct?
12   A      Yes.
13   Q      Interview took place in February, 2021?
14   A      Yes.
15   Q      And in the memorandum of interview, it says let me
16   just blow up that first paragraph so you can see it
17   clearly.  It says that Gamero, the legal assistant,
18   acknowledged that she had received a call from Cecilia
19   Fisher, Olaf Lansgaard's sister, requesting her to
20   contact Special Agent Clark -- that is you -- about her
21   employment with Lansgaard; correct?
22   A      Yes.
23   Q      So, based on this, is it fair to say that you
24   reached out to his sister first and then learned the
25   identity of his legal assistant?
```

```
 1   A     I don't recall how I learned, but I reached out to
 2   his sister who was a trustee for him.
 3   Q     And, then, it looks like the sister asked the legal
 4   assistant to contact you so that you could speak to her?
 5         MR. O'DONNELL:  Objection as to asking about what
 6   appears to be from the interview report.  He can ask the
 7   witness what he recalls.
 8         THE COURT:  All right.  Ask it in that form.
 9         MR. KEOUGH:  Sure.
10   Q     So do you recall whether or not when you reached
11   out to Olaf Lansgaard's sister she said that she would
12   call or ask the legal assistant to call you?
13   A     Yes.
14   Q     And I take it that the legal assistant did call
15   you?
16   A     No, she did not.
17   Q     How did this interview then come about?
18   A     I performed some investigative steps and determined
19   who the legal assistant was.
20   Q     After you had spoken to the sister?
21   A     Correct.
22   Q     And then, as a result, this interview occurred?
23   A     Correct.
24   Q     If we could just pull up your declaration, and if
25   we could go to the third page.  So if we could just blow
```

1   up paragraph 16.  And I won't go through all of this with

2   you because it is here in your declaration.  I just have

3   one question.

4           So paragraph 16, as you can see here,

5   describes at least your attempts to review a Cellebrite

6   for a phone 1B123.  And from the investigation you are

7   aware that 1B123 is the phone that was registered to

8   Iullia Zhadko?

9   A    Yes.

10  Q    And towards the bottom, four lines from the bottom,

11  it says I also recall a video of Richard Ayvazyan's face.

12          You see that there?

13  A    Yes.

14  Q    So, first of all, you recall the video that you saw

15  on the phone that you released from the Cellebrite

16  report?

17  A    Yeah, it was --

18  Q    And do you recall whether or not you shared the

19  fact that that video was on the phone with any other

20  member of the investigation team?

21  A    I am sure I shared it with somebody.  I am sure I

22  shared it with somebody, yes.

23  Q    Specifically, do you recall if you shared it with,

24  say, Agent Massino?

25  A    No.

```
 1   Q    No, you didn't share, or, no, you don't recall?

 2   A    I don't recall.

 3   Q    Do you recall if you shared it with Mr. Fenton?

 4   A    I don't recall.

 5   Q    If we could go back up to the first page.  So the

 6   first page you say that you based the declaration on your

 7   personal investigative actions related to two phones

 8   1B123 which we just talked about and 1B126.

 9        You see that?

10   A    Yes.

11   Q    And you would agree 1B126 is the phone that was

12   registered to Victoria Kauichko, one of the Miami phones?

13   A    That is my understanding.

14   Q    Now, I just want to ask you about the other three

15   phones that were seized in Miami which weren't mentioned

16   in your declaration, and I just want to know if you

17   reviewed the Cellebrites and you can tell me "yes" or

18   "no".

19        So the first phone is 1B4 which is a phone

20   associated with an account for Anton Kudamov.

21        Do you recall reviewing the Cellebrite for

22   that phone?

23   A    That file was -- I couldn't download it.

24   Q    And so you personally didn't review that

25   Cellebrite?
```

```
1    A     Correct.

2    Q     Okay.  Do you know if anybody on the investigation

3    team shared information from that Cellebrite phone, 1B4,

4    with you?

5    A     No.

6    Q     No, they didn't share, or, no, you don't know?

7    A     I don't know if any information from that phone was

8    shared with me.

9    Q     Okay.  The next phone is 1B124 which is the phone

10   associated with Mary Terabelian that was seized in Miami.

11   Same question, did you review the Cellebrite for 1B124?

12   A     No.

13   Q     Do you recall whether anyone on the investigation

14   team shared information from 1B124 with you?

15   A     No.

16   Q     No, you don't recall?

17   A     I don't know.  No, I do not.

18   Q     Okay.  And the last phone is 1B125 which was a

19   phone associated with Richard Ayvazyan that was seized in

20   Miami.  Did you review the Cellebrite for that phone?

21   A     No.

22   Q     And fair to say that you can't recall if anybody

23   shared information from that phone's Cellebrite with you?

24   A     Correct.

25          MR. KEOUGH:  No further questions, your Honor.
```

1        THE COURT:  Anything else?

2        MR. LITTRELL:  No, your Honor.

3        THE COURT:  Thank you, sir.  Step down.  Okay.

4   What time is it now?

5        THE CLERK:  2:53.

6        THE COURT:  Let's take a short recess, and here is

7   what I would like to hear.  We have already had well over

8   a hundred pages of briefs, and the court is very familiar

9   with the evidence in the case and the arguments.  But I

10  would like to hear briefly, and I mean very briefly, from

11  the parties regarding the bullet points.

12        What is the -- what is the takeaway from this

13  hearing, and I guess, more pointedly, what was developed

14  at the hearing that modifies or is different than what

15  was argued in the pleadings.  In other words, what

16  different view of the case should the court consider in

17  light of what was presented today beyond that which was

18  argued in extensive briefing.  And when I say summary, I

19  mean summary.

20        And don't engage in hyperbole.  It won't be

21  helpful.  I am trying to take a very analytical approach

22  to this issue as I should, and, especially in the

23  defendant's briefs, they spent an awful lot of time

24  engaging in hyperbole.  It is not that the arguments are

25  not clear, but it isn't helpful.

1          So this is your opportunity to to make your

2    most important points and don't dwell on something less

3    important or what is understood.  Okay.  I will give you

4    a little time to think about that.

5          MR. RAM:  Your Honor, the defense was planning on

6    submitting post hearing briefing.

7          THE COURT:  I don't want post hearing briefs.  I

8    feel I am adequately prepared, and this is an opportunity

9    to do what I just said.  So I will give you some time to

10   think about it, and then we will hear argument.

11         (Recess from 2:57 to 3:25 p.m.)

12         THE COURT:  Okay.  I will first hear from the

13   defendants.

14         MR. LITTRELL:  Thank you, your Honor.

15          I intend to tailor my remarks to the court's

16   admonition you want to hear the bullet points and the

17   take aways.

18         THE COURT:  Yes.

19         MR. LITTRELL:  Here is the takeaway, and this is

20   with respect to Mary Terabelian.  Prior to October 20th,

21   2020, the government knew very little about her.  The

22   investigation up to that point was focused on the flow of

23   funds, tracing funds from loans to bank accounts to real

24   estate.  It is true that some of that money flowed

25   through Mary Terabelian's bank account, but it was only

1    momentarily and it was clearly at the direction of her

2    husband and not her.

3          She had a prior conviction with her husband in

4    2012, but that had nothing do with this case and had

5    nothing to do with Victoria Kauichko which is the

6    identity they were later going to say she used and

7    controlled.

8          That was essentially the sum total of what

9    they knew about Mary Terabelian.  After October 20th,

10   2020, they were exposed to a tremendous and powerful

11   source of information about who she was, what her role

12   was, and it was evidence that was far more compelling

13   than anything that they had before that.

14         That exposure came in at least four ways:

15   First, it came when the CBP orally conveyed to most of

16   the important players from the prosecution that Mary

17   Terabelian possessed a phone in which she appeared to be

18   using and controlling the identity of Victoria Kauichko.

19   Now, note, that this was an identity, a synthetic

20   identity that the government knew about, but they did not

21   know who controlled it.

22         And, in fact, if there was any evidence about

23   who controlled it, it pointed elsewhere not to Mary

24   Terabelian, but when they got that call from CBP and they

25   learned that Mary Terabelian had text messages in which

1  she was using and controlling that identity, that pretty

2  decisively pinned that synthetic identity to her.

3        That was followed by a couple of more sources.

4  Photographs taken from the actual phone, and the ones

5  that I focus on and I think are most important here are

6  the 141 photographs taken by CBP.  That was revealed to

7  the prosecution team on or about February 2nd, 2021 which

8  was months before trial and with plenty of time to make

9  use of that information.  Just about every member of the

10  prosecution team has admitted that they saw those

11  photographs, that they looked at them carefully.

12        Those photographs not only -- the text message

13  on the phone not only showed that she was using that

14  identity, but that she was communicating with her husband

15  Rich Ayvazian about it.  It also showed that she was

16  making purchases from Picadilly Jewelers.  It also showed

17  that she had the personal identifying information for

18  Victoria Kauichko including her Social Security number,

19  her address and other information.  And, in fact, it

20  showed that she was, in fact, using that identity which

21  was the government's theory of the case.

22        Every witness in this case essentially

23  confirmed that the government saw and relied on that

24  information.  And, in fact, Justin Palmerton was candid,

25  and what he said was the government's theory that Mary

1    Terabelian was using and controlling the idea of Victoria

2    Kauichko was formed based on the messages that they saw

3    on that tainted phone.

4            The only witness that refused to acknowledge

5    that was Chris Fenton, and I want to talk about his

6    testimony in a moment.

7            We know that every member of the prosecution

8    team saw these text messages and photographs.  We know

9    that they used them.  It was their burden to establish

10   that these images which as I said far more important and

11   powerful than anything the government had prior to that

12   point affected no part of their trial preparation, no

13   part of their investigative strategy, did not inform any

14   leads, the questioning of any witnesses and the formation

15   of arguments in closing.

16           We saw at least a couple of examples just

17   right here in the last two days of them doing that.  For

18   example, when Mr. Fenton reached out to the owner of

19   Picadilly Jewelers after having subpoenaed him for

20   records he was able to determine that that response was

21   incomplete because he had already seen communications

22   between Mary Terabelian and the owner of Picadilly

23   Jewelers.  And that is what allowed him to follow up and

24   specifically refer to the tainted messages on the phone

25   in pressuring them to give him more.  That is a use.

1    That is a direct use of the tainted information.

2              We also know that after the government found

3    pictures of Nazar Terabelian's credit card on Mary

4    Terabelian's phone, they then added a charge of

5    aggravated identity theft against Mary Terabelian which

6    did not appear in the indictment that preceded that.

7              We also know that when we approached the

8    government to discuss a plea, they specifically repeated

9    back information they could only have gotten from that

10   tainted phone, information that she and Richard were,

11   quote, like Bonnie and Clyde, two peas in a pod.  There

12   was no evidence to support that theory prior to that.

13   All Christopher Fenton says is that Ms. Terabelian is

14   actually going around spending money as Victoria

15   Kauichko.  Again, no evidence for that position other

16   than what is in the phone.

17             So it is really crystal clear that this -- the

18   contents of that phone affected every stage of their

19   preparation, both the decisions they made about witnesses

20   to interview, how they interviewed those witnesses, what

21   arguments to make, the refusal to plea bargain with us,

22   it was very clear that it was based on the contents of

23   that phone.

24             Now, it is their burden to establish that that

25   is not true, and their burden is by a preponderance of

1     the evidence.  But they have to establish that for every

2     use of that evidence that followed their exposure.  Any

3     ambiguity in this respect has to be interpreted in favor

4     of the defense and against the government.

5               So the very fact that it took well over a

6     hundred pages of briefing to discuss this issue is pretty

7     strong evidence that it is a burden they can't overcome.

8     The fact that we were here for two days talking about use

9     after use, derivative use after derivative use is pretty

10    strong evidence that they cannot overcome that burden,

11    but, again, it is their burden.

12              But I think a clue to what they fail is they

13    don't really acknowledge that they have the burden.  You

14    heard Catherine Ahn testify that when they all got

15    together to discuss what they were going to do about this

16    issue, the only questions they asked were did you use

17    this information in front of the grand jury and did you

18    use this information at trial.  And once they answered

19    those questions in the negative, they decided that they

20    didn't really have to do anything more.

21              So, now, here we are two months later and they

22    are attempting to reverse engineer the situation and now

23    say that they can recall not using this evidence to

24    develop leads or interview witnesses, and it is just not

25    credible.

1     And so I think the easiest and the best way

2     for the court to decide this is to decide it based on the

3     declarations.  They have admitted that they were all

4     exposed extensively.  They have admitted that they all

5     used the information at various stages of the trial.  I

6     think the most powerful evidence is that Mr. Fenton who

7     was the lead prosecutor from the beginning used this

8     since the very beginning.

9     So, really, the only reason for a hearing is

10    to challenge their generalized denials, and, if you look

11    in the case law, the cases are pretty clear that making a

12    generic denial along the lines of we didn't develop any

13    leads based on that evidence, that doesn't really count

14    for anything at all.  The whole purpose of this hearing,

15    however, was to refute their claims, their generic claims

16    that they didn't develop any leads.

17    And I want to say most of the witnesses that

18    testified were largely credible, and they are advocates

19    and they want to win but they were pretty straight with

20    the Court.  Mr. Fenton was an exception.  He was from the

21    beginning of his testimony evasive, defensive, not

22    credible.  He refused to accept propositions of fact that

23    were plain to everybody else in the room.  He refused to

24    accept that, as a fraud prosecutor, that it would be

25    important to him to find text messages between his two

1    main subjects talking about the subject of the fraud.

2            And, remember, this is a case in which prior

3    to that, there was no evidence tying Mary Terabelian to

4    Victoria Kauichko other than the flow of funds.  If you

5    recall when I tried to ask Mr. Fenton what the government

6    knew prior to to October 20th, he went on a long

7    discussion about all of his thoughts and theories and

8    suppositions about what he thought might be there, but

9    his testimony in the end was no different from

10   Palmerton's in substance.  They really didn't have

11   anything other than the flow of funds and the prior

12   conviction.

13           You can hold it against the government and you

14   should that Mr. Fenton refused to acknowledge the

15   importance of these text messages, refused and persisted

16   in an incredible position that these were cumulative to

17   what he already had.  Anybody who is a prosecutor or

18   investigator or really with common sense knows that that

19   is not true.  Now, he is an advocate, and the government

20   worked very, very hard to bring this case and it was an

21   important case.  And they have every right to take

22   aggressive positions as advocates, but it is different

23   when you get on the stand as a witness and you take an

24   oath to tell the truth.  And that is not what Mr. Fenton

25   did.

1          This case is going to turn on what is the

2   standard of proof, and the parties have very different

3   versions of what that should be.  But there is no

4   standard of proof that you can meet if you can't tell the

5   truth in a federal court.

6          So I would submit that this court should

7   decide this on the pleadings which I think are decisive

8   in the favor of the defense.  But to the extent that

9   there is any debate about what the standard is or whether

10  it has been met, the government loses by default because

11  its lead prosecutor didn't tell the Court the truth.

12      THE COURT:  Thank you, Mr. Littrell.

13          The way I want to do this is get a response

14  from the government with each argument.  That way I can

15  process it better.

16      MR. FENTON:  Thank you, your Honor.

17          At the start of the hearing, the Court asked

18  the parties to focus on credibility, and, largely, the

19  parties did not.  They did not develop any evidence on

20  cross undermining the credibility of any of the

21  witnesses.  The only witness that Mr. Littrell challenges

22  the credibility of is myself.

23          And I would contend two things that are

24  extremely important to evaluating my personal

25  credibility.  One would be the corroborating evidence

1    that is submitted in connection with my declaration

2    which, after review of my e-mails and a refreshing of my

3    recollection, tracks, traces in painstaking detail the

4    chronology of the investigation up to and including

5    October 19th and 20th and then beyond to show how we

6    developed evidence for the trial.

7           And, in a moment, I will go through some of

8    the specific evidence that I think showed that we

9    believed that Mary Terabelian was involved, that she

10   should be charged, all before the border stop and

11   additional evidence that showed that she specifically

12   used the Victoria Kauichko identity.

13          But the second thing I will say is that

14   Mr. Littrell made some very serious allegations with

15   respect to matters about which he does not know.  Some of

16   the things that he challenged me on credibility grounds

17   are things that the Court requested that the government

18   submit evidence in camera to support.  There are

19   specifically two things that Mr. Littrell found to be

20   incredible.  One --

21          THE COURT:  One minute.  Are you now referring to

22   things that were submitted in camera?

23          RIGHT1:  Yes, your Honor, but I am not going to

24   refer specifically to the --

25          THE COURT:  Well, should the Court unseal those

 1  now?

 2          MR. FENTON:  Your Honor, the government would have

 3  no objection to the Court unsealing that evidence.

 4          THE COURT:  Well, I mean in light of what has

 5  developed, it seems fairness would dictate that that be

 6  done.  So turn those documents over to the defense, and I

 7  will allow Mr. Littrell to make an additional argument

 8  once he has seen it.

 9              Identify what we are turning over now.  What

10  are we turning over for the record?

11          MR. FENTON:  So we are turning over two sets of

12  documents, the first set of documents are documents that

13  relate to when the government discovered that Nazar

14  Terabelian, Marietta Terabelian's father, was deceased.

15  The government, I testified on the witness stand that I

16  learned on October 22nd.  Mr. Littrell deemed that a

17  coincidence, quote, unquote, challenging my credibility

18  and suggesting that, in reality, I learned when I

19  received a copy of CBP reports on October 23rd.  The

20  evidence submitted to the Court demonstrates that my

21  representation to the court was 100 percent truthful and

22  accurate.

23          THE COURT:  Well, what document that was in camera

24  has now been unsealed and turned over to Mr. Littrell?

25          MR. FENTON:  So we have turned over three e-mails.

```
 1          THE COURT:  I mean, were they identified in the in
 2   camera submission?  Maybe that is the best way.
 3          MR. FENTON:  So there are three e-mails identified
 4   in the in camera submission on pages 63, 64 and 65.
 5          THE COURT:  Of the in camera submission?
 6          MR. FENTON:  That's right.
 7          THE COURT:  What date was that in camera
 8   submission?
 9          MR. FENTON:  It was yesterday evening in response
10   to the Court's order yesterday afternoon, the government
11   compiled the material requested and submitted it in
12   camera.
13          THE COURT:  I see.
14          MR. FENTON:  So there are three e-mails that
15   specifically corroborate my testimony to the court.
16          THE COURT:  They corroborate that you knew about
17   Terabelian's father passing away on October 22nd not
18   23rd.
19          RIGHT1:  That's correct, your Honor.
20          THE COURT:  And what is it in those documents that
21   makes your point?
22          MR. FENTON:  So if you look at the documents,
23   there is an e-mail from agent Palmerton.
24          THE COURT:  Do this slowly because I don't have it
25   before me.
```

```
1         MR. FENTON:  I can hand a copy up, your Honor.

2         THE COURT:  Hand a copy up.

3             Page 64, you said.

4         MR. FENTON:  It is on page 63 out of 65.

5         THE COURT:  Just give me a minute to read it.

6         MR. FENTON:  Yes, your Honor.

7     (Pause in proceedings.)

8         THE COURT:  Mr. Littrell, if you wish to argue

9  further in light of that document, I will allow you to

10 briefly do so, and then I will turn it over to Mr. Fenton

11 to continue his argument.

12        MR. LITTRELL:  Sure.

13        THE COURT:  You can sit down for a minute,

14 Mr. Fenton.

15        MR. LITTRELL:  Just to be clear, I think his

16 testimony was incredible in a number of respects not just

17 this one, but I will say this:  I haven't had a chance to

18 look at these e-mails so I don't really know.  What I do

19 see is an e-mail that he apparently received from

20 Palmerton talking about -- he asks the question on

21 October 22nd when did Nazar die.  I think that still begs

22 the question of how did he learn that Nazar died which I

23 think the only real explanation is he got it from the

24 phone.  So he still hasn't explained how he learned it.

25        THE COURT:  I want to hear your explanation, and
```

1    your colleague has just stood up.  He must have something

2    to say to you.

3         MR. LITTRELL:  He makes a good point that the

4    purpose of the e-mails was to prove that Mr. Fenton

5    learned via e-mail, and they certainly don't prove that.

6    In fact, the first e-mail is a question when did Nazar

7    die from Mr. Fenton suggesting he learned it some other

8    way other than by e-mail.  I see him nodding his head.  I

9    think he learned it from Mr. Palmerton who learned it

10   from tainted evidence.

11        THE COURT:  I wanted to give you an opportunity to

12   make your comment about it because you didn't have it

13   when you argued.  Now, I am going to turn back to

14   Mr. Fenton.

15        MR. FENTON:  Your Honor, the e-mails that we

16   present are in chronological order.  There are three.

17   The first is from Agent Palmerton and Agent Massino

18   copying me.  It is at 7:42 p.m., Eastern time.  In that

19   e-mail, it is noted that Nazar Terabelian is one of the

20   individuals who was related to Marietta Terabelian, and

21   we were concerned, we were looking at this for the

22   purpose of detention to determine who might post bond.

23             In that e-mail, it is noted that Marietta's

24   father is deceased, and that is right at line 5 on that

25   e-mail.  The e-mail that Mr. Littrell refers to where I

1   say when did Nazar Terabelian die was then sent

2   three-and-a-half or three hours and 45 minutes later at

3   10:59 p.m., Eastern time, which means that the question

4   that I was asking was in response to information that I

5   had received hours earlier from the agents.  These three

6   e-mails definitively respond to the question and the

7   credibility challenge made by Mr. Littrell.

8           THE COURT:  Mr. Littrell says that it may respond

9   to one instance of his position, but there are others so

10   this is your opportunity to argue the response to what

11  Mr. Littrell argued.

12          MR. FENTON:  Yes, your Honor.  And I think the

13  second challenge that Mr. Littrell makes is really based

14  around my account of the events on the evening of

15  October 19th and into the morning of October 20th when we

16  were making the decision as to whether or not to effect a

17  probable cause arrest on Marietta Terabelian based on the

18  evidence known to us at that time.

19              Mr. Littrell makes the argument that my

20  testimony is incredible because what it shows is that at

21  the time that we made the arrest, I made it based on

22  information learned from the phone, not specific

23  information but generalized accounts presented by CBP

24  officials that there were text messages on the phone

25  suggesting that Ms. Terabelian was using the identity of

1   Victoria Kauichko.

2           In my view, at the time when I made the

3   decision to request permission and authority from my

4   supervisors to effect the probable cause arrest, it was

5   the fact that she was in physical possession of a credit

6   card in the name of Victoria Kauichko which, coupled with

7   all of the evidence that we had learned in the four

8   months prior to that, showed to me that there was more

9   than probable cause that she was part of the conspiracy,

10  period, working with her husband as she had back in 2012

11  to commit loan fraud and, second, that she was using

12  specifically that identity.

13          It was the physical possession of that credit

14  card.  Yesterday evening, we submitted 63 pages of

15  e-mails that walk through in painstaking detail the

16  events of that evening and my correspondence both with my

17  colleague AUSA Julian Andre, my supervisors Brian Kidd,

18  Rush Atkinson, Henry Van Dyke and others, Julian Andre's

19  communications with his supervisor and our communications

20  with the local AUSAs in the Southern District of Florida

21  who asked us to, among other things, articulate the basis

22  for probable cause to support the arrests because they

23  were going to have to get authorization in the middle of

24  the night effectively.

25          If you look at page 45 of 65, there is an

```
 1   e-mail from me to Kirin Bhat, B-H-A-T.  Kirin Bhat is an
 2   AUSA in the Southern District of Florida.  That e-mail
 3   was sent by me at 12:23 a.m., 23 minutes after midnight
 4   on October 20th.  In that e-mail, I explain that one of
 5   the reasons that -- I articulate the basis for probable
 6   cause so we can obtain authorization from that AUSA to
 7   effect the probable cause arrest in his district, and I
 8   explained that Terabelian was found to be in possession
 9   of contraband including credit cards in the name of
10   Victoria Kauichko.  There is no mention with respect to
11   the phones belonging to Marietta Terabelian.
12          And as I explain when I was on the witness
13   stand, my understanding at the time, my recollection of
14   that evening was that the first piece of information that
15   was learned was that they were in physical possession of
16   these credit cards, number one, and, number two, that
17   they were doing, they were conducting manual searches of
18   these phones.  And there were many phones as your Honor
19   recalls.  There were five.
20          And they were working through those phones,
21   and, at this point in time when I wrote this e-mail, my
22   focus was on the physical possession of the credit card
23   that was in the name of Victoria Kauichko that was on
24   Marietta Terabelian's person.
25          This corroborates my testimony as does the
```

1    testimony that Special Agent Palmerton provided earlier

2    this morning.  So I think, for all of these reasons,

3    there is no reason to question my credibility.

4         What the issue that Mr. Littrell effectively

5    has is one of argument, not credibility but of argument.

6    What matters more to a fraud prosecutor:  The physical

7    possession of a credit card in the name of another

8    individual who has taken out fraudulent loans and then

9    used that money to buy things for themselves including a

10   home that they live in.

11        THE COURT:  Just one minute.  You said an

12   individual who is in possession of a credit card in the

13   name of someone who took out fraudulent loans, in other

14   words, the person who took out the fraudulent loans was

15   Kauichko; correct?

16        MR. FENTON:  The alias Victoria Kauichko.

17   Correct.

18        THE COURT:  So that was the borrower, and, but, go

19   on.  You are saying you found the identity of Kauichko on

20   her person.

21        MR. FENTON:  Right.  So the question, your Honor,

22   is a debate between myself and Mr. Littrell as to what

23   matters more, the physical possession of the credit card

24   or the digital photographs that were on the phone.  That

25   is essentially the issue.  And what I said when I was on

1    the stand was that they are both good pieces of evidence.

2    They are both great pieces of evidence.

3            But, at the end of the day in my mind, what I

4    learned first and what I still believe is better evidence

5    is the evidence of the physical possession of the credit

6    card.

7            THE COURT:  Remind me, who drafted the criminal

8    complaints for the Florida arrest?

9            MR. FENTON:  Those complaints were drafted by

10   Special Agent Palmerton and myself and AUSA Julian Andre.

11           THE COURT:  Because I did notice in those criminal

12   complaints that in the criminal complaint for Terabelian,

13   there was no mention of the phone recordings, phone

14   e-mails or whatever, but there was mention of the credit

15   card found on her person.  With regard to defendant

16   Richard Ayvazyan, the criminal complaint mentioned both

17   the credit cards found and the texts on the phone.

18           MR. FENTON:  Your Honor, I do not have a copy of

19   the complaint up here with me.  I do believe, your Honor,

20   that it does refer to the text messages that were found,

21   the general allegation about the text messages found on

22   Marietta Terabelian's phone.

23           THE COURT:  So on the the criminal complaint, in

24   the criminal complaint, you are saying that Mary

25   Terabelian, you did mention the text messages?

1        MR. FENTON:  Yes, your Honor.

2        THE COURT:  I must have missed that.

3        MR. FENTON:  Yes.  And the time table for that was

4   we made the decision to effect the probable cause arrest

5   around 9:30 or 10:00 p.m., Eastern, and then sought

6   authorization from our supervisors and then began

7   drafting the complaint to swear out in the Central

8   District of California around 12:30 or perhaps 1:00 in

9   the morning and then worked through the evening.

10            What we did was we had learned additional

11   information by that time as I had testified on the

12   witness stand, and we included that additional

13   information in the complaint after we learned it.

14            Both pieces of evidence are no doubt good

15   pieces of evidence, even great pieces of evidence, but,

16   in my view, once we had Marietta Terabelian in physical

17   possession of that credit card, we could not allow her to

18   leave without arresting her, and the reason why is

19   two-fold:  One, we were afraid of risk of flight; two, we

20   were concerned that she would walk out that door and

21   throw those credit cards in the garbage and we would

22   never see them again and take whatever phone she had and

23   toss them into a river, flush them down a toilet, they

24   would be gone.  And then she would go back home and take

25   all the evidence in her house and destroy it.  And once

1    she got to jail and made those jail calls, we heard what

2    Marietta Terabelian wanted to do.  She did want to have

3    those evidence, the evidence cleaned.

4         THE COURT:  All right.  Let's just stay with the

5    argument of Mr. Littrell.

6         MR. FENTON:  Right.  But the point, though, is,

7    your Honor, to the extent that my credibility is in

8    question everything that we produced to the Court last

9    night in camera and Special Agent Palmerton's testimony

10   corroborates everything that I said on the stand, and I

11   think that that is important.  That is Mr. Littrell's

12   challenge, and that is the reason why this Kastigar claim

13   should succeed and he has failed.

14        THE COURT:  All right.

15        MR. FENTON:  In addition to that, I think it is

16   also just important to note that the standard in these

17   cases -- one other point I want to make.  The defendants

18   had previously in prior filings weighed the relative

19   value of the possession of a physical credit card versus

20   digital photographs that are on the phone, and, back

21   then, when the defendants were filing these briefs, they

22   were claiming that the physical possession of these

23   credit cards is better evidence than the digital

24   photographs.

25             And they were downplaying the evidence of the

1   digital photographs in a number of different ways

2   including distancing themselves from them and claiming

3   that just because somebody has a phone that contains one

4   or several images amongst thousands that that is not good

5   evidence.  So, today, they are telling your Honor that

6   this is it is the best evidence.

7           But when they file ECF No. 329, they told your

8   Honor that that evidence was worse than the physical

9   possession of the credit cards, that that was not good

10  evidence.  So I think that that is something that is

11  extremely important when judging the credibility of the

12  position that is taken by the defendants.

13          As a general matter, the question that is

14  before the Court is not whether the government was

15  exposed to this information on the phones.  It is whether

16  the government used that information to build the case.

17          And what we have shown through our nine

18  declarations and our two submissions is that the

19  government had substantially completed its investigation

20  by October 19th and that the government had, as early as

21  August, had identified the subjects of the investigation,

22  the defendants, they had identified connections between

23  Richard Ayvazyan and Iullia Zhadko.  They followed the

24  money.  This has always been a case about following the

25  money and piecing together the bank records, and we did

1    that.  And the bank records lead directly to Marietta

2    Terabelian.

3         Setting aside for the moment the idea that

4    Victoria Kauichko is critical, we see money going through

5    fraudulently obtained PPP and EIDL loan money going

6    through her personal bank accounts being used to buy a

7    $3.25 million mansion on Topeka Drive, and then she buys

8    that house and then she moves into it with her family.

9    That is powerful evidence.  She is the sole signatory on

10   that account.  That is powerful evidence.

11        THE COURT:  Is it powerful evidence that she was

12   part of the loan fraud or powerful evidence that she was

13   Kauichko?

14        MR. FENTON:  I think it is powerful evidence that

15   she is part of the conspiracy.

16        THE COURT:  Well, what the argument from the

17   defense is is that it is evidence of perhaps her

18   participation in the fraud, but it doesn't show that she

19   is Kauichko.  So, and I appreciate your argument about

20   finding the credit card, but that is where things stand.

21        What are you showing me now?

22        MR. FENTON:  Well, your Honor, there are two

23   additional things that I would like to direct your

24   Honor's attention to that do prove that link, that

25   further prove that link.

```
 1              THE COURT:  What link?
 2              MR. FENTON:  The link between Marietta Terabelian
 3    and Victoria Kauichko.
 4              THE COURT:  This is prior to October 19th?
 5              MR. FENTON:  This is prior to October 19th.
 6              The first is Government Exhibit 115 that we
 7    presented at trial.  This shows the flow of funds to the
 8    La Calle Primavera home.  This is an excerpt from -- this
 9    is an excerpt from that exhibit that shows that the
10    Victoria Kauichko money, that Victoria Kauichko is -- the
11    Victoria Kauichko name is being used.
12              THE COURT:  It is blurred on my screen.  I can't
13    see it.  It is not clear.
14              So walk me through this again.
15              MR. FENTON:  So, your Honor, this is an example,
16    an excerpt from Government Exhibit 115 at trial that
17    shows the tracing of the fraudulently obtained PPP loan
18    money.
19              Here, and this is just deemphasized for the
20    purpose of this particular version of this excerpt, but I
21    will show you.  Here is the PPP loan that was taken out.
22              THE COURT:  I see what you are saying.  It was
23    walked through Runyan Tax Service, and you have her name
24    under the Runyan Tax Service.  And then it goes through
25    part of an escrow at the home, a home that she lived in.
```

1    So why is her name under the Runyan Tax Service again?

2         MR. FENTON:   Because Victoria Kauichko is the sole

3    signatory on this bank account.   The money is then -- and

4    if your Honor will indulge me for a moment.   The money is

5    then used to purchase this house that is in the name of

6    Iullia Zhadko which is her husband's alias.

7              And this is the Calle La Primavera property,

8    and, in our opening submission at page 6, we explain that

9    on September 15, 2020, Special Agent Palmerton had

10   conducted surveillance on that house.   And he realized --

11   he observed a certain vehicle bearing a certain license

12   plate, and he had found by tracking down that license

13   plate that it belonged to Marietta Terabelian's sister,

14   her husband, her ex-husband, and that that car was then

15   driven by her sister.

16             And he also found out on October 7th that

17   Gohar Terabelian was receiving mail at that particular

18   address, and he found that information out from the US

19   Postal Service which shows that she is using -- she is

20   applying for these loans using the Victoria Kauichko

21   money.   She is then using it to purchase homes that her

22   family members live in.

23             These are not distant family members.   This is

24   her sister.   And we have evidence prior to the

25   October 19th stop that money that is being taken out by

1    Victoria Kauichko is being used to purchase things for

2    her sister.

3            THE COURT:  Are there other situations like this?

4            MR. FENTON:  Yes, your Honor.

5            THE COURT:  Just show them to me so I can consider

6    them.

7            MR. FENTON:  The second example, and I don't have

8    a demonstrative to put up, but I can briefly explain it

9    to your Honor.  The second example is that there is a

10   Bank of America bank records for an account in the name

11   of Runyan Tax Services shows that she was using the

12   fraudulently obtained PPP money to pay for funeral

13   services for that Nazar Terabelian.  And these are

14   records that we received on September 30th, 2020,

15   approximately three weeks --

16           THE COURT:  And what evidence was there that Nazar

17   Terabelian was her father at that point?

18           MR. FENTON:  We knew that he was her father before

19   she stopped at the border.  The evidence showing that is

20   the very first e-mail that we submitted to your Honor in

21   the in camera submission last night which lists as one of

22   her known associates, her father.

23               And on the check from the Runyan Tax Service

24   account for which Victoria Kauichko is sole signatory, it

25   says in the memo line Nazar Terabelian.  So we have

1  Victoria Kauichko who is the sole signatory using stolen

2  PPP money to purchase things both with respect to her

3  sister, Gohar Terabelian, and her father, Nazar

4  Terabelian.

5          THE COURT:  Are there other examples?

6          MR. FENTON:  These, your Honor, these are the two

7  examples.

8          THE COURT:  Then, you can conclude, or if you have

9  something else to say I will give you the opportunity.

10         MR. FENTON:  Yes, your Honor.

11             So I think the five pieces of evidence I think

12  that are really key here that establish the link are the

13  physical possession of the credit card in the name of

14  Victoria Kauichko on October 19th.  I think it is the

15  fact that the Victoria Kauichko name is being used to

16  take out stolen PPP loans in the name of Runyan Tax

17  Service and then used to purchase a house for her sister.

18             I think it is the fact that that same money is

19  being used to purchase things in the name of her father.

20  And then also the fact that her personal bank accounts

21  are being used also to launder and spend money, stolen

22  PPP funds to buy herself a mansion along with her

23  husband.  That coupled with her 2012 conviction for

24  conspiring with her husband to commit loan fraud is the

25  evidence that we suggest establishes more than sufficient

```
1    for probable cause to effect that arrest.

2             THE COURT:  Very, very briefly.

3             MR. LITTRELL:  Yes, your Honor, very brief.

4             THE COURT:  Because this could go on, you know,

5    forever.  And just I am getting a good review here.  So

6    unless there is something that you think is important.

7             MR. LITTRELL:  I just want to respond very briefly

8    to the point that he made.  First of all, it is easy on

9    the issue of credibility.  When I say there is

10   credibility problems with Mr. Fenton, it is not simply

11   because of a couple of isolated incidents.  It is his

12   demeanor, his refusal to acknowledge obvious facts.  And

13   what he has done is he submitted e-mails to the Court

14   which I had never seen to challenge two discrete

15   challenges to his credibility.  Note how when I argued to

16   the Court that he wasn't credible --

17            THE COURT:  You have now seen them.

18            MR. LITTRELL:  I have actually not had a chance.

19   It is 65 pages.  The point is this --

20            THE COURT:  I read them.  They were only a line,

21   page 63, -4 and -5.

22            MR. LITTRELL:  I did read that one line, but it is

23   hard to figure out the import of it.

24            THE COURT:  Why is it hard?  It is one sentence in

25   an e-mail.  I don't understand that, Mr. Littrell.
```

1          MR. LITTRELL:  The court may well be right.  My

2     point is this:  I challenged him on a number of points.

3     I found some of his answers not persuasive.  It is

4     entirely possible I am wrong.  That is what

5     cross-examination is all about.  It is entirely possible

6     those e-mails will show that some of my challenges were

7     misdirected.  However, the overall refusal to acknowledge

8     what he was planning and argued in his answers goes to

9     his credibility and that stands.

10          Now, what he said was -- and I also would say

11     that if he was so confident in his recollection, why did

12     he talk to Special Agent Palmerton before his testimony

13     to get their stories straight?

14          THE COURT:  What point are you referring to?

15          MR. LITTRELL:  Special Agent Palmerton mentioned

16     that Mr. Fenton actually reached out to him to see what

17     Mr. Palmerton's recollection of the sequence of events.

18          THE COURT:  For this hearing?

19          MR. LITTRELL:  Yes.  Just before his testimony.

20     But I will say this:  Without access to e-mails, I can't

21     affect cross-examine.  So that requires us to take some

22     risk.  We don't know if we are right.  So the fact that

23     Mr. Fenton can defend two discrete pieces of his

24     testimony confidently based on e-mails that he has

25     reviewed and I have not does not mean that his testimony

1   overall is credible.  But I will set that aside for a

2   moment because I don't think his credibility matters for

3   the outcome, but I do think it is in question.

4            What I said was this is a debate between what

5   matters more.  He acknowledged that the evidence found in

6   Ms. Terabelian's cell phone in one of the images I am

7   showing to the court was great.  That is something he

8   refused to admit on the stand.  On the stand, he actually

9   downplayed it, said it was cumulative, wouldn't even

10  acknowledge that it corroborated his theory of the case.

11  And, in fact, he claimed contrary to Special Agent

12  Palmerton that that theory was formed prior to seeing

13  what was on the phone.  That is not credible.

14           But here is the important thing.  This is not

15  a contest about what evidence is great or good or more

16  important.  If this evidence is meaningful in any way,

17  and it guided their investigation, then it is tainted and

18  they have to explain every decision thereafter.  So I

19  don't want the court to lose site of what the question

20  is.  The fact that he acknowledges that it is great, it

21  doesn't matter that there may be another piece of

22  evidence that is also great.

23           THE COURT:  All right.  Thank you.

24           MR. FENTON:  Your Honor, could I just briefly

25  respond?

```
 1              THE COURT:  20 seconds.

 2              MR. FENTON:  Special Agent Palmerton.  The

 3    conversation that we had this morning, Special Agent

 4    Palmerton and I, was limited to this:  I said to him you

 5    may be asked about the events of October 19th and 20th

 6    and you should give some thought in advance of that

 7    testimony as to the events that happened that night and

 8    how things unfolded, and then I asked him a couple of

 9    questions and that was it.

10              THE COURT:  All right.

11              MR. FENTON:  I never suggested to him -- and I

12    think this is consistent with his testimony.  I never

13    suggested to him that there was a correct version of

14    events.  I only asked him some questions so that he gave

15    it some thought before he took the witness stand.

16              THE COURT:  All right.

17              MR. LITTRELL:  I would ask if the Court is going

18    to consider that, I would ask that Mr. Fenton be sworn in

19    again.  Otherwise, I think the Court should disregard

20    that.

21              THE COURT:  All right.  I will disregard it.

22    Okay.  Let's hear from defendant Ayvazian.

23              And, again, no personal criticism intended,

24    but, Mr. Ram, you tend to be somewhat lengthy in your

25    approaches to arguments.  So my instruction was to just
```

```
 1    hit me with the bullet points.

 2           MR. RAM:  That's correct.  I am going to surprise

 3    you here, your Honor.  I am going to be very short.

 4               And the fact is I agree with one thing

 5    Mr. Fenton just shared with you.  The question is whether

 6    the government can prove it didn't use tainted evident.

 7               That is the Kastigar question, and that is --

 8    I agree.  And there is a simple frame work with which the

 9    Court can evaluate the evidence you heard both from the

10    government's submission and the witnesses that were on

11    the stand.

12               At this point, as Mr. Littrell has pointed out

13    and, frankly, the government has conceded, exposure is

14    not in dispute.  We know several individuals were exposed

15    at various times to various sources including the 65

16    photos from Agent Palmerton starting October 20th with

17    information conveyed from CBP.  We don't know the

18    specifics of it because it wasn't documented.

19               Then we know about the 65 photos, your Honor,

20    in November 13th.  Then, 141 photos, February 2nd.  And

21    then critically I think, frankly, this resolves the

22    issue.  On February 11th, 12th and 19th, the Cellebrites

23    from three key Miami phones including the Zhadko phone,

24    the Kauichko phone.  Right.  Those are released.  Those

25    are released.
```

1             And we know starting in February the

2    government accessed and reviewed those Cellebrites.  And

3    the key point, what the government can't show.  Right.

4    And I can break this down as simply Government Exhibit 17

5    and 28.  What the government did in 17 is part of what it

6    has do in a Kastigar burden.  It said here is an image or

7    document on something we had access to.  Here is why we

8    have a -- their claim on why they have an independent

9    source.  We obviously disagree with them across the

10   board.  We submitted rebuttals, but put that aside for a

11   moment.

12            Same thing with Government Exhibit 28.  They

13   went through the 141 photos and said at least here is our

14   position, our claim; right.  And we know in camera and

15   under seal they looked at -- I don't know because I

16   haven't seen it, but it sounds like they went through

17   their trial evidence and said here is how we can

18   independently source it.  Right.  That is what it sounds

19   like they submitted.

20            But they didn't do in Exhibit 17 or 28 for the

21   Cellebrites and that is critical in this case because, as

22   the government admitted to you, it is their burden to

23   show they didn't use tainted evidence.  It is undisputed

24   that those three Cellebrites that were dropped in

25   February on the government contained volumes and volumes

```
 1   of tainted evidence, thousands and thousands of pages,
 2   roughly 400,000 equivalent pages, and we know the
 3   government had access and reviewed them.
 4              In particular, Agent Palmerton and Mr. Fenton,
 5   and we don't need to even make this about a credibility
 6   battle at this moment.  There are credibility issues, but
 7   we know need to make it about that.  We know they had
 8   access and reviewed.  And the other thing you heard on
 9   the stand, Mr. Fenton didn't tag or take notes or
10   document, frankly, in any way what he was reviewing and
11   when.  Didn't do it.  And in a case -- period.
12              Agent Palmerton, same story.  At least Agent
13   Palmerton, for one part of his review, created Exhibit O,
14   so we know for a fact he had access and likely reviewed
15   over 918 pages of text messages on the Zhadko phone.
16              And I will come back to that in two minutes
17   because I promised you I would be short.  But, to me,
18   that resolves the case, your Honor.
19         THE COURT:  Why do you always come back to things.
20   Stay with what you are doing.  You do that frequently,
21   you sort of give someone a taste, then you say I am going
22   to get back to that and that distracts the listener.  In
23   other words, when you say something, the listener is
24   focused on what you just said.  So if you say I will get
25   back to that, it distracts me.  So talk about -- discuss
```

1    what you said you will get back to now.

2              Now, you can't even remember what you will get

3    back to.

4         MR. RAM:  No, I do remember it.  It is a very key

5    point, but it deals with why any uses is not harmless

6    here.  If you don't mind, I just want to finish --

7         THE COURT:  Don't say I will get back to it.  Just

8    get to it because turns me off from even listening.  Go

9    ahead.

10        MR. RAM:  So the Cellebrite images are completely

11   unaccounted for by the government.  And the testimony you

12   heard on the stand, the most common words were I don't

13   recall, I don't remember, and the reason they don't

14   recall or remember, it honestly makes sense because they

15   had at the time no appreciation that the evidence was

16   tainted.  Right.

17             In October, in February, when the Cellebrites

18   are being reviewed, in March, in April, there is zero

19   appreciation of any type of Kastigar taint.  That is a

20   fact you heard from every witness.  This is a line in the

21   line of cases like Martinez which was cited where the

22   government was exposed to tainted evidence with no

23   appreciation of its taint.  That is when it is frankly

24   the most robust showing has to happen from the government

25   because how can they otherwise do what Mr. Fenton told

1    you.  How can they prove by any standard, let alone a

2    preponderance, that they didn't use tainted evidence if

3    they can't even sit here on the stand and in their

4    declarations and tell you which images they reviewed.

5         Let me be specific.  Mr. Fenton in his

6    declaration and his testimony on the stand said I don't

7    even remember reviewing, frankly, a single image from the

8    Cellebrites.  That is the only thing I can specifically

9    recall.  He kept using that word. Specifically recall.

10        And that was the Victoria Kauichko lease, swap

11   with Manuk Grigoryan, but we know he reviewed Cellebrites

12   for hours and hours and hours.  And he didn't review one

13   image on what I think everybody would concede is very

14   strong evidence of fraud, highly relevant evidence that

15   he was -- if you look at Government Exhibit 31 --

16   clamoring to get from the filter team to review; right.

17        There is no question that he had access, and,

18   frankly, the defense doesn't even have to show that he

19   reviewed a single image.  He has to prove he didn't use a

20   single one in any stage in any way.  That means nothing

21   in the decision to arrest, nothing in the decision to

22   indict, no investigatory uses, nothing that led to trial,

23   nothing to confirm evidence.  Right.  These are standards

24   that the Ninth Circuit has adopted for MacDaniels, an

25   Eighth Circuit case, that lays out very clearly all the

1    potential uses that the government cannot make.

2              And the government cannot meet that burden,

3    frankly, because they don't have an Exhibit 17 or 28 for

4    the Cellebrites.  It doesn't exist.  And given the nature

5    of the taint and exposure which is very robust here, your

6    Honor, I think under any description, without being

7    overly rhetorical, it is a burden they cannot meet here.

8    And for that reason, that would be the simplest path to

9    dismissing the indictment in this case.

10             But, beyond that, we don't need to rely on

11   that fact.  Beyond that, your Honor, there is actual use.

12   Throughout the course of the hearing, my associates have

13   made a list of various uses, and I am happy to pass this

14   up as an exhibit and share it with the government.  But I

15   see over 26 actual uses.  So, to be clear, not that there

16   is an independent source, none of that.  We don't get to

17   independent source if there is actual use.

18             And there was over two dozen actual uses that

19   we have seen either through the declarations or on the

20   witness stand.  And what we know even more powerfully,

21   even beyond the quote, unquote, admitted used, there were

22   undisclosed uses made.  And I just want to spend a moment

23   here highlighting some of the undisclosed uses.

24             And, actually, I want to highlight the

25   categories in which those undisclosed uses hit.  First,

1    there was trial strategy.  Specifically, you saw from

2    Kastigar Exhibit 8 when the prosecution team was talking

3    about witnesses for trial, and I believe that is either

4    in April or May e-mail, April e-mail, who are going to be

5    our trial witnesses, Agent Clark responds and says, among

6    other comments, we need witnesses to cover the pics on

7    the phones.  And you heard that cross-examination today,

8    and I won't belabor it.

9         At that time, April whatever it was, sometime

10   in April 20th, end of April, the government didn't have

11   access to the Cellebrites or the feedback from any of the

12   phones seized in the case, the search warrant phones.

13   They only had the Miami phones, period.  That is trial

14   strategy use.

15        Second, there is trial exhibit evidence, and I

16   made the mistake you asked me not to do.  I don't want to

17   address that one yet because it is the biggest one.  We

18   have trial witness exposure.  Okay.  You saw from the,

19   quote, unquote, 10 tainted loans, the investigation from

20   the 65 photos sent to Massino.  Agent Massino runs those

21   names.  They get subpoenas.  They did follow-up.  They

22   interview people.

23        We know that that information that was derived

24   from that work product was sent to Marylee Robinson's

25   firm, Stout, and we know that Stout shared that

1    information with her.  She is on those e-mail chains.  It

2    is the only question I asked about the Stout law firm.

3    That is trial witness exposure.  And there is more than

4    that, and then there is also the use to interpret other

5    evidence.  This is a key one because even if the

6    government has independent sources for some evidence.

7    Right.  If they are using undisputably, actually using

8    tainted evidence to interpret that untainted evidence,

9    that is a Kastigar violation.  Okay.

10           And if you look at Fenton Exhibit 20, I don't

11   think the government realized they were disclosing this.

12   It is just by accident we got this exhibit e-mail chain,

13   and if you look at the top of that e-mail chain,

14   Mr. Andre who didn't testify sends an e-mail to

15   Mr. Fenton.  Okay.  And Mr. Andre is analyzing the case,

16   and he says we should do this follow-up.  A lot of it had

17   to do with the ten tainted phones.

18           But the reason I highlight this point is one

19   of the comments probably like four or five bullet points

20   down from the top of that Exhibit 20, he says with

21   respect to Turcan, one of the loan applicants because

22   information on Turcan was found in multiple sources, a

23   number of them untainted sources, and because that

24   evidence was on the Richard Ayvazyan phone, again, one of

25   the Miami phones, because of that, we should do

1   investigatory activity X, like follow-up, do whatever he

2   said.  So that is an example of interpreting other

3   evidence with tainted evidence which is prohibited under

4   Kastigar.

5        Now, let me come to one of the single biggest

6   uses of tainted evidence in this case, and that is

7   Government Exhibit 10.  Okay.  Government Exhibit 10,

8   according to e-mail I think we received from Ms. Ahn in

9   connection with her declaration is the star witness, star

10  witness of the case.  We agree with her.  Government

11  Exhibit 10 is the star witness.  Your Honor sat here

12  through trial.  I won't belabor the point.

13       But the point is how did the government get

14  Government Exhibit 10 in that form and present it to the

15  jury, and the answer is Agent Palmerton.  We heard on the

16  stand this wasn't in any declaration or anywhere else.

17  Agent Palmerton provided the precursor to Government

18  Exhibit 10 to Ms. Ahn who then took that information from

19  Agent Palmerton and created Government Exhibit 10.

20       So Agent Palmerton sent her information he

21  extracted from the Tamara Dadyan phone.  Okay.  And Agent

22  Palmerton when he was extracting information from the

23  Tamara Dadyan phone, you already heard on the stand today

24  he told you that he had already reviewed the Zhadko phone

25  and the mirror image of many of those text messages on

1    the Zhadko phone.

2           And this is the inherent endemic of the

3    government's burden in this Kastigar setting.  It is

4    impossible for Agent Palmerton, especially in a time

5    crunch, you know, less than seven weeks before trial, six

6    weeks before trial, to compartmentalize the information

7    he learned from his review of the Zhadko phone and

8    others.  I think he said less than 12 times -- right --

9    between February and May before he ever touches the

10   Dadyan phone.  He sees the mirror image.

11          So there is arguments, your Honor, related to

12   this Government Exhibit 10.  I would say there is two or

13   three different arguments.  One, the fact that Agent

14   Palmerton identified the excerpts and text messages he

15   sent to Ms. Ahn, that is tainted.  It is impossible to

16   compartmentalize the knowledge he had.  It was disclosed

17   in Mr. Fenton's second declaration but not his first is

18   that on April 27th, Agent Palmerton sent him the tainted

19   Exhibit O.  So not the 918 pages from the Dadyan phone,

20   but 918 pages of text messages excerpted from the Iullia

21   Zhadko phone with Tamara Dadyan, i.e., all the mirror

22   image texts that ultimately were distilled down to 40 or

23   50 pages and were presented at trial to the jury as

24   Government Exhibit 10.  That is a big deal.  That is

25   significant, your Honor.

1          And I submit to you the government cannot meet

2     their burden to do what Mr. Fenton told you they had to

3     do, and that is they can not prove by any standard that

4     they didn't use tainted evident.

5          THE COURT:  All right.  Thank you.

6          MR. FENTON:  Your Honor, Mr. Ram's articulation of

7     the applicable standard in these cases is completely

8     wrong.  The focus of the inquiry under Kastigar is not

9     whether the prosecutor was aware of the contents of

10    immunized testimony but whether he used the testimony in

11    any way to build the case against the defendants.  That

12    is United States versus Crawson, Ninth Circuit in 1987.

13    It is also well established the government is not

14    required to negate all abstract possibility of taint.

15    Rather, the government need only show by a preponderance,

16    by a preponderance of the evidence that, in fact, the

17    evidence was used, that was used was derived from

18    legitimate independent sources.  That is United States

19    versus Bird, Eleventh Circuit case cited with approval by

20    Crawson.

21          The strongest evidence of that is the evidence

22    that the government had before the taint.  That is the

23    Second Circuit's decision in Nanni which we also cite in

24    our brief.  The government goes into painstaking detail,

25    step by step, throughout its investigation and explains

1    exactly when we made the links between the defendants and

2    the aliases that they were using to perpetrate the loan

3    fraud crime.

4              And when I say we go through in painstaking

5    detail, I mean we go through, in some instances, day by

6    day, and the way that this investigation progressed --

7         MR. RAM:  Your Honor, we don't have that.

8         MR. FENTON:  It is in our opening submission.  It

9    is in our reply brief.  It is in the declarations.

10        THE COURT:  What don't you have.

11        MR. RAM:  We don't have the Exhibit 34 that lays

12   out step by step.

13        MR. FENTON:  That is not Exhibit 34.

14        THE COURT:  Don't debate each other.

15             What don't you have that Mr. Fenton is

16   discussing?  He is talking, as I understand it, about his

17   declaration that was served on you you along with the

18   exhibits to the declaration.

19        MR. RAM:  We have his declaration.  We don't have

20   the exhibit.

21        THE COURT:  You have the exhibits that related to

22   his declaration; correct?

23        MR. RAM:  We don't.  We don't have Exhibit 34

24   cited in his declaration.

25        THE COURT:  He is saying 34 is not part of the

1   argument; is that right?

2          MR. FENTON:  I am saying that what I am referring

3   to at this moment, this detailed chronology, is not

4   Exhibit 34.  It is in our submissions.

5          THE COURT:  Everything you are now saying is in

6   your brief or in exhibit appended to the brief?

7          MR. FENTON:  Yes, your Honor.

8          THE COURT:  Go ahead.

9          MR. FENTON:  And I am not going to walk through in

10  detail all of the arguments all the events here.  We

11  start with August 4th where we have a possible subject

12  identification.  We know the subject is Iullia Zhadko on

13  August 4, and we determine that is likely Richard

14  Ayvazyan by following the money.

15          In the submission we walk through August 5th,

16  August 11th, August 19th, August 26th, August 26,

17  September 25th, October, October 5th, we go through every

18  single week virtually for that three-month time period,

19  and we even show when the agents change their file names

20  from Iullia Zhadko to the two defendants' names, Richard

21  Ayvazyan and Marietta Terabelian.

22          On October 5th, Special Agent Clark who

23  testified said in his declaration that the lead subjects

24  of the investigation were Richard Ayvazyan and Marietta

25  Terabelian based on following the money.  October 5th,

1    three weeks, two-and-a-half weeks before they are stopped

2    at the border.

3         THE COURT:  Clarify what you just said about the

4    internal records demonstrating that the government had

5    internally viewed Terabelian as Kauichko and Ayvazian as

6    Zhadko.

7         MR. FENTON:  You are saying with respect to

8    Special Agent Clark?

9         THE COURT:  I mean, I thought you said there was

10   something internally where the government designated

11   those defendants as having pseudonyms, Kauichko and

12   Zhadko.

13        MR. FENTON:  No.  I was saying that Special Agent

14   Clark had changed the file name on his -- so for his

15   investigatory file, when he has his internal records

16   showing who the subjects of the investigation are, when

17   he opened the investigation in June, 2020, Iullia Zhadko

18   was the subject of that information.

19            When -- once we followed the funds and

20   realized that Richard Ayvazyan and Marietta Terabelian

21   were lead defendants in this case, Special Agent Clark

22   changed -- he opened the matter under a new name on

23   October 5th, and that name was Richard Ayvazyan and

24   Marietta Terabelian.  And that is set forth in his

25   declaration.

 1          THE COURT:  But did he, in his internal

 2     designation, refer to them as Zhadko and Kauichko?

 3          MR. FENTON:  That I don't know, your Honor.  That

 4     is not included in the declaration, and the defendants

 5     did not ask about that at the hearing.

 6          THE COURT:  All right.  Go ahead.

 7          MR. FENTON:  But my point is that we show that we

 8     can meet the standard set forth in Crowson because we

 9     show that we have built our case and that it was

10     substantially complete, the investigation, by

11     October 19th.

12               Now, what this ultimately comes down to I

13     think for Mr. Ram is just these Cellebrite reports.  That

14     seems to be the focus of his argument, and these

15     Cellebrite reports come at a time when the investigation

16     is all but finished.  We have already complainted them.

17     We have already indicted them.  We are now doing our

18     paperwork to finalize this first superseding indictment,

19     and we do not obtain access to these phones until

20     February 11th, February 12th, February 19th, March 19th

21     or thereabouts and April 8th.  That is extremely late in

22     the case.  Given where we were at that point in time, the

23     information that we were obtaining from these phones, it

24     was not information --

25          THE COURT:  When was the first date or first

1  document which shows that the government was considering

2  a superseding indictment?

3       MR. FENTON:  When were we considering a

4  superseding indictment?

5       THE COURT:  What document, internal document shows

6  your earliest point at which the government was

7  considering a superseding indictment.

8       MR. FENTON:  We did not include any documents to

9  that effect.  If your Honor would like, we could submit

10 something to the Court in camera.  We can go back and

11 look.

12      THE COURT:  There was testimony; correct?

13      MR. FENTON:  Yes, your Honor.

14      THE COURT:  But I don't recall a specific

15 timeframe.

16      MR. FENTON:  That's right, your Honor.  I can tell

17 your Honor that in various court filings, the government

18 has represented, and this is accurate that following the

19 first indictment, the government was continuing its

20 investigation focused on adding additional defendants who

21 were also part of the conspiracy, specifically the four

22 defendants.

23      THE COURT:  You are going too fast.  I missed what

24 you just said.

25      MR. FENTON:  So, in the first -- so there is a

1    document in the record.  I apologize, your Honor.

2            If you look at Government Exhibit 15 which is

3    the indictment memorandum for the first indictment, we

4    actually say at the end of that document that part of the

5    follow-up investigation that we are going to complete is

6    complete the investigation of other co-conspirators in

7    preparation for the superseding indictment.  So that is

8    evidence that shows that the government was working

9    towards a superseding indictment as soon as it got its

10   initial indictment.

11           Now, what we established in our opening

12   submission is that we have already identified the

13   subjects of that superseding -- the first superseding

14   indictment before the border stop.  And we articulate and

15   lay out the evidence that shows that we had actually

16   identified the individuals who we were going to add in

17   the superseding indictment as well as the companies.

18           Some of the documentation that we actually

19   point to are internal records that I prepared for

20   deconfliction purposes where I would on a given date

21   which is listed on the document list out the companies

22   that we were then investigating, and these are the

23   companies that eventually became the basis of the overt

24   acts allegations both in the indictment and then later in

25   the first superseding indictment.

1          Fenton declaration Exhibits 7A and 7B contain

2     the detailed list in August, at the end of August 27th

3     and in September as well showing that we were already

4     onto and already had the investigative leads that we were

5     going to pursue not just with respect to the indictment

6     but with respect to the first superseding indictment as

7     well.

8          So our investigation was substantially

9     complete by that point, and at the point in time in

10    February when we first get access to these phones, we are

11    all but done.  We were doing paperwork at that point to

12    paper up the first superseding indictment, and then we

13    are getting ready to prepare for trial.  And that is what

14    we were doing at that point.

15          So when your Honor is evaluating whether or

16    not access to these phones is harmless --

17          THE COURT:  The first superseding indictment was

18    returned in March; correct?

19          MR. FENTON:  That's right, your Honor.

20          THE COURT:  So why the lag between the additional

21    indictment and the first superseding indictment?

22          MR. FENTON:  In large part, it was due to the fact

23    that the grand jury had been suspended.

24          THE COURT:  Because of Covid?

25          MR. FENTON:  Because of Covid-19.  And, once the

1    grand jury was reinstated, certain cases would obtain

2    priority, and we had to get in line which we did.  And we

3    moved quickly to try to obtain the first superseding

4    indictment as soon as practical.  And I think that we did

5    that, but the entire time we were completing our

6    investigation.  So by the time we get to these phones in

7    February, March, April, we have already done the work.

8            We have been done with some of that work for

9    months and we are preparing the paperwork, and none of

10   the evidence as your Honor sees from the documents we

11   submitted in camera, none of that evidence, none of those

12   allegations, none of the evidence presented to the grand

13   jury is from these phones.  It is completely independent.

14       THE COURT:  When did the Court first set a trial

15   date in this case?  With regard to the additional

16   indictment, correct, what date was that trial date?  Was

17   it the trial date we actually had?

18       MR. FENTON:  I don't have a specific recollection.

19   I believe it was in December 20th or thereabouts.

20       MR. SILVERMAN:  Your Honor, the first trial date

21   was January 4th, I believe.  And, I'm sorry,

22   January 12th, then May 4th, then June 15th.

23       THE COURT:  And when was it continued to May 4th?

24       MR. SILVERMAN:  It was continued to May 4th

25   shortly before the January 12th date.  I don't remember

1    that, but I remember we moved for discovery when it was

2    still January 12th, and we moved for discovery on

3    approximately December 7th or so.  So it would have been

4    mid to late December unless the government thinks that

5    sounds wrong.

6         MR. FENTON:  So, your Honor, at the point where we

7    get access to these phones, the investigation is

8    substantially complete.  And, at that point, we are doing

9    the paperwork for the first superseding indictment.  We

10   are preparing for trial.  That is what we are doing at

11   that point.

12        The question becomes, yes, we had access to

13   these phones, though the testimony, the credible

14   testimony has established that only three members of the

15   government team ever accessed these phones, the

16   Cellebrite reports, and all three encountered significant

17   technical difficulties that made it very frustrating to

18   actually work with these phones.

19        So the amount of time that was spent on the

20   phones was extremely limited and, because of the

21   competing demands, our attention was elsewhere.  Yes, we

22   wanted to get this evidence from the phones if it was

23   possible.  But at the same time, we had other things that

24   we had to do and, quite frankly, your Honor, we had a

25   mountain of evidence.  There was never a doubt in the

1   government's mind that we had more than enough in part

2   because of the physical possession of the credit cards,

3   in part because the bank records so clearly demarcated

4   the trail between the stolen PPP funds and the mansion

5   that the defendants purchased for themselves.

6          All the property that they bought with the

7   stolen money and brought to their houses that we seized

8   on November 5th.  We had all of that evidence at the

9   point where we looked at these phones in February.  So

10  the phones were not that much of a consideration to us.

11  If we could get access to them, great, they probably

12  would have been very good evidence.  But, if we didn't,

13  so be it.

14         So, at that point, the question to determine I

15  think whether or not it is harmless is not -- we didn't

16  use it for the grand jury.  We didn't use it to file a

17  complaint.  We didn't use it to obtain a search warrant

18  at that point in time in February, March or April.  The

19  only way this evidence could have been harmful at that

20  point is if we used it to pursue investigative leads but

21  the investigation was basically done or if we used it at

22  trial.

23         And the government demonstrates beyond a

24  reasonable doubt, with a preponderance, by at least a

25  preponderance that we did not use this evidence at trial.

1    There is two components:  Number one, witnesses.  We

2    identify, in our submissions, the specific evidence that

3    we use to identify our witnesses and as your Honor may

4    recall, we had about 23 witnesses, 16 of those 23

5    witnesses or thereabouts were either state or federal

6    employees or contractors.

7            So we didn't determine, we didn't identify

8    them as a result of the investigation.  We identified

9    them because they worked for a state agency or a federal

10   agency, or they were a contractor like Marylee Robinson

11   who we hired.

12           The remaining seven witnesses, we go through

13   in our submission and we point to the specific

14   information that we use to identify those individuals,

15   and, in most instances, we identify them as a result of

16   loan files that we obtained early in the investigation or

17   bank records or escrow records because the escrow records

18   are so critical here because the houses play such an

19   important role in this investigation.

20           Amira Halum, we identify her as a result of

21   the escrow records.  Same thing they talk about Mary

22   Sambatyan, a witness who was never called, we identify

23   her as a result of the escrow records.  We talked about

24   Olaf Lansgaard, a witness who could not be called because

25   he is deceased.

1           The escrow records were key.  We had them even

2    before the border stop, and that is how we identified a

3    large number of these witnesses.  The rest were victims

4    who we identified through loan applications who they

5    never submitted but their names were stolen and used.

6           The other way that this information could have

7    been used for trial evidence is as exhibits, and it is

8    not.  And Exhibit 34 explains piece of evidence by piece

9    of evidence how we obtained it.  Most of the evidence or

10   a lot of the evidence was obtained from the --

11        MR. SILVERMAN:  Your Honor, that is the exhibit

12   that has not been turned over to the defense that is now

13   being argued about.

14        THE COURT:  What exhibit is that?

15        MR. SILVERMAN:  34 I believe.

16        MR. FENTON:  Your Honor, it is Exhibit 34, and it

17   was submitted to the court in camera.

18        THE COURT:  What is it?  Refresh my memory.

19        MR. FENTON:  So it is a copy of the trial exhibit

20   list which the defendants have received, but this

21   particular version contains the dates that we requested

22   the information that ultimately yielded the exhibit.

23        THE COURT:  Can I see that exhibit?

24        MR. FENTON:  Yes, your Honor.

25           Though I will admit that the print is a little

 1    small.

 2         THE COURT:  That is all right.

 3         MR. FRASER:  Your Honor, both defendants object to

 4    the fact that this hasn't been provided to them.

 5         THE COURT:  Just one moment.

 6              All these dates precede February 11th?

 7         MR. FENTON:  Almost all of them do, your Honor,

 8    and the few that don't, if you look at them, they tie

 9    back to things that are just not related to the phones,

10    but we wanted to --

11         THE COURT:  And who prepared this document?

12         MR. FENTON:  So this was prepared by Annamelda

13    Paul who is the law clerk who worked with our team

14    through trial.

15         (Recess from 4:46 to 5:05.)

16         THE COURT:  Okay.  Mr. Fenton, you were in your

17    argument.

18              As I said, this was sort of the opportunity

19    for highlights.  So do you have any more highlights?

20         MR. FENTON:  I just have a few, your Honor.  I

21    promise I will wrap up if you give me five more minutes,

22    and I will conclude.

23         THE COURT:  I want to give Mr. Ram a chance to

24    respond because I did give Mr. Littrell a chance.

25         MR. FENTON:  Understood, your Honor.

```
 1              THE COURT:  Go ahead.

 2              MR. FENTON:  So where we left off, we were talking

 3    about whether or not the phones were harmless, and I

 4    believe the government's submissions which were

 5    substantial demonstrate beyond a reasonable doubt that

 6    any information that would have been viewed on the

 7    Cellebrite reports from February, March and April are

 8    harmless.  And the reason why is because that information

 9    could only have been used for trial evidence at that

10    point.  And it was not used for trial evidence as

11    demonstrated by the trial evidence.

12              And Exhibit 34 and what we submitted and that

13    evidence all ties back to information that was prior to

14    that time, prior to the time when there were -- when

15    those phones were looked at.

16              But Mr. Ram -- and this is a critical point

17    that I want to address and the final point that I want to

18    address.  Mr. Ram makes the argument that Government

19    Exhibit 10 is somehow the fruits of something that was

20    tainted.

21              THE COURT:  Exhibit 10 was the text exchange

22    between Tamara Dadyan and Richard Ayvazyan.

23              MR. FENTON:  That's correct, your Honor.

24              THE COURT:  The Rich New text exchange.

25              MR. FENTON:  That's correct, your Honor.
```

1    Government Exhibit 10 was taken from a phone that

2    belonged to Tamara Dadyan that was seized on November 5th

3    pursuant to a valid search warrant that your Honor deemed

4    had probable cause even if you were to remove all the

5    evidence of the --

6          THE COURT:  I know that.

7          MR. FENTON:  That is where that phone cams from.

8    That is the source.

9              I submitted an affidavit that explained how we

10   selected that phone and then also explained what we did

11   once we selected that phone.  And, as an initial matter,

12   we would have selected a phone from each of the

13   defendants no matter what because we wanted to filter it

14   and review it for evidence for use at trial, and the two

15   defendants who we wanted phones for were Tamara Dadyan

16   and Artur Ayvazian.

17             And when I went through that process and I

18   explained it in detail in my affidavit, I actually told

19   the filter team there were two phones that belonged to

20   Tamara Dadyan.  I told them to prioritize one.

21         THE COURT:  When you say -- you are arguing and

22   you should refer to what your testimony was and not

23   something you are saying now because you can't wear two

24   hats.

25         MR. FENTON:  I understand, your Honor.  So I am

1    referring to my -- the second Fenton declaration where I

2    lay out in detail how I came to choose to prioritize one

3    phone over the other.  And what actually happened, and

4    this is articulated in the sworn declaration is I chose

5    the wrong phone, and the filter team --

6         THE COURT:  I know.  That you chose phone 30 and

7    the right one was 21.

8         MR. FENTON:  That's correct, your Honor, which

9    shows that the decisions that I made with respect to what

10   trial evidence to use at trial was not the result of any

11   sort of mirror image.  It is not the result of any sort

12   of matching, and it demonstrates that this was harmless.

13        THE COURT:  I understand your argument.

14             Let me give Mr. Ram a chance to respond.

15        MR. RAM:  Thank you, your Honor.

16             Your Honor, we do have one big credibility

17   issue, and that is this notion of the investigation was

18   substantially completed when we arrested them in Miami,

19   or that, now, it was substantially completed in February

20   when we got the Cellebrites.  That does not comport with

21   the realities of this case at all.  From day one, and

22   your Honor has this all in the docket, the government --

23   and, frankly, the government hasn't been ready for trial

24   and it asked for continuances three times, three times.

25             And if you look at when they say our

1   investigation was substantially complete which by the way

2   came up for the first time in the reply brief to Kastigar

3   in Mr. Fenton's second declaration that the investigation

4   was substantially complete, here is why that cannot be

5   true.  It cannot be true.

6           If you look at interviews which are the bread

7   and butter of prosecutions.  It is interviews of

8   potential witnesses, interviews of people to develop

9   other evidence.  And that is at Kastigar Exhibit 30.

10  This is just the defense's summary of MOIs and 302s and

11  other interview reports that were received from the

12  government.

13          We know that there are more interviews, but,

14  if you just look at the ones produced in written form,

15  here is the facts.  Can't be disputed.  In 2020 which

16  includes October, 2020, there were less than 15

17  subpoenas, less than 15 interviews in this entire case.

18  From June to December.  And, again, this is based on

19  written interviews that were produced to the defense.

20          Then, compare that 15 to 2021, and we have

21  only had six months of 2021 so far.  There is more than a

22  hundred interviews done, 110.  And I have just asked my

23  associate to do a quick count, and he told me that after

24  the Cellebrite -- after February, the Cellebrite drop in

25  February, more than half of those interviews occurred,

1    more than half of the total interviews.  So rough math,

2    that is more than 50 interviews that are happening, at

3    least, the ones that are documented.

4         THE COURT:  That means that 50 happened before.

5         MR. RAM:  Before the February Cellebrites.  But

6    only 14 in 2020 at the time of the Miami arrest.  Depends

7    which version if you look at their briefs, their

8    investigation was completed in October of 2020.  It

9    wasn't.

10        And the interviews are one piece of that

11   evidence.  If you look at the subpoenas in this case, we

12   don't have the subpoena log.  You do, your Honor.  That

13   wasn't produced to us.  You are going to see the majority

14   of the subpoenas or a substantial number of the subpoenas

15   we suspect were issued in 2021 after the Miami stop.  We

16   also know from the references in discovery that we do

17   have that there were subpoenas issued as late as April of

18   2020 for this trial.

19        And, next, look at the search warrant

20   evidence.  Any prosecutor who is prosecuting a case knows

21   that search warrant evidence can be critical because it

22   reveals, for example, digital devices, domicile and

23   control.  Right.  Things that are critical to

24   investigations.  We know for a fact putting aside the

25   Miami phones that none, none of the 50-plus digital

1    devices that the government seized in this case from

2    however many search warrant locations were processed and

3    ready for the government to review until May of 2021.

4    May.

5              And if you recall, your Honor --

6         THE COURT:  I know that also.  I mean, that is not

7    new information.

8         MR. RAM:  Okay.  But it is directly contrary to

9    the claim that the investigation was substantially

10   completed, and that is the three big picture points

11   there, your Honor.

12             Second, the government has talked about, now,

13   we have talked about Exhibit 34 again.  We haven't seen

14   it, but we understand that it catalogs the trial exhibits

15   and shows an independent source for those exhibits.

16        THE COURT:  It shows a subpoena.

17        MR. RAM:  Okay.  Okay.  And the big picture here

18   is that is not how it works.  We know from the trial

19   evidence here, the hearing evidence, your Honor, that the

20   government reverse engineered their trial exhibits after

21   the Kastigar violation was pointed out to them.  So, in

22   May, and we heard this from the stand.  It is in some of

23   the declarations.  It is undisputed fact.

24             In May of 2021, the government which has been

25   exposed to Kastigar taint since October 20th, since

1    November 13th, 65 photos, since February 2nd, 141 photos,

2    and since February, March Cellebrites, they have been

3    exposed to taint and were building an investigation.  And

4    you heard about some of the two dozen uses and some of

5    the indirect uses that the government didn't point out to

6    you.

7            And we know there is more, and the point is

8    the government can't prove that they didn't build their

9    case.  They didn't follow up on leads.  They didn't focus

10   their investigation.  They can't prove that they didn't

11   rely on the Cellebrites or the 206 photos from the phones

12   or the oral information provided by CBP.  They simply

13   cannot do that, meet their standard here.

14           And that is the big picture point, and they

15   are reverse engineering of trial exhibits doesn't wipe

16   away taint.  They still learned information they can

17   never forget, particularly Agent Palmerton and

18   Mr. Fenton, who reviewed the Cellebrites and the rest of

19   the team, I think everyone as Mr. Littrell said reviewed

20   the 141 photos and knew what CBP conveyed orally.  All of

21   them did.

22           It is impossible to not use that information

23   in interpreting evidence.  We pointed out some examples

24   though the cross-examination, and I know your Honor

25   doesn't like this one.  But one of them is we argued

1    there was multiple conspiracies, and the key to the

2    multiple conspiracies argument, frankly, was the Canoga

3    apartment.  Right.  The fact that Manuk Grigoryan

4    controlled indepently the Canoga apartment.

5           What the government had on tainted evidence

6    the entire time was evidence that suggests, and I concede

7    it, but suggests that Mr. Ayvazyan was, in fact,

8    controlling Canoga apartment.

9           THE COURT:  One moment.

10          Okay.

11          MR. RAM:  And they made arguments to the Court

12    against the multiple conspiracies and schemes knowing of

13    that evidence from day one.  Okay.  And the big picture

14    point here is you can't reverse engineer just from policy

15    and common sense if you are exposed to tainted evidence,

16    you build a case based on tainted evidence, and then you

17    filter out the taint for clean evidence at trial, that

18    doesn't meet the Kastigar burden.  That is why non

19    evidentiary use, pretrial strategy, all of that matters.

20          THE COURT:  I get the argument.

21          MR. RAM:  And the final point here is the

22    government cited some case law to your Honor.  There is a

23    fundamental misunderstanding of Kastigar standards that

24    the government has advanced to this Court in their

25    briefing.  The primary focus is on the Crowson case in

1    the Ninth Circuit.  It is a 1987 decision.  And the issue

2    in that case, it is not analogous to this case in any

3    way.  It was about the authentication of some documents.

4              It is more of the line of cases your Honor

5    sees where there is cannon done and then active

6    production immunities issued, and then there is ancillary

7    grand jury testimony about the authentication of

8    documents.  That is what Crowson is in line with.  The

9    government is comparing the taint in this case to a case

10   that was essentially completed, was entirely completed

11   the investigation but they were authenticating documents.

12   That is not this case.  This case is Hampton, Eleventh

13   Circuit, Martinez, Tenth Circuit, and, by the way, I

14   missed one cite.  Mapelli, I think is very important to

15   this court because you have heard.

16        THE COURT:  What is that?

17        MR. RAM:  Mapelli.  It is a Ninth Circuit case as

18   well.  The reason I point that out here is I cited to the

19   government's admission, frankly, that they reverse

20   engineered evidence for trial.  Right.  Mapelli has an

21   interesting line or quote in there, and they say

22   Mrs. Mapelli testified.  The government didn't

23   cross-examine her.  It was a tax case, your Honor, tax

24   and fraud case in the Ninth Circuit.  And the Ninth

25   Circuit suggested the fact that the government didn't

1    cross-examine Mrs. Mapelli was because they had tainted

2    evidence in their minds, and it would have been revealed

3    to the jury had they cross-examined her.

4            So in the Ninth Circuit's terms that was a

5    trial strategy, pretrial strategy decision not to

6    cross-examine Mrs. Mapelli.  So the government's own

7    confession of its reverse engineering of trial exhibits

8    so they could hand you Exhibit 34, whatever it says, that

9    doesn't -- that is Kastigar violation in and of itself.

10       THE COURT:  You know, we have got to wrap this up.

11   I have -- I think I have your main points.

12       MR. RAM:  Okay, your Honor.  And we are happy to

13   submit a post trial, a post hearing briefing.

14       THE COURT:  Thank you.

15       MR. RAM:  Thanks.

16       THE COURT:  I want Fenton to just comment briefly,

17   and I mean briefly, in a minute or less, well, maybe more

18   than a minute, the number of interviews that argument,

19   and their timing, and that would be it.

20       MR. FENTON:  Yes, your Honor.  The number of

21   interviews that the government conducted in the lead up

22   to trial is a direct result of the fact that we were

23   leading up to trial and preparing for trial as Mr. Ram

24   had asked the court to do to chose the first available

25   trial date.  We prepared for trial.

1          And as the pandemic started to subside and

2     people were able to begin to travel and do some more

3     face-to-face interviews and whatnot, we took advantage of

4     that and started to do those things.  That was the

5     purpose, and that is what you see when you look at what

6     we were doing there.  We were revving up for trial, to

7     get ready to try the case.  And that is what we did.

8          And the suggestion that the government was

9     somehow not ready is, as we have stated in our briefs, a

10    fictionalized account.  Everything that we were doing at

11    that point was to get ready to try this case which we

12    did.

13         THE COURT:  All right.  The minute is up.  Okay.

14         The matter will stand submitted, and I will

15    try to get through this as efficiently as I can.  It may

16    take a little while, but I will get through it.

17         MR. LITTRELL:  Your Honor, with that in mind, I

18    would just reiterate our request to continue sentencing

19    so that we are not all getting ready for sentencing while

20    we are preparing for this ruling to come out.  I just

21    request a short continuance about November or December.

22         THE COURT:  I will put it off by -- put the

23    sentencings off till beginning of October, Paul.

24         THE CLERK:  Yes, your Honor.

25         (Proceedings concluded.)

1                        CERTIFICATE

2

3

4    I hereby certify that pursuant to Section 753, Title 28,

5    United States Code, the foregoing is a true and correct

6    transcript of the stenographically reported proceedings held

7    in the above-entitled matter and that the transcript page

8    format is in conformance with the regulations of the

9    Judicial Conference of the United States.

10   Date:  August 1, 2021

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25

**MR. CIPOLLETTI: [2]**   5/10
144/1

**MR. FENTON: [70]**   165/15
167/1 167/10 167/24 168/2
168/5 168/8 168/13 168/21
168/25 169/3 169/5 170/14
171/11 174/15 174/20 175/8
175/17 175/25 176/2 177/5
177/14 179/13 179/21 180/1
180/4 180/14 181/1 182/3
182/6 182/17 183/5 183/9
186/23 187/1 187/10 198/5
199/7 199/12 200/1 200/6
200/8 201/6 201/12 202/2
202/6 203/2 203/7 203/12
203/15 203/24 205/18 205/21
205/24 206/17 207/5 210/15
210/18 210/23 211/6 211/11
211/19 211/24 212/1 212/22
212/24 213/6 213/24 214/7
221/19

**MR. FRASER: [16]**   47/13
47/15 47/18 48/3 53/7 54/24
55/2 55/5 55/9 58/24 60/16
60/18 60/25 66/17 67/1 211/2

**MR. KEOUGH: [27]**   93/9 104/3
124/22 140/8 140/12 140/22
141/11 142/2 142/5 142/12
142/22 143/25 144/11 144/19
144/25 145/10 146/6 146/9
148/9 148/16 148/20 148/24
149/11 149/14 149/19 152/8
155/24

**MR. LITTRELL: [20]**   88/12
91/3 93/6 104/5 124/19 156/1
157/13 157/18 169/11 169/14
170/2 184/2 184/6 184/17
184/21 184/25 185/14 185/18
187/16 222/16

**MR. O'DONNELL: [24]**   11/1
18/19 19/8 26/13 40/18 48/10
48/15 52/4 58/17 60/23 66/5
99/11 103/25 127/4 128/19
130/18 141/19 141/22 142/15
142/20 143/8 143/18 144/4
152/4

**MR. RAM: [34]**   5/14 15/11
15/15 15/18 18/20 19/12
34/21 35/5 35/8 35/11 40/9
40/12 44/6 44/10 44/14 45/4
47/5 157/4 188/1 191/3 191/9
199/6 199/10 199/18 199/22
214/14 216/4 217/7 217/16
219/10 219/20 220/16 221/11
221/14

**MR. SILVERMAN: [22]**   67/4
71/9 76/12 79/14 79/22 86/6
86/13 86/24 87/5 88/11 104/8
104/17 113/13 115/1 118/3
122/15 122/20 124/17 206/19
206/23 210/10 210/14

**MS. WESTFAHL KONG: [9]**   86/2
89/7 90/23 109/7 113/14
117/25 123/8 123/21 141/9

**RIGHT1: [2]**   166/22 168/18

**THE CLERK: [7]**   5/16 67/6
93/13 104/10 125/1 156/4
222/23

**THE COURT: [225]**

**THE DEFENDANT: [2]**   104/15
128/21

**THE WITNESS: [34]**   5/18 11/4
12/15 19/24 26/15 48/18
52/22 52/25 55/11 55/17 60/3
60/7 60/10 64/7 64/9 67/3
67/8 77/10 84/3 89/9 93/15
99/15 104/13 109/12 118/4

123/10 123/25 125/4 129/24
139/7 139/14 150/7 150/11
150/12

---

**$**

**$3.25 [1]**   179/7
**$3.25 million [1]**   179/7

---

**—**

**-4 [1]**   184/21
**-5 [1]**   184/21
**-and [5]**   2/5 2/6 2/6 2/7 2/9

---

**/**

**/s [1]**   224/12

---

**0**

**04 [1]**   30/21

---

**1**

**10 [20]**   35/20 35/24 73/13
79/7 79/10 79/15 97/15
121/25 194/19 196/7 196/7
196/11 196/14 196/18 196/19
197/12 197/24 212/19 212/21
213/1

**100 [1]**   46/4
**100 percent [1]**   167/21
**104 [1]**   4/10
**10:00 a.m [9]**   47/22 48/10
125/12 125/23 126/6 127/14
129/4 131/17 132/7
**10:00 p.m [1]**   176/5
**10:03 [1]**   5/2
**10:59 p.m [1]**   171/3
**10th [4]**   72/19 72/21 72/23
73/1
**11 [1]**   96/23
**110 [1]**   215/22
**115 [2]**   180/6 180/16
**119 [1]**   35/14
**11:48 [1]**   79/20
**11th [9]**   26/17 72/24 76/6
110/10 110/13 188/22 200/16
202/20 211/6
**12 [1]**   197/8
**125 [2]**   4/11 114/7
**12:23 a.m [1]**   173/3
**12:30 [1]**   176/8
**12:45 [1]**   79/20
**12th [5]**   188/22 202/20
206/22 206/25 207/2
**13 [2]**   94/7 114/8
**1330 [1]**   2/22
**134B [1]**   21/8
**13th [16]**   15/21 18/16 19/17
80/22 81/7 82/18 82/24 83/8
85/15 88/23 89/12 89/19
97/11 132/19 188/20 218/1
**14 [1]**   216/6
**140 [1]**   21/7
**1400 [1]**   2/11
**141 [15]**   21/4 21/7 22/23
59/25 60/6 105/9 107/14
107/17 108/22 109/7 159/6
188/20 189/13 218/1 218/20
**143 [1]**   4/15
**15 [8]**   7/20 7/22 79/15 181/9
204/2 215/16 215/17 215/20
**15th [2]**   67/18 206/22
**16 [4]**   102/11 153/1 153/4
209/4
**16th [3]**   11/11 13/7 57/2
**17 [4]**   189/4 189/5 189/20
193/3
**1834 [1]**   56/4
**19 [3]**   29/7 29/21 205/25
**1900 [1]**   2/17

**1987 [2]**   198/12 220/1
**1:54 [2]**   124/23 124/23
49/3 49/8 54/21 54/23 57/4
166/5 171/15 178/20 180/4
180/5 181/25 183/14 187/5
188/22 200/16 202/11 202/20
202/20
**1:00 [2]**   79/19 176/8
**1:53 [1]**   124/25
**1B123 [12]**   27/6 30/12 31/20
32/15 33/1 69/11 69/13 69/14
69/23 153/6 153/7 154/8
**1B124 [3]**   155/9 155/11
155/14
**1B125 [1]**   155/18
**1B126 [3]**   27/9 154/8 154/11
**1B21 [11]**   32/9 33/16 69/21
69/21 70/20 70/21 71/7 73/3
74/3 76/20 76/24
**1B4 [2]**   154/10 155/3
**1B85 [4]**   75/19 75/21 75/22
76/4
**1st [1]**   1/21

---

**2**

**20 [3]**   187/1 195/10 195/20
**20-579 [1]**   1/8
**2001 [1]**   81/20
**20036 [1]**   2/23
**2012 [4]**   56/24 158/4 172/10
183/23
**2019 [6]**   74/1 147/7 147/9
147/12 147/13 148/6
**2020 [31]**   10/12 10/13 13/7
13/22 14/3 23/12 23/20 46/16
46/18 49/3 49/9 53/5 57/2
74/1 75/24 88/19 94/10
103/19 106/17 114/9 132/19
157/21 158/10 181/9 182/14
201/17 215/15 215/16 216/6
216/8 216/18
**2021 [34]**   1/16 5/1 21/3 25/7
26/1 30/8 37/19 38/4 39/11
41/25 42/1 67/16 67/20 88/19
105/1 110/10 113/11 114/3
115/5 133/7 133/10 133/13
133/15 136/12 136/15 137/18
151/13 159/7 215/20 215/21
216/15 217/3 217/24 224/10
**20530 [1]**   2/12
**206 [1]**   218/11
**20th [15]**   14/16 23/20 49/3
49/8 157/20 158/9 164/6
166/5 171/15 173/4 187/5
188/16 194/10 206/19 217/25
**21 [4]**   18/24 39/7 142/11
214/7
**21st [2]**   18/13 19/14
**22 [1]**   39/7
**22nd [7]**   6/21 6/24 7/6 10/9
167/16 168/17 169/21
**23 [6]**   7/20 7/22 17/13 173/3
209/4 209/4
**23A [2]**   17/11 17/12
**23rd [6]**   25/7 147/9 147/13
148/6 167/19 168/18
**24 [1]**   7/21
**24th [14]**   13/22 26/1 26/21
41/15 41/25 106/23 106/25
107/14 108/20 111/7 111/8
111/17 111/22 111/23
**25 [1]**   41/24
**25th [2]**   106/25 200/17
**26 [12]**   37/25 38/12 38/16
39/17 43/13 44/20 119/9
136/23 142/11 142/12 193/15
200/16
**26.15-26-59 [1]**   30/21
**26th [2]**   45/23 200/16

**2**
**27 [6]** 38/24 39/7 39/11
44/25 119/9 137/2
**27th [16]** 26/1 26/21 38/16
38/19 38/25 41/25 45/15
45/23 135/23 136/2 136/6
136/12 136/15 142/6 197/18
205/2
**28 [6]** 106/14 189/5 189/12
189/20 193/3 224/4
**29 [3]** 1/16 5/1 20/14
**299 [1]** 121/25
**2:09 [1]** 124/25
**2:53 [1]** 156/5
**2:57 [1]** 157/11
**2LA [1]** 30/11
**2nd [9]** 21/3 59/25 60/6
60/16 121/18 147/12 159/7
188/20 218/1

**3**
**30 [3]** 138/11 214/6 215/9
**302 [5]** 12/23 12/25 13/10
14/16 14/19
**302s [1]** 215/10
**30th [1]** 182/14
**31 [3]** 117/21 117/25 192/15
**312 [1]** 2/7
**32 [2]** 106/15 138/23
**329 [1]** 178/7
**338 [2]** 80/10 89/13
**34 [11]** 199/11 199/13 199/23
199/25 200/4 210/8 210/15
210/16 212/12 217/13 221/8
**350 [2]** 1/21 3/5
**37 [1]** 146/17
**37A [2]** 146/17 147/10
**3900 [1]** 2/20
**391 [1]** 33/2
**3:25 [1]** 157/11

**4**
**4,911 [1]** 31/22
**40 [1]** 197/22
**400,000 [1]** 190/2
**4170 [3]** 32/13 69/22 71/8
**4311 [1]** 1/21
**4363847301 [1]** 145/6
**45 [2]** 171/2 172/25
**46A [1]** 18/3
**47 [2]** 4/5 18/3
**474 [1]** 34/4
**48 [2]** 102/5 102/13
**4910 [2]** 22/25 55/23
**4:46 [1]** 211/15
**4th [5]** 200/11 206/21 206/22
206/23 206/24

**5**
**50 [3]** 197/23 216/2 216/4
**50-plus [1]** 216/25
**5533 [2]** 32/6 33/15
**561 [1]** 34/16
**579 [1]** 1/8
**59 [1]** 30/21
**5:05 [1]** 211/15
**5th [14]** 2/16 3/8 19/4 23/1
118/12 118/16 119/2 200/15
200/17 200/22 200/25 201/23
208/8 213/2

**6**
**60 [1]** 18/7
**601 [1]** 3/8
**6150 [1]** 65/21
**63 [4]** 168/4 169/4 172/14
184/21
**633 [1]** 2/16

**64 [2]** 168/4 169/3
**64 [13]** 134/19 135/6 137/21
20/21 97/9 98/22 101/11
102/8 107/8 132/17 134/5
136/12 137/4 138/13 138/24
146/4 146/11 146/16 146/18
149/8 149/11 149/14 151/1
151/4 168/4 169/4 172/25
184/19 188/15 188/19 194/20
218/1
**65A [1]** 20/9
**66A [1]** 18/7
**67 [1]** 4/6

**7**
**70 [1]** 20/9
**720 [1]** 3/8
**74203 [1]** 65/17
**753 [1]** 224/4
**7:42 p.m [1]** 170/18
**7A [1]** 205/1
**7B [1]** 205/1
**7th [9]** 39/10 67/16 80/1
81/20 82/18 88/23 89/15
181/16 207/3

**8**
**83 [1]** 138/2
**88 [1]** 4/7
**8th [4]** 94/10 95/14 96/22
202/21

**9**
**90012 [2]** 1/22 2/8
**90071 [2]** 2/17 3/9
**903 [1]** 3/5
**918 [6]** 32/19 32/22 46/4
190/15 197/19 197/20
**92673 [1]** 3/6
**93 [1]** 4/8
**940s [1]** 116/6
**941 [1]** 73/24
**94105 [1]** 2/20
**9858 [2]** 1/20 224/12
**9:30 [1]** 176/5
**9th [6]** 42/24 43/3 43/5
104/25 105/25 109/13

**A**
**A-H-N [1]** 67/10
**a.m [12]** 5/2 47/22 48/10
79/20 125/12 125/23 126/6
127/14 129/4 131/17 132/7
173/3
**able [5]** 78/19 94/3 139/25
160/20 222/2
**about [165]**
**above [2]** 39/13 224/7
**above-entitled [1]** 224/7
**Absolutely [1]** 107/4
**abstract [1]** 198/14
**accept [3]** 58/24 163/22
163/24
**accepting [1]** 66/11
**access [25]** 24/9 25/11 36/18
41/17 46/20 70/25 91/24
92/17 111/15 116/20 117/2
136/16 185/20 189/7 190/3
190/8 190/14 192/17 194/11
202/19 205/10 205/16 207/7
207/12 208/11
**accessed [4]** 92/23 111/2
189/2 207/15
**accesses [1]** 47/2
**accessing [1]** 42/1
**accident [1]** 195/12
**according [1]** 196/8
**account [18]** 8/19 8/20 8/23

55/20 55/20 55/22 55/22
55/24 56/10 56/11 56/13
157/25 174/14 179/10 181/3
182/10 182/24 222/10
**accounts [5]** 10/1 157/23
171/23 179/6 183/20
**accurate [10]** 9/25 29/12
32/23 98/18 105/19 109/2
110/12 113/10 167/22 203/18
**accurately [2]** 121/24 135/16
**acknowledge [6]** 160/4 162/13
164/14 184/12 185/7 186/10
**acknowledged [2]** 151/18
186/5
**acknowledges [1]** 186/20
**across [1]** 189/9
**actions [1]** 154/7
**active [1]** 220/5
**actively [3]** 40/15 41/5
42/13
**activities [2]** 112/7 112/9
**activity [1]** 7/3 80/25 196/1
**acts [1]** 204/24
**actual [11]** 8/8 32/15 74/16
77/21 143/12 143/17 159/4
193/11 193/15 193/17 193/18
**actually [41]** 8/5 8/15 13/9
13/20 14/10 17/18 18/2 20/8
28/25 31/15 32/16 33/20
38/18 58/8 70/23 77/22 78/3
82/11 86/14 89/10 99/2 99/4
100/15 102/12 106/19 129/9
134/9 147/11 161/14 184/18
185/16 186/8 193/24 195/7
204/4 204/15 204/18 206/17
207/18 213/18 214/3
**add [3]** 120/24 135/7 204/16
**added [1]** 161/4
**adding [1]** 203/20
**addition [4]** 56/21 68/20
83/22 177/15
**additional [15]** 46/19 68/23
74/2 108/4 112/4 116/4 120/5
166/11 167/7 176/10 176/12
179/23 203/20 205/20 206/15
**address [14]** 19/21 20/19
54/14 61/14 62/25 65/13
65/13 65/16 65/22 159/19
181/18 194/17 212/17 212/18
**addressed [1]** 17/24
**addresses [1]** 9/20
**adequately [1]** 157/8
**admission [1]** 220/19
**admit [2]** 186/8 210/25
**admitted [5]** 159/10 163/3
163/4 189/22 193/21
**admonition [1]** 157/16
**adopted [2]** 66/24 192/24
**advance [1]** 187/6
**advanced [1]** 219/24
**advantage [1]** 222/3
**advise [1]** 95/3
**advocate [1]** 164/19
**advocates [2]** 163/18 164/22
**affect [1]** 185/21
**affected [2]** 160/12 161/18
**affidavit [5]** 15/14 142/2
142/10 213/9 213/18
**afraid [1]** 176/19
**after [45]** 8/9 11/8 11/15
11/18 11/22 13/18 14/1 18/15
22/6 22/18 22/22 24/14 24/21
29/24 41/15 42/20 42/22 54/1
54/24 56/9 66/2 80/21 80/22
81/6 82/18 85/14 89/20 95/7
96/23 97/2 103/18 124/4
152/20 158/9 160/19 161/2
162/9 162/9 166/2 173/3
176/13 215/23 215/24 216/15

**A**

**after...** [1]   217/20
**afternoon** [9]   79/24 79/25
93/21 93/22 104/23 104/24
125/10 125/11 168/10
**again** [28]   9/23 20/24 26/23
32/13 41/22 46/6 54/4 78/9
78/12 92/4 92/10 92/15
101/10 106/23 107/2 110/10
138/14 149/6 161/15 162/11
176/22 180/14 181/1 187/19
187/23 195/24 215/18 217/13
**against** [13]   51/8 51/10 58/3
86/16 86/20 87/3 88/9 120/4
161/5 162/4 164/13 198/11
219/12
**agency** [4]   94/15 95/24 209/9
209/10
**agent** [106]   5/24 12/14 13/4
15/13 15/24 15/25 24/2 34/19
36/20 36/21 39/4 47/10 47/15
47/16 47/20 50/25 51/1 51/2
51/3 57/19 59/1 60/21 60/21
70/6 70/19 70/20 70/23 72/13
73/2 74/2 74/21 78/7 78/18
78/23 79/12 93/11 93/21 94/8
97/3 97/10 100/17 100/22
103/1 107/9 114/22 114/23
116/1 116/21 116/21 116/22
116/23 116/24 116/25 124/23
125/10 126/1 126/2 126/2
130/13 132/14 132/18 133/14
134/7 137/3 138/14 139/16
145/2 145/13 146/1 146/5
148/11 149/8 149/9 151/20
153/24 168/23 170/17 170/17
174/1 175/10 177/9 181/9
185/12 185/15 186/11 187/2
187/3 188/16 190/4 190/12
190/12 194/5 194/20 196/15
196/17 196/19 196/20 196/21
197/4 197/13 197/18 200/22
201/8 201/13 201/21 218/17
**agent's** [1]   134/17
**agents** [25]   12/25 24/12 68/5
72/9 95/22 112/6 112/13
112/14 112/19 112/20 113/1
114/17 114/21 114/24 115/23
116/18 116/18 116/21 118/16
125/18 143/11 143/16 143/21
171/5 200/19
**aggravated** [1]   161/5
**aggressive** [1]   164/22
**ago** [4]   45/25 129/24 129/25
130/3
**agree** [25]   10/17 10/18 10/25
25/21 54/17 66/5 86/19 88/9
93/23 94/1 94/2 96/23 98/9
99/7 133/2 134/5 139/8
139/14 140/6 147/23 148/22
154/11 188/4 188/8 196/10
**agreed** [1]   87/16
**ahead** [13]   18/1 18/13 102/25
109/14 113/22 123/10 125/20
137/5 137/11 191/9 200/8
202/6 212/1
**AHN** [20]   2/6 4/6 36/22 67/5
67/9 67/14 71/12 79/22 79/24
86/19 88/18 93/9 126/3
131/16 131/25 132/3 162/14
196/8 196/18 197/15
**Ahn's** [1]   71/10
**airport** [5]   14/6 55/1 58/10
66/20 66/25
**al** [1]   1/9
**Alden** [1]   84/4
**alerts** [1]   57/10
**alias** [8]   7/9 9/2 9/6 9/8

9/12 117/17 174/16 181/6
**aliases** [1]   174/24
**alive** [2]   150/3 150/10
**all** [86]   8/10 10/2 13/15
15/13 15/20 16/4 16/9 16/18
18/12 25/2 28/6 30/17 31/10
34/17 35/1 35/3 46/4 46/4
49/5 51/9 66/10 72/25 73/2
78/1 93/8 94/25 95/22 99/11
100/5 100/10 107/11 111/20
115/11 124/13 124/21 125/20
125/21 130/6 130/7 137/16
139/8 150/7 152/8 153/1
153/14 161/13 162/14 163/3
163/4 163/14 164/7 166/10
172/7 174/2 176/25 177/4
177/14 184/8 185/5 186/23
187/10 187/16 187/21 192/25
197/21 198/5 198/14 200/10
200/10 202/6 202/16 205/11
207/16 208/6 208/8 211/2
211/6 211/7 212/13 213/4
214/21 214/22 218/20 219/19
222/13 222/19
**allegation** [2]   106/15 175/21
**allegations** [3]   166/14
204/24 206/12
**alleged** [3]   87/20 88/5
106/10
**ALLISON** [2]   2/5 125/25
**allow** [5]   48/18 123/24 167/7
169/9 176/17
**allowed** [1]   160/23
**almost** [3]   72/25 73/23 211/7
**alone** [1]   192/1
**along** [5]   47/3 87/16 163/12
183/22 199/17
**already** [18]   71/2 87/6 90/15
92/20 106/21 140/21 143/24
156/7 160/21 164/17 196/23
196/24 202/16 202/17 204/12
205/3 205/4 206/7
**also** [41]   17/15 25/1 27/15
49/14 50/12 52/3 56/14 65/21
72/4 75/10 83/14 84/6 84/15
94/2 110/6 121/1 133/5
137/24 139/9 141/25 142/24
146/12 147/16 153/11 159/15
159/16 161/2 161/7 177/16
181/16 183/20 183/21 185/10
186/22 195/4 198/13 198/23
203/21 213/10 216/16 217/6
**alter** [1]   10/21
**Although** [1]   84/7
**always** [2]   178/24 190/19
**am** [49]   25/9 31/6 61/3 66/8
66/11 66/12 66/17 68/11
68/16 68/19 71/12 73/17
77/23 78/9 81/6 81/23 83/10
84/21 86/5 92/5 94/8 96/10
107/5 117/21 117/25 126/18
132/4 135/20 136/7 142/8
143/22 144/8 153/21 153/21
156/21 157/8 166/23 170/13
184/5 185/4 186/6 188/2
188/3 190/21 191/3 200/2
200/2 200/9 213/25
**Amanecer** [1]   3/5
**ambiguity** [1]   162/3
**America** [3]   1/6 2/3 182/10
**Amira** [1]   209/20
**among** [6]   117/17 122/6 136/7
137/24 172/21 194/5
**amongst** [2]   85/23 178/4
**amount** [1]   207/19
**amounts** [1]   114/18
**analogous** [1]   220/2
**analysis** [4]   81/8 81/8 81/12
81/15

**analyst** [1]   94/14
**analytical** [1]   81/21
**analyzing** [1]   195/15
**Anastasia** [2]   65/17 147/6
**ancillary** [1]   220/6
**Andre** [6]   14/24 105/4 172/17
175/10 195/14 195/15
**Andre's** [1]   172/18
**ANGELES** [6]   1/14 1/22 2/8
2/17 3/9 5/1
**Annamelda** [1]   211/12
**Annandale** [2]   102/8 102/22
**another** [13]   5/13 15/24 18/4
20/7 61/24 79/17 86/15 99/1
118/11 134/17 149/18 174/7
186/21
**answer** [29]   9/17 9/19 12/3
40/22 42/11 50/9 55/11 60/10
68/18 83/11 84/25 85/3 86/10
99/15 99/15 99/16 99/20
100/18 101/16 101/17 113/12
114/11 115/2 123/10 129/18
140/7 141/3 149/1 196/15
**answered** [3]   11/2 49/18
162/18
**answers** [4]   44/16 128/8
185/3 185/8
**Anton** [2]   120/23 154/20
**any** [91]   6/20 9/21 13/10
14/14 16/11 16/24 24/24
32/22 37/3 37/3 39/3 45/13
46/13 46/19 46/20 47/1 47/3
47/24 48/12 55/8 55/16 55/17
65/16 66/15 68/21 69/4 69/10
69/17 70/17 75/20 76/2 80/11
82/1 83/8 83/19 84/24 85/18
87/12 89/1 91/15 93/23 101/6
101/23 102/2 106/2 111/1
112/15 115/9 115/13 124/11
127/25 128/9 128/12 129/13
131/10 131/13 132/2 132/6
132/11 136/14 144/10 153/19
155/7 158/22 160/13 160/14
162/2 163/12 163/16 165/9
165/19 165/20 186/16 190/10
191/5 191/19 192/1 192/20
192/20 193/6 194/11 196/16
198/3 198/11 203/8 211/19
212/6 214/10 214/11 216/20
220/2
**anybody** [13]   36/25 83/23
93/5 103/14 111/14 124/7
124/11 128/15 128/18 136/5
155/2 155/22 164/17
**anyone** [11]   6/5 47/23 48/2
48/5 91/19 91/19 92/24
125/13 128/12 135/6 155/13
**anything** [20]   11/21 16/12
30/17 47/3 54/7 54/11 77/16
95/23 104/5 124/19 126/14
126/21 130/5 141/7 156/1
158/13 160/11 162/20 163/14
164/11
**anyway** [1]   90/16
**anywhere** [1]   196/16
**apartment** [4]   117/8 219/3
219/4 219/8
**apologies** [2]   55/6 77/11
**apologize** [4]   76/18 112/12
145/11 204/1
**app** [1]   34/25
**apparent** [1]   62/22
**apparently** [1]   169/19
**appeals** [2]   84/4 84/6
**appear** [4]   61/6 65/14 138/13
161/6
**appearances** [3]   2/1 3/1 5/12
**appeared** [2]   8/22 70/10
158/17

**A**

**appears [5]**  20/15 34/14
102/22 146/19 152/6
**appellate [3]**  89/24 90/1
90/25
**appended [1]**  200/6
**Apple [1]**  61/13
**applicable [1]**  198/7
**applicants [1]**  195/21
**application [4]**  95/21 123/13
123/15 123/19
**applications [10]**  8/16 8/18
9/22 16/16 34/15 72/3 72/6
78/21 79/2 210/4
**applying [1]**  181/20
**appreciate [3]**  76/19 127/16
179/19
**appreciation [3]**  191/15
191/19 191/23
**approach [5]**  47/16 141/10
142/21 144/1 156/21
**approached [1]**  161/7
**approaches [1]**  187/25
**approaching [1]**  79/18
**approval [1]**  198/19
**approximately [13]**  7/2 15/23
17/7 18/17 45/25 51/4 73/10
73/19 76/5 132/22 132/25
182/15 207/3
**approximation [1]**  132/23
**apps [1]**  34/6
**April [52]**  18/22 22/23 26/1
26/21 37/20 37/21 37/22
37/23 37/25 38/10 38/12
38/16 38/19 38/24 38/25
39/11 39/17 41/25 45/15
45/23 45/23 53/11 69/16
111/7 111/8 111/17 111/22
111/23 121/18 135/23 136/2
136/6 136/12 136/15 136/23
137/2 142/6 147/9 147/13
148/6 191/18 194/4 194/4
194/9 194/10 194/10 197/18
202/21 206/7 208/18 212/7
216/17
**April 20th [1]**  194/10
**April 23rd [3]**  147/9 147/13
148/6
**April 24th [5]**  111/7 111/8
111/17 111/22 111/23
**April 26 [5]**  37/25 38/12
38/16 39/17 136/23
**April 26th [1]**  45/23
**April 27 [3]**  38/24 39/11
137/2
**April 27th [14]**  26/1 26/21
38/19 38/25 41/25 45/15
45/23 135/23 136/2 136/6
136/12 136/15 142/6 197/18
**April 2nd [1]**  121/18
**April 8th [1]**  202/21
**Arakelyan [1]**  19/20
**are [193]**
**aren't [2]**  17/24 44/18
**argue [2]**  169/8 171/10
**argued [10]**  57/20 86/15
156/15 156/18 170/13 171/11
184/15 185/8 210/13 218/25
**arguing [1]**  213/21
**argument [21]**  52/5 66/6 82/7
157/10 165/14 167/7 169/11
171/19 174/5 174/5 177/5
179/16 179/19 200/1 202/14
211/17 212/18 214/13 219/2
219/20 221/18
**argumentative [4]**  58/18
99/12 104/2 123/9
**arguments [9]**  156/9 156/24

160/15 161/21 187/25 197/11
197/14 213/3
**Arkalian [3]**  20/8 20/13
20/20
**Arman [3]**  119/20 120/21
121/6
**around [21]**  39/22 40/17 41/7
42/9 72/21 75/10 86/1 87/8
88/4 88/21 88/24 89/15
108/25 110/9 111/24 123/8
132/18 161/14 171/14 176/5
176/8
**arrest [13]**  6/25 13/1 26/17
42/20 171/17 171/21 172/4
173/7 175/8 176/4 184/1
192/21 216/6
**arrested [1]**  214/18
**arresting [1]**  176/18
**arrests [1]**  172/22
**arrival [2]**  14/5 54/25
**arrived [1]**  11/15
**articulate [3]**  172/21 173/5
204/14
**articulated [1]**  214/4
**articulation [1]**  198/6
**Artur [3]**  134/12 134/14
213/16
**as [178]**
**Ashwin [1]**  2/15
**aside [7]**  9/23 10/1 46/22
179/3 186/1 189/10 216/24
**ask [33]**  22/8 40/23 45/19
48/14 55/4 64/12 68/15 91/19
100/12 101/10 101/25 103/6
108/17 108/20 108/24 115/8
115/13 115/18 115/19 115/21
128/21 130/24 136/10 140/9
145/9 152/6 152/8 152/12
154/14 164/5 187/17 187/18
202/5
**asked [51]**  7/15 7/23 7/24
8/10 9/9 9/21 10/5 10/8 11/2
11/11 21/14 21/16 22/6 40/21
48/15 49/17 50/1 50/18 60/5
64/5 64/11 71/19 84/23 84/24
87/10 91/22 91/23 91/25 92/3
92/7 92/12 92/18 96/3 96/8
96/10 108/23 112/25 122/2
140/24 152/3 162/16 165/17
172/21 187/5 187/8 187/14
194/16 195/2 214/24 215/22
221/24
**asking [17]**  8/3 20/15 21/18
21/20 50/7 50/22 55/7 66/19
90/17 101/23 108/3 113/2
115/16 148/8 148/18 152/5
171/4
**asks [1]**  169/20
**assessing [1]**  45/9
**assign [1]**  71/16
**assigned [6]**  67/16 89/2
104/25 105/3 105/5 109/11
**assist [3]**  15/24 94/16 94/20
**assistance [3]**  14/25 96/3
100/9
**assistant [9]**  150/20 150/22
151/10 151/17 151/25 152/4
152/12 152/14 152/19
**associate [1]**  215/23
**associated [11]**  19/1 19/15
20/25 22/24 31/1 62/18 77/15
120/23 154/20 155/10 155/19
**associates [2]**  182/22 193/12
**assumed [2]**  57/21 77/13
**Assumes [2]**  40/19 104/1
**Atkinson [1]**  172/18
**attach [6]**  29/1 40/6 43/11
43/17 43/22 46/10
**attached [10]**  23/7 28/22

29/11 71/12 89/13 98/8
90/14 97/22 98/2 98/5 98/5
**attachment [1]**  101/1
**attachments [2]**  73/15 74/17
**attempt [2]**  6/15 144/3
**attempting [2]**  117/21 162/22
**attempts [1]**  153/5
**attended [1]**  82/22
**attention [2]**  179/24 207/21
**attorney [19]**  7/17 24/24
24/24 38/1 38/22 68/2 68/4
69/6 76/12 81/11 82/5 87/14
107/22 108/3 108/9 123/18
146/24 147/3 150/11
**ATTORNEY'S [2]**  2/4 124/6
**attorneys [3]**  112/21 141/12
144/7
**audible [1]**  128/5
**August [12]**  7/3 178/21
200/11 200/13 200/15 200/16
200/16 200/16 200/16 205/2
205/2 224/10
**August 26 [1]**  200/16
**August 26th [1]**  200/16
**August 4 [1]**  200/13
**August 4th [1]**  200/11
**August 5th [1]**  200/15
**AUSA [21]**  2/5 2/5 2/6 2/7
43/14 68/2 71/19 87/14 105/4
110/13 110/18 124/5 126/3
126/3 141/10 143/9 143/20
172/17 173/2 173/6 175/10
**AUSA's [1]**  105/3
**AUSAs [2]**  105/5 172/20
**authenticating [1]**  220/11
**authentication [2]**  220/3
220/7
**author [1]**  150/9
**authority [1]**  172/3
**authorization [3]**  172/23
173/6 176/6
**Auto [2]**  43/15 119/18
**available [3]**  16/18 47/11
221/24
**Avenue [3]**  2/11 2/22 65/22
**average [4]**  26/12 26/22
26/23 42/19
**avert [1]**  16/24
**averted [1]**  17/3
**avoid [1]**  52/21
**aware [15]**  24/25 35/18 47/4
53/9 57/22 81/6 81/23 101/6
101/14 126/18 135/25 136/23
138/5 153/7 198/9
**away [7]**  86/8 147/13 148/6
150/23 150/24 168/17 218/16
**aways [1]**  157/17
**awful [1]**  156/23
**Ayvazian [13]**  8/14 10/2 23/4
23/12 50/5 82/20 106/11
134/12 134/15 159/15 187/22
201/5 213/16
**Ayvazian's [2]**  7/17 118/7
**Ayvazyan [43]**  1/9 2/14 7/9
8/4 8/22 9/2 9/6 9/7 9/15
9/19 10/21 14/5 21/10 22/25
31/13 31/18 56/15 57/11
70/19 77/6 77/14 85/19 85/20
86/12 86/16 87/1 96/16
118/11 131/6 145/22 148/15
148/20 155/19 175/16 178/23
195/24 200/14 200/21 200/24
201/20 201/23 212/22 219/7
**Ayvazyan's [11]**  10/18 75/22
117/16 120/20 120/22 121/21
122/8 138/2 138/10 145/24
153/11

**B**

**B-R-I-A-N [1]** 104/17

**back [34]** 6/12 9/23 19/7 19/10 19/16 21/3 27/15 29/22 35/7 37/4 38/3 42/19 45/15 48/21 79/19 115/19 125/19 138/8 154/5 161/9 170/13 172/10 176/24 177/20 190/16 190/19 190/22 190/25 191/1 191/3 191/7 203/10 211/9 212/13

**backdrop [1]** 35/11
**background [1]** 67/23
**bad [1]** 145/12
**bank [22]** 8/19 8/23 10/1 55/20 55/22 72/7 110/2 116/7 116/9 137/19 145/6 157/23 157/25 178/25 179/1 179/6 181/3 182/10 182/10 183/20 208/3 209/17
**bargain [5]** 83/5 83/7 83/24 85/19 161/21
**based [31]** 31/19 38/11 40/9 59/22 66/24 82/8 87/2 90/22 91/12 97/17 98/14 99/18 99/25 100/9 102/7 115/9 115/14 144/6 151/23 154/6 160/2 161/22 163/2 163/13 171/13 171/17 171/21 185/24 200/25 215/18 219/16
**basically [7]** 7/18 33/9 50/2 78/1 95/23 150/10 208/21
**basics [1]** 68/3
**basis [4]** 70/3 172/21 173/5 204/23
**battle [1]** 190/6
**be [105]** 8/22 10/14 11/10 12/3 18/15 20/15 26/23 33/11 40/9 44/20 45/8 48/1 48/1 48/17 53/25 55/4 57/3 58/2 58/4 59/2 59/22 61/6 64/3 65/14 68/4 68/9 68/16 70/2 70/10 70/13 71/20 72/9 75/9 76/18 76/22 76/23 77/5 77/13 78/19 79/5 80/6 82/13 87/7 87/10 89/11 91/17 92/5 92/21 95/9 96/16 99/16 99/23 99/24 104/11 118/18 120/14 121/22 125/2 128/5 128/6 130/6 135/12 139/25 140/1 140/6 140/10 142/24 143/14 144/18 144/19 146/20 150/11 152/6 156/20 158/17 162/3 163/24 164/8 165/3 165/25 166/10 166/19 167/5 169/15 173/8 176/24 185/1 186/21 187/5 187/18 187/24 188/3 190/17 192/5 193/8 193/15 194/4 202/14 208/13 209/24 215/4 215/5 215/15 216/21 221/19
**bearing [1]** 181/11
**became [1]** 204/23
**because [73]** 11/21 16/11 24/11 35/15 36/6 39/25 41/10 44/2 52/22 57/20 59/1 70/10 72/23 73/14 75/6 78/3 78/20 81/7 82/12 83/17 86/12 87/22 88/4 92/3 92/15 98/22 111/18 119/12 134/16 144/21 153/2 160/21 165/10 168/24 170/12 171/20 172/22 175/11 178/3 181/2 184/4 184/11 186/2 188/18 189/15 189/21 190/17 191/8 191/14 191/25 193/3 194/17 195/5 195/21 195/23 195/25 202/8 205/24 205/25 207/20 208/2 208/3 209/9 209/17 209/18 209/24 211/24

212/8 213/13 213/23 216/21 217/3 221/3 221/25
**become [1]** 53/9
**becomes [3]** 51/25 123/24 207/12
**becoming [1]** 79/7
**been [67]** 9/24 16/25 36/20 37/16 37/21 39/10 39/15 40/3 42/22 46/7 51/1 56/22 64/13 68/24 69/4 69/11 69/18 70/19 70/22 71/2 72/25 74/8 78/15 81/17 81/20 82/7 86/9 88/3 88/22 89/1 90/8 90/15 94/6 97/5 108/5 109/3 112/14 115/5 118/11 118/14 118/20 118/23 118/24 124/9 129/13 133/17 134/19 135/25 136/24 145/3 165/10 167/24 178/24 205/23 206/8 207/3 208/12 208/19 210/7 210/12 211/4 212/6 212/9 214/23 217/24 218/2 221/2
**before [46]** 6/7 6/19 13/9 20/24 30/7 30/11 33/21 42/24 43/3 52/8 52/12 52/15 54/1 54/24 55/2 55/15 55/25 56/15 66/20 68/7 70/17 95/2 110/3 114/6 131/13 150/21 150/24 158/13 159/8 166/10 168/25 178/14 182/18 185/12 185/19 187/15 197/5 197/6 197/9 198/22 201/1 204/14 206/25 210/2 216/4 216/5
**began [2]** 72/19 176/6
**begin [2]** 50/17 222/2
**beginning [5]** 114/3 163/7 163/8 163/21 222/23
**begs [1]** 169/21
**begun [1]** 76/20
**behalf [2]** 2/3 87/20
**being [23]** 61/4 75/20 83/20 84/9 84/22 84/24 85/16 88/3 89/17 91/23 91/23 94/3 117/17 179/6 180/11 181/25 182/1 183/15 183/19 183/21 191/18 193/6 210/13
**belabor [2]** 194/8 196/12
**belief [1]** 87/3
**believe [65]** 7/17 11/18 14/18 16/3 17/25 20/4 23/9 30/10 31/25 32/10 32/12 45/16 46/15 54/19 58/11 59/21 60/8 62/7 62/18 64/13 64/14 71/20 80/3 86/19 87/6 90/3 90/19 96/2 97/14 98/25 100/20 101/3 101/16 101/24 102/3 103/9 103/9 106/14 108/14 109/2 109/3 109/23 109/23 109/24 110/3 110/21 110/25 111/22 112/14 117/13 118/19 118/25 119/3 124/23 134/8 141/13 147/9 150/24 175/4 175/19 194/3 206/19 206/21 210/15 212/4
**believed [2]** 97/23 166/9
**belonged [3]** 181/13 213/2 213/19
**belonging [3]** 121/2 121/20 173/11
**below [1]** 33/22
**Benson [1]** 124/4
**beside [1]** 136/6
**besides [4]** 85/23 115/22 116/1 136/12
**best [10]** 8/11 26/4 31/25 107/11 107/24 108/14 111/3 163/1 168/2 178/6
**better [5]** 83/25 122/17 165/15 175/4 177/23

**between [35]** 9/12 9/22 21/9 69/10 69/17 69/22 70/18 71/1 71/5 73/23 74/8 74/11 74/14 75/6 77/5 77/13 78/2 82/19 108/11 160/22 163/25 174/22 178/22 180/2 186/4 197/9 199/1 205/20 208/4 212/22
**beyond [8]** 141/1 156/17 166/5 193/10 193/11 193/21 208/23 212/5
**Bhat [2]** 173/1 173/1
**Bienert [2]** 3/4 3/7
**big [9]** 22/5 23/11 93/23 197/24 214/16 217/10 217/17 218/14 219/13
**biggest [2]** 194/17 196/5
**binder [3]** 111/6 111/9 111/10
**Bird [1]** 198/19
**birth [1]** 65/13
**blow [6]** 32/4 33/21 39/7 137/15 151/16 152/25
**blurred [1]** 180/12
**board [1]** 189/10
**bogged [1]** 95/8
**bond [1]** 170/22
**Bonnie [1]** 161/11
**bookended [1]** 61/8
**border [7]** 96/24 105/10 166/10 182/19 201/2 204/14 210/2
**borders [1]** 57/9
**bore [1]** 140/17
**borrower [1]** 174/18
**both [12]** 77/4 116/7 161/19 172/16 175/1 175/2 175/16 176/14 183/2 188/9 204/24 211/3
**bottom [10]** 8/9 29/17 76/15 96/6 100/2 102/18 122/1 135/2 153/10 153/10
**bought [1]** 208/6
**boy [1]** 71/11
**Bradford [5]** 21/9 21/19 21/22 21/24 23/5
**Bram [1]** 84/4
**bread [1]** 215/6
**break [4]** 128/15 128/19 129/2 189/4
**BRIAN [5]** 4/9 36/22 84/5 104/17 172/17
**brief [7]** 41/13 184/3 198/24 199/9 200/6 200/6 215/2
**briefing [5]** 156/18 157/6 162/6 219/25 221/13
**briefly [11]** 70/1 89/14 156/10 156/10 169/10 182/8 184/2 184/7 186/24 221/16 221/17
**briefs [6]** 156/8 156/23 157/7 177/21 216/7 222/9
**bring [5]** 102/4 105/20 106/19 117/24 164/20
**broached [1]** 83/5
**broad [4]** 48/1 54/13 68/16 73/25
**brought [3]** 15/24 124/3 208/7
**build [6]** 51/7 51/17 178/16 198/11 218/8 219/16
**building [1]** 218/3
**built [1]** 202/9
**bullet [4]** 156/11 157/16 188/1 195/19
**bunch [1]** 129/1
**burden [14]** 160/9 161/24 161/25 162/7 162/10 162/11 162/13 189/6 189/22 193/2

**B**

burden... **[4]**   193/7 197/3 198/2 219/18
business **[1]**   95/24
businesses **[1]**   63/16
busy **[2]**   42/4 79/2
butter **[1]**   215/7
buy **[3]**   174/9 179/6 183/22
buys **[1]**   179/7
Byraya **[4]**   98/25 98/25 100/2 100/3

**C**

C-A-T-H-E-R-I-N-E **[1]**   67/9
C-L-A-R-K **[1]**   125/6
C8924483 **[3]**   121/3 145/23 145/24
CA **[7]**   1/22 2/8 2/17 2/20 3/6 3/9 147/12
Caicos **[1]**   14/6
CALIFORNIA **[9]**   1/2 1/14 5/1 120/21 121/3 124/6 145/22 145/25 176/8
California's **[1]**   138/1
call **[27]**   50/4 50/6 67/5 79/1 82/9 82/19 82/22 83/1 83/1 83/4 88/23 89/12 89/19 92/14 93/8 93/10 104/8 104/9 107/22 107/25 108/3 108/9 151/18 152/12 152/12 152/14 158/24
Calle **[5]**   3/5 56/4 147/5 180/8 181/7
called **[4]**   102/8 142/25 209/22 209/24
calling **[3]**   9/24 65/14 82/12
calls **[9]**   13/14 82/24 83/8 83/14 84/14 84/17 109/8 129/1 177/1
came **[15]**   43/24 62/15 65/3 82/1 85/14 99/11 100/6 100/7 100/16 108/21 131/14 158/14 158/15 214/2 215/2
camera **[14]**   166/18 166/22 167/23 168/2 168/4 168/5 168/7 168/12 177/9 182/21 189/14 203/10 206/11 210/17
cams **[1]**   213/7
can **[105]**   9/17 15/7 15/8 15/11 18/12 20/8 23/10 27/19 27/23 27/23 27/24 29/6 29/23 30/6 30/19 31/5 32/4 33/12 33/21 35/22 39/7 40/21 44/11 44/13 47/25 51/7 51/18 60/2 71/10 73/17 73/22 77/3 77/23 82/10 84/19 91/18 94/9 94/13 94/21 99/14 99/15 100/22 102/18 102/18 102/25 107/3 112/8 113/14 113/24 116/13 117/24 122/1 122/8 123/10 128/21 129/18 130/22 134/9 134/18 134/20 135/7 137/12 137/15 137/15 138/23 139/24 140/11 141/5 141/14 144/18 145/8 145/18 146/17 147/10 149/1 151/16 152/6 153/4 154/17 162/23 164/13 165/4 165/14 169/1 169/13 173/6 182/5 182/8 183/8 185/23 188/6 188/9 189/4 189/17 191/25 192/1 192/8 198/3 202/8 203/10 203/16 210/23 216/21 218/16 222/15
can't **[28]**   12/14 41/18 64/4 64/5 72/21 73/15 81/5 92/5 112/15 114/4 119/1 119/5 130/10 141/20 144/24 155/22 162/7 165/4 180/12 185/20

candid **[1]**   159/24
cannon **[1]**   220/5
cannot **[8]**   162/10 193/1 193/2 193/7 198/1 215/4 215/5 218/13
Canoga **[5]**   65/21 117/7 219/2 219/4 219/8
car **[1]**   181/14
card **[21]**   16/16 58/8 58/9 58/16 59/6 59/9 59/17 67/1 161/3 172/6 172/14 173/22 174/7 174/12 174/23 175/6 175/15 176/17 177/19 179/20 183/13
cards **[14]**   12/2 12/8 49/21 50/6 50/21 59/7 145/20 173/9 173/16 175/17 176/21 177/23 178/9 208/2
carefully **[1]**   159/11
CART **[5]**   23/21 24/3 24/8 24/11 24/14
CART's **[1]**   23/24
case **[1]**
cases **[8]**   51/5 51/6 163/11 177/17 191/21 198/7 206/1 220/4
cash **[1]**   64/14
catalogs **[1]**   217/14
catch **[2]**   89/15 89/16
categories **[3]**   71/17 71/20 193/25
category **[1]**   71/22
CATHERINE **[8]**   2/6 4/6 36/22 67/5 67/9 126/3 131/16 162/14
Cathy **[1]**   84/7
cause **[10]**   51/10 171/17 172/4 172/9 172/22 173/6 173/7 176/4 184/1 213/4
CBD **[5]**   21/12 22/11 22/12 23/15 23/16
CBD.com **[2]**   21/16 22/14
CBP **[55]**   8/24 11/12 11/16 11/22 12/6 12/11 12/18 12/23 13/11 13/15 13/16 14/3 14/11 14/15 15/2 21/4 22/23 49/2 49/15 49/20 50/4 58/14 59/25 61/4 63/8 63/25 66/19 107/6 107/15 107/17 108/7 108/16 108/22 109/7 109/15 110/6 110/14 110/20 111/2 111/8 111/19 111/20 115/22 116/1 123/4 138/3 145/19 158/15 158/24 159/6 167/19 171/23 188/17 218/12 218/20
CBP's **[2]**   49/21 56/11
CD **[3]**   29/1 29/10 29/23
Cecilia **[1]**   151/18
cell **[15]**   62/5 75/11 75/16 84/25 85/1 85/6 90/8 90/10 103/2 107/7 118/11 118/14 120/23 133/3 186/6
Cellebrite **[41]**   22/24 25/5 25/21 27/2 27/20 32/15 34/19 36/10 39/21 41/17 41/22 42/1 42/21 47/2 70/11 70/11 74/24 75/1 75/2 103/2 103/12 103/14 103/17 103/21 103/24 109/6 153/5 153/15 154/21 154/25 155/3 155/11 155/20 155/23 191/10 202/13 202/15 207/16 212/7 215/24 215/24
Cellebrites **[32]**   23/19 25/13 25/15 26/2 26/25 27/1 27/1 38/3 40/18 41/9 41/14 42/9 42/24 43/3 43/4 103/7 109/1 154/17 188/22 189/2 189/21

189/24 191/17 192/8 192/11 218/2 218/11 218/18
Celtic **[2]**   137/19 145/6
CENTRAL **[2]**   1/2 176/7
certain **[6]**   34/20 71/17 110/14 181/11 181/11 206/1
certainly **[4]**   58/5 66/11 66/15 170/5
certainty **[1]**   112/16
CERTIFICATE **[1]**   224/1
certify **[1]**   224/4
cetera **[2]**   73/15 81/10
chain **[8]**   23/4 23/7 46/22 46/23 77/25 78/1 195/12 195/13
chains **[1]**   195/1
challenge **[5]**   163/10 171/7 171/13 177/12 184/14
challenged **[2]**   166/16 185/2
challenges **[3]**   165/21 184/15 185/6
challenging **[1]**   167/17
chance **[5]**   169/17 184/18 211/23 211/24 214/14
change **[2]**   68/19 200/19
changed **[2]**   201/14 201/22
characterize **[1]**   107/16
charge **[1]**   161/4
charged **[2]**   72/6 166/10
charges **[1]**   120/4
chat **[3]**   28/2 28/4 32/1
check **[6]**   11/16 11/19 109/17 109/19 109/21 182/23
chief **[1]**   84/4
choose **[1]**   214/2
chose **[3]**   214/4 214/6 221/24
Chris **[2]**   125/24 160/5
Christopher **[3]**   2/10 36/21 161/13
chronological **[1]**   170/16
chronology **[2]**   166/4 200/3
Cipoletti **[1]**   125/25
Cipolletti **[2]**   48/22 129/5
Circuit **[10]**   192/24 192/25 198/12 198/19 220/1 220/13 220/13 220/17 220/24 220/25
Circuit's **[2]**   198/23 221/4
circumstances **[1]**   44/10
cite **[2]**   198/23 220/14
cited **[5]**   191/21 198/19 199/24 219/22 220/18
cites **[1]**   89/13
claim **[4]**   177/12 189/8 189/14 217/9
claimed **[1]**   186/11
claiming **[2]**   177/22 178/2
claims **[2]**   163/15 163/15
clamoring **[1]**   192/16
clarify **[11]**   19/13 35/22 36/4 47/25 60/2 70/21 91/18 101/21 107/3 119/12 201/3
clarifying **[1]**   68/12
CLARK **[25]**   4/11 36/21 37/13 37/16 114/23 116/21 116/23 116/25 124/23 125/5 125/10 132/14 133/14 137/13 145/2 145/13 146/1 148/11 149/8 151/20 194/5 200/22 201/8 201/14 201/21
clean **[1]**   219/17
cleaned **[1]**   177/3
clear **[19]**   41/5 43/23 44/20 51/25 76/22 92/22 99/19 108/1 120/18 128/5 128/7 130/6 156/25 161/17 161/22 163/11 169/15 180/13 193/15
clearer **[1]**   55/5
clearly **[7]**   64/5 103/10

**C**

**clearly... [5]** 122/20 151/17
158/1 192/25 208/3
**Clemente [1]** 3/6
**clerk [1]** 211/13
**click [2]** 30/20 31/7
**client [2]** 9/12 9/15
**clients [1]** 9/22
**closely [1]** 147/10
**closing [1]** 160/15
**clue [1]** 162/12
**Clyde [1]** 161/11
**co [2]** 144/13 204/6
**co-conspirators [1]** 204/6
**co-counsel [1]** 144/13
**Code [1]** 224/5
**coincidence [1]** 167/17
**collar [1]** 51/6
**colleague [2]** 170/1 172/17
**collecting [2]** 51/16 51/17
**Collision [2]** 43/16 119/18
**column [2]** 113/18 113/24
**combined [3]** 100/8 111/19
111/20
**come [15]** 27/15 44/2 79/19
80/15 81/2 100/15 100/19
100/21 145/9 152/17 190/16
190/19 196/5 202/15 222/20
**comes [1]** 202/12
**coming [2]** 100/13 122/20
**comment [4]** 75/25 76/1
170/12 221/16
**comments [2]** 194/6 195/19
**commit [2]** 172/11 183/24
**common [3]** 164/18 191/12
219/15
**communicate [1]** 24/3
**communicating [1]** 159/14
**communication [3]** 49/7 50/10
50/12
**communications [11]** 15/2
25/1 34/20 37/3 43/10 48/13
49/12 82/2 160/21 172/19
172/19
**companies [3]** 204/17 204/21
204/23
**company [6]** 8/21 95/20 95/21
102/8 106/8 108/6
**compare [2]** 143/17 215/20
**comparing [1]** 220/9
**compartmentalize [2]** 197/6
197/16
**compelled [1]** 53/3
**compelling [1]** 158/12
**competing [1]** 207/21
**compiled [4]** 116/15 116/16
117/1 168/11
**compiling [1]** 116/19
**complaint [14]** 13/17 13/17
14/18 14/21 15/14 59/23
175/12 175/16 175/19 175/23
175/24 176/7 176/13 208/17
**complainted [1]** 202/16
**complaints [3]** 175/8 175/9
175/12
**complete [7]** 202/10 204/5
204/6 205/9 207/8 215/1
215/4
**completed [8]** 147/16 178/19
214/18 214/19 216/8 217/10
220/10 220/10
**completely [4]** 143/19 191/10
198/7 206/13
**completing [1]** 206/5
**components [1]** 209/1
**comport [1]** 214/20
**computer [4]** 7/25 8/10 8/16
144/3

**computers [1]** 8/5
**conceal [1]** 119/19
**conceded [1]** 188/13
**concern [2]** 50/23 95/10
**concerned [3]** 82/13 170/21
176/20
**conclude [2]** 183/8 211/22
**concluded [2]** 90/23 222/25
**conclusion [2]** 90/3 91/5
**concrete [2]** 84/8 84/12
**conducted [6]** 25/12 97/25
114/5 151/8 181/10 221/21
**conducting [3]** 96/18 113/2
173/17
**confer [2]** 144/13 144/15
**Conference [1]** 224/9
**confession [1]** 221/7
**confident [1]** 185/11
**confidently [1]** 185/24
**confirm [3]** 7/11 7/18 192/23
**confirmed [2]** 7/8 159/23
**confirming [1]** 66/13
**conformance [1]** 224/8
**confused [1]** 20/4
**confusing [1]** 76/16
**confusion [1]** 38/5
**connect [1]** 144/3
**connected [3]** 19/7 19/10
95/9
**Connecticut [1]** 2/22
**connection [12]** 9/1 9/5 9/12
55/9 96/15 97/16 110/18
110/21 123/11 148/19 166/1
196/9
**connections [4]** 9/17 9/21
95/11 178/22
**consider [5]** 58/21 80/6
156/16 182/5 187/18
**consideration [1]** 208/10
**considered [1]** 91/17
**considering [3]** 203/1 203/3
203/7
**consistent [1]** 187/12
**conspiracies [3]** 219/1 219/2
219/12
**conspiracy [5]** 72/5 72/7
172/9 179/15 203/21
**conspirators [1]** 204/6
**conspiring [1]** 183/24
**constitution [1]** 52/3
**Construction [11]** 94/24
119/20 119/21 121/5 137/9
137/19 138/5 139/5 139/17
143/4 145/6
**Cont'd [1]** 3/1
**contact [11]** 19/20 19/23
20/2 20/18 20/19 65/3 71/8
75/3 75/7 151/20 152/4
**contain [3]** 25/15 70/10
205/1
**contained [7]** 29/15 43/15
69/21 73/25 85/6 117/4
189/25
**containing [3]** 30/4 120/21
120/23
**contains [2]** 178/3 210/21
**contend [1]** 165/23
**content [2]** 14/14 70/4
**contents [11]** 10/19 15/2
29/10 59/15 59/19 75/25 76/1
84/16 161/18 161/22 198/9
**contest [1]** 186/15
**context [3]** 7/13 7/14 85/14
**continuance [1]** 222/21
**continuances [1]** 214/24
**continue [6]** 51/13 86/11
88/7 122/16 169/11 222/18
**continued [2]** 206/23 206/24
**continuing [1]** 203/19

**contraband [1]** 173/9
**contracting out [1]** 173/10
**contractor [1]** 209/10
**contractors [1]** 209/6
**contrary [2]** 186/11 217/8
**contributing [1]** 82/8
**control [2]** 117/16 216/23
**controlled [5]** 10/21 158/7
158/21 158/23 219/4
**controlling [4]** 158/18 159/1
160/1 219/8
**conversation [25]** 31/21
45/22 49/24 50/15 50/16 71/1
72/24 73/23 74/4 74/8 74/11
74/14 75/8 78/12 78/13 79/11
79/12 84/10 87/13 88/8 92/2
118/25 124/15 129/10 187/3
**conversations [12]** 13/11
14/15 36/2 37/15 74/3 81/15
82/11 84/11 90/12 108/18
108/21 136/7
**conveyed [3]** 158/15 188/17
218/20
**convicted [1]** 56/22
**conviction [4]** 56/24 158/3
164/12 183/23
**copies [7]** 24/1 24/17 24/18
24/22 25/4 25/4 140/16
**copy [19]** 40/10 44/7 47/10
47/15 118/2 140/2 140/9
140/10 141/17 142/17 142/18
142/24 144/4 144/21 167/19
169/1 169/2 175/18 210/19
**copying [1]** 170/18
**correct [214]**
**correctly [2]** 9/3 117/25
**correspondence [3]** 113/5
113/6 172/16
**corroborate [3]** 92/19 168/15
168/16
**corroborated [1]** 186/10
**corroborates [2]** 173/25
177/10
**corroborating [1]** 165/25
**could [50]** 44/1 46/7 58/2
59/16 64/3 70/2 70/9 70/13
71/11 76/13 92/25 93/1 98/6
98/7 101/9 101/21 105/20
106/19 109/3 111/14 115/25
119/9 121/25 130/17 133/25
135/22 135/23 138/8 138/10
141/10 144/12 144/21 150/5
150/6 152/4 152/24 152/25
152/25 154/5 161/9 176/17
184/4 186/24 203/9 208/11
208/19 209/24 210/6 212/9
221/8
**couldn't [6]** 16/8 26/7 34/10
38/2 38/10 154/23
**counsel [19]** 2/1 82/19 83/2
83/4 83/4 86/2 87/9 87/10
87/18 87/25 88/6 107/23
108/3 108/10 124/3 124/4
124/8 144/13 144/15
**count [2]** 163/13 215/23
**counts [1]** 106/14
**couple [9]** 43/11 97/20 98/20
123/24 144/23 159/3 160/16
184/11 187/8
**coupled [2]** 172/6 183/23
**course [7]** 34/12 49/18 52/15
54/15 63/23 114/18 193/12
**court [42]** 1/1 1/20 4/15
27/19 30/6 35/20 47/14 69/24
142/18 145/13 156/8 156/16
163/2 163/20 165/5 165/6
165/11 165/17 166/17 166/25
167/3 167/20 167/21 168/15
177/8 178/14 184/13 184/16

**C**

**court...** **[14]** 185/1 186/7
186/19 187/17 187/19 188/9
203/10 203/17 206/14 210/17
219/11 219/24 220/15 221/24
**court's [9]** 6/18 34/24 45/6
53/17 64/17 143/23 145/3
157/15 168/10
**courtroom [1]** 131/14
**cover [4]** 23/15 25/22 142/3
194/6
**covered [1]** 56/18
**Covid [3]** 23/12 205/24
205/25
**Covid-19 [1]** 205/25
**CR [1]** 1/8
**Crawson [2]** 198/12 198/20
**create [2]** 39/19 79/9
**created [6]** 38/7 39/17 81/24
111/22 190/13 196/19
**credibility [20]** 48/17
165/18 165/20 165/22 165/25
166/16 167/17 171/7 174/3
174/5 177/7 178/11 184/9
184/10 184/15 185/9 186/2
190/5 190/6 214/16
**credible [7]** 162/25 163/18
163/22 184/16 186/1 186/13
207/13
**credit [29]** 12/2 12/8 16/16
49/21 50/5 50/21 58/8 59/6
67/1 161/3 172/5 172/13
173/9 173/16 173/22 174/7
174/12 174/23 175/5 175/14
175/17 176/17 176/21 177/19
177/23 178/9 179/20 183/13
208/2
**crime [1]** 199/3
**criminal [7]** 114/22 175/7
175/11 175/12 175/16 175/23
175/24
**criteria [1]** 74/25
**critical [7]** 60/17 179/4
189/21 209/18 212/16 216/21
216/23
**critically [1]** 188/21
**criticism [1]** 187/23
**cross [24]** 4/4 4/5 4/6 4/7
4/8 4/10 4/11 5/22 47/8
67/12 82/15 88/16 93/19
104/21 125/8 165/20 185/5
185/21 194/7 218/24 220/23
221/1 221/3 221/6
**cross-examination [18]** 4/4
4/5 4/6 4/7 4/8 4/10 4/11
5/22 47/8 67/12 82/15 88/16
93/19 104/21 125/8 185/5
194/7 218/24
**cross-examine [4]** 185/21
220/23 221/1 221/6
**cross-examined [1]** 221/3
**Crowson [3]** 202/8 219/25
220/8
**CRR [1]** 224/12
**crunch [1]** 197/5
**crystal [1]** 161/17
**crystallize [1]** 89/18
**CSR [2]** 1/20 224/12
**cumulative [4]** 58/19 66/14
164/16 186/9
**cursory [1]** 118/17
**custody [2]** 46/22 46/23
**custom [1]** 58/24
**Customs [1]** 105/10

**D**

**Dadyan [36]** 19/1 19/15 21/1
29/4 31/1 31/12 32/11 33/15
34/1 39/12 45/2 69/11 69/18
86/2 86/9 86/20 86/22 87/9
87/25 88/10 136/18 136/19
196/21 196/23 197/10 197/19
197/21 212/22 213/2 213/15
213/20
**Dadyan's [1]** 69/20
**data [1]** 25/20
**database [1]** 95/11
**date [28]** 13/7 13/22 30/11
37/25 38/12 38/12 39/24
60/12 60/15 65/12 96/5
100/11 111/21 114/25 115/3
143/6 143/6 168/7 202/25
204/20 206/15 206/16 206/16
206/17 206/20 206/25 221/25
224/10
**dates [6]** 30/9 38/17 109/4
114/3 210/21 211/6
**day [14]** 1/15 5/8 6/25 38/18
40/1 50/1 50/3 50/20 71/14
175/3 199/5 199/6 214/21
219/13
**days [3]** 96/23 160/17 162/8
**DC [2]** 2/12 2/23
**dead [5]** 147/25 150/3 150/15
150/16 151/5
**deal [1]** 197/24
**deals [1]** 191/5
**death [2]** 148/13 148/22
**debate [4]** 165/9 174/22
186/4 199/14
**debit [2]** 58/9 145/19
**Debois [5]** 133/8 133/9
133/14 133/23 134/1
**deceased [3]** 167/14 170/24
209/25
**December [7]** 18/22 106/17
206/19 207/3 207/4 215/18
222/21
**December 20th [1]** 206/19
**December 7th [1]** 207/3
**decide [3]** 163/2 163/2 165/7
**decided [2]** 85/17 162/19
**deciding [1]** 86/24
**decision [12]** 82/9 86/6
86/25 171/16 172/3 176/4
186/18 192/21 192/21 198/23
220/1 221/5
**decisions [2]** 161/19 214/9
**decisive [1]** 165/7
**decisively [1]** 159/2
**declaration [95]** 6/1 6/10
6/20 7/4 13/3 16/15 17/12
17/24 23/8 28/22 29/8 29/11
38/6 39/2 39/8 39/21 40/6
40/9 41/10 41/20 41/24 43/9
43/12 43/18 45/1 45/11 45/17
46/10 47/11 53/14 53/16
53/24 54/8 54/20 56/6 60/14
60/23 60/25 71/13 76/9 80/23
97/15 98/20 99/2 101/1 103/1
105/11 105/20 107/10 107/13
107/17 107/19 109/25 110/12
110/19 110/23 114/12 117/9
117/22 117/24 118/2 118/10
119/6 123/14 124/13 132/14
133/1 133/5 137/6 137/11
137/13 137/14 140/14 140/20
152/24 153/2 154/6 154/16
166/1 192/6 196/9 196/16
197/17 199/17 199/18 199/19
199/22 199/24 200/23 201/25
202/4 205/1 214/1 214/4
215/3
**declarations [9]** 39/4 45/13
69/25 163/3 178/18 192/4
193/19 199/9 217/23

**declined [1]** 85/22
**deconfliction [2]** 74/21
74/22
**deemed [2]** 167/16 213/3
**deemphasized [1]** 180/19
**deeply [1]** 81/11
**default [1]** 165/10
**defend [1]** 185/23
**defendant [12]** 1/9 2/14 3/3
65/8 119/19 119/20 122/8
131/6 131/8 148/12 175/15
187/22
**defendant's [1]** 156/23
**defendants [26]** 72/2 72/4
85/7 97/6 108/12 112/5 120/5
133/3 133/19 157/13 177/17
177/21 178/12 178/22 198/11
199/1 201/11 201/21 202/4
203/20 203/22 208/5 210/20
211/3 213/13 213/15
**defendants' [1]** 200/20
**defense [20]** 15/7 15/10
24/18 82/13 82/19 83/2 83/4
83/4 114/2 114/8 140/1
142/24 157/5 162/4 165/8
167/6 179/17 192/18 210/12
215/19
**defense's [1]** 215/10
**defensive [1]** 163/21
**Define [1]** 52/13
**Definitely [1]** 72/22
**definitively [1]** 171/6
**deleted [2]** 16/11 16/20
**delve [1]** 95/3
**demands [1]** 207/21
**demarcated [1]** 208/3
**demeanor [1]** 184/12
**demonstrate [1]** 212/5
**demonstrated [1]** 212/11
**demonstrates [3]** 167/20
208/23 214/12
**demonstrating [1]** 201/4
**demonstrative [1]** 182/8
**denial [2]** 59/16 163/12
**denials [1]** 163/10
**denied [5]** 58/12 58/22 58/24
59/1 59/9
**Denver [1]** 95/23
**DEPARTMENT [2]** 2/4 2/11
**Depends [1]** 216/6
**depicted [1]** 146/18
**deposited [1]** 8/19
**derivative [4]** 91/15 91/18
162/9 162/9
**derived [3]** 103/10 194/23
198/17
**describe [6]** 7/3 80/23
100/13 112/8 127/16 141/7
**described [7]** 29/18 30/24
106/8 107/13 107/19 110/14
110/25
**describes [2]** 133/22 153/5
**describing [2]** 50/10 80/5
**description [2]** 113/19 193/6
**descriptions [1]** 113/19
**designated [1]** 201/10
**designation [1]** 202/2
**destroy [1]** 176/25
**detail [9]** 43/1 70/4 166/3
172/15 198/24 199/5 200/10
213/18 214/2
**detailed [3]** 16/15 200/3
205/2
**details [1]** 13/9
**detect [1]** 57/7
**detention [6]** 6/21 6/24 7/7
7/13 7/16 170/22
**determine [7]** 90/13 92/13
160/20 170/22 200/13 208/14
209/7

**D**

**determined [2]** 97/24 152/18
**determining [1]** 91/17
**develop [7]** 92/1 92/8 162/24
 163/12 163/16 165/19 215/8
**developed [3]** 156/13 166/6
 167/5
**device [2]** 9/1 30/13
**devices [14]** 23/25 24/7
 24/10 25/4 25/6 25/16 27/3
 27/13 87/23 117/18 118/8
 118/9 216/22 217/1
**dictate [1]** 167/5
**did [237]**
**didn't [86]** 14/19 16/9 16/11
 21/15 22/12 28/8 28/12 28/16
 41/11 41/15 42/14 45/1 45/7
 45/13 46/10 48/14 70/3 70/11
 70/12 75/4 75/7 76/18 77/7
 77/9 77/19 78/12 79/3 81/14
 86/11 89/10 89/11 89/15
 89/18 91/9 91/9 92/2 92/17
 97/16 100/4 103/7 103/24
 112/22 115/8 115/13 121/14
 126/13 126/20 127/24 128/23
 130/5 150/15 150/16 150/17
 154/1 154/24 155/6 162/20
 163/12 163/16 164/10 165/11
 170/12 188/6 189/20 189/23
 190/9 190/11 192/2 192/12
 192/19 194/10 195/14 198/4
 208/12 208/15 208/16 208/17
 209/7 209/7 218/5 218/8
 218/9 218/9 218/10 220/22
 220/25
**die [3]** 169/21 170/7 171/1
**died [6]** 147/7 150/18 151/2
 151/3 151/6 169/22
**different [30]** 22/18 27/22
 29/19 92/11 92/15 100/6
 100/7 109/12 100/16 103/6
 121/1 121/2 130/25 136/10
 138/1 139/18 139/21 140/18
 140/25 143/19 144/9 145/22
 146/2 156/14 156/16 164/9
 164/22 165/2 178/1 197/13
**difficult [1]** 101/8
**difficulties [1]** 207/17
**digest [1]** 70/4
**digital [14]** 8/25 23/24 24/7
 25/4 25/6 25/16 30/13 87/23
 174/24 177/20 177/23 178/1
 216/22 216/25
**direct [5]** 6/15 117/14 161/1
 179/23 221/22
**directed [1]** 116/17
**directing [1]** 8/22
**direction [2]** 144/7 158/1
**directions [1]** 68/19
**directly [4]** 81/14 129/10
 179/1 217/8
**disagree [1]** 189/9
**disaster [2]** 62/19 100/8
**disclaimed [1]** 58/16
**disclosed [1]** 197/16
**disclosing [1]** 195/11
**discouraged [1]** 82/12
**discovered [2]** 97/5 167/13
**discovery [8]** 24/2 24/19
 80/4 113/4 113/6 207/1 207/2
 216/16
**discrete [2]** 184/14 185/23
**discuss [40]** 36/24 37/8 49/2
 50/21 60/9 83/12 83/13 103/2
 112/17 124/11 126/5 126/8
 126/10 126/12 126/14 126/20
 126/23 126/25 127/7 127/10
 127/13 127/20 127/25 128/3

 128/9 128/23 129/5 129/8
 129/11 129/19 131/19 131/22
 131/25 132/2 132/8 132/11
 161/8 162/6 162/15 190/25
**discussed [32]** 13/16 37/11
 50/7 59/24 60/5 83/7 83/15
 83/20 84/9 84/16 101/10
 103/7 103/13 108/2 112/24
 124/16 127/1 127/4 127/15
 127/22 128/12 129/4 129/17
 129/19 130/10 130/14 130/15
 131/1 131/3 132/7 142/19
 146/12
**discussing [5]** 50/19 112/20
 126/21 131/17 199/16
**discussion [14]** 75/17 80/21
 82/4 85/9 85/14 85/15 87/12
 87/21 91/15 91/24 92/11
 92/16 103/16 164/7
**discussions [12]** 13/18 81/7
 84/13 85/18 85/22 85/25 86/2
 86/9 86/18 89/23 92/24 130/7
**disk [3]** 70/7 70/15 70/15
**dismissing [1]** 193/9
**disprove [1]** 59/2
**dispute [2]** 61/2 188/14
**disputed [2]** 57/16 215/15
**disqualified [1]** 124/4
**disregard [2]** 187/19 187/21
**distancing [1]** 178/2
**distant [1]** 181/23
**distilled [1]** 197/22
**distinct [1]** 128/8
**distinctly [1]** 35/1
**distinguishing [1]** 100/1
**distracts [2]** 190/22 190/25
**district [8]** 1/1 1/2 1/4
 124/6 172/20 173/2 173/7
 176/8
**DIVISION [1]** 1/2
**DL [1]** 145/24
**DMV [1]** 145/25
**do [161]**
**docket [2]** 121/25 214/22
**docs [1]** 72/9
**document [24]** 15/1 54/20
 102/14 102/15 111/19 133/20
 141/17 143/8 143/20 145/3
 145/13 145/17 146/3 167/23
 169/9 189/7 190/10 203/1
 203/5 203/5 204/1 204/4
 204/21 211/11
**documentation [1]** 204/18
**documented [2]** 188/18 216/3
**documenting [3]** 14/8 14/10
 17/20
**documents [20]** 20/13 68/14
 72/12 72/15 72/20 108/4
 135/15 138/17 150/11 167/6
 167/12 167/12 167/12 168/20
 168/22 203/8 206/10 220/3
 220/8 220/11
**does [22]** 6/23 24/24 26/5
 27/19 31/24 54/20 62/24
 71/16 102/9 113/18 141/9
 143/5 143/6 143/17 144/23
 145/7 145/24 166/15 173/25
 175/20 185/25 214/20
**doesn't [14]** 6/20 43/10 69/2
 75/20 99/15 163/13 179/18
 186/21 192/18 193/4 218/15
 218/25 219/18 221/9
**doing [18]** 18/21 34/23 51/15
 51/20 57/24 58/2 60/18
 116/19 160/17 173/17 190/20
 202/17 205/11 205/14 207/8
 207/10 222/6 222/10
**DOJ [1]** 84/6
**domicile [1]** 216/22

**don't [182]**
**done [34]** 4/17 14/21 14/23
 167/6 184/13 205/11 206/7
 206/8 208/21 215/22 220/5
**door [1]** 176/20
**doubt [6]** 32/4 32/22 176/14
 207/25 224/24 212/5
**down [25]** 18/12 30/17 68/17
 95/8 98/7 100/2 100/23
 102/23 102/25 122/8 125/21
 133/25 134/9 134/18 137/5
 137/14 138/24 156/3 169/13
 176/23 181/12 189/4 195/20
 197/22 202/12
**download [1]** 154/23
**downplayed [1]** 186/9
**downplaying [1]** 177/25
**downstairs [1]** 144/4
**dozen [6]** 26/2 26/5 26/8
 42/2 193/18 218/4
**draft [12]** 6/7 14/21 14/23
 15/5 15/13 15/16 116/3 117/4
 143/1 143/12 143/15 145/5
**drafted [4]** 15/1 22/16 175/7
 175/9
**drafting [3]** 6/3 6/5 176/7
**drafts [2]** 15/3 15/13
**Drive [1]** 179/7
**driven [1]** 181/15
**driver's [21]** 12/19 16/16
 63/18 63/21 64/19 120/22
 121/3 122/7 122/11 123/2
 123/16 138/1 138/19 138/25
 139/3 139/8 139/12 139/15
 139/20 145/23 146/2
**drop [1]** 215/24
**dropped [1]** 189/24
**DuBos [1]** 133/6
**due [1]** 205/22
**during [15]** 26/11 64/6 84/17
 95/24 108/2 108/9 114/18
 124/7 126/18 128/13 128/19
 129/2 131/23 138/2 145/19
**dwell [1]** 157/2
**Dyke [1]** 172/18

**E**

**e-mail [90]** 8/21 9/11 19/20
 20/11 20/12 20/19 33/12 34/2
 34/6 37/2 39/15 40/3 40/4
 40/6 40/8 40/11 43/14 43/17
 44/8 44/21 45/1 46/6 46/9
 47/24 61/13 62/25 64/12
 64/15 64/18 71/13 71/16 72/8
 72/23 76/6 76/11 76/15 94/9
 94/10 94/16 94/19 95/2 96/12
 96/22 96/24 98/8 98/10 98/12
 98/16 98/17 99/1 99/18 99/22
 100/6 100/7 100/16 100/22
 100/25 110/13 134/21 135/2
 135/10 142/1 142/4 142/6
 142/10 142/17 144/4 147/2
 168/23 169/19 170/5 170/6
 170/8 170/19 170/23 170/25
 170/25 173/1 173/2 173/4
 173/21 182/20 184/25 194/4
 194/4 195/1 195/12 195/13
 195/14 196/8
**e-mailed [4]** 11/16 11/19
 36/17 63/8
**e-mails [21]** 6/11 6/11 24/4
 24/5 64/2 99/17 150/9 166/2
 167/25 168/3 168/14 169/18
 170/4 170/15 171/6 172/15
 175/14 184/13 185/6 185/20
 185/24
**each [11]** 32/1 51/8 74/18
 80/15 81/2 87/7 115/19
 125/21 165/14 199/14 213/12

**E**

**earlier [7]** 13/20 42/17
51/21 95/9 131/13 171/5
174/1
**earliest [1]** 203/6
**early [4]** 94/24 115/5 178/20
209/16
**easier [2]** 28/5 38/6
**easiest [1]** 163/1
**Eastern [3]** 170/18 171/3
176/5
**easy [1]** 184/8
**ECF [2]** 80/10 178/7
**EDD [1]** 116/10
**Edward [2]** 43/16 119/19
**effect [6]** 171/16 172/4
173/7 176/4 184/1 203/9
**effected [2]** 26/17 42/20
**effectively [2]** 172/24 174/4
**efficiently [1]** 222/15
**efforts [1]** 22/18
**ego [1]** 10/22
**EIDL [3]** 34/15 95/11 179/5
**eight [3]** 26/11 26/19 42/18
**Eighth [1]** 192/25
**either [10]** 24/2 24/12 40/3
44/14 45/1 73/20 106/25
193/19 194/3 209/5
**election [1]** 23/13
**Eleventh [2]** 198/19 220/12
**Elmo [1]** 144/22
**else [14]** 30/17 36/9 36/12
36/25 83/23 100/15 104/5
111/14 135/6 151/4 156/1
163/23 183/9 196/16
**elsewhere [2]** 158/23 207/21
**employees [1]** 209/6
**employment [1]** 151/21
**enact [1]** 80/11
**encountered [1]** 207/16
**end [10]** 10/13 33/9 37/20
79/5 111/12 164/9 175/3
194/10 204/4 205/2
**ended [2]** 79/2 79/6
**endemic [1]** 197/2
**ending [2]** 32/6 138/2
**enforcement [1]** 57/8
**engage [8]** 80/14 85/22 85/24
86/17 86/25 87/1 87/25
156/20
**engaged [5]** 81/12 86/1 86/21
87/8 89/23
**engaging [1]** 156/24
**engineer [2]** 162/22 219/14
**engineered [2]** 217/20 220/20
**engineering [2]** 218/15 221/7
**enough [3]** 102/19 120/7
208/1
**entail [1]** 27/20
**entire [4]** 46/8 206/5 215/17
219/6
**entirely [3]** 185/4 185/5
220/10
**entirety [2]** 80/17 80/17
**entitled [1]** 224/7
**entry [3]** 13/7 13/22 146/20
**equivalent [2]** 25/23 190/2
**escrow [17]** 8/20 8/21 33/11
55/20 55/22 149/21 149/25
150/2 150/22 150/14 150/17
180/25 209/17 209/17 209/21
209/23 210/1
**especially [2]** 156/22 197/4
**essentially [11]** 7/18 10/22
11/20 20/15 25/15 27/25 79/9
158/8 159/22 174/25 220/10
**establish [5]** 140/17 160/9
161/24 162/1 183/12

**established [5]** 59/10 117/17
181/3 191/6 196/6 207/3
**establishes [1]** 183/25
**estate [2]** 147/1 157/24
**et [3]** 1/9 73/15 81/10
**evaluate [2]** 13/15 188/9
**evaluating [2]** 165/24 205/15
**evasive [1]** 163/21
**even [20]** 26/11 26/19 41/11
43/23 73/13 114/6 176/15
186/9 190/5 191/2 191/8
192/3 192/7 192/18 193/20
193/21 195/5 200/19 210/1
213/4
**evening [7]** 50/3 168/9
171/14 172/14 172/16 173/14
176/9
**event [2]** 107/1 144/10
**events [9]** 12/22 49/2 171/14
172/16 185/17 187/5 187/7
187/14 200/10
**eventually [2]** 22/19 204/23
**ever [10]** 52/9 52/20 53/2
68/14 69/23 103/16 103/20
112/23 197/9 207/15
**every [14]** 6/15 34/10 46/23
73/5 73/8 159/9 159/22 160/7
161/18 162/1 164/21 186/18
191/20 200/17
**everybody [5]** 125/16 125/18
144/23 163/23 192/13
**everyone [1]** 218/19
**everything [7]** 56/19 108/1
126/11 177/8 177/10 200/5
222/10
**EVID [1]** 4/14
**evidence [197]**
**evident [3]** 75/5 188/6 198/4
**evidentiary [1]** 219/19
**ex [4]** 123/13 123/14 123/19
181/14
**ex-husband [1]** 181/14
**exact [1]** 121/20
**exactly [4]** 25/9 77/7 149/6
199/1
**examination [19]** 4/4 4/5 4/6
4/7 4/8 4/10 4/11 5/22 47/8
67/12 81/1 82/15 88/16 93/19
104/21 125/8 185/5 194/7
218/24
**examine [4]** 185/21 220/23
221/1 221/6
**examined [1]** 221/3
**example [20]** 19/19 19/19
20/7 34/16 35/13 47/1 68/15
69/8 73/12 77/17 81/6 84/21
90/13 91/19 160/18 180/15
182/7 182/9 196/2 216/22
**examples [6]** 32/24 34/23
160/16 183/5 183/7 218/23
**Excel [1]** 27/24
**exception [1]** 163/20
**excerpt [6]** 38/7 38/7 180/8
180/9 180/16 180/20
**excerpted [7]** 29/18 32/19
32/25 36/25 38/14 38/19
197/20
**excerpts [2]** 46/7 197/14
**exchange [3]** 30/25 212/21
212/24
**exchanges [4]** 34/21 107/18
107/21 108/11
**exclude [1]** 87/23
**excuse [4]** 51/3 60/21 106/24
121/2
**executed [1]** 65/23
**exhibit [111]** 4/14 4/15 7/20
7/22 13/2 17/13 18/3 18/8
20/9 20/10 21/7 23/7 28/23

29/7 29/8 29/8 29/21 30/3
35/17 35/16 36/3 36/9 36/12
35/24 36/25 37/23 38/14
38/19 38/22 45/16 46/5 60/22
70/6 70/9 71/11 71/21 73/13
73/13 76/8 76/9 76/10 76/13
76/17 79/6 79/7 79/10 80/10
89/13 94/7 98/6 98/9 100/23
101/1 102/5 102/11 102/13
133/12 133/18 134/19 138/13
141/25 142/4 142/9 143/23
144/18 145/3 180/6 180/9
180/16 189/4 189/12 189/20
190/13 192/15 193/3 193/14
194/2 194/15 195/10 195/12
195/20 196/7 196/7 196/11
196/14 196/18 196/19 197/12
197/19 197/24 199/11 199/13
199/20 199/23 200/4 200/6
204/2 210/8 210/11 210/14
210/16 210/19 210/22 210/23
212/12 212/19 212/21 213/1
215/9 217/13 221/7 221/8
**exhibits [11]** 71/18 72/18
199/18 199/21 205/1 210/7
217/14 217/15 217/20 218/15
221/7
**exist [2]** 145/24 193/4
**expect [1]** 79/14
**experience [2]** 68/6 123/21
**explain [8]** 27/19 30/6 51/21
173/4 173/12 181/8 182/8
186/18
**explained [5]** 169/24 173/8
213/9 213/10 213/18
**explains [2]** 198/25 210/8
**explanation [2]** 169/23
169/25
**explored [1]** 57/15
**export [8]** 27/20 27/22 27/23
27/24 28/8 30/5 38/12 39/23
**exported [10]** 27/16 28/7
28/10 29/15 30/9 35/14 36/9
37/20 37/23 38/16
**exporting [2]** 39/23 41/8
**exposed [10]** 89/1 124/9
158/10 163/4 178/15 188/14
191/22 217/25 218/3 219/15
**exposure [20]** 80/2 83/19
83/21 87/2 89/5 90/4 90/23
90/25 90/25 91/1 91/3 91/6
91/17 93/2 158/14 162/2
188/13 193/5 194/18 195/3
**extensive [2]** 79/10 156/18
**extensively [1]** 163/4
**extent [3]** 66/16 165/8 177/7
**extracted [3]** 70/23 82/14
196/21
**extracting [1]** 196/22
**extremely [5]** 95/23 165/24
178/11 202/21 207/20
**eyes [2]** 16/24 17/3

**F**

**F-A-E-R-S-T-E-I-N [1]** 104/17
**face [3]** 153/11 222/3 222/3
**face-to-face [1]** 222/3
**facility [1]** 24/10
**fact [52]** 9/2 9/6 11/15
12/11 25/5 31/5 59/19 66/8
85/5 86/8 103/7 116/10
122/12 122/24 123/1 139/20
139/22 140/15 140/17 140/24
141/1 148/6 153/19 158/22
159/19 159/20 159/24 162/5
162/8 163/22 170/6 172/5
183/15 183/18 183/20 185/22
186/11 186/20 188/4 190/14
191/20 193/11 197/13 198/16

**fact... [8]** 205/22 211/4
216/24 217/23 219/3 219/7
220/25 221/22
**factor [1]** 82/8
**facts [10]** 40/19 51/9 51/16
51/17 104/1 115/9 115/14
143/16 184/12 215/15
**factual [4]** 35/10 119/17
119/18 119/22
**FAERSTEIN [18]** 4/9 36/22
43/14 104/10 104/17 104/23
113/4 113/18 124/21 126/2
126/3 129/16 129/22 130/3
134/24 141/10 143/9 144/2
**Faerstein's [1]** 105/20
**fail [1]** 162/12
**failed [1]** 177/13
**fair [22]** 17/22 25/18 26/13
28/6 32/19 35/14 68/4 68/9
74/21 78/5 95/14 96/7 103/23
114/1 120/11 123/7 137/2
147/7 147/15 150/14 151/23
155/22
**fairly [1]** 32/21
**fairness [1]** 167/5
**faith [1]** 73/16
**fake [4]** 63/12 63/16 64/13
139/10
**familiar [7]** 35/24 78/20
102/9 143/4 145/7 145/8
156/8
**family [3]** 179/8 181/22
181/23
**far [6]** 18/15 55/24 80/22
158/12 160/10 215/21
**fashion [1]** 12/7
**fast [1]** 203/23
**father [8]** 167/14 168/17
170/24 182/17 182/18 182/22
183/3 183/19
**favor [2]** 162/3 165/8
**favorably [1]** 86/24
**FBI [9]** 12/25 14/16 14/19
15/25 24/11 51/1 51/15
114/22 123/17
**FBI's [1]** 30/12
**February [48]** 18/22 21/3
25/7 26/1 26/21 37/19 38/4
38/9 41/15 41/25 59/25 60/6
60/16 103/19 104/25 105/23
105/25 106/23 107/14 108/20
109/13 112/2 114/6 137/18
137/18 151/13 159/7 188/20
188/22 189/1 189/25 191/17
197/9 202/20 202/20 202/20
205/10 206/7 208/9 208/18
211/6 212/7 214/19 215/24
215/25 216/5 218/1 218/2
**February 11th [3]** 188/22
202/20 211/6
**February 12th [1]** 202/20
**February 19th [1]** 202/20
**February 23rd [1]** 25/7
**February 24th [7]** 26/1 26/21
41/15 41/25 106/23 107/14
108/20
**February 2nd [6]** 21/3 59/25
60/6 60/16 159/7 218/1
**February 9th [3]** 104/25
105/25 109/13
**federal [3]** 165/5 209/5
209/9
**feedback [1]** 194/11
**feel [1]** 157/8
**Fenton [87]** 2/10 14/23 21/14
21/18 36/21 37/13 37/16 38/1
38/20 38/23 39/13 39/19

39/25 40/2 45/16 45/19 45/22
46/6 47/15 48/21 48/22 49/3
49/11 49/14 49/25 50/10
50/12 50/16 50/25 59/24
60/21 68/2 68/4 75/10 76/12
81/11 82/5 82/25 83/9 83/22
87/14 93/1 107/23 108/3
108/9 108/17 109/5 123/18
125/24 126/5 126/12 126/15
127/8 134/24 135/3 154/3
160/5 160/18 161/13 163/6
163/20 164/5 164/14 164/24
169/10 169/14 170/4 170/7
170/14 184/10 185/16 185/23
187/18 188/5 190/4 190/9
191/25 192/5 195/10 195/15
198/2 199/15 205/1 211/16
214/1 218/18 221/16
**Fenton's [4]** 45/11 127/10
197/17 215/3
**few [7]** 11/15 11/18 22/18
88/13 132/24 211/8 211/20
**Fiber [1]** 63/2
**fictionalized [1]** 222/10
**figure [5]** 16/8 71/18 141/13
141/16 184/23
**file [15]** 29/15 29/17 29/17
29/24 36/14 36/16 77/14
77/20 77/21 154/23 178/7
200/19 201/14 201/15 208/16
**filed [6]** 8/15 8/18 70/7
88/4 123/13 123/14
**files [14]** 20/14 46/21 73/10
73/12 73/14 74/18 97/22
97/25 100/9 116/5 149/22
149/25 150/2 209/16
**filing [6]** 70/14 77/7 110/22
116/10 123/19 177/21
**filings [5]** 70/1 116/9
116/12 177/18 203/17
**filled [1]** 33/12
**filter [15]** 24/15 24/19
24/21 24/23 25/2 25/7 136/1
136/3 136/3 136/24 192/16
213/13 213/19 214/5 219/17
**filtered [2]** 25/3 71/3
**final [2]** 212/17 219/21
**finalize [1]** 202/18
**finalized [1]** 6/7
**finally [1]** 18/6
**financial [1]** 70/2
**find [4]** 51/20 51/25 141/11
163/25
**finder [1]** 66/8
**finding [2]** 49/21 179/20
**finish [3]** 9/10 79/21 191/6
**finished [1]** 202/16
**firm [3]** 80/3 194/25 195/2
**first [91]** 7/21 7/23 12/8
15/3 15/5 15/13 15/16 15/21
18/3 24/18 25/11 40/16 41/6
41/20 41/25 42/5 42/10 42/24
43/5 53/9 61/11 65/5 67/25
68/25 71/14 77/22 77/24 85/2
102/12 105/16 105/17 105/22
106/4 106/6 106/8 106/10
109/3 112/2 112/3 112/25
114/4 114/14 115/11 123/20
124/13 134/10 134/14 139/7
139/8 141/19 141/22 146/20
147/11 148/3 151/16 151/24
153/14 154/5 154/6 154/19
157/12 158/15 167/12 170/6
170/17 173/14 175/4 180/6
182/20 184/8 193/25 197/17
202/18 202/25 202/25 203/19
203/25 204/3 204/13 204/25
205/6 205/10 205/12 205/17
205/21 206/3 206/14 206/20

207/9 215/2 221/24
221/24
**five [11]** 11/18 16/2 16/4
17/23 18/18 132/22 132/25
173/19 183/11 195/19 211/21
**flagged [1]** 80/6
**flight [1]** 176/19
**flip [1]** 61/3
**float [1]** 8/20
**Floor [1]** 2/8
**Florida [5]** 145/19 145/19
172/20 173/2 175/8
**flow [9]** 8/23 9/24 55/19
55/21 56/2 157/22 164/4
164/11 180/7
**flowed [1]** 157/24
**flowing [1]** 123/8
**flurry [1]** 80/24
**flush [1]** 176/23
**focus [10]** 94/3 95/4 96/2
159/5 165/18 173/22 198/8
202/14 218/9 219/25
**focused [5]** 27/3 74/12
157/22 190/24 203/20
**focuses [1]** 112/3
**focusing [1]** 45/15
**fold [1]** 176/19
**folder [9]** 16/13 16/19 16/25
29/13 29/23 29/24 30/7 46/8
111/18
**folders [5]** 38/11 39/16
39/19 116/20 117/1
**follow [12]** 22/7 53/16 79/1
93/25 95/17 101/8 160/23
194/21 195/16 196/1 204/5
218/9
**follow-up [5]** 22/7 194/21
195/16 196/1 204/5
**followed [4]** 159/3 162/2
178/23 201/19
**following [5]** 95/4 178/24
200/14 200/25 203/18
**footnote [5]** 137/7 137/15
137/17 137/24 138/20
**foregoing [1]** 224/5
**forensic [6]** 23/21 24/1
24/17 24/21 25/4 25/16
**foreshadowed [1]** 87/7
**forever [1]** 184/5
**forget [2]** 87/19 218/17
**form [7]** 12/23 19/9 35/19
116/6 152/8 196/14 215/14
**format [9]** 27/17 27/24 27/24
74/15 74/17 74/20 143/4
144/9 224/8
**formation [1]** 160/14
**formats [1]** 74/19
**formed [2]** 160/2 186/12
**forms [2]** 33/11 116/7
**formulate [1]** 91/21
**forth [3]** 123/3 201/24 202/8
**forward [2]** 33/13 34/1
**forwardtoprojecthype30 [1]**
33/24
**found [34]** 12/18 27/13 28/19
49/15 50/5 51/21 51/25 58/10
58/11 59/5 59/7 59/9 60/6
71/7 73/5 75/23 78/2 85/10
121/21 140/22 161/2 166/19
173/8 174/19 175/15 175/17
175/20 175/21 181/12 181/16
181/18 185/3 186/5 195/22
**Fountainhead [1]** 20/11
**four [14]** 10/15 11/18 28/19
29/3 29/19 30/2 34/6 64/6
145/19 153/10 158/14 172/7
195/19 203/21
**frame [2]** 109/10 188/8
**Francisco [1]** 2/20

**F**

**frankly [11]** 188/13 188/21 190/10 191/23 192/7 192/18 193/3 207/24 214/23 219/2 220/19
**Fraser [3]** 3/7 4/5 47/9
**fraud [15]** 55/8 56/22 63/11 72/7 84/5 163/24 164/1 172/11 174/6 179/12 179/18 183/24 192/14 199/3 220/24
**fraudulent [2]** 174/8 174/13 174/14
**fraudulently [4]** 62/19 179/5 180/17 182/12
**frequently [1]** 190/20
**front [7]** 47/12 133/17 145/2 147/17 148/13 148/16 162/17
**fruits [1]** 212/19
**frustrating [1]** 207/17
**full [5]** 5/17 67/7 93/14 104/12 125/3
**functions [1]** 39/23
**fundamental [1]** 219/23
**funded [1]** 34/7
**funds [16]** 8/19 8/20 8/23 9/24 55/19 55/21 56/2 62/20 157/23 157/23 164/4 164/11 180/7 183/22 201/19 208/4
**funeral [1]** 182/12
**further [13]** 47/6 67/2 85/18 85/22 88/12 92/8 93/7 104/4 124/18 124/19 155/25 169/9 179/25

**G**

**G-E-F-F-R-E-Y [1]** 125/5
**Gamero [1]** 151/17
**garbage [1]** 176/21
**gather [1]** 86/5
**gave [7]** 6/21 40/14 50/9 127/10 139/16 144/16 187/14
**GEFFREY [3]** 4/11 114/23 125/5
**general [21]** 24/4 37/2 83/15 84/17 84/18 84/20 84/23 85/24 90/5 112/19 126/9 126/10 126/11 127/15 128/24 130/4 130/12 131/19 135/12 175/21 178/13
**generality [1]** 85/4
**generalized [2]** 163/10 171/23
**generally [10]** 7/24 24/5 24/23 25/3 52/20 113/9 113/21 126/23 127/17 131/4
**generic [2]** 163/12 163/15
**gentleman [3]** 39/12 45/2 125/24
**gentlemen's [1]** 126/1
**germane [1]** 130/23
**get [43]** 13/9 21/4 22/11 40/10 57/16 67/21 67/24 73/17 73/17 95/8 96/6 121/19 122/17 122/18 135/7 142/17 142/22 144/4 164/23 165/13 172/23 185/13 190/22 190/24 191/1 191/2 191/7 191/8 192/16 193/16 194/21 196/13 205/10 206/2 206/6 207/7 207/22 208/11 219/20 222/7 222/11 222/15 222/16
**gets [1]** 24/21
**getting [9]** 23/12 44/16 79/2 105/6 105/13 117/19 184/5 205/13 222/19
**give [19]** 16/8 33/13 47/14 73/15 79/1 84/19 128/4 157/3 157/9 160/25 169/5 170/11

183/9 187/6 190/21 211/21
**given [9]** 122/23 128/10 128/13 129/14 131/11 131/13 193/4 202/22 204/20
**giving [1]** 63/9
**go [59]** 6/12 6/19 15/20 16/19 20/9 22/5 24/9 29/21 29/21 29/22 29/22 31/5 31/6 33/20 34/16 41/24 45/11 59/10 64/18 71/11 79/14 87/16 102/11 102/17 102/25 105/21 109/14 112/20 113/22 113/24 117/24 119/9 121/25 121/25 123/10 125/20 137/5 137/11 137/13 138/8 138/10 138/23 146/17 152/25 153/1 154/5 166/7 174/18 176/24 184/4 191/8 199/4 199/5 200/8 200/17 202/6 203/10 209/12 212/1
**goes [4]** 24/23 180/24 185/8 198/24
**Gohar [3]** 56/4 181/17 183/3
**going [41]** 11/20 16/12 22/13 30/24 31/6 38/11 41/12 57/14 59/5 61/3 68/19 75/19 79/21 90/16 93/10 95/15 95/17 123/23 143/22 144/3 150/7 158/6 161/14 162/15 165/1 166/23 170/13 172/23 179/4 179/5 187/17 188/2 188/3 190/21 194/4 200/9 203/23 204/5 204/16 205/5 216/13
**gold [1]** 64/14
**gone [1]** 176/24
**good [26]** 5/24 5/25 47/20 47/21 67/14 67/15 73/16 79/5 79/24 79/25 93/21 93/22 99/17 102/19 104/23 104/24 125/10 125/11 170/3 175/1 176/14 178/4 178/9 184/5 186/15 208/12
**got [13]** 22/19 34/6 66/20 96/12 134/8 158/24 162/14 169/23 177/1 195/12 204/9 214/20 221/10
**gotten [1]** 161/9
**government [119]**
**government's [9]** 102/17 159/21 159/25 188/10 197/3 208/1 212/4 220/19 221/6
**grand [12]** 6/11 41/12 68/1 85/2 90/9 90/11 162/17 205/23 206/1 206/12 208/16 220/7
**great [7]** 175/2 176/15 186/7 186/15 186/20 186/22 208/11
**greater [1]** 93/2
**Grigoryan [2]** 192/11 219/3
**grounded [1]** 122/18
**grounds [1]** 166/16
**guess [10]** 12/13 38/4 39/14 39/24 49/25 60/4 60/11 137/12 143/23 156/13
**guided [1]** 186/17
**guilty [1]** 57/20
**Gusto [2]** 20/14 116/6
**guy [2]** 21/22 22/9

**H**

**had [195]**
**half [7]** 8/9 51/4 114/1 171/2 201/1 215/25 216/1
**halfway [1]** 102/23
**Halum [1]** 209/20
**Hampton [1]** 220/12
**hand [6]** 62/23 138/12 141/24 169/1 169/2 221/8

**handed [2]** 142/25 145/4
**handled [1]** 115/24
**Hang [1]** 54/22
**happen [1]** 191/24
**happened [14]** 49/6 59/5 70/4 111/10 111/11 127/1 127/2 127/3 129/20 130/7 131/23 187/7 214/3 216/4
**happening [1]** 216/2
**happens [1]** 24/22
**happy [3]** 140/1 193/13 221/12
**Harapetyan [1]** 121/6
**hard [6]** 35/2 99/10 99/21 164/20 184/23 184/24
**harmful [1]** 208/19
**harmless [6]** 191/5 205/16 208/15 212/3 212/8 214/12
**Hart [8]** 119/20 121/5 137/9 137/19 138/5 139/4 139/17 143/3
**has [50]** 38/11 40/21 54/16 61/24 62/22 63/2 63/5 73/14 78/1 86/15 90/8 94/6 111/19 132/12 133/17 134/19 139/9 140/10 143/24 145/3 159/10 162/3 165/10 167/4 167/8 167/24 170/1 174/5 174/8 177/13 178/3 178/24 184/13 185/24 188/12 188/13 189/6 191/24 192/19 192/24 195/6 201/15 203/18 207/14 210/12 214/22 217/12 217/24 219/24 220/20
**hasn't [3]** 169/24 211/4 214/23
**hats [1]** 213/24
**have [195]**
**haven't [5]** 140/1 140/3 169/17 189/16 217/13
**having [7]** 89/12 103/16 107/16 129/9 139/21 160/19 201/11
**Hayrapetyan [1]** 119/20
**he [177]**
**head [1]** 170/8
**Health [2]** 99/1 100/3
**hear [13]** 12/15 64/4 77/9 126/13 141/20 145/18 156/7 156/10 157/10 157/12 157/16 169/25 187/22
**heard [14]** 11/21 52/9 162/14 177/1 188/9 190/8 191/12 191/20 194/7 196/15 196/23 217/22 218/4 220/15
**hearing [35]** 5/8 6/21 6/24 7/7 7/13 7/16 44/10 45/12 45/14 53/17 70/8 121/15 121/18 123/11 123/12 123/18 128/10 129/14 129/24 130/23 131/11 132/12 132/15 156/13 156/14 157/6 157/7 163/9 163/14 165/17 185/18 193/12 202/5 217/19 221/13
**hearings [1]** 53/13
**Heart [1]** 145/5
**hectic [1]** 50/3
**held [1]** 224/6
**help [13]** 6/5 51/21 59/16 61/18 78/15 78/19 78/23 79/9 95/16 96/8 96/10 141/11 143/14
**helped [1]** 114/15
**helpful [4]** 121/23 140/7 156/21 156/25
**helping [1]** 25/8
**helps [1]** 59/11
**Henry [1]** 172/18
**her [69]** 57/24 58/2 58/2

**H**

**her... [66]** 58/3 58/11 59/6
59/9 59/16 59/19 59/21 66/21
82/12 82/14 82/14 86/10
87/10 87/18 131/17 132/5
151/19 151/20 152/4 157/21
158/1 158/2 158/3 158/11
159/2 159/14 159/18 159/19
172/10 174/20 175/15 176/17
176/18 176/25 179/6 179/8
179/17 180/23 181/1 181/6
181/14 181/14 181/15 181/21
181/24 182/2 182/17 182/18
182/22 182/22 183/2 183/3
183/17 183/19 183/20 183/22
183/23 183/24 195/1 196/9
196/10 196/20 209/20 209/23
220/23 221/3

**here [81]** 5/9 5/9 9/9 20/10
21/15 22/5 22/7 28/15 31/7
32/4 34/13 61/11 61/21 61/24
63/2 63/18 64/19 64/22 66/8
71/6 76/15 77/25 96/13 99/10
109/11 113/12 119/5 126/1
130/11 133/17 134/1 134/20
135/4 138/18 138/24 141/8
142/14 144/9 146/4 146/16
146/18 147/10 147/11 148/12
148/22 151/7 153/2 153/4
156/6 157/19 159/5 160/17
162/8 162/21 175/19 180/19
180/21 183/12 184/5 186/14
188/3 189/6 189/7 189/13
189/17 191/6 192/3 193/5
193/7 193/23 196/11 200/10
209/18 215/4 215/15 217/17
217/19 218/13 219/14 219/21
220/18

**hereby [1]** 224/4
**herself [1]** 183/22
**hesitant [1]** 60/10
**hey [2]** 75/17 95/2
**highlight [6]** 7/21 35/6
43/11 94/21 193/24 195/18
**highlighted [2]** 142/19
144/10
**highlighting [1]** 193/23
**highlights [2]** 211/19 211/19
**highly [1]** 192/14
**him [51]** 21/20 22/7 22/10
45/19 55/7 60/25 75/4 75/8
75/18 76/3 78/13 78/25 79/1
79/8 87/4 95/25 96/1 96/2
96/3 108/20 108/23 108/24
126/8 129/6 129/8 129/10
129/11 129/14 129/17 130/14
133/9 134/3 143/10 144/23
145/8 148/8 148/16 152/2
160/19 160/23 160/25 163/25
170/8 185/2 185/16 187/4
187/8 187/11 187/13 187/14
197/18

**hired [1]** 209/11
**his [57]** 9/15 48/3 49/1 55/8
117/17 117/18 117/24 118/9
125/24 134/2 134/4 144/3
150/20 151/24 151/25 152/2
160/5 163/21 163/25 164/7
164/9 169/11 169/15 170/8
171/9 172/19 173/7 184/11
184/12 184/15 185/3 185/8
185/9 185/11 185/12 185/19
185/23 185/25 186/2 186/10
187/12 190/13 192/5 192/6
197/7 197/17 199/16 199/19
199/22 199/24 200/23 201/14
201/14 201/15 201/24 202/1
202/14

**hit [2]** 188/11 193/25
**Hitral [1]** 190/21
**hold [1]** 164/13
**home [7]** 99/1 100/3 174/10
176/24 180/8 180/25 180/25
**homes [1]** 181/21
**honestly [2]** 74/10 191/14
**Honor [144]**
**Honor's [2]** 144/20 179/24
**HONORABLE [1]** 1/3
**hopefully [1]** 95/15
**hour [1]** 79/18
**hours [8]** 11/15 11/18 15/22
171/2 171/5 192/12 192/12
192/12
**house [7]** 65/13 65/16 176/25
179/8 181/5 181/10 183/17
**houses [2]** 208/7 209/18
**how [51]** 7/24 8/14 11/17
11/19 15/16 16/7 16/9 17/18
18/15 18/15 24/3 39/23 40/2
50/16 50/25 57/6 59/12 73/10
73/19 74/21 79/14 108/7
111/17 115/18 120/6 130/13
131/8 132/24 140/4 143/6
143/17 145/8 150/17 150/25
152/1 152/17 161/20 166/5
169/22 169/24 184/15 187/8
189/17 191/25 192/1 196/13
210/2 210/9 213/9 214/2
217/18
**however [5]** 71/2 107/12
163/15 185/7 217/2
**huh [4]** 11/9 39/18 42/3 91/7
**humorous [6]** 127/1 130/15
130/17 130/22 130/25 131/23
**humurous [1]** 131/3
**hundred [3]** 156/8 162/6
215/22
**husband [10]** 59/8 65/6 158/2
158/3 159/14 172/10 181/14
181/14 183/23 183/24
**husband's [1]** 181/6
**hyperbole [2]** 156/20 156/24
**hypothetical [2]** 26/14 84/21

**I**

**I'm [12]** 17/12 30/11 45/10
46/4 52/23 64/8 75/25 88/19
101/8 105/21 121/19 206/21
**I.D [1]** 4/14
**i.e [1]** 197/21
**ID [1]** 61/13
**ID's [2]** 63/12 63/14
**idea [3]** 84/19 160/1 179/3
**identification [2]** 9/11
200/12
**identified [17]** 71/9 71/21
97/14 98/14 100/9 101/11
102/7 168/1 168/3 178/21
178/22 197/14 204/12 204/16
209/8 210/2 210/4
**identify [10]** 6/15 106/12
167/9 209/2 209/3 209/7
209/14 209/15 209/20 209/22
**identifying [3]** 62/2 62/22
159/17
**identities [3]** 64/14 85/7
116/11
**identity [21]** 7/18 7/19
10/21 56/2 57/21 66/21
97/24 151/25 158/6 158/18
158/19 158/20 159/1 159/2
159/14 159/20 161/5 166/12
161/25 172/12 174/19
**IE4170 [1]** 33/7
**image [34]** 12/18 17/11 17/12
18/2 18/3 18/7 20/9 20/25
21/7 21/15 21/17 25/16 61/18

**I**

61/21 61/24 62/8 63/18 64/18
134/5 146/17 147/10 148/23
189/6 192/7 192/13 192/19
196/25 197/10 197/22 214/11
**images [21]** 16/13 16/14
17/22 19/7 19/16 29/14 60/9
60/20 61/8 74/18 97/9 97/12
111/20 132/17 132/22 133/2
160/10 178/4 186/6 191/10
192/4
**IMEI [1]** 61/25
**immediately [1]** 96/2
**immunities [1]** 220/6
**immunized [1]** 198/10
**impact [1]** 81/10
**Imperial [1]** 147/6
**import [2]** 86/5 184/23
**importance [2]** 45/8 164/15
**important [20]** 57/17 57/24
60/15 75/9 157/2 157/3
158/16 159/5 160/10 163/25
164/21 165/24 177/11 177/16
178/11 184/6 186/14 186/16
209/19 220/14
**impossible [3]** 197/4 197/15
218/22
**impression [1]** 70/24
**Improper [1]** 113/15
**incidents [1]** 184/11
**include [6]** 6/19 6/20 45/1
48/3 72/4 203/8
**included [11]** 43/24 90/20
90/20 99/4 99/23 120/11
120/16 145/20 146/12 176/12
202/4
**includes [3]** 41/4 49/20
215/16
**including [13]** 7/13 43/25
69/25 116/7 134/24 148/2
159/18 166/4 173/9 174/9
178/2 188/15 188/23
**incomplete [1]** 160/21
**incredible [4]** 164/16 166/20
169/16 171/20
**independent [7]** 189/8 193/16
193/17 195/6 198/18 206/13
217/15
**independently [1]** 189/18
**indepently [1]** 219/4
**indicate [2]** 61/8 150/2
**indicated [2]** 108/9 150/9
**indicating [2]** 65/3 147/2
**indict [1]** 192/22
**indicted [1]** 202/17
**indictment [53]** 40/17 41/6
41/21 42/5 42/11 42/20 42/22
42/25 43/5 65/8 67/25 69/1
69/1 85/2 90/10 106/4 106/7
106/9 106/10 111/25 112/4
113/1 114/14 115/4 143/1
143/12 143/15 145/5 161/6
193/9 202/18 203/2 203/4
203/7 203/19 204/3 204/3
204/7 204/9 204/10 204/14
204/17 204/24 204/25 205/5
205/6 205/12 205/17 205/21
205/21 206/4 206/16 207/9
**indirect [2]** 6/16 218/5
**individual [4]** 78/10 97/23
174/8 174/12
**individuals [6]** 20/20 57/12
170/20 188/14 204/16 209/14
**indulge [1]** 181/4
**Info [3]** 106/7 106/12 106/16
**inform [2]** 150/15 160/13
**information [108]** 6/16 7/7
14/15 20/2 20/16 20/21 25/19
25/24 40/18 43/4 43/6 43/7

**I**

**information... [96]**   43/8
43/24 44/21 46/15 46/21
51/18 62/23 63/9 63/9 70/2
80/7 82/8 85/6 87/17 89/17
90/7 92/18 96/4 96/17 98/3
99/25 100/7 101/5 106/3
109/6 109/22 116/5 116/9
116/19 117/5 117/7 117/11
117/11 117/15 118/18 118/20
120/6 120/13 120/25 121/11
121/14 121/17 122/23 123/8
124/9 136/1 136/5 136/11
147/17 148/13 148/16 155/3
155/7 155/14 155/23 158/11
159/9 159/17 159/19 159/24
161/1 161/9 161/10 162/17
162/18 163/5 171/4 171/22
171/23 173/14 176/11 176/13
178/15 178/16 181/18 188/17
194/23 195/1 195/22 196/18
196/20 196/22 197/6 201/18
202/23 202/24 209/14 210/6
210/22 212/6 212/8 212/13
217/7 218/12 218/16 218/22
**informed [2]**   92/16 148/11
**inherent [1]**   197/2
**initial [4]**   73/22 119/4
204/10 213/11
**initiate [1]**   11/12
**Injijian's [1]**   120/21
**inquiry [1]**   198/8
**inspection [3]**   8/24 11/12
14/4
**instance [7]**   24/25 27/21
32/1 52/19 61/1 61/11 171/9
**instances [2]**   199/5 209/15
**instant [1]**   31/22
**instituted [1]**   47/4
**instructed [1]**   57/13
**instruction [1]**   187/25
**intend [1]**   157/15
**intended [3]**   48/1 71/25
187/23
**intending [1]**   87/24
**intensive [1]**   111/2
**interaction [1]**   13/11
**interactions [2]**   12/23 13/14
**interesting [2]**   64/22 220/21
**internal [11]**   39/6 68/21
101/19 111/18 122/12 122/24
201/4 201/15 202/1 203/5
204/19
**internally [2]**   201/5 201/10
**International [1]**   14/6
**Internet [1]**   144/3
**interpret [2]**   195/4 195/8
**interpreted [1]**   162/3
**interpreting [4]**   68/14 78/23
196/2 218/23
**interrogate [1]**   75/8
**interview [17]**   21/21 21/23
22/9 97/23 98/1 112/17
133/22 151/8 151/13 151/15
152/6 152/17 152/22 161/20
162/24 194/22 215/11
**interviewed [4]**   133/6 133/9
133/14 161/20
**interviewing [7]**   22/7 56/12
112/10 112/11 112/13 112/14
112/24
**interviews [21]**   112/20 113/2
113/3 113/11 114/2 114/5
114/7 115/6 215/7 215/8
215/13 215/17 215/19 215/22
215/25 216/1 216/2 216/10
221/18 221/21 222/3
**intrusion [1]**   48/12

**investigate [2]**   51/5 51/9
**investigated [1]**   130/21
**investigating [5]**   40/16 41/5
51/13 68/5 204/22
**investigation [80]**   7/3 10/11
10/15 18/2 31/19 32/8 34/15
35/16 37/6 46/15 51/22 52/12
52/15 52/21 53/21 55/8 55/13
55/17 57/25 62/12 62/16 63/5
65/21 92/9 94/3 94/24 95/19
96/17 97/17 99/8 101/18
101/25 103/18 114/19 114/23
115/18 126/23 128/1 131/4
132/2 132/4 134/11 134/14
134/23 149/21 153/6 153/20
155/2 155/13 157/22 166/4
178/19 178/21 186/17 194/19
198/25 199/6 200/24 201/16
201/17 202/10 202/15 203/20
204/5 204/6 205/8 206/6
207/7 208/21 209/8 209/16
209/19 214/17 215/1 215/3
216/8 217/9 218/3 218/10
220/11
**investigations [1]**   216/24
**investigative [14]**   25/3
25/10 36/15 40/25 41/4 94/14
96/4 136/8 150/19 152/18
154/7 160/13 205/4 208/20
**investigator [3]**   10/5 66/15
164/18
**investigatory [5]**   112/7
112/9 192/22 196/1 201/15
**invited [1]**   84/10
**involved [7]**   29/3 56/24
63/11 95/19 124/15 146/25
166/9
**involvement [1]**   63/11
**involving [2]**   82/25 83/9
**iPad [1]**   23/21
**iPhone [1]**   28/4
**irrelevant [1]**   96/19
**IRS [6]**   36/20 101/23 101/25
102/21 114/22 116/9
**is [739]**
**Islands [1]**   14/6
**isn't [5]**   56/12 58/6 64/23
148/24 156/25
**isolated [1]**   184/11
**issue [27]**   48/17 53/10 58/21
80/24 81/9 82/16 85/23 86/24
88/22 89/6 89/11 89/15 89/18
90/2 96/25 123/21 124/2
144/9 156/22 162/6 162/16
174/4 174/25 184/9 188/22
214/17 220/1
**issued [5]**   108/5 137/19
216/15 216/17 220/6
**issues [4]**   44/19 84/9 84/12
190/6
**it [564]**
**items [7]**   16/20 27/12 52/14
52/17 52/18 55/12 95/4
**its [9]**   61/10 81/9 165/11
178/19 191/23 198/25 203/19
204/9 221/7
**itself [3]**   17/15 32/20 221/9
**Iullia [47]**   7/8 7/9 7/14
8/18 8/25 9/1 9/5 9/7 9/19
10/19 10/21 12/19 27/6 30/15
30/25 31/15 31/16 32/13
32/25 55/19 69/15 80/7 80/17
106/12 117/17 118/6 121/7
121/9 121/21 122/4 122/7
122/22 122/25 123/1 123/5
123/16 138/25 139/9 139/11
145/20 153/8 178/23 181/6
197/20 200/12 200/20 201/17

**J**

**J-U-S-T-I-N [1]**   5/20
**jail [2]**   177/1 177/1
**January [9]**   18/22 133/7
133/10 133/11 133/15 206/21
206/22 206/25 207/2
**January 12th [2]**   206/22
206/25
**January 2021 [1]**   133/7
**January 4th [1]**   206/10
**Jencks [1]**   44/11
**Jewelers [11]**   80/9 107/23
108/4 108/10 108/11 109/16
109/18 109/20 159/16 160/19
160/23
**Jewelers' [1]**   109/21
**job [4]**   23/24 51/5 94/2
99/24
**Jobe [5]**   94/16 94/20 94/23
95/3 95/19
**John [5]**   3/4 21/9 21/19
21/22 21/23
**Johnson [3]**   2/16 2/19 2/22
**joined [9]**   68/7 87/18 88/18
88/25 89/20 105/25 110/3
112/2 143/10
**JPEG [2]**   74/19 111/20
**JUDGE [1]**   1/4
**judging [1]**   178/11
**Judicial [1]**   224/9
**Julian [4]**   14/23 172/17
172/18 175/10
**JULY [3]**   1/16 5/1 39/10
**July 7th [1]**   39/10
**jump [2]**   18/1 21/3
**jumping [1]**   18/13
**June [9]**   10/11 10/11 10/13
46/16 55/3 67/18 201/17
206/22 215/18
**June 15th [2]**   67/18 206/22
**jury [16]**   6/11 41/12 58/21
68/1 85/2 90/9 90/11 162/17
196/15 197/23 205/23 206/1
206/13 208/16 220/7 221/3
**just [139]**
**JUSTICE [2]**   2/4 2/11
**JUSTIN [7]**   4/4 5/15 5/19
98/15 114/22 126/1 159/24

**K**

**KASTIGAR [50]**   1/15 5/8 7/20
17/13 18/3 20/9 20/10 21/7
29/7 45/12 45/14 52/9 53/6
53/9 53/17 80/24 81/9 82/16
83/18 84/12 85/14 85/23
87/12 88/22 89/6 89/11 89/14
90/1 94/6 133/12 124/1
133/12 133/18 134/19 177/12
188/7 189/6 191/19 194/2
195/9 196/4 197/3 198/8
215/2 215/9 217/21 217/25
219/18 219/23 221/9
**Kastigar-related [3]**   87/12
123/21 124/1
**KATIE [2]**   1/20 224/12
**KATZENSTEIN [5]**   2/5 84/15
125/25 127/13 128/10
**Katzman [2]**   3/4 3/7
**Kauichko [48]**   27/10 28/9
28/11 28/11 28/16 54/18
56/23 57/21 58/9 59/22 65/1
65/11 66/21 122/4 154/12
158/5 158/18 159/18 160/2
161/15 164/4 166/12 172/1
172/6 173/10 173/23 174/15
174/16 174/19 179/4 179/13
179/19 180/3 180/10 180/10
180/11 181/2 181/20 182/1

**K**

**Kauichko... [9]** 182/24 183/1
183/14 183/15 188/24 192/10
201/5 201/11 202/2
**keep [6]** 12/14 51/15 51/16
51/17 99/10 99/21
**Ken [3]** 95/2 95/21 96/9
**Kenneth [2]** 94/12 95/15
**Keough [5]** 2/19 4/8 4/11
93/20 125/9
**kept [1]** 192/9
**key [9]** 68/25 69/2 183/12
188/23 189/3 191/4 195/5
210/1 219/1
**Kidd [1]** 172/17
**kind [3]** 19/6 63/25 77/23
**Kirin [2]** 173/1 173/1
**knew [20]** 43/3 43/6 54/21
54/23 55/7 55/15 56/14 56/18
56/21 58/8 89/6 118/25 119/3
157/21 158/9 158/20 164/6
168/16 182/18 218/20
**know [117]**
**knowing [2]** 28/16 219/12
**knowledge [7]** 8/11 26/4 32/1
53/6 58/16 103/12 197/16
**known [2]** 171/18 182/22
**knows [4]** 40/22 145/14
164/18 216/20
**KONG [1]** 2/5
**Kudamov [2]** 120/23 154/20
**KX1 [3]** 17/12 138/10 146/16
**KX2 [1]** 106/19
**KX28 [2]** 150/5 151/7
**KX30 [1]** 113/14
**KX60 [1]** 13/19

**L**

**La [4]** 56/4 147/5 180/8
181/7
**lab [2]** 24/3 24/8
**label [1]** 66/9
**labeled [4]** 30/21 32/5 77/25
113/19
**lag [1]** 205/20
**Lane [1]** 65/17
**language [1]** 121/20
**Lansgaard [17]** 80/8 146/13
146/15 146/21 146/24 147/7
147/12 147/25 148/2 150/3
150/10 150/18 151/2 151/5
151/10 151/21 209/24
**Lansgaard's [5]** 148/13
148/22 149/25 151/19 152/11
**large [7]** 25/18 36/16 73/14
111/21 114/17 205/22 210/3
**largely [2]** 163/18 165/18
**larger [1]** 78/3
**last [14]** 6/4 34/16 35/12
70/16 77/24 110/5 122/14
124/24 125/25 131/16 155/18
160/17 177/8 182/21
**Lastly [1]** 46/13
**late [8]** 46/16 69/16 73/25
92/17 137/18 202/21 207/4
216/17
**later [17]** 18/1 18/24 22/22
51/25 56/3 72/23 79/3 97/8
98/19 100/14 106/22 110/9
134/3 158/6 162/21 171/2
204/24
**launder [1]** 183/21
**laundering [1]** 106/14
**law [5]** 57/8 163/11 195/2
211/13 219/22
**lawyers [1]** 5/9
**lay [2]** 204/15 214/2
**lays [2]** 192/25 199/11

**lead [9]** 10/5 94/25 108/7
111/3 113/24 120/8 200/24
201/21 221/21
**leading [3]** 26/16 43/4
221/23
**leads [17]** 92/8 93/24 94/3
95/15 95/16 95/18 96/7 96/12
99/25 111/22 160/14 162/24
163/13 163/16 205/4 208/20
218/9
**lean [2]** 68/9 68/11
**learn [6]** 12/4 12/11 57/6
150/18 151/1 169/22
**learned [31]** 8/24 11/10
11/25 12/6 12/8 12/9 12/18
14/16 56/6 57/2 97/2 150/22
150/24 151/24 152/1 158/25
167/16 167/18 169/24 170/5
170/7 170/9 170/9 171/22
172/7 173/15 175/4 176/10
176/13 197/7 218/16
**learning [1]** 39/22
**lease [1]** 192/10
**least [16]** 12/14 24/14 34/15
83/15 87/2 87/25 95/20 97/9
97/16 153/5 158/14 160/16
189/13 190/12 208/24 216/3
**leave [5]** 47/14 54/7 124/14
134/9 176/18
**led [4]** 96/15 107/1 107/20
192/22
**left [4]** 54/12 55/13 138/12
212/2
**left-hand [1]** 138/12
**legal [9]** 150/20 150/22
151/10 151/17 151/25 152/3
152/12 152/14 152/19
**legitimate [1]** 198/18
**lender [2]** 69/1 69/2
**lenders [1]** 20/12
**lengthy [1]** 187/24
**less [11]** 26/2 26/5 26/8
42/1 111/2 157/2 197/5 197/8
215/16 215/17 221/17
**let [15]** 19/13 37/4 40/23
54/11 54/22 88/6 120/13
121/19 135/6 142/15 151/15
192/1 192/5 196/5 214/14
**let's [53]** 7/20 7/21 8/8
11/7 13/19 15/20 17/11 18/1
18/2 18/18 19/19 20/7 20/7
21/3 23/18 26/11 26/24 29/22
32/4 33/1 33/2 33/2 33/20
33/20 34/4 34/16 39/6 41/24
43/12 44/25 45/10 46/13
57/16 59/10 64/18 79/18 86/4
94/6 95/10 102/4 113/17
125/20 126/4 133/12 134/18
137/11 137/13 137/13 138/10
145/15 156/6 177/4 187/22
**letter [10]** 80/2 80/3 80/4
80/4 80/6 80/12 80/21 80/25
82/18 89/13
**letters [6]** 80/4 113/7
113/20 113/23 116/10 116/10
**letting [2]** 50/4 95/25
**level [3]** 29/13 71/16 85/3
**Lewis [1]** 3/4
**license [19]** 12/19 63/18
63/21 64/19 120/22 121/3
121/7 121/10 123/5 138/1
138/25 139/3 139/9 139/12
140/16 145/23 146/2 181/11
181/12
**licenses [16]** 16/16 121/20
122/7 122/12 122/22 122/25
123/2 123/16 138/19 139/15
139/16 139/20 140/14 141/2
141/6 141/7

**light [3]** 156/17 167/4 169/9
**like [63]** 7/18 17/14 20/1
20/12 28/1 28/4 28/4 29/13
37/2 39/16 39/20 40/1 41/10
42/19 50/18 50/20 50/23
60/20 65/12 69/1 69/6 72/2
73/5 73/8 73/12 73/14 73/25
74/16 74/17 77/8 77/15 77/16
80/17 82/10 85/3 90/6 93/23
99/17 100/4 113/19 129/19
130/4 130/5 140/17 141/19
141/22 141/25 145/9 146/8
152/3 156/7 156/10 161/11
179/23 182/3 189/16 189/19
191/21 195/19 196/1 203/9
209/10 218/25
**likelihood [3]** 83/18 84/1
89/25
**likely [14]** 15/3 22/2 26/7
26/16 37/21 38/15 45/24 60/8
72/23 84/6 84/10 86/19
190/14 200/13
**likenesses [1]** 140/21
**limited [2]** 187/4 207/20
**line [15]** 76/25 94/19 95/7
102/22 147/11 170/24 182/25
184/20 184/22 191/20 191/21
206/2 220/4 220/8 220/21
**line 5 [1]** 170/24
**lines [8]** 47/3 102/19 119/9
120/10 120/13 120/14 153/10
163/12
**link [5]** 179/24 179/25 180/1
180/2 183/12
**linkage [1]** 72/1
**linking [3]** 8/4 72/2 72/4
**links [1]** 199/1
**list [17]** 79/4 81/23 81/24
95/4 95/8 99/23 99/24 100/13
129/3 131/16 132/6 135/4
135/7 193/13 204/21 205/2
210/20
**listed [7]** 9/13 81/21 81/23
98/13 99/2 99/3 204/21
**listener [2]** 190/22 190/23
**listening [1]** 191/8
**lists [1]** 182/21
**literal [1]** 74/16
**literally [1]** 89/2
**little [8]** 13/25 34/10 68/17
143/13 157/4 157/21 210/25
222/16
**Littrell [26]** 3/4 3/4 3/7
4/7 88/17 165/12 165/21
166/14 166/19 167/7 167/16
167/24 169/8 170/25 171/7
171/8 171/11 171/13 171/19
174/4 174/22 177/5 184/25
188/12 211/24 218/19
**Littrell's [1]** 177/11
**live [2]** 174/10 181/22
**lived [1]** 180/25
**living [1]** 56/4
**LLP [5]** 2/16 2/19 2/22 3/4
3/7
**loaded [3]** 36/19 42/19 68/24
**loading [1]** 102/6
**loan [27]** 20/16 21/12 21/16
21/19 22/12 22/14 23/16
62/20 95/5 95/20 97/22 97/25
100/9 116/5 137/8 138/16
145/6 172/11 179/5 179/12
180/17 180/21 183/24 195/21
199/2 209/16 210/4
**loans [26]** 7/25 8/5 43/15
76/12 95/7 95/19 97/15 97/20
98/13 98/21 99/3 99/7 100/13
100/18 101/6 101/12 101/15
102/7 106/12 157/23 174/8

loans.... **[5]**   174/13 174/14
181/20 183/16 194/19
**local [1]**   172/20
**locations [1]**   217/2
**lodge [1]**   144/5
**lodged [1]**   70/15
**log [1]**   216/12
**long [2]**   32/21 164/6
**longer [1]**   79/14
**look [58]**   7/12 7/20 8/8
13/19 15/6 16/11 17/11 18/2
21/6 21/14 21/16 21/19 21/20
22/1 22/13 23/10 28/16 32/24
33/3 34/4 34/19 39/2 39/6
44/25 46/6 46/9 64/2 64/12
70/1 73/8 75/19 75/21 76/4
97/13 107/20 108/16 113/19
142/17 144/10 144/17 147/10
163/10 168/22 169/18 172/25
192/15 195/10 195/13 203/11
204/2 211/8 214/25 215/6
215/14 216/7 216/11 216/19
222/5
**looked [16]**   12/13 21/17
39/16 41/19 69/2 70/9 77/19
77/21 99/22 123/4 139/15
140/3 159/11 189/15 208/9
212/15
**looking [18]**   16/15 20/6
20/10 27/21 32/16 55/18 61/9
61/12 62/8 63/10 64/1 71/20
79/9 90/6 96/3 107/18 113/23
170/21
**looks [8]**   20/11 20/12 24/23
28/1 29/12 65/12 143/4 152/3
**LOS [6]**   1/14 1/22 2/8 2/17
3/9 5/1
**lose [1]**   186/19
**loses [1]**   165/10
**loss [1]**   105/4
**lost [1]**   109/10
**lot [14]**   17/2 25/20 26/8
26/9 41/11 41/21 42/15 88/3
89/17 95/18 99/7 156/23
195/16 210/10
**lots [1]**   93/24
**luggage [1]**   59/8
**lunch [5]**   128/15 128/18
128/19 128/22 129/2
**Luncheon [1]**   79/20
**Lynne [1]**   15/25

**M**

**M-A-S-S-I-N-O [1]**   93/17
**MacDaniels [1]**   192/24
**made [27]**   6/17 9/1 9/5 11/14
24/17 82/17 106/21 109/17
109/17 109/19 133/19 161/19
166/14 171/7 171/21 171/21
172/2 176/4 177/1 184/8
193/13 193/22 194/16 199/1
207/17 214/9 219/11
**mail [91]**   8/21 9/11 19/20
20/11 20/12 20/19 33/12 34/2
34/6 37/2 39/15 40/3 40/4
40/6 40/8 40/11 43/14 43/17
44/8 44/21 45/1 46/6 46/9
47/24 61/13 62/25 64/12
64/15 64/18 71/13 71/16 72/8
72/23 76/6 76/11 76/15 94/9
94/10 94/16 94/19 95/2 96/12
96/22 96/24 98/8 98/10 98/12
98/16 98/17 99/1 99/18 99/22
100/6 100/7 100/16 100/22
100/25 110/13 134/21 135/2
135/10 142/1 142/4 142/6
142/10 142/17 144/4 147/2

168/23 169/19 170/5 170/6
170/25 173/1 173/2 173/4
173/21 181/17 182/20 184/25
194/4 194/4 195/1 195/12
195/13 195/14 196/8
**mailed [4]**   11/16 11/19 36/17
63/8
**mails [21]**   6/11 6/11 24/4
24/5 64/2 99/17 150/9 166/2
167/25 168/3 168/14 169/18
170/4 170/15 171/6 172/15
175/14 184/13 185/6 185/20
185/24
**main [5]**   16/18 16/25 84/6
164/1 221/11
**majority [2]**   37/15 216/13
**make [25]**   15/12 24/1 26/18
38/6 43/25 45/5 68/18 75/19
105/3 108/4 114/12 117/25
120/18 121/19 121/23 148/18
157/1 159/8 161/21 167/7
170/12 177/17 190/5 190/7
193/1
**makes [8]**   28/5 137/25 168/21
170/3 171/13 171/19 191/14
212/18
**making [3]**   159/16 163/11
171/16
**Management [2]**   98/25 100/3
**mansion [3]**   179/7 183/22
208/4
**manual [1]**   173/17
**manually [1]**   70/15
**Manuk [2]**   192/11 219/3
**many [10]**   16/7 18/15 50/25
73/10 73/19 114/5 132/24
173/18 196/25 217/2
**Mapelli [6]**   220/14 220/17
220/20 220/22 221/1 221/6
**March [21]**   18/22 22/23 26/17
26/17 37/19 38/4 38/10 41/16
42/24 43/3 43/5 110/10
110/13 115/5 191/18 202/20
205/18 206/7 208/18 212/7
218/2
**March 11th [3]**   26/17 110/10
110/13
**March 19th [1]**   202/20
**March 9th [3]**   42/24 43/3
43/5
**Marietta [26]**   14/4 54/16
54/21 55/9 55/21 55/25 56/7
56/14 56/19 63/23 131/8
167/14 170/20 171/17 173/11
173/24 175/22 176/16 177/2
179/1 180/2 181/13 200/21
200/24 201/20 201/24
**Marietta's [1]**   170/23
**marital [1]**   25/1
**mark [2]**   125/25 143/22
**marked [6]**   94/6 102/4 133/18
134/19 144/18 145/3
**married [2]**   25/1 56/15
**Martinez [2]**   191/21 220/13
**mary [23]**   8/4 11/10 55/16
80/8 81/16 81/20 81/24 96/16
155/10 157/20 157/25 158/9
158/16 158/23 158/25 159/25
160/22 161/3 161/5 164/3
166/9 175/24 209/21
**mary.abelian [1]**   61/16
**Marylee [2]**   194/24 209/10
**mask [1]**   104/14
**MASSINO [19]**   4/8 36/21 78/18
78/23 79/12 93/11 93/16
93/21 94/8 98/6 100/23 103/1
116/23 126/2 130/13 153/24
170/17 194/20 194/20

**matching [1]**   214/12
8/9 60/21
168/11
**materials [8]**   22/19 67/23
68/20 68/23 105/6 105/9
116/15 116/17
**math [2]**   18/21 216/1
**matter [8]**   79/17 178/13
186/21 201/22 213/11 213/13
222/14 224/7
**matters [6]**   166/15 174/6
174/23 186/2 186/5 219/19
**may [63]**   18/13 18/22 18/24
19/14 21/17 22/23 22/24
40/10 44/2 47/16 48/17 53/12
67/16 72/19 72/21 72/23
72/24 73/1 76/6 80/1 80/22
81/7 81/20 82/18 82/18 82/24
83/8 85/15 86/9 88/3 88/18
88/23 88/23 89/12 89/15
89/19 90/19 95/9 99/3 104/18
111/1 112/14 118/1 124/14
142/21 143/25 144/1 147/12
171/8 185/1 186/21 187/5
194/4 197/9 206/22 206/23
206/24 209/3 217/3 217/4
217/22 217/24 222/15
**May 10th [4]**   72/19 72/21
72/23 73/1
**May 11th [2]**   72/24 76/6
**May 13th [8]**   80/22 81/7
82/18 83/8 85/15 88/23 89/12
89/19
**May 21 [1]**   18/24
**May 21st [2]**   18/13 19/14
**May 2nd [1]**   147/12
**May 4th [3]**   206/22 206/23
206/24
**May 7th [6]**   67/16 80/1 81/20
82/18 88/23 89/15
**maybe [10]**   37/13 37/22 43/12
91/4 103/6 108/15 142/11
142/11 168/2 221/17
**me [72]**   6/6 19/13 21/16
21/18 33/13 33/13 33/18
34/14 37/4 40/23 47/12 49/17
49/24 50/4 50/18 51/3 54/11
54/22 59/11 60/21 75/9 76/4
76/19 77/3 79/9 84/19 90/19
93/6 99/19 101/8 106/24
107/12 111/22 112/25 113/2
120/13 121/2 121/19 123/18
139/24 142/15 142/22 142/25
145/2 148/22 151/6 151/15
154/17 155/8 166/16 168/25
169/5 170/18 172/8 173/1
173/3 175/7 175/19 179/21
180/14 181/4 182/5 188/1
190/17 190/25 191/8 192/5
194/16 196/5 211/21 214/14
215/23
**mean [52]**   11/1 16/13 21/23
26/6 31/24 31/25 37/13 44/13
52/20 53/19 54/24 55/12 59/5
61/20 66/8 68/3 68/11 69/6
75/3 76/18 80/13 84/19 89/2
90/5 90/12 90/20 91/3 91/8
91/18 92/22 99/14 108/12
109/19 112/8 115/11 118/22
124/1 126/3 129/23 129/23
130/21 145/9 148/24 156/10
156/19 167/4 168/1 185/25
199/5 201/9 217/6 221/17
**meaning [3]**   9/23 21/22 51/24
**meaningful [1]**   186/16
**means [6]**   56/9 77/3 91/3
171/3 192/20 216/4
**meant [3]**   13/20 128/6 143/13
**measures [2]**   80/12 80/13

**mechanisms [2]** 46/14 47/1
**Media [1]** 63/3
**medium [1]** 47/24
**meet [8]** 87/24 165/4 193/2
193/7 198/1 202/8 218/13
219/18
**meeting [1]** 133/23
**member [3]** 153/20 159/9
160/7
**members [6]** 96/5 98/12
134/23 181/22 181/23 207/14
**memo [11]** 68/1 68/22 115/1
115/3 117/4 120/8 120/11
120/25 143/7 143/18 182/25
**memorandum [11]** 114/15
115/24 116/3 118/15 119/4
119/14 120/17 133/22 151/8
151/15 204/3
**memorialized [1]** 12/22
**memory [6]** 7/24 13/14 35/3
60/14 64/17 210/18
**mention [4]** 173/10 175/13
175/14 175/25
**mentioned [22]** 42/18 43/9
53/14 56/3 68/20 71/19 82/5
82/24 116/22 116/24 124/13
129/5 133/5 137/6 137/24
138/6 140/15 140/16 141/25
154/15 175/16 185/15
**merits [1]** 89/25
**message [31]** 22/11 23/4 23/7
28/19 29/3 29/19 30/25 33/3
33/15 33/23 34/9 34/11 37/17
71/1 73/5 73/8 73/13 73/22
74/3 74/7 74/11 74/14 78/12
79/11 107/18 107/20 108/11
108/18 108/21 109/24 159/12
**messages [83]** 21/21 22/1
23/10 23/11 27/16 27/22
27/23 27/25 28/7 28/9 28/10
29/4 29/16 31/11 31/22 32/25
33/21 33/22 34/18 35/19 36/5
36/6 36/9 36/19 36/24 37/5
38/8 38/15 39/13 41/8 45/3
45/20 45/23 59/21 69/4 69/7
69/7 69/10 69/17 69/20 69/21
70/18 70/20 70/22 70/23 71/4
72/25 73/3 73/20 73/20 74/13
74/16 74/22 75/2 76/23 77/1
77/4 77/12 77/17 77/21 78/6
78/9 78/10 78/15 78/24 79/6
79/13 108/13 142/7 158/25
160/2 160/8 160/24 163/25
164/15 171/24 175/20 175/21
175/25 190/15 196/25 197/14
197/20
**messagings [1]** 37/8
**met [1]** 165/10
**Miami [87]** 6/16 6/25 7/8
11/7 11/16 11/16 12/20 12/25
13/11 14/1 14/6 14/8 15/21
15/22 23/22 24/8 25/6 25/22
25/22 40/18 41/9 42/9 44/22
46/14 46/18 54/16 55/1 55/25
56/15 56/19 58/10 60/1 61/5
62/8 66/25 83/16 84/16 84/25
85/1 85/6 90/8 90/10 92/8
96/24 98/22 99/3 100/19
103/3 103/8 103/11 103/17
103/21 103/24 107/7 115/14
117/5 117/12 117/15 117/15
121/10 126/12 126/14 126/17
126/18 127/23 129/11 131/1
131/25 133/3 135/19 135/21
136/6 136/15 138/21 145/19
146/19 154/12 154/15 155/10
155/20 188/23 194/13 195/25

**mechani [1]** 214/18 216/6 216/15 216/25
**Michel [1]** 141/21
**mid [6]** 37/21 105/22 112/2
114/6 133/11 207/4
**middle [3]** 34/5 61/25 172/23
**midnight [1]** 173/3
**might [8]** 15/6 64/13 75/13
78/19 93/24 103/14 164/8
170/22
**million [1]** 179/7
**Minasian [1]** 87/18
**mind [12]** 6/12 6/13 43/7
68/11 68/17 82/17 89/18 92/6
175/3 191/6 208/1 222/17
**minds [1]** 221/2
**minor [1]** 43/21
**minute [8]** 66/2 166/21 169/5
169/13 174/11 221/17 221/18
222/13
**minutes [5]** 79/15 171/2
173/3 190/16 211/21
**mirror [4]** 196/25 197/10
197/21 214/11
**Misak [6]** 19/20 19/21 20/7
20/12 20/15 20/19
**misconduct [3]** 85/25 87/20
88/5
**misdirected [1]** 185/7
**misleading [1]** 143/13
**miss [1]** 58/5
**missed [3]** 176/2 203/23
220/14
**missing [1]** 20/13
**Misstates [1]** 89/8
**mistake [2]** 100/1 194/16
**misunderstanding [1]** 219/23
**misunderstood [1]** 119/13
**Mkrtchyan [1]** 62/9
**mobile [3]** 117/18 118/8
118/9
**model [1]** 61/22
**modified [1]** 123/12
**modifies [1]** 156/14
**modify [1]** 123/13
**MOIs [1]** 215/10
**moment [13]** 66/12 89/2 160/6
166/7 179/3 181/4 186/2
189/11 190/6 193/22 200/3
211/5 219/9
**momentarily [1]** 158/1
**Monday [2]** 72/19 72/23
**money [25]** 9/23 10/1 106/14
106/17 116/8 157/24 161/14
174/9 178/24 178/25 179/4
179/5 180/10 180/18 181/3
181/4 181/21 181/25 182/12
183/2 183/18 183/21 200/14
200/25 208/7
**month [5]** 13/25 129/24
129/25 130/3 200/18
**months [14]** 7/2 10/15 18/17
18/18 18/23 18/24 20/24
22/22 45/25 159/8 162/21
172/8 206/9 215/21
**more [47]** 13/25 29/22 30/18
42/19 42/21 42/21 54/14
59/11 64/5 64/6 66/19 68/5
78/2 79/10 82/15 107/6 114/1
116/13 133/25 133/25 137/14
156/13 158/12 159/3 160/10
160/25 162/20 172/8 174/6
174/23 183/25 186/5 186/15
193/20 195/3 208/1 211/19
211/21 215/13 215/21 215/25
216/1 216/2 218/7 220/4
221/17 222/2
**morning [19]** 5/24 5/25 39/11
47/20 47/21 49/13 49/15
49/25 50/11 50/16 67/14

**mechani [1]** 67/15 128/13 142/1 142/9
**mechani [1]** 149/10 153/20 183/5
**mortgage [3]** 56/22 135/14
135/15
**most [12]** 79/15 94/4 140/18
157/2 158/15 159/5 163/6
163/17 191/12 191/24 209/15
210/9
**motion [10]** 45/9 57/15 83/18
86/10 86/24 87/23 88/2 88/4
110/17 110/18
**motions [6]** 1/15 5/8 85/25
87/19 87/19 88/3
**mountain [1]** 207/25
**move [2]** 60/19 149/1
**moved [3]** 206/3 207/1 207/2
**moves [1]** 179/8
**moving [1]** 61/21
**Mr [15]** 4/4 4/5 4/6 4/7 4/8
4/10 4/11 5/23 47/9 67/13
88/17 93/20 104/9 104/22
125/9
**Mr. [144]**
**Mr. Andre [2]** 195/14 195/15
**Mr. Ayvazian [5]** 8/14 10/2
50/5 82/20 106/11
**Mr. Ayvazian's [1]** 118/7
**Mr. Ayvazyan [5]** 57/11 85/19
87/1 118/11 219/7
**Mr. Ayvazyan's [1]** 117/16
**Mr. Cipolletti [2]** 48/22
129/5
**Mr. Clark [2]** 37/13 37/16
**Mr. Debois [3]** 133/14 133/23
134/1
**Mr. Faerstein [9]** 104/23
113/4 113/18 124/21 129/16
129/22 130/3 134/24 144/2
**Mr. Faerstein's [1]** 105/20
**Mr. Fenton [62]** 21/18 37/13
37/16 38/20 39/13 39/19
39/25 40/2 45/16 45/19 45/22
46/5 48/22 48/23 49/2 49/8
49/11 49/14 49/25 50/10
50/12 50/16 59/24 75/10
82/25 83/9 83/22 93/1 108/17
109/5 126/5 126/12 126/15
127/8 134/24 153/3 154/3
160/18 163/6 163/20 164/5
164/14 164/24 169/10 169/14
170/4 170/7 170/14 184/10
185/16 185/23 187/18 188/5
190/4 190/9 191/25 192/5
195/15 198/2 199/15 211/16
218/18
**Mr. Fenton's [4]** 45/11
127/10 197/17 215/3
**Mr. Lansgaard [1]** 147/7
**Mr. Littrell [21]** 165/12
165/21 166/14 166/19 167/7
167/16 167/24 169/8 170/25
171/7 171/8 171/11 171/13
171/19 174/4 174/22 177/5
184/25 188/12 211/23 218/19
**Mr. Littrell's [1]** 177/11
**Mr. Minasian [1]** 87/18
**Mr. Paetty [5]** 71/13 82/25
83/9 83/22 134/24
**Mr. Paetty's [1]** 72/8
**Mr. Palmerton [1]** 170/9
**Mr. Palmerton's [1]** 185/17
**Mr. Ram [8]** 83/12 187/24
202/13 211/23 212/16 212/18
214/14 221/23
**Mr. Ram's [1]** 198/6
**Mr. Richard [2]** 85/20 86/16
**Mr. Trontz [2]** 17/6 72/2
**Mr. Young [2]** 90/20 90/21
**Mrs. [3]** 220/22 221/1 221/6

**M**

**Mrs. Mapelli [3]** 220/22 221/1 221/6
**Ms [7]** 57/11 79/24 86/22 161/13 171/25 186/6 196/8
**Ms. [38]** 8/15 32/18 50/5 54/25 56/12 57/3 57/10 57/20 58/10 61/18 63/8 63/10 65/5 65/24 66/20 67/5 67/14 71/10 71/12 76/14 79/22 82/5 82/9 84/15 85/11 86/2 86/19 86/20 87/9 88/10 88/18 93/9 127/13 128/10 131/25 132/3 196/18 197/15
**Ms. Ahn [10]** 67/14 71/12 79/22 86/19 88/18 93/9 131/25 132/3 196/18 197/15
**Ms. Ahn's [1]** 71/10
**Ms. Catherine [1]** 67/5
**Ms. Dadyan [3]** 86/20 87/9 88/10
**Ms. Katzenstein [3]** 84/15 127/13 128/10
**Ms. Romero [2]** 32/18 76/14
**Ms. Simbatyan [2]** 82/5 82/9
**Ms. Tamara [1]** 86/2
**Ms. Terabelian [12]** 8/15 50/5 56/12 57/3 57/10 57/20 58/10 61/18 63/8 63/10 66/20 85/11
**Ms. Terabelian's [3]** 54/25 65/5 65/24
**much [9]** 43/25 51/18 54/10 79/10 79/14 83/10 95/3 123/7 208/10
**multi [1]** 28/1
**multi-page [1]** 28/1
**multiple [12]** 11/25 12/2 12/2 12/4 16/14 16/14 122/11 122/22 195/22 219/1 219/2 219/12
**mumble [1]** 64/9
**must [5]** 39/14 40/3 40/9 170/1 176/2
**my [123]**
**myself [6]** 36/20 108/14 108/15 165/22 174/22 175/10

**N**

**name [57]** 4/3 5/17 5/19 8/18 10/19 12/19 20/19 58/9 62/12 62/14 63/5 63/21 64/25 65/2 65/5 65/10 67/7 69/15 75/3 75/7 81/25 93/15 94/24 104/12 106/13 125/3 125/20 125/25 126/1 133/6 134/11 134/17 138/25 139/9 139/11 139/21 145/20 145/21 146/25 149/25 172/6 173/9 173/23 174/7 174/13 180/11 180/23 181/1 181/5 182/10 183/13 183/15 183/16 183/19 201/14 201/22 201/23
**named [2]** 132/6 146/13
**names [7]** 24/25 30/7 77/15 194/21 200/19 200/20 210/5
**naming [1]** 95/19
**Nanni [1]** 198/23
**narrow [1]** 95/16
**narrowing [4]** 68/17 94/17 94/20 96/22
**nature [2]** 16/17 193/4
**Nazar [15]** 80/7 80/18 85/9 85/11 161/3 167/13 169/21 169/22 170/6 170/19 171/1 182/13 182/16 182/25 183/3
**necessarily [1]** 11/5
**necessary [3]** 15/15 15/18

44/14
**need [12]** 22/6 31/21 32/21 35/12 54/10 92/4 106/20 190/5 190/7 193/10 194/6 198/15
**needed [3]** 78/14 90/13 96/1
**negate [1]** 198/14
**negative [1]** 162/19
**negotiations [4]** 86/12 86/21 87/1 87/9
**never [18]** 52/11 52/14 92/22 93/3 93/4 93/4 93/6 103/11 107/8 136/3 176/22 184/14 187/11 187/12 207/25 209/22 210/5 218/17
**new [12]** 2/11 46/19 71/9 73/23 74/9 74/12 74/15 75/3 92/25 201/22 212/24 217/7
**next [22]** 18/2 24/22 29/21 30/2 33/23 38/18 64/18 64/22 67/5 93/8 93/11 98/19 104/8 111/10 113/24 119/10 122/9 124/22 135/8 149/2 155/9 216/19
**NIALL [3]** 2/6 48/22 125/24
**Nicholas [1]** 2/21
**night [8]** 34/6 35/2 49/8 72/25 172/24 177/9 182/21 187/7
**nine [2]** 107/12 178/17
**Ninth [7]** 192/24 198/12 220/1 220/17 220/24 220/24 221/4
**no [136]**
**No. [1]** 178/7
**No. 329 [1]** 178/7
**nobody [3]** 91/25 92/7 92/12
**nodding [1]** 170/8
**non [1]** 219/18
**none [7]** 193/16 206/9 206/11 206/11 206/12 216/25 216/25
**nonexistence [1]** 116/11
**noon [1]** 79/18
**Norayr [1]** 63/22
**normal [1]** 70/13
**North [1]** 2/7
**Northern [1]** 124/5
**Northwest [1]** 20/3
**not [214]**
**notaries [1]** 135/14
**notary [2]** 133/6 134/2
**note [8]** 9/18 41/20 98/20 118/10 141/5 158/19 177/16 184/15
**noted [8]** 5/12 36/16 40/4 42/14 85/16 148/22 170/19 170/23
**notes [3]** 28/12 65/14 190/9
**nothing [11]** 48/6 48/25 48/25 126/7 129/7 158/4 158/5 192/20 192/21 192/22 192/23
**notice [1]** 175/11
**noticed [2]** 114/4 148/9
**notifies [1]** 57/8
**notion [1]** 214/17
**November [20]** 13/7 13/22 15/21 18/16 19/3 19/4 19/17 23/1 23/20 75/24 97/11 118/12 118/16 119/2 132/19 188/20 208/8 213/2 218/1 222/21
**November 13th [7]** 15/21 18/16 19/17 97/11 132/19 188/20 218/1
**November 16th [1]** 13/7
**November 20th [1]** 23/20
**November 24th [1]** 13/22
**November 5 [1]** 19/3

19/4 23/1
**November 5th [6]** 19/4 23/1
**now [72]** 13/19 15/20 18/13 21/3 28/19 33/20 34/2 45/15 55/14 55/19 56/18 61/21 62/8 74/21 78/5 79/17 81/13 94/8 94/25 96/22 102/17 103/1 109/15 111/6 111/17 111/24 112/16 113/13 116/13 117/4 117/7 119/5 119/6 134/11 134/18 134/20 137/17 138/5 138/23 139/7 140/11 141/18 142/17 145/4 146/11 149/24 154/14 156/4 158/19 161/24 162/21 162/22 164/19 166/21 167/1 167/9 167/24 170/13 179/21 184/17 185/10 191/1 191/2 196/5 200/5 202/12 202/17 204/11 210/12 213/23 214/19 217/12
**number [31]** 30/12 32/5 33/9 59/7 61/25 62/2 62/5 65/12 65/13 69/22 71/8 73/14 73/16 95/18 96/7 98/13 105/6 134/16 143/23 159/18 169/16 173/16 173/16 178/1 185/2 195/23 209/1 210/3 216/14 221/18 221/20
**numbers [5]** 30/7 71/1 71/5 71/5 95/5
**numerous [1]** 57/11
**Nursery [2]** 102/8 102/22
**NW [2]** 2/11 2/22
**NWtradings.com [1]** 19/21

**O**

**O'DONNELL [1]** 2/6
**oath [1]** 164/24
**obituary [4]** 146/21 148/2 148/4 149/13
**object [1]** 211/3
**objection [25]** 11/2 18/20 19/9 19/12 26/14 40/19 48/11 52/5 58/18 66/6 86/3 89/8 90/24 91/2 99/12 109/8 113/15 123/9 123/22 127/5 128/20 130/19 146/6 152/5 167/3
**observation [1]** 81/11
**observed [5]** 23/4 138/2 138/9 145/23 181/11
**obtain [7]** 101/7 106/12 173/6 202/19 206/1 206/3 208/17
**obtained [11]** 62/19 69/7 76/24 99/25 114/18 179/5 180/17 182/12 209/16 210/9 210/10
**obtaining [1]** 202/23
**obviated [3]** 92/4 92/10 92/15
**obvious [2]** 75/9 184/12
**obviously [4]** 37/5 81/15 90/14 189/9
**occurred [7]** 83/8 96/24 99/19 129/24 131/23 152/22 215/25
**occurs [1]** 32/1
**October [49]** 6/21 6/24 7/6 10/9 11/11 12/23 14/3 14/16 14/16 46/18 49/3 49/8 54/21 54/23 57/2 74/1 94/10 95/14 96/22 157/20 158/9 164/6 166/5 167/16 167/19 168/17 169/21 171/15 171/15 173/4 178/20 180/4 180/5 181/16 181/25 183/14 187/5 188/16 191/17 200/17 200/17 200/22 200/25 201/23 202/11 215/16

**O**

**October... [3]** 216/8 217/25 222/23
**October 16th [2]** 11/11 57/2
**October 19th [16]** 12/23 14/3 14/16 49/3 49/8 54/21 54/23 166/5 171/15 178/20 180/4 180/5 181/25 183/14 187/5 202/11
**October 20th [5]** 14/16 171/15 173/4 188/16 217/25
**October 22nd [7]** 6/21 6/24 7/6 10/9 167/16 168/17 169/21
**October 23rd [1]** 167/19
**October 5th [4]** 200/17 200/22 200/25 201/23
**October 7th [1]** 181/16
**October 8th [2]** 94/10 96/22
**off [8]** 15/21 55/13 78/4 122/15 191/8 212/2 222/22 222/23
**offer [1]** 83/24
**office [5]** 2/4 85/24 100/8 111/13 124/6
**officer [1]** 11/22
**officers [5]** 11/12 11/16 13/12 13/16 57/13
**Official [1]** 1/20
**officials [1]** 171/24
**Oh [3]** 76/10 76/16 130/1
**OIG [2]** 36/21 95/22
**Okay [121]**
**Olaf [20]** 80/8 146/13 146/15 146/21 146/24 147/12 147/25 148/2 148/13 148/22 149/25 150/3 150/10 150/18 151/1 151/5 151/10 151/19 152/11 209/24
**omitted [1]** 140/20
**once [11]** 8/23 26/12 26/22 42/19 162/18 167/8 176/16 176/25 201/19 205/25 213/11
**one [116]**
**ones [11]** 8/15 96/8 98/14 98/21 98/24 99/11 99/23 117/1 159/4 215/14 216/3
**only [35]** 51/25 63/2 70/5 70/23 74/7 82/10 84/18 89/14 102/21 117/10 117/13 117/14 123/5 144/21 144/25 157/25 159/12 159/13 160/4 161/9 162/16 163/9 165/21 169/23 184/20 187/14 192/8 194/13 195/2 198/15 207/14 208/19 212/9 215/21 216/6
**open [7]** 9/18 16/21 16/21 29/24 41/22 70/11 70/12
**opened [4]** 31/4 42/17 201/17 201/22
**opening [4]** 116/9 181/8 199/8 204/11
**opportunity [6]** 157/1 157/8 170/11 171/10 183/9 211/18
**opposed [3]** 46/8 75/1 109/7
**opposite [1]** 58/25
**oral [1]** 218/12
**orally [2]** 158/15 218/20
**order [7]** 6/18 49/15 53/17 123/12 123/14 168/10 170/16
**organizational [1]** 111/6
**originally [1]** 79/11
**Ostiller [1]** 84/7
**other [79]** 9/10 9/12 9/17 9/21 13/10 27/9 32/11 35/19 36/2 39/3 45/13 48/15 48/21 51/25 57/11 59/7 59/7 66/14 69/25 74/3 74/13 74/18 75/2

75/15 78/1 85/15 85/23 92/3 93/24 96/10 97/21 99/11 102/23 110/17 112/15 115/23 116/2 116/7 117/18 118/10 118/14 119/1 122/6 123/3 127/25 132/11 135/24 136/5 136/15 136/16 136/17 137/25 139/3 142/22 148/5 153/19 154/14 156/15 159/19 161/15 164/4 164/11 170/7 170/8 172/21 174/13 177/17 182/3 183/5 190/8 190/23 194/6 195/4 196/2 199/14 204/6 207/23 210/6 214/3 215/9 215/11
**others [10]** 37/9 37/14 80/9 81/6 93/2 96/10 134/25 171/9 172/18 197/8
**otherwise [5]** 14/14 22/8 28/12 187/19 191/25
**our [33]** 24/10 36/14 46/22 85/24 88/7 95/24 111/18 120/9 172/19 176/6 178/17 178/18 181/8 189/13 189/14 194/5 198/24 199/8 199/9 200/4 202/9 202/17 204/11 205/8 206/5 207/21 209/2 209/3 209/13 211/13 214/25 222/9 222/18
**ourselves [1]** 95/10
**out [53]** 25/2 33/12 33/20 35/21 39/16 42/4 54/7 54/12 71/18 78/10 78/22 79/8 79/10 87/10 88/6 109/17 109/19 111/8 111/23 112/20 122/20 135/8 141/14 141/17 151/24 152/1 152/11 160/18 169/4 174/8 174/13 174/14 176/7 176/20 180/21 181/16 181/18 181/25 183/14 184/23 185/16 188/12 192/25 199/12 204/15 204/21 214/2 217/21 218/5 218/23 219/17 220/18 222/20
**outcome [1]** 186/3
**over [23]** 22/5 24/5 57/9 57/14 71/17 72/9 78/25 92/25 117/17 156/7 162/5 167/6 167/9 167/10 167/11 167/24 167/25 169/10 190/15 193/15 193/18 210/12 214/3
**overall [3]** 72/5 185/7 186/1
**overcome [2]** 162/7 162/10
**overly [1]** 193/7
**Overruled [2]** 11/4 26/15
**overt [1]** 204/23
**overwhelming [4]** 86/17 86/20 87/4 88/10
**own [1]** 221/6
**owned [1]** 10/2
**owner [3]** 108/11 160/18 160/22

**P**

**P-A-L-M-E-R-T-O-N [1]** 5/20
**p.m [6]** 79/20 124/25 157/11 170/18 171/3 176/5
**PAETTY [13]** 2/7 60/23 60/24 68/3 71/13 71/19 82/25 83/9 83/22 87/14 110/13 110/19 134/24
**Paetty's [1]** 72/8
**page [53]** 4/3 7/22 17/13 18/3 18/7 20/9 21/7 28/1 29/21 29/21 29/22 30/2 33/2 33/3 34/4 34/5 34/16 39/3 39/6 39/6 71/11 98/7 100/24 102/11 102/12 102/17 102/20 102/23 113/24 114/4 114/5 119/10 121/25 122/1 122/9 133/25 134/1 134/10 137/7

137/14 138/11 138/23 145/17 169/3 169/4 172/25 181/8 184/21 224/7
**pages [22]** 7/20 25/23 32/19 32/22 35/14 46/5 73/20 73/24 73/24 138/23 139/7 156/8 162/6 168/4 172/14 184/19 190/1 190/2 190/15 197/19 197/20 197/23
**painstaking [4]** 166/3 172/15 198/24 199/4
**PALMERTON [68]** 4/4 5/15 5/19 5/24 13/2 13/5 39/4 47/10 47/15 47/17 47/20 51/2 51/3 57/19 59/1 60/21 60/25 70/19 70/21 70/23 72/13 73/2 74/2 74/22 78/7 97/3 97/10 100/17 100/22 107/9 114/22 116/22 116/24 126/2 132/18 134/7 137/3 138/14 139/16 142/1 146/5 149/9 159/24 168/23 169/20 170/9 170/17 174/1 175/10 181/9 185/12 185/15 186/12 187/2 187/4 188/16 190/4 190/12 190/13 196/15 196/17 196/19 196/20 196/22 197/4 197/14 197/18 218/17
**Palmerton's [6]** 15/13 70/6 142/10 164/10 177/9 185/17
**pandemic [1]** 222/1
**paper [2]** 70/14 205/12
**paperwork [4]** 202/18 205/11 206/9 207/9
**paragraph [16]** 39/7 41/24 43/13 44/20 44/25 72/8 77/25 105/21 117/21 117/25 119/9 142/11 142/12 151/16 153/1 153/4
**paragraph 16 [2]** 153/1 153/4
**Paragraph 21 [1]** 142/11
**paragraph 25 [1]** 41/24
**paragraph 26 [2]** 43/13 142/12
**paragraph 27 [3]** 39/7 44/25 119/9
**paragraph 31 [2]** 117/21 117/25
**paragraph 5 [1]** 105/21
**paralegal [1]** 25/8
**paralegals [1]** 36/22
**Paronyan [2]** 43/16 119/19
**part [70]** 7/6 10/17 12/17 14/9 17/14 24/11 29/8 32/4 35/20 38/5 40/24 56/11 57/20 69/6 72/6 77/1 77/3 77/8 77/15 77/18 77/19 77/22 77/23 78/1 78/3 78/4 81/15 84/8 87/2 92/11 92/16 94/2 99/8 101/15 101/18 101/23 102/16 103/18 106/11 120/8 122/14 127/25 132/2 132/15 133/18 134/6 136/11 139/22 140/25 142/9 143/24 144/10 144/16 144/18 146/18 149/21 160/12 160/13 172/9 179/12 179/15 180/25 189/5 190/13 199/25 203/21 204/4 205/22 208/1 208/3
**parte [3]** 123/13 123/14 123/19
**participant [1]** 82/23
**participants [1]** 32/3
**participate [2]** 81/12 81/14
**participated [6]** 80/22 81/5 81/7 82/10 82/11 107/22
**participating [1]** 112/6
**participation [1]** 179/18
**particular [15]** 27/4 30/20

**P**

**particular... [13]** 45/8
51/11 52/14 62/5 112/4
115/15 120/10 121/11 121/16
180/20 181/17 190/4 210/21
**particularly [3]** 35/9 44/5
218/17
**parties [5]** 5/9 156/11 165/2
165/18 165/19
**pass [2]** 118/1 193/13
**passed [4]** 147/12 148/6
150/23 150/24
**passing [1]** 168/17
**password [2]** 33/13 33/24
**pasted [1]** 113/23
**path [1]** 193/8
**Patrol [1]** 105/10
**Paul [2]** 211/13 222/23
**Pause [1]** 169/7
**pay [1]** 182/12
**payroll [3]** 20/14 116/5
116/6
**PDF [21]** 27/17 27/20 27/24
28/1 30/4 30/23 32/19 33/2
38/7 38/14 38/14 39/23 46/8
70/10 74/15 74/17 74/19
77/20 111/19 111/21 146/17
**PDFs [1]** 29/18
**peas [1]** 161/11
**pending [3]** 19/11 85/25
86/10
**people [14]** 48/8 48/15 57/8
59/12 76/7 89/24 129/3 132/6
135/3 139/18 144/24 194/22
215/8 222/2
**per [4]** 26/12 26/22 51/15
88/7
**perceive [1]** 66/17
**perceiving [1]** 66/17
**percent [1]** 167/21
**performed [3]** 14/3 147/24
152/18
**perhaps [3]** 87/24 176/8
179/17
**period [7]** 26/12 26/20 26/21
172/10 190/11 194/13 200/18
**permission [2]** 144/20 172/3
**perpetrate [1]** 199/2
**persisted [1]** 164/15
**person [13]** 24/4 32/5 47/23
59/6 125/21 131/16 140/22
147/15 148/11 173/24 174/14
174/20 175/15
**personal [9]** 62/22 70/2
129/1 154/7 159/17 165/24
179/6 183/20 187/23
**personally [4]** 14/21 101/24
112/11 154/24
**persons [2]** 25/2 97/5
**persuasive [3]** 78/6 78/8
185/3
**phone [179]**
**phone's [1]** 155/23
**phones [150]**
**photo [10]** 17/15 19/23 19/25
120/21 138/15 139/8 146/15
147/20 148/1 148/7
**photograph [3]** 8/25 61/12
138/18
**photographed [2]** 18/4 18/10
**photographs [56]** 11/8 17/9
19/8 20/22 61/4 61/5 61/8
105/10 105/12 105/17 106/2
106/24 107/5 107/6 107/9
107/15 107/17 108/8 108/16
108/22 109/7 109/16 110/6
110/10 110/14 110/14 110/20
110/20 111/8 111/19 111/21

**photos [53]** 16/1 16/4 16/7
16/10 16/11 16/16 16/21
16/24 17/6 17/14 17/16 17/17
17/19 17/21 19/16 20/2 20/5
21/4 21/7 22/23 29/14 59/25
97/18 98/15 98/22 100/14
101/11 102/8 103/10 111/2
121/3 138/1 138/9 138/13
139/15 145/22 146/2 146/4
146/11 146/12 146/16 146/19
148/11 149/14 188/16 188/19
188/20 189/13 194/20 218/1
218/1 218/11 218/20
**physical [13]** 172/5 172/13
173/15 173/22 174/6 174/23
175/5 176/16 177/19 177/22
178/8 183/13 208/2
**physically [1]** 24/7
**Picadilly [12]** 80/8 107/23
108/3 108/10 108/11 109/16
109/17 109/20 109/21 159/16
160/19 160/22
**pick [2]** 24/9 136/14
**pics [1]** 194/6
**picture [10]** 17/23 22/5
23/11 64/19 138/24 146/19
217/10 217/17 218/14 219/13
**pictures [8]** 135/15 135/18
135/22 139/18 139/21 140/18
140/25 161/3
**piece [12]** 10/23 103/19
115/19 121/11 121/14 121/16
140/19 173/14 186/21 210/8
210/8 216/10
**pieces [7]** 175/1 175/2
176/14 176/15 176/15 183/11
185/23
**piecing [1]** 178/25
**PII [1]** 120/23
**pinned [1]** 159/2
**place [5]** 46/14 97/3 113/11
114/8 151/13
**placed [1]** 57/9
**plain [1]** 163/23
**PLAINTIFF [2]** 1/7 2/3
**planning [5]** 90/6 90/7 135/5
157/5 185/8
**plate [2]** 181/12 181/13
**platform [1]** 36/18
**play [1]** 209/18
**players [1]** 158/16
**playing [1]** 39/22
**plea [12]** 83/5 83/7 83/23
85/19 85/24 86/12 86/18
86/21 87/1 87/19 161/8 161/21
**pleadings [2]** 156/15 165/7
**pleas [1]** 86/10
**please [11]** 54/10 71/10
76/13 93/14 104/11 105/21
106/19 113/14 113/25 125/2
135/6
**plenty [1]** 159/8
**plural [1]** 122/7
**plus [1]** 216/25
**pod [1]** 161/11
**point [62]** 13/16 34/17 35/4
42/4 45/8 58/20 66/19 76/21
79/8 81/16 81/19 88/25 89/6
90/15 92/3 115/8 118/21
124/11 157/22 160/12 168/21
170/3 173/21 177/6 177/17
182/17 184/8 184/19 185/2

**pointed [6]** 35/20 39/16
158/23 188/12 217/21 218/23
**pointedly [1]** 156/13
**points [8]** 156/11 157/2
157/16 185/2 188/1 195/19
217/10 221/11
**policy [6]** 51/16 85/24 86/13
87/22 88/7 219/14
**pop [1]** 76/18
**pornographic [2]** 17/2 17/4
**portion [2]** 113/11 142/19
**portions [1]** 68/1
**position [6]** 59/2 161/15
164/16 171/9 178/12 189/14
**positions [1]** 164/22
**possessed [2]** 148/12 158/17
**possession [18]** 9/11 10/18
145/21 172/5 172/13 173/8
173/15 173/22 174/7 174/12
174/23 175/5 176/17 177/19
177/22 178/9 183/13 208/2
**possibility [5]** 83/7 92/25
124/8 124/12 198/14
**possible [13]** 44/6 46/7
53/23 74/5 74/7 83/5 109/5
111/4 111/14 185/4 185/5
200/11 207/23
**possibly [5]** 36/13 42/17
44/3 53/12 59/18
**post [5]** 157/6 157/7 170/22
221/13 221/13
**Postal [1]** 181/19
**potential [15]** 72/17 80/23
81/9 81/10 81/17 81/21 82/2
82/6 85/18 89/25 93/24 112/4
135/5 193/1 215/8
**potentially [2]** 75/20 118/18
**powerful [16]** 10/20 10/25
11/6 35/9 58/3 66/5 66/13
140/18 158/10 160/11 163/6
179/9 179/10 179/11 179/12
179/14
**powerfully [1]** 193/20
**PPP [16]** 16/15 20/16 22/12
22/14 23/15 34/15 55/8 145/6
179/5 180/17 180/21 182/12
183/2 183/16 183/22 208/4
**practical [1]** 206/4
**precede [1]** 211/6
**preceded [1]** 161/6
**precisely [1]** 99/17
**precursor [1]** 196/17
**predicate [1]** 40/23
**premise [1]** 21/25
**preparation [7]** 53/13 54/4
70/7 110/17 160/12 161/19
204/7
**prepare [6]** 6/9 13/10 39/8
114/15 143/14 205/13
**prepared [14]** 6/1 53/14
137/22 139/4 141/1 143/2
143/20 144/6 145/15 157/8
204/19 211/11 211/12 221/25
**preparing [13]** 41/20 42/5
42/10 53/24 87/17 112/25
116/3 120/3 120/4 206/9
207/10 221/23 222/20
**preponderance [6]** 161/25
192/2 198/15 198/16 208/24
208/25

## P

**prepping [2]**  40/16 41/6
**present [6]**  41/6 79/5 90/6
 90/10 170/16 196/14
**presented [5]**  156/17 171/23
 180/7 197/23 206/12
**presenting [1]**  90/7
**presidential [1]**  23/12
**PRESIDING [1]**  1/4
**pressuring [1]**  160/25
**presumably [1]**  20/16
**pretrial [2]**  219/19 221/5
**pretty [12]**  68/16 73/12 75/8
 81/8 81/11 96/10 99/18 159/1
 162/6 162/9 163/11 163/19
**prevailing [1]**  83/18
**previous [1]**  20/13
**previously [5]**  56/22 81/16
 97/15 97/16 177/18
**primarily [2]**  6/11 51/6
**primary [6]**  110/24 111/24
 111/25 112/3 114/24 219/25
**Primavera [4]**  56/5 147/5
 180/8 181/7
**print [1]**  210/25
**printed [3]**  111/6 111/8
 111/23
**prior [24]**  41/12 123/18
 123/18 124/11 124/14 136/6
 136/12 136/15 137/2 157/20
 158/3 160/11 161/12 164/2
 164/6 164/11 172/8 177/18
 180/4 180/5 181/24 186/12
 212/13 212/14
**prioritize [2]**  213/20 214/2
**priority [1]**  206/2
**privilege [2]**  25/1 71/3
**privileged [3]**  48/12 75/21
 118/18
**Proactive [2]**  99/1 100/3
**probable [10]**  51/10 171/11
 172/4 172/9 172/22 173/5
 173/7 176/4 184/1 213/4
**probably [7]**  72/21 90/20
 111/16 125/16 149/17 195/19
 208/11
**probe [1]**  91/4
**problems [1]**  184/10
**procedural [1]**  46/13
**proceed [4]**  5/7 85/18 90/14
 104/18
**proceedings [5]**  1/13 48/24
 169/7 222/25 224/6
**process [5]**  6/9 6/13 17/20
 165/15 213/17
**processed [1]**  217/2
**processes [1]**  24/14
**produce [3]**  15/7 15/9 139/25
**produced [11]**  114/2 114/7
 118/20 118/22 118/23 118/25
 140/10 177/8 215/14 215/19
 216/13
**product [7]**  68/21 68/21 69/6
 82/2 144/6 144/9 194/24
**production [5]**  109/1 113/7
 113/20 113/23 220/6
**proffer [3]**  87/11 87/18 88/1
**profile [1]**  134/2
**progressed [1]**  199/6
**prohibited [1]**  196/3
**project [1]**  34/2
**promise [1]**  211/21
**promised [1]**  190/17
**proof [3]**  20/14 165/2 165/4
**properties [1]**  65/18
**property [6]**  55/23 56/5
 147/3 147/4 181/7 208/6
**prophylactic [2]**  80/11 80/13

**proposal [2]**  83/12 83/13
**proposed [1]**  216/9
**propositions [1]**  163/22
**prosecuting [1]**  216/20
**prosecution [41]**  22/16 36/25
 37/4 37/9 37/12 40/15 40/24
 41/3 42/10 43/10 68/1 68/22
 88/18 88/25 89/20 93/1 98/13
 114/15 114/25 115/3 115/24
 116/3 117/4 118/15 119/4
 119/14 120/8 120/11 120/17
 120/25 124/16 125/13 125/22
 128/18 143/7 143/18 158/16
 159/7 159/10 160/7 194/2
**prosecutions [1]**  215/7
**prosecutor [9]**  21/14 92/25
 163/7 163/24 164/17 165/11
 174/6 198/9 216/20
**prosecutors [6]**  14/23 41/4
 44/22 98/4 137/8 137/20
**protective [2]**  123/12 123/13
**protocols [1]**  47/3
**prove [11]**  71/25 170/4 170/5
 179/24 179/25 188/6 192/1
 192/19 198/3 218/8 218/10
**provide [5]**  25/3 87/11 99/25
 136/5 140/11
**provided [18]**  119/23 119/24
 120/10 134/7 136/1 137/7
 137/19 138/14 139/22 140/2
 142/24 143/10 143/16 146/4
 174/1 196/17 211/4 218/12
**pseudonyms [1]**  201/11
**PTF's [1]**  38/19
**public [1]**  116/9
**pull [16]**  13/2 13/20 19/19
 20/8 29/7 71/10 76/13 94/6
 98/6 100/23 133/12 134/18
 138/8 138/10 150/5 152/24
**pulled [2]**  72/12 72/15
**pulling [2]**  31/8 72/9
**purchase [8]**  55/22 147/3
 181/5 181/21 182/1 183/2
 183/17 183/19
**purchased [2]**  62/19 208/5
**purchases [1]**  159/16
**purpose [8]**  53/16 84/14
 120/2 163/14 170/4 170/22
 180/20 222/5
**purposes [4]**  70/5 111/7
 120/3 204/20
**purse [1]**  58/11
**pursuant [3]**  6/18 213/3
 224/4
**pursue [2]**  205/5 208/20
**put [15]**  46/14 46/20 58/12
 111/9 113/14 120/8 120/8
 133/17 137/11 137/13 144/21
 182/8 189/10 222/22 222/22
**puts [1]**  27/25
**putting [1]**  216/24

## Q

**QLA1232021 [1]**  30/21
**QLA1232021-04 [1]**  30/21
**Quality [1]**  145/21
**quarter [1]**  79/19
**queries [1]**  95/12
**question [80]**  7/19 7/21 8/13
 8/13 8/14 12/3 18/9 19/9
 22/5 22/6 25/16 26/19 40/21
 40/23 41/3 42/8 42/11 43/2
 48/1 48/18 52/25 54/13 55/9
 55/14 60/3 68/16 68/18 70/16
 80/18 83/11 83/11 83/17 84/3
 84/22 84/22 84/24 91/22
 91/23 92/4 92/21 98/19 99/16
 99/20 100/12 102/21 115/17
 115/25 118/5 123/10 129/16

 136/10 139/11 140/7 140/23
 145/5 146/25 147/2 148/2
 148/10 148/25 149/18 153/3
 155/11 169/20 169/22 170/6
 171/3 171/6 174/3 174/21
 177/8 178/13 186/3 186/19
 188/5 188/7 192/17 195/2
 207/12 208/14
**questioner [2]**  92/5 92/6
**questioning [2]**  66/12 160/14
**questions [25]**  19/10 24/6
 44/17 44/18 47/6 66/14 67/2
 68/13 68/15 79/1 87/7 88/12
 90/17 90/22 91/12 92/3 93/7
 104/4 123/24 124/18 155/25
 162/16 162/19 187/9 187/14
**quick [2]**  107/3 215/23
**quickly [4]**  67/21 114/10
 142/22 206/3
**quite [3]**  58/25 92/17 207/24
**quiz [1]**  76/18
**quote [9]**  8/13 91/6 117/21
 121/14 161/11 167/17 193/21
 194/19 220/21
**quoted [2]**  121/9 121/16
**quoting [2]**  117/20 117/25

## R

**raised [6]**  83/12 88/22 93/3
 93/4 93/4 93/6
**raising [1]**  84/21
**Ram [11]**  2/15 4/4 5/23 83/12
 187/24 202/13 211/23 212/16
 212/18 214/14 221/23
**Ram's [1]**  198/6
**ran [1]**  139/10
**RANEE [2]**  2/5 125/25
**range [1]**  73/25
**rather [4]**  95/20 100/2 100/7
 198/15
**reach [2]**  78/22 92/3
**reached [8]**  79/8 87/10 88/6
 151/24 152/1 152/10 160/18
 185/16
**read [15]**  9/3 28/5 67/24
 67/25 67/25 68/1 69/24 120/7
 135/16 144/23 145/18 146/3
 169/5 184/20 184/22
**reading [1]**  43/23
**reads [1]**  94/19
**ready [9]**  5/7 5/13 205/13
 214/23 217/3 222/7 222/9
 222/11 222/19
**real [5]**  107/3 122/3 146/25
 157/23 169/23
**realities [1]**  214/21
**reality [1]**  167/18
**realize [1]**  89/11
**realized [7]**  78/3 98/20
 99/22 100/14 181/10 195/11
 201/20
**really [17]**  13/15 16/11
 73/15 82/16 89/10 89/18
 92/17 161/17 162/13 162/20
 163/9 163/13 164/10 164/18
 169/18 171/13 183/12
**reason [10]**  86/15 163/9
 174/3 176/18 177/12 191/13
 193/8 195/18 212/8 220/18
**reasonable [2]**  208/24 212/5
**reasons [5]**  34/22 85/23
 86/11 173/5 174/2
**rebuttals [1]**  189/10
**recall [118]**
**recalled [1]**  72/24
**recalls [2]**  152/7 173/19
**receive [1]**  82/1
**received [27]**  14/11 22/14
 41/14 71/2 80/1 80/1 80/3

**received...** **[20]**   91/24 96/4
97/9 100/10 100/17 102/2
110/13 115/23 120/1 122/12
132/18 137/3 151/18 167/19
169/19 171/5 182/14 196/8
210/20 215/11
**receiving [4]**   50/4 66/2
108/25 181/17
**recess [6]**   79/18 79/20
124/25 156/6 157/11 211/15
**recitation [1]**   119/7
**recited [1]**   91/13
**recognize [12]**   19/10 31/10
61/4 89/12 94/10 98/9 101/2
102/14 102/15 133/20 138/14
151/7
**recognized [8]**   19/6 19/6
19/15 19/20 20/1 77/22 78/5
78/8
**recollection [21]**   49/19 50/1
50/8 76/2 83/20 84/8 84/12
92/2 92/5 92/10 107/11
107/24 108/1 108/15 111/3
113/16 166/3 173/13 185/11
185/17 206/18
**recommendation [1]**   82/17
**record [16]**   5/18 14/12 22/4
59/8 60/22 67/8 93/15 104/13
106/20 114/13 120/18 125/4
125/20 141/12 167/10 204/1
**recordings [1]**   175/13
**records [27]**   8/21 22/11
22/14 101/23 101/25 102/20
110/2 116/7 116/8 145/25
150/15 150/17 160/20 178/25
179/1 182/10 182/14 201/4
201/15 204/19 208/3 209/17
209/17 209/17 209/21 209/23
210/1
**recreate [1]**   6/13
**recuse [1]**   93/1
**recusing [2]**   124/8 124/16
**Redline [2]**   43/15 119/18
**refer [7]**   9/23 110/23 160/24
166/24 175/20 202/2 213/22
**reference [22]**   43/21 44/5
85/5 109/11 117/5 117/10
117/13 117/14 117/14 117/16
118/6 120/20 121/1 121/7
121/9 122/11 122/22 122/25
135/18 137/25 138/9 146/2
**referenced [14]**   39/13 74/4
76/5 84/13 108/21 135/22
135/23 137/8 139/4 139/17
140/4 142/8 142/11 151/11
**references [6]**   21/12 22/12
120/16 120/19 146/12 216/16
**referencing [8]**   71/6 77/24
108/18 109/5 135/20 138/19
148/19 149/7
**referred [1]**   56/11
**referring [19]**   9/14 52/19
76/8 107/5 119/13 119/16
119/17 120/14 120/15 120/19
121/22 136/13 136/19 142/3
142/8 166/21 185/14 200/2
214/1
**refers [1]**   170/25
**reflected [1]**   36/1
**reflecting [3]**   38/12 116/8
116/10
**reflects [1]**   15/2
**refresh [2]**   60/14 210/18
**refreshed [1]**   45/17
**refreshing [1]**   166/2
**refreshment [1]**   113/16
**refusal [3]**   161/21 184/12

185/2
**refused [8]**   98/22 163/17
163/23 164/14 164/15 186/8
**refute [2]**   59/16 163/15
**regard [3]**   49/5 175/15
206/15
**regarding [15]**   50/14 55/8
80/2 80/4 80/15 81/2 81/9
82/2 83/23 103/17 109/16
117/7 119/18 121/5 156/11
**regards [1]**   131/20
**Region [1]**   95/22
**registered [9]**   10/19 27/6
27/9 30/14 31/16 62/15 69/15
153/7 154/12
**regulations [1]**   224/8
**reinstated [1]**   206/1
**reiterate [1]**   222/18
**relate [8]**   55/16 130/22
131/1 131/3 131/6 131/10
143/7 167/13
**related [26]**   6/17 13/10
43/15 45/12 45/13 48/25
53/22 54/16 79/6 84/5 85/10
85/11 87/12 90/1 101/14
106/3 123/21 124/1 126/14
127/18 137/18 154/7 170/20
197/11 199/21 211/9
**relates [1]**   44/21
**relating [2]**   20/2 45/2
**relation [1]**   84/11
**relative [1]**   177/18
**relay [1]**   75/25
**released [7]**   25/6 25/10
136/24 137/1 153/15 188/24
188/25
**relevance [9]**   48/11 78/5
78/8 86/3 99/13 123/22 127/5
128/20 130/19
**relevant [28]**   10/23 26/20
27/12 27/16 28/19 35/15 37/5
37/8 38/7 39/25 40/12 43/22
44/10 44/18 58/4 66/11 66/15
94/4 96/17 96/19 96/20 100/4
123/25 130/22 143/25 144/16
145/16 192/14
**relied [1]**   159/23
**relief [1]**   62/19
**rely [4]**   90/9 91/10 193/10
218/11
**remaining [1]**   209/12
**remarks [1]**   157/15
**remember [40]**   7/13 7/23
19/21 21/18 21/20 21/25 22/8
34/18 34/25 35/1 37/11 40/8
73/10 73/19 74/5 74/6 74/10
74/10 75/17 75/18 77/7 78/25
82/4 85/13 85/15 88/2 90/19
91/22 91/23 116/13 122/15
130/4 164/2 191/2 191/4
191/13 191/14 192/7 206/25
207/1
**remembers [2]**   44/17 149/17
**Remind [1]**   175/7
**remove [2]**   104/14 213/4
**repeat [2]**   101/9 115/25
**repeated [1]**   161/8
**rephrase [2]**   73/17 112/12
**replacing [1]**   124/8
**reply [2]**   199/9 215/2
**report [18]**   20/14 27/25
30/23 30/24 31/3 31/7 34/20
34/21 56/12 58/14 70/11
70/12 74/24 75/1 75/2 103/12
152/6 153/16
**reported [1]**   224/6
**Reporter [1]**   1/20
**REPORTER'S [1]**   1/13
**reports [19]**   14/10 25/5

185/7
**purchased [8]**   96/4 163/7
163/16 163/17 163/19 163/20
163/20 163/22
**25/21 41/18 41/22 42/1 42/21**

**25/21 41/18 41/22 42/1 42/21**
116/6 116/6 167/19 202/13
202/15 207/16 212/7 215/11
**repositories [1]**   25/18
**represent [6]**   30/25 31/6
69/14 102/16 113/22 138/12
**representation [1]**   167/21
**represented [1]**   203/18
**representing [1]**   59/22
**request [15]**   11/14 15/12
23/21 44/7 44/11 45/5 70/3
100/8 102/21 141/17 142/23
143/20 172/3 222/18 222/21
**requested [5]**   97/22 97/25
166/17 168/11 210/21
**requesting [1]**   151/19
**requests [1]**   101/19
**required [1]**   198/14
**requires [1]**   185/21
**rereviewed [1]**   89/12
**research [1]**   9/18
**residence [2]**   75/24 136/21
**residences [1]**   62/18
**residential [1]**   69/8
**resolves [2]**   188/21 190/18
**respect [11]**   83/19 157/20
162/3 166/15 173/10 183/2
195/21 201/7 205/5 205/6
214/9
**respects [1]**   169/16
**respond [8]**   8/9 8/17 171/6
171/8 184/7 186/25 211/24
214/14
**responded [3]**   65/25 66/2
135/10
**responds [2]**   34/1 194/5
**response [13]**   22/19 33/14
76/11 80/12 80/21 83/1 86/14
135/12 160/20 165/13 168/9
171/4 171/10
**responses [2]**   90/22 101/19
**responsibilities [1]**   111/25
**responsibility [2]**   59/16
71/17
**responsible [1]**   106/11
**responsive [1]**   108/5
**rest [5]**   95/24 144/17 144/19
210/3 218/18
**restrict [1]**   35/4
**restrictions [1]**   46/20
**result [11]**   69/8 80/25 83/1
152/22 209/8 209/15 209/20
209/23 214/10 214/11 221/22
**return [3]**   139/7 144/17
146/8
**returned [2]**   144/19 205/18
**returning [3]**   50/15 129/3
146/11
**returns [1]**   6/12
**revealed [1]**   159/6 221/2
**reveals [1]**   216/22
**Revenue [1]**   101/20
**reverse [9]**   87/11 87/17
87/25 162/22 217/20 218/15
219/14 220/19 221/7
**review [69]**   6/5 12/17 15/21
16/4 16/7 16/9 23/18 23/21
24/2 24/20 25/12 26/6 26/20
28/13 36/15 37/18 38/5 38/6
41/15 42/21 42/23 43/1 45/11
45/13 49/21 54/4 54/10 59/23
60/20 68/21 68/23 69/4 69/10
69/17 70/3 70/5 70/7 72/16
72/17 75/14 76/7 76/11 78/11
80/14 97/17 98/15 100/10
103/7 107/11 108/7 110/15
111/2 115/24 116/2 118/17
136/11 149/8 153/5 154/24

**R**

review... **[10]** 155/11 155/20 166/2 184/5 190/13 192/12 192/16 197/7 213/14 217/3
reviewed **[74]** 6/7 6/11 12/6 12/12 16/2 17/23 18/24 20/18 22/24 23/3 26/2 26/25 34/9 34/10 35/6 36/9 38/3 38/13 38/15 39/3 39/15 41/11 42/13 42/16 42/18 43/3 54/1 69/20 70/16 70/17 89/14 97/8 97/12 101/11 103/15 105/6 105/16 106/23 107/8 107/14 107/16 109/6 110/6 110/10 110/16 110/21 113/4 113/7 116/4 116/5 116/7 132/17 132/21 134/6 134/6 136/8 136/14 136/17 149/16 149/21 151/4 154/17 185/25 189/2 190/3 190/8 190/14 191/18 192/4 192/11 192/19 196/24 218/18 218/19
reviewing **[33]** 8/20 15/22 19/5 19/14 22/22 26/12 28/14 34/20 40/17 41/7 41/8 42/8 42/14 46/14 60/13 69/23 72/19 72/24 76/20 76/23 99/18 100/14 101/19 101/22 107/1 109/15 110/22 141/18 149/24 150/11 154/21 190/10 192/7
reviews **[2]** 110/24 110/24
revving **[1]** 222/6
rhetorical **[1]** 193/7
Rich **[10]** 65/4 71/9 73/23 74/9 74/12 74/15 75/3 75/6 159/15 212/24
Richard **[51]** 1/9 7/8 8/4 8/22 9/2 9/6 9/7 9/14 9/19 10/18 10/20 14/4 21/10 22/25 31/12 31/13 31/18 56/15 70/18 75/22 77/1 77/6 77/8 77/13 77/17 85/20 86/12 86/16 96/16 120/20 120/22 121/21 131/6 138/2 138/9 145/22 145/23 148/15 148/20 153/11 155/19 161/10 175/16 178/23 195/24 200/13 200/20 200/24 201/20 201/23 212/22
right **[139]**
risk **[3]** 90/1 176/19 185/22
river **[1]** 176/23
Robinson **[1]** 209/10
Robinson's **[1]** 194/24
robust **[2]** 191/24 193/5
role **[4]** 55/16 56/1 158/11 209/19
Romero **[2]** 32/18 76/14
room **[2]** 129/9 163/23
Rosamond **[1]** 147/12
Rotary **[1]** 134/2
rough **[1]** 216/1
roughly **[9]** 10/11 10/14 13/25 18/15 19/3 20/24 22/23 37/18 190/2
routine **[1]** 46/23
RPR **[1]** 224/12
ruling **[3]** 40/14 45/6 222/20
runs **[1]** 194/20
Runyan **[6]** 180/23 180/24 181/1 182/11 182/23 183/16
Rush **[1]** 172/18
Ryan **[1]** 3/7

**S**

Sabala **[1]** 119/20
safeguards **[1]** 46/13
said **[61]** 8/9 10/6 15/17

26/19 26/20 35/1 37/6 39/20 44/15 46/14 49/1 49/3 50/20 50/2 50/23 53/7 64/3 66/9 77/10 77/18 91/5 97/14 97/25 98/14 100/21 103/9 107/10 113/3 122/10 129/8 129/16 132/21 133/1 135/13 138/20 152/11 157/9 159/25 160/10 169/3 174/11 174/25 177/10 185/10 186/4 186/9 187/4 189/6 189/13 189/17 190/24 191/1 192/6 196/2 197/8 200/23 201/3 201/9 203/24 211/18 218/19
Sambatyan **[1]** 209/22
same **[29]** 5/9 16/25 18/9 19/16 20/5 34/4 40/17 41/7 41/7 42/9 45/5 59/6 64/7 83/14 86/1 86/21 88/21 100/11 105/13 129/16 135/3 139/21 142/22 155/11 183/18 189/12 190/12 207/23 209/21
San **[2]** 2/20 3/6
sat **[1]** 196/11
saw **[27]** 17/4 19/7 20/5 20/18 20/20 20/25 36/24 70/9 70/12 103/11 145/14 146/4 147/24 148/9 148/19 149/4 149/17 149/18 149/19 153/14 159/10 159/23 160/2 160/8 160/16 194/1 194/18
say **[89]** 8/11 9/5 11/5 15/9 17/22 18/18 25/18 25/25 26/5 26/11 26/13 28/6 29/9 31/18 32/19 35/14 35/22 35/22 39/22 42/16 43/6 43/14 46/9 68/4 68/9 69/2 71/4 74/21 75/16 78/5 80/20 80/24 86/4 92/22 95/2 95/7 95/14 96/7 96/15 96/19 103/23 107/5 112/22 113/10 114/1 114/4 117/14 119/5 120/12 122/6 123/7 126/13 135/13 135/14 137/2 137/17 141/9 146/25 147/7 147/15 150/8 150/14 150/16 151/23 153/24 154/6 155/22 156/18 158/6 162/23 163/17 166/13 169/17 170/2 171/1 183/9 184/9 185/10 185/20 190/21 190/23 190/24 191/7 197/12 199/4 204/4 213/21 214/25 220/21
saying **[14]** 9/7 64/4 75/18 103/20 142/14 174/19 175/24 180/22 199/25 200/2 200/5 201/7 201/13 213/23
says **[36]** 14/3 29/25 30/11 33/4 33/11 33/18 33/23 34/5 38/6 39/11 61/13 62/9 77/25 98/16 98/17 118/9 134/12 135/4 143/3 145/4 145/14 145/18 145/18 146/21 147/11 149/18 151/15 151/17 153/11 161/13 171/8 182/25 194/5 195/16 195/20 221/8
SBA **[3]** 36/21 95/5 95/22
SBA's **[1]** 100/8
scanned **[2]** 70/1 105/11
scheduled **[1]** 67/18
scheme **[1]** 63/11
schemes **[1]** 219/12
scope **[5]** 81/9 94/17 94/20 95/16 96/23
SCOTT **[3]** 2/7 60/23 60/24
screen **[12]** 13/4 21/15 27/12 28/7 28/8 30/19 61/12 65/2 109/24 149/4 149/12 180/12
scroll **[10]** 30/17 32/18 98/7 100/23 113/25 113/25 122/8

133/25 134/10 137/14 137/19 190/10 199/23 209/25 217/20
seal **[1]** 189/15
sealing **[2]** 70/3 70/5
search **[24]** 54/24 54/24 55/2 55/15 55/25 56/15 65/23 69/8 117/18 118/7 118/9 136/20 146/20 147/16 147/19 147/24 148/1 149/13 194/12 208/17 213/3 216/19 216/21 217/2
searched **[1]** 118/15
searches **[4]** 24/24 56/19 95/11 173/17
seat **[1]** 93/14
seated **[2]** 104/11 125/2
second **[23]** 5/8 18/6 45/11 61/21 72/8 77/18 95/7 102/12 114/5 137/7 138/24 144/13 166/13 171/13 172/11 182/7 182/9 194/15 197/17 198/23 214/1 215/3 217/12
secondary **[3]** 8/24 11/12 14/4
seconds **[1]** 187/1
Secretary **[1]** 116/12
Section **[1]** 224/4
Security **[2]** 65/12 159/18
see **[85]** 10/3 11/17 11/19 13/4 16/19 16/20 16/21 21/15 21/21 29/6 29/18 29/23 30/19 31/3 31/21 34/7 35/4 36/3 38/13 42/2 45/8 58/20 61/25 62/9 63/19 65/10 66/3 73/7 73/11 73/21 77/23 87/5 94/9 94/12 95/5 95/12 99/10 102/22 106/2 109/14 109/16 109/21 113/17 117/23 121/23 122/1 123/24 130/1 134/11 134/12 134/20 134/20 134/21 135/4 135/8 137/16 137/20 138/3 138/25 141/19 141/22 141/25 142/13 142/15 144/24 146/17 146/22 147/11 149/6 151/16 153/4 153/12 154/9 168/13 169/19 170/8 176/22 179/4 180/13 180/22 185/16 193/15 210/23 216/13 222/5
seeing **[5]** 74/10 140/6 148/10 149/5 186/12
seem **[2]** 43/22 122/18
seemed **[1]** 75/8
seems **[4]** 32/23 34/18 167/5 202/14
seen **[10]** 108/10 140/1 147/20 160/21 167/8 184/14 184/17 189/16 193/19 217/13
sees **[3]** 197/10 206/10 220/5
seized **[27]** 12/1 12/4 18/25 19/3 22/25 23/22 25/22 46/19 83/15 103/3 103/8 103/11 118/11 126/17 127/23 133/3 135/19 135/24 136/20 140/19 154/15 155/10 155/19 194/12 208/7 213/2 217/1
select **[4]** 17/6 74/25 75/4 78/10
selected **[10]** 70/19 70/20 70/23 70/24 74/22 78/6 82/7 213/10 213/11 213/12
self **[1]** 75/5
send **[9]** 24/19 33/18 34/2 36/12 38/19 39/19 40/2 45/19 46/4
sending **[1]** 38/22
sends **[1]** 195/14
sense **[7]** 103/11 126/9 126/10 131/19 164/18 191/14 219/15
sensitive **[1]** 70/2

**sent [32]**   24/7 24/15 24/18 33/11 38/1 39/12 39/15 39/24 43/14 46/7 65/24 74/18 74/20 76/6 76/12 78/10 94/9 94/12 95/9 96/22 98/12 107/12 123/18 134/21 134/23 171/1 173/3 194/20 194/24 196/20 197/15 197/18

**sentence [5]**   41/25 77/24 122/3 144/24 184/24

**sentences [2]**   122/14 144/25

**sentencing [2]**   222/18 222/19

**sentencings [1]**   222/23

**separate [5]**   35/25 36/1 87/11 87/13 100/22

**separately [2]**   42/4 119/19

**September [4]**   181/9 182/14 200/17 205/3

**September 15 [1]**   181/9

**sequence [2]**   49/20 185/17

**serious [1]**   166/14

**serve [1]**   22/10

**served [2]**   22/17 199/17

**serves [1]**   95/21

**Service [7]**   101/20 180/23 180/24 181/1 181/19 182/23 183/17

**services [4]**   99/1 100/4 182/11 182/13

**session [1]**   128/13

**set [19]**   57/10 59/25 61/7 61/12 70/17 77/14 77/22 78/4 105/9 107/8 123/2 132/21 134/7 146/18 167/12 186/1 201/24 202/8 206/14

**sets [3]**   77/4 77/12 167/11

**setting [2]**   179/3 197/3

**seven [8]**   18/17 18/22 18/24 20/24 34/5 34/25 197/5 209/12

**several [6]**   43/9 95/15 138/6 150/13 178/4 188/14

**share [6]**   36/14 103/23 130/18 154/1 155/6 193/14

**shared [16]**   9/19 9/20 44/22 98/3 103/19 153/18 153/21 153/22 153/23 154/3 155/3 155/8 155/14 155/23 188/5 194/25

**sharing [1]**   115/20

**she [60]**   11/15 33/18 56/21 57/21 58/12 58/12 58/16 58/21 58/23 59/1 59/5 59/9 59/9 64/3 64/13 65/25 66/2 82/7 84/8 84/10 151/18 152/11 152/11 152/16 158/3 158/6 158/11 158/17 159/1 159/13 159/14 159/15 159/17 159/20 161/10 166/9 166/11 172/5 172/9 172/10 172/11 176/20 176/22 176/24 177/1 177/2 179/7 179/8 179/9 179/11 179/12 179/15 179/18 180/25 181/19 181/19 181/21 182/11 182/19 195/1

**short [6]**   29/10 128/8 156/6 188/3 190/17 222/21

**shorthand [1]**   19/6

**shortly [3]**   13/18 89/20 206/25

**shot [3]**   30/19 109/24 149/12

**shots [3]**   27/12 28/7 28/8

**should [31]**   15/9 21/21 22/9 29/9 39/2 58/24 70/21 71/20 86/8 86/23 91/16 103/6 104/14 108/15 117/14 122/20 135/7 144/19 156/16 156/22

**shown [2]**   36/5 178/17

**shows [17]**   59/8 61/13 61/22 147/21 171/20 180/7 180/9 180/17 181/19 182/11 203/1 203/5 204/8 204/15 214/9 217/15 217/16

**sic [2]**   16/18 50/25

**side [2]**   36/2 138/12

**signatory [4]**   179/9 181/3 182/24 183/1

**significance [6]**   30/6 62/12 63/5 66/10 140/12 140/13

**significant [7]**   54/7 54/11 86/6 116/4 120/7 197/25 207/16

**signing [1]**   54/2

**Silverman [5]**   2/21 4/6 4/10 67/13 104/22

**Simbatyan [4]**   81/16 81/20 82/5 82/9

**Simbatyan's [1]**   81/24

**simple [3]**   43/2 100/1 188/8

**simplest [1]**   193/8

**simply [5]**   100/6 139/11 184/10 189/4 218/12

**since [18]**   9/9 47/22 48/9 49/14 125/12 125/22 126/5 127/14 129/4 130/7 131/17 132/7 140/3 163/8 217/25 217/25 218/1 218/2

**single [7]**   73/5 73/8 192/7 192/19 192/20 196/5 200/18

**sir [4]**   39/9 93/22 104/7 156/3

**sister [13]**   56/7 151/19 151/24 152/2 152/3 152/11 152/20 181/13 181/15 181/24 182/2 183/3 183/17

**sit [4]**   28/15 130/10 169/13 192/3

**site [1]**   186/19

**sitting [3]**   113/12 119/5 125/18

**situation [1]**   162/22

**situations [1]**   182/3

**six [5]**   18/18 59/6 102/18 197/5 215/21

**slash [1]**   95/12

**slightly [1]**   68/19

**slowly [1]**   168/24

**small [1]**   211/1

**smaller [3]**   77/20 77/20 77/21

**smart [4]**   28/1 28/4 59/12 62/3

**Smbatian [1]**   80/8

**so [257]**

**Social [2]**   65/12 159/18

**sole [4]**   179/9 181/2 182/24 183/1

**solely [1]**   15/1

**Solutions [2]**   106/7 106/16

**Solutions' [1]**   106/13

**some [67]**   6/3 8/17 12/7 17/4

**164/14 165/3 165/6 166/10** 195/16 195/25 213/22

**show [19]**   35/12 60/25 61/18 137/12 139/24 140/1 141/14 166/5 179/18 180/21 182/5 185/6 189/3 189/23 192/18 198/15 200/19 202/7 202/9

**showed [11]**   36/2 134/1 134/3 145/13 159/13 159/15 159/16 159/20 166/8 166/11 172/8

**showing [11]**   53/19 64/18 71/12 76/19 94/8 179/21 182/19 186/7 191/24 201/16 205/3

**shown [2]**   36/5 178/17

**sic [2]**   16/18 50/25

**17/6 19/7 19/15 22/6 26/16** 38/7 43/8 44/17 48/21 50/3 52/21 59/7 61/3 63/9 65/14 71/16 78/14 82/24 84/8 85/15 87/20 88/5 95/9 96/3 98/3 109/10 110/6 110/8 110/16 120/7 146/25 148/5 150/19 152/18 157/9 157/24 166/7 166/14 166/15 170/7 185/3 185/6 185/21 187/6 187/14 187/15 193/23 195/6 199/5 204/18 206/8 217/22 218/4 218/4 218/23 219/22 220/3 222/2

**somebody [8]**   90/23 103/19 103/20 151/4 151/6 153/21 153/22 178/3

**somehow [2]**   212/19 222/9

**someone [5]**   47/2 146/13 148/8 174/13 190/21

**someone's [1]**   16/21

**something [25]**   35/1 35/2 51/24 59/10 70/13 73/7 82/16 85/10 85/13 103/23 117/20 130/23 140/20 157/2 170/1 178/10 183/9 184/6 186/7 189/7 190/23 201/10 203/10 212/19 213/23

**sometime [3]**   53/11 72/21 194/9

**sometimes [3]**   24/5 51/24 99/10

**somewhat [1]**   187/24

**somewhere [2]**   100/15 122/19

**soon [2]**   204/9 206/4

**sorry [23]**   9/20 10/17 13/9 17/12 18/21 18/21 29/22 30/11 30/21 38/24 45/10 46/4 64/8 64/10 76/1 76/16 88/19 101/8 105/21 121/19 138/9 141/20 206/21

**sort [8]**   67/23 75/5 81/1 87/6 190/21 211/18 214/11 214/11

**sought [1]**   176/5

**sound [3]**   102/9 145/7 145/8

**sounds [3]**   189/16 189/18 207/5

**source [8]**   9/18 158/11 189/9 189/18 193/16 193/17 213/8 217/15

**sources [11]**   115/23 116/2 116/4 123/3 137/25 159/3 188/15 195/6 195/22 195/23 198/18

**Southern [2]**   172/20 173/2

**speak [10]**   48/19 48/20 64/5 75/4 81/5 82/10 83/23 84/2 131/20 152/4

**Spear [1]**   2/20

**Special [24]**   97/3 97/10 100/17 100/22 114/22 114/23 116/24 116/25 134/7 137/3 151/20 174/1 175/10 177/9 181/9 185/12 185/15 186/11 187/2 187/3 200/22 201/8 201/13 201/21

**specifiably [1]**   130/2

**specific [20]**   16/8 68/16 75/7 78/13 84/17 84/23 88/2 96/8 107/18 115/16 117/13 120/14 126/7 166/8 171/22 192/5 203/14 206/18 209/2 209/13

**specifically [56]**   19/18 21/18 22/3 30/7 30/23 31/15 36/13 36/16 38/14 40/1 41/19 53/11 54/14 64/2 64/11 66/22

**S**

183/16 183/21 208/4 208/7

**specifically... [40]** 66/23
70/6 71/22 72/15 72/22 73/4
74/11 75/1 76/3 77/14 78/18
84/22 85/12 90/18 90/21
105/16 107/6 109/4 110/9
116/21 117/7 118/7 119/1
119/8 120/15 127/17 129/21
147/4 153/23 160/24 161/8
166/11 166/19 166/24 168/15
172/12 192/8 192/9 194/1
203/21
**specifics [5]** 127/19 128/24
130/4 131/22 188/18
**specify [1]** 14/14
**speculation [2]** 104/2 109/9
**speed [5]** 67/21 67/24 89/16
105/7 105/14
**spell [5]** 5/17 67/7 93/15
104/12 125/3
**spend [2]** 183/21 193/22
**spending [1]** 161/14
**spent [6]** 6/3 15/22 42/22
116/8 156/23 207/19
**spoke [9]** 11/22 48/15 48/23
68/2 75/10 87/13 125/22
131/19 136/3
**spoken [6]** 47/22 48/2 48/9
125/12 125/15 152/20
**Spring [1]** 2/7
**stage [2]** 161/18 192/20
**stages [1]** 163/5
**stamp [1]** 39/17
**stamped [1]** 111/21
**stamps [1]** 135/15
**stand [20]** 164/23 167/15
173/13 175/1 176/12 177/10
179/20 186/8 186/8 187/15
188/11 190/9 191/12 192/3
192/6 193/20 196/16 196/23
217/22 222/14
**standard [9]** 165/2 165/4
165/9 177/16 192/1 198/3
198/7 202/8 218/13
**standards [2]** 192/23 219/23
**stands [1]** 185/9
**star [3]** 196/9 196/9 196/11
**start [9]** 10/15 33/1 33/2
43/12 75/14 79/9 135/2
165/17 200/11
**started [6]** 10/11 46/16
76/22 87/17 222/1 222/4
**starting [2]** 188/16 189/1
**state [8]** 5/17 67/7 93/14
104/12 116/12 125/3 209/5
209/9
**stated [6]** 103/9 105/11
107/17 117/9 121/18 222/9
**statement [4]** 7/12 7/14
58/14 94/1
**states [14]** 1/1 1/4 1/6 2/3
11/11 48/5 56/6 57/3 72/9
140/14 198/12 198/18 224/5
224/9
**stating [2]** 121/24 132/17
**stay [4]** 20/7 102/12 177/4
190/20
**stenographically [1]** 224/6
**step [6]** 37/4 156/3 198/25
198/25 199/12 199/12
**STEPHEN [1]** 1/3
**steps [3]** 70/14 150/19
152/18
**Steptoe [3]** 2/16 2/19 2/22
**still [8]** 26/12 78/14 95/25
169/21 169/24 175/4 207/2
218/16
**stolen [7]** 64/14 183/1

**stood [1]** 170/1
**stop [21]** 11/8 11/8 14/1
14/8 50/19 51/10 56/9 57/13
63/8 83/16 96/24 97/2 97/3
126/18 138/3 145/19 166/10
181/25 204/14 210/2 216/15
**stopped [5]** 8/24 50/5 87/21
182/19 201/1
**stories [1]** 185/13
**story [1]** 190/12
**Stout [3]** 194/25 194/25
195/2
**straight [5]** 99/11 99/21
113/23 163/19 185/13
**strategy [9]** 82/15 91/21
92/1 160/13 194/1 194/14
219/19 221/5 221/5
**Street [4]** 1/21 2/7 2/16 3/8
**strictly [1]** 16/12
**Strike [1]** 76/1
**string [2]** 32/2 32/3
**strings [3]** 28/19 29/3 29/19
**strong [3]** 162/7 162/10
192/14
**strongest [2]** 51/7 198/21
**structure [1]** 29/23
**stuff [5]** 71/2 75/18 75/20
75/20 130/4
**subcategories [1]** 71/23
**subfolder [1]** 30/20
**subfolders [2]** 30/2 30/4
**subject [10]** 65/18 76/25
83/5 94/16 94/19 135/3 164/1
200/11 200/12 201/18
**subjects [5]** 164/1 178/21
200/23 201/16 204/13
**submission [12]** 133/19 168/2
168/4 168/5 168/8 181/8
182/21 188/10 199/8 200/15
204/12 209/13
**submissions [5]** 69/24 178/18
200/4 209/2 212/4
**submit [7]** 70/14 114/12
165/6 166/18 198/1 203/9
221/13
**submitted [23]** 7/25 8/5 8/10
23/20 70/13 110/19 140/4
143/7 166/1 166/22 167/20
168/11 172/14 182/20 184/13
189/10 189/19 206/11 210/5
210/17 212/12 213/9 222/14
**submitting [2]** 132/14 157/6
**subpoena [8]** 6/12 22/10
22/17 22/20 108/5 135/5
216/12 217/16
**subpoenaed [2]** 110/1 160/19
**subpoenas [7]** 135/7 194/21
215/17 216/11 216/14 216/14
216/17
**subsequent [3]** 12/9 14/5
50/6
**subsequently [3]** 56/7 56/9
97/22
**subset [7]** 35/18 35/23 77/23
110/6 110/8 110/20 110/21
**subside [1]** 222/1
**substance [7]** 37/14 64/15
87/20 88/5 128/3 132/8
164/10
**substantial [3]** 113/10 212/5
216/14
**substantially [9]** 178/19
202/10 205/8 207/8 214/18
214/19 215/1 215/4 217/9
**substantive [2]** 48/7 48/25
**succeed [1]** 177/13
**success [1]** 90/1

**such [3]** 24/24 54/13 209/18
**sufficient [2]** 54/4 130/18
**sufficiently [3]** 40/12 44/9
130/22
**suggest [5]** 75/13 92/24
124/7 143/13 183/25
**suggested [4]** 87/14 187/11
187/13 220/25
**suggesting [3]** 167/18 170/7
171/25
**suggestion [2]** 87/16 222/8
**suggests [2]** 219/6 219/7
**Suite [5]** 1/21 2/17 2/20 3/5
3/8
**sum [1]** 158/8
**summaries [6]** 115/22 116/2
119/17 119/18 119/22 140/3
**summarizing [1]** 143/11
**summary [29]** 43/15 43/23
121/5 122/13 122/24 137/8
137/18 137/22 137/25 139/4
139/17 139/22 139/23 139/24
139/24 140/5 140/6 140/15
140/16 140/25 141/8 141/14
142/18 143/10 143/14 143/16
156/18 156/19 215/10
**SUN [1]** 2/6
**superseding [40]** 40/16 41/6
41/21 42/5 42/10 42/24 43/5
67/25 68/25 85/2 106/4 106/6
106/9 106/10 111/25 112/3
113/1 114/14 115/4 120/4
143/1 143/12 143/15 145/5
202/18 203/2 203/4 203/7
204/7 204/9 204/13 204/13
204/17 204/25 205/6 205/12
205/17 205/21 206/3 207/9
**supervisor [1]** 172/19
**supervisors [4]** 89/23 172/4
172/17 176/6
**support [4]** 123/14 161/12
166/18 172/22
**supporting [1]** 120/9
**suppose [2]** 55/18 111/4
**supposed [2]** 99/23 99/24
**suppositions [1]** 164/8
**suppress [3]** 57/15 110/17
110/18
**suppressed [10]** 36/7 52/17
52/18 52/22 52/23 69/16 90/9
90/14 90/15 91/11
**sure [29]** 10/24 18/19 19/13
25/9 26/6 26/18 37/23 41/1
43/25 60/11 68/11 68/18
68/19 75/19 96/10 101/10
101/22 108/4 117/25 120/18
121/19 121/23 126/18 132/4
136/7 152/9 153/21 153/21
169/12
**surprise [1]** 188/2
**surrounding [1]** 37/16
**surveillance [1]** 181/10
**Susanna [1]** 62/9
**suspect [3]** 51/8 51/11
216/15
**suspected [1]** 63/10
**suspended [1]** 205/23
**sustained [5]** 19/12 52/7
104/3 109/10 127/6
**SVW [1]** 1/8
**swap [1]** 192/10
**swear [1]** 176/7
**sworn [6]** 5/16 67/6 93/13
125/1 187/18 214/4
**synthesize [1]** 114/17
**synthesized [2]** 115/9 115/14
**synthetic [6]** 63/14 64/14
85/7 116/11 158/19 159/2
**system [4]** 57/7 57/8 57/9

**S**

system... [1] 111/18
systematic [2] 81/1 81/8

**T**

T-I-M-O-T-H-Y [1] 93/16
tabbed [1] 143/24
table [3] 125/18 141/13
176/3
tailor [1] 157/15
taint [13] 52/11 52/13 89/12
191/19 191/23 193/5 198/14
198/22 217/25 218/3 218/16
219/17 220/9
tainted [43] 80/2 80/5 80/7
82/8 87/2 89/1 91/16 91/20
91/25 92/7 92/13 92/19 93/2
115/10 115/12 117/10 123/7
124/9 160/3 160/24 161/1
161/10 170/10 186/17 188/6
189/23 190/1 191/16 191/22
192/2 194/19 195/8 195/17
196/3 196/6 197/15 197/18
198/4 212/20 219/5 219/15
219/16 221/1
take [40] 7/20 13/19 17/11
17/23 18/12 21/6 21/14 21/20
21/25 24/1 28/8 28/12 34/4
37/4 39/2 39/6 54/10 64/17
79/18 86/8 86/23 92/25 93/14
102/25 126/4 134/9 134/18
137/5 152/14 156/6 156/21
157/17 164/21 164/23 176/22
176/24 183/16 185/21 190/9
222/16
takeaway [2] 156/12 157/19
taken [15] 20/2 59/25 97/3
107/9 122/23 123/1 133/2
138/20 159/4 159/6 174/8
178/12 180/21 181/25 213/1
takes [1] 27/25
taking [3] 17/14 57/17 129/2
talk [20] 11/7 23/15 23/18
26/24 46/13 48/6 49/5 50/22
55/21 119/6 127/17 128/15
128/17 128/25 129/17 130/5
160/5 185/12 190/25 209/21
talked [13] 23/11 49/6 49/7
49/11 49/14 55/19 132/4
150/20 150/21 154/8 209/23
217/12 217/13
talking [14] 16/20 29/6
34/12 34/13 34/14 94/25
113/2 124/10 162/8 164/1
169/20 194/2 199/16 212/2
Tam [1] 33/11
Tamara [31] 19/1 19/15 20/25
29/4 31/1 31/11 32/11 39/12
69/10 69/18 69/20 70/18 71/7
75/6 76/25 77/5 77/8 77/13
77/16 86/2 86/9 87/25 136/17
136/19 196/21 196/23 197/21
212/22 213/2 213/15 213/20
Tammy [4] 73/23 74/8 74/11
74/14
tasked [1] 96/2
taste [1] 190/21
tax [9] 116/7 180/23 180/24
181/1 182/11 182/23 183/16
220/23 220/23
team [56] 22/16 24/15 24/19
24/21 24/23 25/3 25/7 25/10
36/15 37/1 37/4 37/9 37/12
40/24 40/25 41/3 41/4 42/10
43/10 80/1 80/11 80/14 82/20
86/1 88/18 89/1 89/21 91/20
96/5 98/13 100/1 101/25

113/20 124/16 125/13 128/19
128/24 131/5 132/23 136/8
136/8 136/24 136/25 153/20
155/3 155/14 159/7 159/10
160/8 192/16 194/2 207/15
211/13 213/19 214/5 218/19
technical [1] 207/17
technicians [1] 24/13
telephone [5] 11/23 82/19
82/24 83/8 83/14
tell [17] 26/7 38/2 38/10
49/24 73/22 77/3 94/13
103/24 112/15 121/21 151/5
154/17 164/24 165/4 165/11
192/4 203/16
telling [4] 76/4 78/25 151/6
178/5
ten [7] 26/6 97/20 101/6
101/11 101/14 102/7 195/17
tend [1] 187/24
Tenth [1] 220/13
TERABELIAN [67] 3/3 8/4 8/15
11/10 14/4 50/5 54/16 54/21
55/9 56/4 56/12 56/14 56/19
57/3 57/10 57/11 57/20 58/10
61/18 63/8 63/10 63/23 66/20
80/8 80/18 85/9 85/11 85/11
96/16 131/8 155/10 157/20
158/9 158/17 158/24 158/25
160/1 160/22 161/5 161/13
164/3 166/9 167/14 170/19
170/20 171/1 171/17 171/25
173/8 173/11 175/12 175/25
176/16 177/2 179/2 180/2
181/17 182/13 182/17 182/25
183/3 183/4 200/21 200/25
201/5 201/20 201/24
Terabelian's [16] 54/25
55/16 55/21 56/1 56/7 65/5
65/24 157/25 161/3 161/4
167/14 168/17 173/24 175/22
181/13 186/6
terms [9] 83/15 84/17 84/18
84/20 86/24 90/5 124/15
128/24 221/4
territory [1] 57/14
test [1] 29/4
testified [11] 40/20 90/3
94/23 132/12 143/9 149/24
163/18 167/15 176/11 200/23
220/22
testify [2] 162/14 195/14
testimony [47] 6/20 7/6 10/8
41/14 42/23 49/1 53/3 54/5
82/14 89/9 91/5 106/20 127/7
127/10 128/3 128/9 128/12
129/13 131/10 131/13 132/9
132/11 150/21 160/6 163/21
164/9 168/15 169/16 171/20
173/25 174/1 177/9 185/12
185/19 185/24 185/25 187/7
187/12 191/11 192/6 198/10
198/10 203/12 207/13 207/14
213/22 220/7
text [113]
texts [2] 175/17 197/22
than [35] 9/10 13/25 26/2
26/5 26/8 42/1 59/11 68/6
74/3 100/16 114/1 136/15
136/16 156/14 158/13 160/11
161/16 164/4 164/11 170/8
172/9 177/23 178/8 183/25
195/3 197/5 197/8 208/1
215/16 215/17 215/21 215/25
216/1 216/2 221/18
thank [29] 15/9 47/19 50/25
53/8 56/23 67/2 67/3 67/4
76/17 87/5 93/9 103/13 104/7
118/4 124/18 124/21 133/9

139/14 146/7 146/10 149/20
147/7 149/24 197/17 219/6
186/23 198/5 214/15 221/14
Thanks [1] 221/15
that [1493]
that's [32] 10/6 28/21 71/24
72/11 74/23 83/3 89/4 95/1
96/14 97/4 97/19 98/23 99/6
105/2 105/8 105/15 105/24
106/1 106/18 118/13 121/6
121/13 122/5 124/5 168/6
168/19 188/2 203/16 205/19
212/23 212/25 214/8
theft [2] 97/24 161/5
their [38] 14/5 14/25 68/10
80/15 113/20 115/9 115/13
115/18 160/9 160/12 160/13
161/18 161/24 161/25 162/2
162/11 163/10 163/15 163/15
185/13 186/17 189/8 189/17
189/22 192/3 198/2 200/19
208/7 210/5 216/7 216/7
217/20 218/8 218/10 218/13
219/24 221/2 221/19
them [102] 11/21 12/13 23/10
24/1 24/1 24/19 25/11 25/20
27/23 27/23 27/24 28/22 34/6
37/11 38/1 38/2 39/23 41/15
41/19 41/23 42/13 42/14
42/16 42/17 43/1 43/11 44/17
62/4 63/9 63/9 64/12 68/14
70/3 72/16 74/24 78/2 88/6
97/13 99/11 99/21 100/10
100/16 101/3 103/15 110/15
110/16 111/9 114/8 115/9
115/13 115/16 115/19 115/21
116/16 120/1 125/20 125/21
126/20 126/22 136/14 139/10
139/21 140/4 140/4 140/10
147/17 148/14 149/16 149/18
149/19 149/25 159/11 160/9
160/17 160/25 176/22 176/23
176/23 178/2 182/5 182/6
184/17 184/20 189/9 190/3
195/23 202/2 202/16 202/17
208/11 209/8 209/9 209/15
210/1 211/4 211/7 211/8
213/20 214/18 217/21 218/21
218/25
themselves [5] 74/16 150/2
174/9 178/2 208/5
then [88] 6/12 8/8 8/13 8/17
8/23 9/9 9/17 9/21 9/22 12/9
17/6 18/1 18/6 18/7 24/18
24/19 25/2 25/2 26/6 29/15
29/24 30/23 33/14 35/13
38/16 38/18 39/24 40/4 50/6
55/2 55/11 56/3 65/13 65/14
70/14 72/21 77/21 78/2 87/18
87/21 88/23 97/8 135/13
135/14 149/16 151/24 152/3
152/17 152/22 157/10 161/4
166/5 169/10 171/1 174/8
176/5 176/6 176/9 176/24
177/21 179/7 179/8 180/24
181/3 181/5 181/14 181/21
183/8 183/17 183/20 186/17
187/8 188/19 188/20 188/21
190/21 195/4 196/18 204/22
204/24 205/12 206/22 206/22
213/10 215/20 219/16 220/5
220/6
theories [1] 164/7
theory [7] 66/24 82/13
159/21 159/25 161/12 186/10
186/12
there [186]
thereabouts [3] 202/21
206/19 209/5

**thereafter [2]** 111/15 186/18
**therefore [1]** 86/17
**thereof [2]** 110/7 110/8
**these [83]** 7/24 8/10 8/15
9/22 21/21 22/1 27/13 30/2
31/11 34/18 34/23 35/3 35/6
35/14 35/18 36/5 36/6 36/19
37/5 37/8 37/16 37/20 39/19
45/10 57/16 61/4 66/10 66/16
74/22 75/1 96/2 96/8 98/14
98/21 100/13 105/9 108/16
110/23 110/24 120/4 120/10
120/13 120/14 120/24 130/6
130/6 148/11 150/11 160/8
160/10 164/15 164/16 169/18
171/5 173/16 173/18 174/2
177/16 177/21 177/22 181/20
181/23 182/13 183/6 183/6
192/23 198/7 202/13 202/14
202/19 202/23 204/22 205/10
205/16 206/6 206/13 207/7
207/13 207/15 207/18 208/9
210/3 211/6
**they [188]**
**THIBODEAUX [2]** 1/20 224/12
**thing [12]** 34/25 56/1 63/25
64/7 142/22 166/13 186/14
188/4 189/12 190/8 192/8
209/21
**things [41]** 16/17 35/3 51/20
51/21 57/16 57/17 66/10
66/16 75/21 76/3 78/14 97/21
116/19 117/18 122/6 127/2
127/3 130/15 130/21 130/25
131/3 131/23 144/24 165/23
166/16 166/17 166/19 166/22
172/21 174/9 179/20 179/23
182/1 183/2 183/19 187/8
190/19 207/23 211/9 216/23
222/4
**think [107]** 7/11 7/25 8/9
10/8 10/23 15/17 16/6 17/17
21/16 22/10 22/11 24/5 24/17
28/10 28/18 28/21 30/18
30/24 31/5 35/21 36/17 37/6
37/13 37/20 37/25 38/5 38/16
39/20 41/11 41/17 43/21 44/9
44/14 44/16 50/18 50/23
51/15 56/3 56/21 58/14 64/3
66/17 72/22 73/24 73/25
74/18 76/17 80/10 83/10 84/6
84/6 84/7 91/9 119/12 121/13
121/16 130/21 135/7 141/5
141/7 141/16 142/1 142/10
143/25 144/8 145/15 147/5
149/1 157/4 157/10 159/5
162/12 163/1 163/6 165/7
166/8 169/15 169/21 169/23
170/9 171/12 174/2 177/11
177/15 178/10 179/14 183/11
183/11 183/14 183/18 184/6
186/2 186/3 187/12 187/19
188/21 192/13 193/6 195/11
196/8 197/8 202/13 206/4
208/15 218/19 220/14 221/11
**thinking [3]** 52/24 79/3
135/13
**thinks [1]** 207/4
**third [5]** 18/7 18/9 100/24
110/5 152/25
**this [351]**
**thornier [1]** 84/9
**thorough [1]** 53/23
**thoroughly [2]** 54/20 57/15
**those [107]** 8/5 12/6 13/18
14/12 16/1 16/24 17/6 21/6
23/10 23/11 23/24 25/15

25/18 29/3 30/9 38/11 45/19
50/15 51/22 53/25 58/18 61/6
68/3 71/1 71/5 72/12 73/21
74/19 80/15 81/2 81/7 81/15
83/14 84/13 84/17 85/3 90/12
90/17 90/22 92/24 95/9 97/8
97/9 97/12 97/17 97/20 98/24
99/4 99/5 100/18 101/11
101/14 105/11 105/16 106/2
107/12 107/20 108/17 111/4
113/3 114/23 116/15 116/17
118/23 119/22 120/24 120/24
123/17 126/4 133/2 135/3
135/20 136/1 137/1 140/3
146/3 146/12 159/10 159/12
161/20 162/19 166/25 167/6
168/20 173/20 175/9 175/11
176/21 177/1 177/3 185/6
188/24 188/24 189/2 189/24
193/25 194/20 195/1 196/25
201/11 206/11 209/4 209/14
212/15 215/25 217/15 222/4
**though [6]** 96/12 99/21 177/6
207/13 210/25 218/24
**thought [12]** 6/13 20/4 27/16
35/15 78/18 79/4 108/13
108/15 164/8 187/6 187/15
201/9
**thoughts [1]** 164/7
**thousand [1]** 73/24
**thousands [5]** 25/23 25/23
178/4 190/1 190/1
**three [40]** 10/14 16/1 17/7
17/17 17/19 22/22 32/24
34/23 46/2 46/3 51/4 64/6
95/4 95/4 95/7 96/8 96/12
100/2 100/16 100/18 110/24
154/14 167/25 168/3 168/14
170/16 171/2 171/2 171/5
182/15 188/23 189/24 197/13
200/18 201/1 207/14 207/16
214/24 214/24 217/10
**three-and-a-half [2]** 51/4
171/2
**three-month [1]** 200/18
**throat [1]** 122/19
**through [52]** 8/16 12/13
16/13 24/23 32/18 38/11
47/24 49/3 52/11 52/15 57/7
61/3 70/13 74/1 79/9 82/14
95/11 106/14 113/24 113/25
113/25 114/10 118/25 119/9
144/17 153/1 157/25 166/7
172/15 173/20 176/9 178/17
179/4 179/6 180/14 180/23
180/24 189/13 189/16 193/19
196/12 199/4 199/5 200/9
200/15 200/17 209/12 210/4
211/14 213/17 222/15 222/16
**throughout [2]** 193/12 198/25
**throw [1]** 176/21
**thrown [1]** 89/17
**THURSDAY [2]** 1/16 5/1
**tie [1]** 211/8
**ties [1]** 212/13
**till [1]** 222/23
**Tim [1]** 36/21
**time [83]** 6/3 6/14 7/17
11/25 26/8 26/12 26/20 26/21
34/24 36/20 37/21 40/17 41/7
41/7 41/11 41/21 42/9 42/15
42/21 42/22 50/3 54/10 57/18
59/6 64/17 67/18 68/6 70/17
75/10 81/4 86/1 86/21 87/8
88/4 88/21 88/24 95/24 100/4
105/13 105/16 108/25 110/5
110/5 110/15 110/16 111/24
112/7 112/15 118/24 119/3
124/7 126/4 156/4 156/23

157/4 157/9 159/8 170/18
171/1 171/21 173/21 176/3
173/13 173/21 176/3 176/11
191/15 194/9 197/4 200/18
202/15 202/22 205/9 206/5
206/6 207/19 207/23 208/18
212/14 212/14 215/2 216/6
219/6
**timeframe [3]** 37/18 124/10
203/15
**timeline [6]** 38/10 49/6 50/2
50/8 50/19 50/24
**Timepieces [2]** 39/12 45/2
**times [21]** 26/2 26/5 26/6
26/9 26/11 26/19 42/2 42/18
53/20 64/6 96/11 111/1 111/4
112/21 132/22 132/24 138/6
188/15 197/8 214/24 214/24
**timing [2]** 40/13 221/19
**TIMOTHY [3]** 4/8 93/16 126/2
**title [2]** 145/4 224/4
**titled [1]** 134/14
**today [13]** 5/10 54/5 96/25
127/7 128/4 128/13 128/19
130/11 131/13 156/17 178/5
194/7 196/23
**today's [1]** 53/13
**together [2]** 162/15 178/25
**toilet [1]** 176/23
**told [10]** 51/14 63/25 133/4
178/7 191/25 196/24 198/2
213/18 213/20 215/23
**too [4]** 63/6 95/3 147/17
203/23
**took [26]** 11/8 16/1 17/6
17/15 17/16 17/17 17/18
17/21 19/8 19/16 20/21 24/17
27/12 28/6 70/14 74/24
108/12 113/11 114/8 151/13
162/5 174/13 174/14 187/15
196/18 222/3
**top [17]** 7/22 7/22 31/21
32/4 33/3 62/9 64/25 65/2
94/9 94/21 134/12 134/21
135/10 143/4 145/21 195/13
195/20
**Topeka [4]** 22/25 55/23 75/24
179/7
**topics [4]** 80/15 81/2 106/3
106/6
**toss [1]** 176/23
**total [4]** 17/9 132/23 158/8
216/1
**touches [1]** 197/9
**towards [2]** 153/10 204/9
**Tower [1]** 2/20
**trace [3]** 52/11 52/14 115/19
**traced [1]** 53/2
**traces [1]** 166/3
**tracing [2]** 157/23 180/17
**track [1]** 47/1
**tracking [2]** 46/20 181/12
**tracks [1]** 166/3
**Tradings [1]** 20/3
**trail [2]** 122/14 208/4
**trained [1]** 59/13
**training [1]** 52/3
**transactions [1]** 147/1
**transcript [5]** 1/13 8/8
121/23 224/6 224/7
**transcripts [1]** 68/2
**transfer [2]** 45/16 106/16
**transfers [2]** 9/23 10/1
**transpired [1]** 107/25
**travel [1]** 222/2
**traveling [5]** 11/11 57/3
57/9 64/3 64/13
**tremendous [1]** 158/10
**trial [109]** 34/18 35/19 36/5

**T**

**trial...** [106]  64/6 67/18
68/2 68/4 70/17 71/18 72/18
72/18 76/12 79/6 80/1 80/11
80/14 81/10 81/10 82/5 82/15
82/20 83/19 84/25 87/13 90/7
90/8 90/14 91/9 91/21 92/1
94/23 101/7 101/15 102/4
102/13 102/17 122/15 124/4
124/11 124/14 127/1 127/2
127/3 129/20 129/21 129/23
129/24 130/3 130/16 130/17
130/25 131/22 131/24 135/6
138/6 159/8 160/12 162/18
163/5 166/6 180/7 180/16
189/17 192/22 194/1 194/3
194/5 194/13 194/15 194/18
195/3 196/12 197/5 197/6
197/23 205/13 206/14 206/16
206/17 206/20 207/10 208/22
208/25 210/7 210/19 211/14
212/9 212/10 212/11 213/14
214/10 214/10 214/23 216/18
217/14 217/18 217/20 218/15
219/17 220/20 221/5 221/7
221/13 221/22 221/23 221/23
221/25 221/25 222/6
**tried** [3]  6/18 53/25 164/5
**Trontz** [2]  7/16 7/22
**true** [7]  7/10 157/24 161/25
164/19 215/5 215/5 224/5
**trustee** [1]  152/2
**truth** [3]  164/24 165/5
165/11
**truthful** [1]  167/21
**try** [11]  6/12 51/12 70/4
70/11 70/12 122/17 142/17
206/3 222/7 222/11 222/15
**trying** [12]  7/18 60/25 68/16
71/18 73/17 83/10 86/5 89/16
127/16 141/13 141/16 156/21
**Tuesday** [1]  76/6
**Turcan** [2]  195/21 195/22
**Turing** [3]  106/7 106/12
106/16
**Turks** [1]  14/5
**turn** [6]  68/14 145/15 165/1
167/6 169/10 170/13
**turned** [4]  70/10 167/24
167/25 210/12
**turning** [3]  167/9 167/10
167/11
**turns** [1]  191/8
**Twelfth** [1]  2/8
**two** [79]  1/15 6/25 7/2 15/22
19/10 20/5 20/13 27/3 33/11
33/22 34/22 45/25 53/22 71/1
71/5 71/5 77/4 77/12 78/2
80/4 101/4 105/3 105/5
106/22 109/3 110/9 114/24
116/22 120/10 120/14 120/16
121/1 121/2 123/15 138/1
138/20 138/23 139/7 139/14
139/16 139/20 139/21 140/14
140/15 140/17 140/21 141/2
141/6 145/22 146/2 146/4
146/12 154/7 160/17 161/11
162/8 162/21 163/25 165/23
166/19 167/11 173/16 176/19
176/19 178/18 179/22 183/6
184/14 185/23 190/16 193/18
197/12 200/20 201/1 209/1
213/14 213/19 213/23 218/4
**two-and-a-half** [1]  201/1
**two-fold** [1]  176/19
**tying** [2]  85/6 164/3
**type** [4]  22/6 46/19 47/3
191/19

**types** [2]  85/3 90/12

**U**

**U.S** [3]  1/20 2/4 2/4
**Uh** [4]  11/9 39/18 42/3 91/7
**Uh-huh** [4]  11/9 39/18 42/3
91/7
**ultimate** [1]  44/18
**ultimately** [8]  12/22 16/1
22/16 85/17 106/3 197/22
202/12 210/22
**unable** [1]  88/7
**unaccounted** [1]  191/11
**unaware** [1]  97/15
**unclear** [1]  60/3
**uncover** [1]  95/10
**undated** [1]  143/5
**under** [12]  8/18 44/10 44/11
71/22 134/16 180/24 181/1
189/15 193/6 196/3 198/8
201/22
**undermining** [1]  165/20
**underneath** [2]  61/13 65/10
**understand** [13]  9/14 34/12
45/6 59/12 69/21 84/5 128/6
144/24 184/25 199/16 213/25
214/13 217/14
**understanding** [13]  68/10
74/23 78/10 78/11 78/15
78/23 80/20 83/25 90/18
120/3 123/16 154/13 173/13
**understood** [11]  26/18 43/2
48/16 53/19 59/15 70/25
76/23 77/5 118/17 157/3
211/25
**underwent** [1]  6/9
**undisclosed** [3]  193/22
193/23 193/25
**undisputably** [1]  195/7
**undisputed** [3]  34/19 189/23
217/23
**unfamiliar** [2]  39/21 41/23
**unfolded** [2]  115/19 187/8
**unique** [1]  62/5
**UNITED** [12]  1/1 1/4 1/6 2/3
11/11 48/5 57/3 135/14
198/12 198/18 224/5 224/9
**unless** [4]  95/10 130/22
184/6 207/4
**unnecessary** [1]  57/17
**unquote** [3]  167/17 193/21
194/19
**unseal** [1]  166/25
**unsealed** [1]  167/24
**unsealing** [1]  167/3
**untainted** [2]  195/8 195/23
**until** [11]  41/15 51/13 79/3
81/16 81/20 87/23 89/11
89/18 92/17 202/19 217/3
**up** [89]  12/14 13/2 13/20
16/21 16/21 19/19 20/8 22/7
24/9 26/17 29/7 29/22 31/8
32/4 33/21 35/1 39/7 41/22
42/17 43/4 57/10 57/17 67/21
67/24 68/24 71/10 76/13 79/1
79/2 79/5 79/6 79/21 81/16
81/20 85/14 87/23 89/16 94/6
98/6 100/23 102/4 105/3
105/7 105/13 105/20 106/19
111/12 113/14 117/24 118/1
133/12 134/10 134/18 137/12
137/13 137/15 138/8 138/10
139/7 141/24 142/25 145/4
150/5 151/16 152/24 153/1
154/5 157/22 160/23 166/4
169/1 169/2 170/1 175/19
182/8 193/14 194/21 195/16
196/1 204/5 205/12 211/21
215/2 218/9 221/10 221/21

221/23 222/6 222/13
224/24 254/

**updating** [1]  76/6
**upload** [1]  25/9
**uploaded** [19]  36/13 38/2
40/4 40/5 41/18 69/5 69/11
69/18 70/22 70/24 71/4 72/13
72/16 72/20 73/2 74/2 74/8
78/16 98/15
**uploading** [2]  72/10 75/18
**upon** [5]  75/25 76/1 90/9
91/10 100/14
**us** [19]  2/11 25/8 41/12
94/13 123/19 124/6 125/21
130/18 135/6 140/2 141/11
146/8 161/21 171/18 172/21
181/18 185/21 208/10 216/13
**USAFX** [12]  25/9 36/14 36/18
40/4 68/24 69/5 69/12 69/19
70/22 72/10 72/13 75/18
**use** [44]  6/16 7/11 39/23
52/14 53/3 59/12 62/2 63/11
66/21 72/17 85/1 90/16 91/15
91/18 120/6 159/9 160/25
161/1 162/2 162/8 162/9
162/9 162/9 162/16 162/18
188/6 189/23 192/2 192/19
193/11 193/17 194/14 195/4
198/4 208/16 208/16 208/17
208/25 209/3 209/14 213/14
214/10 218/22 219/19
**used** [43]  8/1 35/19 44/22
74/25 91/20 92/1 92/8 92/13
92/19 97/21 101/6 101/7
101/15 106/16 113/20 116/11
121/11 143/14 158/6 160/9
163/5 163/7 166/12 174/9
178/16 179/6 180/11 181/5
182/1 183/15 183/17 183/19
183/21 193/21 198/10 198/17
198/17 208/20 208/21 210/5
210/7 212/9 212/10
**user** [1]  61/19
**uses** [13]  101/5 191/5 192/22
193/1 193/13 193/15 193/18
193/22 193/23 193/25 196/6
218/4 218/5
**using** [21]  7/9 9/8 84/24
106/11 158/18 159/1 159/13
159/20 160/1 162/23 171/25
172/11 181/19 181/20 181/21
182/11 183/1 192/9 195/7
195/7 199/2
**utilities** [1]  65/15

**V**

**vaccinated** [1]  104/15
**Vague** [1]  90/24
**valid** [1]  213/3
**value** [3]  78/6 78/8 177/19
**Van** [1]  172/18
**Vardanian** [1]  63/22
**variety** [1]  74/19
**various** [6]  53/20 163/5
188/15 188/15 193/13 203/17
**Vaughan** [1]  3/7
**vehicle** [2]  62/14 181/11
**verified** [1]  134/3
**version** [4]  180/20 187/13
210/21 216/7
**versions** [1]  165/3
**versus** [6]  49/21 50/21 75/5
177/19 198/12 198/19
**very** [39]  31/21 33/3 41/13
43/2 43/21 70/1 84/18 84/20
89/14 90/5 100/4 103/10
105/17 114/10 132/24 156/8
156/10 156/21 157/21 161/22
162/5 163/8 164/20 164/20

**V**

**very...** **[15]**  165/2 166/14 182/20 184/2 184/2 184/3 184/7 188/3 191/4 192/13 192/25 193/5 207/17 208/12 220/14

**via** **[5]**  8/10 37/2 47/23 97/2 170/5

**victim** **[1]**  97/24

**victims** **[1]**  210/3

**Victoria** **[36]**  27/10 54/18 56/23 57/21 58/9 59/22 65/1 65/10 66/21 122/4 154/12 158/5 158/18 159/18 160/1 161/14 164/4 166/12 172/1 172/6 173/10 173/23 174/16 179/4 180/3 180/10 180/10 180/11 181/2 181/20 182/1 182/24 183/1 183/14 183/15 192/10

**video** **[3]**  153/11 153/14 153/19

**view** **[9]**  29/13 35/10 44/18 58/23 66/10 100/4 156/16 172/2 176/16

**viewed** **[3]**  103/10 201/5 212/6

**viewing** **[1]**  17/1

**violation** **[3]**  195/9 217/21 221/9

**virtually** **[1]**  200/18

**voice** **[1]**  12/14

**volumes** **[2]**  189/25 189/25

**voluminous** **[1]**  28/25

**W**

**W2s** **[1]**  20/14

**waiting** **[1]**  129/19

**walk** **[5]**  172/15 176/20 180/14 200/9 200/15

**walked** **[1]**  180/23

**want** **[38]**  26/18 34/23 35/4 39/22 43/11 51/7 51/9 58/5 59/2 66/15 75/13 93/25 95/8 119/12 120/18 144/5 145/9 154/14 154/16 157/7 157/16 160/5 163/17 163/19 165/13 169/25 177/2 177/17 184/7 186/19 191/6 193/22 193/24 194/16 211/23 212/17 212/17 221/16

**wanted** **[13]**  21/23 22/10 36/4 83/25 95/3 96/1 96/6 170/11 177/2 207/22 211/10 213/13 213/15

**wants** **[1]**  55/15

**warrant** **[8]**  65/23 69/9 194/12 208/17 213/3 216/19 216/21 217/2

**was** **[586]**

**Washington** **[2]**  2/12 2/23

**wasn't** **[17]**  26/8 36/5 41/5 43/23 60/11 65/24 79/3 82/16 90/19 91/22 98/17 110/5 184/16 188/18 196/16 216/9 216/13

**waste** **[1]**  34/23

**way** **[30]**  26/25 28/15 37/3 55/4 71/25 84/23 89/17 95/25 100/12 103/6 103/20 114/13 116/8 130/25 136/10 163/1 165/13 165/14 168/2 170/8 186/16 190/10 192/20 198/11 199/6 208/19 210/6 215/1 220/3 220/13

**ways** **[3]**  27/22 158/14 178/1

**we** **[436]**

**wear** **[1]**  213/23

**web** **[6]**  146/20 147/16 147/19 182/24 184/14 188/8 191/21

**website** **[2]**  146/20 148/5

**Weddington** **[3]**  18/25 71/8 136/20

**week** **[8]**  26/13 26/22 42/19 105/17 105/22 106/22 135/8 200/18

**weekend** **[1]**  72/10

**weeks** **[7]**  26/16 110/9 182/15 197/5 197/6 201/1 201/1

**weighed** **[1]**  177/18

**Welch** **[3]**  94/12 95/15 96/9

**well** **[46]**  6/19 12/8 19/19 35/8 36/12 36/23 42/13 43/12 44/8 48/12 52/25 55/2 55/14 59/4 59/10 70/21 75/3 76/22 81/14 91/9 99/14 108/15 109/1 113/24 116/14 121/18 123/3 135/24 139/25 147/5 148/24 149/16 156/7 162/5 166/25 167/4 167/23 179/16 179/22 185/1 198/13 204/17 205/3 205/7 220/18 221/17

**went** **[5]**  11/17 164/6 189/13 189/16 213/17

**were** **[259]**

**weren't** **[4]**  90/16 99/4 99/23 154/15

**west** **[4]**  1/21 2/16 3/8 95/23

**WESTERN** **[2]**  1/2 95/22

**WESTFAHL** **[1]**  2/5

**what** **[268]**

**whatever** **[9]**  66/14 74/20 79/5 143/22 175/14 176/22 194/9 196/1 221/8

**whatnot** **[1]**  222/3

**when** **[126]**

**where** **[33]**  30/11 50/6 52/21 59/4 59/21 78/14 80/14 81/2 81/23 86/4 92/16 99/11 111/12 116/16 117/19 119/8 122/19 123/23 124/15 134/8 170/25 179/20 191/21 200/11 201/10 202/22 204/20 207/6 208/9 212/2 213/7 214/1 220/5

**whether** **[50]**  22/7 22/13 44/21 47/23 48/15 60/5 66/13 74/13 78/22 90/13 90/25 91/16 91/17 91/19 91/25 92/7 92/12 92/18 108/17 108/20 108/23 110/1 112/23 113/1 115/9 115/13 118/14 118/24 124/15 127/22 135/25 140/24 148/8 148/10 148/15 149/17 150/3 152/10 153/18 155/13 165/9 171/16 178/14 178/15 188/5 198/9 198/10 205/15 208/15 212/5

**which** **[104]**  17/12 17/20 18/3 18/7 18/25 20/11 21/7 27/6 27/9 29/7 29/15 29/17 30/24 33/15 36/7 36/14 41/3 45/16 49/15 57/7 61/8 61/22 61/24 71/5 71/20 71/25 75/13 77/25 79/6 80/23 81/19 86/15 87/19 92/13 95/16 95/22 98/24 99/11 110/19 111/22 114/21 123/2 123/15 123/17 133/18 135/2 136/13 138/23 138/25 140/18 142/9 145/20 146/16 146/18 146/18 147/4 148/12 151/7 154/8 154/15 154/19 155/9 155/18 156/17 158/5 158/17 158/25 159/7 159/20 160/10 161/5 164/2 165/7 166/2 166/15 169/22 171/3 172/6 181/6 181/19 182/21

**182/24 184/14 188/8 191/21** 198/23 203/1 203/6 204/2 204/21 206/2 210/20 212/4 214/8 215/1 215/6 215/15 216/7 217/24 222/11

**while** **[6]**  28/14 86/10 102/6 141/24 222/16 222/19

**white** **[1]**  51/6

**who** **[68]**  5/9 5/13 8/15 9/19 36/9 36/12 36/18 37/11 48/5 48/8 48/8 84/2 84/5 90/17 90/19 93/2 94/13 103/14 112/17 116/15 116/16 116/17 117/1 124/8 124/22 125/15 125/17 132/12 146/24 147/18 148/9 148/11 151/4 152/2 152/19 158/11 158/21 158/23 163/6 164/17 170/9 170/20 170/22 172/21 174/8 174/12 174/13 174/14 175/7 183/1 194/4 195/14 196/18 200/22 201/16 203/20 204/16 209/11 209/22 209/24 210/4 210/4 211/11 211/13 211/13 213/15 216/20 218/18

**whoever** **[3]**  147/16 147/19 147/23

**whole** **[1]**  163/14

**Wholesale** **[1]**  135/14

**whom** **[4]**  48/20 119/22 119/24 119/25

**whose** **[4]**  63/21 64/25 65/2 146/25

**why** **[34]**  7/12 9/10 13/2 20/8 21/6 29/6 34/20 43/20 45/10 50/22 55/4 60/10 60/15 60/18 64/4 75/4 75/9 99/17 143/5 144/23 148/8 176/18 177/12 181/1 184/24 185/11 189/7 189/8 190/19 191/5 205/20 212/8 215/4 219/18

**wife** **[1]**  48/3

**will** **[55]**  15/9 27/15 31/5 33/1 34/1 47/14 48/18 54/14 60/19 69/14 87/7 91/4 101/10 102/16 112/12 113/22 114/12 122/16 123/24 130/24 136/10 138/12 142/17 145/17 146/25 150/11 157/3 157/9 157/10 157/12 166/7 166/13 167/7 169/9 169/10 169/17 180/21 181/4 183/9 185/6 185/20 186/1 187/21 190/16 190/24 191/1 191/2 191/7 210/25 211/21 211/22 222/14 222/14 222/16 222/22

**Williams** **[2]**  3/4 3/7

**willing** **[1]**  87/11

**WILSON** **[1]**  1/3

**win** **[1]**  163/19

**wipe** **[1]**  218/15

**wire** **[1]**  72/7

**wish** **[2]**  86/17 169/8

**within** **[3]**  6/25 7/2 10/14

**without** **[4]**  112/20 176/18 185/20 193/6

**witness** **[42]**  4/3 5/13 5/16 40/20 44/17 67/6 79/4 79/5 81/17 81/21 81/24 82/6 82/12 93/8 93/13 104/8 113/11 114/2 124/24 125/1 132/11 140/11 141/15 149/1 152/7 159/22 160/4 164/23 165/21 167/15 173/12 176/12 187/15 191/20 193/20 194/18 195/3 196/9 196/10 196/11 209/22 209/24

**witness'** **[1]**  39/3

**W**

**witnesses [28]**   48/22 69/25
82/3 92/13 112/10 112/11
112/13 112/15 112/24 135/4
135/5 160/14 161/19 161/20
162/24 163/17 165/21 188/10
194/3 194/5 194/6 209/1
209/3 209/4 209/5 209/12
210/3 215/8
**won't [6]**   32/18 64/17 153/1
156/20 194/8 196/12
**word [5]**   7/11 7/25 27/15
77/9 192/9
**words [8]**   24/24 32/11 121/24
122/18 156/15 174/14 190/23
191/12
**work [15]**   48/8 52/8 68/21
68/21 69/6 82/2 96/15 114/21
144/6 144/9 188/8 194/24
206/7 206/8 207/18
**worked [7]**   78/4 114/17
116/18 164/20 176/9 209/9
211/13
**working [9]**   35/2 114/24
143/1 143/12 143/14 145/5
172/10 173/20 204/8
**works [3]**   48/5 94/14 217/18
**worse [1]**   178/8
**worth [1]**   73/20
**would [123]**
**wouldn't [6]**   11/5 66/5 80/20
80/24 107/16 186/9
**wrap [2]**   211/21 221/10
**writing [1]**   15/4
**written [8]**   13/18 62/23
68/21 118/15 119/17 119/22
215/14 215/19
**wrong [4]**   185/4 198/8 207/5
214/5
**wrote [3]**   12/25 54/1 173/21

**Y**

**yahoo.com [2]**   33/24 61/16
**yeah [15]**   19/23 21/23 29/15
30/4 32/21 37/21 39/24 40/25
46/3 58/15 72/22 126/24
130/9 139/10 153/17
**years [2]**   50/25 51/4
**yes [351]**
**yesterday [21]**   5/9 47/22
48/10 49/11 49/15 50/13 66/9
125/12 125/23 126/6 127/11
127/14 128/10 129/4 130/7
131/11 131/18 132/8 168/9
168/10 172/14
**yesterday's [1]**   48/23
**yet [2]**   75/19 194/17
**yielded [1]**   210/22
**York [1]**   2/11
**you [1034]**
**Young [3]**   84/5 90/20 90/21
**your [288]**
**Yup [1]**   13/8

**Z**

**Zellhart [1]**   15/25
**zero [1]**   191/18
**Zhadko [59]**   7/8 7/9 7/14
8/18 8/25 9/1 9/6 9/7 9/20
10/19 10/21 12/19 27/7 28/7
28/20 30/15 31/1 31/16 31/16
32/13 32/25 33/4 33/12 36/7
36/10 36/10 55/20 80/7 80/17
106/12 117/17 118/7 121/21
122/4 122/7 122/22 122/25
123/2 123/5 123/16 139/1
139/9 139/11 145/20 153/8
178/23 181/6 188/23 190/15

196/24 197/1 197/7 197/21
201/12 201/13 201/14 201/17
201/17 202/2
**Zhadko's [3]**   69/15 121/7
121/10
**zhadko.richard [1]**   29/25
**zip [3]**   29/15 29/17 29/24
**zoom [2]**   33/20 102/18