# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>RICHARD AYVAZYAN, et al.<br><br>Defendants. | **CASE NO.  2:20-cr-579-SVW**<br><br>**ORDER DENYING DEFENDANTS'** ***KASTIGAR* MOTION** |

Before the Court is a motion for *Kastigar* relief filed by Defendants Richard Ayvazyan and Marietta Terabelian (hereinafter referred to together as "Defendants").  Dkt. 338.  For the below reasons, the motion is DENIED.

## I.    Factual and Procedural Background.

In June 2020, the Government began investigating a Los Angeles-based conspiracy involving fraudulent applications for forgivable loans authorized by the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act").  The Government determined that stolen, fake, and synthetic identities were used to obtain forgivable loans as part of the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Relief Program ("EIDL").

The Government conducted an extensive investigation that quickly yielded a tremendous amount of evidence against Defendants.  As discussed below, by October 18, 2020, the Government had identified over 100 fraudulent PPP and EIDL loans connected to the Los Angeles-based conspiracy.  Defendants used dozens of fake businesses and fake, stolen, or synthetic identities to submit these loans.  The false identities listed on the applications included, among others, "Iuliia Zhadko" and "Viktoria Kauichko."  The Government traced the loans to various bank accounts and determined that Defendants and their co-conspirators used the fraudulently obtained proceeds to purchase real estate, precious metals, jewelry, luxury home furnishings, and goods at high-end department stores.  The Government concluded Defendants were using the synthetic identities, including Zhadko and Kauichko.

On October 19, 2020, Defendants were returning to Los Angeles from a vacation in Turks and Caicos.  Their journey included a flight from Turks and Caicos to Miami, Florida. Justin Palmerton—an FBI agent in Los Angeles who was investigating the above described

conspiracy—had previously received notice about Defendants' flight to Miami.  He contacted his colleagues in Miami and requested that customs agents conduct a secondary screening of Defendants upon their arrival at the airport.

At around 3:30 p.m. on October 19, 2020, Defendants arrived at the Miami airport and were referred by customs officials for a secondary screening.  Defendants were detained and interviewed, and customs agents searched Defendants' luggage, wallets, and cell phones.  Those searches yielded the following evidence:

- a credit card in the name of "Viktoria Kauichko," contained in Terabelian's wallet;

- credit cards belonging to "Viktoria Kauichko" and "Iuliia Zhadko," contained in Ayvazyan's luggage;

- images on Ayvazyan's phone of (1) a driver's license in the name of "Iuliia Zhadko," and (2) numerous other credit cards and driver's licenses in various names; and

- text messages on Terabelian's cell phone in which Terabelian purports to be Kauichko.

The Court refers to this border stop below as "the Miami stop," and the phones seized during that stop as "the Miami phones."  On October 20, 2020, the Government filed criminal complaints alleging that Defendants conspired with others to commit bank and wire fraud.  The case proceeded to an indictment in November 2020 and a first superseding indictment in March 2021.

In March 2021, Defendants moved to suppress all of the evidence from the Miami airport on the basis that the search of Defendants' luggage and phones violated the Fourth and Fifth Amendments.

On April 27, 2021, after extensive briefing, the Court granted the motion in part.  *See generally* Dkt. 296.  The Court denied the motion on Fourth Amendment grounds.  As to the Fifth Amendment argument, the Court found a *Miranda* violation.  However, the Court only suppressed the evidence from Defendants' phones; the Court did not suppress the physical credit cards.  This is because the physical cards did not result from actual coercion, but the evidence on the phones did.  *See id.* at 14–18.  Specifically, Defendants' phone passcodes were actually coerced.  *See id.*

Additionally, the Government obtained a warrant to search Defendants' home at 4910 Topeka Drive in Tarzana, California, and executed that search on November 5, 2020.[1]

---

[1] The Government also obtained a warrant for other properties, including 17450 Weddington Street in Encino, California, the residence of Tamara Dadyan and Artur Ayvazyan, two of Defendants' co-conspirators.

Defendants also moved to suppress the evidence from that search.  Defendants argued that the search warrant was tainted by the unlawful Miami stop and, alternatively, that the warrants were overbroad and lacked particularity.  The Court denied the motion on both grounds.  *See id.* at 18–38.  The Court also found that, even after excising all information from the Miami stop (including the physical cards that the Court did not suppress), the warrant to search Defendants' home was supported by probable cause.  *See id.* at 18–22.

On May 7, 2021, Defendants sent a letter to the Government arguing that the Government's coercion of Defendants' phone passcodes entitled them to relief under *Kastigar v. United States*, 406 U.S. 441 (1972).  Defendants filed a motion for *Kastigar* relief on May 17, 2021.  The Court concluded that Defendants were entitled to a *Kastigar* hearing.  The Court also set a *Kastigar* hearing for May 26, 2021.  However, the Court then reconsidered the timing of the hearing and deferred the hearing until after trial.  The Court did so in light of the impending trial date (*i.e.*, June 15, 2021) and the fact that a post-trial hearing would be more focused.  *See* Dkt. 356.

The jury trial started on June 15, 2021.  On June 25, 2021, after deliberating for one day, the jury convicted Defendants of conspiracy to commit bank fraud and wire fraud, bank fraud, wire fraud, and conspiracy to commit money laundering.  *See* Dkt 644.  Ayvazyan was also convicted of aggravated identity theft.  *See id.*

Three days after the verdict, the Court set a briefing schedule and a date for the *Kastigar* hearing.  *See* Dkt. 605.  On July 12, 2021, the Government submitted its opening brief and declarations from the following members of the prosecution team:

- Department of Justice Trial Attorney Christopher Fenton;

- Federal Bureau of Investigation Special Agent Justin Palmerton;

- Assistant United States Attorney Catherine Ahn

- Assistant United States Attorney Scott Paetty;

- Assistant United States Attorney Brian Faerstein;

- Former Assistant United States Attorney Julian André;

- Small Business Administration Office of Inspector General Special Agent Timothy Massino; and

- Internal Revenue Service Criminal Investigation Special Agent Geffrey Clark.

In their declarations, the witnesses explain how, if at all, they used information from the Miami phones during their investigation or prosecution of this case.[2]  Each witness attached supporting exhibits that corroborated their declarations.  The exhibits include, but are not limited to, dozens of emails, memorandums, and other internal documents related to the investigation; documents produced by third parties during the investigation; and charts analyzing some of the tainted information.  The government also filed some exhibits in camera, including grand jury transcripts, subpoena logs, prosecution memorandums, and a trial exhibit list that is annotated with the date of issue for the subpoena or request for information that yielded the documents underlying the exhibit.  All of this information was provided in addition to the trial exhibits themselves and the filings on the docket.  *See* Mot. at 35.

Defendants filed their opposition brief and supporting exhibits on July 22, 2021.  The Government filed a reply brief with supporting exhibits and an additional declaration on July 27, 2021.

The Court held a *Kastigar* hearing on July 28, 2021.  The hearing lasted through July 29, 2021.  At the two-day hearing, Defendants cross-examined all of the Government's witnesses except for André.  Defendants waived the opportunity to cross-examine André.  *See* July 28 Tr. at 7:25-8:4.  The Court took the matter under submission at the close of the hearing.

## II.    Legal Standard.

Before proceeding to its analysis, the Court will discuss some threshold issues related to the legal standard for a *Kastigar* motion.  First, the Court will discuss the Government's burden generally.  Second, the Court will discuss some subsidiary issues related to that burden.

### A.    The Government's Burden.

Under *Kastigar*, a defendant's compelled testimony cannot be used against the defendant either directly or derivatively.  406 U.S. at 460.  Although *Kastigar* related to immunized testimony, the Ninth Circuit has explained that a defendant subjected to actual coercion in violation of the Fifth Amendment is entitled to a *Kastigar* hearing.  *United States v. Anderson*, 79 F.3d 1522, 1526 (9th Cir. 1996) ("If a defendant's statements were compelled in violation of the fifth amendment, he is entitled to a *Kastigar* hearing . . . .");  *see also Chavez v. Martinez*, 538 U.S. 760, 769–70 (2003) (noting in dicta that defendant's protection against statements coerced

---

[2] The Government also submitted a declaration from Federal Bureau of Investigation Special Agent Perry Woo, who stated that he has a "high degree of confidence" that he would have been able to access the contents of the phone even absent the coerced passcodes.  *See generally* Woo Decl.  In its analysis below, the Court does not consider Woo's declaration.

4

in violation of Fifth Amendment is "coextensive with the use and derivative use immunity mandated by *Kastigar* when the government compels testimony from a reluctant witness") (emphasis in original) (citations omitted).

*Kastigar* prohibits three types of uses.  First, the Government is prohibited from using tainted information before the grand jury.  *Id.* at 1431.  Second, the Government is prohibited from using tainted information at trial.  *See id.*  Third, the Government is prohibited from using tainted information in a non-evidentiary or investigative manner, *i.e.*, to investigate leads, develop case theories, initiate prosecution, refuse to plea bargain, interpret evidence, or plan trial strategy.  *See id.* at 1430.  The Government can meet its burden by showing, by a preponderance of the evidence, that it did not use tainted information in any of those three ways.  *See id.*

The Government can also meet its burden by showing, by a preponderance of the evidence, that it had a prior independent source for that information.  *See Kastigar*, 406 U.S. at 461 ("[T]he Fifth Amendment allow[s] the government to prosecute using evidence from legitimate independent sources."); *see also Crowson*,  828 F.3d at 1429 ("The government must prove the independent source by a preponderance of the evidence, and we will uphold a district court's findings unless clearly erroneous.").

"The focus of the inquiry under *Kastigar* is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant," and, if so, whether the prosecutor had an independent source for that use.  *See United States v. Crowson*, 828 F.2d 1427, 1430 (9th Cir. 1987) (cleaned up).

The particular proof that is required to satisfy the Government's heavy burden "will vary from case to case."  *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003), as amended (May 19, 2003).  However, a mere good faith allegation that a piece of evidence or an investigative action is not the fruit of tainted information is insufficient.  *United States v. Montoya*, 45 F.3d 1286, 1292 (9th Cir. 1995).  Rather, in every case, the Government "must present evidence, not just argument."  *United States v. Mapelli*, 971 F.2d 284, 288 (9th Cir. 1992).

Finally, if the Government cannot prove a prior independent source for tainted information, relief is nevertheless not warranted if the Court concludes that the Government's use of tainted information was harmless beyond a reasonable doubt.[3]  *See United States v. Rogers*, 722 F.2d 557, 560 (9th Cir. 1983) (applying harmless error analysis to use of tainted information before grand jury); *see also United States v. Allen*, 864 F.3d 63, 97 (2d Cir. 2017)

---

[3] As discussed in the Court's prior order, nearly every circuit court of appeals applies a harmless error standard to the *Kastigar* inquiry.  *See* Dkt. 605 at 1 (collecting cases).

("Even where a prosecution runs afoul of *Kastigar*'s strict standards, we will not vacate or reverse a conviction where the error was harmless.").

### B.     Subsidiary Issues Related to the Government's Burden.

Although the above framework is straightforward, the parties' briefing and arguments at the hearing raise several issues that must be resolved before the Court proceeds to its analysis. Those issues include (1) what constitutes a prior independent source; (2) the extent to which the Government is required to demonstrate that it implemented prophylactic measures; (3) the distinction between a credibility finding and relying on the good faith of prosecutors and case agents; and (4) the meaning of harmless error in the context of each type of prohibited use.

The case law regarding *Kastigar* resolves those issues as follows.

### 1.     A Prior Independent Source is a Source Containing the *Substance* of Tainted Information, Lawfully Possessed or Requested by the Government Before it *Used* Tainted Information.

The issue of "prior independent source" raises two questions: (a) what constitutes a "prior" source, and (b) does the prior source need to be identical to the tainted information.

As to the first question, the Court concludes that the Government need not have possessed or requested the independent source before the coercion occurred (*i.e.*, before the Miami stop). Rather, a "prior" independent source is one that the Government possessed or requested before it *used* tainted information. This is because the *Kastigar* inquiry presumes compulsion and instead focuses on the *use* of tainted information. *See In re Grand Jury Subpoena*, 75 F.3d 446, 448 (9th Cir. 1996) ("When a statement has been compelled by immunity, the focus then shifts to the *use*, rather than the *obtaining*, of the witness's statement."); *see also id.* (protection of Fifth Amendment privilege "must focus on the *use*" of a defendant's statements). If the Government possessed or requested the independent source before it *used* tainted information, there is no *Kastigar* violation because a defendant is in "precisely the same position as if he had asserted his Fifth Amendment rights [when his statements were coerced] and said nothing." *United States v. Lipkis*, 770 F.2d 1447, 1451 (9th Cir. 1985).

Accordingly, the Government can meet its burden if it shows, by a preponderance of the evidence—*i.e.*, it is more likely than not—that its evidence at trial and before the grand jury was derived from "legitimate independent sources." *Kastigar*, 406 U.S. at 461. And, for non-evidentiary use, the Government can meet its burden if it shows, by a preponderance of the evidence, that its non-evidentiary use stemmed from a legitimate independent source, or that it

inevitably would have used the independent source for the same non-evidentiary use or to take the same investigative steps. *See Crowson*, 828 F.2d at 1432 ("[I]f the government can *prove a prior, independent source for its evidence*,[4] then the non-evidentiary purposes of trial strategy, etc., would seemingly have been developed anyway. Thus, any non-evidentiary use of the immunized testimony would have been inevitable and harmless in any regard.") (emphasis added);[5] *United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995) ("In determining whether the immunized testimony could have influenced the government's decision to pursue its line of investigation, if it appears that that pursuit could have been motivated by both tainted and independent factors, the court must determine whether the government would have taken the same steps entirely apart from the motivating effect of the immunized testimony.") (quotations omitted).[6]

---

[4] The Court emphasizes this language to note that *Crowson* is not referring to the harmless error doctrine when it proceeds to use the phrase "inevitable and harmless." 828 F.2d at 1432. This is because the inevitability that satisfies the Government's burden in *Crowson* is rooted in a prior independent source. *See id.* ("[I]f the government can *prove a prior, independent source for its evidence*, then the non-evidentiary purposes of trial strategy, etc., would seemingly have been developed anyway.") (emphasis added). That is not the same as "harmless error" for the purposes of *Kastigar*. After all, harmless error analysis only applies if there was a constitutional violation—*i.e.*, if the Government both (1) used tainted information, and (2) *lacked* a prior independent source.

This is confirmed by *United States v. Nanni*. There, the Second Circuit stated, in essence, the same rule as *Crowson*: the Government can meet its burden as to non-evidentiary use if it shows it would have "taken the same steps entirely apart from the motivating effect of the immunized testimony." 59 F.3d 1425, 1432 (2d Cir. 1995). That rule was stated during a discussion regarding prior independent sources. *See id.* By contrast, the applicability of the harmless error doctrine was discussed separately in *Nanni*. *See id.* at 1433; *see also United States v. France*, 164 F.3d 203, 206 (4th Cir. 1998) (affirming district court's finding of prior independent sources for "most of the evidence" defendant claimed was used against him and separately finding harmless any use of evidence for which government lacked prior independent source).

Accordingly, in the *Kastigar* context, the inevitability of non-evidentiary use based on a prior independent source is an inquiry distinct from harmless error analysis.

[5] This language about inevitability applies only to non-evidentiary use and not to the use of tainted information at trial or before the grand jury. In other words, the Government cannot use tainted information at trial or before the grand jury and then argue that it inevitably would have been able to use that same evidence based on a prior independent source. Rather, the Government must show that "all of the evidence it [used] was derived from legitimate independent sources." *Kastigar*, 406 U.S. at 461–62.

[6] At the hearing, counsel for Ayvazyan argued that prior independent sources are irrelevant if the Government actually *used* tainted information. July 29 Tr. at 193:16-17 ("We don't get to independent source if there is actual use."). That is incorrect. A *Kastigar* violation means that a defendant's Fifth Amendment rights have been violated. However, if the Government's evidence was derived from legitimate independent sources—or if the Government would have inevitably taken the same investigative steps based on a prior source—there is no Fifth Amendment violation because the defendant is left in "precisely the same position as if he had asserted his Fifth Amendment rights [when his statements were coerced] and said nothing." *Lipkis*, 770 F.2d at 1451 (declining to require Government to establish non-use because Government established prior independent source for tainted information). And Defendants also acknowledge in their brief that the Government could meet its burden by establishing that it "did not use the [tainted] information in any way." Opp. at 4. Accordingly, there are two ways for the Government to establish the absence of a Fifth Amendment violation: (1) non-use, or (2) a prior independent source. (continued on next page…)

As to the second question, the Court concludes that the prior independent source need not be entirely identical to the tainted information (*e.g.*, the exact same photograph).  Rather, the Government must show that, if it used tainted information to accomplish a certain goal, the information contained in the prior independent source would have allowed the Government to accomplish that same goal.  *See Crowson*, 828 F.2d at 1247 (citing Second Circuit case and explaining prior independent sources sufficient where they provide "independent knowledge of substantially all of the information covered in the compelled testimony"); *Montoya*, 45 F.3d at 1293 (affirming district court's finding of prior independent source where agent identified investigative steps taken after compelled testimony and established that prior leads allowed him to take same steps).  For example, if the Government used a tainted image to identify a bank account and subpoena records for that account, a prior independent source is is any source that would have allowed the Government to identify the same bank account.

For this reason, the Court rejects Defendants' "bundle of uses" framework for non-evidentiary use.  Defendants argue that the Government bears the burden of showing that it had a prior independent source for *any conceivable* non-evidentiary use of tainted information.

For example, one of the tainted images from the Miami phones contains information about Viktoria Kauichko and two fake businesses: Fiber One Media, and Journeyman Construction.  This information could be used in a variety of ways.  It could be used to discover a synthetic identity (*i.e.*, Viktoria Kauichko).  It could also be used to identify fake entities (Journeyman Construction or Fiber One Media) for which PPP or EIDL loans may have been submitted.  Alternatively, Defendants argue, the image could be used "for another significant evidentiary and investigative use: the tainted image ties Viktoria Kauichko, Journeyman Construction, and Fiber One Media together on an image located on a phone that was found on

---

The Court notes that, often, the evidence used to show non-use will overlap with the evidence of legitimate independent sources.  Indeed, as Defendants state, the ways in which the Government can meet its burden are "interconnected and overlapping in practice."  Opp. at 3.  Nevertheless, there is—at least doctrinally, and primarily for the non-evidentiary use analysis—a difference between the two inquiries.  In the context of non-evidentiary use, a finding of non-use means that the Court is convinced, by a preponderance of the evidence, that the Government *did not use* tainted information.  By contrast, a finding that relies on prior independent sources means that, although the Government may have used tainted information, there is still no Fifth Amendment violation because, due to the prior independent sources, the Government "would have taken the same steps entirely apart from the motivating effect of the immunized testimony."  *Nanni*, 59 F.3d at 1432; *see also Crowson*, 828 F.2d at 1432.

Finally, to the extent Defendants argue that the *only* way the Government can establish non-use is to provide a prior independent source for every single element of the investigation, the Court rejects that argument.  Imposing that burden upon the Government is akin to asking the Government to "negate all abstract possibility of taint," which the Government is not required to do.  *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985).  Rather, the Government must establish either (1) non-use, or (2) a prior independent source.  Precisely *how* the Government can meet that burden will "vary from case to case."  *Danielson*, 325 F.3d at 1072.  The Court notes that it reviewed several cases where the Ninth Circuit affirmed the district court's finding that the Government met its *Kastigar* burden, and in none of those cases was the Government required to meet the burden proposed by Defendants.  *See, e.g.*, *Montoya*, 45 F.3d at 1292–99; *Crowson*, 828 F.2d at 1429–32; *Rogers*, 722 F.2d at 560–61.

Richard Ayvazyan's person.  This image provided critical connections between the government's investigation targets."  KX1 at 58.

Under Defendants' standard, the Government bears the burden of showing an independent source for all three of those potential uses of the image and, more broadly, for *all conceivable* uses.  Thus, in Defendants' view, loan files and bank records for Kauichko, Journeyman Construction, and Fiber One Media would not constitute a prior independent source.  That is because the loan files and bank records do not expressly connect Kauichko, Fiber One Media, and Journeyman Construction together, nor do they expressly identify Ayvazyan.[7]

The problem with this framework is that it ignores the focus of the *Kastigar* inquiry: the Government's *use* of tainted information.  *See In re Grand Jury*, 75 F.3d at 448 ("When a statement has been compelled by immunity, the focus then shifts to the *use*, rather than the *obtaining*, of the witness's statement.") (emphasis in original).  As noted above, there is no *Kastigar* violation where a defendant is left in "precisely the same position as if he had asserted his Fifth Amendment rights [when his statements were coerced] and said nothing."  *Lipkis*, 770 F.2d at 1451.  Thus, if the Government did not use tainted information for some hypothetical use, there is no Fifth Amendment violation based on that hypothetical use, and the Government need not identify a prior independent source for that hypothetical use.  Rather, a prior independent source must be tailored to the Government's actual use—*i.e.*, the source should contain substantive information that would allow the Government to take the investigative steps it actually took.

Moreover, Defendants misconstrue the case law that says the Government may not use tainted information "in any respect."  *Kastigar*, 406 U.S. at 453; *see also Montoya*, 45 F.3d at 1292 (noting that the Government cannot use coerced statements "in any way to build a case against the defendant") (quotations omitted).  These cases simply mean exactly what they say: the Government cannot *use* tainted information.  They do not address *how* the Government can meet its burden of showing that it did *not* use tainted information or, if it did use tainted information, that it had a prior independent source.  No case addressing that question holds that the Government must negate all conceivable use (*i.e.*, Defendants' "bundle of uses").  Indeed, "[t]he government is not required to negate all abstract 'possibility' of taint.  Rather, the government need only show by a preponderance of the evidence that, in fact, the evidence used was derived from legitimate, independent sources."  *Byrd*, 765 F.2d at 1529; *see also Crowson*, 828 F.2d at 1431–32 (citing favorably to *Byrd* and declining to "negat[e] the plain import of *Kastigar* that . . . the Fifth Amendment allow[s] the government to prosecute using evidence from legitimate independent sources").

---

[7] Although the Court will discuss this below, *see infra* at 65–66, it bears mentioning that there *are* prior independent sources demonstrating that Kauichko, Journeyman Construction, and Fiber One Media are all connected, and that they are connected to Ayvazyan.

Accordingly, to satisfy its burden, the Government need not identify a prior independent source through which it could accomplish any conceivable non-evidentiary use. Rather, the Government must show that, if it used tainted information to accomplish a goal, it had an independent source that would have allowed it to accomplish that same goal. Any other result would ignore the rule that the Government is "not required to negate all abstract possibility of taint." *Byrd*, 765 F.2d at 1529; *see also United States v. Connolly*, 2019 WL 2120523, at *21 (S.D.N.Y. May 2, 2019) ("Nothing in *Kastigar* suggests that the mere invocation of that word by a defendant compels the Government to try to prove a negative.") (alteration and quotations omitted).

For those reasons, the Court concludes that a "prior independent source" is a lawful source of the *substance* of tainted information, possessed or requested by the Government before it *used* tainted information.

### 2. Although Prophylactic Measures Can Prevent Use, they are Not Required to Satisfy the Government's Burden.

Much of Defendants' questioning at the hearing related to the measures the Government took to prevent prosecutors and agents from accessing material from the Miami phones. *See, e.g.*, July 28 Tr. at 24:10-20 (inquiring whether Government logged or tracked access to information from Miami phones). These questions were presumably asked to support Defendants' argument that, absent prophylactic measures, the Government's burden is "nearly insurmountable." Opp. at 5.

The Court disagrees with that argument. While prophylactic measures can be relevant to the inquiry, *see infra* at 11 n.8, 12, they are not required. "*Even if* agents and prosecutors actually participated in both investigations, and/or were exposed to immunized testimony, there is no per se rule requiring their withdrawal from the case." *Montoya*, 45 F.3d at 1293 (emphasis in original). Indeed, "if the prosecution team has been exposed to the immunized testimony, the government may still use the evidence derived from compelled testimony if it meets its burden of showing that the evidence it intends to present is derived from a prior, independent source." *Crowson*, 828 F.2d at 1430. *Id.*

The reason prophylactic measures are not dispositive is because, as noted above, "[t]he focus of the inquiry under *Kastigar* is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant." *Id.* (cleaned up); *cf. Montoya*, 45 F.3d at 1293 ("Simply arguing that the investigations overlapped does not answer the question of the existence of legitimate independent sources for all of the evidence."). Accordingly, the Government can meet its burden of establishing non-use or a prior independent source without prophylactic measures.

The rule that a lack of prophylactic measures is not dispositive—as established by Ninth Circuit case law—makes particular sense in a case like this one.  Specifically, although the Fifth Amendment violation here technically occurred in October 2020, the Court did not make that finding until April 27, 2021, *see* Dkt. 296, and Defendants did not claim they were entitled to *Kastigar* relief until May 7, 2021, *see* Dkt. 338-3.[8]

Under these circumstances—*i.e.*, a defendant who unexpectedly claims *Kastigar* relief late in the case—requiring prophylactic measures or relying on their absence too heavily in the analysis creates an impossible burden for the Government.  Indeed, it would render a defendant subjected to actual coercion entirely immune from prosecution without any regard to the focus of the *Kastigar* inquiry: whether the Government used the coerced statement and, if so, how.  That would effectively lead to the result expressly rejected in *Kastigar* itself: transactional immunity.[9] *See Crowson*, 828 F.2d at 1432 ("[R]equir[ing] that a Chinese wall be erected between the immunized testimony and the prosecution would be the equivalent of granting transactional immunity, thus negating the plain import of *Kastigar* that both 18 U.S.C. § 6002 and the Fifth

---

[8] In their motion to suppress, Defendants did not request relief under *Kastigar* as a remedy.  *See* Dkt. 135.  Rather, Defendants' motion focused entirely on *Miranda* and did not reference coercion or compulsion.  *See generally id.* Defendants sought relief based on the fruit of the poisonous tree doctrine.  *See id.* at 18 (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).  And although Defendants cited *Kastigar* once in their reply brief, *see* Dkt. 209, the citation was in support of a premise analogous to fruit of the poisonous tree.  A stray citation like that, without any reference to the heavy burdens of *Kastigar* (*e.g.*, identifying prior independent sources), does not meaningfully inform the Government or the Court that *Kastigar* may apply.  Indeed, it appears that, as late as April 21, 2021, Defendants themselves had not considered the applicability of *Kastigar* to this case.  On that date, Defendants filed a motion arguing that the Miami stop tainted the indictments and the entire case.  *See* Dkt. 289 at 3–9.  Defendants did not cite *Kastigar* in that motion.  *See generally id.*

Moreover, *Kastigar* relief usually arises in the context of immunity.  Indeed, even the Department of Justice guidance that Defendants argue the Government should have followed applies to "[p]rosecution of a witness using evidence independent of his or her *immunized testimony*."  Ex. KX7 (emphasis added).  With an immunized statement, the Government is on notice *at the outset—i.e.*, from the moment the compelled testimony is spoken into existence—that it cannot use the immunized statement.  In that scenario, the lack of prophylactic measures is more relevant.

Of course, the Government must always respect constitutional safeguards, regardless of when defendants allege that the Government failed to do so.  And the *Kastigar* burden is the same whether the inquiry stems from immunized statements or coerced statements.  However, given the traditional application of *Kastigar* (*i.e.*, immunity) and the fact that—as reflected in Defendants' own briefing—neither the parties nor the Court were considering the applicability of *Kastigar* until late in the case, prophylactic measures are less relevant to the inquiry here.  *See Danielson*, 325 F.3d at 1072 (proof required to meet Government's burden "will vary from case to case").

