UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.    2:20-cr-579-SVW                                              Date: August 20, 2021

Present: The Honorable:    Stephen V. Wilson, U.S. District Judge

Interpreter    NA

| Paul M. Cruz | N/A | N/A |
|---|---|---|
| *Deputy Clerk* | *Court Reporter / Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s) | Present | Cust | Bond | Attorneys for Defendants: | Present | App | Ret |
|---|---|---|---|---|---|---|---|
| Richard Ayvazyan   |   |   | X | N/A |   |   |   |
| Marietta Terabelian |   |   | X | N/A |   |   |   |
| Artur Ayvazyan     |   |   | X | N/A |   |   |   |
| Vahe Dadyan        |   |   | X | N/A |   |   |   |

**Proceedings:** ORDER DENYING RULE 29 AND RULE 33 MOTIONS [683], [686], [687], [689].

Before the Court are Rule 29 and Rule 33 motions filed by Richard Ayvazyan and Marietta Terabelian,[1] *see* Dkt. 683, Artur Ayvazyan, *see* Dkts. 686, 687, and Vahe Dadyan, *see* Dkt. 689. For the below reasons, the motions are DENIED.

**I.    Rule 29 Standard.**

The Rule 29 inquiry "does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319–20 (1979) (emphasis in original) (internal quotation and citations omitted).

In addition to viewing all evidence in the light most favorable to the Government, "the reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *United States v. Ramos*, 558 F.2d 545, 546–47 (9th Cir. 1977).

For those reasons, "when 'faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume - even if it does not affirmatively appear in the record - that the trier of fact

---

[1] Terabelian joined Richard Ayvazyan's motion. *See* Dkt. 691.

resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143 (9th Cir. 2012) (quoting *Jackson*, 443 U.S. at 326).

Similarly, a defendant moving for relief under Rule 29 cannot meet his burden by showing that an innocent explanation of the evidence is no less likely than the incriminating explanation advanced by the Government. *See United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (rejecting prior cases that required reversal when innocent explanation of evidence "was not 'any less likely than the incriminating explanation advanced by the government'").

**II.     Rule 33 Standard.**

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). "The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).

Nevertheless, a motion under Rule 33 "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). The evidence must preponderate "sufficiently heavily against the verdict." *Lanoy Alston*, 974 F.2d at 1211. The Second Circuit recently explained that evidence must preponderate so heavily against the verdict "that it would be manifest injustice to let the verdict stand. " *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (reversing district court's granting of Rule 33 motion) (cleaned up).

Evidentiary errors that "substantially affect the fairness of the trial" may warrant a new trial under Rule 33 if the errors resulted in "such prejudicial harm as to require a new trial." *United States v. Medina-Gasca*, 739 F.2d 1451, 1454 (9th Cir. 1984).

**III.    Analysis.**

The Court will discuss each of the defendants' motions in turn.

Before doing so, the Court notes that the evidence the Government presented at trial overwhelmingly supports the guilty verdict. This includes, but is not limited to, the loan files containing fake and synthetic identities, entities, IRS forms, and payroll reports; the bank accounts created for those fake and synthetic

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

identities or entities; the flow of funds between those accounts; the evidence showing how the fraudulently obtained funds were used on real estate, gold coins, luxury watches, cryptocurrency, and other personal expenses; the physical evidence seized at the Miami airport and the Topeka, Weddington, and Canoga residences; and the evidence discovered on the digital devices from the Topeka and Weddington residences.

> A. **The Rule 29 and Rule 33 Motions Filed by Richard Ayvazyan and Marietta Terabelian are Denied.**

Richard Ayvazyan and Marietta Terabelian (collectively referred to in this section as "Defendants") move for relief under Rule 29 and Rule 33 on a variety of grounds.

*First*, Defendants argue that a new trial is required because the Court failed to instruct the jury on multiple conspiracies. The Court rejects that argument for the reasons discussed in its prior order. *See* Dkt. 664 at 9–17.

Similarly, Defendants argue that a judgment of acquittal is required because the Government's evidence at trial was insufficient to prove a single conspiracy or scheme to defraud. Although the Court's prior order dealt with whether the evidence was sufficient to warrant a multiple conspiracies instruction, *see id.*, the same discussion applies here and explains why the evidence was sufficient, under the Rule 29 standard discussed above, *see supra* at 1–2, to convict Defendants of participating in a single conspiracy and scheme to defraud.

*Second*, Defendants argue that a new trial is required because they were precluded from questioning Detective Lyle Barnes about a state investigation into mortgage fraud for which Ayvazyan had been indicted. Defendants argue that Barnes's testimony would have been "fatal to the single, unitary conspiracy and scheme charged by the government in this case." Mot. at 8.

