TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
    1100/1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527/2424/3819
    Facsimile: (213) 894-6269/0141
    E-mail:    Scott.Paetty@usdoj.gov
               Catherine.S.Ahn@usdoj.gov
               Brian.Faerstein@usdoj.gov
BRENT A. WHITTLESEY (Cal Bar No. 73493)
DAN G. BOYLE (Cal Bar No. 332518)
Assistant United States Attorneys
Asset Forfeiture Section
   1400 United States Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-5421/2426
   Facsimile: (213) 894-0142
   E-mail: Brent.Whittlesey@usdoj.gov
         Dan.Boyle@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>RICHARD AYVAZYAN,<br>   Aka "Richard Ayazian" and<br>"Iuliia Zhadko," et al.<br><br>       Defendants. | No. 2:20-cr-00579-SVW<br><br>APPLICATION FOR ENTRY OF MONEY JUDGMENT OF FORFEITURE AGAINST DEFENDANT RICHARD AYVAZYAN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAN G. BOYLE; EXHIBITS<br><br>**Sentencing**<br>Date: November 15, 2021<br>Time: 11:00 a.m.<br>Courtroom: 10A |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brent A. Whittlesey and Dan G. Boyle, respectfully submits this Application for Entry of a Money Judgment of Forfeiture against defendant Richard Ayvazyan ("Defendant") in the sum of $1,420,199.00.

This Application is based upon the attached memorandum of points and authorities, the Declaration of Dan G. Boyle and exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 18, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division
                                 JONATHAN GALATZAN
                                 Assistant United States Attorney
                                 Chief, Asset Forfeiture Division

                                        /s/
                                 _____
                                 DAN G. BOYLE
                                 BRENT A. WHITTLESEY

                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   FACTUAL BACKGROUND...........................................2

      A.    The Allegations in the First Superseding Indictment......2

      B.    Evidence Was Presented at Trial Establishing that
            Accounts Controlled by Defendant Received Millions of
            Dollars in Fraudulent PPP/EIDL Payments..................7

III.  LEGAL STANDARD...............................................8

IV.   ARGUMENT....................................................12

      A.    The Court Should Enter a Money Judgment of Forfeiture
            Pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461........12

      B.    The Court Should Enter the Proposed Money Judgment in
            The Amount Of $1,420,199...............................12

      C.    The Court Need Not Hold an Evidentiary hearing..........19

V.    CONCLUSION..................................................20

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                                 PAGE

**CASES**

Honeycutt v. United States,
        137 S. Ct. 1626 (2017)......................................10

United States v. Bourne,
        2012 WL 526721 (E.D.N.Y. Feb. 15, 2012)....................13

United States v. Casey,
        444 F.3d 1071 (9th Cir. 2006)............................9, 12

United States v. Harris,
        No. 19-10006, 2020 WL 7706625 (9th Cir. Dec. 29, 2020)....9, 19

United States v. Lo,
        839 F.3d 777 (9th Cir. 2016)................................9

United States v. Misla-Aldarondo,
        478 F.3d 52 (1st Cir. 2007).................................9

United States v. Numisgroup Int'l Corp.,
        169 F. Supp. 2d 133 (E.D.N.Y. 2001)........................11

United States v. Phillips,
        704 F.3d 754 (9th Cir. 2012)................................8

United States v. Roberts,
        660 F.3d 149 (2d Cir. 2011)................................18

United States v. Thompson,
        990 F.3d 680 (9th Cir. 2021)...................10, 14, 15, 17

United States v. Vescuso,
        856 F. App'x 742 (9th Cir. 2021)...........................10

