TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/2424/3819
     Facsimile: (213) 894-6269/0141
     E-mail:    Scott.Paetty@usdoj.gov
              Catherine.S.Ahn@usdoj.gov
              Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue NW, 3rd Floor
     Washington, DC 20530
     Telephone: (202) 320-0539
     Facsimile: (202) 514-0152
     E-mail:  Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>RICHARD AYVAZYAN,<br><br>       Defendant. | No. CR 20-579-SVW-1<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RICHARD AYVAZYAN<br><br>Date:        November 15, 2021<br>Time:        11:00 a.m.<br>Location:  Courtroom of the Hon.<br>               Stephen V. Wilson |

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, Assistant United States Attorneys Scott Paetty,

Catherine Ahn, and Brian Faerstein, and Department of Justice Trial Attorney Christopher Fenton, hereby files its sentencing position regarding defendant Richard Ayvazyan.

The government's sentencing position is based upon the attached memorandum of points and authorities, the revised presentence investigation report, the files and records in this case, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

The government reserves the right to file any supplemental sentencing positions that may be necessary.

Dated: November 10, 2021          Respectfully submitted,

                                  TRACY L. WILKISON
                                  Acting United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                  _____/s/_____
                                  SCOTT PAETTY
                                  CATHERINE AHN
                                  BRIAN FAERSTEIN
                                  Assistant United States Attorneys
                                  CHRISTOPHER FENTON
                                  Department of Justice Trial Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF CONTENTS....................................................i

TABLE OF AUTHORITIES...............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   RELEVANT PROCEDURAL HISTORY....................................2

III.  DEFENDANT'S OFFENSE CONDUCT....................................5

IV.   ADVISORY SENTENCING GUIDELINES CALCULATION....................6

      A.    The PSR Correctly Applied a Four-Level Aggravated Role
            Adjustment..............................................7

      B.    The PSR Correctly Calculated Loss......................11

      C.    The PSR Correctly Applied a Two-Level Enhancement
            Based on the Number of Victims.........................14

      D.    The PSR Correctly Applied a Two-Level Vulnerable
            Victim Adjustment......................................14

      E.    The PSR Correctly Applied a Two-Level Obstruction
            Adjustment.............................................15

      F.    A Two-level Enhancement in Accordance with U.S.S.G. §
            2B1.1(b)(11) Should Apply..............................16

V.    SECTION 3553(a) FACTORS......................................16

VI.   GOVERNMENT'S SENTENCING RECOMMENDATION.......................17

      A.    Term of Custody........................................17

            1.    Nature and Circumstances of the Offense and
                  History and Characteristics of the Defendant (18
                  U.S.C. § 3553(a)(1))............................17

            2.    Seriousness of the Offense, Respect for the Law,
                  and Just Punishment (18 U.S.C. § 3553(a)(2)(A)).....19

            3.    Affording Adequate Deterrence and Protecting the
                  Public from Further Crimes of the Defendant (18
                  U.S.C. § 3553(a)(2)(B) and (C))...................20

      B.    The Court Should Deny Ayvazyan's Request to Modify the
            Money Judgment of Forfeiture...........................22

      C.    Supervised Release, Fine, Restitution, and Mandatory
            Special Assessment.....................................25

VII. CONCLUSION.......................................................25

1

**TABLE OF AUTHORITIES**

2

**CASES**

3 <u>Gall v. United States</u>, 552 U.S. 38 (2007)...........................16

4 <u>Honeycutt v. United States</u>, 137 S. Ct. 1626 (2017).................23

5 <u>Molina-Martinez v. United States</u>, 136 S.Ct. 1338 (2016)...........16

6 <u>United States v. Blitz</u>, 151 F.3d 1002 (9th Cir. 1998).............11

7 <u>United States v. Carty</u>, 520 F.3d 984 (9th Cir. 2008)..............16

8 <u>United States v. Cuellar</u>, 165 F.3d 918 (9th Cir. 1998)........14, 15

9 <u>United States v. Jernigan</u>, 60 F.3d 562 (9th Cir. 1995)............16

10 <u>United States v. Lloyd</u>, 807 F.3d 1128 (9th Cir. 2015).........11, 12

11 <u>United States v. Maciel-Alcala</u>, 612 F.3d 1092 (9th Cir. 2010)..14, 15

12 <u>United States v. Ovsepian</u>, 739 Fed. Appx. 448 (9th Cir. 2018)......16

13 <u>United States v. Rita</u>, 551 U.S. 338 (2007)........................16

14 <u>United States v. Smith</u>, Case No. 20-cr-196-1 (E.D. Wis.)...........10

15 <u>United States v. Thompson</u>, 990 F.3d 680 (9th Cir. 2021)....23, 24, 25

16 <u>United States v. Treadwell</u>, 593 F.3d 990 (9th Cir. 2010)...11, 12, 21

17 <u>United States v. Wells</u>, 804 F. App'x 515 (9th Cir. 2020)..........12

18

**STATUTES**

19 18 U.S.C. § 3553(a)........................................passim

20

**OTHER AUTHORITIES**

21 USSG § 1B1.3(a)(1)(B)..........................................11, 12

22 USSG § 2B1.1(a)(1)................................................6

23 USSG § 2B1.1(b)(11)(A)(ii).......................................16

24 USSG § 2B1.1(b)(1)(K)............................................6

25 USSG § 2B1.1(b)(10)..............................................6

26 USSG § 2B1.1(b)(2)...............................................6

27 USSG § 3A1.1(b)(1)...............................................7

28 USSG § 3B1.1(b).................................................7

USSG § 3B1.1, Application Note 4....................................7

USSG § 3C1.1.........................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

The government respectfully submits this sentencing memorandum to advise the Court of its sentencing position regarding defendant Richard Ayvazyan ("defendant"), who was convicted by a jury of 23 felony counts.

