TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
        1100/1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-6527/2424/3819
        Facsimile: (213) 894-6269/0141
        E-mail:    Scott.Paetty@usdoj.gov
                   Catherine.S.Ahn@usdoj.gov
                   Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
        1400 New York Avenue NW, 3rd Floor
        Washington, DC 20530
        Telephone: (202) 320-0539
        Facsimile: (202) 514-0152
        E-mail:    Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-579(A)-SVW-1-2-3 |
|---|---|
| Plaintiff, | GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT ON RESTITUTION AND FORFEITURE FOR DEFENDANTS RICHARD AYVAZYAN, MARIETTA TERABELIAN, AND ARTUR AYVAZYAN; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| RICHARD AYVAZYAN, aka "Richard Avazian" and "Iuliia Zhadko," MARIETTA TERABELIAN, aka "Marietta Abelian" and "Viktoria Kauichko," ARTUR AYVAZYAN, aka "Arthur Ayvazyan,", | |
| Defendants. | Hearing Date: December 6, 2021 Hearing Time: 11:00 a.m. Location:    Courtroom of the Hon. Stephen V. Wilson |

1    Plaintiff United States of America, by and through its counsel

2 of record, the United States Attorney for the Central District of

3 California and Assistant United States Attorneys Scott Paetty,

4 Catherine Ahn, and Brian Faerstein, and Department of Justice Trial

5 Attorney Christopher Fenton, hereby files its supplemental statement

6 on restitution and forfeiture for defendants Richard Ayvazyan,

7 Marietta Terabelian, and Artur Ayvazyan.

8    This statement is based upon the attached memorandum of points

9 and authorities, the files and records in this case, and such further

10 evidence and argument as the Court may permit.

11 Dated: November 24, 2021          Respectfully submitted,

12                                   TRACY L. WILKISON
                                     United States Attorney
13
                                     SCOTT M. GARRINGER
14                                   Assistant United States Attorney
                                     Chief, Criminal Division
15

16                                       _____/s/_____
                                     SCOTT PAETTY
17                                   CATHERINE AHN
                                     BRIAN FAERSTEIN
18                                   Assistant United States Attorneys
                                     CHRISTOPHER FENTON
19                                   Department of Justice Trial Attorney

20
                                     Attorneys for Plaintiff
21                                   UNITED STATES OF AMERICA

22

23

24

25

26

27

28

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................1

II.   RESTITUTION.....................................................4

      A.    The Law of Restitution...................................4

      B.    Restitution Must Be Ordered for Losses Incurred by the
            Victim Lenders as a Result of the Conspiracy.............7

III.  FORFEITURE.....................................................10

      A.    The Court Should Deny Defendant R. Ayvazyan's Request
            to Modify the Court's Money Judgment of Forfeiture.......10

            1.    The Money Judgment Property Discounted Specific
                  Forfeited Assets ..................................11

            2.    The Money Judgment Property Reflects Tainted Funds
                  that Came to Rest in Accounts R. Ayvazyan
                  Controlled ........................................19

IV.   CONCLUSION.....................................................21

i

1

**TABLE OF AUTHORITIES**

2

DESCRIPTION                                                               PAGE

3

**Federal Cases**

4

Honeycutt v. United States,
   137 S. Ct. 1626 (2017) ........................................... 16

5

6

Kaley v. United States,
   571 U.S. 320 (2014) .............................................. 17

7

Lagos v. United States,
   138 S. Ct. 1684 (2018) ............................................ 6

8

9

Paroline v. United States,
   572 U.S. 434 (2014) ............................................... 5

10

Robers v. United States,
   134 S. Ct. 1854 (2014) ............................................ 5

11

12

United States v. Bailey,
   973 F.3d 548 (6th Cir. 2020) .................................... 6-7

13

United States v. Gamma Tech Indus., Inc.,
   265 F.3d 917 (9th Cir. 2011) ...................................... 5

14

15

United States v. Gordon,
   393 F.3d 1044 (9th Cir. 2004) .................................. 6, 8

16

United States v. Gossi,
   608 F.3d 574 (9th Cir. 2010) ................................... 6, 9

17

18

United States v. Hackett,
   311 F.3d 989 (9th Cir. 2002) ...................................... 6

19

United States v. Karie,
   976 F.3d 800 (8th Cir. 2020) ...................................... 7

20

United States v. Morgan,
   376 F.3d 1002 (9th Cir. 2004) ..................................... 7

21

22

United States v. Newman,
   659 F.3d 1235 (9th Cir. 2011) ................................ 16, 17

23

United States v. Prasad, No. 19-10454,
   2021 WL 5174096 (9th Cir. Nov. 8, 2021) ...................... 16, 17

24

United States v. Sullins,
   529 Fed. App'x 584 (6th Cir. 2013) ................................ 7

25

26

United States v. Thompson,
   990 F.3d 680 (9th Cir. 2021) ............................. 11, 12, 18

27

United States v. Yeung,
   672 F.3d 594 (9th Cir. 2012) ...................................... 5

