Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>RICHARD AYVAZYAN, *et al.*,<br><br>*Defendants*. | Case No. 20-cr-579 (SVW)<br><br>**RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT**<br><br>Hon. Stephen V. Wilson<br><br>December 6, 2021, 11:00 a.m. |

RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT

# TABLE OF CONTENTS

I.  The Court Should Deny the Government's Request for Reconsideration of Loss and Either Award $1,840,556 in Restitution to the Small Business Administration or Abstain from Awarding Restitution Altogether ...................................................................................3

    A.  Legal Standard ................................................................................4

    B.  The Court Should Construe the Government's Submission as a Request for Reconsideration and Deny It ......................................5

    C.  If the Court Orders Restitution, It Should Order the Amount Supported by GX 115 and Order that the Restitution Paid to the Small Business Administration .............................................................7

        1.  Any Restitution Award Should Be Paid to the Small Business Administration .................................................................7

        2.  GX 115 Supports, at Most, Joint and Several Liability for $1,840,556 ................................................................................8

    D.  The Court May Abstain From Awarding Restitution Based on the Government's Failure to Resolve Complex, Burdensome Factual Disputes ...............................................................................................9

II. The Court Should Reduce the Personal Money Judgment of Forfeiture to Credit Specific Property Already Forfeited and Include Only that Property that Came to Rest with Ayvazyan ....................................9

    A.  Any Personal Money Judgment Should Be Reduced by $1,225,813 to Account for Specific Property that Was Already Forfeited...................10

    B.  Any Personal Money Judgment of Forfeiture Should be Reduced by $1,245,775 Because That Money Did Not Come to Rest With Ayvazyan ...........................................................................................13

III. The Court Should Order the Return of the Children's Passports to Their Guardian and Clarify that the Conditions of Bond Have Been Extinguished Because the Underlying Bonds Have Been Forfeited ..............15

IV. Conclusion ........................................................................................16

1

RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT

**Preliminary Statement**

At the November 15, 2021 sentencing hearing, the Court permitted further submissions regarding the amount of restitution based on application of the loss bracket U.S.S.G. § 2B1.1(b)(1)(I) (more than $1.5 million) instead of § 2B1.1(b)(1)(J) (more than $4.5 million) or § 2B1.1(b)(1)(K) (more than $9.5 million); whether a personal money judgment of forfeiture should be ordered against Richard Ayvazyan in addition to the previous forfeiture of specific property; and the government's retention of the Ayvazyan children's passports and previous Conditions of Bond that applied to them. This submission addresses each of those three topics.

First, the Court should order at most $1,840,556 in restitution. Restitution has two elements: who qualifies as a "victim" suffering actual loss, and what amount of actual loss did they suffer from the defendant's crime of conviction. Here, the Court has already concluded that the government proved only one victim who suffered pecuniary harm[1]: the Small Business Administration (SBA). The Court has further concluded that the government has carried its burden of proof as to the loss suffered by the SBA (directly or through loans it guaranteed): the loss testified to by Marylee Robinson and GX 115, which the Court described as either close to $2 million or over $4 million. The government shows no cause for reconsidering either determination, and refuses to even admit that it is seeking reconsideration. The Court should therefore deny the government's request and either award $1,840,556 in restitution to the SBA or abstain from awarding restitution altogether pursuant to 18 U.S.C. § 3663A(c)(3)(B) (directing that the statute providing for restitution "shall not apply … if the court finds,

---

[1] Excluding any collateral consequences to Celtic Bank, which the Court referenced in passing but neither the government nor the bank has quantified.

from facts on the records, that … determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.").

Second, the Court should not order a personal money judgment against Ayvazyan in addition to the forfeiture of the specific property traceable to the crime of conviction. Although forfeiture is traditionally *in rem* against specific personal property, an *in personam* money judgment is possible when the government proves how much money came to rest with a particular defendant *after the co-conspirators had split their proceeds* (as long as the government can ensure it has not already forfeited that money). What the government has done here, however, is merely trace money to—at best—a jointly controlled account that was used by multiple co-conspirators as a "stop[] on the way to splitting up the money," which justifies only *in rem* forfeiture of the accounts in question, not a personal money judgment against a single disfavored co-conspirator with alleged access to the accounts. *See United States v. Thompson*, 990 F.3d 680, 691 (9th Cir. 2021). The government has not demonstrated that money in the relevant accounts came to rest with Ayvazyan and therefore cannot seek a personal money judgment against him.

