Carlo Brooks, CA Bar # 316485
3826 Grand View Boulevard, Suite 661472
Los Angeles, CA 90066
(310) 691-9373
carlo@carlobrooks.com

Attorney for Petitioner
RICHARD AYVAZYAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| RICHARD AYVAZYAN,      ) <br>         ) <br>        Petitioner   ) <br> vs.         ) <br>         ) <br> UNITED STATES OF AMERICA, ) <br>         ) <br>       Respondent.   ) <br>         ) | Case No.: 2:22-cv-8915 <br><br> [CR No. 2:20-cr-579-SVW] <br><br> **MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255** |

Petitioner Richard Ayvazyan through undersigned counsel, hereby

respectfully moves this Court to vacate, set aside, or correct his sentence pursuant

to 28 U.S.C. § 2255.

DATED: December 8, 2022         Respectfully submitted,

                          */s/ Carlo Brooks*
                          CARLO BROOKS

                          *Attorney for Petitioner*

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
## UNDER 28 U.S.C. § 2255

## I.   INTRODUCTION

Petitioner Richard Ayvazyan, by and through his attorney, Carlo Brooks, hereby submits his motion to vacate, set aside, or correct his sentence. The government's entire case against Mr. Ayvazyan rests on an intentional egregious violation of petitioner's Fourth, Fifth, and Sixth Amendment rights based on the government's sustained pattern of misconduct, including a pretextual border stop and lies about the purpose of that stop, deprivation of the right to counsel, destruction of evidence, lying about that misconduct, abusing the grand jury process, disregarding *Brady* obligations, flagrantly violating court orders, and lying to the Court, and, above all, building the lynchpin of its case and "star witness" at trial out of undeniably tainted evidence.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The government's case against Petitioner and the resulting judgment rest *entirely* on the use of unconstitutionally obtained evidence.

Based on a suspicion of fraud committed by a certain Iuliia Zhadko and his company, Timeline Transport, in a PPP loan application, the government's sights turned to Mr. Ayvazyan because Zhadko was one of several friends and associates who transferred money to help make a down-payment on Mr. Ayvazyan's home. Based on Petitioner's decade-old record involving a non-jail plea, the government

1

assumed that he too must be culpable; however, the government had zero direct evidence that Mr. Ayvazyan was involved in Zhadko's allegedly fraudulent application.

In an effort to fill this critical gap in its investigation, the government began a pattern of misconduct that plagued the case from the beginning till the end. The government unlawfully stopped, interrogated, and searched Petitioner based on a pretextual invocation of the border search authority and "National Security." *See* Dkt. 130, 135, 136. As case agent Justin Palmerton testified at the Miami bail hearing, "once the CBP stopped for the secondary inspection, we learned that there was a photograph of Iuliia Zhadko on the digital device and we made the connection that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan." Oct. 22, 2020 Hr'g Tr. at 23-24, *United States v. Ayvazyan*, 20-mj-3857, Dkt. 17 (S.D. Fla. Oct. 22, 2020) ("Oct. 22 Tr.").

The tainted evidence from the October 19, 2020 Miami airport stop became the *lynchpin* of the government's case against Mr. Ayvazyan. In effect, the fruit of the pretextual Miami airport customs inspection ultimately found its way into government trial exhibit GEX 10, which contained text messages in which Petitioner and co-defendant Tamara Dadyan allegedly discussed the conspiracy. Without that tainted evidence, the government would not have been able to obtain the evidence seized at 17450 Weddington Street in Encino, California, the residence

2

of Tamara Dadyan and Artur Ayvazyan, two of Defendants' accused co-conspirators Weddington home, including Dadyan's phone, which contained the text messages. The Government used Mr. Ayvazyan's tainted phone information to obtain the search warrants on the Weddington residence.

In March 2021, Defendants moved to suppress all of the evidence from the Miami airport on the basis that the Fourth Amendment prohibited the warrantless detention and searches the government conducted by deputizing Customs and Border Protection (CBP) officials to the investigation of suspected PPP loan fraud. *See* Dkt. 130, Motion to Suppress Evidence From Pretextual Detention and Warrantless Searches. Defendants also moved to suppress all of the evidence from the Miami airport on the basis that the search of Defendants' luggage and phones violated the Fifth and Sixth Amendments. *See* Dkt. 135, Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments.

On April 27, 2021, the Court granted in part Petitioner's Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments the motion in part. As to the Fifth Amendment argument, the Court found a *Miranda* violation and suppressed the evidence from Defendants' phones. *See* Dkt. 296.

Notably, the Court found that Defendants' disclosure of their phone passcodes was not voluntary. Dkt. 296 at 17. The Court found several factors compelled this result. Defendants were in custody without being given *Miranda* warnings.

Defendants had been detained for approximately four hours when they provided their phone passcodes and, at that time, Defendants had been separated from one another and individually interrogated. *Id.*

The Court found that, most importantly, each defendant was induced to provide their phone passcode with *false information*. *Id.* Specifically, Mr. Ayvazyan was told that he only needed to search the cell phone for "national security purposes and just to confirm that [he] was not a terrorist." *See* Dkt. 133, Ayvazyan Decl. ¶ 24; *see also id.*, Ex. 13 (transcript of video interrogation in which Ayvazyan asks "What does credit cards have to do with national security that Ramirez is talking about? What is it?"). Terabelian was told that agents needed to look at her phone to see if Terabelian was a national security threat, and that Terabelian would "be on the next flight" if she cooperated with agents. *See* Dkt. 133, Terabelian Decl. ¶ 12.

Under these circumstances, the Court found, the provision of passcodes by Defendants to customs agents was not voluntary, and any evidence discovered on Defendants' smartphones at the Miami airport was ordered suppressed. Dkt. 296 at 18 (citing *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) ("Sufficiently coercive conduct normally involves . . . the making of a promise that induces a confession.").

Yet while the Court granted Defendant's Motion to suppress the physical

fruits of an alleged Miranda violation at the Miami airport, the Court *rejected* Petitioner's argument that because the applications for warrants to search Defendants' homes referenced the tainted evidence seized at the Miami airport, the evidence seized during the search of Defendants' home was the fruit of the poisonous tree and should also be suppressed.[1]

In his Motion to Suppress Evidence Seized at the Miami Airport on Fourth Amendment Grounds, Petitioner argued that the government's entire case against him was the fruit of a "disturbing emerging practice of law enforcement agencies [directing] direct border officers to use their border search authority to investigate alleged criminal conduct untethered from any border or national security concern. The result is an "anything goes" free-for-all when hapless subjects of a domestic criminal investigation happen to travel through an airport and are denied fundamental rights." Dkt. 130 at 1.

Petitioner argued that Ninth Circuit case law was controlling and that precedent in *United States v. Cano*, 934 F.3d 1002, 1017 (9th Cir. 2019) expressly forbade intrusive searches conducted for general law enforcement purposes, which are distinguishable from the "routine searches" to "to prevent smuggling and to prevent prohibited articles from entry, which are proper under the government's plenary border search authority.  *See* U.S. Const. art. I, § 8, cl. 1. Indeed, Petitioner

---

[1] Later, in its August 20, 2021 Order denying Defendants' Kastigar Motion, the Court similarly concluded that the Weddington and Canoga homes were not added as search warrant targets based on tainted information

argued, as set forth in *Cano*, "[w]arrants are generally required 'unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Cano*, 934 F.3d at 1010 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978).

The Court agreed that the pretextual stop would have been unlawful if Ninth Circuit law applied: "Indeed, under Ninth Circuit law, the search at issue falls outside the scope of the border search exception. In the Ninth Circuit, '[a] border search must be conducted to enforce importation laws, and not for general law enforcement purposes.' Dkt. 296 at 4 (quoting *Cano*, 934 F.3d at 1013). Therefore, under *Cano* and general Fourth Amendment jurisprudence, to determine whether a search was conducted for general law enforcement purposes, courts must conduct an objective inquiry. Dkt. 296 at 5 (citing *Cano*, 934 F.3d at 1016 n.9).

However, based on the Eleventh Circuit location of the search, Miami, FL, the Court found that Eleventh Circuit law applied, and the search was lawful, because in the Eleventh Circuit, "border searches of property are reasonable without any level of suspicion." Dkt. 296 at 4 (quoting *United States v. Touset*, 890 F.3d 1227, 1232, 1237 (11th Cir. 2018)). *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) involved the "importation of contraband" – specifically, child pornography on two laptops and two external hard drives in the traveler's possession. *Id.* at 1230.

