

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  20-mj-03857-AOR-1

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )        October 22, 2020
v.                               )
                                 )
RICHARD AYVAZYAN,                )        Pages 1 - 42
                                 )
                Defendant.       )
_____/

DETENTION HEARING
(Via Zoom)

BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

            UNITED STATES ATTORNEY'S OFFICE
            99 N.E. 4th Street
            Miami, FL 33132
            BY:  LINDSEY L. FRIEDMAN, AUSA

EXHIBIT 1
1

APPEARANCES CONTINUED:


Appearance on behalf of the Defendant:

                DONET MCMILLAN & TRONTZ, P.A.
                3250 Mary Street
                Suite 406,
                Coconut Grove, FL 33133
                BY:  DAVID M. TRONTZ, ESQ.




Transcribed By:

                BONNIE JOY LEWIS, R.P.R.
                7001 SW 13 Street
                Pembroke Pines, FL  33023
                954-985-8875
                caselawrptg@gmail.com

EXHIBIT 1
2

```
1                        I N D E X

2

3   THE WITNESS:                                    PAGE:

4
    FBI SPECIAL AGENT JUSTIN PALMERTON
5

6
    Cross Examination by Mr. Trontz:                  16
7

8   Redirect Examination by Ms. Friedman:             27

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 1
3

 1                    (Thereupon, the following proceeding was held:)

 2          THE COURT:  We have Mr. Trontz.

 3          THE COURTROOM DEPUTY:  I see Mr. Trontz right here.

 4          MR. TRONTZ:  Hello, Judge.  How are you today?

 5          THE COURT:  Hello.  How are you, sir?

 6          MR. TRONTZ:  Good, Your Honor.

 7          THE COURT:  All right.  So we continued this matter to

 8   this afternoon initially for the hearing and also report re

 9   counsel and also for the detention hearing.

10          Did you get the opportunity yesterday to speak to

11   speak to Mr. Ayvazyan?

12          MR. TRONTZ:  We did, Your Honor.

13          We were able to speak, myself and McMillan, was on the

14   line and we spoke to him for about 20 minutes.

15          THE COURT:  All right.  And we need to go forward with

16   the *Garcia* hearing then?

17          MR. TRONTZ:  Well, I think we need to have the

18   hearing.  I don't think they are going to have any objection to

19   our representation.  I don't know if you want to get their

20   testimony on the record.

21          THE COURT:  And is the representation for the moment

22   only for purposes of the detention hearing and you are still

23   temporary?

24          MR. TRONTZ:  Still temporary, Your Honor.

25          THE COURT:  All right.  So I am going to make a

EXHIBIT 1

4

1  limited inquiry for purposes only of the detention hearing.

2  And this will be subject to a further *Garcia* hearing should the

3  situation continue in terms of you and Mr. McMillan being

4  permanent counsel at a later date; all right?

5          MR. TRONTZ:  Yes, ma'am.

6          THE COURT:  Can you hear me, Mr. Ayvazyan?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Am I pronouncing your name right, sir?

9          THE DEFENDANT:  Yes.  Yes, Judge.

10         THE COURT:  Good.  All right.

11         The first thing we need to do is inform you of the

12 fact that you are being represented by Mr. Trontz.  And Miss

13 Terabelian, who is your co-Defendant, is being represented by

14 Mr. Trontz' partner Mr. McMillan.

15         Now under the United States Constitution each

16 Defendant has the right to -- oh, I didn't swear him.

17         Stephanie.

18         THE COURTROOM DEPUTY:  Raise your right hand.

19         THE DEFENDANT:  (Complied.)

20 (Defendant sworn.)

21         THE COURTROOM DEPUTY:  Thank you.

22         THE COURT:  All right.  And do you agree to proceed by

23 way of videoconference?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Okay.  So, as I was saying, under the

EXHIBIT 1

5

1  Constitution, each defendant has the right to have counsel who

2  is independent and committed to the defendant without any

3  conflict of interest.

4         So because of this present situation that we have

5  discussed, we need to conduct a hearing to ensure that if we

6  proceed in this fashion that you are waiving any potential

7  conflict that your counsel may have.

8         Do you understand that?

9         THE DEFENDANT:  Yes.  Yes, Judge.

10        THE COURT:  All right.  So can you tell me, first of

11 all, how old are you?

12        THE DEFENDANT:  42, Judge.

13        THE COURT:  And how far did you get in school?

14        THE DEFENDANT:  I got about two years of college.

15 There was just about maybe 15 credits shy of my Associates

16 Degree.

17        THE COURT:  And are you currently under the influence

18 of any substances or anything that would render your testimony

19 here, regarding conflict, not reliable?

20        THE DEFENDANT:  No.

21        THE COURT:  All right.  Have you ever been involved in

22 either a trial, or a civil, or a criminal matter?

23        THE DEFENDANT:  Trial, you said?

24        THE COURT:  Well, are you familiar with the Criminal

25 Justice System?

EXHIBIT 1

6

1    THE DEFENDANT:  I little bit.  Yes, a little bit.

2    THE COURT:  All right.  So you understand that under

3 the U.S. Constitution, Sixth Amendment, every Defendant has the

4 right to have counsel who is competent and who is loyal to the

5 defendant.

6    Do you understand that?

7    THE DEFENDANT:  Yes, Judge.

8    THE COURT:  So when you have a lawyer in this case, it

9 would be your lawyer's partner representing your co-Defendant

10 that may present potential conflicts of interest because each

11 lawyer would not necessarily be able to completely ignore what

12 is happening with the co-Defendant.

13    Do you understand that?

14    THE DEFENDANT:  Yes, Judge.

15    THE COURT:  Now, the present situation is limited to

16 purposes of the detention hearing.  And so some of the issues

17 that might come up later, if the case were to progress, do not

18 need to be addressed at this time.

19    But for purposes of this detention hearing, do you

20 have any concerns with regard to Mr. Trontz' representation of

21 you while Mr. McMillan represents your co-Defendant?

22    THE DEFENDANT:  No, Judge.

23    THE COURT:  All right.  Mr. Trontz, is there anything

24 else you want to make Mr. Ayvazyan aware of at this time

25 regarding the representation?

EXHIBIT 1

7

```
 1          MR. TRONTZ:  Not at this time, Your Honor.