[9] It would also otherwise run contrary to *Kastigar*, wherein both the majority and the dissent suggested that a defendant raising *Kastigar* claims on the basis of immunity is on stronger ground than a defendant raising *Kastigar* claims on the basis of Fifth Amendment coercion.  *See* 406 U.S. at 461 ("[A] defendant against whom incriminating evidence has been obtained through a grant of immunity may be in a stronger position at trial than a defendant who asserts a Fifth Amendment coerced-confession claim."); *see also id.* at 471 (Marshall, J., dissenting) ("[I]t is clear to me that an immunity statute must be tested by a standard far more demanding than that appropriate for an exclusionary rule fashioned to deal with past constitutional violations.").

Amendment allow the government to prosecute using evidence from legitimate independent sources.") (cleaned up).

Of course, in some cases, the lack of prophylactic measures may be relevant to the ultimate issue of whether the Government can satisfy its burden.  For example, if the Government had a weak case before the prosecution team was exposed to tainted information,[10] then the lack of prophylactic measures may render it more difficult for the Government to meet its burden.  This is because a weak case likely means fewer prior independent sources, a greater likelihood that the Government used tainted information, and a smaller likelihood of harmless error.

Ultimately, however, prophylactic measures are not *required* to satisfy the Government's burden under *Kastigar*.  Rather, if the Government can establish (1) non-use of tainted information, (2) a prior independent source for tainted information it used, or (3) harmless error, then the Government will have met its burden even in the absence of prophylactic measures.[11]

### 3.    A Credibility Finding is Distinct from Reliance on the Good-Faith of Prosecutors and Case Agents.

As noted above, a bare assertion that a piece of evidence or an investigative action is not the fruit of tainted information is insufficient for the Government to meet its burden, even if that assertion is made in good faith.  *Montoya*, 45 F.3d at 1292.

However, this does not mean that a witness's credibility is entirely irrelevant to the analysis.  Indeed, courts conducting *Kastigar* hearings routinely rely on credibility determinations.  *See, e.g.*, *United States v. Blau*, 159 F.3d 68, 73 (2d Cir. 1998) (affirming denial of *Kastigar* relief where "district court credited Lupo's explanation at trial that it was solely Lupo's desire to be released from prison that led him to seek out FBI Agent Meyer, to cooperate with the government and, ultimately, to implicate Blau"); *United States v. Slough*, 36 F. Supp. 3d 37, 48 (D.D.C. 2014) ("Ultimately, the Court's determination rests on its assessment of Ridgeway's credibility as a witness.").

---

[10] Here, the Government did not have a weak case before the Miami stop.  *See infra* at 15–21.

[11] At the hearing, counsel for Terabelian argued that, with regard to whether the Government has met its burden, "any ambiguity in this respect has to be interpreted in favor of the defense and against the government."  July 29 Tr. at 162:2-4.  To the extent this argument means that the Government has failed to meet its burden if the evidence is in equipoise, the Court agrees.  *Cf. United States v. Alvarado-Guizar*, 361 F.3d 597, 602 (9th Cir. 2004) ("evidence in equipoise is not enough" to satisfy preponderance of evidence standard).  However, to the extent counsel was arguing that all inferences must be drawn in favor of Defendants, the Court rejects that argument.  This is not a Rule 29 motion where all reasonable inferences must be drawn against the party that bears the burden.  Rather, the Court is the fact finder and must evaluate the record as a whole to determine whether it is more likely than not that the Government did not use tainted information or had a prior independent source.

This is because finding that a particular explanation or statement is credible is distinct from relying on a good faith allegation of non-use. For example, below, the Court finds credible Fenton's assertion that he did not rely on the contents of the Miami phones in determining which phones the Government should prioritize for review. *See infra* at 43–46. In doing so, the Court does not rely merely on the good faith of Fenton. Rather, the Court found his explanation for how he prioritized phones credible based on corroborating evidence and a variety of factors related to assessing credibility.[12] *See id.*

Another example is when a witness explains the ways in which she used information from the Miami phones and then testifies that she does not recall any other use. Defendants take issue with such assertions. *See, e.g.*, Opp. at 13 ("[I]t is disturbing that Attorney Fenton can now rely solely on his 'recollection' to draft his declaration regarding the leads he pursued from the 141 photographs.").

However, the Government's witnesses did not simply make a good-faith assertion of non-use—or that they can't recall at all whether or not they used tainted information—and then ask the Court to blindly accept that assertion. Rather, as discussed above, each witness submitted detailed declarations and multiple supporting exhibits. *See supra* at 3–4. Each witness explained the ways in which they recall using the information. In total, the Government's presentation contained over 2,000 pages of declarations and supporting exhibits.[13] And those declarations and exhibits were provided in addition to all of the trial exhibits, which the Court can cross-reference with the subpoena log and annotated trial exhibit list to determine when the Government possessed or requested evidence presented at trial.[14] *See* Mot. at 35.

Given the scale and detail of the Government's presentation, the Court has ample evidence to determine whether a witness is credible[15] when they state that they did not use

---

[12] *See* Ninth Circuit Manual of Model Criminal Jury Instructions § 1.7 (identifying following factors to be used in assessing credibility: (1) the witness's opportunity and ability to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's testimony in light of all the evidence; and (8) any other factors that bear on believability).

[13] This excludes Exhibit O to the Palmerton declaration, which contains over 1,000 pages.

[14] At the hearing, counsel for Terabelian suggested that the depth of the Government's submission is evidence that the Government cannot meet its burden. *See* July 29 Tr. at 162:5-10 ("[T]he very fact that it took well over a hundred pages of briefing to discuss this issue is pretty strong evidence that it is a burden they can't overcome. The fact that we were here for two days talking about use after use, derivative use after derivative use is pretty strong evidence that they cannot overcome that burden . . . ."). This argument effectively asks the Court to penalize the Government for meeting its burden. The Court declines to do so.

[15] The only witness whose credibility Defendants seriously contested is Fenton. *See* July 29 Tr. at 163:17-20 ("And I want to say most of the witnesses that testified were largely credible, and they are advocates and they want to win but they were pretty straight with the Court. Mr. Fenton was an exception."). As explained below, the Court finds

information from the Miami phones or that, beyond the use they identified, they cannot recall additional use.[16]  *See Montoya*, 45 F.3d at 1293–94 (finding that agent's declaration was "not limited to a negation of taint" because conclusory statement of non-use was bolstered by detailed timeline and tracing of investigation and prior independent sources).

### 4.    Harmless Error Standards.

The harmless error standard depends on the type of use at issue.  If the Government used tainted information before the grand jury, then the Court must determine if there was "adequate untainted evidence to support the indictment."  *Rogers*, 722 F.2d at 560; *see also Nanni*, 59 F.3d at 1433 ("[I]f the government has presented immunized testimony to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony.").

If the Government used tainted information at trial, the *Chapman* harmless error standard applies.  Under that standard, an error is harmless beyond a reasonable doubt if it "did not contribute to the verdict obtained."  *Chapman v. California*, 386 U.S. 18, 24 (1967).  "To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous."  *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *disapproved of on other grounds by Estelle v. McGuire*, 502 U.S. 62 (1991).  Rather, the inquiry is "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."  *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original).

Finally, if the Government used tainted information for a non-evidentiary purpose and lacked a prior independent source that would have allowed it to accomplish the same purpose, the Court must determine whether—in light of the record as a whole—the Government's use was "so unimportant and insignificant and had so little, if any, likelihood of having changed the result of the proceeding that it may be deemed harmless."  *United States v. Ponds*, 454 F.3d 313, 329 (D.C. Cir. 2006) (cleaned up).

---

Fenton's testimony wholly credible.  *See infra* at 49–50.  And, as for the other witnesses, the Court also concludes— in light of their testimony on the stand and the corroborating evidence—that those witnesses were credible as well.

[16] Indeed, it is unreasonable to expect that a witness will ultimately *not* state that, based on their recollection, the only use they made of tainted information was the use described in their declaration.  After all, once a witness has described all the use they can recall based on their memory and review of correspondence or other documents, there is only one thing left for that witness to say: they do not recall using the information for anything else.  The question for the Court is whether that is credible or not.

### III.    Analysis.

The Court will analyze whether the Government has met its burden as to each prohibited use.  However, a review of the Government's investigation prior to the Miami stop is necessary to understand the analysis.  Accordingly, the Court will review the state of the Government's case prior to the Miami stop.  The Court will also review the evidence seized during the November 5, 2020 searches of the Topeka and Weddington residences, because that evidence was seized prior to November 13, 2020—*i.e.*, the date anyone from the investigative team first reviewed actual images and data from the phone.  Finally, the Court will discuss the four categories of tainted information that prosecutors or agents could have accessed or used.

After discussing that background information, the Court will turn to its analysis and determine whether the Government has met its burden as to the prohibition on using tainted information (1) before the grand jury, (2) at trial, and (3) for non-evidentiary or investigative purposes.

### A.    The State of the Government's Case Prior to the Miami Stop and Prior to November 13, 2020.

On June 12, 2020, Fenton received an email from his supervisor regarding the Government's investigation into a Los Angeles-based PPP fraud ring.  Fenton Decl., Ex. 1.  The email shows that, as of that date, the Government had identified 17 suspicious loan applications, including applications for Top Quality Contracting, Hart Construction, Sabala Construction, Mod Interiors, Inc., and Timeline Transport.  *Id.*  All of those entities were included in either the original indictment, the first superseding indictment, or both.  *See* Dkts. 32, 154.  The email also includes information regarding Arman Hayrapetyan, a defendant in this case, and Iuliia Zhadko.  Fenton Decl., Ex. 1.  Finally, the email provided information about Mark Zindroski, a victim in this case who testified at trial.  *Id.*

On June 18, 2020, Palmerton began investigating the loan fraud ring.  Palmerton Decl. ¶ 1.  Palmerton quickly learned that the individuals initially named in his investigation included likely stolen or synthetic identities, including Iuliia Zhadko.  *Id.*

The Government began its investigation by requesting information from federal and state agencies, banks, escrow companies, lenders, telephone companies, internet providers, and others.  *See id.*; *see also* Fenton Decl. ¶ 3.  Indeed, by the end of July, the Government had served dozens of subpoenas to those types of entities.  *See* Fenton Decl., Ex. 2 (in camera log of requests for information).

By following the money, Palmerton soon determined that Ayvazyan was the individual using the Iuliia Zhadko identity.  Palmerton Decl. ¶ 1.  For example, in June 2020, the Government subpoenaed documents related to Timeline Transport, including loan applications, documents from government agencies, and bank records.  *See* Fenton Decl., Ex. 2.  Those documents demonstrated that Zhadko had submitted a fraudulent EIDL loan application for Timeline Transport.  Palmerton Decl. ¶ 1.  The application was approved and the loan was deposited into a Radius Bank account in the name of Zhadko.  *Id.*  The Radius Bank records showed $110,000 of fraudulently obtained PPP funds being wired to Encore Escrow.  *Id.* Records from Encore Escrow subpoenaed in July 2020 showed that the $110,000 was used for a portion of a down payment on a house located at 4910 Topeka Drive.  *Id.*

The house at 4910 Topeka was purchased in the name of Ayvazyan and Terabelian.  *Id.* In emails with a representative from the escrow company, Richard Ayvazyan explained that he will forward the confirmation for the $110,000 wire transfer as soon as he receives the confirmation.  Palmerton Decl., Exs. A, B.

Around the same time, Palmerton noticed transfers from Zhadko's Radius Bank account to accounts belonging to Gentleman Timepieces.  *Id.*  ¶ 2.  The Government's contact at Gentleman Timepieces was Anthony Farrer, a witness who later testified at trial.  Fenton Decl. ¶ 5 n.4.  Farrer informed Palmerton that the funds from the Radius Bank accounts were used for a watch purchased by Ayvazyan, who had purchased numerous luxury watches from Farrer and with whom Farrer had corresponded via text.  Palmerton Decl. ¶ 2.

Farrer provided Palmerton with images of text messages in which Ayvazyan references Fiber One Media (another entity related to loans in the indictments) and Timeline Transport.  *Id.* In the messages, Ayvazyan also sends Farrer an image of his driver's license, *see id.*, refers to Viktoria Kauichko as his "wife," *see* GEX 37.c, and tells Farrer to send Kauichko a watch at the Canoga Ave. apartment,[17] *see* GEX 37.b; *see also* Fenton Decl., Ex. 34 (identifying source of GEX 37.b and 37.c as information requested in July 2020); Fenton Decl., Ex. 2 (log of requests for information showing request propounded to Gentleman Timepieces in July 2020).

Internal emails produced by Fenton and Palmerton confirm that, by early August 2020, the Government had concluded Ayvazyan was using the Zhadko identity.  For example, on August 4, 2020, Palmerton emailed his colleagues and stated as follows: "I think I found out the identity of one of our subjects. I just received partial information from Encore Escrow in regards to the wire transfer they received in the name of Iuliia Zhadko/ Timeline Transport.  There is an email discussion with a Richard Ayvazyan discussing the $110,000 wire as well as another from BofA for $65K."  Palmerton Decl., Ex. B.

---

[17] The apartment on Canoga Ave. was listed as an address on numerous fraudulent PPP and EIDL loan applications submitted by the conspirators.

Similarly, on August 5, 2020, André emailed his colleagues and explains that "I just spoke with Justin. It looks like Richard Ayvazyan was also the one who purchased expensive watches from Gentleman Timepieces in Texas using PPP funds." Fenton Decl., Ex. 4. And on August 19, 2020—when investigators discovered that Iuliia Zhadko had purchased another house—Palmerton emailed his colleagues and stated "[l]ooks like Richard may have purchased another house." Palmerton Decl., Ex. G.

Later in August, the prosecution team discussed the fact that, approximately ten years ago, Ayvazyan and Terabelian had pleaded guilty to conspiring together to commit bank fraud. *See* Fenton Decl., Ex. 6.

The investigation continued through August, September, and October. Much of the investigation focused on the "flow of funds," *i.e.*, tracing fraudulently obtained PPP funds to determine who was benefitting from those funds. For example, data from the SBA showed that the Kauichko identity was used to apply for loans in the names of several entities, including but not limited to Fiber One Media and Runyan Tax Service. Fenton Decl. ¶ 6; *see also id.*, Ex. 8. In text messages with Anthony Farrer, Ayvazyan associates Kauichko with Fiber One Media and refers to Kauichko as his "wife." *See* GEX 37.b, 37.c.

The flow of funds showed that fraudulent PPP funds obtained using the Kauichko identity substantially benefited Ayvazyan's actual wife, Terabelian, or her family. For example, on July 8, 2020, the entity associated with the Kauichko identity, Fiber One Media, transferred $25,000 to Terabelian's personal bank account. *See* GEX 89; *see also* Fenton Decl., Ex. 34 (identifying source of GEX 89 as information first requested in August 2020); Fenton Decl., Ex. 2 (log of requests for information showing request propounded to Bank of America in August 2020).

As another example, records for a Wells Fargo account belonging to Kauichko show that approximately $150,000 in fraudulently obtained SBA funds were transferred into the account in late May. *See* GEX 88; *see also* Fenton Decl., Ex. 34 (identifying source of GEX 88 as information requested in September 2020); Fenton Decl., Ex. 2 (log of requests for information showing request propounded to Wells Fargo in September 2020). In early July, that account received approximately $75,000 from "Fiber One Media Viktoria Kauichko." *See* GEX 88.

The Wells Fargo records revealed that, from June through August, a debit card linked to Kauichko's Wells Fargo account was regularly used at jewelry stores (*e.g.*, "Gold Craft Jewelry" and "Picadilly Jewelers"), high-end retail and department stores (*e.g.*, Saks Fifth Avenue, Bloomingdale's, Nordstrom's, and Anthropologie), and furniture stores (*e.g.*, Restoration Hardware and Italy 2000). *See generally* GEX 88. The Kauichko card was also

used at "Polish Me Pretty," a name that sounds associated with cosmetics or women's products.[18]  *See id.* at 35.

Additionally, Kauichko was the sole signatory for a Bank of America account for Runyan Tax Service.  *See* GEX 1.p (Bank of America records for Runyan Tax Service account ending in 9700); *see also* Fenton Decl., Ex. 2 (log of requests for information showing request for information related to Runyan account ending in 9700 propounded to Bank of America in mid-September 2020).  A check for that account was used in relation to Terabelian's father, Nazar Terabelian.  *See* GEX 1.p at 60 (check with memo "For: Nazar Terabelian").[19]

Finally, the funds from the fraudulent Runyan Tax Service loans were used to purchase a home at 834 Calle La Primavera in Glendale, California.  Fenton  Decl. ¶ 10; Palmerton Decl. ¶¶ 7–8.  Although the house was purchased in the name of Iuliia Zhadko, Terabelian's sister Gohar was receiving mail there, *id.*, Ex. H,[20] and surveillance revealed that Gohar's ex-husband was also present at the home, *see id.* ¶ 6.

As the investigation continued, the Government discovered additional loans, entities, identities, and suspects.  On August 11, 2020, the Government determined—on the basis of documents requested in June and July, *see id.*, Ex. 2—that Mod Interiors had applied for and received $260,000 in fraudulent PPP funds, *see id.*, Ex. 5; *see also id.* ¶ 6.  The funds were deposited into a bank account for which Ayvazyan was a co-signer.  *Id.,* Ex. 5.  Fenton concluded that the funds were "largely spent on defendant Richard Ayvazyan, his wife, and his family."  *Id.* ¶ 6; *see also id.*, Ex. 5.

Another Mod Interiors application was discovered in September 2020.  This time, the application used Terabelian's father's name (*i.e.*, Nazar Terabelian).  *Id.* ¶ 12.  Palmerton

---

[18] Although the Government did not mention any of these specific examples during the hearing, Fenton identified general categories of retailers, and the Court reviewed the bank records to determine whether Fenton's characterization was accurate and whether it was reasonable for Fenton to conclude, based on the records, that a woman was using the Kauichko account.  *See infra* at 54–56.

[19] Fenton did not learn about Nazar Terabelian's death until October 22, 2020.  *See* Supplemental In Camera Production at 63–65.  Although it appears that Clark and Palmerton knew before that date, *see id.*, the Court is not certain of precisely when they knew and, accordingly, cannot conclude that the Government knew that the check described above was specifically for Nazar Terabelian's funeral.  Regardless, however, the check clearly reflects a substantial payment related to Terabelian's father Nazar—*i.e.*, a substantial payment for Terabelian's father from an account belonging to Kauichko.  Moreover, the Government did not use information from the Miami stop to determine that Nazar Terabelian was dead.  Customs did not send the interview report containing that information to the prosecution team until October 23, 2020, but Fenton learned that Nazar Terabelian was dead on October 22, 2020, and it appears that Clark and Palmerton knew before that date.  *See* Supplemental In Camera Production at 63–65; *see also* Fenton Decl. ¶ 21 n.16.

[20] Palmerton learned this fact on October 7, 2020, *i.e.*, before the Miami stop.  Palmerton Decl., Ex. H.

determined that Nazar's most recent address was 4910 Topeka Drive—*i.e.*, the house Ayvayzan and Marietta Terabelian had recently purchased.  *Id.*

In early October 2020, the investigative team identified Voyage Limo LLC as another entity of interest.  *See id.*, Ex. 10; *see also id.* ¶ 13.  This occurred after Palmerton noticed that Voyage Limo, LLC had transferred a large amount of funds to Runyan Tax Service.  *Id.*

The Government also identified additional real estate transactions executed using fraudulently obtained PPP funds.  One of those was for the property at Anastacia Lane in Palm Desert, California.  *See id.* ¶ 14.  That property was purchased in the name of Kauichko, and records from the escrow company related to the purchase were requested in early October.  *See id.*; *see also id.*, Ex. 2.  A property in Woodland Hills, California was also purchased using fraudulently obtained PPP funds.  *See* Fenton Decl. ¶ 16; *see also* Palmerton Decl. ¶¶ 4–5.  That property was located at 20547 Aetna Street and was purchased in the name of Anna Manukyan, an identity used to submit fraudulent loan applications for which the Government had already requested information.  *Id.*; *see also* Fenton Decl., Ex. 2 (identifying multiple requests related to Manukyan or Manukyan construction in each of June, July, August, and September 2020).

In addition to the extensive documentary evidence discussed above, the investigative team conducted surveillance and pulled trash from a variety of the residences discussed above.  For example, in early September, Palmerton initiated surveillance after learning that Gentleman Timepieces was shipping a watch to Ayvazyan at a FedEx store in Encino, California.  Palmerton Decl. ¶ 3.  Palmerton observed an individual picking up the package and—after requesting records from FedEx on September 24, 2020—confirmed that the individual who picked up the watch was Ayvazyan.  *See id.*; *see also* Fenton Decl., Ex. 2 (identifying requests for information from FedEx on September 24, 2020).

Palmerton also observed that the license plate on Ayvazyan's vehicle was 8FTF932.  Palmerton Decl. ¶ 3.  That license plate was registered to "Fiber One Media"—*i.e.*, the entity that Ayvazyan referred to in text messages with Gentleman Timepieces and that transferred $25,000 to Terabelian's personal bank account.

The trash-pulls that the Government conducted yielded mail, receipts, and other documents addressed to Zhadko, Kauichko, and many of the entities discussed above.  *Id.* ¶ 6; *see generally In the Matter of the Search of [REDACTED]*, No. 2:20-MJ-05282, Dkt. 1 (search warrant affidavit discussing trash-pulls and surveillance conducted at subject premises before Miami stop).

As a result of all the above described investigative efforts, the Government had identified nearly every entity relevant to this case by mid-September, *i.e.*, a month before the Miami stop.

This is confirmed by a list of entities included in internal DOJ emails.  That list identifies 57 separate entities as subjects of the investigation as of September 18, 2020.  *See* Fenton Decl., Ex. 7.b.  The list included, but was not limited to, ABC Realty Advisors, Inc., Allstate Towing and Transport Inc., Classic Nursery, EM Construction Co., Fadehaus Barbershop, Fetch Industries, Inc., Fiber One Media, Inc., GAZ Construction, G&A Diamonds, Hart Construction, Journeymen Construction, Nelson's Nursery, Manukyan Construction, Mod Interiors Inc., Redline Auto Collision Inc., Redline Auto Mechanics Inc., Runyan Tax Service, Inc, Sabala Construction, Samuel Sauza DDS, Secureline Realty and Funding Inc., Time Line Transport Inc., TM Events, Top Quality Contracting, Turing Info Solutions, Inc., and VLA Construction—*i.e.*, the vast majority of the entities referenced on the Government's summary charts at trial.  *Compare* Fenton Decl., Ex. 7.b *with* GEXs 115, 116.  The list included every entity in the original and first superseding indictment aside from Voyage Limo and Anna Dzukaeva dba Six Star Farms.[21]  *Compare* Fenton Decl., Ex. 7.b *with* Dkts. 32, 154.

André's undisputed testimony confirms the thoroughness of the Government's investigation prior to the Miami stop.  Specifically, Andre testified that, "[b]y October 18, 2020, we had already identified over 100 PPP or EIDL loans which we believed were tied to defendants Ayvazyan and Terabelian and their co-conspirators."  André Decl. ¶ 3.

The identification of loans and entities was a critical component of the investigation because it triggered the flow of funds.  *See* Fenton Decl. ¶ 58 ("[T]he case relied heavily on following the money . . . .").  This makes sense.  The flow of funds focuses on a chain: (1) a fraudulent loan application; (2) a bank account into which lenders deposited the fraudulently obtained proceeds; and (3) a transfer of the proceeds from that bank account to businesses, escrow companies, or other bank accounts.  Once any link in that chain is identified, it is more likely than not that the rest of the chain will be identified as well.[22]

\* \* \*

The above description is not an exhaustive account of the Government's investigation prior to the Miami stop.  Nevertheless, it sheds significant light on the state of the Government's case at that time.

---

[21] As discussed below, neither of those entities were identified using tainted information. *See infra* at 26 n.33, 27.

[22] Defendants argue that the "[t]he issuance of a subpoena does not mean that the government reviewed and interpreted the responsive documents before being exposed to taint."  KX2 at 19.  This argument is unavailing.  As discussed above, the Government can meet its burden if it shows, by a preponderance of the evidence, that its evidence was derived from legitimate independent sources or, for non-evidentiary use, that its investigative steps stemmed from a legitimate independent source or inevitably would have been taken based on that independent source.  *See supra* at 6–10.  Once the Government requests information, it is inevitable that it will use the information it receives.  Accordingly, a prior independent source includes documents requested before exposure to tainted information, even if the Government received the documents after that exposure.  *See Nanni*, 59 F.3d at 1432 ("[E]vidence that was obtained subsequent to the agent's exposure to the immunized testimony can suffice to support a finding that the information was derived from independent sources.").

Specifically—and contrary to Defendants' suggestion that the Government was "still learning the basic facts of the case" and "had not reviewed and interpreted the documents it subpoenaed," Opp. at 3—the Government had already accumulated a tremendous amount of evidence and knowledge before Defendants were stopped in Miami.  And the Government had either directly identified, or had a lead for, every one of its witnesses at trial.  Simply put, on the eve of the Miami stop, the Government's investigation was firmly established and comprehensive.

* * *

The Miami stop occurred on October 19, 2020.  During the stop, and before Defendants' phone passcodes were coerced, *see infra* at 53 n.57, customs agents discovered credit cards belonging to Zhadko and Kauichko in Ayvazyan's possession, and a card belonging to Kauichko in Terabelian's possession.  The card in Terabelian's possession was linked to Kauichko's Wells Fargo account.  *See supra* at 17–18.

The investigative team did not have access to the phones immediately.  Rather, between October 19 and November 12, the only tainted pieces of information the Government had were the following three pieces of information, which were orally communicated to the investigative team by customs agents:

(1) Ayvazyan's phone contained an image of a driver's license belonging to Zhadko;

(2) Ayvazyan's phone contained numerous other images of driver's licenses, credit cards, and social security cards in the names of other persons; and

(3) Terabelian's phone contained text messages in which Terabelian purported to be Kauichko.

The Government did not receive additional tainted information until November 13, 2020, when Palmerton conducted a manual review of images on the phones and took 65 photographs of images on the phones.  See Palmerton Decl. ¶ 13.

On November 5, 2020, agents executed search warrants at several residences, including the Topeka residence where Richard Ayvazyan and Marietta Terabelian lived, and the Weddington residence where Tamara Dadyan and Artur Ayvazyan lived.  As discussed below, the evidence seized during those searches was not tainted and constitutes one of the prior independent sources for some of the tainted information used after November 5, 2020.  *See infra* at 61, 62.

The Government seized a significant amount of evidence at the various residences, including driver's licenses, credit cards, and social security cards for fake, stolen, and synthetic identities; blank checks for a number of entities that had filed fraudulent PPP loan applications; handwritten notes with login credentials and personal identification information for fake, stolen, and synthetic identities; financial records showing that the Topeka house was purchased with fraudulently obtained PPP funds; web history reports regarding VPN services; mail addressed to fake, stolen, and synthetic identities in the case; the fruits of fraudulently obtained PPP funds, including gold coins; and digital devices containing incriminating photos and text messages.  *See* Fenton Decl. ¶¶ 26–29.

### B.      The Four Categories of Tainted Information the Government Could Have Used.

There were four categories of tainted information that the prosecution team could have used or been exposed to.  First, there were the oral communications from customs described above.  *See supra* at 21.

Second, on November 13, 2020, Palmerton accessed the phones pursuant to a lawfully issued warrant.  *See In the Matter of the Search of Six Digital Devices in the Custody of the Federal Bureau of Investigation*, No. 2:20-mj-05484, Dkt. 3; *see also* Palmerton Decl. ¶¶ 11–12. Palmerton only reviewed the images on the phone.  *Id.* ¶ 13.  Palmerton took 65 photographs of images on the physical phones.  *Id.*  The photographs were of images of driver's licenses, social security cards, checkbooks, SBA loan applications, and handwritten notes.  *Id.*  Palmerton then uploaded the 65 photos to the Government's shared folder.  *Id.*

Third, during customs' manual review of Defendants' phones during the Miami stop, customs agents took approximately 141 photographs of images on the phones.  Fenton Decl. ¶ 43.  However, the Government did not have access to those photos until February 2, 2021, when customs sent the photos to the prosecution team.  *See id.*; *see also id.*, Ex. 27.