The Court rejects this argument for the reasons discussed in its prior order. *See* Dkt. 664 at 1–2. Specifically, the probative value of Lyle Barnes's was substantially outweighed by numerous dangers. *See id.* Moreover, as explained in the Court's prior order, "[p]roof that a defendant was involved in the mortgage fraud conspiracy would not be relevant to determining whether the defendant was also involved in the PPP/EIDL conspiracy." *Id.* at 2 (citing *United States v. Torres*, 869 F.3d 1089, 1102 (9th Cir. 2017); *United States v. Eubanks*, 591 F.2d 513, 518 (9th Cir. 1979) ("[T]he existence of other conspiracies would not preclude the jury from finding that defendants were involved in the overall conspiracy charged in the indictment.")).

Moreover, the Court also rejects Defendants' argument that a severance would have resolved the Court's concern that Artur Ayvazyan would be unfairly prejudiced by Barnes's testimony. Defendants did not request a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

severance during trial and have therefore waived this argument.[2] *See United States v. Alvarez*, 358 F.3d 1194, 1206 (9th Cir. 2004) ("It is well settled that the motion to sever 'must be renewed at the close of evidence or it is waived.'"). Moreover, the prejudice to Artur Ayvazyan was not the only danger that led the Court to conclude that the evidence was inadmissible under FRE 403. *See* Dkt. 664 at 1–2.

Finally, the Court notes that, regardless of whether some of the evidence from the Weddington home was related to both the mortgage fraud and the PPP/EIDL fraud conspiracies, the Court concluded that the evidence was inextricably intertwined with the charged offenses because the Government established a "sufficient contextual or substantive connection between the proffered evidence and the alleged crime." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995). Specifically, the evidence provided "a coherent and comprehensible story regarding the commission of the crime"—*i.e.*, it was highly probative of the methods and instruments Defendants used to execute the conspiracy alleged in the indictment. *United States v. Loftis*, 843 F.3d 1173, 1178 (9th Cir. 2016) (quoting *Vizcarra-Martinez*, 66 F.3d at 1012–13)

***Third***, Defendants argue a new trial is required on the aggravated identity theft counts because the evidence preponderates heavily against the verdict on those counts, and the jury was incorrectly instructed regarding those counts.

The Court rejects that argument. As detailed extensively in the Government's opposition, there was ample evidence at trial that Defendants used or possessed the Mark Zindroski and Nazar Terabelian identities while committing bank fraud and wire fraud based on those identities. *See* Opp. at 8–10.

The Court also rejects Defendants' argument that the jury was incorrectly instructed on the aggravated identity theft counts. Defendants argue that the language of the aggravated identity theft instruction, coupled with the aiding and abetting instruction, allowed the jury to convict Defendants of aggravated identity theft based solely on the fact that they possessed a means of identification for Mark Zindroski and Nazar Terabelian. *See* Mot. at 11.

However, the Court instructed the jury that the aiding and abetting instruction does not apply to the identity theft counts. *See* Dkt. 609 at 33 ("The following instruction only applies to Counts 2 through 12, for wire fraud and Counts 13 through 20, for bank fraud. You must not apply this instruction to any other counts."). Moreover, the jury was instructed that possession alone is insufficient; rather, any such possession

---

[2] Defendants were certainly on notice of the objection by Artur Ayvazyan (who is also involved in the state mortgage fraud case) because counsel for Artur Ayvazyan strenuously objected to the presentation of any evidence about the state mortgage fraud case. *See* Dkt. 642 at 26:20-27:3 ("Your Honor, we think it's suicidal if our client's charged, but unproven case in state court, comes into this courtroom. We think it is irreparably damaging and we would ask for a mistrial if it does. . . . If the jury hears that, it's only going to be damaging to Artur Ayvazyan. We feel very strongly about that.").

must have been "without legal authority" and "during and in relation to" a specific bank or wire fraud count charged in the indictment. *See id.* at 41–42.

Accordingly, the Court rejects Defendants' arguments regarding the aggravated identity theft counts.

***Fourth***, Defendants argue that the evidence was insufficient to support venue in this District and that the Court should have presented the jury with a verdict form that contained a question about venue. Defendants argue that venue is only proper in those Districts where a wire was sent from, passed through, or received. Mot. at 14.

This argument is flatly contradicted by Ninth Circuit case law, which explains that, for the purposes of 18 U.S.C. § 1343, "venue is established in those locations where the wire transmission at issue originated, passed through, or was received, *or from which it was orchestrated*. In other words, venue may lie only where there is a direct or *causal* connection to the misuse of wires." *United States v. Pace*, 314 F.3d 344, 349–50 (9th Cir. 2002) (emphases added).