**STATUTES**

18 U.S.C. § 1343...............................................4

18 U.S.C. § 1349...............................................4

18 U.S.C. § 981.............................................6, 12

21 U.S.C. § 853................................................9

28 U.S.C. § 2461...........................................7, 12

**RULES**

Fed. R. Crim. P. 32.2...............................6, 8, 12, 19

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

3

4

5

6

7

8

9

10

11

12

In June of 2021, the jury returned verdicts of guilty against defendant Richard Ayvazyan ("Defendant") on 23 counts charged in the First Superseding Indictment ("FSI") in this case. See Dkt. 644. Subsequently, the Court denied Defendant's motions to dismiss the FSI and for acquittal or a new trial. See Dkt Nos. 874-875. Shortly thereafter, Defendant, along with his spouse and co-defendant Marietta Terabelian ("Terabelian"), cut his ankle monitor and fled. While Defendant remains a fugitive as of the date of this filing, Defendant's sentencing is presently scheduled for November 15, 2021. See Dkt. No. 980.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Pursuant to the forfeiture allegations in the FSI, the government respectfully submits that as part of the financial component of Defendant's sentence, the Court should enter a money judgment of forfeiture against Defendant in an amount of $1,420,199. This amount reflects funds traced at trial into accounts Defendant controlled, as established through the evidence admitted at trial. While this proposed amount almost certainly does not capture the full amount Defendant obtained as a result of the wide-ranging fraud for which he was convicted, this calculation accords with Ninth Circuit precedent on the proper calculation of forfeiture money judgments. The proposed money judgment is both necessary and appropriate to forfeit criminal proceeds Defendant received based on his participation in the broad and egregious fraudulent scheme for which he was found guilty.

27

28

## II.   FACTUAL BACKGROUND

### A.   The Allegations in the First Superseding Indictment

As alleged in the First Superseding Indictment (the "FSI") (see Dkt. No. 154), beginning in or around March 2020 and continuing through at least August of 2020, Defendant and his co-conspirators (the "Ayvazyan Group") knowingly submitted dozens of fraudulent loan applications (the "False Applications") to federally insured financial institutions and the Small Business Administration (the "SBA"), and in turn, fraudulently obtained millions of dollars in proceeds from disaster loans authorized by the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act. See FSI ¶¶ 30-32.

The False Applications included false statements and incorporated or attached altered or forged documents in order to obtain loans guaranteed by the SBA through programs created by the CARES Act, including the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program. See FSI ¶ 31. The Ayvazyan Group submitted the False Applications on behalf of shell corporations, fictitious busines entities, and real businesses they did not actually own or control. Id. At times, members of the Ayvazyan Group would steal the identities of real persons, living and deceased, in order to submit False Applications in these victims' names. See FSI ¶¶ 31; 42-43; 44-45.

Among other misstatements, the False Applications typically included material misrepresentations about the purported applicant's payroll, payroll taxes, number of employees, and income. See FSI ¶ 31. Once the funds from a False Application were received, these funds were generally not used for any legitimate business purpose,

but instead, would be spent by the Ayvazyan Group on lifestyle expenses, luxury goods, cryptocurrency, and residential properties. See FSI ¶¶ 31-32.

As is specifically relevant to this application, the FSI alleged that Defendant controlled the following bank accounts (collectively, the "Ayvazyan Accounts"):

- A business checking account at Radius Bank in the name of "Timeline Transport, Inc." (the "Timeline Transport Bank Account");

- A business checking account at Wells Fargo Bank in the name of "Iuliia Zhadko dba Top Quality Contracting" (the "TQC Bank Account");

- A business checking account at Radius Bank in the name of "Mod Interiors, Inc." (the "Mod Interiors Bank Account");[1]

- A business checking account at JP Morgan Chase Bank in the name of "Turing Info Solutions Inc." (the "Turing Info Bank Account"); and

- A personal checking account at JM Morgan Chase Bank in the name of "Iuliia Zhadko" (the "Zhadko Bank Account").

See FSI, ¶ 22.

The FSI alleged the following substantive counts (as relevant to this application), each of which resulted in a verdict of guilty:

- In Count Two, Defendant was charged with one violation of 18 U.S.C. § 1343 based on the transfer of approximately $182,637 in PPP loan proceeds from WebBank into an account in the name

---

[1] The FSI alleged that defendant Terabelian also controlled the Mod Interiors Bank Account. See FSI, ¶ 23(c).