Defendant is the most culpable participant in a horrendous fraud.  As soon as the federal government declared a national emergency and began to take action to respond to the crisis caused by the COVID-19 pandemic, defendant started scheming to steal the relief funds intended to save small businesses from going bankrupt.  As the experienced leader of a loan fraud ring, he directed several co-conspirators to relentlessly steal millions of dollars using the identities of dead people, elderly semi-retired business owners, and others.  In one instance, he opened bank accounts and applied for loans using the identity of his wife's deceased father, who had passed away only three days earlier.  Rushing to pocket and launder as much money as he could before federal funding ran out, he upgraded from his old mansion (that was the subject of a loan fraud scheme for which he was previously convicted) to a new mansion, which he then filled with gold coins, luxury watches, and imported furniture using the stolen COVID-19 disaster relief funds.  After he was arrested, tried and convicted along with several of his co-conspirators, defendant absconded and abandoned his young children.

For the reasons stated below, the government respectfully recommends the Court sentence defendant to at least 348 months' imprisonment, consisting of a sentence of 324 months on Counts 1-20 and 240 months on Count 26 to be served concurrently, and 24 months

on Count 21 and 22 to be served consecutively to the terms imposed on Counts 1-20 and 26.  The government further recommends five years of supervised release,[1] restitution in the amount of $16,464,071.26, forfeiture consistent with the Court's previous preliminary orders of forfeiture as to defendant (ECF 1083, 1087), and a special assessment of $2,300.

## II.   RELEVANT PROCEDURAL HISTORY

At the height of the pandemic, on October 20, 2020, the government made a probable cause arrest of defendant and his wife, co-defendant Marietta Terabelian upon their return to the United States from a luxury vacation in Turks & Caicos.  Within hours, they were charged in a detailed complaint for their role in a massive fraud ring.  (ECF 1.)  At the time of his arrest, defendant was in possession of various credit cards in the names "Iuliia Zhadko" and "Viktoria Kauichko," which were synthetic identities that had been used to steal COVID-19 disaster relief funds and launder the proceeds of the same.  (GEX 76.a, 115, 116.)

Approximately two weeks later, on November 5, 2020, the government executed a search warrant on a home that defendant had purchased using stolen COVID-19 disaster relief loan money, and seized two smartphones belonging to defendant that contained evidence showing he had already violated his conditions of release by continuing to possess images of credit cards, driver's licenses and other financial instruments in the names of other purported identities (including Zhadko, Kauichko, and other individuals and

---

[1] This term consists of five years on each of Counts 1 through 20, three years on Count 26, and 1 year on each of Counts 21 and 22, all to be served concurrently.

businesses he used to perpetrate the fraudulent scheme).  (See, e.g., GEX 19.b, 19.c, 19.d, 56.d.)[2]  Agents also found a grocery bag containing approximately $450,000 that co-defendant Terabelian had hidden in the bushes as law enforcement approached the house.  (See, e.g., ECF 188-9, 188-10.)

On November 17, 2020, a grand jury returned an indictment against defendant and his co-conspirators for conspiracy to commit wire fraud and bank fraud, wire fraud, bank fraud, and aggravated identity theft (as to defendant only).  (ECF 32.)

On March 9, 2021, a grand jury returned a superseding indictment against defendant and his co-conspirators for conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, aggravated identity theft, wire fraud, bank fraud, and money laundering.  (ECF 154.)

On June 25, 2021, following a nine-day trial, a jury convicted defendant on 23 felony counts, including conspiracy to commit wire fraud and bank fraud (Count 1), wire fraud (Counts 2-12), bank fraud (Counts 13-20), aggravated identity theft (Counts 21-22), and conspiracy to commit money laundering (Count 26).[3]  Defendant's wife was also convicted of nearly all counts.

The government moved to remand defendant pending sentencing.  In response, defendant assured the Court he did not present a flight

---

[2] These and other identities found on his phone on November 5, 2020 had been used to fraudulently obtain COVID-19 disaster relief funds and launder the proceeds.  (See GEX 115, 116; Declaration of Catherine Ahn in support of the Government's Sentencing Position for Marietta Terabelian ("Ahn Decl."), Ex. 1 (a chart titled "Loans for Loss Calculation – Richard Ayvazyan and Marietta Terabelian").)

[3] Defendant was acquitted of five counts of money laundering the government alleged he had committed while on pre-trial release.

risk because, according to him, "[h]is family, children, church, and business relationships are all [in the LA area]" and "he lacks the resources to flee the jurisdiction even if he wanted to". (ECF 603 at 3-4.) Defendant lied. While on release awaiting sentencing, he declined to be interviewed by the United States Probation and Pretrial Services Office ("USPO"), failed to make the mandatory financial disclosures, and as soon as the Court denied his post-trial motions (ECF 874, 875), absconded with his wife (ECF 1094).

Counsel immediately attempted to withdraw its representation of defendant and indefinitely continue defendant's sentencing, claiming – without evidence - that defendant may have been abducted. (ECF 942, 954, 1062.) The Court denied counsel's motions and determined to proceed with sentencing defendant in absentia. (ECF 980, 1094.)