28

ii

## <u>TABLE OF AUTHORITIES  (CONTINUED)</u>

<u>DESCRIPTION</u>                                                                                            <u>PAGE</u>

**Federal Statutes**

18 U.S.C. 982 ......................................................  15

18 U.S.C. § 3553 ...................................................   4

18 U.S.C. § 3663 ................................................  4, 5

18 U.S.C. § 3664 .............................................  4, 5, 7

18 U.S.C. § 3771 ...................................................   4

**Other Authorities**

Fed. Crim. Rule. 32.2 .............................................  11

Fed. R. Evid. 1101 ................................................   5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants Richard Ayvazyan ("R. Ayvazyan"), Marietta Terabelian ("Terabelian"), and Artur Ayvazyan ("A. Ayvazyan") (collectively, "defendants") were convicted after a nine-day jury trial of numerous crimes for their roles in what the Court described as a "raw" and "horrendous" fraud scheme designed to steal millions of dollars from COVID-19 relief programs. Defendants' fraudulent scheme targeted and stole loan proceeds otherwise earmarked for small businesses at the height of the pandemic from the United States Small Business Administration (the "SBA") and numerous institutional lenders, resulting in sustained losses of over $16 million with respect to R. Ayvazyan and Terabelian and over $17 million with respect to A. Ayvazyan.

Defendants were all convicted of conspiracy to commit wire fraud and bank fraud, 11 counts of wire fraud, 8 counts of bank fraud, and conspiracy to commit money laundering. R. Ayvazyan and A. Ayvazyan also were convicted of aggravated identity theft (R. Ayvazyan was convicted of two counts and A. Ayvazyan one count). At the conclusion of trial, the jury made additional findings as to specific property for which defendants' interests should be forfeited as a result of their convictions.

On November 15, 2021, the Court conducted sentencing hearings for all three defendants.[1] The Court sentenced R. Ayvazyan to 17 years in custody, five years of supervised release, and a fine of $50,000. The Court applied a leader/organizer enhancement to R.

---

[1] Defendants R. Ayvazyan and Terabelian are currently fugitives. The Court sentenced them in absentia.

Ayvazyan's Guidelines calculations and described him as an "endemic, cold-hearted fraudster" for whom fraud was a "way of life" and something he viewed as an "achievement."[2]  The Court noted that it could not recall a fraud that was orchestrated and conducted in such a "calloused, intentional way without any regard for the law" and depicted R. Ayvazyan's attitude as leader of the conspiracies as one of "get as much as we can."

The Court sentenced Terabelian to 6 years (72 months) in custody, five years of supervised release, and a fine of $50,000. The Court noted that Terabelian had a different role in the conspiracy than her husband, R. Ayvazyan, but nonetheless recognized that she was aware and supportive of the "family business" of fraud and was not only R. Ayvazyan's "partner in marriage" but also his "partner in crime."  The Court further found that Terabelian enjoyed the ill-gotten proceeds of the conspiracy, took active steps to obstruct justice, and should be held accountable for the same amount of restitution as R. Ayvazyan.

The Court sentenced A. Ayvazyan to five years in custody (60 months) to be followed by a five-year period of supervised release. The Court did not impose a fine on A. Ayvazyan.  The Court found that A. Ayvazyan had perjured himself when he testified at trial and denied his role in the fraudulent scheme.  Moreover, the Court rejected A. Ayvazyan's attempts to distance himself from the vast trove of evidence related to the fraud that was found at the

---

[2] All quotations and citations related to the sentencing hearings are based on the government's notes and recollections.  A transcript of those proceedings has been ordered and the government can supplement the record with the final transcript when it becomes available.

residence he shared with his wife, co-defendant Tamara Dadyan.  The Court similarly rejected A. Ayvazyan's argument for a mitigating role adjustment in the "horrific, calculated, and callous" fraud scheme that targeted vulnerable relief programs at a critical time in this country's history.

At the sentencing hearings for all three defendants, the Court found that the loss amounts associated with the fraudulent scheme amounted to at least $1.5 million for purposes of the Sentencing Guidelines offense level calculations, but the Court did not put an upward limit on loss as to each defendant.[3]  The Court further stated that, as part of its final judgment as to each defendant, it would order restitution but left open the determination of these amounts pending supplemental briefing by the parties.  Separately, the Court reserved decision on defendant R. Ayvazyan's request to modify the Court's previously-entered Money Judgment of Forfeiture against him, pending further briefing.  The Court set a hearing on these matters for three weeks from the date of the sentencing hearings, or December 6, 2021.  The government thus submits this statement on restitution

---

[3] For example, during the sentencing hearing for R. Ayvazyan, the Court stated that it relied, among other things, on Government Exhibit ("GEX") 115 from trial and Exhibit 1 to the Declarations of Catherine Ahn in support of the Government's Sentencing Positions for defendants in determining loss.  The loss amount referenced in GEX 115 is $4,649,515, and, as discussed in more detail below, the loss amounts in the exhibits attached to the government's sentencing positions were $16,464,071.26 (for defendants R. Ayvazyan and Terabelian) and $17,723,141.26 (for defendant A. Ayvazyan).  In applying a loss level of more than $1.5 million for purposes of the Guidelines calculation, the Court recognized that the government might still be able to show even on clear and convincing evidence (though the standard was preponderance of the evidence) that the loss amount was more than $9.5 million.  The Court later observed that, with respect to the Guidelines loss amount, all it had to find was "more than $1.5 million" but again did not put a cap on that finding.

and forfeiture for defendants Richard Ayvazyan, Marietta Terabelian, and Artur Ayvazyan.