And finally, the Court should order the return of the passports belonging to Ayvazyan's three teenage children. The Conditions of Bond (Dkt. 47, 48) required surrender of the children's passports. It is counsel's understanding that those passports were either surrendered in Florida or California, seized in California, or otherwise lost. Because the underlying Appearance Bonds have been forfeited, the passports in question should be returned to the guardian of the children. The children have not been

2
RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT

convicted of a crime and are entitled to their passports. Furthermore, to the extent that the guardian's application may have been denied based on the Conditions of Bond, the Court should issue an Order clarifying that the Conditions of Bond have been extinguished and are no longer in effect. A proposed order is attached.

**I.    The Court Should Deny the Government's Request for Reconsideration of Loss and Either Award $1,840,556 in Restitution to the Small Business Administration or Abstain from Awarding Restitution Altogether**

During the November 15, 2021 hearing, the government correctly disclosed that case law in the Ninth Circuit and Supreme Court limits restitution to the actual loss found by the Court. Silverman Decl. Ex. A at 36 (Tr. of Nov. 15, 2021 hearing). The Court had found the $1.5 million loss bracket applicable and concluded that the lendor banks did not qualify as victims because they were assured that they would be reimbursed. *See id.* at 13, 14. The government responded that the $16,464,071.26 in restitution that it had sought "exceeds the loss amount found by the Court." *Id.*[2] Because the government's requested restitution exceeded the loss amount found by the Court, the Court stated that the Judgment "has to be amended." *Id.* The government responded by "suggest[ing] that the Court revise the loss amount" to the restitution amount the government sought: revising the loss amount to $16,464,071.26 or more, and awarding $16,464,071.26 in restitution. *See id.* at 38. The Court rejected that request for reconsideration. *Id.* After the Court rejected its request for reconsideration, the government sought leave to file a brief because "the amount of loans at issue on

---

[2] Neither the government nor defense counsel flagged the second issue for the Court: the proposed recipients of the government's restitution did not suffer actual loss except for the Small Business Administration. *See id.* at 14; U.S.S.G. § 2B1.1 n.1 (defining victim as the persons who "sustained any part of the actual loss determined under subsection (b)(1)"). Any award of restitution should be to the SBA as the agency responsible for reimbursing the lender banks.

[GX 115's] charts is 4.6 million which is in excess of the loss amount for the loss level that the Court had found with respect to the guidelines calculation." *Id.* The government has now gone back for a third bite at the apple, attempting to convince the Court that it should revisit its determination of who suffered actual loss, revisit its loss calculation, and reach a conclusion it has twice rejected.

The Court should decline the government's request to reconsider its previous rulings, and either enter a restitution order consistent with GX 115 or decline to award restitution based on the complexity of the factual issues in dispute.

### A. Legal Standard

The Mandatory Victims Restitution Act (MVRA) requires the Court to order restitution to victims who were directly and proximately harmed unless the Court finds that there are complex issues of fact related to the cause or amount of the victim's losses that would complicate or prolong the sentencing process to a degree that the need for restitution is outweighed by the burden on the sentencing process. 18 U.S.C. §§ 3663A(a), (c)(1)(A)(ii), (c)(3)(B). The government must prove two elements with respect to each restitution award it seeks. "The government bears the burden of proving that a person or entity is a victim for purposes of restitution, and of proving the amount of the loss." *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008) (internal citations omitted) (vacating restitution order because the government and victims' loss summaries were "too summary and too conclusory"); *see also United States v. Frazier*, 651 F.3d 899, 905 (8th Cir. 2011) ("[T]he court should first determine who all qualifies as a victim," and second, "calculate each victim's actual, provable losses based on a preponderance of the evidence … .").