The Court in *Touset* held that border agents needed no justification

whatsoever to detain (for seventeen days) and forensically search electronic devices of an American citizen returning from abroad. *Id.* at 1237. As stated in the concurring opinion, "This new-found government position presents a different and difficult question, one not addressed by the Supreme Court or (until today) any appellate court. *Touset*, 890 F.3d at 1238-39 (Corrigan, J., concurring in part). Justice Corrigan therefore concurred only in the Court's alternative holding that "the district court correctly denied Touset's motions to suppress because the forensic searches of his electronic devices were supported by reasonable suspicion." *Id.*

What ensued was an essential "free for all" in which text messages featured at trial (GEX 10) were selected using notes from the FBI or OIG Agent's review of Petitioner's unconstitutionally seized phone. Under *Kastigar*, the government bears the "heavy burden" of proving by a preponderance "that 'all of the evidence it proposes to use,' and all of its trial strategy, were 'derived from legitimate independent sources.'" *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (quoting *Kastigar*, 406 U.S. at 460). In addition to this prospective burden of proof, the government must "demonstrate that 'none of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony[.]'" *United States v. Hampton*, 775 F.2d 1479, 1489 (11th Cir. 1985).

The record abounds with documents, pleadings and testimony showing both

evidentiary and non-evidentiary uses by the government of the tainted information – use which the government must *disprove* to survive Kastigar scrutiny.

As set forth herein, the record shows that at every stage of the litigation following the Miami customs stop, the government used tainted information and derivative tainted information in many respects, including but not limited to interpreting evidence, focusing the investigation, developing pre-trial strategy, and building its case. It used Petitioner's unlawfully seized phone as an investigatory lead and to uncover other evidence, to present evidence or testimony to the grand jury, to refuse to plea bargain, to plan or adjust trial strategy such as case theory, anticipating defenses, selecting exhibits – especially Exhibit 10 – making witness decisions, or planning examinations.

Petitioner's sentence was "imposed in violation of the Constitution or laws of the United States," and must be vacated and set aside.

## III.   ARGUMENT

    **A. Fourth Amendment Violation: The credit cards offered as evidence at trial were seized as part of a pretextual border search that violated the Fourth Amendment as applied in Ninth Circuit law. The court erroneously applied Eleventh Circuit law even though (a) if it was one circuit's law, it should be the Ninth Circuit because that's where the search was directed from; (b) the court misinterpreted Eleventh Circuit law; (c) the law at issue should have been the Fourth Amendment, not one circuit's jurisprudence, and suppression of all fruits of the unlawful search and seizure was proper due as a matter of deterrence to the egregious violations of Petitioner's constitutional rights.**

The government's case against Petitioner and the resulting judgment rest *entirely* on the use of unconstitutionally obtained evidence.

Based on a suspicion of fraud committed by a certain Iuliia Zhadko and his company, Timeline Transport, in a PPP loan application, the government's sights turned to Mr. Ayvazyan because Zhadko was one of several friends and associates who transferred money to help make a down-payment on Mr. Ayvazyan's home. Based on Petitioner's decade-old record involving a non-jail plea, the government assumed that he too must be culpable; however, the government had zero direct evidence that Mr. Ayvazyan was involved in Zhadko's allegedly fraudulent application.

In an effort to fill this critical gap in its investigation, the government began a pattern of misconduct that plagued the case from the beginning till the end. The government unlawfully stopped, interrogated, and searched Petitioner based on a pretextual invocation of the border search authority and "National Security." *See* Dkt. 130, 135, 136. As case agent Justin Palmerton testified at the Miami bail hearing, "once the CBP stopped for the secondary inspection, we learned that there was a photograph of Iuliia Zhadko on the digital device and we made the connection that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan." Oct. 22, 2020 Hr'g Tr. at 23-24, *United States v. Ayvazyan*, 20-mj-3857, Dkt. 17 (S.D. Fla. Oct. 22, 2020) ("Oct. 22 Tr.").

The tainted evidence from the October 19, 2020 Miami airport stop became the *lynchpin* of the government's case against Mr. Ayvazyan. In effect, the fruit of the pretextual Miami airport customs inspection ultimately found its way into government trial exhibit GEX 10, which contained text messages in which Petitioner and co-defendant Tamara Dadyan allegedly discussed the conspiracy. Without that tainted evidence, the government would not have been able to obtain the evidence seized at the Weddington Street residence in Encino, California, the residence of Tamara Dadyan and Artur Ayvazyan, two of Defendants' accused co-conspirators Weddington home, including Dadyan's phone, which contained the text messages. The Government used Mr. Ayvazyan's tainted phone information to obtain the search warrants on the Weddington residence.

In March 2021, Defendants moved to suppress all of the evidence from the Miami airport on the basis that the Fourth Amendment prohibited the warrantless detention and searches the government conducted by deputizing Customs and Border Protection (CBP) officials to the investigation of suspected PPP loan fraud. *See* Dkt. 130, Motion to Suppress Evidence From Pretextual Detention and Warrantless Searches. Defendants also moved to suppress all of the evidence from the Miami airport on the basis that the search of Defendants' luggage and phones violated the Fifth and Sixth Amendments. *See* Dkt. 135, Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments.

On April 27, 2021, the Court granted in part Petitioner's Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments the motion in part. As to the Fifth Amendment argument, the Court found a *Miranda* violation and suppressed the evidence from Defendants' phones. *See* Dkt. 296.

Notably, the Court found that Defendants' disclosure of their phone passcodes was not voluntary. Dkt. 296 at 17. The Court found several factors compelled this result. Defendants were in custody without being given *Miranda* warnings. Defendants had been detained for approximately four hours when they provided their phone passcodes and, at that time, Defendants had been separated from one another and individually interrogated. *Id.*

The Court found that, most importantly, each defendant was induced to provide their phone passcode with *false information*. *Id.* Specifically, Mr. Ayvazyan was told that he only needed to search the cell phone for "national security purposes and just to confirm that [he] was not a terrorist." *See* Dkt. 133, Ayvazyan Decl. ¶ 24; *see also id.*, Ex. 13 (transcript of video interrogation in which Ayvazyan asks "What does credit cards have to do with national security that Ramirez is talking about? What is it?"). Terabelian was told that agents needed to look at her phone to see if Terabelian was a national security threat, and that Terabelian would "be on the next flight" if she cooperated with agents. *See* Dkt. 133, Terabelian Decl. ¶ 12.

Under these circumstances, the Court found, the provision of passcodes by Defendants to customs agents was not voluntary, and any evidence discovered on Defendants' smartphones at the Miami airport was ordered suppressed. Dkt. 296 at 18 (citing *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) ("Sufficiently coercive conduct normally involves . . . the making of a promise that induces a confession.").

Yet while the Court granted Defendant's Motion to suppress the physical fruits of the *Miranda* violation at the Miami airport, the Court *rejected* Petitioner's argument that because the applications for warrants to search Defendants' homes referenced the tainted evidence seized at the Miami airport, the evidence seized during the search of Defendants' home was the fruit of the poisonous tree and should also be suppressed.

In his Motion to Suppress Evidence Seized at the Miami Airport on Fourth Amendment Grounds, Petitioner argued that the government's entire case against him was the fruit of a "disturbing emerging practice of law enforcement agencies [directing] direct border officers to use their border search authority to investigate alleged criminal conduct untethered from any border or national security concern. The result is an "anything goes" free-for-all when hapless subjects of a domestic criminal investigation happen to travel through an airport and are denied fundamental rights." Dkt. 130 at 1.

Petitioner argued that Ninth Circuit case law was controlling and that precedent in *United States v. Cano*, 934 F.3d 1002, 1017 (9th Cir. 2019) expressly forbade intrusive searches conducted for general law enforcement purposes, which are distinguishable from the "routine searches" to "to prevent smuggling and to prevent prohibited articles from entry, which are proper under the government's plenary border search authority. *See* U.S. Const. art. I, § 8, cl. 1.

The Court denied Defendants' Motion to Suppress on Fourth Amendment grounds, chastising Petitioner for limiting its argument that the Miami airport search was not permissible under Eleventh Circuit to "a single footnote." Dkt. 296 at 6. The Court countered that "[n]owhere in Touset did the Eleventh Circuit limit its holding to searches of electronic devices for child pornography." *Id.* The Court then leaped to a second, crucial, conclusion based on its reading of the second portion of the *Touset* opinion, stating that in finding the record supported a finding of reasonable suspicion, the court in *Touset* "did not apply the standard Defendants suggest" and "analyze whether agents had reasonable suspicion of contraband" but rather applied a "broader" standard enunciated by the Eleventh Circuit in *Denson v. United States*, 574 F.3d 1318, 1339 (11th Cir. 2009): that reasonable suspicion must be based upon a "particularized and objective basis for suspecting the particular person of *criminal activity*." Dkt. 296 at 7 (adding emphasis).