 2          THE COURT:  Does the Government have any questions or

 3    issues to raise?

 4          MS. FRIEDMAN:  We do not, Your Honor.  Thank you.

 5          THE COURT:  All right.  So I find that only for the

 6    limited purpose of the detention hearing, any potential

 7    conflict arising from the representations of Mr. Trontz and Mr.

 8    McMillan for the two Defendants in this case are waived.

 9          Do you confirm that, Mr. Ayvazyan?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.  Okay.  So we can proceed,

12    then, to the detention hearing for him?

13          MR. TRONTZ:  Yes, Judge.

14          MS. FRIEDMAN:  Thank you, Your Honor.

15          THE COURT:  Normally we would have both Defendants

16    present, but that does not seem to be a possibility at this

17    time.  So we will need to go forward with the detention hearing

18    given Mr. Ayvazyan's waiver.  All right.

19          MS. FRIEDMAN:  Thank you, Your Honor.

20          And for the record, Lindsey Lazopoulos Friedman on

21    behalf of the United States.

22          And also, for the record, this case is out of the

23    Central District of California where the Defendant has been

24    charged in a criminal complaint for conspiracy to commit wire

25    fraud and bank fraud.
```

EXHIBIT 1

8

1        Also, on this Zoom hearing, Your Honor, is Federal

2   Bureau of Investigation Special Agent Justin Palmerton and if

3   you will permit me, I will proceed by proffer at this time.

4        THE COURT:  Go ahead.

5        MS. FRIEDMAN:  Thank you, Your Honor.

6        Your Honor, the Government is seeking detention based

7   on a risk of flight and a danger to the community for the

8   following reasons.

9        Your Honor, from the beginning of the COVID-19

10  pandemic, this Defendant Richard Ayvazyan and his co-Defendant

11  and wife, Marietta Terabelian, conspired to use fake and stolen

12  identities.  And in fact, did so to fraudulently obtain

13  disaster loan funds that were intended for families and

14  businesses in need.

15       The Defendant and his wife fraudulently applied for

16  Paycheck Protection Program loans, which I may refer to as PPP

17  loans and Economic Injury Disaster loans also called EIDL

18  loans.

19       The Defendant and his wife defrauded several federally

20  insured financial institutions as well as the United States

21  Small Business Administration.  The Defendant and his wife used

22  several fake and stolen individual identities, including

23  Viktoria Kauchko and Iuliia Zhadko among others.  The Defendant

24  and his wife also used fake or stolen corporate identities

25  using shell companies or borrowing other individuals'

EXHIBIT 1

9

companies.  They are also charged with co-conspirators in the

complaint as well, Your Honor.

When the fraudulent loan applications were approved

and funded, the Defendant and his wife directed the

fraudulently obtained disaster loan proceeds to bank accounts

that they controlled.  And then, they used the stolen money to

purchase residential properties in the name of the Defendants

and in the name of the Defendant's alias Iuliia Zhadko.

Your Honor, they used disaster loan proceeds as part

of a down payment on a residence for their personal benefit and

this is a violation of the requirements for both PPP and EIDL

loans.

They also used fake federal tax filings and other fake

and fraudulent documents such as fake driver's licenses to

obtain the loans.  They applied for at least 20 disaster loans

ranging from $112,000 to $276,000 per loan.  The intended loss

is in excess of more than three million dollars and is still

being investigated.

Your Honor, the funds were used to purchase a number

of things including a one million dollar and a three million

dollar house.  And the complaint allegations are supported by

evidence that includes the fraudulent loan applications, the

fake documents used, e-mails, bank records, as well as

significant witness testimony.  And the allegations are

corroborated by other developments.

EXHIBIT 1

10

1    The Defendants were returning from a luxury vacation

2  in Turks and Caicos when they were stopped by Customs and

3  Border Protection at Miami International Airport and there they

4  were searched for contraband.

5    The Customs and Border Protection officers found that

6  on this Defendant, he was in possession of significant

7  contraband including a credit card in the name of Iuliia Zhadko

8  and Viktoria Kauchko, which are the fraudulent names that these

9  Defendants used.  As well as photographs of the California

10  driver's license in the name of Iuliia Zhadko.

11    The Defendant's co-Defendant, his wife, was also found

12  to be in possession of contraband including at least one credit

13  card in the name of Viktoria Kauchko.  These are the same

14  names, again, Your Honor, that they used to apply for the

15  disaster loans.

16    Customs and Border Protection officers also indicated

17  that during the search of the Defendant's digital devices, they

18  discovered additional access devices such as credit cards,

19  driver's licenses, and photographs of the same in other names

20  and other potential aliases besides the two that are known and

21  described here.

22    Your Honor, as the Defendant said, he is familiar with

23  the Criminal Justice System.  Back in 2012, in the Central

24  District of California, he and his wife were convicted of

25  conspiracy to commit bank fraud.  That criminal conduct took

EXHIBIT 1
11

1  place between 2007 and 2011 and there are significant

2  similarities between that offense and this offense here.

3       In his factual basis for that offense, he admitted

4  that he and his wife submitted fraudulent residential loan and

5  credit applications to a bank in which they also inflated their

6  income.

7       He also admitted to defrauding other banks including

8  Bank of America and Chase Bank.  He also provided in that case

9  banks with false documentation to support the fraudulent loan

10  applications, including falsified W-2s and falsified tax

11  returns.

12       Additionally, in connection with a short sale of his

13  residence to his mother, he caused his mother to submit a

14  fraudulent letter to Chase Bank, which falsely stated that she

15  was not related to the owner of the property.  He appears to

16  owe approximately $360,000 in restitution from the 2012

17  conviction.

18       In addition, Your Honor, I would note that his

19  Pretrial Services Report indicates yet another white collar

20  crime and that would be a 1999 conviction for money laundering.

21       In addition, Your Honor, his Pretrial Services Report

22  notes that he purportedly makes $37,500 a month in income and

23  he attributes this to a company called Inception Ventures.  And

24  he claims that this company has been in existence for four

25  years and that he is making this monthly income.

EXHIBIT 1
12

 1          He lists the address as the same address where he

 2    lives, which is the home procured with the fraudulent funds,

 3    Your Honor.

 4          Your Honor, California business records show that this

 5    company Inception Ventures is suspended.  It is not an active

 6    corporation.  And the review of the bank records of this

 7    Defendant do not show that there is any sort of legitimate

 8    income to support these statements that he has made to Pretrial

 9    Services.  So I would just note that for the record here, Your

10    Honor.

11          There is no evidence that he receives a regular

12    paycheck through any sort of legitimate source, such as a

13    payroll processor, something that would be attributed to

14    Inception Ventures, which is purportedly a venture capitalist

15    business, Your Honor.

16          In addition, the bank account for Inception Ventures

17    was opened in June of this year.  So, again, that claim that he

18    has been making this money for four years through this company

19    is not supported by that evidence.

20          Your Honor, in addition, the Defendant, and his wife

21    and co-Defendant, have purchased two additional homes in and

22    around the Los Angeles area using criminal proceeds from these

23    loans.

24          They have also used credit cards in the name of stolen

25    identifications.  And they have a history of using these funds

EXHIBIT 1
13

1  besides for the purchases of residences in other ways, such as

2  purchasing luxury goods including watches.

3          For example, this Defendant, himself, used

4  fraudulently obtained loan funds to purchase eight luxury

5  watches that totaled more than $248,000.  And he was wearing

6  one of these new luxury watches when he was stopped at the

7  Miami International Airport.

8          Your Honor, this Defendant also has a history of

9  foreign travel.  In addition to this trip to Turks and Caicos,

10 this Defendant has traveled to Italy, Mexico, and Poland within

11 the last three years.

12         He also has possession and access to firearms, Your

13 Honor.  Although he is a convicted felon, law enforcement

14 databases show that he previously owned the following five

15 firearms:  A Taurus .38-caliber revolver, a semiautomatic Carl

16 Walther P99 pistol, a semiautomatic Kimber pistol, a

17 semiautomatic Sig Sauer pistol, and a Smith and Wesson

18 revolver.

19         Around the time of his 2012 conviction, he transferred

20 these firearms to Archer Ayvazyan, which according to

21 investigation, is his brother and his brother lives near him in

22 Los Angeles County.

23         Your Honor, in addition, as part of the investigation

24 law enforcement conducted what they commonly refer to as a

25 trash cover.  They remove trash from the home after it has been

EXHIBIT 1
14

1  placed in public at the outside of the home.

2          And here, the trash cover was conducted and one of the

3  Defendant's new residences and that would be at 834 Calle Vera

4  in Glendora, California.

5          In the trash they found packaging for attachments for

6  certain types of rifles, including packaging for a carbine

7  stock, carbine pistol grip, and carbine hand guard, as well as

8  an empty ammunition box.

9          Your Honor, I can proceed to argument or permit the

10  agent to be cross examined at the Court's --

11          THE COURT:  We do evidence first and then we do

12  argument.  You made your proffer, not just from the complaint,

13  but also from some additional matters.  I will allow Mr. Trontz

14  to inquire from the agent into any of these matters that you

15  have proffered.

16          MR. TRONTZ:  Thank you, Your Honor.

17          THE COURT:  All right.  We need to swear the agent

18  first.

19          THE COURTROOM DEPUTY:  Raise your right hand.

20          THE WITNESS:  (Complied.)

21  (Witness sworn.)

22          THE COURT:  Please state your full name for the record

23  and spell your last name.

24          THE WITNESS:  Justin Palmerton; P-A-L-M-E-R-T-O-N.

25          THE COURTROOM DEPUTY:  Thank you.

EXHIBIT 1
15