Finally, on the following dates, the filter team[23] released Cellebrite reports[24] of the Miami phones to the prosecution team: February 11, 2021; February 12, 2021; February 19, 2021; March 19, 2021; and April 8, 2021.

\* \* \*

---

[23] The Government used a filter team to review the contents of the phone for privileged material and filter out that material before releasing the contents to the prosecution team.

[24] A Cellebrite report is a report produced by software the extracts data from a digital device, such as cellphones. The report portrays the data extracted from the device so that the data can be more easily reviewed.

The Court now turns to the merits of the inquiry.  The Court will determine whether the Government has met its *Kastigar* burden as to (1) the grand jury proceedings and indictment, (2) trial, and (3) non-evidentiary or investigative use.

### C.     The Grand Jury Proceedings Were Based Almost Entirely on Untainted Information, and the Single Potentially Tainted Reference Was Harmless Beyond a Reasonable Doubt.

In their declarations, the prosecutors responsible for presenting the case to the grand jury all state that they did not use evidence from the Miami phones before the grand jury.[25]  *See* Fenton Decl. ¶¶ 30, 35; André Decl. ¶¶ 6, 10; Faerstein Decl. ¶ 28.

To assess these claims, the Court reviewed the indictments and the grand jury transcripts. The indictments do not directly reference any information from the Miami phones.  *See* Dkts. 32, 154.  Similarly, during the grand jury proceedings, neither the prosecutor nor the witness directly reference information from the Miami phones.[26]  *See generally* Fenton Decl., Exs. 16.a, 16.b.

Accordingly, the only way the Miami phones could have been used before the grand jury is if they were used derivatively—*i.e.*, if the evidence presented to the grand jury, or the charges in the indictment, derived from the Miami phones.

The Court conducted a line-by-line analysis of each grand jury transcript and indictment. In light of that analysis, the Court concludes that the grand jury proceedings were based almost entirely on untainted information.  The single exception is a brief reference, in the first superseding indictment, to the number of loans in the conspiracy.  That reference, however, was harmless beyond any measure of doubt.

### 1.     No Tainted Information Derived from the Miami Phones Was Used During the Grand Jury Proceedings that Resulted in the Original Indictment.

André and Fenton submitted a draft of the original indictment to their supervisors on November 11, 2020.  André Decl. ¶ 6; Fenton Decl. ¶ 33.  After receiving comments from supervisors on November 12, 2020, André and Fenton circulated a revised indictment on

---

[25] The Court will address pre-indictment tasks and decisions (*e.g.*, the prosecution memorandum or charging decisions) in the non-evidentiary use section.  *See infra* at 50–85.

[26] The grand jury transcripts for both indictments do include references to the physical cards found on Defendants during the Miami stop.  *See* Fenton Decl., Exs. 16.a, 16.b.  Those cards were lawfully seized, *see* Dkt. 296 at 3–18, and, accordingly, were untainted.

November 13, 2020, before Palmerton uploaded the 65 photos to the Government's shared folder. *Id.* ¶ 34. The supervisors approved that revised indictment, which was presented to the grand jury on November 17, 2020. *Id.* ¶¶ 34–35.

A review of the grand jury transcripts confirms that the original indictment was based entirely on untainted evidence. For example, the proceedings began with a discussion about the relationships between the defendants, the bank accounts relevant to tracing the loans in the original indictment, and the property Defendants acquired using fraudulently obtained funds (*e.g.*, houses and luxury watches). *See generally* Fenton Decl., Ex. 16.a. This entire discussion was based on evidence the Government acquired before the Miami stop. *see supra* at 15–22.

The witness then discussed the specific loans identified in the indictment. Information relating to those fraudulent loans and entities was requested from banks, lenders, and/or government agencies well before the Miami stop:

- **Secureline Realty:** information requested in August and September of 2020. *See* Fenton Decl., Ex. 2.

- **Top Quality Contracting:** information requested in June and July of 2020. *See id.*

- **Allstate Towing:** information requested in August and September of 2020. *See id.*

- **G&A Diamonds:** information requested in August and September of 2020. *See id.*

- **Redline Auto Collision:** information requested in September 2020. *See id.*

- **Timeline Transport:** information requested in June and July of 2020. *See id.*

- **Runyan Tax Service:** information requested in September 2020. *See id.*

Following the discussion of specific loans, the witness tied the loans to the relevant bank fraud and wire fraud charges. *See generally* Fenton Decl., Ex. 16.a. Finally, the witness discussed the count for aggravated identity theft involving Mark Zindroski. *See id.* Information regarding Mark Zindroski—a victim whose identity was stolen—was first requested in June 2020, *see* Fenton Decl., Ex. 2, and Zindroski was first interviewed by the Government in July 2020, *see* Dkt. 281 at 11.

The grand jury presentation also included a reference to the number of potential loans that were part of the conspiracy. Specifically, the original indictment and the grand jury presentation each reference the phrase "at least 35 fraudulent PPP and EIDL loan applications,"

without specifically identifying each of the 35 applications.  *See* Dkt. 32; *see also* Fenton Decl., Ex. 16.a.

To the extent Defendants argue that the reference to 35 loans was tainted,[27] the Court rejects that argument.  André states in his declaration that the Government "had already obtained extensive evidence relating to each of these 35 loans prior to CBP's October 19, 2020 secondary inspection."  André Decl., ¶ 6.  Defendants waived their right to cross-examine André at the *Kastigar* hearing.  *See* July 28 Tr. at 7:25-8:4.  Moreover, André's assertion is corroborated by the extensive investigation the Government had already conducted prior to the Miami stop.  *See supra* at 15–22.  Accordingly, the reference to 35 loans was not tainted.

Nothing in the original grand jury indictment—or the transcript of the proceedings that resulted in that indictment—reflects the Government's use of tainted information directly or derivatively.  Coupled with the credible testimony to that effect by the Government's witnesses, the Court concludes that the first grand jury indictment was not the result of tainted information.

> ## 2. The Grand Jury Proceeding that Resulted in the First Superseding Indictment Was Based Almost Entirely on Untainted Information, and the Single Exception Was Harmless Beyond Any Measure of Doubt.

The grand jury proceedings that resulted in the first superseding indictment were, similarly, based almost entirely on untainted information.[28]

The grand jury proceedings began with a discussion of additional fake, synthetic, or stolen identities used by Defendants.  This discussion did not include evidence derived from tainted information.  For example, the grand jury was presented with information regarding Terabelian's deceased father, Nazar Terabelian.  *See generally* Fenton Decl., Ex. 16.b.  As noted above, *see supra* at 18 n.19, the Government did not learn that Nazar Terabelian was deceased based on tainted information.  Similarly, the grand jury was presented with evidence regarding Anna Dzukaeva and the use of her identity by Tamara Dadyan and Artur Ayvazyan.  *See generally* Fenton Decl., Ex. 16.b.  That discussion was based on untainted evidence discovered at the Weddington home.  *See id.*; *see also* GEXs 57.a, 57.d, 57.e, 57.f, 57.g.

---

[27] The only potential basis for that argument would be that, on November 13, 2020—*i.e.*, four days before the grand jury returned the original indictment—Massino identified ten additional loans based on his review of 65 photographs from the Miami phones.  *See infra* at 69.

[28] The single exception, discussed below, *see infra* at 29–30, is an inconsequential reference to the number of loans in the conspiracy.

The witness then discussed the new defendants that were being added to the indictment. None of this discussion was tainted. The discussion began with Manuk Grigoryan and the Kudiumov identity,[29] as well as Grigoryan's links to Ayvazyan. For example, the witness discussed how individuals had witnessed Ayvazyan and Grigoryan discussing real estate transactions.[30] *See generally* Fenton Decl., Ex. 16.b. The witness then briefly discussed Arman Hayrapetyan,[31] Edvard Paronyan,[32] and Vahe Dadyan.[33] *See id.*

The presentation then turned to some miscellaneous discussion, none of which was tainted. For example, the witness discussed certain bank accounts, including the Mod Interiors bank account belonging to Nazar Terabelian, and the G&A Diamonds account belonging to Artashes Grigoryan.[34] *See id.* Then the witness presented a high-level overview of how the conspiracy operated, including the use of fake and synthetic identities to apply for PPP and EIDL

---

[29] Information regarding Grigoryan and Kudiumov was first requested in early September 2020. *See* Fenton Decl., Ex. 2.

[30] It is not clear who these "individuals" were. To the extent Defendants argue that it was Jon Bradford, the Court rejects that argument. Although prosecutors and agents attempted to interview Bradford, they did not make that attempt until April 27, 2021—*i.e.*, well after the grand jury returned the first superseding indictment. *See* Fenton Decl. ¶¶ 43–46. Moreover, the effort to interview Bradford was abandoned after the Court entered its suppression order, and Bradford was never interviewed. *See id.*

Rather, it is likely that the "individuals" that the grand jury witness was referring to included, at the least, Amira Halum, the real estate agent for the Imperial Court property. The Government identified Halum based on records requested from CV Escrow on October 28, 2020. *See* Fenton Decl., ¶ 15; *see also id.*, Ex. 2. At that point, the only tainted information that prosecutors or agents had were the three pieces of information orally communicated to Palmerton by customs. *See supra* at 21. Nothing about those general pieces of information would have led prosecutors to Amira Halum or CV Escrow, particularly because the Imperial Court property was purchased in the name of Kudiumov, while the oral communications from customs related to the Zhadko and Kauichko identities. *See id.*

Finally, if the individual referenced in the grand jury proceeding was Mary Smbatian, that reference was also untainted for the reasons discussed below. *See infra* at 82–83.

[31] Hayrapetyan was identified in the very first email that Fenton received about this case in June 2020. *See* Fenton Decl., Ex. 1.

[32] Information regarding Paronyan was first requested in early September 2020. *See* Fenton Decl., Ex. 2.

[33] Dadyan's company, Voyage Limo, was first identified in early October 2020, when Palmerton noticed that "large amounts of funds" in Runyan Tax Service's bank account "came in from . . . Voyage Limo LLC." Fenton Decl., Ex. 10. Information about the Voyage Limo application and accounts was not requested until November 2020, and information about Vahe Dadyan was not requested until December 2020. *See id.*, Ex. 2. Those requests were not based on tainted information. When the information was requested, the only tainted information available to the Government was (1) the oral communications from customs, and (2) the 65 photographs of images on the phones taken by Palmerton and uploaded to the Government's shared folder. Neither the oral communications nor the 65 photographs contained any references to Voyage Limo or Vahe Dadyan. *See id.*, Ex. 17.

[34] Information about these two accounts was first requested in early September 2020. *See* Fenton Decl., Ex. 2.

loans, the use of fake forms (*e.g.*, IRS forms, fake driver's licenses, and fake Gusto[35] payroll reports), and the transfers of proceeds to various accounts. *See id.* Finally, the witness turned to a discussion of three of the real estate properties purchased with fraudulently obtained PPP and EIDL funds: the Topeka property, the Calle La Primavera property, and the property at 74203 Anastacia Lane in Palm Desert, California.[36] *See id.*

Following these miscellaneous topics, the witness presented evidence regarding the new loans in the superseding indictment. For each of those loans, the Government has established that it did not use tainted information to identify the loan:

- **Hart Construction:** information requested from banks, lenders, and/or government agencies in June 2020. *See* Fenton Decl., Ex. 2.

- **Sabala Construction:** information requested from banks, lenders, and/or government agencies in September 2020. *See id.*

- **Redline Auto Mechanics:** information requested from banks, lenders, and/or government agencies in September 2020. *See id.*

- **Mod Interiors:** information first requested from banks, lenders, and/or government agencies in June and July of 2020 and, for the particular loan referenced in the indictment, August and September of 2020. *See id.*

- **Turing Info Solutions:** information requested from banks, lenders, and/or government agencies September 2020. *See id.*

- **Voyage Limo LLC:** this loan is not tainted for the reasons discussed above. *See supra* at 26 n.33.

- **Anna Dzukaeva:** the Anna Dzukaeva loan was identified based on untainted evidence discovered at the Weddington home. *See* Fenton Decl. ¶¶ 17 n.15, 26–27; see also GEXs 57.a, 57.d, 57.e, 57.f, 57.g.

The witness then discussed the flow of funds that supported the money laundering counts. The Court concludes that none of the bank accounts referenced in this discussion were identified

---

[35] Information from Gusto was first requested in early October 2020. *See* Fenton Decl., Ex. 2.

[36] As discussed above, the use of fraudulently obtained PPP and EIDL funds to purchase the Topeka and Calle La Primavera properties was known to the Government well in advance of the Miami stop. *See supra* at 16, 18. The same is true for the Anastacia Lane property, for which information was first requested in early October 2020. *See* Fenton Decl., Ex. 2.

based on tainted information. The Court reviewed Grand Jury Exhibit 2, which was a chart referenced during the money laundering discussion. The accounts identified on Grand Jury Exhibit 2 are a subset of the 24 accounts identified on the Government's summary chart for tracing.[37] *See* GEX 115. As discussed below, none of the 24 accounts in GEX 115 were identified based on tainted information. *See infra* at 41–43. Accordingly, the same holds true for the subset of those 24 accounts included in Grand Jury Exhibit 2.

The specific examples of money laundering described to the grand jury were also untainted. One example was the transfer from Voyage Limo to Runyan Tax Service to Beverly Hills Escrow. *See generally* Fenton Decl., Ex. 16.b. Records for each of those three entities are untainted.[38] Another example is the transfer from Mod Interiors to two jewelry companies: Belgium New York and Picadilly Jewelers. *See id.* Those records are also untainted.[39] The final example involved a transfer from Redline Auto Mechanics to Perfect Escrow. *See id.* Neither of those entities' records are tainted.[40]

The next portion of the grand jury presentation focused on the aggravated identity theft charges. The Government discussed five identities that formed the basis of the charges: (1) Mark Zindroski, (2) Nazar Terabelian, (3) Alexander Fard, (4) Anna Dzukaeva, and (5) Michael Hart. *See id.* The Government has met its burden of establishing that it did not identify any of those individuals using tainted information.[41]

---

[37] Although Grand Jury Exhibit 2 does not include account numbers for each of the accounts, the Court was able to identify the specific account numbers by comparing Grand Jury Exhibit 2 to the transfers and dates on bank account records included in the Government's trial exhibits. The Court then compared the accounts it identified on Grand Jury Exhibit 2 to the accounts reviewed in the summary chart. Based on that comparison, the Court determined that all accounts identified in Grand Jury Exhibit 2 were included in the summary chart.

[38] Voyage Limo records are untainted for the reasons discussed above. *See supra* at 26 n.33. Records for the Runyan Tax Service account were requested in mid-September 2020, and records from Beverly Hills Escrow were requested in August 2020. *See* Fenton Decl., Ex. 2.

[39] Radius Bank records for the relevant Mod Interiors account were requested in early October 2020. *See* Fenton Decl., Ex. 2. Those records include images of checks totaling hundreds of thousands of dollars payable to Belgium New York and Picadilly Jewelers. *See* GEX 1.q. Additionally, records from both Belgium New York and Picadilly Jewelers were requested in early December 2020. *See* Fenton Decl., Ex. 2. Those records could not be tainted. First, as just noted, the untainted Radius Bank records requested in early October 2020 clearly identified hundreds of thousands of dollars flowing to Belgium New York and Picadilly Jewelers. *See* Fenton Decl., Ex. 2; *see also* GEX 1.q. Second, the only tainted information available to the Government when the records were requested (*i.e.*, December 2020) was customs' oral communications and the 65 photos Palmerton uploaded to the Government's shared folder. Neither the 65 photos nor customs' oral communications reference Belgium New York or Picadilly Jewelers. *See* Fenton Decl., Ex. 17.

[40] Records for Perfect Escrow were requested in early October 2020, and records for the Redline Auto Mechanics account from which funds were transferred to Perfect Escrow were requested in September 2020. *See* Fenton Decl., Ex. 2.

[41] For the reasons discussed above, the identities of Mark Zindroski and Nazar Terabelian (and the fact that the latter was dead) were not the result of tainted information. *See supra* at 18 n.19, 24. Moreover, contrary to the argument

The final portion of the grand jury presentation focused on charges against Ayvazyan and Tamara Dadyan stemming from additional crimes they allegedly committed after they were released on bond. This portion of the presentation centered around several bank accounts, all of which overlap with the untainted bank accounts discussed above. *See supra* at 27–28.

* * *

The above line-by-line analysis establishes that the first superseding indictment and the grand jury presentation resulting in that indictment were untainted. Specifically, the Government's exhaustive filings demonstrate that information regarding all of the loans, bank accounts, and entities discussed before the grand jury was requested at a time when said requests could not have been tainted. Coupled with the Government's witnesses' credible assertions that the basis of the grand jury presentation was the untainted requests for information—and not tainted information from the Miami phones—the Court is persuaded, by a preponderance of the evidence, that the Government did not use tainted information before the grand jury.

There is, however, one inconsequential exception to this finding: a reference to 151 loans that were part of the conspiracy. As the Court will discuss further below, in November 2020, Massino identified 10 additional loans based on his review of 65 tainted photographs from the Miami phones. *See infra* at 69. Those ten loans were included in the list of 151 loans that the Government concluded were fraudulently obtained as part of the conspiracy. *See* Fenton Decl., Ex. 22. Although the Government did not present the list of 151 loans to the grand jury or name all 151 loans, the grand jury witness did state that 151 loans were part of the conspiracy. *See* Fenton Decl., Ex. 16.b at 22:23-23:3.

The Court concludes that the Government's indirect use of those 10 loans before the grand jury was harmless beyond any measure of doubt. The Government did not specifically identify any of the ten potentially tainted loans or present evidence about those loans during the grand jury proceedings. The specific loans were not directly included in the indictment itself. For example, they were not the loans that formed the basis for the substantive counts of conspiracy, wire fraud, or bank fraud. Instead, the loans were part of an overall count of 151 loans in the conspiracy. And, had the ten loans not been included in the total count, the overall

---

presented by counsel for Terabelian, *see* July 29 Tr. at 161:2-6, the Government did not use tainted photos as a basis for charging Terabelian with aggravated identity theft; instead, that decision was made on the basis of Nazar Terabelian's death and the flow of funds, *see* Fenton Decl., Ex. 32 at 15–16 (prosecution memorandum explaining aggravated identity theft charging decision).

Information about Anna Dzukaeva is not tainted because it was discovered at the Weddington home. *See* Fenton Decl. ¶¶ 17 n.15, 26–27; *see also* GEXs 57.a, 57.d, 57.e, 57 f, 57.g. Michael Hart was a victim whose identity was stolen and used in multiple loan applications for which records were requested in June 2020. *See* Fenton Decl., Ex. 2. Finally, Alexander Fard was a victim whose identity was stolen and used in a Redline Auto Mechanics loan application for which records were requested in early September 2020. *See id.*

number of loans in the conspiracy would still have been tremendous: 141, rather than 151. Finally, the untainted evidence presented to the grand jury was overwhelming. *See supra* at 15–22, 25–28.

Accordingly, the Court is persuaded beyond a reasonable doubt that, even absent this single use of tainted information, the grand jury would have returned the first superseding indictment. Thus, that single use of tainted information before the grand jury was harmless. *See Rogers*, 722 F.2d at 560 (no *Kastigar* relief warranted in relation to grand jury proceedings where court found "adequate untainted evidence to support the indictment").

For the foregoing reasons, the Government has met its *Kastigar* burden as to the grand jury proceedings.

### D.   The Government Has Met its *Kastigar* Burden as to the Trial.

To determine whether the Government used tainted information at trial, the Court identified the witnesses that testified for the Government and the Government's evidence the Court admitted at trial. The Court then assessed whether the witnesses and evidence were tainted. The Court also reviewed the trial transcripts. Finally, the Court reviewed some of the specific arguments at trial that Defendants argued were tainted.

In light of that review, the Court concludes that the Government has met its *Kastigar* burden as to the trial.

### 1.   None of the Government's Witnesses Were Identified Using Tainted Information, and their Testimony Was Not Tainted.

The Government presented the following witnesses at trial: (1) Caitlin Bowdler, (2) Geffrey Clark, (3) Nicolas M. Felando, (4) Breanna Fitzgerald, (5) Artur Hakopyan, (6) Victoria Hernandez, (7) Andrew Jaung, (8) Spencer Kim, (9) Kathleen Littwin, (10) Theodora Louissaint, (11) Timothy Massino, (12) Madison McDonald, (13) Pinal Modi, (14) Greg Parra, (15) Marylee Robinson, (16) Adrian Rosado, (17) Shelly Abril, (18) Alexander Fard, (19) Anthony Farrer, (20) Amira Halum, (21) Justin Masterman, (22) Jack Runyan, and (23) Mark Zindroski.

The first sixteen witnesses were either (a) members of the investigative team; (b) employees of government agencies; or (c) retained by the Government to testify. None of the agencies that the employees represented were identified using tainted information. There is no reason to believe that any of these witnesses were identified using tainted information, and the Court is persuaded, by a preponderance of the evidence, that they were not.

The other seven witnesses also were not identified using tainted information.  Shelly Abril testified on behalf of Gusto, a payroll processing company.  The conspirators in this case used fake Gusto payroll reports in some of the fraudulent PPP and EIDL loan applications.  The Government first identified that pattern and requested records from Gusto in early October 2020.  *See* Fenton Decl., Ex. 2.

Alexander Fard was an identity theft victim.  In support of a fraudulent application submitted to Celtic Bank for Redline Auto Mechanics, the conspirators in this case used IRS forms that fraudulently identified Fard as the tax preparer for the form.  *See* GEX 2.m.  The loan file for that application was requested by the Government in early September 2020.  *See* Fenton Decl., Ex. 2.

Anthony Farrer was the representative from Gentleman Timepieces.  As discussed above, *see supra* at 16, Farrer was identified and contacted by the Government in July 2020.

Amira Halum was the real estate agent for the Imperial Court property.  Halum was identified based on based on records requested from CV Escrow on October 28, 2020, *see* Fenton Decl., ¶ 15; *see also id.*, Ex. 2; Ex. 12 (email correspondence identifying Amira Halum produced by CV Escrow as indicated by CV bates stamp on lower right hand corner).  As discussed above, *see supra* at 26 n.30, the Government has met its burden of establishing that records from CV Escrow were not requested based on tainted information.

Justin Masterman testified on behalf of Celtic Bank.  The co-conspirators in this case submitted numerous fraudulent PPP loans to Celtic Bank, and some of the earliest requests for information in this case were sent to Celtic Bank in late June 2020.  *See* Fenton Decl., Ex. 2.

Jack Runyan was an identity theft victim in this case.  Although it appears he was not interviewed until early February 2021, information about Runyan Tax Service was requested from banks, lenders, and government agencies in September 2020.  *See* Fenton Decl., Ex. 2.

Finally, Mark Zindroski, another identity theft victim in this case, was not identified using tainted information.  Information regarding Mark Zindroski—a victim whose identity was stolen—was first requested in June 2020, *see* Fenton Decl., Ex. 2, and Zindroski was first interviewed by the Government in July 2020, *see* Dkt. 281 at 11.

Accordingly, the Court concludes that the Government did not use tainted information to identify any of the witnesses at trial.  Rather, all of the witnesses were derived from legitimate independent sources.  *See Kastigar*, 406 U.S. at 461–62.

31

The Court also reviewed the substance of these 23 individuals' testimony. In doing so, the Court sought to determine whether any of the witnesses testified about information that was derived from tainted sources. Based upon its analysis, the Court concludes that none of the witnesses provided testimony derived from tainted sources.

At the hearing, Defendants argued that Robinson was tainted because she was exposed to the ten tainted loans that Massino discovered. *See* July 29 Tr. at 194:23-195:9. However, the focus of the inquiry "is not whether [Robinson] was aware of [tainted information], but whether [s]he used the [information] in any way to build a case against the defendant." *Crowson*, 828 F.2d at 1430 (cleaned up). As discussed below, the summary chart presented by Robinson was entirely untainted, and she did not discuss any of the ten tainted loans in her testimony. *See infra* at 41–43. The same holds true for Massino, whose summary chart was entirely untainted, and who did not discuss the tainted loans. *See* GEX 116; *see also infra* at 41. Accordingly, neither Robinson nor Massino used tainted information when testifying at trial.[42]

For the foregoing reasons, the Court concludes that none of the Government's witnesses were identified using tainted information, and none of their testimony was tainted.

### 2.    The Government has Met its *Kastigar* Burden as to the Evidence Admitted at Trial.

The Court reviewed the trial exhibit log provided by the Government. *See* Fenton Decl., Ex. 34. The Court cross-referenced that log with the log of requests for information and the trial exhibits themselves. *See id.*, Ex. 2. Those materials establish that the vast majority of trial exhibits were based on requests for information that predated November 13, 2020.[43] *See* Fenton Decl., Exs. 2, 34.

---

[42] Defendants argued at the hearing that Robinson's use of the tainted loans to "interpret" untainted evidence constitutes a *Kastigar* violation. This argument could be addressed in the non-evidentiary use section below, but the Court addresses it now. Although the loans were shared with Robinson, that simply means that Robinson was exposed to the loans and may have been aware of them, not that she used them. *See Crowson*, 828 F.2d at 1430 ("The focus of the inquiry under *Kastigar* is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.") (cleaned up). The tainted loans were not identified for the jury, included in Robinson's summary chart, or otherwise referenced at trial. Moreover, the Court reviewed Robinson's testimony, and the Court is persuaded, by a preponderance of the evidence, that there is nothing about her testimony that would have been different had the Government not shared the ten tainted loans with her. Accordingly, any alleged use of the tainted loans by Robinson to interpret untainted evidence was "so unimportant and insignificant and had so little, if any, likelihood of having changed the result of the proceeding that it may be deemed harmless." *Ponds*, 454 F.3d at 329 (cleaned up).

[43] The Court uses this date because the only tainted information the Government had access to between the Miami stop and November 13, 2020 was the oral communications made by customs. As discussed above, those oral communications provided the following general information: (1) a driver's license belonging to Zhadko was seen on Ayvazyan's phone; (2) photos of driver's licenses, credit cards, and social security cards in various individuals' names were found on Ayvazyan's phone; and (3) text messages were seen on Terabelian's phone in which Terabelian was purporting to be Kauichko. Given that the oral communications lacked specificity, the Court

As for any exhibits based on requests for information made after that date, the Court concludes that all of those exhibits are untainted.  In subsections (a) through (d) below, the Court will discuss categories of exhibits separately.[44]  Then, in subsections (e) and (f), the Court will discuss three specific exhibits: GEXs 115, 116, and 10.

### a.  Loan Files.

Some of the exhibits stemming from information requested on or after November 13, 2020 are loan files.

Two of those exhibits are loan files for Voyage Limo and Anna Dzukaeva dba Six Star Farms.  *See* Fenton Decl., Exs. 2, 34.  Those loans are not tainted for the reasons discussed above.  *See supra* at 26 n.33, 27.

Other loan files requested after November 13, 2020 were requested between that date and February 1, 2021.  *See* Fenton Decl., Exs. 2, 34.  These are the loan files associated with GEXs 3.d, 3.k, 3.l, 3.n, 4.c, 4.d, 4.h, 4.t, 5.d, 5.e, 5.f, 5.h, 5.p, 5.q, 5.r, 5.s, and 6.h.  The Court finds by a preponderance of the evidence that these loan files were derived from the untainted searches of the various residences on November 5, 2020:

- **GEX 3.d:** The applicant on the Escrow Doc loan is Roza Avakian.  *See* GEX 3.d.  A driver's license belonging to Avakian was found at the Weddington home, *see* GEX 57.a at 5, as were blank checks for Roza Avakian dba Escrow Doc, *see* GEX 57.g at 15.