For example, in *Pace*, the Ninth Circuit focused on where the defendant was physically located when he authorized the misuse of wires. The court concluded that the Government had failed to produce sufficient evidence that the defendant "gave this authorization from Arizona." *Id.* at 350–51; *see also id.* at 351 n.5 (discussing Government's circumstantial evidence and noting that said evidence "does not demonstrate by a preponderance of the evidence that [the defendant] was *in Arizona* when he instructed his secretary to give AFIMEX his bank information") (emphasis added).

Defendants suggest that tying venue to the location where a particular wire transmission was "orchestrated from" or from which there is a "causal connection" would effectively be "rewriting the fraud statute to make the scheme to defraud the actus reus." Mot. at 13–14. This is incorrect. The statute covers any individual who "transmits or *causes to be transmitted*" a fraudulent wire. 18 U.S.C. § 1343 (emphasis added). For this reason, *Pace* "interpret[ed] the essential conduct prohibited by § 1343 to be the misuse of wires as well as *any acts that cause* such misuse." 314 F.3d at 349 (emphasis added). Thus, the actus reus of 18 U.S.C. § 1343 already covers the causation of a fraudulent wire, and *Pace* did not rewrite the statute.[3]

---

[3] Rewriting the statute would be allowing venue to lie in a district where the defendant concocted the scheme to defraud even though the specific misuse of wires was caused from a *different* district. That result is exactly what *Pace* sought to avoid. Indeed, in *Pace*, there was evidence that the defendant concocted the scheme to defraud in a different district than where he caused the misuse of wires. Specifically, although the Defendant was prosecuted in the District of Arizona, there was evidence that the defendant was in Pasadena when he executed the specific tasks—*i.e.*, when the actus reus occurred—that caused the misuse of wires.

Here, by contrast, there is complete overlap between the location where Defendants concocted their scheme to defraud and the location where they actually caused the misuse of wires. Specifically, and as detailed in the Government's brief, there is ample evidence to establish, by a preponderance of the evidence, that both of those occurred in this District. *See* Opp. at 13–14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

As to the sufficiency of the evidence, the Court need not discuss the evidence at length. As detailed extensively in the Government's opposition, there is far more than a preponderance of the evidence establishing "a direct or causal connection to the misuse of wires" in this District. *Id.* at 350; *see also* Opp. at 13–14.

Accordingly, the Court rejects Defendants' arguments regarding venue.

*Fifth*, Defendants argue that the Government knowingly allowed one of its witnesses, Anthony Farrer, to provide false testimony and that the Government failed to correct that false testimony.

Farrer was asked the following question: "Is your testimony that you have never sold watches to Mike from Instagram or Manuk Grigoryan?" June 17 p.m. Tr. at 49:22-23. Farrer answered as follows: "I have never received any payments or completed a watch deal with him." *Id.* at 49:24-25. Defendants argue that this was false because Farrer had, in fact, sold watches to Mike from Instagram. Mot. at 16.

This argument is unavailing. The question was confusing, as it identified multiple names (Mike from Instagram, and Manuk Grigoryan) and asked whether he had sold watches to them. Moments before, Farrer had testified that he had never seen Mike from Instagram's real legal name, couldn't pronounce it, and couldn't even recall if it was spelled with the letter "g." June 17 p.m. Tr. at 46:11-24. Farrer was then asked if he did "a number of deals with Manuk Grigoryan," and Farrer responded "no." *Id.* at 49:12-14. Farrer was then again asked, "[y]our testimony is that you have never sold watches to Manuk Grigoryan, Mike from Instagram?" *Id.* at 49:15-16. After counsel repeated the question, Farrer responded that he had "never received any payments or completed a watch deal with him." *Id.* at 49:24-25. It is clear from the transcript that, at the very least, the questions were confusing and Farrer believed counsel was asking about Manuk Grigoryan—*i.e.*, the individual whose real legal name Farrer hadn't seen, couldn't pronounce, and couldn't even recall if it was spelled with a "g." Accordingly, Farrer did not present false testimony.[4]

*Sixth*, Defendants argue that the Court erred in denying Defendants' motion to exclude the testimony of the Government's two summary witnesses and their charts.