3

of Sabala Construction ending '9906 (the "Sabala Construction Bank Account");

- In Count Four, Defendant was charged with one violation of 18 U.S.C. § 1343 based on the transfer of approximately $130,000 in PPP loan proceeds from Celtic Bank into the TQC Bank Account;

- In Count Ten, Defendant was charged with one violation of 18 U.S.C. § 1343 based on the transfer of approximately $149,900 in EIDL loan proceeds from the SBA into the Timeline Transport Bank Account;

- In Count Eleven, Defendant was charged with one violation of 18 U.S.C. § 1343 based on the transfer of approximately $384,150 in PPP loan proceeds from Newtek Small Business Finance ("Newtek") into the Mod Interiors Bank Account;

- In Count Fourteen, Defendant was charged with one violation of 18 U.S.C. § 1344 based on the submission of a false application for $130,000 in PPP loan proceeds to Celtic Bank, the proceeds of which were paid into the TQC Bank Account.

See FSI, ¶ 41.

Finally, the following acts and transactions were alleged as overt acts in Count One, which charged Defendant and others with a conspiracy to violate 18 U.S.C. §§ 1343 and 1344, in violation of 18 U.S.C. § 1349, and for which Defendant was found guilty (Dkt. No. 644):

- Using the alias Iuliia Zhadko ("Zhadko"), together with other coconspirators, Defendant submitted and caused to be submitted to the SBA an application in the name of Timeline Transport, Inc. seeking an EIDL loan in the amount of

4

approximately $150,000, which (a) falsely represented that
Zhadko had owned Timeline Transport since 2016 and was the
company's Chief Executive Officer; (b) falsely represented
that Timeline Transport had 22 employees, including employees
for whom it had paid wages and payroll taxes; and (c) falsely
certified Timeline Transport would use the loan proceeds for
permissible business purposes;

- Defendant, together with other coconspirators, caused the SBA
to wire approximately $149,900 in proceeds from the above-
described Timeline Transport EIDL loan to the Timeline
Transport Bank Account;

- Defendant, using the name of his deceased father-in-law,
Nazar Terabelian ("N.T."), together with other
coconspirators, submitted and caused to be submitted to
Newtek an application in the name of Mod Interiors seeking a
PPP loan in the amount of $384,150, which (a) falsely
represented that N.T. was Mod Interiors' President; (b)
falsely represented that Mod Interiors had 36 employees,
including employees for whom it had paid wages and payroll
taxes; and (c) included, as a supporting record, a copy of
N.T.'s California driver's license.

- Defendant, together with other coconspirators, caused Newtek
to wire approximately $384,150 in proceeds from the above-
described Mod Interiors Newtek PPP loan to the Mod Interiors
Bank Account.

- Defendant, using his alias Zhadko, together with other
coconspirators, submitted and caused to be submitted to
Newtek an application in the name of Turing Info Solutions

5

Inc. ("Turing Info"), seeking a PPP loan in the amount of $384,150, which included a fake California driver's license in the name of "Iuliia Zhadko" and fake IRS Forms 940 and 1120-S, which falsely represented that each had been prepared by J.R., a professional tax preparer.

- Defendant, together with other coconspirators, caused Newtek to wire approximately $384,100 in proceeds from the above-described Turing Info PPP loan to the Turing Info Bank Account.

See FSI, ¶ 33.

The FSI contained multiple forfeiture allegations pursuant to Fed. R. Crim. P. 32.2(a). See FSI, at 48-55. In relevant part, the government provided the following forfeiture notice:

- In the event of Defendant's conviction on Count One of the FSI, pursuant to 18 U.S.C. § 982, the government would seek forfeiture as part of any sentence.  The government gave notice of its intent to forfeit property constituting or derived from the proceeds traceable to the underlying violation. See FSI, ¶ 65-66.  The government also gave notice that it may seek a judgment for a sum of money up to the total amount of money involved in the offense of which Defendant was convicted. Id., ¶ 66(b).

- In the event of Defendant's conviction on any of Counts Two through Twelve of the FSI, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the government would seek forfeiture as part of any sentence. The government gave notice of its intent to forfeit property constituting or derived from the proceeds traceable to the underlying

6

violation. See FSI, ¶ 68-69.  The government also gave notice that it may seek a judgment for a sum of money up to the total amount of money involved in each offense for which Defendant was convicted. Id., ¶ 69(b).