On November 8, 2021, the USPO filed its second revised PSR (ECF 1121, 1122), which addresses the parties' respective responses to the initial and first revised PSR. In the second revised PSR, the USPO calculated a total offense level of 39 (with respect to Counts 1-20 and 26) and a Criminal History Category I, resulting in an advisory Guidelines range of 262 to 327 months' imprisonment for Counts 1-20 and 26. (ECF 1120, 1121, 1122.) Taking into account a 24-month mandatory consecutive sentence for Counts 21-22,[4] the USPO thus

---

[4] The Court is required to run the mandatory 24-month sentence under 18 U.S.C. § 1028A(a)(1) consecutive to "any other term of imprisonment imposed on the person under any other provision of law." 18 U.S.C. § 1028A(b)(2). Here, defendant was convicted of two counts of aggravated identity theft under 18 U.S.C. § 1028A(a)(1), for which the Court maintains discretion to run "concurrently, in whole or in part," as to each other. 18 U.S.C. § 1028A(b)(3). In other words, the Court must impose at least one 24-month consecutive sentence (for Count 21) to defendant's other convictions for Counts 1-20 and 26, but the Court has discretion as to whether it imposes an additional 24-month consecutive sentence (for Count 22) or runs that 24-month sentence for Count 22 concurrent to that of Count 21.

calculated the effective advisory Guideline range as 286 to 351 months' imprisonment.  The USPO recommends defendant be sentenced to a term of 286 months' imprisonment (consisting of 262 months on Counts 1-20 and 240 months on Count 26 to be served concurrently, followed by the mandatory consecutive 24-months sentence on Counts 21 and 22 to be served concurrently with each other), five years of supervised release, restitution of $16,464,071.26, and a $2,300 mandatory special assessment.  (ECF 1120.)

The government agrees with the second revised PSR in nearly all respects.  In Sections IV and V below, the government addresses its one remaining objection, and discusses the reasons for its recommended sentence.

**III. DEFENDANT'S OFFENSE CONDUCT**

Beginning as soon as the federal government made COVID-19 disaster relief loans funds available in March 2020 through the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program, defendant created an assembly line for preparing and submitting fraudulent loan applications.  As the ringleader of a conspiracy involving his wife, brother, sister-in-law, and several others, defendant worked with and directed his co-conspirators to use dozens of stolen, fictitious, and synthetic identities of other individuals in order to submit fraudulent applications for PPP and EIDL loans and launder the funds (see, e.g., GEX 10, 13.b, 13.c, 13.d, 13.e, 13.f, 13.h, 19.b, 19.c, 19.d, 24.a, 24.b, 24.d, 24.e, 56.d, 57.a, 57.c, 57.d, 57.e, 57.f, 57.g, GEX 115, GEX 116).  The names used included dead people (e.g., Nazar Terabelian, Olaf Landsgaard, Alak Mikaelian), elderly individuals who

owned local businesses whose names were stolen (e.g., Jack Runyan, Mark Zindroski, Donald Sabala), foreign exchange students who spent only months in the United States and then never returned (e.g., Anna Dzukaeva, Viktoria Kauichko, Liudmyla Kopytova, Anton Kudiumov, Iuliia Zhadko, Medet Murat), and dozens of other synthetic or stolen individual identities and fictitious or misappropriated business names (e.g., Roza Avakian, Hagop Bartoumian, Mykhail Diuzhenko, Ara Haritunian, Armen Inijian, Diana Saakyan, Leoncio Galver, Am & Am Financial Services, Continual Closings, Escrow Doc Co., Fiber One Media, LK Design, MD Acquisition Services, Meds Abrank, Montadrath, Mod Interiors Inc., New Acre Farm Produce Inc., Runyan Tax Service Inc., Sabala Construction, Six Star Farms Inc., Top Quality Contracting).  Defendant also created a vast network of bank accounts opened under false pretenses using fake and stolen identities, which he used to launder the criminal proceeds.  Defendants used the money to purchase luxury homes, gold coins, diamonds, jewelry, luxury watches, and other luxury items.

## IV.  ADVISORY SENTENCING GUIDELINES CALCULATION

The government agrees with the advisory Guidelines calculation for Counts 1-20 and 26 as set forth in the second revised PSR in nearly every respect.  Specifically, the government agrees with: a base offense level of 7 pursuant to USSG § 2B1.1(a)(1); a 20-level enhancement pursuant to USSG § 2B1.1(b)(1)(K) for losses greater than $9,500,000; a two-level enhancement for sophisticated means pursuant to USSG § 2B1.1(b)(10); a two-level enhancement because the offenses involved more than 10 victims in accordance with USSG § 2B1.1(b)(2); a four-level aggravating role adjustment based on the fact that

defendant was a leader/organizer in accordance with USSG § 3B1.1(b);
a two-level "vulnerable victim" adjustment pursuant to USSG §
3A1.1(b)(1); and a two-level adjustment for obstruction of justice
pursuant to USSG § 3C1.1.  (ECF 1121 ¶¶ 58-73.)

The government respectfully submits that a two-level enhancement
should also apply pursuant to U.S.S.G. § 2B1.1(b)(11) for the reasons
set forth in its sentencing memorandum for co-defendant Artur
Ayvazyan, incorporated here by reference.  (ECF 1133.)  The
government therefore believes the applicable guidelines range for
defendant on Counts 1-20 and 26 is 324 to 405 months' imprisonment,
based on a total offense level of 41 and Criminal History Category I.
At least a 24-month mandatory consecutive term of imprisonment is
also required on Counts 21 and 22, resulting in an effective advisory
Guidelines range for all counts of 348 to 429 months' imprisonment.

## A. The PSR Correctly Applied a Four-Level Aggravated Role Adjustment

The evidence overwhelmingly proves defendant is the most
culpable participant and the ringleader of both fraud and money
laundering conspiracies.  When determining whether a defendant was a
leader or organizer, the "[f]actors the court should consider include
the exercise of decision making authority, the nature of
participation in the commission of the offense, the recruitment of
accomplices, the claimed right to a larger share of the fruits of the
crime, the degree of participation in planning or organizing the
offense, the nature and scope of the illegal activity, and the degree
of control and authority exercised over others."  USSG § 3B1.1,
Application Note 4.  Each of these factors support the USPO's finding
that defendant was a leader and organizer here.