**II. RESTITUTION**

As described in more detail below, defendants should be held accountable for restitution for the direct and proximate losses sustained by the victim lenders (both the SBA and the individual institutional lenders that suffered losses) as a result of the fraud conspiracy for which all three defendants were convicted.  The government thus seeks restitution orders in the following amounts: $16,464,071.26 (for defendants R. Ayvazyan and Terabelian) and $17,723,141.26 (for defendant A. Ayvazyan).

**A.   The Law of Restitution**

Section 3553(a)(7) requires the Court, "in determining the particular sentence to be imposed," to consider "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7). Unlike loss calculations under the Sentencing Guidelines and forfeiture, restitution owed to fraud victims is governed by statutes specific to restitution, including the Mandatory Victims Restitution Act of 1996 ("MVRA"), codified at 18 U.S.C. § 3663A.[4]  The MVRA applies to defendants' convictions in this case.  (ECF 1121 (R. Avyazyan PSR) ¶ 48; ECF 1125 (Terabelian PSR) ¶ 78; ECF 1128 (A. Ayvazyan PSR) ¶ 76.)

Specifically, the MVRA requires a district court to order restitution when (1) a defendant commits an "offense against property under [Title 18] . . . including any offense committed by fraud or

---

[4] Other statutes providing for restitution to victims are the Victim and Witness Protection Act of 1982, codified at 18 U.S.C. §§ 3663, 3664; and the Crime Victims' Rights Act, codified at 18 U.S.C. § 3771.

4

deceit," and (2) there is an "identifiable victim" that has "suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1). A victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). The MVRA provides for "restitution to each victim in the full amount of each victim's losses," and restitution must be determined "without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); 18 U.S.C. § 3663A(d) (a restitution order under Section 3663A "shall be issued and enforced in accordance with section 3664"). The burden of proof is on the government, by "the preponderance of the evidence," to "demonstrate[e] the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. 3664(e). The Court may rely on hearsay in determining the proper amount of restitution. Fed. R. Evid. 1101(d)(3); United States v. Yeung, 672 F.3d 594, 606 (9th Cir. 2012), abrogated on other grounds by Robers v. United States, 134 S. Ct. 1854 (2014).

Proximate causation in the restitution context "is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." Paroline v. United States, 572 U.S. 434, 445 (2014). The fact that defendants acted with other co-conspirators in causing the losses does not negate the fact that these losses are appropriately attributable to defendants. Applying a proximate-cause standard, the Ninth Circuit has "approved restitution awards that included losses at least one step removed from the offense conduct itself." United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 928 (9th Cir. 2011). Indeed, so long as

1   it is not "unreasonable," a causal chain may have "multiple links."

2   United States v. Hackett, 311 F.3d 989, 993 (9th Cir. 2002).

3       The Ninth Circuit has explained that "the advisory Sentencing

4   Guidelines and restitution to victims under the MVRA clearly focus on

5   different aspects of the offense and serve different purposes."

6   United States v. Gossi, 608 F.3d 574, 582 (9th Cir. 2010).

7   "Restitution clearly focuses on the victim, not the individual

8   defendant.  Restitution seeks to compensate the victim for all the

9   direct and proximate losses resulting from the defendant's conduct,

10  not only for the reasonable foreseeable losses.  The purpose of

11  restitution is to put the victim back in the position he or she would

12  have been but for the defendant's criminal conduct."  Id. at 581

13  (rejecting defendant's contention that court "should look to the

14  advisory Sentencing Guidelines for calculating the victim's losses")

15  (emphasis in original).  See also United States v. Gordon, 393 F.3d

16  1044, 1052 n.6 (9th Cir. 2004) ("[T]he MVRA's purpose is to make the

17  victims whole; conversely, the Sentencing Guidelines serve a punitive

18  purpose, necessitating a different loss calculation scheme than the

19  MVRA."), abrogated on other grounds by Lagos v. United States, 138 S.

20  Ct. 1684 (2018).

21      Consistent with the MVRA's focus on direct and proximate

22  causation and making victims whole, courts have recognized that the

23  amount of restitution under the MVRA need not be coextensive with the

24  loss amount used for purposes of calculating a fraud defendant's

25  advisory Guidelines offense level.  See, e.g., United States v.