"[R]estitution can only include losses directly resulting from a defendant's offense." *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010) (quoting *United States v. Stoddard*, 150 F.3d 1140, 1147 (9th Cir. 1998)). "For that reason, a restitution order must be based on losses directly resulting from the defendant's criminal conduct." *Id.* (quoting *Stoddard*, 150 F.3d at 1147); *see also United States v. Minter*, 146 F. App'x 123, 125 (9th Cir. 2005) ("[R]estitution is limited to losses flowing from conduct that constitutes an element of the offense; losses that are related to, but not caused by, the offense of conviction are likewise irrelevant for restitution purposes."). In *Stoddard*, for example, the Ninth Circuit vacated a $116,223 restitution order in a case involving $30,000 in loss because restitution cannot exceed the actual losses directly resulting from defendant's conduct.

### B. The Court Should Construe the Government's Submission as a Request for Reconsideration and Deny It

In its sentencing submission, the government included 141 loans that it alleged were part of the conspiracy of conviction with assorted one-sentence summaries like "Bank records linked Marco Rivas to Anton Kudiumov" or third-party companies owned by non-conspirators that engaged in financial transactions with Ayvazyan or his company, e.g., Arsa Medical, Comfort Diagnostics Inc., and Byraya Management. *See, e.g.*, Sent'g Mem re Richard Ayvazyan at 11-12. Indeed, for many of these loans involving real companies, it was unclear whether the loans were fraudulent at all or whether the third party simply had a connection to Dadyan, Grigoryan, or Ayvazyan. *Cf. United States v. Arledge*, 553 F.3d 881, 898-99 (5th Cir. 2008) (vacating restitution award because it included three claims for which there was no proof of falsity). Defense counsel argued that because the government did not adduce proof of these

loans' fraudulence and culpable connection to Ayvazyan, the Court should use the amount of proceeds tied to Ayvazyan ($1.14 million) as the loss amount. *Id.* at 11. The government argued that all 141 loans with a total actual loss of $16,464,071.26 should be attributed to Ayvazyan.

The Court rejected both arguments. Looking at the record evidence, the Court concluded that the applicable loss bracket was that for greater than $1.5 million. Sent'g Tr. at 12-13 (Silverman Decl. Ex. A).³ The Court reasoned that although the government's list of 141 loans added up to $16.5 million, the evidence at trial and GX 115 supported using "**2 [million dollars] or close**" or "**over $4 million**." *Id.* at 13. The government then requested reconsideration—noting twice on the record that its requested restitution "exceed[ed] the loss amount found by the Court," *id.* at 36, and and that the alternative calculation of $4.6 million "is in excess of the loss amount for the loss level that the Court had found," *id.* at 38. The Court rejected the government's request to reconsider the loss finding, concluding "I am not doing that." *Id.*

The government's supplemental submission asks the Court once again to reconsider its finding that the $1.5 million loss bracket applies—effectively a second request for reconsideration. Motions for reconsideration require material facts or law that were previously unavailable to the movant, the emergence of new material facts or law after the initial finding, or a manifest showing of a failure to consider material facts. Local Rule 7-18. The rules prohibit moving to reconsider based on repeated oral

---

³ The Court noted that the government "might even be able to show by clear and convincing evidence that [loss] was more than 9.5 [million dollars]," but that "the evidence at trial itself" showed $1.5 million to over $4 million. Ex. A at 13. The government has not adduced any further evidence since then. Regardless of what the government might be able to show, it has not done so. The evidence actually adduced by the government does not prove that Ayvazyan caused the losses the government now asks the Court to hold against him.

6
RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT

or written arguments made in support of the original motion. *Id.*; *see United States v. Herrera*, No. 02-cr-531 (RSWL), 2008 WL 618982 (C.D. Cal. Mar. 4, 2008) (applying Rule 7-18 to criminal proceeding and denying motion based on arguments that were already presented); *United States v. Boyajian*, No. 09-cr-333(A) (CAS), 2015 WL 4128526, at *2, 3 (C.D. Cal. June 19, 2015) (same). The Court has already rejected the government's arguments twice, and the government presents no new evidence as to why reconsideration is merited. No hearing is necessary. The government's request for reconsideration should be summarily rejected, and the Court should enter an order of $1,840,556 in restitution to the Small Business Administration—the amount arguably justified by GX 115.