The Court's misreading of Eleventh Circuit case law for the proposition that

CBP's search and seizure authority extends warrantless border searches based on suspicion of general criminal activity was pivotal in this case. Critically, the Court's interpretation of Eleventh Circuit case law allowed it to dismiss any notion that Ninth Circuit or (analogous jurisprudence) might apply, and thereby find that the forum agents' reliance "on the law of the situs" was reasonable when directing the out-of-circuit search, Dkt. 296 at 12, and that "all agents involved fully complied with Eleventh Circuit law." *Id.* at 12-13. This, in turn, caused the Court to find Petitioner's arguments undermined by the Supreme Court's discussion in *Davis v. United States*, 564 U.S. 229 (2011) regarding the circumstances warranting deterrence. *See Davis*, 564 U.S. at 241 ("An officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances.") Thus, concluded the Court, "Applying those principles to the unique circumstances before the Court, deterrence is not warranted merely because the Miami airport search violated Ninth Circuit law." Dkt. 296 at 12.

The Court noted that under *Davis*, deterrence would only be warranted if forum agents from directing out-of-circuit searches that comply with the law of the situs of the search "exhibited deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." Dkt. 296 at 13 (citing *Davis*, 564 U.S. at 238). The Court noted that nothing suggested Agent Palmerton "controlled the location of the

border search." *Id.* "In sum," the Court concluded, "there is no 'forum shopping' to deter here because no forum shopping occurred." *Id.* at 14. Persuaded that the government's untested interpretation of Eleventh Circuit law controlled the case, the Court concluded that "Eleventh Circuit law requires the denial of Defendants' motion to suppress" on Fourth Amendment grounds. *Id.*

Petitioner argued that Ninth Circuit precedent in *United States v. Cano*, 934 F.3d 1002, 1017 (9th Cir. 2019) expressly forbade intrusive searches conducted for general law enforcement purposes, which are distinguishable from the "routine searches" to "to prevent smuggling and to prevent prohibited articles from entry, which are proper under the government's plenary border search authority. *See* U.S. Const. art. I, § 8, cl. 1. Indeed, Petitioner argued, as set forth in *Cano*, "[w]arrants are generally required 'unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Cano*, 934 F.3d at 1010 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978).

The Court agreed that the pretextual stop would have been unlawful if Ninth Circuit law applied: "Indeed, under Ninth Circuit law, the search at issue falls outside the scope of the border search exception. In the Ninth Circuit, '[a] border search must be conducted to enforce importation laws, and not for general law enforcement purposes.' Dkt. 296 at 4 (quoting *Cano*, 934 F.3d at 1013). Therefore,

under *Cano* and general Fourth Amendment jurisprudence, to determine whether a search was conducted for general law enforcement purposes, courts must conduct an objective inquiry. Dkt. 296 at 5 (citing *Cano*, 934 F.3d at 1016 n.9).

However, based on the Eleventh Circuit location of the search, Miami, FL, the Court found that Eleventh Circuit law applied, and the search was lawful, because in the Eleventh Circuit, "border searches of property are reasonable without any level of suspicion." Dkt. 296 at 4 (quoting *United States v. Touset*, 890 F.3d 1227, 1232, 1237 (11th Cir. 2018)). *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) involved the "importation of contraband" – specifically, child pornography on two laptops and two external hard drives in the traveler's possession. *Id.* at 1230.

The Court in *Touset* held that border agents needed no justification whatsoever to detain (for seventeen days) and forensically search electronic devices of an American citizen returning from abroad. *Id.* at 1237. As stated in the concurring opinion, "This new-found government position presents a different and difficult question, one not addressed by the Supreme Court or (until today) any appellate court. *Touset*, 890 F.3d at 1238-39 (Corrigan, J., concurring in part). Justice Corrigan therefore concurred only in the Court's alternative holding that "the district court correctly denied Touset's motions to suppress because the forensic searches of his electronic devices were supported by reasonable suspicion." *Id.*

*Touset's* holding that border searches of property are reasonable without any level of suspicion is anchored in Congress' broad powers under the Commerce Clause "to prevent smuggling and to prevent prohibited articles from entry." *Touset*, 890 F.3d at 1229. "[B]ecause child pornography is unprotected by the First Amendment, the Court reasoned, "Congress may declare it contraband and prohibit its importation." *Id.* at 1232 (citing *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376-77 (1971); accord *United States v. 12 200-Ft. Reels of Super 8MM. Film*, 413 U.S. 123, 128-29 (1973). Therefore, CBP's 17-day detention and forensic search of the defendant's two laptops and two external hard drives to prevent the "importation of contraband" – child pornography in the traveler's possession –, the Court reasoned, did not require reasonable suspicion because such search and seizure was proper under the government's plenary border search authority.

In his reply brief in Support of Motions To Suppress Evidence From Pretextual Detention and Warrantless Searches [Dkt. 208], Petitioner cited well-settled authorities and case law delimiting the nature of CBP's police power. As Petitioner stated, "CBP has statutory authority to conduct border searches to 'interdict[] persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry" and to "deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband.'" Dkt. 208 at 8-9 (quoting 6

U.S.C. § 211(e)(3)(A)-(B)).

In its Opposition to Petitioner's Motion [Dkt. 152], the government characterized items seized from the defendants' phones, such as a photograph of a fake driver's license, as "counterfeit access devices and identification documents," which it argued were a "form of digital contraband," subject to seizure like the pornographic images in *Touset*. Dkt. 152 at 9, 17. In his Reply, Petitioner made clear that no law declares third parties' "access devices" to be contraband and prohibits their importation:

> To the contrary, the definition of contraband that cannot be transported, concealed, or possessed on an aircraft includes drugs, weapons, counterfeit money, certain cigarettes, counterfeit versions of certain copyrighted materials, and goods bearing a counterfeit mark as defined under 18 U.S.C. § 2320. 49 U.S.C. § 80302(a)-(b); accord 19 U.S.C. § 4301 (adopting that definition and adding other goods whose importation is prohibited by the Tariff Act of 1930, i.e., the Act prohibiting importation of child pornography but not photographs of allegedly fake identification documents). Not one of the "AUTHORITY/REFERENCES" cited in the CBP memorandum provided by the government (Dkt. 152 Ex. 4 ¶ 4) references authority to interdict third parties' access devices. Indeed, Counsel has been unable to find a single case, statute, or regulation that would take the step the government requests here and define CBP's authority to search for "contraband" as including authority to search for third parties' access devices.

Dkt. 208 at 9-10.

Based on the foregoing, Petitioner argued that whether or not a reasonable search for contraband would have been permissible, this was neither a search for

contraband nor a reasonable search and was "therefore unconstitutional under the Fourth Amendment regardless of which circuit's law applied." Dkt. 208 at 15-16 n.19. Petitioner distinguished *Touset* as a case permitting searching for actual digital contraband – child pornography – "rather than evidence of an intent-based crime." *Id.* (citing *Touset*, 890 F.3d at 1236; *see Cano*, 934 at 1015 n.8 (distinguishing *Touset* on this ground)).

In denying Defendants' Motion to Suppress on Fourth Amendment grounds, the Court chastised Petitioner for limiting its argument that the Miami airport search was not permissible under Eleventh Circuit to "a single footnote." Dkt. 296 at 6. The Court countered that "[n]owhere in Touset did the Eleventh Circuit limit its holding to searches of electronic devices for child pornography." *Id.* The Court then leaped to a second, crucial, conclusion based on its reading of the second portion of the *Touset* opinion, stating that in finding the record supported a finding of reasonable suspicion, the court in *Touset* "did not apply the standard Defendants suggest" and  "analyze whether agents had reasonable suspicion of contraband" but rather applied a "broader" standard enunciated by the Eleventh Circuit in *Denson v. United States*, 574 F.3d 1318, 1339 (11th Cir. 2009): that reasonable suspicion must be based upon a "particularized and objective basis for suspecting the particular person of *criminal activity*." Dkt. 296 at 7 (adding emphasis).

<u>In emphasizing and seizing on the phrase "criminal activity," the Court</u>

<u>completely lost sight of the contours of CBP's statutory authority, which does not</u> <u>permit it to conduct warrantless border searches based on reasonable suspicion of</u> <u>general "criminal activity."</u> As Petitioner had taken pains to make clear in his Motion and Reply, a border search must be conducted to enforce importation laws, and not for general law enforcement purposes. *See* Dkt. 208 at 8-9 (quoting 6 U.S.C. § 211(e)(3)(A)-(B)) (CBP has statutory authority to conduct border searches to "interdict[] persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry" and to "deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband.").