```
 1              THE COURT:  Go ahead, Mr. Trontz.
 2              MR. TRONTZ:  Thank you, Judge.
 3          FBI S/A JUSTIN PALMERTON, GOVERNMENT'S WITNESS SWORN
 4                       CROSS EXAMINATION
 5  BY MR. TRONTZ:
 6  Q.  Good afternoon, Agent Palmerton.  How are you today?
 7  A.  Good.  How are you, sir?
 8  Q.  I'm good.  Thank you.
 9      Were you able to listen to the proffer that the Government
10  just provided the Court?
11  A.  I was.
12  Q.  And your testimony at trial, if it goes to trial, would be
13  similar or the same as the testimony that you just provided?
14  A.  Yes.
15  Q.  Can you explain how the investigation began?
16              MS. FRIEDMAN:  Your Honor, I'm going to object.
17  That's outside the scope of a detention proceeding.
18              THE COURT:  All right.  What is the basis of that
19  question, Mr. Trontz?
20              MR. TRONTZ:  Just trying to get the background as to
21  the two Defendants seem to have names and aliases and I'm
22  inquiring as to what name and how the investigation began.
23              THE COURT:  All right.  Can you tell us what prompted
24  the investigation and I will allow that question.
25  A.  Yes.  So the investigation began from a lead that came in.
```

EXHIBIT 1

1  We had a Task Force that covers these fraudulent applications

2  and a lead came into our office that listed one of these

3  identities, Iuliia Zhadko identity, as one of the fraudulent

4  applications and that is how we began our investigation.

5  BY MR. TRONTZ:

6  Q.   Okay.  So the investigation began investigating more of the

7  a/k/a's and the names that were stated on the complaint,

8  correct?

9  A.   That's correct.

10  Q.   Okay.  And based on your investigation, I guess you put an

11  arrest warrant into the system for the a/k/a's?

12        MS. FRIEDMAN:  Your Honor, same objection.  This is --

13        THE COURT:  Now you're going further, Mr. Trontz.

14  BY MR. TRONTZ:

15  Q.   Okay.  So you put them into the system.

16      Did you have a chance to talk to the Border Patrol agents

17  as a part of your investigation?

18  A.   I did.

19  Q.   And apparently they were searched by Customs and Border

20  Patrol?

21  A.   Yes, sir.

22  Q.   Do you know if they were searched prior to or after the

23  discovery of the warrant?

24        MS. FRIEDMAN:  Objection, Your Honor.

25         That has nothing to do with whether these Defendants

EXHIBIT 1
17

1  are a risk of flight or a danger to the community.

2          THE COURT:  Are you challenging identity here, Mr.

3  Trontz?

4          MR. TRONTZ:  I am, Your Honor.

5          Because there are multiple I.D.s and credit cards.

6  And since they were found on or about their person, I don't

7  know what that means looking at the complaint.  I don't know if

8  it was in a backpack that somebody was carrying, or in his

9  pocket, or where the wife was carrying her I.D., or the alleged

10  fake I.D.  It's not really specific in the complaint.

11          THE COURT:  All right.  Let's kind of stick to what is

12  being alleged here as an offense conduct.

13          Are you saying that they were stopped at the Miami

14  International Airport under a misunderstanding as to who they

15  were?

16          MR. TRONTZ:  That's a possibility, Your Honor.

17          I don't know why they were stopped.  If they

18  discovered the warrant, or their conduct, or behavior there.

19  And then, again, where those I.D.s and where the I.D.s and the

20  credit cards were found and who they were found on.

21          THE COURT:  All right.  I will give you a little bit

22  of leeway to pursue that.

23          MR. TRONTZ:  Thank you, Judge.

24  BY MR. TRONTZ:

25  Q.  Do you want me to restate the question, Agent Palmerton?

EXHIBIT 1
18