- **GEXs 3.k, 5.d, 5.e, 5.f**: Several of the loans relate to Liudmyla Kopytova or her business, LK Design.  *See* GEXs 3.k, 5.d, 5.e, 5.f.  Substantial evidence relating to that identity and entity were discovered at the Weddington home, including fake driver's licenses and social security cards in Kopytova's name, *see* GEX 57.a at 1, 7; a portion of a PPP application for LK Designs in Kopytova's name, *see* GEX 57.e at 40, 44; GEX 57.g at 4; and an email address for LK Design, *see* GEX 57.k at 1.

---

concludes that any requests for information after the Miami stop could not have been tainted by the oral communications.  Indeed, the only specific information provided by the oral communications were the identities of Kauichko and Zhadko, which the Government was well aware of by the time of the Miami stop.  Accordingly, in reviewing exhibits that were based on requests for information after the Miami stop, the Court is satisfied that they could not be tainted by customs agents' general description of the contents on the Miami phones.

[44] To be clear, the Court concludes, by a preponderance of the evidence, that any exhibits not specifically discussed below were untainted because they were derived from either (1) information requested before November 13, 2020, or (2) the untainted November 5, 2020 searches of the conspirators' residences.

- **GEX 3.l, 5.h**: The applicant on the MD Acquisitions loans is Mykhail Diuzhenko. *See* GEX 3.l, 5.h. A driver's license belonging to Diuzhenko was discovered at the Weddington home, *see* GEX 57.a at 3, as were handwritten notes and voided checks regarding Diuzhenko and MD Acquisitions, *see* GEXs 57.f, 57.k, 57.d at 2 (handwritten notes); *see also* GEX 57.g at 16 (voided check).

- **GEX 4.c**: Blank checks for the entity on this application, ABC Legal Services and Management, *see* GEX 4.c, were found at the Weddington home, *see* GEX 57.g at 8.

- **GEX 3.n**: Blank checks for Montradath, *see* GEX 3.n, were also found at the Weddington home, *see* GEX 57.g at 10. Specifically, the checks belong to "Diana Saakyan Sole Prop dba Montradath," whose address is 9422 Woodley Ave. *See id.* That is the exact applicant and address listed on the Montradath application, *see* GEX 3.n, and a social security card (with the same social security number listed on the Montradath application) was also found at the Weddington address, *see* GEX 57.a at 7.

- **GEX 4.d**: Another entity for which the loan file was requested between November 13, 2020 and January 29, 2020 is ABC Realty Advisors. *See* GEX 4.d. Blank checks for that entity were found at the Weddington home, *see* GEX 57.d at 21, as was a portion of the EIDL application, *see* GEX 57.e at 59.

- **GEX 4.t**: Another entity was First Class Property Management. *See* GEX 4.t. Blank checks for that entity were found at the Weddington home. *See* GEX 57.g at 25. Additionally, a list of emails found at the Weddington home includes the exact same email used to fraudulently apply for the EIDL loan. *See* GEX 57.d at 1.

- **GEXs 4.h, 5.p through 5.s**: These loans relate to Cactus Mart (GEXs 4.h) and Ocean Choice Seafood (5.p through 5.s). Information related to those loans was discovered at the Canoga address when that residence was searched on November 5, 2020. Specifically, the Government discovered mail addressed to Olena Sosunova, the individual who applied for the Cactus Mart and Ocean Choice Seafood loans. *See* GEX 54.f. Moreover, information about Sosunova and Ocean Choice Seafood was first requested by the Government in December. *See* Fenton Decl., Exs. 2, 34.

The only loan file not clearly linked to the physical evidence seized from the residences searched on November 5, 2020 is GEX 6.h for Tia Mia Daycare. The trial exhibits for those residences do

not include information about that entity or Estephanie Reynoso, the individual who applied for the Tia Mia Daycare loan.[45]

The Court concludes, by a preponderance of the evidence, that the Tia Mia Daycare loan was identified based on a prior independent source. This is because information about Tia Mia Daycare was requested in mid-January. *See* Fenton Decl., Exs. 2, 34. Given the timing of that request, the only tainted information that could have instigated it is the 65 photographs uploaded by Palmerton to the Government's shared drive. However, the Court reviewed the 65 photographs, and none of them reference Tia Mia Daycare or Estephanie Reynoso. Accordingly, the Court concludes that it is more likely than not that those loan files were identified on the basis of a prior independent source.

For the foregoing reasons, none of the loan files used at trial were tainted. Rather, the Court is persuaded by a preponderance of the evidence that the Government used a legitimate independent source—*e.g.*, the physical evidence seized at the Weddington home, the Canoga apartment, or other residences searched on November 5, 2020—to discover the loan files requested on or after November 13, 2020. *See Kastigar*, 406 U.S. at 461–62.

### b.  Bank Records.

Several of the records for bank accounts requested after November 13, 2020 (*i.e.*, Sabala Construction account ending in 9906, Voyage Limo account ending in 7900, Turing Info Solutions Account ending in 5268, Dzukaeva ending in 1441, and Zhadko ending in 6822) are records for accounts included in the Government's summary tracing chart. *See* GEX 115. Those accounts are untainted for the reasons discussed below. *See infra* at 41–43.

Other records for bank accounts were requested between November 13, 2020 and January 22, 2021. Those are the records and accounts associated with GEXs 92, 102–106, and 110–111.[46] *See* Fenton Decl., Ex. 34. The Court finds by a preponderance of the evidence that those exhibits were untainted:

- **GEXs 92, 105:** This is the account for Diana Saakyan dba Montradath. As discussed above, blank checks for this account were discovered during the search of the

---

[45] The Court notes that it does not have *all* of the physical evidence seized from the residences. Rather, it only has the evidence that ultimately became a trial exhibit.

[46] It appears that the calls between Tamara Dadyan and Capital One—in which Dadyan purports to be Dzukaeva—were requested on February 3, 2021. *See* Fenton Decl., Exs. 2, 34. However, those calls relate to the Dzukaeva account ending in 1441 which, as explained below, is not tainted. *See infra* at 42. Moreover, those calls could not have been requested before February 3, 2021 because that is the date of the final call. *See* Fenton Decl., Exs. 2, 34.

Weddington home.  *See* GEX 57.g at 10; *see also supra* at 34.

- **GEX 104:** This is an account ending in 7337 for Liudmyla Kopytova at Bank of the West.  Statements for this account (or the account number) were included in the fraudulent loan application the conspirators submitted in Kopytova's name.  *See* GEXs 3.k, 5.d, 5.e.  As discussed above, those loan applications were not tainted.  *See supra* at 33.

- **GEX 110:** This is an account ending in 5076 for New Acre Farm produce.  *See* GEX 110.  Blank checks for this account were discovered during the search of the Weddington home.  *See* GEX 57.g at 11.

- **GEX 111:** This is an account ending in 5700 for Mykhail Diuzhenko.  *See* GEX 111.  This account number was included in a fraudulent loan application the conspirators submitted in Diuzhenko's name.  *See* GEX 3.l at 8.  As discussed above, that loan application was not tainted.  *See supra* at 34.

- **GEXs 102, 103:** These accounts at Bank of the West either belong to Tamara Dadyan or have Tamara Dadyan as the sole signatory.  *See* GEXs 102, 103.  Information about Tamara Dadyan's accounts at Bank of the West was first requested on November 19, 2020.  *See* Fenton Decl., Exs. 2, 34.

- **GEX 106:** This is an account for AM & AM Financial Services at First Republic Bank, and the sole signatory on the account is Tamara Dadyan.  *See* GEX 106.  Information about accounts belonging to AM & AM Financial Services was first requested from First Republic Bank on November 30, 2020.  *See* Fenton Decl., Exs. 2, 34.

Like the Tia Mia Daycare loan file, these last three accounts (*i.e.*, GEXs 102, 103, and 106) are not clearly linked to the physical evidence seized from the residences searched on November 5, 2020.  The trial exhibits for those residences do not include information about these three accounts.

The Court concludes, by a preponderance of the evidence, that the requests for information for these accounts were based on a legitimate independent source.  First, given the timing of the requests upon which those exhibits are based (*i.e.*, mid to late November), the only tainted information that could have led to those accounts is the 65 photographs uploaded by Palmerton to the Government's shared drive.  However, the Court reviewed the 65 photographs, and none of them reference the accounts associated with GEXs 102, 103, or 106.

36

Second, the three accounts share a common thread: Tamara Dadyan is the sole signatory on each account.  *See* GEXs 102, 103, 106.  Given that the Weddington home is Tamara Dadyan's residence and that a substantial amount of information regarding loans and bank accounts was discovered at that home, the Court concludes that it is far more likely than not that GEXs 102, 103, and 106 were requested on the basis of a prior independent source and, specifically, information discovered during the searches of the residences on November 5, 2020.

For the foregoing reasons, the bank records included as trial exhibits and based on information requested after November 13, 2020 are not tainted.  *See Kastigar*, 406 U.S. at 461–62.

### c.    *Miscellaneous Exhibits.*

A number of miscellaneous exhibits were also based on requests for information issued between November 13, 2020 and February 19, 2021.  The Government has met its *Kastigar* burden as to all of those exhibits.

First, records from Belgium New York and Picadilly Jewelers (requested on December 7, 2020, *see* Fenton Decl., Exs. 2, 34) are not tainted for the reasons discussed above, *see supra* at 28 n.39.

Second, records from TD Ameritrade and Coinbase (requested on January 22, 2020, *see* Fenton Decl., Exs. 2, 34) are not tainted.  The accounts from those entities received funds from the Zhadko account ending in 6822 and the Turing Info Solutions Account ending in 5268.  *See* GEXs 1.r, 91.  As discussed below, neither of those bank accounts are tainted.  *See infra* at 42–43.  Moreover, none of the 65 photographs uploaded by Palmerton reference TD Ameritrade or Coinbase.  *See* Fenton Decl., Ex. 17.

Third, records from Amira Halum were requested on January 22, 2021.  *See* Fenton Decl., Exs. 2, 34.  As discussed above, Halum was identified based on untainted information. *See supra* at 26 n.30.  Moreover, none of the 65 photographs uploaded by Palmerton reference Halum.  *See* Fenton Decl., Ex. 17.

Fourth records requested on November 19, 2020 from Greystar Worldwide LLC (*i.e.*, the management company for the Canoga apartment) are not tainted. *See* Fenton Decl., Exs. 2, 34. As discussed below, prior to the Miami stop, the Government was well aware of the Canoga address and Ayvazyan's use of that address as part of the fraudulent scheme. *See infra* at 65–66, 79–80 (discussing multiple untainted links between Ayvazyan and Canoga address).

Fifth, records requested on February 19, 2021 from Fay Servicing are not tainted. In August 2020, the Dzukaeva account ending in 1441 sent over $30,000 of fraudulently obtained PPP funds to Fay Servicing. *See* GEX 1.s at 16. As discussed below, records for the Anna Dzukaeva account ending in 1441 were requested in early December on the basis of untainted information. *See infra* at 41–42.

Finally, furniture invoices from Italy 2000, *see* GEX 38, were requested on February 3, 2021. *See* Fenton Decl., Ex. 34. The day before, customs had sent the Government 141 images of photos on the Miami phones. *See* Fenton Decl., Ex. 28. One of those images includes a text message on Terabelian's phone between Kauichko and "Paniv Italy 2000." *See id.* at 24.

The Court concludes that the Italy 2000 invoices were derived from a legitimate independent source. This is so for three reasons. First, none of the declarants (all of whom the Court finds credible) recalled using the 141 photos to request records from Italy 2000.

Second, on September 15, 2020—*i.e.*, before the Miami stop—the Government requested records from Bank of America for the Runyan Tax Services account ending in 9700. *See* Fenton Decl., Ex. 2. Those records included a check for nearly $25,000 to Italy 2000. *See* GEX 100 at 12. The signatory on the Runyan Tax Service account was Kauichko, and Runyan Tax Service was one of the primary entities in the original indictment.

Third, on November 5, 2020, the Government requested all records pertaining to Italy 2000 from Chase bank.[47]  *See* Fenton Decl., Ex. 2. In other words, the Government had *already* begun pursuing its line of investigation into Italy 2000 almost 3 months before anyone on the investigative team was exposed to the tainted image contained in the 141 photos.

For these reasons, the Court is persuaded by a preponderance of the evidence that the Italy 2000 invoices were derived from a legitimate independent source. *See Kastigar*, 406 U.S. at 461–62.

---

[47] The only tainted information available to the Government at this point was (1) customs' oral communications, and (2) the 65 photographs uploaded by Palmerton to the Government's shared drive. Neither of those referenced Italy 2000 or could have been derivatively used to identify Italy 2000. Accordingly, the Court is persuaded by a preponderance of the evidence that the request for information from Chase was untainted and, instead, was based on the Runyan Tax Service bank account records.

However, even assuming *arguendo* that the admission of the Italy 2000 records at trial constituted a Fifth Amendment violation (it did not), the Court is persuaded that any such error was harmless beyond a reasonable doubt. This is because the Government presented evidence about Defendants' use of the fraudulently obtained loans that was far more persuasive than the Italy 2000 records. Specifically, the Government presented evidence that the conspirators used the funds for nearly $1 million worth of down payments on three properties. *See* GEX 115 at 5–7. Those properties had purchase prices of $3.25 million, $1 million, and $600,000. *See id.* The Government also presented evidence that fraudulently obtained loans were used for (a) over $200,000 worth of deposits in stock brokerage accounts like Robinhood and TD Ameritrade; (b) $22,000 of cryptocurrency; (c) $82,000 in luxury watches; and (d) over $300,000 in gold coins and jewelry. *See id.* at 8–10.

Under these circumstances, the Court is persuaded beyond a reasonable doubt that, even if the admission of the Italy 2000 records at trial constituted a Fifth Amendment violation (it did not), "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279 (emphasis in original).[48]

For the foregoing reasons, the Government has met its *Kastigar* burden as to the miscellaneous exhibits described above.

### d. *Phone and IP Address Subscriber Information.*

A handful of exhibits that contained subscriber information for phone numbers and IP addresses were based on requests for information propounded by the Government between January 13, 2021 and February 24, 2021. The Government has met its *Kastigar* burden as to these exhibits.

### i. IP Address Subscriber Information

One of the exhibits (GEX 73.d) was based on a request for information propounded on January 14, 2021. *See* Fenton Decl., Exs. 2, 34. That exhibit contained the subscriber information for the IP address 23.242.208.63. *See* GEX 73.d. On that date, the only tainted information the Government had was customs' oral communications and the 65 photographs uploaded by Palmerton. The IP address 23.242.208.63 is not contained in either.

---

[48] To the extent Defendants argue that there was no other evidence that the fraudulently obtained PPP proceeds deposited into the Runyan Tax Services account were used for unauthorized purposes, the Court rejects that argument. First, in the months before and after the $24,858 check to Italy 2000 was written, hundreds of thousands of fraudulently obtained PPP funds in the account were used on escrow deposits and at retailers like Home Depot, Nordstrom's, and Bob's Discount Furniture. *See* GEX 1.p at 34–48. Second, there is not a shred of evidence in this case that any of the fraudulently obtained PPP funds were used for legitimate business expenses (*e.g.*, payroll, rent, utilities, etc.).

The Court is persuaded that neither of those would have led the Government to the IP address 23.242.208.63 and, accordingly, neither could have been used to identify the IP address. Moreover, the IP address was used to submit the Voyage Limo PPP loan application to Celtic bank, and the IP address was included in the loan file requested from Celtic Bank on November 24, 2020.[49]  *See* GEX 2.k at 47.  Accordingly, the Court concludes, by a preponderance of the evidence, that the Government has met its burden of establishing a legitimate independent source for that IP address.

Two other exhibits (GEXs 73.g and 73.i) were based on a request for information propounded on February 24, 2021.  *See* Fenton Decl., Exs. 2, 34.  Those exhibits contained subscriber information for the IP address 75.83.234.33.  However, subscriber information for that exact same IP address was first requested on September 2, 2020—*i.e.*, well before the Miami stop.  *See* Fenton Decl., Exs. 2, 34.  Accordingly, the Government has met its burden of establishing a legitimate independent source for that IP address.

ii.     Phone Subscriber and Payment Information

Seven exhibits were based on requests for information propounded on January 13, 2021. Those are GEXs 59.a, 59.b, 62.a, 62.b 66.a, 66.b, and 69.  *See* Fenton Decl., Exs. 2, 34.  Those exhibits contained subscriber and/or payment information for four different phone numbers.  *See* GEXs 59.a, 59.b (310-300-0005); 62.a, 62.b (818-266-3314); 66.a, 66.b (818-442-8777) and 69 (818-551-6005).  The Court is persuaded, by a preponderance of the evidence, that the Government did not use tainted information to identify these phone numbers.  None of these four phone numbers appear in customs' oral communications or the 65 photographs uploaded by Palmerton (*i.e.*, the only tainted information available to the Government on January 13, 2021). *See* Fenton Decl., Ex. 17.

Similarly, another two exhibits containing subscriber and payment information for 747-271-8243 were based on requests for information propounded on February 22, 2021.  *See* GEX 60.a, 60.b.  This phone number does not appear in customs' oral communications, the 65 photographs uploaded by Palmerton, or the 141 photographs customs sent the investigative team. *See* Fenton Decl., Exs. 17, 28.

To the extent tainted information was used to identify this phone number and request records for it, the Court is persuaded that the admission of any such records was harmless beyond a reasonable doubt.  The Court reviewed the trial transcripts and, while other phone numbers were mentioned several times, this phone number was never referenced.  If the phone number had any impact on the trial at all, it was, at most, like "a leaf dropping unobserved in a

---

[49] For the reasons discussed above, this loan file was not requested on the basis of tainted information.  *See supra* at 26 n.33.

deep forest." *United States v. Gallo*, 859 F.2d 1078, 1091 (2d Cir. 1988) (Van Graafeiland, J., concurring). Accordingly, the Court is persuaded beyond a reasonable doubt that, even assuming the admission of the subscriber records for 747-271-8243 constituted a Fifth Amendment violation, "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279 (emphasis in original).

### e.    The Government's Summary Charts.

The Government presented two summary charts at trial: GEXs 115 and 116. The Court is persuaded, by a preponderance of the evidence, that neither was tainted.

As to GEX 116, that was a summary chart that compared loan applications and identified overlapping elements of fraud. The entire basis of the chart was the loan files admitted into evidence. And, as discussed above, the Government has met its burden of establishing, by a preponderance of the evidence, that every loan file admitted into evidence was derived from a legitimate independent source. *See supra* at 33–35. Accordingly, GEX 116 itself is untainted.

As to GEX 115, that was a summary chart that traced the flow of funds from lenders, to bank accounts, and then to expenditures. The chart was based on (a) loan files, and (b) bank accounts. As with the loan files in GEX 116, the loan files in GEX 115 are not tainted.

The 24 bank accounts included in GEX 115 are also untainted. Out of those 24 accounts, records for 15 were first requested prior to the Miami stop.[50]

Records for 4 of the 24 accounts were requested after the Miami stop but before November 13, 2020 (*i.e.*, when Palmerton uploaded 65 images of photos on the phones to the Government's shared folder). Those four accounts are: (1) a Secureline account ending in 8935; (2) a Secureline account ending in 1754; (3) an ABC Realty account ending in 8366; and (4) an Artashes Grigoryan dba G&A Diamonds account ending in 1964. *See* Fenton Decl., Ex. 2. None of those accounts could be tainted by customs' oral communications because nothing about customs' oral communications would have led the Government to those accounts.

Similarly, information for another 4 of the 24 accounts was requested after November 13, 2020, but before February 2, 2020 (*i.e.*, when customs sent the investigative team 141 images of

---

[50] These include the following: Redline Collision account x1732 (September 2020); Marietta Terabelian's account x1475 (August 2020); Allstate Towing account x5135 (early October 2020); Zhadko account x8054 (June 2020); Hart Construction account x1511 (July 2020); Hart Construction account x9066 (August 2020); Zhadko account x3517 (June 2020); Kauichko account x2085 (September 2020); Kudiumov account x7572 (September 2020); Zhadko account x0172 (September 2020); Allstate Towing account x7695 (early October 2020); Inception Ventures account x4043 (early August 2020); Redline Mechanic account x16271 (September 2020); Runyan Tax Service account x9700 (September 2020); Mod Interiors account x2395 (early October 2020). *See* Fenton Decl., Exs. 2, 34.

photos on the Miami phones).  Those four accounts are (1) a Dzukaeva account ending in 1441; (2) a Voyage Limo account ending in 7900; (3) a Sabala Construction account ending in 9906; and (4) a Zhadko account ending in 6822.  None of these accounts could be tainted by customs' oral communications or by the 65 photos uploaded by Palmerton to the Government's shared folder.  This is because neither the 65 photos nor customs' oral communications reference these accounts.[51]

Finally, records for one account—a Turing Info Solutions account ending in 5268—were requested on February 9, 2021.  This was after customs sent the investigative team 141 images of photos on the Miami phones, but before the filter team released any Cellebrite reports for the Miami phones to the investigative team.  *See* Fenton Decl. ¶¶ 43, 47.  A picture of the debit card linked to the Turing Info Solutions account ending in 5268 was included in the 141 images sent by customs to the investigative team.  *See* Fenton Decl., Ex. 28 at 75.

To the extent Defendants argue that this timeline is evidence of a *Kastigar* violation, the Court rejects that argument and concludes, by a preponderance of the evidence, that the records for the Turing Info Solutions account ending in 5268 were derived from legitimate independent sources.  First, there was the physical debit card itself, which was found during a lawful search of Ayvazyan's belongings during the Miami stop on October 19, 2020.  Second, the fraudulent loan application submitted by Turing Info Solutions was requested by the Government in September 2020, and that application includes a voided check for the Turing Info Solutions account ending in 5268.  *See* Fenton Decl., Ex. 2; *see also* GEX 2.p.  Finally, records from the Zhadko account ending in 6822—which were untainted and requested on January 22, 2021, *see infra* at n.51— show December 2020 transfers of over $130,000 of fraudulently obtained PPP funds to the Turing Info Solutions account ending in 5268, *see* GEX 91.

Accordingly, the Court concludes that the Government did not use tainted information to identify the Turing Info Solutions account ending in 5268.  Rather, it is far more likely than not

---

[51] Moreover, the Court concludes by a preponderance of the evidence that records for all of these accounts were derived from legitimate independent sources.  For example, the Dzukaeva account was an account for Dzukaeva dba Six Star Farms—*i.e.*, the entity that submitted a fraudulent loan application discovered at the Weddington house on November 5, 2020.  *See supra* at 27.  The loan file for the fraudulent loan application submitted by Voyage Limo was first requested in late November 2020, and that loan file included a voided check for the Voyage Limo account ending in 7900.  *See* Fenton Decl., Ex. 2; *see also* GEX 2.k.  Similarly, a loan file for Sabala Construction requested in September 2020 includes account statements for the Sabala Construction account ending in 9906.  *See* Fenton Decl., Ex. 2; *see also* GEX 2.a.  The Sabala, Dzukaeva, and Voyage loans were all included in the first superseding indictment, and the Court has no doubt that the Government would have requested bank accounts related to those loans even in the absence of tainted information.

Finally, on July 20, 2020, the Zhadko account ending in 6822 received a transfer from another Zhadko account ending in 6994.  *See* GEX 91.  The records for the Zhadko account ending in 6994 that would have identified this transfer (and, accordingly, the Zhadko account ending in 6822) were requested on September 1, 2020.  *See* Fenton Decl., Ex. 2.

that the account was identified using one of the above described legitimate independent sources. *See Kastigar*, 406 U.S. at 461–62.

For the foregoing reasons, the Government's summary charts, *see* GEXs 115, 116 were not tainted.

### f.      GEX 10.

Defendants argue that GEX 10 (*i.e.*, the text messages in which Ayvazyan and Tamara Dadyan discuss the conspiracy) is tainted.  Defendants make two arguments in support of that position.  First, Defendants argue that the evidence seized at the Weddington home (including the phone containing the text messages) is tainted because the Government used tainted information to obtain the search warrants.  The Court rejects that argument for the reasons discussed below.  *See infra* at 61, 62.

Second, Defendants argue that GEX 10 is tainted because, absent the Government's use of tainted information, GEX 10 would not have been a trial exhibit.  Defendants' theory is as follows.

To avoid the disclosure of privileged material to the prosecution team, the Government had to have a filter team review the contents of any digital device before those contents were turned over to the prosecution team.  Depending on the device, the filtering process could take a substantial amount of time.  Accordingly, the Government had to prioritize certain devices and make choices about which phones would be filtered and turned over to the prosecution team, and which phones would not be filtered or turned over.  Fenton was the liaison between the prosecution team and the filter team.  *See* Fenton Supp. Decl. ¶ 13.  Fenton was responsible for determining which phones to prioritize.  *See id.*

There came a point where Fenton had to choose between two phones belonging to Tamara Dadyan: 1B21, and 1B130.  Phone 1B21 contained the text message conversation that ultimately constituted GEX 10.  That text message conversation was between phones 1B21 and phone 1B123—*i.e.*, one of the phones seized at the Miami airport.  In other words, the mirror image of GEX 10 was contained on 1B123, a suppressed phone.  The filter team ended up filtering phone 1B21 and not reviewing phone 1B130.

In Defendants' view, this decision to filter phone 1B21 was tainted.  Specifically, Defendants argue that Fenton chose to prioritize 1B21 because (1) Fenton must have seen the text conversation contained on phone 1B123;[52] (2) Fenton knew that the phone on the other end

---

[52] The basis of this assumption is that the filter team released the Cellebrite report for Miami phone 1B123 to the prosecution on February 12, 2021.  *See* Fenton Decl. ¶ 47.

of the text conversation was phone 1B21; and, accordingly, (3) Fenton used that knowledge to prioritize 1B21. Accordingly, Defendants argue, GEX 10 is tainted because it was derived from the tainted phone 1B21.

The problem with Defendants' view is that it is flatly contradicted by the documentary evidence and credible testimony provided by the Government. First, Fenton credibly testified that he did not know which of the two Dadyan phones had communicated with 1B123. *See* July 28 Tr. at 165:8-12 ("I didn't know whether 1B21 or 1B130 was the phone that had communicated with 1B123 . . . .").

Second, if Fenton prioritized phones for review based on tainted information in 1B123, he presumably would have told the filter team to prioritize the correct phone—*i.e.*, 1B21, the phone containing the mirror image of the conversation on 1B123.

But Fenton did not do that. Instead, Fenton repeatedly told the filter team to prioritize the wrong phone: 1B130.

On April 21, 2021, at 9:12 a.m., Fenton directed the filter team to continue reviewing digital devices, "starting with 1B130." Fenton Supp. Decl., Ex. 2 at 1. Later that day, at 9:43 p.m., Fenton asked the filter team for an update and whether "it would be possible to review and release filtered copies of B17[53] and/or B30 this week." Fenton Supp. Decl., Ex. 3 at 4. From the outset, Fenton very easily could have directed the filter team, based on tainted information, to start with phone 1B21. Yet, he chose 1B130, suggesting his decision was not guided by the tainted text messages on phone 1B123.

Fenton's colleagues understood the situation similarly. Specifically, on April 22, 2021, at 2:43 p.m., one of the members of the filter team, John Kosmidis, emailed his colleague Mike Murali the following: "Chris identified B30 as a priority—Tamara Dadyan's phone. Is that the one you've started the transfer on, by chance?" *Id.*

As chance would have it, it was not. Rather, shortly after receiving Kosmidis's email, Murali informed Fenton and Kosmidis that the filter team had started with 1B21. *See id.* at 3. Murali asked if the team should "pivot" to 1B130 and 1B17. *Id.* Murali copied Fenton on that email. *Id.* Kosmidis followed up, explaining to Fenton that "1B21 looks like Tamara's iPhone X and 1B30 is her iPhone 11. I'm guessing you want to start on 1B30, but please confirm . . . ." *Id.* Fenton responded: "Yes B30." *Id.* at 2. Fenton credibly explained that the reason he chose to prioritize 1B130 was because "it was a newer model iPhone and, in [his] view, was more likely to have been used by defendant Tamara Dadyan more recently." *Id.* ¶ 17.