---

[4] Even if Farrer's testimony was false (it was not), Defendants would only be entitled to a new trial if there is a reasonable probability that, without the false testimony, the result of the proceeding would have been different. *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994). Here, there is no reasonable probability that, absent this exchange about Mike from Instagram, the result of the proceeding would have been different. There is overwhelming evidence that Richard Ayvazyan was texting Farrer and buying luxury watches with fraudulently obtained PPP and EIDL loans. Even if Manuk Grigoryan was separately using his cut of the fraudulent scheme to also buy watches from Farrer, that would not, as Defendants suggest, allow a reasonable juror to find multiple conspiracies. This is because both of the alleged subgroups (*i.e.*, the Grigoryan group and the Dadyan group) (1) had the exact same objective (*i.e.*, obtaining fraudulent PPP and EIDL loans); (2) accomplished that goal using the exact same methods (*i.e.*, the same set of fake and synthetic identities and entities); and (3) obtained and concealed their benefits through their coconspirators' use of these methods. Dkt. 664 at 11–14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

The Court rejects this argument. The Court held a hearing in which it extensively discussed the contents of Robinson's chart. *See* Dkt. 533 at 31–60. The Court then noted that, subject to the findings discussed on the record, Robinson's testimony and chart were admissible. *See* Dkt. 511. The contents of the charts presented by Massino and Robinson were based on voluminous records, and the charts were helpful for the jury in that they summarized the contents of those voluminous records.

As for Massino's testimony regarding the text messages, the Court reviewed the transcript and concludes that the testimony was not improper. *See generally* Dkt. 621 at 60–98. Massino simply read certain messages from the exhibit (or described images attached to those messages) and, where necessary, explained terms or concepts that an ordinary layperson would be unfamiliar with. *See id.* Additionally, when a particular identity, EIN, tax ID, etc., appeared in the messages, Massino—on the basis of his investigation—explained the loan file or bank record that some of those identities, EINs, tax IDs, etc., appeared in. *See id.* Those are facts, not argument. Defendants cite to no specific examples of argumentative testimony or testimony that exceeded the scope of proper summary witness testimony.

Accordingly, the Court rejects Defendants' argument regarding the summary witnesses.

**_Seventh_**, Defendants argue that the Court erroneously instructed the jury on the substantive money laundering counts. Specifically, they argue the Court erred by instructing the jury that the defendant must know that the property in the financial transaction represented the proceeds of "some form of unlawful activity" rather than "unlawful activity as charged in the indictment." Mot. at 17–18.

Defendants' argument is incorrect. First, the Court's instruction on the second element was a verbatim copy of the Ninth Circuit Model Jury Instructions. *Compare* Dkt. 609 at 36 *with* Ninth Circuit Model Jury Instructions No. 8.147.

Second, the statute expressly precludes Defendants' proposed instruction. Specifically, the statute states as follows: "As used in this section, the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from *some form, though not necessarily which form*, of activity that constitutes a felony . . . ." 18 U.S.C. § 1956(c)(1) (cleaned up) (emphasis added). In conjunction with the first element of the statute—which *does* require that the proceeds actually resulted from a *specific* felony—the statute allows a defendant to be convicted without knowledge of the specific underlying crime, so long as the defendant has knowledge that the proceeds resulted from "some form" of crime. *Id.*

Finally, the Court notes that the indictment and the entirety of the Government's evidence at trial focused on PPP and EIDL fraud. Even if Defendants had to have known the specific felony from which the proceeds resulted (they did not), there is virtually no chance that the jury convicted Defendants based on a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

finding that Defendants believed the property represented the proceeds of some crime other than PPP and EIDL fraud.

Accordingly, the Court rejects Defendants' argument regarding the money laundering instruction.

***Eighth***, Defendants argue that the Government failed to adduce sufficient untainted evidence for a jury to find them guilty. Defendants are presumably referring to alleged *Kastigar* violations. The Court rejects this argument for the reasons discussed in the Court's order denying Defendants' *Kastigar* motion. *See* Dkt. 874.

***Ninth***, Defendants argue that the evidence during the forfeiture phase (which included evidence presented at trial) was against the great weight of the forfeiture verdict. Specifically, Defendants argue that the Government did not tie the forfeited cash and watches to specific transactions or PPP/EIDL funds. Mot. at 20–22.

Defendants' argument fails for two reasons. First, Defendants incorrectly imply in their argument that every piece of forfeited property must be directly connected to a specific offense. To the contrary, "[c]ircumstantial evidence and inferences therefrom are good grounds" for forfeiture. *United States v. Brock*, 747 F.2d 761, 763 (D.C. Cir. 1984); *see also United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1434 (9th Cir. 1985) (explaining circumstantial evidence is sufficient).[5] Said circumstantial evidence must be "substantial." *Ramsey v. United States*, 263 F.2d 805, 807 (9th Cir. 1959).

Moreover, the Government can meet its burden without tying each piece of property to a specific offense. For example, in *1982 Yukon Delta*, the Ninth Circuit explained that there is "[t]here is no need to tie the [forfeited property] to proceeds of a particular identifiable illicit drug transaction." 774 F.2d at 1435 n.4. Other circuits have held similarly in fraud cases. *See United States v. Melrose E. Subdivision*, 357 F.3d 493, 506 (5th Cir. 2004) (finding property forfeitable in light of timing of purchases and "pervasive" nature of fraud).