- In the event of Defendant's conviction on any of Counts Thirteen through Twenty of the FSI, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the government would seek forfeiture as part of any sentence. The government gave notice of its intent to forfeit property constituting or derived from the proceeds traceable to the underlying violation. See FSI, ¶ 71-72.  The government also gave notice that it may seek a judgment for a sum of money up to the total amount of money involved in each offense of which Defendant was convicted. Id., ¶ 72(b).

B.   **Evidence Was Presented at Trial Establishing that Accounts Controlled by Defendant Received Millions of Dollars in Fraudulent PPP/EIDL Payments**

At trial, the government introduced evidence regarding payments received by Defendant in the Ayvazyan Accounts, all of which related to the above-described alleged conduct. As detailed to the jury, the total amount which was obtained through the scheme was at least $4,799,415, which represented just the proceeds of 28 EIDL and PPP loans traced and testified to by the government's summary witness, Ms. Marylee Robinson. See GX 115, at 3-4 (identifying 27 EIDL/PPP loans); GX 401, at 2 (identifying additional $149,900 SBA loan payment). As detailed further herein, through Ms. Robinson's testimony, the government traced funds from EIDL and PPP loans into bank accounts controlled by the conspirators, millions of dollars of

7

1  which ended up in the Ayvazyan Accounts controlled by Defendant,

2  either in his own name, or more often, through his alias, Zhadko.[2]

3  Presently, the government's assessment of the total proceeds of all

4  approximately 140 fraudulent loans obtained by the Ayvazyan Group

5  exceeds $17 million dollars. See, e.g., Dkt. No. 886 at 42

6  (estimating total amount of all PPP/EIDL loans obtained by the

7  Ayvazyan Group at $17,029,484.26).

8  ### III. LEGAL STANDARD

9      When the government has given notice in an indictment of its

10  intent to seek forfeiture, the court may enter a judgment of

11  forfeiture as part of the defendant's sentence. See Fed. R. Crim. P.

12  32.2(a). "If the government seeks a personal money judgment, the

13  court must determine the amount of money that the defendant will be

14  ordered to pay." Id. at 32.2(b)(1)(A).

15      The Ninth Circuit has held that Rule 32.2 "does not permit the

16  district court to do anything other than 'determine the amount of

17  money that the defendant will be ordered to pay,' in an amount

18  determined by statute." United States v. Phillips, 704 F.3d 754, 771

19  (9th Cir. 2012). "Those proceeds need not be in the defendant's

20  possession at the time of sentencing; in fact, imposition of

21  forfeiture is still necessary even if defendant has no assets to

22  forfeit." Id.; see also United States v. Casey, 444 F.3d 1071, 1074

23  (9th Cir. 2006) (forcing a defendant to disgorge his ill-gotten

24

25      [2] The jury necessarily found that Zhadko was Defendant's alias,
    for the following reasons: (1) Defendant's use of the Zhadko alias
26  was alleged in the FSI in Count One, upon which Defendant was
    convicted, (2) Defendant was convicted on Counts Fourteen and Twenty-
27  One, which alleged that Defendant obtained a PPP loan paid into the
    TQC Bank account under Zhadko's name; and (3) the government seized
28  from Defendant multiple physical credit cards in the name of  Zhadko,
    which were admitted into evidence through the seizing agents.

gains, "even those already spent," ensures that defendants do not benefit from their crimes); United States v. Misla-Aldarondo, 478 F.3d 52, 73-74 (1st Cir. 2007) ("If the government has proven that there was at one point an amount of cash that was directly traceable to the offenses, and that thus would be forfeitable . . . . , that is sufficient for the court to issue a money judgment, for which the defendant will be fully liable whether or not he still has the original corpus of tainted funds – indeed, whether or not he has any funds at all.").

In the case of a fraud scheme such as that alleged in Counts One through Twenty, a money judgment of forfeiture is not limited to those specific acts alleged in any substantive count for which a defendant may be found guilty.  Rather, a money judgment is appropriate for all proceeds obtained through the fraudulent scheme alleged, not just specific executions of that scheme charged in a substantive count of conviction.  See United States v. Harris, No. 19-10006, 2020 WL 7706625, at *4 (9th Cir. Dec. 29, 2020) (Memorandum) ("Section 981 authorizes the government to seek forfeiture of all proceeds obtained from the fraudulent scheme of a wire fraud offense"); United States v. Lo, 839 F.3d 777, 793-94 (9th Cir. 2016) (where "[e]ach individual count included both the scheme to defraud and a specific use of the wires as an act in furtherance of that scheme," the court was authorized to order forfeiture of all funds obtained from the scheme "because the commission of those wire fraud and mail fraud offenses necessarily involved execution of the relevant fraudulent schemes").