Text messages between defendant and co-defendant Tamara Dadyan show that defendant came up with the idea to file fraudulent COVID-19 disaster relief loan applications (GEX 10 at 1), developed the "formula" for successfully defrauding the SBA and its lenders (id. at 10), took the lead in filing fraudulent applications (id. at 4-5 ("I did 7 apps last night and 4 of them got email that it's funded ... I didn't sleep all night I was working 24 hours straight")), and provided co-defendant Tamara Dadyan with directions and advice on where to focus her efforts and when (id. at 4-5 ("Go to bluevine.com right now and apply")). Defendant also provided her with information about many of the identities being used as part of the conspiracies. (See, e.g., id. at 6 ("Use the bank statement I gave you for iuliia[.]"); id. at 13 (providing PII for Viktoria Kauichko and Fiber One Media); id. at 40 (directing her to use the Top Quality identity).) Defendant thus exercised decision making authority, was extensively involved in the commission of the fraud, planned and organized the fraud, and defined the scope of the illegal activity. Government Exhibit 116 further demonstrates that defendant provided his co-conspirators with the raw materials they needed to prepare and submit fraudulent loan applications – the summary chart shows how the fake documentation defendant and co-defendant Tamara Dadyan discuss in the texts was later used in support of fraudulent applications submitted by other co-defendants.

These texts also show defendant's role as a leader and organizer of the money laundering conspiracy. Defendant repeatedly explained the steps he took to open and use bank accounts in various names and directing co-defendant Tamara Dadyan to take certain steps in

furtherance of the money laundering conspiracy.  (See, e.g., GEX 10 at 14 (explaining "Will have the account open next week [for Runyantax.com]. Just in case u need to use it for something[.]"); id. at 20 ("I'm getting everything ready to give so they can open for us. Email me everything on whatever you need to open[.]"); id. at 21 ("Tam you keep track of your portion I got to much shit going in and out[.] Or you just use the business and I will use the personal[.]"); id. at 30 ("Have art go buy those blank ones from Office Depot and just buy the software […] For every bank").

Government Exhibit 115 further demonstrates that defendant directed the lion's share of the criminal proceeds to his own family, buying the $3.25 million mansion defendant moved into at the height of the pandemic in 2020, which he filled with gold coins and luxury watches he bought with stolen disaster relief funds.  (GEX 115.)

Defendant's leadership role in the money laundering conspiracy is further confirmed by his direction of the efforts to use the criminal proceeds to purchase real estate using the conspirators' aliases, as reflected in GEX 115 and the voluminous escrow records offered into evidence at trial.  (GEX 30.f, 30.j, 33.f, 33.h, 33.i, 33.j, 33.k,33.l, 33.m.)  The texts between defendant and co-defendant Tamara Dadyan also show them working together to direct the real estate transactions.  (GEX 10 at 20, 40-41.)

In its sentencing memorandum, defendant argues that the government's evidence at trial "reaffirmed that defendant was on even footing with other participants" because, among other things, the other participants also used some of the same identities in furtherance of the fraud and money laundering.  (ECF 1105 at 8-9.)

1    Defendant is wrong.  The evidence defendant cites is proof that the

2    co-conspirators worked together with, and at the direction of,

3    defendant, not evidence that defendant was an average participant.

4         Defendant also asserts that the Court should not apply a role

5    adjustment for defendant because the government is not seeking an

6    aggravated role adjustment for co-defendant Tamara Dadyan and it

7    would create a sentencing disparity.  (ECF 1105 at 16.)  He is

8    incorrect.  The government is seeking a three-level aggravating role

9    adjustment because she managed and supervised the criminal activity.

10   (ECF 1001 at 3-7; ECF 1135 at 9-11.)

11        Defendant also argues that, to the extent the Court applies an

12   aggravated role adjustment, it should be limited to a two-level

13   increase because the conspiracy involved a small group of friends and

14   family, not a large criminal organization.  (ECF 1105 at 16-17

15   (citing United States v. Smith, Case No. 20-cr-196-1 (E.D. Wis.).)

16   However, the sentence in Smith, upon which defendant relies, was

17   based on the extent of the scope, planning and preparation of the

18   scheme, not the size of the group.  (See Gov't Sentencing Memo.,

19   United States v. Smith, Case No. 20-cr-196-1 (E.D. Wis.) (ECF 99).)

20        In Smith, the defendant (who pleaded guilty) helped friends and

21   family submit nine fraudulent PPP loan applications using the names

22   of businesses they actually owned.  (Id.)  Each business name was

23   used for a single application.  (Id.)  The total loss was around $1

24   million.  (Id.)  Based on this record, the court described the crime

25   as a "short-term and opportunistic" scheme by "a group of people who

26   kinda came together over a short period of time."  (United States v.

27   Smith, Case No. 20-cr-196-1 (E.D. Wis.) (ECF 116), at 10-11.)

28

Contrary to defendant's suggestion that the cases are "nearly identical" (ECF 1105 at 17), the facts in this case are very different from those in Smith.  Here, defendant organized a massive conspiracy which required extensive planning and preparation to fraudulently seek tens of millions in pandemic relief funds using dozens of fake, stolen, and synthetic identities and launder the proceeds through a vast network of bank accounts opened under false pretenses.  If anything, Smith underscores why a four-level increase is appropriate here.

### B.  The PSR Correctly Calculated Loss

The PSR correctly found that defendant and his co-conspirators attempted to obtain $20,107,392.26.  (ECF 1121 ¶ 59.)  This finding is based on binding Ninth Circuit precedent that, at sentencing, a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." United States v. Lloyd, 807 F.3d 1128, 1142–45 (9th Cir. 2015) (citing U.S.S.G. § 1B1.3(a)(1)(B)).  As such defendant is accountable for the conduct of his co-conspirators that are: "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." Id. (quoting United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998)).  See also United States v. Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010).