26  Bailey, 973 F.3d 548, 576 (6th Cir. 2020) (affirming restitution

27  amount under MVRA even where loss may have been overcounted under

28  Guidelines, explaining that "[n]or is it incongruous to order an

6

amount of restitution that reflects the loss caused by the entire conspiracy, even while simultaneously finding an amount of loss that reflects only conduct closely related to the defendant"); United States v. Karie, 976 F.3d 800, 805-07 (8th Cir. 2020) (finding even if district court erred in calculating loss for Guidelines offense level purposes of $536,833.75, and a conservative Guidelines loss estimate could only demonstrate the "loss amount was over $250,000," district court did not err in finding restitution of $536,833.75 was owed under the MVRA); cf. United States v. Morgan, 376 F.3d 1002, 1014 (9th Cir. 2004) (affirming restitution order including contractual interest and finance charges in fraud case even where those amounts were found to be improperly counted in the loss amount for purposes of the Guidelines calculation).

Finally, restitution may be "joint and several," meaning that only one restitution amount need be determined for defendants who are determined to have participated in the conspiracy during the same time frame.  See 18 U.S.C. § 3664(h); see also, e.g., United States v. Sullins, 529 Fed. App'x 584, 587 (6th Cir. 2013) (finding district court did not abuse its discretion in entering order of restitution holding defendant jointly and severally liable under the MVRA for entire amount of loss caused by conspiracy).

### B. Restitution Must Be Ordered for Losses Incurred by the Victim Lenders as a Result of the Conspiracy

In this case, the applicable amount of restitution for each defendant is the aggregate amount of loan proceeds disbursed by the SBA and the lenders who funded the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") program loans that were the subject of the fraud conspiracy for which all three

defendants were convicted.  For defendants R. Ayvazyan and Terabelian, the restitution amount as to each lender and the total restitution amount owed in the aggregate ($16,464,071.26) is reflected in the actual loss column of the loss chart attached as sealed Exhibit 1 to the Declaration of Catherine Ahn in support of the Government's Sentencing Position for Defendant Marietta Terabelian.  (See ECF Nos. 1147, 1148; see also R. Ayvazyan PSR ¶ 49; Terabelian PSR ¶ 78.)  The lender-specific and total restitution ($17,723,141.26) amounts owed by A. Ayvazyan are similarly set forth in the actual loss column of the loss chart attached as sealed Exhibit 1 to the Declaration of Catherine Ahn in support of the Government's Sentencing Position for Defendant Artur Ayvazyan.  (See ECF 1133; see also A. Ayvazyan PSR ¶ 77.)  In both cases, the sealed exhibits consist of loss charts with various columns of information regarding the fraudulent loans connected to the conspiracy including, among other things, the actual losses sustained by the lenders.  This evidence is in addition to that offered at trial, which included, among other things, the testimony of Marylee Robinson and Government Exhibits 115 and 116, which were summary charts providing further evidence linking loans set forth in Exhibit 1 to the Ahn Declarations to the fraud conspiracy for which defendants were convicted.

The Ninth Circuit has recognized that the "primary and overarching goal of the MVRA is to make victims of crime whole," and, in "achieving this objective, Congress intended district courts to engage in an expedient and reasonable restitution process, with uncertainties resolved with a view toward achieving fairness to the victim." Gordon, 393 F.3d at 1048.  The focus of fashioning a restitution order is accounting for "all the direct and proximate

losses resulting from the defendant's conduct, not only for the

reasonable foreseeable losses." Gossi, 608 F.3d at 581 (emphasis in

original).  The losses reflected in the aforementioned sealed

exhibits derived directly from the fraudulent PPP and EIDL loans that

were disbursed from March 2020 to August 2020, during the course of

defendants' involvement in the conspiracy to fraudulently obtain

COVID-19 relief loan proceeds.  The loss amounts – both as to each

individual lender and in the aggregate - were the direct and

proximate result of defendants' participation in the conspiracy and

are appropriately compensable as restitution.

Specifically, the sealed Exhibit 1 to the Ahn Declaration in

support of the Government's Sentencing Position for Terabelian, upon

which the government also relied in its sentencing position as to R.

Ayvazyan, sets forth the list of loans connected to the conspiracy

for which defendants R. Ayvazyan and Terabelian were convicted.  The

exhibit includes both a list of the fraudulent loans applied for and

the actual loss attributable to those loans (see Ex. 1 to the Ahn

Declaration in Support of ECF Nos. 1147 at 1-2), as well as a column

depicting examples connecting the loans to the conspiracy (id. at 3-

26).  The actual loss sustained as a result of the disbursement of

these loans (and thus the applicable amount of restitution for

defendants R. Ayvazyan and Terabelian) totals $16,464,071.26.[5]  (Id.

at 2.)

_____

[5] Defendants R. Ayvayan and Terabelian filed a motion for
Kastigar relief related to a search of their cellphones at the Miami
International airport in October 2020.  (ECF 338.)  Although the
Court denied the Kastigar claims in full (ECF 874), the government
has taken a conservative approach for purposes of restitution as to
these two defendants and therefore has excluded certain loans that
were arguably identified solely as a result of the search of those
digital devices.