### C. If the Court Orders Restitution, It Should Order the Amount Supported by GX 115 and Order that the Restitution Paid to the Small Business Administration

#### 1. Any Restitution Award Should Be Paid to the Small Business Administration

Before the Court considers the amount of restitution awarded to any given victim, "[t]he government bears the burden of proving that [the] person or entity is a victim for purposes of restitution …." *Waknine*, 543 F.3d at 556. To be a victim, the entity must have been "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); *see* Sarah N. Welling, 3 Fed. Prac. & Proc. Crim. § 546 (4th ed.) (text accompanying nn. 31-32).

The government's request for restitution to various lendor banks should be summarily rejected, and the restitution should be awarded to the SBA, which has or will reimburse the lendor banks. The Court has already found that the SBA constituted the "victim" under U.S.S.G. § 2B1.1(b)(2)(A)(i), because the SBA was the one who
7
RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING STATEMENT

ultimately sustained loss under U.S.S.G. § 2B1.1(b)(1) and application note 1.  Sent'g Tr. at 13 (noting that "there was some evidence with respect to … a collateral consequence" with respect to Celtic Bank,[4] but "that doesn't constitute 10 or more [victims]").  Any restitution should therefore be ordered to the SBA, which can use it to offset the cost of reimbursing the lendor banks.[5]

### 2. GX 115 Supports, at Most, Joint and Several Liability for $1,840,556

During sentencing, the Court mentioned two numbers as the basis for its finding drawn from the trial evidence generally, and GX 115 in particular.  Without prejudice to the defense's overall position that no restitution is required, defense counsel suggests that restitution of $1,840,556 would be the most supported by that record evidence. Pages 5-10 of GX 115 allege that the co-conspirators received proceeds totaling $1,840,556, consistent with the Court's reference to $2 million dollars:

| GX 115 Page | Amount | Proceeds type |
|---|---|---|
| 5 | $238,614 | Calle La Primavera House |
| 6 | $110,300 | Anastacia Lane House |
| 7 | $639,807 | Topeka Drive House |
| 8 | $227,699 | Robinhood/Zhadko JPMC/Fiber One/Manukyan |
| 9 | $477,136 | Italy2000/BelgiumNY/Picadilly/Gentleman Timepieces/Fay Servicing |
| 10 | $147,000 | TDAmeritrade/Coinbase from Turing/Zhadko JPMC |
| | | |
| Total | $1,840,556 | |

---

[4] Celtic Bank is not entitled to restitution of these collateral costs.  *See Lagos v. United States*, 138 S. Ct. 1684, 1690 (2018) (MVRA does not cover the costs of a private investigation that the victim chooses to conduct).

[5] This result will yield immediate reimbursement for the lendor banks consistent with their expectations going into the program.  Surprisingly, it would accrue to the institutions' detriment to be labeled as "victims" and awarded restitution because it could inhibit their ability to seek reimbursement from the SBA despite the uncertain nature of criminal restitution.

Not all of these proceeds went to Ayvazyan, and indeed, some of them concern loans applied for by Arman Hayrapetyan, a person who never met or interacted with Ayvazyan, much less conspired with him. Restitution of $1,840,556 would be a conservative estimate based in evidence and consistent with the Court's ruling.

### D. The Court May Abstain From Awarding Restitution Based on the Government's Failure to Resolve Complex, Burdensome Factual Disputes

Alternatively, if the Court finds that there are complex issues of fact related to the cause or amount of the victim's losses that would complicate or prolong the sentencing process to a degree that the need for restitution is outweighed by the burden on the sentencing process, the Court may abstain from entering a restitution order. 18 U.S.C. § 3663A(c)(3)(B); *see also* S. Rep. No. 179 at 19, 104th Cong., 1st Sess. (1995) ("In all cases, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution. The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution."). The government and Small Business Administration would not be left without recourse. They could continue with the *in rem* forfeiture of bank accounts, brokerage accounts, and other properties allegedly representing proceeds of loan fraud.