Nothing in *Touset* or *Denson* violate this bedrock principle because both cases and the progeny they rely on involve searches for *importation of contraband* – a circumstance *not present* in Petitioner's case. *Denson* cannot stand for an expansion of the contours of CBP's search and seizure authority to warrantless border searches based on suspicion of general criminal activity. *Denson* arose when the defendant claimed customs agents violated her rights under the U.S. Constitution and Florida tort law by searching her at the Miami airport after she arrived aboard a flight from Jamaica "on the purported suspicion that she was attempting to smuggle narcotics into the United States inside her alimentary canal." *Denson*, 574 F.3d at 1323. As expressly stated in *Denson*, cases like *Denson* and

*Touset* involve *searches for the interception of contraband*, not intrusive searches

conducted for general law enforcement purposes:

> Reasonable suspicion requires more than mere fanciful conjecture; it must be based upon a "particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981). Although this standard imposes limits on a Customs official's discretion after an individual has crossed the border, *it relaxes the normal warrant requirement of probable cause in recognition of the "many difficulties that attend the attempt[s] to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers." United States v. Bilir*, 592 F.2d 735, 739-40 (4th Cir. 1979)

*Denson*, 574 F.3d at 1341 (emphasis added).

The Court's misreading of Eleventh Circuit case law for the proposition that

CBP's search and seizure authority extends warrantless border searches based on

suspicion of general criminal activity was pivotal in this case. Critically, the Court's

interpretation of Eleventh Circuit case law allowed it to dismiss any notion that

Ninth Circuit or (analogous jurisprudence) might apply, and thereby find that the

forum agents' reliance "on the law of the situs" was reasonable when directing the

out-of-circuit search, Dkt. 296 at 12, and that "all agents involved fully complied

with Eleventh Circuit law." *Id.* at 12-13. This, in turn, caused the Court to find

Petitioner's arguments undermined by the Supreme Court's discussion in *Davis v.*

*United States*, 564 U.S. 229 (2011) regarding the circumstances warranting

deterrence. *See Davis*, 564 U.S. at 241 ("An officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances.") Thus, concluded the Court, "Applying those principles to the unique circumstances before the Court, deterrence is not warranted merely because the Miami airport search violated Ninth Circuit law." Dkt. 296 at 12.

The Court noted that under *Davis*, deterrence would only be warranted if forum agents from directing out-of-circuit searches that comply with the law of the situs of the search "exhibited deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." Dkt. 296 at 13 (citing *Davis*, 564 U.S. at 238). The Court noted that nothing suggested Agent Palmerton "controlled the location of the border search." *Id.* "In sum," the Court concluded, "there is no 'forum shopping' to deter here because no forum shopping occurred." *Id.* at 14. Persuaded that the government's untested interpretation of Eleventh Circuit law controlled the case, the Court concluded that "Eleventh Circuit law requires the denial of Defendants' motion to suppress" on Fourth Amendment grounds. *Id.*

Yet The Court failed to consider CBP agents' violation of their own regulations and policies, which apply regardless of the "situs of the search"

It is undisputed based on the above-described CBP and FBI conduct that deterrence and suppression of *all* unconstitutionally obtained evidence, including

evidence that was utilized to obtain the search warrants, was warranted. It is true that to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it. The police conduct here was sufficiently deliberate under any circuit law." CBP agents deliberately fabricated a "national security concern" as a pretext for the search and the search was not for "importation of contraband," but  for aiding the FBI in investigating the alleged PPP loan fraud. The Court limited its inquiry to whether forum agents directing out-of-circuit searches complied with "the law of the situs of the search." As set forth above, they did not. Yet the Court failed to consider CBP agents' violation of their own regulations and policies, which apply regardless of the "situs of the search"

There exists a line of venerable Ninth Circuit case law holding that  egregious Fourth Amendment violations warrant the application of the exclusionary rule in civil proceedings, such as CBP border inspections. *See Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448 (9th Cir. 1994); *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2017) (evidence obtained in an unlawful manner will be excluded from civil proceedings (1) "when the agency violates a regulation promulgated for the benefit of petitioners and that violation prejudices the petitioner's protected interests" and (2) "when the agency egregiously violates a petitioner's Fourth Amendment rights.") Part 162 of Chapter I of Title 19 of the Code of Federal Regulations Customs sets forth the rules which regulate U.S. Customs and Border Protection's Inspection,

Search, and Seizure powers. 19 CFR § 162.21 of Subpart C, "Seizures," provides that "Property may be seized, if available, by any Customs officer *who has reasonable cause to believe that any law or regulation enforced by Customs and Border Protection or Immigration and Customs Enforcement has been violated*, by reason of which the property has become subject to seizure or forfeiture." 19 C.F.R. § 162.21 (Lexis Advance through the Nov. 30, 2022 issue of the Federal Register, with the exception of the amendments appearing at 87 FR 71748, 87 FR 73400, 87 FR 73433, and 87 FR 73488).

Here, Mr. Ayvazyan's interest in being free from pretextual searches and seizures clearly fall within the purposes of 19 C.F.R. § 162.21. CBP admittedly did not have "reasonable cause" to believe that any law or regulation enforced by Customs and Border Protection or Immigration and Customs Enforcement had been violated. There was no "reasonable cause" to believe Petitioner was attempting to import contraband. CBP officers falsified their reports by stating that the search and detention occurred "for purposes of national security." CBP conducted a series of searches of private smartphones over the course of almost four hours, lied about the purpose of their search, violated CBP policy by executing the search without the travelers present, and clearly violated 19 C.F.R. § 162.21. Bad faith constitutional violations are *per se* egregious. *See Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 n.5 (9th Cir. 1994) ("Federal courts cannot countenance deliberate violations of basic

constitutional rights. To do so would violate our judicial oath to uphold the Constitution of the United States."); *Adamson v. C.I.R.*, 745 F.2d 541, 546 (9th Cir. 1984). Because the pretext search and seizure by CBP agents was an egregious constitutional violation and per se violation of 19 C.F.R. § 162.21, the violation required suppression of the evidence obtained, regardless of whether the FBI agents directing the out-of-circuit search complied with Ninth Circuit, Eleventh Circuit, or any circuit case law.

Thus, despite egregious violations of the Fourth Amendment and the agency's own regulations, the Court found the government to be free of misconduct and therefore deterrence completely unwarranted. Yet Petitioner was severely prejudiced and irreparably harmed by the government's conduct. As such, Petitioner's sentence was imposed in violation of the Constitution or laws of the United States, and must be set aside.

> **B. The government obtained an extension of the search warrant – that ultimately provided the key evidence at trial – on an *ex parte* basis without statutory authority for doing so. The government – despite already telling the defense that it was reviewing the phones to seek a superseding indictment – lodged as its only reason for proceeding *ex parte* that it could not disclose that information to the defense.**

In his April 21, 2021 Motion to Dismiss for Prosecutorial Misconduct, Petitioner provided a chart Section II.C describing the many examples of how the government abused the grand jury process to continue gathering evidence regarding the entities and people in the initial indictment. The government's misconduct also extended to failing to disclose to the Court that it planned all along to supersede on the same conspiracy charged in November as a way of evading its Speedy Trial and Discovery Order obligations.

In October and November 2020, the government filed both a complaint and indictment alleging probable cause to believe that many of the loans and entities in the superseding indictment were part of the same conspiracy as the original indictment. For example, in the October 20, 2020 complaint, the government alleged probable cause to believe that Edward Paronyan submitted the allegedly fraudulent Redline Auto Collision loan application in the indictment. Compare Compl. ¶¶ 26.c-.e (Dkt. 152 Ex. 11 at 68), with Superseding Ind. Overt Acts 29-31 (Dkt. 154 at 18). Similarly, the November 3, 2020 search warrant application alleged that Ayvazyan and Terabelian had "stolen" the identity of N.T. and used that identity to apply for disaster loans, i.e., Counts Eleven and Twenty-Two in the superseding indictment, but it held those allegations back for four more months. Compare Search Warrant App. ¶¶ 33.k, 62.d (Dkt. 152 Ex. 11 at 31, 44-45), with Superseding Ind. ¶¶ 37, 44-45 (Dkt. 154 at 29-30, 36). But the government held these allegations and others back from the indictment, and instead succeeded in

using a superseding indictment to *extend* its evidence gathering process without being bound by the limitations in Fed. R. Crim. P. 16 and 17.