```
 1        THE COURT:  Yes.  Go ahead and ask it again for my

 2 benefit.

 3 BY MR. TRONTZ:

 4 Q.   Okay.  So you don't know whether or not they were stopped

 5 to a warrant or for some other reason?

 6 A.   They were not stopped pursuant to the warrant.

 7 Q.   Okay.  And were you able to speak to these Customs and

 8 Border Protection agents?

 9 A.   I was.

10 Q.   Can you tell me -- I know there were a bunch of items that

11 were listed in your description of events.  Were you aware of

12 where these credit cards and I.D.s were found on these

13 particular clients or particularly my client?

14 A.   To the best of my understanding, again, this is from the

15 Border Patrol agents that they were found in his wallet.

16 Q.   I'm sorry.  I didn't hear that.

17 A.   They were found in his wallet on his person.

18 Q.   Okay.  And as it was mentioned those digital images, where

19 were those found?

20 A.   My understanding they were found on his cellular phone.

21 Q.   Do you know where his phone was at the time that they

22 removed it from his person?

23 A.   I do not.

24 Q.   So it could have been on him, or in a backpack, or some

25 other carryon luggage; is that correct?
```

EXHIBIT 1
19

1  A.  **That is correct.**

2  Q.  And how soon after they were stopped did they contact you?

3  A.  **Approximately three hours later.**

4  Q.  So they had some means to find out whether or not there was

5  a warrant?

6  A.  **The warrant had not been issued yet.**

7  Q.  Do you know who the Customs and Border Patrol contacted

8  after they were stopped and searched?

9  A.  **I don't know the names of the officers.**

10 Q.  Would that be in the report that was later issued if that

11 information exists?

12 A.  **Yes.**

13 Q.  Once you became aware of the case and the fact that they

14 were arrested, what did you do?

15     MS. FRIEDMAN:  Your Honor, I'm going to object.  That

16 has nothing to do with identity or risk of flight and a danger.

17     THE COURT:  I think you have covered the identity

18 questions.  What more do you want, Mr. Trontz?

19 BY MR. TRONTZ:

20 Q.  Well, how did you know you had the right people?

21     THE COURT:  All right.  How do you know that you had

22 the right people.  I guess that's the question, Mr. Palmerton.

23     THE WITNESS:  I understood.

24 A.  **We know we had the right people.  Again we investigated or**

25 **working on this case for --**

EXHIBIT 1
20

```
 1          THE COURT:  Sorry.  You are not coming through
 2   clearly.  We are having trouble hearing you, sir.
 3          THE WITNESS:  My apologizes.  I will get a little
 4   closer to the microphone.  Is this better?
 5          THE COURT:  Yes.  How do you know you had the right
 6   people was the question.
 7          THE WITNESS:  Correct.
 8   A.   So, we, in the course of the investigation, I had seen
 9   I.D.s, California driver's licenses to be specific for Mr.
10   Terabelian and Mr. Ayvazyan from California DMV.
11          These driver's licenses were observed in the complaint in a
12   records review from Encore Escrow, which was the escrow company
13   that was used for the purchase of the fraudulent property.  I
14   saw copies of those same driver's licenses.  And then, CBP
15   notified me that they had committed a search on those
16   individuals.
17          And then, subsequent to that, I was provided with
18   photographs of driver's licenses obtained from Mr. Ayvazyan and
19   Miss Terabelian, which match what we've seen, again, from the
20   driver's license records from California, Department of Motor
21   Vehicles.
22   BY MR. TRONTZ:
23   Q.   Okay.  And in reading the complaint I saw that there were
24   applications made under, I guess, the alias; under the aliases?
25   A.   Yes.
```

EXHIBIT 1
21

1  Q.  And what evidence do you have that my client or Mr.

2  Ayvazyan made or submitted those applications?

3          MS. FRIEDMAN:  Your Honor, I am going to object.

4          This is far afield from whether the Defendant is

5  actually Richard Ayvazyan or whether he is a risk of flight or

6  a danger to the community.

7          MR. TRONTZ:  My other point is, Judge, based on --

8          THE COURT:  One moment.

9          Miss Friedman, you went into extensive discussion of

10 credit cards and aliases and so on.  And it seems to me that

11 you are using that in part for the basis of the risk of flight

12 argument.

13         MS. FRIEDMAN:  Yes, Your Honor.

14         THE COURT:  So I think, in all fairness, I should

15 allow Mr. Trontz to at least challenge those proffers.

16         I am telling him to keep it tight and keep it on

17 point, but basically he is entitled to inquire because the

18 weight of what you are arguing seems to be prior fraud

19 associated with the current fraud and the current fraud being

20 perpetrated by the Defendant under an alias.

21         So, again, in fairness, I am giving Mr. Trontz some

22 latitude to establish the basis for this evidence.

23         MS. FRIEDMAN:  Understood, Your Honor.  Thank you.

24         THE COURT:  All right.

25         MR. TRONTZ:  I will try to keep it short, Your Honor.

EXHIBIT 1

22