---

[53] This is a phone belonging to Artur Ayvazyan.

The Court finds these last few emails particularly persuasive.  Fenton was faced with two options: (1) pivot to 1B130, or (2) continue filtering 1B21 (*i.e.*, the phone containing the mirror image of tainted text messages on 1B123).  Again, if Fenton was using tainted information to make his choice, he presumably would have selected 1B21.  Yet, he chose 1B130.

Shortly thereafter, Fenton followed up to ask how long it would take the filter team to finish 1B21, because he didn't want to stop the team if 1B21 was almost done.  *Id.*, Ex. 3 at 1–2.  Murali responded "[p]robably a couple days," and that he would tell the team to switch to 1B130 if there was still "a ways to go" with 1B21.  *Id.* at 1.  Later that evening, Fenton sought an update from Muralis and Kosmidis, asking them how long they "expect[ed] it to take to review/filter 21?  Then 30 (*i.e.* the two Dadyan phones)."  *Id.*

The next morning, on April 23, 2021, Fenton had a phone call with the filter team and "learned that 1B21 contained a significant amount of data and that the review would take more time than 1B130."  *Id.* ¶ 21.  For that reason, Fenton told the filter team to prioritize 1B130.  *Id.*

This testimony is corroborated, again, by internal emails produced by the Government.  Specifically, on April 23, 2021 at 1:43 p.m. (*i.e.*, several hours after the morning phone call with the filter team) Fenton emailed Kosmidis and Muralis and identified two phones to "filter after 1B130."  *Id.*, Ex. 4 at 1.  In other words, Fenton was under the impression that the filter team would, in fact, pivot to 1B130.

Shortly after midnight on April 26, 2021, Fenton emailed Murali and Kosmidis about a letter that he was planning to send to opposing counsel.  *See id.*, Ex. 5 at 1.  The email included three draft exhibits.  *See id.*  Exhibit A was a list of devices that the filter team would review and then release to the prosecution team.  *See id.*  Exhibits B and C were devices that would not be filtered or turned over to the prosecution team, either because of time constraints or accessibility issues.  *See id.*  Fenton included 1B130 on Exhibit A, and 1B21 on Exhibit B—*i.e.*, in the early hours of April 26, 2021, Fenton *still* believed that the filter team would be prioritizing 1B130, and that the prosecution team would not have access to 1B21.  *See id.* at 2–3.

However, later on April 26, 2021, Fenton learned that the filter team had continued its review of 1B21, not 1B130.  *Id.* ¶ 23.  Accordingly, at 4:37 p.m., he forwarded the filter team his previous request to prioritize 1B130 but also told them that, if they completed 1B21, that was fine as well: "Here's the request we made on Friday.  We need one of the Dadyan devices – 1B21 is fine.  Then 1B81 and 1B85 – one phone each for Richard and Marietta."  *Id.*; *see also id.*, Ex. 4.  "1B21 is fine" is not the language one would expect Fenton to use if he preferred to have 1B21 instead of 1B130.  Rather, it is clear that Fenton was settling for 1B21 because limited resources required him to do so.

Shortly thereafter, Fenton circulated a new draft of the exhibits that would be attached to the letter to opposing counsel. *See id.*, Ex. 5 at 5–7. By the end of the day on April 26, 2021, Fenton had informed defense counsel that the filter team would be filtering 1B21 and that 1B130 would not be filtered or released to the prosecution team. *See* KX3 at 2–6.

Fenton's credible testimony and the emails described above make it clear that Fenton did not use tainted information to choose which phones the filter team should prioritize. The Court is persuaded by a preponderance of the evidence that GEX 10—*i.e.*, the trial exhibit based on the 1B21 phone that the filter team ultimately prioritized—is not tainted.

After the Government provided the above evidence with its reply brief, Defendants amended their argument. Specifically, during the evidentiary hearing, Defendants argued that Fenton did not use tainted information to prioritize 1B21 but, rather, to prioritize 1B130. *See* July 28 Tr. at 164:18-21 ("So, frankly, as a prosecutor it makes sense to prioritize 1B130 because that is a different phone. You already had the other side of the Dadyan's conversations from 1B123; right?").

This argument is unpersuasive for two reasons. First, as established above, it is not consistent with the documentary evidence or Fenton's credible testimony. Fenton explained that the reason he chose 1B130 was not because of tainted information but because, in his view, it was a newer model and was therefore more likely to contain better evidence. *See* Fenton Supp. Decl. ¶ 17; *see also* July 28 Tr. at 165:8-12 ("I didn't know whether 1B21 or 1B130 was the phone that had communicated with 1B123, and the decision I made was to prioritize 1B130 because I believed that that phone was a newer model and I thought that it would have better information.").

Second, assuming *arguendo* that Fenton chose to filter 1B130 on the basis of tainted information (he did not),[54] that would most certainly constitute harmless error. The reason is simple: he failed. The filter team did not follow the allegedly tainted instruction. Instead, the team filtered 1B21. Accordingly, any allegedly tainted instruction to prioritize 1B130 on the

---

[54] Fenton acknowledged that, around the time he was deciding which phones to prioritize, he "became generally aware that text messages between defendants Richard Ayvazyan and Tamara Dadyan had been found on the Zhadko phone." Fenton Supp. Decl. ¶ 18. However, he also states that he "did not use that information to identify which of the November 5 Phones to prioritize." *Id.* Based on the documentary evidence, *see supra* at 44–46, and the Court's findings regarding Fenton's credibility more generally, *see infra* at 49–50, the Court accepts that testimony as true. Indeed, unless Fenton knew *which* Dadyan phone (*i.e.*, 1B21 or 1B130) was corresponding with 1B123 (he did not), a general awareness that text messages between Richard Ayvazyan and Tamara Dadyan exist on 1B123 would not provide a means for Fenton to prioritize which Dadyan phone to filter. *See* July 28 Tr. at 165:8-12 ("I didn't know whether 1B21 or 1B130 was the phone that had communicated with 1B123 . . . ."). Fenton's testimony is further corroborated by the fact that, as discussed below, Fenton did not receive the contents of the text messages on phone 1B123 until April 27, 2021—*i.e.*, *after* he had already informed Defendants that the prosecution team would have access to 1B21. *See infra* at 80–81.

basis of tainted information was "so unimportant and insignificant and had so little, if any, likelihood of having changed the result of the proceeding that it may be deemed harmless."[55] *Ponds*, 454 F.3d at 329 (cleaned up).

* * *

For the foregoing reasons, the Court concludes that the Government has met its *Kastigar* burden as to all of its trial witnesses and evidence.

### 3.   The Government has Met its *Kastigar* Burden as to the Arguments it Presented at Trial.

Defendants assert that some of the arguments that the Government made at trial were tainted. Some of Defendants' arguments (*e.g.*, that the Government used tainted information to develop its theories that Terabelian used the Kauichko alias, or that Ayvazyan was linked to the Canoga apartment) are better addressed in the section below on non-evidentiary use. *See infra* at 54–59 (discussing untainted evidence showing Terabelian's use of Kauichko identity); 65–66, 79–80 (discussing untainted evidence showing Ayvazyan's use of Canoga address in furtherance of fraud); *see also Crowson*, 828 F.2d at 1430 (noting that non-evidentiary use includes "focus[ing] the investigation" and "interpret[ing] other evidence"). However, the Court will address three specific arguments the Government made at trial.

The first is the argument that Defendants were operating an "assembly line of fraud." *See* July 28 Tr. at 46:24-47:1 ("Now, would you agree with me that this image supports your trial narrative of an assembly line of fraud?"). This argument was not tainted. First, all of the evidence cited in support of that argument was untainted evidence admitted at trial. *See supra* at 30–46. Second, the fundamental components of that argument were unrelated to the Miami phones. Specifically, the Government focused on the overlapping aspects of fraudulent loan applications (*e.g.*, the same fake IRS forms or Gusto payroll reports); the substantial amount of physical evidence seized at the Weddington home, including fake driver's licenses and social security cards; and the untainted text messages between Ayvazyan and Tamara Dadyan. *See* Dkt. 638 (June 24 p.m. Trial Transcript) at 55:11-14 ("These are the parts of the assembly line of fraud that we spoke about earlier. There are the fake ID's, there are the applications, there are the payroll reports."); 44:1-22 (discussing text messages reflecting an assembly line of fraud); 56:4-9 ("Dozens of fake ID's, fake driver's license, all parts of the assembly line for fraud. And they found PPP loan applications as well. These are not digital copies. These are hard copies.").

The other two arguments Defendants assert were tainted are specific statements made during the Government's closing.

---

[55] The Court applies the harmless error standard for non-evidentiary use to this alleged tainted use because the alleged use did not result in the admission of evidence at trial.

First, Defendants point to Paetty's rebuttal argument, during which he made the following argument: "In fact, the only sloppiness in this investigation, the only sloppiness here is Richard Ayvazyan, when he got caught carrying those IDs, we will talk about it in a minute. He got caught with his hand in the cookie jar in Miami." *Id.* at 136:3-8.

In Defendants' view, this reference to IDs was tainted, because the only IDs on Ayvazyan's person were photos of IDs on his phone. Paetty, by contrast, testified that the IDs on Ayvazyan's phone are not what he was referring to. *See* July 28 Tr. at 812:6-8 ("I don't think those are what I am talking about here, but yes, I did see those and that is not what I am talking about here. . . . I'm sure if we go down [on the page] and say to we'll talk about it in a minute I am referring to the credit cards").

Paetty's view is corroborated by the context of his statements. Specifically, Paetty did not state that Avazyan was caught with IDs on his phone, or with photographs of IDs. Instead, he stated that Ayvazyan was "carrying" IDs. The only evidence the Government presented to the jury about what Ayvazyan was carrying in Miami was the evidence of the physical cards. The jury surely understood that, particularly because the Government presented no evidence of IDs from the Miami airport.

Moreover, shortly after the allegedly tainted comment—indeed, on the same page of the transcript—Paetty explains what he was referring to: "Credit card is on his person, *as I mentioned* that -- you saw those, you saw those as they were put up in the screen in front of you. Mr. Fenton had one in his hands today. Five in the name of Iuliia Zhadko, an alias he used." Dkt. 638 (June 24 p.m. Trial Transcript) at 136:22-137:1 (emphasis added). Under these circumstances, the Court concludes that Paetty's reference to IDs was not tainted and that the jury surely understood Paetty's statement as a reference to the credit cards.

Even assuming *arguendo* that Paetty's reference was tainted, the error was harmless beyond a reasonable doubt. The reference to IDs was brief, and Paetty quickly explained that he was talking about the credit cards in Ayvazyan's luggage. Moreover, Paetty did not reference the name on the ID (*i.e.*, Zhadko), so the jury would not have interpreted Paetty's reference as drawing a link between Ayvazyan and Zhadko. Accordingly, the Court is persuaded beyond a reasonable doubt that, even assuming Paetty's reference to IDs was tainted, "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279 (emphasis in original).

Second, Defendants point to a statement made during Fenton's closing argument. Specifically, when discussing the evidence against Marietta Terabelian, Fenton made the following statement:

> On a phone that was seized elsewhere, *not at the airport*, but somewhere else, at her home on November 5th, there is an image that is discovered on Marietta Terabelian's phone of Fiber One Media and the name Suzanna Merkuchian, which should be familiar because it is the same name on the card in Richard's possession.  And there is personally identifiable information contained on this note.

June 24 a.m. Tr. at 52:2-9 (emphasis added).  Defendants argue that Fenton's statement "not at the airport" was tainted because, as Fenton was presenting his closing argument, he was actively thinking about evidence seized at the Miami airport.  *See* July 28 Tr. at 208:18-211:6.  By contrast, Fenton explained that he wanted to be clear for the record that the phone did not come from the airport so that there would not be any issues on appeal.  *See id.* at 209:3-210:19.

The Court rejects Defendants' argument and finds Fenton's explanation credible.  The Court also takes this opportunity to more broadly address Fenton's credibility.

At the evidentiary hearing, Defendants argued that, although most of the Government's witnesses were credible, Fenton was not.  *See* July 29 Tr. at 163:17-20 ("And I want to say most of the witnesses that testified were largely credible, and they are advocates and they want to win but they were pretty straight with the Court.  Mr. Fenton was an exception.").  Defendants argued that Fenton was evasive, defensive, and refused to accept plain propositions of fact.  *See id.* at 163:20-23.

The Court is not persuaded by Defendants' attack on Fenton's credibility.  First, Fenton's testimony was corroborated by over forty exhibits he attached to his declarations.  It was also corroborated by the testimony and supporting exhibits of the Government's witnesses.  Considering all of the factors relevant to witness credibility, *see* Ninth Circuit Manual of Model Criminal Jury Instructions § 1.7, the Court concludes that Fenton was wholly credible.

Second, what Defendants believed was evasive and defensive was, in fact, Fenton trying to be precise with his testimony.  Indeed, as the Court noted during the hearing, many of the questions were, in fact, confusing and imprecise.  *See* July 28 Tr. at 35:8-9; 54:11-12; 81:20-23; 125:4.  And Fenton credibly explained that he was trying to ensure precision and clarity in his testimony.  *See* July 28 Tr. at 44:5-13, 49:18-25, 103:3-10, 212:1-10.

This makes sense.  From its inception, this case was hotly litigated.  The parties filed dozens of substantive pretrial motions and ex parte applications.  And throughout the case, Defendants accused the Government of deceit, manipulation, and flagrantly violating Defendants' constitutional rights.  *See* Dkt. 130 at 2 (accusing Government of "repeated manipulation and deceit" and a "cover up"); Dkt. 135 at 21 (accusing Government of bad faith); Dkt 146 at 21 (accusing Government of "flagrant disregard" of warrant's limitations); Dkt. 289

at 3, 16 (accusing Government of recklessly destroying material evidence and lying to this Court). The Court found that these accusations were not warranted, *see generally* Dkts. 296, 343, but the history of the case nevertheless explains why Fenton, during his testimony, would strive for precision and clarity when answering counsel's argumentative questions.

Under these circumstances, it is more than reasonable that, at a *Kastigar* hearing focused on the Government's conduct—*i.e.*, conduct that Defendants had repeatedly characterized as reckless, flagrant, and deceitful—Fenton would answer questions carefully. Accordingly, the Court concludes that Defendants' attack on Fenton's credibility is unpersuasive, and Fenton's testimony was wholly credible. And, for the same reasons, the Court concludes that Fenton's statement in closing argument (*i.e.*, "not at the airport") was not tainted. Instead, that statement was clearly intended to preserve the record.

* * *

For the foregoing reasons, the Court concludes that the Government has met its *Kastigar* burden as to the trial.

### E.  The Government Has Met its *Kastigar* Burden as to Non-Evidentiary Use.

The Court will separately address the Government's non-evidentiary use of each set of tainted information: (1) the oral communications from customs; (2) the 65 photographs uploaded by Palmerton on November 13, 2020; (3) the 141 photographs customs sent to the prosecution team on February 2, 2020; and (4) the Cellebrite reports.

For the below reasons, the Court concludes that the Government has met its *Kastigar* burden as to non-evidentiary use.

#### 1.  The Government Has Met its *Kastigar* Burden as to Non-Evidentiary Use of Customs' Oral Communications.

As noted above, on October 19, 2020, customs orally communicated three pieces of information from their review of the Miami phones: (1) Ayvazyan's phone contained an image of a driver's license belonging to Zhadko; (2) Ayvazyan's phone contained numerous other images of driver's licenses, credit cards, and social security cards in the names of other persons; and (3) Terabelian's phone contained text messages in which Terabelian purported to be Kauichko. *See supra* at 21.

There is no dispute that the Government used this tainted information in a handful of ways (*e.g.*, in the criminal complaints, the affidavits in support of search warrants, and the

prosecution memorandum).  The Court will explain below why those uses were harmless beyond a reasonable doubt.  *See infra* at 59–62.

However, before doing so, the Court will discuss Defendants' primary contention regarding the oral communications: the Government used them to develop the theories that Ayvazyan was using the Zhadko identity and Terabelian was using the Kauichko identity.

> ### a.        The Government Developed its Theory that Ayvazyan Was Using the Zhadko Identity Before Customs' Oral Communications.

As discussed above, the Government's investigation prior to the Miami stop was comprehensive and resulted in a substantial amount of evidence that was highly probative of Defendants' role in the conspiracy.  This evidence led the Government to conclude, by early August 2020, that Ayvazyan was using the Zhadko identity to fraudulently apply for PPP and EIDL funds.  *See* Fenton Decl. ¶ 3 ("[B]y early August 2020, the investigation revealed a direct connection between Iuliia Zhadko and defendant Richard Ayvazyan, leading federal law enforcement agents to believe that Iuliia Zhadko was defendant Richard Ayvazyan's alias."); Palmerton Decl. ¶ 3 ("By August 2020 (two months prior to the Miami stop) I had made the initial connection that Iuliia Zhadko was a synthetic identity being used by Richard Ayvazyan.").

The Government had strong evidence to support that conclusion.  Iuliia Zhadko had applied for numerous PPP and EIDL loans.  *See* GEXs 6.l, 6.j, 2.l, 6.q, 6.p, 6.s, 2.p.  These applications were fraudulent.  For example, in June 2020, the Government had subpoenaed documents related to Timeline Transport, including loan applications, documents from government agencies, and bank records.  *See* Fenton Decl., Ex. 2.  Those documents demonstrated that Zhadko had submitted a fraudulent EIDL loan application for Timeline Transport, and the loan was deposited into a Radius Bank account in the name of Timeline Transport, the sole signatory of which was Zhadko.  Palmerton Decl. ¶ 1.

The Radius Bank records showed $110,000 of fraudulently obtained PPP funds being wired to Encore Escrow, and records from Encore Escrow subpoenaed in July 2020 showed that the $110,000 was used for a portion of a down payment on a house located at 4910 Topeka Drive.  *Id.*  The house at 4910 Topeka was purchased in the name of Ayvazyan and Terabelian.  *Id.*

Similarly, Iuliia Zhadko submitted fraudulent PPP loan applications to Newtek Small Business Finance, and that loan file was requested in July 2020.  *See* Fenton Decl., Ex. 2.  The Newtek funds were deposited into the same Radius Bank account belonging to Timeline Transport and Iuliia Zhadko.  Funds in that same account were used by Ayvazyan to purchase watches from Gentleman Timepieces.  *See* GEX 115; *see also* Palmerton Decl. ¶ 2.

This flow of funds on its own raises a highly reasonable inference that Ayvazyan was using the Zhadko identity. Specifically, it is reasonable to infer that the person receiving the benefits of fraudulent PPP and EIDL loans submitted in Zhadko's name is the same individual who is actually submitting the fraudulent PPP and EIDL applications in Zhadko's name.

That inference was confirmed by documents produced by Gentleman Timepieces and Encore Escrow. Those documents were requested in July 2020. *See* Fenton Decl., Ex. 2. Gentleman Timepieces informed Palmerton that the wires from Timeline Transport and Zhadko were payments for a watch purchased by Ayvazyan. Palmerton Decl. ¶ 2. Gentleman Timepieces also provided text messages in which Ayvazyan provided his real driver's license. *Id.*

Similarly, the Encore Escrow documents include correspondence in which Ayvazyan forwards an email that he received from Bank of America confirming that the bank had transferred $65,000 to Encore Escrow. Palmerton Decl., Ex. A. In forwarding that email, Ayvazyan states as follows: "This one went through for 65k. The other one for 110k I don't have confirmation yet. *I will send that over as soon as I get it.*" *Id.* (emphasis added). The inference is clear: *Ayvazyan* will send the "other one for 110k" and, after *he* receives the confirmation, *he* will forward it to Encore Escrow. In other words, when "Zhadko" wired $110,000 to Encore Escrow, it was reasonable to infer that Ayvazyan was controlling the Zhadko identity and account.

Indeed, internal emails confirm that is precisely what the Government concluded. For example, on August 4, 2020, Palmerton emailed his colleagues and stated as follows: "I think I found out the identity of one of our subjects. I just received partial information from Encore Escrow in regards to the wire transfer they received in the name of Iuliia Zhadko/ Timeline Transport. There is an email discussion with a Richard Ayvazyan discussing the $110,000 wire as well as another from BoFA for $65K." Palmerton Decl., Ex. B.

Similarly, on August 5, 2020, André emails his colleagues and explains that "I just spoke with Justin. It looks like Richard Ayvazyan was also the one who purchased expensive watches from Gentleman Timepieces in Texas using PPP funds." Fenton Decl., Ex. 4. And on August 19, 2020—when investigators discovered that Iuliia Zhadko had purchased another house— Palmerton emailed his colleagues and stated "[l]ooks like *Richard* may have purchased another house." Palmerton Decl., Ex. G (emphasis added).

In light of the foregoing, the Court finds by a preponderance of the evidence that, prior to the Miami stop, the Government had already concluded that Ayvazyan was using the Zhadko identity. Based on the above evidence, that conclusion was more than reasonable. And, of course, before ever learning from customs that Ayvazyan's phone contained an image of a

Zhadko driver's license, the Government learned that Ayvazyan was carrying credit cards belonging to Zhadko.[56]

Moreover, to the extent the Government considered customs' oral communication about a Zhadko driver's license on Ayvazyan's phone as additional evidence of Ayvazyan's use of the Zhadko identity, the Government has still met its *Kastigar* burden.  This is because there is a substantial prior independent source that the Government had already used to reach the same conclusion: the Government's investigation prior to the Miami stop, and, specifically, the flow of funds described above, the records from Gentleman Timepieces and Encore Escrow, and the multiple physical credit cards in Zhadko's name.[57]  *See supra* at 51–52.

---

[56] The Government established, by a preponderance of the evidence, that members of the investigative team learned about the physical cards *before* learning about the contents of the phones.  Both Fenton and Palmerton credibly testified to that effect.  *See* July 28 Tr. at 89:3-90:17, 190:11-191:7 (Fenton explaining he learned of phones' contents after midnight); *id.* at 197:13-17 (Fenton explaining that delay in learning about text messages was "because it took some time for CBP to open those phones and look at them.  I believe it took several hours for them to do that, which is why they were working late into the evening"); July 29 Tr. at 12:6-10, 49:24-50:8 (Palmerton explaining he learned that phones were seized after learning about physical cards).

On cross-examination, Palmerton testified that he and Fenton had discussed the timeline of events leading up to the probable cause arrest.  Palmerton testified that Fenton began the conversation by asking "when we did the stop, what was the timeline, what do you recall from that day?  Like, when did they discuss the credit cards versus the phones?" *Id.* at 50:15-21.  Palmerton stated that Fenton said he was asking those questions because there was a "concern about what the timeline of evidence was."  *Id.* at 50:22-24.

To the extent Defendants argue that this conversation between Fenton and Palmerton undermines either witness's credibility, the Court rejects that argument.  It is clear from context that Fenton was simply asking what Palmerton recalled from the October 19 stop because Defendants' counsel had focused on the timeline.  Indeed, moments before the above testimony, Palmerton explained that Fenton simply "asked what my recollection was of that day, and I said basically what the timeline was.  And it was – it was a hectic day, and it was some time in the evening receiving a call from CBP letting me know that they had stopped Ms. Terabelian and Mr. Ayvazyan, found credit cards, and then we had a subsequent call where they discussed the phones.  He was just asking what my recollection was of the timeline."  *Id.* at 50:1-8.  Palmerton had also testified that the conversation he had with Fenton was "nothing substantive, nothing related to his testimony."  *Id.* at 48:23-49:1.

[57] For similar reasons, any use of the Zhadko driver's license to "confirm" Ayvazyan was Zhadko was harmless.  This is because, by August 2020, the Government had already concluded that Ayvazyan was using the Zhadko identity, and the Government discovered multiple physical credit cards in Zhadko's name on Ayvazyan's person. *See supra* at 50–53.  In other words, absent the Zhadko driver's license, the Government would *still* have confirmed that Ayvazyan was using the Zhadko identity.  Accordingly, the Government's knowledge or use of that driver's license in support of that theory was "so unimportant and insignificant and had so little, if any, likelihood of having changed the result of the proceeding that it may be deemed harmless."  *Ponds*, 454 F.3d at 329.

    **b.**  *The Government Developed its Theory that Terabelian Was Using the Kauichko Identity Before Customs' Oral Communications.*

  At the evidentiary hearing, Fenton testified that, prior to the Miami stop, he believed that Terabelian was one of the conspirators using the Kauichko identity. *See generally* July 28 Tr. at 171:24-185:20 (Fenton explaining evidence leading to conclusion Terabelian was using Kauichko identity); *see also id.* at 185:13-17 ("Q: So you would have actually indicted Mary Terabelian based on [evidence acquired prior to October 20th, 2020] alone as being someone who actually assumed the identity of Victoria Kauichko; is that correct?  A: Yes . . . .").[58]  At the hearing, Terabelian's counsel argued that this assertion was not credible and that, prior to the Miami stop, the Government lacked evidence tying Terabelian to the Viktoria Kauichko identity. *See* July 29 Tr. at 164:2-12.

  The Court reviewed the evidence Fenton discussed to determine whether he was credible when he asserted that, prior to the Miami stop, he had already concluded Terabelian was one of the conspirators using the Kauichko identity.  The Court's inquiry is not whether Fenton was *correct* in reaching that conclusion.  Rather, the inquiry is whether he is *credible* when he says he did so.  And Fenton's credibility on that issue turns on whether it was reasonable for him to conclude that Terabelian was using the Kauichko identity.

  Having reviewed that evidence, the Court concludes Fenton's testimony on this issue was credible and reasonable.  Specifically, the flow of funds, the reasonable inferences Fenton made about Terabelian's employment and Kauichko's sex, and Terabelian's criminal history all support the reasonable conclusion that Terabelian was using the Kauichko identity.

  The most important evidence is the flow of funds.  For example, on July 8, 2020, an entity associated with the Kauichko identity, Fiber One Media, transferred $25,000 to Terabelian's *personal* bank account.  *See* GEX 89; *see also* Fenton Decl., Ex. 34 (identifying source of GEX 89 as information first requested in August 2020); Fenton Decl., Ex. 2 (log of requests for information showing request propounded to Bank of America in August 2020).

  As another example, records for a Wells Fargo account belonging to Kauichko show that approximately $150,000 in fraudulently obtained SBA funds were transferred into the account in late May.  *See* GEX 88; *see also* Fenton Decl., Ex. 34 (identifying source of GEX 88 as information requested in September 2020); Fenton Decl., Ex. 2 (log of requests for information

---

[58] The Government did not believe Terabelian was the *only* person using the Kauichko identity.  Rather, Fenton repeatedly explained that he believed Terabelian was one of several conspirators (including Ayvazyan) using the identity to perpetrate the fraud.  *See* July 28 Tr. at 183:25-184:8, 186:12-19.

showing request propounded to Wells Fargo in September 2020).  In early July, that account also received approximately $75,000 from "Fiber One Media Viktoria Kauichko."  *See* GEX 88.

The Kauichko-Wells Fargo account records revealed that, from June through August, a debit card linked to the account was regularly used at jewelry stores (*e.g.*,  "Gold Craft Jewelry" and "Picadilly Jewelers"), high-end retail and department stores (*e.g.*, Saks Fifth Avenue, Bloomingdale's, Nordstrom's, and Anthropologie), and furniture stores (*e.g.*, Restoration Hardware and Italy 2000).  *See generally* GEX 88.  The Kauichko card was also used at "Polish Me Pretty," a name that sounds associated with cosmetics or women's products.  *See id.* at 35.