Second, and similarly, the argument ignores the substantial circumstantial evidence that supports the jury's verdict. For example, the jury was presented with evidence that the conspiracy was much broader than the loans included in the indictment. Indeed, although the Court redacted the portion of the indictment in which the number of loans is referenced, Defendants nevertheless raised that number during their cross-examinations and closing argument. *See, e.g.*, June 22 a.m. Tr. at 78:12-17 (asking witness to confirm 151 loans in

---

[5] *See also* Stefan Cassela, *Asset Forfeiture Law in the United States*, § 25-2 ("In most forfeiture cases, the Government must rely on circumstantial evidence to establish by a preponderance of the evidence that the property constitutes proceeds traceable to the underlying offense. In determining whether the Government has met its burden, the court or the jury must look to the totality of the circumstances, including such factors as the timing of the wrongdoer's acquisition of the property in relation to his commission of the offense, his lack of other legitimate sources of income, and the peculiar ways in which the property may have been titled, packaged, concealed or disbursed.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

superseding indictment); June 24 p.m. Tr. at 17:24-18:2, 39:4-9, 45:2-6, 92:7-11 (repeated references during closing argument to 151 loans in superseding indictment). Moreover, Defendants were transferring illicit proceeds through dozens of accounts belonging to fake entities.

As another example, the cash at issue here was discovered at a home purchased with proceeds of PPP and EIDL fraud (*i.e.*, 4910 Topeka) where other proceeds of PPP and EIDL fraud (*e.g.*, gold coins and luxury watches) were also discovered. Similarly, hundreds of thousands of dollars (aside from the two watches with direct links to PPP and EIDL funds) were transferred from "Viktoria Kauichko" (*i.e.*, the alias used by Marietta Terabelian and Richard Ayvazyan in furtherance of PPP and EIDL fraud) to the companies that sold the luxury watches.

Given the number of loans elicited by Defendants (151), the number of transfers across accounts belonging to fake entities and individuals (over a period of months), and the other direct and circumstantial evidence discussed above and in the Government's opposition, the Court concludes that the evidence presented at trial was sufficient for a reasonable juror to find, beyond a preponderance of the evidence, that the cash and watches are forfeitable. Accordingly, the Court rejects Defendants' argument regarding the sufficiency of the evidence during the forfeiture phase.

***Tenth***, and finally, Defendants argue that the Court's *voir dire* was inadequate to guarantee Ayvazyan the right to an impartial jury and resulted in prejudice.

"[C]ourt-conducted *voir dire* assures that the parties do not stray into impermissible areas that could potentially taint the prospective jurors' answers or points of view." *United States v. Saipov*, 2020 WL 958527, at *1 (S.D.N.Y. Feb. 27, 2020). That is precisely why the Court chose to conduct *voir dire* in this case; in fact, it is this Court's standard practice to conduct *voir dire* rather than allowing the attorneys to do so.

Defendants identify two specific examples of *voir dire* that they believe were inadequate. Neither is persuasive.

First, Defendants argue that "a retired probation officer responded with an equivocal 'I don't think so' when asked if her service as a probation officer would prevent her from being fair and impartial." Mot. at 23. Defendants' quote is taken out of context. The Court first asked a series of background questions, including questions about the prospective juror's career, the courts she worked in, her marital status, her husband's career, her children, her children's careers, her educational background, her criminal record, and her family's criminal record. June 15 a.m. Tr. at 131:9-133:10. The Court then asked the questions that Defendants argue were inadequate, and the full exchange is as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

> THE COURT: And having served as a probation officer, you have some familiarity with the criminal justice system. Would that experience prevent you from being fair and impartial to both sides?
>
> THE PROSPECTIVE JUROR: I don't think so. No.
>
> THE COURT: As I said --
>
> THE PROSPECTIVE JUROR: Can I be impartial?
>
> THE COURT: Yes.
>
> THE PROSPECTIVE JUROR: Oh, yes, of course.
>
> THE COURT: In other words, the point is you have to give both sides a fair trial and let the chips fall where they may. If the facts tend to show -- if the government doesn't prove its case beyond a reasonable doubt, than the verdict should be for the defendant. If the evidence shows that the government has proved its case beyond a reasonable doubt, then the verdict should be for the government under the law as I give it to you. I mean, can you do that?
>
> THE PROSPECTIVE JUROR: Yes, sir.

*Id.* at 133:11-134:4. This exchange, coupled with all the background questions asked before it, was adequate to determine whether the prospective juror had any biases that would require excusing the juror for cause or provide Defendants a basis to use a peremptory challenge.