In Honeycutt v. United States, the Supreme Court held that under the criminal narcotics forfeiture statute, 21 U.S.C. § 853, a money

judgement of forfeiture was "limited to property the defendant himself actually acquired as the result of the crime," and thus, joint and several liability was impermissible. 137 S. Ct. 1626, 1635 (2017). While the Supreme Court has not addressed whether Honeycutt applies to analogous forfeiture statutes under Title 18, such as 18 U.S.C § 981, in United States v. Thompson, the Ninth Circuit held that "Honeycutt does apply to 18 U.S.C. § 981(a)(1)(C)," and that a district court is required by Section 981 to determine the amount to be forfeited based on those proceeds which "came to rest with [the defendant] as a result of his crimes." 990 F.3d 680, 689-91 (9th Cir. 2021); see also United States v. Vescuso, 856 F. App'x 742, 743 (9th Cir. 2021) ("A co-conspirator can be ordered to forfeit only the amount of money that came to rest with him as a result of his crimes.").[3] The Thompson court noted that in determining whether and what funds came to rest with any co-conspirator, a trial court need not be exact, and may take into account the questionable nature of how criminals keep and hide criminal proceeds. See Thompson, 990 F.3d at 692 ("The numbers used throughout this opinion of course may be approximate because swindlers and other criminals may be less than honest…").[4]

---

[3] The Ninth Circuit has recognized that there is a developing circuit split over whether Honeycutt applies to 18 U.S.C. § 981. See Thompson, 990 F.3d at 689 ("[T]he Sixth Circuit, in United States v. Sexton, holds that Honeycutt does not apply to 18 U.S.C. § 981(a)(1)(C)").

[4] The court in Thompson also noted that a money judgment is not appropriate for funds which have been traced into specific property that has already been forfeited. 990 F.3d at 690-691. For example, if $1000 in fraud proceeds were deposited in a criminal's bank account, and $500 was then spent on jewelry which is ultimately forfeited at trial, a money judgment would generally be limited to the remaining $500 not already forfeited as specific property.

A forfeiture order must be entered at or before sentencing. Fed. R. Crim P. 32.2(b)(2). The order becomes final as to the defendant at sentencing and must be included in the oral pronouncement of sentence and noted in the judgment and commitment order. Id., at 32.2(b)(4). Where a defendant has fled prior to sentencing but after trial – as Defendant has done here – the Court has authority under Criminal Rule 43 to impose a sentence including forfeiture. See Fed.R.Crim.P. 43(c)(1)(A-B)(defendant waives presence at sentencing "(A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial; [or] (B) in a noncapital case, when the defendant is voluntarily absent during sentencing").

Once a money judgment is entered, the government may move at any time, pursuant to Rule 32.2(e)(1), to amend the judgment or order to add additional property identified subsequent to that order or to forfeit specific property of the defendant as a substitute asset, having a value up to the amount of the money judgment. See Fed.R.Crim.P. 32.2(e)(1); United States v. Numisgroup Int'l Corp., 169 F. Supp. 2d 133 (E.D.N.Y. 2001) (Rule 32.2(e) authorizes forfeiture of substitute assets to satisfy a money judgment, including a judgment based on the value of the missing proceeds and the value of the missing facilitating property).

### IV.   ARGUMENT

### A.   The Court Should Enter a Money Judgment of Forfeiture Pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461

The proposed money judgment of forfeiture accompanying this application is warranted on based on Defendant's convictions on Counts One, Two, Four, Ten, Eleven, and Fourteen.

Defendant's convictions under these Counts of the FSI, for violations of the wire and bank fraud statutes, and conspiracy to commit the same, give rise to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which incorporates 18 U.S.C. § 1956(c)(7)(A), which itself incorporates 18 U.S.C. § 1961(1) to define "specified unlawful activity," to includes violations of 18 U.S.C. §§ 1343 and 1344. Alternately, pursuant to 18 U.S.C. § 982(a)(2)(A), forfeiture is mandatory for violations of 18 U.S.C. §§ 1343 and 1344 which affect a financial institution, as each of the charged offenses do here.