Defendant argues that his loss should be measured in terms of the amount of stolen money that he spent, which he estimates to be

11

$1,144,391.  The Court already rejected a similar argument when
sentencing co-defendant Vahe Dadyan.  And for good reason.
Defendant's argument is inconsistent with how relevant conduct is
analyzed in the scope of jointly undertaken criminal activities, like
the conspiracy counts for which defendant was convicted.  See Lloyd,
807 F.3d at 1142-1143.  The fact that defendant was convicted on two
counts of conspiracy therefore means he is liable for the entire loss
amount reasonably foreseeable within the scope of his conspiratorial
agreement, and not just for his own activity.  See, e.g., United
States v. Wells, 804 F. App'x 515, 518 (9th Cir. 2020) (citing
Treadwell, 593 F.3d at 1002-03 ("[T]o comply with USSG §
1B1.3(a)(1)(B), a district court is not required to proceed item-by-
item through a complete list of all losses attributed to a criminal
conspiracy and to then make an individualized determination whether
or not each item was within the scope of the defendant's 'joint
undertaking' and was 'reasonably foreseeable' to that defendant.").)

The evidence against defendant is overwhelming, including the
evidence of the scope of his agreement with his co-conspirators:

- defendant's texts with co-defendant Tamara Dadyan
  detailing the inner workings of the conspiracy, including
  texts and attachments specific to many of the synthetic
  identities that were central to the crimes charged
  (including Iuliia Zhadko, Viktoria Kauichko, Anton
  Kudiumov, and Liudmyla Kopytova).  (GEX 10 at 1-70.)

- the volumes of physical and digital evidence discovered in
  the homes where defendant and his co-defendants (including
  his brother and sister-in-law) lived, including the
  components of the assembly line defendant built together
  with his co-defendants to defraud lenders and the SBA
  (see, e.g., GEX 13.b, 13.c, 13.d, 13.e, 13.f, 13.h, 13.i,
  19.b, 19.c, 19.d, 24.a, 24.b, 24.d, 24.e, 56.d, 57.a,
  57.e, 57.g);

12

- the summary evidence tracing the flow of funds between defendant and his co-conspirators (GEX 115); and

- the summary chart evidence demonstrating how the fraudulent supporting documents defendant and his co-conspirators created were used to prepare and submit dozens of fraudulent loan applications submitted as part of the conspiracy (GEX 116).

Even were a loan-by-loan analysis required (which it is not), there is no serious question the evidence overwhelmingly ties defendant to well over $9.5 million in fraudulent COVID-19 disaster relief loan applications.  (Ahn Decl. Ex. 1.)

Defendant attempts to discount the amount of loss for which defendant is liable by shifting the blame to defendant's co-conspirators, arguing that they also used the Zhadko identity to commit fraud and launder the proceeds.  (ECF 1105 at 13-14.) Defendant's argument lacks merit.  Regardless of whether defendant or one of his co-conspirators used the Zhadko identity to apply for a particular loan or launder an amount of money is irrelevant because, under Ninth Circuit law, defendant is responsible for all foreseeable losses caused by his co-conspirators as part of the conspiracy.[5]

---

[5] Defendant also argues that because co-defendant Manuk Grigoryan took responsibility for specific loans that he personally submitted as part of his agreement pleading guilty to certain substantive offenses, the Court should only hold defendant for the amount of stolen money that defendant personally spent.  (ECF 1105 at 7, 14-15.)  This is an apples-to-oranges comparison that is not supported by the law.  It is also not supported by the facts.  A jury found defendant guilty in connection with his involvement in a conspiracy to fraudulently obtain COVID-19 disaster relief loan funds and a second separate conspiracy to launder the criminal proceeds. And Grigoryan admitted in his plea agreement factual basis and at sentencing that defendant directed his involvement in the conspiracy in any event.  As explained above, the law and the facts support holding defendant accountable for the entire loss amount.

13

### C. The PSR Correctly Applied a Two-Level Enhancement Based on the Number of Victims

The government incorporates by reference here the sentencing memorandum for co-defendant Marietta Terabelian, which addresses the same objections about the applicability of the enhancement for ten or more victims. (ECF 1147 at 13-16.)

### D. The PSR Correctly Applied a Two-Level Vulnerable Victim Adjustment

Defendant and his co-conspirators stole the identities of recently deceased people (e.g., Nazar Terabelian, Olaf Landsgaard) and foreign exchange students who had briefly visited the United States on J-1 visas several years ago.[6] The USPO agreed the "vulnerable victim" adjustment applies, and made findings with respect to Nazar Terabelian and Iuliia Zhadko. (ECF 1013 ¶¶ 62-64.)

Defendant argues that deceased people are "invulnerable to identity theft". (ECF 1105 at 18-19.) The Ninth Circuit disagrees. United States v. Maciel-Alcala, 612 F.3d 1092, 1101-02 (9th Cir. 2010) ("[Defendant] fails to appreciate the significance—legal and personal—of one's identity even after one dies; theft of these identities is not a victimless crime.") Moreover, the Ninth Circuit has affirmed the application of the "vulnerable victim" adjustment where a defendant used the identity of a deceased person to fraudulently obtain a credit card in the deceased's name. United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998). This is because stealing the identity of a deceased person may cause harm to the

---

[6] See, e.g., Nazar Terabelian (deceased) (GEX 2o, GEX 75), Olaf Landsgaard (deceased) (GEX 10 at 40, GEX 74), Iuliia Zhadko (foreign exchange student) (GEX 35a, GEX 6j, GEX 6l, GEX 44), Viktoria Kauichko (foreign exchange student) (GEX 44 at 11, 32), and Anton Kudiumov (foreign exchange student) (GEX 2m, GEX 10 at 40, GEX 44).