Similarly, the sealed Exhibit 1 to the Ahn Declaration in support of the Government's Sentencing Position for A. Ayvazyan sets forth the list of loans connected to the conspiracy for which defendant A. Ayvazyan also was convicted.  The exhibit includes a list of the loans and the actual loss attributable to those loans (Ex. 1 to the Ahn Declaration in Support of ECF No. 1133 at 1-2), as well as a column depicting examples connecting the loans to the conspiracy (id. at 3-21).  The actual loss sustained as a result of the disbursement of these loans (and thus the applicable amount of restitution for defendant A. Ayvazyan) totals $17,723,141.26.  (Id. at 2.)

## III.  FORFEITURE

### A.   The Court Should Deny Defendant R. Ayvazyan's Request to Modify the Court's Money Judgment of Forfeiture

In his November 2, 2021 Sentencing Position (ECF No. 1105, the "Position" or "Pos."), defendant R. Ayvazyan moved the Court to effectively eliminate the Court's October 28, 2021, Money Judgment of Forfeiture against defendant R. Ayvazyan in the amount of $1,420,199.[6]  (See ECF No. 1087.)  In substance, defendant R. Ayvazyan makes two arguments in support of this request: first, that the Court did not credit amounts forfeited at trial against the amount of the money judgment (Pos. at 35), and second, that the Court erred because the funds in question might have come to rest with codefendant Manuk Grigoryan instead of defendant R. Ayvazyan.  (See Pos., at 38.)  The first argument is both legally unsupported and

---

[6] Neither defendant Terabelian nor defendant A. Ayvazyan have raised challenges to forfeiture as part of these sentencing proceedings.  Thus, the government focuses its arguments here to issues raised in the sentencing position of defendant R. Ayvazyan.

factually incorrect, and the second simply belies the evidence at trial and the jury's verdict.  The Court should deny the request to modify the money judgment.

1. *The Money Judgment Property Discounted Specific Forfeited Assets*

As detailed in the government's Application for a Money Judgment of Forfeiture (ECF No. 1053, the "Application" or "App."), the government fully acknowledged that under United States v. Thompson, 990 F.3d 680 (9th Cir. 2021), it was limited to seeking a money judgment of forfeiture only for those funds which came to rest with any particular coconspirator, and at the same time, was also mindful of the sprawling complexity of this heavily-litigated case.  For these reasons, the government did not attempt to reopen the evidentiary record and begin anew tracing fraudulent loans which were not traced at trial to calculate an amount for defendant's money judgment, although that would have been well within the government's prerogative.[7]  See Fed. Crim. Rule. 32.2(b)(1)(B) (permitting additional evidence and evidentiary hearings in determining forfeiture).

Instead, for clarity of the record and reasons of judicial efficiency, the government limited its calculations to only certain fraudulent loans already traced at trial, through the testimony of summary witness Marylee Robinson, and relied only on record evidence

---

[7] Indeed, the government would have been fully entitled to request an evidentiary hearing to begin tracing any of the other dozens of fraudulent loans that were part of the conspiracy for which defendant was convicted.  As the Court recently recognized at defendant's sentencing, the government even may have established by clear and convincing evidence, although it was not required to do so, that the total loss amount exceeded $9,500,000.

11

already admitted at trial.  (See App., Exs. A-C.)  Specifically, and
as detailed in the Application, the government traced the following
twelve fraudulent loans (the "Traced Loans"), each of which was
traced by Ms. Robinson at trial and was identified in the First
Superseding Indictment ("FSI") either as part of the conspiracy
charged in Count One or a Substantive Count upon which defendant was
convicted:

| Loan | Borrower | Tracing |
|------|----------|---------|
| PPP x8007 | Timeline Transport | GX 115, at 4,9 |
| PPP x7903 | Timeline Transport | GX 115, at 4,9 |
| EIDL x3854 | Timeline Transport | GX 115, at 4,9 |
| PPP x7305 | Sabala Construction | GX 115, at 8 |
| PPP x8101 | Mod Interiors | GX 115, at 9 |
| EIDL x8350 | Mod Interiors | GX 115, at 9 |
| PPP x7202 | Top Quality Contracting | GX 115, at 8 |
| PPP x7304 | Top Quality Contracting | GX 115, at 8 |
| PPP x7706 | Top Quality Contracting | GX 115, at 8 |
| EIDL x0246 | Top Quality Contracting | GX 115, at 8 |
| PPP x8210 | Turing Info Solutions | GX 115, at 10 |
| EIDL x2336 | Turing Info Solutions | GX 115, at 10 |

For each of the Traced Loans, the government made detailed
deductions where funds traceable to these loans were either
transferred to other coconspirators or spent on specific property
forfeited at trial.  (See, e.g., App. at 13 (deducting $82,000
transferred to purchase luxury watches forfeited at trial); id.
(deducting $110,000 transferred for purchase of real property in
Tarzana (the "Tarzana Property") forfeited at trial); and id., at 15

1    (deducting $238,960 transferred to purchase a gold coins forfeited at

2    trial).)[8]  As such, defendant R. Ayvazyan's claim that "[t]he

3    government has not reduced its request by the amount of property

4    forfeited in order to avoid double-counting" is simply false.  (Pos.