### II. The Court Should Reduce the Personal Money Judgment of Forfeiture to Credit Specific Property Already Forfeited and Include Only that Property that Came to Rest with Ayvazyan

There are two principle areas of dispute with respect to forfeiture: (A) whether credit should be given for forfeitures of specific property that included untainted assets;

and (B) whether the government has proven that all of the funds in accounts controlled by multiple people came to rest with Ayvazyan, contrary to the jury's acquittal on Counts 28-32.  The government's supplemental submission adds minimal clarity—tracing only the disputed watches to tainted funds.  *See* GX 401 at 10 (tracing watches to funds in Time Line Transport, Zhadko/Top Quality Contracting, Viktoria Kauichko, and other accounts).  Removing those watches from the calculation, counsel submits that (A) any personal money judgment against Ayvazyan should be reduced by $1,225,813 to offset the forfeiture of untainted funds paid into the Topeka Drive home and the U.S. currency seized from that home; and (B) any personal money judgment should be reduced by $1,245,775 because that money did not come to rest with Ayvazyan.  Because the government has not proven what money came to rest with Ayvazyan, its remedy is in *in rem* seizure and forfeiture of the tainted property, not a money judgment against a single alleged member of the conspiracy.

### A.   Any Personal Money Judgment Should Be Reduced by $1,225,813 to Account for Specific Property that Was Already Forfeited

Counsel previously submitted that the specific property forfeited included $1,367,863 in funds that had not been traced to tainted proceeds and that those untainted funds should be credited against any personal money judgment.  *See United States v. Bradley*, 969 F.3d 585, 592 (6th Cir. 2020) (noting that specific property subject to forfeiture would be credited against the money judgment); *United States v. Segal*, 495 F.3d 826, 839 (7th Cir. 2007) (holding that amounts a defendant invested into a business must be deducted from a money judgment where the business itself is also forfeited); *United States v. Ponzo*, No. 97-cr-40009, 2014 WL 3893790, at *5 (D. Mass. Aug. 6, 2014) ("The Court is also mindful of the fact that, under Fed. R. Crim. P.

32.2(e), the value of the specific assets found forfeitable by the jury will be applied to the money judgment as will any assets that are located and identified after the entry of this Order. As a result, defendant will not be required to earn and re-pay the full $2,250,000 in any event."); *United States v. Ventura-Oliver*, No. 11-cr-503, 2014 WL 2712294, at *6 (D. Hawaii June 23, 2014) (defense and government agreed that specific property forfeited should be deducted from money judgment).

This $1,367,863 in funds was made up of $774,628 in untainted payments towards the forfeited Topeka Drive property, $142,050 in payments towards the forfeited watches, and $451,185 in forfeited U.S. currency. Based on the government's point that the payments for the forfeited watches were, in fact, traced to tainted funds, counsel rescinds that portion of the request. Instead, counsel requests that any personal money judgment be credited $1,225,813 (comprising the untainted funds in the Topeka Drive property and the U.S. currency).

With respect to the Topeka Drive property, the government makes two arguments. First, the government ignores Ayvazyan's $774,628 in payments and claims he paid only $610,000—effectively ignoring money he received from third parties or paid after the down payment. *See* Gov't's Suppl. Sent'g Statement at 15 & n.10. The money Ayvazyan received from third parties was his, and he has been forced to forfeit that money. It should be credited against any further judgments against him. Second, the government argues that the untainted funds became tainted when used with the alleged PPP loan funds to purchase the forfeited property. This defies common sense. The untainted funds were not used to conceal the tainted funds. To the contrary, the resulting property was put in the name of Ayvazyan and his wife. While their earlier transactions may have met the statutory definition of concealment money

laundering according to the general verdict, there was no finding that the untainted money was involved in the concealment and in fact it was not.