The Court made clear that the government could not leverage COVID-19 as an opportunity to build out its case, but that is precisely what the government did. From the moment Ayvazyan invoked his speedy trial rights, the government appears to have intentionally manipulated the grand jury process to lengthen the time during which it could build a case against Ayvazyan without disclosing tainted information to the defense. As described in Petitioner's April 21, 2021 Motion to Enforce the December 22, 2020 Discovery Order, the government violated the Court's discovery order and continued producing documents after the Court's March 15 deadline. Dkt. 248.

The government attempted to excuse its blatant violations of the Discovery Order by misrepresenting what it was producing, claiming that the documents related to the superseding indictment. The government's excuses fall flat for three reasons. First, as reflected in the Chart in Ayvazyan's Reply in Support of his Motion to Enforce the Court's December 22, 2020 Discovery Order (Dkt. 287 at 6-8), many of the late productions relate to the entities and loans in the initial indictment. *Second, nothing in the Court's Discovery Order contemplated an extension of the order should the government file a superseding indictment. The March 15 discovery deadline did not contain an exception where the prosecutors – who had already alleged a conspiracy involving others known to the government –*

*could evade their obligations by seeking another indictment of the same conspiracy*. Third, even if the late-produced documents only concerned the new conduct alleged in the superseding indictment (which they did not), all of the documents produced to date relate to one conspiracy – the one charged in the November indictment. Indeed, the pre-March 12 indictment discovery included documents related to every one of the new defendants and new allegations that were allegedly part of the same overarching conspiracy. The government's dumping of data related to this alleged overarching conspiracy and continued production after the close of discovery violated the Court's Discovery Order and operated as an extension of the search warrant that ultimately provided the key evidence at trial.

## C. In Violation of Petitioner's Fourth and Fifth Amendment rights, the text messages featured at trial (GEX 10) were selected using notes from the FBI or OIG Agent's review of an unconstitutionally seized phone.

At a *Kastigar* hearing, the government bears the "heavy burden" of proving by a preponderance "that 'all of the evidence it proposes to use,' and all of its trial strategy, were 'derived from legitimate independent sources.'" *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (quoting *Kastigar*, 406 U.S. at 460). In addition to this prospective burden of proof, the government must "demonstrate that 'none of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony[.]'" *United States v. Hampton*,

775 F.2d 1479, 1489 (11th Cir. 1985). "The particular proof that will satisfy the government's 'heavy burden,' ... [varies] from case to case...." *Danielson*, 325 F.3d at 1072. But "the mere assertion by the government of 'the integrity and good faith of the prosecuting authorities' is not enough. ... Rather, the government must present evidence" to carry its burden. *Id.*; *see United States v. Mapelli*, 971 F.2d 284, 288 (9th Cir. 1992).

The onus is on the government to disprove both evidentiary and non-evidentiary uses of the tainted information. The government must prove that it did not use the tainted information or any derivative information in any respect, including but not limited to: To interpret evidence, focus the investigation, develop pre-trial strategy, or to build a case; As an investigatory lead or to uncover other evidence; To identify, prepare, refresh, or in any way impact the statement of a witness; To decide to initiate prosecution; To present evidence or testimony to the grand jury; To refuse to plea bargain; To plan or adjust trial strategy such as case theory, anticipating defenses, selecting exhibits, making witness decisions, or planning examinations. *See*, *e.g., Kastigar*, 406 U.S. at 460; *Dudden*, 65 F.3d at 1467; *Hsia*, 131 F. Supp. 2d at 202. *See, e.g., United States v. North*, 910 F.2d 843, 860-63, on pet. for reh'g, 920 F.2d 940 (D.C. Cir. 1990); *Hampton*, 775 F.2d at 1488; *see also United States v. Allen*, 864 F.3d 63, 93 (2d Cir. 2017). *See, e.g., Danielson*, 325 F.3d at 1072; *Dudden*, 65 F.3d at 1467. *United States v. Zielzinsky*, 740 F.2d 727, 733 (9th Cir. 1984); *Hampton*, 775 F.2d at 1485 (11th Cir. 1985). *See*,

*e.g., Danielson*, 325 F.3d at 1072; *Hsia*, 131 F. Supp. 2d at 202. *See, e.g., Danielson*, 325 F.3d at 1072; *Mapelli*, 971 F.2d at 287; *Dudden*, 65 F.3d at 1467; *Benson*, 2016 WL 215233, at *4.

In short, the government must prove that there was no "link in the chain" involving tainted evidence and that Ayvazyan and Terabelian will be left "in substantially the same position" as if their Fifth Amendment rights had never been violated. *See Kastigar*, 406 U.S. at 462.

On April 27, 2021, the Court granted in part Petitioner's Motion to Suppress Evidence Collected in Violation of the Fifth and Sixth Amendments the motion in part. As to the Fifth Amendment argument, the Court found a *Miranda* violation and suppressed the evidence from Defendants' phones. *See* Dkt. 296. Yet while the Court granted Defendant's Motion to suppress the physical fruits of the *Miranda* violation at the Miami airport, the Court *rejected* Petitioner's argument that because the applications for warrants to search Defendants' homes referenced the tainted evidence seized at the Miami airport, the evidence seized during the search of Defendants' home was the fruit of the poisonous tree and should also be suppressed.[2]

Later, despite the evidence adduced in Defendants' May 17, 2021 Motion For A Kastigar Hearing, To Disqualify The Prosecution Team, And To Dismiss [Dkt. 338] and the July 28, 2021 and July 29, 2021 hearings thereon [Dkt. 820, 821; 813,

---

[2] Later, in its August 20, 2021 Order denying Defendants' Kastigar Motion, the Court similarly concluded that the Weddington and Canoga homes were not added as search warrant targets based on tainted information

814 (hearing transcripts)], the Court found that messages featured at trial (GEX 10) and which were selected using notes from the FBI or OIG Agent's review of Petitioner's unconstitutionally seized phone passed muster under *Kastigar's* strict standards. Petitioner demonstrated irrefutable "links in the chain" involving tainted evidence – specifically, the use of his unconstitutionally seized phone – to what came to be known as the government's "star witness" in the case and trial: Government Exhibit 10 ("GEX 10"), Dkt. 113 (transcript of July 28, 2021 *Kastigar* hearing) at 196.

As case agent Justin Palmerton testified at the Miami bail hearing, "once the CBP stopped for the secondary inspection, we learned that there was a photograph of Iuliia Zhadko on the digital device and we made the connection that Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan." Oct. 22, 2020 Hr'g Tr. at 23-24, *United States v. Ayvazyan*, 20-mj-3857, Dkt. 17 (S.D. Fla. Oct. 22, 2020) ("Oct. 22 Tr."). As Defendants set forth in their Kastigar Motion and at the hearings, the illegal search and seizure directed by Agent Palmerton *was* the precursor to Government Exhibit 10. This is because Petitioner's unlawfully seized phone (referred to as the "Zhadko phone" or "phone 1B23") contained the "mirror image" of many of the text messages from the Tamara Dadyan phone ("phone 1B21), which was obtained via the search warrant on the Weddington Street residence. Up to six to seven weeks before trial, between February and May 2021,

Agent Palmerton hardly touches the Dadyan phone; he relies on its mirror image, phone 1B23, Petitioner's phone. Dkt. 113 (transcript of July 28, 2021 Kastigar hearing) at 197.

### D. The government's failure to use a taint team meant that all of their review and trial strategy happened with tainted evidence in mind, in violation of Petitioner's Fifth Amendment rights.

When the U.S. Department of Justice seizes potentially privileged files or devices, the fundamental protections offered by the attorney-client privilege, attorney work product protection, and other privileges and protections are put at risk. "Taint teams," also referred to as "filter teams" or "privilege teams" are a team of prosecutors and agents who are, *in theory*, screened from the investigation team and asked to pass along only those communications that are neither privileged nor protected by constitutional rights. *See* Justice Manual § 9-13.420; *see also id.* § 9-13.400(D)(7) ("In executing a warrant . . . , investigators should use protocols designed to minimize intrusion into potentially protected materials . . . , including but not limited to keyword searches (for electronic searches) and filter teams.")