```
 1  I'm sorry.
 2          THE COURT:  It's all right.
 3  BY MR. TRONTZ:
 4  Q.   My understanding, from reading the complaint, that all
 5  applications on these loans were made in the name of Iuliia
 6  Zhadko and Viktoria Kauchko; is that accurate?
 7  A.   That's accurate.
 8  Q.   No applications that were made under the names of Richard
 9  Ayvazyan or Marietta Terabelian?
10  A.   Not to my knowledge, no.
11  Q.   Based on your investigation, how can you determine that --
12  and I guess all these applications were -- I'm sorry.
13      Strike that.
14      Were all submitted via computer?
15  A.   To the best of my knowledge, yes.
16  Q.   My question is how do you know that Mr. Ayvazyan and Miss
17  Terabelian were the ones who actually filed these applications
18  through the computer?
19  A.   For some of the applications filed under the name Iuliia
20  Zhadko, the funds were deposited into a bank account.
21      From there, the funds float into an escrow account.  And in
22  reviewing the records from that escrow company, there was an
23  e-mail from a Richard Ayvazyan that appeared to be directing
24  the flow of funds from that bank account.
25      And then, once the CBP stopped for the secondary
```

EXHIBIT 1
23

1  inspection, we learned that there was a photograph of Iuliia

2  Zhadko on the digital device and we made the connection that

3  Iuliia Zhadko was, in fact, an alias of Richard Ayvazyan.

4  Q.   So other than the possession of that identification and

5  that e-mail there is no other connection between my client and

6  the alias that's listed, correct?

7  A.   **Other connections that I can note are open source research**

8  **in the case that they had shared addresses.**

9  Q.   Who?

10 A.   **Richard Ayvazyan and Iuliia Zhadko.**

11 Q.   Any other connections between these applications and my

12 client?

13 A.   **Aside from money transfers into bank accounts owned by Mr.**

14 **Ayvazyan, that's all I have.**

15 Q.   Okay.  And you are the lead investigator of this case,

16 correct?

17 A.   **That's correct.**

18 Q.   Do you have any indication that they would not appear for

19 court as requested?

20 A.   **The concern would be that we've seen additional identities.**

21    **And CBP notified me that they had found additional**

22 **photographs of I.D.s of California driver's licenses on the**

23 **digital devices.  And I suppose the concern would be that they**

24 **could use these I.D.s to hide either within the country or**

25 **outside of the country.**

EXHIBIT 1

24