Fenton credibly explained that he believed Terabelian was making these purchases because they were consistent with purchases made by a female homemaker.  First, Fenton reasonably[59] inferred that Terabelian was not employed.[60]  Specifically, Fenton credibly testified that, "[w]hen we looked at her bank records, typically what we would see if somebody is employed is that they would receive a pay stub, that they would receive checks from ADP or other payroll processors.  We saw no evidence of that.  All we saw was money coming in from illegitimate sources . . . spent in and around where she lived."  July 28 Tr. at 174:14-21.  Fenton elaborated on *why* he was interested in Terabelian's employment status:

> I wanted to know if she was gainfully employed. I wanted to know what she did.  [W]e try to learn information from our subjects that is potentially relevant to the investigation. She lives in a 3.25 million mansion.  She is buying all these things.  We want to understand who she is.  And whether or not she is gainfully employed is relevant. Looking to see if she has a paycheck matters and where she gets that paycheck from. So that is something at that we learned.

*Id.* at 175:9-19 (cleaned up).  Fenton's interest in Terabelian's employment is corroborated by an October 21, 2021 outline he sent to Miami prosecutors preparing for the detention hearing. Based on that outline, Fenton had already reviewed bank records to look for evidence of paychecks.  *See* Fenton Decl., Ex. 14 at 49 ("There is no evidence that either defendant receives a regular paycheck through a payroll processor, as one typically sees when an individual is gainfully and lawfully employed.").

---

[59] The Court focuses on the reasonableness of this inference because, as noted above, the question is not whether Fenton *correctly* determined that Terabelian was using the Kauichko identity but, rather, whether it was reasonable for him to hold that opinion before the Miami stop (and, therefore, he was credible when he says he did).  *See supra* at 54.  Similarly, this specific inquiry is not whether Fenton correctly determined that Kauichko was a woman and that Terabelian was a homemaker; rather, the inquiry is whether it was reasonable for him to draw that inference.

[60] This inference was also correct.  Indeed, on escrow documents for the 4910 Topeka home—requested well in advance of the Miami stop, *see* Fenton Decl., Ex. 2—Terabelian listed her occupation for the last 16 years as "homemaker."  GEX 32.g.

Second, Fenton reasonably inferred that the person using the Kauichko identity was a woman. This was because, in the loan applications submitted in those names, the licenses for Zhadko contained pictures of men, but the licenses for Kauichko contained pictures of women. *See id.* at 177:4-17. Additionally, Kauichko's first name (Viktoria) is, traditionally, a female name. *See id.*

Given Fenton's reasonable inferences about the Kauichko's sex and Terabelian's employment status, it was certainly reasonable for him to conclude that Terabelian made the purchases described above on Kauichko's Wells Fargo debit card. Moreover, in light of those inferences, Fenton was credible when he testified that he believed the purchases described above (*e.g.*, jewelry, department stores, and furniture) are typically associated with women. *Id.* at 172:23-173:1. Of course, many men are also interested in jewelry, furniture, and shopping at department stores. But, given the context—*i.e.*, a female fake identity and a female suspect receiving large sums of illicit money—it was reasonable to assume that these particular purchases were made by Terabelian.

Another example regarding the flow of funds relates to a Bank of America account for Runyan Tax Service, of which Kauichko was the sole signatory. *See* GEX 1.p (Bank of America records for Runyan Tax Service account ending in 9700); *see also* Fenton Decl., Ex. 2 (log of requests for information showing request for information related to Runyan account ending in 9700 propounded to Bank of America in mid-September 2020). Specifically, a check for $8,476 was issued from that account in relation to Terabelian's father, Nazar Terabelian. *See* GEX 1.p at 60 (check with memo "For: Nazar Terabelian").

Finally, the funds from the fraudulent Runyan Tax Service loans were used to purchase a home at 834 Calle La Primavera in Glendale, California. Fenton Decl. ¶ 10; Palmerton Decl. ¶¶ 7–8. Although the house was purchased in the name of Iuliia Zhadko, Terabelian's sister Gohar was receiving mail there, *id.*, Ex. H,[61] and surveillance revealed that Gohar's ex-husband was also present at the home, *see id.* ¶ 6.

Terabelian argues that the above flow of funds was simply insufficient to conclude that Terabelian was using the Kauichko identity. The Court disagrees. Rather, the extensive flow of funds clearly shows that fraudulent PPP funds obtained using the Kauichko identity substantially benefited Terabelian or her family. Indeed, the Court concludes that the flow of funds alone was sufficient for Fenton to reasonably conclude that Terabelian was one of the conspirators using the Kauichko identity.[62]

---

[61] Palmerton learned this fact on October 7, 2020, *i.e.*, before the Miami stop. Palmerton Decl., Ex. H.

[62] It is worth noting that, in large part, Defendants' arguments rely on the same premise: the flow of funds is insufficient to infer culpability in this case. Specifically, in Defendants' view, the fact that Ayvazyan and Terabelian are receiving the benefits of fraudulent PPP and EIDL loans submitted on behalf of fake and synthetic

However, there was more than just the flow of funds.  Indeed, while the flow of funds provided a more direct link between Kauichko and Terabelian, there was circumstantial evidence as well.  First, Terabelian benefitted tremendously from the fraudulent activity.  All of the money in the Kauichko accounts came from PPP and EIDL fraud.  Terabelian lived in a home purchased substantially with the proceeds of PPP and EIDL fraud.  And untainted records for Terabelian's *personal* account showed a $150,000 transfer from Redline Auto Collision—*i.e.*, another entity that was already under investigation prior to the Miami stop.  *See* GEX 89 at 23; *see also supra* at 24 (discussing untainted inclusion of Redline Auto Collision loans in grand jury indictment).  Simply put, because Terabelian was reaping substantial benefits of fraud, it was reasonable to infer that she was sowing that fraud using the identity to which she was most directly linked: Kauichko.

Second, there was Terabelian's criminal history.  Terabelian had previously pleaded guilty to conspiring with Ayvazyan to commit bank fraud.  This further supported the inference that Terabelian was playing a substantial role in the instant conspiracy.  And, again, it was reasonable to infer that her role involved the identity to which she was most directly linked: Kauichko.

Finally, there was the physical credit card in Kauichko's name that was found on Terabelian during the Miami stop.  As discussed above, *see supra* at 53 n.57, the Government found that card several hours before it learned that Terabelian's phone contained text messages in which she purported to be Kauichko.

If anything from the Miami stop played a role in tying Terabelian to Kauichko, it was this untainted card, not the knowledge of the text messages.  That is confirmed by internal emails produced by the Government.  In those emails, André, Fenton, and other prosecutors correspond about a probable cause arrest of Defendants.  *See generally* Supp. Kastigar Docs. at 2–61.[63]  Fenton and André repeatedly refer to the credit cards discovered on Terabelian.  *See id.* at 45 (Fenton emailing probable cause synopsis to AUSA in Miami and stating "Terabelian was found to be in possession of contraband, including credit cards in the name of Viktoria Kauichko"); 54

---

identities and entities is insufficient to infer that Ayvazyan and Terabelian are controlling those fake and synthetic identities and entities.

This is unpersuasive.  The bedrock element of a fraud investigation is following the money.  That investigative method is particularly probative where, technically speaking, the individuals submitting the loans are fake identities.  Simply put, when loans are submitted by fake identities but flow to real persons, it is more than reasonable to infer that the real person is controlling the fake identity.

[63] Although these documents were originally produced *in camera*, the Government produced them to Defendants during the *Kastigar* hearing.  *See* July 29 Tr. at 166:13-167:8.

(Fenton emailing summary of matter to DOJ colleague and identifying Terabelian's possession of Kauichko card); 56 ("CBP just found a bunch of fake IDs and credit cards tied to fraudulent PPP loans in their possession and during a manual search of their phones."). By contrast, *nowhere* in those emails is there a reference to the text messages on Terabelian's phone. And prosecutors certainly could have referred to the text messages, because they did refer to the Zhadko driver's license on Ayvazyan's phone.[64]

Similarly, in an outline that Fenton sent to Miami prosecutors who were preparing for the detention hearing, Fenton references the physical Kauichko card in Terabelian's possession but does not reference the text messages. *See* Fenton Decl., Ex. 14 at 48–49.

In light of the foregoing, the Court finds by a preponderance of the evidence that, prior to the Miami stop, the Government had already concluded that Terabelian was using the Kauichko identity.[65] Based on the above evidence, that conclusion was more than reasonable. And before

---

[64] These emails include references to Ayvazyan's possession of a driver's license belonging to Zhadko. *See* Supp. Kastigar Docs. at 45, 54. This constitutes use of tainted information. However, the primary "use" of this evidence would be to support the theory that Ayvazyan was using the Zhadko identity. As discussed above, the Government had already developed that theory and had a prior independent source for that theory: the entirety of the Government's investigation prior to the Miami stop. *See supra* at 51–53. Moreover, even absent the Zhadko driver's license, the Government would still have believed that Ayvazyan was using the Zhadko identity, made a probable cause arrest of Ayvazyan, and indicted Ayvazyan. *See id.*; *see also infra* at 59–61 (finding Government's charging and indicting decisions unaffected by use of tainted information). Accordingly, the Government's knowledge or use of that driver's license in this correspondence was harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

[65] During the evidentiary hearing, Palmerton identified the same type of evidence discussed above when asked what he knew, prior to the Miami stop, about Terabelian's connection to the conspiracy. *See* July 29 Tr. at 55:7-56:22. Later, Palmerton was asked the following:

> Q:     [Y]ou were not asking CBP before Ms. Terabelian got to the airport for evidence by her of use of the Victoria Kauichko identity specifically, were you?
>
> A:     Not specifically, no.
>
> Q:     That is a theory that was adopted based on the Miami airport evidence; correct?
>
> A:     Yes. The credit card and the phone.

*Id.* at 66:19-67:1. To the extent Terabelian argues that this exchange establishes the investigative team had not concluded Terabelian was using the Kauichko identity until it learned of the text messages, the Court rejects that argument. While Palmerton himself may not have developed that opinion before the Miami stop, it is clear that Fenton already had on the basis of substantial untainted evidence. *See supra* at 54–59. Moreover, as Palmerton's answer makes clear, his opinion relied not only on the text messages but also on the credit card that he received first. *See supra* at 53 n.57. In other words, even absent the tainted text messages, it is more likely than not that Palmerton would have concluded that Kauichko was using the Terabelian identity. This is particularly true in light of the fact that Fenton had already reached that conclusion, and that internal emails amongst the prosecution team immediately following the Miami stop repeatedly refer to the physical card but not the text messages. *See supra* at 57–58. Accordingly, there was a prior independent source for Palmerton's opinion that Terabelian was using the Kauichko identity. *See Crowson*, 828 F.2d at 1432; *Nanni*, 59 F.3d at 1432.

ever learning from customs that Terabelian's phone contained text messages in which Terabelian purported to be Kauichko, the Government learned that Terabelian was carrying a credit card belonging to Kauichko.

Moreover, to the extent the Government considered the text messages as additional evidence of Terabelian's use of the Kauichko identity, the Government has still met its *Kastigar* burden. This is because there is a substantial prior independent source that the Government had already used to conclude that Terabelian was using the Kauichko identity: the Government's investigation prior to the Miami stop, and, specifically, the flow of funds described above, Terabelian's criminal history, and Terabelian's possession of the Kauichko card.[66] *See supra* at 54–59.

For similar reasons, any use of the knowledge of text messages on Terabelian's phone to confirm Terabelian's link to Kauichko was harmless. This is because, prior to the Miami stop, the Government had already concluded that Terabelian was using the Kauichko identity, and the Government discovered the Kauichko card on Terabelian's person. *See id.* In other words, absent the text messages, the Government would *still* have confirmed that Terabelian was one of the conspirators using the Kauichko identity and indicted her on that basis. *See* July 28 Tr. at 185:13-17 ("Q: So you would have actually indicted Mary Terabelian based on [evidence acquired prior to October 20th, 2020] alone as being someone who actually assumed the identity of Victoria Kauichko; is that correct? A: Yes . . . ."). Accordingly, the Government's knowledge or use of the text messages in support of that theory was "so unimportant and insignificant and had so little, if any, likelihood of having changed the result of the proceeding that it may be deemed harmless." *Ponds*, 454 F.3d at 329.

> c.    *The Government's Non-Evidentiary Use of Customs' Oral Communications Was Harmless Beyond a Reasonable Doubt.*

As noted above, customs orally communicated three pieces of information to the prosecution team: (1) Ayvazyan's phone contained an image of a driver's license belonging to Zhadko; (2) Ayvazyan's phone contained numerous other images of driver's licenses, credit

---

[66] Ultimately, the thrust of Terabelian's argument on this issue is that, "[w]ithout Terabelian's Miami phone contents, all Kauichko activities were plausibly attributable to other defendants." Opp. at 52. Even if that is true, it is irrelevant. Specifically, even if Kauichko's activities were plausibly attributable to other defendants, that does not mean those activities were not also plausibly attributable to Terabelian. To the contrary, as discussed above, it was both plausible and reasonable for Fenton to conclude that Terabelian was one of the conspirators using the Kauichko identity. *See supra* at 54–59. And, as noted above, the Government's theory was not that Terabelian was the *only* person using the Kauichko identity but, rather, that Terabelian was one of several conspirators (including Ayvazyan) using the identity to perpetrate the fraud. *See supra* at 54 n.58.

cards, and social security cards in the names of other persons; and (3) Terabelian's phone contained text messages in which Terabelian purported to be Kauichko. *See supra* at 21.

The Government used this information in three non-evidentiary ways. First, Palmerton mentioned the Zhadko driver's license at the detention hearing in Miami. Second, in the prosecution memorandum, André and Fenton referenced the Zhadko driver's license on the Ayvayzan phone and the Kauichko text messages on Terabelian's phone. Third, in the criminal complaint against Defendants and the application for a warrant to search Defendants' home, the Government referenced the Zhadko driver's license on the Ayvayzan phone and the Kauichko text messages on Terabelian's phone.

Each of these uses was harmless beyond a reasonable doubt. First, the reference to Zhadko's driver's license at the detention hearing was harmless. This is because the magistrate judge rejected the Government's arguments about flight risk and danger to the community and did not order detention. *See* Dkt. 310-6 (Detention Hearing Transcript) at 35:7-36:19. Moreover, the Government also included the untainted credit cards in its argument. *See id.* at 11:5-15, 19:10-17, 30:12-19. Accordingly, there is no likelihood that the reference to the Zhadko driver's license changed the result of the proceedings. *See Ponds*, 454 F.3d at 329.

Second, the references to the Zhadko driver's license and Kauichko text messages in the prosecution memorandum were harmless. *See* Fenton Decl., Ex. 15. Those references were brief. They were minor components of an eight-page factual summary (contained in a fourteen-page memorandum) that covered a substantial amount of incriminating evidence, including the fraudulent loan applications submitted by the conspirators; the conspirators' use of stolen and synthetic identities; the conspirators' use of fraud proceeds to purchase real estate, luxury watches, and precious metals; the premises searches conducted on November 5, 2020; the trash pulls and surveillance; and jail calls. *See id.* at 5–13. The Court is persuaded beyond a reasonable doubt that the Government would have proceeded to indict Defendants even absent the tainted references.

This is confirmed by the testimony of Fenton, who explains that they were already preparing to indict Defendants prior to the Miami stop and that the charges they considered against Defendants after that stop were the same charges they considered before the stop. *See* Fenton Decl. ¶ 32. This assertion is corroborated by the undisputed testimony of André, who explains that, prior to the Miami stop, the Government was already preparing to indict Defendants. *See* André Decl. ¶ 3. There is no likelihood that the reference to the Zhadko driver's license or Kauichko text messages in the prosecution memorandum altered the Government's charging or indictment decisions. Accordingly, those references were harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

Finally, the references to the Zhadko driver's license and Kauichko text messages in the criminal complaint and the application for a warrant to search Defendants' home were harmless. In its order resolving Defendants' motions to suppress, the Court explained why—even absent those references—the warrant was nevertheless supported by probable cause. *See* Dkt. 296 at 19–22. Indeed, that analysis did not even account for the untainted physical cards. *See id.* at 19 n.16.

For the reasons the Court discussed in that analysis—and considering the physical cards as well—there was ample probable cause to search the Topeka residence even absent the tainted references. That conclusion applies with equal force to the criminal complaint, because the Court's analysis in its prior order relies on the same information contained in the criminal complaint. In other words, the probable cause to support a search of Defendants' home (absent the tainted information) is the same probable cause that supports the criminal complaint. There is no likelihood that, absent the references to the Zhadko driver's license and Kauichko text messages, the criminal complaint or search warrants would not have issued. Accordingly, those references were harmless beyond a reasonable doubt.[67] *See Ponds*, 454 F.3d at 329.

> **d.  The Government Did Not Use Customs' Oral Communications to Choose to Search the Weddington and Canoga Homes.**

Defendants argue that the Weddington and Canoga homes "appear to have been added as search warrant targets based on tainted decisions." Opp. at 32.

The Court concludes, by a preponderance of the evidence, that the Weddington and Canoga homes were not added as search warrant targets based on tainted information. First, there is nothing about customs' oral communications that would have led the Government to search the Weddington and Canoga homes. The oral communications did not even reference those addresses.

Second, Fenton credibly explained that the decision to search those homes was based on other factors. For example, the Weddington home was searched because Artur Ayvazyan and Tamara Dadyan lived there together; the Weddington address was used on fraudulent PPP loan applications; and an October 8, 2020 trash pull at the Weddington home yielded evidence of PPP and EIDL fraud. Fenton Supp. Decl. ¶¶ 3–5. Similarly, the Canoga address was searched because it was the listed residential address for Anton Kudiumov and Viktoria Kauichko, and it was the address associated with over one dozen PPP and EIDL applications that were the subject

---

[67] The Court reaches the same conclusion with respect to the application to for a warrant to search the Weddington home. That application incorporated the criminal complaint against Terabelian and Ayvazyan. *See In the Matter of Search of [REDACTED]*, 2:20-mj-05286, Dkt. 1 at 58-75. However, as discussed in the order denying defendants Artur Ayvazyan's and Tamara Dadyan's motion to suppress, that application was also supported by probable cause even with tainted references excised. *See* Dkt. 297 at 2–6.

of the investigation.  *Id.* ¶ 7.  These reasons for searching the Weddington and Canoga homes are corroborated by an email from Palmerton to Fenton in which Palmerton identifies residential targets for search warrants and the basis for targeting those residences.  *Id.*, Ex. 1.

Accordingly, the Court concludes, by a preponderance of the evidence, that the Weddington and Canoga homes were not added as search warrant targets based on tainted information.

* * *

For the foregoing reasons, the Government has met its *Kastigar* burden as to non-evidentiary use of customs' oral communications.

2. **The Government Has Met its *Kastigar* Burden as to Non-Evidentiary Use of the 65 Photographs and 141 Photographs Sent to the Government on, Respectively, November 13, 2020 and February 2, 2021.**

As noted above, on November 13, 2020, Palmerton reviewed the photographs on the Miami phones and uploaded 65 of them to the Government's shared folder.  The photographs were of images of driver's licenses, social security cards, checkbooks, SBA loan applications, and handwritten notes.  Additionally, on February 2, 2021, customs sent the investigative team 141 photos of content on the Miami phones that customs took during the manual review on October 19, 2020.  The 141 photographs were similar to the 65 uploaded by Palmerton, but the 141 also included screenshots of text messages and contact information for various individuals.

The Government produced two charts focused on those 206 photos.  For each photograph, the Government either (1) asserts that it did not use the photo, or (2) identifies a prior independent source for the photo.  *See* Fenton Decl., Exs. 17, 28.

The Court will first discuss the two charts created by the Government, including Defendants' responses to those charts.  The Court will then discuss the specific instances in which agents and prosecutors used the 206 photos.

>            *a.*      ***The Government's Charts Regarding the 206 Photos.***

>                  i.      <u>Analysis.</u>

The Government's charts cover 206 tainted photographs that the prosecution team had access to.  For each photograph, the Government either (1) asserts that it did not use the photo, or (2) identifies a prior independent source for the photo.  *See id.*

The Court reviewed each photograph and each explanation by the Government.  Based on the corroborating evidence (*e.g.*, logs of requests for information) and the Court's familiarity with the record as a whole, the Court concludes, by a preponderance of the evidence, that the Government has met its *Kastigar* burden of establishing non-use or a prior independent source for nearly all of the 206 photos.  And, for those it did not, the Government's use was harmless beyond a reasonable doubt.  *See infra* at 69–75.

As to non-use, the primary reason the Court reaches that conclusion is the contents of the photos.  Specifically, the photos that the Government asserts it did not use for an investigative lead are photos depicting, for example, Manuk Grigoryan on a couch; general information about PPP loans from Reddit and lenders' websites; information (including personal identifying information) about entities and identities the Government was already aware of (*e.g.*, Timeline Transport, Manukyan Construction, Viktoria Kauichko, and Iuliia Zhadko); loans other than PPP and EIDL; information from the "About" section on an iPhone (*e.g.*, software version, serial number, IMEI, etc.); miscellaneous social media pages (*e.g.*, Instagram and Snapchat); cash; and miscellaneous identities (*e.g.*, Benigno Soto, Stepan Lytvin, Suzy Krboyan, Andriy Novoselskyy, and Norayr Vardanyan).  The Government's assertion that it did not investigate these photos is credible because the photos provide little to no valuable information, or they contain information the Government was already aware of.

Moreover, for the photographs containing phone numbers or email addresses, the Government identifies prior independent sources for some numbers and emails and, for others, asserts that it did not investigate that number or email.  That assertion is confirmed by the log of requests for information: there is no request for any of the numbers or emails for which the Government did not identify a prior independent source.  *See* Fenton Decl., Ex. 2.

The only photos containing relevant information that the Government asserts it did not use are photos from Terabelian's phone in which she corresponds, via text, with retailers and Richard Ayvazyan.  *See* Fenton Decl., Ex. 28 at 7–9, 18–21, 24–27, 29–30.  Those photos were sent to the prosecution team on February 2, 2021 and are relevant because they depict Terabelian's use of the Kauichko identity.  However, as discussed above, *see supra* at 54–59, the Government had already concluded well before February 2, 2021 that Terabelian was using the

Kauichko identity, particularly when purchasing items from retailers. Nothing about these messages provides anything but cumulative information in that regard and, accordingly, it is unlikely the Government needed to investigate leads based on those photos.

Accordingly, the Court is persuaded by a preponderance of the evidence that the Government did not use, for investigative leads, the above described photos.[68]

With regard to the photos for which the Government asserts a prior independent source, the Government identifies three types of prior independent sources: (1) information acquired on the basis of a subpoena or other request for information; (2) physical evidence seized during the searches of the conspirators' residences on November 5, 2020; and (3) digital devices seized during the searches of the conspirators' residences on November 5, 2020.

The Court reviewed the cited documents that the Government asserts constitute a prior independent source. *See* Fenton Decl., Exs. 1, 1.a, 2, 3, 8, 11, 25, 26, 35; *see also* GEXs 10, 10-13, 10-30, 10-31, 10-50, 10-51, 10-52, 10-66, 10-67, 10-68, 10-69, 10-70, 13.b, 16.b, 19.a, 19.b, 19.c, 19.d, 19.e, 19.f, 19.g, 54.b, 54.d, 76.a, 76.b. Each of these documents are either an identical copy of the tainted photograph or a document that provides the same information as the photograph. The Court finds, by a preponderance of the evidence, that the Government has satisfied its burden of identifying a prior independent source for the photos at issue. Accordingly, "the non-evidentiary purposes of trial strategy, etc." stemming from these photos "would seemingly have been developed anyway. Thus, any non-evidentiary use of the [photos] would have been inevitable and harmless in any regard." *Crowson*, 828 F.2d at 1432.

ii.     Defendants' Arguments Regarding the Charts.

Defendants submitted responsive charts in which Defendants argue, for each photo, why the Government has not met its *Kastigar* burden. Defendants' submission boils down to three arguments,[69] and the Court will address each in turn.

---

[68] For a handful of photos, the Government states that the information depicted in the photo was "not used in grand jury proceedings, trial, or to develop trial strategy." *See, e.g.*, Fenton Decl., Ex. 17 at 62. Although this statement does not consider non-evidentiary use, a review of the photos for which the Government makes this specific assertion makes clear that the photos are those that Massino used to identify additional loans. In other words, the Government has candidly acknowledged how it used those photos for investigative use. And, as discussed below, that use did not constitute a *Kastigar* violation because (1) there was a prior independent source for most of the loans or identities, and (2) the use was harmless beyond a reasonable doubt. *See infra* at 69–72.

[69] In addition to these three arguments, Defendants also argue that (1) the residences searched on November 5, 2020 cannot constitute a prior independent source because tainted information was used to obtain the warrants for those residences; and (2) the Tamara Dadyan phone (*i.e.*, 1B21) is tainted because Fenton used the contents of the Zhadko phone (*i.e.*, 1B123) to prioritize filtering the Tamara Dadyan phone. The Court rejects these arguments for the reasons discussed above. *See supra* at 61, 62 (finding November 5 search warrants untainted); 43–47 (finding phone 1B21 untainted)

***First***, Defendants argue that the Government's proffered prior independent source doesn't account for a particular hypothetical use of a photograph. *See, e.g.*, KX1 at 32 ("This evidence, however, did not address the evidentiary value of a driver's license in Zhadko's name being located on a phone registered to Zhadko that was found in Ayvazyan's possession. The government does not identify how its independent sources provided confirmation of Ayvazyan's access to the Zhadko identity.").

The Court rejects this argument because the Government need not identify a prior independent source for every conceivable non-evidentiary use of a photograph. As discussed above, requiring the Government to negate all conceivable uses ignores the focus of the *Kastigar* inquiry: the Government's *actual use* of tainted information. *See supra* at 6–10. Indeed, "[t]he government is not required to negate all abstract 'possibility' of taint. Rather, the government need only show by a preponderance of the evidence that, in fact, the evidence used was derived from legitimate, independent sources." *Byrd*, 765 F.2d at 1529; *see also Crowson*, 828 F.2d at 1431–32 (citing favorably to *Byrd* and declining to "negat[e] the plain import of *Kastigar* that . . . the Fifth Amendment allow[s] the government to prosecute using evidence from legitimate independent sources"). Thus, the Government must show that, if it used tainted information to accomplish a certain non-evidentiary task, it had a prior independent source that would have allowed it to accomplish that same non-evidentiary task. *See supra* at 6–10.

Below, the Court will address each way in which the Government used the 206 photographs and explain why either (1) there was a prior independent source that allowed the Government to accomplish the same investigative task, or (2) the Government's use was harmless beyond a reasonable doubt. *See infra* at 69–75. Accordingly, the Court rejects Defendants' argument that the Government's independent sources must account for all conceivable uses.

Moreover, it is worth noting that, in many instances, the Government has met even Defendants' incorrect burden of satisfying other conceivable uses. For example, Defendants repeatedly argue that the Government's independent sources do not provide confirmation of Ayvazyan's access to, or control of, the Zhadko identity. *See, e.g.*, KX 1 at 32. To the contrary, the Government had a significant prior independent source for Ayvazyan's access to, or control of, the Zhadko identity: the Government's investigation prior to the Miami stop, and, specifically, the flow of funds described above, the records from Gentleman Timepieces and Encore Escrow, and the multiple physical credit cards in Zhadko's name. *See supra* at 51–53.

Similarly, in regards to an image containing information for Viktoria Kauichko, Fiber One Media, and Journeyman Construction, Defendants argue that the Government "does not account for another significant evidentiary and investigative use: the tainted image ties Viktoria Kauichko, Journeyman Construction, and Fiber One Media together on an image located on a

phone that was found on Richard Ayvazyan's person.  This image provided critical connections between the government's investigation targets."  KX1 at 58.  Yet, this critical connection was clear from basic facts: Viktoria Kauichko submitted fraudulent loan applications on behalf of both Journeyman Construction *and* Fiber One Media.  *See* GEXs 3.e, 5.c.  The same email address (vkauichko89@gmail.com) was used on both applications.  *Compare* GEX 3.e at 10 *with* GEX 5.c at 21.  The same phone number (818-485-7163) was used on both applications.  *Id.*  Kauichko's personal address is the same on both applications: 6150 Canoga Ave.  *Id.*  Finally, Ayvazyan provided that email address (vkauichko89@gmail.com) to Gentleman Timepieces in text messages, *see* GEX 37.b at 1, and, as discussed below, there was significant evidence linking Ayvazyan to the use of the Canoga address, *see infra* at 79–80.