The second example provided by Defendants is equally unavailing. Defendants argue that the Court's *voir dire* was inadequate because one of the jurors—who later became the foreperson—did not disclose her military service when she was asked, "[d]o you know of any reason that would prevent you from being fair and impartial to both sides?" Mot. at 23. The implication in Defendants' argument is clear: the foreperson's military service rendered her a biased juror.

The Court rejects this argument. This is not a case where a prospective juror's military service raises a "real possibility of bias." *United States v. Payne*, 944 F.2d 1458, 1475 (9th Cir. 1991) (finding no abuse of discretion where district court declined to ask question about military service because said question "do[es] not fall within one of the three recognized classes raising a real possibility of bias and [is] only speculatively related to bias"). For example, this is not a case where Defendants were charged with attacking a military base or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

otherwise harming military operations. Rather, it is a fraud case. Nothing about prior military service suggests bias in a fraud case. Any other result would mean that past military service is indicative of bias in virtually every case; the Court rejects that premise.

Accordingly, the Court rejects Defendants' arguments regarding *voir dire*.

\* \* \*

For the foregoing reasons, Defendants' Rule 29 and Rule 33 motions are denied.[6]

### B. The Rule 29 and Rule 33 Motion Filed by Artur Ayvayzan is Denied.

Artur Ayvazyan (referred to in this section as "Defendant") moves for judgment of acquittal on all counts or, alternatively, a new trial. Defendant's motion is largely conclusory, and the only evidence cited in the motion is his testimony.

The Court concludes that the evidence at trial was sufficient for a rational juror to conclude, beyond a reasonable doubt, that Defendant was guilty. As detailed extensively in the Government's opposition, there was ample evidence for a rational juror to find that Defendant was aware of the conspiracy and actively participated in it by submitting fraudulent loans, using fake and synthetic identities, and laundering money. Opp. at 2–13.

The only evidence that raised a conflicting inference was Defendant's testimony. Specifically, Defendant testified that all of the evidence discovered at the Weddington home belonged solely to Tamara Dadyan; Tamara Dadyan filled out and submitted the Allstate Towing loan; Tamara Dadyan put the photographs of fake and synthetic identities on Defendant's phone; and Defendant was not laundering money but, instead, was paying back a debt owed to his brother, Richard Ayvazyan. Dkt. 687 at 3–10. Indeed, Defendant relies solely on that testimony in both of his motions. *See id.*; *see generally* Dkt. 686.

The Court rejects this argument. First, there was overwhelming evidence of Defendant's guilt. Second, the Court notes that it "must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *Ramos*, 558 F.2d at 546–47; *see also Del Toro-Barboza*, 673 F.3d at 1143 ("[W]hen 'faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'").

---

[6] The Court rejects Defendants' cumulative error argument because, even assuming error occurred, any such error was, "at best, marginal. Therefore, the cumulative effect of such error cannot be deemed so prejudicial that reversal is warranted." *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Here, the jury was presented with, on the one hand, all of the evidence outlined in the Government's opposition and, on the other, Defendant's testimony. The Court must assume that the jury resolved the conflicts between those two sets of evidence in a manner that supports the verdict. *See id.* Accordingly, Defendant's Rule 29 motion must be denied.

As for the Rule 33 motion, it is true that the Court "is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Kellington*, 217 F.3d at 1097. Nevertheless, a motion under Rule 33 "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *Pimentel*, 654 F.2d at 545.

The evidence in this case does not preponderate heavily against the verdict. Instead, it preponderates heavily in favor of the verdict against Defendant. Accordingly, Defendant's Rule 33 motion must be denied.

**C.     The Rule 29 and Rule 33 Motion filed by Vahe Dadyan is Denied.**

Vahe[7] argues that the Government's evidence at trial was insufficient to convict him on any of the counts. Alternatively, he argues that a new trial is warranted on all counts.

The Court rejects that argument. The Court will first address the conspiracy counts and then will address the substantive counts.

**1.     The Evidence at Trial Was Sufficient to Convict Vahe of Both the Fraud and Money Laundering Conspiracies.**

Once the Government establishes a conspiracy, the Government must establish the defendant's participation in that conspiracy beyond a reasonable doubt. "At minimum, the government must show that each defendant knew or had a reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture." *United States v. Collazo*, 984 F.3d 1308, 1319 (9th Cir. 2021) (internal quotations omitted).

However, "evidence of only a slight connection with it is sufficient to establish a defendant's participation in it." *United States v. Castaneda*, 16 F.3d 1504, 1510 (9th Cir. 1994). Indeed, a person may be a member of a conspiracy "even though the person does not know all of the purposes of . . . the conspiracy." *United States v. Escalante*, 637 F.2d 1197, 1200 (9th Cir. 1980).