### B.   The Court Should Enter the Proposed Money Judgment in The Amount Of $1,420,199

Through the Ayvazyan Accounts, Defendant received proceeds from the scheme alleged in the FSI in an amount of at least $1,420,199. Accordingly, Defendant should be required to disgorge this sum as part of his sentence in this case, regardless of whether Defendant has already dissipated these funds. See United States v. Casey, 444 F.3d 1071, 1074 (9th Cir. 2006) (forcing a defendant to disgorge his ill-gotten gains, "even those already spent," ensures that defendants do not benefit from their crimes).

In determining the amount of the money judgment, the Court may rely upon evidence admitted at trial and already in the record. See Fed. R. Crim. P. 32.2(b)(1)(B). The government has the burden of

12

establishing the amount of the money judgment by a preponderance of the evidence. See United States v. Bourne, 2012 WL 526721, at *3 (E.D.N.Y. Feb. 15, 2012).

The evidence admitted at trial through the government's summary witness, Ms. Robinson, established that Defendant received a least $1,420,199 into the Ayvazyan Accounts he controlled, either in his own name or that of his alias, Zhadko. This amount is calculated based on loans and transactions which were traced by Ms. Robinson during her trial testimony, and were represented in the summary charts as to which she testified before the jury (see GX 115, 401, 402), as follows:

- Between June 22, 2020 and July 3, 2020, $394,700 was deposited into the Timeline Transport Bank Account based on PPP Loan Application Nos. x8007 and x7903 and EIDL Loan Application No. x3854. See GX 115, at 4,9; see also GX 1.n at 179, 182.[5] As described above, Timeline Transport was a business used by Defendant and the Ayvazyan Group to obtain fraudulent EIDL and/or PPP loans as part of the scheme for which Defendant was convicted, including on Counts One and Ten. $110,000 was transferred from the Timeline Transport Bank Account to Encore Escrow in order to purchase a residential property which was forfeited at trial, $82,000 was transferred from the Timeline Transport Bank Account in order to purchase luxury watches which were forfeited at trial, and $50,000 was transferred to an account controlled by co-conspirator Vahe Dadyan (GX 115, at 4,

---

[5] These underlying bank records were summarized by Ms. Robinson's testimony and associated exhibits and admitted pursuant to the Court's Order of June 13, 2021. See Dkt. No. 517.

9, 12), leaving a balance of $152,700 in fraud proceeds in the Timeline Transport Bank Account controlled by Defendant.[6]

- On May 1, 2020, $182,637 was transferred to the Sabala Construction Bank Account based on PPP Loan Application No. x7305. See GX 115, at 8. As described above, Sabala Construction was a business used by Defendant and the Ayvazyan Group to obtain fraudulent EIDL and/or PPP loans as part of the scheme for which Defendant was convicted, including on Counts One and Two. These proceeds were then transferred into an account in the name of Hart Construction at JP Morgan Bank (id.), $50,000 of which was then transferred into the Zhadko Bank Account,[7] leaving a balance of $50,000 in fraud proceeds in the Zhadko Bank Account controlled by Defendant.

- On July 31, 2020, $384,100 was transferred to the Mod Interiors Bank Account based on PPP Loan Application No. x8101, and on August 7, 2020, $149,900 was transferred to the Mod Interiors Bank Account based on EIDL Loan Application No. x8350. See GX

---

[6] In accordance with Thompson, the government has deducted the value of forfeited specific property from its calculation of the amount of the proposed money judgment. Where forfeited property was not directly traced, such as the $451,185.00 in U.S. currency forfeited at trial, this amount falls well within the difference between the total amount fraudulently obtained through the conspiracy (approximately $17,029,484.26), and the amount sought by the government here. If the Court were inclined to deduct the amount of forfeited cash from any money judgment, any such deduction should be made pro rata among all defendants to avoid the possibility of double-counting (i.e., to avoid more than one defendant claiming a deduction of the full amount), leaving a deduction of $53,398 for Defendant here, resulting in a money judgment amount of $1,366,801.