14

deceased's friends and family, who, because of their loss, may be particularly susceptible.  Maciel-Alcala, 612 F.3d at 1101–02; Cuellar, 165 F.3d 918.  Here, Nazar Terabelian died on July 18, 2020. (GEX 75.)  Only three days later, defendant used his name to open a bank account (GEX 1.q, 115), and fraudulently apply for a COVID-19 disaster relief loan (GEX 5.m, 116).  The (non-criminal) members of Nazar Terabelian's family would have been particularly susceptible at that time to defendant's fraud.  The same would have been true for the family of Olaf Landsgaard, who died only one year before defendant stole his name in order to launder stolen COVID-19 disaster relief money by purchasing luxury homes.  (GEX 74, (GEX 30.f, 30.j, 33.f, 33.h, 33.i, 33.j, 33.k,33.l, 33.m.)

In addition, defendant mistakenly claims the USPO did not accept the government's argument that the "vulnerable victim" adjustment applies here based on defendant's victimization of foreign exchange students.  (ECF 1105 at n. 12.)  Defendant is wrong.  The USPO did accept the government's argument and made a specific finding based on facts unique to the real Iuliia Zhadko.[7]  (ECF 1013 ¶¶ 62–64.)

## E.    The PSR Correctly Applied a Two-Level Obstruction Adjustment

Defendant claims the obstruction adjustment "does not apply because it would violate the double jeopardy clause".  (ECF 1105 at 19.)  This is not true.  As defendant admits, the Ninth Circuit has expressly held double jeopardy principles do not bar the government

---

[7] Defendant asserts – without evidence – that Ms. Zhadko sold her identity to defendant.  (ECF 1105 at 18 n.12.)  As the USPO points out in the second addendum to the PSR, nothing in the record supports his effort to shift blame to the victim.  (ECF 1122 at 2.)

1   from both seeking a sentencing enhancement now and later charging

2   defendant for failure to appear.  See United States v. Jernigan, 60

3   F.3d 562, 563 (9th Cir. 1995).  In any event, even if it had merit,

4   his double jeopardy claim would not be actionable until he was later

5   charged.

6      **F.   A Two-level Enhancement in Accordance with U.S.S.G.
            § 2B1.1(b)(11) Should Apply**

7      The government incorporates by reference here Part III.A.2.b of

8   its sentencing memorandum for co-defendant Artur Ayvazyan (ECF 1133),

9   which explains the government's recommendation that the Court apply

10  the enhancement based on U.S.S.G. § 2B1.1(b)(11)(A)(ii), as affirmed

11  in United States v. Ovsepian, 739 Fed. Appx. 448 (9th Cir. 2018).

12  The reasoning set forth therein applies equally to defendant.

13  **V.   SECTION 3553(a) FACTORS**

14     The Court should impose a sentence sufficient, but not greater

15  than necessary, to reflect the purposes of sentencing identified in

16  18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th

17  Cir. 2008).  The advisory Guidelines range provides the "starting

18  point and . . . initial benchmark" for this Court's consideration of

19  an appropriate sentence.  Molina-Martinez v. United States, 136 S.Ct.

20  1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49

21  (2007)).  Although the Guidelines are not binding, they "reflect a

22  rough approximation of sentences that might achieve section 3553(a)'s

23  objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

24     Under 18 U.S.C. § 3553(a), the Court should consider, among

25  other factors, the nature and circumstances of the offense and the

26  history and characteristics of the defendant, § 3553(a)(1); the need

27  for the sentence imposed to reflect the seriousness of the offense,

28                                    16

to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

## VI.   GOVERNMENT'S SENTENCING RECOMMENDATION

### A.   Term of Custody

In light of the relevant 18 U.S.C. § 3553(a) factors, a sentence of at least 348 months in prison is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

> 1.   <u>Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

Defendant's history and characteristics and the nature and circumstances of his many offenses weigh heavily in favor of a significant sentence of imprisonment.

Defendant has a history of committing loan fraud.  (ECF 1121 ¶¶ 81, 85.)  Defendant pleaded guilty to conspiring with co-defendant Marietta Terabelian between 2007 and 2011 to fraudulently obtain a home economic line of credit; defendant was convicted in this case of conspiring with co-defendants Marietta Terabelian, Artur Ayvazyan, and Tamara Dadyan in 2020 to fraudulently obtain pandemic relief loans and launder the proceeds; and defendant has been charged with conspiring with co-defendants Artur Ayvazyan and Tamara Dadyan between 2014 and 2020 to use stolen identities to fraudulently obtain mortgage and green loans for eco-friendly home projects.  (<u>Id.</u>)

Defendant began stealing disaster relief funds as soon as the

money became available in March 2020, when the country was grappling with a public health crisis and faced the very real prospect of an economic collapse. And he continued through the height of the pandemic until he was arrested; indeed, defendant was relentless in his efforts to steal as much as possible. He specifically expressed an understanding that the amount of disaster relief money was limited, explicitly discussed the urgency to act quickly, and openly joked about the federal government running out of money:

- "[laugh my ass off] they ran out of money and can't fund. Just got an email. Thi is bullshit" (GEX 10 at 3);
- "Fuck man signed loan docs this morning for 180k and got email hour after saying we are out of money" (id. at 3);
- "I did 7 apps last night and 4 of them got email that it's funded … I didn't sleep all night I was working 24 hours straight" (id. at 4-5); and
- "Good cause you know this program is over by end of the month so get as much as you can" (id. at 14).