5    at 35).  The government made detailed deductions to ensure it was not

6    seeking a money judgment based on funds from the Traced Loans which

7    were spent on assets forfeited at trial.

8         There is also no serious question that defendant R. Ayvazyan

9    obtained proceeds from other fraudulent loans beside the Traced

10   Loans.  For example, as traced by Ms. Robinson, defendant R. Ayvazyan

11   received at least $200,000 into a bank account in the name of

12   "Inception Ventures," which was traceable to proceeds of two

13   fraudulent PPP loans from Wells Fargo Bank and Comerica Bank, with

14   loan numbers x7709 and x7410, respectively, and collectively worth

15   $260,338.  (See GX 115, at 7.)  Because these proceeds were forfeited

16   as part of the forfeiture of the Tarzana Property, however, the

17   government properly did not include these loans in the calculation of

18   the money judgment.  This alone is fatal to defendant R. Ayvazyan's

19   argument, because as seen with the Tarzana Property, the government

20   has already excluded forfeited specific assets by not using the

21   underlying fraudulent loans in its calculation of the money judgment.

22   Indeed, the government specifically avoided including such loans

23   because the resulting assets had already been forfeited.  None of

24   defendant R. Ayvazyan's arguments otherwise have merit.

25   _____

26        [8] In fact, the Application was overly-conservative in this
     respect, and deducted traced funds even where only part of the
27   property bought with such funds were forfeited.  See App. at 15, n.8
     (deducting full $238,960 transferred to gold merchant despite having
28   never recovered multiple kilograms of gold purchased with part of
     these funds).

1    Defendant R. Ayvazyan first objects that the government has not

2    deducted $142,050 from the money judgment representing luxury watches

3    forfeited at trial. (Pos. at 36-37.) Again, the government's

4    tracing meticulously followed Thompson. As described above and

5    acknowledged by defendant, the government did indeed deduct $82,000

6    for the purchase of these watches, which came from Traced Loans in

7    the name of Timeline Transport. (See App. at 13.) But the evidence

8    at trial showed that the remainder of the funds to purchase these

9    watches was traceable to the Viktoria Kauichko identity. (See GEX

10   401, at 10 (tracing transfers totaling $145,320 used to purchase the

11   forfeited watches to a card associated with Kauichko).) But because

12   the FSI did not allege that defendant R. Ayvazyan was Kauichko

13   (although there was ample evidence that defendant R. Ayvazyan also

14   used that identity and was caught carrying banking cards in that

15   name) in calculating the money judgment the government did not seek

16   to attribute the amount of fraudulent loans into Kauichko's accounts

17   to defendant R. Ayvazyan.[9] As described below addressing defendant

18   R. Ayvazyan's second point, the government has abided by what was

19   charged in Count One of the FSI, upon which defendant was convicted.

20   Indeed, if defendant were right and he were entitled to deduct

21   Kauichko's forfeited assets, then he would also need to be held

22   accountable for Kauichko's criminal gains in the form of the funds

23   which came to rest with Kauichko, and thus the money judgment would

24   need to be _increased_ by at least $667,169 – reflecting those

---

[9] Indeed, because the FSI alleged the Kauichko identity and
accounts were controlled by co-defendant Terabelian (see FSI ¶ 3,
23(b)), in an abundance of caution, in the Application the government
allocated Kauichko's gains to Terabelian and actually deducted these
amount from defendant R. Ayvazyan's money judgment. (See, e.g., App.,
at 14, n.7; 16; 16 n.10.)

fraudulent loan proceeds transferred to Kauichko's accounts.  (See GEX 115, at 3, 5, 6, 9.)  Defendant R. Ayvazyan cannot have it both ways, claiming that forfeited assets traceable to the Kauichko accounts should be credited against his money judgment, while the fraudulent loans paid into the Kauichko accounts should not.  If the Court is inclined to deduct the $142,050 defendant requests, then the Court must also increase the money judgment by $667,169, reflecting transfers of fraudulent loans into Kauichko accounts, leaving a _net increase_ of $525,119.

Similarly, defendant R. Ayvazyan objects that he was ordered to "forfeit his home despite having contributed $632,193 in untainted funds towards the down-payment" (Pos. at 37).  Again, he misrepresents the facts.  Defendant R. Ayvazyan did not contribute "$632,193 in untainted funds" – he contributed only $610,000 in total (see GEX 115, at 7),[10] more than half of which was traced to fraudulent loans.  In essence, defendant R. Ayvazyan argues because he commingled his clean money with his criminal proceeds (for which he was convicted on Count 26) he should get a credit against his money judgment.

But defendant R. Ayvazyan fails to acknowledge that the jury convicted him of a money laundering conspiracy, including by commingling fraud proceeds into the Tarzana Property (see FSI ¶ 53(c)), and ordered forfeiture of the same.  Under 18 U.S.C. 982(a)(1), the government is entitled to both the tainted and untainted funds "involved in" such a money laundering conviction.