With respect to the U.S. currency, the government's argument is irreconcilable with its argument to the jury. The government convinced the jury to forfeit $451,185 in U.S. currency because loan proceeds had been transferred out of the recipient bank accounts into fungible assets. *See* Order Denying Rule 29 and Rule 33 Motions at 9 (Dkt. 875) ("Given the number of loans elicited by Defendants (151), the number of transfers across accounts belonging to fake entities and individuals (over a period of months), and the other direct and circumstantial evidence discussed above and in the Government's opposition, the Court concludes that the evidence presented at trial was sufficient for a reasonable juror to find, beyond a preponderance of the evidence, that the cash and watches are forfeitable."); 6/28/2021 Tr. at 74 ("So you heard there was ample money moving around in this conspiracy."); *id.* at 75 ("you heard again and again the defendants were rapidly converting their criminal proceeds into property. … You are entitled to draw a reasonable inference from this evidence you have seen, ladies and gentlemen. These conspirators were conspiring to launder and convert the tainted funds that they had obtained in multiple ways."). Having successfully persuaded the jury that the $451,185 in Ayvazyan's possession came from the untraced loan proceeds, the government cannot force Ayvazyan to pay a money judgment for that same $451,185.[6]

---

[6] Although the government argues that credit should be split among the alleged co-conspirators, no other co-conspirator has claimed the money. Moreover, with the exception of Marietta Terabelian, there is no evidence that any co-conspirator owned Ayvazyan's money. At most, the ownership would be split between Ayvazyan and Terabelian, but Terabelian has not objected to Ayvazyan's claim of ownership, nor has she claimed she should be entitled to credit for its forfeiture.

### B. Any Personal Money Judgment of Forfeiture Should be Reduced by $1,245,775 Because That Money Did Not Come to Rest With Ayvazyan

"A co-conspirator can be ordered to forfeit only the amount of money that 'came to rest with him as a result of his crimes.'" *United States v. Vescuso*, 856 F. App'x 742, 743 (9th Cir. 2021) (quoting *United States v. Thompson*, 990 F.3d 680, 691 (9th Cir. 2021)). "*Honeycutt* does not allow for an interpretation that any conspirator who at some point had physical control is subject to forfeiture of all the proceeds." *Thompson*, 990 F.3d at 691.

The question before the Court is whether jointly controlled accounts "were stops on the way to splitting up the money" or the money came to rest in a jointly controlled account "after the [co-conspirator]s split it up." *Id.* (vacating forfeiture orders for total amount deposited into accounts directed by each defendant because the money did not come to rest in those accounts); *see also* Gov't App'n for Entry of Money Judgment at 15 n.9 (Dkt. 1053) (recognizing the second half of this principle).[7]  Here, the evidence shows that the jointly controlled accounts were mere stops on the way to splitting up the money.

The accounts were addressed in defense counsel's sentencing submission (Dkt. 1105 at 38-40). Except for the Mod Interiors bank account—which defense counsel's

---

[7] *United States v. Prasad* deals with proceeds that are deposited into an account "sole[ly]" controlled by one defendant. 2021 WL 5174096, at *5 (9th Cir. Nov. 8, 2021). *Prasad* does not deal with the questions of jointly controlled accounts and when money "comes to rest" that were addressed by the Ninth Circuit in *Thompson*. In fact, *Prasad* does not address or even cite *Thompson* at all. Unlike *Prasad*, this case involves accounts that were controlled by multiple persons and proceeds that were still in the process of being split up, bringing it squarely within the *Thompson* framework, not that of *Prasad*.

submission did not contest—the evidence proved that even if Ayvazyan had access to the Turing Info Solutions JPMC account, Zhadko/Top Quality Wells Fargo account, Zhadko JPMC account, Timeline Transport Radius account,[8] third parties also exercised control over those accounts to divvy up alleged proceeds of fraud. *See generally* Sent'g Mem. Regarding Richard Ayvazyan at 38-40 (Dkt. 1105). It is non-sensical to hold Ayvazyan solely responsible for accounts that were used to divvy up funds among other people—as confirmed by Grigoryan's notebook, IP address records, and bank records including access logs showing user access continued during Ayvazyan's incarceration. *See, e.g., id.*; GX 1.n at 139-144 (access logs for Timeline Transport for late October 2020).The government does not introduce any factual argument at all except for the Turing Info Solutions account. *See* Gov't Suppl. Sent'g Statement at 20-21 n.12. The government argues that even though Ayvazyan was acquitted of key transactions from this account (Counts 28-32), he must have been responsible for the account because it was included in the overall conspiracy allegation. *Id.* But neither the law nor the jury instructions required the jury to conclude that Ayvazyan was responsible for every overt act in the indictment, much less that he was solely responsible. Counts 28-32 were the only Counts that demanded the jury consider Ayvazyan's individual responsibility for the Turing Info Solutions account, and on those Counts, he was acquitted. DX 55 and the jury verdict both the support the logical conclusion: Grigoryan had full access to the Turing Info Solutions account and Ayvazyan was not responsible for the transactions dissipating the account.