The prosecution team in the instant case purportedly used a filter team. *See* Dkt. 813, Kastigar hearing transcript, at 25-25; 136; 192; 213-214. However, government testimony proves that the taint from Petitioner's unlawfully seized phone was hardly "filtered." Agent Palmerton testified that the Cellebrite reports from the digital devices from the Miami seizure were released to him from the filter

team on February 23, 2021. *Id.* at 25. Agent Palmerton reviewed phone 1B123 which was registered to Zhadko, and the other was 1B126, which was registered to a Victoria Kauichko, approximately once per week from February 24 and April 27 2021. *Id.* at 26-27. He exported what he thought were relevant text messages into a PDF format. *Id.* at 27. IRS Criminal Investigation Special Agent Geffrey Clark "never spoke with the filter team." *Id.* at 136. Prior to April 27, 2021, no one provided Agent Clark with information from *any other other phones* besides the Miami phones. *Id.* Agent Clark reviewed the Tamara Dadyan phone, of which the Zhadko phone contained the mirror image, but as of April 26, 2021, that phone had *not* been released from the filter team to the government team. *Id.* at 136-137. In other words, the Tamara Dadyan phone was not purged of the taint of the Zhadko phone – Petitioner's phone.

The testimony demonstrates that no tainted information was filtered in any meaningful way. The government's "fox" was left in charge of the Defendants' "henhouse" and unfiltered information flowed from agent to agent. There was no judicial review before any tainted materials could be released to the prosecution team. Petitioner's Fifth Amendment rights were clearly violated.

> **E. The Court's substantively unreasonable or even unconscionable total sentence and departure from the guidelines calculation was an unlawful and procedurally unreasonable sentence, especially in light of the fact that the proceeding was held *in absentia*.**

33

On September 8, 2021, Petitioner's counsel sought leave of the Court to withdraw because Petitioner had not provided counsel with any instructions or authorized counsel to advocate for one outcome or another at sentencing. Dkt. 942. The Court denied that motion and directed counsel to proceed with sentencing in absentia. Dkt. 980. Petitioner's counsel was forced to submit a sentencing memorandum as a submission of counsel alone with the risk of prejudice to Petitioner's rights.

In his Memorandum, Petitioner's counsel made clear that this was a rare case in which other defendants around the country allegedly committed substantially similar crimes at substantially similar times. A summary submitted to the Court of substantially all sentences of PPP/EIDL loan fraud cases involving loss amounts similar to this case made one takeaway clear: a sentence of no more than 72 months was appropriate for Ayvazyan. The 286-month sentence suggested by Probation, which appeared to be driven by its adherence to the proposed Guidelines range, was substantially greater than any sentence imposed on similarly situated defendants across the country. However, as pointed out by counsel, the Guidelines range was 81-95 months of incarceration: 57-71 months for the money laundering counts (Counts 1-20, 26) plus a consecutive 24-month term for the aggravated identity theft counts (Counts 21 and 22). This potential 95 months of imprisonment was still exceeded by orders of magnitude the Court's "overarching duty" at sentencing to impose the most lenient sentence possible that is sufficient to serve the sentencing

purposes in Section 3553(a)(2). *Pepper v. United States*, 562 U.S. 476, 491 (2011); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (central tenet of sentencing is that a criminal sentence must be sufficient, but not greater than necessary to serve the purposes codified in 18 U.S.C. § 3553(a)(2)). The precedent from PPP/EIDL loan fraud cases affirmed that a sentence of 72 months was sufficient but not greater than necessary.

At the November 15, 2021 Sentencing Hearing, which was conducted in absentia, the Court ultimately elected to fashion a sentence that comported neither with the guidelines calculation nor the sentencing purposes in Section 3553(a)(2). *See* Dkt. 1166 (minutes); 1154 (transcript). Petitioner's counsel reiterated to the Court that a "sentence of 72 months would put Mr. Ayvazyan towards the very upper end of that greater than 20 of the 22 defendants including several that we summarized in our papers that I believe are more culpable than Mr. Ayvazyan." Dkt. 1154 at 18. The government advocated for 159 months: "135 which is top end of the guidelines range plus 24 mandatory minimum." *Id.* at 23. For un-enunciated reasons, The Court elected to go beyond the guidelines and the government's own recommendation and sentenced Petitioner to *180 months* ("15 years on each of Counts 1 through 20 and 15 years on Count 26 to be served concurrently") plus 24 months on each of Counts 21 and 22 to be served concurrently with each other but consecutive to the terms imposed on Counts 1 through 20 and 26 – i.e., *a total of 204 months. Id.* at 26.

The Court's "reasoning" for the sentencing was not based on fact or law, but on its own personal view of the case. "Not to sound hyperbolic, but, in the Court's experience which now is in excess of 30 years, I can't recall a fraud case that was conducted in a more calloused, intentional way without any regard for the law." *Id.* at 29. "I mean, the sentence is necessary to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense. The Court recognizes that in the universe of white collar cases, this is a sentence that is very meaningful and not unprecedented but certainly at the higher range of sentences that this Court has imposed and other courts have imposed. But, given the nature of what was introduced at trial, the Court is convinced that this is the least sentence that the Court can impose to satisfy the element of promoting respect for the law and to provide punishment and, on the second factor, adequate deterrence to criminal conduct." *Id.*

<u>Notably, in support of the admittedly exemplary sentencing, the Court relied on the text messages from Petitioner's unlawfully seized and tainted phone</u>: "He says, for example, *in the text messages*, I didn't sleep all night, I was working 24 hours straight, this program is over at the end of the month, get as much as we can. And he and Tamara Dadyan described their fraud as an achievement."

The Court's words speak for themselves. A scope of the taint extended all the way to Petitioner's substantively unreasonable and unconscionable in absentia sentence. Petitioner's phone was not derived from a legitimate independent source.

It was used as an investigatory lead or to uncover other evidence, which tainted the entire case, including the sentence. *See, e.g., Danielson*, 325 F.3d at 1072; *United States v. Dudden,* 65 F.3d 1461, 1467 (9th Cir. 1995). Petitioner's sentence must be set aside.

Moreover, the government was free to proceed with a fugitive complaint to further enhance the sentence based on flight, while the government gamed the extradition process by waiting until the last minute to extract Petitioner from Montenegro, in an apparent effort to deprive him of his ability to appeal or collaterally attack his sentence.

> **F.  Holding the *Kastigar* hearing after trial denied Petitioner of the ability to plead guilty and due process right to bargain with the government knowingly and intelligently.**

A defendant has a due process right to bargain with the government knowingly and intelligently (presumably advised by competent counsel) and explicitly offered to forego a constitutional claim in exchange for a benefit, except in unusual circumstances where a claim cannot be waived. *See United States v. Doyle*, 348 F.2d 715, 718-19 (2d Cir.), cert. denied, 382 U.S. 843 (1965).

Here, on May 18, 2021, the Court ordered the *Kastigar* hearing would be held on May 26, 2021, *before trial.* Dkt. 341. However, on May 19, 2021, the government filed ex parte application for Reconsideration of the Scheduling Order Setting Kastigar Hearing, arguing, *inter alia*, that "considerations of judicial

economy counsel in favor of holding a *Kastigar* hearing after trial" because "[w]hereas a pre-trial *Kastigar* hearing requires the parties and the Court to *predict what evidence will ultimately be received*, a post-trial hearing enables the factfinder to adjudicate the issues with the benefit of knowing the evidence that was actually used at trial."   Dkt. 344 at 11 (emphasis added). "Moreover," the government added, "the jury's verdict (*or an entry of a pre-trial guilty plea by any defendant*) could very well influence the scope of the inquiry or obviate the need for it altogether."

In opposition to the government's timing argument, Petitioner argued that the government's argument that it was "almost impossible to predict the evidence that will be admitted at trial" was nonsensical given that the government claimed to be "ready to proceed to trial" on April 5, 2021. Dkt. 351 at 17 n.17 (citing Dkt. 267-2). "It is hard to fathom how the government could be ready to proceed to trial, yet not know which exhibits it intends to use in its case-in-chief or their admissibility. … At this point, the government should know with a reasonable degree of certainty which exhibits it intends to introduce in its case-in-chief." *Id.*

Indeed, after trial and once the post-trial *Kastigar* hearing was held, it became imminently clear the government knew which exhibits it intended to use in its case-in-chief – namely, the text messages featured at trial which were selected using notes from the FBI or OIG Agent's review of Petitioner's unconstitutionally seized phone, which made their way into what came to be known as the

government's "star witness" in the case and trial: GEX 10. *See* Dkt. 113 (transcript of July 28, 2021 Kastigar hearing) at 196. At the time of the government's ex parte application, Petitioner's unlawfully seized phone (phone 1B23) was being used as the "mirror image" to select the text messages from the Tamara Dadyan phone ("phone 1B21), which was obtained from the Weddington Street residence. Therefore, it was *not* "almost impossible to predict the evidence that [would] be admitted at trial." Without the benefit of *Kastigar* review, GEX 10 was almost certain to be admitted at trial in light of the Court's limited suppression of Petitioner's phone.