```
 1  Q.   But all these I.D.s are in the possession of the Federal
 2  Government, correct?  All the ones that were taken?
 3  A.   The ones that I'm aware.  The digital devices we don't have
 4  the actual I.D.s.
 5  Q.   These fraudulent passports on either party, correct?
 6  A.   I'm sorry.  You kind of broke up.
 7  Q.   The only passport they had on each person were their
 8  passports in their regular names, correct?
 9  A.   To the best of my knowledge, yes.
10  Q.   There is no evidence that you have that would make you
11  believe that they won't appear for court in Central California,
12  right?
13          MS. FRIEDMAN:  Your Honor, I'm going to object.
14  BY MR. TRONTZ:
15  Q.   You can speculate, but there's no evidence, correct?
16          THE COURT:  All right.  The objection is sustained.
17          You can just ask a straight question, Mr. Trontz.  You
18  have asked those questions on whether the passports were
19  legitimate or fraudulent.  I think the agent answered that they
20  were legitimate passports and not forged passports.
21          Correct?
22          THE WITNESS:  Correct, Your Honor.
23          THE COURT:  All right.  Anything else regarding forged
24  documents?
25  BY MR. TRONTZ:
```

EXHIBIT 1
25

1  Q.  And when they were stopped at the airport, neither party

2  had any kind of firearms or weapons on them, correct?

3  A.  **Correct.**

4  Q.  How long was the investigation before you submitted for the

5  warrant?

6         MS. FRIEDMAN:  Same objection, Your Honor; outside the

7  scope.

8         THE COURT:  That is sustained.

9  BY MR. TRONTZ:

10  Q.  During your investigation was there any indication that

11  either my client or Mr. Ayvazyan had any possession of any

12  firearms they weren't supposed to have?

13  A.  **Aside from what was discussed earlier in the proffer about**

14  **the gun rifle attachments that were found during the trash pull**

15  **and the empty box of ammunition, no.**

16  Q.  Okay.  They haven't been charged with anything regarding

17  firearms, correct?

18  A.  **No.**

19  Q.  And as part of your investigation there were no firearms

20  involved in your case, correct?

21  A.  **Aside from what we've already discussed, no.**

22         MR. TRONTZ:  I don't have any further questions, Your

23  Honor.

24         THE COURT:  Any followup?

25         MS. FRIEDMAN:  Yes, thank you.

EXHIBIT 1
26

1    MS. FRIEDMAN:  May I?  Yes, please.

2                        REDIRECT EXAMINATION

3    BY MS. FRIEDMAN:

4    Q.   Agent Palmerton, I am going to take you briefly to the

5    discussion about identification.

6         First, what name was this Defendant traveling under?

7    A.   **Richard Ayvazyan.**

8    Q.   And did he have an identification with that name on it?

9    A.   **He did.**

10   Q.   And do you believe that to be who he is?

11   A.   **I do.**

12   Q.   Did he have other identifications or pictures of

13   identifications on him?

14   A.   **Yes.**

15   Q.   Did those identifications have his photograph on them?

16   A.   **They did not to the best of my knowledge.**

17   Q.   Did they have other names on them?

18   A.   **They did.**

19   Q.   Now, did the fraudulently obtained loan applications use

20   false identifications?

21   A.   **They did.**

22   Q.   Did any of those false identifications have a picture of

23   the Defendant on them?

24   A.   **They did not.**

25   Q.   What name did they use?

EXHIBIT 1
27

1   A.   **Iuliia Zhadko and Viktoria Kauchko.**

2   Q.   And were funds obtained using those names?

3   A.   **They were.**

4   Q.   Were those funds that were fraudulently obtained with those

5   names used to purchase a residence?

6   A.   **Yes.**

7   Q.   And what identifications were used to purchase the

8   residence or in whose name was the residence purchased?

9   A.   **The residence was purchased under the name of Richard**

10  **Ayvazyan and Marietta Terabelian.**

11  Q.   Did you review any sort of identification documents used to

12  purchase the residence?

13  A.   **I did.**

14  Q.   And were one of those identifications in the name of

15  Richard Ayvazyan?

16  A.   **Yes.**

17  Q.   Did that identification have a picture on it?

18  A.   **Yes, it did.**

19  Q.   And based on that picture -- I'm sorry.

20       Strike that.

21       Did you review any other forms of identification for

22  Richard Ayvazyan?

23  A.   **Yes.**

24  Q.   And did any of those records or identifications that you

25  have viewed also include a picture?

EXHIBIT 1

28

1  A.  **Yes.**

2  Q.  And based on your investigation, those pictures, did they

3  depict the individual that you see in the cell block?

4  A.  **Yes, they did.**

5          MS. FRIEDMAN:  That's all, Your Honor.

6          THE COURT:  All right.  So that's the evidentiary

7  portion.

8          Let me hear the argument from the Government.  You

9  said that you were traveling on both risk of flight and danger

10  to the community.  Please tell me the basis for those and then

11  I will hear from Defense counsel.

12          MS. FRIEDMAN:  Thank you, Your Honor.

13          Your Honor, first as to risk of flight, the Defendant

14  poses a risk of flight for a number of reasons.  First and

15  foremost, his access to false identifications and aliases.

16          And as the agent noted during cross-examination, the

17  Government does not have the actual fake identifications or

18  fraudulent identification documents that they saw in the

19  Defendant's possession.

20          Furthermore, it appears that the Defendant has the

21  ability and the access to fake and fraudulent identifications,

22  which could be used to flee.

23          In addition, Your Honor, the Defendant has familiarity

24  with using such false identification.  And in doing so to

25  obtain PPP and EIDL loans, including under the names Iuliia

EXHIBIT 1

29

1  Zhadko and Viktoria Kauchko.

2          Further, the Defendant has used that money to purchase

3  the property, the residential property that is in his name.

4  So, in other words, Your Honor, he obtained funds using the

5  name Iuliia Zhadko.  Those funds were then transferred for the

6  purchase of a property in his name with his real

7  identification.

8          Your Honor, the Defendant also used fake federal tax

9  filings and other fake documents to obtain the loans.  This

10  further shows the Defendant's access to fake and fraudulent

11  documents.

12          In addition, Your Honor, when the Defendant was

13  stopped at Miami International Airport, he was in the

14  possession of a credit card in the name of his alias, Iuliia

15  Zhadko.  As well as his wife's alias, Viktoria Kauchko.

16          As well as a digital photograph of the California

17  driver's license in the name of Iuliia Zhadko.  The Defendant's

18  wife, who is his co-Defendant, also had a credit card in her

19  alias' name.

20          Your Honor, in addition for the Court's consideration,

21  the weight of the evidence.  The evidence in the complaint --

22          THE COURT:  I'm sorry.  I've heard the weight of the

23  evidence.  You don't need to go into that.  Just give me the

24  risk of flight and danger to the community.

25          MS. FRIEDMAN:  Sure.  In addition, Your Honor, a risk

EXHIBIT 1
30

1    of flight because this Defendant has no real employment.  The

2    company that he mentioned is defunct, according to California

3    business records.  And he gives a number of $37,500 which if he

4    is having that kind of money through some fraudulent means,

5    then he has access to funds in order to facilitate his flight.

6            In addition, Your Honor, there is a significant loss

7    amount of money, more than three million dollars, which he

8    would also have access to assist flight.  As well as things

9    that he has purchased, such as luxury watches, which he could

10   use to assist his flight and further hide his behavior.  He

11   also is familiar with foreign travel and has traveled abroad

12   recently.

13           Your Honor, in addition, this is a charge that carries

14   a statutory maximum of 30 years.  This Defendant has done

15   prison time before; 36 months.  But in his most recent

16   conviction in 2012, he did not do prison time.  So the United

17   States argues that he would be very eager to avoid prison time

18   again.

19           His guidelines in this case are believed to be 70 to

20   87 months and that history of fraud crimes further supports

21   that he would be a risk of flight.

22           In addition, Your Honor, to the lack of legitimate

23   employment, other than the homes that were purchased using

24   fraudulently procured loan funds, this Defendant does not own

25   any legitimate real estate.

EXHIBIT 1
31

1    In addition, this Defendant is a danger to the

2    community based on his repeated fraud that he has inflicted on

3    the community.  He already has two criminal convictions.  And

4    now he is charged with an even more significant economic crime

5    that depletes the funds that are intended to help struggling

6    Americans during the COVID-19 pandemic.

7    In addition, Your Honor, I would just note that he has

8    had access to firearms.  Although, in full disclosure, there is

9    no indication that this Defendant is a violent person.

10    And Your Honor, I guess, lastly I would just emphasize

11    that the Defendant does have a wife and children.  His wife is

12    his co-Defendant.  That also changes the implication and the

13    incentive for him to flee.

14    And again, he has significant access to funds.

15    Significant access to fraudulent and fake identifications in

16    which to aid his flight and/or the flight of his family.

17    Thank you, Your Honor.

18    THE COURT:  All right.  Mr. Trontz, let's hear from

19    you, sir.

20    MR. TRONTZ:  Thank you, Your Honor.

21    First of all, he is a U.S. citizen.  His passport was

22    seized, I believe, at MIA.  So he has no ability to travel

23    outside of the United States.  He has been in this country for

24    many years.  He owns a home -- illegitimately he owns.  His

25    mother resides in the same location that he resides.  His

EXHIBIT 1
32

1  brother is there.  And more importantly, he has three children,

2  15, 14, and 12 that reside with him.  I hardly believe that he

3  would flee the country and not face any charges with his entire

4  family being left behind.

5  　　　　　The Government of pointed out that he has priors.

6  There is no indication that he ever missed court, or jumped

7  bail, or did anything in these cases.  He faced his charges and

8  took whatever punishment that the Court handed out at that

9  particular time.

10  　　　　　He doesn't need to surrender his passport because the

11  Government already has it.  And there is no other indication

12  presented by the Government or the agent that my client has any

13  travel passports other than what they took at the airport.

14  　　　　　As to danger to the community, the Government makes a

15  lot of claims about guns and the agent, but there were no guns

16  used.  If he had been charged with guns that would have been

17  one of the charges on the complaint, possession of a firearm by

18  convicted felon.

19  　　　　　The guns, when he was required to turn them over, were

20  provided to his brother.  So there is no indication that they

21  are in this allegation or during the entire time of the

22  investigation guns were used by him, or by his wife, for that

23  matter.

24  　　　　　There are no weapons found when they were taken into

25  custody at MIA or had a knife.  Nothing.  This was an economic

EXHIBIT 1
33

1   crime and it is a serious allegation, but it is strictly an

2   economic crime and none of his previous offenses was there any

3   indication of violence.

4         The Government named two cases. I saw one in the

5   Presentence Report. But, again, it was not a gun offense and

6   it was solely an economic crime. So I don't see where my

7   client would be a danger to the community.

8         Also the Court understands and I was on Zoom yesterday

9   and today that COVID is a serious problem. And I had written

10   and article today that it is on the rise in the State of

11   Florida.

12         We believe that our client and his wife will return to

13   California to face the charges. And keeping them in custody,

14   not only for this case because there is a removal pending, the

15   subject to the possibility of catching COVID and spreading that

16   out there in California to their family who they more or less

17   have contact with.

18         And finally, Your Honor, I reviewed the actual typed

19   version of the Pretrial Services Report today. And after my

20   client was interviewed, it was the recommendation of the

21   Probation Officer that my client be removed on a percentage

22   bond with a *Nebbia* co-signed by a family member.

23         Obviously, if the Court does not find that strict

24   enough, a corporate surety bond could be arranged as well and

25   have a bondsman on the case.

EXHIBIT 1
34