As another example, Defendants argue that, with regard to the photos depicting messages from Terabelian's phone, the Government has not identified a prior independent source for its theory that Terabelian was using the Kauichko identity.  To the contrary, the Government had already developed that theory prior to the Miami stop, *see supra* at 54–59, and the Government did not receive the photos depicting messages from Terabelian's phone until over three months later.

As a final example, Defendants argue that, with regard to an image depicting a wire transfer to Gentleman Timepieces, the Government's independent source is insufficient: "[O]ne of the government's critical arguments at trial was that, when Anthony Farrer was texting with the phone number associated with the Zhadko phone, he was actually texting with Ayvazyan.  Finding this tainted image on the Zhadko phone in Ayvazyan's possession[70] thus had *critical* evidentiary and investigative use."  KX1 at 68 (emphasis in original).  This assertion ignores other critical evidence establishing that Ayvazyan was the individual texting Farrer.  That evidence includes, but is not limited to, (1) a text message from Ayvazyan to Farrer in which Ayvazyan sends an image of his real driver's license; (2) Farrer knew who Ayvazyan was but did not have records for Zhadko; and (3) Palmerton witnessed an individual picking up a watch shipped to a FedEx store by Farrer and later learned, based on FedEx records, that the individual was Ayvazyan.  *See* Palmerton Decl. ¶¶ 2–3.

The Court need not continue with examples because, as noted above, Defendants' proposed burden is not supported by the law.  For that reason, the Court concludes that the Government need not identify a prior independent source for every conceivable non-evidentiary use of a photograph.

---

[70] Defendants repeatedly refer to the critical fact of possession as a potential evidentiary use.  But the *reason* possession is relevant is that it constitutes evidence that the person possessing the information about the identity or entity is also controlling that identity or entity.  As discussed throughout this order, there is ample untainted evidence establishing Defendants' control and use of the fake and synthetic identities and entities at issue in this case.

**_Second_**, Defendants repeatedly argue that the Government "does not account for how [the photos] were 'used' between October 20 and the time it took the government to gain access to and review the phone seized on November 5, 2020 (which we understand was not reviewed by the government until after April 26, 2021)." *See, e.g.*, KX2 at 26.

To the contrary, the Government does exactly that. Specifically, each of the declarants explain how (if at all) they used the 206 photographs. And, as discussed below, the Court finds that either (1) there was a prior independent source that allowed the Government to accomplish the same investigative task, or (2) the Government's use was harmless beyond a reasonable doubt. *See infra* at 69–75.

**_Third_**, and similarly, Defendants argue that the digital devices the Government seized on November 5, 2020 cannot constitute a prior independent source because the Government could not have reviewed those devices until April 28, 2021. *See* Opp. at 29.

The Court rejects this argument for two reasons. First, it is not supported by the law. As explained above, the term "prior independent source" encompasses evidence that the Government would have inevitably been able to use to take the same investigative steps. *See Crowson*, 828 F.2d at 1432 ("[I]f the government can prove a prior, independent source for its evidence, then the non-evidentiary purposes of trial strategy, etc., *would seemingly have been developed anyway*. Thus, any non-evidentiary use of the immunized testimony *would have been inevitable* and harmless in any regard.") (emphasis added); *Nanni*, 59 F.3d at 1432 ("In determining whether the immunized testimony could have influenced the government's decision to pursue its line of investigation, if it appears that that pursuit could have been motivated by both tainted and independent factors, the court must determine whether the government *would have taken the same steps* entirely apart from the motivating effect of the immunized testimony.") (emphasis added) (quotations omitted). Because the term encompasses evidence that the Government will inevitably use, it makes sense to consider acquired after the Government's exposure to tainted information.

Indeed, in *Nanni*, the Second Circuit expressly stated as follows:

> While the strongest proof that the information came from an independent source would be evidence that the government was in possession of independent leads or evidence prior to the giving of the immunized testimony, evidence that was obtained subsequent to the agent's exposure to the immunized testimony can suffice to support a finding that the information was derived from independent sources.

*Id.* (citations omitted). The Second Circuit provided an example in which a defendant gave immunized testimony about firearms trafficking to local authorities, who forwarded the

information to a federal agent.  *See id.*  Later, that same federal agent received additional, untainted information about the defendant's firearm trafficking, and the federal agent began investigating the defendant.  *See id.*  The court explained that, even if the first set of immunized testimony was used by the federal agent to initiate investigation, there was no *Kastigar* violation. This was because the later, additional information "alone would have caused [the federal agent] to undertake his investigation," and the immunized testimony was therefore "irrelevant since it would not have saved the defendant from federal investigation."  *Id.* (quoting *United States v. Fisher*, 700 F.2d 780, 784 (2d Cir. 1983)).

Here, the prosecution team did not have access to the contents of the digital devices seized during the November 5, 2020 searches until approximately April 28, 2020.  That was a month and a half before trial—*i.e.*, the Government had a substantial amount of time to investigate the contents of the phones.  Indeed, within two weeks of receiving the contents of the Dadyan phone, the Government was closely reviewing the text messages between Ayvazyan and Dadyan.  *See* Ahn Decl., Ex. A.

Given the thoroughness of the Government's investigation, *see supra* at 15–21, the Court is persuaded, by a preponderance of the evidence, that the Government would have taken at least some of the same investigative steps using the November 5 digital devices that it took using the 206 photographs.  *See Crowson*, 828 F.2d at 1432; *Nanni*, 59 F.3d at 1432.  And, for those it could not have taken in time (*e.g.*, the use of photographs in support of filings or proceedings that occurred before April 28, 2021), the use was harmless beyond a reasonable doubt.  Indeed, as discussed below, *every single use* of those photos (regardless of whether there was a prior independent source) was harmless beyond a reasonable doubt.[71]

\* \* \*

---

[71] In other words, even if the November 5 digital devices are not a prior independent source for any of the 206 photos, the Government has met its burden.

This reflects a broader point: the Government had built nearly its entire case well before it received the Cellebrite report for *any* digital device.  That is confirmed by the Court's grand jury and trial analysis above, in which the untainted digital devices seized from the November 5 searches were not referenced once (*i.e.*, they were not a prior independent source for anything).  *See supra* at 23–42.  Indeed, virtually all of the trial evidence (aside from the untainted digital devices themselves) either (1) was requested before the Government had Cellebrite reports for *any* of the digital devices, including the Miami phones, or (2) stemmed from the physical evidence seized during the November 5 searches.  This corroborates Fenton's testimony that "the case relied heavily on following the money," Fenton Decl. ¶ 58, and his testimony that, by February 2021, the investigation was largely complete, and the Government was focused on superseding and preparing for trial, *see* July 28 Tr. at 70:24-71:8.

For the foregoing reasons, the Court concludes, by a preponderance of the evidence, that the Government has met its *Kastigar* burden of establishing non-use or a prior independent source for each of the 206 photos.

The Court will now discuss the specific instances in which the Government used the 206 photographs for non-evidentiary purposes.

### b.      The Government Has Met its Burden as to its Use of the 65 Photos Uploaded by Palmerton on November 13, 2020.

The Court reviewed the Government's witnesses' declarations and supporting exhibits. The Court also reviewed those witnesses' testimony from the evidentiary hearing.  In light of that review, the Court concludes that the Government used the 65 photos four times.  Each of those uses was harmless beyond a reasonable doubt.  The Court will address each in turn.

i.      Massino's Use of the 65 Photos to Identify Ten Additional Loans.

After Palmerton uploaded the 65 photos to the Government's shared folder, Massino reviewed the photos and identified some entities and identities that he was unfamiliar with. Massino Decl. ¶ 3.  Massino then searched SBA databases to identify PPP or EIDL loans associated with those identities and entities.  *Id.*  Massino identified the following loans: (a) four loans for "New World Trading Empire Inc." or "New World Empire Inc." submitted by "Misak Arakelyan" (b) one loan for "BART1CO Inc."; (c) one loan for "KGG Home" submitted by "Gagik Khachatryan"; (d) one loan for "Turcan Tours" submitted by "Lilia Turcan"; (e) one loan for "Camilo Amaya"; (f) one loan for "Annandale Nursery"; and (g) one loan for "Long Canyon Nursery."  *Id.*

Massino requested the files for those ten loans from the SBA.  *Id.* ¶ 4.  Approximately two months later, Massino interviewed the owner of Long Canyon Nursery, Chris Kelly, who explained that he never submitted the loan Massino discovered.  *Id.* ¶ 7.

The Court concludes that the Government had a prior independent source for nine of the ten loans.  In fact, four of the ten loans have two prior independent sources from November 5, 2020: (1) the physical evidence seized at the Weddington home, and (2) the Dadyan phone seized at the Weddington home.

- **BART1CO Inc.:**  (1) A handwritten note containing BART1CO's bank account information was discovered at the Weddington home; and (2) an email relating to the BART1CO PPP loan was discovered on the Dadyan phone.  *See* Fenton Decl., Exs.

19.b, 19.c.

- **KGG Home and Gagik Khachatryan:** (1) Khachatryan's California driver's licenses, bank records, social security card, and PPP application were discovered at the Weddington home; and (2) an image similar to the one with which Massino identified Khachatryan from the 65 photos is on the Dadyan phone. *See id.*, Ex. 19.d; Ahn Decl., Ex. F at 8–15.

- **Turcan Tours and Lilia Turcan:** (1) Personal identifying information for Lilia Turcan and correspondence related to an EIDL application in her name were discovered at the Weddington home; (2) the Government first requested information about Lilia Turcan on November 5, 2020 (*i.e.*, before Massino saw the 65 photos); and (3) the Dadyan phone contains the same image of Turcan's driver's license that is contained on the 65 photos. *See* Fenton Decl., Exs. 2, 19.e; Ahn Decl., Ex. F at 18.

- **Long Canyon Nursery:** (1) Handwritten notes discovered at the Weddington home refer to Long Canyon Nursery; and (2) the Dadyan phone contains text messages about the Long Canyon Nursery loan. *See id.* at 1–4; Fenton Decl., Ex. 19.g.

Another five of the ten loans have, as a prior independent source, the Dadyan phone. With regards to the New World Trading loans submitted by Misak Arakelyan, the Dadyan phone contained a fake Gusto payroll report for that company, an email address for Arakelyan, and text messages and images about the New World Trading loans. *See id.*, Ex. 19.a; Palmerton Decl., Ex. M; Ahn Decl., Ex. F at 5–7. And, as for the Annandale Nursery loan, the same image that led Massino to that loan was discovered on Ayvazyan's phone seized at the Topeka residence on November 5, 2020. *See* Fenton Decl., Ex. 19.f.

To the extent Defendants argue that the Government would not have been able to use the phones seized at Topeka or Weddington to discover these loans, the Court rejects that argument. The Government had access to the contents of the Dadyan phone by April 28, 2021. At that point, over a month and a half remained until trial. Moreover, within two weeks of receiving the contents of the Dadyan phone, the Government was closely reviewing the text messages between Ayvazyan and Dadyan. *See* Ahn Decl., Ex. A. Given how quickly the Government was reviewing the messages, *see id.*, and in light of the thoroughness of the Government's investigation, *see supra* at 15–21, the Court concludes it is more likely than not that the Government would have inevitably identified these nine loans on the basis of the contents of the Dadyan phone. *See Crowson*, 828 F.2d at 1432; *Nanni*, 59 F.3d at 1432.

There is one loan out of the ten for which the Government concedes it lacks a prior independent source. That is the loan for Camilo Amaya.

70

The Court concludes that Massino's use of the 65 photographs to identify the Camilo Amaya loan was harmless beyond a reasonable doubt.  Indeed, the Court concludes that Massino's use of the 65 photographs to identify all ten additional loans was harmless beyond a reasonable doubt.  This is because the Government's use of those loan files and related records was inconsequential.

Massino interviewed a single witness in relation to one of the loans.  Massino Decl. ¶ 7. That witness did not testify before the grand jury or at trial.  Fenton Decl. ¶ 41 n.20.  Aside from that interview and the requests for loan files and related records, no investigative action was taken with regards to any of the ten loans.

Moreover, the Government did not reference any of the ten loans at trial,[72] directly or indirectly.[73]  And none of the ten loans were presented directly to the grand jury.  Instead, they were part of the overall number of loans in the conspiracy (151) that was briefly referenced during the grand jury proceedings that resulted in the first superseding indictment.  *See supra* at 29–30.  As discussed above, that reference was harmless beyond a reasonable doubt.  *See id.* Indeed, four of the ten loans would likely have been identified prior to the grand jury proceedings based on physical evidence seized at the Weddington home.  *See supra* at 69–70.

Ultimately, these loans were simply 10 unindicted loans of little consequence (at least in terms of the investigation and prosecution) out of a broader conspiracy of 151 loans.  Aside from

---

[72] During the evidentiary hearing, Defendants suggested that the decision to *not* use tainted information constitutes a *Kastigar* violation.  *See* July 29 Tr. at 220:17-221:3. Defendants effectively argue that a decision to proactively avoid a Fifth Amendment violation is itself tainted and violates the Fifth Amendment.

The Court rejects this argument.  The dicta Defendants rely on from *Mapelli* is just that—dicta.  *See* 971 F.2d at 288 ("The prosecutors' decision not to cross examine Mrs. Mapelli might well have been made on the basis of her compelled testimony.").  *Mapelli* never held that a decision to cautiously *not* use tainted information constitutes a prohibited use.  Such a rule would make it impossible for the Government to meet its burden and lead to the very result the Supreme Court rejected in *Kastigar*: transactional immunity.  Moreover, even assuming a decision to not use tainted information out of caution is itself tainted (it is not), that decision would almost certainly be harmless beyond a reasonable doubt.  After all, if no use is made of the tainted information, then the tainted information could not have contributed to the verdict obtained or had any effect on the proceedings.

Finally, the Court notes that Defendants' broader reliance on *Mapelli* is unavailing because of a critical distinction between that case and the instant one.  Specifically, in *Mapelli*, the Government made *no effort whatsoever* to meet its *Kastigar* burden; instead, it argued that, as a matter of law, the prosecutors did not need to recuse themselves. *See id.* at 287–88 ("Since the government presented no evidence, it necessarily failed to meet its Kastigar burden of proof.").  The district court also held no evidentiary hearings regarding the *Kastigar* issue.  *See id.* at 288.  Here, by contrast, the Government presented over 2,000 pages of declarations and supporting exhibits, and the Court held a 2-day evidentiary hearing at which Defendants had the opportunity to cross-examine every Government witness.

[73] Defendants indirectly referenced the ten loans by repeatedly referring to the 151 loans in the conspiracy.  *See, e.g.*, June 22 a.m. Tr. at 78:12-17 (asking witness to confirm 151 loans in superseding indictment); June 24 p.m. Tr. at 17:24-18:2, 39:4-9, 45:2-6, 92:7-11 (repeated references during closing argument to 151 loans in superseding indictment).

the harmless reference to 151 loans before the grand jury, nothing about this case would have been different absent Massino's identification of the ten loans.

Under these circumstances, the Court concludes that, regardless of whether there was a prior independent source for the ten loans, there is no likelihood that Massino's use of the 65 photographs to identify the ten loans changed the result of the proceedings. Accordingly, that use was harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

### ii.     Clark's Use of the Roy DuBos Photo.

Roy DuBos is a notary who purportedly notarized documents used by the conspirators to purchase a property in Palm Desert, California. Clark Decl. ¶ 21. During an interview of DuBos on January 13, 2021, Clark presented DuBos with one of the 65 photographs from the Miami phones: a screenshot of DuBos's profile on a website for notaries. *Id.*

This use was harmless beyond a reasonable doubt. The Government was well aware of Roy DuBos prior to November 13, 2020 (*i.e.*, the date Palmerton shared the 65 photos with the investigative team). Specifically, Clark first learned of DuBos during a trash pull at the Weddington home in early October 2020. *Id.* Documents requested in late October 2020 from the escrow company connected to the Palm Desert property include documents purportedly notarized by DuBos. *See* GEX 31.h at 15; *see also* Fenton Decl., Ex. 2 (October 28, 2020 request for information from CV escrow). Finally, real estate documents purportedly notarized by DuBos were discovered at the Weddington home on November 5, 2020. Fenton Decl., Ex. 26 at 1.

Moreover, presenting DuBos with the photo during the interview had no likelihood of changing the result of the proceeding. DuBos was never called as a witness at trial. He was not presented to the grand jury. Clark's presentation of the photo to DuBos was like "a leaf dropping unobserved in a deep forest." *Gallo*, 859 F.2d at 1091 (Van Graafeiland, J., concurring). Accordingly, Clark's presentation of the photo to DuBos was sufficiently "unimportant and insignificant" to be deemed harmless. *Ponds*, 454 F.3d at 329.

### iii.     Clark's Use of 2 California Driver's Licenses.

In advance of the first superseding indictment, Clark wrote a factual summary of proposed charges against Arman Hayrapetyan. Clark Decl. ¶ 11 n.1. Clark provided that summary to prosecutors who were preparing the first superseding indictment, including Faerstein. *See id.*; *see also* Faerstein Decl. ¶¶ 26–27. The factual summary included a reference to two of the Zhadko driver's licenses contained in the 65 photographs. *See id.*; Clark Decl. ¶ 11 n.1; *see also* Fenton Decl., Ex. 17 at 30, 32.

This reference was harmless beyond a reasonable doubt. The factual summary related to charges for Arman Hayrapetyan, who is not a party to the *Kastigar* proceedings. The reference to the two Zhadko driver's licenses was not included in the prosecution memorandum supporting the first superseding indictment. *See* Faerstein Decl. ¶ 28; *see also* Fenton Decl., Ex. 32. And the Government was already firmly convinced that Ayvazyan was using the Zhadko identity. *See supra* at 51–53. The reference to the two driver's license was insignificant and had no likelihood of changing the result of the proceedings. Accordingly, the reference was harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

iv.    Faerstein's Use of 8 of the 65 Photos in Support of an *Ex Parte* Application.

On March 29, 2021, the Government filed an *ex parte* application to modify the protective order in this case. *See* Dkt. 219. In support of that application, Faerstein attached 8 photos from the 65 photos that Palmerton uploaded to the Government's shared drive. *See* Faerstein Decl. ¶ 15. Faerstein attached the photos to illustrate the Government's concern with allowing Ayvazyan access to the Zhadko identity. *Id.* ¶ 16.

There is no likelihood that the inclusion of the 8 photographs in the *ex parte* application changed the result of the proceedings. That is because the Court denied the Government's *ex parte* application. Accordingly, any use of the 8 photographs in support of the *ex parte* application was harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

* * *

For the foregoing reasons, the Court concludes that the Government has met its burden as to its use of the 65 photos uploaded by Palmerton on November 13, 2020.

**c.**    **The Government Has Met its Burden as to its Use of the 141 Photos Customs Sent to the Prosecution Team on February 2, 2020.**

The Court reviewed the Government's witnesses' declarations and supporting exhibits. The Court also reviewed those witnesses' testimony from the evidentiary hearing. In light of that review, the Court concludes that the Government used the 141 photos three times.[74] Each of those uses was harmless beyond a reasonable doubt. The Court will address each in turn.

---

[74] In this tabulation, the Court did not include mere exposure to the 141 photographs, which does not constitute a *Kastigar* violation. *See Crowson*, 828 F.2d at 1430 ("The focus of the inquiry under Kastigar is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.") (cleaned up). Specifically, the Court did not include (1) Ahn's exposure to general descriptions of the contents of the phones, *see* Ahn Decl. ¶¶ 5–7; (2) Faerstein's overview of the 141

73

i.      Paetty's Use of 17 of the 141 Photographs in Support of the
Government's Opposition to Defendants' Motion to
Suppress.

Paetty was responsible for responding to Defendants' motions to suppress related to the border stop.  Paetty Decl. ¶ 4.  In preparation for that motion, Paetty reviewed the 141 photographs customs sent to the Government on February 2, 2021.  *Id.* ¶ 6.  Paetty also emailed his colleagues a list of photographs that he was considering using as exhibits in support of the Government's opposition to the motion to suppress.  *Id.* ¶ 12; Faerstein Decl. ¶ 11.  Ultimately, Paetty attached 17 photos as "possible examples of digital contraband" in order to establish that the border search complied with *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).  Paetty Decl. ¶ 12.

Paetty's use of these 17 photos was harmless beyond a reasonable doubt.  The Court never reached the issue of whether the photos on Defendants' phones constituted "digital contraband."  *See* Dkt. 296 at 6 n.7 ("Because an objective inquiry establishes that the search was conducted for general law enforcement purposes, the Court need not address the parties' dispute regarding whether fake (or synthetic) third-party access devices—or images of those devices—constitute 'contraband' for the purposes of the border search exception.").  At no point did the Court consider the 17 photos in its analysis.  *See generally id.*  There is no likelihood that the 17 photos attached to the Government's opposition to the motion to suppress changed the outcome of that motion.  Accordingly, the Government's use of those 17 photos was harmless beyond a reasonable doubt.  *See Ponds*, 454 F.3d at 329.

ii.     Fenton's Two Uses of Some of the 141 Photographs in
Relation to Picadilly Jewelers and Jon Bradford.

Fenton used portions of the 141 photos on two occasions.

First, Fenton investigated the screenshots of text messages between Ayvazyan and Jon Bradford.  Fenton Decl. ¶ 45; *see also* Fenton Decl., Ex. 28 at 132–135.  In early February 2021, Fenton obtained a copy of an EIDL loan file that Bradford had submitted for a company called CBDEECOM LLC.  *Id.*  Fenton and the investigative team then requested information from CBDEECOM.  *Id.* ¶ 46.  Fenton reviewed CBDEECOM's document production, which included texts between Bradford and Ayvazyan.  *Id.*  Fenton thought the texts contained useful evidence.  *Id.*  April 24, 2021, he emailed Paetty and Faerstein to inform them that he was going to call Bradford's attorney to arrange an interview and subpoena Bradford for trial.  *Id.*  On April 26, 2021, at around 4:00 p.m., Fenton had a phone call with Bradford's attorneys to discuss the

---

photographs as he got up to speed on the case in February 2021, *see* Faerstein Decl. ¶¶ 5–6; and (3) Faerstein's creation of binders, for organizational purposes, that included the photographs, *see id.* ¶ 9.

interview.  *Id.*  Approximately two hours later, the Court entered its suppression order; Fenton then decided not to continue pursuing investigative leads regarding Bradford or CBDEECOM. *Id.*

Second, during a February 24, 2021 conversation with a lawyer representing Picadilly Jewelers, Fenton indirectly referenced the screenshots of text messages between Terabelian and Berj, the owner of Picadilly Jewelers.  *See* July 28. Tr. at 133:18-134:3; Faerstein Decl. ¶ 7; *see also* Fenton Decl., Ex. 28 at 17, 26–27.  Prior to the call, Picadilly Jewelers had produced documents to the Government.  *See* July 28. Tr. at 133:18-134:3.  Fenton explained to Picadilly Jewelers's lawyer that he believed the document production was incomplete and that text messages were missing.  *See* July 28. Tr. at 133:18-134:3; Faerstein Decl. ¶ 7.

Both of these uses were harmless beyond a reasonable doubt because they were inconsequential and did not affect the outcome of the proceedings.  As to Bradford and CBDEECOM, the Government did not interview Bradford; no documents or messages from CBDEECOM were used at trial or before the grand jury; and, aside from attempting to interview Bradford, there was no derivative use of CBDEECOM's document production.  Ultimately, Bradford and CBDEECOM added little to no value to the Government's investigation.

Similarly, Picadilly Jewelers never produced the text messages that Fenton referenced in the call with Picadilly Jewelers's lawyer.  All documents from Picadilly Jewelers (or from other entities that possessed records regarding Picadilly Jewelers) were requested by the Government on or before December 30, 2020.  *See* Fenton Decl., Ex. 2.  The only documents from Picadilly Jewelers that the Government used at trial were invoices and checks produced by Picadilly Jewelers in response to an early December 2020 request for information.  *See id.*; *see also* GEX 39.  No witness from Picadilly Jewelers appeared at trial.  In sum, the Government learned nothing new as a result of Fenton's indirect reference to the text messages during his conversation with Picadilly Jewelers's lawyer.

Under these circumstances, there is no likelihood that Fenton's two uses of the 141 photographs changed the result of the proceedings.  Accordingly, those uses were harmless beyond a reasonable doubt.  *See Ponds*, 454 F.3d at 329.

\* \* \*

For the foregoing reasons, the Court concludes that the Government has met its burden as to its non-evidentiary use of the 206 photos—*i.e.*, the 65 uploaded by Palmerton on November 13, 2020, and the 141 photos customs sent to the prosecution team on February 2, 2021.

### 3. The Government Has Met its *Kastigar* Burden as to Non-Evidentiary Use of the Cellebrite Reports for the Miami Phones.

As noted above, the filter team released Cellebrite reports for three of the Miami phones to the prosecution team in February 2021.  Specifically, those three reports were released on February 11, 12, and 19.  Fenton Decl. ¶ 47.  Cellebrite reports for the other two phones were released on March 19, 2021 and April 8, 2021.  *Id.*

To determine the extent to which the Government used these Cellebrite reports, the Court reviewed the witnesses' declarations and supporting exhibits.  The Court also reviewed the witnesses' testimony at the evidentiary hearing.

In light of that review, the Court concludes that there was minimal use of the Cellebrite reports.  Specifically, the Court concludes that the use of the Cellebrite reports was limited to the use described by Fenton and Palmerton.  After explaining why, the Court will discuss why the Government's minimal use of the Cellebrite reports was harmless beyond a reasonable doubt.

#### a. The Court Concludes by a Preponderance of the Evidence that the Government's Use of the Cellebrite Reports Was Limited to the Use Described by Fenton and Palmerton.

In their declarations and testimony at the evidentiary hearing, the Government's witnesses each described their exposure to and use of the Cellebrite reports for the Miami phones.

Four out of the seven witnesses credibly testified that they never accessed the Cellebrite reports at all.  *See* Paetty Decl. ¶¶ 8, 13; Faerstein Decl. ¶¶ 19–25; Ahn Decl. ¶ 3; July 29 Tr. at 103:1-17 (Massino testifying that he never saw Cellebrite reports for Miami phones).  A fifth witness, Clark, credibly testified that he performed a cursory review of the Cellebrite report for one of the Miami phones but did not use any information from that review.[75]  Clark Decl. ¶ 16.

Two witnesses testified that they used information from one of the Cellebrite reports.  In the prosecution memorandum, Fenton included a reference to one email from a report.  Fenton Decl. ¶ 49 n.2.  Additionally, in a factual summary provided to prosecutors who were preparing to indict Edvard Paronyan, Palmerton included a brief reference to some of the information contained on one of the Cellebrite reports.  Palmerton Decl. ¶ 26.  Finally, Palmerton also emailed Fenton two sets of text messages from the Cellebrite report.  *Id.* ¶ 27.

---

[75] This cursory review does not constitute a *Kastigar* violation because "[t]he focus of the inquiry under *Kastigar* is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant."  *Crowson*, 828 F.2d at 1430 (cleaned up).

At the hearing, Defendants argued that the Government failed to meet its burden as to the Cellebrite reports because the Government cannot prove it did not use the Cellebrite reports in other ways. *See* July 29 Tr. at 189:23-193:9. In Defendants' view, the Cellebrite reports were so voluminous and powerful that the Government *must* have used them extensively. *See id.* at 189:23-190:3 ("It is undisputed that those three Cellebrites that were dropped in February on the government contained volumes and volumes of tainted evidence, thousands and thousands of pages, roughly 400,000 equivalent pages, and we know the government had access and reviewed them.").