---

[7] Because the Court refers extensively in this section to both Vahe Dadyan and Tamara Dadyan, the Court will refer to them by their first names for ease.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

"The government need not show direct contact or explicit agreement between the defendants." *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978). Indeed, "[t]he term 'slight connection' means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details." *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001). "A connection to the conspiracy may be inferred from circumstantial evidence." *Herrera-Gonzalez*, 263 F.3d at 1095.

Rather, a "slight connection" exists if the Government establishes what the jury instructions here required: (1) that the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy; (2) that the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and (3) that the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture. Dkt. 609 at 25; *see also Daily v. United States*, 282 F.2d 818, 820 (9th Cir.1960) ("That a defendant was aware that he was not alone in plotting with common conspirators to violate the law is sufficient to raise the necessary inference that he had joined in an overall agreement.").

Applying the Rule 29 standard here, *see supra* at 1–2, the Court concludes that the evidence at trial was sufficient to convict Vahe of both the fraud and money laundering conspiracies.[8]

First, the evidence at trial was sufficient for a rational trier of fact to conclude that Vahe directly conspired with Tamara to carry out at least one of the objects of the conspiracy. Specifically, on May 18, 2020, Vahe signed—and Tamara submitted—a PPP loan application to Celtic Bank requesting $157,500 for Voyage Limo. As discussed below in the substantive wire fraud and bank fraud sections, there is ample evidence that the loan application contained materially false information and that Vahe had a fraudulent intent. *See infra* at 15–16.

Second, the evidence at trial was sufficient for a rational trier of fact to conclude that Vahe had reason to know that (a) other conspirators besides Tamara were involved, and (b) Vahe's benefits depended upon the success of the entire venture.

---

[8] The Court notes that Vahe's statements at his plea colloquy are irrelevant to the instant inquiry. During that colloquy, Vahe claimed that his cousin, Tamara Dadyan, filled out the PPP loan application on his behalf and directed Vahe to transfer the funds to Runyan Tax Service. Vahe also claimed that he read and spoke little to no English. Throughout his motion, Vahe references arguments that could only be supported by that narrative. *See, e.g.*, Dkt. 689 at 5 ("[T]he Voyage Limo PPP loan application was in English."). But evidence supporting that narrative was not admitted at trial. For example, there was no evidence regarding Vahe's English language proficiency. Accordingly, to the extent Vahe relies on information presented at the plea colloquy but not to the jury at trial, the Court declines to consider that information.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Critically, Vahe did not keep all of the $157,500 that Celtic Bank deposited into the Voyage Limo account. He did not even keep half of it. Rather, Vahe transferred $155,000—*i.e.*, nearly the entirety of the PPP loan—to another account. The memo for the transfer included a notation indicating that the transfer was for "payroll," even though Voyage Limo had no employees. *See infra* at 15. Moreover, the account that Vahe transferred the $155,000 to did not belong to Tamara Dadyan. Instead, it was a Runyan Tax Service[9] account for which the sole signatory was Victoria Kauichko, *i.e.*, an alias used by Marietta Terabelian and Richard Ayvazyan. The Celtic Bank funds were then used to purchase the Calle La Primavera home titled in Zhadko's name where Terabelian's sister was living.

Later, when Vahe received his "cut" of the deal, he also did not receive it from Tamara Dadyan. Rather, he received it in the form of two separate wires, five days apart, from a Radius Bank account for Timeline Transport. The sole signatory for that account was Zhadko (*i.e.*, Richard Ayvazyan). Moreover, the funds were not deposited into the Voyage Limo account but, rather, into a fourth account to which Vahe was now connected: a V&D Limo account.

In sum, (1) Vahe was transferring the entirety of the Celtic Bank loan from the Voyage Limo account to the Runyan Tax Service account (with a false memo indicating the transfer was for "payroll"), and then receiving his cut (as multiple wires) from a Timeline Transport account into a V&D Limo account; and (2) none of those accounts belonged to Tamara Dadyan. Given that Vahe was sending and receiving funds to and from multiple accounts—none of which belonged to Tamara Dadyan—it was reasonable for a juror to infer that Vahe knew that other members were involved in the conspiracy.