[7] The trial evidence reflects one May 15, 2020 $5,000 transfer from the Zhadko bank Account to an account in the name of Fiber One Media (see GX 115, at 12), an account controlled by Terabelian. See FSI, at 13. This amount is not deducted, however, as this is effectively cancelled out by a $5,000 transfer from the same account on July 10, 2020 to "Inception Ventures," an account controlled by Defendant. See id.; FSI ¶ 22(b).

115, at 9. As described above, Mod Interiors was a business used by Defendant and the Ayvazyan Group to obtain fraudulent EIDL and/or PPP loans as part of the scheme for which Defendant was convicted, including on Counts One and Eleven. $238,960 was then transferred from the Mod Interiors Bank Account to Piccadilly Jewelers to purchase a gold coins and jewelry which were forfeited at trial[8], $74,616 was transferred to an account in the name of Viktoria Kauichko (an alias of co-conspirator Terabelian), and $46,000 was transferred to an account controlled by co-conspirator Artur Ayvazyan (id., at 12), leaving a balance of $174,424 in fraud proceeds in the Mod Interiors Bank Account controlled by Defendant.[9]

- Between May 5, 2020 and May 19, 2020, $546,750 was deposited into the TQC Bank Account based on PPP Loan Application Nos. x7202, x7304, and x7706 and EIDL Loan Application No. x0246. See GX 115, at 8; see also GX 1.f at 23. As described above, TQC was

---

[8] The government contends that the value of the forfeited assets traceable to Piccadilly Jewelers (namely, 60 gold coins, one pair of earrings, and one necklace) was dramatically lower than the $238,960 transferred from the Mod Interiors Bank Account, and certain property purchased with these funds was never recovered. See GX 39, at 1-2 (receipts reflecting purchases of at least $127,000 in unrecovered kilograms of gold). For the purpose of this application, however, the government has deducted the full $238,960 to avoid any dispute as to the apportionment of those proceeds. As noted in Thompson, some reasonable approximation is permitted when calculating a money judgment, and the Court would be well within its discretion to add some or all of this $127,000 to the proposed money judgment.

[9] Defendant may argue that the Mod Interiors Bank Account was jointly controlled by Defendant and his wife and co-conspirator, Terabelian, but the Ninth Circuit recognized in Thompson that funds may come to rest in spouses' jointly controlled bank accounts, and so long as the government does not seek to double-count such funds (i.e., by seeking to collect these funds from both spouses), a money judgment in such amount is permissible. See Thompson, 990 F.3d at 691 ("If the money came to rest in a joint account, or property owned jointly or as tenants by the entirety, the swindlers would each have an unfettered right to enjoy the whole…").

15

a business used by Defendant and the Ayvazyan Group to obtain fraudulent EIDL and/or PPP loans as part of the scheme for which Defendant was convicted, including on Counts One, Three, and Fourteen. As reflected in the account records for the TQC Bank Account, while these fraud proceeds were either spent or transferred into other accounts controlled by Defendant (including through his alias Zhadko), with the exception of one $10,000 transfer,[10] these funds were not distributed to other conspirators, leaving an effective balance of $536,750 in fraud proceeds in the TQC Bank Account controlled by Defendant.

- Between August 12, 2020 and August 25, 2020, $534,000 was deposited into the Turing Info Bank Account based on PPP Loan Application No. x8210 and EIDL Loan Application No. x2336. See GX 115, at 10; see also GX 1.r at 6. As described above, Turing Info was a business used by the Ayvazyan Group to obtain fraudulent EIDL and/or PPP loans as part of the scheme for which Defendant was convicted, including on Count One. As reflected in the account records for the Turing Info Bank Account, these fraud proceeds were either spent or transferred out of the Turing Info Bank Account into other accounts controlled by Defendant, including through his alias Zhadko. See GX 1.r; GX 115, at 10. Other than one September 23, 2020 $18,475 transfer to an account in the name of Runyan Tax Services (see GX 115, at 12), an account controlled by Terabelian (see FSI ¶ 23(b)), these funds were not distributed to other conspirators or

---

[10] On May 11, 2020, $10,000 was transferred from the TQC Bank Account to a bank account in the name of Fiber One Media, an entity allegedly controlled by Terabelian. See GX 115, at 12.