Defendant labels his words as "plain-spoken", "not pretty", "sometimes vulgar", and "mean". (ECF 1105 at 10.) This is an understatement. These and other statements defendant made throughout the pandemic reveal unbridled greed and cruelty toward fellow citizens who actually needed this money to survive.

Also highly relevant to the nature and circumstances of the offense is how defendant used the money earmarked for persons in need: he upgraded mansions, moving from the mansion he used in connection with his earlier fraud into a new, larger mansion, and he splurged on gold coins, diamonds, luxury watches and fine imported furniture. (GEX 115.) Defendant gloated about his excessive acquisition of wealth:

T. Dadyan:     "love u my big brother in truely happy for your kyank for this new achievement in your Life.. god

18

knows you deserve it. Fuck any one of the looser who have their eye on you …"

R. Ayvazyan:   "Tnx kyank it's not just me trust me you, Art everyone I care about plays a big role in my life that drives me to achieve."

(GEX 10 at 16.)  What defendant viewed as something he had "achieved" was, in reality, fraud and theft on a massive and unmitigated scale.

> 2.   Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))

A custodial sentence within the advisory Guidelines range is also needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

The record shows defendant simply has no respect for the law whatsoever.  He is a repeat fraud offender who lied to the Court, violated his conditions immediately upon pretrial release, and absconded from supervision on the eve of sentencing.  Defendant has no intention of ever being held accountable for his many crimes.

Moreover, the scope and execution of defendant's crimes and relevant conduct make plain the seriousness of the offenses. Defendant and his co-conspirators sought and stole finite relief funds necessary to the survival of the country's small businesses and working families at the height of the pandemic.  The extensive planning and coordination of the scheme which defendant and his co-conspirators carried out against the backdrop of an unprecedented public health and economic crisis reflect a significant lack of respect for the law and the need for just punishment in this case.

Defendant's lack of respect for the law is further underscored by his disregard for the impact his actions had on his fellow citizens and those who were trying to provide aid to them.  Among

1  other things, defendant joked with co-defendant Tamara Dadyan about

2  the possibility that the federal government may run out of money and

3  file for bankruptcy, writing "lmao" (which means "laugh my ass off")

4  upon learning that a bank had run out of PPP money.  (GEX 10.)

5           3.   <u>Affording Adequate Deterrence and Protecting the</u>
                 <u>Public from Further Crimes of the Defendant (18 U.S.C.</u>

6                <u>§ 3553(a)(2)(B) and (C))</u>

7       There is a strong need in this case to impose a sentence that

8  will specifically deter defendant from committing fraud post-release

9  and protect the public from further crimes of defendant: he was

10 previously convicted for a similar crime together with his wife and,

11 after being given probation, they together committed the same crime.

12      There is also a strong need to impose a sentence that generally

13 deters others from stealing disaster relief money earmarked for small

14 businesses and families in crisis.  Like the need to promote respect

15 for the law, a significant custodial sentence in a case such as this

16 will signal to other potential wrongdoers that there are serious

17 consequences for exploiting a national emergency such as that brought

18 on by the COVID-19 pandemic.  This case is particularly significant

19 to the government's effort to deter pandemic fraud because it is

20 amongst the most egregious examples prosecuted to date, and defendant

21 the most culpable participant.  It is necessary for potential

22 wrongdoers to understand that, although submitting any number of

23 fraudulent disaster relief loan applications constitutes a serious

24 crime and will result in the imposition of a sentence of

25 imprisonment, submitting dozens or hundreds of fraudulent loan

26 applications will result in substantially greater prison time.  In

27 light of the fact that the tools required to commit these crimes,

28

namely Internet access and a bank account, are available to almost anyone, it is critical that the Court send a message that a defendant who is engaged in a vast scheme involving dozens of fake, stolen and synthetic identities, over 140 fraudulent disaster relief loan applications, and a vast network of bank accounts opened under false pretenses, will be sentenced in a way that is meaningfully different.

In the name of unwarranted sentencing disparities, defendant advocates for a sentence of no more than 72 months' imprisonment based on defendant's purported analysis of precedent from PPP/EIDL loan fraud defendants from around the country.  (ECF 1105 at 20-21.) In an effort to give weight to the median or mean (which defendant wishes to use as a starting point), defendant lists some one-off features this case may share with others that have been recently sentenced.  (Id.)  This exercise misses the point.  The Ninth Circuit has specifically instructed that "sentencing disparity is only one factor a court considers in crafting an individualized sentence under § 3553(a) [and] [a] district court need not, and, as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before.  Too many factors dictate the exercise of sound sentencing discretion in a particular case to make the inquiry [defendant] urges helpful or even feasible."  Treadwell, 593 F.3d at 1012.  To the contrary, federal sentences are required to be individualized.  Id.

Here, the government recommends a Guidelines sentence based on a calculation with which the USPO concurs in nearly all respects. Defendant does not point to any cases that are actually similar to this fraud in all material respects, nor does he identify any

already-sentenced defendants who are similarly situated to defendant. And even if he could, the Court's consideration of the § 3553(a) in this remarkable case should render any disparities here entirely warranted, chief among them being the strong interest in protecting the public from another disaster relief loan fraud ring like the one led by defendant Richard Ayvazyan.

**B.    The Court Should Deny Ayvazyan's Request to Modify the Money Judgment of Forfeiture**

Defendant also moves the Court to reduce the Court's October 28, 2021, Money Judgment of Forfeiture to zero.  In substance, defendant's position is that effectively no funds came to rest with him other than those forfeited at trial.  This position is wrong.

At the outset, defendant's claim that "[t]he government has not reduced its request by the amount of property forfeited in order to avoid double-counting" is simply false.  (ECF 1105 at 35).  The government's application for a Money Judgment of Forfeiture (the "Application" or "App.") went into extensive detail calculating deductions where funds were spent on specific forfeited assets.  See, e.g., App. at 13 (deducting $82,000 transferred to purchase luxury watches forfeited at trial); id., at 15 (deducting $238,960 transferred to purchase a gold coins forfeited at trial).[8]

But defendant seeks to go much further, and asks the Court deduct the total value of all of his forfeited property, even where those forfeitures had nothing to do with the calculations underlying

---

[8] In fact, the Application was overly conservative in this respect, and deducted traced funds even where only part of the property bought with such funds were forfeited.  See App. at 15, n.8 (deducting full $238,960 transferred to gold merchant despite having never recovered multiple kilograms of gold purchased with part of these funds).

the amount of the money judgment.  Defendant has simply misunderstood
the state of the law post-United States v. Thompson: the government
is not permitted to forfeit more than the total value of the gross
amount of criminal proceeds, when considering both specific property
forfeited and a money judgment for unrecovered tainted property.  990
F.3d 680, 685 (9th Cir. 2021).[9]  Here, the total criminal proceeds
exceed $17 million (App. at 8), and the money judgment is nowhere
near that amount.  Thompson simply dictates that the government must
establish what share of the total came to rest with a defendant,
which is exactly what the government has done.[10]

For example, defendant asks to deduct the entire $451,185 in
forfeited cash, but as the government addressed in the Application
(App. at 14, n.6), there is no basis for crediting this one defendant
with the entirety of this forfeiture.  There certainly is no risk the
government will over-recover, because the gap between the total
amount in proceeds (roughly $17 million) and the amount of the money

---

[9] Notably, all of defendant's cited precedent predates Honeycutt
v. United States, 137 S. Ct. 1626 (2017), see generally App. at 9-10,
when the government would regularly obtain joint and several money
judgments for the full value of tainted proceeds against all
conspirators, and thus the government risked over-recovering if
specific forfeited property was not discounted.  Post-Honeycutt and
Thompson, this previous case law has been largely rendered
unpersuasive, as the government can no longer obtain joint and
several forfeiture judgments up to the total loss amount, and must
trace individual proceeds to obtain a money judgment, and thus over-
recovery is far less of a risk.  As descried herein, there is
certainly no risk over over-recovery here.

[10] Defendant's position would also lead to absurd results: If a
defendant hypothetically stole a million dollars, and wasted $250,000
on lavish living while spending another $250,000 on a luxury vehicle
subsequently forfeited at trial, under defendant's math, these
amounts would offset, and the government would have no way of
recovering the value of the wasted funds.  Nothing in Thompson
obligates the government to trace every last dollar of tainted funds
simply in order to obtain a money judgment.

judgment ($1,420,199) is enormous.  On the present record, the $1,420,199 traced in the Application did not result in property which was forfeited, and as noted above, the government was conservative in making deductions when there was a risk of double recovery.[11]

Defendant also points the finger at co-defendant Manuk Grigoryan – who has pleaded guilty, expressed remorse, and has not absconded – claiming that Grigoryan might have received the funds the government has traced in the Application.  (ECF 1105 at 38-39).  The jury rejected these arguments in convicting defendant on the conspiracy charged in Count One, and the Court should as well.  The FSI alleged that defendant controlled the Zhadko accounts, including for Top Quality Contracting, Turing Info Solutions Inc., and Timeline Transport (App. at 3), and the jury convicted on the conspiracy count incorporating these allegations.  Even assuming that co-defendant Manuk Grigoryan may have had some access to these accounts, the jury's conviction on Count One is more than sufficient to find that these accounts belonged to defendant, whether or not he allowed others to access them.  Indeed, in Thompson, the Ninth Circuit specifically said a defendant could be liable for the entire amount of a jointly held account.  990 F.3d at 691.

Ultimately, the Ninth Circuit was clear in Thompson that, in determining whether and what funds came to rest with any co-conspirator, a trial court need not be exact, and may take into account the questionable nature of how criminals hide criminal

---

[11] While it is theoretically possible that some of funds traced in the Application may have ended up in the bag of cash, some approximation is permitted under Thompson, and as stated in the Application, at most defendant should be credited a *pro rata* share of $53,398, as there is no way to know how much of the tainted cash came from any one defendant's share of the fraud proceeds.

proceeds.  990 F.3d 680, 692 (9th Cir. 2021) ("The numbers used throughout this opinion of course may be approximate because swindlers and other criminals may be less than honest…").  This is a textbook case of the soundness of the circuit's holding in <u>Thompson</u>: these defendants used a web of stolen identities used to launder fraud proceeds.  They intentionally did not keep assets in their own names, for the very reason that they wanted to conceal their ownership of these assts.  Some approximation is inevitable, and the money judgment signed by the Court reflects just such a reasonable approximate in light of the scheme for which defendant was convicted.

### C.   Supervised Release, Fine, Restitution, and Mandatory Special Assessment

The government concurs with the USPO's recommendation that defendant be sentenced to five years of supervised release, restitution of $16,464,071.26, and a $2,300 mandatory special assessment.[12]   (ECF 1120.)

## VII. CONCLUSION

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant Richard Ayvazyan: (i) at least 348 months' imprisonment, consisting of 324 months on Counts 1-20 and 240 months on Count 26 to be served concurrently and 24 months on Counts 21 and 22 to be served concurrently to each other and consecutively to the terms imposed on Counts 1-20 and 26; (ii) 5 years of supervised release (explained in footnote 1); (iii) restitution in the amount of $16,464,071.26, (iv) forfeiture consistent with the Court's prior preliminary orders of forfeiture; and (v) a special assessment of $2,300.

---

[12] The government takes no position on the imposition of a fine.