---

[10] Reflecting transfers from both the Inception Ventures and Timeline Transport accounts, each of which were controlled by defendant R. Ayvazyan.  See FSI ¶ 22(a-b).

Put another way, there simply are no _untainted_ funds for the government to credit in the Tarzana Property transaction, and as to the tainted funds, the government has already deducted these proceeds, either by directly subtracting such funds from the Traced Loans (see App., at 13 (deducting $110,000 used to purchase Tarzana Property)), or as described above, by simply not including such loans in its calculations when all the traced proceeds of those loans were used to purchase the Tarzana Property.  In sum, there is simply nothing to credit here.  Defendant R. Ayvazyan deserves no offset for the funds he chose to commingle in his money laundering scheme.

In fact, any other holding would run contrary to the fundamental goal of ensuring that criminals do not profit from crime.  The defense argument fails to understand the purpose of criminal forfeiture.  While restitution restores assets to a victim (as explained section II above), forfeiture ensures that a criminal does not enjoy the fruits of crime – which is exactly what defendant R. Ayvazyan is seeking to do here.  See United States v. Newman, 659 F.3d 1235, 1241 (9th Cir. 2011) ("Criminal forfeiture is also separate from restitution, which serves an entirely different purpose.  Congress conceived of forfeiture as punishment for the commission of various crimes.  The purpose of restitution however, is not to punish the defendant, but to make the victim whole again") (cleaned up), abrogated on other grounds by Honeycutt v. United States, 137 S. Ct. 1626 (2017).  "Forfeitures help to ensure that crime does not pay: They at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises." United States v. Prasad, No. 19-10454, 2021 WL 5174096, at *8 (9th

Cir. Nov. 8, 2021) (quoting Kaley v. United States, 571 U.S. 320, 323 (2014)).[11]

For example, if a defendant stole a million dollars, and spent half on luxurious living and invested half in a property which ultimately doubled in value prior to being forfeited at trial, under the defense theory, the government would be entitled to no money judgement, because a million dollars was stolen and a million dollars forfeited.  And under a theory of restitution, the defense might be correct.  But forfeiture is not restitution – the goal of a money judgment of forfeiture is not to make the government whole, but to force the defendant to disgorge the value of those assets he has already dissipated.  See Prasad, 2021 WL 5174096, at *5 (Congress intended criminal forfeiture to ensure criminals "disgorge their ill-gotten gains, even those already spent.").  Because the government

---

[11] Prasad was decided on November 8, 2021, roughly one week after defendant R. Ayvazyan filed his sentencing position and the government responded, and this very-recent binding precedent reinforces why the defendant's argument regarding the Tarzana Property must fail.  In Prasad, the Ninth Circuit held that calculation of a money judgment must be based on the proceeds of the underlying offense, not a defendant's profit or loss after reinvestment or use of those proceeds.  2021 WL 5174096, at *3,6-7. Thus in Prasad, the defendant was liable to the government for a money judgment in the full amount of the fraudulent proceeds he received in an immigration visa scheme, and could not deduct amounts he had paid to the workers he hired as part of this scheme – in sum, the gross proceeds of the fraud were what mattered, not what was actually left in defendant's pocket.  Id., at *5-6, 8 (forfeiture statutes do not "allow a defendant to avoid forfeiture of certain property obtained from his criminal activity by reinvesting it in the criminal enterprise or using sophisticated accounting practices to conceal profits.").  So too here: the calculation of defendant's money judgment must be (and was) based on the fraud proceeds he received from the Traced Loans, and his subsequent commingling and investment these proceeds in the Tarzana Property cannot reduce the proceeds he must repay through a money judgment.  See id. at 7 ("[T]he focus of forfeiture is whether the defendant obtained the property from the commission of the crime, not whether the defendant made a profit based on what he later chose to do with that property.").

1    cannot forfeit criminal proceeds already spent on "wine, women, and

2    song," Newman, 659 F.3d at 1243, the money judgment of forfeiture

3    does the next best thing, by creating an in personam debt to the

4    government the criminal must pay down, effectively forcing him to

5    disgorge the value of these dissipated criminal proceeds.  This is

6    exactly what the government has done here by calculating the Traced

7    Loans and making deduction from those loans.

8         Finally, defendant R. Ayvazyan asks to deduct the entire

9    $451,185 in seized cash found forfeited at trial, but as the

10   government addressed in the Application (App. at 14, n.6), there is

11   no basis for crediting this one defendant with the entirety of this

12   forfeiture.  On the present record, the Traced Loans did not result

13   in property which was forfeited, and as noted above, the government

14   was conservative in making deductions.  The government fully

15   acknowledges that it is theoretically possible that some of the funds

16   traced in the Application could have ended up in the forfeited bag of

17   cash, but some approximation is permitted under Thompson, because

18   career criminals like defendant R. Ayvazyan intentionally do not keep

19   accurate records tracing where their bags of stolen cash come from.

20   990 F.3d at 692.  If the Court were inclined to make any deduction

21   for this forfeited sack of cash, at most defendant should be credited

22   a pro rata share of $53,398, because there is simply no way to know

23   how much of the forfeited bag of cash came from any one defendant's

24   share of the fraud proceeds.  Ultimately, the Ninth Circuit was clear

25   in Thompson that, in determining whether and what funds came to rest

26   with any co-conspirator, a trial court need not be exact, and may

27   take into account the questionable nature of how criminals hide

28   criminal proceeds.  990 F.3d 680, 692 ("The numbers used throughout

18

this opinion of course may be approximate because swindlers and other criminals may be less than honest…").  This is a textbook case of the soundness of the Ninth Circuit's holding in <u>Thompson</u>: these defendants used a web of stolen identities in order to obtain, hide, and launder fraud proceeds.  They intentionally did not keep assets in their own names, for the very reason that they wanted to conceal their ownership of these assts.  Some approximation is inevitable, and the money judgment signed by the Court reflects just such a reasonable approximate in light of the scheme for which defendant R. Ayvazyan was convicted.

Ultimately, defendant R. Ayvazyan would have the Court reopen the evidentiary record and force the government to conduct a massive new tracing exercise, likely occupying days or weeks of the Court's time, in order to trace every single loan which was part of the conspiracy to create a full accounting of every last dollar that defendant R. Ayvazyan and his cohorts stole, before the Court could impose a money judgment.  The rules do not require any such exercise.  The government has calculated the traced loans and made all appropriate deductions, and to the extent the government chose not to trace other fraudulent loans than those seen at trial such a decision inures to defendant's benefit.

    *2. The Money Judgment Properly Reflects Tainted Funds that Came to Rest in Accounts R. Ayvazyan Controlled*

Defendant R. Ayvazyan's second argument – that the funds the government traced in the Application were not actually his – is similarly without merit.  Similar to their arguments at trial, defense counsel attempt to distract the Court by pointing the finger at codefendant Manuk Grigoryan – a defendant who pleaded guilty,

admitted responsibility, acknowledged remorse, and has not absconded – arguing that Grigoryan might have received the funds the government has traced in the Application.  (Pos. at 38-39.)  The Court has repeatedly rejected defendant R. Ayvazyan's "multiple conspiracies" theories accusing Grigoryan of being the true villain here, most recently by finding at defendant R. Ayvazyan's sentencing that he was the ringleader directing this conspiracy.  The Court should not entertain defense counsel's retread arguments to the contrary.

In the conspiracy count for which defendant R. Ayvazyan was convicted, the FSI alleged that he controlled the bank accounts which received each of the Traced Loans.  See App. at 3; FSI ¶ 22.  The jury then convicted on the conspiracy count incorporating these allegations.  And the jury verdict was well supported by the trial evidence – defendant R. Ayvazyan alone was convicted in Counts Twenty-One and Twenty-Two which resulted in the deposit of funds into two of these accounts (specifically those of Top Quality Contracting and Mod Interiors), and defendant R. Ayvazyan was caught red-handed with nearly half a dozen banking cards in the name of Iuulia Zhadko when stopped at Miami International Airport – the same alias on numerous of the accounts which received the proceeds of the Traced Loans (specially, Timeline Transport, Top Quality Contracting, and Turing Info Solutions).  As such, the Court was well within the preponderance standard in finding that these accounts, and thus the proceeds of the Traced Loans, were controlled by defendant.[12]

_____

[12] Defense counsel argues that defendant R. Ayvazyan was acquitted on Counts 28-32 which alleged post-arrest money laundering counts, but defense counsel fails to address the conspiracy for which he was convicted.  (See App., at 5-6, 16-17.)  The fact that the jury did not find beyond a reasonable doubt that defendant conducted the

*(footnote cont'd on next page)*

At sentencing, the Court found by at least a preponderance that defendant R. Ayvazyan was the ringleader of this "horrendous" fraud operation.  Even if co-defendant Manuk Grigoryan may have had some access to these accounts while following defendant R. Ayvazyan's lead, the jury's conviction on Count One is more than sufficient to find that these accounts belonged to defendant R. Ayvazyan, whether or not he allowed others to access them as part of the scheme.[13]

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court (1) grant forfeiture in the amounts stated herein; (2) order restitution in the amount of $16,464,071.26 for defendants R. Ayvazyan and Terabelian; and (3) order restitution in the amount of $17,723,141.26 for defendant A. Ayvazyan.

---

alleged post-release money laundering transactions charged in these counts does not change the fact that, as detailed in the Application, as part of the conspiracy alleged in Count One, the government alleged that Turing Info Solutions fraudulently obtained PPP loan proceeds under the name of defendant's alias, Zhadko, which came to rest in accounts defendant controlled. (See App. at 16-17; GX 115, at 10.)  Defendant R. Ayvazyan was convicted of that conspiracy, and as discussed above, there is ample evidence that defendant R. Ayvazyan used the Zhadko identity, the name on the Turing Info Solutions account which received the fraud proceeds.  This more than meets the preponderance standard required at the forfeiture stage.

[13] Indeed, in Thompson, the Ninth Circuit specifically held a defendant could be liable for the entire amount of a jointly held account.  990 F.3d at 691.