---

[8] In addition to the points mentioned in Dkt. 1105, several of these transactions appear to be transfers to a Bank of America account belonging to Iuliia Zhadko. That account's log-in information was found in Grigoryan's possession. DX 55 at 8.

The accounts in question were not repositories for Richard Ayvazyan alone; they were stops on the way to splitting up the money. That means that the money did not come to rest with Ayvazyan rather than the co-conspirators, and he cannot be singled out for a personal money judgment forfeiture order.

Denying the government a personal money judgment will not leave the government without a remedy. If the government believes that the money was transferred into other accounts under the name of Iuliia Zhadko or other identities involved in the conspiracy, then the government has the ability to pursue *in rem* administrative or judicial forfeiture of those accounts. *See Thompson*, 990 F.3d at 686 ("Very commonly, civil in rem actions are filed in the district courts against sums of money, ships, and automobiles independently of any proceedings against the criminals whose conduct tainted the property."). Indeed, the government has previously served defense counsel with notice that it intended to forfeit several bank accounts. *In personam* judgments are reserved for those circumstances in which one defendant clearly received certain proceeds. The government should not, however, be allowed to take a shortcut by obtaining an *in personam* judgment that pins sole responsibility on a sole individual when the evidence does not prove sole authority over the accounts in question.

### III. The Court Should Order the Return of the Children's Passports to Their Guardian and Clarify that the Conditions of Bond Have Been Extinguished Because the Underlying Bonds Have Been Forfeited

During the November 15, 2021 hearing, undersigned counsel raised the issue of the passports belonging to the defendant's children. Silverman Decl. Ex. A at 37. The Court directed counsel to submit this request to the Court. *See id.* The Court should order Pretrial Services, Probation, or the government to return any passports in their

possession to the children, and clarify that the Standard Conditions of Bond and Special Conditions of Bond are extinguished and no longer in effect (such that there is no restrictions on the children's passports).

The Appearance Bonds in this case required surrender of the three children's passports and travel documents to Pretrial Services. It is the understanding of undersigned counsel that the aforementioned passports or travel documents were either surrendered or seized during the November 5, 2020 search warrant executions, remain in the custody of Pretrial Services, Probation, or the government, or have otherwise been lost.

The Appearance Bonds have now been forfeited. Judgment & Commitment at 2 (Dkt. 1167). The Standard and Special Conditions of those Bonds are therefore no longer in effect.

Although the defendant remains absent, and the Court has found that absence to be voluntary, the absence does not merit punishment of the defendant's children or their legal guardian. "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Aptheker v. Sec'y of State*, 378 U.S. 500, 505 (1964) (quoting *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958)). The children have the right to travel, and that right is not extinguished based on their father's conviction or alleged flight.

### IV.   Conclusion

For the foregoing reasons, the Court should issue the Proposed Order attached hereto (1) ordering the government, Pretrial Services, or Probation to return any passports or travel documents belonging to the defendant's children, (2) clarifying that the Standard Conditions of Bond and Special Conditions of Bond are extinguished and

no longer in effect, (3) ordering restitution to the Small Business Administration in the amount of $1,840,556 (if any restitution amount is to be ordered), and (4) rescinding the money judgment of forfeiture preliminarily entered as Dkt. 1087.

Dated: November 1, 2021

Respectfully submitted,

**STEPTOE & JOHNSON LLP**

/s/ *Ashwin J. Ram*
Ashwin J. Ram (SBN 227513)
*aram@steptoe.com*
Nicholas P. Silverman (*pro hac vice*)
*nsilverman@steptoe.com*
**STEPTOE & JOHNSON LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400