At a *Kastigar* hearing, the government bears the "heavy burden" of proving by a preponderance "that 'all of the evidence it proposes to use,' and all of its trial strategy, were 'derived from legitimate independent sources.'" *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (quoting *Kastigar*, 406 U.S. at 460). The government must prove that it did not use the tainted information or any derivative information in any respect, including but not limited to, *refusing to plea bargain. See, e.g., United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003); *United States v. Hsia*, 131 F. Supp. 2d 195, 202 (D.D.C. 2001).

The government's concern of "an entry of a pre-trial guilty plea by any defendant" was disingenuous as it made no offer to Petitioner before trial. It goes without saying that if Petitioner learned pre-trial that the government's makings of GEX 10 would be found to be free of taint, he could have exercised his due process

right to bargain with the government knowingly and intelligently and forego trial (and other constitutional claims) in exchange for the benefit of a plea in line with the level of punishment his co-defendants received. Instead, due to the government's trial tactics and lack of candor to the Court, Petitioner was deprived of this right.

### G. The Government's Failure to turn over *Brady* Evidence Warrants Vacatur of the Conviction

In, *Brady v. Maryland*, 373 U.S. 83 (1963) the U.S. Supreme Court ruled that suppression by the prosecution of evidence favorable to a defendant who has requested it violates due process. "One of the principal, sworn duties of a prosecutor is to disclose to a defendant all material, favorable evidence, including impeachment evidence, in the Government's possession." *United States v. Govey*, 284 F. Supp. 3d 1054, 1061 (C.D. Cal. 2018) (citing *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972)). The evidence must be disclosed "at a time when the disclosure would be of value to the accused." *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) (granting habeas relief where prosecutors failed to disclose exculpatory evidence in time for use by defendant at trial). "Strict compliance with these discovery obligations is required for a defendant to be afforded due process and to meaningfully exercise his Sixth Amendment right to a fair and speedy trial and his right to call and confront witnesses." *Govey*, 284 F. Supp. 3d at 1061.

In Petitioner's April 21, 2021 Motion to Enforce the December 22, 2020 Discovery Order, Petitioner had already argued that the government's inability to produce evidence in its possession before trial warranted dismissal of the indictment. Dkt. 248 at 7-9.

On May 20, 2021, Petitioner's counsel sent a letter to the prosecuting attorney regarding outstanding discovery,  requesting that the government produce all information or documents responsive to Category One ("Information and Documents Regarding Kastigar Taint") by May 22, 2021 and produce all information or documents responsive to Categories Two ("*Brady* Evidence from Other Agencies Participating in the Prosecution"), Three ("Information Regarding the Responsiveness Review of Seized Devices 1B17, 1B21, 1B81, and 1B85"), and Four ("Notice of the Core Allegations for Trial") by May 24, 2021. Dkt. 353-1 (Ex. A to Notice Regarding Defendant Richard Ayvazyan's Discovery Demands). With respect to *Brady* evidence, counsel noted that on May 7, 2021, he had asked the government several basic questions about its *Brady* obligations in light of the expansive government team involved in investigating and/or prosecuting this case – documents and information in any such agency's custody or control that is material to preparing the defense; is favorable to the defense; would tend to contradict any of the government's evidence or argument; would tend to support any of the defense's stated or anticipated arguments including those listed in Petitioner's November 18, 2020 discovery letter and subsequent statements to the Court; would

tend to impeach any government witness; would tend to cast doubt on the accuracy or admissibility of witness testimony on which the prosecution may rely; is relevant to sentencing; or would tend to exculpate Petitioner or mitigate his culpability in any respect, and documents or information could lead to the discovery of evidence that would do the same. In its May 17, 2021 email, the government claimed it had responded to this request in a court filing, but it had not.

In his May 20, 2021 Response to the government's Notice Regarding Defendant Richard Ayvazyan's Discovery Demands, Petitioner noted that the government had "roped a multitude of agencies into a sprawling investigation and prosecution," and that, for example, a state investigation team had participated in the investigation since at least November 5, 2020, when it participated in executing the search warrants in *this case, see e.g.*, Nov. 6, 2020 Mem. of Activity (DOJ_PROD_0000162787, produced on May 13, 2021) (noting that the lead investigator on the state case who had referred that case to the FBI/USAO in 2017 "conducted the search" in this case at co-defendant Dadyan and Artur Ayvazyan's home); Nov. 9, 2020 FD-302 (DOJ_PROD_ 0000152511, produced on Mar. 15, 2021) (noting that three LAPD task force officers participated in the search in this case at Residential Property 2 (allegedly owned by Ayvazyan)), and likely have continued consulting, investigating, and working with the rest of the prosecution team ever since. It was therefore not unreasonable to ask the government to adhere to its *Brady*, Rule 16, and ethical obligations and turn over the *Brady* discovery.

Nevertheless, the Court allowed the government to disclose no exculpatory evidence while allowing it simultaneously to introduce evidence prejudicial to Petitioner. As set forth in Petitioner's July 12, 2021 Motion For New Trial And/Or Judgment Of Acquittal, *the Court allowed evidence of "reserve identities" while simultaneously excluding exculpatory evidence related to those identities*. Dkt. 683 at 8-9. The government had argued that the "reserve identities" (for example, fake or synthetic drivers licenses that were seized from Tamara Dadyan's residence and admitted into evidence at trial as GX 57.a) were evidence of "the parts for an assembly line to produce fraudulent loan applications" that were relevant to whether the defendants were guilty of the single, unitary conspiracy and scheme charged in Counts 1-20 of the First Superseding Indictment. *See* Dkt. 384, May 31, 2021 Motion in Limine to Admit Evidence Inextricably Intertwined with the Charged Offenses (Government's MIL #2) (Exhibits 1-4 filed under seal) Filed by Plaintiff USA as to Defendant Richard Ayvazyan, Marietta Terabelian, Artur Ayvazyan, Tamara Dadyan, Manuk Grigoryan, Arman Hayrapetyan, Edvard Paronyan, Vahe Dadyan, at 6.

In response to this evidence, the defense attempted to introduce evidence that this "assembly line of fraud" was actually part of a separate mortgage fraud scheme (unrelated to PPP or EIDL applications) operated by Tamara Dadyan. The existence of this other conspiracy, completely unrelated to the Grigoryan crew, made it more likely that Dadyan operated her own PPP scheme using the same infrastructure

from the alleged mortgage fraud scheme. This is fatal to the single, unitary conspiracy and scheme charged by the government in this case. Petitioner was precluded from presenting this evidence via the testimony of Detective Lyle Barnes, Dkt. 664 at 1-3, and repeatedly precluded from questioning other witnesses regarding the same. Because Petitioner was not permitted to present this relevant and exculpatory evidence to the jury, his conviction should be set aside.

Further, to the extent such evidence was excluded because it could have prejudiced co-defendant Artur Ayvazyan (Dkt. 664 at 1), severance – *not the exclusion of exculpatory evidence* – was the appropriate remedy. Under Rule 14 of the Federal Rules of Criminal Procedure the district court may order a severance when it appears that a defendant may be significantly prejudiced by a joint trial with his co-defendants. When one defendant's exculpatory evidence might prejudice another, the remedy is not to deny the first defendant the right to present his defense, but rather to sever the two defendants and conduct their trials separately. *See United States v. Williams*, 878 F.2d 388 (9th Cir. 1989) (both antagonistic defenses and the risk of spillover evidence from another defendant's defense are grounds for severance). The Courts' failure to sever the two defendants and instead exclude evidence that was exculpatory vis-a-vis Petitioner prejudiced Petitioner and violated his *Brady* rights.

### H. Petitioner did not receive information concerning the availability of, or ability to, appeal his convictions and/or sentence, which is ineffective assistance of counsel

A criminal defendant has the right to the effective assistance of counsel. This right is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). "To establish 'that counsel was constitutionally ineffective for failing to file a notice of appeal,' a defendant 'must show (1) that counsel's representation 'fell below an objective standard of reasonableness,' and (2) that counsel's deficient performance prejudiced the defendant." *United States v. Cheevers*, No. 19-55484, 2022 U.S. App. LEXIS 12213, at *1-2 (9th Cir. May 5, 2022) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000) (citations omitted). "In order to satisfy the first prong, a defendant must make at least one of the following three showings: (1) that counsel 'fail[ed] to follow the defendant's express instructions with respect to an appeal'; (2) that 'a rational defendant would want to appeal' and counsel did not consult with the defendant about appealing; or (3) that the defendant 'reasonably demonstrated to counsel that he [or she] was interested in appealing' and counsel did not consult with the defendant. *Id.* (quoting *Flores-Ortega*, 528 U.S. at 478, 480).

Petitioner makes a sufficient showing as to any of several of the three alternatives, and his ineffective assistance claim therefore is valid. Petitioner

discussed a motion for a new trial with his attorney, but appealing the conviction or sentence was not discussed. *See* Exhibit B, Declaration of Richard Ayvazyan. Petitioner avers that based on what he knows today, he believes he had strong grounds to appeal. *Id.* Petitioner was not advised he had only fourteen days to appeal after the judgment, or that he could appeal from outside the country. *Id.* Petitioner missed an opportunity he would have seized if properly advised. *Id.* As set forth in this brief and the Court's pleadings and transcripts, a rational defendant in Petitioner's position would want to appeal. Petitioner's lawyer had a duty to consult with his client about the choice to appeal. Therefore, for this reason too, Petitioner's sentence was "imposed in violation of the Constitution or laws of the United States."

## I. The Court erred in charging only one conspiracy despite the finding of multiple conspiracies.

The court failed to properly instruct the jury on the issue of multiple conspiracies and schemes. In reviewing instructions for error, the court must ask whether the jury instructions, "taken as a whole, [] misle[d] the jury or state[d] the law incorrectly to the prejudice of the objecting party." *City of Long Beach v. Standard Oil of California*, 46 F.3d 929, 933 (9th Cir. 1995); *see also United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law").

Here, the jury instructions misled the jury by not informing them that, if the government's evidence supported the existence of multiple, separate conspiracies and schemes rather than the single, unitary conspiracy and scheme charged in Counts 1-20 of the indictment, they were required to acquit the defendants on all of these counts. The defense was entitled to this instruction because the government failed to adduce sufficient evidence to carry its burden with respect to the elements of each of the above- referenced counts. The government charged a single, unitary conspiracy and executions of a single, unitary scheme to defraud in the indictment and were required to prove that single conspiracy and scheme beyond a reasonable doubt. "A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators." *United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004) (quoting *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999)). To prove a conspiracy, "the evidence must show that each defendant knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation." *Id.* If the evidence at trial establishes multiple conspiracies (as it did here), then there is insufficient evidence to support conviction of a single conspiracy and any conviction must be reversed. *Id.* at 1226-27; *see also United States v. Brown*, 912 F.2d 1040, 1043 (9th Cir. 1990) ("the trial court instructed the jury that in order to convict Brown it must find that he was a member of the single conspiracy charged in the indictment. If he did conspire but not as a member of that conspiracy, a not guilty verdict was required. This is of no

little importance. It underscores the fact that this is not a case where a trial court permitted a defendant to be convicted of a single overall conspiracy even though only separate conspiracies were shown.").

Similarly, the evidence must establish "a single scheme to defraud" in order to convict on the wire and bank fraud counts. *See United States v. Wellington*, 754 F.2d 1457, 1463 & n.3 (9th Cir. 1985); s*ee also United States v. Morse*, 785 F.2d 771, 776- 77 (9th Cir. 1986) ("In a mail fraud case in which a defendant contends that a variance has occurred between the single scheme charged in each count of the indictment and the proof at trial, the jury must be instructed that, to return a guilty verdict, each of the jurors must find the defendant guilty of participation in the same single scheme to defraud alleged in the indictment."); *United States v. Mastelotto,* 717 F.2d 1238 (9th Cir. 1983) (same).

In this case, there were (if anything) multiple conspiracies and schemes lacking a single "overall agreement . . . among the conspirators." The alleged conspirators' success was not dependent upon the success of the entire operation, and – even though the alleged co-conspirators had substantial pre-existing ties unrelated to any charged conspiracy – there was not sufficient conspiratorial interconnectivity and interdependence to permit a factual finding of a single conspiracy or scheme. The evidence adduced at trial supported the existence of at least two (and potentially many more) different conspiracies and corresponding schemes embedded within the charged conspiracy and scheme. First, Manuk

Grigoryan was at the center of a set of schemes involving credit card fraud and construction funding fraud that involved the use of synthetic identities of Russian and Ukrainian foreign exchange students, including Iuliia Zhadko, Viktoria Kauichko, and Anton Kudiumov. This conduct pre-dated the existence of PPP loans. Several of Manuk Grigoryan's dedicated group of co-conspirators, including Asya Vostanikyan, Paruyr Hayrapetyan, Hayk Ohanyan, and Edvard Paronyan, further engaged in Employment Development Department (EDD) fraud, and separately engaged in PPP loan fraud, at the same time, using overlapping synthetic identities and entities. Grigoryan's Canoga Avenue apartment, for example, was found to contain references to Grigoryan's PPP loan fraud companies and synthetic identities, EDD fraud documents, and medical bills for Grigoryan's wife. *See* GX 54.b; DX 59; DX 48.

Second, over the last several years, Tamara Dadyan was at the center of a different set of schemes, and is alleged to involve Grigor Tatoian, Arshak Bartoumian, and Art Martirosyan among others. Dadyan also deployed some of these people to commit PPP loan fraud in 2020. Although Dadyan's group also obtained synthetic identities derived from Russian and Ukrainian foreign exchange students (among other sources) including Iuliia Zhadko, there was no joint venture or sufficient interdependence between the Grigoryan and Dadyan groups to allow the jury to find, beyond a reasonable doubt, the existence of a conspiracy involving all of the defendants charged in the indictment. Taken together, this evidence of

separate, unrelated conspiracies led by Tamara Dadyan and Manuk Grigoryan required that the jury be given a multiple conspiracies and multiple schemes instruction as requested by Ayvazyan. Because this instruction was not given, Petitioner's sentence was imposed in violation of the Constitution or laws of the United States.

Petitioner was also prejudiced because he was denied a jury instruction on his theory of the defense: that the government's evidence demonstrated multiple conspiracies and schemes rather than the single, unitary conspiracy and scheme charged. Thus, acquittal was required. The burden to receive such an instruction is minimal—all that is required is "some foundation in the evidence" even if that evidence is "weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Sotelo-Murillo*, 887 F.2d 176, 179 (9th Cir. 1989) ("A criminal defendant is entitled to a jury instruction on any defense which provides a legal defense to the charge against him and has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. Where a defendant's requested instruction is supported by some evidence, a trial court's failure to give it is reversible error."). A jury instruction on the defendant's theory of the defense is a right "so basic to a fair trial" that failure to give it is reversible error. *United States v. Escobar de Bright*, 742 F.2d 1196, 1201 (9th Cir. 1984) ("The right to have the jury instructed as to the defendant's theory of the case is one of

those rights 'so basic to a fair trial' that failure to instruct where there is evidence to support the instruction can never be considered harmless error.") (citations omitted).

At a minimum, a specific unanimity instruction was required because of the specter of multiple conspiracies and schemes underlying the indictment. Petitioner requested such an instruction. *See* June 25, 2021 Trial Transcript (AM & PM) at 9:14-10:2. Such an instruction is required where evidence of multiple conspiracies is presented, because there is a "genuine possibility of jury confusion" or a possibility "that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *United States v. Lapier*, 796 F.3d 1090, 1096 (9th Cir. 2015) ("Because the evidence in this case tended to show multiple conspiracies instead of the single charged conspiracy, the failure to give a specific unanimity instruction was plain error violating [defendant]'s substantial right to a unanimous jury verdict as granted by Article III, § 2, and the Sixth Amendment of the United States Constitution."). As such, Petitioner's sentence was imposed in violation of the Constitution or laws of the United States, and must be vacated and set aside.

## IV.   CONCLUSION

For the reasons set forth above, Petitioner's sentence was "imposed in violation of the Constitution or laws of the United States." Pursuant to 28 U.S.C. § 2255, "[u]nless the motion and the files and records of the case conclusively show

that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). Here, Petitioner has alleged cognizable claims that are supported by the record. Therefore, the Court should vacate the conviction or promptly schedule this matter for an evidentiary hearing.

Dated: December 8, 2022                    Respectfully submitted,

                                            _/s/ Carlo Brooks_
                                           Carlo Brooks, Esq.
                                           3826 Grand View Bl, Ste 661472
                                           Los Angeles, CA 90066
                                           (310) 691-9373
                                           carlo@carlobrooks.com

                                           *Attorney for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served a copy of this document and its attachments on the Court and all parties by filing this document with the Clerk of the Court through the CM/ECF system, which will provide electronic notice and an electronic link to this document to all counsel of record.


DATED: December 8, 2022                    Respectfully submitted,

                                           */s/ Carlo Brooks*
                                           Carlo Brooks, Esq.