```
 1              And those are all options and they will go back to
 2   California and obviously face these charges.
 3              THE COURT:  Right.  Anything else?
 4              MR. TRONTZ:  Not from me, Your Honor.
 5              THE COURT:  The Government?
 6              MS. FRIEDMAN:  No, Your Honor.
 7              THE COURT:  All right.  Well, as Defense counsel
 8   stated, this is as the characteristics of an economic crime.  I
 9   honestly see no basis for the argument for danger to the
10   community.  Generally danger to the community needs to be
11   proven by clear and convincing evidence.
12              Generally when there is history of violence, things of
13   that nature, to predicate a danger to the community, an
14   argument based on fraud would basically mean that all fraud
15   cases would basically be incarcerated and that is not what it
16   has done.  I find no basis for danger to the community.
17              With regard to risk of flight, the Government's burden
18   is lower.  It is preponderance of the evidence.  However, we
19   keep in mind that the present status of the COVID pandemic.
20   The tendency is to provide bond where it can be provided with
21   assurances.
22              Counsel is proposing various types of bonds.  I will
23   hear about that, but I believe that I can fashion a bond that
24   would ensure the Defendant's appearance in court.
25              I note that he has three teenage children in
```

EXHIBIT 1
35

California.  He has a mother and a brother.  He has ties to

that community.  I would, as part of the bond requirements,

require that not only the Defendant's, but also his children's

travel documents be turned over as further assurance that he

would remain in this country with his family intact and face

the charges that have been brought against him.

So I am cognizant of the Government's argument that

the Defendant has unaccounted for funds and has access to both

identification.  I am weighing that against the possibility of

fashioning a bond that would ensure that he would neither use

those funds, nor use those false identifications to depart the

Central District of California, given his ties to the community

and I find that those outweigh any potential of nonappearance.

So I am inclined, Mr. Trontz, to go with the corporate

surety bond proposal.  That would mean that we have an extra

pair of eyes of a bondsman in addition to Probation to assure

Mr. Ayvazyan, the Defendant's compliance.

So let me hear what you propose and then we will

discuss that further.

MR. TRONTZ:  Judge, I was speaking to his, I guess,

relatives; sister, and a couple of other people.

I think a bond of $75,000 corporate surety bond.  I

don't know if there are forms securing release that Your Honor

would want, but that's about the monetary amount that they have

at this point.  I know that there are allegations of millions

EXHIBIT 1
36

1  of dollars and $35,000 a month paychecks.  I am just looking at

2  the Presentence Report.  So I don't know if that is accurate or

3  not.

4        THE COURT:  Is the family able to obtain a $100,000

5  corporate surety bond?

6        MR. TRONTZ:  I would think that they would be able to

7  do that.  I would have to actually speak with them, but I'm

8  sure that they could figure that out.

9        THE COURT:  All right.  So that is my inclination.

10        $100,000 corporate surety with a *Nebbia*.  And I would

11  also be inclined to have another $150,000 personal surety and

12  that would need to be co-signed by the mother and the brother.

13        MS. FRIEDMAN:  Your Honor, I am so sorry to interrupt

14  you, but before you continue -- and I want to tread lightly

15  because I know that the investigation is still under way, but I

16  think that there may be some issues with certain family members

17  being co-signors on the bond.

18        So I think the mother would be a permissible co-signer

19  at this point, but I would ask that the agent weigh in if there

20  is an issue with other family members.

21        THE COURT:  All right.  Is there an issue with the

22  mother or the brother co-signing the personal surety bond and

23  pledging their not to alienate any property that they may have?

24        THE WITNESS:  At this point, Your Honor, I have no

25  issues with the mother.  However, with the brother, I would

EXHIBIT 1
37

1    have issues with that.

2          THE COURT:  All right.  I will not use the brother,

3    then.  Thank you.  I appreciate your interruption because it

4    advances.

5          So $100,000 personal surety to be co-signed by the

6    mother.  And she may not pledge, or alienate, or in any way

7    dispose of any real property that she may have and that the

8    address of any such property needs to be put on the bond.

9          So that is the monetary terms that I am inclined to

10   grant.  Does anybody have any further comments on that?

11         MS. FRIEDMAN:  Not as to the monetary terms, Your

12   Honor.

13         THE COURT:  All right.

14         MR. TRONTZ:  We're fine with the monetary terms,

15   Judge.  I guess I would need to know and talk to the Government

16   to see who I need to provide the *Nebbia* to because the case is

17   being prosecuted out of DC in California.  Would I deal with

18   the local prosecutor on that and --

19         THE COURT:  The *Nebbia* comes to me because I am the

20   one who has imposed the bond.  So I have a form that Stephanie

21   can e-mail to you.  Both sides sign off on it.  We don't need a

22   *Nebbia* hearing and the Government and you will sign off and I'm

23   sure Miss Friedman --

24         MR. TRONTZ:  And I guess my last question would be the

25   bond should only be posted and done before they are released

EXHIBIT 1
38

```
 1   and they could take off obviously with the COVID.  I don't
 2   know.
 3              THE COURT:  All right.  Today is Thursday.
 4              MR. TRONTZ:  Yes, ma'am.
 5              THE COURT:  Hopefully you will have it all done by
 6   Friday and they can be released on Friday.
 7              If you run into problems and you have some things that
 8   are missing, you can reach out to me and maybe we can just give
 9   you extra time for whatever else is left.  But I am going to
10   require that you at least have some level of assurance that
11   these funds are going to be posted before the Defendant is
12   released.
13              MR. TRONTZ:  Yes, ma'am.  And who should my contact --
14   I'm sorry.
15              THE COURT:  No, go ahead.
16              MR. TRONTZ:  Who is my contact in the Government, Your
17   Honor?  If it's tough to reach.  Who do I need to reach about
18   the *Nebbia*?
19              MS. FRIEDMAN:  You can reach out to me and I will
20   coordinate as needed, Mr. Trontz.
21              MR. TRONTZ:  Thank you so much.
22              THE COURT:  Yes.  Locally we'll get it gone.
23              All right.  So report to Pretrial Services as
24   directed.  He will be supervised out of the Central District of
25   California, but let me hear from Pretrial Services.
```

EXHIBIT 1
39

1    Does he need to contact you upon release, or will you

2    provide a number in California, Miss (inaudible)?

3    THE PROBATION:  Your Honor, what I can do is I can

4    contact Mr. Trontz.  And that way I can give him a number to

5    the Pretrial Services officers that were assigned the Pretrial

6    Reports from Miami.  And then, they can also and Mr. Trontz can

7    relay the information to his clients as to where they need to

8    report in California.

9    THE COURT:  And surrender all passports and travel

10    documents as a condition of his bond.  His children's

11    passports, if any, must also be surrendered.  Obviously, that

12    is part of the condition.

13    As I said, the mother may not pledge any of her

14    property.  The Defendant may not pledge any of his property.

15    Travel is permitted to the Central District of

16    California to return there.  He has no need to come back here.

17    So his travel is only allowed from Southern District to the

18    Central District of California to return there.  Once he is

19    there travel is limited within the Central District of

20    California.

21    He will be required to be subject to home confinement,

22    with electronic monitoring.  With allowances only for medical

23    needs, court appearances, attorney visits, religious worship,

24    and employment.

25    He may have no firearms.  He may not visit

EXHIBIT 1
40

1  transportation establishments, except to get himself back to

2  California.

3         Does Pretrial Services have any other suggestions?

4         THE PROBATION:  And Your Honor, would the electronic

5  monitoring be paid for by the Defendant or Pretrial Services?

6         THE COURT:  The Defendant.

7         THE PROBATION:  Okay.  Thank you.

8         THE COURT:  All right.  Anything else that I might

9  have forgotten or missed?

10        MS. FRIEDMAN:  No, Your Honor.

11        MR. TRONTZ:  No, Your Honor.  Thank you for your time.

12        MS. FRIEDMAN:  Your Honor, the AUSA prosecuting this

13 case did have a request for a condition if I might propose it

14 to the Court.

15        That the Defendant be prohibited from directly or

16 indirectly accessing or using a bank account for which he is

17 not a signatory in his legal name.

18        THE COURT:  All right.  I will adopt that.

19        All right.  So do we need to have a renewal hearing,

20 or are you going to waive removal, Mr. Trontz?

21        MR. TRONTZ:  If we can post that bond, Judge, we will

22 waive the removal hearing obviously and get him back to

23 California.

24        THE COURT:  All right.  We will need some paperwork to

25 waive the removal hearing.

EXHIBIT 1
41

```
 1            MR. TRONTZ:  Will I get that through your clerk, Your
 2   Honor?
 3            THE COURT:  Yes, Stephanie can get you that.
 4            MR. TRONTZ:  Okay.
 5            THE COURT:  So we need to have that waived before they
 6   can leave, I believe.
 7            Am I right, Stephanie?
 8            THE COURTROOM DEPUTY:  Yes, Judge.  Because currently
 9   the removal hearing is still set for November 10th.
10            THE COURT:  So you need to take care of that.
11            MR. TRONTZ:  Yes, ma'am.
12            THE COURT:  All right.
13            THE PROBATION:  Your Honor, if I may?  May I please
14   ask Mr. Trontz his phone number or contact number?
15            MR. TRONTZ:  305-318-1519.
16            THE PROBATION:  Perfect.  Thank you.
17            MR. TRONTZ:  My pleasure.
18            THE COURT:  All right.  I am going to ask that let the
19   Court know that we are finished and then we will address Mr.
20   Ayvazyan I don't know.  I have another case.  I don't know who
21   will come next.
22            MR. TRONTZ:  Thank you, Your Honor.  May I be excused?
23            THE COURT:  Yes, sir.
24            MR. TRONTZ:  Thank you.  Have a nice day.
25            (Thereupon, the proceedings concluded.)
```

EXHIBIT 1
42

```
1

2                                    CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10   11/10/20                          Bonnie Joy Lewis,
                              Registered Professional Reporter
11                               CASE LAW REPORTING, INC.
                                7001 Southwest 13 Street,
12                             Pembroke Pines, Florida 33023
                                     954-985-8875
13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 1

43