The Court concludes, by a preponderance of the evidence, that the Government's use of the Cellebrite reports was limited to the use described by Fenton and Palmerton. The Court reaches this conclusion not only because it finds the witness testimony to that effect credible but also because of the following reasons.

First, the prosecution team had substantial technical difficulty accessing the Cellebrite reports. Multiple Government witnesses independently testified about those technical difficulties. Fenton stated as follows:

> In my early attempts, it took several hours to open a filtered Cellebrite report. Once I better learned how to use the software, it took less time to open each filtered Cellebrite report, but still required around 15-30 minutes. Moreover, I encountered a number of issues that made it challenging to review the information in the filtered Cellebrite reports. I did not have a user-friendly way to tag and/or save the information that I found interesting. This made the review arduous as compared to reviewing the digital photographs provided by Special Agent Palmerton and CBP.[76]

Fenton Decl. ¶ 48. Clark also explained that he struggled to access the Cellebrite reports due to hardware limitations and his agency's download capabilities. *See* Clark Decl. ¶ 13. This is confirmed by contemporaneous emails attached to Clark's declaration. *See id.*, Ex. 5. Clark ultimately had to borrow an external hard drive from a colleague in order to conduct a cursory review of one of the Cellebrite reports. *See id.* ¶¶ 14–16, Exs. 6, 7. And, even after that review, both of the Cellebrite reports on the external hard drive ultimately became corrupted. *See id.* ¶¶ 17–19.

Similarly, Faerstein downloaded the Cellebrite reports but "was not able to review the data in the reports given the size of the files and apparent software limitations." Faerstein Decl. ¶ 22. This is confirmed by emails produced by Faerstein. Specifically, on April 26, 2021, Faerstein emailed IT and stated as follows: "The data files are huge, and I cannot figure out how

---

[76] This is consistent with the Court's discussion above. Specifically, the Court found more uses of the 206 photographs than the Cellebrite report. *See supra* at 62–75.

to access the underlying reports.  Is it possible for someone to extract each of the full reports and save as separate large PDFs in each of the Cellebrite subfolders on the Cloud?"  *Id.*, Ex. 4.

Finally, Paetty—who did not access the Cellebrite reports—stated that he recalls receiving several notifications that mentioned "numerous technical difficulties that were encountered while trying to upload the Cellebrite reports to USAfx, including that the files were too large to efficiently upload and review."  Paetty Decl. ¶ 13.  The aforementioned technical difficulties support the conclusion that the Government's use of the Cellebrite reports was limited.

Second, for some of the specific instances in which prosecutors used the 206 photographs, they could have used the Cellebrite reports but did not.  For example, in support of the Government's opposition to Defendants' motion to suppress, Paetty attached 17 photos as "possible examples of digital contraband" in order to establish that the border search complied with *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).  Paetty Decl. ¶ 12.  And for the Government's *ex parte* application to modify the protective order in this case, Faerstein attached photos to illustrate the Government's concern that Ayvazyan was using the Zhadko identity.  Faerstein Decl. ¶¶ 15–16.  Presumably, the Cellebrite reports contained significant examples of alleged digital contraband and Ayvazyan's use of the Zhadko identity.  Yet, Paetty and Faerstein chose to rely on the 206 photographs instead.  This is consistent with Fenton's assertion that reviewing the 206 photographs was less arduous than the Cellebrite reports.  Fenton Decl. ¶ 48.  The lack of any reference to the Cellebrite reports in these filings supports the conclusion that prosecutors were not particularly focused on the contents of the Cellebrite report.

Third, Palmerton did not send material from the Cellebrite report to Fenton until April 27.  Palmerton Decl. ¶ 27.  This is confirmed by the timestamps on the folders containing those text messages.  Those timestamps indicate that the folders were not created until April 26 and April 27.[77]  *See id.*, Ex. O; *see also* July 29 Tr. at 30:6-10 (Palmerton explaining that folder names indicate date that folder was exported).  If, as Defendants suggest, Palmerton was conducting a comprehensive review of the Cellebrite reports, there is no reason he would have waited until late April to send Fenton the material he found in the reports.  Accordingly, the timing of Palmerton's disclosure to Fenton further supports the conclusion that the prosecution team was not particularly focused on the contents of the Cellebrite report.

Finally, the timing of the Government's acquisition of evidence presented at trial and before the grand jury raises the inference that the digital devices were not particularly important to the Government's case.  As discussed above, virtually all of the trial evidence either (1) was

---

[77] The metadata for the PDFs contained in each of the four subfolders in Exhibit O also confirms Palmerton's assertion.  Specifically, the metadata shows that the PDFs were first modified on April 26 and April 27.  *See* Palmerton Decl., Ex. O.

requested before the Government had Cellebrite reports for *any* phones; or (2) stemmed from the physical evidence seized during the November 5 searches.  In other words, the Government had built almost its entire case before anyone on the prosecution team could access a Cellebrite report.[78]  This supports the conclusion that the Government did not use the Cellebrite reports much at all because they did not *need* the Cellebrite reports.

Under these circumstances, the Court concludes, by a preponderance of the evidence, that the Government's use of the Cellebrite reports was limited to the use described by Fenton and Palmerton.

> **b.      The Government Has Met its Burden as to Fenton's and Palmerton's Use of the Cellebrite Reports.**

The Court will discuss Fenton's and Palmerton's use of the Cellebrite report in turn.

> **i.      Fenton's Use of Information from a Cellebrite Report in a Footnote of the Prosecution Memorandum.**

Fenton referenced information from the Cellebrite report in the prosecution memorandum created prior to the first superseding indictment.  Specifically, in a footnote, Fenton referenced an email from a Cellebrite report for Ayvazyan's phone in which Ayvazyan used an email address belonging to Kauichko to "correspond with the leasing office about applying to Grigoryan's 'roommate' – 'Viktoria Kauichko' – assume the lease."  Fenton Decl., Ex. 32 at 5.

The Government has met its *Kastigar* burden as to this reference.  This is so for two reasons.

First, well before the Miami stop, the prosecution team had substantial evidence linking Ayvazyan to the Canoga apartment.  The clearest piece of evidence is Ayvazyan's own statements in text messages.  In July 2020, the Government requested text messages from Anthony Farrer, the owner of Gentleman Timepieces.  *See* Fenton Decl., Ex. 2.  In those messages, Ayvazyan told Farrer to mail a watch to Viktoria Kauichko, and to send it to the Canoga apartment.  GEX 37.b at 2.

Another piece of evidence is the flow of funds.  For example, a Runyan Tax Service loan submitted by Viktoria Kauichko used the Canoga address as Kauichko's address.  *See* GEX 2.n at 3.  The funds from that loan were used for a down payment on the Calle La Primavera home

---

[78] This corroborates Fenton's testimony that "the case relied heavily on following the money," Fenton Decl. ¶ 58, and his testimony that, by February 2021, the investigation was largely complete, and the Government was focused on superseding and preparing for trial, *see* July 28 Tr. at 70:24-71:8.

purchased by Iuliia Zhadko (*i.e.*, an identity used by Ayvazyan), which was used by Ayvazyan's sister-in-law Gohar Terabelian. *See* GEX 115 at 5; *see also* Palmerton Decl., Ex. G (Palmerton emailing prosecution team regarding Calle La Primavera purchase and stating "[l]ooks like Richard may have purchased another house"); *id.*, Ex. H.

There was also evidence showing that Ayvazyan was using the email address purportedly belonging to Kauichko. Specifically, Ayvazyan provided Kauichko's email address (vkauichko89@gmail.com) to Gentleman Timepieces in text messages. *See* GEX 37.b at 1.

Finally, Ayvazyan references the Canoga apartment in text messages with Dadyan. *See* GEX 10. The Government did not have the text messages with Dadyan at the time the prosecution memorandum was written, and the prosecution memorandum could not have been written after the Government secured those text messages. Accordingly, the text messages could not have been used—either actually or inevitably—as a prior independent source for the specific reference in the prosecution memorandum. Nevertheless, the text messages are additional clear and untainted evidence linking Ayvazyan to the Canoga apartment.

Second, the reference in the prosecution memorandum was harmless beyond a reasonable doubt. It was contained in a footnote, and the prosecution memorandum was focused on the charges against the new defendants (*i.e.*, Manuk Grigoryan, Arman Hayrapetyan, Edvard Paronyan, and Vahe Dadyan) and the additional aggravated identity theft counts for the original defendants. *See generally* Fenton Decl., Ex. 32. Simply put, there is no likelihood that the reference to the Cellebrite report in a footnote of the prosecution memorandum altered the Government's decisions related to the first superseding indictment.

For those reasons, the reference was harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

ii.    Palmerton's Use of Information from a Cellebrite Report to Email Fenton Text Messages

On April 27, 2021, Palmerton emailed Fenton two text message threads from a Cellebrite report. The first thread contained messages between Ayvazyan and Dadyan. *See* Palmerton Decl., ¶ 27, Ex. O. The second thread contained messages between Ayvazyan and Farrer, the corporate representative for Gentleman Timepieces. *Id.*

As to the first thread, the Dadyan phone seized at the Weddington address constitutes a prior independent source. Although the prosecution team did not have the Cellebrite report for the Dadyan phone on April 27, 2021, they received the text messages from that phone the next

day.[79]  *See* Fenton Supp. Decl., Ex. 6.  Thus, it is far more likely than not that Palmerton would have inevitably taken the same investigative steps (*i.e.*, emailed Fenton the text messages between Dadyan and Ayvazyan) after receiving the Cellebrite report for the Dadyan.  Thus, the Dadyan phone constitutes a prior independent source.  *See Crowson*, 828 F.2d at 1432; *Nanni*, 59 F.3d at 1432.

As to the second thread, the records from Gentleman Timepieces requested before the Miami stop constitute a prior independent source.  Those records were requested in July 2020 and included at least a subset of the text messages that Palmerton sent to Fenton.  *See* Fenton Decl., Ex. 2; Palmerton Decl. ¶ 2; GEXs 37.b, 37.c.[80]

Accordingly, the Government had a prior independent source for the text message threads that Palmerton emailed to Fenton.

> iii.   Palmerton's Use of Information from a Cellebrite Report in a Factual Summary Written Prior to the First Superseding Indictment.

In advance of the first superseding indictment, Palmerton wrote a factual summary of proposed charges against Edvard Paronyan.  Palmerton Decl. ¶ 26.  Palmerton provided that summary to prosecutors who were preparing the first superseding indictment, including

---

[79] On April 28, 2021, after receiving the text messages that Palmerton emailed him, Fenton asked the filter team to send him any text messages on the 1B21 phone that the filter team was already processing (*i.e.*, the Dadyan phone). Fenton Supp. Decl. ¶ 26.

To the extent Defendants argue that this constitutes Fenton's "use" of the text message thread that Palmerton emailed Fenton, the Court concludes that any such use was harmless beyond a reasonable doubt.  As discussed extensively above, the filter team processed phone 1B21 on the basis of untainted information and, by April 26, 2021, Fenton had informed Defendants that the Cellebrite report for phone 1B21 would be released to the prosecution team.  *See supra* at 46.  In other words, at the time Palmerton emailed Fenton the text message thread (*i.e.*, April 27, 2021), the prosecution team was assuredly and imminently going to acquire the text messages from the Dadyan phone.  Accordingly, the fact that Fenton received the text messages from 1B21 before the rest of the Cellebrite report was "so unimportant and insignificant and had so little, if any, likelihood of having changed the result of the proceeding that it may be deemed harmless."  *Ponds*, 454 F.3d at 329 (cleaned up).  Indeed, if anything, Fenton's request to the filter team may have put Defendants on notice of the text messages earlier than they otherwise would have been.  *See* Fenton Supp. Decl. ¶ 26 ("I asked the filter team to expedite the release of these non-privileged texts because I believed counsel for defendants would want to receive a copy of these texts as soon as possible."); *id.*, Ex. 6 (explaining to filter team that full Cellebrite report for Dadyan phone needs to be produced to Defendants by "Friday [April 30, 2021] at the latest").

[80] It appears that Palmerton emailed Fenton the entire text message thread between Ayvazyan and Farrer, while Gentleman Timepiece's records (*i.e.*, GEX 37.b and 37.c) contain a subset of the thread.  The Court reviewed the messages Palmerton emailed to Fenton that are not contained in GEXs 37.b and 37.c.  They are messages in which Ayvazyan and Farrer correspond about watches that Ayvazyan is interested in in.  *See generally* Palmerton, Ex. O. The messages relevant to the Government's investigation (*i.e.*, messages in which Ayvazyan refers to fake or synthetic identities and entities, or provides bank account information) are all included in GEXs 37.b and 37.c, which the Government requested from Gentleman Timepieces in July 2020, *see* Fenton Decl., Ex. 2.

Faerstein.  *See id.*; *see also* Faerstein Decl. ¶¶ 26–27.  The factual summary included a reference to two pieces of information from a Cellebrite report of the Miami phones: the phone contained (1) a photo of Armen Injijian's driver's license, and (2) photos containing personal identifying information for Anton Kudiumov.  *See id.*; Palmerton Decl. ¶ 26.

This reference was harmless beyond a reasonable doubt.  The factual summary related to charges for Edvard Paronyan, who is not a party to the *Kastigar* proceedings.  The references to the information from the Cellebrite report were not included in the prosecution memorandum supporting the first superseding indictment.  *See* Faerstein Decl. ¶ 28; *see also* Fenton Decl., Ex. 32.  The references were also not included in the indictment itself.  Ultimately, those references were insignificant and had no likelihood of changing the Government's charging or indictment decisions.  Accordingly, the references were harmless beyond a reasonable doubt.  *See Ponds*, 454 F.3d at 329.

* * *

For the foregoing reasons, the Court concludes that the Government has met its burden as to its non-evidentiary use of the Cellebrite reports for the Miami phones.

### 4.     Other Allegations of Non-Evidentiary Use.

Finally, the Court will address some of Defendants' miscellaneous allegations of non-evidentiary use of tainted information.

#### i.     The Government's Identification of Mary Smbatian.

Defendants argue that the Government used tainted information to identify and interview a potential inside witness, Mary Smbatian.  Opp. at 30–31.  Specifically, Defendants note that one of the 141 images customs sent to the prosecution team on February 2, 2021 (image 103B) contains contact information for Smbatian, and Smbatian was interviewed three days later on February 5, 2021.  *Id.*; *see also* Fenton Decl., Ex. 28 at 103.  Smbatian later recorded a telephone call between her and Grigoryan in which Smbatian discussed her work for Grigoryan and the relationship between Grigoryan and Ayvazyan.  The Government argues that it identified Smbatian using escrow records requested in in late September and early October 2020.  Reply at 29–30.

The Court concludes, by a preponderance of the evidence, that Smbatian was identified based on a legitimate independent source: records from Perfect Escrow that the Government requested in early October 2020, several months before customs sent the prosecution team the 141 photographs.  *See* Fenton Decl., Ex. 2.  The records include emails in which the escrow

officer repeatedly corresponds directly with Mary Smbatian about loan documents, escrow documents, wire transfers, and a notary invoice. *See* GEX 33.k at 2–5; GEX 33.j at 4–6; GEX 33.f. In her emails to the escrow officer, Mary Smbatian includes a signature containing the exact same set of contact information included in image 103B. *See* GEX 33.k at 1–5; GEX 33.j at 4–6; GEX 33.f.

Under these circumstances, the Court is persuaded, by a preponderance of the evidence, that the Government identified Mary Smbatian using the Perfect Escrow records. At the very least, the Government would have inevitably identified Mary Smbatian, interviewed her, and asked her to record a phone call with Grigoryan. Accordingly, there was no *Kastigar* violation related to those non-evidentiary actions. *See Crowson*, 828 F.2d at 1432; *Nanni*, 59 F.3d at 1432.

Moreover, any use of tainted information for those non-evidentiary purposes was harmless beyond a reasonable doubt. Mary Smbatian was not identified for, or presented to, the grand jury. She was not called as a witness at trial. Her phone calls with Grigoryan were not presented to the grand jury or at trial. And, to the extent Defendants argue that Smbatian is what allowed the Government to identify a single conspiracy, the Court rejects that argument. The single conspiracy in this case was overwhelmingly supported by untainted evidence. *See* Dkt. 664 at 11–14 (discussing trial evidence upon which no reasonable juror could find multiple conspiracies); *see also supra* at 30–50 (concluding trial evidence was untainted). Virtually all of the trial evidence either (1) was requested before the Government received image 103B; or (2) stemmed from the physical evidence seized during the November 5 searches. *See id.* And the Government was already planning to indict the other members of the single conspiracy when it presented the original indictment to the grand jury. *See* Fenton Decl., Ex. 15 at 2 ("We will likely need to supersede at a later date to include additional coconspirators and loans.").

For these reasons, the Government's investigative actions related to Mary Smbatian were harmless beyond a reasonable doubt. *See Ponds*, 454 F.3d at 329.

### ii.    The Government's Plea Bargaining.

Defendants argue that the Government used tainted information to plea bargain or to refuse to offer a plea deal. The Government discussed potential plea deals with Terabelian's counsel on three occasions in May 2021. *See* Fraser Decl. ¶ 3. Additionally, on May 14, 2021, during a meet and confer with the Government, Ayvazyan's counsel began discussing a potential plea deal. Fenton Supp. Decl. ¶ 31. Following that meet and confer, the Government did not offer Ayvazyan a plea deal or offer to negotiate a plea deal.

The Court concludes, by a preponderance of the evidence, that the Government's conduct and decisions during and in relation to plea bargaining were untainted.  The only basis for the use of tainted information during Terabelian's plea negotiations is that, during those discussions, the Government relied on its theory that Terabelian was using the Kauichko identity.  *See* Opp. at 51–52; July 29 Tr. at 161:7-16.  However, as discussed above, that theory is untainted.  *See supra* at 54–59.

As to Ayvazyan, the refusal to plea bargain was not tainted.  Rather, the Government's witnesses explained that there were three reasons unrelated to *Kastigar* that led them to refuse to plea bargain with Ayvazyan.  First, Ahn credibly testified that the United States Attorney's Office for the Central District of California has a general policy of not engaging in plea discussions when there are pending misconduct motions.  July 29 Tr. at 85:17-25.  Here, Ayvazyan[81] filed a motion to dismiss on the basis of prosecutorial misconduct on April 21, 2021, and the Court did not resolve the motion until May 18, 2021.[82]  *See* Dkts. 289, 343.  By that point, Ayvazyan had filed yet another motion alleging prosecutorial misconduct: the instant *Kastigar* motion.  *See generally* Dkt. 338 (filed May 17, 2021).

Second, during the meet and confer, counsel for Ayvazyan attempted to negotiate a global resolution on behalf of all the defendants in the case, but also cautioned that he only spoke on behalf of Ayvazyan.  Fenton Supp. Decl. ¶ 34.  Fenton explained that he was concerned Ayvazyan's counsel was attempting to negotiate a global resolution without authority from other defendants' counsel.  *Id.*  That was another reason the Government declined to plea bargain with Ayvazyan.  *See id.* ¶ 38.

Finally, Fenton also stated that the Government believed its evidence against Ayvazyan was overwhelming and, accordingly, the Government had no interest in plea bargaining with Ayvazyan.  *Id.*  This is credible because the Government's untainted evidence against Ayvazyan was, in fact, overwhelming.

In light of this testimony, the Court concludes, by a preponderance of the evidence, that the Government's conduct and decisions during and in relation to plea bargaining were untainted.

---

[81] Terabelian did not join this motion.

[82] Fenton stated that, during the May 14, 2021 meet and confer, one of Ayvazyan's lawyers "disclaimed responsibility for the prosecutorial misconduct motions" and blamed his colleague for preparing and filing the motion.  Fenton Supp. Decl. ¶ 36.

### iii.    Olaf Landsgaard.

In relation to the purchase of real estate, the conspirators used the identity of deceased lawyer Olaf Landsgaard.  *See* GEX 33.i at 3 (email from Viktoria Kauichko stating "I am including my attorney on the email and would like to sign at his office.  He always looks over all our loan documents and arranges all necessary notaries"); *id.* at 1 (email purportedly from Olaf Landsgaard explaining he will "coordinate with Ms. Kauichko and our in house Notary Agent to complete the signing in our office today").

Defendants argue that the Government used tainted information to learn that Landsgaard was dead.  Specifically, Defendants note that one of the 65 images Palmerton shared with the prosecution team on November 13, 2020 (image 37A) depicts Google search results that reflect the fact that Landsgaard was deceased.  *See* Fenton Decl., Ex. 17 at 37.

The Court concludes, by a preponderance of the evidence, that there were two prior independent sources for this use.  The first is records from Perfect Escrow that the Government requested in early October 2020, several months before customs sent the prosecution team the 141 photographs.  *See* Fenton Decl., Ex. 2.  The records include multiple emails to and from Landsgaard.  *See* GEX 33.i at 1; GEX 33.l at 1, 4.

Second, Landsgaard is referred to multiple times in the text messages between Ayvazyan and Tamara Dadyan contained on the Dadyan phone from the Weddington residence.  For example, on July 9, 2020, Ayvazyan asks Dadyan, "Tam can u send me that lawyer email again.  I can't find it.  I'm getting the docs on Palm spring today finally."  GEX 10 at 20.  Ayvazyan then confirmed he was referring to "Olaf."  *Id.*  Later, Dadyan and Ayvazyan joke about using Landsgaard's identity: "[Dadyan]: Good morning from Olaf email.  [Ayvazyan]: Lol[.]  Good afternoon."  *Id.* at 40.  Dadyan also tells Ayvazyan to "[r]eply to Olaf email."  *Id.*

Under these circumstances, the Court is persuaded, by a preponderance of the evidence, that the Government would have inevitably taken investigative steps and learned that Landsgaard was dead.  Accordingly, there was no *Kastigar* violation related to the Government's knowledge that Landsgaard was dead.  *See Crowson*, 828 F.2d at 1432; *Nanni*, 59 F.3d at 1432.

Moreover, any use of tainted information for that non-evidentiary purpose was harmless beyond a reasonable doubt.  There was no aggravated identity theft charge for the use of Landsgaard's identity, and Defendants' use of that identity was not presented to the grand jury.  The fact that Landsgaard was dead was insignificant in the context of the full investigation.  For those reasons, any use of tainted information to learn of Landsgaard's death was harmless beyond a reasonable doubt.  *See Ponds*, 454 F.3d at 329.

* * *

For the foregoing reasons, the Court concludes that the Government has met its *Kastigar* burden as to the grand jury, trial, and non-evidentiary use.

## IV. Defendants' Discovery Arguments.

Defendants make two arguments related to discovery for the *Kastigar* inquiry.  First, they argue that they are entitled to sweeping discovery.  *See* Dkts. 670, 670-3.  Second, they argue that they are entitled to production of the documents that the Court ordered the Government to produce in camera.  *See* Dkt. 690.

The Court rejects both arguments.  As to discovery, there is no right to discovery related to a *Kastigar* hearing.  Rather, the Ninth Circuit has explained that the proof the Government will be required to submit to meet its burden "will vary from case to case, and we therefore cannot be specific as to precisely what evidence the government must bring forward." *Danielson*, 325 F.3d at 1072.  The Ninth Circuit has also repeatedly explained that the Government can meet its burdens through affidavits alone: "a hearing is not required if no factual issues are left to resolve, or if the government meets its burden to show independent sources through the use of affidavits," and the "need for an evidentiary hearing . . . also depends on the circumstances of each case."  *United States v. Dudden*, 65 F.3d 1461, 1469 (9th Cir. 1995) (citing *Montoya*, 45 F.3d at 1298).  Given the record and circumstances of this case, discovery is not warranted.

The Court also concludes that *Brady* does not entitle Defendants to discovery.  "*Brady* does not permit a defendant to sift through information held by the government to determine materiality," *United States v. Lucas*, 841 F.3d 796, 807 (9th Cir. 2016), and "mere speculation about materials in the government's files [does not] require the district court to make those materials available, or mandate an in camera inspection," *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009) (cleaned up).  In other words, Defendants are not entitled to a fishing expedition.

Yet, that is exactly what they seek.  In their discovery letter, Defendants effectively request *every* document related to this case, including but not limited to presentations, memoranda, or debriefing information provided to agents executing search warrants; memoranda or other summaries (written or oral) prepared between October 19, 2020 and the present that summarize the facts of the case or evidence against Defendants, including but not limited to summaries for superiors, summaries for new team members, summaries related to witness meetings, summaries related to subpoena issuance or execution, summaries related to empanelment of a second grand jury, or any other portion of pre-trial or trial strategy; and *all*

*communications* regarding trial strategy or pre-trial strategy involving attorneys, agents, and any team members. *See* Dkt. 670-3. "No court has sanctioned such a far-flung fishing expedition." *United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989) (rejecting *Kastigar* related "invitation to speculate as to subtle, tangential, nonevidentiary connections and the defendant's concomitant request for a hearing inquiring of every prosecutor, investigator, trial witness, grand jury witness, interviewee, and grand juror, and document production of every subpoena, every grand jury transcript, every interview note, 'all procedures used and actions taken' in the investigation, the grand jury presentation, the immunizing of witnesses, the drafting of subpoenas, the evaluation of evidence, the determination of charges, and pretrial preparation").

Finally, the Jencks Act does not entitle Defendants to discovery, nor does Rule 26.2 of the Federal Rules of Criminal Procedure. The plain language of the Jencks Act limits the statute to trial testimony, and Rule 26.2 only expands the right to discovery under Jencks to a limited set of hearings, none of which are a *Kastigar* hearing. *See* 18 U.S.C. § 3500(a); *see also* Fed. R. Crim. P. 26.2(g).

Second, Defendants are not entitled to the documents the Court ordered the Government to produce in camera. Those documents include the grand jury transcripts; prosecution memorandums written prior to the grand jury presentations; a grand jury subpoena log; annotated trial exhibit list that connects trial exhibits with grand jury subpoena; two emails in which Fenton's supervisors attach leads they want Fenton to investigate; and two discovery quality check charts created prior to each grand jury presentation.

These documents need not be produced to Defendants because they contain privileged attorney work product or protected grand jury material. Rule 16(a)(2) of the Federal Rules of Criminal procedure exempts from discovery "internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." And protected grand jury material need only be produced to Defendants if the material will avoid a possible injustice and the need for disclosure is greater than the need for continued secrecy. *See United States v. Plummer*, 941 F.2d 799, 806 (9th Cir. 1991).

Indeed, the Court previously explained that it will reserve ruling on discovery issues until it reviews the briefing. *See* June 28 Tr. at 110:16-21. In light of that briefing and hearing, the Court concludes that disclosure of the grand jury material will not avoid a possible injustice, and the need for disclosure is outweighed by the need for secrecy. As discussed extensively above, the Government has exceeded its *Kastigar* burden. Nothing in the in camera production changes that conclusion; to the contrary, it supports the conclusion.

Accordingly, the Court rejects Defendants' discovery related requests.

## V.      Conclusion.

"[T]he Fifth Amendment allow[s] the government to prosecute using evidence from legitimate independent sources."  *Kastigar*, 406 U.S. at 461.  Here, the Government has established that (1) it did not use tainted information; (2) its evidence or non-evidentiary use stemmed from a legitimate independent source; or (3) its use of tainted information was harmless beyond a reasonable doubt.

Accordingly, the Government has met its *Kastigar* burden, and Defendants' motion for *Kastigar* relief is DENIED.[83]

**IT IS SO ORDERED.**

Date: August 20, 2021

_____

HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

---

[83] The Government's motion to dismiss Defendants' *Kastigar* claims on the grounds that Defendants waived that claim, *see* Dkt. 663, is DENIED as moot.  The Court makes no finding as to whether Defendants' arguments and evidence at trial constituted a waiver of Defendants' *Kastigar* claims.