Moreover, the fact that multiple accounts were used also raises the reasonable inference of interdependency—*i.e.*, that Vahe had reason to know his benefits were dependent on the success of his co-conspirators. That is true for both conspiracies (*i.e.*, fraud and money laundering). Had Vahe's benefits *not* depended on the success of his co-conspirators, he would have simply retained the proceeds in the Voyage Limo account. Instead, the money was sent to the Runyan Tax Service account, and then his cut was received *from* a Timeline Transport account *into* a V&D Limo account. This flow of funds through multiple accounts raises the inference that Vahe had reason to believe his co-conspirators had to figure out how to send Vahe his cut—*i.e.*, Vahe's cut was dependent upon the success of his co-conspirators.[10]

Text messages also raise the inference that Vahe's co-conspirators were willing to interface with him and knew of his participation. Later, when Ayvazyan learns that an attempted wire had been cancelled, Ayvazyan offers to give Vahe a check: "It got canceled again, I have a check I can give him." *Id.* at 28. In

---

[9] Runyan Tax Service was a fake entity based on a real business with a similar name, and the real owner (Jack Runyan) testified at trial.

[10] This inference is further corroborated by the text messages between Tamara and Richard Ayvazyan. In those messages, Tamara and Ayvazyan discuss the limitations on wire transfers that made it difficult to send Vahe his cut. *See* GEX 10 at 21.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

response, Tamara offers to have Artur get the check and deposit it for Vahe.  *Id.*  These messages evince a willingness by the Ayvazyan brothers to give checks to Vahe or deposit checks for him.  This evidence further supports the inference that Vahe had reason to know that other conspirators were involved, and that his benefits were dependent upon the success of those conspirators.

Finally, the relationships between the defendants further supports that inference.  Vahe is Tamara's cousin, Tamara's husband is Artur, and Artur is Richard's brother.  Simply put, these four defendants (along with Richard's wife, Marietta Terabelian) are family.  And they were all participating in the same fraudulent activity: submitting PPP loans with materially false information, transferring the proceeds to one another using various accounts belonging to fake entities, and using the proceeds for personal expenses.  Given that Vahe's relatives were perpetrating the same fraud that he was, a juror may have reasonably inferred that Vahe knew about his relatives' participation in the conspiracy and that his benefits were dependent upon his relatives' success.

For the foregoing reasons, the Court concludes that—considered in the light most favorable to the Government—the evidence at trial was sufficient to convict Vahe of both the fraud and money laundering conspiracies.

  2.  **The Evidence at Trial Was Sufficient to Convict Vahe of Bank Fraud, Wire Fraud, and Money Laundering.**

The Court need not discuss these counts extensively because there was ample evidence to convict Vahe of the substantive counts of bank fraud, wire fraud, and money laundering.

Specifically, on May 18, 2020, Vahe signed—and Tamara submitted—a PPP loan application to Celtic Bank requesting $157,500 for Voyage Limo, for which Vahe is the sole owner.  State and federal agency records showed that Voyage Limo had no employees in 2018, 2019 or 2020, and had not filed federal income taxes during that time period.  Nevertheless, the application falsely stated that Voyage Limo had 11 employees and average monthly payroll expenses of $63,000.  The application also included fake IRS Forms 940 and 941.  The false payroll information used in the fake Form 940 was the same payroll information that Vahe's co-defendants had used in at least six other fraudulent PPP applications submitted as part of the conspiracy.  *Compare* GEX 116 at 6 *with* GEX 2.f, 2.k, 3.b, 3.d, 3.j, 3.k.

After Celtic Bank wired the PPP loan to Vahe's Voyage Limo bank account, Vahe wired nearly all of the funds to an account belonging to a fake company, Runyan Tax Service Inc.  Vahe falsely represented on the memo for the transfer that the purpose of the transfer was "payroll."  This was false because, as just noted, Voyage Limo had no employees.  A reasonable juror could infer that the false memo was designed to conceal the source of the funds.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Finally, when Vahe received his cut, he received it in the form of two separate wire transfers from an entirely different account for a different fake company (*i.e.*, Timeline Transport). Those funds were sent to, again, a separate account: V&D Limo.

Based on the foregoing, a rational juror could have concluded beyond a reasonable doubt that (1) Vahe signed a PPP application to obtain PPP funds that his business didn't qualify for; (2) Vahe made false statements on the application; (3) after receiving the funds from Celtic Bank, Vahe did not use the funds for legitimate business purposes and instead wired them to a fake tax preparation company, with the false memo "payroll"; and (4) Vahe later received his cut in the form of two wires from Timeline Transport to V&D Limo.

Under these circumstances the evidence considered in the light most favorable to the Government was sufficient to convict Vahe of bank fraud, wire fraud, and money laundering.

\* \* \*

For the foregoing reasons, the Rule 29 and Rule 33 motions filed by Richard Ayvazyan and Marietta Terabelian, *see* Dkt. 683, Artur Ayvazyan, *see* Dkts. 686, 687, and Vahe Dadyan, *see* Dkt. 689 are DENIED.

**IT IS SO ORDERED.**

:
**Initials of Deputy Clerk**