16

forfeited at trial, with the exception of $9,200 transferred for the purchase of a luxury watch which was forfeited (see GX 402), leaving an effective balance of $506,325 in fraud proceeds in the Turing Info Bank Account controlled by Defendant. While the true amount that Defendant received as part of this scheme may well be an order of magnitude larger than the $1,420,199 the government now seeks, the Court should approve the proposed money judgment for the following reasons:

First, a money judgment in the amount of $1,420,199 fully complies with the Ninth Circuit's guidance in Thompson that a money judgment of forfeiture be based on the best approximated calculation of those funds which can be established to have come to rest with a defendant (regardless of whether they might subsequently have been spent or dissipated), rather than funds which merely passed through shared or intermediate accounts prior to being divided up by the conspirators. See Thompson, 990 F.3d at 692 (holding that forfeiture judgments must be "for the approximate separate amounts that came to rest with each of them after the loot was divided among the swindlers"). As detailed above, the funds included in the government's calculations were traced into the Ayvazyan Accounts and came to rest with Defendant, where they were either spent or transferred to other accounts Defendant controlled. While there is inevitably some approximation in a case fundamentally based on aliases, stolen identities, and fraudulent misrepresentations, the Court's calculation need not be exact, and may use reasonably approximated figures. See Thompson, 990 F.3d at 692 ("[C]riminals may be less than honest and conscientious about their bookkeeping and testimony about what each of them ended up with"); United States v.

17

Roberts, 660 F.3d 149, 166 (2d Cir. 2011) (because forfeiture is punitive, not restitutive, calculation of a forfeiture money judgment need not be exact and is not improper if it exceeds to some extent amount the defendant obtained).

Second, a money judgment of $1,420,199 avoids any concerns with double-counting property forfeited at trial. As described above, the government has deducted the value of those funds which were used to purchase specific property which was ordered forfeited at trial. Where the Defendant purchased property which was not forfeited at trial and remains outstanding, such as diamonds and cryptocurrency (see GX 115, at 8-10), these amounts are appropriately counted in the calculation of a money judgment. In fact, as described above (see n.7, supra), the government's calculations are almost certainly overly cautious in deducting amounts for specific property already forfeited, such as where Defendant transferred over $230,000 from the Mod Interiors Bank Account to Piccadilly Jewelers, but the government recovered and forfeited property representing only approximately half of this amount.

Finally, pursuant to Rule 32.2(e)(1), the government may seek to amend this judgment in the future as additional forfeitable property is identified or funds are discovered to have come to rest with Defendant. Considering the web of synthetic and stolen identities used by the Ayvazyan Group and the sheer volume of False Applications involved in the conspiracy, the government's work tracing these assets is understandably ongoing, but the government will bring any subsequently-discovered forfeitable assets to the Court's attention.

**C.    The Court Need Not Hold an Evidentiary hearing**

Pursuant to Fed. R. Crim. P. 32.2(b)(1)(B), a court's determination on forfeiture "may be based on evidence already in the record" and "[i]f the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." A defendant's right to a hearing, however, is not license to relitigate evidence already admitted into the record.  In <u>Harris</u>, the Ninth Circuit held that a defendant may not use a hearing on potential money judgment of forfeiture as an opportunity for a second chance at challenging evidence already admitted at trial.  <u>See</u> <u>Harris</u>, No. 19-10006, 2020 WL 7706625, at *3 (9th Cir. Dec. 29, 2020) ("The district court held that expert testimony was unnecessary because the government's forfeiture calculations rested on the trial evidence, not extrapolation or sampling, and that Harris sought to challenge the trial evidence improperly. . . . Thus, the district court did not abuse its discretion by refusing to hold an evidentiary hearing on forfeiture.").  Here, the government relies solely on evidence and testimony already entered into the record, and thus much like in <u>Harris</u>, an evidentiary hearing is neither necessary nor appropriate.

//

//

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant the government's Application and requests that the Court enter the Proposed Money Judgment lodged contemporaneously with this application.

Dated: October 18, 2021          Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Division

              /s/
DAN G. BOYLE
BRENT A. WHITTLESEY

Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA